# 2024-1757

# Appendix Volume I

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE, Plaintiffs-Appellees,

v.

UNITED STATES, Defendant-Appellee.

v.

ERIC ALAN ISAACSON, Interested Party-Appellant

_____

Appeal from the United States District Court
for the District of Columbia
in 1:16-cv-00745-PLF
The Honorable Paul L. Friedman

## APPENDIX

ERIC ALAN ISAACSON
LAW OFFICE OF ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858) 263-9581
Email: ericalanisaacson@icloud.com
         eri628@g.harvard.edu

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
NATIONAL VETERANS LEGAL )
SERVICES PROGRAM, NATIONAL )
CONSUMER LAW CENTER, and )
ALLIANCE FOR JUSTICE, for themselves )
and all others similarly situated, )
)
v.                    )         Civil Action No. 16-0745 (PLF)
)
UNITED STATES OF AMERICA, )
)
Defendant. )
_____)

OPINION

For over fifteen years, PACER fees – the per-page fees that the federal judiciary

charges the public for online access to court documents – have been a subject of controversy. As

a result of the litigation in this case, the United States will return over $100 million of these fees

to users of PACER. Today, this litigation substantially comes to a close.

The Court has before it a motion of class representatives National Veterans Legal

Services Program, National Consumer Law Center, and Alliance for Justice (the "Named

Plaintiffs") for final approval of a settlement agreement that would resolve the pending claims of

hundreds of thousands of plaintiffs and reimburse them for PACER fees that the judiciary

unlawfully used to fund certain non-PACER services. Counsel for the Named Plaintiffs also

request attorney's fees, costs, and service awards.

After careful consideration of the arguments made by the Named Plaintiffs and by

the government, and of the comments and objections by interested persons submitted to the

Court and made at the hearing held on October 12, 2023, the Court will approve the settlement

agreement and award $23,863,345.02 in attorney's fees, $1,106,654.98 in costs, and $30,000 in

service awards.[1]

---

[1]     The filings and attachments considered by the Court in connection with this matter include:  Complaint ("Compl.") [Dkt. No. 1]; Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment ("Mot. to Dismiss") [Dkt. No. 11]; Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents, Exhibit 3 ("Class Cert. Web Notice") [Dkt. No. 42-5]; Notice of Filing of Revised Notice Documents, Exhibit 1 ("Class Cert. Email Notice") [Dkt. No. 43-1]; Plaintiffs' Motion for Summary Judgment as to Liability ("Pls.' Summ. J. Mot.") [Dkt. No. 52]; Declaration of Jonathan E. Taylor, Exhibit B ("1997 AO Report") [Dkt. No. 52-3]; Declaration of Jonathan E. Taylor, Exhibit E ("Jud. Conf. Letter") [Dkt. No. 52-6]; Declaration of Jonathan E. Taylor, Exhibit H ("Lieberman Letter") [Dkt. No. 52-9]; Plaintiffs' Statement of Undisputed Material Facts ("Pls.' Facts") [Dkt. No. 52-16];  Defendant's Cross-Motion for Summary Judgment ("Def.'s Summ. J. Mot.") [Dkt. No. 74]; Declaration of Wendell A. Skidgel Jr. ("Skidgel Decl.") [Dkt. No. 74-2]; Defendant's Statement of Material Facts as to Which There is No Genuine Dispute and Response to Plaintiffs' Statement of Undisputed Material Facts ("Def.'s Facts") [Dkt. No. 74-3]; Declaration of Wendell A. Skidgel Jr. ("2d Skidgel Decl.") [Dkt. No. 81-1]; Notice of Submission of Revised Proposed Order and Revised Notice Documents, Exhibit 5 ("Sett. Web Notice") [Dkt. No. 152-5]; Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Sett. Mot.") [Dkt. No. 158]; Declaration of Renée Burbank ("Burbank Decl.") [Dkt. No. 158-1]; Declaration of Stuart T. Rossman ("Rossman Decl.") [Dkt. No. 158-2]; Declaration of Rakim Brooks ("Brooks Decl.") [Dkt. No. 158-3]; Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.") [Dkt. No. 158-4]; Declaration of Deepak Gupta ("Gupta Decl.") [Dkt. No. 158-5]; Declaration of Meghan S.B. Oliver ("Oliver Decl.") [Dkt. No. 158-6]; Declaration of Gio Santiago Regarding Implementation of Settlement Notice Program ("KCC Decl.") [Dkt. No. 158-7]; Defendant's Response to Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Def.'s Resp.") [Dkt. No. 159]; Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Reply") [Dkt. No. 160]; Supplemental Declaration of Brian T. Fitzpatrick ("Fitzpatrick Supp. Decl.") [Dkt. No. 160-1]; Declaration of William B. Rubenstein in Support of Class Counsel's Motion for Attorneys' Fees ("Rubenstein Supp. Decl.") [Dkt. No. 160-2]; Supplemental Declaration of Deepak Gupta ("Gupta Supp. Decl.") [Dkt. No. 160-3]; Declaration of Meghan S.B. Oliver ("Oliver Supp. Decl.") [Dkt. No. 160-4]; Declaration of Gio Santiago Regarding Settlement Administration Costs ("KCC Supp. Decl.") [Dkt. No. 160-5]; Plaintiff-Class Member Don Kozich's Verified Objections to Settlement and Motion to Appear Telephonically or by Zoom ("Kozich Obj. and Mot.") [Dkt. No. 163]; Plaintiffs' Response to Objection of Don Kozich ("Resp. to Kozich Obj.") [Dkt. No. 165]; and Plaintiffs' Notice of Filing of All Objections Received to Date ("Compiled Objs.") [Dkt. No. 166].

        The Court also reviewed the following objections to the settlement agreement: Objection of Aaron Greenspan ("Greenspan Obj.") [Dkt. No. 166-1]; Objection of Alexander Jiggetts ("Jiggetts Obj.") [Dkt. No. 166-2]; Objection of Geoffrey Miller ("Miller Obj.") [Dkt.

## I.  BACKGROUND

### A.  *Origin and History of PACER Fees*

Before the late 1980s, federal courts operated on paper.  If members of the public wanted to view court dockets or filings, they had to travel to the courthouses where those records physically existed.  Then, in 1988, the judiciary "authorized an experimental program of electronic access for the public to court information."  JUD. CONF. OF THE U.S., REPORT OF THE PROCEEDINGS 83 (Sept. 14, 1988), www.uscourts.gov/file/1642/download [perma.cc/HKS6-4B34].  This experiment gave rise to the Public Access to Court Electronic Records system, or "PACER."  Pls.' Facts ¶ 1.  PACER allows the public to access court documents without the need to review physical records or travel to the courthouse to access them.  25 Years Later, PACER, Electronic Filing Continue to Change Courts, U.S. CTS. (Dec. 9, 2013), www.uscourts.gov/news/2013/12/09/25-years-later-pacer-electronic-filing-continue-change-courts [perma.cc/92NB-8BM7].

Originally, PACER worked via a dial-up phone connection and users were charged fees by the minute.  25 Years Later, PACER, Electronic Filing Continue to Change Courts, supra.  But in 1998, PACER moved online, and the judiciary started charging users on a per-page basis.  See Def.'s Facts ¶ 16.  Around the same time, the judiciary began to use PACER

---

No. 166-3]; Objection of Eric Isaacson ("Isaacson Obj.") [Dkt. No. 166-5]; and Written Statement of Eric Alan Isaacson of Intent to Appeal in Person at the October 12, 2023, Final-Approval Hearing ("Isaacson Stmt.") [Dkt. No. 166-6].

The Court also reviewed the following prior opinions in this case:  Nat'l Veterans Legal Servs. Program v. United States, Civil Action No. 16-0745, 2016 WL 7076986 (D.D.C. Dec. 5, 2016) ("Motion to Dismiss Op."); Nat'l Veterans Legal Servs. Program v. United States, 235 F. Supp. 3d 32 (D.D.C. 2017) ("Class Certification Op."); Nat'l Veterans Legal Servs. Program v. United States, 291 F. Supp. 3d 123 (D.D.C. 2018) ("Summary Judgment Op."); and Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d 1340 (Fed. Cir. 2020) ("Federal Circuit Op.").

fees to pay for programs other than PACER, like Case Management / Electronic Case Filing ("CM/ECF"), a new system that allowed parties to file documents electronically. See 1997 AO Report at 36; Pls.' Facts ¶ 9. By fiscal year 2000, the judiciary was using the fees to pay for PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN") costs. 2d Skidgel Decl. ¶ 31; id. tab 30; see Summary Judgment Op., 291 F. Supp. 3d at 131.

In 2002, Congress passed the E-Government Act, a statute whose broad purpose was to improve electronic services and processes in government. See E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899. As relevant to this litigation, the Act amended the statutory note to 28 U.S.C. § 1913 ("Section 1913 Note") so that it read:

COURT FEES FOR ELECTRONIC ACCESS TO INFORMATION

[. . . .]

(a) The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts . . . for access to information available through automatic data processing equipment. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services.

28 U.S.C. § 1913 note (internal quotation marks omitted); see E-Government Act of 2002, § 205(e). The Senate Governmental Affairs Committee explained:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

S. Rep. No. 107-174 at 23 (June 24, 2002). At that point, PACER fees were set at $0.07 per page. See Skidgel Decl. Ex. G at 64.

But PACER fees continued to rise. Effective January 2005, the Judicial Conference increased fees to $0.08 per page. Jud. Conf. Letter at 1. The Director of the Administrative Office of the United States Courts explained that the increase was "predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue to fund CM/ECF operations and maintenance." Id.

By the end of 2006, the judiciary had accumulated $32.2 million of excess revenue from PACER fees. Pls.' Facts ¶ 16; Summary Judgment Op., 291 F. Supp. 3d at 134. For that reason, the judiciary further expanded the categories of programs that would be funded by the fees. See Summary Judgment Op., 291 F. Supp. 3d at 134-35. These programs included CM/ECF, EBN, courtroom technology upgrades, an online Jury Management System ("Web Juror"), a Violent Crime Control Act ("VCCA") notification system, and a study to determine the feasibility of providing access to state court documents through CM/ECF (the "State of Mississippi Study"). 2d Skidgel Decl. tab 11, tab 12; see Summary Judgment Op., 291 F. Supp. 3d at 135. In 2012, the judiciary increased PACER fees to $0.10 per page. Pls.' Facts at ¶ 22.

PACER fees have been controversial since at least 2008. That year, a group of activists attempted to download significant portions of the court documents available on PACER and make them available for free. John Schwartz, An Effort to Upgrade a Court Archive System to Free and Easy, N.Y. TIMES (Feb. 12. 2009), www.nytimes.com/2009/02/13/us/13records.html. These activists, along with scholars and public officials, argued that PACER fees make it difficult for the public to access information integral to understanding our country's law and legal system. E.g., Timothy B. Lee, The Case Against PACER: Tearing Down the Courts' Paywall, ARSTECHNICA (Apr. 9, 2009), www.arstechnica.com/tech-policy/2009/04/case-against-pacer [perma.cc/X52V-RYQT]; see also Pls.' Sett. Mot. at 5 ("High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts.").

In 2009, Senator Joe Lieberman, sponsor of the E-Government Act, expressed concern that the judiciary may have been violating the Act by collecting PACER fees "well higher than" the cost of funding PACER. Lieberman Letter at 1. Still, this trend continued. From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased from about $102.5 million in 2010 to $146.4 million in 2016. See Pls.' Facts ¶¶ 28, 46, 62, 80, 98, 116, 134.

### B. Procedural History

The current litigation began in April 2016, when the Named Plaintiffs filed a class-action lawsuit against the United States alleging that the judiciary had violated the

E-Government Act by charging excessive PACER fees.  Compl. ¶¶ 1-3, 34.[2]  The Named

Plaintiffs alleged jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a).  Id. ¶ 33.  The

Named Plaintiffs were, and still are, represented by Gupta Wessler LLP and Motley Rice LLC

("Class Counsel").

        The United States moved to dismiss.  See Mot. to Dismiss.  The government

argued that the Court lacked jurisdiction, id. at 15-19, that the Named Plaintiffs could not sue

without first alerting the PACER Service Center, id. at 13-15, and that other similar class action

lawsuits challenging PACER fees should be litigated first under the "first-to-file rule."  Id.

at 12-13.  This Court denied the motion to dismiss.  See Motion to Dismiss Op., 2016

WL 7076986.  In January 2017, the Court certified a class.  See Class Certification Op., 235 F.

Supp. 3d 32.  The class consisted of "[a]ll individuals and entities who have paid fees for the use

of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and

federal government entities."  Id. at 39.  These class members were given notice and an

opportunity to opt out.  Gupta Decl. ¶ 14; see Order Approving Plan of Class Notice ("1st Notice

Appr.") [Dkt. No. 44].  The parties then engaged in informal discovery, which clarified what

categories of expenses were funded by PACER fees.  Gupta Decl. ¶ 15.

        In August 2017, the Named Plaintiffs filed a motion seeking "summary

adjudication of the defendant's liability, reserving the damages determination for after formal

discovery."  Pls.' Summ. J. Mot. at 1.  The United States then filed a cross-motion for summary

judgment as to liability.  Def.'s Summ. J. Mot. at 1.  In these motions, the parties asked the Court

to decide the central question in the case:  Under the E-Government Act, what categories of

---

[2]      Judge Ellen Segal Huvelle presided over this case until her retirement, at which
time the case was reassigned to the undersigned.

expenses may be funded by PACER fees?  See id. at 1-2; Pls.' Summ. J. Mot. at 1.  The Named

Plaintiffs argued that the Act "prohibits the [judiciary] from charging more in PACER fees than

is necessary to recoup the total marginal cost of operating PACER," so none of the additional

categories of expenses were permitted.  Pls.' Summ. J. Mot. at 11.  The United States urged a

broader reading of the statute which would allow the judiciary to "charge fees, as it deems

necessary, for the provision of information to the public through electronic means," making all of

the additional categories of expenses lawful.  Def.'s Summ. J. Mot. at 11.

        The Court rejected both positions, holding that the government's interpretation of

the E-Government Act was too broad, but that the Named Plaintiffs' interpretation was too

narrow.  See Summary Judgment Op., 291 F. Supp. 3d at 141-44.  The Court concluded that the

judiciary "properly used PACER fees to pay for CM/ECF and EBN, but should not have used

PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the

expenditures for [c]ourtroom [t]echnology."  Id. at 146.  Using PACER fees to pay for these

expenses was improper because the programs failed to further "the public's ability to access

information on the federal court's CM/ECF docketing system."  Id. at 150.

        The parties cross-appealed to the United States Court of Appeals for the Federal

Circuit.  In August 2020, the Federal Circuit affirmed this Court's interpretation.  See Federal

Circuit Op., 968 F.3d at 1359.  The Federal Circuit wrote that Judge Huvelle "got it just right" in

interpreting the E-Government Act to "limit[] PACER fees to the amount needed to cover

expenses incurred in services providing public access to federal court electronic docketing

information."  Id. at 1343, 1350.  The Named Plaintiffs' interpretation failed because it

"combine[d] part of the first sentence of paragraph (a) [of the Section 1913 Note] ('The Judicial

Conference may, only to the extent necessary, prescribe reasonable fees . . . .') with two parts of

the last sentence of paragraph (b) ('to reimburse expenses incurred in providing' the 'services

rendered,' which plaintiffs construe to mean PACER access), paying little heed to the substantial

amount of text in between." Id. at 1350. Instead, the full text of the Section 1913 Note, along

with its legislative history, made clear that the E-Government Act "limits the use of PACER fees

to expenses incurred in providing (1) electronic access for members of the public (2) to

information stored on a federal court docketing system." Id. at 1351-52.[3]

        Applying this interpretation to the contested categories of expenses, the Federal

Circuit agreed with this Court that it was unlawful for the judiciary to use PACER fees to pay for

the State of Mississippi Study, VCCA, Web-Juror, and most courtroom technology expenses.

Federal Circuit Op., 968 F.3d at 1358. The appellate court declined to decide whether it was

lawful for PACER fees to fund all CM/ECF expenditures, holding that the issue was not properly

before it and remanding to this Court for further proceedings. Id. at 1358-59.

        After remand, the parties began settlement discussions. See Gupta Decl.

¶¶ 23-24. Even after the Federal Circuit ruling, the government took the position that it did not

owe damages to class members because the class could not prove that PACER fees would have

been lower if the judiciary had refrained from making the unlawful expenditures. Id. ¶ 23. The

government also maintained that all CM/ECF expenditures were properly funded by PACER

fees. Id. The Named Plaintiffs disagreed with both positions. Id.

        In May 2021, the parties engaged in an all-day mediation session with Professor

Eric Green. Gupta Decl. ¶ 25. During the mediation, the parties agreed to a common-fund

settlement structure and the United States made a "final offer" for the total amount of the fund.

---

[3]     The Federal Circuit also held that the Little Tucker Act granted jurisdiction over
the lawsuit because the E-Government Act was sufficiently "money-mandating." Federal Circuit
Op., 968 F.3d at 1347-49.

Id. ¶ 26.  Over the next few weeks, Professor Green continued to mediate, and the parties agreed

on a fund amount of $125 million.  See id. ¶ 27.  Reaching agreement on the remaining sticking

points – including how the fund would be distributed, what would happen to unclaimed money,

and the scope of the release of legal claims – took many months more.  Id. ¶¶ 27-28.  In July

2022, the parties executed a settlement agreement, which they amended once in September 2022

and again in April 2023 (collectively, the "Agreement").  Id. ¶ 28; see id. Ex. A ("Sett.

Agreement"); id. Ex. B ("First Supp. Agreement"); id. Ex. C ("Second Supp. Agreement").

       On May 8, 2023, the Court granted preliminary approval of the Agreement and

scheduled a hearing to consider final approval for October 12, 2023 (the "Settlement Hearing").

See Order Granting Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement

("Prelim. Approval") [Dkt. No. 153] at ¶¶ 1, 3.  At that time, the Court certified a revised

settlement class.  Id. ¶ 7.  The settlement class included all members of the original class who did

not opt out, plus those meeting the same criteria who had paid PACER fees before May 2018 but

after the original class was certified.  Id.  The Court directed that notice of the Agreement and its

terms be provided to the settlement class.  Id. ¶¶ 15, 16, 18.  Using the government's PACER

registration data, the claims administrator identified members of the class to be notified.  Id.

¶ 13; KCC Decl. ¶¶ 5-7.

       In July 2023, the claims administrator sent the court-approved settlement notice,

both through email and through postcards, to over 500,000 PACER account holders.  KCC Decl.

¶¶ 8-11.  These notices provided class members with the settlement amount, an overview of the

litigation, information about opting out and submitting objections, and a link to additional

information and the full Agreement on a website dedicated to the settlement.  Id. Ex. B; see

PACER FEES CLASS ACTION, www.pacerfeesclassaction.com [https://perma.cc/N4L5-AYHS].

Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web Notice at 5.  Because some class members already had the opportunity to opt out when the original class was certified, the notice sent to them did not include the option to opt out.  KCC Decl. ¶8; see id. Ex. A.  The claims administrator also issued publication notice through a widely disseminated press release and a banking newsletter.  Id. ¶¶ 12, 13.

There were a few hiccups in the notice process.  First, the initial notice omitted some class members who were part of the original class.  KCC Decl. ¶ 15.  Second, the notice sent to some members of the original class incorrectly indicated that they had another opportunity to opt out.  Id. ¶ 16.  The settlement administrator corrected both mistakes and sent new notices on August 7, 2023.  Id. ¶¶ 15, 16.  Thirty-three individuals timely opted out of the settlement class.[4]  Five individuals filed objections.  See Compiled Objs.[5]

On August 28, 2023, the Named Plaintiffs moved for final approval of the class settlement and for attorney's fees, costs, and service awards.  Pls.' Sett. Mot.  The Court held the Settlement Hearing on October 12, 2023.  Class Counsel, as well as representatives for each of the three Named Plaintiffs, gave statements in support of the Agreement.  Two objectors spoke in opposition to the Agreement.  Then the Court gave the parties an opportunity to respond to

---

[4]    While the Named Plaintiffs initially stated that thirty-four individuals timely opted out, Pls.' Sett. Mot. at 13, the parties clarified at the Settlement Hearing that they had included a duplicate in their count and that the correct number is thirty-three.  In addition, the parties clarified at the Settlement Hearing that sixteen individuals attempted to opt out after the opt out deadline.  But none of these sixteen individuals were actually eligible to opt out, as all were either part of the original class and had the opportunity to opt out in 2017, or were federal employees who were never part of the class to begin with.  See id.

[5]    These individuals were:  Aaron Greenspan, Alexander Jiggetts, Geoffrey Miller, Don Kozich, and Eric Isaacson.  Of the written objections, two of the five were timely (Mr. Miller's and Mr. Isaacson's), and one of the three untimely objections was filed by an individual who is likely not a class member (Mr. Kozich).  Nevertheless, the Court has considered all five objections filed.

11

written and oral objections.  Finally, the Court heard from the parties and from objectors on the issue of attorney's fees.

## II.  THE SETTLEMENT AGREEMENT

The Agreement creates a common fund of $125 million and provides for the distribution of at least 80% of that fund to the hundreds of thousands of persons or entities who paid PACER fees between April 21, 2010 and May 31, 2018 (the "Class Period").

### A.  The Settlement Class and Fund

The settlement class includes all persons or entities who paid PACER fees in the period beginning six years before the Named Plaintiffs filed their original complaint (April 22, 2010) and ending on the date the judiciary stopped using PACER fees to fund prohibited expenses (May 31, 2018) – with the exception of those who opted out, of federal agencies, and of Class Counsel.  Sett. Agreement ¶ 3; First Supp. Agreement; see Pls.' Sett. Mot. at 11.  This class includes at least several hundred thousand members.  See Class Certification Op., 235 F. Supp. 3d at 39.

The settlement common fund totals $125 million.  Sett. Agreement ¶ 11.  From this fund, at least 80%, or $100 million, is to be distributed to class members.  Id. ¶ 18.  Up to 20%, or $25 million, is to be used for attorney's fees, litigation expenses, and service awards for the class representatives.  Id. ¶ 28.  As to the attorney's fees and service awards, the Agreement specifies that "the Court will ultimately determine whether the amounts requested are reasonable."  Id.  The Agreement further specifies that service awards cannot exceed $10,000 per class representative.  Id.

### B. Fund Allocation and Distribution to Class Members

The Agreement allocates the common fund to class members through a two-step calculation.  See Sett. Agreement ¶ 19.  First, all class members are allocated either $350 or, if they paid less than $350 in PACER fees during the Class Period, the actual amount that they paid.  Id.  Second, class members who paid over $350 receive, in addition to the first $350, a pro rata allocation of the remaining common fund.  Id.  This pro rata allocation compares the amount that a given class member paid over $350 to the amounts that other class members paid over $350, and allots the remaining common fund accordingly.  See id.  To illustrate the calculation, if a class member paid $100 in PACER fees during the Class Period, they will get all of it back.  See id. ¶¶ 19, 20.  But if a class member paid $1000 in PACER fees during the Class Period, they will get $350 plus an amount from the remaining common fund proportional to the additional $650 that they paid.  See id.  If there is unclaimed money after these allocations are distributed to class members, then the rest of the common fund will be distributed to class members who have not been fully reimbursed for the PACER fees they paid during the Class Period and who successfully collected their first distribution.  Id. ¶ 23.

In contrast to most class action settlements, class members will not need to submit claims to get their share of this common fund.  See Pls.' Sett. Mot. at 13.  Instead, the claims administrator will use the information provided to them by the government – which has comprehensive records of PACER registrants and the fees they paid – to identify class members and distribute their payments.  See id.; Sett. Agreement ¶¶ 14, 21, 23; KCC Decl. ¶¶ 5-7.  The claims administrator will disburse the first set of payments within 180 days of receiving the settlement fund from the government, and will distribute any remaining money three months after that.  Second Supp. Agreement ¶ 21; Sett. Agreement ¶ 24.

## III.  FAIRNESS

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be dismissed, settled, or compromised without the approval of the Court.  FED. R. CIV. P. 23(e). Before giving its approval, the Court must direct the provision of adequate notice to all members of the class, conduct a hearing, and find, after notice and a hearing, that the settlement is "fair, reasonable, and adequate."  Id.; see Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998); In re Black Farmers Discrimination Litig., 856 F. Supp. 2d 1, 26 (D.D.C. 2011).  In performing this task, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action.  See WILLIAM B. RUBENSTEIN, 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:40 (6th ed. 2023).

To determine whether a settlement is fair, reasonable, and adequate, the Court "looks to the 'paramount twin elements of procedural and substantive fairness.'"  Mercier v. United States, 156 Fed. Cl. 580, 584 (2021) (quoting Courval v. United States, 140 Fed. Cl. 133, 139 (2018) (internal quotation marks omitted)).  The Federal Rules instruct the Court to consider a variety of factors in doing so.  The first two of these factors are procedural:  whether "(A) the class representatives and class counsel have adequately represented the class; [and] (B) the proposal was negotiated at arm's length."  FED. R. CIV. P. 23(e)(2).  The remaining factors are substantive; the Court is to consider whether:

> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness
> of any proposed method of distributing relief to the class, including
> the method of processing class-member claims; (iii) the terms of any
> proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each
> other.

Id.

Having carefully considered the parties' arguments and all of the objections that have been filed with the Court and expressed at the Settlement Hearing, the Court concludes that the settlement is fair, reasonable, and adequate.

### A. Procedural Fairness

The Court finds that the Named Plaintiffs and Class Counsel have more than "adequately represented" the class. See FED. R. CIV. P. 23(e)(2)(A). The Named Plaintiffs are nonprofit organizations who pay PACER fees despite their nonprofit status, and whose members experienced real burdens because of the fees. Class Certification Op., 235 F. Supp. 3d at 42. These characteristics made them "particularly good class representatives." Id. The two law firms representing the class, in tandem, have extensive experience both in class actions and in lawsuits against the federal government. See Gupta Decl. ¶¶ 45-48, 50-55, 59-61; see also infra Section IV.B.1.

The Named Plaintiffs and Class Counsel have vigorously litigated this case for nearly eight years, over seven of them after the class was certified. See Gupta Decl. ¶¶ 11-13. They engaged in informal discovery, argued (and, in part, won) summary judgment, and successfully defended the summary judgment ruling on appeal. See id. ¶¶ 14-21; see also infra Section IV.B.2. After remand, they engaged in extensive settlement negotiations with the government. Gupta Decl. ¶¶ 23-28.

By all accounts, these settlement negotiations happened at "arm's length," indicating no collusion between the parties. See FED. R. CIV. P. 23(e)(2)(B). Negotiations came at a point in the litigation where liability was resolved but there were still significant questions about the possibility, and amount, of damages. The negotiations were thus neither "too early to be suspicious nor too late to be a waste of resources." In re Vitamins Antitrust Litig., 305 F.

15

Supp. 2d 100, 105 (D.D.C. 2004). And because of "significant informal discovery, . . . the parties were well-positioned to mediate their claims." Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 56 (D.D.C. 2010). The negotiations took place over nearly two years but came together "after a lengthy mediation session that was presided over by an experienced mediator," indicating skilled negotiating on both sides. See id. Further evidence that the negotiations were at arm's length and not collusive is provided by the positions taken by the parties during settlement negotiations and the compromises ultimately reached. See infra at 24.

The notice requirements of Rule 23 were also satisfied. When the Court preliminarily approved the settlement, it "direct[ed] notice in a reasonable manner to all class members who would be bound by the proposal." FED. R. CIV. P. 23(e)(1)(B); see Prelim. Approval ¶¶ 15, 16, 18. The Court also found the planned notice to be "the best notice practicable under the circumstances," Prelim. Approval ¶ 21, as was required for the individuals and entities who were not part of the originally certified class. See FED. R. CIV. P. 23(c)(2)(B). The claims administrator adequately executed this notice. Using the government's PACER registration data, it identified over 500,000 potential class members and sent them court-approved notices, both through email and through postcards. KCC Decl. ¶¶ 5-7, 8-11; see Prelim. Approval ¶ 13; see also FED. R. CIV. P. 23(c)(2)(B) (requiring, for new class members, "individual notice to all members who can be identified through reasonable effort"). The claims administrator also issued publication notice. KCC Decl. ¶¶ 12, 13. Each form of notice directed class members to additional information on the dedicated settlement website. See id. Exs. A-H. While there were a few errors in the notice process – the initial notice omitted some class members and gave some class members incorrect information – the claims administrator promptly corrected these errors and gave recipients sufficient time to opt out or object.

16

Id. ¶¶ 15-18.[6]  The notice also satisfied Rule 23's substantive requirements for new class members.  The emails, postcards, and publications, along with the dedicated settlement website:

> clearly and concisely state[d] in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

See FED. R. CIV. P. 23(c)(2)(B).  The Court finds that this notice was more than sufficient and was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Haggart v. Woodley, 809 F.3d 1336, 1348-49 (Fed. Cir. 2016) (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950)).

After class members were given notice, they had over a month (and most had over two months) to file written objections.  See KCC Decl. ¶¶ 10, 15; Prelim. Approval ¶¶ 3, 20.  Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web Notice at 5.  Only five individuals filed written objections.  On October 12, 2023, the Court held the Settlement Hearing.  After the parties' opening statements, the Court heard objections to the settlement.  No one spoke who had not already submitted a written objection.  Then, the Court gave the parties an opportunity to respond to objections.  Finally, the Court heard from the parties and from objectors on the issue of attorney's fees.

---

[6]     Objector Don Kozich contends that he did not receive notice of the settlement. Kozich Obj. and Mot. at 2.  While no method of notice is perfect, Mr. Kozich's failure to receive notice was likely proper.  Mr. Kozich does not appear to be a member of the class.  He incurred PACER fees during the Class Period, but he did not pay those fees during the Class Period, and thus is ineligible for relief.  Resp. to Kozich Obj. at 1.

Objector Eric Isaacson has questioned a few procedural aspects of the Settlement Hearing.  First, he argues that discussing the proper award of attorney's fees after the time scheduled for objectors to speak deprives objectors of due process and runs afoul of the Federal Rules, Isaacson Stmt. at 7, which instruct the Court to consider "the terms of any proposed award of attorney's fees" in evaluating the adequacy of "the relief provided for the class" in the proposed settlement.  FED. R. CIV. P. 23(e)(2)(C)(iii).  Second, Mr. Isaacson argues that objectors at the hearing should have been given the opportunity to cross-examine declarants who provided support for Class Counsel's requested fees.  Isaacson Stmt. at 7.[7]

Both of these arguments overstate an objector's role in the class settlement process.  While the Court must consider – and has considered – the arguments of any class member who objects to the settlement, the Court need not give objectors the opportunity to speak at every possible point in the hearing; nor does the Court need to give objectors the opportunity to probe declarations or exhibits through cross-examination or other means.  See 4 RUBENSTEIN, supra, § 13:42.  Moreover, to assuage Mr. Isaacson's concerns, the Court allowed him to speak during the portion of the hearing addressing attorney's fees, in addition to his opportunity to speak during the portion of the hearing during which the reasonableness of the settlement was discussed.

---

[7]      Mr. Isaacson further objects that "the settling parties arranged with the court to keep class members' objections off the public record."  Isaacson Stmt. at 3.  This objection has no factual basis.  Though the objections the Court received through email were not automatically docketed, they were available upon request.  In fact, at Mr. Isaacson's request, Class Counsel filed all objections to the public docket.  See Compiled Objs.

### B.  Substantive Fairness

In considering a proposed class action settlement, the Court must compare the benefits afforded to class members under the settlement with the likely recovery that plaintiffs would have realized if they pursued the resolution of their claims through litigation in court. Thomas v. Albright, 139 F.3d at 231; see In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 30.  The Court must look at the settlement as a whole and should not reject a settlement merely because individual class members claim that they would have received more by litigating rather than settling.  Thomas v. Albright, 139 F.3d at 231.  The Court should scrutinize the terms of the settlement carefully, but should also keep in mind "the interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources."  Christensen v. United States, 65 Fed. Cl. 625, 629 (2005) (quoting Mayfield v. Barr, 985 F.2d 1090, 1092 (D.C. Cir. 1993)).  And "the opinion of 'experienced and informed counsel should be afforded substantial consideration by [the C]ourt in evaluating the reasonableness of a proposed settlement.'"  Prince v. Aramark Corp., 257 F. Supp. 3d 20, 26 (D.D.C. 2017) (quoting In re Lorazepam & Clorazepate Antitrust Litig., Civil Action No. 99-0790, 2003 WL 22037741, at *6 (D.D.C. June 16, 2003)).

In its analysis of the Agreement's substantive fairness, the Court is guided by the substantive factors enumerated in the Federal Rules of Civil Procedure:  whether "the relief provided for the class is adequate, taking into account" various subfactors, and whether "the proposal treats class members equitably relative to each other."  FED. R. CIV. P. 23(e)(2).

### 1.  Whether the Relief is Adequate

The relief the settlement provides to class members is substantial.  The majority of class members will receive a full refund for the PACER fees they paid during the Class

Period.  Gupta Decl. ¶ 43.  Although the minority of class members – those who paid over $350 in fees during the Class Period – will likely not receive a full refund, they may receive substantially more than $350.  See Sett. Agreement ¶ 19.  In addition, the "proposed method of distributing relief to the class" is efficient.  See FED. R. CIV. P. 23(e)(2)(C)(ii).  There are no claims to process, and class members will receive the relief even if they have never contacted Class Counsel or the claims administrator.  See Pls.' Sett. Mot. at 13.

Contrast this substantial relief with the potential "costs, risks, and delay of trial and appeal."  See FED. R. CIV. P. 23(e)(2)(C)(i).  The Federal Circuit's liability ruling in this case found some, but not all, of the PACER fees collected during the Class Period to be unlawful. Federal Circuit Op., 968 F.3d at 1350-51, 1357.  It left open the question of the extent to which it was lawful for the judiciary to fund CM/ECF through PACER fees.  See id. at 1358.  And the ruling effectively set the maximum possible recoverable damages for the class at around $500 million.  Fitzpatrick Decl. ¶ 20.

Even putting aside the costs of trial and potential further appeal, the path to obtaining this $500 million would have been anything but smooth.  "[T]here are several reasons to think a full recovery is unrealistic."  In re APA Assessment Fee Litig., 311 F.R.D. 8, 19 (D.D.C. 2015).  After the Federal Circuit's ruling, the government continued to assert that the class had no claim to damages because class members could not prove that – but for the unlawful expenditures – PACER fees would have been lower.  Gupta Decl. ¶ 23.  Moreover, even if class members would not have had to prove damages with specificity, the amount of potentially recoverable damages still would have been uncertain.  Much of the potential recovery came from fees the judiciary used to pay for CM/ECF services, Fitzpatrick Decl. ¶ 20, and the Federal Circuit explicitly declined to rule on how much of these services were appropriately funded

through PACER fees. Federal Circuit Op., 968 F.3d at 1358. The recoverability of a sizable portion of the potential damages was thus an open question at the time of settlement.

In other words, at the point of the litigation at which the parties agreed on the terms of their settlement, it would have been a substantial risk to class members to proceed to trial. Evidence could have shown that <u>all</u> of the judiciary's CM/ECF expenditures were lawful. Or the government could have convinced the Court of its position on damages. In that case, the Named Plaintiffs would have faced the difficult task of proving that the judiciary would have chosen to charge lower PACER fees had its expenditures been limited to the lawful categories. The common fund amount – roughly a quarter of the potential recovery if every legal and factual issue had gone the plaintiffs' way – was impressively large in comparison to the risks of continuing to litigate.

Some objectors see a quarter of the maximum potential recovery as an unimpressive figure. <u>See</u> Isaacson Obj. at 3 (calling the settlement "remarkably mediocre"); Greenspan Obj. at 1 (asserting that the settlement should have fully reimbursed PACER users). These views do not properly account for the formidable arguments that were available to the government if the case had proceeded to trial. In addition, Objector Aaron Greenspan asserts that the common fund amount is too low because the judiciary can only legally charge for the marginal cost of document transmission, and that marginal cost is zero. Greenspan Obj. at 1. But the Court has explicitly rejected an interpretation of the E-Government Act that would limit lawful fees to those necessary to pay the marginal cost of operating PACER. Summary Judgment Op., 291 F. Supp. 3d at 140-43. Instead, the judiciary can use PACER fees to fund the full cost of providing public access to federal court electronic docketing information, including fixed costs. <u>See</u> Federal Circuit Op., 968 F.3d at 1349-52.

Other objectors argue that the Agreement is unreasonable because of its provision regarding attorney's fees, expenses, and service awards.  See Isaacson Obj. at 9-17; Greenspan Obj. at 1-2.  The Court has conducted a full analysis of the proper fee awards below.  See infra Section IV.  For now, it suffices to say that the fees provision of the Agreement is reasonable. See FED. R. CIV. P. 23(e)(2)(C)(iii) (instructing courts to consider the provisions of settlement agreements that relate to attorney's fees).  The Agreement does not fix an amount of attorney's fees or service awards.  Instead, it sets an upper limit on both – Class Counsel was able to request up to 20% of the common fund for attorney's fees, expenses, and service awards, including no more than $10,000 per service award for each class representative.  Sett. Agreement ¶ 28.  The Agreement leaves to the Court the ultimate determinations of how much to award.  Id. Rather than setting an unreasonably high amount of attorney's fees or service awards, the Agreement thus caps the amount the Court has the opportunity to approve as reasonable.

Finally, the relative paucity of objections to the Agreement is a strong indicator of the adequacy of the relief.  See In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 29; Mercier v. United States, 156 Fed. Cl. at 597.  As Class Counsel notes, the settlement class is comprised of hundreds of thousands of PACER users and is "perhaps the most litigious group of people and entities ever assembled in a single class action, . . . including sophisticated data aggregators, federal-court litigators, and law firms of every stripe."  Pls.' Reply at 1.  Of this group, only thirty-three opted out of the class, and only five have objected to the settlement.  In light of the terms of the Agreement and class members' lack of opposition to them, the Court finds the settlement relief adequate.

22

2. Whether the Settlement Treats Class Members Equitably

The Court concludes that the Agreement "treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D). While it treats those who paid $350 or less in PACER fees during the Class Period differently from those who paid more than $350, this difference in treatment is fair and justified.

The requirement of intra-class equity exists to ensure that "class counsel ha[s not] sold out some of the class members at the expense of others, or for their own benefit." 4 RUBENSTEIN, supra, § 13:56. If class counsel prioritizes settling a case over vigorously advocating for all class members' claims, counsel may agree to provide some (more powerful or more vocal) class members more relief than they deserve while giving other class members less than they deserve. To ensure that class counsel has not done so, it falls upon the Court to determine whether similarly situated class members are treated similarly and whether "dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." Id.

There is absolutely no indication that Class Counsel "sold out" any group of class members in this case. The Agreement strikes a balance between two competing goals: First, to give relief to small-scale PACER users – the non-lawyer members of the public and individual law practitioners who were most affected by having to pay unlawful fees; the full reimbursement of all PACER fees paid up to $350 makes it more likely that small-scale users will be wholly compensated. See Sett. Agreement ¶ 20. And second, to treat all class members – including large-scale users like law firms – equitably based on what they actually paid. The pro rata allocation above $350 makes it more likely that the sizable fees paid by large-scale users will be adequately accounted for. See id. The Agreement thus does a good job of treating similarly

situated class members similarly, while accounting for the differences between dissimilarly situated class members.

The details the parties have provided about the settlement negotiations further support the reasonableness of the Agreement's common fund distribution. As to the allocation of settlement funds, the Named Plaintiffs initially took the position that the fund should be distributed on an exclusively pro rata basis. Gupta Decl. ¶ 28. The government countered that, before the pro rata allocation, class members should first be fully reimbursed up to a large amount. Id. It grounded this position in the E-Government Act's authorization to "'distinguish between classes of persons' in setting PACER fees . . . 'to avoid unreasonable burdens and to promote public access to'" electronic docketing information. Id. (quoting 28 U.S.C. § 1913 note). Consistent with the judiciary's policy of offering waivers and other pricing mechanisms to make PACER cheaper for some groups of users, the government wanted more of the settlement fund to go to reimbursing those who used PACER less. See id. The $350 figure reflected a compromise between the Named Plaintiffs' position and the government's position. Far from "selling out" class members, the different treatment of different groups within the class reflects vigorous negotiation on both sides, and reflects the text of the E-Government Act.

A number of the objectors dispute the reasonableness of the distribution. Mr. Isaacson argues that too much of the common fund is allocated pro rata, unfairly favoring large-scale users over small-scale users. Isaacson Obj. at 4-5. Objector Geoffrey Miller argues that too much of the common fund is allocated to fully reimbursing users who paid $350 or less, unfairly favoring small-scale users over large-scale users. Miller Obj. at 1-2.[8] As Class Counsel

---

[8]     Mr. Miller also objects that "[t]he proposed plan of allocation under Federal Rule 23 is in tension with the Rules Enabling Act, 28 U.S.C. §[§] 2071-2077, because, by providing different treatment to litigants with identical legal claims, it arguably abridges their

points out, these arguments cannot both be correct, and the fact that each of them was made indicates, if anything, a good compromise. See Pls.' Reply at 4. Moreover, the structure of the distribution is on sound legal footing. "Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members . . . ." Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 629 (6th Cir. 2007). At the same time, courts routinely approve settlements providing for pro rata distributions of common funds because such distributions directly account for the differences in the value of the claims of different class members. See, e.g., In re APA Assessment Fee Litig., 311 F.R.D. at 13; In re Facebook Biometric Info. Priv. Litig., 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021); In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 580-81 (S.D.N.Y. 2008).

   The fact that two objectors (Mr. Isaacson and Mr. Miller) hold these contradictory positions is understandable. A class member who paid substantially more than $350 in PACER fees, but substantially less than a large-scale user, may look at large-scale users and feel disappointed that these users are getting so much more in absolute dollars. And a large-scale user may look at a class member who paid $350 or less in PACER fees and find it unfair that that class member is getting fully reimbursed by the Agreement, while the large-scale user is not. At bottom, however, this dissatisfaction arises from the amount of the common fund, not its allocation. There is simply not enough money in the common fund to reimburse every class member for all of what they paid in PACER fees – nor should there be, as some of the fees were

---

right to be treated equally before the law." Miller Obj. at 2. But the Rules Enabling Act is irrelevant to allocations between class members in common-fund settlements. Instead, as applied to class actions, the Rules Enabling Act prevents courts from "giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 458 (2016).

lawful. No settlement is perfect. But the Court finds that the difference in how this settlement treats different class members is justified, fair, and equitable.

Mr. Isaacson raises another issue of equity. He points out that many of the institutional class members are law firms, and that these firms have likely already been reimbursed – by their clients or through settlement agreements in other cases – for PACER fees paid during the Class Period. Isaacson Obj. at 4-7. Because these law firms have already been reimbursed, he argues, it is inequitable to treat them like other class members, particularly like individuals who never received reimbursement. See id. at 4.[9]

This argument makes some sense in the abstract. While a reasonable settlement hypothetically could differentiate between law firm class members who had been reimbursed for their PACER fees and other class members who had not been reimbursed for their PACER fees, there were good reasons not to do so here. First, prior to settlement, the claims of the law firms that had been reimbursed by their clients were just as valid as the claims of other class members. See S. Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533 (1918). In fact, the law firm class members were likely the only plaintiffs who could have brought claims against the government to recover the relevant PACER fees. Their clients could not have brought such claims because damages under the Little Tucker Act are available only to those who paid unlawful fees to the government, to those who paid unlawful fees to others "at the direction of

---

[9] Mr. Isaacson further argues that the common fund allocations to many large-scale claimants are improper because entities whose aggregated claims total over $10,000 fall outside of Little Tucker Act jurisdiction. Isaacson Obj. at 7-8. This argument misunderstands the law. "A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Class Certification Op., 235 F. Supp. 3d at 38 (citing Am. Airlines, Inc. v. Austin, 778 F. Supp. 72, 76-77 (D.D.C. 1991); Alaska Airlines v. Austin, 801 F. Supp. 760, 762 (D.D.C. 1992); United States v. Louisville & Nashville R.R. Co., 221 F.2d 698, 701 (6th Cir. 1955)).

the government to meet a governmental obligation," see Aerolineas Argentinas v. United States,

77 F.3d 1564, 1573 (Fed. Cir. 1996), or to those against whom the government took action,

related to unlawful fees, that had a "direct and substantial impact."  See Ontario Power

Generation, Inc. v. United States, 369 F.3d 1298, 1303 (Fed. Cir. 2004) (quoting Casa de

Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002)).  Because

clients who reimbursed law firms for unlawful PACER fees do not appear to fit into any of these

categories, it would have been difficult – perhaps impossible – for them to recover anything from

the government.  Instead, once law firm class members have received their distributions under

the Agreement, clients may have claims against them – to recover what the clients paid to the

law firms in PACER fees – through sources of law unrelated to class actions, like contract law or

state statutes.  See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 789 F. Supp. 2d

935, 967 (N.D. Ill. 2011) (approving a settlement even though some class members had been

reimbursed for unlawful fees).  That is between lawyers and their clients and beyond the scope of

this litigation.

Second, it makes sense to leave disputes concerning reimbursement to law firm

class members and the clients who reimbursed them, rather than to the claims administrator.  It is

true, as Mr. Isaacson points out, that law firms often bill clients for PACER fees.  Isaacson Obj.

at 4; see, e.g., Decastro v. City of New York, Civil Action No. 16-3850, 2017 WL 4386372, at

*10 (S.D.N.Y. Sept. 30, 2017).  But it would be complicated and burdensome for the claims

administrator to sort through billing records to determine what happened with respect to each set

of PACER fees billed.  Sometimes, firms write fees off.  Sometimes, clients do not pay.  And if a

client paid part, but not all, of their bills, it may not even be possible for the claims administrator

to figure out what portion of a client's payment went towards PACER charges.  On the other

hand, law firm class members are better equipped to determine which of their clients to reimburse for PACER charges, and by how much. If the clients believe the firms to be unlawfully withholding reimbursement, they can sue. More likely, law firms and clients will resolve any disputes over reimbursement out of court. Allowing this process to play out does not make the settlement inequitable.

In short, the benefits offered to class members by the Agreement are substantial, and the likely outcome for the class if the case were to proceed to trial is uncertain. The Court is convinced that the Agreement is fair, reasonable, and adequate.

## IV.  ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). Here, the Agreement authorizes attorney's fees, costs, and services awards, but limits the amount the Court can award for these categories combined to no more than 20% of the common fund, or $25 million. Sett. Agreement ¶ 28. The Agreement further specifies that service awards cannot exceed $10,000 per Named Plaintiff. Id.

Class Counsel effectively requests the maximum amount allowed by the settlement: $1,106,654.98 in costs, $30,000 in service awards ($10,000 for each of the three Named Plaintiffs), and $23,863,345.02 – the difference between the $25 million cap and the

other two amounts – in attorney's fees. Pls.' Sett. Mot. at 4.[10] The government does not oppose their request.[11]

The Court must independently determine the reasonableness of the requested fees, costs, and service awards. After carefully considering the submissions of the parties, the relevant Federal Rule, and the case law, and after considering all of the objections that have been filed with the Court and expressed at the Settlement Hearing, the Court awards the full amount requested by Class Counsel in fees, costs, and service awards.

### A. Legal Background

#### 1. Attorney's Fees

"The 'common fund doctrine' allows an attorney whose efforts created, increased or preserved a fund 'to recover from the fund the costs of his litigation, including attorneys' fees.'" In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 16 (D.D.C. 2003) (quoting Vincent v. Hughes Air West, Inc., 557 F.2d 759, 769 (9th Cir.1977)). In common-fund cases, courts have a duty to "ensure that claims for attorneys' fees are reasonable, in light of the results obtained." Rogers v. Lumina Solar, Inc., Civil Action No. 18-2128, 2020 WL 3402360, at *11 (D.D.C. June 19, 2020) (K.B. Jackson, J.) (quoting In re Black Farmers Discrimination Litig., 953 F. Supp. 2d 82, 87 (D.D.C. 2013)). The Court's independent scrutiny of an award's reasonableness is particularly important in common-fund cases because "the conflict between a class and its

---

[10] The $1,106,654.98 that Class Counsel requests in costs is comprised of $29,654.98 in attorney expenses and $1,077,000 in settlement-administration and noticing costs. Pls.' Sett. Mot. at 4.

[11] In its briefs, the government raised concerns about the size of the requested fees. Def.'s Resp. at 4-7. At the Settlement Hearing, however, the government indicated that Class Counsel's reply brief had alleviated their concerns.

attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (quoting Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991)). Thus, in common-fund cases, the court acts "as fiduciary for the beneficiaries" of the fund "because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set" and because "there is no adversary process that can be relied upon in the setting of a reasonable fee." In re Dep't of Veterans Affs. (VA) Data Theft Litig., 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (quoting Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 251 (1985)).

Courts have identified two approaches to calculating reasonable attorney's fees in common-fund cases. The first is the "percentage-of-the-fund method, through which 'a reasonable fee is based on a percentage of the fund bestowed on the class.'" Health Republic Ins. Co. v. United States, 58 F.4th 1365, 1371 (Fed. Cir. 2023) (quoting Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984)). The second is the lodestar method, "through which the court calculates the product of reasonable hours times a reasonable rate, and then adjusts that 'lodestar' result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings." Id. (cleaned up).

While courts have discretion to use either method, fee awards in common-fund cases are "typically based on some percentage of the common fund." Moore v. United States, 63 Fed. Cl. 781, 786 (2005). The lodestar method, by contrast, generally is used in fee-shifting cases. Health Republic Ins. Co. v. United States, 58 F.4th at 1371. Many courts of appeals have expressed an explicit preference for using the percentage method in common-fund cases. 5 RUBENSTEIN, supra, § 15:64 & n.15; see, e.g., Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261,

1271 (D.C. Cir. 1993); see also In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 17.  This is because the percentage method "helps to align more closely the interests of the attorneys with the interests of the parties," Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d at 1573, by discouraging inflation of attorney hours and promoting "efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system."  Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 205 (D.D.C. 2011) (quoting In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 383 (D.D.C. 2002)). The lodestar method, on the other hand, may give attorneys "an incentive to run up" "the number of hours they have billed," which could "prolong[] litigation unnecessarily and hence defer[] the class's compensation."  5 RUBENSTEIN, supra, § 15:65; see Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268.

When using the percentage-of-the-fund method, the Federal Circuit has identified the following factors to consider:

> (1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award.

Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787).  In addition, "as settlement amounts increase in magnitude, the percentage of fees awarded should decrease."  Haggart v. United States, 116 Fed. Cl. 131, 147 (2014).  This is because "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel."  Id. (alterations in original) (quoting In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998)).

Courts sometimes employ a "lodestar cross-check" when they use the percentage method.  See 5 RUBENSTEIN, supra, § 15:85.  In a lodestar cross-check, "the reasonableness of a potential percentage-of-the-fund fee is checked by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier, and when this implicit multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (cleaned up).  While "the resulting multiplier need not fall within any pre-defined range, . . . courts must take care to explain how the application of a multiplier is justified by the facts of a particular case, . . . [and] must provide sufficient analysis and consideration of multipliers used in comparable cases to justify the award made."  Id. at 1375 (cleaned up).  That said, lodestar cross-checks "need entail neither mathematical precision nor bean-counting," as "district courts may rely on summaries submitted by the attorneys and need not review actual billing records."  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306-07 (3d Cir. 2005).  Although not required, the Federal Circuit has strongly suggested using a lodestar cross-check, "at least as a general matter."  Health Republic Ins. Co. v. United States, 58 F.4th at 1374 n.2.

### 2.   Costs and Service Awards

Rule 23 contemplates recovery of "nontaxable costs," FED. R. CIV. P. 23(h), the "reasonable expenses normally charged to a fee paying client."  5 RUBENSTEIN, supra, § 16:5; see Quimby v. United States, 107 Fed. Cl. 126, 135 (2012).  And "[i]t is well settled that counsel who have created a common fund for the benefit of a class are entitled to be awarded for out-of-pocket costs reasonably incurred in creating the fund."  Mercier v. United States, 156 Fed. Cl. at 593.  Aside from being reasonable, such expenses must be adequately documented. 5 RUBENSTEIN, supra, § 16:10.

Service awards, also known as "incentive" or "case-contribution" awards, are distributions from the common fund to class representatives in recognition of their service to the class and their role in the litigation. See 5 RUBENSTEIN, supra, § 17:1. Service awards "recognize the unique risks incurred and additional responsibility undertaken by named plaintiffs in class actions," Mercier v. United States, 156 Fed. Cl. at 589, and also compensate class representatives for expenses and work performed by in-house counsel. See In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 400. Service awards must be reasonable and proportionate to class representatives' role in the case. See 5 RUBENSTEIN, supra, § 17:13.

### B. Reasonableness of Requested Attorney's Fees

Class Counsel and the government agree that the Court should use the percentage-of-the-fund method to assess the reasonableness of the requested fees. Pls.' Sett. Mot. at 27; Def.'s Resp. at 8-9. Mr. Isaacson argues that the Court should use the lodestar method and award fees not exceeding Class Counsel's lodestar. Isaacson Obj. at 9-10. He relies primarily on Supreme Court precedent discussing fee-shifting cases and on precedent predating Rule 23 and the modern class action lawsuit. Id. But as the D.C. Circuit has noted, "the latest guidance from the High Court counsels the use of a percentage-of-the-fund methodology." Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268 (citing Blum v. Stenson, 465 U.S. at 900 n.16); see also In re Home Depot Inc., 931 F.3d 1065, 1085 (11th Cir. 2019) ("[T]he Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases does not apply to common-fund cases."); In re BioScrip, Inc. Sec. Litig., 273 F. Supp. 3d 474, 479-89 (S.D.N.Y. 2017) (Nathan, J.) (rejecting similar arguments made by Mr. Isaacson). For these reasons, and because the percentage method promotes efficiency and ensures that class counsel is compensated primarily based on the result achieved, the Court will use the percentage method.

The government urges the Court to also employ a lodestar cross-check. Def.'s Resp. at 7. Class Counsel points out, rightly, that a lodestar cross-check is not required, but it stops short of arguing that the Court should refrain from doing one. Pls.' Sett. Mot. at 35; see id. at 36-37; Pls.' Reply at 10. The Court will add a lodestar cross-check to its percentage-method analysis to confirm that the fee awarded properly accounts for the effort Class Counsel expended to litigate the case. The Court will first analyze the percentage requested using each of the above-described Federal Circuit factors, and then will conduct a lodestar cross-check.

## 1. The Quality of Counsel

As the Court has stated before, "[t]here is no dispute about the competency of class counsel." Class Certification Op., 235 F. Supp. 3d at 43. Gupta Wessler is one of the nation's leading plaintiff and public interest appellate boutiques, and also has extensive experience in complex litigation against the federal government. See Gupta Decl. ¶¶ 46-48, 50-55, 59-61. Motley Rice is a leading class-action law firm. Id. ¶ 45. In dividing case responsibilities, each firm took charge of what it does best – Gupta Wessler led the briefing, argument, research, and legal analysis, and Motley Rice led the case management, discovery, and settlement administration. Id. These two firms have "thoroughly impress[ive] . . . qualifications" and class members undoubtedly "benefit[ted] from the wealth of experience" they brought to the case. Steele v. United States, Civil Action No. 14-2221, 2015 WL 4121607, at *4 (D.D.C. June 30, 2015) (describing groups of attorneys including current members of Class Counsel).

### 2.   The Complexity and Duration of the Litigation

The litigation was reasonably complex.  As in most class actions, the litigation involved a motion to dismiss, disputes regarding class certification, and cross-motions for summary judgment.  See Motion to Dismiss Op., 2016 WL 7076986; Class Certification Op., 235 F. Supp. 3d 32; Summary Judgment Op., 291 F. Supp. 3d 123.  But unlike most class actions, this case required appellate argument both as to a novel theory of jurisdiction and as to the most important merits issue in the case.  See Federal Circuit Op., 968 F.3d at 1343.  After remand, Class Counsel engaged in lengthy settlement negotiation with the government.  Gupta Decl. ¶¶ 23-28.  And even after the parties reached an agreement, Class Counsel put significant effort into answering class members' questions.  Gupta Supp. Decl. ¶¶ 2, 3.  All told, Class Counsel worked on this case for nearly eight years.  See Gupta Decl. ¶¶ 11, 12.

Mr. Isaacson asserts that this case was easy to litigate because it involved an issue of statutory construction that was ultimately settled by the Federal Circuit.  Isaacson Obj. at 14.  But this argument ignores the fact that it was Class Counsel's very efforts that caused the Federal Circuit to construe the statute in a way that would allow the class to recover.  The unsettled interpretation of the E-Government Act at the outset of the litigation speaks to the complexity of the case, not against it.

### 3.   The Risk of Nonrecovery

There was an exceptionally high risk of nonrecovery in this case.  As one of the attorneys representing the class describes, before this lawsuit, "litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime" – both because "the judiciary has statutory authority to charge at least some amount in fees" and because "the fees were still assumed to be beyond the reach of litigation."  Gupta Decl. ¶ 7.  He

35

points out correctly that the Administrative Procedure Act – which normally provides

jurisdiction and a waiver of sovereign immunity for lawsuits against agencies – explicitly

exempts the federal judiciary from its reach.  See id.; 5 U.S.C. § 551(1)(B).

      Even after Class Counsel identified their alternative and ultimately successful

strategy of arguing that the Little Tucker Act provided the necessary jurisdiction and waiver of

sovereign immunity, there was still a significant risk of nonrecovery for class members.  To

show illegal exaction under the Little Tucker Act, the Named Plaintiffs had to "demonstrate that

the statute or provision causing the exaction itself provides, either expressly or by necessary

implication, that the remedy for its violation entails a return of money unlawfully exacted."

Federal Circuit Op., 968 F.3d at 1348 (internal quotation marks omitted) (quoting Norman v.

United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005)).  But the E-Government Act, which Class

Counsel argued caused the exaction, "nowhere explicitly requires payment of damages by the

government for overcharging users."  Id.  Thus, before even getting to the merits, Class Counsel

had to fight an uphill interpretive battle.

      On the merits, Class Counsel's argument was similarly difficult.  Take, for

example, the one sentence in the E-Government Act that explicitly spoke to PACER fees:  "The

Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for

collection by the courts under those sections for access to information available through

automatic data processing equipment."  28 U.S.C. § 1913 note.  As the Federal Circuit

acknowledged, far from supporting its ultimate holding, this sentence "supports the

government's interpretation, as it authorizes charging fees for electronic access to information

without any express restrictions."  Federal Circuit Op., 968 F.3d at 1351.  Nevertheless, Class

Counsel persuaded the Federal Circuit that the rest of the statute, and its context, imposed

restrictions on the sorts of electronic information dissemination for which the judiciary could use PACER fees.  See id. at 1352-57.

Finally, there was litigation risk even after the Federal Circuit held that the E-Government Act did impose such restrictions.  See supra Section III.B.1.  Whether the judiciary could use PACER fees to pay for all of CM/ECF was still an open question.  See Federal Circuit Op., 968 F.3d at 1358.  And the government made plausible arguments that the class could not recover damages without an additional evidentiary showing.  See Gupta Decl. ¶ 23.  Until the moment the Named Plaintiffs reached a settlement with the government, there was a significant risk of nonrecovery.

4.  The Fee that Likely Would Have Been Negotiated in Similar Cases

The Court is to consider what fee "likely would have been negotiated between private parties in similar cases."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787).  The truth is that there are few "similar cases" with which to compare this case:  a class action lawsuit against the federal judiciary for charging too much in fees that it is explicitly authorized to charge at least in part.  See infra Section IV.B.6.  Still, it is worth noting that the percentage award Class Counsel requests here is below the typical 33% contingency fee.  And as Class Counsel points out, each Named Plaintiff signed a retainer agreement providing for a contingency fee of up to 33% of the common fund, Gupta Decl. ¶ 65, and each class member who was also part of the original class agreed to a contingency fee of up to 30% by declining to opt out.  Class Cert. Email Notice; Class Cert. Web Notice at 7; see 1st Notice Appr.  At the same time, the Court takes these agreements with a grain of salt.  Each plaintiff in a class action "typically has a small interest in the overall controversy" and thus "has no incentive to negotiate a competitive rate with class counsel."

5 RUBENSTEIN, supra, § 15:74.  And while one third of the recovery may be the typical fee in cases with relatively few plaintiffs, it is not the standard for large class actions where the size of the class is one of the main determinants of the size of the recovery.  This factor thus has minimal bearing on the reasonableness of Class Counsel's requested fee.  See Mercier v. United States 156 Fed. Cl. at 592 ("Even if some other class members had agreed to a 33.3% contingency fee, they almost certainly would have evaluated the fee's reasonableness in terms of their own recoveries, overlooking the economies of scale that class counsel enjoyed by representing thousands of similarly situated plaintiffs.").

5. Class Members' Objections to the Settlement Terms or Fees Requested by Class Counsel

Most of the objections to the Agreement or the requested fees have already been discussed in the context of the fairness of the settlement, see supra Section III, or with regard to another fee approval factor.  See supra Section IV.B.2.  Mr. Isaacson raises several additional arguments regarding attorney's fees.  First, Mr. Isaacson argues that the Court should not consider the supplemental declarations of Professor William Rubenstein and Professor Brian Fitzpatrick because Class Counsel submitted these declarations after the deadline for class members to file objections.  Isaacson Stmt. at 3.  Second, Mr. Isaacson quibbles with the content of these supplemental declarations.  Id. at 3-6.

Strictly construed, Mr. Isaacson's first argument lacks merit.  Under the Federal Rules of Civil Procedure, the only relevant requirement is that notice of a motion for attorney's fees must be "directed to class members in a reasonable manner" so that class members "may object to the motion."  FED. R. CIV. P. 23(h).  The Advisory Committee notes that, "[i]n setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion."  Id. advisory committee's note (2003).

Rule 23 thus requires only that class members have sufficient time to respond to the fee <u>motion</u> and accompanying evidence, not to evidence submitted in response or reply. Here, Class Counsel submitted their motion for attorney's fees over two weeks before the objection deadline, giving objectors sufficient time to respond. <u>See</u> Pls.' Sett. Mot.

       That said, it is a fair point that class members lack a meaningful opportunity to object to attorney's fees requests if counsel submits declarations raising new bases of support for the requested fees after the objection deadline. And the professors' supplemental declarations do just that. Professor Fitzpatrick's declaration provides information about why the Fitzpatrick Matrix should not be used as Mr. Isaacson suggests. <u>See</u> Fitzpatrick Supp. Decl. ¶¶ 4-6. Professor Rubenstein's declaration examines the data used in the Fitzpatrick Matrix and comes to certain conclusions about reasonable fees based on a subset of that data. <u>See</u> Rubenstein Supp. Decl. ¶¶ 13-26. Neither of these points was raised in the professors' original declarations, which accompanied Class Counsel's fees motion.

       Based on Mr. Isaacson's objections, the Court will not rely on the supplemental declarations of Professor Fitzpatrick or Professor Rubenstein in assessing the reasonableness of Class Counsel's requested fees. Because the Court will not rely on the declarations, it need not address Mr. Isaacson's arguments about their content.

### 6. The Percentage Applied in Other Class Actions

       Thirty years ago, the D.C. Circuit noted that "a majority of common fund class action fee awards fall between twenty and thirty percent." <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1272. This remains true today. <u>See</u> 5 Rubenstein, <u>supra</u>, § 15:83 (summary of empirical studies on common fund fee awards finding means between 22% and 27% and medians between 24% and 29%). For cases in which the common fund is especially large, fee

awards tend towards the low end of this range. The latest comprehensive study on class action fee awards, using data from 2009-2013, reports that the mean percentage awarded from common funds greater than $67.5 million is 22.3%. Theodore Eisenberg et al., Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. REV. 937, 948 (2017).

Although it is difficult to locate good comparisons to the settlement in this case, the comparisons that the Court did find are in line with these statistics. Two cases involving insufficient pay by the Department of Veterans Affairs provide the closest analogues. In Quimby v. United States, a class of over 40,000 health professionals formerly employed by the Department alleged that they were deprived of additional pay that they earned for working undesirable shifts. Quimby v. United States, 107 Fed. Cl. at 128-29. As this Court has done in this case, the Court of Claims granted in part and denied in part cross-motions for summary judgment on the government's liability. Id. at 128. The class ultimately settled with the government in 2012 – after eleven years of contentious litigation – and the settlement agreement provided for a common fund of $74 million. See id. at 133. The Court of Claims granted class counsel's request for 30% of the common fund in attorney's fees, id. at 132, 135, reasoning that the attorneys obtained "excellent results," id. at 133 (quoting Hensley v. Eckerhart, 461 U.S. 424, 435 (1983)), and that "[t]he complexity of this litigation, the government's opposition to the Court's ruling on the merits, and the absence of controlling precedent concerning many of the issues presented together indicate that continued litigation would have created substantial uncertainty for members of the class." Id.

The plaintiffs in Mercier v. United States brought similar claims. See Mercier v. United States, 156 Fed. Cl. 580. There, a class of over 3,000 nurses and physician assistants sued the Department of Veterans Affairs, alleging that they were deprived of overtime pay. Id.

at 583.  The Court of Claims granted the government's motion to dismiss, but was reversed on appeal.  Id.  The litigation continued.  Id.  The class settled with the government in 2021 – after eight years of litigation – and the settlement agreement provided for a common fund of $160 million.  Id. at 583-84.  Class counsel requested 30% of the common fund in attorney's fees.  Id. at 590.  In analyzing the reasonableness of this request, the Court of Claims found that class counsel was skilled and experienced, that the litigation was complex, and that the risk of nonrecovery was substantial.  Id. at 591.  But because the common fund was so large (in part due to the size of the class itself), the court rejected class counsel's request and awarded 20% of the fund instead of the requested 30%.  Id. at 592-93.  The court found that the awarded percentage would "protect[] the interests of the class members but also provide[] ample compensation to counsel for their excellent work in this case" and "encourage other counsel to take on the representation of plaintiffs in similar cases."  Id. at 593.

Here, the requested percentage is 19.1%.  It is smaller than the percentage the Court of Claims awarded in Quimby, a complex case that lasted longer than this one – and where, as here, the government opposed the court's rulings on novel issues of law.  See Quimby v. United States, 107 Fed. Cl. at 128-133.  It is approximately what the Court of Claims awarded in Mercier, another complex case, of similar duration to this one – and where, as here, counsel for the class successfully litigated issues of liability on appeal.  See Mercier v. United States 156 Fed. Cl. at 583-84, 591-93.  Furthermore, according to the most recent comprehensive study on class action fee awards, the requested percentage is around the average for common funds in the range of the fund created by this settlement.  See Eisenberg et al., supra, at 948.  Because the requested fee award fits neatly within the relevant statistical range and aligns with the best case analogues, this factor strongly counsels in favor of approval of the attorney's fees request.

41

7.   The Size of the Award

The size of the requested fee award – nearly $24 million – is large.  But "so is the class members' total recovery."  See Raulerson v. United States, 108 Fed. Cl. 675, 680 (2013) (approving fee award of approximately $11 million).  Three additional considerations convince the Court that the absolute size of the requested award is not a cause for concern.  First, $24 million is nowhere near the highest amounts courts have awarded in attorney's fees in common-fund cases.  See, e.g., 52 Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 723-24 (2d Cir. 2023) (affirming fee award of approximately $523 million); In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1281 (11th Cir. 2021) (affirming fee award of $77.5 million); see also Eisenberg et al., supra, at 943-44 (finding yearly average fee awards between $37.9 million and $124 million in common-fund cases with recoveries greater than $100 million).  Second, $24 million is close to the absolute size of the fees awarded in the closest comparator cases identified above.  See Mercier v. United States 156 Fed. Cl. at 593 (awarding $32 million in fees); Quimby v. United States, 107 Fed. Cl. at 135 (awarding approximately $22 million in fees).  And third, the Court's lodestar cross-check, performed below, directly accounts for the size of the fee award by comparing it to the amount of effort that Class Counsel expended in this case.  As a result, this factor does not move the needle in either direction.

8.   Lodestar Cross-Check

The Federal Circuit has noted a "norm of . . . multipliers in the range of 1 to 4" in lodestar cross-checks of reasonable fee requests.  Health Republic Ins. Co. v. United States, 58 F.4th at 1375.  Statistics show that, between 2009 and 2013, the mean lodestar multiplier was 1.48.  Eisenberg et al., supra, at 965 tbl.12.  For cases with common funds over $67.5 million, the mean multiplier was 2.72.  Id. at 967 tbl.13.  Multipliers significantly above this

mean may be cause for concern.  In <u>Mercier</u>, for example, the Court of Claims found a multiplier of 4.4 to be too high, but a multiplier of 2.95 to result in "a very generous but reasonable recovery."  <u>Mercier v. United States</u>, 156 Fed. Cl. at 592; <u>see</u> <u>also</u> 5 RUBENSTEIN, <u>supra</u>, § 15:87 ("Empirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1-2 range; this fact counsels in favor of a presumptive ceiling of 4, or slightly above twice the mean.").

Here, Class Counsel estimates their lodestar at $6,031,678.25 based on the hourly rates that the firms' attorneys charge in non-contingency cases.  Gupta Decl. ¶¶ 63, 64; Oliver Decl. ¶¶ 12, 13.  Both the government and Mr. Isaacson suggest that Class Counsel's lodestar should be estimated using the hourly rates in the U.S. Attorney's Office Fitzpatrick Matrix, instead of using Class Counsel's actual rates.  Def.'s Resp. at 5-7; Isaacson Obj. at 12-13.  But the Fitzpatrick Matrix was not designed to be used for lodestar cross-checks in common fund class actions; instead, "[t]he matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees."  U.S. ATT'Y'S OFF. FOR D.C., THE FITZPATRICK MATRIX, Explanatory Note 2, www.justice.gov/usao-dc/page/file/ 1504361/download [https://perma.cc/EVQ5-NNMC]; <u>see</u>, <u>e.g.</u>, <u>J.T. v. District of Columbia</u>, 652 F. Supp. 3d 11, 26-27, 31-36 (D.D.C. 2023) (using Fitzpatrick Matrix to calculate reasonable attorney's fees under the fee-shifting provision of the Individuals with Disabilities Education Act).  Mr. Isaacson also asserts that the Court should require Class Counsel to submit itemized records of hours billed in order to make "appropriate deductions."  Isaacson Obj. at 12.  But the Court declines to engage in the "bean-counting" that it has been cautioned against, and instead

will "rely on summaries submitted by the attorneys."  In re Rite Aid Corp. Sec. Litig., 396 F.3d at 306-07.[12]

In addition, the government argues that Class Counsel's use of current billing rates "fail[s] to account [for the fact] that the litigation began in 2016, with class certification in 2017, when rates for both firms presumably were lower."  Def's Resp. at 4.  But courts routinely use current billing rates for lodestar cross-checks, even when the attorneys requesting fees charged lower rates at the outset of litigation.  See, e.g., Bakhtiar v. Info. Res., Inc., Civil Action No. 17-4559, 2021 WL 4472606, at *9 (N.D. Cal. Feb. 10, 2021); In re Apollo Grp. Inc. Sec. Litig., Civil Action No. 04-2147, 2012 WL 1378677, at *7 & n.2 (D. Ariz. Apr. 20, 2012).  Until fees are awarded, class action attorneys work on a case without pay.  Using current billing rates, which are almost always higher than historical rates, accounts for this delay in payment. See James v. District of Columbia, 302 F. Supp. 3d 213, 226-28 (D.D.C. 2018) (citing Perdue v. Kenny A. ex. rel. Winn, 559 U.S. 542, 556 (2010)); cf. Stetson v. Grissom, 821 F.3d 1157, 1166 (9th Cir. 2016) (when calculating attorney's fees using the lodestar method, rather than the percentage-of-the-fund method, in common-fund cases, "[t]he lodestar should be computed either using an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or using historical rates and compensating for delays with a prime-rate enhancement").

Dividing Class Counsel's requested fees ($23,863,345.02) by their estimated lodestar ($6,031,678.25) results in a multiplier of 3.96.  Put another way, Class Counsel's

---

[12]  The Court agrees with the government, as it represented at the Settlement Hearing, that any concerns about Class Counsel's future time estimate included in their estimated lodestar have been addressed through Class Counsel's supplemental declarations.  See Gupta Supp. Decl. ¶¶ 2-3; Oliver Supp. Decl. ¶¶ 3-5.

requested fee award would compensate them at slightly below four times their hourly rates for the work they performed in this case. This multiplier is within the normal range of one to four – although, admittedly, on the high end of it. The Court believes that a multiplier of this magnitude is warranted due to the risk Class Counsel took on in agreeing to litigate the case. Class Counsel provided exceptional service to the class for over seven years, all the while in danger of being paid nothing (or close to it). And multipliers of this size, or even higher, are by no means unheard of. See 5 RUBENSTEIN, supra, § 15:89 (noting "roughly 70 reported cases with multipliers over 4"); e.g., Kane Cnty., Utah v. United States, 145 Fed. Cl. 15, 20 (2019) (multiplier of 6.13 for attorney's fee award of approximately $6 million, one third of the common fund); Geneva Rock Prod., Inc. v. United States, 119 Fed. Cl. 581, 595 (2015) (multiplier of 5.39 for attorney's fee award of approximately $4 million, 17.5% of the common fund). After all, when counsel in a class action request a reasonable percentage of a common fund, the lodestar cross-check must remain a cross-check of that percentage, and no more. "[T]he point is not to identify the precise outdoor temperature at noon but to know whether or not a coat might be necessary when venturing out for lunch." 5 RUBENSTEIN, supra, § 15:87. Here, the temperature is just fine.

The Court will award the full amount of attorney's fees requested by Class Counsel. In addition to reflecting a reasonable lodestar multiplier, the fees requested reflect a percentage of the fund around the average for common funds of similar size – even though Class Counsel's representation, and the result they achieved for the class, were well above average. Class Counsel did an exceptional job in novel litigation with a high risk of nonrecovery. For these reasons, their fee request is warranted.

### C. Expenses and Service Awards

Class Counsel requests $10,000 for each of the three Named Plaintiffs as service awards.  Pls.' Sett. Mot. at 40-41.  Mr. Isaacson objects that awards of this type are unlawful under nineteenth-century Supreme Court precedent.  Isaacson Obj. at 14-15; see Trustees v. Greenough, 105 U.S. 527 (1882); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885).  The "overwhelming majority" of circuits disagree with Mr. Isaacson's interpretation of these cases. Moses v. N.Y. Times Co., 79 F.4th 235, 253 (2d Cir. 2023) (collecting cases).  Mr. Isaacson urges the Court to adopt the reasoning of the Eleventh Circuit, the one outlier from this modern consensus.  See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1255 (11th Cir. 2020).  But even the Eleventh Circuit – and the Supreme Court cases on which Mr. Isaacson relies – acknowledges that "[a] plaintiff suing on behalf of a class can be reimbursed for attorneys' fees and expenses incurred in carrying on the litigation."  Id. at 1257; see Trustees v. Greenough, 105 U.S. at 537; Cent. R.R. & Banking Co. v. Pettus, 113 U.S. at 122-23.  And each Named Plaintiff in this case has expended over $10,000 worth of attorney time and expenses in leading this litigation.  See Burbank Decl. ¶ 6; Rossman Decl. ¶ 3; Brooks Decl. ¶ 2.  Thus, the Court finds the award to the Named Plaintiffs here appropriate.  As one of the attorneys representing the class stated in his declaration:

> [E]xperienced in-house lawyers [for the Named Plaintiffs] performed invaluable work that was necessary to prosecute this case effectively and ethically.  Had they not performed that work on the litigation, the same work would have had to be performed by class counsel or, perhaps more likely, by other outside counsel hired by each organization at far greater expense.

Gupta Supp. Decl. ¶ 7.

The Court also approves Class Counsel's request for $29,654.98 in attorney expenses and $1,077,000 in settlement administration costs. Pls.' Sett. Mot. at 40. As documented by Class Counsel, the attorney expense reimbursements requested include travel, food, lodging, court fees, Westlaw/Lexis fees, photocopying, printing, and mail services; they also include the plaintiffs' portion of the cost of mediation services. Oliver Decl. ¶¶ 14-18. The settlement administration amount was calculated based on the noticing expenses, as well as the "not-to-exceed" amount quoted by the settlement administrator. Id. ¶ 19; KCC Supp. Decl. ¶ 4. The Court finds these expenses and administration costs to be reasonable and adequately documented.

## V. CONCLUSION

The Named Plaintiffs and the United States have reached an historic settlement agreement in this case that reimburses PACER users for $100 million of the fees they paid within a period of over eight years. The Agreement reimburses many small-scale PACER users for all of the fees they paid during this period. And it reimburses large-scale users substantially, and in proportion to what they paid. The Court finds the Agreement to be fair, reasonable, and adequate.

Before reaching a settlement in this unique case, Class Counsel impressively litigated for nearly eight years. They took the case from an untested idea, to a certified class action, to a win on partial summary judgment, to a successful appeal. They negotiated with the federal government to deliver to the class much of the recovery the class sought – although, as with any compromise, not all of it. The Court approves Class Counsel's full request for attorney's fees, costs, and service awards.

Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards [Dkt. No. 158] is hereby GRANTED. The Final Judgment and Order on Final Approval of Class Settlement, Attorney's Fees, Costs, and Service Awards will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3|20|24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL SERVICES
PROGRAM, NATIONAL CONSUMER LAW
CENTER, and ALLIANCE FOR JUSTICE, for
themselves and all others similarly situated,
                                    *Plaintiffs*,

v.

UNITED STATES OF AMERICA,
                                    *Defendant*.

Civil Action No. 16-0745 (PLF)

## FINAL JUDGMENT AND ORDER ON FINAL APPROVAL OF CLASS SETTLEMENT, ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

This matter came before the Court on October 12, 2023 for a hearing pursuant to the

Order of this Court, dated May 8, 2023, on the application of the Settling Parties for approval

of the Settlement set forth in the Class Action Settlement Agreement, as amended. Due and

adequate notice having been given to the Class as required in the Order, the Court having

considered all papers filed and proceedings held herein, and for the reasons explained in this

Court's Opinion issued today, and good cause having been shown, IT IS HEREBY ORDERED,

ADJUDGED AND DECREED that:

1.       This Judgment incorporates by reference the definitions in the Settlement

Agreement, and all terms used herein shall have the same meanings as set forth in the Settlement

Agreement, unless otherwise stated herein.

2.       This Court has jurisdiction over the subject matter of the Litigation and over all

parties to the Litigation, including all members of the Class.

3.       Excluded from the Class is any person who timely and validly sought exclusion

from the Class, as identified in Exhibit 1 hereto.

4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement set forth in the Agreement, and finds that:

a.      in light of the benefits to the Class and the complexity and expense of further litigation, the Settlement Agreement is, in all respects, fair, reasonable, and adequate and in the best interests of the Class;

b.      there was no collusion in connection with the Settlement Agreement;

c.      Class Representatives and Class Counsel had adequately represented the Class;

d.      the Settlement Agreement was the product of informed, arm's-length negotiations among competent, able counsel;

e.      the relief provided for the Class is adequate, having taken into account (i) the costs, risks and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the Class, including the use of billing data maintained by the Administrative Office of the U.S. Courts and the notification and dispute procedures on the class website; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Federal Rule of Civil Procedure 23(e)(3);

f.      the Settlement Agreement treats Class Members equitably relative to each other; and

g.      the record is sufficiently developed and complete to have enabled Class Representatives and Defendant to have adequately evaluated and considered their positions.

5.      Accordingly, the Court authorizes and directs implementation and performance of all the terms and provisions of the Settlement Agreement, as well as the terms and provisions set forth in this Order. Except as to any individual claim of those persons who have validly and

timely requested exclusion from the Class, the Litigation and all claims alleged therein are dismissed with prejudice as to the Class Representatives, and the other Class Members, as defined in the Settlement Agreement.

6.      No person shall have any claim against the Class Representatives, Class Counsel, or the Claims Administrator, or any other person designated by Class Counsel, based on determinations or distributions made substantially in accordance with the Settlement Agreement or order of this Court.

7.      Upon release of the Aggregate Amount of $125,000,000 from the U.S. Department of the Treasury's Judgment Fund, the Class Representatives, and each of the Class Members not timely and validly excluded, shall be deemed to have and by operation of this Judgment shall have, fully, finally, and forever waived, released, discharged, and dismissed as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period, with prejudice on the merits, whether or not the Class Representatives, or each of the Class Members ever obtains any distribution from the Settlement Fund. Claims to enforce the terms of the Stipulation and the Agreement are not released.

8.      The distribution and publication of notice of the settlement as provided for in this Court's Order of May 8, 2023, constituted the best notice practicable under the circumstances, including individual notice to Class Members in the data maintained by the Administrative Office of the U.S. Courts. This notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and due process. No Class Member is relieved from the terms of the Settlement

Agreement, including the releases provided for, based on the contention or proof that such Class

Member failed to receive actual or adequate notice. A full opportunity has been offered to the

Class Members to object to the proposed Settlement and to participate in the approval hearing. It

is hereby determined that all members of the Class are bound by this Judgment, except those

persons listed in Exhibit 1 to this Judgment.

9.      Any order entered regarding any fee and expense application, any appeal from

any such order, or any reversal or modification of any such order shall not affect or delay the

finality of the Final Judgment in this litigation.

10.     Neither the Settlement Agreement, nor any act performed or document executed

pursuant to or in furtherance of the Settlement Agreement: (a) is or may be deemed to be or may

be used as an admission of, or evidence of, the validity of any released claim, or of any

wrongdoing or liability of the United States; or (b) is or may be deemed to be or may be used as

an admission or evidence that any claims asserted by plaintiffs were not valid or that the amount

recoverable would not have exceeded the Aggregate Amount of $125,000,000 in any civil,

criminal, or administrative proceeding in any court, administrative agency or other tribunal. The

United States may file the Settlement Agreement or this Judgment in any other action that may

be brought against it in order to support a defense or counterclaim based on principles of res

judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any

other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

11.     The United States shall pay $125,000,000 into the PACER Class Action

Settlement Trust upon the expiration of the period to appeal from this Order.

12.     Without affecting the finality of this Judgment in any way, this Court hereby

retains continuing jurisdiction over: (a) implementation of the Settlement and any award or

distribution from the Aggregate Amount paid by the United States in settlement of this litigation; (b) disposition of the PACER Class Action Settlement Trust; (c) hearing and determining any fee and expense application; and (d) all parties hereto for the purpose of construing, enforcing and administering the Settlement.

13. The Court finds that during the course of the Litigation, plaintiffs and the United States, and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

14. In the event that the settlement does not become effective in accordance with the terms of the Settlement Agreement, then this Judgment shall be rendered null and void and shall be vacated; and in such event, all orders entered and releases delivered in connection with this Order and Final Judgment shall be null and void and shall be vacated, and the parties shall revert to their respective positions in the Litigation as of July 12, 2022.

15. Plaintiffs ask that the Court grant their request for 20% of the settlement fund to cover attorney's fees, notice and settlement costs, litigation expenses, and service awards. That request is granted. Specifically, the Court hereby (1) awards $10,000 to each class representative, (2) awards $29,654.98 to class counsel to reimburse litigation expenses, (3) orders that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) awards the remaining amount ($23,863,345.02) to class counsel as attorney's fees.

16. Upon consideration of this submission and the entire record before the Court, and for the reasons stated in the Opinion issued this same day, the Court finds that the attorney's fees, costs and expenses, and service awards, as agreed by the parties, are fair and reasonable pursuant to paragraph VI(A) of the Settlement Agreement and Federal Rule of Civil Procedure 23(e)(2)(C) (iii), (h).

17.     The parties are hereby authorized, without further approval of the Court, to unanimously agree to and adopt in writing amendments, modifications, and expansions of the Settlement Agreement, provided that such amendments, modifications, and expansions of the Settlement Agreement are not materially inconsistent with this Judgment, and do not materially limit the rights of the Members of the Class under the Settlement Agreement.

18.     Without further order of the Court, the parties to the Settlement Agreement may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

19.     The Court directs immediate entry of this Judgment by the Clerk of the Court.

20.     The Court's orders entered during this litigation relating to the confidentiality of information shall survive the settlement and resolution and dismissal of this litigation.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3/20/24

# EXHIBIT 1

| ClaimID | Year First Notice Sent |
|---|---|
| 10034328-7 | 2023 |
| 10035184-0 | 2023 |
| 10037459-0 | 2023 |
| 10040932-6 | 2023 |
| 10041843-0 | 2023 |
| 10049120-0 | 2023 |
| 10049953-8 | 2023 |
| 10061501-5 | 2023 |
| 10065649-8 | 2023 |
| 10066366-4 | 2023 |
| 10083140-0 | 2023 |
| 10084333-6 | 2023 |
| 10085991-7 | 2023 |
| 10095277-1 | 2023 |
| 10113350-2 | 2023 |
| 10116080-1 | 2023 |
| 10118614-2 | 2023 |
| 10132009-4 | 2023 |
| 10133913-5 | 2023 |
| 10141727-6 | 2023 |
| 10147158-0 | 2023 |
| 10152565-6 | 2023 |
| 10173016-0 | 2023 |
| 10176126-0 | 2023 |
| 10182150-6 | 2023 |
| 10185685-7 | 2023 |
| 10189089-3 | 2023 |
| 10192998-6 | 2023 |
| 10196979-1 | 2023 |
| 10197284-9 | 2023 |
| 10203395-1 | 2023 |
| 10016846-9 | 2023 |
| 10052120-7 | 2023 |
| 10133913-5 | 2023 |
| 10000447701 | 2017 |
| 10000707701 | 2017 |
| 10002821401 | 2017 |
| 10005011601 | 2017 |
| 10005499701 | 2017 |
| 10005664701 | 2017 |
| 10006372001 | 2017 |
| 10007313001 | 2017 |
| 10008363801 | 2017 |
| 10008769301 | 2017 |
| 10008798001 | 2017 |
| 10009012601 | 2017 |

| | |
|---|---|
| 10009273101 | 2017 |
| 10010171901 | 2017 |
| 10010221901 | 2017 |
| 10011076901 | 2017 |
| 10011551201 | 2017 |
| 10012220601 | 2017 |
| 10012456201 | 2017 |
| 10013915201 | 2017 |
| 10014611901 | 2017 |
| 10015286701 | 2017 |
| 10016324501 | 2017 |
| 10017909501 | 2017 |
| 10018775401 | 2017 |
| 10018943001 | 2017 |
| 10020415601 | 2017 |
| 10023376401 | 2017 |
| 10026066401 | 2017 |
| 10026930801 | 2017 |
| 10028461901 | 2017 |
| 10028932001 | 2017 |
| 10029603801 | 2017 |
| 10029844801 | 2017 |
| 10032537301 | 2017 |
| 10032704701 | 2017 |
| 10033616401 | 2017 |
| 10035469501 | 2017 |
| 10036014201 | 2017 |
| 10036567001 | 2017 |
| 10037093701 | 2017 |
| 10039315901 | 2017 |
| 10040300101 | 2017 |
| 10041710301 | 2017 |
| 10042162301 | 2017 |
| 10042250001 | 2017 |
| 10043184701 | 2017 |
| 10043617101 | 2017 |
| 10044286901 | 2017 |
| 10044493301 | 2017 |
| 10045532301 | 2017 |
| 10046948601 | 2017 |
| 10048740301 | 2017 |
| 10050286601 | 2017 |
| 10050994001 | 2017 |
| 10053464801 | 2017 |
| 10054856801 | 2017 |
| 10054968801 | 2017 |
| 10057104901 | 2017 |

| | |
|---|---|
| 10058481001 | 2017 |
| 10060415801 | 2017 |
| 10063799101 | 2017 |
| 10063923901 | 2017 |
| 10064479001 | 2017 |
| 10064600101 | 2017 |
| 10065803901 | 2017 |
| 10066151801 | 2017 |
| 10067057001 | 2017 |
| 10067820801 | 2017 |
| 10069992301 | 2017 |
| 10071549701 | 2017 |
| 10071662301 | 2017 |
| 10071925901 | 2017 |
| 10072056001 | 2017 |
| 10072482601 | 2017 |
| 10073102801 | 2017 |
| 10075224001 | 2017 |
| 10075273101 | 2017 |
| 10075352801 | 2017 |
| 10075769801 | 2017 |
| 10077286901 | 2017 |
| 10077932301 | 2017 |
| 10077997901 | 2017 |
| 10078550501 | 2017 |
| 10080612001 | 2017 |
| 10081622801 | 2017 |
| 10082241101 | 2017 |
| 10083173401 | 2017 |
| 10084766301 | 2017 |
| 10085064901 | 2017 |
| 10085996301 | 2017 |
| 10086464801 | 2017 |
| 10087257801 | 2017 |
| 10087762001 | 2017 |
| 10089389201 | 2017 |
| 10089507401 | 2017 |
| 10090051301 | 2017 |
| 10090174801 | 2017 |
| 10090236401 | 2017 |
| 10090480401 | 2017 |
| 10091442101 | 2017 |
| 10092739701 | 2017 |
| 10093180701 | 2017 |
| 10095383901 | 2017 |
| 10095879501 | 2017 |
| 10096283001 | 2017 |

| | |
|---|---|
| 10096482501 | 2017 |
| 10096522201 | 2017 |
| 10097267601 | 2017 |
| 10100271301 | 2017 |
| 10100599401 | 2017 |
| 10101080101 | 2017 |
| 10101868001 | 2017 |
| 10101941501 | 2017 |
| 10102590701 | 2017 |
| 10103010101 | 2017 |
| 10105763501 | 2017 |
| 10105855001 | 2017 |
| 10107851101 | 2017 |
| 10108906501 | 2017 |
| 10111320101 | 2017 |
| 10112826501 | 2017 |
| 10114817301 | 2017 |
| 10115231001 | 2017 |
| 10115433101 | 2017 |
| 10116343501 | 2017 |
| 10117151101 | 2017 |
| 10118423201 | 2017 |
| 10118950301 | 2017 |
| 10119125001 | 2017 |
| 10119759701 | 2017 |
| 10121185501 | 2017 |
| 10121819901 | 2017 |
| 10122205101 | 2017 |
| 10122629901 | 2017 |
| 10123395401 | 2017 |
| 10124592001 | 2017 |
| 10125315101 | 2017 |
| 10125364301 | 2017 |
| 10126285101 | 2017 |
| 10126752601 | 2017 |
| 10126762901 | 2017 |
| 10127924301 | 2017 |
| 10129225901 | 2017 |
| 10131063801 | 2017 |
| 10133388201 | 2017 |
| 10133687101 | 2017 |
| 10133958601 | 2017 |
| 10134825301 | 2017 |
| 10134968301 | 2017 |
| 10135144601 | 2017 |
| 10135756401 | 2017 |
| 10136099001 | 2017 |

11

| | |
|---|---|
| 10136855001 | 2017 |
| 10137251601 | 2017 |
| 10137528101 | 2017 |
| 10137903101 | 2017 |
| 10139299001 | 2017 |
| 10140073101 | 2017 |
| 10140505401 | 2017 |
| 10140555801 | 2017 |
| 10141339701 | 2017 |
| 10141594101 | 2017 |
| 10141736601 | 2017 |
| 10143024301 | 2017 |
| 10143222701 | 2017 |
| 10143236701 | 2017 |
| 10143458301 | 2017 |
| 10145173801 | 2017 |
| 10147350301 | 2017 |
| 10149014801 | 2017 |
| 10149717901 | 2017 |
| 10149718001 | 2017 |
| 10152536901 | 2017 |
| 10152625801 | 2017 |
| 10153428001 | 2017 |
| 10153618501 | 2017 |
| 10153754201 | 2017 |
| 10153756601 | 2017 |
| 10153779701 | 2017 |
| 10156471501 | 2017 |
| 10157012001 | 2017 |
| 10157124001 | 2017 |
| 10158021601 | 2017 |
| 10158209201 | 2017 |
| 10158298501 | 2017 |
| 10158888401 | 2017 |
| 10159890701 | 2017 |
| 10159891901 | 2017 |
| 10160015001 | 2017 |
| 10160315001 | 2017 |
| 10161686701 | 2017 |
| 10161894301 | 2017 |
| 10161898001 | 2017 |
| 10161944301 | 2017 |
| 10162799301 | 2017 |
| 10163708101 | 2017 |
| 10164776101 | 2017 |
| 10165562901 | 2017 |
| 10167227501 | 2017 |

| | |
|---|---|
| 10171950401 | 2017 |
| 10174000101 | 2017 |
| 10174868101 | 2017 |
| 10175374301 | 2017 |
| 10175548001 | 2017 |
| 10176373601 | 2017 |
| 10176919201 | 2017 |
| 10177057101 | 2017 |
| 10177956201 | 2017 |
| 10178536701 | 2017 |
| 10178913001 | 2017 |
| 10182011201 | 2017 |
| 10182792101 | 2017 |
| 10185798601 | 2017 |
| 10185857701 | 2017 |
| 10185858901 | 2017 |
| 10185874701 | 2017 |
| 10186179501 | 2017 |
| 10188095901 | 2017 |
| 10188321301 | 2017 |
| 10188669001 | 2017 |
| 10190279701 | 2017 |
| 10190402201 | 2017 |
| 10190457501 | 2017 |
| 10190550601 | 2017 |
| 10190625001 | 2017 |
| 10191926801 | 2017 |
| 10192316801 | 2017 |
| 10192357001 | 2017 |
| 10192847601 | 2017 |
| 10192879801 | 2017 |
| 10192963801 | 2017 |
| 10194141901 | 2017 |
| 10197285401 | 2017 |
| 10199679201 | 2017 |
| 10199890901 | 2017 |
| 10204292501 | 2017 |
| 10205252901 | 2017 |
| 10205690001 | 2017 |
| 10206206701 | 2017 |
| 10207278401 | 2017 |
| 10207584001 | 2017 |
| 10207639001 | 2017 |
| 10207782401 | 2017 |
| 10207896801 | 2017 |
| 10208191801 | 2017 |
| 10208513401 | 2017 |

| | |
|---|---|
| 10209552801 | 2017 |
| 10209592901 | 2017 |
| 10209627201 | 2017 |
| 10209638701 | 2017 |
| 10210263601 | 2017 |
| 10210694001 | 2017 |
| 10210945001 | 2017 |
| 10212706201 | 2017 |
| 10212823601 | 2017 |
| 10213182001 | 2017 |
| 10214228201 | 2017 |
| 10214823501 | 2017 |
| 10214922701 | 2017 |
| 10216477001 | 2017 |
| 10217089701 | 2017 |
| 10217396501 | 2017 |
| 10219369101 | 2017 |
| 10219889501 | 2017 |
| 10221713001 | 2017 |
| 10221823701 | 2017 |
| 10222565501 | 2017 |
| 10222645301 | 2017 |
| 10223006701 | 2017 |
| 10224013901 | 2017 |
| 10225094701 | 2017 |
| 10225657301 | 2017 |
| 10225834001 | 2017 |
| 10226300001 | 2017 |
| 10227002801 | 2017 |
| 10229283801 | 2017 |
| 10229428801 | 2017 |
| 10229838501 | 2017 |
| 10230357501 | 2017 |
| 10231975301 | 2017 |
| 10232606001 | 2017 |
| 10234539901 | 2017 |
| 10234608201 | 2017 |
| 10235129601 | 2017 |
| 10236098401 | 2017 |
| 10236449701 | 2017 |
| 10237057601 | 2017 |
| 10237680301 | 2017 |
| 10237912901 | 2017 |
| 10238284001 | 2017 |
| 10238489701 | 2017 |
| 10240243701 | 2017 |
| 10240374001 | 2017 |

| | |
|---|---|
| 10240773301 | 2017 |
| 10241983801 | 2017 |
| 10242752501 | 2017 |
| 10243338001 | 2017 |
| 10243778601 | 2017 |
| 10244498501 | 2017 |
| 10245781501 | 2017 |
| 10247787501 | 2017 |
| 10248160001 | 2017 |
| 10248356501 | 2017 |
| 10249090901 | 2017 |
| 10252117701 | 2017 |
| 10252888301 | 2017 |
| 10253744601 | 2017 |
| 10253873601 | 2017 |
| 10254792001 | 2017 |
| 10254933301 | 2017 |
| 10255719601 | 2017 |
| 10255720201 | 2017 |
| 10256855801 | 2017 |
| 10258835101 | 2017 |
| 10259957901 | 2017 |
| 10260649301 | 2017 |
| 10260794101 | 2017 |
| 10261595001 | 2017 |
| 10261762401 | 2017 |
| 10261872001 | 2017 |
| 10261931101 | 2017 |
| 10264115801 | 2017 |
| 10264948001 | 2017 |
| 10266425001 | 2017 |
| 10266442001 | 2017 |
| 10267627601 | 2017 |
| 10268262801 | 2017 |
| 10270268801 | 2017 |
| 10270866601 | 2017 |
| 10270975001 | 2017 |
| 10271070301 | 2017 |
| 10272628001 | 2017 |
| 10275055501 | 2017 |
| 10275578401 | 2017 |
| 10275752501 | 2017 |
| 10276905901 | 2017 |
| 10276939401 | 2017 |
| 10278126601 | 2017 |
| 10279936201 | 2017 |
| 10280532501 | 2017 |

| | |
|---|---|
| 10280979301 | 2017 |
| 10281698001 | 2017 |
| 10282170701 | 2017 |
| 10283751001 | 2017 |
| 10283870701 | 2017 |
| 10285227301 | 2017 |
| 10285840801 | 2017 |
| 10286029401 | 2017 |
| 10286805001 | 2017 |
| 10290375001 | 2017 |
| 10290479001 | 2017 |
| 10290610501 | 2017 |
| 10290828001 | 2017 |
| 10290963501 | 2017 |
| 10291126501 | 2017 |
| 10292602501 | 2017 |
| 10293085501 | 2017 |
| 10293375301 | 2017 |
| 10293436801 | 2017 |
| 10293529401 | 2017 |
| 10293741201 | 2017 |
| 10293742401 | 2017 |
| 10293743601 | 2017 |
| 10293744801 | 2017 |
| 10293752701 | 2017 |
| 10293754001 | 2017 |
| 10293755201 | 2017 |
| 10293756401 | 2017 |
| 10293767901 | 2017 |
| 10294485401 | 2017 |
| 10294549401 | 2017 |
| 10299634901 | 2017 |
| 10299939901 | 2017 |
| 10302542001 | 2017 |
| 10303226501 | 2017 |
| 10303651901 | 2017 |
| 10303892901 | 2017 |
| 10304105901 | 2017 |
| 10304591001 | 2017 |
| 10304647101 | 2017 |
| 10304775001 | 2017 |
| 10306101001 | 2017 |
| 10307986501 | 2017 |
| 10308360101 | 2017 |
| 10308965201 | 2017 |
| 10309480501 | 2017 |
| 10310113501 | 2017 |

| | |
|---|---|
| 10310527001 | 2017 |
| 10311774001 | 2017 |
| 10314669601 | 2017 |
| 10315147301 | 2017 |
| 10315819401 | 2017 |
| 10316350501 | 2017 |
| 10316465001 | 2017 |
| 10318066701 | 2017 |
| 10318659101 | 2017 |
| 10318663301 | 2017 |
| 10319721701 | 2017 |
| 10319867201 | 2017 |
| 10320106301 | 2017 |
| 10320188901 | 2017 |
| 10320630901 | 2017 |
| 10321188301 | 2017 |
| 10322023901 | 2017 |
| 10322689801 | 2017 |
| 10323321001 | 2017 |
| 10323716101 | 2017 |
| 10323788401 | 2017 |
| 10324271501 | 2017 |
| 10324930801 | 2017 |
| 10325317801 | 2017 |
| 10326900901 | 2017 |
| 10327238001 | 2017 |
| 10331800801 | 2017 |
| 10332566901 | 2017 |
| 10332936501 | 2017 |
| 10333954101 | 2017 |
| 10334751301 | 2017 |
| 10335736101 | 2017 |
| 10335880801 | 2017 |
| 10336323301 | 2017 |
| 10336522901 | 2017 |
| 10336907701 | 2017 |
| 10337218001 | 2017 |
| 10337518101 | 2017 |
| 10337600801 | 2017 |
| 10338330001 | 2017 |
| 10338463701 | 2017 |
| 10340665701 | 2017 |
| 10342676001 | 2017 |
| 10342826401 | 2017 |
| 10343027101 | 2017 |
| 10344487701 | 2017 |
| 10345305201 | 2017 |

| | |
|---|---|
| 10347913201 | 2017 |
| 10352035101 | 2017 |
| 10355032001 | 2017 |
| 10356012901 | 2017 |
| 10358553901 | 2017 |
| 10358696901 | 2017 |
| 10360334701 | 2017 |
| 10362064301 | 2017 |
| 10362238001 | 2017 |
| 10363633001 | 2017 |
| 10363834901 | 2017 |
| 10364037001 | 2017 |
| 10364629201 | 2017 |
| 10364748001 | 2017 |
| 10365380601 | 2017 |
| 10365649201 | 2017 |
| 10366285601 | 2017 |
| 10366975901 | 2017 |
| 10367643001 | 2017 |
| 10369316601 | 2017 |
| 10370723201 | 2017 |
| 10371138701 | 2017 |
| 10371143001 | 2017 |
| 10371370001 | 2017 |
| 10374877501 | 2017 |
| 10375560301 | 2017 |
| 10376252801 | 2017 |
| 10378049001 | 2017 |
| 10378215101 | 2017 |
| 10380385301 | 2017 |
| 10380974001 | 2017 |
| 10381918601 | 2017 |
| 10382676201 | 2017 |
| 10383373001 | 2017 |
| 10385190201 | 2017 |
| 10385642001 | 2017 |
| 10386520201 | 2017 |
| 10388149901 | 2017 |
| 10388499301 | 2017 |
| 10389454801 | 2017 |
| 10390691501 | 2017 |
| 10390736101 | 2017 |
| 10391800001 | 2017 |
| 10392971001 | 2017 |
| 10393677401 | 2017 |
| 10393723701 | 2017 |
| 60000001101 | 2017 |

| | |
|---|---|
| 60000004701 | 2017 |
| 60000005901 | 2017 |
| 60000006001 | 2017 |
| 60000007201 | 2017 |
| 60000008401 | 2017 |
| 60000009601 | 2017 |
| 60000010201 | 2017 |
| 60000011401 | 2017 |
| 60000012601 | 2017 |
| 60000013801 | 2017 |
| 60000014001 | 2017 |
| 60000015101 | 2017 |
| 60000016301 | 2017 |
| 60000017501 | 2017 |
| 60000018701 | 2017 |
| 60000019901 | 2017 |
| 60000020501 | 2017 |
| 60000021701 | 2017 |
| 60000022901 | 2017 |
| 60000023001 | 2017 |
| 60000024201 | 2017 |
| 60000025401 | 2017 |
| 60000026601 | 2017 |
| 60000027801 | 2017 |
| 60000028001 | 2017 |
| 60000029101 | 2017 |
| 60000030801 | 2017 |
| 60000031001 | 2017 |
| 60000032101 | 2017 |
| 60000033301 | 2017 |
| 60000034501 | 2017 |
| 60000035701 | 2017 |
| 60000036901 | 2017 |
| 60000037001 | 2017 |
| 60000038201 | 2017 |
| 60000039401 | 2017 |
| 60000040001 | 2017 |
| 60000041201 | 2017 |
| 60000042401 | 2017 |
| 60000043601 | 2017 |
| 60000045001 | 2017 |
| 60000046101 | 2017 |
| 60000047301 | 2017 |
| 60000048501 | 2017 |
| 60000049701 | 2017 |
| 60000050301 | 2017 |
| 60000051501 | 2017 |

| | |
|---|---|
| 60000052701 | 2017 |
| 60000053901 | 2017 |
| 60000054001 | 2017 |
| 60000055201 | 2017 |
| 60000056401 | 2017 |
| 60000057601 | 2017 |
| 60000058801 | 2017 |
| 60000060601 | 2017 |
| 60000064301 | 2017 |
| 60000065501 | 2017 |
| 60000067901 | 2017 |
| 60000070901 | 2017 |
| 60000071001 | 2017 |
| 60000073401 | 2017 |
| 60000074601 | 2017 |
| 60000075801 | 2017 |
| 60000076001 | 2017 |
| 60000077101 | 2017 |
| 60000078301 | 2017 |
| 60000079501 | 2017 |
| 60000080101 | 2017 |
| 60000081301 | 2017 |
| 60000082501 | 2017 |
| 60000083701 | 2017 |
| 60000084901 | 2017 |
| 60000085001 | 2017 |
| 60000086201 | 2017 |
| 60000087401 | 2017 |
| 60000088601 | 2017 |
| 60000090401 | 2017 |
| 60000091601 | 2017 |
| 60000092801 | 2017 |
| 60000093001 | 2017 |
| 60000094101 | 2017 |
| 60000095301 | 2017 |
| 60000096501 | 2017 |
| 60000097701 | 2017 |
| 60000099001 | 2017 |
| 60000100301 | 2017 |
| 60000101501 | 2017 |
| 60000102701 | 2017 |
| 60000103901 | 2017 |
| 60000104001 | 2017 |
| 60000105201 | 2017 |
| 60000106401 | 2017 |
| 60000107601 | 2017 |
| 60000108801 | 2017 |

| | |
|---|---|
| 60000109001 | 2017 |
| 60000111801 | 2017 |
| 60000112001 | 2017 |
| 60000113101 | 2017 |
| 60000115501 | 2017 |
| 60000116701 | 2017 |
| 60000117901 | 2017 |
| 60000118001 | 2017 |
| 60000119201 | 2017 |
| 60000120901 | 2017 |
| 60000121001 | 2017 |
| 60000122201 | 2017 |
| 60000123401 | 2017 |
| 60000124601 | 2017 |
| 60000126001 | 2017 |
| 60000127101 | 2017 |
| 60000128301 | 2017 |
| 60000129501 | 2017 |
| 60000130101 | 2017 |
| 60000133701 | 2017 |
| 60000134901 | 2017 |
| 60000136201 | 2017 |
| 60000137401 | 2017 |
| 60000138601 | 2017 |
| 60000139801 | 2017 |
| 60000140401 | 2017 |
| 60000141601 | 2017 |
| 60000142801 | 2017 |
| 60000143001 | 2017 |
| 60000144101 | 2017 |
| 60000145301 | 2017 |
| 60000146501 | 2017 |
| 60000147701 | 2017 |
| 60000149001 | 2017 |
| 60000150701 | 2017 |
| 60000152001 | 2017 |
| 60000153201 | 2017 |
| 60000154401 | 2017 |
| 60000155601 | 2017 |
| 60000156801 | 2017 |
| 60000157001 | 2017 |
| 60000158101 | 2017 |
| 60000159301 | 2017 |
| 60000160001 | 2017 |
| 60000161101 | 2017 |
| 60000162301 | 2017 |
| 60000163501 | 2017 |

| | |
|---|---|
| 60000165901 | 2017 |
| 60000166001 | 2017 |
| 60000168401 | 2017 |
| 60000169601 | 2017 |
| 60000170201 | 2017 |
| 60000171401 | 2017 |
| 60000172601 | 2017 |
| 60000173801 | 2017 |
| 60000174001 | 2017 |
| 60000175101 | 2017 |
| 60000176301 | 2017 |
| 60000177501 | 2017 |
| 60000178701 | 2017 |
| 60000179901 | 2017 |
| 60000180501 | 2017 |
| 60000181701 | 2017 |
| 60000182901 | 2017 |
| 60000183001 | 2017 |
| 60000184201 | 2017 |
| 60000186601 | 2017 |
| 60000187801 | 2017 |
| 60000188001 | 2017 |
| 60000189101 | 2017 |
| 60000190801 | 2017 |
| 60000191001 | 2017 |
| 60000192101 | 2017 |
| 60000193301 | 2017 |
| 60000194501 | 2017 |
| 60000195701 | 2017 |
| 60000196901 | 2017 |
| 60000197001 | 2017 |
| 60000198201 | 2017 |
| 60000199401 | 2017 |
| 60000200701 | 2017 |
| 60000202001 | 2017 |
| 60000203201 | 2017 |
| 60000204401 | 2017 |
| 60000205601 | 2017 |
| 60000206801 | 2017 |
| 60000207001 | 2017 |
| 60000208101 | 2017 |
| 60000209301 | 2017 |
| 60000210001 | 2017 |
| 60000211101 | 2017 |
| 60000212301 | 2017 |
| 60000213501 | 2017 |
| 60000215901 | 2017 |

| | |
|---|---|
| 60000216001 | 2017 |
| 60000217201 | 2017 |
| 60000218401 | 2017 |
| 60000219601 | 2017 |
| 60000220201 | 2017 |
| 60000221401 | 2017 |
| 60000223801 | 2017 |
| 60000224001 | 2017 |
| 60000225101 | 2017 |
| 60000228701 | 2017 |
| 60000229901 | 2017 |
| 60000230501 | 2017 |
| 60000231701 | 2017 |
| 60000233001 | 2017 |
| 60000235401 | 2017 |
| 60000236601 | 2017 |
| 60000237801 | 2017 |
| 60000238001 | 2017 |
| 60000239101 | 2017 |
| 60000241001 | 2017 |
| 60000242101 | 2017 |
| 60000243301 | 2017 |
| 60000244501 | 2017 |
| 60000245701 | 2017 |
| 60000246901 | 2017 |
| 60000247001 | 2017 |
| 60000248201 | 2017 |
| 60000249401 | 2017 |
| 60000250001 | 2017 |
| 60000251201 | 2017 |
| 60000252401 | 2017 |
| 60000253601 | 2017 |
| 60000254801 | 2017 |
| 60000255001 | 2017 |
| 60000256101 | 2017 |
| 60000257301 | 2017 |
| 60000258501 | 2017 |
| 60000259701 | 2017 |
| 60000260301 | 2017 |
| 60000261501 | 2017 |
| 60000262701 | 2017 |
| 60000263901 | 2017 |
| 60000264001 | 2017 |
| 60000265201 | 2017 |
| 60000266401 | 2017 |
| 60000267601 | 2017 |
| 60000268801 | 2017 |

| | |
|---|---|
| 60000271801 | 2017 |
| 60000272001 | 2017 |
| 60000273101 | 2017 |
| 60000274301 | 2017 |
| 60000276701 | 2017 |
| 60000277901 | 2017 |
| 60000279201 | 2017 |
| 60000280901 | 2017 |
| 60000281001 | 2017 |
| 60000282201 | 2017 |
| 60000284601 | 2017 |
| 60000287101 | 2017 |
| 60000288301 | 2017 |
| 60000289501 | 2017 |
| 60000290101 | 2017 |
| 60000292501 | 2017 |
| 60000293701 | 2017 |
| 60000294901 | 2017 |
| 60000295001 | 2017 |
| 60000296201 | 2017 |
| 60000297401 | 2017 |
| 60000298601 | 2017 |
| 60000299801 | 2017 |
| 60000300001 | 2017 |
| 60000302401 | 2017 |
| 60000303601 | 2017 |
| 60000305001 | 2017 |
| 60000307301 | 2017 |
| 60000308501 | 2017 |
| 60000310301 | 2017 |
| 60000311501 | 2017 |
| 60000312701 | 2017 |
| 60000313901 | 2017 |
| 60000314001 | 2017 |
| 60000315201 | 2017 |
| 60000316401 | 2017 |
| 60000317601 | 2017 |
| 60000318801 | 2017 |
| 60000319001 | 2017 |
| 60000320601 | 2017 |
| 60000321801 | 2017 |
| 60000322001 | 2017 |
| 60000323101 | 2017 |
| 60000324301 | 2017 |
| 60000325501 | 2017 |
| 60000326701 | 2017 |
| 60000327901 | 2017 |

| | |
|---|---|
| 60000328001 | 2017 |
| 60000329201 | 2017 |
| 60000330901 | 2017 |
| 60000331001 | 2017 |
| 60000332201 | 2017 |
| 60000333401 | 2017 |
| 60000334601 | 2017 |
| 60000335801 | 2017 |
| 60000336001 | 2017 |
| 60000337101 | 2017 |
| 60000338301 | 2017 |
| 60000339501 | 2017 |
| 60000340101 | 2017 |
| 60000341301 | 2017 |
| 60000342501 | 2017 |
| 60000348601 | 2017 |
| 60000349801 | 2017 |
| 60000350401 | 2017 |
| 60000351601 | 2017 |
| 60000352801 | 2017 |
| 60000353001 | 2017 |
| 60000354101 | 2017 |
| 60000356501 | 2017 |
| 60000357701 | 2017 |
| 60000358901 | 2017 |
| 60000359001 | 2017 |
| 60000360701 | 2017 |
| 60000361901 | 2017 |
| 60000362001 | 2017 |
| 60000363201 | 2017 |
| 60000364401 | 2017 |
| 60000366801 | 2017 |
| 60000367001 | 2017 |
| 60000369301 | 2017 |
| 60000370001 | 2017 |
| 60000371101 | 2017 |
| 60000372301 | 2017 |
| 60000373501 | 2017 |
| 60000374701 | 2017 |
| 60000375901 | 2017 |
| 60000378401 | 2017 |
| 60000379601 | 2017 |
| 60000380201 | 2017 |
| 60000381401 | 2017 |
| 60000382601 | 2017 |
| 60000383801 | 2017 |
| 60000384001 | 2017 |

| | |
|---|---|
| 60000385101 | 2017 |
| 60000386301 | 2017 |
| 60000387501 | 2017 |
| 60000388701 | 2017 |
| 60000389901 | 2017 |
| 60000390501 | 2017 |
| 60000391701 | 2017 |
| 60000392901 | 2017 |
| 60000393001 | 2017 |
| 60000394201 | 2017 |
| 60000395401 | 2017 |
| 60000396601 | 2017 |
| 60000397801 | 2017 |
| 60000398001 | 2017 |
| 60000399101 | 2017 |
| 60000400401 | 2017 |
| 60000401601 | 2017 |
| 60000402801 | 2017 |
| 60000403001 | 2017 |
| 60000404101 | 2017 |
| 60000405301 | 2017 |
| 60000406501 | 2017 |
| 60000408901 | 2017 |
| 60000409001 | 2017 |
| 60000410701 | 2017 |
| 60000411901 | 2017 |
| 60000412001 | 2017 |
| 60000413201 | 2017 |
| 60000414401 | 2017 |
| 60000415601 | 2017 |
| 60000416801 | 2017 |
| 60000417001 | 2017 |
| 60000418101 | 2017 |
| 60000419301 | 2017 |
| 60000420001 | 2017 |
| 60000421101 | 2017 |
| 60000422301 | 2017 |
| 60000423501 | 2017 |
| 60000424701 | 2017 |
| 60000425901 | 2017 |
| 60000426001 | 2017 |
| 60000427201 | 2017 |
| 60000428401 | 2017 |
| 60000429601 | 2017 |
| 60000430201 | 2017 |
| 60000431401 | 2017 |
| 60000432601 | 2017 |

| | |
|---|---|
| 60000433801 | 2017 |
| 60000434001 | 2017 |
| 60000435101 | 2017 |
| 60000437501 | 2017 |
| 60000438701 | 2017 |
| 60000439901 | 2017 |
| 60000440501 | 2017 |
| 60000441701 | 2017 |
| 60000442901 | 2017 |
| 60000443001 | 2017 |
| 60000445401 | 2017 |
| 60000446601 | 2017 |
| 60000447801 | 2017 |
| 60000448001 | 2017 |
| 60000449101 | 2017 |
| 60000450801 | 2017 |
| 60000452101 | 2017 |
| 60000453301 | 2017 |
| 60000454501 | 2017 |
| 60000455701 | 2017 |
| 60000456901 | 2017 |
| 60000457001 | 2017 |
| 60000458201 | 2017 |
| 60000459401 | 2017 |
| 60000460001 | 2017 |
| 60000461201 | 2017 |
| 60000462401 | 2017 |
| 60000465001 | 2017 |
| 60000467301 | 2017 |
| 60000468501 | 2017 |
| 60000469701 | 2017 |
| 60000471501 | 2017 |
| 60000472701 | 2017 |
| 60000473901 | 2017 |
| 60000474001 | 2017 |
| 60000475201 | 2017 |
| 60000476401 | 2017 |
| 60000477601 | 2017 |
| 60000478801 | 2017 |
| 60000479001 | 2017 |
| 60000480601 | 2017 |
| 60000482001 | 2017 |
| 60000483101 | 2017 |
| 60000486701 | 2017 |
| 60000487901 | 2017 |
| 60000488001 | 2017 |
| 60000489201 | 2017 |

| | |
|---|---|
| 60000490901 | 2017 |
| 60000491001 | 2017 |
| 60000492201 | 2017 |
| 60000493401 | 2017 |
| 60000494601 | 2017 |
| 60000496001 | 2017 |
| 60000497101 | 2017 |
| 60000498301 | 2017 |
| 60000499501 | 2017 |
| 60000500801 | 2017 |
| 60000501001 | 2017 |
| 60000502101 | 2017 |
| 60000503301 | 2017 |
| 60000504501 | 2017 |
| 60000505701 | 2017 |
| 60000506901 | 2017 |
| 60000507001 | 2017 |
| 60000509401 | 2017 |
| 60000510001 | 2017 |
| 60000511201 | 2017 |
| 60000512401 | 2017 |
| 60000513601 | 2017 |
| 60000514801 | 2017 |
| 60000517301 | 2017 |
| 60000518501 | 2017 |
| 60000519701 | 2017 |
| 60000520301 | 2017 |
| 60000521501 | 2017 |
| 60000522701 | 2017 |
| 60000523901 | 2017 |
| 60000525201 | 2017 |
| 60000526401 | 2017 |
| 60000527601 | 2017 |
| 60000528801 | 2017 |
| 60000529001 | 2017 |
| 60000530601 | 2017 |
| 60000531801 | 2017 |
| 60000532001 | 2017 |
| 60000533101 | 2017 |
| 60000535501 | 2017 |
| 60000536701 | 2017 |
| 60000539201 | 2017 |
| 60000541001 | 2017 |
| 60000544601 | 2017 |
| 60000545801 | 2017 |
| 60000546001 | 2017 |
| 60000547101 | 2017 |

| | |
|---|---|
| 60000548301 | 2017 |
| 60000549501 | 2017 |
| 60000550101 | 2017 |
| 60000551301 | 2017 |
| 60000552501 | 2017 |
| 60000553701 | 2017 |
| 60000554901 | 2017 |
| 60000555001 | 2017 |
| 60000558601 | 2017 |
| 60000559801 | 2017 |
| 60000560401 | 2017 |
| 60000561601 | 2017 |
| 60000562801 | 2017 |
| 60000563001 | 2017 |
| 60000564101 | 2017 |
| 60000565301 | 2017 |
| 60000566501 | 2017 |
| 60000567701 | 2017 |
| 60000568901 | 2017 |
| 60000570701 | 2017 |
| 60000572001 | 2017 |
| 60000573201 | 2017 |
| 60000574401 | 2017 |
| 60000575601 | 2017 |
| 60000576801 | 2017 |
| 60000577001 | 2017 |
| 60000578101 | 2017 |
| 60000580001 | 2017 |
| 60000581101 | 2017 |
| 60000582301 | 2017 |
| 60000583501 | 2017 |
| 60000584701 | 2017 |
| 60000586001 | 2017 |
| 60000587201 | 2017 |
| 60000589601 | 2017 |
| 60000591401 | 2017 |
| 60000592601 | 2017 |
| 60000593801 | 2017 |
| 60000594001 | 2017 |
| 60000595101 | 2017 |
| 60000596301 | 2017 |
| 60000597501 | 2017 |
| 60000598701 | 2017 |
| 60000601301 | 2017 |
| 60000603701 | 2017 |
| 60000605001 | 2017 |
| 60000606201 | 2017 |

| | |
|---|---|
| 60000607401 | 2017 |
| 60000608601 | 2017 |
| 60000609801 | 2017 |
| 60000613001 | 2017 |
| 60000614101 | 2017 |
| 60000615301 | 2017 |
| 60000618901 | 2017 |
| 60000619001 | 2017 |
| 60000621901 | 2017 |
| 60000622001 | 2017 |
| 60000623201 | 2017 |
| 60000624401 | 2017 |
| 60000625601 | 2017 |
| 60000626801 | 2017 |
| 60000627001 | 2017 |
| 60000628101 | 2017 |
| 60000629301 | 2017 |
| 60000630001 | 2017 |
| 60000631101 | 2017 |
| 60000632301 | 2017 |
| 60000633501 | 2017 |
| 60000634701 | 2017 |
| 60000635901 | 2017 |
| 60000636001 | 2017 |
| 60000637201 | 2017 |
| 60000638401 | 2017 |
| 60000639601 | 2017 |
| 60000640201 | 2017 |
| 60000641401 | 2017 |
| 60000642601 | 2017 |
| 60000643801 | 2017 |
| 60000644001 | 2017 |
| 60000645101 | 2017 |
| 60000646301 | 2017 |
| 60000647501 | 2017 |
| 60000648701 | 2017 |
| 60000649901 | 2017 |
| 60000650501 | 2017 |
| 60000651701 | 2017 |
| 60000652901 | 2017 |
| 60000653001 | 2017 |
| 60000654201 | 2017 |
| 60000655401 | 2017 |
| 60000656601 | 2017 |
| 60000657801 | 2017 |
| 60000658001 | 2017 |
| 60000659101 | 2017 |

| | |
|---|---|
| 60000660801 | 2017 |
| 60000663301 | 2017 |
| 60000664501 | 2017 |
| 60000665701 | 2017 |
| 60000668201 | 2017 |
| 60000669401 | 2017 |
| 60000670001 | 2017 |
| 60000671201 | 2017 |
| 60000672401 | 2017 |
| 60000673601 | 2017 |
| 60000674801 | 2017 |
| 60000676101 | 2017 |
| 60000677301 | 2017 |
| 60000679701 | 2017 |
| 60000680301 | 2017 |
| 60000681501 | 2017 |
| 60000682701 | 2017 |
| 60000684001 | 2017 |
| 60000685201 | 2017 |
| 60000686401 | 2017 |
| 60000688801 | 2017 |
| 60000689001 | 2017 |
| 60000690601 | 2017 |
| 60000691801 | 2017 |
| 60000692001 | 2017 |
| 60000693101 | 2017 |
| 60000694301 | 2017 |
| 60000695501 | 2017 |
| 60000696701 | 2017 |
| 60000697901 | 2017 |
| 60000698001 | 2017 |
| 60000699201 | 2017 |
| 60000700501 | 2017 |
| 60000701701 | 2017 |
| 60000702901 | 2017 |
| 60000703001 | 2017 |
| 60000704201 | 2017 |
| 60000705401 | 2017 |
| 60000706601 | 2017 |
| 60000707801 | 2017 |
| 60000708001 | 2017 |
| 60000709101 | 2017 |
| 60000710801 | 2017 |
| 60000711001 | 2017 |
| 60000712101 | 2017 |
| 60000713301 | 2017 |
| 60000714501 | 2017 |

| | |
|---|---|
| 60000715701 | 2017 |
| 60000716901 | 2017 |
| 60000717001 | 2017 |
| 60000718201 | 2017 |
| 60000719401 | 2017 |
| 60000720001 | 2017 |
| 60000721201 | 2017 |
| 60000722401 | 2017 |
| 60000723601 | 2017 |
| 60000724801 | 2017 |
| 60000725001 | 2017 |
| 9000003201 | 2017 |
| 9000004501 | 2017 |
| 9000005801 | 2017 |
| 9000006001 | 2017 |
| 9000007301 | 2017 |
| 9000008601 | 2017 |
| 9000009901 | 2017 |
| 9000010801 | 2017 |
| 10136788001 | 2017 |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:16−cv−00745−PLF

NATIONAL VETERANS LEGAL SERVICES PROGRAM et al v. UNITED STATES OF AMERICA
Assigned to: Judge Paul L. Friedman
Case in other court:  USCA−Federal Circuit, 19−01083−SJ
                                USCA−Federal Circuit, 18−00154−CP
                                USCA −Federal Circuit, 18−00155−CP
                                USCA−Federal Circuit, 19−01081−SJ
                                USCA−DC Circuit, 21−05291
                                USCA−Federal Circuit, 24−01757
Cause: 28:1346 Tort Claim

Date Filed: 04/21/2016
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NATIONAL VETERANS LEGAL SERVICES PROGRAM**

      represented by  **Jonathan E. Taylor**
GUPTA WESSLER PLLC
1900 L Sreet, NW
Suite 312
Washington, DC 20036
(202) 888−1741
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meghan S.B. Oliver**
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
843−216−9492
Email: moliver@motleyrice.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William H. Narwold**
1 Corporate Center
20 Church Street
17th Floor
Hartford, CT 06103
860−882−1676
Fax: 860−882−1682
Email: bnarwold@motleyrice.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Smith**
MOTLEY RICE, LLC
401 9th Street, NW
Suite 1001
Washington, DC 20004
(202) 386−9627
Fax: (843) 216−9350
Email: esmith@motleyrice.com
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
GUPTA WESSLER LLP
2001 K Street, NW

Suite 850 North
Washington, DC 20006
202−888−1741
Fax: 202−888−7792
Email: deepak@guptawessler.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL CONSUMER LAW CENTER**                    represented by **Jonathan E. Taylor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meghan S.B. Oliver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William H. Narwold**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALLIANCE FOR JUSTICE**                    represented by **Jonathan E. Taylor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meghan S.B. Oliver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William H. Narwold**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES OF AMERICA**          represented by     **Brenda A. Gonzalez Horowitz**
DOJ–USAO
U.S. Department of Justice
601 D Street NW
Washington, DC 20530
(202) 252–2512
Email: brenda.gonzalez.horowitz@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Derek S. Hammond**
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, NW
Washington, DC 20581
202–418–5000
Email: dhammond@cftc.gov
*TERMINATED: 07/03/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy S. Simon**
DOJ–USAO
Patrick Henry Building
601 D. Street, N.W.
Washington, DC 20530
(202) 252–2528
Email: jeremy.simon@usdoj.gov
*TERMINATED: 03/29/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Aaron Caplen**
DOJ–USAO
601 D Street, NW
Washington, DC 20530
(202) 252–2523
Email: rcaplen@gmail.com
*TERMINATED: 03/29/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian J. Field**
SCHAERR JAFFE LLP
1717 K Street, NW
Suite 900
Washington, DC 20006
(202) 787–1060
Fax: (202) 776–0136
Email: bfield@schaerr–jaffe.com
*TERMINATED: 06/03/2021*

**William Mark Nebeker**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2536
Fax: (202) 252–2599
Email: mark.nebeker@usdoj.gov
*TERMINATED: 06/02/2021*

V.

**Interested Party**

**ROSEMARIE HOWELL**                 represented by   **ROSEMARIE HOWELL**
                                                      9504 N.E. 5th Street
                                                      Vancouver, WA 98664
                                                      (360) 953–0798
                                                      PRO SE

**Interested Party**

**ROB RAWSON**                       represented by   **ROB RAWSON**
                                                      P.O. Box 632
                                                      Sanford, FL 32772–0632
                                                      PRO SE

**Interested Party**

**TROY LAW, PLLC**                   represented by   **John Troy**
                                                      TROY LAW, PLLC
                                                      41–25 Kissena Boulevard, Suite 110
                                                      Flushing, NY 11355
                                                      718–762–2332
                                                      Email: johntroy@troypllc.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Interested Party**

**ERIC ALAN ISAACSON**               represented by   **ERIC ALAN ISAACSON**
                                                      6580 Avenida Mirola
                                                      La Jolla, CA 92037
                                                      (858) 263–9581
                                                      PRO SE

**Movant**

**DON KOZICH**                       represented by   **DON KOZICH**
                                                      P.O. Box 2032
                                                      Fort Lauderdale, FL 33303–2032
                                                      (954) 709–0537
                                                      Email: dtkctr@gmail.com
                                                      PRO SE

**Movant**

**MICHAEL T. PINES**                 represented by   **MICHAEL T. PINES**
                                                      619–771–5302
                                                      PRO SE

**Amicus**

**REPORTERS COMMITTEE FOR**          represented by   **Bruce D. Brown**
**FREEDOM OF THE PRESS**                              REPORTERS COMMITTEE FOR
                                                      FREEDOM OF THE PRESS
                                                      1156 15th St, NW
                                                      Suite 1020
                                                      Washington, DC 20005
                                                      (202) 795–9301
                                                      Fax: (202) 795–9310
                                                      Email: bbrown@rcfp.org
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN ASSOCIATION OF LAW LIBRARIES**

represented by **Sasha Samberg–Champion**
RELMAN COLFAX PLLC
1225 19th Street NW
Suite 600
Washington, DC 20036
202–728–1888
Email: ssamberg–champion@relmanlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**JOSEPH I. LIEBERMAN**

represented by **Mark Bailen**
LAW OFFICES OF MARK I BAILEN
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
(202) 656–0422
Fax: (202) 261–3508
Email: mb@bailenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**AMERICAN SOCIETY OF NEWSPAPER EDITORS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ASSOCIATED PRESS MEDIA EDITORS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ASSOCIATION OF ALTERNATIVE NEWS MEDIA**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**CENTER FOR INVESTIGATIVE REPORTING**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**FIRST AMENDMENT COALITION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**FIRST LOOK MEDIA WORKS, INC.**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**INTERNATIONAL DOCUMENTARY ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**INVESTIGATIVE REPORTING WORKSHOP**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MEDIA CONSORTIUM**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MPA**
*The Association of Magazine Media*

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ONLINE NEWS ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**RADIO TELEVISION DIGITAL NEWS ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**REPORTERS WITHOUT BORDERS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**SEATTLE TIMES COMPANY**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**SOCIETY OF PROFESSIONAL JOURNALISTS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**TULLY CENTER FOR FREE**                  represented by    **Bruce D. Brown**
**SPEECH**                                                   (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**DEBORAH BEIM**                           represented by    **Sasha Samberg–Champion**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**THOMAS BRUCE**                           represented by    **Sasha Samberg–Champion**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**PHILLIP MALONE**                         represented by    **Sasha Samberg–Champion**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**JONATHAN ZITTRAIN**                      represented by    **Sasha Samberg–Champion**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**DARRELL ISSA**                           represented by    **Mark Bailen**
*Congressman*                                                (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/21/2016 | 1 | COMPLAINT against All Defendants *United States of America* ( Filing fee $ 400 receipt number 0090–4495374) filed by NATIONAL VETERANS LEGAL SERVICES PROGRAM, ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to United States Attorney General, # 3 Summons to U.S. Attorney for the District of Columbia)(Gupta, Deepak) (Entered: 04/21/2016) |
| 04/21/2016 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Gupta, Deepak) (Entered: 04/21/2016) |
| 04/21/2016 | | Case Assigned to Judge Ellen S. Huvelle. (jd) (Entered: 04/22/2016) |
| 04/22/2016 | 3 | SUMMONS (2) Issued Electronically as to UNITED STATES OF AMERICA, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Consent Forms)(jd) (Entered: 04/22/2016) |

| | | |
|---|---|---|
| 04/26/2016 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/26/2016. Answer due for ALL FEDERAL DEFENDANTS by 6/25/2016. (Gupta, Deepak) (Entered: 04/26/2016) |
| 04/26/2016 | 5 | NOTICE of Appearance by Elizabeth S. Smith on behalf of All Plaintiffs (Smith, Elizabeth) (Entered: 04/26/2016) |
| 04/26/2016 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– William H. Narwold, :Firm– Motley Rice LLC, :Address– 20 Church Street, 17th Floor, Hartford, CT 06103. Phone No. – 860–882–1676. Fax No. – 860–882–1682 Filing fee $ 100, receipt number 0090–4500590. Fee Status: Fee Paid. by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Smith, Elizabeth) (Entered: 04/26/2016) |
| 04/26/2016 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice: It is hereby ORDERED that the motion for leave to appear pro hac vice is GRANTED; and it is further ORDERED that William H. Narwold is admitted pro hac vice for the purpose of appearing in the above–captioned case. Signed by Judge Ellen S. Huvelle on April 26, 2016. (AG) (Entered: 04/26/2016) |
| 05/02/2016 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 05/02/2016. (Gupta, Deepak) (Entered: 05/02/2016) |
| 05/02/2016 | 8 | MOTION to Certify Class by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration of Deepak Gupta, # 2 Declaration of William Narwold, # 3 Declaration of Jonathan Taylor, # 4 Text of Proposed Order)(Gupta, Deepak) (Entered: 05/02/2016) |
| 05/16/2016 | 9 | NOTICE of Appearance by William Mark Nebeker on behalf of UNITED STATES OF AMERICA (Nebeker, William) (Entered: 05/16/2016) |
| 05/16/2016 | 10 | Unopposed MOTION for Extension of Time to File Response/Reply as to 8 MOTION to Certify Class by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 05/16/2016) |
| 05/17/2016 | | MINUTE ORDER: It is hereby ORDERED that defendant's unopposed 10 Motion for Extension of Time to File Response/Reply is GRANTED, and defendant's Response is due by July 11, 2016. Signed by Judge Ellen S. Huvelle on May 17, 2016. (lcesh2 ) (Entered: 05/17/2016) |
| 06/27/2016 | 11 | MOTION to Dismiss *Or, In The Alternative*, MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit (1 through 5), # 2 Text of Proposed Order)(Nebeker, William) (Entered: 06/27/2016) |
| 07/08/2016 | 12 | Joint MOTION for Extension of Time to File Response/Reply as to 8 MOTION to Certify Class , 11 MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 07/08/2016) |
| 07/08/2016 | | MINUTE ORDER granting 12 Motion for Extension of Time to File Response re 8 MOTION to Certify Class and 11 MOTION to Dismiss: Upon consideration of the parties' joint motion to extend the briefing schedule, it is hereby ORDERED that the motion is GRANTED; it is FURTHER ORDERED that the time within which the defendant may file a memorandum of points and authorities in response to plaintiffs' motion for class certification is further extended though July 25, 2016, and no additional extensions shall be granted; and it isFURTHER ORDERED that the time within which the plaintiffs may file a memorandum of points and authorities in response to defendant's motion to dismiss is initially extended though July 29, 2016. Signed by Judge Ellen S. Huvelle on July 7, 2016. (AG) (Entered: 07/08/2016) |
| 07/25/2016 | 13 | Memorandum in opposition to re 8 MOTION to Certify Class filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Declaration Garcia, # 3 Text of Proposed Order)(Nebeker, William) (Entered: 07/25/2016) |

| | | |
|---|---|---|
| 07/26/2016 | <u>14</u> | MOTION to Stay *Discovery* by UNITED STATES OF AMERICA (Attachments: # <u>1</u> Text of Proposed Order)(Nebeker, William) (Entered: 07/26/2016) |
| 07/29/2016 | <u>15</u> | RESPONSE re <u>11</u> MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # <u>1</u> Exhibit Govt's MTD in Fisher, # <u>2</u> Exhibit Complaint in NVLSP v. USA, # <u>3</u> Exhibit Complaint in Fisher)(Gupta, Deepak) (Entered: 07/29/2016) |
| 08/04/2016 | <u>16</u> | Unopposed MOTION for Extension of Time to File Response/Reply as to <u>11</u> MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # <u>1</u> Text of Proposed Order)(Nebeker, William) (Entered: 08/04/2016) |
| 08/04/2016 | <u>17</u> | REPLY to opposition to motion re <u>8</u> MOTION to Certify Class filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 08/04/2016) |
| 08/05/2016 | | MINUTE ORDER granting <u>16</u> Unopposed Motion for Extension of Time to File Reply re <u>11</u> MOTION to Dismiss *Or, In The Alternative*, MOTION for Summary Judgment : Upon consideration of the Unopposed Motion For An Enlargement Of Time, And Memorandum In Support Thereof, and for the reasons set forth in support thereof, it is hereby ORDERED that the motion is GRANTED; and it is FURTHER ORDERED that the time within which Defendant may file a reply to Plaintiffs' opposition to the pending Motion To Dismiss Or, In The Alternative, For Summary Judgment is enlarged up to and including August 16, 2016. Signed by Judge Ellen S. Huvelle on August 5, 2016. (AG) (Entered: 08/05/2016) |
| 08/09/2016 | <u>18</u> | Joint MOTION for Scheduling Order by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # <u>1</u> Text of Proposed Order)(Narwold, William) (Entered: 08/09/2016) |
| 08/16/2016 | | MINUTE ORDER: It is hereby ORDERED that the <u>18</u> Joint Motion for Scheduling Order is GRANTED. Signed by Judge Ellen S. Huvelle on August 16, 2016. (lcesh2) (Entered: 08/16/2016) |
| 08/16/2016 | | MINUTE ORDER: It is hereby ORDERED that defendant's <u>14</u> Motion to Stay is DENIED as moot. Signed by Judge Ellen S. Huvelle on August 16, 2016. (lcesh2) (Entered: 08/16/2016) |
| 08/16/2016 | <u>19</u> | SCHEDULING ORDER: The parties' <u>18</u> Joint Motion for Proposed Phased Schedule is hereby GRANTED. See Order for details. Signed by Judge Ellen S. Huvelle on August 16, 2016. (lcesh2) (Entered: 08/16/2016) |
| 08/16/2016 | <u>20</u> | REPLY to opposition to motion re <u>11</u> MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Declaration Second Garcia)(Nebeker, William) (Entered: 08/16/2016) |
| 08/17/2016 | <u>21</u> | MOTION for Leave to File *Sur−Reply* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # <u>1</u> Exhibit Sur−Reply, # <u>2</u> Statement of Facts, # <u>3</u> Text of Proposed Order)(Gupta, Deepak) (Entered: 08/17/2016) |
| 08/17/2016 | <u>22</u> | RESPONSE re <u>21</u> MOTION for Leave to File *Sur−Reply* filed by UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Text of Proposed Order)(Nebeker, William) (Entered: 08/17/2016) |
| 10/01/2016 | <u>23</u> | NOTICE OF SUPPLEMENTAL AUTHORITY by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # <u>1</u> Exhibit Opinion in Fisher v. United States)(Gupta, Deepak) (Entered: 10/01/2016) |
| 12/05/2016 | | MINUTE ORDER granting in part and denying in part <u>21</u> Plaintiffs' Motion for Leave to File Sur−Reply: It is hereby ORDERED that plaintiffs may file [21−2] Plaintiffs' Concise Statement of Genuine Issues of Material Fact, but plaintiffs may not file |

| | | |
|---|---|---|
| | | [21−1] Plaintiffs' Sur−Reply. A sur−reply is unnecessary because plaintiffs seek to reply to a statement that defendant originally presented in its motion to dismiss. Signed by Judge Ellen S. Huvelle on December 5, 2016. (lcesh2) (Entered: 12/05/2016) |
| 12/05/2016 | 24 | ORDER denying 11 Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment for the reasons stated in the accompanying Memorandum Opinion. Signed by Judge Ellen S. Huvelle on December 5, 2016. (lcesh2) (Entered: 12/05/2016) |
| 12/05/2016 | 25 | MEMORANDUM OPINION in support of 24 Order Denying 11 Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Signed by Judge Ellen S. Huvelle on December 5, 2016. (lcesh2) (Entered: 12/05/2016) |
| 12/05/2016 | 26 | SUPPLEMENTAL MEMORANDUM (Statement of Genuine Issues of Material Fact) to re 11 MOTION to Dismiss *Or, In the Alternative* MOTION for Summary Judgment filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (znmw) (Entered: 12/06/2016) |
| 12/15/2016 | | MINUTE ORDER Setting Hearing on Motion: It is hereby ORDERED that a motion hearing on 8 Plaintiffs' MOTION to Certify Class is set for 1/18/2017 at 02:30 PM in Courtroom 23A before Judge Ellen S. Huvelle. Signed by Judge Ellen S. Huvelle on December 15, 2016. (lcesh2) (Entered: 12/15/2016) |
| 12/19/2016 | 27 | ANSWER to Complaint by UNITED STATES OF AMERICA.(Nebeker, William) (Entered: 12/19/2016) |
| 01/18/2017 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Motion Hearing held on 1/18/2017, re 8 MOTION to Certify Class, heard and taken under advisement. (Court Reporter Scott Wallace) (gdf) (Entered: 01/18/2017) |
| 01/20/2017 | 28 | AFFIDAVIT re 8 MOTION to Certify Class *of Daniel L. Goldberg* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 01/20/2017) |
| 01/20/2017 | 29 | AFFIDAVIT re 8 MOTION to Certify Class *of Stuart Rossman* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 01/20/2017) |
| 01/20/2017 | 30 | AFFIDAVIT re 8 MOTION to Certify Class *of Barton F. Stichman* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 01/20/2017) |
| 01/20/2017 | 31 | AFFIDAVIT re 8 MOTION to Certify Class *of Deepak Gupta (Second)* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Gupta, Deepak) (Entered: 01/20/2017) |
| 01/24/2017 | 32 | ORDER granting 8 Plaintiffs' Motion to Certify Class for the reasons stated in the accompanying Memorandum Opinion. See Order for details. Signed by Judge Ellen S. Huvelle on January 24, 2017. (lcesh2) (Entered: 01/24/2017) |
| 01/24/2017 | 33 | MEMORANDUM OPINION in support of 32 Order Granting 8 Plaintiffs' Motion to Certify Class. Signed by Judge Ellen S. Huvelle on January 24, 2017. (lcesh2) (Entered: 01/24/2017) |
| 01/24/2017 | 34 | SCHEDULING ORDER: See Order for deadlines and details. Signed by Judge Ellen S. Huvelle on January 24, 2017. (lcesh2) (Entered: 01/24/2017) |
| 02/14/2017 | 35 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 1−18−17; Page Numbers: (1−29). Date of Issuance:1−29−17. Court Reporter/Transcriber Scott Wallace, Telephone number 202−354−3196, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court |

| | | |
|---|---|---|
| | | reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.\<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.\<P>\</P> Redaction Request due 3/7/2017. Redacted Transcript Deadline set for 3/17/2017. Release of Transcript Restriction set for 5/15/2017.(Wallace, Scott) (Entered: 02/14/2017) |
| 02/21/2017 | 36 | NOTICE of Appearance by Brian J. Field on behalf of All Defendants (Field, Brian) (Entered: 02/21/2017) |
| 02/23/2017 | 37 | Unopposed MOTION For Approval of Plan of Class Notice by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 − Email Notice, # 2 Exhibit 2 − Postcard Notice, # 3 Exhibit 2 − Website Notice, # 4 Text of Proposed Order)(Narwold, William) (Entered: 02/23/2017) |
| 02/28/2017 | 38 | RESPONSE re 37 Unopposed MOTION For Approval of Plan of Class Notice filed by UNITED STATES OF AMERICA. (Nebeker, William) (Entered: 02/28/2017) |
| 03/31/2017 | 39 | NOTICE *of Joint Filing of Proposed Order* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 37 Unopposed MOTION For Approval of Plan of Class Notice (Attachments: # 1 Text of Proposed Order)(Narwold, William) (Entered: 03/31/2017) |
| 03/31/2017 | 40 | Consent MOTION for Protective Order by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Narwold, William) (Entered: 03/31/2017) |
| 04/03/2017 | 41 | STIPULATED PROTECTIVE ORDER granting 40 Motion for Protective Order. Signed by Judge Ellen S. Huvelle on April 3, 2017. (lcesh2) (Entered: 04/03/2017) |
| 04/13/2017 | 42 | Unopposed MOTION for Approval of Revised Plan of Class Notice and Class Notice Documents by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 − Email Notice, # 2 Exhibit 1−A − BLACKLINE Email Notice, # 3 Exhibit 2 − Postcard Notice, # 4 Exhibit 2−A − BLACKLINE Postcard Notice, # 5 Exhibit 3 − Website Notice, # 6 Exhibit 3−A − BLACKLINE Website Notice, # 7 Exhibit 4 − Online Exclusion, # 8 Exhibit 5 − Printable Exclusion, # 9 Exhibit 6 − Proposed Order, # 10 Exhibit 6−A − BLACKLINE Proposed Order)(Narwold, William) (Entered: 04/13/2017) |
| 04/14/2017 | 43 | NOTICE *of Filing of Revised Notice Documents* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 Revised Email Notice, # 2 Exhibit 1A Revised and Blacklined Email Notice, # 3 Exhibit 2 Revised Postcard Notice, # 4 Exhibit 2A Revised and Blacklined Postcard Notice)(Narwold, William) (Entered: 04/14/2017) |
| 04/17/2017 | 44 | ORDER granting 42 Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents: See Order for details. Signed by Judge Ellen S. Huvelle on April 17, 2017. (lcesh2) (Entered: 04/17/2017) |
| 04/17/2017 | | MINUTE ORDER finding as moot 37 Motion for Approval of Class Notice in light of approval of 42 Motion for Approval of Revised Class Notice. Signed by Judge Ellen S. Huvelle on April 17, 2017. (AG) (Entered: 04/17/2017) |
| 05/22/2017 | 45 | NOTICE to Exclude by ROSEMARIE HOWELL re 44 ORDER granting 42 Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents (jf) (Entered: 05/24/2017) |
| 06/15/2017 | 46 | MOTION for Order for Exclusion by ROB RAWSON. "Let this be filed" signed by Judge Ellen Segal Huvelle on 06/09/2017 (jf) Modified event title on 6/16/2017 |

| | | |
|---|---|---|
| | | (znmw). (Entered: 06/15/2017) |
| 06/15/2017 | | MINUTE ORDER: It is hereby ORDERED that the Clerk shall mail a copy of 46 NOTICE of and MOTION For An Order For Exclusion filed by ROB RAWSON to the PACER Fees Class Action Administrator, P.O. Box 43434, Providence, RI 02940–3434. Signed by Judge Ellen S. Huvelle on June 15, 2017. (lcesh2) (Entered: 06/15/2017) |
| 07/05/2017 | 47 | NOTICE of Change of Address by Deepak Gupta (Gupta, Deepak) (Entered: 07/05/2017) |
| 07/05/2017 | 48 | Unopposed MOTION for Extension of Time to File *Motion for Summary Judgment* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 07/05/2017) |
| 07/05/2017 | | MINUTE ORDER granting 48 Unopposed Motion for Extension of Time to File Motion for Summary Judgment: Upon consideration of the plaintiffs' unopposed motion to extend the briefing schedule, it is hereby ORDERED that the motion is GRANTED; and it is FURTHER ORDERED that the time within which the plaintiffs may file their motion for summary judgment solely on the issue of liability, i.e., whether the fees charged to access records through PACER violate the E–Government Act of 2002, Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C. § 1913 note), is extended through August 28, 2017; and it is FURTHER ORDERED that the defendant shall file its opposition 20 days after this date, on September 18, 2017, and the plaintiffs' reply is due 10 days after that, on September 28, 2017, consistent with this Courts scheduling order entered on January 24, 2017. Signed by Judge Ellen S. Huvelle on July 5, 2017. (AG) (Entered: 07/05/2017) |
| 07/07/2017 | | Set/Reset Deadlines: Plaintiff's Summary Judgment motion due by 8/28/2017. Response to Motion for Summary Judgment due by 9/18/2017. Plaintiff's Reply in support of Motion for Summary Judgment due by 9/28/2017. (hs) (Entered: 07/07/2017) |
| 07/17/2017 | 49 | MOTION for Leave to File Amicus Curiae, MOTION to Appear by Phone, by DON KOZICH (Attachments: # 1 Exhibit Application to Proceed In Forma Pauperis)(jf) Modified text on 7/19/2017 (znmw). (Entered: 07/18/2017) |
| 07/19/2017 | 50 | SUPPLEMENT re 45 NOTICE to Exclude re ROSEMARIE HOWELL re 44 ORDER granting 42 Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents filed by ROSEMARIE HOWELL. (jf) (Entered: 07/19/2017) |
| 08/24/2017 | 51 | NOTICE of Change of Address by Elizabeth S. Smith (Smith, Elizabeth) (Entered: 08/24/2017) |
| 08/28/2017 | 52 | MOTION for Summary Judgment *as to Liability* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration Declaration of Jonathan Taylor, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F, # 8 Exhibit Exhibit G, # 9 Exhibit Exhibit H, # 10 Exhibit Exhibit I, # 11 Exhibit Exhibit J, # 12 Exhibit Exhibit K, # 13 Exhibit Exhibit L, # 14 Exhibit Exhibit M, # 15 Declaration Declaration of Thomas Lee and Michael Lissner, # 16 Statement of Facts Plaintiffs' Statement of Undisputed Material Facts)(Gupta, Deepak) (Entered: 08/28/2017) |
| 09/05/2017 | 53 | MOTION for Leave to File *Amicus Curiae Brief* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Proposed Order, # 3 Certificate of Corporate Disclosure)(Brown, Bruce) (Entered: 09/05/2017) |
| 09/05/2017 | 54 | NOTICE of Appearance by Sasha Samberg–Champion on behalf of AMERICAN ASSOCIATION OF LAW LIBRARIES (Samberg–Champion, Sasha) (Entered: 09/05/2017) |
| 09/05/2017 | 55 | MOTION for Leave to File *Brief Amici Curiae* by AMERICAN ASSOCIATION OF LAW LIBRARIES (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order)(Samberg–Champion, Sasha) (Entered: 09/05/2017) |

| | | |
|---|---|---|
| 09/05/2017 | <u>56</u> | MOTION for Leave to File *Amicus Curiae Brief* by JOSEPH I. LIEBERMAN (Attachments: # <u>1</u> Exhibit Proposed Amicus Brief, # <u>2</u> Text of Proposed Order)(Bailen, Mark) (Entered: 09/05/2017) |
| 09/13/2017 | <u>57</u> | MOTION for Extension of Time to File Response/Reply by UNITED STATES OF AMERICA (Field, Brian) (Entered: 09/13/2017) |
| 09/13/2017 | | MINUTE ORDER granting <u>53</u> <u>55</u> <u>56</u> Movants' Motions for Leave to File Briefs as Amicus Curiae: Upon consideration of the above–referenced motions, plaintiffs' consent and defendant's representation that it will not oppose, it is hereby ORDERED that the motions are GRANTED and movants are granted leave to file briefs as amicus curiae. Signed by Judge Ellen S. Huvelle on September 13, 2017. (AG) (Entered: 09/13/2017) |
| 09/13/2017 | <u>58</u> | RESPONSE re <u>57</u> MOTION for Extension of Time to File Response/Reply filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/13/2017) |
| 09/13/2017 | <u>59</u> | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AMERICAN SOCIETY OF NEWSPAPER EDITORS, ASSOCIATED PRESS MEDIA EDITORS, ASSOCIATION OF ALTERNATIVE NEWS MEDIA, CENTER FOR INVESTIGATIVE REPORTING, FIRST AMENDMENT COALITION, FIRST LOOK MEDIA WORKS, INC., INTERNATIONAL DOCUMENTARY ASSOCIATION, INVESTIGATIVE REPORTING WORKSHOP, MEDIA CONSORTIUM, MPA, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, ONLINE NEWS ASSOCIATION, RADIO TELEVISION DIGITAL NEWS ASSOCIATION, REPORTERS WITHOUT BORDERS, SEATTLE TIMES COMPANY, SOCIETY OF PROFESSIONAL JOURNALISTS, TULLY CENTER FOR FREE SPEECH. (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | <u>60</u> | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN SOCIETY OF NEWSPAPER EDITORS, ASSOCIATED PRESS MEDIA EDITORS, ASSOCIATION OF ALTERNATIVE NEWS MEDIA, CENTER FOR INVESTIGATIVE REPORTING, FIRST AMENDMENT COALITION, FIRST LOOK MEDIA WORKS, INC., INTERNATIONAL DOCUMENTARY ASSOCIATION, INVESTIGATIVE REPORTING WORKSHOP, MEDIA CONSORTIUM, MPA, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, ONLINE NEWS ASSOCIATION, RADIO TELEVISION DIGITAL NEWS ASSOCIATION, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, REPORTERS WITHOUT BORDERS, SEATTLE TIMES COMPANY, SOCIETY OF PROFESSIONAL JOURNALISTS, TULLY CENTER FOR FREE SPEECH identifying Other Affiliate SYRACUSE UNIVERSITY for TULLY CENTER FOR FREE SPEECH; Other Affiliate AMERICAN UNIVERSITY SCHOOL OF COMMUNICATION for INVESTIGATIVE REPORTING WORKSHOP; Corporate Parent MCCLATCHY COMPANY for SEATTLE TIMES COMPANY. (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | <u>61</u> | AMICUS BRIEF by AMERICAN ASSOCIATION OF LAW LIBRARIES, DEBORAH BEIM, THOMAS BRUCE, PHILLIP MALONE, JONATHAN ZITTRAIN. (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | 62 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN ASSOCIATION OF LAW LIBRARIES. (See Docket Entry <u>61</u> to view document). (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | <u>63</u> | AMICUS BRIEF by JOSEPH I. LIEBERMAN, DARRELL ISSA. (znmw) (Entered: 09/14/2017) |
| 09/14/2017 | | MINUTE ORDER granting in part and denying in part <u>57</u> defendant's Motion for Extension of Time to File Response re <u>52</u> plaintiffs' MOTION for Summary Judgment *as to Liability*: Upon consideration of defendant's motion, plaintiff's partial consent and partial opposition thereto, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that defendant shall have until November 2, 2017, to file its response to plaintiffs' motion for summary judgment; and it is further ORDERED that plaintiffs reply is due by November 13, 2017. Signed by Judge Ellen S. Huvelle on September 14, 2017. (AG) (Entered: 09/14/2017) |

| 09/25/2017 | 64 | Verified MOTION For Free Access To Pacer by DON KOZICH (jf) (Entered: 09/27/2017) |
|---|---|---|
| 09/29/2017 | 65 | RESPONSE re 64 MOTION For Free Access To Pacer filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/29/2017) |
| 10/02/2017 | 66 | ORDER DENYING as moot 64 Motion for Free Access to PACER Until Final Disposition of this Case. Signed by Judge Ellen S. Huvelle on October 2, 2017. (lcesh2,) (Entered: 10/02/2017) |
| 10/10/2017 | 67 | MOTION to Clarify Minute Order dated 09/13/2017 by DON KOZICH (jf) (Entered: 10/13/2017) |
| 10/17/2017 | 68 | ORDER denying 49 Motion for Leave to File Amicus Brief and to Appear Telephonically; denying as moot 67 Motion to Clarify: see Order for details. Signed by Judge Ellen S. Huvelle on October 17, 2017. (lcesh2) (Entered: 10/17/2017) |
| 10/30/2017 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to 52 MOTION for Summary Judgment *as to Liability* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 10/30/2017) |
| 10/30/2017 | 72 | STRIKEN PURSUANT TO MINUTE ORDER FILED ON 11/9/17.....Verified MOTION with Briefing by ROSEMARIE HOWELL (Attachments: # 1 Appendix 1, # 2 Appendix 2, # 3 Appendix 3)(jf) Modified on 11/12/2017 (zgdf). (Entered: 11/08/2017) |
| 10/31/2017 | | MINUTE ORDER granting 69 Unopposed Motion for Extension of Time to File Response re 52 MOTION for Summary Judgment as to Liability: Upon Consideration of the Unopposed Motion For An Enlargement Of Time, AndMemorandum In Support Thereof in response thereto, and for the reasons set forth in support thereof, it is hereby ORDERED that the motion should be and is hereby GRANTED; and it is FURTHER ORDERED that Defendant file its opposition to Plaintiff's Motion For Summary Judgment As To Liability (ECF No. 52 ) on or before November 17, 2017; and it is FURTHER ORDERED that Plaintiffs may respond to Defendant's filing on or before December 5, 2017. Signed by Judge Ellen S. Huvelle on October 31, 2017. (AG) (Entered: 10/31/2017) |
| 10/31/2017 | 70 | MOTION for Reconsideration re 68 Order on Motion for Miscellaneous Relief, Order on Motion for Leave to File, Order on Motion to Clarify by DON KOZICH (Attachments: # 1 Exhibit)(jf) (Entered: 11/01/2017) |
| 11/06/2017 | 71 | ORDER denying 70 Motion for Reconsideration of October 17, 2017 Order Denying Petitioners Motion for Clarification of September 13, 2017 Order and Denying Petitioners Motion to File Amicus Curiae; and granting Movant access to documents filed in this case. See Order for details. Signed by Judge Ellen S. Huvelle on November 6, 2017. (lcesh2) (Entered: 11/06/2017) |
| 11/09/2017 | | MINUTE ORDER: It is hereby ORDERED that Rosemarie Howell's Verified Motion with Briefing 72 is STRICKEN from the docket as filed without leave of Court; it is further ORDERED that leave to file is denied because Rosemarie Howell has opted out of the class, see ECF 45; and it is further ORDERED that the Clerk shall return the motion to Rosemarie Howell, along with a copy of this Minute Order. Signed by Judge Ellen S. Huvelle on November 9, 2017. (lcesh2) (Entered: 11/09/2017) |
| 11/17/2017 | 73 | Cross MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Declaration Decl. of W. Skidgel, # 3 Statement of Facts, # 4 Text of Proposed Order)(Field, Brian) (Entered: 11/17/2017) |
| 11/17/2017 | 74 | Memorandum in opposition to re 52 MOTION for Summary Judgment *as to Liability* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum in Support, # 2 Declaration Decl. of W. Skidgel, # 3 Statement of Facts, # 4 Text of Proposed Order)(Field, Brian) (Entered: 11/17/2017) |
| 12/05/2017 | 75 | REPLY to opposition to motion re 52 MOTION for Summary Judgment *as to Liability*, filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Statement of Facts Response to Defendant's Statement of Facts)(Gupta, Deepak) Modified to remove link on 12/6/2017 (znmw). (Entered: 12/05/2017) |
| 12/05/2017 | 76 | Memorandum in opposition to re 73 Cross MOTION for Summary Judgment filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (See Docket Entry 75 to view document). (znmw) (Entered: 12/06/2017) |
| 12/08/2017 | 77 | MOTION for Extension of Time to File Response/Reply as to 73 Cross MOTION for Summary Judgment by UNITED STATES OF AMERICA (Field, Brian) (Entered: 12/08/2017) |
| 12/08/2017 | | MINUTE ORDER granting in part and denying in part 77 defendant's opposed Motion for Extension of Time to File Reply re 73 Cross Motion for Summary Judgment: Upon consideration of the above–referenced motion, and the entire record herein, it is hereby ORDERED that the motion is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED that defendant shall have until January 5, 2018, to file its reply in support of its cross–motion for summary judgment. Signed by Judge Ellen S. Huvelle on December 8, 2017. (lcesh2) (Entered: 12/08/2017) |
| 12/12/2017 | 78 | LEAVE TO FILE DENIED– Declaration of Amended Service. This document is unavailable as the Court denied its filing. "Leave To File Denied" Signed by Judge Ellen S. Huvelle on 12/12/2017. (jf) (Entered: 12/15/2017) |
| 01/05/2018 | 79 | REPLY to opposition to motion re 73 Cross MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 01/05/2018) |
| 02/27/2018 | | MINUTE ORDER Setting Hearing on Motions: It is hereby ORDERED that a hearing on 52 plaintiffs' MOTION for Summary Judgment as to Liability and 73 defendant's Cross MOTION for Summary Judgment is set for Monday, March 19, 2017, at 11:00 a.m. in Courtroom 23A before Judge Ellen S. Huvelle. Signed by Judge Ellen S. Huvelle on February 27, 2018. (AG) (Entered: 02/27/2018) |
| 03/01/2018 | 80 | Consent MOTION to Continue *Motions Hearing* by UNITED STATES OF AMERICA (Field, Brian) (Entered: 03/01/2018) |
| 03/02/2018 | | MINUTE ORDER granting in part and denying in part 80 Consent Motion to Continue: Upon consideration of the Consent Motion to Continue, it is hereby ORDERED that the motion is granted in part and denied in part; and it is further ORDERED that the Summary Judgment Motions Hearing presently set for 3/19/2018 is CONTINUED TO 3/21/2018 at 11:00 AM in Courtroom 23A. Signed by Judge Ellen S. Huvelle on March 2, 2018. (AG) (Entered: 03/02/2018) |
| 03/15/2018 | 81 | NOTICE *Of Filing* by UNITED STATES OF AMERICA re 52 MOTION for Summary Judgment *as to Liability*, Order Setting Hearing on Motion, 73 Cross MOTION for Summary Judgment (Attachments: # 1 Exhibit Tabs 1 through 40)(Nebeker, William) (Entered: 03/15/2018) |
| 03/21/2018 | 82 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Meghan Oliver, :Firm– Motley Rice LLC, :Address– 28 Bridgeside Blvd, Mt. Pleasant, SC 29464. Phone No. – 843–216–9492. Fax No. – 843–216–9430 Filing fee $ 100, receipt number 0090–5382765. Fee Status: Fee Paid. by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration Declaration of Meghan Oliver, # 2 Text of Proposed Order Proposed Order)(Smith, Elizabeth) (Entered: 03/21/2018) |
| 03/21/2018 | | MINUTE ORDER: It is hereby ORDERED that the hearing on plaintiffs' MOTION for Summary Judgment as to Liability and defendant's Cross MOTION for Summary Judgment is CONTINUED from Wednesday, March 21, 2018, to Friday, March 23, 2018, at 1:30 p.m. in Courtroom 23A before Judge Ellen S. Huvelle. Signed by Judge Ellen S. Huvelle on March 21, 2018. (AG) (Entered: 03/21/2018) |
| 03/21/2018 | | MINUTE ORDER granting 82 Unopposed Motion for Leave to Appear Pro Hac Vice: Upon consideration of the above–referenced motion, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that Meghan Oliver is admitted pro hac vice for the purpose of appearing in the above–captioned case. Signed by Judge Ellen S. Huvelle on March 21, 2018. (AG) (Entered: 03/21/2018) |

| 03/21/2018 | 83 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jonathan Taylor, :Firm– Gupta Wessler PLLC, :Address– jon@guptawessler.com. Phone No. – 2028881741. Fax No. – 2028887792 *Address: 1900 L Street NW, Suite 312, Washington DC 20036* Filing fee $ 100, receipt number 0090–5383035. Fee Status: Fee Paid. by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration of Jonathan Taylor, # 2 Text of Proposed Order)(Gupta, Deepak) (Entered: 03/21/2018) |
| --- | --- | --- |
| 03/21/2018 | | MINUTE ORDER granting 83 Unopposed Motion for Leave to Appear Pro Hac Vice: Upon consideration of the Unopposed MOTION for Leave to Appear Pro Hac Vice, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that Jonathan Taylor is admitted pro hac vice for the purpose of appearing in proceedings in the above–captioned case. Counsel is reminded that pursuant to LCvR 83.2(c)(2) "An attorney who engages in the practice of law from an office located in the District of Columbia must be a member of the District of Columbia Bar and the Bar of this Court to file papers in this Court." Signed by Judge Ellen S. Huvelle on March 21, 2018. (AG) (Entered: 03/21/2018) |
| 03/22/2018 | | Set/Reset Hearings: Motion Hearing set for 3/23/2018 at 1:30 PM in Courtroom 23A before Judge Ellen S. Huvelle. (gdf) (Entered: 03/22/2018) |
| 03/23/2018 | | Minute Entry; for proceedings held before Judge Ellen S. Huvelle: Oral Arguments held on 3/23/2018. Plaintiffs' 52 MOTION for Summary Judgment as to Liability and Defendant's 73 Cross MOTION for Summary Judgment; heard and Taken Under Advisement. (Court Reporter Lisa Griffith) (hs) (Entered: 03/23/2018) |
| 03/24/2018 | 84 | NOTICE by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E, # 6 Exhibit Ex. F, # 7 Exhibit Ex. G)(Field, Brian) (Entered: 03/24/2018) |
| 03/28/2018 | 85 | RESPONSE *to Defendant's supplemental authority* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 84 Notice (Other) (Gupta, Deepak) Modified event title on 3/29/2018 (znmw). (Entered: 03/28/2018) |
| 03/29/2018 | 86 | RESPONSE re 85 Notice (Other) filed by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 03/29/2018) |
| 03/29/2018 | 87 | REPLY re 86 Response to Document filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 03/29/2018) |
| 03/31/2018 | 88 | ORDER denying 52 plaintiffs' Motion for Summary Judgment; granting in part and denying in part 73 defendant's Motion for Summary Judgment; and setting Status Conference for 4/18/2018 at 03:00 PM in Courtroom 23A. Joint status report due by April 16, 2018. Signed by Judge Ellen S. Huvelle on March 31, 2018. (AG) (Entered: 03/31/2018) |
| 03/31/2018 | 89 | MEMORANDUM OPINION accompanying Order, ECF No. 88 , denying 52 plaintiffs' Motion for Summary Judgment and granting in part and denying in part defendant's Cross–Motion for Summary Judgment. Signed by Judge Ellen S. Huvelle on March 31, 2018. (AG) Modified on 4/2/2018 to remove attachment. Attachment docketed separately for opinion posting purposes.(ztnr) (Entered: 03/31/2018) |
| 03/31/2018 | 90 | ATTACHMENT to 89 Memorandum & Opinion Signed by Judge Ellen S. Huvelle on March 31, 2018. (ztnr) (Entered: 04/02/2018) |
| 04/02/2018 | | Set/Reset Deadlines: Joint Status Report due by 4/16/2018. (gdf) (Entered: 04/02/2018) |
| 04/16/2018 | 91 | Joint STATUS REPORT *Proposing a Schedule to Govern Further Proceedings* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 04/16/2018) |
| 04/18/2018 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Status Conference held on 4/18/2018. Status Report due by 5/11/2018. Status Conference set for |

| | | |
|---|---|---|
| | | 5/18/2018 at 1:30 PM in Courtroom 23A before Judge Ellen S. Huvelle. (Court Reporter Lisa Griffith) (gdf) (Entered: 04/18/2018) |
| 04/18/2018 | 92 | ORDER setting Status Conference for May 18, 2018, at 1:30 p.m. in Courtroom 23A. Joint Status Report due by May 11, 2018. See order for details. Signed by Judge Ellen S. Huvelle on April 18, 2018. (AG) (Entered: 04/18/2018) |
| 04/26/2018 | 93 | MOTION for Extension of Time to *File Status Report*, MOTION to Continue *Status Conference* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Field, Brian) (Entered: 04/26/2018) |
| 04/27/2018 | | MINUTE ORDER denying 93 Motion for Extension of Time to file Status Report; granting in part and denying in part 93 Motion to Continue Status Conference: Upon consideration of defendant's motion, plaintiffs' opposition thereto, and the entire record herein, it is hereby ORDERED that defendant's motion for an extension of time to file a status report is DENIED; and it is further ORDERED that defendant's motion to continue the Status Conference presently set for May 18, 2018, is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED that the Status Conference presently scheduled for May 18, 2018, is RESCHEDULED to May 17, 2018, at 11:00 a.m. in Courtroom 23A. Signed by Judge Ellen S. Huvelle on April 27, 2018. (AG) (Entered: 04/27/2018) |
| 05/11/2018 | 94 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 05/11/2018) |
| 05/17/2018 | 95 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 3–23–18; Page Numbers: 1–121. Date of Issuance:5–17–18. Court Reporter/Transcriber Lisa Griffith, Telephone number (202) 354–3247, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 6/7/2018. Redacted Transcript Deadline set for 6/17/2018. Release of Transcript Restriction set for 8/15/2018.(Griffith, Lisa) (Entered: 05/17/2018) |
| 05/17/2018 | 96 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 4–18–18; Page Numbers: 1–38. Date of Issuance:5–17–18. Court Reporter/Transcriber Lisa Griffith, Telephone number (202) 354–3247, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 6/7/2018. Redacted Transcript Deadline set for 6/17/2018. Release of Transcript Restriction set for 8/15/2018.(Griffith, Lisa) (Entered: 05/17/2018) |
| 05/17/2018 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle on 5/17/18 : Status Conference held. Order to be issued. Joint Status Report due by 7/13/18. Further Status Conference set for 7/18/18 at 12:00 PM in Courtroom 23A before Judge Ellen S. Huvelle. (Court Reporter: Lisa Griffith) (kk) (Entered: 05/17/2018) |
| 05/17/2018 | 97 | ORDER re discovery and future proceedings. Joint Status Report due by 7/13/2018. Status Conference set for 7/18/2018 at 12:00 PM in Courtroom 23A before Judge Ellen S. Huvelle. See order for details. Signed by Judge Ellen S. Huvelle on May 17, |

| | | 2018. (AG) (Entered: 05/17/2018) |
|---|---|---|
| 07/13/2018 | 98 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 07/13/2018) |
| 07/13/2018 | 99 | MOTION for Certification for interlocutory appeal, MOTION to Stay by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Field, Brian). Added MOTION to Stay on 7/17/2018 (jf). (Entered: 07/13/2018) |
| 07/18/2018 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Status Conference held on 7/18/2018. Parties should submit a report by the C.O.B. on Friday, 7/20/18. (Court Reporter: Scott Wallace) (gdf) (Entered: 07/19/2018) |
| 07/20/2018 | 100 | NOTICE *Regarding Annual Courtroom Technology Expenditures* by UNITED STATES OF AMERICA (Field, Brian) (Entered: 07/20/2018) |
| 07/20/2018 | 101 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 07/20/2018) |
| 07/27/2018 | 102 | RESPONSE re 99 MOTION for Certification for interlocutory appeal MOTION to Stay filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 07/27/2018) |
| 08/02/2018 | 103 | REPLY to opposition to motion re 99 MOTION for Certification for interlocutory appeal MOTION to Stay filed by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 08/02/2018) |
| 08/13/2018 | 104 | ORDER granting in part and denying in part 99 defendant's Motion for to Certify Orders for Interlocutory Appeal; amending Order filed on March 31, 2018, ECF No. 88 , to certify for interlocutory appeal for the reasons stated in an accompanying Memorandum Opinion, ECF No. 105 ; and granting 99 unopposed Motion to Stay. See order for details. Signed by Judge Ellen S. Huvelle on August 13, 2018. (AG) (Entered: 08/13/2018) |
| 08/13/2018 | 105 | MEMORANDUM OPINION accompanying August 13, 2018 Order, ECF No. 104 , re certification of March 31, 2018 Order, ECF No. 88 for interlocutory appeal. Signed by Judge Ellen S. Huvelle on August 13, 2018. (AG) (Entered: 08/13/2018) |
| 08/20/2018 | 106 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 7–18–18; Page Numbers: 1–21. Date of Issuance:7–18–18. Court Reporter/Transcriber Scott Wallace, Telephone number 202–354–3196, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 9/10/2018. Redacted Transcript Deadline set for 9/20/2018. Release of Transcript Restriction set for 11/18/2018.(Wallace, Scott) (Entered: 08/20/2018) |
| 08/23/2018 | | USCA for the Federal Circuit Case Number 18–154–CP (zrdj) (Entered: 08/23/2018) |
| 08/23/2018 | | USCA for the Federal Circuit Case Number 18–155–CP (zrdj) (Entered: 08/23/2018) |
| 10/16/2018 | | USCA for the Federal Circuit Case Number 19–1081–SJ (zrdj) (Entered: 10/18/2018) |
| 10/16/2018 | | USCA for the Federal Circuit Case Number 19–1083–SJ (zrdj) (Entered: 10/18/2018) |
| 11/28/2018 | 107 | NOTICE OF GRANT OF PERMISSION TO APPEAL UNDER 28 U.S.C. § 1292(B)by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. Filing fee $ 505, receipt |

| | | |
|---|---|---|
| | | number 0090–5811958. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 USCA Order)(Narwold, William) Modified on 11/29/2018 to correct docket event/text (jf). (Entered: 11/28/2018) |
| 11/29/2018 | 108 | Transmission of the Notice of Grant of Permission to Appeal Under 28 U.S.C. § 1292(B)and Docket Sheet to Federal Circuit. The appeal fee was paid this date re 107 Notice of Appeal to the Federal Circuit. (jf) (Entered: 11/29/2018) |
| 09/10/2020 | 109 | ENTERED IN ERROR.....Case randomly reassigned to Judge Christopher R. Cooper. Judge Ellen S. Huvelle is no longer assigned to the case. (rj) Modified on 9/11/2020 (rj). (Entered: 09/11/2020) |
| 09/10/2020 | 110 | Case directly reassigned to Judge Paul L. Friedman by consent. Judge Christopher R. Cooper is no longer assigned to the case. (rj) (Entered: 09/11/2020) |
| 09/28/2020 | 111 | MANDATE of USCA as to 107 Notice of Appeal to the Federal Circuit, filed by ALLIANCE FOR JUSTICE, NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER ; USCA Case Number 19–1081, 19–1083. (Attachments: # 1 USCA Judgment)(zrdj) (Entered: 09/29/2020) |
| 12/11/2020 | | MINUTE ORDER: In view of the recent decision by the United States Court of Appeals for the Federal Circuit remanding this case for further proceedings, it is ORDERED that the parties file a joint status report on or before December 23, 2020 addressing how they wish to proceed. Signed by Judge Paul L. Friedman on 12/11/2020. (lceg) (Entered: 12/11/2020) |
| 12/23/2020 | 112 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 12/23/2020) |
| 12/29/2020 | | MINUTE ORDER: In light of the parties joint status report 112 , this matter is STAYED until June 25, 2021. The parties shall file a joint status report on or before June 18, 2021 updating the Court on the status of any mediation. Signed by Judge Paul L. Friedman on 12/29/2020. (lceg) (Entered: 12/29/2020) |
| 12/29/2020 | | Set/Reset Deadlines: Status Report due by 6/18/2021. (tj) (Entered: 12/29/2020) |
| 06/02/2021 | 113 | NOTICE OF SUBSTITUTION OF COUNSEL by Robert Aaron Caplen on behalf of UNITED STATES OF AMERICA Substituting for attorney W. Mark Nebeker (Caplen, Robert) (Entered: 06/02/2021) |
| 06/03/2021 | 114 | NOTICE OF SUBSTITUTION OF COUNSEL by Jeremy S. Simon on behalf of UNITED STATES OF AMERICA Substituting for attorney Brian J. Field (Simon, Jeremy) (Entered: 06/03/2021) |
| 06/16/2021 | 115 | Joint STATUS REPORT by NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 06/16/2021) |
| 06/16/2021 | | MINUTE ORDER: In light of 115 the parties' joint status report, this matter is STAYED until September 23, 2021. The parties shall file a joint status report on or before September 16, 2021, updating the Court on the progress of their discussions. Signed by Judge Paul L. Friedman on June 16, 2021. (lcaf) (Entered: 06/16/2021) |
| 08/26/2021 | 116 | MOTION to Intervene, MOTION to Modify by MICHAEL T. PINES. (Attachments: # 1 Declaration redacted)(ztd); ("Leave to file Granted" signed 8/26/2021 by Judge Paul L. Friedman) Modified on 10/1/2021 (znmw). Added MOTION for Sanctions on 10/1/2021 (znmw). (Entered: 08/27/2021) |
| 08/26/2021 | 117 | SEALED DOCUMENT (MOTION FOR INTERVENTION AND LEAVE TO FILE) filed by MICHAEL T. PINES. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration)(ztd);("Leave to File Granted – Document Under Seal" signed 8/26/2021 by Judge Paul L. Friedman) (Entered: 08/27/2021) |
| 08/27/2021 | | MINUTE ORDER: Counsel for the parties are directed to file responses to 116 Mr. Pines' motion to intervene on or before September 10, 2021. Signed by Judge Paul L. Friedman on August 27, 2021. (lcaf) (Entered: 08/27/2021) |

| | | |
|---|---|---|
| 09/08/2021 | 118 | MOTION for Extension of Time to *File Response to Motion for Intervention, to Modify Class Certification Order, and for Sanctions* by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order)(Simon, Jeremy) Modified event on 9/9/2021 (ztd). (Entered: 09/08/2021) |
| 09/09/2021 | 119 | ORDER granting 118 defendant's motion for extension of time up to and including October 1, 2021 within which to respond to motion for intervention, to modify class certification order and for sanctions. Signed by Judge Paul L. Friedman on September 9, 2021. (MA) (Entered: 09/09/2021) |
| 09/09/2021 | 120 | Memorandum in opposition to re 118 MOTION for Extension of Time to File Response/Reply filed by MICHAEL T. PINES. (ztd) (Entered: 09/10/2021) |
| 09/09/2021 | 121 | NOTICE by MICHAEL T. PINES (ztd) (Entered: 09/10/2021) |
| 09/10/2021 | 122 | RESPONSE re 116 MOTION to Intervene MOTION for Leave to File filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/10/2021) |
| 09/14/2021 | | MINUTE ORDER: The Court has reviewed 121 Mr. Pines' notice requesting reconsideration of 119 the Court's order granting the government an extension of time up to October 1, 2021 in which to respond to the motion to intervene. The Court concludes that Mr. Pines has not demonstrated that he will suffer prejudice as a result of the extension of time, and the government has established good cause for the extension of time. The Court therefore will not alter the deadline for the government's response to the motion to intervene. The government, in its response to the motion to intervene, is directed to also address the concerns about delay raised in 120 121 Mr. Pines' notices. Signed by Judge Paul L. Friedman on September 14, 2021. (lcaf) (Entered: 09/14/2021) |
| 09/15/2021 | 123 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 09/15/2021) |
| 09/17/2021 | | MINUTE ORDER: In light of the parties' representations concerning settlement discussions in 123 the joint status report, the stay in this case is extended through November 22, 2021. The parties shall file a joint status report on or before November 15, 2021, notifying the Court of the progress of their discussions. Signed by Judge Paul L. Friedman on September 17, 2021. (lcaf) (Entered: 09/17/2021) |
| 10/01/2021 | 124 | RESPONSE re 116 MOTION to Intervene MOTION for Leave to File filed by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 10/01/2021) |
| 10/12/2021 | | MINUTE ORDER: The Court has reviewed the parties' briefs 122 124 in opposition to 116 Mr. Pines's Motion for Intervention, Motion to Modify Class Certification Order, and for Sanctions. On or before October 26, 2021, the parties are directed to file supplemental briefs addressing (1) whether, to the parties' knowledge, Mr. Pines is in fact a member of the class in this case; (2) if so, whether Mr. Pines has opted out of the class, and noting any applicable deadlines for opting out; and (3) setting forth the legal standard for a motion for intervention by a class member. Signed by Judge Paul L. Friedman on October 12, 2021. (lcaa) (Entered: 10/12/2021) |
| 10/21/2021 | 125 | Emergency MOTION for Order to Reactivate PACER Account by MICHAEL T. PINES. "Let this be filed," signed by Judge Paul L. Friedman on 10/21/2021. (znmw) (Entered: 10/25/2021) |
| 10/26/2021 | 126 | SUPPLEMENTAL MEMORANDUM to re Order,, *(Supplemental Brief In Response To Court Order Dated October 12, 2021)* filed by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 10/26/2021) |
| 10/26/2021 | 127 | RESPONSE TO ORDER OF THE COURT re Order,, *REGARDING MICHAEL PINESS MOTION FOR INTERVENTION, TO MODIFY THE CLASS DEFINITION, AND FOR SANCTIONS* filed by NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 10/26/2021) |
| 11/01/2021 | 128 | RESPONSE re 125 MOTION for Order *(Defendant's Response to Michael Pines' Motion to Reactivate Pines' PACER Account)* filed by UNITED STATES OF |

|  |  | AMERICA. (Simon, Jeremy) (Entered: 11/01/2021) |
|---|---|---|
| 11/15/2021 | 129 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 11/15/2021) |
| 11/15/2021 | 131 | PER CURIAM ORDER of USCA (certified copy) filed re: petitioner Michael T. Pines, granting motion for in forma pauperis; dismissing petition for writ of mandamus; dismissing as moot motion to reactivate Pacer account; USCA Case Number 21–5204. (znmw) (Entered: 11/16/2021) |
| 11/16/2021 |  | MINUTE ORDER: In light of the parties' representations concerning settlement discussions in 129 the Joint Status Report, the stay in this case is extended through January 27, 2022. The parties shall file a further joint status report on or before January 20, 2022 notifying the Court of the progress of their settlement efforts. Signed by Judge Paul L. Friedman on November 16, 2021. (lcaa) (Entered: 11/16/2021) |
| 11/16/2021 | 130 | MEMORANDUM OPINION AND ORDER denying 116 Mr. Pines pro se Motion for Intervention and for Leave to File Complaint in Intervention, Motion to Modify Class Certification Order, and for Sanctions; denying as moot Mr. Pines Motion for Pretrial Conference and to Appoint a Special Master; denying as moot 125 Mr. Pines Emergency Motion for Order to Reactivate PACER Account; and granting Mr. Pines Application to Proceed in District Court Without Prepaying Fees or Costs. The Clerk of the Court is directed to file that application on the docket in this case. Signed by Judge Paul L. Friedman on November 16, 2021. (MA) (Entered: 11/16/2021) |
| 11/16/2021 |  | Set/Reset Deadlines: Joint Status Report due by 1/20/2022 (hs) (Entered: 11/16/2021) |
| 12/16/2021 | 132 | NOTICE OF APPEAL as to 130 Memorandum & Opinion by MICHAEL T. PINES. Fee Status: IFP. Parties have been notified. (znmw) Modified fee status on 12/17/2021 (znmw). (Entered: 12/17/2021) |
| 12/17/2021 | 133 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The fee was not paid because it was filed in forma pauperis re 132 Notice of Appeal. (znmw) (Entered: 12/17/2021) |
| 12/27/2021 |  | USCA Case Number 21–5291 for 132 Notice of Appeal filed by MICHAEL T. PINES. (zjf) (Entered: 12/27/2021) |
| 01/20/2022 | 134 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 01/20/2022) |
| 01/21/2022 |  | MINUTE ORDER: In consideration of the joint status report 134 filed on January 20, 22, it is hereby ORDERED that the parties shall file a further joint status report on or before April 1, 2022, and that the stay of proceedings is extended through April 8, 2022. Signed by Judge Paul L. Friedman on January 21, 2022. (MA) (Entered: 01/21/2022) |
| 04/01/2022 | 135 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 04/01/2022) |
| 05/17/2022 | 136 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 05/17/2022) |
| 05/18/2022 |  | MINUTE ORDER: In consideration of the parties' 135 joint status report and 136 joint status report, it is hereby ORDERED that the parties shall file a further joint status report on or before June 30, 2022, and that the stay of proceedings is extended from April 8, 2022 through July 12, 2022. Signed by Judge Paul L. Friedman on May 18, 2022. (lcjr) (Entered: 05/18/2022) |
| 06/29/2022 | 137 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 06/29/2022) |
| 06/30/2022 |  | MINUTE ORDER: In consideration of the parties' 137 joint status report, it is hereby ORDERED that the parties shall file a further joint status report on or before August 12, 2022, and that the stay of proceedings is extended from July 12, 2022, to August 26, 2022. Signed by Judge Paul L. Friedman on June 30, 2022. (ATM) (Entered: |

| | | 06/30/2022) |
|---|---|---|
| 08/12/2022 | 138 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 08/12/2022) |
| 08/12/2022 | | MINUTE ORDER: In consideration of the parties' 138 joint status report, it is hereby ORDERED that the plaintiffs shall file a motion for an order approving settlement notice to the class, pursuant to Fed. R. Civ. P. 23(e)(1), on or before September 26, 2022, and that the stay of proceedings is extended from August 12, 2022 to September 26, 2022. Signed by Judge Paul L. Friedman on August 12, 2022. (lcjr) (Entered: 08/12/2022) |
| 09/22/2022 | 139 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/22/2022) |
| 09/22/2022 | | MINUTE ORDER: In consideration of the parties' 139 joint status report, it is hereby ORDERED that the plaintiffs shall file a motion for an order approving settlement notice to the class, pursuant to Fed. R. Civ. P. 23(e)(1), on or before October 15, 2022, and that the stay of proceedings is extended from September 22, 2022 to October 15, 2022. Signed by Judge Paul L. Friedman on September 22, 2022. (ATM) (Entered: 09/22/2022) |
| 10/11/2022 | 140 | MOTION for Settlement *Preliminary Approval* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Text of Proposed Order Proposed Order)(Gupta, Deepak) (Entered: 10/11/2022) |
| 10/11/2022 | 141 | DECLARATION of *Deepak Gupta* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 140 MOTION for Settlement *Preliminary Approval* filed by ALLIANCE FOR JUSTICE, NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER. (Attachments: # 1 Exhibit Settlement Agreement, # 2 Exhibit Supplemental Settlement Agreement, # 3 Exhibit Proposed Notice Plan, # 4 Exhibit KCC (Administrator) Declaration)(Gupta, Deepak) (Entered: 10/11/2022) |
| 10/28/2022 | 142 | RESPONSE re 140 MOTION for Settlement *Preliminary Approval (Defendant's Response to Motion for Preliminary Approval of Class Settlement)* filed by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 10/28/2022) |
| 11/14/2022 | 143 | MANDATE of USCA as to 132 Notice of Appeal to DC Circuit Court filed by MICHAEL T. PINES ; USCA Case Number 21–5291. (Attachment: # 1 USCA Order September 28, 2022)(zjm) (Entered: 11/15/2022) |
| 11/28/2022 | | MINUTE ORDER: The parties shall appear for a status conference on December 6, 2022 at 9:00 a.m. via Zoom videoconference, the details of which will be provided the morning of or in advance of the hearing. Signed by Judge Paul L. Friedman on November 28, 2022. (lceh) (Entered: 11/28/2022) |
| 11/29/2022 | | Set/Reset Hearings: Status Conference set for 12/6/2022 at 9:00 AM before Judge Paul L. Friedman via zoom video. (tj) (Entered: 11/29/2022) |
| 12/06/2022 | | Minute Entry for proceedings held Via Videoconference (ZOOM) before Judge Paul L. Friedman: Status Conference held on 12/6/2022.Parties Updated The Court In Regards To The Current Posture Of This Matter. Parties Will Confer And Contact The Court's Chambers In Regards To the Next Status Conference Date. (Court Reporter TAMMY NESTOR.) (mac) (Entered: 12/06/2022) |
| 12/07/2022 | | MINUTE ORDER: The parties shall appear for a status conference on January 12, 2023 at 10:00 a.m. via Zoom videoconference, the details of which will be provided the morning of or in advance of the hearing. Signed by Judge Paul L. Friedman on December 7, 2022. (lceh) (Entered: 12/07/2022) |
| 12/12/2022 | | Set/Reset Hearings: Status Conference set for 1/12/2023 at 10:00 AM before Judge Paul L. Friedman via zoom video. (tj) (Entered: 12/12/2022) |

| 01/11/2023 | 144 | STIPULATION *(Stipulated Supplement to Protective Order)* by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 01/11/2023) |
|---|---|---|
| 01/11/2023 | | MINUTE ORDER: The status conference scheduled for January 12, 2023 at 10:00 a.m. is hereby VACATED. The Court will reschedule the status conference for a later date. Signed by Judge Paul L. Friedman on January 11, 2023. (lceh) (Entered: 01/11/2023) |
| 01/13/2023 | 145 | TRANSCRIPT OF PROCEEDINGS before Judge Paul L. Friedman held on 12/6/22; Page Numbers: 1–10. Court Reporter/Transcriber Tammy Nestor, Telephone number 2023543127, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript m ay be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/3/2023. Redacted Transcript Deadline set for 2/13/2023. Release of Transcript Restriction set for 4/13/2023.(Nestor, Tammy) (Entered: 01/13/2023) |
| 01/17/2023 | | MINUTE ORDER: The parties shall appear for a status conference on February 22, 2023 at 11:00 a.m. via Zoom videoconference, the details of which will be provided the morning of or in advance of the hearing. Signed by Judge Paul L. Friedman on January 17, 2023. (lceh) (Entered: 01/17/2023) |
| 02/02/2023 | 146 | ORDER approving 144 Stipulated Supplement to 41 Protective Order. Signed by Judge Paul L. Friedman on February 2, 2023. (lceh) (Entered: 02/02/2023) |
| 02/22/2023 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Status Conference held on 2/22/2023. Parties inform the court of the status of this action with regard to settlement. Next Status Conference is set for 4/5/2023 at 10:00 AM in before Judge Paul L. Friedman via zoom video. (Court Reporter: Sara Wick) (tj) (Entered: 02/22/2023) |
| 03/29/2023 | 147 | NOTICE OF SUBSTITUTION OF COUNSEL by Derek S. Hammond on behalf of All Defendants Substituting for attorney Jeremy S. Simon and Robert A. Caplen (Hammond, Derek) (Entered: 03/29/2023) |
| 04/05/2023 | | Minute Entry for Zoom Status Conference proceeding held on 4/5/23 before Judge Paul L. Friedman. The parties updated the Court on the status of the case. A revised Motion for Settlement Preliminary Approval due within a week. Court Reporter: Stacy Heavenridge (zgf) (Entered: 04/05/2023) |
| 04/12/2023 | 148 | Amended MOTION for Settlement *Preliminary Approval* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 04/12/2023) |
| 04/12/2023 | 149 | DECLARATION of *Deepak Gupta* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 148 Amended MOTION for Settlement *Preliminary Approval* filed by ALLIANCE FOR JUSTICE, NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER. (Attachments: # 1 Exhibit Settlement Agreement, # 2 Exhibit First Amendment to Settlement Agreement, # 3 Exhibit Second Amendment to Settlement Agreement, # 4 Exhibit Revised Notice Plan & Exhibits 1–6, # 5 Exhibit KCC Supplemental Declaration)(Gupta, Deepak) (Entered: 04/12/2023) |

| | | |
|---|---|---|
| 04/26/2023 | 150 | RESPONSE re 148 Amended MOTION for Settlement *Preliminary Approval* filed by UNITED STATES OF AMERICA. (Hammond, Derek) (Entered: 04/26/2023) |
| 04/27/2023 | 151 | REPLY to opposition to motion re 148 Amended MOTION for Settlement *Preliminary Approval Reply in Further Support of Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement [ECF No. 148]* filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Proposed Order)(Narwold, William) (Entered: 04/27/2023) |
| 05/08/2023 | 152 | NOTICE *of Submission of Revised Proposed Order and Revised Notice Documents* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 148 Motion for Settlement (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Revised Proposed Order)(Narwold, William) (Entered: 05/08/2023) |
| 05/08/2023 | 153 | ORDER granting plaintiffs' 148 Revised Motion for Preliminary Approval of Class Settlement. The Court shall convene a Settlement Hearing on October 12, 2023, at 10:00 a.m. in the Ceremonial Courtroom (Courtroom 20) at the United States District Court for the District of Columbia, 333 Constitution Avenue, NW, Washington, D.C. 20001. See Order for details. Signed by Judge Paul L. Friedman on May 8, 2023. (ATM) (Entered: 05/08/2023) |
| 05/10/2023 | | Set/Reset Hearings: Settlement Conference set for 10/12/2023 at 10:00 AM in Ceremonial Courtroom before Judge Paul L. Friedman. (tj) (Entered: 05/10/2023) |
| 06/07/2023 | 154 | MOTION to Amend/Correct *the Opt−Out Deadline* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Proposed Order)(Narwold, William) (Entered: 06/07/2023) |
| 06/07/2023 | 155 | ORDER granting 154 Motion to Amend the Opt−Out Deadline. See Order for details. Signed by Judge Paul L. Friedman on June 7, 2023. (lceh) (Entered: 06/07/2023) |
| 06/28/2023 | | Set/Reset Deadlines: Opt−Out deadline 8/20/2023. (tj) (Entered: 06/28/2023) |
| 07/03/2023 | 156 | NOTICE OF SUBSTITUTION OF COUNSEL by Brenda A. Gonzalez Horowitz on behalf of UNITED STATES OF AMERICA Substituting for attorney Derek S. Hammond (Gonzalez Horowitz, Brenda) (Entered: 07/03/2023) |
| 08/08/2023 | 157 | NOTICE of Appearance by John Troy on behalf of TROY LAW, PLLC (Troy, John) (Entered: 08/08/2023) |
| 08/28/2023 | 158 | MOTION for Settlement *Final Approval*, MOTION for Attorney Fees *, Costs, and Expenses* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Declaration of NVLSP, # 2 Declaration of NCLC, # 3 Declaration of AFJ, # 4 Declaration of Brian Fitzpatrick, # 5 Declaration of Deepak Gupta, # 6 Declaration of Meghan Oliver, # 7 Declaration of Gio Santiago, # 8 Text of Proposed Order)(Gupta, Deepak) (Entered: 08/28/2023) |
| 09/12/2023 | 159 | RESPONSE re 158 MOTION for Settlement *Final Approval* MOTION for Attorney Fees *, Costs, and Expenses* filed by UNITED STATES OF AMERICA. (Gonzalez Horowitz, Brenda) (Entered: 09/12/2023) |
| 09/21/2023 | | MINUTE ORDER: In light of the 153 Order granting plaintiffs' 148 Revised Motion for Preliminary Approval of Class Settlement, plaintiffs' original 140 Motion for Preliminary Approval of Class Settlement is hereby DENIED AS MOOT. Signed by Judge Paul L. Friedman on September 21, 2023. (lceh) (Entered: 09/21/2023) |
| 10/03/2023 | 160 | REPLY to opposition to motion re 158 MOTION for Settlement *Final Approval* MOTION for Attorney Fees *, Costs, and Expenses* filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Declaration of Brian Fitzpatrick, # 2 Declaration of William Rubenstein, # 3 Declaration of Deepak Gupta, # 4 Declaration of Meghan Oliver, # 5 Declaration of Gio Santiago)(Gupta, Deepak) (Entered: 10/03/2023) |

| | | |
|---|---|---|
| 10/04/2023 | 161 | ORDER changing Settlement Hearing location. The Settlement Hearing will be held on October 12, 2023, at 10:00 a.m. (Eastern Daylight Time) in Courtroom 29 in the William B. Bryant Annex to the United States District Court for the District of Columbia, 333 Constitution Avenue N.W., Washington, D.C. 20001. See Order for details. Signed by Judge Paul L. Friedman on October 4, 2023. (lcak) (Entered: 10/04/2023) |
| 10/04/2023 | 162 | ORDER setting Settlement Hearing procedures. See Order for details. Signed by Judge Paul L. Friedman on October 4, 2023. (lcak) (Entered: 10/04/2023) |
| 10/06/2023 | 163 | OBJECTION re 162 Order, Memorandum & Opinion filed by DON KOZICH. (Attachments: # 1 Exhibits, # 2 Certificate of Service)(zjm) (Entered: 10/11/2023) |
| 10/06/2023 | 164 | MOTION for Leave to Appear by Telephone or Zoom by DON KOZICH. (See Docket Entry 163 to view document) (zjm) (Entered: 10/11/2023) |
| 10/11/2023 | 165 | RESPONSE re 163 OBJECTION *Final Approval* MOTION for Attorney Fees *, Costs, and Expenses* filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) Modified on 10/12/2023 to correct event/ docket link (zjm). (Entered: 10/11/2023) |
| 10/11/2023 | | Set/Reset Hearings: Settlement Hearing set for 10/12/2023 at 10:00 AM in Courtroom 29A– In Person (Audio Line Available) before Judge Paul L. Friedman. (tj) (Entered: 10/11/2023) |
| 10/11/2023 | | MINUTE ORDER granting Don Kozich's 164 Motion to Appear Telephonically or by Zoom. Zoom details will be sent in advance of the Settlement Hearing. Signed by Judge Paul L. Friedman on October 11, 2023. (lcak) (Entered: 10/11/2023) |
| 10/11/2023 | 166 | NOTICE *of Filing of Objections* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit Greenspan Objection, # 2 Exhibit Jiggetts Objection, # 3 Exhibit Miller Objection, # 4 Exhibit Kozich Objection, # 5 Exhibit Isaacson Objection, # 6 Exhibit Isaacson Written Statement)(Gupta, Deepak) (Entered: 10/11/2023) |
| 10/12/2023 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Settlement Hearing held on 10/12/2023. The court takes all filings and oral argument under consideration. (Court Reporter: Elizabeth Saint Loth.) (tj) (Entered: 10/12/2023) |
| 10/13/2023 | 167 | NOTICE of Appearance by Meghan S.B. Oliver on behalf of ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Oliver, Meghan) (Entered: 10/13/2023) |
| 10/13/2023 | 168 | NOTICE *Notice of Submission of Payment Notification Forms* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 – Account Holder Notification Form, # 2 Exhibit 2 –Payer Notification Form, # 3 Exhibit 3 – USO Payment Notification – Email Template, # 4 Exhibit 4 – Dispute Form)(Narwold, William) (Entered: 10/13/2023) |
| 03/20/2024 | 169 | OPINION granting Plaintiffs' 158 Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards. See Opinion for details. Signed by Judge Paul L. Friedman on March 20, 2024. (ATM) (Entered: 03/20/2024) |
| 03/20/2024 | 170 | FINAL JUDGMENT AND ORDER granting 158 Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards. See Final Judgment and Order for details. Signed by Judge Paul L. Friedman on March 20, 2024. (ATM) (Entered: 03/20/2024) |
| 04/18/2024 | 171 | ENTERED IN ERROR.....NOTICE OF APPEAL TO DC CIRCUIT COURT as to 170 Memorandum & Opinion,, Order, 169 Memorandum & Opinion by ERIC ALAN ISAACSON. Filing fee $ 605, receipt number 207171. Fee Status: Fee Paid. Parties have been notified. (zjm) Modified on 4/24/2024 (zjm). (Entered: 04/24/2024) |
| 04/24/2024 | 172 | ENTERED IN ERROR.....Transmission of the Notice of Appeal, Order Appealed ( Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 171 Notice of Appeal to DC Circuit Court. (zjm) Modified on 4/24/2024 (zjm). |

| | | |
|---|---|---|
| | | (Entered: 04/24/2024) |
| 04/24/2024 | <u>173</u> | NOTICE OF APPEAL to the Federal Circuit as to <u>170</u> Order, <u>169</u> Opinion by ERIC ALAN ISAACSON. Filing fee $ 605, receipt number 207171. Fee Status: Fee Paid. Parties have been notified. (zjm) (Entered: 04/24/2024) |
| 04/24/2024 | <u>174</u> | Transmission of the Notice of Appeal, Order Appealed ( Opinion), and Docket Sheet to Federal Circuit. The appeal fee was paid re <u>173</u> Notice of Appeal to the Federal Circuit. (zjm) (Entered: 04/24/2024) |
| 04/30/2024 | | USCA Case Number 24–1757 for <u>173</u> Notice of Appeal to the Federal Circuit filed by ERIC ALAN ISAACSON. (znmw) (Entered: 04/30/2024) |
| 05/15/2024 | <u>175</u> | TRANSCRIPT OF PROCEEDINGS, before Judge Paul L. Friedman, held on 10–12–2023; Page Numbers: 1 – 112. Date of Issuance: 5–15–2024. Court Reporter: Elizabeth SaintLoth, Telephone number: 202–354–3242. Transcripts may be ordered by submitting the <u>Transcript Order Form</u>

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/15/2024. Release of Transcript Restriction set for 8/13/2024.(Saint–Loth, Elizabeth) (Entered: 05/15/2024) |
| 05/24/2024 | <u>176</u> | TRANSCRIPT OF STATUS CONFERENCE before Judge Paul L. Friedman held on 02/22/2023. Page Numbers: 1–13. Date of Issuance: 05/24/2024. Court Reporter: Sara Wick, telephone number 202–354–3284. Transcripts may be ordered by submitting the <u>Transcript Order Form</u>

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/14/2024. Redacted Transcript Deadline set for 6/24/2024. Release of Transcript Restriction set for 8/22/2024.(Wick, Sara) (Entered: 05/24/2024) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM,<br>　1600 K Street, NW<br>　Washington, DC 20006<br><br>NATIONAL CONSUMER LAW CENTER,<br>　1001 Connecticut Avenue, NW<br>　Washington, DC 20036<br><br>ALLIANCE FOR JUSTICE,<br>　11 Dupont Circle, NW<br>　Washington, DC 20036,<br><br>for themselves and all others similarly situated,<br>　　　　　*Plaintiffs*,<br><br>　　　v.<br><br>UNITED STATES OF AMERICA,<br>　950 Pennsylvania Avenue, NW<br>　Washington, DC 20530,<br>　　　　　*Defendant*. | Case No. _____<br><br><br><br>CLASS ACTION COMPLAINT |

## INTRODUCTION

The Administrative Office of the U.S. Courts (AO) requires people to pay a fee to access records through its Public Access to Court Electronic Records system, commonly known as PACER. This action challenges the legality of those fees for one reason: the fees far exceed the cost of providing the records. In 2002, Congress recognized that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information," and sought to ensure that records would instead be "freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). To that end, the E-Government Act of 2002 authorizes PACER fees "as a charge for services rendered," but "only to the extent necessary" "to reimburse expenses in providing these services." 28 U.S.C. § 1913 note.

Despite this express statutory limitation, PACER fees have twice been increased since the Act's passage. This prompted the Act's sponsor to reproach the AO for continuing to charge fees "well higher than the cost of dissemination"—"against the requirement of the E-Government Act"—rather than doing what the Act demands: "create a payment system that is used only to recover the direct cost of distributing documents via PACER." Instead of complying with the law, the AO has used excess PACER fees to cover the costs of unrelated projects—ranging from audio systems to flat screens for jurors—at the expense of public access.

This noncompliance with the E-Government Act has inhibited public understanding of the courts and thwarted equal access to justice. And the AO has further compounded those harms by discouraging fee waivers, even for *pro se* litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who cannot afford to pay the fees.

The plaintiffs are three national nonprofit organizations that have downloaded public court records from PACER—downloads for which they agreed to incur fees, and were in fact charged fees, in excess of the cost of providing the records. Each download thus gave rise to a separate claim for illegal exaction in violation of the E-Government Act. On behalf of themselves and a nationwide class of those similarly situated, they ask this Court to determine that the PACER fee schedule violates the E-Government Act and to award them a full recovery of past overcharges.[1]

---

[1] This case is the first effort to challenge the PACER fee schedule by parties represented by counsel. A now-dismissed *pro se* action, *Greenspan v. Administrative Office*, No. 14-cv-2396 (N.D. Cal.), did seek to challenge the fees (among a slew of other claims), but it was dismissed on jurisdictional grounds inapplicable here. Last year, two other cases were filed alleging that PACER, in violation of its own terms and conditions, overcharges its users due to a systemic billing error concerning the display of some HTML docket sheets—an issue not raised in this case. *Fisher v. Duff*, 15-5944 (W.D. Wash.), and *Fisher v. United States*, 15-1575C (Ct. Fed. Cl.). Neither case challenges the PACER fee schedule itself, as this case does.

## PARTIES

1.      Plaintiff National Veterans Legal Services Program (NVLSP) is a nonprofit organization founded in 1980 and based in Washington, D.C. It seeks to ensure that American veterans and active-duty personnel receive the full benefits to which they are entitled for disabilities resulting from their military service. Over the years, the organization has represented thousands of veterans in individual court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs. As a result, NVLSP has paid fees to the PACER Service Center to obtain public court records within the past six years.

2.      Plaintiff National Consumer Law Center (NCLC) is a national nonprofit organization that seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans. From its offices in Washington, D.C. and Boston, NCLC pursues these goals through policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates throughout the nation, and does so on a wide range of issues, including consumer protection, unfair and deceptive acts and practices, privacy rights, civil rights, and employment. Among other things, NCLC prepares and publishes 20 different treatise volumes on various consumer-law topics. In the course of its research, litigation, and other activities, NCLC has paid fees to the PACER Service Center to obtain public court records within the past six years.

3.      Plaintiff Alliance for Justice (AFJ) is a nonprofit corporation with its headquarters in Washington, D.C. and offices in Los Angeles, Oakland, and Dallas. It is a national association of over 100 public-interest organizations that focus on a broad array of issues—including civil rights, human rights, women's rights, children's rights, consumer rights, and ensuring legal representation for all Americans. Its members include AARP, the Center for Digital Democracy,

Consumers Union, the National Center on Poverty Law, and the National Legal Aid & Defender Association. On behalf of these groups and the public-interest community, AFJ works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans. AFJ has paid fees to the PACER Service Center to obtain public court records within the past six years.

4. Defendant United States of America, through the AO and its PACER Service Center, administers PACER and charges fees for access to public court records.

<div align="center">

**JURISDICTION AND VENUE**

</div>

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a). Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000.

6. The Court has personal jurisdiction over all parties to this lawsuit, and venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1402(a).

<div align="center">

**FACTUAL ALLEGATIONS**

***How PACER works: A brief overview***

</div>

7. PACER is a decentralized system of electronic judicial-records databases. It is managed by the AO, and each federal court maintains its own database. Any person may access records through PACER by registering for an online account and searching the applicable court database. Before accessing a particular record, however, each person must first agree to pay a specific fee, shown on the computer screen, which says: "To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser." The current fee is $.10 per page (with a maximum of $3.00 per record) and $2.40 per audio file. There is no charge for judicial opinions. Only if the person affirmatively agrees to pay the fee will a PDF of the record appear for downloading and printing. Unless that person obtains a fee waiver or

incurs less than $15 in PACER charges in a given quarter, he or she will have a contractual obligation to pay the fees.

**How we got here: Congress authorizes fees "to reimburse" PACER expenses.**

8.      This system stretches back to the early 1990s, when Congress began requiring the federal judiciary to charge "reasonable fees . . . for access to information available through automatic data processing equipment," including records available through what is now known as PACER. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the amount of the fees to the cost of providing access to the records: "All fees hereafter collected by the Judiciary . . . *as a charge for services rendered* shall be deposited as offsetting collections . . . *to reimburse expenses incurred in providing these services*." *Id.* (emphasis added). When the system moved from a dial-in phone service to an Internet portal in 1998, the AO set the PACER fees at $.07 per page (introducing in 2002 a maximum of $2.10 per request), without explaining how it arrived at these figures. *See* Chronology of the Federal Judiciary's Electronic Public Access (EPA) Program, http://1.usa.gov/1lrrM78.

9.      It soon became clear that these amounts were far more than necessary to recover the cost of providing access to electronic records. But rather than reduce the fees to cover only the costs incurred, the AO instead decided to use the extra revenue to subsidize other information-technology-related projects—a mission creep that only grew worse over time.

**The AO begins using excess PACER fees to fund ECF.**

10.      The expansion began in 1997, when the judiciary started planning for a new e-filing system called ECF. The AO produced an internal report discussing how the system would be funded. It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." Admin. Office of the U.S. Courts, *Electronic Case Files in the*

*Federal Courts: A Preliminary Examination of Goals, Issues and the Road Ahead* (discussion draft), at 34 (Mar. 1997). Yet, just two pages later, the AO contemplated that the ECF system could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* at 36. The AO believed that these fees could lawfully be used not only to reimburse the cost of providing access to records through PACER, but also for technology-related purposes more broadly, including "electronic filings, electronic documents, use of the Internet, etc." *Id.* The AO did not offer any statutory authority to support this view.

### *Congress responds by passing the E-Government Act of 2002.*

11.     After the AO began charging PACER fees that exceeded the cost of providing access to records, Congress did not respond by relaxing the statutory requirement that the fees be limited to those costs. To the contrary, when Congress revisited the subject of PACER fees a few years later, it amended the statute to *strengthen* this requirement.

12.     Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information*

*available through automatic data processing equipment.* These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

**(b)** The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services.*

28 U.S.C. § 1913 note (emphasis added).

### *Even after the E-Government Act, the AO increases PACER fees.*

13.     Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Memorandum from Leonidas Ralph Mecham, Director of the Admin. Office, to Chief Judges and Clerks (Oct. 21, 2004). To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund—the account into which PACER fees and other funds (including appropriations) are deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. As before, the AO cited no statutory authority for this increase.

### *The AO finds new ways to spend extra PACER fees as they continue to grow.*

14.     Even expanding the conception of costs to cover ECF did not bring the PACER balance sheet to zero. Far from it: By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. Admin. Office, *Judiciary Information Technology Annual Report for Fiscal Year 2006*, at 8, http://bit.ly/1V5B9p2. But once again, the AO declined to reduce or eliminate PACER fees,

7

and instead chose to seek out new ways to spend the excess, using it to fund "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance." Quoted in Letter from Sen. Lieberman, Chair, Sen. Comm. on Homeland Security and Governmental Affairs, to Sens. Durban and Collins, Sen. Comm. on Appropriations (Mar. 25, 2010).

15.     Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She explained that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260, 110th Cong. 51 (2008). Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements in the courts' Salaries and Expenses account, thereby reducing our need for appropriated funds." *Id.*

### The E-Government Act's sponsor says that the AO is violating the law.

16.     In early 2009, Senator Joe Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the statute. He noted that the Act's "goal" was "to increase free public access to [judicial] records," yet "PACER [is] charging a higher rate" than it did when the law was passed. Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." He asked the Judicial Conference to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." Letter from Sen. Lieberman to Hon. Lee Rosenthal, Chair, Committee on Rules of Practice and Procedure, Judicial Conf. of the U.S. (Feb. 27, 2009).

17.     The Judicial Conference replied with a letter adhering to the AO's view that it is authorized to use PACER fees to recoup non-PACER-related costs. The letter did not identify any statutory language supporting this view, and acknowledged that the E-Government Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" Letter from Hon. Lee Rosenthal and James C. Duff, Judicial Conf. of the U.S., to Sen. Lieberman, Chair, Sen. Comm. on Homeland Security and Governmental Affairs (Mar. 26, 2009). The letter did not cite any statute that says otherwise. Yet it claimed that Congress, since 1991, has "expand[ed] the permissible use of the fee revenue to pay for other services"—even though Congress has actually done the opposite, enacting the E-Government Act in 2002 specifically to limit any fees to those "necessary" to "reimburse expenses incurred" in providing the records. 28 U.S.C. § 1913 note. The sole support the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said only that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." *Id.* The letter did not provide any support (even from a committee report) for using the fees to recover non-PACER-related expenses beyond ECF.

18.     Later, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." And it has done so for only one reason: so that the AO can fund "initiatives that are unrelated to providing public access via PACER." He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to recover the direct cost of distributing documents via PACER"—not other technology-related projects that "should be funded through direct appropriations." Letter from

9

Sen. Lieberman, Chair, Sen. Comm. on Homeland Security and Governmental Affairs, to Sens. Durban and Collins, Sen. Comm. on Appropriations (Mar. 25, 2010).

### *The AO again increases PACER fees.*

19.     Undeterred by Senator Lieberman's concerns, the AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the Case Management/Electronic Case Files system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." Admin. Office, *Electronic Public Access Program Summary* 1 (2012), http://1.usa.gov/1Ryavr0. But the AO believed that the fees comply with the E-Government Act because they "are only used for public access, and are not subject to being redirected for other purposes." *Id.* at 10. It did not elaborate.

20.     In a subsequent congressional budget summary, however, the judiciary reported that (of the money generated from "Electronic Public Access Receipts") it spent just $12.1 million on "public access services" in 2012, while spending more than $28.9 million on courtroom technology. *The Judiciary: Fiscal Year 2014 Congressional Budget Summary*, App. 2.4.

### *The AO continues to charge more in fees than the cost of PACER.*

21.     Since the 2012 fee increase, the AO has continued to collect large amounts in PACER fees and to use these fees to fund activities beyond providing access to records. In 2014, for example, the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems. Admin. Office of the U.S. Courts, *The Judiciary Fiscal Year 2016 Congressional Budget Summary* 12.2 (Feb. 2015). When questioned during a House appropriations hearing that same year, representatives from the judiciary acknowledged that "the Judiciary's Electronic

Public Access Program encompasses more than just offering real-time access to electronic records." *Financial Services and General Government Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 113th Cong. 152 (2014).

22.     Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. For example, Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitors. . . . [There have also been] audio enhancements. . . . We spent a lot of money on audio so the people could hear what's going on. . . . This all ties together and it's funded through these [PACER] fees." Hon. William Smith, Panel Discussion on Public Electronic Access to Federal Court Records at the William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), bit.ly/1PmR0LJ.

***The AO's policy of limiting fee waivers and targeting those who cannot pay the fees***

23.     The judiciary's decision to increase PACER fees to fund these (otherwise unobjectionable) expenses has created substantial barriers to accessing public records—for litigants, journalists, researchers, and others. The AO has compounded these barriers through a policy of discouraging fee waivers, even for journalists, *pro se* litigants, and nonprofits; by prohibiting the transfer of information, even for free, by those who manage to obtain waivers; and by hiring private collection lawyers to sue individuals who cannot pay the fees.

24.     Two examples help illustrate the point: In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Public Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-

checking software and hardware to help federal judges identify situations requiring their recusal,'" and "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes accompanying the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media" or anyone not in one of the specific groups listed. *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

25.     The other example is from five years earlier, when private collection lawyers representing the PACER Service Center brought suit in the name of the United States against "a single mother of two minor children" who had "no assets whatsoever," claiming that she owed $30,330.80 in PACER fees. *See* Compl. in *United States v. Deanna Manning*, No. 07-cv-04595, filed July 3, 2007 (C.D. Cal.); Answer, Dkt. 12, filed Oct. 16, 2007. Representing herself, the woman "admit[ted] to downloading and printing a small amount [of] material from PACER, no more than $80 worth," which "would be 1,000 pages, actually much more than she remembers printing." Answer, Dkt. 12, at 1. But she explained that "[t]here is no way she would have had enough paper and ink to print 380,000 pages as the Complaint alleges," so "[t]his must be a huge mistake." *Id.* She concluded: "Our great and just government would have better luck squeezing blood from a lemon than trying to get even a single dollar from this defendant who can barely scrape up enough money to feed and clothe her children." *Id.* at 2. Only then did the government dismiss the complaint.

### Class Action Allegations

26.     The plaintiffs bring this class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

27.     The plaintiffs seek certification of the following class:

> *All individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government.*

28.     The class is so numerous that joinder of all members is impractical. While the exact number and identity of class members is unknown to the plaintiffs at this time and can only be ascertained through appropriate discovery, the plaintiffs believe that the number of class members is approximately 2,000,000. The precise number and identification of the class members will be ascertainable from the defendant's records.

29.     There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

(i)     Are the fees imposed for PACER access excessive in relation to the cost of providing the access—that is, are the fees higher than "necessary" to "reimburse expenses incurred in providing the[] services" for which they are "charge[d]"? 28 U.S.C. § 1913 note.

(ii)    What is the measure of damages for the excessive fees charged?

30.     The plaintiffs' claims are typical of the claims of the class because they, like the class members, paid the uniform fees required by the defendant in order to access PACER.

31.     The plaintiffs will fairly and adequately protect the interests of the class because each of them has paid PACER fees during the class period, their interests do not conflict with the interests of the class, and they have obtained counsel experienced in litigating class actions and matters involving similar or the same questions of law.

32.     The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the plaintiffs' claims. Joinder of all members is impracticable. Furthermore, because the injury suffered by the individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIM FOR RELIEF: ILLEGAL EXACTION

33.    The plaintiffs bring this case under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–74 (Fed. Cir. 1996) (allowing an illegal-exaction claim for excess user fees). Courts have long recognized such an "illegal exaction" claim—a claim that money was "improperly paid, exacted, or taken from the claimant" in violation of a statute, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)—regardless of whether the statute itself creates an express cause of action. As one court has explained, "the lack of express money-mandating language in the statute does not defeat [an] illegal exaction claim" because "otherwise, the Government could assess any fee or payment it wants from a plaintiff acting under the color of a statute that does not expressly require compensation to the plaintiff for wrongful or illegal action by the Government, and the plaintiff would have no recourse." *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015).

34.    Here, each download of a public record for which the plaintiffs agreed to incur a fee, and were in fact charged a fee, gives rise to a separate illegal-exaction claim. The fees charged by the defendant for the use of PACER exceeded the amount that could be lawfully charged, under the E-Government Act of 2002 and other applicable statutory authority, because they did not reasonably reflect the cost to the government of the specific service for which they are charged. The plaintiffs are entitled to the return or refund of the excessive PACER fees illegally exacted or otherwise unlawfully charged.

## PRAYER FOR RELIEF

The plaintiffs request that the Court:

a.   Certify this action as a class action under Federal Rule of Civil Procedure 23(b)(3);

b.  Declare that the fees charged for access to records through PACER are excessive;

c.  Award monetary relief for any PACER fees collected by the defendant in the past six

years that are found to exceed the amount authorized by law;

d.  Award the plaintiffs their costs, expenses, and attorney fees under 28 U.S.C. § 2412

and/or from a common fund; and

e.  Award all other appropriate relief.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

MICHAEL T. KIRKPATRICK (D.C. Bar No. 486293)
**INSTITUTE FOR PUBLIC REPRESENTATION**
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
*michael.kirkpatrick@law.georgetown.edu*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
*bnarwold@motleyrice.com*

April 21, 2016                                    *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,

*Plaintiffs*,

v.

UNITED STATES OF AMERICA,
*Defendant*.

Case No. 16-745-ESH

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This case challenges the legality of fees charged to access records through the Public Access to Court Electronic Records system, commonly known as PACER. The theory of liability is that these fees—set at the same rate across the judiciary—far exceed the cost of providing the records, and thus violate the E-Government Act, which authorizes fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note. As the Act's sponsor put it: PACER fees are now "well higher than the cost of dissemination" and hence "against the requirement of the E-Government Act," which allows fees "only to recover the direct cost of distributing documents via PACER"—not unrelated projects that "should be funded through direct appropriations." Taylor Decl., Ex. B.

Because this theory of liability applies equally to everyone who has paid a PACER fee within the six-year limitations period, the plaintiffs move to certify the case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class: "All individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government."

## BACKGROUND

PACER is a system that provides online access to federal judicial records and is managed by the Administrative Office of the U.S. Courts (or AO). The AO has designed the system so that, before accessing a particular record, a person must first agree to pay a specific fee, shown on the computer screen, which says: "To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser." Here is an example of what the person sees on the screen:



The current PACER fee is set at $.10 per page (with a maximum of $3.00 per record) and $2.40 per audio file. Only if the person affirmatively agrees to pay the fee will a PDF of the record appear. Unless that person obtains a fee waiver or incurs less than $15 in PACER charges in a given quarter, he or she will incur an obligation to pay the fees.

Each of the named plaintiffs here—the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice—has repeatedly incurred fees to access court records through the PACER system.

***Congress authorizes fees "to reimburse" PACER expenses.*** This system stretches back to the early 1990s, when Congress began requiring the judiciary to charge "reasonable fees" for access to records. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the fees to the cost of providing the records: "All fees hereafter collected by the Judiciary . . . *as a charge for services rendered*

shall be deposited as offsetting collections . . . *to reimburse expenses incurred in providing these services*." *Id.* (emphasis added). The AO set the fees at $.07 per page in 1998. *See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program, http://1.usa.gov/1lrrM78.

It soon became clear that this amount was far more than necessary to recover the cost of providing access to records. But rather than reduce the rate to cover only the costs incurred, the AO instead used the extra revenue to subsidize other information-technology-related projects.

**The AO begins using excess PACER fees to fund ECF.** The expansion began in 1997, when the judiciary started planning for a new e-filing system called ECF. The AO produced an internal report discussing how the system would be funded. It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." AO, *Electronic Case Files in the Federal Courts: A Preliminary Examination of Goals, Issues and the Road Ahead* (discussion draft), at 34 (Mar. 1997), http://bit.ly/1Y3zrX0. Yet, just two pages later, the AO contemplated that ECF could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* at 36. The AO did not offer any statutory authority to support this view.

**Congress responds by passing the E-Government Act of 2002.** When Congress revisited the subject of PACER fees a few years later, it did not relax the requirement that the fees be limited to the cost of providing access to records. To the contrary, it amended the statute to *strengthen* this requirement. Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this

3

information is freely available to the greatest extent possible." S. Rep. No. 107–174, 107th Cong., 2d Sess. 23 (2002).

The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.
>
> **(b)** The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services*.

28 U.S.C. § 1913 note (emphasis added).

***Even after the E-Government Act, the AO increases PACER fees.*** Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Memorandum from AO Director Leonidas Ralph Mecham to Chief Judges and Clerks (Oct. 21, 2004). To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund—the account into which PACER fees and other funds (including appropriations) are

4

deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. *Id.* As before, the AO cited no statutory authority for this increase.

**The AO finds new ways to spend extra PACER fees as they keep growing.** By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. AO, *Judiciary Information Technology Annual Report for Fiscal Year 2006*, at 8, http://bit.ly/1V5B9p2. But once again, the AO declined to reduce or eliminate PACER fees. It instead sought out new ways to spend the excess, using it to cover "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance"—services that relate to those provided by PACER only in the sense that they too concern technology and the courts. Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She admitted that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260, 110th Cong. 51 (2008). Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements . . . , thereby reducing our need for appropriated funds." *Id.*

**The E-Government Act's sponsor says that the AO is violating the law.** In early 2009, Senator Joe Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the law. Taylor Decl., Ex. B (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)). He noted that the Act's "goal" was "to increase free public access to [judicial] records," yet "PACER [is] charging a higher rate" than it did when the law was passed.

*Id.* Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* Invoking the key statutory text, he asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

The Judicial Conference replied with a letter defending the AO's position that it may use PACER fees to recoup non-PACER-related costs. The letter acknowledged that the Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" Letter from Hon. Lee Rosenthal and James C. Duff to Sen. Lieberman (Mar. 26, 2009). Yet the letter claimed that Congress has "expand[ed] the permissible use of the fee revenue to pay for other services," *id.*—even though it actually did the opposite, enacting the E-Government Act specifically to limit any fees to those "necessary" to "reimburse expenses incurred" in providing the records. 28 U.S.C. § 1913 note. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Letter from Rosenthal and Duff to Sen. Lieberman. The letter did not provide any support (even from a committee report) for using fees to recover non-PACER-related expenses beyond ECF.

Later, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins). "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." *Id.* It has done so because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to

recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

**The AO again increases PACER fees.** The AO responded by raising PACER fees once again, to \$.10 per page beginning in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." AO, *Electronic Public Access Program Summary* 1 (2012), http://1.usa.gov/1Ryavr0. But the AO believed that the fees comply with the E-Government Act because they "are only used for public access." *Id.* at 10. It did not elaborate.

Subsequent congressional budget summaries, however, indicate that the PACER revenue at that time was more than enough to cover the costs of providing the service. The judiciary reported that in 2012, of the money generated from "Electronic Public Access Receipts," it spent just \$12.1 million on "public access services," while spending more than \$28.9 million on courtroom technology. *The Judiciary: Fiscal Year 2014 Congressional Budget Summary*, App. 2.4.

**The AO continues to charge fees that exceed the cost of PACER.** Since the 2012 fee increase, the AO has continued to collect large amounts in PACER fees and to use these fees to fund activities beyond providing access to records. In 2014, for example, the judiciary collected more than \$145 million in fees, much of which was earmarked for other purposes, like courtroom technology, websites for jurors, and bankruptcy-notification systems. AO, *The Judiciary Fiscal Year 2016 Congressional Budget Summary* 12.2, App. 2.4 (Feb. 2015).

The chart on the following page—based entirely on data from the published version of the judiciary's annual budget, *see* Taylor Decl. ¶ 3—illustrates the rapid growth in PACER revenue over the past two decades, a period when "technological innovations," including

exponentially cheaper data storage, "should have led to reduced costs." Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins).



For much of this period, the judiciary projected that the annual cost of running the program would remain well under $30 million. AO, *Long Range Plan for Information Technology in the Federal Judiciary: Fiscal Year 2009 Update* 16 (2009).

Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. When questioned during a 2014 House appropriations hearing, representatives from the judiciary admitted that the "Electronic Public Access Program encompasses more than just offering real-time access to electronic records." *Fin. Servs. and General Gov. Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 113th Cong. 152 (2014).[1] And Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding

---

[1] As a percentage of the judiciary's total budget, however, PACER fees are quite small. Based on the judiciary's budget request of $7.533 billion for fiscal year 2016, PACER fees make up less than 2% of the total budget—meaning that the excess fees are a fraction of a fraction. Matthew E. Glassman, *Judiciary Appropriations FY2016*, at 1 (June 18, 2015), http://bit.ly/1QF8enE.

courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitor. . . . [There have also been] audio enhancements. . . . This all ties together and it's funded through these [PACER] fees." Panel Discussion, William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), bit.ly/1PmR0LJ.

## ARGUMENT

### I.      This Court has jurisdiction over the claims of all class members.

Before certifying the class, the Court must first assure itself that it has subject-matter jurisdiction over the claims of all class members. The basis for jurisdiction here is the Little Tucker Act, which waives the federal government's sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1348 (Fed. Cir. 2005) (quoting *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996)). Courts have long recognized such illegal-exaction claims—claims that money was "improperly paid, exacted, or taken from the claimant" in violation of a statute, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)—regardless of whether the statute itself creates an express cause of action.

By its terms, the Little Tucker Act grants district courts "original jurisdiction, concurrent with the United States Court of Federal Claims," over any non-tort, non-tax "claim against the United States, not exceeding $10,000," 28 U.S.C. § 1346(a)(2), while vesting exclusive appellate jurisdiction in the Federal Circuit, *id.* § 1295(a). This means that the Federal Circuit's interpretation of the Act is binding on district courts. And the Federal Circuit has made clear that, in a class action, "there will be no aggregation of claims" for purposes of assessing the $10,000 limit. *Chula Vista City Sch. Dist. v. Bennett*, 824 F.2d 1573, 1579 (Fed. Cir. 1987).

The Federal Circuit has also made clear that the Little Tucker Act does not require that each plaintiff's total *recovery* be $10,000 or less. Quite the contrary: Federal Circuit precedent holds that even a single plaintiff seeking millions of dollars may bring suit in federal district court under the Little Tucker Act if the total amount sought represents the accumulation of many separate transactions, each of which gives rise to a separate claim that does not itself exceed $10,000. *See Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 797 (Fed. Cir. 1993).

In the 1990s, airline companies brought two lawsuits in this district seeking to recover what they claimed were illegal exactions by the government. In one case, the General Services Administration (or GSA) deducted roughly $100 million from future payments it owed the airlines after determining that it had overpaid for plane tickets. *Alaska Airlines v. Austin*, 801 F. Supp. 760 (D.D.C. 1992). In the other, GSA "withheld future payments to the airlines to offset" the costs of tickets that were never used. *Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 74 (D.D.C. 1991). The airlines claimed that GSA was "recouping alleged overcharges from them in violation of the law," and sought "return of the funds" that had "been assessed against them unlawfully." *Alaska Airlines*, 801 F. Supp. at 761.

In both cases, the court recognized that each airline was seeking well over $10,000, but determined that the total amount each plaintiff sought "represents the accumulation of disputes over alleged overcharges on thousands of individual tickets." *Id.* at 762. Thus, the court held that the asserted overcharge for each individual ticket constituted its own claim under the Little Tucker Act—even though the airlines paid numerous overcharges at a time through GSA's withholdings, and even though each case presented one "straightforward" legal question. *Id.* Because "[e]ach contested overcharge is based on a single ticket and is for less than $10,000," the district court had jurisdiction. *Id.*; *see Am. Airlines*, 778 F. Supp. at 76. The court explained that "[t]he Government cannot escape [Little Tucker Act] jurisdiction by taking a lump sum offset

10

that totals over $10,000 and then alleging that the claims should be aggregated." *Id.* On appeal, the Federal Circuit agreed, holding that "the district court had concurrent jurisdiction with the Court of Federal Claims." *Alaska Airlines*, 8 F.3d at 797.

Under this binding precedent, each transaction to access a record through PACER in exchange for a certain fee—a fee alleged to be excessive, in violation of the E-Government Act— constitutes a separate claim under the Little Tucker Act. As a result, each class member has multiple individual illegal-exaction claims, none of which exceeds $10,000. Even if a very small percentage of class members might ultimately receive more than $10,000, that amount "represents the accumulation of disputes over alleged overcharges on thousands of individual [transactions]"; it is no bar to this Court's jurisdiction. *Alaska Airlines*, 801 F. Supp. at 762.

Nor does the Little Tucker Act's venue provision pose a barrier to certifying the class here. Although it requires that individual actions be brought "in the judicial district where the plaintiff resides," 28 U.S.C. § 1402(a)(1), it does not alter the general rule in class actions that absent class members "need not satisfy the applicable venue requirements," *Briggs v. Army & Air Force Exch. Serv.*, No. 07–05760, 2009 WL 113387, *6 (N.D. Cal. 2009); *see also Whittington v. United States*, 240 F.R.D. 344, 349 (S.D. Tex. 2006); *Bywaters v. United States*, 196 F.R.D. 458, 463–64 (E.D. Tex. 2000).

Were the law otherwise, the Little Tucker Act would preclude nationwide class actions, instead requiring nearly a hundred mini class actions, one in each federal district, to remedy a widespread, uniform wrong committed by the federal government. That extreme result "simply is not to be found in the text of the Act itself," and "the venue provision would be an awkward vehicle by which to effectuate any anti-class policy." *Briggs*, 2009 WL 113387, at *7. This Court thus has the authority to certify the class if it meets the requirements of Rule 23.

## II.     This Court should certify the class under Rule 23.

Class certification is appropriate where, as here, the plaintiffs can satisfy the requirements of both Rule 23(a) and (b). Rule 23(a) requires a showing that (1) the class is sufficiently numerous to make joinder of all class members impracticable, (2) there are common factual or legal issues, (3) the named plaintiffs' claims are typical of the class, and (4) the named plaintiffs will fairly and adequately protect the interests of the class.

Rule 23(b) requires one of three things. Under subsection (b)(1), the plaintiffs may show that prosecuting separate actions would create a risk of inconsistent results, such as where the defendant is "obliged by law to treat the members of the class alike." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Under (b)(2), the plaintiffs may show that the defendant "has acted or refused to act on grounds that apply generally to the class," such that declaratory or injunctive relief is appropriate. And under (b)(3), the plaintiffs may show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The class in this case satisfies both (b)(1) and (b)(3).

### A.     This case meets Rule 23(a)'s requirements.

#### 1.     The class is sufficiently numerous.

To begin, this case satisfies Rule 23(a)(1)'s requirement that the class be "so numerous that joinder of all members is impracticable." "Courts in this District have generally found that the numerosity requirement is satisfied and that joinder is impracticable where a proposed class has at least forty members," *Cohen v. Warner Chilcott Public Ltd. Co.*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007), and a plaintiff need not "provide an exact number of putative class members in order to satisfy the numerosity requirement," *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998); *see Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 305–06 (D.D.C. 2007)

(certifying class of 30 people). Although the plaintiffs do not have access to the defendant's records, and so cannot yet know exactly how many people have paid PACER fees in the past six years, they estimate that the class contains at least several hundred thousand class members. According to documents prepared by the judiciary and submitted to Congress, there are nearly two million PACER accounts, "approximately one-third" of which "are active in a given year." *The Judiciary: Fiscal Year 2016 Congressional Budget Justification*, App. 2.1. Making even the most generous assumptions about how many of these people receive fee waivers or have never incurred more than $15 in charges in a given quarter (and thus have never paid a fee), there can be no serious dispute that this class satisfies Rule 23(a)(1).

### 2. The legal and factual issues are common to the class.

This case likewise easily satisfies Rule 23(a)(2)'s requirement of "questions of law or fact common to the class." This requirement is met if "[e]ven a single common question" exists, *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) (Huvelle, J.), so long as "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, the two most important questions in the case are common: (1) Are the fees imposed for PACER access excessive in relation to the cost of providing the access—that is, are the fees higher than "necessary" to "reimburse expenses incurred in providing the[] services" for which they are "charge[d]"? 28 U.S.C. § 1913 note; and (2) what is the measure of damages for the excessive fees charged? *See* Compl. ¶ 29. These questions "will generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim and the claims of the class as a whole." *Thorpe*, 303 F.R.D. at 146–47.

### 3.     The named plaintiffs' claims are typical of the class.

This case also meets Rule 23(a)(3)'s requirement that the named plaintiffs' claims be typical of the class's claims, a requirement that is "liberally construed." *Bynum v. District of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003). When "the named plaintiffs' claims are based on the same legal theory as the claims of the other class members, it will suffice to show that the named plaintiffs' injuries arise from the same course of conduct that gives rise to the other class members' claims." *Id.* at 35. That is the case here. The named plaintiffs' claims are typical of the class because they arise from the same course of conduct by the United States (imposing a uniform PACER fee schedule that is higher than necessary to reimburse the cost of providing the service) and are based on the same legal theory (challenging the fees as excessive, in violation of the E-Government Act). *See* Compl. ¶ 30.

### 4.     The named plaintiffs are adequate representatives.

Rule 23(a)(4) asks whether the named plaintiffs "will fairly and adequately protect the interests of the class," an inquiry that "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. It has two elements: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997); *Thorpe*, 303 F.R.D. at 150. Both are met here.

***a. The named plaintiffs.*** The plaintiffs are three of the nation's leading nonprofit legal advocacy organizations: the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice. Compl. ¶¶ 1–3. They all care deeply about "preserv[ing] unfettered access to the courts," *id.* ¶ 3, and brought this suit to vindicate

Congress's goal in passing the E-Government Act: to ensure that court records are "freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002).

Since 1980, the National Veterans Legal Services Program has represented thousands of veterans in individual court cases, and has worked to ensure that our nation's 25 million veterans and active-duty personnel receive all benefits to which they are entitled for disabilities resulting from their military service. Compl. ¶ 1. Excessive PACER fees impede this mission in numerous ways—including by making it difficult to analyze patterns in veterans' cases, and thus to detect pervasive problems and delays. The organization is concerned that the fees have not only hindered individual veterans' ability to handle their own cases, but have also "inhibited public understanding of the courts and thwarted equal access to justice." *Id.* at 2.

The excessive fees likewise impede access to justice for low-income consumers—like those waging legal battles to try to save their homes from foreclosure—which is why the National Consumer Law Center also brought this suit. The Law Center conducts a wide variety of research, litigation, and other activities on behalf of elderly and low-income consumers, and publishes 20 different treatises that comprehensively report on the development of consumer law in the courts. *Id.* ¶ 2. The organization has incurred PACER fees in carrying out all of these activities, *id.*, and is also concerned about the many *pro se* consumers whose interaction with the judicial system has been made far more difficult by the PACER fee structure.

Finally, the Alliance for Justice is a national association of over 100 public-interest organizations—such as the National Center on Poverty Law and the National Legal Aid & Defender Association—nearly all of whom are affected by excess PACER fees. *Id.* ¶ 3. These organizations also strongly support the judiciary's efforts to obtain whatever resources it needs. They do not aim to deplete the judiciary's budget, nor do they object to the judiciary's quest for

increased funding. All they object to is using excess PACER fees to fund unrelated projects that "should be funded through direct appropriations." Letter from Sen. Lieberman to Rosenthal.

Because excess PACER fees are unlawful and significantly impede public access (and yet make up only a fraction of a fraction of the judiciary's budget, as explained in footnote 1), the named plaintiffs will vigorously prosecute this case on behalf of themselves and all absent class members. Each named plaintiff has paid numerous PACER fees in the past six years, and each has the same interests as the unnamed class members. Compl. ¶ 31. And the relief the plaintiffs are seeking—a full refund of excess fees charged within the limitations period, plus a declaration that the fees violate the E-Government Act—would plainly "be desired by the rest of the class." *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 446 (D.D.C. 2002) (Huvelle, J.).

**b. Class counsel.** Proposed co-lead class counsel are Gupta Wessler PLLC, a national boutique based in Washington that specializes in Supreme Court, appellate, and complex litigation; and Motley Rice LLC, one of the nation's largest and most well-respected class-action firms. The firms will also consult with two lawyers with relevant expertise: Michael Kirkpatrick of Georgetown Law's Institute for Public Representation and Brian Wolfman of Stanford Law School. Together, these law firms and lawyers have a wealth of relevant experience.

One of the two co-lead firms, Gupta Wessler, has distinctive experience with class actions against the federal government. Two of its lawyers, Deepak Gupta and Jonathan Taylor, represent a certified class of federal bankruptcy judges and their beneficiaries in a suit concerning judicial compensation, recently obtaining a judgment of more than $56 million. *See* Gupta Decl. ¶¶ 1, 4–8; *Houser v. United States*, No. 13-607 (Fed. Cl.). Mr. Gupta and Mr. Taylor both received the President's Award from the National Conference of Bankruptcy Judges for their work on the case. Gupta Decl. ¶ 8. Just over a month ago, the *American Lawyer* reported on the firm's work, observing that "[i]t's hard to imagine a higher compliment than being hired to represent federal

judges" in this important class-action litigation. *Id.* Mr. Gupta and Mr. Taylor also currently represent (along with Motley Rice) a certified class of tax-return preparers seeking the recovery of unlawful fees paid to the IRS. *See id.* ¶¶ 1, 9–10; *Steele v. United States*, No. 14-1523 (D.D.C.). And Mr. Gupta, who worked at the Consumer Financial Protection Bureau and Public Citizen Litigation Group before founding the firm, has successfully represented a certified class of veterans challenging the government's illegal withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering about $7.4 million in illegal charges. Gupta Decl. ¶¶ 1, 13–16.

The other co-lead firm, Motley Rice, regularly handles class actions and complex litigation in jurisdictions across the U.S., and currently serves as lead or co-lead counsel in over 25 class actions and as a member of the plaintiffs' steering committee in numerous MDL actions. Narwold Decl. ¶ 3. William Narwold, chair of the firm's class-action practice, will play a lead role in prosecuting this case and is also currently class counsel in *Steele v. United States*, the tax-return-preparer case mentioned above. *Id.* ¶¶ 1–3, 6. His colleague Joseph Rice, one of the top class-action and mass-tort-settlement negotiators in American history, will play a lead role in any settlement negotiations. *Id.* ¶ 1. Under their leadership, Motley Rice has secured some of the largest verdicts and settlements in history, in cases involving enormously complex matters. The firm is a member of the plaintiffs' steering committee in the *BP Deepwater Horizon Oil Spill Litigation*, where Mr. Rice served as one of the two lead negotiators in reaching settlements. One of those settlements, estimated to pay out between $7.8 billion and $18 billion to class members, is the largest civil class-action settlement in U.S. history. *Id.* ¶ 6. The firm also served as co-lead trial counsel on behalf of ten California cities and counties against companies that had concealed the dangers of lead paint. In 2014, after a lengthy bench trial, the court entered judgment in favor of the cities and counties for $1.15 billion. *Id.*

**B.      This case meets Rule 23(b)'s requirements.**

**1.      This case satisfies Rule 23(b)(1).**

Rule 23(b)(1) permits class certification if prosecuting separate actions by individual class members would risk "inconsistent or varying adjudications" establishing "incompatible standards of conduct" for the defendant. Because this case seeks equitable relief in addition to return of the excessive PACER fees already paid, the risk of inconsistent results is acute. If there were separate actions for equitable relief, the AO could be "forced into a 'conflicted position,'" Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356, 388 (1967), potentially subjecting it to "incompatible court orders," 2 William B. Rubenstein, *Newberg on Class Actions* § 4.2 (5th ed. 2015). That makes this case the rare one in which a class action is "not only preferable but essential." Rubenstein, *Newberg on Class Actions* § 4.2; *see also* Fed. R. Civ. P. 23(b)(1), 1966 advisory committee note (listing as examples cases against the government "to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment"). Under these circumstances, Rule 23(b)(1) is satisfied.

**2.      This case satisfies Rule 23(b)(3).**

Because this case seeks the return of all excessive PACER fees paid in the last six years, however, the most appropriate basis for certification is Rule 23(b)(3). *See Dukes*, 563 U.S. at 362 ("[I]ndividualized monetary claims belong in Rule 23(b)(3)."). Rule 23(b)(3) contains two requirements, predominance and superiority, both of which are met here.

"The first requirement is that common factual and legal issues predominate over any such issues that affect only individual class members." *Bynum*, 214 F.R.D. at 39. As already explained, the plaintiffs allege that the AO lacks the authority to charge (and in fact charges) PACER fees that exceed the costs of providing the service. The central argument is that the E-

18

Government Act unambiguously limits any PACER fees "charge[d] for services rendered" to those "necessary" to "reimburse expenses in providing these services"—a limit the AO has failed to heed. 28 U.S.C. § 1913 note. And even if this language were somehow ambiguous, the background rule of administrative law is that user fees may not exceed the cost of the service provided (because then they would become taxes) unless Congress "indicate[d] clearly" an "intention to delegate" its taxing authority. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). The plaintiffs might prevail on their theory; they might not. But either way, these are the common predominant legal questions in this case.

The sole individual issue—calculation of the amount of each class member's recovery, which depends on how many PACER fees they have paid—is ministerial, and hence cannot defeat predominance. The government's "own records . . . reflect the monetary amount that each plaintiff" has paid in fees over the past six years. *Hardy v. District of Columbia*, 283 F.R.D. 20, 28 (D.D.C. 2012). Once the total excess amount is calculated and the measure of damages is determined (both common questions), divvying up the excess on a pro rata basis would "clearly be a mechanical task." *Id.*

"The second requirement of Rule 23(b)(3) is that the Court find that maintaining the present action as a class action will be superior to other available methods of adjudication." *Bynum*, 214 F.R.D. at 40. This requirement, too, presents no obstacle here. Class treatment is most appropriate in cases like this one, "in which the individual claims of many of the putative class members are so small that it would not be economically efficient for them to maintain individual suits." *Id.* The vast majority of class members "stand to recover only a small amount of damages," making it difficult to "entice many attorneys into filing such separate actions." *Id.* Nor are there any concerns that "potential difficulties in identifying the class members and sending them notice will make the class unmanageable." *Id.* To the contrary, this class is manageable

because the government itself has all the information needed to identify and notify every class member, including their names and email addresses. Class counsel can send notice to the email addresses the PACER Service Center has on file for everyone who has paid a fee.

## III. The Court should approve class counsel's notice proposal.

As required by Local Civil Rule 23.1(c), we propose the following class-notice plan, as reflected in the proposed order filed with this motion. First, we propose that class counsel retain a national, reputable class-action-administration firm to provide class notice. Second, to the extent possible, we propose that email notice be sent to each class member using the contact information maintained by the government for each person or entity who has paid PACER fees over the past six years. Third, we propose that if the PACER Service Center does not have an email address on file for someone, or if follow-up notice is required, notice then be sent via U.S. mail. Class counsel would pay all costs incurred to send the notice, and all responses would go to the class-action-administration firm. We respectfully request that the Court direct the parties to file an agreed-upon proposed form of notice (or, if the parties cannot agree, separate forms of notice) within 30 days of the Court's certification order, and direct that email notice be sent to the class within 90 days of the Court's approval of a form of notice.

Because the government has yet to enter an appearance, we were unable to confer with opposing counsel under Local Civil Rule 7(m) regarding the notice proposal or this motion. We are filing the motion now to toll the limitations period for the class, *see Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and to ensure that class certification is decided at the outset, *cf.* Fed. R. Civ. P. 23 (class certification must be decided "[a]t an early practicable time after a person sues"); Local Civil Rule 23(b) (requiring motion to be filed "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action"). We intend to confer with opposing counsel as soon as they make their appearance.

**CONCLUSION**

The plaintiffs' motion for class certification should be granted.

Respectfully submitted,

/s/ Deepak Gupta
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
deepak@guptawessler.com, jon@guptawessler.com

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
bnarwold@motleyrice.com

MICHAEL T. KIRKPATRICK (D.C. Bar No. 486293)
**INSTITUTE FOR PUBLIC REPRESENTATION**
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
michael.kirkpatrick@law.georgetown.edu

May 2, 2016                     *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2016, I filed this class-certification motion through this

Court's CM/ECF system. I further certify that, because no counsel for the defendant has yet

appeared, I served copies via U.S. mail on the following counsel:

United States Attorney for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

Attorney General of the United States
United States Department of Justice
Room 4400
950 Pennsylvania Avenue, NW
Washington, DC 20530

*/s/ Deepak Gupta*

Deepak Gupta

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, *et al.*,
    Plaintiffs,

v.

UNITED STATES OF AMERICA,

    Defendant.

</td><td>

Civil Action No. 16-745 (ESH)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Plaintiffs, organizations and individuals who have paid fees to obtain records through the Public Access to Court Electronic Records system (PACER), claim that PACER's fee schedule is higher than necessary to cover the costs of operating PACER and therefore violates the E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (codified as 28 U.S.C § 1913 note). (Compl. at 2, ECF No. 1.) They have brought this class action suit against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), to recover the allegedly excessive fees that they have paid over the last six years. (*Id.* at 14-15, ¶¶ 33-34.) Defendant has moved to dismiss the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), claiming that it is barred by the first-to-file rule and does not state a claim within this Court's jurisdiction under the Little Tucker Act. (Def.'s Mot. Dismiss, ECF. No. 11; *see also* Pls.' Opp., ECF No. 15; Def.'s Reply, ECF No. 20.) For the reasons herein, the Court will deny the motion.[1]

---

[1] Defendant has also moved for summary judgment, but it has not offered any grounds upon which summary judgment should be granted if the motion to dismiss is denied. (*See* Def.'s Mot. at 1, 19.) Therefore, the Court will deny defendant's unsupported motion for summary judgment.

## BACKGROUND

According to plaintiffs, "PACER is a decentralized system of electronic judicial-records databases" operated by the Administrative Office for the U.S. Courts ("AO"). (Compl. at 1, ¶ 7.) "Any person may access records through PACER" but "must first agree to pay a specific fee." (*Id.* at ¶ 7.) Congress has authorized the Judicial Conference that it "may, only to the extent necessary, prescribe reasonable fees . . . for access to information available through automatic data processing equipment." 28 U.S.C. § 1913 note. The fees "shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.*

Plaintiffs allege that the fee was $.07 per page in 1998, with a maximum of $2.10 per request introduced in 2002. (Compl. at ¶ 8.) The AO increased the fee to $.08 per page in 2005 and to $.10 per page in 2012. (*Id.* at ¶¶ 13, 19.) The current fee is $.10 per page, with a maximum of $3.00 per record. (*Id.* at ¶ 7.) Plaintiffs claim that these fees are "far more than necessary to recover the cost of providing access to electronic records." (*Id.* at ¶ 9.) For example, in 2012 the judiciary spent $12.1 million generated from public access receipts on the public access system, while it spent more than $28.9 million of the receipts on courtroom technology. (*Id.* at ¶ 20.) "In 2014 . . . the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems." (*Id.* at ¶ 21.)

Named plaintiffs are nonprofit organizations that have incurred fees for downloading records from PACER. (Compl. at ¶¶ 1-3.) Plaintiff National Veterans Legal Services Program (NVLSP) "has represented thousands of veterans in individual court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs." (*Id.* at ¶ 1.) Plaintiff

National Consumer Law Center (NCLC) conducts "policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates." (*Id.* at ¶ 2.)  Plaintiff Alliance for Justice (AFJ) "is a national association of over 100 public-interest organizations that focus on a broad array of issues" and "works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans." (*Id.* at ¶ 3.)

Plaintiffs claim that the fees they have been charged violate the E-Government Act because they exceed the cost of providing the records.  (Compl. at 2.)  Furthermore, they claim that excessive fees have "inhibited public understanding of the courts and thwarted equal access to justice." (*Id.* at 2.)  Based on the alleged violation of the E-Government Act, plaintiffs assert that the Little Tucker Act entitles them to a "refund of the excessive PACER fees illegally exacted." (*Id.* at ¶¶ 33-34.)  Plaintiffs seek to pursue this claim on behalf of a class of "all individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (*Id.* at ¶ 27.)  "Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000." (*Id.* at ¶ 5.)

## ANALYSIS

Defendant seeks dismissal of plaintiffs' complaint on two grounds.  First, defendant argues that this suit is barred because a similar suit was filed first in the Court of Federal Claims. Second, it argues that plaintiffs have failed to state a claim under the Little Tucker Act because they did not first present their challenge to the PACER Service Center.  The Court rejects both arguments.

## I.    LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In ruling on a 12(b)(6) motion, a court may consider the complaint, documents incorporated in the complaint, and matters of which courts may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  To survive a motion to dismiss under Rule 12(b)(1), plaintiffs bear the burden of demonstrating that the Court has subject-matter jurisdiction, and the Court may consider materials outside the pleadings.  *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

## II.    FIRST-TO-FILE RULE

Under the "first-to-file rule," "when two cases are the same or very similar, efficiency concerns dictate that only one court decide both cases."  *In re Telebrands Corp.*, 824 F.3d 982, 984 (Fed. Cir. 2016); *see also UtahAmerican Energy, Inc. v. Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) ("[W]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first." (quoting *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980))).[2]  The rule reflects concerns that "district courts

---

[2] The Federal Circuit has exclusive jurisdiction over appeals from Little Tucker Act suits, and therefore, the law of the Federal Circuit applies to both the merits of those cases and related procedural issues.  28 U.S.C. § 1295(a)(2); *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952-53 (Fed. Cir. 1990); *United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*, 833 F.2d 994, 997 (Fed. Cir. 1987).  Here, the Court would reach the same result on the first-to-file issue under either the Federal Circuit's or the D.C. Circuit's law.

would be required to duplicate their efforts" and "twin claims could generate contradictory results." *UtahAmerican*, 685 F.3d at 1124. A judge considering a first-to-file challenge to a suit that was filed second and that raises different claims from the first suit should determine "whether the facts and issues 'substantially overlap.'" *Telebrands*, 824 F.3d at 984-85.

Defendant contends that this suit is barred by *Fisher v. United States*, No. 15-1575C, 2016 WL 5362927 (Fed. Cl. Sept. 26, 2016). According to defendant, both this case and *Fisher* "involve allegations that the same entities utilized the PACER System and were charged more for downloading information than is authorized by the same statutes and agreements." (Def.'s Mot. at 13.) Furthermore, defendant asserts that "[t]he class here would include nearly every class member in *Fisher*." (*Id.*) Plaintiffs respond that "plaintiff in *Fisher* challenges a particular aspect of the formula that PACER uses to convert docket reports to billable pages" but he "does *not* . . . challenge the PACER fee schedule itself, as our case does." (Pls.' Opp. at 2.)

The Court agrees that the first-to-file rule does not apply here. According to the class action complaint in *Fisher*, "PACER claims to charge users $0.10 for each page in a docket report" and calculates pages by equating 4,320 extracted bytes to one page, thus "purporting to charge users $0.10 per 4,320 bytes. But the PACER system actually miscalculates the number of extracted bytes in a docket report, resulting in an overcharge to users." First Am. Class Action Compl. at ¶¶ 2, 37, *Fisher v. United States*, No. 15-1575C (Fed. Cl. May 12, 2016), ECF No. 8. In their illegal exaction claim, the *Fisher* plaintiffs assert that "[t]he Electronic Public Access Fee Schedule only authorizes fees of $0.10 per page," but "[b]y miscalculating the number of bytes in a page, the AO collected charges from Plaintiff and the Class in excess of $0.10 per page . . . ." *Id.* at ¶¶ 73-74. In other words, *Fisher* claims an *error in the application* of the PACER fee schedule to a particular type of request. In contrast, plaintiffs here challenge the

*legality* of the fee schedule.  (Compl. at 2.)  These are separate issues, and a finding of liability in one case would have no impact on liability in the other case.  Therefore, the Court will not dismiss the suit based on the first-to-file rule.

## III.    FAILURE TO STATE A LITTLE TUCKER ACT CLAIM

The Little Tucker Act gives district courts jurisdiction over a "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States."  28 U.S.C. § 1346(a)(2).  Interpreting the identical wording of the Tucker Act, which applies to claims that exceed $10,000, the Federal Circuit has held that a plaintiff can "recover an illegal exaction by government officials when the exaction is based on an asserted statutory power" and "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).  The statute causing the exaction must also provide "either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000)); *see also N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015).

According to defendant, plaintiffs have failed to state a claim under the Little Tucker Act and that failure warrants dismissal under Federal Rules of Civil Procedure 12(b)(6) and also 12(b)(1), because the Little Tucker Act is the source of the Court's jurisdiction.  (Def.'s Mot. at 1, 16 n.6.)  Defendant asks this Court to take judicial notice of the fact that users cannot obtain a

PACER account without agreeing to the PACER policies and procedures, which include a statement that users "must alert the PACER Service Center to any errors in billing within 90 days of the date of the bill." (*Id.* at 10, 13.) On the basis of this policy, defendant argues that (1) plaintiffs have not performed a condition precedent in the contract, which is akin to an administrative exhaustion requirement, and (2) plaintiffs have no statutory remedy when they have failed to fulfill the contractual condition. (Def.'s Mot. at 13-19.) Plaintiffs do not dispute the PACER policy statement or object to this Court's taking judicial notice of it, but they argue that the statement is irrelevant because they are not claiming a billing error. (Pls.' Opp. at 4-5.)

The court in *Fisher* has already rejected defendant's arguments that the PACER notification requirement is a contractual condition or creates an administrative exhaustion requirement. *Fisher*, 2016 WL 5362927, at *3, *5-*6 (reasoning that contractual conditions must be expressly stated in conditional language and that there can be no administrative exhaustion requirement unless the suggested administrative proceeding involves some adversarial process). This Court need not reach those legal issues because, unlike *Fisher*, plaintiffs here do not claim a billing error. Therefore, even if the notification requirement constituted a contractual condition, it would not apply to the plaintiffs' challenges to the legality of the fee schedule. Likewise, even if users were required to exhaust their claims for billing errors, that requirement would not apply to the claim in this case. In sum, the PACER policy statement provides no basis for dismissing this suit.

## CONCLUSION

For the reasons discussed above, defendant's motion to dismiss or, in the alternative, for summary judgment is denied. A separate Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   December 5, 2016

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, et al. *Plaintiffs,* v. UNITED STATES OF AMERICA, *Defendant.* | Case No. 16-745 |

## DECLARATION OF DANIEL L. GOLDBERG

I, Daniel L. Goldberg, declare as follows:

1.     I am the Legal Director of the Alliance for Justice (AFJ), a national association of over 100 public-interest organizations that focus on a broad array of issues—including civil rights, human rights, women's rights, children's rights, consumer rights, and ensuring legal representation for all Americans. On behalf of these groups and the public-interest community, AFJ works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans.

2.     AFJ has paid at least $391.40 in fees to the PACER Service Center to obtain public court records within the past six years. AFJ has never sought exemptions from PACER fees at any time during the class period given the financial-hardship and other requirements that would have applied. In 2015, AFJ's annual revenues were $4.02 million, our expenses were $4.50 million, and our net assets were $4.36 million.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

*/s/ Daniel L. Goldberg*

Executed on January 19, 2017.     _____

Daniel L. Goldberg

Case: 24-1757     Document: 12     Page: 154     Filed: 07/01/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.
                    *Plaintiffs,*

        v.

UNITED STATES OF AMERICA,                    Case No. 16-745
                    *Defendant.*

### DECLARATION OF STUART ROSSMAN

I, Stuart T. Rossman, declare as follows:

1.        I am the Litigation Director of the National Consumer Law Center (NCLC), a national nonprofit organization that seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans. NCLC pursues these goals through policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates throughout the nation.

2.        In the course of its research, litigation, and other activities, NCLC has paid at least $5,863.92 in fees to the PACER Service Center to obtain public court records within the past six years. NCLC has never sought exemptions from PACER fees at any time during the class period given the financial-hardship and other requirements that would have applied. In 2015, NCLC's annual revenues were $11.49 million, our expenses were $11.72 million, and our net assets were $17.97 million.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on January 19, 2017.

_____
Stuart T. Rossman

<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

</div>

| | |
|---|---|
| NATIONAL VETERANS LEGAL<br>SERVICES PROGRAM, et al.<br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>*Defendant*. | Case No. 16-745 |

<div align="center">

**DECLARATION OF BARTON F. STICHMAN**

</div>

I, Barton F. Stichman, declare as follows:

1. I am Joint Executive Director of the National Veterans Legal Services Program (NVLSP), a nonprofit organization that seeks to ensure that American veterans and active-duty personnel receive the full benefits to which they are entitled for disabilities resulting from their military service. Over the years, the organization has represented thousands of veterans in court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs.

2. In 2016, NVLSP paid $317 in fees to the PACER Service Center to obtain public court records. I estimate that we paid similar amounts annually over the past six years. NVLSP has never sought exemptions from PACER fees during the class period given the financial-hardship requirements that would have applied. In 2014, NVLSP had revenues of $3.75 million, expenses of $3.72 million, and net assets of $3.86 million.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on January 19, 2017.

_____
Barton F. Stichman

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*,**
<div align="center">**Plaintiffs,**</div>

<div align="center">**v.**</div>

**UNITED STATES OF AMERICA,**

<div align="center">**Defendant.**</div>

</td><td>

**Civil Action No. 16-745 (ESH)**

</td></tr>
</table>

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' motion for class certification [ECF No. 8] is **GRANTED**; and it is further

**ORDERED** that pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), a class is certified that consists of:

> All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities.

It is further **ORDERED** that the Court certifies one class claim: that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act; it is further

**ORDERED** that Gupta Wessler PLLC and Motley Rice LLC are appointed as co-lead class counsel; and it is further

**ORDERED** that within 30 days of the date of this Order, the parties shall file an agreed-

upon proposed form of class notice. If the parties cannot agree on a proposed form of class notice, then they shall file separate proposed forms within 20 days of the date of this Order. After a form of class notice has been determined by the Court, class counsel shall ensure that individual notice is provided to all absent class members who can be identified through reasonable efforts using the records maintained by defendant, as required by Fed. R. Civ. P. 23(c)(2), within 90 days of the Court's order approving the form of notice. Class counsel shall pay all costs incurred to provide notice.

It is further **ORDERED** that the parties shall proceed according to the Scheduling Order issued on January 24, 2017.


/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: January 24, 2017

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*, Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 16-745 (ESH) |

## MEMORANDUM OPINION

Plaintiffs, organizations and individuals who have paid fees to obtain records through the Public Access to Court Electronic Records system (PACER), claim that PACER's fee schedule is higher than necessary to cover the costs of operating PACER and therefore violates the E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (codified as 28 U.S.C § 1913 note). (Compl. at 2, ECF No. 1.) They have brought this class action against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), to recover the allegedly excessive fees that they have paid over the last six years. (*Id.* at 14-15, ¶¶ 33-34.) Plaintiffs have moved to certify a class of "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (Pls.' Mot. Class Certif., ECF No. 8.) The proposed class representatives are three nonprofit legal advocacy organizations: the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice. (*Id.* at 14.) Defendant opposes class certification primarily on the ground that the named plaintiffs are not adequate representatives because they are eligible to apply for PACER fee exemptions, while some other

class members are not. (Def.'s Opp., ECF. No. 13) For the reasons herein, the Court will grant plaintiffs' motion and certify a class under Rule 23(b)(3).

## BACKGROUND

PACER is an online electronic records system provided by the Federal Judiciary that allows public access to case and docket information from federal courts. PACER, https://www.pacer.gov (last visited Jan. 23, 2017). Congress has authorized the Judicial Conference that it "may, only to the extent necessary, prescribe reasonable fees . . . for access to information available through automatic data processing equipment." 28 U.S.C. § 1913 note. The fees "shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.* Plaintiffs allege that the fee to use PACER was $.07 per page in 1998, with a maximum of $2.10 per request introduced in 2002. (Compl. at ¶ 8.) The fee increased to $.08 per page in 2005 and to $.10 per page in 2012. (*Id.* at ¶¶ 13, 19.)

The current PACER fee schedule issued by the Judicial Conference sets forth both the access fees and the conditions for exemption from the fees. *Electronic Public Access Fee Schedule*, PACER, https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013). The current fee is $.10 per page, with a maximum of $3.00 per record for case documents but no maximum for transcripts and non-case specific reports. *Id.* There is no fee for access to judicial opinions, for viewing documents at courthouse public access terminals, for any quarterly billing cycle in which a user accrues no more than $15.00 in charges, or for parties and attorneys in a case to receive one free electronic copy of documents filed in that case. *Id.* As a matter of discretion, courts may grant fee exemptions to "indigents, bankruptcy case trustees, *pro bono* attorneys, *pro bono* alternative dispute resolution neutrals, Section 501(c)(3) not-for-profit organizations, and individual researchers associated with educational institutions," but only if

they "have demonstrated that an exemption is necessary in order to avoid unreasonable burdens and to promote public access to information." *Id.* "Courts should not . . . exempt individuals or groups that have the ability to pay the statutorily established access fee." *Id.* "[E]xemptions should be granted as the exception, not the rule," should be granted for a definite period of time, and should be limited in scope. *Id.*

Plaintiffs claim that the fees they have been charged violate the E-Government Act because they are "far more than necessary to recover the cost of providing access to electronic records." (Compl. at 2, ¶ 9.) For example, in 2012 the judiciary spent $12.1 million generated from public access receipts on the public access system, while it spent more than $28.9 million of the receipts on courtroom technology. (*Id.* at ¶ 20.) "In 2014 . . . the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems." (*Id.* at ¶ 21.) Furthermore, plaintiffs claim that excessive fees have "inhibited public understanding of the courts and thwarted equal access to justice." (*Id.* at 2.) Based on the alleged violation of the E-Government Act, plaintiffs assert that the Little Tucker Act entitles them to a "refund of the excessive PACER fees illegally exacted." (*Id.* at ¶¶ 33-34.) "Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000." (*Id.* at ¶ 5.)

Named plaintiffs are nonprofit organizations that have incurred fees for downloading records from PACER. (Compl. at ¶¶ 1-3.) Plaintiff National Veterans Legal Services Program (NVLSP) "has represented thousands of veterans in individual court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs." (*Id.* at ¶ 1; Stichman

Decl. ¶ 1, ECF No. 30.)  Plaintiff National Consumer Law Center (NCLC) conducts "policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates." (Compl. at ¶ 2; Rossman Decl. ¶ 1, ECF No. 29.)  Plaintiff Alliance for Justice (AFJ) "is a national association of over 100 public-interest organizations that focus on a broad array of issues" and "works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans."  (Compl. at ¶ 3; Goldberg Decl. ¶ 1, ECF No. 28.)

During the six years covered by this lawsuit, named plaintiffs regularly paid fees to use PACER.  NVLSP paid $317 in PACER fees in 2016 and estimates that it has paid similar amounts annually over the past six years.  (Stichman Decl. ¶ 2.)  NCLC paid at least $5,863 in fees during the past six years.  (Rossman Decl. ¶ 2; Mot. Hr'g Tr. 2, Jan. 18, 2017.)  AFJ paid at least $391 in fees during the past six years.  (Goldberg Decl. ¶ 2; Tr. 3.)  None of the three named plaintiffs asked for exemptions from PACER fees, because they could not represent to a court that they were unable to pay the fees.  (Tr. 3-4.)  The reason for this is that each organization has annual revenue of at least $3 million.  (*Id.*; Stichman Decl. ¶ 2; Rossman Decl. ¶ 2; Goldberg Decl. ¶ 2.)

In a prior opinion, this Court denied defendant's motion to dismiss the suit.  *See National Veterans Legal Services Program v. United States*, No. 16-cv-745, 2016 WL 7076986 (D.D.C. Dec. 5, 2016).  First, the Court held that the first-to-file rule did not bar this suit because it concerns the legality of the PACER fee schedule, whereas the plaintiffs in *Fisher v. United States*, No. 15-1575C (Fed. Cl. May 12, 2016), claim an error in the application of the fee schedule.  *Id.* at *3.  Second, the Court held that plaintiffs were not required to alert the PACER Service Center about their claims as a prerequisite to bringing suit under the Little Tucker

Act. *Id.*

In the current motion, plaintiffs have asked this Court to certify a class under Rule

23(b)(3) or, in the alternative, 23(b)(1). (Pls.' Mot. at 18.) Their motion proposed a class of

"[a]ll individuals and entities who have paid fees for the use of PACER within the past six years,

excluding class counsel and agencies of the federal government." (*Id.* at 1.) In opposition to

class certification, defendant argues that (1) plaintiffs have failed to demonstrate that they satisfy

the numerosity requirement, because they have not established the number of users who raised

their concerns with the PACER Service Center or the number of potential plaintiffs who are

nonprofit organizations; (2) the class representatives fail the typicality and adequacy

requirements, because their nonprofit status makes them eligible to request fee exemptions,

which not all class members can do; (3) the Court should not allow this suit to proceed as a class

action, because it could produce results that conflict with those in *Fisher*; and (4) individual

questions predominate, because the Court would need to determine whether each user received

free pages in excess of the 30 charged pages, such that the user's per page cost did not violate the

E-Government Act. (Def.'s Opp. at 9-22.)

## ANALYSIS

## I.   JURISDICTION

Although defendant has not raised any jurisdictional arguments in its opposition to class

certification, courts must assure themselves that they have jurisdiction. Plaintiffs have brought

this case under the Little Tucker Act, which gives district courts jurisdiction over a "civil action

or claim against the United States, not exceeding $10,000 in amount, founded either upon the

Constitution, or any Act of Congress, or any regulation of an executive department, or upon any

express or implied contract with the United States." 28 U.S.C. § 1346(a)(2).[1]  Interpreting the identical wording of the Tucker Act, which applies to claims that exceed $10,000, the Federal Circuit has held that a plaintiff can "recover an illegal exaction by government officials when the exaction is based on an asserted statutory power" and "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).[2]

In their complaint, plaintiffs request "monetary relief for any PACER fees collected by the defendant in the past six years that are found to exceed the amount authorized by law." (Compl. at 14-15.)  A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000.  *Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 76-77 (D.D.C. 1991); *Alaska Airlines v. Austin*, 801 F. Supp. 760, 762 (D.D.C. 1992), *aff'd*

---

[1] The Federal Circuit has exclusive jurisdiction over appeals from Little Tucker Act suits, and therefore, the law of the Federal Circuit applies to both the merits of those cases and related procedural issues.  28 U.S.C. § 1295(a)(2); *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952-53 (Fed. Cir. 1990); *United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*, 833 F.2d 994, 997 (Fed. Cir. 1987).  This Court refers to Federal Circuit precedent when it exists.

[2] For the Court to have jurisdiction over an illegal exaction claim under the Little Tucker Act, the statute causing the exaction must also provide "either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000)).  The Court of Federal Claims has taken an expansive view of the phrase "necessary implication" because "[o]therwise, the Government could assess any fee or payment it wants from a plaintiff acting under the color of a statute that does not expressly require compensation to the plaintiff for wrongful or illegal action by the Government, and the plaintiff would have no recourse for recouping the money overpaid."  *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015).

*in relevant part by Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 797 (Fed. Cir. 1993); *United States v. Louisville & Nashville R.R. Co.*, 221 F.2d 698, 701 (6th Cir. 1955). Plaintiffs assert that no class member has a claim exceeding $10,000 for a single PACER transaction, and defendant does not dispute this. (Pls.' Mot. at 11; Tr. 22-23.) Therefore, plaintiffs' monetary claim does not exceed the jurisdictional limitation of the Little Tucker Act.

## II.     CLASS CERTIFICATION

Rule 23 sets forth two sets of requirements for a suit to be maintained as a class action. Fed. R. Civ. P. 23. First, under Rule 23(a), all class actions must satisfy the four requirements of numerosity, commonality, typicality, and adequacy. Second, the suit must fit into one of the three types of class action outlined in Rule 23(b)(1), (b)(2), and (b)(3). The Court finds that this suit satisfies the 23(a) requirements and that a class should be certified under 23(b)(3).

### A.  Class Definition

In their motion for class certification, plaintiffs propose a class of "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (Pls.' Mot. at 1.) At the motion hearing, plaintiffs suggested that it would actually only be necessary to exclude federal executive branch agencies, because their concern was that the Justice Department could not both defend the suit and represent executive branch agency plaintiffs. (Tr. 5-7.) The Court shares plaintiffs' concern but finds that the issue is not limited to executive branch agencies. "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General." 28 U.S.C. § 516. Many independent agencies lack independent litigating authority and are instead represented by the Justice Department, at least on some issues or in

some courts.  *See* Neal Devins, *Unitariness and Independence: Solicitor General Control over Independent Agency Litigation*, 82 Cal. L. Rev. 255, 263-80 (1994); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 799-804 (2013).  Some commentators consider independent regulatory commissions and boards to be on the boundary between the executive and legislative branches, and yet the Solicitor General typically controls their litigation before the Supreme Court.  Anne Joseph O'Connell, *Bureaucracy at the Boundary*, 162 U. Pa. L. Rev. 841, 867, 920-21 (2014).  To avoid individualized questions about the litigating authority of federal entities, the Court will exclude from the class all federal government entities, not only executive branch agencies.

For the sake of clarity, the Court will make two additional minor modifications to the proposed class definition before analyzing the requirements of Rule 23.  First, the class definition that plaintiffs introduced in their complaint and repeated in their motion for class certification defines the class in terms of those "who have paid fees for the use of PACER within the past six years," but that language is unclear when it is no longer associated with the dated complaint. Thus, the Court will substitute the actual dates for the six-year period ending on the date of the complaint—April 21, 2016.  (Compl. at 15.)  Second, rather than stating that the definition excludes "class counsel," the Court will state that it excludes "class counsel in this case." Plaintiffs' counsel stated at the motion hearing that they were excluding only themselves, not all PACER users who have acted as counsel in class actions.  (*See* Tr. 7.).  The modified class definition is: "All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities."

## B. Rule 23(a) Requirements

Under Rule 23(a), a suit may be maintained as a class action "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

### 1. Numerosity

Plaintiffs claim that the joinder of all members of their proposed class would be impracticable because they estimate that the class contains at least several hundred thousand members. (Pls.' Mot. at 12-13.) Defendant raises two arguments to challenge this contention. First, defendant argues that "[p]laintiffs have failed to establish that there exist sufficient numbers of would-be class members who may pursue viable claims for alleged overpayment of PACER fees, because all PACER users agree that they will raise any concerns with their PACER bills with the PACER Service Center within 90 days of receiving their bills." (Def.'s Opp. at 9.) In denying defendant's motion to dismiss, this Court has already held that plaintiffs were not required to alert the PACER Service Center about their claims as a prerequisite to bringing suit under the Little Tucker Act. *NVLSP*, 2016 WL 7076986, at *3. Therefore, defendant is wrong to count only potential class members who have alerted the PACER Service Center.

Second, defendant argues that "[p]laintiffs are only able adequately to represent the

interests of non-profit PACER users" and "named Plaintiffs have made no attempt to identify the number of non-profit organizations who would share their claims." (Def.'s Opp. at 10.) As defendant's own language suggests, defendant's argument is actually about adequacy of representation, not about numerosity. When the Court reaches the adequacy requirement below, it will address plaintiffs' ability to represent entities other than nonprofit organizations.

Defendant does not dispute that it would be impracticable to join all members of the class that plaintiffs have proposed: "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (Pls.' Mot. at 1; Def.'s Opp. at 9-10.) In 2012 the Judiciary reported that there were currently more than 1.4 million user accounts, and there had been 325,000 active users in 2009. *Electronic Public Access Program Summary*, PACER (Dec. 2012), https://www.pacer.gov/documents/epasum2012.pdf. Accepting the Judiciary's estimate that approximately 65-75 percent of active users are exempt from fees in at least one quarter during a typical fiscal year, *id.*, there remain a very large number of users paying fees in a typical year. Although the parties have not presented any precise data about the size of the class, there is no question that the class satisfies the numerosity requirement.

### 2. Commonality

A common question is a question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Plaintiffs argue that the two most important questions presented by their suit are common: (1) "Are the fees imposed for PACER access excessive in relation to the cost of providing the access . . . ?" and (2) "[W]hat is the measure of damages for the excessive fees charged?" (Pls.'

Mot. at 13.)  Defendant has not argued that plaintiffs' proposed class fails to satisfy the commonality requirement (*see* Def.'s Opp. at 8),[3] and this Court agrees that the legality of the PACER fee schedule and the formula for measuring any damages are common questions.

### 3. Typicality

A class representative's "'claim is typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory.'" *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003) (quoting *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C.1996)).  A leading treatise on class actions has explained that "typicality focuses on the similarities between the class representative's claims and those of the class while adequacy focuses on evaluating the incentives that might influence the class representative in litigating the action, such as conflicts of interest."  William B. Rubenstein, *Newberg on Class Actions* § 3:32 (5th ed. 2016).

According to named plaintiffs, their claims "are typical of the class because they arise from the same course of conduct by the United States (imposing a uniform PACER fee schedule that is higher than necessary to reimburse the cost of providing the service) and are based on the same legal theory (challenging the fees as excessive, in violation of the E-Government Act)." (Pls.' Mot. at 14.).  In response, defendant argues that named plaintiffs are "unlike other PACER users, in that they have the ability to request PACER fee exemptions as non-profits."  (Def.'s Opp. at 11.)  According to defendant, named plaintiffs' claims are not typical because they "appear unwilling to push to reduce those fees beyond the limit that would affect free access to their favored sub-set of PACER users."  (*Id.* at 13.)

---

[3] Defendant stated on the first page of its filing that "Plaintiffs have failed to establish . . . a commonality of claims."  (Def.'s Opp. at 1.)  However, it omitted commonality from a later list of challenges, *see id.* at 8, and failed to raise any argument about commonality.

Contrary to defendant's argument, plaintiffs satisfy the typicality requirement. Named plaintiffs and all class members are challenging the PACER fee schedule on the theory that it violates the E-Government Act by generating revenue that exceeds the costs of providing PACER. Defendant's objection focuses not on differences between named plaintiffs' claims and those of other class members but on incentives that could affect how named plaintiffs would pursue the litigation. Thus, the Court will address defendant's objection under the rubric of adequacy, which is the crux of defendant's opposition.

### 4. Adequacy

"'Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel.'" *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575-76 (D.C. Cir. 1997) (quoting *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)). Conflicts of interest prevent named plaintiffs from satisfying the adequacy requirement only if they are "fundamental to the suit and . . . go to the heart of the litigation." *Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 216 (D.D.C. 2015) (quoting *Newberg* § 3:58); *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012). Furthermore, conflicts will not defeat the adequacy requirement if they are speculative or hypothetical. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003). "[P]otential conflicts over the distribution of damages . . . will not bar a finding of adequacy at the class certification stage." *Newberg* § 3:58.

According to defendant, named plaintiffs are not adequate representatives because "[t]heir interests in free PACER access for their favored subset of PACER users diverge from the

interests of those PACER [users] seeking to minimize their costs of PACER use." (Def.'s Opp. at 15.) Defendant argues that named plaintiffs' nonprofit status gives them "the ability to request PACER fee exemptions." (*Id.* at 11.) Defendant further asserts that named plaintiffs are "interest[ed] in free PACER access to their groups of veterans, elderly and low-income consumers, and other public interest organizations of concern to the named Plaintiffs." (*Id.* at 12.) As a result, defendant reasons, "Plaintiffs appear unwilling to push to reduce those fees beyond the limit that would affect free access to their favored sub-set of PACER users." (*Id.* at 13.)

Defendant greatly exaggerates the relevance of named plaintiffs' nonprofit status. It is true that "a court may consider exempting . . . Section 501(c)(3) not-for-profit organizations" from payment of PACER fees. *Electronic Public Access Fee Schedule*. However, the Fee Schedule also instructs courts that applicants must "have demonstrated that an exemption is necessary in order to avoid unreasonable burdens and to promote public access to information." *Id.* "Courts should not . . . exempt individuals or groups that have the ability to pay the statutorily established access fee." *Id.* "[E]xemptions should be granted *as the exception*, not the rule." *Id.* (emphasis added). Courts grant exemptions only for access to their own district's records, and some districts are more willing than others to grant exemptions. *See* Christina L. Boyd & Jacqueline M. Sievert, *Unaccountable Justice? The Decision Making of Magistrate Judges in the Federal District Courts*, 34 Just. Sys. J. 249, 255 & n.1 (2013). This Court has found examples where courts granted exemptions to nonprofit organizations for purposes of litigation, but those organizations had claimed that payment of PACER fees was a financial hardship. *See, e.g.*, Orders Granting Request for Exemption, *PACER Service Center Exemption Requests & Orders*, No. 3:02-mc-00006 (D. Or. 2015), ECF Nos. 33, 35.

Named plaintiffs are not exempt from PACER fees and thus share with the other class members an interest in reducing the fees. The PACER fees that named plaintiffs have paid are low relative to their annual revenue and other costs of litigation. Because of their multimillion dollar annual budgets, named plaintiffs have averred that they cannot represent that they are unable to pay PACER fees, and as a result, they cannot qualify for exemptions. (Tr. 3-4.) Thus, named plaintiffs must pay PACER fees and accordingly have an interest in reducing those fees.

In fact, the nonprofit organizations who are named plaintiffs in this case make particularly good class representatives. They are interested in reducing PACER fees not only for themselves but also for their constituents. As nonprofit organizations, named plaintiffs exist to advocate for consumers, veterans, and other public-interest causes. (Compl. at ¶¶ 1-3.) The Alliance for Justice is an association of over 100 public-interest organizations, many of whom may face the same barriers as named plaintiffs to obtaining fee exemptions. Individual consumers and veterans may be eligible to apply for exemptions if they are indigent. *Electronic Public Access Fee Schedule*. However, courts frequently deny exemptions even to plaintiffs who have *in forma pauperis* status. *See, e.g.*, *Oliva v. Brookwood Coram I, LLC*, No. 14–cv–2513, 2015 WL 1966357, at *2 (E.D.N.Y. April 30, 2015); *Emrit v. Cent. Payment Corp.*, No. 14–cv–00042, 2014 WL 1028388, at *3 (N.D. Cal. Mar. 13, 2014); *Scott v. South Carolina*, Civ. No. 6:08-1684, 2009 WL 750419, at *1-*2 (D.S.C. March 18, 2009). Thus, named plaintiffs have dual incentives to reduce PACER fees, both for themselves and for the constituents that they represent. In addition, "organizational representatives with experience" can "provide more vigilant and consistent representation than individual representatives." *In re Pharm. Indus. Average Wholesale Price Litig.*, 277 F.R.D. 52, 62 (D. Mass. 2011).

In an attempt to argue that named plaintiffs' commitment to increasing public PACER

access actually disqualifies them from being representatives in this suit, defendant asserts that "[p]laintiffs appear unwilling to push to reduce those fees beyond the limit that would affect free access to their favored sub-set of PACER users." (Def.'s Opp. at 13.) This argument assumes the existence of some class members who would argue that the E-Government Act requires the Judicial Conference to eliminate exemptions and charge paying users only the fees that are necessary to provide PACER to them. Not only is such a claim based on sheer speculation, it also lacks viability given that Congress has explicitly directed the Judicial Conference that the "fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information." 28 U.S.C. § 1913 note. Even if a claim to eliminate exemptions were viable and not speculative, it would not create a conflict of interest that would prevent named plaintiffs from being adequate representatives, for a claim to eliminate exemptions would be independent from the claim in this case (i.e., that the E-Government Act prevents the Judiciary from collecting PACER fees that are not necessary to fund PACER). Named plaintiffs' pursuit of this class action will not interfere with other plaintiffs' ability to pursue a claim for elimination of exemptions. For all of these reasons, whether named plaintiffs lack interest in challenging the current exemption policy is irrelevant to their ability to serve as representatives in this suit.

Regarding the adequacy of class counsel, defendant argues only that the divergence in interests between named plaintiffs and other class members prevents named plaintiffs' counsel from adequately representing all class members. (Def.'s Opp. at 15.) The Court rejects this argument for the same reasons that it has already rejected defendant's argument that named plaintiffs have a conflict of interest with other class members. There is no dispute about the

competency of class counsel.  (*See* Pls.' Mot., Attachments 1-3; Def.'s Opp. at 15.)  In sum, named plaintiffs and their counsel satisfy the adequacy requirement.

### C.  Rule 23(b) Requirements

Rule 23(b) describes three types of class action and requires every class action to match one or more of the three types.  Fed. R. Civ. P. 23(b); *Newberg* § 4:1.  Plaintiffs argue that their proposed class can be certified under 23(b)(1) or 23(b)(3).

### 1.  Rule 23(b)(1)

In a 23(b)(1) class action, "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1).  According to the Advisory Committee notes to Rule 23, an action "to compel or invalidate an assessment" is the type of class action contemplated in Rule 23(b)(1).  Fed. R. Civ. P. 23(b)(1) advisory committee's note to 1966 amendment.

In their motion, plaintiffs argue that Rule 23(b)(1) permits certification of this class action because plaintiffs' complaint "seeks equitable relief," and inconsistent results in separate actions for equitable relief could force the Judiciary into a conflicted position.  (Pls.' Mot. at 18.)  Plaintiffs' complaint does ask the Court to "[d]eclare that the fees charged for access to records through PACER are excessive."  (Compl. at 15.)  However, at the motion hearing, plaintiffs stated that the declaration they are requesting is merely a step on the way to granting monetary relief, it is "not . . . equitable relief," and it "wouldn't bind anyone."  (Tr. 12-13.)  Indeed,

16

plaintiffs acknowledged that they "couldn't seek equitable relief" under the Little Tucker Act. (*Id.*; *see also Doe v. United States*, 372 F.3d 1308, 1312-14 (Fed. Cir. 2004); *Bobula v. U.S. Dep't of Justice*, 970 F.2d 854, 859 (Fed. Cir. 1992).) Therefore, the Court will not certify the class under Rule 23(b)(1).

### 2. Rule 23(b)(3)

To certify a class under Rule 23(b)(3), a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs argue that "[t]he sole individual issue—calculation of each class member's recovery . . . is ministerial" and therefore the common legal questions predominate. (Pls.' Mot. at 19.) In opposition, defendant contends that "the Court will have to assess whether and in what degree the individual Plaintiffs were able to secure free pages in excess of the 30 pages for which they were charged for lengthy documents. If the individual plaintiff's downloads of these documents operate to decrease the per page cost to below that sought by Plaintiffs, then there will be no liability to the class-member." (Def.'s Opp. at 20.) The Court does not share defendant's concern, because plaintiffs' theory of liability is that the fee schedule itself violated the E-Government Act, not that charges to individual plaintiffs violated the Act when they amounted to more than the cost of distribution to those particular plaintiffs. (*See* Pls.' Reply at 6, ECF No. 17.) If plaintiffs prevail on their common legal theory that the Judiciary was required to set a lower rate that corresponded to PACER's funding needs, defendant would be liable to any class member who paid the illegal higher rate. Calculating the amount of damages would be ministerial because it would be proportional to the fees that plaintiffs paid, rather than dependent upon the types of

documents that they obtained.  Therefore, the Court finds that common questions predominate.

Although defendant does not use the word "superiority," it also objects that "class action litigation was not intended to facilitate *two* class actions, which would result if this case proceeds as a class and the *Fisher* case is similarly prosecuted."  (Def.'s Opp. at 21.)  This Court has already rejected the argument that *Fisher* should bar this suit, explaining that the suits make different claims.  *NVLSP*, 2016 WL 7076986, at *3.  Besides, defendant's argument has nothing to do with the superiority of the class action vehicle, as opposed to individual actions.[4]

Allowing this action to proceed as a class action is superior to requiring individual actions, both for reasons of efficiency and to enable individuals to pursue small claims.  As the Supreme Court has explained, "'[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

In sum, the Court will certify the class under Rule 23(b)(3), but it in no way resolves the merits of plaintiffs' challenge to the PACER fee schedule.

## III.  NOTICE TO CLASS MEMBERS

"For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  In their motion for class certification, plaintiffs proposed a class-notice plan involving "email notice . . . to each class member using the contact information maintained by the government" for PACER users.  (*See* Pls.' Mot. at 20.)  Plaintiffs "request that the Court direct the parties to file an agreed-upon

---

[4] Furthermore, the plaintiff in *Fisher* has not yet moved for class certification.  (Tr. 9.)

proposed form of notice (or, if the parties cannot agree, separate forms of notice) within 30 days of the Court's certification order, and direct that email notice be sent to the class within 90 days of the Court's approval of a form of notice." (*Id.*)  With no opposition from defendant, the Court will grant this request.

## CONCLUSION

Plaintiffs' motion for class certification is granted, with minor modifications to the proposed class definition.  A separate Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 24, 2017

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No. 16-745 (ESH)

## PROPOSED BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

———————————

Bruce D. Brown (D.C. Bar No. 457317)
*Counsel of record for Amicus Curiae*
Caitlin Vogus (D.C. Bar No. 988826)
REPORTERS COMMITTEE FOR
      FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
(202) 795-9301

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ...................................... 1

SUMMARY OF ARGUMENT ................................................................................................ 2

ARGUMENT ......................................................................................................................... 4

    I.    The public and the press benefit from unfettered access to electronic court records. ........ 4

        A.    The news media uses electronic court records to inform the public about matters of public concern. ....................................................................................................... 4

        B.    Ready access to electronic court records prompts fairness and accuracy in reporting... 7

    II.    The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with First Amendment values. ....................................................................... 9

    III.    PACER fees in excess of those authorized by the E-Government Act of 2002 hinders journalists and members of the public from accessing court records. ............................ 12

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) .......................................................... 7

**Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) ........................... 9, 10

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ...................................................... 11

*In re Application for Exemption from Electronic Public Access Fees by Gollan & Shifflet*,
728 F.3d 1033 (9th Cir. 2013) ............................................................................. 11, 14

*In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*,
585 F. Supp. 2d 83 (D.D.C. 2008) ............................................................................ 10

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) ......... 11

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ............................................... 11

**Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589 (1978) ......................................... 9, 10

**Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ..................................... 9, 10

**Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ......................................... 9, 10

**Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) .......................... 9, 10, 12

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ............................................................... 11

**United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) ................................... 9, 10

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ............................................. 9

**Statutes**

**E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17,
2002) (28 U.S.C § 1913 note) ................................................................................... 1

**Other Authorities**

*About the Herald Investigation*, Miami Herald, July 20, 2008,
https://perma.cc/6M9D-HB8D ................................................................................... 6

Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, Pew Research Center, June 15,
2016, https://perma.cc/5ZPF-Q3H5 ......................................................................... 12

Anne Urda, *Mother Blasts Crib Company in Court*, Law360, Sept. 26, 2007,
https://perma.cc/2ZNY-EYR9 .................................................................................... 4

Brad Heath, *ATF uses fake drugs, big bucks to snare suspects*, USA TODAY (June 27, 2013),
https://perma.cc/U5LF-JZGV ..................................................................................... 5

Craig Silverman, *Show the reporting and sources that support your work*, American Press
Institute, Sept. 24, 2014, https://perma.cc/M8UU-H6E5 .......................................... 8

Danny Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed
Documents*, N.Y. Times, Mar. 14, 2017, http://nyti.ms/2mLxYuW ........................... 4

Dylan Byers, *Time Inc. cuts 300 positions*, CNNMoney.com, June 13, 2017,
https://perma.cc/UA3K-G99G .................................................................................. 12

Electronic Public Access Fee Schedule, PACER,
https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013) ........... 11, 13, 14

Erik Sass, *Signs of the Times: More Local Newspapers Closing*, MediaPost, Feb. 10, 2017,
https://perma.cc/LE6H-UWAG ............................................................................................ 12

Harlan Yu & Stephen Schultze, *Using Software to Liberate U.S. Case Law*, 18 ACM XRDS 12
(2011), *available at* https://perma.cc/7FPD-NL4E ................................................................... 13

Howard Berkes, Anna Boiko-Weyrauch, & Robert Benincasa, *Coal Mines Keep Operating
Despite Injuries, Violation And Millions In Fines*, NPR, Nov. 12, 2014, http://n.pr/1zkB86v 13

Jack Dolan, Rob Barry, & Matthew Haggman, *Ex-convicts active in mortgage fraud*, Miami
Herald, July 20, 2008, https://perma.cc/8AXS-7C4C .................................................................. 6

Janet Roberts, *Data for Criminal Justice Stories*, Investigative Reporters and Editors Conference
(2008), *available at* http://bit.ly/2vlRf7I ................................................................................. 7

Jeff Sturgeon, *Former Giles County doctor, stripped of license, faces federal criminal probe*,
Apr. 18, 2017, https://perma.cc/2PFX-6BX5 ......................................................................... 13

Joe Palazzolo & Devlin Barrett, *Roots of Apple-FBI Standoff Reach Back to 2008 Case*, Wall
Street J., Apr. 7, 2016, http://on.wsj.com/2x82QMe .............................................................. 6

Joel Rose & Jessica Taylor, *DOJ Files Brief In Appeals Court, Defending Trump's Immigration
Executive Order*, NPR, Feb. 6, 2017, http://n.pr/2kM3J6w ...................................................... 8

Jonathan D. Silver, *Defaulting developer is target of fraud probe*, Pittsburgh Post-Gazette, Feb.
14, 2009, http://bit.ly/2wpfFAX ............................................................................................ 13

Joseph Cox, *Unsealed Court Docs Show FBI Used Malware Like 'A Grenade'*, Motherboard,
Nov. 7, 2016, http://bit.ly/2uMX2XH ..................................................................................... 5

Josh Gerstein, *Legal fight breaks out over deposition of Trump dossier author Christopher Steel*,
Politico, Aug. 10, 2017, http://politi.co/2iewDfK ...................................................................... 8

Kate Willson, *How to Search Federal Court Records*, International Consortium of Investigative
Journalists, Mar. 30, 2012, http://bit.ly/2vG6Miw ................................................................... 6

Keith J. Kelly, *NY Times will cut budget and staff to reach digital demands*, N.Y. Post, Jan. 17,
2017, https://perma.cc/ALG4-8TNR ...................................................................................... 12

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse
Reporter*, 9 J. App. Prac. & Process 299 (Fall 2007) ............................................................. 7

Matt Apuzzo, *A.T.F. Filled Secret Bank Account With Millions From Shadowy Cigarette Sales*,
N.Y. Times, Feb. 22, 2017, https://nyti.ms/2lurrCq ................................................................ 6

Michael Calderone, *The Guardian Continues to Pare U.S. Edition*, HuffPost, Mar. 22, 2017,
**h**ttps://perma.cc/6YN5-U2QG ............................................................................................ 12

Michael Harriot, *Everything You Think You Know About the Death of Mike Brown Is Wrong, and
the Man Who Killed Him Admits It*, TheRoot, Mar. 15, 2017, **https://perma.cc/2L6D-BB53** . 5

Robert Snell, *Feds use anti-terror tool to hunt the undocumented*, Detroit News, May 18, 2017,
https://perma.cc/86TB-D245 ................................................................................................. 12

Susan E. Seager, *Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40 Years Ago*, Comm. Law, Spring 2016 ...................................................... 7

Toni Locy, *Covering America's Courts* (2013) ............................................................. 8

Wesley Lowery, *Darren Wilson told attorneys he and other Ferguson officers used the n-word*, Wash. Post, Mar. 14, 2017, https://perma.cc/6RQS-52A5 ......................................... 5

Zoe Tillman, *Lawsuit Accuses Baton Rouge Police Of Excessive Force During Protests Over Alton Sterling's Death*, BuzzFeed, July 10, 2017, http://bzfd.it/2wYaF3X ............................... 8

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

*Amici curiae* are the Reporters Committee for Freedom of the Press and American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, The Center for Investigative Reporting, First Amendment Coalition, First Look Media Works, Inc., International Documentary Assn., Investigative Reporting Workshop at American University, The Media Consortium, MPA - The Association of Magazine Media, National Press Photographers Association, Online News Association, Radio Television Digital News Association, Reporters Without Borders, The Seattle Times Company, Society of Professional Journalists, and Tully Center for Free Speech. A supplemental statement of identity and interest of *amici* is included below as Appendix A. Pursuant to Local Civ. R. 7(o), *amici* have submitted a motion for leave to file their brief as *amici curiae*.[1]

As representatives and members of the news media, *amici* have a strong interest in ensuring that the press and the public have ready access to court documents. Members of the news media frequently use court records to report on matters of public concern, and such records serve as the foundation for reporting on the justice system, including important criminal and civil proceedings. Because the news media serves as a conduit through which the public receives information, when reporters cannot access court records, it is the public that loses.

The E-Government Act of 2002 permits the Judicial Conference to charge reasonable fees for electronic access to court records "only to the extent necessary." Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C § 1913 note) (hereinafter "E-

---

[1] Counsel for *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than *amici*, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

Government Act of 2002"). Charging fees through the Public Access to Court Electronic Records system ("PACER") which are higher than the cost of dissemination impinges on access to court records by journalists and members of the public. Independent journalists and local news media, in particular, cannot afford to pay excessive fees. It is vital that access to these important records is not inhibited by fees in excess of what the E-Government Act of 2002 permits. *Amici* write to emphasize the importance of unfettered access to court records by all members of the press and the public.

## SUMMARY OF ARGUMENT

Access to court records is essential to the public's understanding of our judicial system. Court records shed light on the actions of parties, counsel, and the judiciary, as well as the basis for judicial decisions and orders. Access to court records discourages corruption and obfuscation—the eradication of which is essential to a democracy. The news media frequently relies on court records to report on criminal and civil cases, and media coverage permits the public to engage in meaningful discussion about the judicial system and the allegations made or issues raised in particular cases. Unfettered and inexpensive access to court documents promotes accuracy and fairness in the news media's reporting and, therefore, the public's knowledge.

Ready access to court records is also consistent with First Amendment values. The U.S. Supreme Court and U.S. Court of Appeals for the D.C. Circuit have recognized that the First Amendment and common law create presumptions of access to judicial proceedings and judicial records and that such access is essential to a healthy democracy and judicial system. The E-Government Act of 2002's limitation on fees for access to court records through PACER to cover only the cost of dissemination is consonant with the constitutional and common law presumptions of access to court records.

In contrast, imposing fees for access to court records higher than the cost of dissemination—and higher than what the E-Government Act of 2002 permits—erects an improper barrier to public access.  The impact will be felt throughout the broad community of PACER users but particularly at news organizations.  As news outlets' budgets shrink, even large media companies are daunted by higher fees for court records.  Independent journalists and community news media companies are even less able to pay such fees.  Thus, charging fees for court records beyond the cost of dissemination not only violates the E-Government Act of 2002, but also inhibits the press from producing original reporting about cases of public importance.  It is also out of step with vast benefits to judicial administration brought on by digitization.

Because the government is charging fees for access to judicial records that are not authorized by the E-Government Act of 2002 and such charges harm the press and public's ability to access court records, *amici* urge this Court to grant Plaintiffs' motion for summary judgment as to liability.

## ARGUMENT

**I.    The public and the press benefit from unfettered access to electronic court records.**

    A.    The news media uses electronic court records to inform the public about matters of public concern.

A wide variety of news organizations use PACER to access electronic records in the federal district and appellate courts and to report on a broad array of topics important to the public interest.  Journalists routinely rely on electronic court records to report on matters concerning public safety, government misconduct, and public controversy and to conduct in-depth investigations on matters of public concern.

News organizations have used court records available through PACER to report on civil disputes that implicate public safety.  For example, in March of 2017, *The New York Times* relied on federal court documents that raised questions about the safety of certain pesticides manufactured by Monsanto to report on those concerns.  *See, e.g.*, Danny Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents*, N.Y. Times, Mar. 14, 2017, http://nyti.ms/2mLxYuW.  The records also revealed disagreement within the Environmental Protection Agency over its safety assessment of the pesticide's main ingredient, a possible carcinogen.  *Id.*  Similarly, in 2007, Law360 reported on a putative class action lawsuit against a crib manufacturer that accused the company of negligence after its crib allegedly caused the death of at least one infant.  Anne Urda, *Mother Blasts Crib Company in Court*, Law360, Sept. 26, 2007, https://perma.cc/2ZNY-EYR9.  The report quoted from the complaint's description of the crib's defects, explaining that the crib could develop "'a dangerous gap leading to a child falling through and being trapped between the side rail and the mattress.'"  *Id.*

In addition, reporters have used court records available on PACER to inform the public about possible government misconduct or controversial government activities.  In 2016, for

example, Motherboard used federal court records to report that the FBI may have illegally

exceeded the scope of search warrants that authorized them to use a form of malware against

specific users of the email service TorMail.  Joseph Cox, *Unsealed Court Docs Show FBI Used*

*Malware Like 'A Grenade'*, Motherboard, Nov. 7, 2016, http://bit.ly/2uMX2XH.  According to

one expert, the FBI delivered the malware to "innocent TorMail users" and did not inform the

federal court "about the extent to which they botched the TorMail operation." *Id.*  In another

example, in 2013, USA TODAY reported on controversial sting operations conducted by the

U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives.  Brad Heath, *ATF uses fake drugs,*

*big bucks to snare suspects*, USA TODAY (June 27, 2013), https://perma.cc/U5LF-JZGV.  USA

TODAY reporters reviewed "thousands of pages of court records" to "tell the story of how an

ATF strategy meant to target armed and violent criminals has regularly used risky and expensive

undercover stings to ensnare low-level crooks." *Id.*

Court records available through PACER also shed light on ongoing matters of public

debate.  After the shooting of Michael Brown by a Ferguson, Missouri police officer, *The*

*Washington Post* relied on federal court records to report that the officer had made a sworn

admission that he and other officers had used a racial slur to describe black people.  Wesley

Lowery, *Darren Wilson told attorneys he and other Ferguson officers used the n-word*, Wash.

Post, Mar. 14, 2017, https://perma.cc/6RQS-52A5.  This report, and the court records upon

which it was based, informed public discussion concerning Mr. Brown's shooting, which

prompted nationwide protests. *Id.*; *see also* Michael Harriot, *Everything You Think You Know*

*About the Death of Mike Brown Is Wrong, and the Man Who Killed Him Admits It*, TheRoot,

Mar. 15, 2017, https://perma.cc/2L6D-BB53 (discussing competing interpretations of the court

records reported by *The Washington Post*).  In addition, after the Department of Justice sought to

5

compel Apple Inc. to unlock a smartphone belonging to the man who shot and killed 14 people

in San Bernardino in December 2015, reporters from *The Wall Street Journal* used federal court

records to report about the first case, in 2008, in which a federal judge ordered Apple to assist the

government in unlocking a phone. Joe Palazzolo & Devlin Barrett, *Roots of Apple-FBI Standoff*

*Reach Back to 2008 Case*, Wall Street J., Apr. 7, 2016, http://on.wsj.com/2x82QMe.

Investigative journalists, too, routinely rely on court records available through PACER to

uncover stories important to the public interest. *See* Kate Willson, *How to Search Federal Court*

*Records*, International Consortium of Investigative Journalists, Mar. 30, 2012,

http://bit.ly/2vG6Miw. For example, *New York Times* reporter Matt Apuzzo used court records

from a federal racketeering lawsuit, some of which were available on PACER, to write an in-

depth report revealing that agents from the Bureau of Alcohol, Tobacco, Firearms and

Explosives "used a web of shadowy cigarette sales to funnel tens of millions of dollars into a

secret bank account." Matt Apuzzo, *A.T.F. Filled Secret Bank Account With Millions From*

*Shadowy Cigarette Sales*, N.Y. Times, Feb. 22, 2017, https://nyti.ms/2lurrCq. In addition, *The*

*Miami Herald* won the Gerald Loeb Award for a series of stories that relied on federal court

records and other documents to report lapses by Florida regulators that allowed thousands of

convicted felons to work in the state's mortgage industry, some of whom went on the steal

millions of dollars from lenders and borrowers. *See* Jack Dolan, Rob Barry, & Matthew

Haggman, *Ex-convicts active in mortgage fraud*, Miami Herald, July 20, 2008,

https://perma.cc/8AXS-7C4C; *About the Herald Investigation*, Miami Herald, July 20, 2008,

https://perma.cc/6M9D-HB8D. Reliance on PACER is so routine that organizations for

investigative journalists even provide training on how to use the system to unearth important

news stories. Willson, *supra*; *see also* Janet Roberts, *Data for Criminal Justice Stories*,

Investigative Reporters and Editors Conference (2008), *available at* http://bit.ly/2vlRf7I

(directing reporters to PACER for federal court records in criminal cases).

B.   Ready access to electronic court records prompts fairness and accuracy in
     <u>reporting.</u>

Court records are among the most reliable sources of information for reporting on

lawsuits and matters of public concern.  As official, primary sources, court records are essential

to reporters' ability to report the news accurately and completely.  As longtime U.S. Supreme

Court correspondent Lyle Denniston has noted:

> No courthouse reporter can do his or her work without prompt——
> sometimes, virtually immediate—access to original documents. . . .
> News reporters and editors are fond of saying that a reporter is only
> as good as his or her sources.  For the courthouse reporter—indeed,
> for any reporter who would undertake to cover the law, possibly at
> any level—there is no source equal to, and certainly none superior
> to, an actual document.

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse*

*Reporter*, 9 J. App. Prac. & Process 299, 299–300 (Fall 2007).

Reporting on legal disputes is most authoritative and accurate when court records are

readily available for inspection, copying, and reference by members of the news media.  Indeed,

many states have recognized the reliability of reporting based on official records by adopting a

common law or statutory fair report privilege that shields reporters from liability when they

accurately report material from official meetings, records, or statements.  *See* Susan E. Seager,

*Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair*

*Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40*

*Years Ago*, Comm. Law, Spring 2016, at 1 n.1 (noting that "[a]t least 47 states and the District of

Columbia have adopted either a common law or statutory fair report privilege"); *see also Cox*

*Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975) (stating that "[g]reat responsibility is . . .

placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations").

Reporters and their readers benefit tremendously when news reports can reference and quote directly from court documents. In a textbook on legal news reporting, professor and veteran journalist Toni Locy stresses this point. *See* Toni Locy, *Covering America's Courts* 61–67 (2013)**Error! Bookmark not defined.** (focusing on the theme that, when reporting on courts, "reading is fundamental"). Locy advises reporters not to rely solely on press releases and statements given by attorneys and instead to "review[] court filings or other public records," among other things, to determine whether and how a fact or allegation should be reported. *Id*. at 3–4, 9.

Moreover, in the digital age, when media outlets are no longer constrained by space in the same way they once were in print, many choose to publish the court records behind a report by posting them alongside a story or linking to them. *See* Craig Silverman, *Show the reporting and sources that support your work*, American Press Institute, Sept. 24, 2014, https://perma.cc/M8UU-H6E5; *see also, e.g.*, Joel Rose & Jessica Taylor, *DOJ Files Brief In Appeals Court, Defending Trump's Immigration Executive Order*, NPR, Feb. 6, 2017, http://n.pr/2kM3J6w (reporting on and embedding DOJ brief filed in the Ninth Circuit); Josh Gerstein, *Legal fight breaks out over deposition of Trump dossier author Christopher Steel*, Politico, Aug. 10, 2017, http://politi.co/2iewDfK (reporting on and linking to motion to intervene to oppose a deposition and opposition filed in response in the Southern District of Florida); Zoe Tillman, *Lawsuit Accuses Baton Rouge Police Of Excessive Force During Protests Over Alton Sterling's Death*, BuzzFeed, July 10, 2017, http://bzfd.it/2wYaF3X (reporting on and linking to

complaint filed in the Middle District of Louisiana).

In short, access to court records makes reporting more accurate, fair, and transparent. Reporters with access to primary source materials are more likely to get the story right when reporting on legal news. And publication of court records alongside such stories enhances readers' trust by allowing readers to read the documents themselves and hold reporters accountable for the facts underlying a story. These benefits of access to court records can accrue, however, only if news organizations can afford to access them.

## II. The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with First Amendment values.

The common law provides a broad presumptive right of access to judicial documents. *See Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents"); *United States v. Hubbard*, 650 F.2d 293, 314 (D.C. Cir. 1980) (recognizing "this country's common law tradition of public access to records of a judicial proceeding"). In addition, the U.S. Supreme Court has recognized a First Amendment right of access to criminal proceedings. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press–Enterprise II*"); *Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press–Enterprise I*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). The D.C. Circuit has also found that the First Amendment "guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Wash. Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991).

These presumptions of access arise from the public's interest in observing matters before the federal courts. *See Globe Newspaper Co*, 457 U.S. at 606. Public access to judicial

proceedings and records "permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Id.*; *Hubbard*, 650 F.2d at 314–15 (explaining that "access to records serves the important functions of ensuring the integrity of judicial proceedings in particular"). As the U.S. Supreme Court has explained, "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed[.]" *Press-Enterprise I*, 464 U.S. at 508. Thus, "[i]n addition to ensuring actual fairness, the openness of judicial proceedings helps ensure the appearance of fairness." *In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 90 (D.D.C. 2008).

Indeed, the public's interest in obtaining information contained within judicial documents plays a key role in determining whether access is allowed under both the common law and First Amendment. The common law test requires courts to "weigh[] the interests advanced by the parties in light of the public interest and the duty of the courts." *Nixon*, 435 U.S. at 602. The First Amendment standard employs the well-established "experience and logic" test, examining both whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II*, 478 U.S. at 8.

Although the presumptions of access apply to all members of the public, access to court records by the news media is especially important because the press serves as a conduit of information for the public. *See Richmond Newspapers, Inc.*, 448 U.S. at 573 (stating that members of the press often "function[] as surrogates for the public" by, for example, attending proceedings, reviewing court documents, and reporting on judicial matters to the public at large). The American people rely on the news media for information. "'[A]n untrammeled press [is] a

vital source of public information,' . . . and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (alterations in original)); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) (writing that "the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. . . .The press was protected so that it could bare the secrets of government and inform the people"). The U.S. Supreme Court has recognized that the news media plays a vital role in facilitating public monitoring of the judicial system, in particular. As the Court has noted:

> A responsible press has always been regarded the handmaiden of effective judicial administration, especially in the criminal field. . . . The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

The E-Government Act of 2002's authorization of the judiciary to prescribe "reasonable fees" for access to electronic court records "only to the extent necessary" is consistent with the presumption of access found in the First Amendment and common law. In addition, the Electronic Public Access Fee Schedule's fee waiver provision, which was implemented at the direction of Congress and applies when a requester demonstrates a waiver "is necessary. . . to avoid unreasonable burdens and *to promote public access to information*," is also in accord with the constitutional and common law presumptions of access. *See* Electronic Public Access Fee Schedule, PACER, https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013) (emphasis added); *In re Application for Exemption from Electronic Public Access Fees by Gollan & Shifflet*, 728 F.3d 1033, 1035 (9th Cir. 2013) ("*In re Application for Exemption*")

11

(stating that "Congress directed to the Judicial Conference to provide for exempting persons or classes or persons for whom fees would be an unreasonable burden" (internal quotation marks omitted)).  These provisions, if followed, promote the openness that is "an indispensable attribute" of the judicial system.  *Richmond Newspapers*, 448 U.S. at 569.

### III.   PACER fees in excess of those authorized by the E-Government Act of 2002 hinders journalists and members of the public from accessing court records.

The news media today faces serious financial stresses.  "Eight years after the Great Recession sent the U.S. newspaper industry into a tailspin, the pressures facing America's newsrooms have intensified to nothing less than a reorganization of the industry itself."  Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, Pew Research Center, June 15, 2016, https://perma.cc/5ZPF-Q3H5.  In response, many newsrooms have cut jobs; the newspaper workforce has shrunk by nearly 40% in the last twenty years, and cuts continue to occur.  *See id.* at 9 (Michael Barthel, *Newspapers: Fact Sheet*); *see also, e.g.*, Keith J. Kelly, *NY Times will cut budget and staff to reach digital demands*, N.Y. Post, Jan. 17, 2017, https://perma.cc/ALG4-8TNR; Dylan Byers, *Time Inc. cuts 300 positions*, CNNMoney.com, June 13, 2017, https://perma.cc/UA3K-G99G; Michael Calderone, *The Guardian Continues to Pare U.S. Edition*, HuffPost, Mar. 22, 2017, https://perma.cc/6YN5-U2QG.

As newsrooms across the country, and their budgets, continue to shrink, substantial fees for court records are a burden to even established news organizations.  *See* Mitchell & Holcomb, *supra.*  Local and freelance journalists who lack institutional support are even less likely to be able to pay high PACER fees.  *See, e.g.*, Erik Sass, *Signs of the Times: More Local Newspapers Closing*, MediaPost, Feb. 10, 2017, https://perma.cc/LE6H-UWAG.  If they cannot afford to access to court records, these community news outlets will lose a valuable source of information for informing the public on local events.  *See, e.g.*, Robert Snell, *Feds use anti-terror tool to hunt*

*the undocumented*, Detroit News, May 18, 2017, https://perma.cc/86TB-D245 (using court

records from Eastern District of Michigan to report government's use of cellphone tracking to

track undocumented immigrants in Michigan); Jonathan D. Silver, *Defaulting developer is target*

*of fraud probe*, Pittsburgh Post-Gazette, Feb. 14, 2009, http://bit.ly/2wpfFAX (reporting about

the local targets of a federal mortgage fraud conspiracy probe using federal court records); Jeff

Sturgeon, *Former Giles County doctor, stripped of license, faces federal criminal probe*, Apr.

18, 2017, https://perma.cc/2PFX-6BX5 (relying on federal court records "posted to the online

federal case management system" to report about a local doctor being investigated by federal

authorities following drug overdose deaths of 20 of his patients); Howard Berkes, Anna Boiko-

Weyrauch, & Robert Benincasa, *Coal Mines Keep Operating Despite Injuries, Violation And*

*Millions In Fines*, NPR, Nov. 12, 2014, http://n.pr/1zkB86v (reporting results of joint

investigation by NPR and *Mine Safety & Health News*, a legal reporting service for the U.S.

mining industry, that used federal court records and other government documents to show that

thousands of mine operators fail to pay safety penalties).

PACER fees in excess of those authorized by the E-Government Act of 2002 may also be

prohibitively expensive for investigative journalists, who often need to look at court documents

in the aggregate for large-scale analysis. *See* Harlan Yu & Stephen Schultze, *Using Software to*

*Liberate U.S. Case Law*, 18 ACM XRDS 12 (2011), *available at* https://perma.cc/7FPD-NL4E

(noting that users such as academics and journalists "who want to study large quantities of court

documents are effectively shut out" because of PACER fees). Because PACER charges a user

by the page for certain activities like downloading a PDF or making a search query, *see*

Electronic Public Access Fee Schedule, *supra*, the larger the data set the user seeks, the higher

the cost. As aggregate data analysis has become an increasingly important tool for investigative

journalists, PACER fees have become palpably more burdensome.  *See, e.g.*, *In re Application for Exemption*, 728 F.3d at 1035–36 (affirming denial of temporary PACER fee waiver sought by two reporters so they could "comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identifying situations requiring their recusal'" and publish their findings).

Moreover, members of the news media are often unable to obtain fee waivers for PACER fees, even when reporting on stories of public interest.  The Electronic Public Access Fee Schedule expressly states that courts "should not exempt . . . members of the media" from payment of PACER fees.   Electronic Public Access Fee Schedule, *supra*.  Even if non-profit media organizations may, in some cases, be granted fee waivers, *see In Re Application for Exemption*, 728 F.3d at 1040 n.5, the vast majority of news organizations are for-profit and therefore unable to obtain waivers of PACER fees, even if they cannot afford them.

In short, newsgathering is substantially hindered by PACER fees in excess of the cost of dissemination, which is the amount authorized by the E-Government Act of 2002, and members of the news media are generally not eligible for fee waivers.  Charging PACER fees greater than those permitted by law negatively impacts the news media's—and therefore the public's—right to access court records and impinges upon the distribution of information necessary to informed communities and a healthy democracy.

**CONCLUSION**

For the foregoing reasons, *amici curiae* respectfully request that this Court grant

judgment in favor of Plaintiffs.

Respectfully submitted,

/s/ *Bruce D. Brown*
Bruce D. Brown
*Counsel for Amici Curiae*
THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

Dated: September 5, 2017

## CERTIFICATE OF COMPLIANCE

I, Bruce Brown, do hereby certify: (1) Brief of *Amici Curiae* complies with the type-volume limitation Fed. R. App. P. 29(a)(5) because it contains 4,220 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); (2) Brief of *Amici Curiae* complies with Local Civ. R. 7(o)(4) because it does not exceed 25 pages; and (3) Brief of *Amici Curiae* complies with the typeface requirements of Local Civ. R. 5(d) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 12-point Times New Roman.

Dated: September 5, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Bruce Brown, hereby certify that on September 5, 2017, I electronically filed the

foregoing document with United States Court of Appeals for the District of Columbia by using

the CM/ECF system. I certify that the following parties or their counsel of record are registered

as ECF filers and that they will be served through the CM/ECF system.

Dated: September 5, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

## APPENDIX A

### SUPPLEMENTAL STATEMENT OF IDENTITY OF *AMICI CURIAE*

**The Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press Media Editors** is a nonprofit, tax-exempt organization of newsroom leaders and journalism educators that works closely with The Associated Press to promote journalism excellence. APME advances the principles and practices of responsible journalism; supports and mentors a diverse network of current and emerging newsroom leaders; and champions the First Amendment and promotes freedom of information.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**The Center for Investigative Reporting** (CIR) believes journalism that moves citizens to action is an essential pillar of democracy. Since 1977, CIR has relentlessly pursued and revealed injustices that otherwise would remain hidden from the public eye. Today, we're upholding this legacy and looking forward, working at the forefront of journalistic innovation to produce important stories that make a difference and engage you, our audience, across the aisle, coast to coast and worldwide.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**First Look Media Works, Inc.** is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

**The International Documentary Association** (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

**The Investigative Reporting Workshop**, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**The Media Consortium** is a network of the country's leading, progressive, independent media outlets. Our mission is to amplify independent media's voice, increase our collective clout, leverage our current audience and reach new ones.

**MPA - The Association of Magazine Media**, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**Online News Association** ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reporters Without Borders** has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## APPENDIX B

### ADDITIONAL COUNSEL FOR *AMICI CURIAE*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*
*Counsel for Association of Alternative Newsmedia*

Judy Alexander
Chief Legal Counsel
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, California 94608

David Snyder
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

James Cregan
Executive Vice President
MPA - The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Laura R. Handman
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Thomas R. Burke
Davis Wright Tremaine LLP
Suite 800
500 Montgomery Street
San Francisco, CA 94111
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, | Case No. 16-745-ESH |
| | Judge Ellen S. Huvelle |
| v. | |
| UNITED STATES OF AMERICA, *Defendant*. | |

**Proposed Brief *Amici Curiae* by The American Association of Law Libraries, et al., <u>In Support of Plaintiffs' Motion for Summary Judgment</u>**

Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5) of this Court, which requires compliance with the

requirements of Rule 29(a)(4)(A)) and Rule 26.1 of the Federal Rules of Appellate Procedure:

I, the undersigned, counsel of record for *amici curiae*, certify that to the best of my knowledge

and belief, the American Association of Law Libraries has no parent corporation and no publicly

held corporation holds 10% or more of its stock.

Dated: September 5, 2017

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

i

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................... 1

ARGUMENT ................................................................................. 2

I.   CURRENT PACER FEES PREVENT SCHOLARS FROM DOING
     DEMOCRATICALLY IMPORTANT WORK ........................................................ 4
     A.  Building Systems For Accessing, Teaching, And Practicing The Law .................... 4

     B.  Diagnosing Societal Issues By Examining The Legal Record ................................. 6

     C.  Studying And Contributing To Jurisprudential Development ................................. 9

II.  PACER FEES PREVENT LAW LIBRARIES FROM PROVIDING PUBLIC
     ACCESS TO LEGAL INFORMATION ......................................................... 13
     A.  PACER Fees Harm Patron Access And Legal Research Instruction .................... 14

     B.  PACER Fees Impede Law Libraries' Responsibility To Preserve
         Legal Materials ..................................................................... 16

III. THIS COURT MUST ENFORCE CONGRESS'S REQUIREMENT THAT THE
     FEDERAL COURTS MAKE FEDERAL ELECTRONIC COURT RECORDS
     "FREELY AVAILABLE TO THE GREATEST EXTENT POSSIBLE,"
     BECAUSE COURT ADMINISTRATORS HAVE PROVEN UNWILLING TO
     DO SO VOLUNTARILY ..................................................................... 17

CONCLUSION ............................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Ashcroft v. Iqbal*, 55 U.S. 662 (2009) ........................................................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................ 11

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)........................................ 2

*Richmond Newspapers v. Virginia*, 448 U.S. 555, 567 (1980) ....................................2

**Other Authorities**

Administrative Office of the United States Courts, *Electronic Public Access at 10*, The
    Third Branch, September 2000 ............................................................................ 3

Civil Rights Litigation Clearinghouse, https://www.clearinghouse.net/about.php ....... 6

CodeX, The Stanford Center for Legal Informatics, http://codex.stanford.edu/ ........... 5

Clifford J. Carrubba and Tom S. Clark, *Rule Creation in a Political Hierarchy*, 106 Am.
    Pol. Sci. R. 622, 634 (2012) ............................................................................ 10

Cornell Legal Information Institute, https://www.law.cornell.edu/.............................. 4

Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. of Pol. 591 (2017)............................ 10

Digital Public Library of America, https://dp.la/ ........................................................17

Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016).................... 19

Elizabeth Warren, *Bankrupt Children*, 86 Minn. L. Rev. 1003 (2002)........................7

Erika Wayne, *PACER Spending Survey*, Legal Research Plus (Aug. 28, 2009),
    https://perma.cc/4CEC-Z7JT ............................................................................ 15

HathiTrust Digital Library, https://www.hathitrust.org/................................................ 17

Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach
    to the Problems of Inconsistency and Bias in Adjudication* (October 21, 2016)
    (working paper), https://ssrn.com/abstract=2694326 ....................................... 12

Iain Carmichael, James Wudel, Michael Kim, and James Jushchuk, Comment, *Examining
    the Evolution of Legal Precedent through Citation Network Analysis*, 96
    N.C. L. Rev. (forthcoming 2017)..................................................................... 10

J. Michael Greenwood & John Brinkema, *E-Filing Case Management Services in the US
    Federal Courts: The Next Generation: A Case Study*, 7 Int'l J. for Ct. Admin. 3, 3
    (2015), https://perma.cc/33S9-XW3Z ..............................................................18

Jay Lawrence Westbrook, *Empirical Research in Consumer Bankruptcy*, 80 Tex. L. Rev. 2123, 2148 (2002) ...................................................................................................... 7

Jennifer Mascott, *Who are "Officers of the United States"?* 70 Stanford L. Rev. (forthcoming 2017) ........................................................................................................11

Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (2011) ............................................................................................... 12

*Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property  and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017) ............................................................................... 3

Judith Cobb & Joan Allen-Hart, *Preserving Legal Materials in Digital Formats* (prepared for the Legal Information Preservation Alliance) (Feb. 4 2005) ...................... 16

Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record (Apr. 26, 2017) (working paper), https://ssrn.com/abstract=3019494 .................................................................. 11

Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Reps. Issa and Nadler, H. Comm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary (Feb. 10, 2017), https://perma.cc/BT6M-4J56 .................... 20

Letter from Professor Elizabeth Warren, Harvard Law School to The Honorable John J. Thomas, U.S Bankr. Court, Middle District of Pa. (Jan. 4, 2008), https://perma.cc/P2D7-9UV6 ............................................................................... 7

Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 Writings of James Madison 103, 103 (Hunt ed., 1910) ...................................................................................... 2

Library Innovation Lab at Harvard University, http://lil.law.harvard.edu/ .................................... 5

Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions To Dismiss*, 6 FED. CTS. L. REV. 1 (2011)............................. 12

Lynn M. LoPucki, *Court-System Transparency,* 94 IOWA L. REV. 481, 515 (2009)................... 21

Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 Texas L. Rev. 2161 (2002)..................................................................................................................... 8

Media Freedom and Information Access Clinic, https://law.yale.edu/mfia/ ................................. 5

NARA Records Disposition Schedule N1-021-10-2 ................................................................16

Paul Conway, *Preservation in the Age of Google: Digitization, Digital Preservation, and Dilemmas*, 80 Libr. Quarterly 61 (2010) ........................................................................16

Peter W. Martin, *District Court Opinions that Remain Hidden Despite a Longstanding Congressional Mandate of Transparency – The Result of Judicial Autonomy and Systemic Indifference* (working paper) (Aug. 17, 2017) ..................................................19

Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to Patterns*, 53 VILL. L. REV. 855, 864 (2008) .............................................17

*Preservation Policy*, AALL, https://perma.cc/UKH7-M2GL ....................................................16

Rebecca Kunkel, *Law Libraries and the Future of Public Access to Born-Digital Government Information*, 109 LAW LIBR. J. 67 (2017) ....................................................16

S. Rep. No. 107-174, at 23 (2002) ................................................................................. 3

Sara S. Greene, Parina Patel, and Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 Minn. L. Rev. 1031 (2017) ...................8

Teresa A. Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *As We Forgive Our Debtors: Bankruptcy and Consumer Credit in America* (1989)................... 6

Teresa A. Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *Persistence of Local Legal Culture: Twenty Years of Evidence from the Federal Bankruptcy Courts*, 17 Harv. J. L. & Pub. Pol'y 801 (1994)....................................................................6

Thomas Lee & Stephen Mouritsen, Judging Ordinary Meaning, 127 Yale L.J. (forthcoming 2017)........................................................................................... 11

Thomas Lee & Stephen Mouritsen, The Path Forward for Law and Corpus Linguistics, Volokh Conspiracy (Aug. 11, 2017), http://wapo.st/2vVWG19 ...................................... 11

William M. Landes & Richard A. Posner, Legal Precedent: A Theoretical and Empirical Analysis, 19 J.L. & Econ. 249 (1976) ...............................................................................9

### STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

**The American Association of Law Libraries** (AALL) is the only national association dedicated to the legal information profession and its professionals. Founded in 1906 on the belief that people—lawyers, judges, students, and the public—need timely access to relevant legal information to make sound legal arguments and wise legal decisions, its nearly 4,500 members are problem solvers of the highest order.

**Deborah Beim** is an **Assistant Professor of Political Science** at **Yale University**. Her work focuses on "learning in the judicial hierarchy," probing the ways in which law develops. She and her colleagues across the country seek to explain the development of the law using empirical methods that rely on fulsome legal corpuses and refinement of theoretical models.

**Thomas Bruce** is **Director and Co-founder** of **Cornell Legal Information Institute.** He co-founded LII (the first legal information web site) in 1992 with Peter Martin, former Dean of Cornell Law School. The LII publishes electronic versions of core materials in many areas of the law, relying on the government to provide reasonable access to primary legal sources.

**Phillip Malone** is a **Professor of Law** at **Stanford Law School**. He is Director of the Juelsgaard Intellectual Property and Innovation Clinic, serving clients by advocating for greater opportunities for innovation and generativity. His work focuses on legal innovation, increased access to justice, and facilitating open access to information and online expression.

---

[1] Counsel for amici declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than amici, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief. The named individuals sign this brief in their individual, not representational, capacity. Their professional affiliations are listed for identification and contextual purposes only.

**Jonathan Zittrain** is the **George Bemis Professor of International Law** and **Professor of Computer Science** at **Harvard University**. He is Director of the Harvard Law Library, which houses the Library Innovation Lab (LIL). LIL seeks to make electronic case law available for free; to confront archival challenges of the legal record; and to improve tools for teaching the law.

## <u>ARGUMENT</u>

*Popular government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.*[2] — James Madison

As Madison knew, our democracy's success requires that the people know how the governmental apparatus exerts its power. Public access to federal court proceedings and records is essential to this knowledge. Accordingly, while *amici* submit that plaintiffs' construction of the E-Government Act provision at issue on this motion is correct as a matter of pure textual analysis and legislative history, they urge this Court also to take into account that adopting plaintiffs' position is likewise consistent with the fulfillment of basic democratic principles.

It is by now well-established that fundamental democratic ideals underpin the common law, constitutional, and statutory mandates for public access to court proceedings. *See, e.g.*, *Richmond Newspapers v. Virginia*, 448 U.S. 555, 567 (1980) (describing the "unbroken, uncontradicted history" of common-law access to court proceedings when presented with a judge-ordered closure of courthouse doors, and further locating such a right in the First Amendment); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (recognizing the same for written records maintained by the clerk). Justice Brennan observed a "special solicitude for

---

[2] Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 WRITINGS OF JAMES MADISON 103, 103 (Hunt ed., 1910).

2

the public character of judicial proceedings." *Richmond*, 448 U.S. at 592 (Brennan, J., concurring in judgment). Such solicitude is due because public access to proceedings is foundational to popular justice. Access guarantees, especially to trial court records, are "bottomed upon a keen appreciation of the structural interest served in opening the judicial system to public inspection." *Id.*

Congress clearly intended that the E-Government Act help ensure that the adoption of e-filing would make the federal court system more accessible to the public, rather than becoming a profit center for the federal courts. Administrative Office of the United States Courts, *Electronic Public Access at 10*, THE THIRD BRANCH, September 2000, at 3-4 (describing PACER as allowing the public to "surf to the courthouse door on the Internet"); S. Rep. No. 107-174, at 23 (2002) (expressing the intent to make PACER access "freely available to the greatest extent possible"); *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017) (statement of Rep. Darrell Issa, Chairman) (expressing concern at the "tidy profit" that PACER continues to make).

This brief describes how PACER's fees have prevented scholars and libraries from protecting and promoting essential public access benefits. Scholars and libraries play a critical role in creating, protecting, and amplifying the democratic benefits that flow from public access to court records. Whereas litigants may interact with court records only with respect to individual cases, libraries and scholars need the ability to use those records to examine our judicial system more systemically—a task that, in many cases, requires access to the full body of PACER records and the ability to share those records.

3

## I.    Current PACER Fees Prevent Scholars from Doing Democratically Important Work

Scholars, academic institutions, and legal clinics amplify the benefits of public access to court records, and their work suffers when access is restricted.  They rely on access to court records in various ways to enhance the effectiveness of our legal system as a whole and ensure greater public access to justice.  Scholars, academic institutions, and legal clinics: 1) build systems for accessing, teaching, and practicing the law, 2) diagnose societal issues by examining the legal record, and 3) study and contribute to jurisprudential development.  Each of these components of their missions is hampered by the excessive PACER fees they currently must pay.

### A.  Building systems for accessing, teaching, and practicing the law

Scholars are responsible for creating many of the innovative platforms that provide greater public access to the law and greater ability to analyze and understand it.  These platforms frequently find more use than do government sources of legal information: indeed, they are used every day by practitioners, students, and the public.

For example, the Cornell Legal Information Institute (LII) is perhaps best known as the first result in any web search for the United States Code or the Code of Federal Regulations.  The organization's simple vision is that "everyone should be able to read and understand the laws that govern them, without cost."[3]  To that end, LII publishes the law online for free (when it is obtainable), creates materials that help people to understand the law, and develops tools that make it easier for people to find and to understand the law.

LII is not alone.  The Harvard Law Library Innovation Lab is working to make all reported U.S. case law freely accessible online.  It also is providing tools for educators to assign

---

[3] CORNELL LEGAL INFORMATION INSTITUTE, https://www.law.cornell.edu/.

and excerpt raw legal materials as part of free, next-generation casebooks and is permanently archiving online materials that are cited in court filings, opinions, and articles.[4]

Meanwhile, Stanford's Center for Legal Informatics brings together researchers, lawyers, entrepreneurs, and technologists in order to enhance legal efficiency, court transparency, and access to legal systems and services.[5] For example, it "incubated" Lex Machina, an innovative tool for analyzing intellectual property jurisprudence that mines data from millions of pages of litigation documents, many from PACER. The project was spun off as a for-profit and acquired by LexisNexis. Unfortunately, the underlying data that powers Lex Machina—court records derived from PACER—is expensive, driving up the cost of the service. Major law firms and well-compensated practitioners can afford the benefits of this system; others cannot. Many public-minded efforts to make federal trial court records more accessible to all, not just those with ample resources, suffer the same limitation: PACER is prohibitively expensive.

Scholars do more than make information available and conduct research. They also develop the next generation of practitioners through hands-on experience. Law school clinics teach aspiring legal professionals; like the lead plaintiffs in the instant case, they also enhance the public's access to justice by directly serving the public. Yale's Media Freedom and Information Access Clinic (MFIA) helps clients to enforce their constitutional and statutory rights of access to government information—often in federal court.[6]

Yet, one of the most difficult-to-access bodies of government information is the corpus of federal district court records. While individual records are reasonably obtainable (if not always reasonably findable) via PACER, securing any significant portion of these records is fiscally

---

[4] LIBRARY INNOVATION LAB AT HARVARD UNIVERSITY, http://lil.law.harvard.edu/.
[5] CODEX, THE STANFORD CENTER FOR LEGAL INFORMATICS, http://codex.stanford.edu/.
[6] MEDIA FREEDOM AND INFORMATION ACCESS CLINIC, https://law.yale.edu/mfia/.

impossible.  Efforts like the University of Michigan's Civil Rights Litigation Clearinghouse have

limited resources, so the supervising faculty simply directs patrons seeking additional

information to PACER.[7]  Because it is impossible to obtain a substantial corpus of PACER data,

both clinic work in general and the specific public access work of entities like MFIA can be

difficult or impractical.  Access to information about the workings of the courts suffers, as does

the public's access to justice.

### B.  Diagnosing societal issues by examining the legal record

Beyond providing access to the law, scholars also seek to understand how other social

phenomena manifest in legal proceedings.  These endeavors, too, have been frustrated by the

high price of obtaining records through PACER.

For decades, a group of preeminent scholars has examined bankruptcy through the best

available lens: bankruptcy court records.  The Consumer Bankruptcy Project gathered records

first in 1981, fueling scholarship by this group for more than twenty years.  *See, e.g.*, Teresa A.

Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *As We Forgive Our Debtors:*

*Bankruptcy and Consumer Credit in America* (1989); Teresa A. Sullivan, Elizabeth Warren, and

Jay Lawrence Westbrook, P*ersistence of Local Legal Culture: Twenty Years of Evidence from*

*the Federal Bankruptcy Courts*, 17 HARV. J. L. & PUB. POL'Y 801 (1994).  In 2002, on the heels

of their second major data gathering effort, these scholars realized that their work could be at a

turning point.  They had been laboriously gathering court records through manual photocopying,

but one of the scholars predicted that "empirical work in the bankruptcy field will be

revolutionized over the next few years by the arrival around the country of Case

Management/Electronic Case Filing ('CM/ECF')."  Jay Lawrence Westbrook, *Empirical*

---

[7]  CIVIL RIGHTS LITIGATION CLEARINGHOUSE, https://www.clearinghouse.net/about.php.

*Research in Consumer Bankruptcy*, 80 TEX. L. REV. 2123, 2148 (2002).  One scholar warned

that the PACER fee structure could extinguish this hope, but the optimists advocated for a policy

"that permits the broadest possible access to data."  *Id.* at 2150.

While promoting the "broadest possible access" may have been the policy intended by

Congress when it passed the E-Government Act that same year, it was not the approach adopted

by the Administrative Office of the United States Courts ("AO").  In the following years, the

researchers were forced to make do by applying for fee waivers individually at each bankruptcy

court.  *See, e.g.*, Letter from Professor Elizabeth Warren, Harvard Law School to The Honorable

John J. Thomas, U.S Bankr. Court, Middle District of Pa. (Jan. 4, 2008), https://perma.cc/P2D7-

9UV6 (requesting reinstatement of an expired fee waiver and describing the patchwork of

agreements with different courts).  Behind the scenes, an army of research assistants tried to keep

the waivers up-to-date, and the scholars promised not to share the public court records with the

public.  *Id.*  This jury-rigged arrangement held up long enough to allow the Consumer

Bankruptcy Project team to research the rise in bankruptcies in the mid-2000's, and to apply the

data in new domains such as medical research.[8]

Then-Professor Elizabeth Warren sought to use empirical bankruptcy data as a "sort of

pathology laboratory for data and insights about other social issues."  Westbrook, *supra*, at 2125.

Through the legal record, she and her colleagues sought to explore economic fractures in

American society.  *See, e.g.*, Elizabeth Warren, *Bankrupt Children*, 86 MINN. L. REV. 1003

---

[8] PACER fee waivers are entirely discretionary, may be revoked at any time for any reason, must
be applied for individually at each court, and must be limited in time.  No PACER documents
obtained as a result of a fee waiver may be redistributed—presumably because the AO has the
economic incentive to require others to engage in otherwise unnecessary downloading so that
they will have pay for the same documents.  Collectively, these limitations not only hinder the
*gathering* of data but expressly prohibit *redistribution* of the data underlying any study—a core
requirement of rigorous scholarship.

(2002).  However, the perpetual need to renegotiate fee waivers and restrictions on distributing source data made the work unsustainable.  Nothing has since filled the void: today's consumer bankruptcy empiricists are stuck working with decade-old data.  *See, e.g.*, Sara S. Greene, Parina Patel, and Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 MINN. L. REV. 1031 (2017).

The lack of fresh data for this badly needed research into how our bankruptcy system works in practice is not for want of capability of PACER.  Indeed, the Department of Justice, by contrast, appears to receive free nightly updates of bankruptcy data from PACER.  *See* Memorandum of Understanding Between the Admin. Office of the United States Courts and the Exec. Office for United States Trs. Concerning the Bankruptcy Data Download (Dec. 14, 2009), https://perma.cc/UFA9-UA3X.  Yet this information is not made available to the general public, and the AO's policies preclude researchers from replicating it.

Nor is it for want of creativity and effort from researchers, who have always gone to remarkable lengths to acquire necessary data. Consider the backstory of the Consumer Bankruptcy Project's data gathering phases in 1981 and 2001, as described by Professor Lynn LoPucki.  *See* Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 TEXAS L. REV. 2161 (2002).  In 1981, the team "bought photocopy machines, flew the copiers air freight to the cities where they would collect the data, and rolled them into the clerks' offices on dollies."  *Id*. at 2166-2167.  With the consent of the courts, they copied the records for a tenth of the rate mandated by the public access fee schedule under the formal process.

In 2001, the team followed much the same process for courts that would allow it, despite considerable advances in technology in the intervening years. The most significant improvement they were able to make was paying moonlighting clerks to make copies using the courts' existing

8

photocopiers. PACER was available in many courts by 2001, but the electronic fee schedule made it far more expensive than relying on 20-year-old technology.

### C. Studying and contributing to jurisprudential development

Research enabled by public access touches the core of the common law—jurisprudential development. In 1976, Landes and Posner set out a method for systematically analyzing development of the law by mapping citation history. William M. Landes & Richard A. Posner, *Legal Precedent: A Theoretical and Empirical Analysis*, 19 J.L. & ECON. 249 (1976). They described what lawyers and judges already knew to be true—the accretion of citations to a given judicial opinion could, over time, forge legal rules. In short, they described precedent.

Landes and Posner proposed that, by quantitatively examining networks of citations, they could document—and perhaps even shape or predict—the development of the law. In classic Chicago School style, they characterized precedents as "capital stock that yields a flow of information services." *Id.* at 250-51. The currency of our judiciary is legal precedent, and any precedent's value depends upon knowledge of and citation to it. Transaction costs in this legal economy serve only to devalue the informational commodity and reduce efficiency.

Landes and Posner's work infused empirical approaches into legal practice in a way that presaged our contemporary electronic research tools. It also indicated that efficient service by our justice system was bound up—figuratively and literally—with efficient access to judicial information.

In the following 40 years, citation analysis of published opinions has flourished in scholarship and legal research, providing lawyers and judges with far better tools for understanding and interpreting the law. Published opinions—at least for federal Supreme Court and circuit court decisions—are readily available. Law students now collaborate with computer

science students in order to discover algorithmic approaches drawn from network science that
better explain how rules of law develop. *See, e.g.*, Iain Carmichael, James Wudel, Michael Kim,
and James Jushchuk, Comment, *Examining the Evolution of Legal Precedent through Citation
Network Analysis*, 96 N.C. L. Rev. (forthcoming 2017).[9]

Empirical scholarship that moves beyond citation-based analysis of our higher courts,
however, has been made difficult by lack of access to court records. For example, Yale political
science professor Deborah Beim studies what she and her colleagues call "learning in the judicial
hierarchy." Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. OF POL. 591 (2017). She
set out to examine the development of rules of law not simply by looking at citations, but also by
examining the actual language used by jurists at every level of the judicial hierarchy. She sought
to answer questions such as, "how and how often do terms or phrases used by district court
judges become adopted by circuit court judges or by the Supreme Court?" Her research ended
before it began because district court opinions are not accessible as a coherent electronic
corpus.[10] Colleagues in her field build models of judicial "rule creation" that theoretically apply
to the whole judiciary, but these scholars can only test their hypotheses against corpuses of
Supreme Court and circuit court opinions. *See, e.g.*, Clifford J. Carrubba and Tom S. Clark, *Rule
Creation in a Political Hierarchy*, 106 AM. POL. SCI. R. 622, 634 (2012).

---

[9] The authors of that forthcoming piece explained to *amici* that their work had focused solely on
Supreme Court and circuit court opinions because there were no accessible electronic corpuses
of federal trial court opinions or established scholarly citation networks. Even though law
students and faculty generally have free access to major commercial electronic databases, they
do not have the ability to download and process the public data contained therein. Nor do those
databases contain much of the relevant non-opinion data about cases.
[10] Even PACER's per-court "free opinions report" gives wildly inconsistent and inadequate
results, making any systematic study impractical.

The emerging field of "corpus linguistics" analyzes language's meaning by studying how it is actually used in a large body of writing over time—an exercise with obvious utility to the legal profession. Last month, a Utah Supreme Court judge and his clerk explained, "we see corpus linguistic analysis playing a central role in legal interpretation going forward."  Thomas Lee & Stephen Mouritsen, *The Path Forward for Law and Corpus Linguistics*, Volokh Conspiracy (Aug. 11, 2017), http://wapo.st/2vVWG19.  In a forthcoming article in the *Yale Law Journal*, they explain one application—interpreting "ordinary meaning."  Thomas Lee & Stephen Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. (forthcoming 2017).  The use of corpus linguistics for legal scholarship and practice is promising indeed.  *See, e.g.*, Jennifer L. Mascott, *Who are "Officers of the United States"?*, 70 STANFORD L. REV. (forthcoming 2017); *see also* Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record (Apr. 26, 2017) (working paper), https://ssrn.com/abstract=3019494.

But for all of its promise, corpus-based analysis fails without a corpus.  PACER fees artificially limit access to a vast body of federal case law (the opinions themselves) and the likewise-important case record documents and data.

Without public access to the raw material that collectively constitutes our body of precedent, scholars cannot effectively study many of the pressing questions facing litigants and judges.  For example, the most important recent change to federal trial practice may be the Supreme Court's alteration of the pleading-sufficiency standard via *Towmbly* and *Iqbal*. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 55 U.S. 662 (2009). The effect of these decisions has been as unclear as it is controversial, and the high price of PACER documents has hindered relevant research.

11

With respect to the study of *Twombly* and *Iqbal*, the Judicial Conference has acknowledged the value of empirical research based on judicial records. It has taken the position that the federal court system itself—relying on its unique access to PACER records—should authoritatively study the issue and make policy recommendations, even as outside scholars are deprived of the information necessary to conduct similar analysis. The Federal Judicial Center (FJC) conducted an extensive study of the decisions' empirical effects. Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (2011). Scholar Lonny Hoffman explained that the FJC's study benefited from data that had eluded all others. Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions To Dismiss*, 6 Fed. Cts. L. Rev. 1 (2011). The FJC had direct access to all records in PACER, rather than having to rely, as most scholars must, on whatever is available via searches of commercial electronic databases. *Id.* at 10. That is to say, the FJC had monopoly access to the best information about the most important evolution to federal trial practice in recent history. Whatever one's take on the FJC's conclusions in this study, it is difficult to dispute that the federal judiciary would benefit from the insight of creative and innovative research by the nation's best scholars. Indeed, Hoffman identified some potentially significant methodological issues with the FJC study. *Id.* at 31-35. Citing the same concerns that Professor LoPucki had raised a decade earlier, he observed that thorough empirical examination of these questions was made impossible because scholars lacked access to data. *Id.* at 9 n. 18.

When scholars have direct electronic access to public records, they can buttress the integrity and efficiency of the justice system.[11] For example, Berkeley Law doctoral students developed a method for detecting possible problems of inconsistency and bias using data from the California Board of Parole. Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach to the Problems of Inconsistency and Bias in Adjudication* (October 21, 2016) (working paper), https://ssrn.com/abstract=2694326. The systemic study of federal trial court records has untapped potential to similarly detect and remedy instances of individual injustice. This is where data can fuel innovation. The next generation of legal scholars will stand not just on the shoulders of their forbears, but—hopefully—on the structural foundation created by access to the electronic public record. When they "surf to the courthouse door," they should find it open.

## II. PACER Fees Prevent Law Libraries from Providing Public Access to Legal Information

Law librarians are committed to providing the greatest possible public access to court records. Academic law librarians also support the scholarly work of faculty and students, conduct their own scholarly work, and teach effective legal research skills. The PACER charges at issue here limit law libraries' ability to provide effective patron access and equitable legal research instruction. They also hinder law librarians' ability to fulfill their responsibility to preserve and provide access to legal materials.

---

[11] It should go without saying that many other entities would likewise contribute to these ends, including the press, public interest organizations, government employees, and practicing attorneys.

### A.   PACER fees harm patron access and legal research instruction

Because PACER fees are so high, academic law libraries have been forced to limit patron access. The majority of law libraries require students (and sometimes faculty) to approach a research librarian for access to PACER documents, which the librarian provides by logging into a central library account.  Others libraries limit their assistance to helping users set up their own personal accounts.  Few give the library's PACER password directly to students and faculty.  Most libraries' PACER passwords are kept confidential to limit "overuse" of the library's account.

This controlled access limits the usefulness of PACER to researchers.  Research through PACER may only be conducted during library hours, in the library.  Given that much of the modern academic's and law student's research is done outside of the physical library using the library's subscription databases and other electronic resources, this is a major impediment to conducting legal research.

Even with controlled access, libraries that allow patrons to use their PACER passwords cannot predict how much they will spend on PACER fees in any given month, making effective budgeting impossible.  PACER bills are entirely dependent on the interest and activity of library users.  Supporting a budget item with such unpredictability is difficult to justify, so many libraries no longer provide direct access.

PACER fees also lead to inequitable access: wealthier schools are able to provide greater access.  In 2009, Erika Wayne, then a law librarian at Stanford Law School, conducted a survey of law libraries and their spending on PACER.  The survey found that private law school libraries spent nearly twice as much as public law school libraries on PACER, indicating that private law schools can afford to provide students with greater access.  Wayne wrote that

14

academic law librarians reported that they "were very concerned about the costs" of PACER, with some commenting that "there is no way to limit costs"; "it gets expensive rather quickly"; and "if PACER were cheaper . . . we would use PACER more frequently." Erika Wayne, *PACER Spending Survey*, Legal Research Plus (Aug. 28, 2009), https://perma.cc/4CEC-Z7JT. Wayne concluded that "[t]he unknown/potential costs of using PACER hold back most law school libraries from letting their patrons fully utilize PACER . . . We need to train our students and equip our patrons with access to this important resource, but we can't afford to do so." *Id.*

Law libraries' concerns are valid, because costs can mount quickly. In order to view the Docket, Complaint, Motion for Summary Judgment, and accompanying records in the instant case, a user would incur a charge of $25.40. For ordinary users, PACER waives fees for users that do not accumulate more than $15 in charges per quarter. Thus, the quarterly allowance would be void and the full amount would be due once a user looked at *basic documents* in a *single pending case*. If patrons viewed additional relevant documents in this docket, they would easily exceed the $50 quarterly limit.

PACER fees also hinder the ability of academic law librarians to teach law students how to conduct effective research. Many law courses, including legal research courses taught by law librarians, are simulation-based. Students use resources as they would in real life. And yet, students cannot use PACER freely because it is impractical to give the entire class the library's PACER password. Instead, instructors choose to demonstrate PACER usage rather than permitting their students to use the system. Thus, emerging lawyers graduate from law school without any hands-on experience with the authoritative source of federal court records.

**B.  PACER fees impede law libraries' responsibility to preserve legal materials**

Digital government information must be preserved to ensure its equitable, permanent, and public accessibility.  *See Preservation Policy*, AALL, https://perma.cc/UKH7-M2GL.  PACER fees impede law libraries' efforts to provide permanent public access to legal information and to develop next-generation resources to serve their patrons.  Law libraries have become acutely aware of the challenges to digital preservation, including an inability to fulfill their obligation to preserve our digital legal record.  *See, e.g.*, Rebecca Kunkel, *Law Libraries and the Future of Public Access to Born-Digital Government Information*, 109 LAW LIBR. J. 67 (2017); Paul Conway, *Preservation in the Age of Google: Digitization, Digital Preservation, and Dilemmas*, 80 LIBR. QUARTERLY 61 (2010); Judith Cobb & Joan Allen-Hart, *Preserving Legal Materials in Digital Formats* (prepared for the Legal Information Preservation Alliance) (Feb. 4 2005).  While law librarians are familiar with the difficulty of archiving digital information held in proprietary commercial databases—a subject of great concern to institutions traditionally built on physical preservation—they are frustrated that PACER makes it impossible to archive public government records.  Furthermore, court administrators have failed to send any electronic court records to the National Archives and Records Administration as laid out in records disposition schedules with the courts.[12]

---

[12] NARA External Affairs Liason Meg Phillips confirmed this fact in an email to Emily Feltren, Director of Government Relations, AALL, on September 1, 2017.  The reality appears to be that the U.S. Courts have repeatedly established disposition schedules with NARA, only to put them on indefinite hold.  *See, e.g.*, NARA Records Disposition Schedule N1-021-10-2. (signed by the AO on June 29, 2010) (requiring deposit of electronic records within 3 years of close of case), https://perma.cc/U6K7-6RK9.  Ms. Phillips' email stated that the relevant current disposition schedules now bear the following disclaimer: "The Judiciary is in the process of reviewing internal requirements to establish an effective national policy concerning the future transmission of electronic records to NARA. The completion of the requirement analysis, clearance, and implementation of said policy is a prerequisite to the transmission of electronic records included in this and similar proposed schedules."  The court administrators' failure to ever provide NARA

With greater access to PACER, law libraries could also contribute to large-scale cooperative digital libraries and related organizations, such as the Digital Public Library of America[13] or HathiTrust.[14]  Libraries could expand on projects like Perma.cc, a service created by Harvard's Library Innovation Lab that archives digital records that are cited in briefs, opinions, and articles—generating a permanent link to an archived record.  Law libraries could mine PACER dockets and provide digital access to and preservation of materials on a local or regional issue, or on a substantive topic.  With greater access to PACER, opportunities abound for librarians to curate and preserve the raw legal materials that are important to students, scholars, and society.

### III.   This Court Must Enforce Congress's Requirement that the Federal Courts Make Federal Electronic Court Records "Freely Available to the Greatest Extent Possible," Because Court Administrators Have Proven Unwilling to Do So Voluntarily

The E-Government Act of 2002 was intended to reorient the federal courts' electronic access policies from serving primarily the interests of the courts to instead focusing on the needs of the public.  As LII co-founder Peter Martin explains, "[t]he federal courts did not establish computer-based case management systems or subsequent electronic filing and document management systems in order to provide the public with better access to court records.  Those systems were created because they offered major gains for judges and court administrators."  Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to*

---

with any electronic court records is a longstanding problem that could be ameliorated by allowing institutions such as libraries to help archive electronic records for posterity.

[13] DIGITAL PUBLIC LIBRARY OF AMERICA, https://dp.la/.

[14] HATHITRUST DIGITAL LIBRARY, https://www.hathitrust.org/.

*Patterns*, 53 VILL. L. REV. 855, 864 (2008). This conclusion is supported by the detailed retelling of CM/ECF and PACER development by the system architects.[15]

While the potential for PACER to provide heightened public access soon became clear, the court system's financial dependency on PACER fees has always hamstrung its willingness to take steps that would be in the public interest. Indeed, "[o]therwise-beneficial arrangements that might have threatened the willingness of the commercial sector to pay PACER fees have not been treated as realistic options." Martin, *Online Access*, *supra*, at 870. Put simply, the AO has a perverse incentive to maintain artificially high PACER fees and to limit functionality.

AALL has a long history of working with the AO to move it toward a model of no-fee access. In the early 2000s, the Association worked closely with Senator Lieberman on language that was added to the E-Government Act of 2002 to direct the Judicial Conference to charge fees "only to the extent necessary." For the next decade, the AALL encouraged the AO to promote public access and partnered with the AO to expand access to PACER at law libraries. These attempts at partnership have not succeeded in providing anything resembling full public access to court records.

In 2006, the AALL Executive Board approved a Resolution on No-Fee FDLP Access to PACER, which was likewise endorsed by the American Library Association (ALA). This resolution helped motivate the Government Publishing Office (GPO) to work with the AO on a

---

[15] The court administrators' myopic focus on CM/ECF improvements is evident from the extensive list of features slated for CM/ECF, and the lack of PACER improvements promised as part of the "NextGen" effort. *See* J. Michael Greenwood & John Brinkema, *E-Filing Case Management Services in the US Federal Courts: The Next Generation: A Case Study*, 7 Int'l J. for Ct. Admin. 3, 3 (2015), https://perma.cc/33S9-XW3Z. The authors also note the high cost, delays, and budget overruns on "NextGen" due to "serious management issues that have adversely affected the project and pose a serious risk to its eventual completion." *Id*. at 11. In short, PACER fees have supported an expensive and mismanaged project, with little benefit to PACER itself.

pilot project to make PACER available at no cost to users of federal depository libraries. A three-year pilot project was launched in 2007 at 17 federal depository libraries, 10 of which were law libraries. This very modest experiment, which gave free PACER access to those few people who lived near a participating library, was ended prematurely and never reinstated.

Then, in 2011, the AO and GPO announced plans to make PACER opinions available to the public. AALL applauded the decision to make opinions available through GPO's FDsys, which provides access to authentic electronic information from all three branches of government. This program, however, has turned out to be no substitute for PACER access.

One fundamental flaw in the program is the limited set of documents made available. Only *some* courts transmit *some* opinions to the GPO for free distribution online. Each court's participation in the system is voluntary. Each judge's determination of what constitutes an opinion is discretionary. The result is wildly inconsistent publication that is useless for most purposes. *See* Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016); Peter W. Martin, *District Court Opinions that Remain Hidden Despite a Longstanding Congressional Mandate of Transparency – The Result of Judicial Autonomy and Systemic Indifference* (working paper) (Aug. 17, 2017).

And even if *all* courts transmitted *all* opinions—and they currently do not—the outcome would be far inferior to the treasure trove that is buried inside PACER. Only opinions are transmitted to the GPO, and so no other case documents are made available through this program; indeed, there is no record at all of ongoing cases or cases for which there was no opinion. The opinions often are stripped of obviously relevant data—such as the presiding

judge—without which they are of much less use for research purposes as well as for general public access.[16]

In 2012, AALL, GPO, and the AO established the "PACER: Access and Education Program" with the aim of increasing use of PACER at federal depository libraries, public law libraries, and public libraries.  Participating libraries, which are asked to create PACER educational materials and training guides, are exempt from the first $50 of quarterly usage charges.  The program has experienced low participation from libraries, with approximately 15 participating as of 2017.[17]

After more than a decade of attempting to work collaboratively with the AO to increase no-fee access to PACER, the inescapable conclusion is that there is little progress to be made through voluntary arrangements.  Even as digital storage and transmission costs have plummeted, PACER fees have increased. The goals of the E-Government Act are frustrated by this increasing divergence between PACER fees and the costs that purportedly justify them, particularly when the AO declines to take measures that would reduce costs still further or even eliminate them. For example, the Internet Archive—a well-respected partner of many forward-thinking law libraries—has offered to host all PACER content for public access for free, forever. *See* Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Reps. Issa and Nadler, H. Comm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary (Feb. 10, 2017), https://perma.cc/BT6M-4J56.

---

[16] The name of the presiding judge might be useful, for example, for research on potential bias or sentencing trends.

[17] It has been difficult to determine the exact participation from libraries. This estimate was provided by Robert Lowney, manager of the Electronic Public Access Program, AO, in an email to Emily Feltren, Director of Government Relations, AALL, May 10, 2017.

Professor Lynn LoPucki warned in 2002 that the field of empirical legal research as a whole was destined to remain small and insular because of an artificial limitation created by court administrators—access fees. Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 TEXAS L. REV. 2161 (2002). LoPucki surmised that PACER's anachronistic fees were motivated at least in part by judges' desire to limit scrutiny of themselves. *Id*. at 2170 (noting that the annual summary databases produced by the Federal Judicial Center are stripped of judge names prior to public release).[18] Whether his hypothesis was correct or if the longstanding over-charging is instead motivated by court administrators' desire to subsidize unrelated costs with PACER revenues, the fee schedule seems patently at odds with principles of public access and the mandates of the E-Government Act. It is time for this Court to step in and enforce Congress's clear direction that unreasonable PACER fees unrelated to actual costs must stop.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.

Dated: September 5, 2017

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)

---

[18] Years later, Professor LoPucki noted that the fee waiver system that ostensibly relieved some burden for researchers was both ineffective and might encourage perverse outcomes: "One problem is that the courts may grant, deny, or condition them in ways that encourage researchers to portray the courts in a positive light." Lynn M. LoPucki, *Court-System Transparency* , 94 IOWA L. REV. 481, 515 (2009) (describing how one court denied his request for waiver renewal after he published research critical of that court).

RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> *Defendant*. | Case No. 16-745-ESH |

## BRIEF OF AMICI CURIAE SENATOR JOSEPH I. LIEBERMAN AND CONGRESSMAN DARRELL ISSA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

September 5, 2017

<table>
<tr>
<td>

*Of counsel:*

Michael K. Farrell
Michael D. Meuti
BakerHostetler LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: (216) 621-0200
mfarrell@bakerlaw.com
mmeuti@bakerlaw.com

</td>
<td>

Mark I. Bailen (D.C. Bar No. 459623)
BakerHostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036-5304
Telephone: (202) 861-1500
mbailen@bakerlaw.com

*Counsel for Amici Curiae Senator Joseph I. Lieberman and Congressman Darrell Issa*

</td>
</tr>
</table>

# TABLE OF CONTENTS

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* ................................1

SUMMARY OF ARGUMENT .................................................................................................2

ARGUMENT ...........................................................................................................................3

      A.     The E-Government Act was intended to prohibit the AO from charging more in PACER fees than is necessary to recoup the cost of operating PACER. ............3

           1.     Congress' intent in passing the E-Government Act of 2002. ..................3

           2.     Plaintiffs' reading of the Act is confirmed by its sponsor, Senator Lieberman. ...........................................................................................4

      B.     Since 2002, the AO has continually violated the E-Government Act. ...............6

CONCLUSION.........................................................................................................................8

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes**

28 U.S.C. 612(c)(1)(A) ...................................................................................................4

28 U.S.C. § 612(c)(1) .....................................................................................................6

28 U.S.C. § 1913 note ...........................................................................................2, 3, 4, 7

Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33 .....................................................................................................................3

**Rules**

Local Civ. R. 7(o) ...........................................................................................................1

**Other Authorities**

S. Rep. No. 107–174, 2d Sess. (2002) ...................................................................1, 4,7

611257290.1

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amicus curiae* Senator Joseph Lieberman served as United States Senator from Connecticut from 1989 until his retirement from Congress in 2013. Senator Lieberman served as Chair of the United States Senate Committee on Homeland Security and Governmental Affairs and in that capacity was the sponsor of the E-Government Act of 2002—the legislation upon which this lawsuit turns.

Given his experience, Senator Lieberman is uniquely situated to confirm that plaintiffs' reading of the E-Government Act accurately reflects Congress' intent in passing that Act and to confirm that the judiciary's practice of charging "PACER" fees for access to public information that far exceed the cost of providing that information is contrary to the intent of the Act.

*Amicus curiae* Congressman Darrell Issa is a member of the United States House of Representatives, representing the 49th District of California. As Chairman of the House Judiciary Subcommittee on Courts, Intellectual Property, and the Internet, he has examined PACER fees. He also co-founded of the Congressional Transparency Caucus, based on the simple idea that all Americans have the right to know exactly what their government is doing.

He is also a lifelong technophile with a passion for open, accountable government. The Congressman co-founded the OpenGov Foundation, an apolitical 501(c)(3), which supports free software solutions that help citizens to access government information and give them a voice in governance.

Pursuant to Local Civ. R. 7(o), *amici* have submitted a motion for leave to file this brief as *amici curiae*.[1]

---

[1] Counsel for *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief;

## SUMMARY OF ARGUMENT

In 2002, Congress found that PACER fees were "higher than the marginal cost of disseminating the information" accessed through that system.  Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); Plaintiffs' Statement of Undisputed Material Facts ¶ 11. [2] To correct this, and to ensure that court records be "freely available to the greatest extent possible," the E-Government Act prohibits the imposition of fees that are not "necessary" to "reimburse expenses in providing" access to the records. *Id.;* 28 U.S.C. § 1913 note. The purpose and intent of including this language in the Act was to prevent the judiciary from charging PACER fees that, in the aggregate, exceed the reasonable costs of administering the PACER system.

Despite passage of the Act, PACER fees have only increased since 2002.  Those fees now greatly exceed the cost of providing the records, and with the excess being used to fund projects that are entirely unrelated to PACER.  As a result, Senator Lieberman, as sponsor of the Act and Chairman of the Senate Homeland Security and Governmental Affairs Committee, twice challenged the imposition by the Administrative Office of the U.S. Courts ("AO") of PACER fees that are "well higher than the cost of dissemination" and urged it to adopt "a payment system that is used only to recover the direct cost of distributing documents via PACER."  Taylor Decl., Exs. G & H.  The AO, however, continues to charge PACER fees that exceed the costs of providing records and violate the E-Government Act.  As Congressman Issa has observed, the courts earn a "tidy profit" from PACER in a way that "circumvent[s] appropriations." *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property and the Internet of*

---

and no person—other than *amicus* or his counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2] In the interest of brevity, Plaintiffs' Statement of Undisputed Material Facts ("Statement") is incorporated by reference herein and citations herein are to the evidence and exhibits submitted therewith.

*the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017). For these reasons, Senator Lieberman and Congressman Issa urge this Court to grant Plaintiffs' Motion for Summary Judgment As to Liability, and thus vindicate the purpose of the Act and ensure that it is enforced as Congress intended.

## ARGUMENT

**A.** **The E-Government Act was intended to prohibit the AO from charging more in PACER fees than is necessary to recoup the cost of operating PACER.**

On its face, the E-Government Act allows the AO to impose PACER fees only "as a charge for services rendered" in providing "electronic access to information" through PACER, and "only to the extent necessary" to "reimburse expenses" incurred in providing that service. 28 U.S.C. § 1913 note. In other words, the Act prohibits the AO from charging more for PACER than the cost of providing access to records through PACER. Moreover, the statutory history of the Act and the interpretation of it by its sponsor, Senator Lieberman, confirm that that is exactly what Congress intended to do.

### 1. Congress' intent in passing the E-Government Act of 2002.

Before PACER, Congress required the judiciary to charge "reasonable fees" to access court records, including those now available through PACER. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. Congress also sought to limit those fees to break-even levels. *Id.*; Plaintiffs' Statement of Undisputed Material Facts (Statement) ¶ 10.

During PACER's early years, it became clear that PACER fees exceeded the amount necessary to recover the cost of providing access to those records, and that the AO was using the extra revenue to subsidize other information-technology-related projects. Statement ¶¶ 8-11. Recognizing this, Congress enacted the E-Government Act of 2002 "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported

3

primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); *see* Statement ¶ 11.

The E-Government Act of 2002 amended language requiring the imposition of fees to remove the mandatory phrase "shall prescribe" and replace it with language permitting fees to be charged "only to the extent necessary" "to reimburse expenses in providing these services." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note). Congress added this language specifically to prevent the AO from "charg[ing] fees that are higher than the marginal cost of disseminating the information." Statement ¶ 11.

With these critical changes, the full statute reads as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

> **(b)** The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services*.

28 U.S.C. § 1913 note (emphasis added).

### 2. Plaintiffs' reading of the Act is confirmed by its sponsor, Senator Lieberman.

Senator Lieberman's commitment to the E-Government Act and its intended effects, did not end with its passage. For example, in early 2009, Senator Lieberman wrote the AO "to

inquire if [it] is complying" with the Act. Taylor Decl., Ex. H, at 1 (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)); *see* Statement ¶ 19. This letter noted that although the Act was intended "to increase free public access to" judicial records by limiting fees to "the marginal cost of disseminating the information," PACER fees were higher than when the law was passed and that the revenue from them was "still well higher than the cost of dissemination." Taylor Decl., Ex. H, at 1. Invoking the statute's text, the senator then asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

Despite the fact that the E-Government Act was enacted to do the opposite, the AO responded by claiming that Congress had "expand[ed] the permissible use of the fee revenue to pay for other services," which permitted it to use PACER fees to pay non-PACER costs. Taylor Decl., Ex. I, at 2. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Taylor Decl., Ex. I, at 2.

The next year, Senator Lieberman again expressed concerns about the AO's interpretation of the Act in his annual letter to the Appropriations Committee. Taylor Decl., Ex. G, at 2; Statement ¶ 21. He wrote: "despite the technological innovations that should have led to reduced costs in the past eight years," the "cost for these documents has gone up" because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* Significantly, Senator Lieberman also reiterated his understanding that, as plaintiffs argue here, this is "against the requirement of the E-Government Act," because it permits "a payment system that is used only to

5

recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

Nonetheless, the AO then raised PACER fees again, to $.10 per page, in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." Statement ¶ 22.

Moreover, the apparent backdoor-appropriations scheme is troubling as a constitutional and policy matter. As Congressman Issa observed, "when it comes to the taxation of the American people, which includes fees; when it comes to transparency, meaning American citizens and others' right to know; when it comes to the ethics of the judiciary, we have an obligation." *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017). Congress has made this statute clear, but it is up to the courts to say what the law is—even to the most powerful and democratically devoted holders of government power.

**B.    Since 2002, the AO has continually violated the E-Government Act.**

By the end of 2006, the judiciary's information-technology fund—the account into which PACER fees and other funds are deposited--had a surplus of nearly $150 million. Of that $150 million, at least $32 million was from PACER fees. 28 U.S.C. § 612(c)(1); Statement ¶ 16. Rather than reduce PACER fees, the AO sought out new ways to spend the excess on things unrelated to PACER, like "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance." *Id.*; Taylor Decl., Ex. G, at 3 (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

6

From 2010 through 2016, the judiciary collected over $920 million in PACER fees, and the annual fees increased from $102.5 million to $146.4 million. *Id.* ¶¶ 28, 46, 62, 80, 98, 116, 134. PACER revenue grew dramatically during this period despite "technological innovations," including exponentially cheaper data storage, that "should have led to reduced costs." Taylor Decl., Ex. G, at 3; *see also* Lee and Lissner Decl. ¶ 16 (explaining that cost per gigabyte of storage fell by 99.9% during this period).

According to the AO's own records, the costs of operating the "Electronic Public Access Program" declined significantly over this same period, going from nearly $19 million for fiscal year 2010 to less than $1 million for fiscal year 2016. Statement ¶¶ 29 & 135. Even including all other expenses that the AO includes as costs of providing "Public Access Services"—including "[d]evelopment and [i]mplementation costs for CM/ECF," "expenses for CM/ECF servers," "costs associated with the support of the uscourts.gov website," and "[c]osts associated with managing the non-technical portion of the PACER Service Center"—the total annual expenses of providing these services ranged between $12 and $24 million over this period. *Id.* ¶¶ 29, 47–48, 63–64, 81–82, 99–100, 117–18, 135–36; *see* Taylor Decl., Ex. L.

Thus, undisputed evidence submitted by plaintiffs shows that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information." Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); *see* Statement ¶ 11. That evidence also shows that during the class period, the AO has used PACER fees to: (1) upgrade courtroom technology, Statement ¶¶ 31, 50, 66, 84, 102, 120, 138; (2) send notices to creditors in bankruptcy proceedings, *id.* ¶¶ 37, 54, 72, 90, 108, 126, 144; (3) send notices to law-enforcement agencies under the Violent Crime Control Act, *id.* ¶¶ 33, 52, 68, 86, 104, 122, 140; (4) provide online services to jurors, *id.*

7

¶¶ 70, 88, 106, 124, 142; (5) cover "costs associated with the support of the uscourts.gov website," ¶ 118; and (6) fund a state-court study in Mississippi, *id.* ¶ 35.

Worthy or not, none of these things is part of the marginal cost of making records available through PACER and, as Senator Lieberman has explained, such projects "should be funded through direct appropriations," not by overcharging PACER users. Taylor Decl., Ex. G, at 3.

## CONCLUSION

Under any fair reading of the E-Government Act, the AO is not charging PACER fees only "to the extent necessary" to make records available through that system. For this reason and those set forth above, *amici curiae* Senator Lieberman and Congressman Issa urge this Court to grant the plaintiffs' motion for summary judgment as to liability.

Respectfully submitted,


September 5, 2017                              */s/ Mark I. Bailen*
                                              Mark I. Bailen
                                              BakerHostetler LLP
                                              Washington Square, Suite 1100
                                              1050 Connecticut Avenue, NW
                                              Washington, DC 20036-5304
                                              Telephone: (202) 861-1500
                                              mbailen@bakerlaw.com

                                              *Of counsel*

                                              Michael K. Farrell
                                              Michael D. Meuti
                                              BakerHostetler LLP
                                              Key Tower
                                              127 Public Square, Suite 2000
                                              Cleveland, OH 44114-1214
                                              Telephone: (216) 621-0200
                                              mfarrell@bakerlaw.com
                                              mmeuti@bakerlaw.com

                                              *Counsel for Amicus Curiae Senator Joseph I.
                                              Lieberman*

8

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM**, *et al.*,<br>            **Plaintiffs**,<br><br>v.<br><br>**UNITED STATES OF AMERICA**,<br><br>            **Defendant**. | **Civil Action No. 16-745 (ESH)** |

## ORDER

For the reasons stated in an accompanying Memorandum Opinion, ECF No. 89, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment as to liability, ECF No. 52, is **DENIED**; and it is further

**ORDERED** that defendant's cross-motion for summary judgment as to liability, ECF No. 73, is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that the parties shall confer and file a Joint Status Report with a proposed schedule for further proceedings by **April 16, 2018**; and it is further

**ORDERED** that a Status Conference is scheduled for **April 18, 2018, at 3:00 p.m.** in Courtroom 23A.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2018

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 16-745 (ESH) |

## <u>MEMORANDUM OPINION</u>

The federal judiciary's Public Access to Court Electronic Records ("PACER") system, which is managed by the Administrative Office of the United States Courts ("AO"), provides the public with online access to the electronic records of federal court cases. The fees for using PACER are established by the Judicial Conference of the United States Courts and set forth in the judiciary's Electronic Public Access ("EPA") Fee Schedule. In this class action, users of the PACER system contend that the fees charged from 2010 to 2016 violated federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)). Before the Court are the parties' cross-motions for summary judgment as to liability. (*See* Pls.' Mot. Summ. J., ECF No. 52; Def.'s Cross-Mot. Summ. J., ECF No. 73.) For the reasons stated herein, the Court will deny plaintiffs' motion and grant in part and deny in part defendant's motion.

# BACKGROUND

## I.     FACTUAL BACKGROUND

Although the present litigation is a dispute over whether, during the years 2010–2016, the PACER fees charged violated 28 U.S.C. § 1913 note, the relevant facts date back to PACER's creation.[1]

### A.     Origins of PACER and the Judiciary's Electronic Public Access ("EPA") Fee Schedule

In September 1988, the Judicial Conference "authorized an experimental *program of electronic access for the public to court information* in one or more district, bankruptcy, or appellate courts in which the experiment can be conducted at nominal cost, and delegated to the Committee [on Judicial Improvements] the authority to establish access fees during the pendency of the program."  (Rep. of Proceedings of the Jud. Conf. of the U.S. ("Jud. Conf. Rep.") at 83 (Sept. 18, 1988) (emphasis added) (Ex. A to the Decl. of Wendell Skidgel, Nov. 11, 2017, ECF No. 73-2 ("Skidgel Decl.")); *see also* Def.'s Statement Facts ¶¶ 1-2, ECF No. 73-3 ("Def.'s Facts")).  The following year, the Federal Judicial Center initiated pilot PACER programs in several bankruptcy and district courts.  (*See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program at 1 ("EPA Chronology") (Ex. C to the Decl. of Jonathan Taylor, Aug. 28, 2017, ECF No. 52-1 ("Taylor Decl.")).)

In February 1990, during a hearing on judiciary appropriations for 1991, a subcommittee of the House Committee on Appropriations took up the judiciary's "request[] [for] authority to collect fees for access to information obtained through automation."  *Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1991: Hearing Before*

---

[1] The facts set forth herein are undisputed.

*a Subcomm. of the H. Comm. on Appropriations*, 101st Cong. 323 (1990) ("1990 Hrg.").  It

asked a representative for the judiciary whether there were "any estimates on how much you will

collect and will this fee help offset some of your automation costs."  *Id*. at 324.  The response

from the judiciary was that "estimates of the revenue that will be generated from these fees are

not possible due to the lack of information on the number of attorneys and individuals who have

the capability of electronic access," but that there "ha[d] been a great deal of interest expressed"

and it was "anticipated that the revenue generated will offset a portion of the Judiciary's cost of

automation."  *Id*.  The Senate Report on 1991 appropriations bill noted that it "included language

which authorizes the Judicial Conference to prescribe reasonable fees for public access to case

information, *to reimburse the courts for automating the collection of the information*."  S. Rep.

No. 101-515, at 86 (1990) ("1990 S. Rep.") (emphasis added).

In March 1990, "barring congressional objection," the Judicial Conference "approved an

initial rate schedule for electronic public access to court data [in the district and bankruptcy

courts] via the PACER system."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990) (Skidgel Decl. Ex. C);

Def.'s Facts ¶ 5.)[2]

Then, in November 1990, Congress included the following language in the Judiciary

Appropriations Act of 1991:

> (a) The Judicial Conference shall prescribe reasonable fees, pursuant to sections
> 1913, 1914, 1926, and 1930 of title 28, United States Code, for collection by the
> courts under those sections for access to information available through automatic
> data processing equipment.  These fees may distinguish between classes of
> persons, and shall provide for exempting persons or classes of persons from the

---

[2] At that time, "PACER allow[ed] a law firm, or other organization or individual, to use a
personal computer to access a court's computer and extract public data in the form of docket
sheets, calendars, and other records."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990).)  The initial fee
schedule included a Yearly Subscription Rate ($60 per court for commercial users; $30 per court
for non-profits) and a Per Minute Charge ($1 per minute for commercial users; 50 cents per
minute for non-profits).  (*Id*.)

fees, in order to avoid unreasonable burdens and to promote public access to such information.  The Director, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective.  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) to reimburse expenses incurred in providing these services.

Pub. L. 101-515, § 404, 104 Stat. 2101 (Nov. 5, 1990) (codified at 28 U.S.C. § 1913 note).[3]

Three aspects of this law are relevant to this litigation: (1) the Judicial Conference was given the authority (indeed, it was required) to charge reasonable fees for "access to information available through automatic data processing equipment,"[4] which covered its newly-developed PACER

---

[3]  The statutory sections referenced authorize the federal courts to charge certain fees. *See* 28 U.S.C. § 1913 (fees for courts of appeals); *id.* § 1914 (fees for district courts); *id.* § 1926 (fees for Court of Federal Claims); *id.* § 1930 (fees for bankruptcy courts).

[4]  The term "automatic data processing equipment" is not defined in 28 U.S.C. § 1913 note, but it was defined in 28 U.S.C. § 612 as having "the meaning given that term in section 111(a)(2)(A) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(a)(2)(A))," which at that time defined it as:

> . . . any equipment or interconnected system or subsystems of equipment that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching interchange, transmission, or reception, of data or information—
>
> . . .
>
> (B) Such term includes—
>
> (i)    computers;
> (ii)    ancillary equipment;
> (iii)    software, firmware, and similar procedures;
> (iv)    services, including support services; and
> (v)    related resources as defined by regulations issued by the Administrator for General Services.

system; (2) the Director of the AO was required to publish a "schedule of reasonable fees for electronic access to information"; and (3) the fees collected by the judiciary pursuant to that fee schedule were to be deposited in the Judiciary Automation Fund[5] "to reimburse expenses incurred in providing these services." *Id*.

In the summer of 1992, the House Committee on Appropriations issued a report that "note[d] that the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media" and "request[ed] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so." H.R. Rep. No. 102-709, at 58 (July 23, 1992) ("1992 H.R. Rep.") (report accompanying appropriations bill for the judiciary for fiscal year ("FY") 1993).[6]

---

[5] Congress had established the Judiciary Automation Fund ("JAF") in 1989 to be "available to the Director [of the AO] without fiscal year limitation for the procurement (by lease, purchase, exchange, transfer, or otherwise) of automatic data processing equipment for the judicial branch of the United States" and "for expenses, including personal services and other costs, for the effective management, coordination, operation, and use of automatic data processing equipment in the judicial branch." *See* Pub. L. 101-162, 103 Stat 988 (1989) (codified at 28 U.S.C. § 612(a)). Before 28 U.S.C. § 1913 note was enacted, PACER fees were required to be deposited in the U.S. Treasury. (*See* Jud. Conf. Rep. at 20 (Mar. 14, 1989) (Skidgel Decl. Ex. B).) In 1989, the Judicial Conference, "[o]bserving that such fees could provide significant levels of new revenues at a time when the judiciary face[d] severe funding shortages," had "voted to recommend that Congress credit to the judiciary's appropriations account any fees generated by providing public access to court records"; determined that it would try to change that. (*See id.*; Def.'s Facts ¶ 3; *see also* Jud. Conf. Rep. at 21 (Mar. 13, 1990) (noting that the FY 1990 appropriations act provided that the judiciary was "entitled to retain the fees collected for PACER services in the bankruptcy courts," and that the Conference would "seek similar legislative language to permit the judiciary to retain the fees collected for district court PACER services").)

[6] According to this report, the Committee believed that "more than 75 courts are providing this service, most of them at no charge to subscribers"; that "approximately a third of current access to court records is by non-Judiciary, governmental agencies" and that "fees for access in these instances are desirable"; and that it was "aware that a pilot program for the collection of fees ha[d] been successfully implemented in the Courts and encourage[d] the Judiciary to assess charges in all courts, in accordance with the provisions of section 404(a) of P.L. 101-515[.]"

In 1993, the Judicial Conference amended the fee schedules for the Courts of Appeals to include a "fee for usage of electronic access to court data" for "users of PACER and other similar electronic access systems," while deciding not to impose fees for another "very different electronic access system" then in use by the appellate courts. (Jud. Conf. Rep. at 44–45 (Sept. 20, 1993) (Skidgel Decl. Ex. D).)[7] In 1994, the Judicial Conference approved a "fee for usage of electronic access to court data" for the Court of Federal Claims. (Jud. Conf. Rep. at 16 (Mar. 15, 1994) (Skidgel Decl. Ex. E).) Finally, in March 1997, it did the same for the Judicial Panel on Multidistrict Litigation. (Jud. Conf. Rep. at 20 (Mar. 11, 1997)[8]; Def.'s Facts ¶ 13.)

## B.    EPA Fees Before the E-Government Act (1993–2002)

As the Judicial Conference was adding EPA fees to the fee schedules for additional courts, it became apparent that the "income accruing from the fee[s] w[ould] exceed the costs of providing the service." (Jud. Conf. Rep. at 13–14 (Mar. 14, 1995).) Accordingly, after noting that this revenue "is to be used to support and enhance the electronic public access systems," the Judicial Conference reduced the fee from $1.00 to 75 cents per minute in 1995. (*Id.*) In 1996, after noting that the previous reduction had been "to avoid an ongoing surplus," it "reduce[d] the

---

1992 H.R. Rep. at 58.

[7] The Judicial Conference Report explained that:

> Some appellate courts utilize a very different electronic access system called Appellate Court Electronic Services (ACES) (formerly known as Electronic Dissemination of Opinions System (EDOS)). The Committee determined that, at this time, the costs of implementing and operating a billing and fee collection system for electronic access to the ACES/EDOS system would outweigh the benefit of the revenues to be generated.

(Jud. Conf. Rep. at 44 (Sept. 20, 1993).)

[8] Legislation authorizing the Judicial Conference to establish a fee schedule for the Judicial Panel on Multidistrict Litigation was enacted in 1996. *See* Pub. L. No. 104-317 (1996) § 403(b), Oct. 19, 1996, 110 Stat. 3854 (codified at 28 U.S.C. § 1932).

fee for electronic public access further," from 75 to 60 cents per minute.  (Jud. Conf. Rep. at 16

(Mar. 13, 1996) (Skidgel Decl. Ex. F); *see also* EPA Chronology at 1; Def.'s Facts ¶ 14.)

Shortly after the 1996 fee reduction, the House and Senate Appropriations Committees

issued reports that included commentary on the judiciary's EPA fees.  The House Report stated:

> The Committee supports the ongoing efforts of the Judiciary to improve and
> expand information made available in electronic form to the public.  Accordingly,
> the Committee expects the Judiciary to utilize available balances derived from
> electronic public access fees in the Judiciary Automation Fund to make
> information and services more accessible to the public through improvements to
> enhance the availability of electronic information.  *The overall quality of service
> to the public will be improved with the availability of enhancements such as
> electronic case documents, electronic filings, enhanced use of the Internet, and
> electronic bankruptcy noticing*.

H.R. Rep. No. 104-676, at 89 (July 16, 1996) (emphasis added) ("1996 H.R. Rep.").  The Senate

Report stated that:

> The Committee supports efforts of the judiciary to make electronic information
> available to the public, and expects that available balances from public access fees
> in the judiciary automation fund will be used to enhance availability of public
> access.

S. Rep. No. 104-353, at 88 (Aug. 27, 1996) ("1996 S. Rep.").

Soon thereafter, "the judiciary started planning for a new e-filing system called ECF

[Electronic Case Filing]." (Pls.' Statement Facts ¶ 9, ECF No. 52-16 ("Pls.' Facts").)  In March

1997, the staff of the AO prepared a paper, entitled "Electronic Case Files in the Federal Courts:

A Preliminary Examination of Goals, Issues and the Road Ahead," "to aid the deliberations of

the Judicial Conference in this endeavor," which would allow courts to maintain complete

electronic case files.  (Taylor Decl. Ex. B, at 36 ("1997 AO Paper").)  In discussing how the ECF

system could be funded, the paper discussed the possibility of charging a separate fee for ECF,

but also opined that "[s]tarting with fiscal year 1997, the judiciary has greater freedom in the use

of revenues generated from electronic public access fees" because "the [1996] House and Senate

appropriations committee reports . . . include[d] language expressly approving use of these monies for electronic filings, electronic documents, use of the Internet, etc." (1997 AO Paper at 36; *see* Pls.' Facts ¶ 9; *see also* Second Decl. of Wendell Skidgel, March 14, 2018, ECF 81-1 ("2d Skidgel Decl."), Tab 1 ("FY 2002 Budget Request") ("Fiscal year 1997 appropriations report language expanded the judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").) In the summer of 1998, the Senate Appropriations Committee reiterated its view that it "support[ed] efforts of the judiciary to make information available to the public electronically, and expect[ed] that available balances from public access fees in the judiciary automation fund will be used to enhance the availability of public access." S. Rep. No. 105-235, at 114 (July 2, 1998) ("1998 S. Rep.").

At some point, "a web interface was created for PACER" and the Judicial Conference prescribed the first Internet Fee for Electronic Access to Court Information, charging 7 cents per page "for public users obtaining PACER information through a federal judiciary Internet site." (Jud. Conf. Rep. at 64 (Sept. 15, 1998) (Skidgel Decl. Ex. G); *see* EPA Chronology at 1.) The Judicial Conference stated in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services. With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue while introducing new technologies to expand public accessibility to PACER information.

(Jud. Conf. Rep. at 64 (Sept. 15, 1998).)[9]

---

[9] At the same time, the Judicial Conference "addressed the issue of what types of data or information made available for electronic public access should have an associated fee and what types of data should be provided at no cost." (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998).) It concluded that while it "prescribed a fee for access to court data obtained electronically from the

In March 2001, the Judicial Conference eliminated the EPA fees from the court-specific miscellaneous fee schedules and replaced them with "an independent miscellaneous EPA fee schedule that would apply to all court types." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001) (Skidgel Decl. Ex. H); *see also* EPA Chronology at 1.) At the same time, it amended the EPA fee schedule to provide: (1) that attorneys of record and parties in a case would receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer, which could then be printed and saved to the recipient's own computer or network; (2) that no fee is owed by a PACER user until charges of more than $10 in a calendar year are accrued; (3) a new fee of 10 cents per page for printing paper copies of documents through public access terminals at clerks' offices; and (4) a new PACER Service Center search fee of $20.[10] (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).) In 2002, the Judicial Conference further amended the EPA fee schedule "to cap the charge for accessing any single document via the Internet at the fee for 30 pages."[11] (Jud. Conf. Rep. at 11 (Mar. 13, 2002) (Skidgel Decl. Ex. I).)

Starting no later than fiscal year 2000,[12] the judiciary was using its EPA fees to pay for

---

public dockets of individual case records in the court," courts should be allowed to "provide other local court information at no cost," such as local rules, court forms, news items, court calendars, opinions designated by the court for publication, and other information—such as court hours, court location, telephone listings—determined locally to benefit the public and the court." (*Id.*)

[10] At the time, "[t]he PACER Service Center provide[d]s registration, billing, and technical support for the judiciary's EPA systems and receive[d] numerous requests daily for particular docket sheets from individuals who d[id] not have PACER accounts." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).)

[11] The Judicial Conference took this step because otherwise "the fee is based upon the total number of pages in a document, even if only one page is viewed, because the case management/electronic case files system (CM/ECF) software cannot accommodate a request for a specific range of pages from a document," which "can result in a relatively high charge for a small usage." (Jud. Conf. Rep. at 11 (Mar. 13, 2002).)

[12] The record does not include any specifics as to the use of EPA fees prior to FY 2000.

PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN").[13]
(*See* 2d Skidgel Decl. ¶¶ 31–33 & Tabs 30–32 ("expenditures relating to the Judiciary's
Electronic Public Access Program" for FY 2000–2002).)

### C.  E-Government Act of 2002

In December 2002, Congress passed the E-Government Act of 2002.  Section 205
pertained to the "Federal Courts.  Subsection (a) required all courts to have "individual court
websites" containing certain specified information or links to websites that include such
information (e.g., courthouse location, contact information, local rules, general orders, docket
information for all cases, access to electronically filed documents, written opinions, and any
other information useful to the public)"; subsection (b) provided that "[t]he information and rules
on each website shall be updated regularly and kept reasonably current; subsection (c), entitled
"Electronic Filings," provided that, with certain exceptions for sealed documents and privacy and
security concerns, "each court shall make any document that is filed electronically publicly
available online"; subsection (d), entitled "Dockets with links to documents" provided that "[t]he
Judicial Conference of the United States shall explore the feasibility of technology to post online
dockets with links allowing all filings, decisions, and rulings in each case to be obtained from the
docket sheet of that case"; and subsections (f) and (g) address the time limits for courts to
comply with the above requirements.  E-Government Act of 2002, § 205(a)–(d), (f), and (g)
(codified at 44 U.S.C. § 3501 note).  Subsection (e), entitled Cost of Providing Electronic
Docketing Information, "amend[ed] existing law regarding the fees that the Judicial Conference
prescribes for access to electronic information" by amending the first sentence of 28 U.S.C. §

---

[13]  A line item amount expended from EPA fees for Electronic Bankruptcy Noticing appears in
AO's accounting of EPA fees for FY 2000, but not for 2001 or 2002.  (*See* 2d Skidgel Decl.
Tabs 30–32.)

1913 note to replace the words "shall hereafter" with "may, only to the extent necessary."  E-Government Act of 2002, § 205(e).  The E-Government Act left the remainder of 28 U.S.C. § 1913 note unchanged.

> The Senate Governmental Affairs Committee Report describes Section 205 as follows:
>
> Section 205 requires federal courts to provide greater access to judicial information over the Internet. Greater access to judicial information enhances opportunities for the public to become educated about their legal system and to research case-law, and it improves access to the court system. The mandates contained in section 205 are not absolute, however.  Any court is authorized to defer compliance with the requirements of this section, and the Judicial Conference of the United States is authorized to promulgate rules to protect privacy and security concerns.

S. Rep. No. 107-174, at 23 (June 24, 2002) ("2002 S. Rep.") (Taylor Decl. Ex. D).  As to the amending language in subsection 205(e), the report stated:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible.  For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index.  Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

2002 S. Rep. at 23.

**D.    EPA Fees After the E-Government Act**

**1.    2003–2006**

After the passage of the E-Government Act, the judiciary continued to use EPA fees for the development of its CM/ECF system.  (*See* Taylor Decl. Ex. F (FY 2006 Annual Report for the Judiciary Information Technology Fund ("JITF") (formerly the "Judiciary Automation Fund")[14] ("The entire development costs for the Case Management/Electronic Case Files

---

[14] In 2005, 28 U.S.C. § 612 had been amended to substitute "Judiciary Information Technology

(CM/ECF) project have been funded solely through EPA collections.").)

In 2003, a report from the House Appropriations Committee stated that: "The Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs." H.R. Rep. No. 108-221, at 116 (July 21, 2003) ("2003 H.R. Rep."). The Senate Appropriations Committee also expressed its enthusiasm for CM/ECF:

> The Committee fully supports the Judiciary's budget request for the Judiciary Information Technology Fund [JITF]. The Committee would like to see an even greater emphasis on automation in the local courts. To this end, the Committee expects the full recommended appropriation for the JITF, as reflected in the budget request, be deposited into this account. The Committee lauds the Judicial Committee on Information Technology (IT Committee) and their Chairman for their successes helping the Courts run more efficiently through the use of new automation. Of particular note, the Committee is impressed and encouraged by the new Case Management/Electronic Case File system [CM/ECF]. This new and innovative system allows judges, their staffs, the bar and the general public to work within the judicial system with greater efficiency. This new system is currently implemented in many bankruptcy and district courts and will soon begin implementation in the appellate courts. The CM/ECF system is already showing its potential to revolutionize the management and handling of case files and within the next few years should show significant cost savings throughout the Judiciary. The Committee on Appropriations expects a report on the savings generated by this program at the earliest possible date.

S. Rep. No. 108-144, at 118 (Sept. 5, 2003) ("2003 S. Rep."). The associated Conference Committee report "adopt[ed] by reference the House report language concerning Electronic Public Access fees." *See* 149 Cong Rec. H12323, at H12515 (Nov. 23, 2003) ("2003 Conf. Rep.").

In September 2004, the Judicial Conference, "[i]n order to provide sufficient revenue to fully fund currently identified case management/electronic case files system costs," "increase[d]

---

Fund" for "Judiciary Automation Fund" and "information technology" for "automatic data processing."

the fee for public users obtaining information through a federal judiciary Internet site from seven to eight cents per page." (Jud. Conf. Rep. at 12 (Sept. 21, 2004) (Skidgel Decl. Ex. J); *see also* EPA Chronology at 2; Taylor Decl. Ex. E (Oct. 21, 2004 AO memorandum) ("This increase is predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue to fund CM/ECF operations and maintenance. The fee increase will enable the judiciary to continue to fully fund the EPA Program, in addition to CM/ECF implementation costs until the system is fully deployed throughout the judiciary and its currently defined operations and maintenance costs thereafter.").)

> The judiciary's Financial Plan for fiscal year 2006 described its EPA program at the time:

> The judiciary's Electronic Public Access (EPA) program provides for the development, implementation and enhancement of electronic public access systems in the federal judiciary. The EPA program provides centralized billing, registration and technical support services for PACER (Public Access to Court Electronic Records), which facilitates Internet access to data from case files in all court types, in accordance with policies set by the Judicial Conference. The increase in fiscal year 2006 EPA program operations includes one-time costs associated with renegotiation of the Federal Telephone System (FTS) 2001 telecommunications contract.

> Pursuant to congressional directives, the program is self-funded and collections are used to fund information technology initiatives in the judiciary related to public access. Fee revenue from electronic access is deposited into the Judiciary Information Technology Fund. Funds are used first to pay the expenses of the PACER program. Funds collected above the level needed for the PACER program are then used to fund other initiatives related to public access. The development and implementation costs for the CM/ECF project have been funded through EPA collections. Beginning last year, in accordance with congressional direction, EPA collections were used to support CM/ECF operations and maintenance as well. In fiscal year 200[6], the judiciary plans to use EPA collections to continue PACER operations, complete CM/ECF development and implementation, and operate and maintain the installed CM/ECF systems in the various courts across the country.

(2d Skidgel Decl. Tab 9 (FY 2006 Financial Plan at 45).)

### 2. 2006–2009

In July 2006, the Senate Appropriations Committee issued a report pertaining to the 2007

appropriations bill in which it stated: "The Committee supports the Federal judiciary sharing its case management electronic case filing system at the State level and urges the judiciary to undertake a study of whether sharing such technology, including electronic billing processes, is a viable option." S. Rep. No. 109-293, at 176 (July 26, 2006) ("2006 S. Rep.") (2d Skidgel Decl. Tab 38).

By the end of 2006, "resulting from unanticipated revenue growth associated with public requests for case information," the judiciary found that its EPA fees fully covered the costs of its "EPA Program" and left it with an "unobligated balance" of $32.2 million from EPA fees in the JITF. (FY 2006 JITF Annual Rep. at 8; Pls.' Facts ¶ 16.) In light of this "unobligated balance," the judiciary reported that it was "examining expanded use of the fee revenue in accordance with the authorizing legislation." (FY 2006 JITF Annual Rep. at 8.)

In March 2007, the judiciary submitted its financial plan for fiscal year 2007 to the House and Senate Appropriations Committees. (Def.'s Facts ¶ 27.) In the section of the plan that covered the JITF, it proposed using EPA fees "first to pay the expenses of the PACER program" and then "to fund other initiatives related to public access." (Skidgel Decl. Ex. K (FY 2007 Financial Plan at 45).) It identified the "public access initiatives" that it planned to fund with EPA fees as CM/ECF Infrastructure and Allotments; EBN; Internet Gateways; and Courtroom Technology Allotments for Maintenance/Technology Refreshment. (*Id.*) With respect to Courtroom Technology, the plan requested "expanded authority" to use EPA fees for that purpose:

> Via this financial plan submission, the Judiciary seeks authority to expand use of Electronic Public Access (EPA) receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance. The Judiciary seeks this expanded authority as an appropriate use of EPA receipts to improve the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically

14

through electronic public access services when it is presented electronically and becomes an electronic court record.

(FY 2007 Financial Plan at 43, 46.) With no specific reference to EPA fees, the plan also sought

spending authority to implement a Memorandum of Agreement with the State of Mississippi to undertake a three-year study of the feasibility of sharing the Judiciary's case management electronic case filing system at the state level, to include electronic billing processes. The estimated cost of this three year pilot will not exceed $1.4 million.

(*Id*. at 41.) In May 2007, the FY 2007 Financial Plan was approved by the House and Senate Appropriations Committees, with the approval letter signed on May 2, 2007, by the Chairman and the Ranking Member of the Subcommittee on Financial Services and General Government, stating that there was no objection to "the expanded use of Electronic Public Access Receipts" or "a feasibility study for sharing the Judiciary's case management system with the State of Mississippi." (Skidgel Decl. Ex. L ("FY 2007 Senate Approval Letter"); *id*. Ex. M ("FY 2007 House Approval Letter").)

The judiciary began using EPA fees to pay for courtroom technology expenses in 2007, "to offset some costs in [its] information technology program that would otherwise have to be funded with appropriated funds." (Pls.' Facts ¶ 18; 2d Skidgel Decl. Tab 35 (FY 2007–08 EPA Expenditures); *Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260*, 110th Cong. 51 (2008) (testimony of the chair of the Judicial Conference's Comm. on the Budget) ("[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements in the courts' Salaries and Expenses account, thereby reducing our need for appropriated funds").)

In its fiscal year 2008 financial plan, the judiciary indicated that it intended to use EPA fees for Courtroom Technology ($24.8 million) and two new programs: a Jury Management System ("JMS") Web Page ($2.0 million) and a Violent Crime Control Act ("VCCA")

Notification.  (2d Skidgel Decl. Tab 11 (FY 2008 Financial Plan at 11).)  Actual expenditures for fiscal year 2008 included spending on those programs.  (*Id.* Tab 35 (FY 2008 EPA Expenditures) ($24.7 million spent on Courtroom Technology; $1.5 million spent on the JMS Web Page; $1.1 million spent on the VCCA Notification).)  Its fiscal year 2009 financial plan included a third new expense category: a CM/ECF state feasibility study ($1.4 million)—this was previously described in the 2007 financial plan as the State of Mississippi study, albeit not in the section related to EPA fee use.  (*Id.* Tab 12 (FY 2009 Financial Plan at 45).)  The judiciary also projected spending $25.8 million on Courtroom Technology; $200,000 on the JMS Public Web Page; and $1 million on VCCA Notification.  (*Id.*)  Again, actual expenditures for fiscal year 2009 included each of these programs.  *(Id.* Tab 36 (FY 2009 EPA Expenditures) ($160,000 spent on the State of Mississippi study; $24.6 million spent on Courtroom Technology; $260,000 spent on Web-Based Juror Services (replacing line item for JMS); and $69,000 spent on VCCA Notification).)

In February 2009, Senator Lieberman, in his capacity as Chair of the Senate Committee on Homeland Security and Government Affairs, sent a letter to the Chair of the Judicial Conference Committee on Rules of Practice and Procedure, inquiring whether the judiciary was complying with the E-Government Act.  (*See* Taylor Decl. Ex. H.)  According to Senator Lieberman, the "goal of this provision . . . was to increase free public access to [court] records." (*Id.*)  Given that PACER fees had increased since 2002, and that "the funds generated by these fees [were] still well higher than the cost of dissemination," he asked the Judicial Conference to "explain whether the Judicial Conference is complying with Section 205(e) of the E-Government Act, how PACER fees are determined, and whether the Judicial Conference is only charging 'to the extent necessary' for records using the PACER system."  (*Id.*)

On behalf of the Judicial Conference and its Rules Committee, the Committee Chair and the Director of the AO responded that the judiciary was complying with the law because EPA fees are "used only to fund public access initiatives," such as "CM/ECF, the primary source of electronic information on PACER," and the "EBN system, which "provides access to bankruptcy case information to parties listed in the case by eliminating the production and mailing of traditional paper notices and associated postage costs, while speeding public service." (Taylor Decl. Ex. I ("3/26/2009 AO Letter").)

In March 2010, Senator Lieberman raised his concerns in a letter to the Senate Appropriations Committee. (*See* Taylor Decl. Ex. G.) In addition, he specifically questioned the use of EPA receipts for courtroom technology, acknowledging that the Appropriations Committees had approved this use in 2007, but expressing his opinion that this was "an initiative that [was] unrelated to providing public access via PACER and against the requirement of the E-Government Act." (*Id*. at 3.)

In 2011, the Judicial Conference, "[n]oting that . . . for the past three fiscal years the EPA program's obligations have exceeded its revenue," again amended the PACER fee schedule, raising the per-page cost from 8 to 10 cents. (Jud. Conf. Rep. at 16 (Sept. 13, 2011) (Skidgel Decl. Ex. N).) At the same time, it increased the fee waiver amount from $10 to $15 per quarter. (*Id*.)

### 3. 2010–2016[15]

From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased

---

[15] These are the years that are relevant to the present litigation because there is a six-year statute of limitation on plaintiffs' claims.

from about \$102.5 million in 2010 to \$146.4 million in 2016. [16]  (*See* Pls.' Facts ¶¶ 28, 46, 62,

80, 98, 116, 134; Taylor Decl. Ex. L; *see also* Attachment 1 hereto.[17])

During that time, PACER fees were used to pay for the costs of PACER, CM/ECF, EBN,

the State of Mississippi study, Web-Based Juror Services, VCCA Notification, and Courtroom

Technology.  In its internal accounting, the judiciary divided these costs into Program

Requirements and Congressional Priorities.  (Taylor Decl. Ex. L.)

Under Program Requirements, there are five categories: (1) Public Access Services;

(2) CM/ECF System; (3) Telecommunications (2010–11) or Communications Infrastructure,

Services and Security (2012–16); (4) Court Allotments; and (5) EBN.  (*Id.*)  The Public Access

Services category includes only expenses that relate directly to PACER.  (*See* Taylor Decl. Ex.

M, at 22-23 ("Def.'s Resp. to Pls.' Interrogs."); 3/23/18 Tr. at __.)  From 2010 to 2016, the

judiciary spent nearly \$129.9 million on Public Access Services.  (*Id.*)  The next three categories,

CM/ECF System, Telecommunications/Communications Infrastructure, and Court Allotments,

include only expenses that relate to CM/ECF or PACER.  (*See* 3/23/18 Tr. at __[18]; *see also*

Def.'s Resp. to Pls.' Interrogs. at 22–26.)  From 2010 to 2016, the judiciary spent \$217.9 million

on the CM/ECF System; \$229.4 million on Telecommunications/ Communications

Infrastructure; and \$74.9 million on Court Allotments.  (Taylor Decl. Ex. L (FY 2010-2016 EPA

---

[16]  This number does not include print fee revenues, which are also collected pursuant to the EPA fee schedule.

[17]  The document submitted to the Court as Exhibit L to the Taylor Declaration is defendant's internal accounting of PACER revenues and the use of PACER fees from FY 2010 through FY 2016.  (*See* Taylor Decl. Ex. L; 3/23/18 Tr. at __.)  While the contents of this document are described in this Memorandum Opinion, for the reader's benefit, an example of this internal accounting for the year 2010 is appended hereto as Attachment 1 in order to demonstrate how the judiciary has described and categorized the expenditures that were paid for by PACER fees.

[18]  The official transcript from the March 23, 2018 motions hearing is not yet available.  The Court will add page citations once it is.

Expenditures).)  The final category, Electronic Bankruptcy Noticing, refers to the system which "produces and sends court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases."  (Def.'s Resp. to Pls.' Interrogs. at 10.)  From 2010 to 2016, the judiciary spent a total of $73.3 million on EBN.  (Taylor Decl. Ex. L.)

Under Congressional Priorities, there are four categories: (1) State of Mississippi; (2) VCCA Victim Notification; (3) Web-Based Juror Services; and (4) Courtroom Technology. (*Id.*)  The State of Mississippi category refers to a study which "provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  In 2010— the only year this category appears between 2010 and 2016—the judiciary spent a total of $120,988 for the State of Mississippi study.  (Taylor Decl. Ex. L.)  The next category is Victim Notification (Violent Crime Control Act), which refers to "[c]osts associated with the program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  Via this program, "[l]aw enforcement officers receive electronic notification of court documents that were previously sent to them through the mail."  (*Id.*)  From 2010 to 2016, the judiciary spent $3.7 million on the VCCA victim notification program.  The third category, Web-Based Juror Services, refers to "[c]osts associated with E-Juror software maintenance, escrow services, and scanner support." (*Id.* at 26.)  "E-Juror provides prospective jurors with electronic copies of courts documents regarding jury service."  (*Id.*)  From 2010 to 2016, the judiciary spent $9.4 million on Web-Based Juror Services.  (Taylor Decl. Ex. L.)  Finally, the category labeled Courtroom Technology funds "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 26.)  From 2010 to 2016, the judiciary spent

19

$185 million on courtroom technology.  (Taylor Decl. Ex. L.)

## II.    PROCEDURAL HISTORY

 On April 21, 2016, three national nonprofit organizations, National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice, on behalf of themselves and a nationwide class of similarly-situated PACER users, filed suit against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), claiming that the PACER fees charged by the Administrative Office of the United States Courts "exceeded the amount that could be lawfully charged, under the E-Government Act of 2002" and seeking "the return or refund of the excessive PACER fees."  (Compl. ¶¶ 33–34.)

After denying defendant's motion to dismiss (*see* Mem. Op. & Order, Dec. 5, 2016, ECF Nos. 24, 25), the Court granted plaintiffs' motion for class certification (*see* Mem. Op. & Order, Jan. 24, 2017, ECF Nos. 32, 33).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court certified a class consisting of: "[a]ll individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities" and "certifie[d] one class claim: that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act."  (Order, Jan. 24, 2017, ECF No. 32.)

On August 28, 2017, plaintiffs filed a motion seeking "summary adjudication of the defendant's liability," while "reserving the damages determination for after formal discovery." (Pls.' Mot. at 1.)  On November 17, 2017, defendant filed a cross-motion for summary judgment as to liability.  The Court permitted the filing of three amicus briefs.[19]  The cross-motions for

---

[19] Amicus briefs were filed by the Reporters Committee for Freedom of the Press, *et al.*, ECF No. 59, the American Association of Law Libraries, *et al.*, ECF No. 61, and Senator Joseph

summary judgment on liability are fully-briefed and a hearing on the motions was held on March 23, 2018.

## ANALYSIS

The parties' cross-motions for summary judgment on liability present the following question of statutory interpretation:  what restrictions does 28 U.S.C. § 1913 note place on the amount the judiciary may charge in PACER fees?

In relevant part, 28 U.S.C. § 1913 note reads:

Court Fees for Electronic Access to Information

 (a) The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts . . . for access to information available through automatic data processing equipment.

. . .

The Director, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) . . .  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund . . . to reimburse expenses incurred in providing these services.

28 U.S.C. § 1913 note.

## I.    LEGAL STANDARD

Statutory interpretation "begins with the language of the statute."  *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1569 (2017).  This means examining "'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole'" to determine if it has a "'plain and unambiguous meaning with regard to the particular dispute in the case.'"  *United States v. Wilson*, 290 F.3d 347, 352–53 (D.C. Cir. 2002) (quoting *Robinson v.*

---

Lieberman and Congressman Darrell Issa, ECF No. 63.

*Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (statutory interpretation "requires examination of the statute's text in light of context, structure, and related statutory provisions"). A statutory term that is neither a term of art nor statutorily defined is customarily "construe[d] . . . in accordance with its ordinary or natural meaning," frequently derived from the dictionary. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

Where statutory language does not compel either side's interpretation, the Court may "look to the statute's legislative history to determine its plain meaning." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 146 (D.D.C. 2015) (citing *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text."). The fact that a statute can be read in more than one way does not demonstrate that it lacks "plain meaning." *United States v. Hite*, 896 F. Supp. 2d 17, 25 (D.D.C. 2012); *see, e.g.*, *Abbott v. United States,* 562 U.S. 8, 23 (2010).

A statute's legislative history includes its "statutory history," a comparison of the current statute to its predecessors and differences between their language and structure, *see, e.g.*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 231–32 (2007), along with relevant committee reports, hearings, or floor debates. In general, "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1289 n.26 (D.C. Cir. 1983) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)). But even though, "[t]he view of a later Congress cannot control the interpretation of an earlier enacted statute," *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996), in certain narrow circumstances, "'congressional

22

acquiescence to administrative interpretations of a statute'" may "inform the meaning of an earlier enacted statute." *U.S. Ass'n of Reptile Keepers*, 103 F. Supp. 3d at 153 & 154 n.7 (D.D.C. 2015) (quoting *O'Gilvie*, 519 U.S. at 90); *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001)).  Such a situation may be where Congress has amended the relevant provisions without making any other changes.  *See, e.g.*, *Barnhart v. Walton*, 535 U.S. 212, 220 (2002).  However, "[e]xpressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 191 (1978).

## II.  APPLICATION

Applying the "ordinary principles of statutory construction," the parties arrive at starkly different interpretations of this statute.  Plaintiffs take the position that the statute "prohibits the AO from charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER."  (Pls.' Mot. at 12.)  Under plaintiffs' interpretation, defendant's liability is established because with the exception of the category of expenditures labeled Public Access Services (*see* Attachment 1), most, if not all, of the other expenditures covered by PACER fees are not part of the "'marginal cost of disseminating records' through PACER."  (*See* Pls.' Mot. at 17; *see also*, *e.g.*, Pls.' Facts ¶¶ 32, 34, 36, 38, 41, 43, 45 (fiscal year 2010).)  Defendant readily admits that PACER fees are being used to cover expenses that are not part of the "marginal cost" of operating PACER (*see, e.g.*, Def.'s Resp. to Pls.' Facts ¶¶ 32, 34, 36, 38, 41, 43, 45), but it rejects plaintiffs' interpretation of the statute.  Instead, defendant reads the statute broadly to mean that the Judicial Conference "may charge [PACER] fees in order to fund the dissemination of information through electronic means."  (3/23/18 Tr. at __; *see also* Def.'s Mot. at 11 (Judicial Conference may "charge fees, as it deems necessary, for the provision of

information to the public through electronic means").)  Under defendant's interpretation, it is not liable because "every single expenditure . . . [is] tied to disseminating information through electronic means."  (3/23/18 Tr. at __.)

If the Court agreed with either proposed interpretation, the ultimate question of defendant's liability would be relatively straightforward.  If PACER fees can only be spent to cover the "marginal cost" of operating PACER, defendant is liable most expenditures.[20]  If PACER fees can be spent on any expenditure that involves "the dissemination of information through electronic means," defendant is not liable.  But the Court rejects the parties' polar opposite views of the statute, and finds the defendant liable for certain costs that post-date the passage of the E-Government Act, even though these expenses involve dissemination of information via the Internet.

### A.  Does the E-Government Act Limit PACER Fees to the Marginal Cost of Operating PACER?

As noted, plaintiffs interpret the statute as prohibiting the AO "from charging more in

---

[20]  The Court would still have to determine the meaning of "marginal cost" and whether any of the expenditures beyond those in the category of Public Access Services are part of that cost, since plaintiffs only expressly challenged "some" of the expenditures in several important categories, and defendant has only admitted that "some" of the expenditures in those categories are not part of the marginal cost.  (*See, e.g.*, Pls.' Facts ¶¶ 41 (CM/ECF), 43 (Telecommunications), 45 (Court Allotments); Def.'s Resp. to Pls.' Facts ¶¶ 41, 43, 45.)  The categories that plaintiffs argue should be examined as part of a determination of damages (as opposed to liability), since they may include PACER-related costs, are CM/ECF, Telecommunications/Communications Infrastructure, and Court Allotments.  (Pls.' Mot. at 19; *see also* Attachment 1.)

Defendant, on the other hand, responds that even though only some of the costs associated with these categories involve PACER-related expenses, all of the expenses related to PACER and/or CM/ECF.  (3/23/18 Tr. at __.)

However these costs are categorized, the Court rejects plaintiffs' suggestion that the issue is one to be decided as part of a determination of damages, for the issue as to liability necessarily requires a determination of whether these costs are proper expenditures under the E-Government Act.

PACER fees than is necessary to recoup the total marginal cost of operating PACER." (Pls.' Mot. at 12.) Plaintiffs concede, as they must, that this is not what the text of the statute actually says. But they argue that this is the best reading of the statutory language in light of its "plain language," its "history," and the need to "avoid[] two serious constitutional concerns that would be triggered by a broader reading." (*See* Pls.' Reply at 1.)

Plaintiffs first argue that it is clear from the text that the words "these services" in the last sentence of subparagraph (b), where it provides that the fees collected must be used "to reimburse expenses incurred in providing *these* services," include only the services that the AO is actually charging fees for as set forth in the EPA Fee Schedule, i.e., the PACER system, the PACER Service Center, and the provision of printed copies of documents "accessed electronically at a public terminal in a courthouse." (Pls.' Reply at 3–4; 3/23/18 Tr. at __.) The Court does not agree that the text dictates this constraint. The term "these services" could also mean any service that provides "access to information available through automatic data processing equipment," whether or not it is expressly part of the EPA fee schedule.

Plaintiffs' next argument is based on the legislative history of the 2002 amendment, which consists of the following single paragraph in a Senate Committee Report:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

2002 S. Rep. at 23. Plaintiffs argue that this paragraph "makes clear that Congress added this language because it sought to prevent the AO from 'charg[ing] fees that are higher than the marginal cost of disseminating the information,'" as it had been doing for several years, and that

"although the E-Government Act does not refer to PACER by name, Congress clearly had PACER in mind when it passed the Act."  (Pls.' Mot. at 11 (quoting 2002 S. Rep. at 23).)

The Court finds this argument unconvincing for several reasons.  First, there is no mention in the statute of PACER or its "marginal cost," and in the 2002 Senate Report, the reference to PACER and "marginal cost" follows the words "For example," suggesting that the amendment was not intended to apply only to PACER.  *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 649 (1990) ("[T]he language of a statute—particularly language expressly granting an agency broad authority—is not to be regarded as modified by examples set forth in the legislative history.").  And, in fact, the 2002 Senate Report recognizes that PACER is only a subset of a larger system when it stated: "[t]he Committee intends to encourage the Judicial Conference to move from a structure in which *electronic docketing systems* are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible."  2002 S. Rep. at 23 (emphasis added).  The use of the phrase "electronic docketing systems" appears to envision more than just PACER, and to at least encompass CM/ECF, given that it, unlike PACER, is an electronic docketing system.

Second, a single committee's report reflects only what the committee members might have agreed to, not the "intent" of Congress in passing the law.  As the Supreme Court observed, "[u]nenacted approvals, beliefs, and desires are not laws."  *P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988).  As the Supreme Court observed in rejecting reliance on "excerpts" said to reflect congressional intent to preempt state law, "we have never [looked for] congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text."  *Id*.

Perhaps most tellingly, the E-Government Act changed only one phrase in the first

sentence of the first paragraph—replacing "shall hereafter" with "may, only to the extent

necessary." It did not alter the third sentence of paragraph (b), which is the part of the statute

that governs what expenses can be reimbursed by PACER fees. Thus, even though the 2002

Senate Report correctly observes that PACER fees exceeded the marginal cost of operating

PACER, the amendment to the statute did not address which services could be reimbursed, but

only the amount of fees for services that could be charged. In addition, at the time the E-

Government Act was passed, CM/ECF had been in operation for at least four years, PACER fees

were already being used to pay for non-PACER costs, such as EBN and CM/ECF (*see* 2d

Skidgel Decl. Tabs 30–32), and there is nothing in the statute's text or legislative history to

suggest that Congress intended to disallow the use of PACER fees for those services. In the end,

a single sentence in a committee report, which has been taken out of context, is not enough to

persuade the Court that Congress intended the E-Government Act to impose a specific limitation

on the judiciary's collection and use of EPA fees to the operation of only PACER.

Plaintiffs also point to "[p]ost-enactment history"—the letters from the E-Government

Act's sponsor, Senator Joseph Lieberman, in 2009 and 2010. (Pls.' Mot. at 11–12 ("The Act's

sponsor has repeatedly expressed his view, in correspondence with the AO's Director, that the

law permits the AO to charge fees 'only to recover the direct cost of distributing documents via

PACER,' and that the AO is violating the Act by charging more in PACER fees than is necessary

for providing access to 'records using the PACER system.'").) But, as plaintiffs essentially

conceded during the motions hearing, the post-enactment statements of a single legislator carry

no legal weight when it comes to discerning the meaning of a statute. (3/23/18 Tr. at __); *see*

*Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J. concurring) ("the views of a

legislator concerning a statute already enacted are entitled to no more weight than the views of a

judge concerning a statute not yet passed"); *see also Consumer Prod. Safety Comm'n*, 447 U.S.

at 117–18 ("even the contemporaneous remarks of a single legislator who sponsors a bill are not

controlling in analyzing legislative history").

Plaintiffs' final argument is that the "constitutional doubt" canon of construction requires

their interpretation because any other interpretation would raise a question as to whether

Congress had unconstitutionally delegated its taxing authority because the statute does not

clearly state its intention to do so. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989)

("Congress must indicate clearly its intention to delegate to the Executive the discretionary

authority to recover administrative costs not inuring directly to the benefit of regulated parties by

imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those

parties."). Assuming *arguendo* that this doctrine applies with equal force to unregulated parties,

an issue not addressed by the parties, the Court does not find plaintiffs' argument persuasive.

First, this canon of construction has a role only where the statute is ambiguous, which, as

explained herein, the Court concludes is not the case. *See FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 516 (2009) ("The so-called canon of constitutional avoidance is an interpretive

tool, counseling that ambiguous statutory language be construed to avoid serious constitutional

doubts."). Second, the canon can only be applied where there is a "reasonable alternative

interpretation," *Gomez v. United States*, 490 U.S. 858, 864 (1989), but the Court has already

explained that it does not find plaintiffs' proposed interpretation to be a reasonable alternative

interpretation. Finally, as will be discussed in Section C, *infra*, the Court finds that the statute

does clearly state that the judiciary has the authority to use its PACER fees for services that may

not directly benefit a particular PACER user. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S.

145, 153–54 (2013) ("This is not to say that Congress must incant magic words in order to speak

clearly.  We consider context . . . as probative of [Congress' intent].").

For these reasons, the Court will not adopt plaintiffs' interpretation of the statute as limiting PACER fees to the total marginal cost of operating PACER.

**B.**     **Does the E-Government Act Allow PACER Fees to Fund Any "Dissemination of Information Through Electronic Means"?**

Defendant's interpretation of the statute embraces the other extreme, positing that the statute allows PACER fees to be used for any expenditure that is related to "disseminating information through electronic means."  (3/23/18 Tr. at __; *see* Def.'s Mot. at 11.)  It is not entirely clear to the Court how the defendant arrived at this definition.  Most of the reasons defendant gives to justify its interpretation are really just arguments against plaintiffs' interpretation, such as (1) the authority to charge EPA fees and use them to reimburse "services" predated the E-Government Act and that language was not changed by the Act; (2) there is no mention of PACER or "marginal cost" in the 2002 amendment; and (3) the legislative history discussed PACER only as an "example."  As for defendant's affirmative arguments, addressed below, none demonstrates that defendant's conclusion is correct.

Defendant's first argument is based on the fact that the text of the statute requires that EPA fees be deposited in the JITF, which is the fund that the judiciary is allowed to use for "broad range of information technology expenditures."  (Def.'s Mot. at 10.)  According to defendant, the fact that EPA fees are deposited in this fund "informs how Congress intended the fees received from PACER access to be spent."  (*Id*.)  However, while the statute provides that PACER fees are to be deposited in the JITF, it also directs that they are to be used to "reimburse expenses incurred" in providing "access to information available through data processing equipment."  That statutory language cannot be ignored as defendant attempts to do.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its

29

provisions, so that no part will be inoperative or superfluous, void or insignificant.").  Notably, it is clear that the judiciary has never treated its EPA fees in the JITF as fungible with the rest of the money in the JAF.  (*See* FY 2006 JITF Annual Report; FY 2007 Financial Plan; 3/26/2009 AO Letter at 3-4 ("While fee collections from the EPA program are also deposited into the JITF, they are used only to fund electronic public access initiatives and account for only a small portion of its balance.").)

Defendant's main argument is that its interpretation of the statute has been accepted by Congress because the Appropriations Committees, either explicitly or implicitly, endorsed, mandated, or approved every request pertaining to the use of EPA fees.  For example, defendant points out that the 1996 House Report stated that the Committee "expect[ed] available balances from public access fees" to be used for electronic bankruptcy noticing and electronic case filing, 1996 H.R. Rep. at 89; the 2003 House and Senate Committee Reports "expressly directed the AO to use PACER fees to update the CM/ECF system," 2003 H.R. Rep. at 116; 2003 S. Rep. at 118; those same Committees endorsed the Judiciary's FY 2007 Financial Plan, which set forth the AO's plan "to use receipts from PACER fees to fund courtroom technology and to perform infrastructure maintenance consistent with Congressional actions" (FY 2007 Financial Plan at 45; FY 2007 Senate Approval Letter; FY 2007 House Approval Letter); and the 2006 Senate Report, which urged the judiciary to undertake a study about the feasibility of sharing CM/ECF technology with states, *see* 2006 S. Rep. at 176, which the judiciary then did via its State of Mississippi study (FY 2009 EPA Expenditures).  (*See* Def.'s Mot. at 17–18.)  More generally, and applicable at least as to the expenditures that post-date the passage of the E-Government Act, congressional approval is reflected by the fact that after the judiciary submitted its proposed budget to Congress and Congress appropriated money to the judiciary, the judiciary was then

required to submit its proposed financial plan, which included its intended use of EPA fees, to the House and Senate Appropriations Committees for approval. (Def.'s Reply at 3; 3/23/18 Tr. at __.) Looking at this entire process as a "totality," defendant argues, establishes that by implicitly approving certain expenditures, Congress agreed with the Judicial Conference's interpretation of the statute. (3/23/18 Tr. at __ ("[W]e have 26 years where the only legislative history that has gone to the judicial conference, but for Senator Lieberman's letter, says the judicial conference's interpretation is correct. The judicial conference's interpretation of that language that PACER fees may be used more broadly is correct.").)

For a number of reasons, defendant's argument is flawed. First, the record does not reflect meaningful congressional approval of each category of expenditures. Each so-called "approval" came from congressional committees, which is not the same as approval by Congress "as a whole." *See Tenn. Valley Auth.*, 437 U.S. at 192.[21] Moreover, the Court questions whether it is even possible to infer approval of a specific expenditure based solely on committee-approval of the judiciary's financial plans, where the record does not show any particular attention was paid to this itemization of intended uses of EPA fees. For almost of all the years for which defendant has included copies of approvals, the "approvals" consist of a mere line in an email or letter that indicates, without any elaboration or specification, that the Appropriations Committee has "no objection."[22] (*See, e.g.*, 2d Skidgel Decl. Tab 16 (2010); *see also id.* Tabs 15, 17, 20–27

---

[21] Despite having the opportunity to respond to the holding of *Tennessee Valley Authority v. Hill*, defendant has failed to cite any legal support for its use of approvals by the Committee on Appropriations.

[22] The one exception was courtroom technology. In response to the judiciary's request in its FY 2007 Financial Plan to use PACER fees for Courtroom Technology, the Chairman and Ranking Member of the Subcommittee on Financial Services and General Government wrote on May 2, 2007: "We have reviewed the information included and have no objection to the financial plan including . . . the expanded use of Electronic Public Access Receipts." (2007 Senate Approval Lettter; *see also id.* 2007 House Approval Letter.)

(2011, 2013–2016).)  In 2009 and 2012, there are letters from the Appropriations Committees which reflect a closer analysis of some parts of the financial plan, but neither mentions the judiciary's planned uses of PACER fees.  (*Id*. Tabs 14, 18–19.)  By contrast, in July 2013, the AO sent an email to the Senate Appropriation Committee at 1:02 p.m. noting that "[i]n looking through our records we don't seem to have approval of our FY 2013 financial plan.  Would you be able to send us an email or something approving the plan?  The auditors ask for it so we like to have the House and Senate approvals on file."  (2d Skidgel Decl. Tab 20.)  Less than an hour later, at 1:47 p.m., an email came from a staff member on the Senate Appropriations Committee stating "Sorry about that and thanks for the reminder.  We have no objection."  (*Id*.)

     Second, even if the record established approval of the various uses of EPA fees, there is nothing to support the leap from approval of specific expenditures to defendant's contention that the Appropriations Committees were cognizant and approved of the Judicial Conference's "interpretation."  (*See* 3/23/18 Tr. at __).  In fact, the AO never used the definition defendant now urges the Court to adopt—the "dissemination of information through electronic means"—to explain its use of EPA fees for more than PACER.  Rather, it used terms like "public access initiatives" to describe these expenditures.  (*See* FY 2007 Financial Plan ("collections are used to fund information technology initiatives in the judiciary related to public access"); 2d Skidgel Decl. Tab 12 (FY 2009 Financial Plan at 45) (EPA revenues "are used to fund IT projects related to public access"); Taylor Decl. Ex. J at 10 (AO document, entitled Electronic Public Access Program Summary, December 2012, stating that EPA revenue "is dedicated solely to promoting and enhancing public access")).)

     Finally, as defendant acknowledges, the post-enactment action of an appropriations committee cannot alter the meaning of the statute, which is what controls what expenditures are

permissible. *See Tenn. Valley Auth.*, 437 U.S. at 191 ("Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress.").[23] Thus, the fact that appropriations committees expressly or implicitly endorsed the use of EPA fees for certain expenditures cannot establish that those expenditures are permissible uses of EPA fees.

For these reasons, the Court is not persuaded that the statute permits the collection of EPA fees to fund any expense that involves the "dissemination of information through electronic means."

### C.  What Limitation Did the E-Government Act Place on the Use of PACER Fees?

Having rejected the parties' diametrically opposed interpretations, the Court must embark on its own analysis to determine whether defendant's use of PACER fees between 2010 and 2016 violated the E-Government Act. The Court concludes that defendant properly used PACER fees to pay for CM/ECF[24] and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the expenditures for Courtroom

---

[23]  Even an appropriations Act passed by Congress cannot alter the meaning of statute. *See Tenn. Valley Auth.*, 437 U.S. at 190–91 ("We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. [This] would lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation . . . .").

[24]  It is undisputed that the expenses in the categories now labeled CM/ECF, Court Allotments and Telecommunication/Communications Infrastructure include only expenses that are directly related to PACER or CM/ECF. (*See* 3/23/18 Tr. at __; *see also* Skidgel Decl. ¶ 19 ("through court allotments, "courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server)" and "[f]unding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors"; Def.'s Resp. to Pls.' Interrogs. at 22–26.)

Technology.  (*See* Attachment 1.)

The statutory language in 28 U.S.C. § 1913 note is clear that, to be paid for with PACER fees, a "service" must be one that provides the public with "access to information available through automatic data processing equipment."  An examination of this statutory provision's history—dating from its enactment in 1990 and culminating in its amendment by the E-Government Act in 2002—resolves any ambiguity in its meaning and allows the Court to determine which expenditures between 2010 and 2016 were properly funded by PACER fees.

When the 28 U.S.C. § 1913 note was first enacted in 1989, s*ee* Pub. L. 101-515, § 404, PACER was in its infancy, but it was operational, and the statute clearly applied to it.  (*See* Jud. Conf. Rep. at 83 (Sept. 14, 1988); EPA Chronology at 1; Jud. Conf. Rep. at 19 (Mar. 14, 1989); Jud. Conf. Rep. at 21 (Mar. 13, 1990); 1990 S. Rep. at 86.)  Yet, there was no mention of PACER in the statute, nor was there any suggestion that the judiciary was precluded from recouping expenses beyond the cost of operating PACER.  In fact, it is apparent that Congress recognized the possibility that fees would cover the costs of making court records available to the public electronically.  *See* 1990 S. Rep. at 86 ("language  . . .  authorizes the Judicial Conference to prescribe reasonable fees for public access to case information, to reimburse the courts for automating the collection of the information"); *see also* 1992 H.R. Rep. at 58 (noting that "the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media" and "request[ing] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so").

The first federal court experiment with electronic case filing began in the Northern

District of Ohio in 1996.  (1997 AO Paper at 4.)  Later that year, both the House and Senate

Appropriations Committees made clear that they expected the judiciary to use its EPA fee

collections for more than just paying for the cost of PACER.  (1996 H.R. Rep. at 89 ("The

Committee supports the ongoing efforts of the Judiciary to improve and expand information

made available in electronic form to the public. Accordingly, the Committee expects the

Judiciary to utilize available balances derived from electronic public access fees in the Judiciary

Automation Fund to make information and services more accessible to the public through

improvements to enhance the availability of electronic information.  The overall quality of

service to the public will be improved with the availability of enhancements such as *electronic

case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy

noticing*.") (emphasis added); 1996 S. Rep. at 88 ("The Committee supports efforts of the

judiciary to make electronic information available to the public, and expects that available

balances from public access fees in the judiciary automation fund will be used to enhance

availability of public access.").)

    While these statements in the reports of the Committee on Appropriations predated the

passage of the E-Government Act, they are not dispositive in terms of discerning what Congress

intended the statute to mean.  They are part of a bigger picture and an important backdrop to the

passage of the E-Government Act.  Contemporaneously with Congress's prompting the judiciary

to use EPA fees to pay for public access to electronically-stored case documents "[t]he transition

towards electronic case files ("ECF") in the federal courts [wa]s underway" by March 1997.

(1997 AO Paper at v.)  Over the next few years, relying expressly on the 1996 House and Senate

Reports relating to fiscal year 1997 appropriations, the judiciary began using EPA fees to fund

the development of a national case management and electronic case filing system, CM/ECF,

which would allow federal courts to maintain complete electronic files. (*See, e.g.*, FY 2002 Budget Request ("Fiscal year 1997 appropriations report language expanded the Judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").) The judiciary anticipated that CM/ECF would "produce an impressive range of benefits . . . including . . . public access to case file information." (1997 AO Paper at v.) For instance, in 1998, the Judicial Conference created a web interface for PACER and added a per page fee for accessing case dockets and electronic filings via the Internet. (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998); EPA Chronology at 1.) At that time, the Judicial Conference noted in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services. With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue *while introducing new technologies to expand public accessibility to PACER information*.

(Jud. Conf. Rep. at 64–65 (Sept. 15, 1998) (emphasis added).) By no later than fiscal year 2000, the judiciary was spending substantial sums of money, derived from EPA fees, on CM/ECF and EBN. (2d Skidgel Decl. Tab 30 (FY 2000 EPA Expenditures).) In fact, over $10 million was spent on case management/electronic case files, infrastructure and electronic bankruptcy noticing in 2000. (*Id.*)

Then in 2002, Congress passed the E-Government Act. This Act encompassed far more than § 205(e)'s limitation on the charging of fees. The overall purpose of the section pertaining to the judiciary was to "require federal courts to provide greater access to judicial information over the Internet." 2002 S. Rep. at 23. To that end, the Act mandated that the judiciary expand the public's access to electronically stored information that was accessible via PACER:

- § 205(a), "Individual Court Websites," "require[d] the Supreme Court, each circuit court,

each district court, and each bankruptcy court of a district to establish a website that would include public information such as location and contact information for courthouses, local rules and standing orders of the court, docket information for each case, and access to written opinions issued by the court, in a text searchable format." 2002 S. Rep. at 22.

- § 205(b), "Maintenance of Data Online," required that "[t]he information and rules on each website . . . be updated regularly and kept reasonably current."

- § 205(c), "Electronic Filings," required, subject to certain specified exceptions, that courts provide public access to all electronically filed documents and all documents filed in paper that the court converts to electronic form.

  and

- § 205(d), "Dockets with Links to Documents," directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filing, decision, and rulings in each case to be obtained from the docket sheet of that case."

Subsection 205(e), entitled "Cost of Providing Electronic Docketing Information," changed the language that required the judiciary to charge fees ("shall, hereafter") to make its decision to charge fees discretionary and to limit those fees "to the extent necessary." Even though the judiciary was already using EPA fees to pay for the costs of CM/ECF and EBN, no changes were made to the last sentence of subparagraph (b), which defined the scope of services that can be reimbursed with EPA fees.

As is clear from the E-Government Act, Congress intended in 2002 for the judiciary to expand its capability to provide access to court information, including public information relating to the specific court and docket information for each case, including filings and court opinions. With certain exceptions, documents filed electronically were to be made available publicly, and the judiciary was to explore the possibility of providing access to the underlying contents of the docket sheets through links to filings, decisions and rulings. This ambitious program of providing an electronic document case management system was mandated by Congress, although no funds were appropriated for these existing and future services, but

Congress did provide that fees could be charged even though the fees could be "only to the extent necessary."

Consistent with this view the Appropriations Committees reiterated their support for allowing EPA fees to be spent on CM/ECF in 2003. 2003 H.R. Rep. at 116; 2003 S. Rep. at 118; 2003 Conf. Rep. at H12515.

Although congressional "acquiescence" as an interpretative tool is to be viewed with caution, the Court is persuaded that when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of EPA fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and EBN. Accordingly, the Court concludes that the E-Government Act allows the judiciary to use EPA fees to pay for the categories of expenses listed under Program Requirements: CM/ECF, EBN, Court Allotments and Telecommunications/Communications Infrastructure.[25] (See Attachment 1.)

However, Congress' endorsement of the expenditures being made in 2002, in conjunction with the statutory language, the evolution of the E-Government Act, and the judiciary's practices as of the date of the Act's passage, leads the Court to conclude that the E-Government Act and its predecessor statute imposed a limitation on the use of PACER fees to expenses incurred in providing services, such as CM/ECF and EBN, that are part of providing the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system. This interpretation recognizes that PACER cannot be divorced from CM/ECF, since

---

[25] Plaintiffs' recent supplemental filing after the motions hearing suggested for the first time that the CM/ECF category might require closer examination to determine whether the expenditures therein, in particular CM/ECF NextGen, were all appropriately treated as "public access services." (See Pls.' Resp. to Def.'s Supp. Authority at 3, ECF No. 85.) But plaintiffs made no such argument in response to defendant's motion for summary judgment. (See Pls.' Reply at 6 (raising no challenge to CM/ECF if the statute authorizes "PACER fees to cover all costs necessary for providing PACER access and other public access services").)

PACER is merely the portal to the millions of electronically-filed documents that are housed by the judiciary on CM/ECF and are available to the public via the Internet only because of CM/ECF.

With this understanding, the Court will consider whether the judiciary properly used PACER fees for the remaining categories of expenses, which the judiciary now identifies as Congressional Priorities: Courtroom Technology, the State of Mississippi study, Web-Juror, and VCCA. (*See* Attachment 1.)

The judiciary only began using EPA fees for these expenses five or more years after the E-Government Act. Defendant's first attempt to justify the use of EPA fees for each of these categories focused almost exclusively on purported congressional approvals. As previously discussed, post-enactment legislative history as a general rule is of limited use in statutory interpretation, particularly when the action comes from a committee—especially an appropriations committee—rather than Congress as a whole. Compounding that problem here, also as previously noted (with the exception of courtroom technology, *see* supra note 22), is the questionable substance of the congressional approvals for several of these expenditures with the exception of courtroom technology.

Even if defendant could rely on congressional approvals, the Court would still have to decide whether the expenses fit within the definition of permissible expenses.

*State of Mississippi*: The category labeled "State of Mississippi" is described by defendant as a study that "provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents." (Def.'s Resp. to Pls.' Interrogs. at 5.) It is apparent from this description that this study was not a permissible expenditure since it was unrelated to providing access to electronic

information on the federal courts' CM/ECF docketing system.

*VCCA*: The category labeled Victim Notification (Violent Crime Control Act) refers to "[c]osts associated with the program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." (Def.'s Resp. to Pls.' Interrogs. at 11.) Via this program, "[l]aw enforcement officers receive electronic notification of court documents that were previously sent to the through the mail." (*Id.*) Defendant first defended the use of EPA fees to pay for this program on the ground that it "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 34, 53, 69, 87, 105, 123, 141.) Defendant has also argued that this program benefits the public because by sharing this information electronically, the information gets to law enforcement agencies more quickly, and they in turn may be able to revoke supervision, if warranted, more quickly. (*See* 3/23/18 Tr. at __.) But neither of these justifications establishes that VCCA is a permissible expenditure of PACER funds. While this program disseminates federal criminal case information, and its outcome may indirectly have some benefit to the public, it does not give the public access to any electronically stored CM/ECF information.

*Web-Juror*: The category labeled Web-Based Juror Services refers to the costs associated with E-Juror, a juror management system. (Def.'s Resp. to Pls.' Interrogs. at 11.) It "provides prospective jurors with electronic copies of court documents regarding jury service." (*Id.*) Defendant's justification for using EPA fees to pay for these costs is that the E-Juror program "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 71, 89, 107, 125, 143.) Again, whether a program "improves the overall quality of electronic service to the public via an enhanced use of the Internet" does not establish that it is permissible use of EPA fees where there is no nexus to the

public's ability to access information on the federal court's CM/ECF docketing system.

*Courtroom Technology*:  The category labeled "Courtroom Technology" funds "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 11.)  The expenses in this category include "the costs of repairs and maintenance for end user IT equipment in the courtroom; obligations incurred for the acquisition and replacement of digital audio recording equipment in the courtroom; costs for audio equipment in the courtroom, including purchase, design, wiring and installation; and costs for video equipment in the courtroom, including purchase, design, wiring and installation."  (Def.'s Resp. to Pls.' Interrogs. at 32.)  Defendant argues that EPA fees are appropriately used for courtroom technology because "it improves the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically through electronic public access services when it is presented electronically and becomes an electronic court record."  (FY 2007 Financial Report at 46.)  Again, there is a lack of nexus with PACER or CM/ECF.  From the existing record, it would appear that the only courtroom technology expenditure that might be a permissible use of EPA fees is the "digital audio equipment" that allows digital audio recordings to be made during court proceedings and then made part of the electronic docket accessible through PACER.  (*See* Taylor Decl. Ex. A (2013 EPA Fee Schedule) (charging $2.40 "for electronic access to an audio file of a court hearing via PACER").)  But, the Court does not see how flat-screen TVs for jurors or those seated in the courtroom, which are used to display exhibits or other evidence during a court proceeding, fall within the statute as they do not provide the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system.

Accordingly, with the exception of expenses related to digital audio equipment that is

used to create electronic court records that are publicly accessible via PACER, the Court

concludes that the expenses in the categories listed as Congressional Priorities are not a

permissible use of EPA fees.[26]

## CONCLUSION

For the reasons stated above, the Court will deny plaintiffs' motion for summary

judgment as to liability and will grant in part and deny in part defendant's cross-motion for

summary judgment as to liability.  A separate Order, ECF No. 88, accompanies this

Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2018

---

[26]  The Court urges the parties to confer prior to the next status conference to determine for the years 2010 to 2016 the amount of courtroom technology expenditures that cannot be paid with PACER fees.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, *et al.*,

        Plaintiffs,

      v.

UNITED STATES OF AMERICA,

        Defendant.

Civil Action No. 16-745 (ESH)

## ORDER

Before the Court is defendant's Motion to Certify the Court's Orders of December 5, 2016, and March 31, 2018 for Interlocutory Appeal and to Stay Proceedings Pending Appeal (ECF No. 99). Plaintiffs advised the Court during a status conference on July 18, 2018, that they opposed certification of the December 5, 2016 Order, but otherwise consented to defendant's motion. Upon consideration of the motion, plaintiffs' partial consent thereto, and the entire record herein, and for the reasons stated in open court on July 18, 2018, and in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the defendant's motion is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) For the reasons stated in open court on July 18, 2018, the motion is **DENIED** as to the December 5, 2016 Order (ECF No. 24).

(2) For the reasons stated in an accompanying Memorandum Opinion, ECF No. 105, the motion is **GRANTED** as to the Court's Order of March 31, 2018 (ECF No. 88).

(3) The motion to stay further proceedings pending appeal is **GRANTED** and all proceedings in this matter are hereby **STAYED** pending further order from this Court.

It is further **ORDERED** that the Court's Order of March 31, 2018 (ECF No. 88) is **AMENDED** to add the following statement:

It is further **ORDERED** that this Order is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because it involves "a controlling question of law as to which there is substantial ground for difference of opinion" and because "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).  A separate Memorandum Opinion issued today sets out in greater detail the basis for the Court's decision to certify this Order.

**SO ORDERED**.

_____
ELLEN S. HUVELLE
United States District Judge

DATE:  August 13, 2018

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM,** *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **Civil Action No. 16-745 (ESH)** |

## MEMORANDUM OPINION

The Court issues this Memorandum Opinion in further support of its Order granting defendant's Motion to Certify the Court's Order of March 31, 2018 for Interlocutory Appeal. (*See* Order, ECF No. 104; Defs.' Mot. to Certify, ECF No. 99; March 31, 2018 Order, ECF No 88.)

## BACKGROUND

This case concerns the lawfulness of the fees charged by the federal judiciary for the use of its Public Access to Court Electronic Records (PACER) system. Plaintiffs are PACER users who contend that the fees charged from 2010 to 2016 exceeded the amount allowed by federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)). They brought suit under the Little Tucker Act, seeking monetary relief from the excessive fees.

On December 5, 2016, the Court denied defendants' motion to dismiss (*see* Order, ECF

No. 24), and, on January 24, 2017, it granted plaintiffs' motion for class certification (*see* Order,

ECF No. 32).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court certified a class

consisting of:

> All individuals and entities who have paid fees for the use of PACER between
> April 21, 2010, and April 21, 2016, excluding class counsel in this case and
> federal government entities.

The parties then filed cross-motions for summary judgment on liability, which, they

agreed, depended on a single and novel question of statutory interpretation: "what restrictions

does 28 U.S.C. § 1913 note place on the amount the judiciary may charge in PACER fees?"

*Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 138 (D.D.C. 2018).

The parties advocated for starkly different interpretations of the statute, *id*. at 139-40, neither of

which the Court found persuasive.  In the end, it arrived at its own interpretation, which led to

the denial of plaintiffs' motion and the granting in part and denying in part of defendant's

motion.  (*See* Order, ECF No. 89.)

At the first status conference after deciding the cross-motions for summary judgment, the

Court asked the parties to consider whether the March 31, 2018 Order should be certified for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b), given the fact that the exact determination

of damages would likely require a lengthy period of fact and expert discovery, additional

summary judgment briefing and potentially a bench trial.  (*See* Tr., Apr. 18, 2018, at 5, 6, 13, 20;

*see also* Joint Status Report Proposing a Schedule to Govern Further Proceedings, ECF No. 91

(proposing an additional five months of fact discovery, then five months for expert discovery, to

be followed by summary judgment briefing or a bench trial).)  Plaintiffs readily agreed that

certification would be appropriate and desirable.  (*Id*. at 21.)  The government indicated that it

needed additional time to respond in order to seek the necessary approval from the Solicitor

General.  (*Id.* at 20.)

On July 13, 2018, the parties filed a joint status report advising the Court that "the Solicitor General has authorized interlocutory appeal in this case."  (Joint Status Report at 2, ECF No. 98.)  That same day, defendant filed the pending motion to certify the March 31, 2018 Order.[1]  At the status conference on July 18, 2018, and in their written response filed on July 27, 2018, plaintiffs noted their continued belief that the March 2018 Order should be certified.  (*See* Pls.' Resp., ECF No. 102.)

## ANALYSIS

A district judge may certify a non-final order for appeal if it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see Z St. v. Koskinen*, 791 F.3d 24, 28 (D.C. Cir. 2015).  The decision whether to certify a case for interlocutory appeal is within the discretion of the district court.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014).  If the district court finds that each requirement is met, it "shall so state in writing in such order," and the party seeking to appeal must then file an application with the Court of Appeals "within ten days after the entry of the order."  28 U.S.C. § 1292(b).

Although the statute does not expressly require the Court to do anything more than state that each of these requirements is met in the order itself, the general rule is that "[a] district court order certifying a § 1292(b) appeal should state the reasons that warrant appeal," and "a

---

[1] Defendants' motion also sought certification of the December 5, 2016 Order denying their motion to dismiss.  The Court explained in open court during the status conference on July 18, 2018, why it would not certify that Order, but noted that defendant was free to raise a challenge to the Court's subject matter jurisdiction at any time.  (*See* Tr., July 18, 2018.)

thoroughly defective attempt may be found inadequate to support appeal." 16 Wright & Miller, Federal Practice & Procedure § 3929 (3d ed. 2008).  Accordingly, the Court sets forth herein the basis for its conclusion that the March 31, 2018 Order satisfies each of the three requirements of § 1292(b).

### 1.  Controlling Question of Law

The first requirement for § 1292(b) certification is that the order involve a "controlling question of law."  "[A] 'controlling question of law is one that would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court's or the parties' resources.'" *APCC Servs. v. Sprint Communs. Co*., 297 F. Supp. 2d 90, 95–96 (D.D.C. 2003) (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002)).  The March 31, 2018 Order involves a controlling question of law under either prong.

The parties' cross-motions for summary judgment presented the Court with a pure legal issue -- the proper interpretation of 28 U.S.C. § 1913 note.  That statute provides, in relevant part:

> The Judicial Conference may, only to the extent necessary, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections for access to information available through automatic data processing equipment. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.
>
> (b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph as a charge for services rendered shall be deposited as offsetting

collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) to reimburse expenses incurred in providing these services.

Plaintiffs took the position that the statute prohibits the government from charging more in PACER fees "than is necessary to recoup the total marginal cost of operating PACER,'" and that the government is liable for fees it has charged in excess of this amount. *Nat'l Veterans Legal Servs. Program*, 291 F. Supp. 3d at 139. The government "readily admit[ted] that PACER fees are being used to cover expenses that are not part of the 'marginal cost' of operating PACER," but countered that the statute allows the government to "charge [PACER] fees in order to fund the dissemination of information through electronic means," which was exactly what it had done. *Id.* at 140. The Court adopted neither view, concluding the statute did not preclude the use of PACER fees to cover certain expenses beyond the marginal cost of operating PACER, but that certain uses of PACER fees were impermissible. *Id*. at 140-150. Thus, if the Court's interpretation is incorrect, the March 31, 2018 Order would require reversal – one of the prongs of the definition of a "controlling question of law."

In addition, regardless of which of these three interpretations of the statute is correct, the answer will "materially affect the course of [the] litigation." If the Federal Circuit were to reverse and adopt defendant's view, there would be no liability and the case would be over. If it were to reverse and adopt plaintiffs' view or affirm this Court, the case would continue, but the nature of what would follow would differ significantly. If the Circuit were to adopt plaintiffs' interpretation, the government would be liable for the difference between the approximately $923 million in PACER user fees collected from 2010 to 2016 and the "marginal cost" of operating PACER. Therefore, the main issue would be determining the marginal cost of operating PACER. Plaintiffs concede that at least $129 million was part of the "marginal cost"

of operating PACER, while defendant admits that at least $271 million was not,[2] and as to the remaining $522 million the parties agree "at least some" is not part of the "marginal cost," but there is no agreement as to how much of that $522 million is part of the marginal cost.[3]  On the other hand, if the Federal Circuit affirms this Court's Order, there will be no need to determine the marginal cost of operating PACER, for the only issue unresolved by the Court's opinion is the precise amount spent from PACER fees on impermissible expenditures.[4]  These vastly different possible outcomes lead to the conclusion that immediate review of the March 31, 2018 Order will materially affect the course of this litigation with resulting savings of time and resources.

Accordingly, the March 31, 2018 Order involves a "controlling question of law."

### 2.  Substantial ground for difference of opinion

The second requirement for § 1292(b) certification is that there must "exist a substantial ground for difference of opinion."  "A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits." *APCC Servs.*, 297 F. Supp. 2d at 97.  Here, there is a complete absence of any precedent from any jurisdiction.  In addition, although the Court ultimately found the arguments

---

[2] Defendant admits that none of the money spent on EBN, the State of Mississippi study, the VCCA Notification System, and Web-Based Juror Services was part of the "marginal cost" of operating PACER,

[3] Defendant admits that "at least some of the money" spent on CM/ECF, Telecommunications, Court Allotments, and Courtroom Technology is not part of the "marginal cost" of operating PACER.

[4] Based on the current record, that amount is approximately $192 million.  This number reflects the total expenditures from 2010 to 2016 for the State of Mississippi study ($120,998); the Violent Crime Control Act notification system ($3,650,979); Web-Based Juror Services ($9,443,628); and Courtroom Technology ($185,001,870), less the expenditures made for digital audio equipment, including software ($6,052,647).

in favor of each parties' position unpersuasive, this Court's opinion made clear that these arguments are not without merit and that "the issue is truly one on which there is a substantial ground for dispute." *APCC Servs.*, 297 F. Supp. 2d at 98; *see also Molock v. Whole Foods Mkt. Grp.*, 2018 WL 2926162, at *3 (D.D.C. June 11, 2018). Accordingly, the Court concludes that there exists a substantial ground for difference of opinion on the issue resolved by the March 31, 2018 Order.

### 3. Materially advance the litigation

The third requirement for § 1292(b) certification is that an immediate appeal will "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "To satisfy this element a movant need not show that a reversal on appeal would actually end the litigation. Instead, the relevant inquiry is whether reversal would hasten or at least simplify the litigation in some material way, such as by significantly narrowing the issues, conserving judicial resources, or saving the parties from needless expense." *Molock*, 2018 WL 2926162, at *3 (citing *APCC Servs.*, 297 F. Supp. 2d at 100). Here, there is no question that this requirement is satisfied. As previously explained, if the Court's Order is reversed in the government's favor, the litigation will be over. If it is reversed in plaintiffs' favor, it would significantly alter the issues to be addressed. Either outcome now, instead of later, would conserve judicial resources and save the parties from needless expenses. Thus, before proceeding to a potentially lengthy and complicated damages phase based on an interpretation of the statute that could be later reversed on appeal, it is more efficient to allow the Federal Circuit an opportunity first to determine what the statute means. Accordingly, the Court concludes that an immediate appeal will "materially advance the ultimate termination of the litigation."

## CONCLUSION

Having concluded that the March 31, 2018 Order satisfies all three requirements for §1292(b) certification, the Court will exercise its discretion and certify that Order for immediate appeal.  A separate Order accompanies this Memorandum Opinion.



_____
ELLEN S. HUVELLE
United States District Judge

DATE:  August 13, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
          *Plaintiffs*,

          v.

UNITED STATES OF AMERICA,
          *Defendant*.

Case No. 16-745

## DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.      I am the founding principal of Gupta Wessler LLP, one of the two law firms appointed as lead class counsel by this Court on January 24, 2017. *See* ECF Nos. 32 & 33. Along with my partner Jonathan E. Taylor and our co-counsel at Motley Rice LLC, I have represented the plaintiffs throughout this litigation. I am submitting this declaration in support of the plaintiffs' motion for final approval of the class settlement and for attorneys' fees, costs, and service awards. This declaration is accompanied by four exhibits: a copy of the executed settlement agreement (Exhibit A), a copy of the executed supplemental agreement (Exhibit B), a copy of a second amendment making further technical modifications (Exhibit C), a copy of my law firm biographical page (Exhibit D), and a copy of my colleague Jonathan Taylor's biographical page (Exhibit E).

### *Background on PACER Fees*

2.      The Administrative Office of the U.S. Courts (AO) requires people to pay fees to access records through its Public Access to Court Electronic Records system, commonly known as

PACER. This lawsuit was brought to challenge the lawfulness of those fees for one reason: the fees far exceed the cost of providing the records.

3.      By statute, the federal judiciary has long had the authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then set at $.07 per page) were "higher than the marginal cost of disseminating the information." S. Rep. 107-174, at 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, Congress passed the E-Government Act of 2002, which amended the statute by authorizing fees "only to the extent necessary." 28 U.S.C. § 1913 note.

4.      Despite this statutory limitation designed to *reduce* PACER fees, the AO twice *increased* PACER fees in the years after the E-Government Act's passage—first to $.08 per page and then to $.10 per page. And it did so over a period when the costs of electronic data storage plunged exponentially.

5.      The result has been a widely unpopular PACER fee regime that has hindered equal access to justice, imposed serious barriers for low-income and *pro se* litigants, discouraged academic research and journalism, and thus inhibited public understanding of the courts. And the AO has further compounded those harms by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

6.      I first became aware of the practical problems and dubious legality of PACER fees, and first considered whether litigation could be brought to address the issue, when I was a staff attorney at the nonprofit Public Citizen Litigation Group between 2005 and 2011. Government transparency was among the group's specialties, and I followed the efforts of Carl Malamud of Public.Resource.org, who led a sustained campaign to draw public attention to PACER fees and

persuade the AO to make PACER free. As I recall, my colleagues and I considered the possibility of bringing litigation to challenge PACER fees but were unable to identify a viable legal path.

7.  Until this case was filed, litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime, for at least three main reasons. First, the judiciary has statutory authority to charge at least *some* amount in fees, so litigation alone could never result in a free PACER system—the ultimate goal of reformers. Second, few practicing litigators, let alone those who specialize in complex federal litigation, were likely to be eager to sue the federal judiciary and challenge policy decisions made by the Judicial Conference of the United States. They were even less likely to commit considerable time and resources to litigation when the prospect of recovery was so uncertain. Third, even if PACER fees could be shown to be excessive and even if qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. And advocates were unable to identify an alternative basis for jurisdiction, a cause of action, and a waiver of sovereign immunity to challenge PACER fees in court.

8.  I am aware of only one previous lawsuit directly challenging the PACER fee schedule; that suit was dismissed for lack of jurisdiction. *See Greenspan v. Admin. Office*, No. 14-cv-2396 (N.D. Cal.). I am also aware of one previous effort to challenge the AO's policy on fee waivers, which also foundered on jurisdiction. In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Pub. Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identify situations requiring their recusal,'" and they "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes accompanying

the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media." *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

9. With litigation seemingly unavailable as a pathway, advocates for PACER reform had largely devoted their efforts to grassroots and technological strategies: making certain records available in an online database that could be accessed for free, downloading records in bulk, or mounting public-information campaigns to expand access. At one point, for example, when the judiciary initiated a free trial of PACER at several libraries, Carl Malamud encouraged activists "to push the court records system into the 21st century by simply grabbing enormous chunks of the database and giving the documents away." John Schwartz, *An Effort to Upgrade a Court Archive System to Free and Easy*, N.Y. Times (Feb. 12, 2009). An enterprising 22-year-old activist named Aaron Swartz managed to download millions of documents before the AO responded by pulling the plug on the free trial and calling in the FBI to investigate Swartz. *Id.* This heavy-handed response was seen by many as motivated by a desire to protect fee revenue at the expense of public access. Today, the Free Law Project and the Center for Information Technology Policy at Princeton University operate a searchable collection of millions of PACER documents and dockets that were gathered using their RECAP software, which allows users to share the records they download.

10. These efforts have been important in raising public awareness, and ameliorating the effects of PACER fees, but they have not eliminated or reduced the fees themselves. To the contrary, the fees have only continued on their seemingly inexorable—and indefensible—rise.

### *Overview of this Litigation*

11. Then came this case. On April 21, 2016, three nonprofits filed this lawsuit, asking this Court to declare that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges during the limitations period. They sued under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an

illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because that Act provides jurisdiction only for claims seeking monetary relief based on past overcharges, and because the judiciary is not subject to the APA, *see* 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek any injunctive relief or other relief requiring the judiciary to lower PACER fees going forward. They therefore limited their requested relief to retroactive monetary relief.

12.     From the start, the plaintiffs were represented by a team of lawyers at our firm, Gupta Wessler LLP, a litigation boutique with experience bringing complex cases involving the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. By the time that we filed this lawsuit together (as further detailed in my declaration in support of class certification, ECF No. 8-1, and as described further below), the two law firms together had an unparalleled combination of experience and expertise in prosecuting class claims for monetary relief against the federal government.

13.     In its first year, the litigation met with early success when this Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, on January 24, 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' Little Tucker Act illegal-exaction claim for classwide treatment and appointed my firm and Motley Rice as co-lead class counsel. *Id.*

14.     The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (KCC) as claims administrator. ECF Nos. 37 & 42. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, about 1,100 opted out of the class.

5

15.     Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only a category labeled by the judiciary as "Public Access Services," but also the following categories of expenses: "Case Management/Electronic Case Files System" (CM/ECF); "Electronic Bankruptcy Notification" (EBN); "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under the heading "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi."

16.     The parties subsequently filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to "disseminating information through electronic means." ECF No. 89 at 24.

17.     On March 31, 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [such] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

18.     Within months, the judiciary took steps "to implement the district court's ruling" and "to begin transitioning disallowed expenditures from the [PACER] program to courts' Salaries

and Expenses appropriated funding." *See FY 2018 Judiciary Report Requirement on PACER, July 2018*, at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018), https://perma.cc/CP8S-XRVQ. In July 2018, the AO's Director informed the House Appropriations Committee that, "beginning in FY 2019, Courtroom Technology, Web-based Juror Services, and Violent Crime Control Act Notification categories will no longer be funded" with PACER fees, "to reduce potential future legal exposure." *Id.* "The Judiciary will instead seek appropriated funds for those categories." *Id.*

19.     Meanwhile, both parties sought permission for an interlocutory appeal from this Court's decision, and the U.S. Court of Appeals for the Federal Circuit accepted both appeals to decide the scope of the statutory authorization to charge fees. The parties adhered to their same interpretations of the statute on appeal. In addition, the government argued that the court lacked jurisdiction, so the class was not entitled to damages even assuming that the AO had violated the statute.

20.     On appeal, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups," the "sponsor of the 2002 law" (Senator Joseph Lieberman) and legal-technology firms—all detailing the practical harms caused by excessive PACER fees. Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times (Feb. 4, 2019), https://perma.cc/LN5E-EBE9. Prominent media outlets, like the *New York Times*, published editorials championing the lawsuit. *See Public Records Belong to the Public*, N.Y. Times (Feb. 7, 2019), https://perma.cc/76P8-WFF7. And by the end of 2019, the judiciary announced that it was doubling the quarterly fee waiver for PACER from $15 to $30, which had the effect of eliminating PACER fees for approximately 75% of PACER users. *See* Kimberly Robinson, *Judiciary Doubles Fee Waiver for PACER Access to Court Records*, Bloomberg Law (Sept. 17, 2019), https://perma.cc/CHF3-XVTT; Theresa A. Reiss, Cong. Research Serv., LSB10672, *Legislative & Judicial Developments*

*Affecting Public Access to Court Electronic Records (PACER)* 1 (Feb. 1, 2022), https://perma.cc/WT8K-G64X.

21.     In August 2020, the Federal Circuit unanimously rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (specifically, those that were not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was "one other potential source of liability," because the court was not able to confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The court left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

22.     Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. *See* Reiss, *Legislative & Judicial Developments Affecting PACER* at 1–2; Senate Judiciary Committee, *Judiciary Committee Advances Legislation to Remove PACER Paywall, Increase Accessibility to Court Records* (Dec. 9, 2021), https://perma.cc/8WBB-FTDY; Nate Raymond, *Free PACER? Bill to end fees for online court records advances in Senate*, Reuters (Dec. 9, 2021), https://perma.cc/H29N-C52M. Notes from a closed March 2022 meeting showed that "[t]he Judicial Conference of the United States [also now] supported offering free public access to the

federal court records system for noncommercial users." Craig Clough, *Federal Judiciary Policy Body Endorses Free PACER Searches*, Law360 (May 31, 2022), https://perma.cc/YP8M-Q5CK.

### The Settlement Negotiations

23.     On remand, the case was reassigned to Judge Paul Friedman, and the parties came together to discuss the path forward. They understood that, were the case to remain on a litigation track, there would be significant uncertainty and delay. Years of protracted litigation lay ahead, including a lengthy formal discovery process that could require the judiciary to painstakingly reconstruct line-item expenses and likely a second appeal and a trial on damages. And the range of potential outcomes was enormous: On one side, the government maintained that it owed *no* damages because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower—a litigating position that also made it difficult for the judiciary to lower fees during the pendency of the litigation. The government further maintained that, in any event, the full category of CM/ECF was properly funded with PACER fees. On the other side, the plaintiffs maintained that liability had been established, and that some portion of CM/ECF was likely improper.

24.     Hoping to bridge this divide and avoid years of litigation, the parties were able to agree on certain structural aspects of a potential settlement, and they agreed to engage in mediation on the amount and details. On December 29, 2020, at the parties' request, Judge Friedman stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation.

25.     Over the next few months, the parties prepared and exchanged information and substantive memoranda, with detailed supporting materials, which together provided a balanced and comprehensive view of the strengths and weaknesses of the case. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, a retired Boston University law professor and one of the nation's most experienced and accomplished mediators.

26.     With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-made settlement, and the plaintiffs agreed to consider the government's final offer concerning the total amount of that fund, inclusive of all settlement costs, attorneys' fees, and service awards.

27.     But by the time the session had ended, the parties still hadn't reached agreement on the total amount of the settlement or several other key terms—including how the funds would be distributed, what to do with any unclaimed funds after the initial distribution, and the scope of the release. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed.

28.     Further progress was slow, and at times the parties reached what could have been insurmountable impasses. A particular sticking point concerned the allocation of settlement funds. Consistent with the parties' starkly differing litigating positions on both liability and damages, the plaintiffs argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers— "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note. Over a period of many months, the parties were able to resolve their differences and reach a compromise of these competing approaches: a minimum payment of $350—the smallest amount that the government would agree to—with a pro rata distribution beyond that amount.

The final version of the agreement was executed on July 27, 2022. *See* Ex. A. The parties later executed two supplemental agreements making certain technical modifications to the agreement. *See* Ex. B & C.

### The Parties' Settlement

29.     As clarified by the supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the class period"), excluding opt-outs, federal agencies, and class counsel. Ex. A ¶ 3 & Ex. B. This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Ex. A ¶ 4. Because this second group of people are not part of the original class, they did not receive notice or an opportunity to opt out when the original class was certified. For that reason, under the settlement, these additional class members will receive notice and an opportunity to opt out. *Id.*

30.     The settlement provides for a total common-fund payment by the United States of $125 million, which covers monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11. Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust (to be called the "PACER Class Action Settlement Trust"). *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16. In exchange for their payments, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the class period. *Id.* ¶ 13. This release does not cover any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.), the only pending PACER-fee related lawsuit of which the AO is aware. Ex.

A ¶ 13. The amount of settlement funds disbursed to any class member in this case, however, will be deducted from any monetary recovery that the class member may receive in *Fisher*. *Id.*

31.     Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, and with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41), the extension of which the parties will be jointly requesting from this Court. Ex. A ¶ 14. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

32.     Under the settlement, class members will not have to submit a claim or to receive their payment. *Id.* Instead, KCC has and will continue to use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.*

33.     The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to at least $100 million.

34.     ***First distribution.*** KCC will distribute the Remaining Amount to class members like so: It will allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. *Id.* ¶ 19. KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* It will then deduct this Aggregate Minimum Payment

Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the class period. *Id.*

35.    Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the class period will receive a payment equal to the total amount of PACER fees paid by that class member during the class period; and (b) each class member who paid more than $350 in PACER fees during the class period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

36.    KCC will complete disbursement of each class member's share of the recovery within 90 days of receiving the $125 million from the United States, or within 21 days after receiving the necessary information from AO, whichever is later. *Id.* ¶ 21. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. *Id.* ¶ 22.

37.    ***Second distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the trust one year after the $125 million payment by the United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. *Id.* ¶ 23. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the class period, and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After

First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the class period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. *Id.* ¶ 24. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

38. **Fairness hearing.** The agreement further provides that, within 75 days of its execution—that is, by October 11, 2022—the plaintiffs will submit to the Court a motion for an order approving settlement notice to the class under Rule 23(e). *Id.* ¶ 27, Ex. B.

39. Consistent with the agreement, the plaintiffs are applying to this Court for an award of attorneys' fees and reimbursement of litigation expenses, and for service awards for the class representatives in amounts not to exceed $10,000 per representative. Ex. A ¶ 28. As noted above, these awards will be paid out of the settlement trust and will not exceed 20% of the $125 million paid by the United States. *Id.* The motion for an award of attorneys' fees and litigation expenses is subject to this Court's approval, and class members have the right to object to the motion. *Id.*

40. Within 30 days of the order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, if later), KCC provided notice via email to class members for whom the AO has an email address. *Id.* ¶ 29; Ex. C ¶ 2. Within 45 days of the order approving settlement notice, KCC sent postcard notice via U.S. mail to all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Ex. A ¶ 29; Ex. C ¶ 5. KCC has also provided the relevant case documents on a

website it has maintained that is dedicated to the settlement (www.pacerfeesclassaction.com). Ex. A ¶ 29; Ex. C ¶ 3. The notice included an explanation of the procedures for allocating and distributing the trust funds, the date upon which the Court will hold a fairness hearing under Rule 23(e), and the date by which class members must file their written objections, if any, to the settlement. Ex. A ¶ 29. The notice sent to the additional class members—those who are not part of the class already certified by this Court—also informed them of their right to opt out and the procedures through which they may exercise that right. Ex. C ¶ 6. The opt-out period for these additional class members is 90 days. *Id.*

41. Any class member may express their views supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Ex. A ¶ 30. Counsel for the parties may respond to any objection within 21 days after receipt of the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32; Ex. C ¶ 7.

42. After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing at which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Ex. A ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.*

\* \* \*

43. This settlement is the result of more than seven years of hard-fought litigation, including more than a year of careful negotiation by the parties. It is, in my view and the view of the three class representatives, an excellent settlement for the class. Before this case was filed, there was no historical precedent for bringing suit against the federal judiciary—*in* the federal judiciary—

based on fees charged *by* the federal judiciary. Now there is. If approved, the settlement will deliver real relief to every single class member: a full refund of up to $350 for any PACER fees that each class member paid during the class period, plus additional amounts for class members who paid more than $350 in PACER fees during that period. According to data provided by the government, this means that the vast majority of class members will receive a full refund—100 cents on the dollar—for the PACER fees that they paid during the class period.

44.     And the settlement will provide this relief quickly. Whereas litigating the case to a final judgment would take years—with no guarantee of *any* recovery for class members given the government's legal position—the settlement will produce a final judgment in a matter of months. Moreover, although the settlement does not include injunctive relief, that is only because this relief is unavailable against the judiciary. After this litigation was filed, however, Congress began taking steps to eliminate PACER fees, and there is now a Federal Circuit decision that interprets (and imposes limits on) the statute authorizing fees, while making clear that PACER users have a cause of action to challenge such fees in the future. It is hard to imagine a better result for the class.

### *Class Counsel's Experience and Qualifications*

45.     Throughout the seven years of this hard-fought litigation, the plaintiffs were represented by two law firms appointed by the Court as lead class counsel: Gupta Wessler LLP and Motley Rice LLC. The firms worked together on all aspects of the litigation, with our team at Gupta Wessler taking the lead role on briefing, argument, research, and legal analysis, and Motley Rice taking a lead role in case management, discovery, and settlement administration.

46.     I am the founding principal of Gupta Wessler LLP, a boutique law firm that focuses on Supreme Court, appellate, and complex litigation on behalf of plaintiffs and public-interest clients. I am also a Lecturer on Law at Harvard Law School, where I teach the Harvard Supreme Court Litigation Clinic and regularly teach courses on the American civil-justice system. I am a

public member of the American Law Institute and an elected member of the Administrative Conference of the United States. Over more than two decades, I have led high-stakes litigation before the U.S. Supreme Court, all thirteen federal circuits, and numerous state and federal courts nationwide. I have also testified before the U.S. Senate, the U.S. House of Representatives, and the Presidential Commission on the Supreme Court. Much of my advocacy has focused on ensuring access to justice for consumers, workers, and communities injured by corporate or governmental wrongdoing. My biographical page is attached as Exhibit D.

47.     My colleague Jonathan Taylor played a key role on all aspects of this litigation, from conceptualizing the case with me at the outset, to presenting oral argument on summary judgment in the district court, to putting the finishing touches on the motion for final approval. When the case was filed, Mr. Taylor was an associate at the firm; he is now a principal. Mr. Taylor is a graduate of Harvard Law School who clerked for a federal circuit judge before joining Gupta Wessler. He has presented oral argument in the majority of federal circuits and has been the principal author of dozens of briefs filed in the U.S. Supreme Court and all levels of the state and federal judiciaries. His law firm biography is attached as Exhibit E.

48.     Class actions and litigation involving the federal government are a particular focus of my work and my firm's work. Mr. Taylor and I have both argued numerous appeals on class-action issues at all levels of the federal courts, and much of our firm's docket is occupied by appeals arising from class actions. Our firm also initiates select class-action cases, like this one, from the ground up—typically in collaboration with large, sophisticated class-action firms like Motley Rice.

49.     By the time that Gupta Wessler and Motley Rice filed this lawsuit together, we were able to draw from a considerable body of collective experience successfully bringing class actions for monetary relief against the federal government—a relatively rare form of litigation. Among other things, my colleague Jonathan Taylor and I had successfully represented a nationwide

certified class of all of the nation's federal bankruptcy judges and their surviving spouses, estates, and beneficiaries, resulting in a judgment against the United States for $56 million in illegally withheld judicial pay and benefits. *Houser v. United States*, No. 13–607C (Fed. Cl.). While still at Public Citizen, I had successfully represented a nationwide class of veterans challenging the Army Air Force Exchange Service's withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering $7.4 million in illegal charges. *Briggs v. Army & Air Force Exchange Service*, No. C 07–05760 (N.D. Cal.). And, together with Motley Rice, we were already representing a recently certified class of tax-return prepares in this Court, seeking the recovery of millions of dollars in unlawfully excessive fees paid to the IRS. In each one of these cases, the claims sought recovery of illegal exactions from the federal government on a class basis, with jurisdiction premised on the Tucker Act or the Little Tucker Act. *Steele v. United States*, No. 14-cv-01523-RCL (D.D.C.). This experience is further detailed below.

50. ***Bankruptcy Judges' Compensation Litigation.*** In November 2012, I was approached by the National Conference of Bankruptcy Judges about whether I would agree to represent the nation's federal bankruptcy judges in preparation for class-action litigation over salary and benefits that the United States allegedly owed to the judges and their beneficiaries. Over a number of years, Congress had violated the U.S. Constitution's Compensation Clause with respect to the salaries of federal district judges. The bankruptcy judges wanted to explore potential statutory claims, under the Tucker Act, arising from those constitutional violations. The Conference had appointed members of a litigation committee, led by Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas (herself a former experienced complex litigator).

51. This committee of federal bankruptcy judges conducted a nationwide search for the counsel most qualified to represent them. They sought lawyers experienced in both litigation with the federal government and class actions, and capable of handling any appellate proceedings. After

soliciting recommendations and interviewing several firms, they chose our firm to represent them and asked me to serve as lead counsel.

52.    As a result, our firm served as sole counsel to a certified nationwide class of current and former federal bankruptcy judges and their surviving spouses, life-insurance beneficiaries, and estates in *Houser v. United States*, No. 13–607C (Fed. Cl.)—one of the few certified class actions of federal judges in U.S. history. We litigated the case from start to finish, ultimately securing a judgment of approximately $56 million in November 2014 in the Court of Federal Claims, and working thereafter to administer a comprehensive claims process.

53.    I served as lead class counsel in *Houser*, working closely with Jonathan Taylor. The case required us to interact on a constant basis with our counterparts at the Department of Justice. Our formal litigation work eventually included successful briefing and argument on the government's motion to dismiss, cross-motions for summary judgment on liability, a motion for class certification, and a class-notice plan. Our work did not end with the certification of a class and the court's determination of liability. To the contrary, we retained damages experts, vetted the government's damages calculations, continued to respond to class members' inquiries, and negotiated with the government over a stipulated judgment and a class-claims process that delivered our clients one hundred cents on the dollar.

54.    In recognition of our successful efforts in the litigation, Mr. Taylor and I both received the President's Award from the National Conference of Bankruptcy Judges. On March 22, 2016, *The American Lawyer* reported on our role in this litigation, observing that "[i]t's hard to imagine a higher compliment than being hired to represent federal judges" in this important class-action litigation against the United States.

55.    ***IRS Tax Preparer Fees Litigation.***  We currently serve as co-counsel for the plaintiffs in *Steele v. United States*, No. 14-cv-01523-RCL (D.D.C.), another case in this Court with

many similarities to this litigation. In that case, we represent a certified nationwide class of tax-return preparers suing the federal government under the Little Tucker Act for excessive user fees.

56.     As in the litigation here, the plaintiffs in *Steele* bring an illegal-exaction claim against the government. A team from the national class-action firm Motley Rice LLC (co-lead in this case) serves as lead counsel in *Steele*, and brought us into the case because of our relevant expertise with litigation involving the federal government. On June 30, 2015, Judge Lamberth issued a decision appointing our team as interim class counsel in *Steele*. In his decision, he noted that he was "thoroughly impressed by the qualifications" of counsel—including previous work on "class actions against the government" and "illegal exaction claims." *Steele*, Dkt. 37, at 7. On February 9, 2016, Judge Lamberth certified a nationwide class and named us class counsel. *Steele*, Dkt. 54

57.     **Experience Defending the Federal Government in Litigation.** Before founding Gupta Wessler in 2012, I served as Senior Litigation Counsel in the U.S. Department of the Treasury, setting up the new Consumer Financial Protection Bureau (CFPB), and then in the Office of the General Counsel at the CFPB, where I successfully defended the agency in litigation. That work included serving as lead counsel in a successful defense in this Court—against an APA and Fifth Amendment challenge—of federal regulations that established nationwide licensing and regulation of mortgage brokers for the first time. *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112 (D.D.C. 2012). I was also responsible for setting up the new agency's appellate litigation and amicus programs and working with the Office of the Solicitor General on cases before the U.S. Supreme Court. Finally, my duties included advising senior government officials on issues of constitutional and administrative law, including issues related to the launch of the new federal agency. *See* Deepak Gupta, *The Consumer Protection Bureau and the Constitution*, 65 ADMIN. L. REV. 945 (2013).

58.      Before my stint in government service (and following my federal judicial clerkship), I spent seven years at Public Citizen Litigation Group in Washington, DC—one of the nation's preeminent public-interest organizations. There, as a staff attorney and director of the Consumer Justice Project, I focused on litigating cutting-edge class actions and appeals nationwide. I also spent my first year at the organization as the Alan Morrison Supreme Court Fellow, working on litigation before the U.S. Supreme Court.

59.      ***Veterans' Withholding Litigation.*** Much of my litigation at Public Citizen involved the federal government. In *Briggs v. Army & Air Force Exchange Service*, No. C 07–05760, 2009 WL 113387 (N.D. Cal. Jan. 16, 2009), for example, I successfully represented a nationwide class of veterans challenging the government's illegal withholding of federal benefits to collect old debts arising out of purchases of military uniforms. I took the lead in briefing and arguing several issues relevant to this litigation—including Little Tucker Act jurisdiction, and the interaction between the class-action device and the special venue rules applicable to the federal government. My co-counsel and I ultimately obtained a $7.4 million settlement for our clients.

60.      I also served as lead counsel for three national consumer groups in a successful and groundbreaking APA unreasonable-delay suit against the U.S. Department of Justice, resulting in the creation and implementation of the National Motor Vehicle Title Information System. *See Pub. Citizen, et al v. Mukasey*, 2008 WL 4532540 (N.D. Cal.).

61.      Finally, I served as co-counsel in a case in which we successfully represented survivors of Hurricanes Katrina and Rita in an APA and constitutional due-process challenge to FEMA's denial of federal disaster assistance. *See Ass'n of Comty. Orgs. for Reform Now v. Fed. Emergency Mgmt. Agency*, 463 F. Supp. 2d 26 (D.D.C. 2006).

### *Class Counsel's Hours, Lodestar, and Multiplier*

62.     The information in this declaration regarding the time spent on the case by Gupta Wessler LLP attorneys and other professional support staff is based on contemporaneous daily time records regularly prepared and maintained by the firm. I reviewed these time records in connection with the preparation of this declaration. The purpose of this review was to confirm both the accuracy of the time entries as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation.

63.     Below is a summary lodestar chart which lists (1) the name of each timekeeper in my firm who worked on this case; (2) their title or position (e.g., principal, associate, paralegal) in the firm; (3) the total number of hours they worked on the case from its inception through and including August 28, 2023; (4) their current hourly rate; and (5) their lodestar (not including projected future work on class-action settlement administration). The chart also includes a projected $400,000 that we conservatively estimate for time that will be incurred address post-settlement issues and inquiries.

| Name | Title | Total Hours | Current Rate | Total Lodestar |
|---|---|---|---|---|
| Deepak Gupta | Principal | 1497.5 | 1150 | $1,722,125.00 |
| Jonathan E. Taylor | Principal | 1519 | 975 | $1,481,025.00 |
| Rachel Bloomekatz | Principal | 5.73 | 875 | $5,013.75 |
| Peter Romer-Friedman | Principal | 3.00 | 875 | $2,625.00 |
| Daniel Wilf-Townsend | Associate | 12.60 | 700 | $8,820.00 |
| Joshua Matz | Associate | 6.40 | 700 | $4,480.00 |
| Neil Sawhney | Associate | 3.30 | 700 | $2,310.00 |
| Robert Friedman | Associate | 2.60 | 700 | $1,820.00 |
| Stephanie Garlock | Paralegal | 27.55 | 350 | $9,642.50 |

| | | | | |
|---|---|---|---|---|
| Mahek Ahmad | Paralegal | 52.75 | 350 | $18,462.50 |
| Rana Thabata | Paralegal | 24.62 | 350 | $8,617.00 |
| Nabila Abdallah | Paralegal | 17.57 | 350 | $6,149.50 |
| Total Past Lodestar | | | | $3,271,090.25 |
| Gupta Wessler Projected Post-Settlement Lodestar | | | | $400,000 |
| Total Gupta Wessler Lodesar | | | | $3,671,090.25 |
| Total Lodestar for Both Law Firms | | | | $6,031,678.25 |

64.    Our firm's total lodestar is thus $3,671,090.25. As reflected in the contemporaneously filed Declaration of Meghan S.B. Oliver, Motley Rice calculates $1,860,588.00 in lodestar plus future projected lodestar of $500,000, for a total of $2,360,588. The total lodestar for both firms is thus $6,031,678.25. Because we are seeking a total fee award of $23,863,345.02—the amount equal to 20% of the $125 million common fund, minus the requested costs, expenses, and service awards— the multiplier in this case is approximately 3.956.

65.    Before this case was filed, each named plaintiff signed a retainer agreement with class counsel that provided for a contingency fee of up to 33% of the common fund.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC, on August 28, 2023.        _/s/ Deepak Gupta_____
                                                        Deepak Gupta

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>    *Defendant*. | Civ. A. No. 16-0745 (PLF) |

## CLASS ACTION SETTLEMENT AGREEMENT

For the purpose of disposing of the plaintiffs' claims in this case without any further judicial proceedings on the merits and without there being any trial or final judgment on any issue of law or fact, and without constituting an admission of liability on the part of the defendant, and for no other purpose except as provided herein, the parties stipulate and agree as follows:

### Background and Definitions

1.      The plaintiffs challenge the lawfulness of fees charged by the federal government to access to records through the Public Access to Court Electronic Records program or "PACER." The lawsuit claims that the fees are set above the amount permitted by statute and seeks monetary relief under the Little Tucker Act, 28 U.S.C. § 1346(a) in the amount of the excess fees paid. The government contends that all such fees are lawful.

2.      The complaint was filed on April 21, 2016. ECF No. 1. On January 24, 2017, this Court certified a nationwide class under Federal Rule of Civil Procedure ("Rule") 23(b)(3) and a single class claim alleging that PACER fees exceeded the amount authorized by statute and seeking

recovery of past overpayments. ECF Nos. 32, 33. The Court also appointed Gupta Wessler PLLC and Motley Rice LLC (collectively, "Class Counsel") as co-lead class counsel. *Id.*

3.      "Plaintiffs" or "Class Members," as used in this agreement, are defined to include all persons or entities who paid PACER fees between April 22, 2010, and May 31, 2018 ("the Class Period"). Excluded from that class are: (i) entities that have already opted out; (ii) federal agencies; and (iii) Class Counsel.

4.      The class originally certified by this Court consists only of individuals and entities who paid fees for use of PACER between April 21, 2010, and April 21, 2016 (with the same three exceptions noted in the previous paragraph). Plaintiffs who were not included in that original class definition—that is to say, PACER users who were not included in the original class and who paid fees for use of PACER between April 22, 2016, and May 31, 2018—shall be provided with notice of this action and an opportunity to opt out of the class.

5.      On April 17, 2017, the Court entered an order approving the plaintiffs' proposed plan for providing notice to potential class members. ECF No. 44. The proposed plan designated KCC as Class Action Administrator ("Administrator"). Notice was subsequently provided to all Class Members included in the original class, and they had until July 17, 2017, to opt out of the class, as explained in the notice and consistent with the Court's order approving the notice plan. The notice referenced in paragraph 4 above shall be provided by the Administrator.

6.      On March 31, 2018, the Court issued an opinion on the parties' cross-motions for summary judgment on liability. ECF No. 89; *see Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 126 (D.D.C. 2018). While briefing cross-motions on liability, the parties "reserv[ed] the damages determination for" a later point "after formal discovery." *Id.* at 138.

7.      On August 13, 2018, the Court certified its March 31, 2018, summary-judgment decision for interlocutory appeal to the Federal Circuit under 28 U.S.C. § 1292(b). ECF Nos. 104,

105; *see Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018).

8.    On August 6, 2020, the Federal Circuit affirmed this Court's decision on the parties' motions for summary judgment and remanded the case to this Court for further proceedings. *See Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1343 (Fed. Cir. 2020).

9.    Following the Federal Circuit's decision, the parties agreed to engage in mediation to discuss the possibility of settling Plaintiffs' claims. On December 29, 2020, this Court stayed the proceedings through June 25, 2021, and it has repeatedly extended that stay since then as the parties have made progress on negotiating a global settlement.

10.   On May 3, 2021, the parties participated in a day-long private mediation session in an attempt to resolve Plaintiffs' claims. Since then, the parties have engaged in numerous follow-up conversations via phone and email to come to an agreement on resolving the claims.

**Common Fund Payment and Release**

11.   Plaintiffs have offered to settle this action in exchange for a common-fund payment by the United States in the total amount of one hundred and twenty-five million dollars ($125,000,000.00) (the "Aggregate Amount") inclusive of monetary relief for Plaintiffs' claims, interest, attorney fees, litigation expenses, administration costs, and any service awards to Class Representatives. Subject to this Court's approval, as set forth in paragraph 33, Plaintiffs' offer has been accepted by the United States.

12.   Following the Court's order granting final approval of the settlement, as described in the "Fairness Hearing" portion of this agreement, and only after the appeal period for that order has expired, the United States shall pay the Aggregate Amount to the Administrator for deposit in the Settlement Trust, as referenced in paragraph 16.

3

13. Upon release of the Aggregate Amount from the U.S. Department of the Treasury's Judgment Fund, Plaintiffs and all Class Members release, waive, and abandon, as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period. This release does not cover any claims based on PACER usage after May 31, 2018, nor any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). But the amount of settlement funds disbursed to any Class Member in this case shall be deducted in full from any monetary recovery that the Class Member may receive in *Fisher*. The Administrative Office of the U.S. Courts ("Administrative Office") represents that, apart from *Fisher*, it is aware of no other pending PACER-fee lawsuit pertaining to claims based on PACER usage on or before May 31, 2018.

**Information**

14. Within 30 days of a final order approving the settlement, Class Counsel shall provide to the Administrative Office the PACER account numbers of Class Counsel and all individuals who have opted out of the Class. Within 90 days of a final order approving the settlement, the Administrative Office shall make available to the Administrator the records necessary to determine the total amount owed to each Class Member, and the last known address or other contact information of each Class Member contained in its records. Should the Administrative Office need more than 90 days to do so, it will notify the Administrator and Class Counsel and provide the necessary information as quickly as reasonably possible. The Administrator shall bear sole responsibility for making payments to Class Members, using funds drawn from the Settlement Trust, as provided below. In doing so, the Administrator will use the data that the Administrative Office

currently possesses for each Class Member, and the United States shall be free of any liability based on errors in this data (*e.g.*, inaccurate account information, incorrect addresses, etc.).

15. The PACER account information provided in accordance with the previous paragraph shall be provided pursuant to the terms of the Stipulated Protective Order issued in this lawsuit on April 3, 2017 (ECF No. 41) as modified to encompass such information and shall be subject to the terms of the Stipulated Protective Order. The parties agree to jointly request that the Court extend the Stipulated Protective Order to encompass such information prior to the 90-day period set forth in the previous paragraph.

### Disbursement of the Aggregate Amount

16. The Administrator shall establish a Settlement Trust, designated the "PACER Class Action Settlement Trust," to disburse the proceeds of the settlement. The administration and maintenance of the Settlement Trust, including responsibility for distributing the funds to Class Members using methods that are most likely to ensure that Class Members receive the payments, shall be the sole responsibility of the Administrator. Class Members will not be required to submit a claim form or make any attestation to receive their payments. The only obligation of the United States in connection with the disbursement of the Aggregate Amount will be: (i) to transfer the Aggregate Amount to the Administrator once the Court has issued a final order approving the settlement and the appeal period for that order has expired, and (ii) to provide the Administrator with the requisite account information for PACER users, as referenced in paragraph 14. The United States makes no warranties, representations, or guarantees concerning any disbursements that the Administrator makes from the Settlement Trust, or fails to make, to any Class Member. If any Class Member has any disagreement concerning any disbursement, the Class Member shall resolve any such concern with the Administrator.

17.     The Settlement Trust is intended to be an interest-bearing Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1. The Administrator shall be solely responsible for filing all informational and other tax returns as may be necessary. The Administrator shall also be responsible for causing payments to be made from the Settlement Trust for any taxes owed with respect to the funds held by the Settlement Trust. The Administrator shall timely make all such elections and take such other actions as are necessary or advisable to carry out this paragraph.

18.     As approved by the Court, the Administrator shall disburse the proceeds of the settlement as follows: The Administrator shall retain from the Settlement Trust all notice and administration costs actually and reasonably incurred, which includes actual costs of publication, printing, and mailing the notice, as well as the administrative expenses actually incurred and fees reasonably charged by the Administrator in connection with providing notice and processing the submitted claims. The Administrator shall distribute any service awards approved by the Court to the named plaintiffs, and any attorney fees and costs approved by the Court to Class Counsel, as set forth in the "Fairness Hearing" portion of this agreement. After the amounts for attorney fees, expenses, service awards, and notice and administration costs have been paid from the Aggregate Amount, the remaining funds shall be distributed to the class ("Remaining Amount"). The Remaining Amount shall be no less than 80% of the Aggregate Amount, or $100,000,000.

19.     *First Distribution.* The Administrator shall allocate the Remaining Amount among Class Members as follows: First, the Administrator shall allocate to each Class Member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that Class Member for use of PACER during the Class Period. Second, the Administrator shall add together each minimum payment amount for each Class Member, which will produce the Aggregate Minimum Payment Amount. Third, the Administrator shall then deduct the Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata (based on the

amount of PACER fees paid in excess of $350 during the Class Period) to all Class Members who paid more than $350 in PACER fees during the Class Period.

20.     Thus, under the formula for the initial allocation: (a) each Class Member who paid a total amount less than or equal to $350 in PACER fees for use of PACER during the Class Period would receive a payment equal to the total amount of PACER fees paid by that Class Member for PACER use during the Class Period; and (b) each Class Member who paid more than $350 in PACER fees for use of PACER during the Class Period would receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount.

21.     The Administrator shall complete disbursement of each Class Member's individual share of the recovery, calculated in accordance with the formula set forth in the previous two paragraphs, within 90 days of receipt of the Aggregate amount, or within 21 days after receiving from the Administrative Office the information set forth in paragraph 14 above, whichever is later. The Administrator shall complete disbursement of the amounts for attorney fees and litigation expenses to Class Counsel, and service awards to the named plaintiffs, within 30 days of the receipt of the Aggregate Amount.

22.     The Administrator shall keep an accounting of the disbursements made to Class Members, including the amounts, dates, and outcomes (*e.g.*, deposited, returned, or unknown) for each Class Member, and shall make all reasonable efforts, in coordination with Class Counsel, to contact Class Members who do not deposit their payments within 90 days of the payment being made to them.

23.     *Second Distribution.* If, despite these efforts, unclaimed or undistributed funds remain in the Settlement Trust one year after the United States has made the payment set forth in paragraph 12, those funds ("the Remaining Amount After First Distribution") shall be distributed to

Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed following one year after the United States has made the payment set forth in paragraph 12 shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

> If to the Administrative Office's Court Services Office:
>
> Administrative Office of the U.S. Courts
> Thurgood Marshall Federal Judiciary Building
> Court Services Office
> One Columbus Circle, N.E., Ste. 4-500
> Washington, DC 20544
>
> If to the Administrative Office's Office of General Counsel:
>
> Administrative Office of the U.S. Courts
> Thurgood Marshall Federal Judiciary Building
> Office of General Counsel

One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

24.     Class Members who are eligible to receive a second distribution shall have three months from the time of the distribution to deposit or otherwise collect their payments. If, after this three-month period expires, unclaimed or undistributed funds remain in the Settlement Trust, those funds shall revert unconditionally to the U.S. Department of the Treasury. Upon expiration of this three month period, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the addresses referenced in paragraph 23 of this reverter. Instructions to effectuate the reverter will be provided to the Administrator following receipt of such notice, and the Administrator agrees to promptly comply with those instructions.  The three-month period will run for all Class Members eligible to receive a second distribution from the date the earliest distribution is made of a second distribution to any Class Member eligible for such a distribution. Upon request, the Administrator will notify the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office of the date the three-month period commenced. To the extent a payment in connection with the Second Distribution is made to a Class Member by the Administrator by check, any check that remains uncashed following this three-month period shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for reverter to the United States.

25.     The Class Representatives have agreed to a distribution structure that may result in a reverter to the U.S. Treasury for purposes of this settlement only.

26.     Neither the parties nor their counsel shall be liable for any act or omission of the Administrator or for any mis-payments, overpayments, or underpayments of the Settlement Trust by the Administrator.

### Fairness Hearing

27.     As soon as possible and in no event later than 60 days after the execution of this agreement, Class Counsel shall submit to the Court a motion for an Order Approving Settlement Notice to the Class under Rule 23(e). The motion shall include (a) a copy of this settlement agreement, (b) the proposed form of the order, (c) the proposed form of notice of the settlement to be mailed to Class Members and posted on an internet website dedicated to this settlement by the Administrator, and (d) the proposed form of notice to be mailed to Class Members who were not included in the original class definition certified by the Court on January 24, 2017, as discussed in paragraph 4, and posted on the same website, advising them of their right to opt out. The parties shall request that a decision on the motion be made promptly on the papers or that a hearing on the motion be held at the earliest date available to the Court.

28.     Under Rule 54(d)(2), and subject to the provisions of Rule 23(h), Plaintiffs will apply to the Court for an award of attorney fees and reimbursement of litigation expenses, and for service awards for the three Class Representatives in amounts not to exceed $10,000 per representative. These awards shall be paid out of the Aggregate Amount. When combined, the total amount of attorney fees, service awards, and administrative costs shall not exceed 20% of the Aggregate Amount. With respect to the attorney fees and service awards, the Court will ultimately determine whether the amounts requested are reasonable. The United States reserves its right, upon submission of Class Counsel's applications, to advocate before the Court for the use of a lodestar cross-check in determining the fee award, and for a lower service award for the Class Representatives should Plaintiffs seek more than $1,000 per representative. Plaintiffs' motion for an award of attorney fees and litigation expenses shall be subject to the approval of the Court and notice of the motion shall be provided to Class Members informing them of the request and their right to object to the motion, as required by Rule 23(h).

10

29.    Within 30 days of the Court's entry of the Order Approving Settlement Notice to the Class, the Administrator shall mail or cause to be mailed the Notice of Class Action Settlement by email or first-class mail to all Class Members. Contemporaneous with the mailing of the notice and continuing through the date of the Fairness Hearing, the Administrator shall also display on an internet website dedicated to the settlement the relevant case documents, including the settlement notice, settlement agreement, and order approving the notice. The Notice of Class Action Settlement shall include an explanation of the procedures for allocating and distributing funds paid pursuant to this settlement, the date upon which the Court will hold a "Fairness Hearing" under Rule 23(e), and the date by which Class Members must file their written objections, if any, to the settlement.

30.    Any Class Member may express to the Court his or her views in support of, or in opposition to, the fairness, reasonableness, and adequacy of the proposed settlement. If a Class Member objects to the settlement, such objection will be considered only if received no later than the deadline to file objections established by the Court in the Order Approving Settlement Notice to the Class. The objection shall be filed with the Court, with copies provided to Class Counsel and counsel for the United States, and the objection must include a signed, sworn statement that (a) identifies the case number, (b) describes the basis for the objection, including citations to legal authority and evidence supporting the objection, (c) contains the objector's name, address, and telephone number, and if represented by counsel, the name, address, email address, and telephone number of counsel, and (d) indicates whether objector intends to appear at the Fairness Hearing.

31.    Class Counsel and counsel for the United States may respond to any objection within 21 days after receipt of the objection.

32.    Any Class Member who submits a timely objection to the proposed settlement may appear in person or through counsel at the Fairness Hearing and be heard to the extent allowed by the Court. Any Class Members who do not make and serve written objections in the manner

provided in paragraph 30 shall be deemed to have waived such objections and shall forever be foreclosed from making any objections (by appeal or otherwise) to the proposed settlement.

33.     After the deadlines for filing objections and responses to objections have lapsed, the Court will hold the Fairness Hearing at which it will consider any timely and properly submitted objections made by Class Members to the proposed settlement. The Court will decide whether to approve the settlement and enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. The parties shall request that the Court schedule the Fairness Hearing no later than 150 days after entry of the Court's Order Approving Settlement Notice to the Class.

34.     If this settlement is not approved in its entirety, it shall be void and have no force or effect.

**Miscellaneous Terms**

35.     This agreement is for the purpose of settling Plaintiffs' claims in this action without the need for further litigation, and for no other purpose, and shall neither constitute nor be interpreted as an admission of liability on the part of the United States.

36.     Each party fully participated in the drafting of this settlement agreement, and thus no clause shall be construed against any party for that reason in any subsequent dispute.

37.     In the event that a party believes that the other party has failed to perform an obligation required by this settlement agreement or has violated the terms of the settlement agreement, the party who believes that such a failure has occurred must so notify the other party in writing and afford it 45 days to cure the breach before initiating any legal action to enforce the settlement agreement or any of its provisions.

38.     The Court shall retain jurisdiction for the purpose of enforcing the terms of this settlement agreement.

39.     Plaintiffs' counsel represent that they have been and are authorized to enter into this agreement on behalf of Plaintiffs and the class.

40.     Undersigned defense counsel represents that he has been authorized to enter into this agreement by those within the Department of Justice with appropriate settlement authority to authorize the execution of this agreement.

41.     This document constitutes a complete integration of the agreement between the parties and supersedes any and all prior oral or written representations, understandings, or agreements among or between them.

<REMAINDER OF PAGE LEFT BLANK; SIGNATURES PAGES TO FOLLOW>

AGREED TO ON BEHALF OF PLAINTIFFS:

Deepak Gupta (D.C. Bar No. 495451)
Jonathan E. Taylor (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

William H. Narwold (D.C. Bar No. 502352)
Meghan S.B. Oliver (D.C. Bar No. 493416)
Elizabeth Smith (D.C. Bar No. 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 1001
Washington, DC 20004
(202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 07/27/2022

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____    7-12-22
 JEREMY S. SIMON, D.C. BAR #447956        Dated
 Assistant United States Attorney
 601 D. Street, NW
 Washington, DC 20530
 (202) 252-2528
 Jeremy.Simon@usdoj.gov

Attorneys for the United States of America

15

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL                    )
SERVICES PROGRAM, NATIONAL                 )
CONSUMER LAW CENTER, and                   )
ALLIANCE FOR JUSTICE, for themselves       )
and all others similarly situated,         )
                                           )
                    *Plaintiffs,*          )          Civil Action No. 16-0745 (PLF)
                                           )
        v.                                 )
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
                    *Defendant.*           )
_____)

## STIPULATION AND FIRST AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Amendment, the parties agree to the following modification to

the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July 27, 2022 and

counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 3 of the Agreement shall be replaced with the following language:

3.      "Plaintiffs" or "Class Members," as used in this agreement, are defined to
        include all persons or entities who paid PACER fees between April 21, 2010,
        and May 31, 2018 ("the Class Period") regardless of when such persons or
        entities used the PACER system. Excluded from that class are: (i) persons or
        entities that have already opted out; (ii) federal agencies; and (iii) Class
        Counsel.

In addition, the parties agree that the phrases "who paid PACER fees between [date x] and

[date y]" and "who paid fees for use of PACER between [date x] and [date y]," as used in paragraphs

3 and 4 of the Agreement, refer to the payment of PACER fees in the specified period rather than

the use of PACER in the specified period. The parties further agree that each specified period in

those paragraphs includes both the start and end dates unless otherwise specified.

Finally, in paragraph 27 of the Agreement, the parties agree that the reference to "60 days" shall be changed to "75 days."

The remainder of Agreement remains unchanged by this Stipulation and Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C. Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: _____ September 29, 2022 _____

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____          7-29-22

JEREMY S. SIMON, D.C. Bar No. 447956              Dated
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

*Attorneys for the United States of America*

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL            )
SERVICES PROGRAM, NATIONAL         )
CONSUMER LAW CENTER, and           )
ALLIANCE FOR JUSTICE, for themselves )
and all others similarly situated,  )
                                   )
                   *Plaintiffs*,   )          Civil Action No. 16-0745 (PLF)
                                   )
        v.                         )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                   *Defendant*.    )
_____)

## STIPULATION AND SECOND AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Second Amendment, the parties agree to the following

modification to the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July

27, 2022 and counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 21 of the Agreement shall be replaced with the following language:

21.    The Administrator shall complete disbursement of each Class Member's individual
       share of the recovery, calculated in accordance with the formula set forth in the
       previous two paragraphs, within 180 days of receipt of the Aggregate amount, or
       within 180 days after receiving from the Administrative Office the information set
       forth in paragraph 14 above, whichever is later. The Administrator shall complete
       disbursement of the amounts for attorney fees and litigation expenses to Class
       Counsel, and service awards to the named plaintiffs, within 30 days of the receipt
       of the Aggregate Amount.

Paragraph 23 of the Agreement shall be replaced with the following language:

23.    ***Second Distribution.*** If, despite these efforts, unclaimed or undistributed funds
       remain in the Settlement Trust 180 days after the Administrator has made the
       distribution described in paragraph 21, those funds ("the Remaining Amount After

1

First Distribution") shall be distributed to Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed 180 days after the Administrator has made the distribution described in paragraph 21, shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

If to the Administrative Office's Court Services Office:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Court Services Office
One Columbus Circle, N.E., Ste. 4-500
Washington, DC 20544

If to the Administrative Office's Office of General Counsel:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Office of General Counsel
One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

The remainder of Agreement remains unchanged by this Stipulation and Second Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 04-12-23

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____   4-11-23

DEREK S. HAMMOND, D.C. Bar No. 1017784          Dated
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
(202) 252-2511
Derek.Hammond@usdoj.gov

*Attorneys for the United States of America*

3

# EXHIBIT D

# Gupta / Wessler

## DEEPAK GUPTA

**deepak@guptawessler.com**

**202.888.1741** | 2001 K Street, NW, Suite 850 North, Washington, DC 20006

Legal Assistant: Mahek Ahmad, mahek@guptawessler.com



**Deepak Gupta** is the founding principal of Gupta Wessler, where his practice focuses on Supreme Court, appellate, and complex litigation on behalf of plaintiffs and public-interest clients. He is also a Lecturer at Harvard Law School, where he teaches the Harvard Supreme Court Litigation Clinic and seminars on forced arbitration, the civil justice system, and public interest entrepreneurship.

Over more than two decades, Deepak has led high-stakes litigation before the U.S. Supreme Court, all thirteen federal circuits, and state supreme courts from Alaska to West Virginia. He has also testified before the U.S. Senate, the U.S. House of Representatives, and the Presidential Commission on the Supreme Court. Much of Deepak's advocacy has focused on ensuring access to justice for consumers, workers, and communities injured by corporate or governmental wrongdoing. His varied clients have included national nonprofits, labor unions, state and local governments, public officials ranging from federal judges to members of Congress, professional athletes, distinguished artists and scientists, and people from all walks of life.

Case 1:24-cv-07975-PLD Document 12-15 Page 345 of 672 Filed 08/28/07 Page 2 of 63

Deepak is "known as a skilled appellate lawyer" (*New York Times*) and "an all-star progressive Supreme Court litigator" (*Washington Post*) and has been described as "one of the emerging giants of the appellate and the Supreme Court bar," a "heavy hitter," a "principled" and "incredibly talented lawyer" (*Law 360*), and a "progressive legal rock star." *(New York Law Journal). Chambers USA* cites his "impressive" and "highly rated appellate practice," describing him as "an incredible oral advocate" who "writes terrific briefs" and maintains a "vibrant appellate practice focused on public interest cases and plaintiff-side representations." Deepak is consistently ranked as one of the "Best Lawyers" for Supreme Court cases by *Washingtonian* magazine; he is the only non-corporate lawyer on that list. Fastcase has honored Deepak as "one of the country's top litigators," noting that "what sets him apart" is his legal creativity. The *National Law Journal* has singled out Deepak's "calm, comfortable manner that conveys confidence" in oral argument. And *Empirical SCOTUS* cited one of Deepak's briefs as the single most readable in a recent U.S. Supreme Court term.

Deepak's Supreme Court and appellate advocacy has been recognized with several national awards, including the 2022 Appellate Advocacy Award from the National Civil Justice Institute, which "recognizes excellence in appellate advocacy in America," the Steven J. Sharpe Award for Public Service from the American Association for Justice, and the President's Award from the National Conference of Bankruptcy Judges.

Deepak is a veteran advocate before the U.S. Supreme Court, where he has filed over one hundred briefs and regularly presents oral argument. Highlights include:

- Deepak recently argued and won a landmark victory for access to justice in *Ford Motor Co. v. Montana Eighth Judicial District*, 141 S. Ct. 1017 (2021), in which the Supreme Court ruled that people injured by mass-market products can establish personal jurisdiction to sue out-of-state corporations where their injury occurred, bucking a trend of jurisdiction-limiting decisions stretching back four decades.

- In *Smith v. Berryhill,* 139 S.Ct. 1285 (2019), Deepak argued at the Court's invitation in support of a judgment left undefended by the Solicitor General. He is the first Asian-American to be appointed by the U.S. Supreme Court to argue a case.

- In 2017, Deepak's firm was counsel for parties in three argued merits cases before the Court; he was lead counsel in two, prevailing in both. In *Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144 (2017), he successfully argued a First Amendment challenge to a law designed to keep consumers in the dark about the cost of credit cards. And in *Hernández v. Mesa*, 137 S.Ct. 2003 (2017), he represented the family of a Mexican teenager killed in a cross-border shooting by a border patrol agent, successfully obtaining reversal of the Fifth Circuit's 15-0 en banc ruling that the officer was entitled to qualified immunity.

- Deepak argued *AT&T Mobility v. Concepcion*, 131 S.Ct. 1740 (2011), a watershed case on corporations' use of forced arbitration to prevent consumers and workers from banding together to seek justice.

As an appellate advocate, Deepak is frequently sought out by trial lawyers to defend their most consequential victories or resurrect worthy claims on appeal—often after years of hard-fought litigation. He is currently defending several nine-figure and eight-figure verdicts on appeal, including $275-million and $185-million verdicts against Monsanto (over toxic chemical exposure), and a $200-million verdict against UnitedHealth (over insurance bad faith). He also serves as outside counsel to the American Association for Justice.

In addition to his appellate advocacy, Deepak designs and prosecutes class actions and other legal challenges from the ground up. Highlights include:

- In *National Veterans Legal Services Program v. United States*, Deepak is lead counsel in a nationwide class action in which he persuaded the Federal Circuit that the federal judiciary has been charging people millions of dollars in unlawful fees for online access to court records. The case recently culminated in a $125 million settlement that reimburses the majority of PACER users by 100 cents on the dollar.

- In another one-of-a-kind class action, Deepak represented all of the nation's bankruptcy judges, recovering $56 million in back pay for Congress's violation of the Judicial Compensation Clause. *The American Lawyer* observed: "it's

hard to imagine a higher compliment than being hired to represent federal judges."

Deepak also frequently leads high-stakes administrative and constitutional cases involving the federal government. In recent years, he has:

- persuaded the D.C. Circuit to issue a rare emergency injunction halting an attempted government takeover of the Open Technology Fund, an internet-freedom nonprofit;

- represented environmental groups in a successful procedural challenge to a midnight rule that would have crippled the ability of the incoming EPA leadership to rely on science in setting public-health standards;

- obtained a ruling striking down the Trump Administration's decision to halt IRS collection of nonprofit donor information by dark-money groups;

- established that the Acting Director of the Bureau of Land Management had been serving unlawfully for 424 days; and

- persuaded the Second Circuit, in *Citizens for Responsibility and Ethics v. Trump*, that President Trump's competitors in the hotel and restaurant industry had standing to sue him for accepting payments in violation of the Constitution's Emoluments Clauses.

Before founding his law firm in 2012, Deepak was Senior Counsel for Litigation and Senior Counsel for Enforcement Strategy at the newly created Consumer Financial Protection Bureau. As the first appellate litigator hired under Elizabeth Warren's leadership, he launched the new agency's amicus program, defended its regulations, and worked with the Solicitor General's office on Supreme Court cases.

For seven years previously, Deepak was an attorney at Public Citizen Litigation Group, where he founded and directed the Consumer Justice Project and was the Alan Morrison Supreme Court Assistance Project Fellow. Before that, Deepak worked on voting rights at the Civil Rights Division of the U.S. Department of Justice; prisoners' rights at the ACLU's National Prison Project; and religious freedom at Americans United for Separation of Church and State. He clerked for Judge Lawrence K. Karlton of the

Case 1:24-cv-07975-PLF Document 12-15 Filed 08/21/24 Page 348 of 672

U.S. District Court for the Eastern District of California and studied law at Georgetown, Sanskrit at Oxford, and philosophy at Fordham.

Deepak is a member of the American Law Institute and the Administrative Conference of the United States. He sits on the boards of the National Consumer Law Center, the Alliance for Justice, the Open Markets Institute, the Lawyers' Committee for Civil Rights Under Law, the People's Parity Project, the Civil Justice Research Initiative at UC Berkeley, the Biden Institute, and the Institute for Consumer Antitrust Studies. He is a judge of the American Constitution Society's Annual Richard D. Cudahy Writing Competition on Regulatory and Administrative Law.

Deepak's publications include *Arbitration as Wealth Transfer*, 5 Yale L. & Pol'y Rev. 499 (2017) (with Lina Khan), *Leveling the Playing Field on Appeal: The Case for a Plaintiff-Side Appellate Bar*, 54 Duq. L. Rev. 383 (2016), and *The Consumer Protection Bureau and the Constitution*, 65 Admin L. Rev. 945 (2013), as well as shorter pieces for *The New York Times*, SCOTUSblog, and *Trial* magazine. He has appeared in broadcast and print media including CNN, MSNBC, FOX News, ABC's *World News* and *Good Morning America*, NPR's *All Things Considered* and *Marketplace*, and *The New York Times*, *Washington Post*, *Los Angeles Times*, *Wall Street Journal*, and *USA Today*.

---

Copyright © 2023 Gupta Wessler LLP

Powered by WordPress and Origin

# EXHIBIT E

## Gupta / Wessler

Browse: Home » Jonathan E. Taylor

# JONATHAN E. TAYLOR

**jon@guptawessler.com**

**202.888.1741** | 2001 K Street, NW, Suite 850 North, Washington, DC 20006

Twitter: @jontaylor1 | Legal Assistant: Abbe Murphy, abbe@guptawessler.com



**Jonathan E. Taylor** is a principal at Gupta Wessler, where he represents plaintiffs and public-interest clients in Supreme Court, appellate, and constitutional litigation.

Since joining the firm a few months after it was founded in 2012, Jon has presented oral argument in the majority of federal circuits and has been the principal author of dozens of briefs filed in the U.S. Supreme Court and all levels of the state and federal judiciaries.

In 2021, Jon served as counsel of record in the U.S. Supreme Court in *Lombardo v. City of St. Louis*, in which he successfully obtained an unheard-of opinion summarily vacating a pro-officer decision on the merits of a police-excessive-force case. Jon was awarded the 2021 National Law Journal Rising Star award for his stellar appellate advocacy.

Among Jon's recent arguments are a Ninth Circuit appeal defending a $102 million class-action judgment against Walmart for violations of California labor law; a D.C. Circuit appeal for a certified class of tax-return preparers challenging the legality of

over $250 million in IRS-imposed fees; Third and Seventh Circuit appeals resulting in landmark decisions expanding the availability of paid-military leave; a summary-judgment hearing for a nationwide class of PACER users challenging the judiciary's fee structure for accessing court filings; a First Circuit appeal successfully defending Boston and Brookline's public-carry restrictions against a Second Amendment challenge; an Eighth Circuit appeal upholding a punitive-damages award against a constitutional attack; an Eighth Circuit appeal successfully reinstating a a jury's finding of negligence by GM in the design of a seat-belt system, and ordering a new trial on damages only; and an Eighth Circuit appeal successfully defeating a claim of immunity in a constitutional challenge to a city's "pay-to-play" system, in which people arrested for minor infractions are jailed if they can't afford to pay fees.

As these cases illustrate, Jon's work has spanned a wide range of topics—including the First Amendment, Second Amendment, Fourth Amendment, due process, Article III standing, personal jurisdiction, class certification, civil rights, administrative law, and a broad array of issues involving consumers' and workers' rights. He has represented classes of consumers and workers, tort victims, federal judges, members of Congress, national nonprofits, military reservists, former NFL players, retail merchants, and the families of people killed by police violence. Jon was also part of the litigation team that sued Donald Trump for violating the Constitution's Emoluments Claims.

Jon is from St. Louis, Missouri, and is a *cum laude* graduate of Harvard Law School. He joined the firm following his clerkship with Judge Ronald Lee Gilman of the U.S. Court of Appeals for the Sixth Circuit. In 2014, Jon received the President's Award from the National Conference of Bankruptcy Judges for his work helping to obtain a $56 million judgment on behalf of a nationwide class of federal bankruptcy judges.

Jon's experience at the firm includes the following significant matters:

- Jon presented oral argument in the Eighth Circuit and prepared the firm's successful briefing in *Bavlsik v. General Motors*, an appeal from a district court order vacating a jury's finding of negligence by General Motors in the design of a seat-belt system, following a rollover collision that left the plaintiff quadriplegic. After obtaining reversal in the Eighth

Circuit—which reinstated the jury's negligence finding and ordered a new trial on damages only—Jon served as counsel of record for the firm's brief in opposition in the U.S. Supreme Court, defeating GM's petition for certiorari. Brief in Opposition | Eighth Circuit Opinion | Eighth Circuit Opening Brief | Reply Brief | Oral Argument Audio

- Jon presented oral argument in the D.C. Circuit on behalf of a certified class of tax-return preparers challenging the legality of fees imposed by the IRS. The district court invalidated the fees—which total more than $250 million—as unauthorized. The case is *Montrois v. United States*, and the firm represents the class along with co-counsel from Motley Rice. D.C. Circuit Brief | Oral Argument Audio | Opinion Granting Summary Judgment | Motion for Summary Judgment | Opinion Granting Motion for Reconsideration | Motion for Reconsideration | Class Certification Opinion | Motion for Class Certification | Amended Complaint

- Jon presented oral argument in the First Circuit on behalf of the Town of Brookline, Massachusetts, successfully defending against a Second Amendment challenge to its restrictions on the public carry of firearms. He was also a principal author of the firm's appellate brief, which argues that the restrictions are constitutional because they rest on a seven-century Anglo-American tradition of public-carry regulations. First Circuit Brief

- Jon presented argument and was a principal author of the firm's briefing in *National Veterans Legal Services Program v. United States* (District Court for the District of Columbia), a certified nationwide class action challenging the federal judiciary's PACER fee structure as excessive. In March 2018, the court had a three-hour summary-judgment hearing in which Jon presented argument for the class. Shortly after the hearing, the court held that the judiciary had misused PACER fees during the class period, exceeding the scope of its statutory authorization to charge fees "only to the extent necessary" to recoup the costs of providing records through PACER. Our firm has been appointed class counsel in the case, along with co-counsel from Motley Rice. The lead plaintiffs are three nonprofit legal organizations (National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice). Summary-Judgment Opinion | Motion for Summary Judgment | Reply in Support

Case 1:24-cv-00757-PLF Document 42-15 Page 353 of 672 Filed 07/01/2024

of Motion for Summary Judgment | Opinion Certifying
Class | Class-Certification Motion | Class-Certification Reply |
Opinion Denying Motion to Dismiss | Opposition to Motion to
Dismiss | Complaint

- Jon played a lead role in *Houser v. United States* (U.S. Court
  of Federal Claims), in which the firm represented a class of
  current and former federal bankruptcy judges and their
  beneficiaries in a suit against the federal government under
  the Constitution's Judicial Compensation Clause. His work
  helped obtain class certification and a $56 million judgment
  on behalf of his clients. Jon also took the lead in coordinating
  the administration of the class claims process with the
  Department of Justice. The National Conference of
  Bankruptcy Judges presented Jon with its President's Award
  for his work on the case. Summary Judgment Brief |
  Complaint

- Jon presented oral argument in the Eighth Circuit and
  prepared the firm's appellate brief in *Webb v. City of
  Maplewood*, concerning a constitutional challenge to a
  Missouri city's "pay-to-play" system, in which people arrested
  for minor municipal infractions are placed in jail if they can't
  afford to pay fees. Along with co-counsel from ArchCity
  Defenders and Tycko & Zavareei, the firm successfully
  defeated the city's claim to immunity in an interlocutory
  appeal to the Eighth Circuit. Eighth Circuit Opinion | Eighth
  Circuit Brief | Oral Argument Audio

- Jon has been a principal brief writer in all of the firm's First
  Amendment challenges to state credit-card surcharge laws
  brought in the wake of a $7 billion swipe-fee antitrust
  settlement with the major credit-card companies, including
  the firm's successful briefing in the U.S. Supreme Court in
  *Expressions Hair Design v. Schneiderman*. Jon's work helped
  obtain victories in California, Florida, and New York, where
  courts struck down the laws as unconstitutional. The cases are
  *Expressions Hair Design* (U.S. Supreme Court, Second
  Circuit), *Dana's Railroad Supply v. Bondi* (Eleventh Circuit),
  *Rowell v. Pettijohn* (Fifth Circuit), and *Italian Colors v.
  Harris* (Ninth Circuit). Petitioners' Brief (Expressions) |
  Petitioners' Reply (Expressions) | Supreme Court Opinion
  | Petition for Certiorari (Expressions)| Petition for Certiorari
  (Rowell) | Second Circuit Brief | Eleventh Circuit Brief |
  Eleventh Circuit Reply | Eleventh Circuit Opinion | Fifth

Circuit Brief | Fifth Circuit Reply | Ninth Circuit Brief | Ninth
Circuit Opinion | More Filings in These Matters

- Jon was one of the lead authors of the firm's briefing in the
  U.S. Supreme Court in *Hernández v. United States*, a case
  arising out of a close-range, cross-border shooting of an
  unarmed Mexican teenager by a U.S. border patrol agent
  standing on U.S. soil. After granting the firm's petition, a
  unanimous Supreme Court reversed the en banc Fifth
  Circuit's 15-0 holding that the border guard was entitled to
  qualified immunity. Supreme Court Opinion | Petitioners'
  Brief | Petitioners' Reply | Petition for Certiorari | Reply Brief
  | Supplemental Brief

- Jon is part of the litigation team that has sued Donald Trump
  in two cases for violating the Constitution's Foreign and
  Domestic Emoluments Clauses. The first case, brought on
  behalf of businesses who compete with Trump for
  governmental patrons, is *Citizens for Responsibility and
  Ethics in Washington v. Trump* and is currently on appeal to
  the Second Circuit. The second case, brought on behalf of
  Maryland and the District of Columbia, is *District of
  Columbia v. Trump* and is currently proceeding in the District
  of Maryland, where the district court has denied Trump's
  motion to dismiss for lack of standing and held that the case is
  justiciable. Second Circuit Brief | Opinion on Justiciability
  (Maryland) | Opposition to Motion to Dismiss (Maryland) |
  More Filings in These Matters

- Jon played a leading role in the firm's briefing in *Chevron v.
  Donziger* (Second Circuit), a RICO action brought by Chevron
  in an effort to avoid paying an $8.6 billion Ecuadorian
  judgment holding the company accountable for decades of
  pollution of the Amazon rainforest. Petition for Certiorari
  | Petition for Rehearing | Opening brief | Reply Brief | Post-
  Argument Letter Brief | Motion for Judicial Notice | Motion
  to Dismiss for Lack of Subject Matter Jurisdiction | Reply in
  Support of Motion to Dismiss | More Filings in This Matter

- Jon played a key role in the firm's representation of 34 former
  NFL players currently challenging the proposed global
  settlement of all claims against the NFL related to brain
  injuries caused by professional football. He was a primary
  author of the firm's petition for certiorari in the U.S. Supreme

Court. The case is *In re National Football League Players Concussion Injury Litigation* (U.S. Supreme Court, Third Circuit). Petition for Certiorari | Petitioners' Reply Brief | Third Circuit Opening Brief | Third Circuit Reply Brief

- Jon has written *amicus* briefs on behalf of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, in more than half a dozen Second Amendment cases threatening common-sense gun laws, including *Peruta v. San Diego County*, in which the en banc Ninth Circuit adopted the firm's historical analysis, as well as *Wrenn v. District of Columbia* (D.C. Circuit), *Grace v. District of Columbia* (D.C. Circuit), *Kolbe v. Hogan* (en banc Fourth Circuit), *Silvester v. Harris* (Ninth Circuit), *Peña v. Lindley* (Ninth Circuit), and *Norman v. Florida* (Florida Supreme Court). The briefs in these cases oppose challenges to public-carry regulations in California and the District of Columbia, as well as Maryland's assault-weapons ban and California's 10-day waiting period and "microstamping" law. Peruta Amicus Brief | Peruta En Banc Opinion | Grace Amicus Brief | Wrenn Amicus Brief | Kolbe Amicus Brief (en banc) | Kolbe Amicus Brief (petition stage) | Kolbe En Banc Opinion | Silvester Amicus Brief | Silvester Opinion | Peña Amicus Brief | Norman Opinion

- Jon has written two U.S. Supreme Court *amicus* briefs on behalf of the co-sponsors of the Fair Housing Act of 1968 and other current and former Members of Congress, explaining why Congress intended the Act to permit disparate-impact liability. His work was quoted in a New Yorker article discussing the issue. In June 2015, the Supreme Court issued a surprise opinion upholding disparate-impact liability, in which Justice Kennedy adopted the firm's historical analysis. Texas Department of Housing Amicus Brief | Mount Holly Amicus Brief | U.S. Supreme Court Opinion in Texas Department of Housing

- Jon played a key role in the firm's high-profile petition for en banc review in *Carrera v. Bayer* (Third Circuit), a controversial class-action case about the ascertainability requirement. Jon's efforts helped persuade four judges to dissent from the denial of en banc review and to call on the Federal Rules Committee to examine the issue. Jon has continued to focus on ascertainability issues since *Carrera*, most recently successfully opposing a petition filed by former

Solicitor General Paul Clement in *Soutter v. Equifax* (Fourth Circuit). Carrera Petition | Soutter Answer to Interlocutory Appeal Petition

- Jon has been the lead author of briefs filed in a number of important appeals concerning workers' and consumers' rights, including *Alaska Trustee v. Ambridge* (Supreme Court of Alaska), in which he successfully obtained a ruling that the Fair Debt Collection Practices Act covers foreclosures, and *Mais v. Gulf Coast Collection Bureau* (Eleventh Circuit), concerning the meaning of the Telephone Consumer Protection Act's "prior express consent" requirement. He presented oral argument in both cases. He also presented argument before the Ninth Circuit in *Koby v. ARS National Services*, in which he argued a novel question of class-action jurisdiction, successfully objecting to a nationwide class-action settlement that sought to extinguish millions of claims in exchange for nothing. Ambridge Brief | Alaska Supreme Court Opinion in Ambridge | Oral Argument Video in Ambridge | Mais Brief | Mais Answer to Interlocutory Appeal Petition | Objector's Brief in Koby | Objector's Reply Brief in Koby | Ninth Circuit Opinion in Koby | Oral Argument Video in Koby

- Jon was also a principal drafter in several other cases concerning workers' and consumers' rights, such as *Brady v. Deloitte & Touche* (Ninth Circuit), an appeal from decertification of a class of unlicensed audit employees at Deloitte & Touche who allege overtime violations; *Kingery v. Quicken Loans* (Fourth Circuit), an appeal addressing what it means for a credit-reporting agency to "use" a credit score for purposes of the Fair Credit Reporting Act; *Cole v. CRST* (Ninth Circuit), a petition involving the application of the Supreme Court's *Tyson Foods* decision to California wage-and-hour class actions; and *Dreher v. Experian* (Fourth Circuit), in which Jon twice helped defeat petitions for interlocutory review raising questions of Article III standing, class certification is statutory-damages cases, and application of the Supreme Court's decision in *Safeco v. Burr*. Brady Reply Brief (other briefing in this case filed under seal) | Cole Rule 23(f) Petition | Kingery Opening Brief | Kingery Reply Brief | Dreher Answer to Rule 23(f) Petition | Dreher Answer to § 1292(b) Petition

- Jon was the primary draftsman of the firm's brief opposing certiorari in *American Express v. Italian Colors* (U.S. Supreme Court), a major antitrust case asking whether courts must enforce arbitration even when doing so would preclude the plaintiffs from vindicating their federal statutory rights. Jon also assisted the firm's co-counsel, former Solicitor General Paul Clement, in writing the merits brief and helped coordinate amicus briefs in support of the respondents filed by the United States, 22 States, and various scholars, trade groups, and public-interest organizations. Brief in Opposition

- Jon was a primary drafter of *amicus* briefs filed on behalf of leading nonprofit organizations in two important Supreme Court cases. The first is *Tyson Foods v. Bouaphakeo*, in which the Supreme Court adopted the firm's argument for why the Court should not decertify a class of workers at a slaughterhouse seeking overtime compensation improperly denied to them. The second is *Sheriff v. Gillie*, in which the firm represents three consumer-advocacy groups supporting a challenge to debt-collecting law firms' misleading practice of using Attorney General letterhead to collect debts owed to the state constituted clear violations of the Fair Debt Collection Practices Act. Brief of Nonprofit Organizations in Tyson | U.S. Supreme Court Opinion in Tyson | Brief of Consumer-Advocacy Groups in Gillie

- Jon wrote an *amicus* brief on behalf of former Congressman Patrick Kennedy, the author and lead sponsor of the Mental Health Parity and Addiction Equity Act, in an important test case concerning the Act's scope, in which the Second Circuit held that the Act applies to claims administrators. The case is called *New York State Psychiatric Association v. UnitedHealth* (Second Circuit). Amicus Brief of Former Congressman Kennedy | Second Circuit Opinion

- Jon helped draft the firm's merits briefing in *McBurney v. Young* (U.S. Supreme Court), a constitutional challenge under the Privileges and Immunities Clause and dormant Commerce Clause to a provision of the Virginia Freedom of Information Act denying non-residents the same right of access to public records that Virginia affords its own citizens. Merits Brief for Petitioners | Merits Reply for Petitioners

Before his judicial clerkship, Jon spent a year at Public Citizen Litigation Group on a Redstone Fellowship from Harvard. While there, Jon worked with Deepak Gupta to prepare for his Supreme Court argument in *AT&T Mobility v. Concepcion*, served as principal author of a Supreme Court amicus brief concerning the False Claims Act, wrote a Ninth Circuit brief in a consumer case, and helped advise a public-health nonprofit on federal preemption of food-labeling laws. Jon also worked as an intern at Public Citizen during law school, where he worked with Deepak Gupta and Brian Wolfman on their successful Supreme Court merits brief in *Mohawk Industries v. Carpenter* and assisted with the brief filed on behalf of Senators John McCain and Russell Feingold in *Citizens United v. Federal Election Commission*.

Jon has previously worked on microfinance and antipoverty issues in Ethiopia, studied Spanish in Chile, and helped prepare a Medicaid fraud case against drug companies as an intern in the Missouri Attorney General's Office. During law school, he helped teach legal writing as a member of the Board of Student Advisers, competed in the Upper-Level Ames Moot Court Competition, and had the Best Appellee Brief in his first-year legal writing section. Jon received his undergraduate degree, *magna cum laude*, from the University of Southern California, where he was elected to Phi Beta Kappa, was awarded a Presidential Scholarship, and was a National Merit Scholar. He is a member of the bar of the District of Columbia and the Supreme Court of the United States.

Copyright © 2023 Gupta Wessler LLP

Powered by WordPress and Origin

Case: 24-1757     Document: 12     Page: 359     Filed: 07/01/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                    *Plaintiffs*,

        v.

UNITED STATES OF AMERICA,
                    *Defendant*.

Case No. 1:16-cv-00745-PLF

## DECLARATION OF MEGHAN S.B. OLIVER

I, Meghan S.B. Oliver, declare as follows:

1.      I am a member of the law firm of Motley Rice LLC ("Motley Rice"). I submit this declaration in support of Class Counsel's application for an award of attorneys' fees in connection with services rendered in the above-captioned class action, as well as for reimbursement of expenses incurred by my firm in connection with the action. I have personal knowledge of the matters set forth herein, based upon my active participation in all pertinent aspects of this litigation, my review of the firm's litigation files, and consultation with other Motley Rice personnel who worked on this case. I could and would testify competently to matters set forth herein if called upon to do so.

2.      Motley Rice has served as counsel in this litigation since it was filed on April 21, 2016, and has served as Co-Class Counsel since its appointment on January 24, 2017. In this capacity, my firm (often in conjunction with Co-Class Counsel) performed the following tasks,

Case: 24-1757     Document: 12     Page: 360     Filed: 07/01/2024

among others: conducted a factual and legal investigation of the claims asserted; reviewed, drafted, and assisted with district-court and appellate filings; assisted in preparation for district-court and appellate oral arguments; participated in hearings; conducted limited formal and informal discovery; drafted notice documents; participated in mediation; negotiated the settlement; supervised all notice, notification, and dispute procedures implemented by the class administrator, KCC; and responded to hundreds of contacts and inquiries from class members.

3.    The information in this declaration regarding the time spent on the case by Motley Rice attorneys and other professional support staff is based on contemporaneous daily time records regularly prepared and maintained by my firm. The information in this declaration regarding expenses is based on the records of my firm, which are regularly prepared and maintained in the ordinary course of business. These records are prepared from expense vouchers, check records, and other source materials that are an accurate record of the expenses incurred. I reviewed these time and expense records in connection with the preparation of this declaration.

4.    The purpose of this review was to confirm both the accuracy of the time entries and expenses as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation. Time billed by any timekeeper who spent fewer than 20 hours working on the case has been excluded from my firm's lodestar.

5.    The administration of this settlement to date has been novel and complex, and has required more attorney work than is typical in a class-action settlement. This settlement differs in a number of ways from typical class-action settlements. First, there is no claims procedure. Notice has been made using PACER billing data maintained by the Administrative Office of the U.S. Courts (the AO), and settlement payments also will be made based on that data in order to maximize distribution of settlement funds. This has proved to be a complicated process. For

example, the class members are the *payers* of the PACER fees, but the data maintained by the government reflects accountholder information. Sometimes the accountholders did not pay the PACER fees themselves. The most common scenario where that mismatch occurs is an employer (e.g., a law firm or corporation) directly paying its employees' PACER fees.

6.      To make every effort to ensure that class members receive proper proceeds from the settlement, my firm worked with KCC to design a website that permits (1) someone who paid PACER fees on someone else's behalf (e.g., a law firm paying PACER fees incurred by its attorneys) to so notify the claims administrator (Category 1 Notification); and (2) someone whose PACER fees were paid by someone else (e.g., a lawyer at a law firm that paid its attorneys' PACER fees) to so notify the claims administrator (Category 2 Notification). Category 1 Notifications trigger a dispute procedure. For example, if a law firm submits a Category 1 Notification on the class website that it paid PACER fees for a dozen specified accounts held by individual attorneys at the firm, each of those dozen attorneys will receive an email informing them that someone has notified the claims administrator that they paid that individual's PACER fees. Those individuals will then have 10 days to dispute the accuracy of that notification. Those disputes will be resolved before any distribution of settlement proceeds. As of August 24, 2023, we have received 33 Category 1 Notifications, 386 Category 2 Notifications, and 1 dispute. The website will accept notifications through September 5, 2023.

7.      Class Counsel has learned through this notification process that PACER account identifiers changed in 2014 from alphanumeric identifiers (e.g., AB1234) to seven-numeric-digit identifiers (e.g., 1234567). The data initially provided by the government did not include any alphanumeric identifiers. This presents a problem for some payers (i.e., employers who paid on behalf of their employees) whose accounting records from 2010 – 2014 reflect only alphanumeric

identifiers. We modified the website to permit submission of alphanumeric identifiers, and the government agreed in mid-August to provide a cross-walk reference permitting former alphanumeric account numbers to be linked to the replacement seven-digit account identifiers. They have not yet provided that data.

8.     Last, given the nature of the claims in this case—that public access to court records should be free to the greatest extent possible—Class Counsel have made every effort to make nearly all of the filings in this case available at no cost on the class website.

9.     To account for what is expected to be extensive attorney work in the coming months, handling class member contacts, notifications and disputes, I expect that my firm will spend roughly an additional 750 hours over the next six months, or roughly $500,000 in lodestar. That estimate is based on the nature of the work and time spent on these tasks since notice was sent in July.

10.    As a result of this review, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as set forth in this declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation.

11.    The current hourly rates for the attorneys and professional support staff in my firm are the usual and customary rates set by the firm in complex litigation. These hourly rates are the same as, or comparable to, the rates accepted by courts in other complex class-action litigation. My firm's rates are set based on, among other factors, periodic analysis of rates charged by firms performing comparable work and that have been approved by courts. Different timekeepers within the same employment category (e.g., members, associates, staff attorneys, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year

in the current position (e.g., years as a member), relevant experience, and the rates of similarly experienced peers at our firm or other firms. For personnel who are no longer employed by my firm, the "current rate" used in the lodestar calculation is based upon the rate for that individual in his or her final year of employment at Motley Rice.

**Hours and Lodestar Information**

12.     Below is a summary lodestar chart which lists (1) the name of each timekeeper in my firm who devoted more than 20 hours to the case; (2) their title or position (e.g., member, associate, paralegal); (3) the total number of hours they worked on the case from its inception through and including August 17, 2023; (4) their current hourly rate; and (5) their lodestar (at both current and historical rates).

| Name | Title | Total Hours | Current Rate | Total Lodestar |
|---|---|---|---|---|
| Narwold, William | Member | 714.75 | $1,250 | $893,437.50 |
| Oliver, Meghan | Member | 570.45 | $950 | $541,927.50 |
| Tinkler, William | Associate | 139.15 | $550 | $76,532.50 |
| Loper, Charlotte | Associate | 348.40 | $525 | $182,910.00 |
| Bobbitt, Ebony | Associate | 86.90 | $525 | $45,622.50 |
| Rublee, Laura | Staff Attorney | 184.20 | $500 | $92,100.00 |
| Janelle, Alice | Legal Secretary | 48.60 | $380 | $18,468.00 |
| Shaarda, Lynn | Paralegal | 27.40 | $350 | $9,590.00 |

13.     The total number of hours expended by Motley Rice in this case from inception through August 17, 2023 is 2,119.85 hours. The total resulting lodestar for my firm is $1,860,588.00 based on current rates.

**Expense Information**

14.     My firm's lodestar figures are based on the firm's hourly rates, which do not include charges for expense items. Expense items are billed separately, and such charges are not duplicated in my firm's hourly rates.

15.     My firm seeks an award of $29,654.98 for expenses and charges incurred in connection with the prosecution of the case from its inception through August 17, 2023.

16.     **Mediator:** $9,925.00. Motley Rice paid Resolutions LLC for the plaintiffs' portion of mediation services, specifically provided by Professor Eric D. Green.

17.     **Travel, Food, and Lodging Expenses:** In connection with the prosecution of this case, my firm spent a total of $8,496.86 on out-of-town travel, including travel costs such as airfare, lodging, and meals while traveling.

18.     **Other Expenses:** The following is additional information about certain other categories of expenses:

  a.     Court Fees: $938.40 were paid to the Federal Circuit for my attorney admission fee, and for *pro hac vice* applications to this Court.

  b.     Online Legal and Factual Research: $7,605.08 was paid to Westlaw and Lexis/Nexis for online legal research and cite-checking of briefs.

  c.     Photocopying and Printing: $2,464.24. This includes copies and binders made in-house for hearings and the everyday prosecution of this case. It also includes the cost of a professional printer for the appellate filings in this case.

  d.     Telephone: $146.35. These charges were for long-distance telephone and conference calling.

  e.     Postage & Express Mail: $79.05.

19.    In addition to the expenses incurred by my firm, Class Counsel seeks an award of $977,000 for notice and distribution of the settlement fund. This is based on notice expenses already incurred, and an estimate provided by KCC in late 2022 for settlement notice and distribution. Given complications experienced to date, we seek an additional $100,000 to account for unexpected complexities in the notification and dispute process and distribution of the settlement fund.

Dated: August 28, 2023

Respectfully submitted,

Meghan S.B. Oliver

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,

        Plaintiffs,

  vs.

UNITED STATES OF AMERICA,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 16-745-PLF

OBJECTION OF ERIC ALAN ISAACSON
TO PROPOSED SETTLEMENT IN
*NATIONAL VETERANS LEGAL SERVICES
PROGRAM, ET AL. V. UNITED STATES OF
AMERICA*

## OBJECTION OF ERIC ALAN ISAACSON TO PROPOSED SETTLEMENT
## IN *NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.*
## *V. UNITED STATES OF AMERICA*

As set forth in his accompanying declaration, Eric Alan Isaacson is a Class Member who would be bound by the Proposed Settlement of this matter. As set forth in his declaration, Isaacson opened his own PACER Account (No. 4166698) in March of 2016. He has paid quarterly PACER bills ever since. Isaacson's class-period PACER billings totaled $3,823.50. He has received reimbursement for only $171.80 of that amount. Thus, Isaacson's unreimbursed Class Period PACER expenditures come to $3,651.70. Isaacson expects no further reimbursements for those Class Period PACER charges.

For reasons set forth below, Isaacson respectfully objects to the Proposed Settlement and to the proposed attorney's fees and incentive awards.

1

## I.   INTRODUCTION

Rule 23(e)(2) permits the District Court to approve the Proposed Settlement "only on finding that it is fair, reasonable, and adequate after considering whether," among other things, "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment." Fed.R.Civ.P. 23(e)(2)(C). The Court also must consider whether "the proposal treats class members equitably relative to each other." Fed.R.Civ.P. 23(e)(2)(D).

Here the Settlement is objectionable because it treats Class Members inequitably, allocating far too much to a pro rata distribution on the basis of institutional PACER users and law firms whose Class Period PACER expenditures were reimbursed by their clients, from class-action settlement funds. *See infra* at 4-9. It also is inequitable because it allocates $10,000 apiece to the Named Plaintiffs as special bonuses in this, a Little Tucker Act case in which the Court's jurisdiction is limited to claims for $10,000 or less. *See* 28 U.S.C. §1346(a)(2). The special payments are, moreover, prohibited by decisions of the Supreme Court, sitting in equity, which hold that the equitable common-fund doctrine permits representative plaintiffs to recover their reasonable litigation expenses from a common-fund recovery, but which flatly prohibit any payment compensating litigants for their service as class representatives.

"Since the decisions in *Trustees v. Greenough,* 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v.* Pettus, 113 U.S. 116 (1885), [the Supreme] Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). But any additional payment to compensate representative plaintiffs for their own "personal services" on behalf of a class is both "decidedly objectionable" and "illegally made." *Greenough,* 105 U.S. at 537-38. A representative plaintiff's "claim to be compensated, out of the fund ... for his personal services" the Supreme Court "rejected as

2

unsupported by reason or authority." *Pettus,* 113 U.S. at 122. "Supreme Court precedent prohibits incentive awards."[1] *See infra* at 14-17.

Even more problematic, the Settlement allocates far too much to Class Counsel as attorney's fees. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. ... The result is what matters." *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983). But here Class Counsel have achieved a remarkably mediocre result. "According to class counsel, the absolute maximum possible recoverable damages here following the Federal Circuit's decision were around $500 million." DE158-4¶20 (Fitzpatrick decl.). Their fee expert, Brian Fitzpatrick, concludes that "the class is recovering 25% of what they might have received at trial had everything gone their way." DE158-4:13¶20 (Fitzpatrick decl.). That is exactly what large-stakes class actions can be expected to settle for without regard to the merits of the underlying claims. *See* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan. L.Rev. 497, 500 (1991)(finding that securities class actions "settled at an apparent 'going rate' of approximately one quarter of the potential damages"). It is, in the end, a run-of-the-mill settlement that does not justify the award of attorney's fees that Class Counsel seeks. It appears likely, quite frankly, that Class Counsel have sacrificed the Class's interests in order to obtain clearly extravagant attorney's fees for themselves of nearly four times their claimed lodestar—which lodestar is itself inadequately documented and unsupported. Their claimed billing rates far exceed those that their own expert has found should prevail in complex federal cases like this. *See infra* at 9-14.

---

[1] *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1255 (11th Cir.2020), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022); *accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247, 1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("such service awards are foreclosed by Supreme Court precedent"); *cf. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* 62 F.4th 704, 721 (2d Cir.2023)("Service awards are likely impermissible under Supreme Court precedent.").

## II.    THE SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE

Named Plaintiffs have not demonstrated by a preponderance of the evidence that Rule 23's requirements are satisfied. First and foremost, they have failed to demonstrate that the Proposed Settlement is fair, reasonable, and adequate as required by Fed.R.Civ.P. 23(e)(2). They have not shown that relief provided for the class is adequate, taking into account the method of distributing relief to the class, and the request for Class Counsel to be compensated at nearly four times their reasonable hourly rates, Fed.R.Civ.P. 23(e)(2)(C)(ii), (iii), and they certainly have not shown that the proposal treats class members equitably relative to one another. Fed.R.Civ.P. 23(e)(D).

### A.    The Settlement Allocates Far Too Much Too Large PACER Users, Including Institutional Users Such as the Named Plaintiffs, Large Law Firms That Have Been Reimbursed by Their Clients, and Class-Action Lawyers Who Have Been Reimbursed from Class-Action Settlement Funds

Named Plaintiffs concede that they pushed for a purely pro-rata allocation among members, under which Class Members who spent the most on PACER during the Class Period would take the lion's share of the Settlement proceeds. But the largest users include large law firms, which themselves suffered no injury because they long ago passed most of the PACER charges that they paid on to their clients. The largest users also likely include plaintiffs-side class-action firms (like those representing Named Plaintiffs in this very action), which generally are reimbursed for PACER expenses when class actions settle. To the extent that the funds in this case are allocated to such class members, they constitute a windfall—at the expense of class members, such as Isaacson, whose Class Period PACER expenses were, in greatest part, neither passed on to clients nor otherwise reimbursed.

The Named Plaintiffs have purported to litigate this case in the interest of the little user. Their Complaint demanded compliance with Congress' intent that court documents "be 'freely available to the greatest extent possible.'" DE1:1 (quoting S.Rep. 107–174, 107th Cong., 2d Sess. 23 (2002)). They said that excessive PACER fees had "inhibited public understanding of the courts and thwarted equal access to justice," asserting that "the AO has further compounded these harms by discouraging fee waivers, even for *pro se* litigants," and "by hiring private collection lawyers

to sue people who cannot afford to pay the fees." DE1:1-2; *see also* DE1:11¶23; DE1:12¶25. Plaintiff National Consumer Law Center said it "seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans." DE1: 3¶2.

Yet when it came time to negotiate a settlement, the Named Plaintiffs abandoned such users—and the public interest—by advocating a purely pro-rata distribution of settlement funds that would favor large institutional users such as themselves, and that provides windfalls to large law firms that long ago passed their PACER charges on to paying clients, and to plaintiffs-side class-action lawyers (such as those representing the Named Plaintiffs) who have been fully reimbursed from settlement funds in other cases. Class Counsel concedes that in settlement negotiations with the government, Named Plaintiffs

> argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers—"to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. §1913 note.

DE158-5:10¶28 (Gupta decl.); *see also* DE158:23[ECFp31] ("plaintiffs and class counsel vigorously advocated for a pro-rata approach").

The government was right. Named Plaintiffs' advocacy for pro-rata distribution was grossly inappropriate. The "blend" reached as a compromise allocates far too much to a pro rata distribution that unfairly advantages large users and law firms that already have been reimbursed—and who accordingly receive inequitable windfalls under the Settlement.

The pro-rata portion of the distribution is calculated to produce unfair windfalls. Many law firms, particularly the larger ones, pass the PACER charges that they incur on to their clients and are reimbursed for them on thirty-day billing cycles.[2] Class-action lawyers have to wait a little

---

[2] *See Hallmark v. Cohen & Slamowitz, LLP,* 378 F. Supp. 3d 222, 236 (W.D.N.Y. 2019)(holding PACER fees are among "those ordinarily charged to clients"); *Godson v. Eltman, Eltman, & Cooper, P.C.,* 328 F.R.D. 35, 68 (W.D.N.Y. 2018)(holding PACER fees are among "those ordinarily charged to clients"); *Decastro v. City of New York,* No. 16-cv-3850 (RA), 2017 WL

longer—but they typically are reimbursed for PACER charges when class actions settle.[3] And we know that the great majority of class actions settle.[4] Indeed, Class Counsel's own fee expert

---

4386372, at *10 (S.D.N.Y. Sept. 30, 2017)(no contest that PACER fees are among the "out-of-pocket expenses ordinarily charged to clients").

[3] *See, e.g., Ciapessoni v. United States,* 145 Fed. Cl. 564, 565 (2019); *Godson v. Eltman, Eltman, & Cooper, P.C.,* 328 F.R.D. 35, 67 (W.D.N.Y. 2018); *In re Broadwing, Inc. ERISA Litig.,* 252 F.R.D. 369, 382 (S.D. Ohio 2006); *Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-0762 JLT EPG, 2023 WL 4134656, at *30 (E.D. Cal. June 22, 2023); *Stechert v. Travelers Home & Marine Ins. Co.,* No. CV 17-0784-KSM, 2022 WL 2304306, at *15 (E.D. Pa. June 27, 2022); *In re Wawa, Inc. Data Sec. Litig.,* No. CV 19-6019, 2022 WL 1173179, at *12 (E.D. Pa. Apr. 20, 2022); *Yanez v. HL Welding, Inc.,* No. 20CV1789-MDD, 2022 WL 788703, at *13 (S.D. Cal. Mar. 15, 2022); *Karl v. Zimmer Biomet Holdings, Inc.,* No. C 18-04176 WHA, 2022 WL 658970, at *6 (N.D. Cal. Mar. 4, 2022); *Curry v. Money One Fed. Credit Union,* No. CV DKC 19-3467, 2021 WL 5839432, at *6 (D. Md. Dec. 9, 2021); *Kudatsky v. Tyler Techs., Inc.,* No. C 19-07647 WHA, 2021 WL 5356724, at *5 (N.D. Cal. Nov. 17, 2021); *Espinal v. Victor's Cafe 52nd St., Inc.,* No. 16-CV-8057 (VEC), 2019 WL 5425475, at *5 (S.D.N.Y. Oct. 23, 2019); *Ott v. Mortg. Invs. Corp. of Ohio, Inc.,* No. 3:14-CV-00645-ST, 2016 WL 54678, at *6 (D. Or. Jan. 5, 2016); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.,* No. CIV. 6:12-1609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015); *Jenkins v. Trustmark Nat. Bank,* 300 F.R.D. 291, 310 (S.D. Miss. 2014); *Hargrove v. Ryla Teleservices, Inc.,* No. 2:11CV344, 2013 WL 1897027, at *7 (E.D. Va. Apr. 12, 2013), *report and recommendation adopted,* 2013 WL 1897110 (E.D. Va. May 3, 2013); *Beard v. Dominion Homes Fin. Servs., Inc.,* No. C2 06 137, 2009 WL 10710409, at *7 (S.D. Ohio June 3, 2009); *In re Kirby Inland Marine, L.P.,* No. CIVA 04-611-SCR, 2008 WL 4642616, at *4 (M.D. La. Oct. 16, 2008), aff'd sub nom. In re Kirby Inland Marine LP, 333 F.App'x 872 (5th Cir.2009); *Rankin v. Rots,* No. 02-CV-71045, 2006 WL 1791377, at *3 (E.D. Mich. June 27, 2006); *Jordan v. Michigan Conf. of Teamsters Welfare Fund,* No. 96-73113, 2000 WL 33321350, at *6 (E.D. Mich. Sept. 28, 2000).

[4] *See* Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 6 (Federal Judicial Center, 2005)(according to a 2005 study, certified class actions settled ninety percent of the time); *Redman v. RadioShack Corp.,* 768 F.3d 622, 638 (7th Cir.2014)(noting, in connection with the settlement of a consumer class action, that "very few class actions are tried"); *West v. Prudential Sec., Inc.,* 282 F.3d 935, 937 (7th Cir.2002)("very few securities class actions are litigated to conclusion"); *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 52 (2d Cir.2000)("'there appears to be no appreciable risk of non-recovery" in securities class actions, because 'virtually all cases are settle[]'")(quoting Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan.L.Rev. 497, 578 (1991)); *In re Copley Pharm., Inc.,* 161 F.R.D. 456, 466 (D.Wyo.1995)("most class actions settle and few go to trial"); *see also* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan. L.Rev. 497, 578 (Feb.1991)(arguing that a multiplier designed to address the contingency factor in securities class actions is unnecessary since "there appears to be no appreciable risk of nonrecovery, for virtually all cases are settled"). "When the potential liability created by a lawsuit is very great, even though the probability that the plaintiff will succeed in establishing liability is slight, the defendant will be under pressure to settle rather than to bet the

concedes that "the typical class action settles in only three years." DE158-4:14¶21 (Fitzpatrick decl.). So class-action law firms, like those representing the Named Plaintiffs in this matter, generally receive full reimbursement for their PACER expenditures when the class actions they litigate quite predictably settle.

What this means is that many, if not most, of the class members with the largest Class Period PACER expenditures have already been wholly compensated for all or most of what they spent on PACER. That is a powerful reason for this Court to endorse what Named Plaintiffs report was the government's position: that small users should receive full reimbursement. *See* DE158:21-22. Class Counsel Deepak Gupta explains:

> plaintiffs argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers— "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note.

DE158-5:10¶28.

The government was correct. Public access to court records is critical to American Democracy. Small-scale users should be fully compensated. No significant portion of the Settlement fund should be allocated to the pro-rata distribution advocated by the Named Plaintiffs.

Including large claimants in a pro-rata distribution is problematic, moreover, because the Class cannot be defined to include any entities with claims totaling more than $10,000. Doing so would violate the Little Tucker Act. The Settlement's allocation appears to include, and to distribute Settlement funds to, entities whose claims exceed the Tucker Act's $10,000 jurisdictional limit. "District courts have jurisdiction under the Little Tucker Act to hear claims 'against the United States, ***not exceeding*** $10,000[.]'" *Nat'l Veterans Legal Servs. Program v.*

---

company, even if the betting odds are good." *Kohen v. Pacific Inv. Mgmt. Co. LLC,* 571 F.3d 672, 678 (7th Cir.2009).

*United States,* 968 F.3d 1340, 1347 (Fed.Cir.2020)(emphasis added)(quoting *Corr v. Metro. Washington Airports Auth.,* 702 F.3d 1334, 1336 (Fed.Cir.2012)(quoting 28 U.S.C. §1346(a)(2))).

If Isaacson, as a start-up solo-practitioner who paid PACER fees for less than three years of the eight-year class period, paid $3,823.50 in PACER fees, then many users—particularly institutional users, large law firms, and plaintiffs-side class-action firms—must have run up Class Period PACE bills totaling tens and even hundreds of thousands of dollars. This Court lacks jurisdiction to include them, and their claims, in the Class to whom the Settlement will be distributed. For by now "the question is settled—district courts lose their Little Tucker Act jurisdiction once the amount claimed accrues to more than $10,000, even though jurisdiction was previously proper in the district court." *Simanonok v. Simanonok,* 918 F.2d 947, 950-51 (Fed.Cir.1990). The Federal Circuit has held "the amount of a claim against the United States for back pay is the total amount of back pay the plaintiff stands ultimately to recover in the suit and is not the amount of back pay accrued at the time the claim is filed." *Smith v. Orr,* 855 F.2d 1544, 1553 (Fed.Cir.1988)(following *Chabal v. Reagan,* 822 F.2d 349 (3d Cir.1987); *see Simanonok,* 918 F.2d at 950-51; *see also Shaw v. Gwatney,* 795 F.2d 1351 (8th Cir.1986); *Goble v. Marsh,* 684 F.2d 12 (D.C.Cir.1982)). Clearly, then, Class Members whose claims exceed $10,000 are beyond this Court's Little Tucker Act jurisdiction.

"In a class action such as this, jurisdiction thereunder turns, not upon the aggregate amount of the claims [of all] the members of the class, but upon the amounts claimed individually by those members." *March v. United States,* 506 F.2d 1306, 1309 n.1 (D.C.Cir.1974); *see Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981); *Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11, 25 (3d Cir.1975). Yet Little Tucker Act jurisdiction ultimately covers a class action only if, and to the extent that, "the individual claim of each class member does not exceed $10,000.00." *Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981).

There is one way, of course, to preserve Little Tucker Act jurisdiction with respect to Class Members whose individual claims exceed $10,000. It is well established that "a plaintiff may pursue such a claim in a district court if the plaintiff waives his right to recover the amount

exceeding $10,000." *Smith v. Orr,* 855 F.2d 1544, 1552–53 (Fed. Cir.1988). That can be accomplished by abandoning the notion that large claimants have the right to a pro-rata distribution based on large claims that would place them beyond the jurisdictional limitation. No portion of the Settlement fund should be allocated on the basis of Class Members' PACER expenditures after the first $10,000 they paid during the Class Period. The first distribution should be capped at a much higher level than $350 apiece, and any pro-rata distribution of remaining funds should be based on Class Members' expenditures *up to* $10,000 apiece, thereby waiving Class Members' larger claims in order both to preserve Tucker Act jurisdiction, and also to achieve a more equitable distribution of the Settlement Fund.

### B. The Attorney's Fees Sought Are Grossly Excessive

Class Counsel's expert, Professor Brian Fitzpatrick, says "that the fee request is more than reasonable." DE158-4:5¶8 (Fitzpatrick decl.).

It is, in fact, several times what the Supreme Court's precedents hold is a reasonable attorney's fee to fully compensate class plaintiffs' counsel in contingent class-action litigation that settles. For while the Supreme Court holds that class counsel ordinarily are adequately compensated with an unenhanced lodestar award, *see Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 546 (2010), Class Counsel here ask for roughly *four times* that amount. And while the Supreme Court has never approved a common-fund fee award exceeding ten percent of the common fund, Class Counsel in this case demand twice that. It appears that the driving concern in this settlement is Class Counsel's desire to capture an extravagant fee.

The Supreme Court holds that attorney's fees may be awarded from a common fund or equitable fund based either on the attorney's fees reasonably incurred and billed, *see Trustees v. Greenough,* 105 U.S. 527, 530-31, 537-38 (1882), or as a modest percentage of the fund, *see Central RR & Banking Co. v. Pettus,* 113 U.S. 116, 128 (1885)(cutting fee award from 10% to 5%). At *four times* Class Counsel's claimed hourly rates, and more than twice the percentage supported by Supreme Court common-fund precedents, the attorney's fee award sought by Class Counsel is clearly excessive.

Class Counsel claim a lodestar of $6,031,678.25. DE158-5:22-23¶¶63-64 (Gupta decl.). Supreme Court precedent mandates "a strong presumption that the lodestar is sufficient," without any enhancement, to compensate plaintiffs' counsel when a contested class action settles. *Perdue,* 559 U.S. at 546 (2010); *see Haggart v. Woodley,* 809 F.3d 1336, 1355 n.19 (Fed.Cir.2016). Even in common-fund cases, such as this, "[t]here is a 'strong presumption' that the lodestar figure represents a reasonable fee." *Fischel v. Equitable Life Assur. Soc'y,* 307 F.3d 997, 1007 (9th Cir.2002)(citation omitted). "Because of [that] 'strong presumption that the lodestar is sufficient,' a multiplier is warranted only in 'rare and exceptional circumstances.'" *Chambers v. Whirlpool Corp.,* 980 F.3d 645, 665 (9th Cir.2020)(quoting *Perdue,* 559 U.S. at 546-52, and reversing a 1.68 lodestar multiplier).

"There is a 'strong presumption' that the lodestar figure represents a reasonable attorney's fee, [*Perdue,* 559 U.S. at 546], because '"the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee."'" *Heller v. District of Columbia,* 832 F. Supp. 2d 32, 37 (D.D.C. 2011)(quoting *Perdue,* 559 U.S. at 543(quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 566 (1986)). "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant, *Perdue,* 559 U.S. at 553, who "must produce 'specific evidence'" supporting the enhancement. *Perdue,* 559 U.S. at 553. And, as *Perdue* itself emphasizes, "factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar." *Perdue,* 559 U.S. at 546.

Class Counsel have not demonstrated by a preponderance of the evidence that they are entitled to nearly four times their claimed lodestar. Acting as a fiduciary to the Class, this Court should not grant such an extravagant award.

Class Counsel contend that such a windfall is justified if only the attorney's fee is awarded as a percentage of the $125 million megafund settlement. After all, they say, they only want 19% of the fund. Yet the Supreme Court has never approved a percent-of-fund common-fund fee award exceeding ten percent of the fund.

In *Pettus,* for example, the Supreme Court slashed a common-fund award from ten percent to just five percent of the fund. The Court "consider[ed] whether the sum allowed appellees was too great. We think it was. The decree gave them an amount equal to ten per cent." Pettus, 113 U.S. at 128. "One-half the sum allowed was, under all the circumstances, sufficient." *Id.; see also Harrison v. Perea,* 168 U.S. 311, 325 (1897)(noting with approval the reduction of a $5,000 fee award (or about 14% of an equitable fund) to just 10% of the fund).

In *United States v. Equitable Trust Co.,* 283 U.S. 738 (1931), the Supreme Court rejected the notion that counsel whose efforts secure a fund may receive more than necessary to compensate them adequately for their time. The Second Circuit already had rejected the district court's conclusion that counsel were entitled to a quarter to a third of the fund, cutting the attorney's fee award to just $100,000 (about 15% of the fund) and warning that "[t]he allowance is a payment for legal services, not a speculative interest in a lawsuit." *Barnett v. Equitable Trust Co.*, 34 F.2d 916, 919 (2d Cir.1929)(Learned Hand). The attorneys then complained to the Supreme Court that "from a percentage standpoint, the allowance of $100,000 is but slightly over fifteen per cent," and that "never yet have counsel been cut down to such a low percentage in any contested case taken upon a contingent basis."[5] But the Supreme Court found even "the allowance of $100,000 unreasonably high, and that to bring it within the standard of reasonableness it should be reduced to $50,000," which was about $7^{1}/_{2}$% of the fund. *Equitable Trust,* 283 U.S. at 746. Those are old decisions, to be sure. But the Supreme Court's common-fund precedents remain controlling authority. *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980)(applying common-fund doctrine rooted in *Greenough* and *Pettus*); *Haggart v. Woodley,* 809 F.3d 1336, 1352 (Fed.Cir.2016)(favorably citing *Greenough* and *Pettus*).

And with the development of computerized research, automated document review, and digital storage and retrieval of documents, the difficulty and expense of litigation has surely fallen.

---

[5] Brief for Respondents to Whom Allowances Were Made, *United States v. Equitable Trust,* 283 U.S. 738 [Oct. Term 1929 No. 530], at 55-56 (filed April 16, 1930).

Given the tremendous economies of scale afforded by the class-action device in recovering the $125 million megafund in this case, the five percent of the fund found reasonable in *Pettus* would be wholly appropriate here too. Its reasonableness is, moreover, confirmed by a cross-check against Class Counsel's claimed lodestar. For five percent of the megafund is $6,250,000, and Class Counsel's claimed lodestar is only $6,031,678.25. DE158-5:22-23¶¶63-64 (Gupta decl.). A five-percent award gives Class Counsel something more than their lodestar which, according to *Perdue,* is presumptively sufficient to compensate them for their work on a settling contingent-fee class action.

Of course, that assumes that Class Counsel's lodestar is proper. It is not. Their lodestar is inadequately documented. Class Counsel submitted a summary declaration, giving total hours and billing rates, with no further itemization or explanation of the hours billed, or of the basis for the billing rates. That is not enough to support Class Counsel's purported lodestar.[6] Were appropriate deductions made, their lodestar would be much lower, and the multiplier for their requested fee award doubtless would exceed four.

The claimed lodestar amount is plainly excessive. Class Counsel's paid expert on fees, Professor Brian Fitzpatrick, has developed a matrix of reasonable "Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia." *See* Isaacson Decl. Ex.D

---

[6] *Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984)("The affidavit here was little more than a tally of hours and tasks relative to the case as a whole."); *McDonald v. Pension Plan,* 450 F.3d 91, 96 (2d Cir.2006)("In order to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records."); *Cadena v. Pacesetter Corp.,* 224 F.3d 1203, 1215 (10th Cir.2000)("'[I]f [prevailing parties] intend to seek attorney's fees ... [their attorneys] must keep meticulous, contemporaneous time records [.]"); *Harper v. City of Chicago Heights,* 223 F.3d 593, 605 (7th Cir.2000 ("[I]t is within a district court's power to reduce a fee award because the petition was not supported by contemporaneous time records."); In re Olson, 884 F.2d 1415, 1428 (D.C.Cir.1989 (disallowing entries that failed to identify the subject of a meeting, conference, or phone call and requiring contemporaneous records proving the reasonableness of hours and rates); *Grendel's Den v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984)("in cases involving fee applications ... the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award, or in egregious cases, disallowance"); *Savin ex rel. Savin v. Sec'y of Health & Hum. Servs.,* 85 Fed.Cl. 313, 317 & n.5 (2008).

[https://www.justice.gov/usao-dc/page/file/1189846/download]. Professor Fitzpatrick says his "Fitzpatrick Matrix" is based on research that "allowed us to determine the real hourly rates charged in the market" in complex federal litigation lilke this case. *See* Isaacson Decl. Ex.E. The highest reasonable 2021 billing rate for a lawyer with 35+ years' experience, according to Professor Fitzpatrick's official matrix, is $736 an hour. *See id.* Yet in this case, Class Counsel's lodestar is built on billing rates that grossly exceed what Fitzpatrick deemed reasonable for complex litigation in the District of Columbia. A 2002 Georgetown graduate, Deepak Gupta's time is billed at $1150 an hour, while 2010 Harvard graduate Jonathan E. Taylor's time is billed at $975 an hour—well over the rates deemed reasonable for complex litigation in the District of Columbia. DE158-5:22¶63. Turning to the Motley Rice lawyers, we find William Narwold billing at $1250 an hour, and Meghan Oliver at $950 an hour. DE158-5:5¶12.

Class Counsel have offered adequate justifications neither for their billing rates, nor for the hours claimed. Not even their own expert, Professor Brian Fitzpatrick, has opined that they are reasonable.

Neither have Class Counsel demonstrated that they should be entitled to any multiplier of their inadequately documented lodestar, or to a percentage fee of more than the five percent that the Supreme Court applied to a common-fund fee application in *Pettus,* which would more than adequately compensate them for their efforts.

Class Counsel's fee expert urges a dramatic upward departure from the attorney's fees supported by Supreme Court precedents—based on his own survey of nonprecedential published, and even unpublished district court rulings. Fitzpatrick ignores the fact that "[i]n the vast majority of cases, Class counsel appears before the court to request a big percentage of the settlement fund, cooperative settling Defendants offer no opposition, and class members rarely oppose the request." *In re Quantum Health Res., Inc.,* 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "The situation is a fundamental conflict of interest and is inherently collusive. The lack of opposition to a proposed fee award gives a court the sometimes false impression of reasonableness, and the court might simply approve a request for fees without adequate inquiry or comment." *In re Quantum Health*

*Res., Inc.,* 962 F. Supp. 1254, 1256 (C.D. Cal. 1997)(footnote omitted). Fitzpatrick's survey thus is of minimal value.

Factors cited by Class Counsel and their expert do not justify the large fee. The case, though somewhat novel, was obviously an easy one to litigate. The central contest was on an issue of statutory construction. After the Federal Circuit clarified the law, *see National Veterans Legal Servs. Program v. United States,* 968 F.3d 1340, 1349 (Fed.Cir.2020), the case was an easy one to settle. And that, of course, eliminated any risk of nonpayment that Class Counsel might have faced had they taken the case to trial.

Named Plaintiffs and Class Counsel together seek "an award of attorneys' fees, settlement-administration and notice costs, litigation expenses, and service awards for the three class representatives in a total amount equal to 20% of the $125 million common fund." DE158:4[ECFp13]. Their motion also seeks "an award of $10,000 per class representative to compensate them for their time working on the case and the responsibility that they have shouldered" while Class counsel seeks "$23,863,345.02 in attorneys' fees," or nearly four times their claimed lodestar. DE158:4[ECFp13].

This Court should not award an attorney's fee amounting to more than Class Counsel's unenhanced lodestar recalculated at the rates set forth in their own fee expert's "Fitzpatrick Matrix."

### C.    The $10,000 Apiece Service Awards Named Plaintiffs Seek are Inequitable and Unlawful

The Supreme Court's foundational common-fund class-action precedents hold that payments compensating litigants for their service as class representatives are inequitable and illegal. *See Trustees v. Greenough,* 105 U.S. 527, 537 (1882); *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 122 (1885). The Eleventh Circuit thus soundly holds that "Supreme Court precedent prohibits incentive awards."[7] And the Second Circuit recently conceded: "Service

---

[7] *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1255 (11th Cir.2020), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022); *accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247,

awards are likely impermissible under Supreme Court precedent." *Fikes Wholesale v. HSBC Bank USA,* 62 F.4th 704, 721 (2d Cir.2023).

So "any service award in a class action is at best dubious under *Greenough*." *Fikes Wholesale,* 62 F.4th at 723; *see also id.* at 729 (Jacobs, Cir.J., concurring). The Second Circuit nonetheless chooses to follow its own decisions sustaining incentive awards—rather than the Supreme Court's decisions banning them:

> But practice and usage seem to have superseded Greenough (if that is possible). *See Melito v. Experian Mktg. Sols. Inc.,* 923 F.3d 85, 96 (2d Cir.2019); *Hyland v. Navient Corp.,* 48 F.4th 110, 123-24 (2d Cir.2022). And even if (as we think) practice and usage cannot undo a Supreme Court holding, *Melito* and *Navient* are precedents that we must follow.

*Fikes Wholesale,* 62 F.4th at 721.

Supreme Court precedent cannot be superseded by lower courts' contrary practice and usage. Lower courts are not at liberty to reject Supreme Court precedents as obsolescent. In fact, "the strength of the case for adhering to such decisions grows in proportion to their 'antiquity.'" *Gamble v. United States,* 139 S.Ct. 1960, 1969 (2019)(citing *Montejo v. Louisiana,* 556 U.S. 778, 792 (2009). Even if a Supreme Court precedent was "'unsound when decided'" and even if it over time becomes so "'inconsistent with later decisions'" as to stand upon "'increasingly wobbly, moth-eaten foundations,'" it remains the Supreme Court's "prerogative alone to overrule one of its precedents."[8] The Supreme Court holds: "If a precedent of this Court has direct application in a

---

1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("such service awards are foreclosed by Supreme Court precedent").

[8] *State Oil Co. v. Khan,* 522 U.S. 3, 9, 20 (1997)(quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir.1996)(Posner, J.)); *accord, e.g., Payne v. Taslimi,* 998 F.3d 648, 654 (4th Cir.2021); *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.,* 817 F.3d 755, 770 (Fed.Cir.2016)(O'Malley, Cir.J., concurring).

case," as *Greenough* does here, a lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989); *accord, e.g., Mallory v. Norfolk S. Ry. Co.,* 143 S. Ct. 2028, 2038 (2023).

But even if *Greenough* and *Pettus* do not altogether bar incentive awards, such payments are appropriate only when actually necessary. The Ninth Circuit in *In re Apple Inc. Device Performance Litig.,* 50 F.4th 769, 786 (9th Cir.2022), for example, construed *Greenough* not as a decision that prohibits incentive awards in general, but as one that prohibits incentive awards unless they are necessary to induce the named plaintiffs to pursue the case:

> While private plaintiffs who recover a common fund are entitled to "an extra reward," they are limited to "that which is deemed 'reasonable' under the circumstances." *Id. Greenough,* for example, prohibited recovery for the plaintiff's "personal services and private expenses" because the private plaintiff was a creditor who needed no inducement to bring suit. *Greenough,* 105 U.S. at 537.

*In re Apple Inc. Device Performance Litig.,* 50 F.4th 769, 786 (9th Cir.2022).

The Seventh Circuit similarly holds that incentive awards are appropriate only when "'necessary to induce an individual to participate in the suit.'"[9]

But here, as in *Greenough,* the Named Plaintiffs had substantial claims of their own, and they clearly "needed no inducement to bring suit." *Apple Device,* 50 F.4th at 786. This Court has recognized that they already had "dual incentives to reduce PACER fees, both for themselves and for the constituents that they represent." DE33:14. Named Plaintiffs presented their missions as

---

[9] *Camp Drug Store v. Cochran Wholesale Pharmaceutical,* 897 F.3d 825, 834 (7th Cir.2018)(citation omitted); *see also In re Synthroid Mktg. Litig.,* 264 F.3d 712, 722 (7th Cir.2001)("Incentive awards are justified when necessary to induce individuals to become named representatives."); *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 410 (7th Cir.2000)("Incentive awards are appropriate if compensation would be necessary to induce an individual to become a named plaintiff in the suit.").

nonprofits as their motivations to pursue this litigation. They never needed special $10,000 payments to induce them to file suit.

Finally, anyone who seeks an incentive award must document their time on the case. As the Sixth Circuit has held:

> The settlement agreement provides for incentive awards of up to $10,000 per individual named plaintiff .... Class counsel argues in conclusory terms that the awards compensate the named plaintiffs for their time spent on the case. To ensure that these amounts are not in fact a bounty, however, counsel must provide the district court with specific documentation—in the manner of attorney time sheets—of the time actually spent on the case by each recipient of an award.

*Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan,* 825 F.3d 299, 311 (6th Cir.2016). "Otherwise the district court has no basis for knowing whether the awards are in fact 'a disincentive for the [named] class members to care about the adequacy of relief afforded unnamed class members[.]'" *Id.* (quoting *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir.2013)(emphasis in original).

Named Plaintiffs neither kept, nor presented, the required documentation. *See, e.g.,* DE158:2¶2 (Rossman decl.)("our organization did not keep formal time records"). That is another reason that the payments should be denied.

## III.    CONCLUSION

Although Named Plaintiffs insist that they "'enjoy a presumption of fairness afforded by [this] court's preliminary fairness determination,'" DE158:18[ECFp26] (quoting *Ciapessoni v. United States,* 145 Fed. Cl. 685, 688 (2019)), and also that any settlement "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery" similarly enjoys a "'presumption of fairness, adequacy, and reasonableness,'" DE158:19-20 (quoting *Kinard v. E. Capitol Fam. Rental, L.P.,* 331 F.R.D. 206, 215 (D.D.C.2019)), Rule 23 neither authorizes nor permits any such presumptions. In fact, "Rule 23(e)(2) assumes that a class action settlement is invalid." *Briseno v. Henderson,* 998 F.3d 1014, 1030 (9th Cir.2021).

The Settling Parties have not carried their burden of demonstrating by a preponderance of the evidence that this one is fair, reasonable, and adequate. It is not. Named Plaintiffs seek to

allocate far too much of the Settlement fund to their lawyers, as attorney's fees, and to themselves in special $10,000 incentive awards, and with a further pro-rata distribution that favors large users and that awards windfalls to large law firms and to class-action plaintiffs' counsel.

DATED:  September 12, 2023                    Respectfully Submitted,

                                              Eric Alan Isaacson

                                              LAW OFFICE OF ERIC ALAN ISAACSON
                                              6580 Avenida Mirola
                                              La Jolla, CA 92037-6231
                                              Telephone: (858)263-9581
                                              Email: ericalanisaacson@icloud.com

## DECLARATION OF ERIC ALAN ISAACSON

I, Eric Alan Isaacson, declare and state as follows:

1.　　I am over the age of eighteen, make this declaration based on my personal knowledge and, if called as a witness, would testify competently as to the facts stated herein.

2.　　I make this declaration in support of my objection to approval of the proposed class-action settlement, award of attorney's fees, and of service awards, in *National Veterans Legal Services Program, et al. v. United States of America,* Civil No. 16-745-PLF, which is pending in the United States District Court for the District of Columbia.

3.　　A 1982 baccalaureate graduate of Ohio University, I hold a 1985 J.D. with high honors from the Duke University School of Law, and in May of 2022 I graduated from the Harvard Divinity School with a Master of Religion and Public Life.

4.　　Continuing my graduate studies, I recently enrolled in the Harvard Extension School, where am working toward a Master of Liberal Arts in Extension Studies in the field of History.

5.　　I have been a member in good standing of the bar of the State of California (No. 120584) since 1985.

6.　　I was a founding partner of the law firm of Robbins, Geller, Rudman & Dowd LLP (f.k.a. Lerach Coughlin Stoia Geller Rudman & Robbins LLP), where I practiced law from May 1, 2004 to March 15, 2016.

7.　　Since March of 2016, I have practiced law from the LAW OFFICE OF ERIC ALAN ISAACSON, 6580 Avenida Mirola, La Jolla, CA 92037.

8.　　I am informed and believe I am a member of the Class who would be bound by the proposed Settlement in this matter because I paid PACER bills during the Class Period, and I received an email notice of the Class Action Settlement.

9.      In March of 2016, I opened my own PACER account (No. 4166698), for which I have paid quarterly the PACER bills ever since.

10.     A true and correct of copy my short-form curriculum vita is attached as Exhibit A hereto.

11.     A true and correct copy of the email Class Notice that I received concerning this matter is attached as Exhibit B hereto.

12.     My Class Period PACER billings under that account totaled $3,823.50, as evidenced by invoices and emails attached as Exhibit C hereto.

13.     Attached as Exhibit D hereto is a true and correct copy of "The Fitzpatrick Matrix," a document "prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students," and "Published by the U.S. Attorney's Office for the District of Columbia, Civil Division," that I downloaded today from https://www.justice.gov/usao-dc/page/file/1189846/download, and for which I have prepared the following bitly link: https://bit.ly/USAOfitz

14.     Attached as Exhibit E hereto is a true and correct copy of *Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court*," Feb.7, 2023, that I downloaded today from https://law.vanderbilt.edu/news/fee-matrix-developed-by-professor-brian-fitzpatrick-and-brooke-levy-22-adopted-by-federal-court/ and for which I have prepared the following bitly link: https://bit.ly/463kPjs

15.     I have received reimbursement (from a client) for only $171.80 of the foregoing $3,823.50 Class Period PACER expenditures. Thus, my total unreimbursed Class Period PACER expenditures come to $3,651.70.

16.     I seldom seek reimbursement from clients for my PACER expenditures, and I have not had occasion to seek reimbursement for any of my Class Period PACER expenditures from the settlement fund in any court proceeding.

17.     I do not expect to seek or receive any further reimbursement of my remaining $3,651.70 in unreimbursed Class Period PACER expenditures.

20

18.    A substantial portion of my Class Period PACER expenditures reflect research in connection with my own personal scholarship in matters of law and economics.

19.    A substantial portion of my legal practice during the Class Period was devoted to pro bono matters in which I incurred and paid expenses for documents downloaded from PACER for which I did not seek, and never will seek, reimbursement. These included, for example:

•    *EEOC v. R.G. & G.R. Harris Funeral Homes,* 884 F.3d 560 (6th Cir.2018) – Briefed for amicus curiae Unitarian Universalist Association, supporting the EEOC and defending a transgender employee's right not to be subjected to religiously motivated workplace discrimination. (Amicus brief filed April 28, 2017);

•    *Janus v. AFSCME, Council 31,* 585 U.S. __, 138 S.Ct. 2584 (June 27, 2018) – Counsel of Record for amici curiae Faith in Public Life, religious organizations, and faith leaders supporting respondent labor union and the need for labor-union fair-share agency fees. (Amicus brief filed January 19, 2018);

•    *Voice of the Ex-offender v. Louisiana,* 249 So.3d 857 (La.Ct.App. 1st Cir.2018), *cert. denied,* 255 So.3d 575 (La.2018)(Chief Justice Johnson dissenting) – Co-counsel for amici curiae of historians Walter C. Stern, et al., supporting the right of released ex-offenders to vote. (Amicus brief filed February 21, 2018).

20.    I object to the proposed Settlement in *National Veterans Legal Services Program, et al. v. United States of America,* Civil No. 16-745-PLF, and in particular to the requested attorney's fee award, and the requested service awards, for reasons stated in the Objection of Eric Alan Isaacson that this declaration accompanies.

21.    I have pressed objections in other class actions, but have always done so with the objective of improving the quality of class-action settlements and of developing what I regard as sound principles of law.

22.    Both during the Class Period and after I have sought, with some success, to improve class-action practice in the United States. *See, e.g., Moses v. New York Times Co.*, No. 21-2556-CV, __F.4th__, 2023 WL 5281138, at *1 (2d Cir. Aug. 17, 2023)("we agree with Isaacson that the

district court exceeded its discretion when it approved the settlement based on the wrong legal standard in contravention of Rule 23(e)"); *Murray v. Grocery Delivery E-Servs. USA Inc.,* 55 F.4th 340, 342 (1st Cir.2022)("we vacate [settlement] approval because the absence of separate settlement counsel for distinct groups of class members makes it too difficult to determine whether the settlement treated class members equitably"); *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1248 (11th Cir.2020)("We find that, in approving the settlement here, the district court repeated several errors that, while clear to us, have become commonplace in everyday class-action practice. ... [I]t handled the class-action settlement here in pretty much exactly the same way that hundreds of courts before it have handled similar settlements. But familiarity breeds inattention, and it falls to us to correct the errors in the case before us."); *Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917 (11th Cir.2020)(en banc)(sustaining objection that a representative plaintiff who suffered no injury lacked Article III standing to represent and compromise the interests of the class); *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.,* 888 F.3d 455, 458 (10th Cir.2017) (reversing $17.3 million class-action attorney's fee award).

23.     None of my objections to class-action settlements or attorney's fee awards have been found to be frivolous, and none have been made for improper purposes.

24.     I have never pressed an objection in order to extract a payment in return for the objection's withdrawal, or for the dismissal of any resulting appeal.

25.     I will not accept any payment in return for withdrawing my objection in this case, for foregoing an appeal, or for dismissing any appeal.

26.     I am, moreover, willing to be bound by a court order absolutely prohibiting any such payment in this case.

27.     I desire to be heard at the October 12, 2023, Final Approval Hearing in the above-captioned matter, either in person or remotely by means of telephone or video conferencing.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on September 12, 2023, at La Jolla, California.

Eric Alan Isaacson

Eric Alan Isaacson
Law Office of Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037-6231
(858)263-9581
ericalanisaacson@icloud.com

# EXHIBIT A

# ERIC ALAN ISAACSON

LAW OFFICE OF ERIC ALAN ISAACSON – https://www.ericalanisaacson.com
6580 Avenida Mirola, La Jolla, CA 92037-6231
ericalanisaacson@icloud.com, eri628@g.harvard.edu
(858) 263-9581

**EDUCATION**:

• Harvard Extension School, working toward a Master of Liberal Arts (ALM) in Extension Studies, field of History

• Harvard Divinity School, M.R.P.L. 2022

• Duke University School of Law, J.D. with high honors, 1985; Order of the Coif; *Duke Law Journal* (Member 1983-1984 & Note Editor 1984-1985); Research Assistant to Prof. William A. Reppy, Jr. (summer 1983)

• Ohio University, A.B. with high honor, 1982

**PROFESSIONAL EMPLOYMENT:**

• Law Office of Eric Alan Isaacson (March 16, 2016 to present); Robbins Geller Rudman & Dowd LLP, f.k.a. Lerach Coughlin Stoia Geller Rudman & Robbins LLP (founding partner, May 1, 2004 to March 15, 2016)

• Milberg Weiss Bershad Hynes & Lerach LLP (partner, January 1994 through April 2004; associate, November 1989 through December 1993); • O'Melveny & Myers, Los Angeles (associate, 1986-1989)

• U.S. Court of Appeals for the Ninth Circuit (law clerk to Hon. J. Clifford Wallace, 1985-1986)

**BAR ADMISSIONS**:

California (1985); Supreme Court of the United States (1995); also admitted to practice before the U.S. Courts of Appeals for the First through Eleventh Circuits, Federal Circuit, and D.C. Circuit, and before all federal district courts in California and Oklahoma

**SELECTED PUBLICATIONS**:

• *A Real-World Perspective on Withdrawal of Objections to Class-Action Settlements and Attorneys' Fee Awards: Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(e)(5),* 10 ELON L. REV. 35 (2018) [https://bit.ly/3fKYLB8]

• *The Roberts Court and Securities Class Actions: Reaffirming* Basic *Principles,* 48 AKRON L. REV. 923 (2015) [https://bit.ly/33mWZRJ]

• *Free Exercise for Whom? – Could the Religious-Liberty Principle that Catholics Established in* Perez v. Sharp *Also Protect Same-Sex Couples' Right to Marry?,* 92 U. DET. MERCY L. REV. 29 (2015) [https://bit.ly/3fJnZjs]

• Goodridge *Lights A Nation's Way to Civic Equality,* BOSTON BAR J., Nov. 15, 2013 [https://bit.ly/33qHiZS]

• *Are Same-Sex Marriages Really a Threat to Religious Liberty?,* 8 STANFORD J. CIV. RTS. & CIV. LIBERTIES 123 (2012) [https://bit.ly/2Vr3Fu5]

• *Assaulting America's Mainstream Values: Hans Zeiger's* Get Off My Honor: The Assault on the Boy Scouts of America, 5 PIERCE L. REV. 433 (2007) [https://bit.ly/3q3P3P8]

• *Traditional Values, or a New Tradition of Prejudice?  The Boy Scouts of America vs. the Unitarian Universalist Association of Congregations,* 17 GEO. MASON U. CIV. RTS. L.J. 1 (2006) [https://bit.ly/3li1yTI]

- (with Patrick J. Coughlin & Joseph D. Daley) *What's Brewing in* Dura v. Broudo*? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and its Import for Securities-Fraud Litigation,* 37 LOYOLA U. CHICAGO L. J. 1 (2005) [https://bit.ly/3lhnf6u]
- (with William S. Lerach) *Pleading Scienter Under Section 21D(b)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness and the Private Securities Litigation Reform Act of 1995,* 33 SAN DIEGO L. REV. 893 (1996) [https://bit.ly/3wLmgBY]
- *The Flag Burning Issue: A Legal Analysis and Comment,* 23 LOYOLA L.A. L. REV. 535 (1990) [https://bit.ly/3qkKYX8]

**VOLUNTEER SERVICE**:

- Skinner House Books, Editorial Board member, June 2016 to present;
- American Constitution Society, San Diego Lawyer Chapter, Steering Committee Member ,January 2008 to August 2009, and Board Member, August 2009 to present
- First Unitarian Universalist Church of San Diego, youth leader, September 2019 to June 2020; children's religious-education leader, September 2004 to June 2019; delegate to Unitarian Universalist Association General Assemblies of 2019, 2018, 2017, 2015, 2014 & 2009; Worship Welcome Team, member, May 2008 to May 2011

**SELECTED PRO BONO *AMICUS CURIAE* BRIEFS**:

- *Janus v. AFSCME, Council 31,* 138 S.Ct. 2448 (2018), brief for *amici curiae* Faith in Public Life, *et al.*, supporting public employees' labor-union fair-share agency fees [http://bit.ly/2KohwKr]
- *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,* 884 F.3d 560 (6th Cir. 2018), brief for *amicus curiae* Unitarian Universalist Association, supporting transgender employee's right not to be subjected to religiously motivated workplace discrimination [http://bit.ly/2yKxm0z]
- *Obergefell v. Hodges,* 576 U.S. 644 (2015), brief for *amici curiae* California Council of Churches, *et al.*, supporting same-sex couples' right to marry [https://bit.ly/34KqJJL]
- *Hollingsworth v. Perry,* 570 U.S. 693 (2013), brief for *amici curiae* California Council of Churches, *et al.*, supporting same-sex couples' right to marry [https://bit.ly/2HNQr79]
- *Pickup v. Brown,* 740 F.3d 1208 (9th Cir. 2014), brief for *amici curiae* California Faith for Equality, *et al.*, supporting California legislation barring healthcare professionals from subjecting minors to "Sexual Orientation Change Efforts" [https://bit.ly/2HCINwD]
- *Log Cabin Republicans v. United States,* 658 F.3d 1162 (9th Cir. 2011), brief for *amici curiae* Forum on the Military Chaplaincy, *et al.*, supporting the Log Cabin Republicans' challenge to "Don't Ask Don't Tell" [https://bit.ly/3mCXiiS]
- *Perry v. Brown,* 52 Cal. 4th 1116, 265 P.3d 1002 (2011), brief for *amici* California Faith for Equality, *et al.*, on questions certified to the California Supreme Court [https://bit.ly/2JkT6pu]
- *Perry v. Brown,* 671 F.3d 1052 (9th Cir. 2012), brief for *amici curiae* California Faith for Equality, et al., supporting same-sex couples' challenge to California Proposition 8's ban on same-sex marriages [https://bit.ly/37OtnQu]
- *Perry v. Schwarzenegger,* 704 F.Supp.2d 921 (N.D. Cal. 2010), brief for *amici curiae* Unitarian Universalist Legislative Ministry California, *et al.* [https://bit.ly/3mwYQuD]
- *Strauss v. Horton,* 46 Cal. 4th 364, 377-78, 207 P.3d 48, 93 Cal. Rptr. 3d 591 (2009), brief for *amici curiae* California Council of Churches, *et al.,* opposing California's Proposition 8 [https://bit.ly/3mtYpRE]

- *In re Marriage Cases,* 43 Cal.4th 757, 183 P.3d 384, 76 Cal.Rptr.3d 683 (2008), on team filing *amicus curiae* brief for the Unitarian Universalist Association, *et al.*, supporting the right of same-sex couples to marry [https://bit.ly/2VdpcpL]
- *In re Marriage Cases,* 49 Cal.Rptr.3d 675 (Cal. App. 1st Dist. 2006), on team filing *amicus curiae* brief for the General Synod of the United Church of Christ, *et al.*, supporting the right of same-sex couples to marry [https://bit.ly/3miFMR6]

**AWARDS**:

- American Constitution Society San Diego Lawyer Chapter's third annual *Roberto Alvarez Award*, January 29, 2014
- San Diego Democrats for Equality *Eleanor Roosevelt Award for Community Service,* November 17, 2012
- Unitarian Universalist Association *President's Annual Award for Volunteer Service*, June 28, 2009 [https://bit.ly/3GzRT6K]

# EXHIBIT B



**From: PACER Fees Class Action Administrator** donotreply@pacerfeesclassaction.com
**Subject:** PACER Fees – Notice of Class Action Settlement
**Date:** July 6, 2023 at 8:34 PM
**To:** ericalanisaacson@icloud.com

Account ID: 10176234
PIN: 328319

<div align="center">

**If you paid fees to access federal court records on PACER at any time between
April 21, 2010 and May 31, 2018, a proposed class action settlement may affect your rights.**

</div>

Nonprofit groups filed this lawsuit against the United States, claiming that the government has unlawfully charged users of PACER (the Public Access to Court Electronic Records system) more than necessary to cover the cost of providing public access to federal court records. The lawsuit, *National Veterans Legal Services Program, et al. v. United States*, Case No. 1:16-cv-00745-PLF, is pending in the U.S. District Court for the District of Columbia. This notice is to inform you that the parties have decided to settle the case for $125,000,000. This amount is referred to as the common fund. The settlement has been preliminarily approved by the Court.

**Why am I receiving this notice?** You are receiving this notice because you may have first paid PACER fees between April 22, 2016 and May 31, 2018. This notice explains that the parties have entered into a proposed class action settlement that may affect you. You may have legal rights and options that you may exercise before the Court decides to grant final approval to the settlement.

**What is this lawsuit about?** The lawsuit alleges that federal courts have been charging unlawfully excessive PACER fees. It alleges that Congress has authorized the federal courts to charge PACER fees only to the extent necessary to cover the costs of providing public access to federal court records, and that the fees for use of PACER exceed its costs. The lawsuit further alleges that the excess PACER fees have been used to pay for projects unrelated to PACER. The government denies these claims and contends that the fees are lawful. The parties have agreed to settle.

**Who represents me?** The Court has appointed Gupta Wessler PLLC and Motley Rice LLC to represent the Class as Class Counsel. You do not have to pay Class Counsel or anyone else to participate. Class Counsel's fees and expenses will be deducted from the common fund. By participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court. You may hire your own attorney, if you wish, at your own expense.

**What are my options?**

**OPTION 1. Do nothing. Stay in the settlement.** By doing nothing, you remain part of this class action settlement. If you are an accountholder and directly paid your own PACER fees, you do not have to do anything further to receive money from the settlement. You will be legally bound by all orders and judgments of this Court, and will automatically receive a check for your share of the common fund assuming the Court grants final approval of the settlement. By doing nothing you give up any rights to sue the United States government separately about the same claims in this lawsuit. If someone directly paid PACER fees on your behalf, you should direct your payment to that individual or entity at www.pacerfeesclassaction.com no later than Tuesday, September 5th, 2023. If you accept payment of any settlement proceeds, you are verifying that you paid the PACER fees and are the proper recipient of the settlement funds.

**OPTION 2. Exclude yourself from the settlement.** Alternatively, you have the right to not be part of this settlement by excluding yourself or "opting out" of the settlement and Class. If you exclude yourself, you cannot get any money from the settlement, but you will keep your right to separately sue the United States government over the legal issues in this case. If you do not wish to stay in the Class, you must request exclusion in one of the following ways:

1. Send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *National Veterans Legal Services Program, et al. v. United States,* Case No. 1:16-cv-00745-PLF. Be sure to include your name, address, telephone number, email address, and signature. You must mail your Exclusion Request, **postmarked by Sunday, August 20th, 2023** to: PACER Fees Class Action Administrator, P.O. Box 301134, Los Angeles, CA 90030-1134.

2. Complete and submit online the Exclusion Request form found here by Sunday, August 20th, 2023.

3. Send an "Exclusion Request" Form, available here, by mail. You must mail your Exclusion Request form, **postmarked by Sunday, August 20th, 2023** to: PACER Fees Class Action Administrator, P.O. Box 301134, Los Angeles, CA 90030-1134.

If you choose to exclude yourself from the lawsuit, you should decide soon whether to pursue your own case because your claims may be subject to a statute of limitations which sets a deadline for filing the lawsuit within a certain period of time.

**OPTION 3. Stay in the Class and object or go to a hearing.** If you paid PACER fees and do not opt out of the settlement, you may object to any aspect of the proposed settlement. Your written objection must be **sent by Tuesday, September 12th, 2023** and submitted as set out in the *Notice of Proposed Class Action Settlement* referred to below. You also may

request in writing to appear at the Fairness Hearing on Thursday, October 12th, 2023.

**How do I get more information?** This is only a summary of the proposed settlement. For a more detailed *Notice of Proposed Class Action Settlement*, additional information on the lawsuit and proposed settlement, and a copy of the Settlement Agreement, visit www.pacerfeesclassaction.com, call 866-952-1928, or write to: PACER Fees Class Action Administrator, P.O. Box 301134, Los Angeles, CA 90030-1134.

If ericalanisaacson@icloud.com should not be subscribed or if you need to change your subscription information for KCC/USO, please use this preferences page.

EXHIBIT C


PACER
Public Access to Court Electronic Records

# INVOICE

Invoice Date: 04/07/2016
Usage From: 01/01/2016 to: 03/31/2016

## Account Summary

| | |
|---|---|
| **Pages:** | 958 |
| Rate: | $0.10 |
| Subtotal: | $95.80 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $95.80 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$95.80** |

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q12016 |
| **Due Date:** | 05/10/2016 |
| **Amount Due:** | $95.80 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

### Total Amount Due:  $95.80

---

### PACER Website, Manage My Account Updates

Over the past few months, PACER has made some updates to create a more helpful and efficient experience for users. The following list provides details on the improvements:

· **BrowseAloud:** This screen reader program is available on pacer.gov, the PACER Case Locator (PCL), and the Case Search Sign In page. It assists users with a wide range of needs by reading website text out loud.
· **Setting a Default in Manage My Account:** Users no longer need to select an icon (P, F, or A) to designate a default or autobilling method of payment. Instead, two new links (Set autobill and Set default) make the selection simpler and easier.
· **Checking E-File Status:** This link (under the Maintenance tab in Manage My Account) now automatically provides a list of the courts in which you have registered instead of requiring the user to select from a drop-down list.

Questions about the invoice?
Visit **pacer.gov/billing**

---

*Please detach the coupon below and return with your payment.* **Thank you!**


PACER
Public Access to Court Electronic Records

| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 05/10/2016 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $95.80, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

## Public Access to Court Electronic Records

Invoice Date: 07/05/2016

Usage From: 04/01/2016     to: 06/30/2016

**Account Summary**

| | |
|---|---|
| **Pages:** | 4,751 |
| Rate: | $0.10 |
| Subtotal: | $475.10 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $475.10 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$475.10** |

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q22016 |
| **Due Date:** | 08/10/2016 |
| **Amount Due:** | $475.10 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

**Total Amount Due:**  $475.10

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

### Preparing for NextGen CM/ECF

Over the past year, several appellate, district, and bankruptcy courts throughout the country have implemented the next generation (NextGen) CM/ECF system. While most courts have not yet set a date for when they will switch to NextGen, you can begin preparing now by upgrading your PACER account. To learn more, visit the NextGen information page at pacer.gov/nextgen.

· **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
· **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
· **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions

Questions about the invoice?
Visit **pacer.gov/billing**

---

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 08/10/2016 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing.  The total amount due, $475.10, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

Invoice Date: 10/05/2016
Usage From: 07/01/2016   to: 09/30/2016

## Account Summary

| | |
|---|---|
| **Pages:** | 8,937 |
| Rate: | $0.10 |
| Subtotal: | $893.70 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $893.70 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$893.70** |

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q32016 |
| **Due Date:** | 11/10/2016 |
| **Amount Due:** | $893.70 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

**Total Amount Due:**  $893.70

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

### Preparing for NextGen CM/ECF

In recent months, as more courts throughout the country have implemented the next generation (NextGen) CM/ECF system, some users have encountered issues that can affect account access and registration. The resources listed below can help you avoid many of these issues, creating a smooth transition when your court converts. Check your court's website for updates on when it will implement NextGen.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

---

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 11/10/2016 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $893.70, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

**Invoice Date:** 01/09/2017

**Usage From:** 10/01/2016 **to:** 12/31/2016

## Account Summary

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q42016 |
| **Due Date:** | 02/10/2017 |
| **Amount Due:** | $379.40 |

| | |
|---|---|
| **Pages:** | 3,794 |
| Rate: | $0.10 |
| Subtotal: | $379.40 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $379.40 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$379.40** |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
*74-2747938*

## Total Amount Due:  $379.40

Questions about the invoice?
Visit **pacer.gov/billing**

### Preparing for NextGen CM/ECF

In recent months, as more courts throughout the country have implemented the next generation (NextGen) CM/ECF system, some users have encountered issues that can affect account access and registration. The resources listed below can help you avoid many of these issues, creating a smooth transition when your court converts. Check your court's website for updates on when it will implement NextGen.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

---

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 02/10/2017 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $379.40, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

**Public Access to Court Electronic Records**

Invoice Date: 04/05/2017

Usage From: 01/01/2017     to: 03/31/2017

### Account Summary

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q12017 |
| **Due Date:** | 05/10/2017 |
| **Amount Due:** | $360.70 |

| | |
|---|---|
| **Pages:** | 3,607 |
| Rate: | $0.10 |
| Subtotal: | $360.70 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $360.70 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$360.70** |

## Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

### Total Amount Due:  $360.70

### Eighth Circuit Converts to NextGen

In January, the Eighth Circuit Court of Appeals implemented the next generation (NextGen) CM/ECF system. To date, a total of 10 courts have converted, and more courts will follow in the coming months. See the following websites for what to do when your court announces it will make the transition.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

---

*Please detach the coupon below and return with your payment.* **Thank you!**



**Public Access to Court Electronic Records**

| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 05/10/2017 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $360.70, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

**Public Access to Court Electronic Records**

Invoice Date: 07/06/2017
Usage From: 04/01/2017 to: 06/30/2017

### Account Summary

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q22017 |
| **Due Date:** | 08/10/2017 |
| **Amount Due:** | $644.70 |

| | |
|---|---|
| **Pages:** | 6,447 |
| Rate: | $0.10 |
| Subtotal: | $644.70 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $644.70 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$644.70** |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

**Total Amount Due:**  $644.70

### Tenth Circuit Converts to NextGen

In May, the Tenth Circuit Court of Appeals implemented the next generation (NextGen) CM/ECF system. To date, a total of 11 courts have converted, and more courts will follow in the coming months. See the following websites for what to do when your court announces it will make the transition.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

Questions about the invoice?
Visit **pacer.gov/billing**

---

*Please detach the coupon below and return with your payment.* **Thank you!**



**Public Access to Court Electronic Records**

| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 08/10/2017 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $644.70, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037

**From:** do_not_reply@psc.uscourts.gov 
**Subject:** 4166698 October 2017 PACER Quarterly Invoice
**Date:** October 14, 2017 at 4:40 AM
**To:** ericalanisaacson@icloud.com



| | |
|---|---|
| Account Number: | 4166698 |
| Account Contact: | Eric Alan Isaacson |
| Balance Due: | $288.70 |
| Due Date: | 11/09/2017 |
| | This account is registered for automatic billing. The total amount due, $288.70, will be charged to the credit card on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR. |

To access the statement:

- Log in to Manage My Account.
- From the **Usage** tab, select **View Quarterly Invoice/Statement of Account**.

Go to Billing for detailed billing transactions, instructions on disputing charges, FAQs, and more.

NOTE: *Please do not reply to this message. If you have questions or comments, please email them to PACER or call us at (800) 676-6856.*

**From:** do_not_reply@psc.uscourts.gov 
**Subject:** 4166698 January 2018 PACER Quarterly Invoice
**Date:** January 13, 2018 at 1:48 AM
**To:** ericalanisaacson@icloud.com



| | |
|---|---|
| Account Number: | 4166698 |
| Account Contact: | Eric Alan Isaacson |
| Balance Due: | $280.60 |
| Due Date: | 02/09/2018 |
| | This account is registered for automatic billing. The tot amount due, $280.60, will be charged to the credit car on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR. |

To access the statement:

- Log in to Manage My Account.
- From the **Usage** tab, select **View Quarterly Invoice/Statement of Account**.

Go to Billing for detailed billing transactions, instructions on disputing charges, FAQs, and more.

NOTE: *Please do not reply to this message. If you have questions or comments, please email them to PACER or call us at (800) 676-6856.*

**From:** do_not_reply@psc.uscourts.gov
**Subject:** 4166698 April 2018 PACER Quarterly Invoice
**Date:** April 14, 2018 at 1:44 AM
**To:** ericalanisaacson@icloud.com





| | |
|---|---|
| Account Number: | 4166698 |
| Account Contact: | Eric Alan Isaacson |
| Balance Due: | $404.80 |
| Due Date: | 05/10/2018 |
| | This account is registered for automatic billing. The total amount due, $404.80, will be charged to the credit card on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR. |

To access the statement:

- Log in to Manage My Account.
- From the **Usage** tab, select **View Quarterly Invoice/Statement of Account**.

Go to Billing for detailed billing transactions, instructions on disputing charges, FAQs, and more.

NOTE: *Please do not reply to this message. If you have questions or comments, please email them to PACER or call us at (800) 676-6856.*

# EXHIBIT D

### THE FITZPATRICK MATRIX
Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia

| Years Exp. / Billing Yr. | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| 35+ | 535 | 563 | 591 | 619 | 647 | 675 | 703 | 731 | 736 |
| 34 | 534 | 562 | 590 | 618 | 646 | 674 | 702 | 729 | 734 |
| 33 | 532 | 560 | 588 | 616 | 644 | 672 | 700 | 728 | 733 |
| 32 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 726 | 730 |
| 31 | 527 | 555 | 583 | 611 | 639 | 667 | 695 | 723 | 728 |
| 30 | 524 | 552 | 580 | 608 | 636 | 664 | 692 | 720 | 725 |
| 29 | 521 | 549 | 577 | 605 | 633 | 661 | 689 | 717 | 721 |
| 28 | 517 | 545 | 573 | 601 | 629 | 657 | 685 | 713 | 717 |
| 27 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 708 | 713 |
| 26 | 508 | 536 | 564 | 592 | 620 | 648 | 676 | 704 | 708 |
| 25 | 502 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 703 |
| 24 | 497 | 525 | 553 | 581 | 609 | 637 | 665 | 693 | 697 |
| 23 | 491 | 519 | 547 | 575 | 603 | 630 | 658 | 686 | 691 |
| 22 | 484 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 684 |
| 21 | 477 | 505 | 533 | 561 | 589 | 617 | 645 | 673 | 677 |
| 20 | 470 | 498 | 526 | 553 | 581 | 609 | 637 | 665 | 670 |
| 19 | 462 | 490 | 518 | 546 | 574 | 602 | 630 | 658 | 662 |
| 18 | 453 | 481 | 509 | 537 | 565 | 593 | 621 | 649 | 653 |
| 17 | 445 | 473 | 500 | 528 | 556 | 584 | 612 | 640 | 645 |
| 16 | 435 | 463 | 491 | 519 | 547 | 575 | 603 | 631 | 635 |
| 15 | 426 | 454 | 482 | 510 | 538 | 566 | 593 | 621 | 626 |
| 14 | 416 | 443 | 471 | 499 | 527 | 555 | 583 | 611 | 615 |
| 13 | 405 | 433 | 461 | 489 | 517 | 545 | 573 | 601 | 605 |
| 12 | 394 | 422 | 450 | 478 | 506 | 534 | 562 | 590 | 594 |
| 11 | 382 | 410 | 438 | 466 | 494 | 522 | 550 | 578 | 582 |
| 10 | 371 | 399 | 427 | 455 | 483 | 510 | 538 | 566 | 570 |
| 9 | 358 | 386 | 414 | 442 | 470 | 498 | 526 | 554 | 558 |
| 8 | 345 | 373 | 401 | 429 | 457 | 485 | 513 | 541 | 545 |
| 7 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 528 | 532 |
| 6 | 319 | 347 | 375 | 403 | 431 | 458 | 486 | 514 | 518 |
| 5 | 305 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 504 |
| 4 | 290 | 318 | 346 | 374 | 402 | 430 | 458 | 486 | 489 |
| 3 | 275 | 303 | 331 | 359 | 387 | 415 | 443 | 471 | 474 |
| 2 | 260 | 287 | 315 | 343 | 371 | 399 | 427 | 455 | 458 |
| 1 | 244 | 272 | 300 | 328 | 356 | 384 | 412 | 439 | 442 |
| 0 | 227 | 255 | 283 | 311 | 339 | 367 | 395 | 423 | 426 |
| P* | 130 | 140 | 150 | 160 | 169 | 179 | 189 | 199 | 200 |

* = Paralegals/Law Clerks

*Published by the U.S. Attorney's Office for the District of Columbia, Civil Division*

Explanatory Notes

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia.  It has been developed to provide "a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," as the United States Court of Appeals for the District of Columbia Circuit urged.  *DL v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019).  The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components.

2.  The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees.  *E.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b).  A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases.  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010).  The matrix is not intended for use in cases in which the hourly rate is limited by statute.  *E.g.*, 28 U.S.C. § 2412(d).

3.  For matters in which a prevailing party agrees to payment pursuant to this fee matrix, the United States Attorney's Office will not request that a prevailing party offer the additional evidence that the law otherwise requires.  *See, e.g., Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for similar services'")).

4.  The years in the column on the left refer to an attorney's years of experience practicing law.  Normally, an attorney's experience will be calculated based on the number of years since an attorney graduated from law school.  If the year of law school graduation is unavailable, the year of bar passage should be used instead.  Thus, an attorney who graduated from law school in the same year as the work for which compensation is sought has 0 years of experience.  For all work beginning on January 1 of the calendar year following graduation (or bar admission), the attorney will have 1 year of experience. (For example, an attorney who graduated from law school on May 30 will have 0 years of experience until December 31 of that same calendar year.  As of January 1, all work charged will be computed as performed by an attorney with 1 year of experience.)  Adjustments may be necessary if an attorney did not follow a typical career progression or was effectively performing law clerk work.  *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate).

5.  The data for this matrix was gathered from the dockets of cases litigated in the U.S. District Court for the District of Columbia using the following search in Bloomberg Law: keywords ("motion n/5 fees AND attorney!" under "Dockets Only") + filing type ("brief," "motion," or "order") + date ("May 31, 2013 – May 31, 2020" under "Entries (Docket Key Only)").  This returned a list of 781 cases.  Of those, cases were excluded if there was no motion for fees filed, the motions for fees lacked necessary information, or the motions involved fees not based on hourly rates, involved rates explicitly or implicitly based on an existing fee matrix, involved rates explicitly or implicitly subject to statutory fee caps (e.g., cases subject to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)), or used lower rates prescribed by case law (*e.g., Eley*, 793 F.3d at 105 (Individuals with Disabilities in Education Act

cases)).  After these excisions, 86 cases, many of which included data for multiple billers (and 2 of which only provided hourly rate data for paralegals), remained.

6.  The cases used to generate this matrix constitute complex federal litigation—which caselaw establishes as encompassing a broad range of matters tried in federal court.  *E.g.*, *Reed v. District of Columbia*, 843 F.3d 517, 527-29 (D.C. Cir. 2016) (Tatel, J., concurring) (noting that cases arising under the Freedom of Information Act, Title VII, the Americans with Disabilities Act, Constitutional Amendments, antitrust statutes, and others have been deemed complex, and even "relatively small" cases can constitute complex federal litigation, as they too require "specialized legal skills" and can involve "complex organizations," such as "large companies"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 14-16, 17 (D.D.C. 2008) (prevailing market rates for complex federal litigation should be determined by looking to "a diverse range of cases").  That the attorneys handling these cases asked the court to award the specified rates itself demonstrates that the rates were "'adequate to attract competent counsel, [while] not produc[ing] windfalls to attorneys.'"  *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)).  As a consequence, the resulting analysis yields the "prevailing market rate[] in the relevant community" for complex litigation undertaken in federal courts in the District of Columbia.  *See Blum*, 465 U.S. at 895.

7.  From these 86 complex federal cases, the following information was recorded for 2013 and beyond: hourly rate, the calendar year the rate was charged, and the number of years the lawyer was out of law school when the rate was charged (or, if law school graduation year was unavailable, years since bar passage), as defined above.  If the graduation or bar passage year was not stated in a motion or its exhibits, then the lawyer's biography was researched on the internet.  Although preexisting fee matrices for the District of Columbia provide for mid-year rate changes, very few lawyers in the data submitted rates that changed within a calendar year.  For this reason, the matrix was modeled using one rate for each calendar year.  On the occasions when a lawyer expressed an hourly rate as a range or indicated the rate had increased during the year, the midpoint of the two rates was recorded for that lawyer-year.

8.  The matrix of attorney rates is based on 675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases.  The lawyer-year data points spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years.

9.  Paralegal/law clerk rates were also recorded.  The following titles in the fee motions were included in the paralegal/law clerk data: law clerk, legal assistant, paralegal, senior legal assistant, senior paralegal, and student clerk.  The paralegal/law clerk row is based on 108 paralegal-year data points from 42 unique cases.  They spanned from 2013 to 2019 and from $60 to $290.  (It is unclear how many unique persons are in the 108 data points because paralegals were not always identified by name.)

10. The matrix was created with separate regressions for the lawyer data and the paralegal data.  For the paralegal data, simple linear least-squares regression was used with the dependent variable hourly rate and the independent variable the year the rate was charged subtracted from 2013; years were

combined into one variable and subtracted from 2013 rather than modeled as separate indicator variables to constrain annual inflation to a constant, positive number. The resulting regression formula was rate = 129.8789 + 9.902107 * (year-2013). For the lawyer data, least-squares regression was used with the dependent variable hourly rate and independent variables the year the rate was charged and the number of years of experience of the lawyer when the rate was charged. The year the rate was charged was subtracted from 2013 and modeled linearly as with the paralegal data. The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (e.g., faster growth earlier in one's career than at the end of one's career). *See, e.g.*, Jacob Mincer, *Schooling, Experience, and Earnings* (1974). The resulting regression formula was rate = 227.319 + 16.54492 * experience - 0.2216217 * experience ^ 2 + 27.97634 * (year-2013). Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected here; in order to minimize fee disputes, these models were therefore rejected in favor of the more generous untransformed, fixed-effect model. Rates from one case comprised 20% of the data; the regression was also run without that case, but the resulting rates were mostly lower and therefore rejected, again to minimize fee disputes.

11. The data collected for this matrix runs through 2020. To generate rates in 2021, an inflation adjustment (rounded to the nearest whole dollar) was added. The United States Attorney's Office determined that, because courts and many parties have employed the legal services index of the Consumer Price Index to adjust attorney hourly rates for inflation, this matrix will do likewise. *E.g., Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015); *Eley*, 793 F.3d at 101-02; *DL*, 924 F.3d at 589-90.

12. This matrix was researched and prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students.

# EXHIBIT E

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court | News | Law School | Vanderbilt University

9/12/23, 10:29 AM

Case 1:16-cv-01575-PLF Document 42-16 Filed 03/01/2024 Page 1 of 51



Home (/) / News (/news/)

## Recent News (/news)

Ingrid Brunk Testifies to European Central Bank at ECB Legal Conference 2023 (https://law.vanderbilt.edu/news/ingrid-brunk-testifies-to-european-central-bank-at-ecb-legal-conference-2023/)

James F. Blumstein Files Amicus Brief in Robinson v. Ardoin

# Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court

## Feb 7, 2023

The Chief Judge of the U.S. District Court for the District of Columbia, Beryl A. Howell, ordered a plaintiff to recalculate and resubmit her claim for attorneys' fees using the so-called "Fitzpatrick Matrix (https://law.vanderbilt.edu/files/publications/usao_matrix_2015_-_2020.pdf)" on Jan. 23, marking the successful launch of a new tool developed for the Department

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by federal court | News | Vanderbilt University

Case 3:16-cv-00545-PLR Document 12 16-5 Filed 03/19/24 Page 413 of 672 Filed 03/19/24 Page 413 of 51

9/12/23, 10:29 AM

(https://law.vanderbilt.edu/news/james-f-blumstein-files-amicus-brief-in-robinson-v-ardoin/)

First Amendment Clinics Advocate for Right to Access Government Social Media Accounts (https://law.vanderbilt.edu/news/first-amendment-clinics-advocate-for-right-to-access-government-social-media-accounts/)

A Novel Approach to Teaching Technology Law (https://law.vanderbilt.edu/news/a-novel-approach-to-teaching-technology-law/)

Vanderbilt Law Students and Graduates Secure 39 Clerkships in the 2022-23 Academic Year (https://law.vanderbilt.edu/news/vanderbilt-law-students-and-graduates-secure-39-clerkships-in-the-2022-23-academic-year/)

# Publications

of Justice by complex litigation expert Brian Fitzpatrick (https://law.vanderbilt.edu/bio/brian-fitzpatrick), who holds the Milton R. Underwood Chair in Free Enterprise at Vanderbilt Law School.



Brian Fitzpatrick

Fitzpatrick has published research on attorney compensation and fee awards throughout his career and often provided expert-witness testimony in cases where fee awards are at issue. In 2020, Peter C. Pfaffenroth of the U.S. Attorney's Office for the District of Columbia asked him to take on a daunting task for which Pfaffenroth believed Fitzpatrick was uniquely qualified:  Update the venerable Laffey Matrix (http://www.laffeymatrix.com/), a chart that successful federal litigants had used to calculate and claim reimbursement for their legal fees in the District of Columbia since 1983.

"If you sue the federal government and win, you may be able to file a claim to be reimbursed for your attorneys' fees," Fitzpatrick explains. "But the matrix they were using to calculate these fee awards was 40 years old. Most law firms weren't even

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by federal court | Vanderbilt University

Case 24-0757, Document 12, Page 414 of 672

9/12/23, 10:29 AM

Vanderbilt Law Review
(http://www.vanderbiltlawreview.org/)

Journal of Transnational Law
(http://www.vanderbilt.edu/jotl/)

Environmental Law & Policy
Annual Review (ELPAR)
(/academics/academic-
programs/environmental-
law/environmental-law-policy-
annual-review/index.php)

Journal of Entertainment &
Technology Law
(http://jetlaw.org/)

Apply Now (/prospective-students/admissions/apply/)

Make a Gift (https://vanderbilt.alumniq.com/giving/to/vanderbilt-law)

using computers in 1983 when the Laffey Matrix was developed, but for years it and another matrix from the 1980s were the only games in town for calculating fee awards. I was asked to develop an updated matrix that reflected modern realities."

Fitzpatrick volunteered to do the work pro bono if the DOJ would fund a research assistant. He hired **Brooke Levy '22**, to conduct a comprehensive audit of recent fee petitions in the D.C. District Court.

"Brooke went into the federal courts' electronic docketing system and examined every fee petition filed between 2013 and 2020. In cases where lawyers put in the hourly rates they actually charged the client for their work, we pulled that out and put it in a spreadsheet," he said. "That allowed us to determine the real hourly rates charged in the market."

Fitzpatrick presented the updated matrix to the Department of Justice in late 2021. The chart, which provides fees for attorneys according to their years of experience as well as hourly rates for law clerks and paralegals, was promptly dubbed the "Fitzpatrick Matrix" by DOJ staff.

"My goal was to develop a reliable assessment of fees charged for complex federal litigation that both plaintiffs and judges could use to evaluate fee claims," he said.

The advantage of having a modern, objective tool to calculate attorney's fees is clear in the order (https://law.justia.com/cases/federal/district-courts/district-of-columbia/dcdce/1:2019cv00989/206139/68/) Chief Judge Howell handed down, in which she ordered a plaintiff to use the Fitzpatrick Matrix to calculate the attorneys' fees she was owed. The plaintiff had filed a claim for fees of approximately $415,000, but according to Judge Howell's calculations, "reasonable fees" at the hourly rates set forth in the Fitzpatrick Matrix indicated a fee award of approximately $245,000.

Attorneys representing the government wrote in a court filing that the Fitzpatrick Matrix is "accurate and reliable," noting that since the DOJ adopted it, "disputes about hourly rates have been minimized, both in settlement discussions and in fee

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court | News | Vanderbilt University

Case 3:16-cv-02267-PLT Document 12-16 Filed 10/18/2024 Page 415 of 51

9/12/23, 10:29 AM

petitions."

Fitzpatrick hopes his new matrix will streamline the process for such claims in the future. "The matrix provides objective criteria for determining attorneys' fees based on prevailing rates and the attorneys' experience, so it should simplify the process for filing claims and require less judicial review," he said.

While the Fitzpatrick Matrix can be adjusted upward for inflation, Fitzpatrick recommends that it be more comprehensively updated every five years. "We shouldn't wait another 40 years to update this tool," he said.

---

**Alumni** (https://law.vanderbilt.edu/news/section/alumni/)
**Branstetter Litigation and Dispute Resolution Program** (https://law.vanderbilt.edu/news/section/branstetter/) **Faculty News** (https://law.vanderbilt.edu/news/section/faculty-news/) **General News** (https://law.vanderbilt.edu/news/section/general-news/) **Home Page News** (https://law.vanderbilt.edu/news/section/home-page-news/) **L&G News and Events** (https://law.vanderbilt.edu/news/section/law-government/)



V Law School

131 21st Ave. South
Nashville, TN 37203-1181
615-322-2615 (or by Skype)

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by federal court | Vanderbilt University

Case 1:16-cv-00745-PLF Document 426-10 Filed 07/01/2024 Page 5 of 51

9/12/23, 10:29 AM



© (https://law.vanderbilt.edu/news/manage/wp-login.php) 2023 Vanderbilt University · Nashville, Tennessee 37240 · (615) 322-7311 · Contact Us (/c
Communications (https://web.vanderbilt.edu/)

Vanderbilt University is committed to principles of equal opportunity and affirmative action.

Vanderbilt®, Vanderbilt University®, V Oak Leaf Design®, and Star V Design® are trademarks of The Vanderbilt University. ©2018 Vanderbilt University. J

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) ) ) | Civil No. 16-745-PLF<br><br>STATEMENT OF ERIC ALAN ISAACSON OF INTENT TO APPEAR IN PERSON AT THE OCTOBER 12, 2023, FINAL-APPROVAL HEARING IN *NATIONAL VETERANS LEGAL SERVICES PROGRAM,* |
| Plaintiffs, | ) ) | *ET AL. V. UNITED STATES OF AMERICA* |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

WRITTEN STATEMENT OF ERIC ALAN ISAACSON
OF INTENT TO APPEAR IN PERSON AT THE OCTOBER 12, 2023,
FINAL-APPROVAL HEARING IN
*NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.
V. UNITED STATES OF AMERICA*

I am a class member in the above-captioned action who on September 12, 2023, timely served and submitted my Objection of Eric Alan Isaacson to Proposed Settlement in *National Veterans Legal Services Program, et al. v. United States of America.*

On October 3, 2023, Class Counsel filed, but did not serve on me, Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Fees, Costs and Service Awards. DE160. Class Counsel's reply states that I have said I "intend[] to appear remotely" at the October 12, 2023, hearing. DE160:2. That is not accurate. The Objection and Declaration that I submitted on September 12, 2023, states that "I desire to be heard at the October 12, 2023, Final Approval

Hearing in the above-captioned matter, either in person or remotely by means of telephone or video conference." DE160:22¶27.

This Court's Order Setting Settlement Hearing Procedures, DE162, which was filed on October 4, 2023, but was not served on me by the Court or by any party, makes clear that I will need to appear at the hearing in person. That Order states that "[d]ue to technology constraints, those participating virtually will not be able to present any exhibits or demonstratives to the Court or view any that are physically displayed in the courtroom during the hearing." DE162:2¶1. That Order further states that "[i]f a Class Member has submitted a written statement and wishes to be heard at the Settlement Hearing, the Class Member shall be allocated ten minutes to make their presentation," DE162:2¶2.b.i., while any Class Member who "has not submitted a written statement but wishes to be heard at the Settlement Hearing," will be allocated only "five minutes to make their presentation." DE162:3¶2.ii.

I am accordingly submitting this written statement, and am hereby give notice that I will be appearing in person. In addition to expanding on the points made in the Objection and supporting Declaration that I submitted on September 12, 2023, I intend to make the following points:

I will object that class members, such as myself, who submitted timely objections have not been served by the Court or by the Settling Parties with Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Fees, Costs and Service Awards, DE160, or with this Court's orders changing the location of the Final Approval Hearing, DE161, and imposing limitations and additional requirements on those who seek to participate in that hearing. DE162.

I will further object that class members' objections and supporting documentation have not, to date, been placed on the District Court's docket as part of the public record in this case. Although I timely served and submitted my Objection and supporting Declaration as directed in the class notice, both sending it both by email and by U.S. Postal Service Express Mail addressed to the Honorable Paul L. Friedman, my Objection has never been filed on the District Court's

public PACER-accessible docket for this case. Neither have the objections of any other class members.

In my decades of legal practice connected with class actions and their settlement, I have never before witnessed a case in which the settling parties arranged with the court to keep class members' objections off the public record. This is a gross violation of the First Amendment and common-law rights of public access to court records. "[I]n class actions—where by definition 'some members of the public are also parties to the [case]'—the standards for denying public access to the record 'should be applied ... with particular strictness.'" *Shane Grp., Inc. v. Blue Cross Blue Shield,* 825 F.3d 299, 305 (6th Cir.2016)(quoting *In re Cendant Corp.,* 260 F.3d 183, 194 (3d Cir. 2001)). It also amounts to a denial of due process, obviously impairing objecting class members' ability to seek appellate review.

I also will object to Class Counsel's submission of supplemental expert declarations supporting their fee application as a violation of Rule 23(h), which required them to file their fee motion with supporting affidavits and evidence well before the deadline for class members to file objections. *See* Fed.R.Civ.P. 23(h); *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1252 (11th Cir. 2020); *Redman v. RadioShack Corp.,* 768 F.3d 622, 638 (7th Cir. 2014); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir.2010). This breach implicates fundamental due-process concerns. *See Lawler v. Johnson,* 253 So.3d 939, 948-51 (Ala. 2017).

The Declaration of William Rubenstein, DE160-2, was submitted on October 3, 2023, well after both the August 28, 2023, deadline this Court set for Class Counsel's attorney's fee application, and weeks after the September 12, 2023, deadline for filing objections. Although I had submitted a timely objection, to which Professor Rubenstein's declaration responds, the Rubenstein declaration was not even served on me. Rubenstein's new declaration provides foundational evidence for Class Counsel's fee request long after the relevant deadlines: "I provide the Court with empirical data which would enable it to find that Class Counsel's proposed billing rates are reasonable." DE160-2:¶1.

Rubenstein's analysis not only comes too late, it is plainly unreliable.

Deconstructing Fitzpatrick's Matrix, Professor Rubenstein says that "[t]he 8 class actions" the Fitzpatrick Matrix includes "had, on average, more than 12 times as many docket entries as the non-class action cases." DE160-2:2¶1. He fails to observe that this makes them a poor comparison for this case, in which the docket entries totaled only 141 with the filing of the Settling Parties' proposed Settlement on October 11, 2022. DE141. According to Rubenstein, the great majority of the cases in the Fitzpatrick Matrix are inapposite, because "in the 74 non-class action cases, the mean" number of docket entries "is 100 entries per case." DE160-2:15-16¶21. "By contrast," Rubenstein says, "the average number of docket entries in the 8 class action cases is 1,207, with the median at 884." DE160-2:16¶21. It should be clear, however, that this case—with around 160 docket entries—is much closer to the relatively simple cases that Rubenstein contends warrant lower attorney's fees, than it is to the class actions that Rubenstein contends warranted higher fees.

"Most importantly," Rubenstein adds, the hourly rates in the Matrix's 8 class action cases were roughly 44% higher than the hourly rates in its non-class action cases." DE160-2. Rubenstein does not, however, explain why class members should have to pay so much more. If anything, Rubenstein's presentation suggests that class-action lawyers are systematically overpaid. Yet Rubenstein contends that Class Counsel in this case should receive nearly ten percent more than do counsel in other, genuinely complex, large-fund class actions: "Class Counsel's trend line is on average 9.3% above the trend line for rates in fee petitions approved in other large fund class actions." DE160-2:13-14¶18.

The cases that Rubenstein selects as comparators are obviously inapposite. In *Cobdell v. Salazar,* for example, the district court conducted a full bench trial, and the Final Order Approving Settlement was docket entry 3850. *Cobell v. Jewell,* 234 F. Supp. 3d 126, 130 (D.D.C. 2017), *aff'd sub nom. Cobell v. Zinke,* 741 F.App'x 811 (D.C. Cir. 2018). In *Mercier v United States,* Fed.Cl. No. 1:12-cv-00920, moreover, the plaintiffs' lawyers achieved a far better result than the meagre 25% recovery in this case: "The Gross Settlement Fund of $160,000,000, according to Plaintiffs' damages expert, represents slightly more than 65% of the maximum amount Plaintiffs could have recovered if they had prevailed at trial." *Mercier v. United States,* 156 Fed.Cl. 580, 584 (2021).

Plaintiffs' expert in *Mercier,* Brian T. Fitzpatrick, recommended a 30% fee award, but the Court of Claims concluded that was far too much: "An award of 30% ... yields a windfall to counsel, is not necessary to attract competent counsel to similar cases, and would necessarily be at the expense of the class members." *Mercier v. United States,* 156 Fed. Cl. 580, 592 (2021). The Court of Claims explained that "[t]he fees class counsel requests are approximately 4.4 times the estimated lodestar amount ($10,831,372)." *Id.* That was simply too much. *See id.* Thus, even the cases relied on by Professor Rubenstein demonstrate that the percentage fee award sought by Class Counsel in this case, producing a multiplier of four or 5.5 times their lodestar, amounts to an impermissible windfall.

The Supplemental Declaration of Brian T. Fitzpatrick, DE160-1, also was submitted on October 3, 2023, well after both the August 28, 2023, deadline this Court set for Class Counsel's attorney's fee application, and the September 12, 2023, deadline for submitting objections. Although I had submitted a timely objection, to which Professor Fitzpatrick's supplemental declaration responds, his supplemental declaration was not even served on me.

Remarkably, the untimely declaration signed by Professor Rubenstein attacks the reliability of Professor Fitzpatrick's methodology in constructing the Fitzpatrick Matrix, implicitly suggesting that Professor Fitzpatrick fits his conclusions to the desires of those who pay him. *See, e.g.,* DE160-2:19¶25&n.29. That is a practice with which Professor Rubenstein is very familiar. His treatise on class actions not so long ago recognized that incentive awards were created of "whole cloth," and that "incentive awards threaten to generate a conflict between the representative's own interests and those of the class she purports to represent." 5 William B. Rubenstein, *Newberg on Class Actions* §17:1 at 492 (5th ed. 2015). The Eleventh Circuit naturally quoted Rubenstein's treatise to strike down incentive awards as contrary to law: ""Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards.'" *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1259 (11th Cir. 2020)(quoting Rubenstein, *supra,* § 17:4.). But the class-action plaintiffs' lawyers who frequently pay him to submit favorable declarations complained, and Professor Rubenstein swiftly changed his tune—

submitting an amicus brief supporting en banc rehearing in *Johnson v. NPAS Solutions* that in effect repudiated his own treatise. Professor Rubenstein then rewrote the treatise to suit their ends. Compare 5 William B. Rubenstein, *Newberg on Class Actions* §17:1 at 492 (5th ed. 2015), attached as Exhibit A hereto, which is sensibly hostile to incentive awards, with Professor Rubenstein's amicus brief in *Johnson v. NPAS Solutions,* attached as Exhibit B hereto, and with the newly minted Sixth Edition of Rubenstein's treatise, now arguing for incentive awards.

In a similar vein, I doubt that Professor Fitzpatrick has ever come across a class-action plaintiffs' attorney's fee application that he would characterize as excessive. His position is well known. In one of his law-review articles, Fitzpatrick argues that "class action lawyers not only do not make too much, but actually make too little. Indeed, I argue that in perhaps the most common class action—the so-called 'small stakes' class action—it is hard to see, as a theoretical matter, why the lawyers should not receive everything and leave nothing for class members at all." Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?,* 158 U.Pa.L.Rev. 2043, 2044 (2010). Professor Fitzpatrick explains:

> I assert that we should not be concerned about compensating class members in small-stakes class actions and, instead, should be concerned only with fully incentivizing class action lawyers to bring as many cost-justified actions as possible. That is, the deterrence-insurance theory of civil litigation suggests that the optimal award of fees to class action lawyers in small-stakes actions is 100% of judgments. It is for this reason that I believe class action lawyers are not only not making too much, but, rather, making too little—far too little.

Fitzpatrick, *Do Class Action Lawyers Make Too Little?,* 158 U.Pa.L.Rev. at 2047. Professor Fitzpatrick writes that "even if judges cannot award 100% of settlements to class action lawyers due to political or legal constraints," he believes "they should award fee percentages as high as they can." Fitpatrick, *Do Class Action Lawyers Make Too Little?,* 158 U.Pa.L.Rev. at 2048.

With that, I respectfully submit, the Fitzpatrick and Rubenstein declarations should be rejected as biased, unreliable, and at odds with Rule 23 principles. To place reliance on their conclusions would be to breach this Court's fiduciary duty to the Class.

I also wish to express concerns about this Court's October 4, 2023, Order Setting Settlement Hearing Procedures, which was not served on me, but which I have downloaded from PACER. First, I note that the Order is structured to have settlement approval presented first, with objectors given only a brief opportunity to speak, with only the parties, and not the objectors, then given an opportunity to address attorney's fees. *See* DE162:2-3. This suggests that the Court regards settlement approval as a *fait accompli*. The assumption that objecting class members need not be heard on the subject of attorney's fees also ignores the fact that 2018 amendments to Rule 23(e) make the consideration of attorney's fees a critical element to be considered in connection with whether to approve a settlement in the first place. The current Rule 23(e)(2) says the Court may approve a class-action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether … (C) the relief provided for the class is adequate, taking into account … (iii) the terms of any proposed award of attorney's fees, including timing of payment." Fed.R.Civ.P. 23(e)(2)(C)(iii). Considering attorney's fees only after considering settlement approval, and excluding objectors from commenting in the portion of the hearing concerning attorney's fees, is inconsistent with Rule 23 itself, as well as with principles of fundamental due process.

Also of concern, the schedule in the October 4 Order appears to give objectors no opportunity to cross examine Class Counsel's expert witnesses, Professors Fitzpatrick and Rubenstein. If their opinions are not tested by cross examination, their declarations not only should be discounted as unreliable, they should be stricken as untested and inadmissible hearsay.

On whole, it does not appear that the proceedings are structured to comply with the due-process requirement that objectors receive a full opportunity to be heard. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985).

DATED: October 11, 2023          Respectfully submitted,

Eric Alan Isaacson

LAW OFFICE OF ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858)263-9581
Email: ericalanisaacson@icloud.com

EXHIBIT A

# NEWBERG

## ON CLASS ACTIONS

### FIFTH EDITION

**Volume 5**
**Chapters 15 to 17**

**William B. Rubenstein**

Sidley Austin Professor of Law
Harvard Law School



**THOMSON REUTERS™**

*For Customer Assistance Call 1-800-328-4880*

Mat #41621726

© 2015 Thomson Reuters

For authorization to photocopy, please contact the **Copyright Clearance Center** at 222 Rosewood Drive, Danvers, MA 01923, USA (978) 750-8400; fax (978) 646-8600 or **West's Copyright Services** at 610 Opperman Drive, Eagan, MN 55123, fax (651) 687-7551. Please outline the specific material involved, the number of copies you wish to distribute and the purpose or format of the use.

This publication was created to provide you with accurate and authoritative information concerning the subject matter covered; however, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

Nothing contained herein is intended or written to be used for the purposes of 1) avoiding penalties imposed under the federal Internal Revenue Code, or 2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Acknowledgment

I continue to be blessed by the assistance of remarkable Harvard Law students, without whom this Treatise endeavor would not be possible. Three graduating students—Todd Logan, Rachel Miller-Ziegler, and Shiyu (Vic) Xu, all Harvard Law School Class of 2015, a veritable "dream team" of research assistants—spent much of the spring of their 3L year helping me finish this volume, each contributing unique talents. Three rising 3Ls—Ephraim McDowell, Albert Rivero, and Ben Schwartz, all Harvard Law School Class of 2016 —continued to help in numerous ways throughout their 2L year. And two 1Ls—John Bailey and Mengjie Zou, Harvard Law School Class of 2017—spent portions of their 1L spring and summer helping me put the finishing touches on this volume. If all that were not blessing enough, Kyle Dandelet, Harvard Law School Class of 2010, came out of retirement to assist with the editing of Volume 5. Numerous other students undertook research and writing that is acknowledged throughout the volume.

Harvard Law School continues to support my scholarship with funding for research assistants and summer writing. I am grateful for that support, as well as for the continuing intellectual companionship of so many of my colleagues, but especially that of my Dean, Martha Minow, and colleagues Noah Feldman, Jerry Frug, and John Goldberg. Carol Bateson provides great support.

I remain grateful to my father, and to my friends Peter Eliasberg and Seana Shiffrin, who—without complaint—hear far more about class action law than life should require.

William B. Rubenstein
Cambridge, Massachusetts
July 2015

# Chapter 17

# Incentive Awards[*]

§ 17:1    Incentive awards—Generally
§ 17:2    History and nomenclature of incentive awards
§ 17:3    Rationale for incentive awards
§ 17:4    Legal basis for incentive awards
§ 17:5    Source of incentive awards
§ 17:6    Eligibility for incentive awards
§ 17:7    Frequency of incentive awards
§ 17:8    Size of incentive awards
§ 17:9    Judicial review—Generally
§ 17:10   —Timing of motion
§ 17:11   —Burden of proof
§ 17:12   —Documentation requirement
§ 17:13   —Standards of assessment
§ 17:14   —Disfavored practices—Generally
§ 17:15   — —Conditional awards
§ 17:16   — —Percentage-based awards
§ 17:17   — —*Ex ante* incentive award agreements
§ 17:18   — —Excessive awards
§ 17:19   Incentive awards in securities class actions under the PSLRA
§ 17:20   Incentive awards for objectors
§ 17:21   Appellate review of incentive awards

---

**KeyCite®:** Cases and other legal materials listed in KeyCite Scope can be researched through the KeyCite service on Westlaw®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

---

[*]Professor Rubenstein thanks Shiyu (Vic) Xu, Harvard Law School Class of 2015; Ephraim McDowell, Harvard Law School Class of 2016; and John Bailey and Mengjie Zou, Harvard Law School Class of 2017, for their help in editing this unit.

## § 17:1   Incentive awards—Generally

A class action lawsuit is a form of representative litigation—one or a few class members file suit on behalf of a class of absent class members and pursue the class's claims in the aggregate.[1] At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class.[2] Most courts call that payment an "incentive award," though some courts label it a "service award" or "case contribution award."[3] The names capture the sense that the payments aim to compensate class representatives for their service to the class and simultaneously serve to incentivize them to perform this function. Empirical evidence shows that incentive awards are now paid in most class suits and average between $10–15,000 per class representative.[4]

Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth, yet both judges—and Congress—have expressed concerns about them. The concerns center on the fact that incentive awards have the potential to interfere with a class representative's ability to perform her job adequately. That job is to safeguard the interests of the absent class members. But with the promise of a significant award upon settlement of a class suit, the representative might prioritize securing that payment over serving the class. Thus, incentive awards threaten to generate a conflict between the representative's own interests and those of the class she purports to represent.

Accordingly, the propriety of incentive awards to named

---

[Section 17:1]

[1]Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members . . .").

[2]Other class members may also be eligible for such awards. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[3]For a discussion of the history and nomenclature of incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[4]For a discussion of empirical data on the frequency and size incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 17:7 to § 17:8 (5th ed.).

plaintiffs has been rigorously debated[5] and the law concerning incentive awards is surprisingly nuanced. The following sections of the Treatise attempt to untangle the issues. They proceed to cover the following issues:

- the history and nomenclature of incentive awards;[6]
- the rational for incentive awards;[7]
- the legal basis for incentive awards;[8]
- the source of incentive awards;[9]
- the eligibility requirements for incentive awards;[10]
- the frequency[11] and size of incentive awards;[12]
- the judicial review process, including the timing of the motion;[13] the burden of proof;[14] documentation requirements;[15] standards by which courts assess proposed awards;[16] and disfavored practices with regard to incentive awards, including conditional incentive awards,[17] percentage-based incentive awards,[18] *ex ante* incentive awards agreements,[19] and excessive incentive awards;[20]
- the Private Securities Litigation Reform Act of 1995

---

[5]Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) (quoting **Newberg on Class Actions**).

Lane v. Page, 862 F. Supp. 2d 1182, 1237, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) (quoting **Newberg on Class Actions**).

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *6 (D.N.M. 2011) (quoting **Newberg on Class Actions**).

Estep v. Blackwell, 2006 WL 3469569, *6 (S.D. Ohio 2006) (quoting **Newberg on Class Actions**).

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[7]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[8]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[9]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:5 (5th ed.).

[10]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:7 (5th ed.).

[12]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:8 (5th ed.).

[13]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:10 (5th ed.).

[14]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:11 (5th ed.).

[15]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:12 (5th ed.).

[16]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[17]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:15 (5th ed.).

[18]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:16 (5th ed.).

[19]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:17 (5th ed.).

[20]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

(PSLRA)'s approach to incentive awards;[21]
- the availability of incentive awards for objectors;[22] and
- the process for appellate review of incentive awards.[23]

## § 17:2   History and nomenclature of incentive awards

Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth. The threads initially appear in the reported case law in the late 1980s:[1] a 1987 decision of a federal court in Philadelphia appears to be the first to employ the term "incentive award."[2] That court stated the following:

> In addition to the petition for attorneys fees, plaintiffs counsel have requested that the court award incentive payments to the named plaintiffs, in this litigation in excess of their recovery as class plaintiffs in recognition of their role as private attorneys general in this litigation. Counsel has indicated that the named plaintiffs . . . have helped to effectuate the policies underlying the federal securities laws by instituting this litigation, by monitoring the progress of the litigation and undertaking the other responsibilities attendant upon serving as class representatives. Plaintiffs brought to the attention of counsel the existence of facts which culminated in this law suit and have sought through counsel and obtained substantial compensation for the alleged injuries suffered as a result of the alleged wrongful acts of the defendants. Plaintiffs' counsel have provided numerous citations in this district, in this circuit and elsewhere, in which substantial incentive pay-

---

[21]See Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

[22]See Rubenstein, 5 **Newberg on Class Actions** § 17:20 (5th ed.).

[23]See Rubenstein, 5 **Newberg on Class Actions** § 17:21 (5th ed.).

**[Section 17:2]**

[1]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1310–11 (2006) ("Courts once tended to limit incentive awards to cases where the representative plaintiff had provided special services to the class—for example, providing financial or logistical support to the litigation or acting as an expert consultant. Beginning around 1990, however, awards for representative plaintiffs began to find readier acceptance . . . By the turn of the century, some considered these awards to be 'routine.' " (footnotes omitted) (quoting Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001))).

[2]Re Continental/Midlantic Shareholders Litigation, 1987 WL 16678 (E.D. Pa. 1987).

ments to named plaintiffs in securities class action cases have been made. I believe that such payments are appropriate in this case as well, and will award $10,000.00 payments to both named plaintiffs.[3]

This passage is remarkable in three regards. *First*, as noted, it is the first reference to incentive awards in the reported case law, yet the court states that counsel had provided "numerous citations . . . in which substantial incentive payments to named plaintiffs in securities class action cases have been made." This implies that a practice of incentive awards pre-dated courts' references to such awards. There are, in fact, smatterings of earlier cases providing special awards to plaintiffs without labeling them incentive awards.[4] *Second*, the $10,000 payment in 1987, when adjusted to 2002 dollars to accord with an empirical study on point, shows the award to be about $15,830, which the empirical study reports is almost precisely the average incentive award 15 years later.[5] *Third*, although labeling the payment an "incentive award," the rationale that the court employs speaks more to compensation than incentive, suggesting that the class representatives are being paid for their service to the class, not so as to ensure that class members will step forward in the future.

Perhaps for that reason, some courts refer to the awards as "service awards."[6] The first appearance of this term oc-

---

[3]Re Continental/Midlantic Shareholders Litigation, 1987 WL 16678, *4 (E.D. Pa. 1987).

[4]*See, e.g.,* Bryan v. Pittsburgh Plate Glass Co. (PPG Industries, Inc.), 59 F.R.D. 616, 617, 6 Fair Empl. Prac. Cas. (BNA) 925, 6 Empl. Prac. Dec. (CCH) P 8935 (W.D. Pa. 1973), judgment aff'd, 494 F.2d 799, 7 Fair Empl. Prac. Cas. (BNA) 822, 7 Empl. Prac. Dec. (CCH) P 9269 (3d Cir. 1974) (approving settlement that provided "special awards in the aggregate amount of $17,500 to those members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class").

[5]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1308 (2006) (reporting average award per class representative is $15,992 in inflation adjusted 2002 dollars).

For a discussion of how the magnitude of incentive awards has varied over time, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:8 (5th ed.).

[6]Viafara v. MCIZ Corp., 2014 WL 1777438, *16 (S.D.N.Y. 2014) ("Ser-

curs around 2002[7] and there are about 250 uses of it in federal case law thereafter,[8] though only one by an appellate court.[9] By contrast, about 1,000 district and appellate decisions employ the term "incentive award."[10] The courts appear to utilize the terms interchangeably.

Other courts refer to incentive awards as "case contribution awards."[11] The first case utilizing this term in the reported case law is a 2003 decision of the United States District Court for the Northern District of California. Therein, the court stated that:

> In order to compensate Class Representatives for their time and efforts with respect to this Action, the Class Representatives . . . hereby are awarded Case Contribution Compensation in the amount of $2,000 each, to be paid from the Settlement Fund.[12]

No court employed the case contribution locution again for

---

vice awards are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs.").

[7]In re Sorbates Direct Purchaser Antitrust Litigation, 2002 WL 31165591, *3 (N.D. Cal. 2002) ("Service awards to Class Representatives Nutri-Shield, Inc., Ohio Chemical Services, Inc., Chem/Serv, Inc., Universal Preservachem, Inc., Kraft Chemical Company Nutrishield etc. in the amount of $7,500 each shall be paid from the Settlement Funds.").

[8]A Westlaw search in the federal courts database for <adv: "service award!" /p ("class representative!" or "named plaintiff!")> returned 258 cases on June 1, 2015.

[9]Rodriguez v. National City Bank, 726 F.3d 372, 375, 86 Fed. R. Serv. 3d 414 (3d Cir. 2013) (noting that "the [settlement] agreement provided a service award of $7,500 to each of the named plaintiffs, $200 to each class payee, $75,000 to two organizations that would provide counseling and other services to the settlement class, and $2,100,000 in attorneys' fees").

[10]A Westlaw search in the federal courts database for <adv: "incentive award!" /p ("class representative!" or "named plaintiff!")> returned 930 cases on June 1, 2015.

[11]Joseph v. Bureau of Nat. Affairs, Inc., 2014 WL 5471125, *4 (E.D. Va. 2014) ("The Court finds that Case Contribution Awards of $5,000.00 each to Class Representatives . . . are just and reasonable, and fairly account for their contributions to the pursuit of this Action on behalf of the Settlement Class.").

[12]In re Providian Financial Corp., 2003 WL 22005019, *3 (N.D. Cal. 2003).

three years[13] and indeed that form is less often utilized than the phrase "incentive award." There are about 40 reported cases using a "case contribution" phrase[14] (again compared to close to 1,000 cases employing the term "incentive award") and no appellate court decisions utilizing that term. The courts appear to utilize the terms "incentive awards" and "case contribution awards" interchangeably, with no apparent difference in courts' treatment of the concept based on the utilization of one term or the other.

## § 17:3 Rationale for incentive awards

At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class.[1] Most courts call that payment an "incentive award," though some courts label it a "service award" or "case contribution award."[2] The names capture the sense that the payments aim to compensate class representatives for their service to the class and simultaneously serve to incentivize them to perform this function. Incentive awards for class representatives seem problematic because they appear to treat the class representative differently than the other members of the class. This is a problem for class action law because, generally speaking, a class representative is not entitled to be treated differently than any other class member in the settlement of the class suit.[3] As the Ninth Circuit explained in the context of a settlement that awarded

---

[13]In re Westar Energy, Inc. Erisa Litigation, 2006 WL 6909134, *4 (D. Kan. 2006) ("Each of the Named Plaintiffs is also awarded $1,000.00 for their case contribution.").

In re ADC Telecommunications ERISA Litigation, 2006 WL 6617080, *3 (D. Minn. 2006) (preliminarily approving proposed class action settlement that proposed "payment of the Named Plaintiffs' Case Contribution Compensation").

[14]A Westlaw search in the federal courts database for <adv: "case contribution" /p ("class representative!" or "named plaintiff!")> returned 39 cases on June 1, 2015.

**[Section 17:3]**

[1]Other class members may also be eligible for such awards. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[2]For a discussion of the history and nomenclature of incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[3]Indeed, a class can only be certified if the class representative's claims are typical of those of the rest of the class. Fed. R. Civ. P. 23(a)(3).

some present plaintiffs more money than most absent class members:

> [S]pecial rewards for [class] counsel's individual clients are not permissible when the case is pursued as a class action. . . . [W]hen a person joins in bringing an action as a class action he has disclaimed any right to a preferred position in the settlement. Were that not the case, there would be considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations.[4]

Courts fear that a class representative can be induced by a special payment to sell out the class's interests.[5] Such payments are therefore suspect and the suspicion is sometimes policed by ensuring that the class representative's remuneration from the settlement is the same as that of other class

---

[4]Staton v. Boeing Co., 327 F.3d 938, 976, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (citation omitted) (internal quotation marks omitted).

[5]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("[W]e have expressed a 'sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'" (quoting Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003))).

Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) ("Yet applications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." (citing **Newberg on Class Actions**))).

In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116, 120 (E.D. Pa. 1994) (characterizing class representatives as "fiduciaries" of absent class members and stating that "[t]his fiduciary status introduces concerns about whether the payment of any 'awards' can be reconciled with the punctilio of fairness the fiduciary owes to the beneficiary").

Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720, Fed. Sec. L. Rep. (CCH) P 94403 (E.D.N.Y. 1989) ("A class representative is a fiduciary to the class. If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

Women's Committee For Equal Employment Opportunity (WC=EO) v. National Broadcasting Co., 76 F.R.D. 173, 180, 19 Fair Empl. Prac. Cas. (BNA) 1703, 15 Empl. Prac. Dec. (CCH) P 7832, 24 Fed. R. Serv. 2d 359 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

members.[6]

Given this emphasis, it is somewhat surprising that incentive awards have proliferated. The Sixth Circuit has observed that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design."[7] Yet courts have, in fact, given some attention to the rationale for incentive awards, noting that they work "[1] to compensate class representatives for work done on behalf of the class, [2] to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, [3] to recognize their willingness to act as a private attorney general."[8] Many courts have also noted a fourth rationale for incentive payments: that such payments do precisely what their name hopes they will—incentivize class members to step forward on behalf of the class. Courts regularly reference these four rationales behind incentive awards.

*Compensation.* Most courts state that an incentive award to the class representatives is meant to compensate those entities for the service that they provided to the class.[9] Generally, these services are the time and effort the class representatives invest in the case. Class representatives

---

[6]Lane v. Page, 862 F. Supp. 2d 1182, 1238, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) ("Courts 'have denied preferential allocation on the grounds that the named plaintiff may be tempted to settle an action to the detriment of the class or come to expect a 'bounty' for bringing suit.'" (quoting **Newberg on Class Actions**)).

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *8 (D.N.M. 2011) (quoting **Newberg on Class Actions**) (same).

[7]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013).

[8]Rodriguez v. West Publishing Corp., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (numbers added).

*See also* Sullivan v. DB Investments, Inc., 667 F.3d 273, 333, 2011-2 Trade Cas. (CCH) ¶ 77736, 81 Fed. R. Serv. 2d 580 (3d Cir. 2011) ("The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation and to reward the public service of contributing to the enforcement of mandatory laws." (citations omitted) (internal quotation marks omitted)).

[9]**First Circuit (District Court)**

Nilsen v. York County, 400 F. Supp. 2d 265 (D. Me. 2005) (approving "incentive awards to compensate the three class representatives and

seventeen class member who spent time working with class counsel to achieve the settlement").

**Second Circuit (District Court)**

In re American Intern. Group, Inc. Securities Litigation, 2012 WL 345509, *6 (S.D.N.Y. 2012) ("Courts . . . routinely award . . . costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." (citation omitted) (internal quotation marks omitted)).

**Third Circuit (District Court)**

In re Schering-Plough Corp. Enhance Securities Litigation, 2013 WL 5505744, *37 (D.N.J. 2013), appeal dismissed, (3rd Circ. 13-4328) (Apr. 17, 2014) ("Reasonable payments to compensate class representatives for the time and effort devoted by them have been approved.").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) ("The Court will compensate the class representatives for the time they spent on matters connected to the litigation in this case.").

Pozzi v. Smith, 952 F. Supp. 218, 227, Fed. Sec. L. Rep. (CCH) P 99422 (E.D. Pa. 1997) (awarding class representative fee of $1,600 to compensate the class representative for her actual time and expenses).

Lake v. First Nationwide Bank, 900 F. Supp. 726, 737 (E.D. Pa. 1995) (awarding class representative fee of $500 to both class representatives to compensate them for their actual time and expenses).

**Fifth Circuit (District Court)**

Burford v. Cargill, Inc., 2012 WL 5471985, *6 (W.D. La. 2012) ("[T]he Court finds that each named Plaintiff is entitled to an enhancement award to compensate him or her for the time and effort expended in representing the settlement class during this action.").

Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 868, 52 Employee Benefits Cas. (BNA) 1427 (S.D. Tex. 2011) ("Incentive awards are discretionary and 'are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and sometimes to recognize their willingness to act as private attorney general.'" (quoting Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009))).

**Sixth Circuit (District Court)**

Swigart v. Fifth Third Bank, 2014 WL 3447947, *7 (S.D. Ohio 2014) ("The modest class representative award requests of $10,000 to each of the two Class Representatives have been tailored to compensate each Class Representative in proportion to his or her time and effort in prosecuting the claims asserted in this action.").

**Seventh Circuit**

Eubank v. Pella Corp., 753 F.3d 718, 723, 88 Fed. R. Serv. 3d 920 (7th Cir. 2014) (reversing the settlement approval but noting that the

_____

lower court "awarded [named plaintiffs] compensation (an 'incentive award,' as it is called) for their services to the class of either $5,000 or $10,000, depending on their role in the case. Saltzman, being the lead class representative, was slated to be a $10,000 recipient").

**Eighth Circuit (District Court)**

In re Zurn Pex Plumbing Products Liability Litigation, 2013 WL 716460, *2 (D. Minn. 2013) ("Service award payments are regularly made to compensate class representatives for their help to a class.").

Sauby v. City of Fargo, 2009 WL 2168942, *3 (D.N.D. 2009) ("Incentive awards serve to compensate class representatives for work done on behalf of the class.").

**Ninth Circuit**

In re Online DVD-Rental Antitrust Litigation, 779 F.3d 934, 943, 2015-1 Trade Cas. (CCH) ¶ 79083 (9th Cir. 2015) ("[I]ncentive awards that are intended to compensate class representatives for work undertaken on behalf of a class 'are fairly typical in class action cases.' " (quoting Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009))).

Rodriguez v. West Publishing Corp., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (stating that incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general").

**Tenth Circuit (District Court)**

Chieftain Royalty Co. v. Laredo Petroleum, Inc., 2015 WL 2254606, *4 (W.D. Okla. 2015) ("Case contribution awards are meant to 'compensate class representatives for their work on behalf of the class, which has benefited from their representation.' " (quoting In re Marsh ERISA Litigation, 265 F.R.D. 128, 150 (S.D.N.Y. 2010))).

**Eleventh Circuit (District Court)**

Burrows v. Purchasing Power, LLC, 2013 WL 10167232, *4 (S.D. Fla. 2013) ("[T]he Court finds that the Class Representative is not being treated differently than the Settlement Class members. Although the Class Representative seeks an incentive award, the incentive award is not to compensate the Class Representatives for damages but to reward him for his efforts on behalf of the Settlement Class.").

Morefield v. NoteWorld, LLC, 2012 WL 1355573, *4 (S.D. Ga. 2012) ("Service awards compensate class representatives for services provided and risks incurred during the class action litigation on behalf of other class members.").

**District of Columbia Circuit (District Court)**

Cobell v. Jewell, 29 F. Supp. 3d 18, 25 (D.D.C. 2014) ("[A]n incentive award is 'intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willing-

perform certain functions that arise in most cases, such as monitoring class counsel, being deposed by opposing counsel, keeping informed of the progress of the litigation, and serving as a client for purposes of approving any proposed settlement with the defendant.[10] Class representatives sometimes

---

ness to act as a private attorney general.' " (quoting Rodriguez v. West Publishing Corp., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009))).

[10]Lilly v. Jamba Juice Company, 2015 WL 2062858, *7 (N.D. Cal. 2015) (Granting incentive award because: "Named Plaintiffs have been substantially involved in the course of the litigation spanning two years. Plaintiff Lilly and Plaintiff Cox invested considerable time in the litigation and prepared for and gave deposition testimony. Plaintiff Cox took time off from work to participate in the litigation. Plaintiffs have also taken efforts to protect the interests of the class by discussing acceptable settlement terms with counsel.") (citations omitted).

Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 469, 58 Employee Benefits Cas. (BNA) 2084 (D. Md. 2014) ("In the final approval motion, Plaintiffs represent that this award is justified because each Named Plaintiff spent a considerable amount of time over the past four years contributing to the litigation and benefiting the class by reviewing the relevant documents; staying apprised of developments in the case and making themselves available to class counsel; providing class counsel extensive information and materials regarding their Plan investments; responding to Defendants' document requests; and reviewing and ultimately approving the terms of the settlement.").

Singleton v. Domino's Pizza, LLC, 976 F. Supp. 2d 665, 691 (D. Md. 2013) ("In the final approval motion, Plaintiffs represent that this award is justified because both Named Plaintiffs spent a considerable amount of time 'meeting and communicating with counsel, reviewing pleadings and correspondence, gathering documents' and participating in the mediation, all done in furtherance of the interests of the Settlement Classes.").

Heekin v. Anthem, Inc., 2012 WL 5878032, *1 (S.D. Ind. 2012), appeal dismissed, (7th Cir. 12-3786, 12-3871)(May 17, 2013) (approving award because class representatives "committed considerable time and effort over the seven years of litigation" and "[b]oth have conferred and participated with Class Counsel to make key litigation decisions, traveled to Indianapolis to attend hearings, and reviewed the Settlement to ensure it was a fair recovery for the Class") (citation omitted).

Been v. O.K. Industries, Inc., 2011 WL 4478766, *12 (E.D. Okla. 2011), report and recommendation adopted, 2011 WL 4475291 (E.D. Okla. 2011) ("The Court finds . . . that the five Class Representatives devoted substantial time and energy representing the interests of the Class . . . [Class Representative] testified that, for the nine years of litigation, each of the Class Representatives was actively involved in this case, including communicating with Class Counsel, communicating with Class Members, giving depositions, attending and representing the Class in settlement conferences, assisting with preparation for and attending trial, testifying

serve additional functions specific to the particular case.[11] In some cases, particularly securities cases litigated under the PSLRA which approach incentive awards in a distinct fashion,[12] courts have compensated class representatives directly for these services, for instance on an hourly basis,[13] but more

------

or being available to testify at trial, and continuously reviewing and commenting on copies of the filings made by the parties in this Court and in the Tenth Circuit.").

[11]In re Zurn Pex Plumbing Products Liability Litigation, 2013 WL 716460, *2 (D. Minn. 2013) ("The service payments sought under the settlement reflect the efforts by the class representatives to gather and communicate information to counsel and act as the public face of the litigation. The class representatives opened their homes up to inspection and testing, some of them more than once. Each assisted with the investigation and preparation of these suits, gathered documents for production, and helped class counsel.").

Burford v. Cargill, Inc., 2012 WL 5471985, *6 (W.D. La. 2012) ("Here, each plaintiff initially participated in telephone conferences with counsel, completed an intake questionnaire, discussed the questionnaire responses with counsel, and signed a contract of representation. As the litigation continued and as part of the discovery process, each plaintiff was required to fill out a detailed questionnaire regarding their use of Cargill feed and damages. To answer the two questions, plaintiffs were generally required to go through years of their business records. They were also required to produce hundreds of pages of records ranging from milk production records to tax returns. Therefore, the record supports enhancement awards in this case as all of the named Plaintiffs have provided valuable services to the class.") (citations omitted).

[12]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

[13]Ontiveros v. Zamora, 303 F.R.D. 356, 366 (E.D. Cal. 2014) ("The court finds that a downward departure from the award proposed by parties from $73.80 per hour to $50 per hour fairly compensates the named plaintiff for his time and incorporates an extra incentive to participate in litigation. Multiplying that rate by the 271 hours the named plaintiff spent on litigation, the court finds he would be entitled to an award of $13,550.").

In re Stock Exchanges Options Trading Antitrust Litigation, 2006 WL 3498590, *13 (S.D.N.Y. 2006) ("The Court will award these named plaintiffs $100 per hour they sat in deposition; those that did not even sit for deposition will receive no incentive . . .").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) ("Pursuant to the Court's request, class representative Frank Seidman has furnished the Court with an adequate accounting that the time he spent working on matters related to this litigation is approximately thirty-two hours. Based on the time records and the representations made by counsel as to the activities undertaken by Frank

often courts simply acknowledge these functions as serving as the basis for the incentive award.

*Risks.* Courts often premise incentive awards on the risks that the class representatives undertook in stepping forward to represent the class.[14] These risks are at least two-fold: in some circumstances, the class representative could be liable for the costs of the suit,[15] while in other circumstances, a class representative might face retaliation.[16] Where the risks are specific and substantial, courts may increase the incen-

---

Seidman on behalf of the class, the Court shall award him a class representative fee totaling $1280 (32 hours at a rate of $40.00 per hour) from the D & T settlement fund as compensation for the actual time which he spent on this litigation.").

[14]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235-36 (10th Cir. 2009) ("[A] class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class.").

Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 430, 2007-1 Trade Cas. (CCH) ¶ 75542 (2d Cir. 2007) ("The Court noted that incentive awards were related to the individual's personal risk and additional efforts to benefit the lawsuit.").

[15]Espenscheid v. DirectSat USA, LLC, 688 F.3d 872, 876–77, 19 Wage & Hour Cas. 2d (BNA) 798, 162 Lab. Cas. (CCH) P 36058 (7th Cir. 2012) ("And a class action plaintiff assumes a risk; should the suit fail, he may find himself liable for the defendant's costs or even, if the suit is held to have been frivolous, for the defendant's attorneys' fees. The incentive reward is designed to compensate him for bearing these risks, as well as for any time he spent sitting for depositions and otherwise participating in the litigation as any plaintiff must do. The plaintiff's duties are not onerous and the risk of incurring liability is small; a defendant is unlikely to seek a judgment against an individual of modest means (and how often are wealthy people the named plaintiffs in class action suits?). The incentive award therefore usually is modest—the median award is only $4,000 per class representative.") (citations omitted).

Fraley v. Facebook, Inc., 966 F. Supp. 2d 939, 947 n.13, 86 Fed. R. Serv. 3d 572 (N.D. Cal. 2013), appeal dismissed, (9th Circ. 13-17097)(Dec. 3, 2013) (finding incentive payments justified because, *inter alia*, "[t]he named plaintiffs here also at least theoretically were at risk of an attorney fee award being entered against them if Facebook prevailed, under the fee-shifting provisions of Civil Code § 3344").

[16]DeLeon v. Wells Fargo Bank, N.A., 2015 WL 2255394, *7 (S.D.N.Y. 2015) (approving $15,000 service award and noting that it, *inter alia,* "recognizes the risks that the named-Plaintiff faced by participating in a lawsuit against her former employer").

Parker v. Jekyll and Hyde Entertainment Holdings, L.L.C., 2010 WL 532960, *1 (S.D.N.Y. 2010) (approving $15,000 enhancement awards because, *inter alia*, "[A]s employees suing their current or former

tive award accordingly.[17]

*Private attorneys general*. Courts have often stated that class representatives perform a public function and may be rewarded accordingly. That function is to ensure enforcement of certain laws. As explained elsewhere in the Treatise,[18] one of the functions of the class action is to incentivize private parties to enforce certain laws such that the government is not required to undertake all law enforcement alone. Class action lawyers are often, therefore, labelled "private attorneys general."[19] But since class counsel need class representatives to pursue a class suit, courts have also dubbed the latter with the same moniker[20]—and acknowledged their public service through provision of an incentive

---

employer, the plaintiffs face the risk of retaliation. The current employees risk termination or some other adverse employment action, while former employees put in jeopardy their ability to depend on the employer for references in connection with future employment. The enhancement awards provide an incentive to seek enforcement of the law despite these dangers.").

Frank v. Eastman Kodak Co., 228 F.R.D. 174, 187 (W.D. N.Y. 2005) (recognizing that service awards are "particularly appropriate in the employment context" given the risk of retaliation by a current or former employer).

In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 276 (S.D. Ohio 1997), order rev'd on other grounds, 24 Fed. Appx. 520 (6th Cir. 2001) (noting in prison inmate case that "incentive awards are also justified upon the grounds that the class representatives have . . . assumed the risk of retaliation and/or threats by acting as leaders in an unpopular lawsuit").

[17]Been v. O.K. Industries, Inc., 2011 WL 4478766, *12–13 (E.D. Okla. 2011), report and recommendation adopted, 2011 WL 4475291 (E.D. Okla. 2011) (describing specific forms of retaliation class representatives suffered and justifying $100,000 award in part on this basis).

[18]*See* Rubenstein, 1 **Newberg on Class Actions** § 1:8 (5th ed.).

[19]Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 566, 130 S. Ct. 1662, 176 L. Ed. 2d 494, 109 Fair Empl. Prac. Cas. (BNA) 1, 93 Empl. Prac. Dec. (CCH) P 43877 (2010) ("The upshot is that the plaintiffs' attorneys did what the child advocate could not do: They initiated this lawsuit. They thereby assumed the role of 'a "private attorney general'" by filling an enforcement void in the State's own legal system, a function 'that Congress considered of the highest priority.'" (quoting Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263, 1 Empl. Prac. Dec. (CCH) P 9834 (1968) (per curiam))).

*See generally*, William B. Rubenstein, On What A "Private Attorney General" Is—And Why it Matters, 57 Vand. L. Rev. 2129 (2004).

[20]U.S. Parole Commission v. Geraghty, 445 U.S. 388, 100 S. Ct. 1202,

award.[21]

---

63 L. Ed. 2d 479, 29 Fed. R. Serv. 2d 20 (1980) ("[T]he Federal Rules of Civil Procedure give the proposed class representative the right to have a class certified if the requirements of the Rules are met. This 'right' is more analogous to the private attorney general concept than to the type of interest traditionally thought to satisfy the 'personal stake' requirement.").

Cameron-Grant v. Maxim Healthcare Services, Inc., 347 F.3d 1240, 1246, 9 Wage & Hour Cas. 2d (BNA) 1, 149 Lab. Cas. (CCH) P 34781, 57 Fed. R. Serv. 3d 69 (11th Cir. 2003) ("In essence, the named plaintiff who seeks to represent a class under Rule 23 acts in a role that is analogous to the private attorney general.") (internal quotation marks omitted).

*Cf.* Fox v. Vice, 131 S. Ct. 2205, 2213, 180 L. Ed. 2d 45, 94 Empl. Prac. Dec. (CCH) P 44197 (2011) (noting, in non-class suit that "[w]hen a plaintiff succeeds in remedying a civil rights violation . . . he serves 'as a "private attorney general," vindicating a policy that Congress considered of the highest priority' " (quoting Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263, 1 Empl. Prac. Dec. (CCH) P 9834 (1968) (per curiam))).

*Cf.* Fogerty v. Fantasy, Inc., 510 U.S. 517, 524, 114 S. Ct. 1023, 127 L. Ed. 2d 455, 29 U.S.P.Q.2d 1881 (1994) (noting, in non-class suit that "[o]ftentimes, in the civil rights context, impecunious 'private attorney general' plaintiffs can ill afford to litigate their claims against defendants with more resources").

*See generally*, Daniel J. Meltzer, Deterring Constitutional Violations By Law Enforcement Officials: Plaintiffs and Defendants as Private Attorneys General, 88 Colum. L. Rev. 247 (1988).

[21]In re Linerboard Antitrust Litigation, 2004-1 Trade Cas. (CCH) ¶ 74458, 2004 WL 1221350, *18 (E.D. Pa. 2004), order amended, 2004 WL 1240775 (E.D. Pa. 2004) (noting that incentive payments were "particularly appropriate in this case because there was no preceding governmental action alleging a conspiracy").

In re Cendant Corp., Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (stating that incentive "awards are granted to reward the public service performed by lead plaintiffs in contributing to the vitality and enforcement of securities laws").

In re Plastic Tableware Antitrust Litigation, 1995-2 Trade Cas. (CCH) ¶ 71192, 1995 WL 723175, *2 (E.D. Pa. 1995) (noting that class representative incentive payments "may also be treated as a reward for public service").

In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116, 121 (E.D. Pa. 1994) ("In securities class actions, incentive payments are also thought to encourage the enforcement of federal securities laws.").

In re SmithKline Beckman Corp. Securities Litigation, 751 F. Supp. 525, 535, Fed. Sec. L. Rep. (CCH) P 95,686 (E.D. Pa. 1990) ("[T]he Court agrees that special awards to the class representatives are appropriate. First, they have rendered a public service by contributing to the vitality of the federal Securities Acts. Private litigation aids effective enforcement of the securities laws because private plaintiffs prosecute violations that

*Incentives.* Courts have held that incentive awards are justified as a means for encouraging class members to step forward to represent the class. The Seventh Circuit stated in 1998 that: "[b]ecause a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit."[22] Courts in nearly every circuit have embraced the argument, often directly citing the Seventh Circuit's locution.[23] Typically, courts will simply identify this purpose

---

might otherwise go undetected due to the SEC's limited resources." (citation omitted) (internal quotation marks omitted).

[22]Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

[23]**First Circuit (District Court)**

Baptista v. Mutual of Omaha Ins. Co., 859 F. Supp. 2d 236, 244 (D.R.I. 2012) ("An incentive award to a named plaintiff 'can be appropriate to encourage or induce an individual to participate' in a class action." (quoting In re Puerto Rican Cabotage Antitrust Litigation, 815 F. Supp. 2d 448 (D.P.R. 2011))).

In re Puerto Rican Cabotage Antitrust Litigation, 815 F. Supp. 2d 448, 468 (D.P.R. 2011) (" 'Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit.' " (quoting In re Compact Disc Minimum Advertised Price Antitrust Litigation, 292 F. Supp. 2d 184, 189, 2004-1 Trade Cas. (CCH) ¶ 74293 (D. Me. 2003))).

**Fourth Circuit (District Court)**

Smith v. Toyota Motor Credit Corp., 2014 WL 4953751, *1 n.5 (D. Md. 2014) (" 'Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' " (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 468, 58 Employee Benefits Cas. (BNA) 2084 (D. Md. 2014) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

**Fifth Circuit (District Court)**

Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 869, 52 Employee Benefits Cas. (BNA) 1427 (S.D. Tex. 2011) ("Moreover, '[b]ecause a named plaintiff is an essential ingredient of any class action an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' " (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

**Sixth Circuit**

In re Dry Max Pampers Litigation, 724 F.3d 713, 723, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) (Cole, J., dissenting) ("Where claims are

in approving an incentive award. Occasionally, however, a court will attend to the full meaning of the Seventh Circuit's

---

worth very little, as in this case, even a recovery in the full amount may not be enough to induce anyone to serve as a named plaintiff.").

Bickel v. Sheriff of Whitley County, 2015 WL 1402018, *7 (N.D. Ind. 2015) ("Incentive awards are justified when necessary to induce individuals to become named representatives." (quoting In re Synthroid Marketing Litigation, 264 F.3d 712, 722, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001))).

**Seventh Circuit**

In re Synthroid Marketing Litigation, 264 F.3d 712, 722, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001) ("Incentive awards are justified when necessary to induce individuals to become named representatives.").

Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 410 (7th Cir. 2000) ("Incentive awards are appropriate if compensation would be necessary to induce an individual to become a named plaintiff in the suit.").

Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.").

**Eighth Circuit (District Court)**

Sauby v. City of Fargo, 2009 WL 2168942, *1 (D.N.D. 2009) ("Incentive awards are not intended to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action on behalf of others similarly situated.").

**Ninth Circuit (District Court)**

Barbosa v. MediCredit, Inc., 2015 WL 1966911, *9 (C.D. Cal. 2015) ("An incentive award is appropriate 'if it is necessary to induce an individual to participate in the suit.'" (quoting In re Cellphone Fee Termination Cases, 186 Cal. App. 4th 1380, 1394, 113 Cal. Rptr. 3d 510 (1st Dist. 2010), as modified, (July 27, 2010))).

In re Toys R Us-Delaware, Inc.—Fair and Accurate Credit Transactions Act (FACTA) Litigation, 295 F.R.D. 438, 470, 87 Fed. R. Serv. 3d 968 (C.D. Cal. 2014) ("[I]t is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions.").

**Tenth Circuit**

UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009) ("'Incentive awards [to class representatives] are justified when necessary to induce individuals to become named representatives,' but there is no need for such an award 'if at least one [class member] would have stepped forward without the lure of an incentive award.'" (quoting In re Synthroid Marketing Litigation, 264 F.3d 712, 722–23, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001))).

statement—that an award is appropriate *if* it is necessary to induce an individual to serve as a class representative—and in so doing, the court will scrutinize whether the incentive award truly induced the class representative's service.[24]

Incentive awards surely make it look as if the class representatives are being treated differently than other class members, but the justifications for the awards help illuminate the fact that the class representatives are not similarly situated to other class members. They have typically done something the absent class members have not—

O'Brien v. Airport Concessions, Inc., 2015 WL 232191, *6 (D. Colo. 2015) ("The Court agrees that some award would be necessary to incentivize a plaintiff to come forward on behalf of the class in this case, and that the class has benefitted from his actions.").

Fankhouser v. XTO Energy, Inc., 2012 WL 4867715, *3 (W.D. Okla. 2012) ("Counsel also seek incentive awards for the named class representatives . . . Such awards 'are justified when necessary to induce individuals to become named representatives,' but there is no need for such an award 'if at least one [class member] would have stepped forward without the lure of an 'incentive award.'" (quoting In re Synthroid Marketing Litigation, 264 F.3d 712, 722–23, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001))).

In re Motor Fuel Temperature Sales Practices Litigation, 271 F.R.D. 263, 293 (D. Kan. 2010) ("Courts have found that incentive awards to class representatives are justified if necessary to induce individuals to become named representatives, or to compensate them for personal risk incurred or additional effort and expertise provided for the benefit of the class.").

Droegemueller v. Petroleum Development Corp., 2009 WL 961539, *5 (D. Colo. 2009) ("Numerous courts have recognized that incentive awards are an efficient and productive way of encouraging members of a class to become class representatives, and in rewarding individual efforts taken on behalf of the class.").

[24]Fouks v. Red Wing Hotel Corp., 2013 WL 6169209, *2 (D. Minn. 2013) ("Plaintiffs quote, but fail to satisfy, the prerequisite expressed in those cases that 'an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' . . . Here, Plaintiffs have put forth no evidence or argument that persuades the Court that they required any enticement beyond their potential statutory recovery to bring this case, or that their actions in prosecuting it are deserving of a reward." (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Kinder v. Dearborn Federal Sav. Bank, 2013 WL 879301, *3 (E.D. Mich. 2013) ("[Plaintiff] has not provided evidence of these or any other factors the court should consider with respect to an incentive award. Moreover, in light of [plaintiff's] pursuit of several of these types of cases, the court finds that no additional incentive is necessary beyond the $100 in statutory damages already awarded.").

stepped forward and worked on behalf of the class—and thus to award them only the same recovery as the other class members risks disadvantaging the class representatives by treating these dissimilarly-situated individuals as if they were similarly-situated to other class members. In other words, incentive awards may be necessary to ensure that class representatives are treated equally to other class members, rewarded both for the value of their claims (like all other class members) but also for their unique service to the class.[25]

While the central cost of incentive awards is the risk that the class representative's interests will diverge from or conflict with those of the class, courts have addressed a host of other problems that arise in the implementation of incentive awards. These are discussed elsewhere in this unit of the Treatise.[26]

## § 17:4   Legal basis for incentive awards

It might be most apt to leave this section of the Treatise blank as Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth. In doing so, courts have explained the rationale for incentive awards, as discussed in the preceding section;[1] but few courts have paused to consider the legal authority for incentive awards. The Sixth Circuit's observation that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design"[2] therefore accurately describes the judiciary's attention to the legal basis

---

[25]In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *4 (S.D.N.Y. 2007).

See also Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("A balance must be struck so that a class representative does not view his prospect for rewards as materially different from other members of the class, yet is not disadvantaged by his service in pursuing worthy claims.").

[26]See Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

**[Section 17:4]**

[1]See Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[2]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R.

for making incentive awards.

There are only a few scattered references in the reported case law to the legal basis for incentive awards, with no court addressing the question head on. The few references that exist suggest that courts generally treat incentive awards as somewhat analogous to attorney's fee awards. In common fund cases, the presence of a fund under the court's supervision serves as both the source of the award and, in a sense, as the source of authority for an award.[3] In fee-shifting cases, courts must look to the underlying statute for authority to tax a defendant for an incentive award.[4] Because no statutes do authorize such awards, incentive awards are rare in fee-shifting cases, absent a defendant's agreement to pay such awards.

On the common fund side, restitution supports a *fee* award: if the class representative alone is responsible for paying for class counsel's services, the other class members are unjustly enriched by virtue of receiving the benefit of their services without paying for them; or, if class counsel is not compensated, they will not have realized the fair value of their services.[5] The argument for an incentive award proceeds by analogy: if the class representative provides a service to the class without the class paying for it, the class members will be unjustly enriched by virtue of receiving these services for free, and/or the class representatives are not realizing the full value of their services.[6] This analogy is not quite right, however. The basic rule of unjust enrich-

---

Serv. 3d 216 (6th Cir. 2013).

[3]For a discussion of common fund fee awards, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 15:53 to 15:107 (5th ed.).

[4]For a discussion of statutory fee-shifting, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 15:25 to 15:52 (5th ed.).

[5]For a discussion of the rationale for common fund fee awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:53 (5th ed.).

[6]In re Linerboard Antitrust Litigation, 2004-1 Trade Cas. (CCH) ¶ 74458, 2004 WL 1221350, *18 (E.D. Pa. 2004), order amended, 2004 WL 1240775 (E.D. Pa. 2004) ("Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly.").

In re Plastic Tableware Antitrust Litigation, 1995-2 Trade Cas. (CCH) ¶ 71192, 1995 WL 723175, *2 (E.D. Pa. 1995) ("Payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court. They may also be treated as a reward for

ment is that a person's unsought provision of services generates no entitlement to payment; the common fund fee award is an exception to that rule but an exception typically justified by the fact that class counsel are providing professional (legal) services to the class.[7] Because the class representative is not providing professional services, her situation is best captured not by the exception for attorney's fees but by Judge Posner's summary of the basic rule of unjust enrichment: "If you dive into a lake and save a drowning person, you are entitled to no fee."[8]

A few courts have considered the possibility that incentive payments to the class representatives might be conceptualized as a "cost" or "expense" of the lawsuit that class counsel are entitled to pass on to the class.[9] The Seventh Circuit has speculated that: "Since without a named plaintiff there can be no class action, such compensation as may be necessary to induce [the class representative] to participate in the suit

---

public service and for the conferring of a benefit on the entire class." (citation omitted)).

Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1313 (2006) ("From a doctrinal perspective, incentive awards have been justified as a form of restitution for a benefit conferred on others." (citing Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992))).

[7]Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992) (distinguishing right to fees from right to incentive awards in noting that "the law of restitution (excepting salvage in admiralty) generally confines the right to restitution to professionals, such as doctors and lawyers" (citing 2 George E. Palmer, The Law of Restitution, ch. 10 (1978))).

In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116, 122 (E.D. Pa. 1994) ("We agree with Judge Posner that we cannot equate these investors with professionals 'such as doctors and lawyers.' The value of doctors' and lawyers' contributions are subject to readily available and objective benchmarks of reasonableness that the market supplies a court. No such objective referent exists for 10b-5 heroes. They are therefore not entitled to fees for lay service considerably less dangerous than diving into a lake to save a drowning victim." (discussing Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992))).

[8]Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992).

[9]For a discussion of recoverable costs in class action cases, see Rubenstein, 5 **Newberg on Class Actions** §§ 16:1 to 16:11 (5th ed.).

could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable."[10] The Ninth Circuit suggested that any active class members' actual expenses might be compensated as costs and/or that services rendered to class counsel might be re-paid by class counsel.[11] But the Sixth Circuit, in a decision interpreting the word "expenses" in a settlement agreement, stated:

> Incentive awards, moreover, do not fit comfortably within the commonly accepted meaning of "expenses." Webster's Third New International Dictionary (1981) defines an expense as, alternatively, "something that is expended in order to secure a benefit or bring about a result;" "the financial burden involved typically in a course of action or manner of living;" "the charges that are incurred by an employee in connection with the performance of his duties and that typically include transportation, meals, and lodging while traveling;" "an item of outlay incurred in the operation of a business enterprise allocable to and chargeable against revenue for a specific period;" and "loss, injury, or detriment as the necessary price of something gained or as the inevitable result or penalty of an action." The idea common to these definitions is that of a pecuniary cost or necessary price.

> Under the facts of this case, at least, incentive awards bestowed on class representatives as a matter of grace after the

---

[10]Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992); *see also* Tiffany v. Hometown Buffet, Inc., 2005 WL 991982, *3 (N.D. Cal. 2005) (holding potential incentive payments not part of amount-in-controversy for jurisdictional purposes because jurisdictional inquiry looks only at "claims for special and general damages, attorneys' fees and punitive damages" and incentive payments "do not fall within any of these four categories" but "are more analogous to costs, which are excluded from the calculation of the amount in controversy" (citing Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992) (incentive payments to the class representative "could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable"))).

[11]Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (stating, in the context of denying incentive payments to group of non-class representatives, that "class members can certainly be repaid from any cost allotment for their substantiated litigation expenses, and identifiable services rendered to the class directly under the supervision of class counsel can be reimbursed as well from the fees awarded to the attorneys").

completion of the representatives' services do not constitute the "necessary price" of such services. Neither do the awards cover pecuniary costs. The district court justified the awards not on the basis of any monetary expenditures made by the named plaintiffs, but on the basis of these plaintiffs' non-pecuniary risks and their long-time leadership roles and communication functions. At oral argument, similarly, plaintiffs' counsel pointed to the valuable public service these men were said to have provided in lowering the risk of a recurrence of rioting at the Southern Ohio Correctional Facility. It does not seem to us that rewarding such a service with a cash payment can properly be equated with the reimbursement of "expenses" in any traditional sense of the word.[12]

Each of these three circuit decisions only touched upon the topic of incentive awards and none generated a legal basis supporting—or rejecting—incentive awards in common fund cases.

On the fee-shifting side, at least one court has held that there is no statutory basis for such an award (under Nevada fee-shifting law);[13] there are, however, scattered reports of defendants being ordered to pay incentive awards in fee-shifting cases.[14] More often, defendants may agree to pay such awards in settling fee-shifting cases and courts have

---

[12]In re Southern Ohio Correctional Facility, 24 Fed. Appx. 520, 528-29 (6th Cir. 2001).

[13]Sobel v. Hertz Corp., 53 F. Supp. 3d 1319, 1332 (D. Nev. 2014) (finding incentive awards appropriate but finding no authority to shift cost to defendant under applicable state statute, which provided for equitable relief and for the prevailing party to recover "reasonable attorney's fees and costs," since that provision "most assuredly does not encompass the requested incentive awards," but granting request "to be paid out of the common fund").

[14]Karraker v. Rent-A-Center, Inc., 492 F.3d 896, 899–900, 19 A.D. Cas. (BNA) 737 (7th Cir. 2007) (noting, in context of ascertaining prevailing party status for purposes of fee-shifting entitlement, that court approved $5,000 incentive award to named plaintiff and because "there is no settlement fund . . . the $5,000 is a direct payment from [defendant] to [plaintiff]").

Sauby v. City of Fargo, 2009 WL 2168942, *4 (D.N.D. 2009) ("It is neither improper for the class representatives to receive an award of a different amount as compared to other class members, nor does the Court find it would be improper to require the City to bear the burden of paying the incentive awards. The City's request for a pro rata reduction in each class member's refund improperly shifts the burden and unduly complicates the settlement. Consequently, the Court finds the City is to pay the incentive award from the $1.5 million common fund, with no correspond-

then approved the payments in providing general approval to the settlement itself;[15] consistently, when the settlement agreement does not so provide, courts have rejected requests for incentive awards on that basis.[16] Summarizing this situation, the Sixth Circuit stated in 2003:

> [I]ncentive awards are usually viewed as extensions of the common-fund doctrine, a doctrine that holds that a litigant who recovers a common fund for the benefit of persons other than himself is entitled to recover some of his litigation expenses from the fund as a whole . . . Without a common fund, however, there is no place from which to draw an incentive award. Unsurprisingly, we are unable to find any case where a claim for an incentive award that is not authorized in a settlement agreement has been granted in the absence of a common fund.
>
> Here there is neither authorization in the consent decree for this incentive award nor a common fund from which it could be drawn. As a result, it is plainly inappropriate to grant an incentive award . . . Forcing the defendants to pay the incentive award is certainly an additional expenditure, and it is

---

ing reduction of the refunds to be provided to participating class members." (citations omitted)).

[15]Equal Rights Center v. Washington Metropolitan Area Transit Authority, 573 F. Supp. 2d 205, 210 (D.D.C. 2008) (reporting that defendant agreed to pay incentive awards (of $5,000 to named plaintiffs and $1,000 to class members who were deposed but not named in the complaint) as part of settlement agreement in fee-shifting case brought under 42 U.S.C. § 1983).

Bynum v. District of Columbia, 412 F. Supp. 2d 73, 80–81 (D.D.C. 2006) (reporting that defendant agreed to pay incentive awards (totaling $200,000) as part of settlement agreement in fee-shifting case brought under 42 U.S.C. § 1983).

FitFitzgerald v. City of Los Angeles, 2003 WL 25471424, *1–2 (C.D. Cal. 2003) (reporting that defendant agreed to pay incentive awards ($3,500 to named plaintiff and $3,500 to declarant for the damages class) as part of settlement agreement in fee-shifting case brought under 42 U.S.C. § 1983).

[16]In re Southern Ohio Correctional Facility, 24 Fed. Appx. 520, 522, 529 n.4 (6th Cir. 2001) (reversing award of incentive payments by defendant in non-common fund case because settlement agreement did not provide for them).

Estep v. Blackwell, 2006 WL 3469569, *7 (S.D. Ohio 2006) (denying incentive award because, in absence of common fund, payment would have to come from defendant and settlement agreement did not provide for defendant to make such a payment).

therefore impermissible.[17]

Given that incentive awards are relatively common in class action practice, their legal basis is surprisingly thin. However, as most class suits settle, the parties typically agree to pay the class representatives some incentive award. The only adversarial challenge to this would come from objectors. Absent class members are generally unlikely to object to such awards because even if they were successful, the money would simply remain in the common fund to be distributed to the class and the single member's share of it would be negligible.[18] These dynamics have created few occasions in which courts have been required to consider seriously the legal basis for paying the class representatives from the class's recovery.

## § 17:5   Source of incentive awards

As discussed in the preceding section of the Treatise,[1] the legal basis for incentive awards may vary depending on the fee structure of a class action. In common fund cases, fees are paid out of the common fund; in fee-shifting cases, fees are paid by the defendant. So too incentive awards, though occasionally courts have implied that incentive awards may be paid out of the attorney's fees or re-paid as recoverable costs.

*Common fund.* Courts have generally approved incentive awards that are withdrawn from the common fund at the conclusion of the common fund case. Taking incentive awards from the common fund means that the class members are paying the incentive awards.[2] This is consistent with one legal theory loosely underlying such awards, discussed in

---

[17]Hadix v. Johnson, 322 F.3d 895, 897–99, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003).

[18]*Cf.* Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 573–74 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992) (discussing the awarding of attorney's fees and noting that "[n]o class member objected either—but why should he have? His gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule. So the lawyers had no opponent in the district court and they have none here.").

**[Section 17:5]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157,

the prior section:[3] that class members would be unjustly enriched if they were able to secure the services of the class representatives at no cost.

*Defendant.* If a case does not create a common fund, the defendant may be required by a fee-shifting statute to pay a prevailing party's legal fees;[4] if such a case settles, the defendant will typically agree to pay class counsel's legal fees as part of the settlement. In such settlements, a defendant will often agree to pay the class representatives an incentive award, subject to court approval. In the absence of such an agreement, counsel would have to petition the court to order the defendant to pay the incentive awards. As discussed in the prior section of the Treatise,[5] there is no statutory basis for such an award and courts have rejected awards on that basis, although there are a few scattered reports of defendants being ordered to pay incentive awards in fee-shifting cases.

*Attorney's fees.* In some rare cases, courts have alluded to the idea that incentive awards may be are paid by class counsel out of their fees and expenses.[6] However, if counsel give a portion of their fees to their clients, the payment

---

1163 (9th Cir. 2013) ("In cases where the class receives a monetary settlement, the [incentive] awards are often taken from the class's recovery.").

Shane Group, Inc. v. Blue Cross Blue Shield of Michigan, 2015-1 Trade Cas. (CCH) ¶ 79151, 2015 WL 1498888, *18 (E.D. Mich. 2015) ("Payment of incentive awards to class representatives is a reasonable use of settlement funds." (citing Moulton v. U.S. Steel Corp., 581 F.3d 344, 351, 74 Fed. R. Serv. 3d 918 (6th Cir. 2009))).

[3]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[4]For a discussion of fee-shifting statutes, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 15:25 to 15:52 (5th ed.).

[5]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[6]In re Southern Ohio Correctional Facility, 24 Fed. Appx. 520, 532 n.4(6th Cir. 2001) (reversing a district court's approval of an incentive award and noting that court's "conclusion is in no way affected by the district court's stipulation that the incentive awards were to be deducted from the approximately $1.659 million already set aside for attorney fees and expenses").

In re Cendant Corp., Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) ("Lead Counsel seeks permission to make an incentive payment . . . out of the proposed attorneys' fees . . . An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.").

NEWBERG ON CLASS ACTIONS

would likely violate the ethical prohibition on a lawyer sharing a fee with a non-lawyer,[7] as well as the prohibition on a lawyer going into business with her client.[8] It would also create bad policy.[9]

---

In re Presidential Life Securities, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) ("Plaintiffs' counsels' request for permission to make incentive payments of $2,000 each to five of the individual class representatives is approved as set forth in the order. The matter of payments of incentives to the individual plaintiffs who acted as class representatives need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees awarded to plaintiffs' counsel. The interests of the class, of the public, and of the defendant are not directly affected.").

*Cf.* In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *7 (E.D. Tenn. 2010) (noting, in shareholder derivative suit, that requested incentive awards "would be paid out of the attorney's fees and expenses awarded to Plaintiffs' counsel," but discussing problems with that approach and then holding that "these considerations suggest that it is generally best for incentive awards to be paid out of a common fund or by defendants, rather than by plaintiffs' counsel").

[7]Model Rules of Professional Conduct (ABA), Rule 5.4(a) ("A lawyer or law firm shall not share legal fees with a nonlawyer . . .").

Campbell v. Fireside Thrift Co., 2004 WL 49708, *11 (Cal. App. 1st Dist. 2004), unpublished/noncitable (holding that "funding the incentive award by offsetting it against Class Counsel's fees would constitute sharing fees with a non-lawyer, which is prohibited by rule 1-320 of the State Bar Rules of Professional Conduct").

*But see* In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *8 (E.D. Tenn. 2010) (finding incentive award paid from attorney's fees inappropriate despite concluding that "there is no ethical concern" with such an arrangement because the "Tennessee Rules of Professional Conduct prohibit lawyers from sharing fees with nonlawyers except, *inter alia*, 'a lawyer may share a court-awarded fee with a client represented in the matter for which the fee was awarded' " (quoting Tenn. Sup. Ct. R. 8, RPC 5.4(a)(4))).

In re Presidential Life Securities, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (noting that when incentive awards were to be paid out of counsel's fees, the "sole reason for seeking judicial approval appears to be Code of Professional Responsibility DR 3-102 which bars splitting of legal fees with non-lawyers with exceptions not pertinent here" but approving award).

[8]Model Rules of Professional Conduct (ABA), Rule 1.8(a) ("A lawyer shall not enter into a business transaction with a client . . .").

[9]In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *8 (E.D. Tenn. 2010) ("The scarcity of incentive awards paid from counsel's fees may be indicative of their problematic nature. Because the incentive award will come directly from attorney's fees, Plaintiffs' counsel is asking for the opportunity to pay the named plaintiffs. This puts Plaintiffs'

*Expense.* To the extent that the incentive award is conceptualized as a litigation cost or expense, as a few courts have suggested,[10] then it could be recovered from the fund or the defendant according to any applicable costs provision.[11] That said, few courts regard such payments as recoverable costs.

## § 17:6 Eligibility for incentive awards

At the conclusion of a class action, the class representatives are eligible for incentive awards in recognition of their service to the class. The rationales for incentive awards, discussed in a preceding section,[1] are that the recipient should be compensated for the work she undertook for the class, for the risks she took in doing so, and for stepping forward to serve as a sort of "private attorney general." The tests courts apply in determining whether or not to approve a proposed incentive award, described in the succeeding section,[2] similarly focus on the services that the applicant

---

counsel in an unusual position, seeking to convince a court they should pay money. While the amount of money here ($10,000 total) is small relative to the total attorney's fees, it is still an expenditure, and therefore their own financial interest conflicts with the named plaintiffs. Plaintiffs' counsel has the most information about what involvement the named plaintiffs had; yet their description of the named plaintiffs' activities is skimpy. Furthermore, Defendants have no motivation to challenge Plaintiffs' counsel's assertions. In addition, paying plaintiffs could lead to professional plaintiffs. These considerations suggest that it is generally best for incentive awards to be paid out of a common fund or by defendants, rather than by plaintiffs' counsel.").

Campbell v. Fireside Thrift Co., 2004 WL 49708, *12 (Cal. App. 1st Dist. 2004), unpublished/noncitable ("[I]t also appears to us to present at least a potential conflict of interest for class counsel to negotiate the payment of an incentive award out of their own fees, because of the resulting divergence between their own interests, those of the class representative, and those of the class as a whole.").

[10]The expense rationale for an award is discussed in the preceding section of the Treatise. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[11]For a discussion of the recovery of nontaxable costs in class actions, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 16:5 to 16:10 (5th ed.).

**[Section 17:6]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[2]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

provided to the class.[3] Occasionally, these tests are framed in terms of whether the "class representative" provided these services to the class,[4] but the rationale—that a class member should be rewarded for her service to the class—can apply to a wider group of class members.

Thus, lawyers have sought incentive awards for at least four types of class members:

- *Class representatives* are those plaintiffs whom class counsel proposes, and a court appoints, to represent the class. These class representatives serve as the formal "client" on behalf of the class. As such, they are the class members most likely to undertake the tasks that justify an incentive award and hence are the primary beneficiaries of such awards.

- *Named plaintiffs* are those plaintiffs identified individually in the complaint, on whose behalf the case is initially lodged as a putative class action. Class counsel need not put forward all named plaintiffs, or only named plaintiffs, as proposed class representatives. And even if class counsel does propose that all of the named plaintiffs serve as class representatives, a court might approve some but not others. In many cases, however, the class representatives proposed by class counsel and approved by the court will be precisely (and only) those plaintiffs named in the complaint, meaning the two concepts will overlap completely. For that reason, courts often utilize the terms interchangeably, though in some circumstances, the two are not synonymous. Specifically, in some cases, a named plaintiff will not serve as a formal class representative, but by virtue of having

---

[3] *See, e.g.,* Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) (directing courts to consider "[1] the actions the plaintiff has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation").

[4] *See, e.g.,* Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995) (stating that in reviewing a proposed incentive award, a court should consider: "1) the risk to *the class representative* in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the *class representative*; 3) the amount of time and effort spent by the *class representative*; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the *class representative* as a result of the litigation") (emphasis added).

been named in the complaint, she may have undertaken some of the tasks that would make her eligible for an incentive award.[5]

- *Other class members* who are neither class representatives nor named plaintiffs might be eligible for incentive awards if they meaningfully participated in the litigation and conferred a benefit on the class. Typically, such awards may be paid to class members who, for example, were deposed by the defendant.[6] While any

---

[5]In re TFT-LCD (Flat Panel) Antitrust Litigation, 2013-1 Trade Cas. (CCH) ¶ 78318, 2013 WL 1365900, *17 (N.D. Cal. 2013), appeal dismissed, (9th Circ. 13-15929) (July 12, 2013) and appeal dismissed, (9th Circ. 13-15915) (June 12, 2014) and appeal dismissed, (9th Circ. 13-15916, 13-15930) (June 13, 2014) and appeal dismissed, (9th Circ. 13-15917) (June 13, 2014) ("The Court approves incentive awards of $15,000 to each of the 40 court-appointed class representatives, and $7,500 for each of eight additional named plaintiffs. The Court recognizes the contribution these class representatives and named plaintiffs made to this litigation and finds the amounts requested are reasonable in light of these contributions.").

*Cf.* Shames v. Hertz Corp., 2012-2 Trade Cas. (CCH) ¶ 78120, 2012 WL 5392159, *22 (S.D. Cal. 2012), appeal dismissed, (9th Circ. 12-57247) (Jan. 23, 2013) and appeal dismissed, (9th Circ. 12-57211, 12-57026) (July 16, 2013) and appeal dismissed, (9th Cir 12-27205) (Sept. 20, 2013) (approving incentive award for class representative but noting that second individual, "though a named plaintiff, has not been put forth as a class representative and does not seek an incentive award").

*But see* Mancini v. Ticketmaster, 2013 WL 3995269, *2 (C.D. Cal. 2013), appeal dismissed, (9th Cir. 13-56536) (Oct. 4, 2013) (denying incentive award to named plaintiffs who were not approved class representatives and finding the named plaintiffs' argument that they, like the class representatives, also "incurred risks of liability for defendants' costs, had little to personally gain from the litigation, and remained involved for many years, including producing documents, appearing for deposition and submitting declarations," unpersuasive).

[6]Shaw v. Interthinx, Inc., 2015 WL 1867861, *4 (D. Colo. 2015) (granting incentive awards where the "[n]amed Plaintiffs and Class Counsel request approval of $10,000 incentive awards to each of the five Named Plaintiffs and $2,500 incentive awards to each of the two Deposed Opt-in Plaintiffs—representing *in toto* less than 1% of the maximum value of the common fund, or .1667% for each Named Plaintiff and .04167% for each Deposed Opt-in Plaintiff").

Camp v. Progressive Corp., 2004 WL 2149079, *7 (E.D. La. 2004) (awarding $2,500 to non-representative class members who gave a deposition, and $1,000 to non-representative class members who were not deposed but who assisted in the preparation of discovery responses, in class action to recover unpaid wages under the FLSA).

class member may therefore be eligible for an incentive award based on her work on behalf of the class, courts are hesitant to provide awards to large groups of plaintiffs, even if active in the litigation, beyond the core group identified as class representatives (or named plaintiffs).[7]

- *Objectors.* Counsel who object to a class settlement might also seek an incentive award for the class member on whose behalf they lodged the objection. Specifically, any class member who does not opt out of the class may object to a proposed settlement or attorney fee award at the conclusion of the class suit.[8] In doing so, an objector may provide a service to the class and therefore be eligible for an incentive award. Objector incentive awards are considered in a separate section at the end of this unit of the Treatise.[9]

### § 17:7    Frequency of incentive awards

There are several studies that provide some limited empirical evidence concerning the frequency and size of incentive awards. One study, conducted by the Federal Judicial Center ("FJC"), examined class action terminations in four districts in the early 1990s, with some passing references to incentive awards.[1] The most comprehensive published study of incentive awards looked at 374 opinions in

---

[7]*See, e.g.,* Staton v. Boeing Co., 327 F.3d 938, 976, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (denying higher awards to "[t]he two hundred-odd IIRs who were not class representatives" partly because they "were not essential to the litigation, although they may have been helpful to it").

[8]The objection process is discussed in detail elsewhere in the Treatise. *See* Rubenstein, 4 **Newberg on Class Actions** §§ 13:20 to 13:37 (5th ed.).

[9]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:20 (5th ed.).

**[Section 17:7]**

[1]Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule (1996). A report on that study is published elsewhere. *See* Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996).

class action settlements published from 1993-2002.[2] The Treatise author's own database contains information on incentive awards in nearly 1,200 class actions resolved between 2006–2011.[3] These studies provide data on the frequency with which courts approve incentive awards.

The FJC study from the early 1990s reported that a "substantial minority of all certified, settled class actions in which the court approved a settlement included designated awards to the named class representatives."[4] Specifically, courts granted incentive awards in the four federal districts in 26% (E.D. Pa.), 46% (S.D. Fla.), 40% (N.D. Ill.), and 37% (N.D. Cal.) of all cases, for a total of awards in 44 of 126 cases, or 34.9%.[5] The comprehensive 10 year study found that 27.8% (104) of all 374 cases involved incentive awards.[6] The 1993–2002 study further broke down incentive award frequency by case type. The data show that incentive awards were most frequently granted in consumer credit (59.1%) and commercial cases (57.1%) and least frequently granted in mass tort (7.1%) and corporate cases (4.2%), while no awards were granted in six tax refund cases.[7]

The Treatise author's own data base suggests a remarkable shift in the frequency of class actions culminating in incentive awards, as presented in Table 1, below.

[2]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303 (2006).

[3]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[4]Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996).

[5]Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule* 120 fig.16 (1996).

[6]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1320 (2006).

[7]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1323 tbl.2 (2006).

## Table 1
## Empirical Data on Frequency of Incentive Awards

| Awards Granted | 1993–2002 Study[8] | 2006–2011 Study[9] |
|---|---|---|
| Antitrust | 35% | 79.4% |
| Civil Rights | 10.5% | 94.6% |
| Consumer | 33.3% | 93.4% |
| Employment- Discrimination | 46.2% | 75.0% |
| Employment—Wages/Benefits | 23.1% | 87.8% |
| Securities | 24.5% | 38.7% |
| TOTAL (all case types including types not included above) | 27.8% | 71.3% |

The more recent data suggest four interesting trends. *First*, while the 1993–2002 study found courts providing incentive awards in 27.8% of all cases, the 2006–2011 data show courts providing incentive awards in 71.3% of all cases. The frequency with which incentive awards are awarded therefore appears to have increased by 156% in recent years, with awards being provided in almost three quarters of all cases. *Second,* the increase occurs across case types, as set forth in Table 1, below. *Third,* securities cases remain those with the lowest percentage of award grants, which is consistent with the statutory framework of the PSLRA.[10] Nonetheless, it appears that some form of remuneration is paid to class representatives in about a third of securities cases. *Fourth,* while incentive awards have proliferated, they appear to have simultaneously become more modest; the size of incentive awards is discussed in the succeeding section of the

---

[8]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1323 tbl.2 (2006).

[9]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[10]For a discussion of incentive awards under the PSLRA, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

Treatise.[11]

The increased prevalence of incentive awards in our study was is so stunning, that we broke the data down among each of the six years of the study (2006–2011). Doing so demonstrated that the frequency of incentive awards increased across those years (but for a blip in the second year). Therefore, our conclusion that courts approved incentive awards in 71.3% of all cases between 2006–2011 masks the facts that courts approved awards in 69.6% and 62.8% of cases in the first two years (2006–2007) but in nearly 80% of all cases (78.6%) by 2011. These data are shown in Graph 1, below.

**Graph 1**
**Empirical Data on Frequency of Incentive Awards—2006–2011[12]**



---

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:8 (5th ed.).

[12]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

The increased frequency with which courts have provided incentive awards may be attributable to a combination of several factors. The earlier study went back to 1993, which was about when incentive awards began,[13] so it is not surprising that the practice would have been sparser in those years. As the practice increased, it is quite likely that class counsel sought incentive awards more often, not that courts *sua sponte* offered them more often. However, the dramatic change over time also suggests that courts showed little resistance to the increasing requests for such awards. Neither study provides data on the frequency with which requested awards are approved, rejected, or reduced; but the case law contains far more cases routinely approving awards than outright rejecting them.[14]

These newer data provide strong support for the conclusion that incentive awards are a quite common part of class action practice today.

## § 17:8    Size of incentive awards

There are several studies that provide some limited empirical evidence concerning the frequency and size of incentive awards. One study, conducted by the Federal Judicial Center ("FJC"), examined class action terminations in four districts in the early 1990s, with some passing references to incentive awards.[1] The most comprehensive published study of incentive awards themselves looked at 374

---

[13]On the history of incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[14]*See, e.g.,* In re Dry Max Pampers Litigation, 724 F.3d 713, 717, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("The district court entered its 'Final Approval Order and Final Judgment' later that afternoon [of the fairness hearing]. With the exception of a few typographical changes, the order was a verbatim copy of a proposed order [including incentive award provisions] that the parties had submitted to the court before the hearing. The order was conclusory, for the most part merely reciting the requirements of Rule 23 in stating that they were met. About Greenberg's objections, the order had nothing to say.").

**[Section 17:8]**

[1]Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule* (1996). A report on that study is published elsewhere. *See* Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the

opinions in class action settlements published from 1993–2002.[2] The author's own database contains information on incentive awards in approximately 1,200 class actions resolved between 2006–2011.[3] The studies provide data on the size of incentive awards.

The size of incentive awards can be viewed at the case level (total amount of incentive awards approved in the case) or at the individual level (amount per class representative), with data available on both average and median sizes. The FJC study from the early 1990s reported that the "median amounts of all awards to class representatives in the four districts were $7500 in E.D. Pa. and N.D. Ill., $12,000 in S.D. Fla., and $17,000 in N.D. Cal. . . . The median award per representative in three courts was under $3000 and in N.D. Cal. was $7560."[4] The data from the two more recent studies appear in Table 1 below.

Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996).

[2]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303 (2006).

[3]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[4]Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996). The larger version of this study shows these numbers to be $2,500 (E.D. Pa.), $2,583 (S.D. Fla.), $2,964 (N.D. Ill.). Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule* 121 (1996) (fig. 18).

### Table 1
### Empirical Data on Size of Incentive Awards

| | 1993–2002 Study[5] In 2002 $ | 2006–2011 Study[6] In 2002 $ | 2006–2011 Study[7] In 2011 $ |
|---|---|---|---|
| Median Total Incentive Award | $18,191 | $8,398 | $10,500 |
| Median per Plaintiff | $4,357 | $4,199 | $5,250 |
| Mean Total Incentive Award | $128,803 | $26,326 | $32,915 |
| Mean per Plaintiff | $15,992 | $9,355 | $11,697 |

The two studies show that the average award per plaintiff ranged from $9,355 (in 2002 dollars) in one study to $15,992 (in 2002 dollars) in the other, while the median award per plaintiff in both studies, adjusted to 2002 dollars, fell right between $4,000–$4,500. Both studies therefore show much higher means than medians, suggesting there are some cases in the study with extremely high rewards (driving the average much higher than the median).

This conclusion is supported by data from the 1993–2002 study that breaks down incentive award size by case type. The data show that the mean incentive award per representative was largest in employment discrimination cases ($69,850.20) and smallest in consumer credit cases ($1,326.30).[8] The employment discrimination numbers are far higher than the mean or median numbers, likely because the named plaintiffs in these cases are being rewarded for the risks of retaliation that they faced, as well as for their more routine services provided to the class.

It is difficult to draw any conclusions about trends—the

---

[5]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303, 1346, 1348 (2006).

[6]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[7]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[8]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303, 1333 tbl.5 (2006).

later study (from 2006–2011) had a slightly lower median award per plaintiff than the earlier data (1993–2002), and the later data also showed a 42% decrease in the mean award per plaintiff when all the data is adjusted to 2002 dollars (from $15,992 to $9,355). It is plausible that this decrease reflects a growing judicial unease with the practice of incentive awards and greater attention to their size. However, as discussed in the preceding section of the Treatise,[9] awards are far more common today than they were 15 years ago, suggesting that perhaps the proliferation of awards has simultaneously tempered their magnitude.

While the size of incentive awards vary from case to case, they may also vary within one case. As discussed in a succeeding section,[10] courts employ multifactor tests in reviewing proposed incentive awards; these factors focus the court on issues related to the class representatives' work on the case and the risks they encountered undertaking that work. Two class representatives within the same case might have undertaken different levels of work or encountered different levels of risk, hence justifying different levels of incentive awards.[11]

## §17:9  Judicial review—Generally

As Rule 23 does not explicitly authorize incentive awards for class representatives, there is neither a rule-based process for seeking judicial approval nor a rule-based standard governing the court's decision. Yet, as the awards are made in conjunction with a class action settlement—typically from the class's funds[1] and to the class's representatives[2]—there is no doubt that a court must approve of the disbursement.

---

[9]See Rubenstein, 5 **Newberg on Class Actions** § 17:7 (5th ed.).

[10]See Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[11]Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("A differential payment may be appropriate in order to make the class representative whole. The representative plaintiff may have lost wages, vacation time or commissions from sales because of time spent at depositions or other proceedings. A class representative who has been exposed to a demonstrable risk of employer retaliation or whose future employability has been impaired may be worthy of receiving an additional payment, lest others be dissuaded.") (citations omitted).

**[Section 17:9]**

[1]For a discussion of the source of incentive awards, see Rubenstein, 5

Five sets of issues arise in the judicial review process:

- When is a motion seeking approval of incentive awards brought forward?[3]
- What is the burden of proof the movant must meet to justify an incentive award?[4]
- What documentation is required?[5]
- What standards do courts apply in assessing the reasonableness of a proposed award?[6]
- What practices are disfavored?[7]

## § 17:10   Judicial review—Timing of motion

Incentive awards arise at the time of a proposed settlement of a class action. The parties typically include a provision for incentive awards in the negotiated settlement agreement. A court thus reviews the proposed award in conjunction with its preliminary review of the proposed settlement.[1] If preliminary approval is granted, notice of the proposed settlement is sent to the class and should include information about any proposed incentive award. The notice should specify the amount that class counsel intend to seek for the class representatives so that the class has that information when reviewing the settlement.[2] Class members have the opportunity to object to the proposed settlement, including the proposed incentive awards, both in writing and at the fairness hearing.[3] Class counsel will then move for final approval of the settlement and their fees, typically folding

---

**Newberg on Class Actions** § 17:5 (5th ed.).

[2]For a discussion of who is eligible to receive an incentive award, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[3]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:10 (5th ed.).

[4]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:11 (5th ed.).

[5]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:12 (5th ed.).

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[7]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

**[Section 17:10]**

[1]For a discussion of the preliminary approval process, *see* Rubenstein, 4 **Newberg on Class Actions** §§ 13:10 to 13:19 (5th ed.).

[2]For a discussion of the content of settlement and fee notice, *see* Rubenstein, 3 **Newberg on Class Actions** §§ 8:13 to 8:25 (5th ed.).

[3]For a discussion of the objection process, *see* Rubenstein, 4 **Newberg**

into those motions a request for final approval of the incentive award.[4] Following the fairness hearing, the court's decision granting or rejecting final approval of the settlement and fees typically also reviews the propriety of the proposed awards.

One interesting aspect of this process not discussed in the case law concerns when the class representatives should learn that class counsel and the defendant have negotiated a provision proposing incentive awards and the amount of the proposed awards. The class representative serves a particular function at the moment of a settlement proposal: she is asked to stand in for the absent class members and serve as a representative "client" assessing whether the relief obtained for the class is sufficient. Courts have accordingly expressed concern that the promise of a significant incentive award could persuade the class representative to agree to a settlement not otherwise beneficial to the class.[5] Even though the class representative's claim, like everyone else's, would be compromised at the level of the weak settlement, the size of the incentive award likely so dwarfs the marginal loss from the poor settlement to her personally that she has more reason to embrace the settlement than to resist it. A conflict of interest therefore exists.

Courts have expressed these concerns in policing the *availability* and *size* of incentive awards,[6] but they have not focused on the possibility of addressing the concerns through *process* requirements. When it comes to attorney's fees, it is generally accepted that class counsel and the defendant should not negotiate fees until the settlement terms themselves are in place. The goal of this approach is to ensure

---

**on Class Actions** §§ 13:20 to 13:37 (5th ed.).

[4]For a discussion of the final approval process, *see* Rubenstein, 4 **Newberg on Class Actions** §§ 13:39 to 13:61 (5th ed.).

[5]Lane v. Page, 862 F. Supp. 2d 1182, 1238, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) ("Courts 'have denied preferential allocation on the grounds that the named plaintiff may be tempted to settle an action to the detriment of the class or come to expect a 'bounty' for bringing suit.' " (quoting **Newberg on Class Actions**)).

The Treatise's coverage of the rationale supporting incentive awards examines these concerns in more detail. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[6]For a discussion of excessive incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

that a huge fee offer will not tempt class counsel to settle the class claims on the cheap. With fee discussions forestalled until a later time, they pose less of a threat to the purity of the settlement process. By analogy, the courts could insist that incentive awards not be discussed with (or dangled over) the class representatives until after class counsel has solicited their reactions to the proposed class settlement.[7]

## § 17:11   Judicial review—Burden of proof

The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable. At least three circuits have held that judicial review of incentive awards is searching:

- The Sixth Circuit has held that "applications for incentive awards are *scrutinized carefully* by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain."[1] A number of courts have employed this "scrutinized carefully" language when reviewing proposed incentive awards.[2]
- The Ninth Circuit has held that "district courts must be

---

[7]*See, e.g.*, Lee v. Enterprise Leasing Co.-West, 2015 WL 2345540, *11 (D. Nev. 2015) ("The Court finds that the requested incentive awards are reasonable and appropriate. Importantly, the incentive awards were negotiated after the parties agreed to a settlement to benefit the entire class, so they will not impact the recovery available to other class members.").

**[Section 17:11]**

[1]Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) (emphasis added) (citing **Newberg on Class Actions**).

[2]Arnett v. Bank of America, N.A., 2014 WL 4672458, *11 (D. Or. 2014) ("Although incentive awards are fairly typical in class action cases, they should be scrutinized carefully to ensure that they do not undermine the adequacy of the class representatives." (citation omitted) (internal quotation marks omitted))).

Gascho v. Global Fitness Holdings, LLC, 2014 WL 1350509, *26 (S.D. Ohio 2014), report and recommendation adopted, 2014 WL 3543819 (S.D. Ohio 2014) (" '[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead

*vigilant* in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."[3] District courts in the Ninth Circuit have often reiterated this standard in reviewing incentive awards.[4]

---

named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'") (quoting Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003)).

Dickerson v. Cable Communications, Inc., 2013 WL 6178460, *4 (D. Or. 2013) ("Although incentive awards are fairly typical in class action cases, they should be scrutinized carefully to ensure that they do not undermine the adequacy of the class representatives." (citation omitted) (internal quotation marks omitted)).

Lane v. Page, 862 F. Supp. 2d 1182, 1237, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) (" '[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'" (quoting Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003))).

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *6 (D.N.M. 2011) (same).

Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("Payments to class representatives, while not foreclosed, should be closely scrutinized.").

Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 257 (D.N.J. 2005) (holding that because incentive awards would be paid from the common fund and thereby deplete class members' recoveries, "this Court carefully reviews this request to ensure its fairness to the Class").

[3]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) (emphasis added).

[4]Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) ("The Ninth Circuit requires district courts to be 'vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives.'" (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013))).

Bellinghausen v. Tractor Supply Company, 306 F.R.D. 245, 266 (N.D. Cal. 2015) ("The Ninth Circuit has emphasized that 'district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives.'" (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013))).

Miller v. Ghirardelli Chocolate Company, 2015 WL 758094, *7 (N.D. Cal. 2015) (same).

Boring v. Bed Bath & Beyond of California Limited Liability Company, 2014 WL 2967474, *3 (N.D. Cal. 2014) ("[D]istrict courts must

- The Eleventh Circuit, in a case unrelated to incentive awards, stated that "[w]hen a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a *substantial burden* falls upon the proponents of the settlement to demonstrate and document its fairness"[5] and that *"careful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members."*[6]

---

be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) )).

Custom LED, LLC v. eBay, Inc, 2014 WL 2916871, *9 (N.D. Cal. 2014) (same).

Cordy v. USS-POSCO Industries, 2014 WL 1724311, *2 (N.D. Cal. 2014) (same).

Wallace v. Countrywide Home Loans, Inc., 22 Wage & Hour Cas. 2d (BNA) 849, 2014 WL 5819870, *4 (C.D. Cal. 2014) (same).

Khanna v. Intercon Sec. Systems, Inc., 2014 WL 1379861, *10 (E.D. Cal. 2014), order corrected, 2015 WL 925707 (E.D. Cal. 2015) (same).

Steinfeld v. Discover Financial Services, 2014 WL 1309692, *2 (N.D. Cal. 2014) (same).

Ritchie v. Van Ru Credit Corp., 2014 WL 956131, *4 (D. Ariz. 2014), subsequent determination, 2014 WL 3955268 (D. Ariz. 2014) (same).

Keirsey v. eBay, Inc, 2014 WL 644738, *1 (N.D. Cal. 2014) (same).

Walsh v. Kindred Healthcare, 2013 WL 6623224, *3 (N.D. Cal. 2013) (same).

Davis v. Cole Haan, Inc., 2013 WL 5718452, *3 (N.D. Cal. 2013) (same).

Wolph v. Acer America Corporation, 2013 WL 5718440, *6 (N.D. Cal. 2013) (same).

Johnson v. General Mills, Inc., 2013 WL 3213832, *7 (C.D. Cal. 2013) ("The Ninth Circuit has recently cautioned that 'district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives.'" (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) )).

[5]Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983) (emphasis added).

Cohen v. Resolution Trust Corp., 61 F.3d 725, 728 (9th Cir. 1995), opinion vacated, appeal dismissed, 72 F.3d 686 (9th Cir. 1996) (same).

[6]Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983) (emphasis added) (internal quotation marks

Courts have also cited this standard when reviewing proposed incentive awards.[7]

This heightened judicial scrutiny toward incentive awards[8] is appropriately consistent with the manner in which courts review class counsel's fee petition, as the court acts in a fiduciary capacity for absent class members during the settlement and fee review process.[9]

A few courts have implied that less scrutiny is required if the proposed incentive award is being paid out of the attorney's fees rather than the common fund.[10] However, as

---

omitted).

[7]Johnson v. General Mills, Inc., 2013 WL 3213832, *7 (C.D. Cal. 2013) (reviewing a proposed incentive award and stating that " 'when a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness.' " (quoting Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983))).

Estep v. Blackwell, 2006 WL 3469569, *6 (S.D. Ohio 2006) (same).

Carnegie v. Mutual Sav. Life Ins. Co., 2004 WL 3715446, *23 (N.D. Ala. 2004) (reviewing a proposed incentive award and stating that "[t]he Eleventh Circuit holds that 'a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class,' and that 'a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness' " (quoting Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 1148, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983))).

[8]In re Herald, Primeo, and Thema Securities Litigation, 2011 WL 4351492, *9 (S.D.N.Y. 2011) ("While incentive awards are not prohibited, they are appropriately subject to heightened judicial scrutiny at the preliminary approval stage.").

[9]*See* Rubenstein, 4 **Newberg on Class Actions** § 13:40 (5th ed.).

[10]In re Cendant Corp., Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) ("An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.").

In re Presidential Life Securities, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) ("The matter of payments of incentives to the individual plaintiffs who acted as class representatives need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees awarded to plaintiffs' counsel. The interests of the class, of the public, and of the defendant are not directly affected.").

discussed elsewhere in the Treatise,[11] the practice of paying incentive awards from the attorney's fees is both rare and problematic.

The succeeding sections survey the documentation courts require,[12] the standards they impose,[13] and the practices they disfavor[14]—all of which imply meaningful judicial review. In fact, there are still many settlements in which courts simply rubber stamp approval papers submitted by the parties without sufficient attention to these payments. The fact that the payments are coming from the common fund and consequently reducing the class members' recoveries accordingly triggers the court's fiduciary duties. However, the magnitude of the incentive awards so pales in comparison to the magnitude of attorney's fees that courts likely pay less attention to them than they otherwise might precisely for that reason.

## § 17:12   Judicial review—Documentation requirement

The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable. As discussed elsewhere in the Treatise,[1] incentive awards are premised on the rationale that their recipients have either provided valuable service to the class and/or faced substantial risks in stepping forward to represent the class.[2] Whether the class representatives in a particular case hit this mark is a ques-

---

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:5 (5th ed.).

[12]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:12 (5th ed.).

[13]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[14]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

**[Section 17:12]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[2]Courts have articulated two other rationales for incentive awards: to incentivize class members to step forward to represent the class, and to recognize their service as private attorneys general. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.). The latter of these rationales raises few questions of fact, as the goal is achieved, to a great extent, by the provision of the service itself. At least one court, for example, approved a (reduced) incentive award in recognition of this service, even where the class representatives did very little work for the class. Michel v.

tion of fact. Accordingly, most courts require factual support for any proposed incentive award.[3] Typically, facts relevant

---

WM Healthcare Solutions, Inc., 2014 WL 497031, *11 (S.D. Ohio 2014) (rejecting a $10,000 incentive award because "the named Plaintiffs' involvement in this case was minimal and their expense in pursuing it negligible, if any" but holding that a $3,000 incentive award was appropriate because "fair class action settlement . . . would not [have been] possible were it not for the willingness of the Class Representatives to participate in this suit" and therefore "for class actions to be effectively litigated, at least one plaintiff must be [encouraged] to take on the role of class representative"). The former rationale—to incentivize class members to step forward in the first place—is sometimes framed as a factual question. *See, e.g.*, Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate *if it is necessary* to *induce* an individual to participate in the suit.") (emphasis added). Nonetheless, courts only occasionally scrutinize whether the incentive award truly induced the class representative's service. *See, e.g.*, Fouks v. Red Wing Hotel Corp., 2013 WL 6169209, *2 (D. Minn. 2013) ("Plaintiffs quote, but fail to satisfy, the prerequisite expressed in those cases that 'an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' . . . Here, Plaintiffs have put forth no evidence or argument that persuades the Court that they required any enticement beyond their potential statutory recovery to bring this case, or that their actions in prosecuting it are deserving of a reward." (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))); Kinder v. Dearborn Federal Sav. Bank, 2013 WL 879301, *3 (E.D. Mich. 2013) ("Kinder has not provided evidence of [any] factors the court should consider with respect to an incentive award. Moreover, in light of Kinder's pursuit of several of these types of cases, the court finds that no additional incentive is necessary beyond the $100 in statutory damages already awarded.").

[3]Bellinghausen v. Tractor Supply Company, 306 F.R.D. 245, 266 (N.D. Cal. 2015) ("A class representative must justify an incentive award through 'evidence demonstrating the quality of plaintiff's representative service,' such as 'substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs.'" (quoting Alberto v. GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008))).

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 991 F. Supp. 2d 437, 448–49, 2014-1 Trade Cas. (CCH) ¶ 78644 (E.D.N.Y. 2014) (finding that the declarations of corporate officers were not enough to justify incentive awards and noting that "Class Counsel are expected to provide, at a minimum, documentation setting forth the approximate value of each Class Plaintiff's claim and each one's proposed incentive award").

In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation, 851 F. Supp. 2d 1040, 1090 (S.D. Tex. 2012) ("For the court to approve the incentive awards—even if they are nominal, and even if the defendant does not object—there must be some evidence in the record

to the incentive award determination are demonstrated in affidavits submitted by class counsel and/or the class representatives, through which these persons testify to the particular services performed, the risks encountered, and any other facts pertinent to the award. Courts may also receive this evidence by live testimony at the fairness hearing.[4] While courts have frequently noted the supporting documentation in approving incentive awards,[5] they regularly reject awards where the relevant facts are not suf-

---

demonstrating that the representative plaintiffs were involved. Absent such evidence, the court lacks an adequate basis to approve the incentive awards.").

*But see* In re Southeastern Milk Antitrust Litigation, 2013 WL 2155387, *8 n.9 (E.D. Tenn. 2013) (granting incentive awards even though "[n]o affidavits or other documentation have been submitted in support of the incentive award request" because "[c]lass representatives . . . have clearly been extensively involved in the litigation, settlement discussions and court proceedings and have committed substantial time to the case as confirmed by the Court's own observations").

[4]For a discussion of the fairness hearing process, *see* Rubenstein, 4 **Newberg on Class Actions** § 13:42 (5th ed.).

[5]**First Circuit (District Court)**

In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation, 2014 WL 6968424, *7 (D. Mass. 2014) (granting incentive awards "[b]ased on the declarations of Class Counsel and the Representative Plaintiffs submitted in support of final settlement approval, [showing that] the Representative Plaintiffs have actively participated and assisted Class Counsel in this litigation for the substantial benefit of the Settlement Class despite facing significant personal limitations and sacrifices, including being deposed on deeply personal matters relating to the loss of a loved one").

**Third Circuit (District Court)**

In re General Instrument Securities Litigation, 209 F. Supp. 2d 423, 435, Fed. Sec. L. Rep. (CCH) P 91667 (E.D. Pa. 2001) ("I therefore conclude that upon submission of affidavits attesting to the fact that time and effort were spent by the designated class representatives pursuing this litigation and providing a general description of same, this Court will approve incentive awards.").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) (rejecting an incentive award for one proposed representative due to lack of documentation but approving an award for another because he "has furnished the Court with an adequate accounting that the time he spent working on matters related to this litigation is approximately thirty-two hours" and "[b]ased on the time records and the representations made by counsel as to the activities undertaken by [the representative] on behalf of the class, the Court shall award him a class representative fee totaling

---

$1280 . . . from the D & T settlement fund as compensation for the actual time which he spent on this litigation").

**Sixth Circuit (District Court)**

*Cf.* In re Southeastern Milk Antitrust Litigation, 2013 WL 2155387, *8 n.9 (E.D. Tenn. 2013) (granting incentive awards even though "[n]o affidavits or other documentation have been submitted in support of the incentive award request" because the "[c]lass representatives . . . have clearly been extensively involved in the litigation, settlement discussions and court proceedings and have committed substantial time to the case as confirmed by the Court's own observations").

**Seventh Circuit (District Court)**

In re Southwest Airlines Voucher Litigation, 2013 WL 4510197, *11 (N.D. Ill. 2013), appeal dismissed, (7th Circ. 13-3542)(Jan. 3, 2014) (granting incentive awards based on the record and "class counsel report" showing that the plaintiffs had been active participants throughout the litigation).

**Eighth Circuit (District Court)**

Albright v. Bi-State Development Agency of Missouri-Illinois Metropolitan Dist., 2013 WL 4855304, *1 (E.D. Mo. 2013) ("Plaintiffs have also presented evidence regarding the contributions made by the named class representatives to the action, and the time commitment involved. The Court does not believe that such incentive payments should be granted simply as a matter of course. In light of the evidence presented in this case, however, the Court shall also approve an incentive award of $2,500.00 to each of the class representatives, based on their contributions to the case.").

**Ninth Circuit (District Court)**

R.H. v. Premera Blue Cross, 2014 WL 3867617, *3 n.3 (W.D. Wash. 2014) (granting preliminary approval for a settlement that included incentive awards and stating "[t]he court will accept counsel's declaration representing the time and effort undertaken by class representatives on preliminary approval. However, the court expects that the class representatives will provide declarations to the court detailing the time and effort they dedicated in support of the motion for incentive awards" (citation omitted)).

**District of Columbia Circuit (District Court)**

In re Lorazepam & Clorazepate Antitrust Litigation, 2003-2 Trade Cas. (CCH) ¶ 74134, 2003 WL 22037741, *10–11 (D.D.C. 2003) ("This Court has previously determined that incentive awards to named plaintiffs are not uncommon in class action litigation, particularly where a common fund has been created for the benefit of the entire class . . . Through their affidavits and the Petition for Incentives, Counsel has sufficiently explained that the named Plaintiffs 'ultimately played a role in achieving the $35,000,000 settlement.' . . . For the foregoing reasons, the Court will approve [incentive awards] in the amount of $20,000 to each of the four named Plaintiffs." (citation omitted)).

**§ 17:12**                                   NEWBERG ON CLASS ACTIONS

ficiently documented.[6] Courts may also provide preliminary

---

[6]**Second Circuit (District Court)**

In re Nassau County Strip Search Cases, 12 F. Supp. 3d 485, 503 (E.D.N.Y. 2014) (denying incentive awards because, *inter alia,* of "the absence of any information from movants concerning the concomitant costs or consequences, if any, to those class members who were deposed or testified at trial, thereby precluding an appropriate evaluation of their services").

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 991 F. Supp. 2d 437, 448–49, 2014-1 Trade Cas. (CCH) ¶ 78644 (E.D.N.Y. 2014) (finding that the declarations of corporate officers were not enough to justify incentive awards and noting that "Class Counsel are expected to provide, at a minimum, documentation setting forth the approximate value of each Class Plaintiff's claim and each one's proposed incentive award").

**Third Circuit (District Court)**

In re General Instrument Securities Litigation, 209 F. Supp. 2d 423, 434–35, Fed. Sec. L. Rep. (CCH) P 91667 (E.D. Pa. 2001) ("I conclude that it is fair and appropriate to compensate these class representatives for time spent on matters connected with this litigation. The record, however, lacks any evidentiary support for the fact that these four representatives expended time and effort which would justify the incentive awards. Counsel for plaintiffs represented to this Court at the fairness hearing that these four individuals are worthy of such an award. No affidavits in support, however, have been submitted. I therefore conclude that upon submission of affidavits attesting to the fact that time and effort were spent by the designated class representatives pursuing this litigation and providing a general description of same, this Court will approve incentive awards. The attached Order will provide deadlines by which such submissions shall result.").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) (noting that the court "will compensate the class representatives for the time they spent on matters connected to the litigation" but denying an incentive award to one representative because she "has not provided the Court with any documentation as to the time which she spent on matters related to this litigation").

**Fourth Circuit (District Court)**

Jones v. Dominion Resources Services, Inc., 601 F. Supp. 2d 756, 768 (S.D. W. Va. 2009) (reducing proposed incentive awards because "the court has received no evidence of the class representatives' participation in this case" and the record "does not indicate that the class representatives were deposed or produced any personal documents").

**Fifth Circuit (District Court)**

Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 869, 52 Employee Benefits Cas. (BNA) 1427 (S.D. Tex. 2011) (denying incentive award because, *inter alia,* "[w]hile Plaintiff has requested an incentive award of $10,000, significantly she has not provided any details

nor documentary support demonstrating the nature of her contribution, the hours she put in, the time consulting with counsel, time spent in discovery proceedings, or what information she provided to counsel").

**Sixth Circuit (District Court)**

Bessey v. Packerland Plainwell, Inc., 2007 WL 3173972, *5 (W.D. Mich. 2007) ("[U]p to this point the plaintiffs have not pointed to any specific factual or legal reasons why each class representative should receive $250 above and beyond what he or she will receive in damages under the settlement . . . [T]he record does not at this point justify the proposed extra payments.").

**Seventh Circuit**

Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 410 (7th Cir. 2000) (affirming the district court's denial of an incentive award where counsel failed to make any serious argument in favor of such an award and where it did not appear that the lead plaintiff "had to devote an inordinate amount of time to the case or that . . . he suffered or risked any retaliation [from the defendant]").

**Eighth Circuit (District Court)**

Fouks v. Red Wing Hotel Corp., 2013 WL 6169209, *3 (D. Minn. 2013) (reducing proposed incentive awards to class representatives because there was "simply no evidence before the Court that the Plaintiffs faced any risks or burdens in undertaking this litigation, or that there exist any other factors that would justify the amount they seek, whether styled as an incentive award or reimbursement").

**Ninth Circuit (District Court)**

Davis v. Cole Haan, Inc., 2013 WL 5718452, *3 (N.D. Cal. 2013) ("Here, without any declaration from the named representatives, or any substantive description of the time devoted and work expended on this case by the named representatives, the Court finds the request for incentive payments to be woefully inadequate. Moreover, although Plaintiffs argue that they risked being held liable for Cole Haan's costs in the event of a defense judgment, there is no declaration attesting that the named representatives would have been held personally responsible, as opposed to counsel, for the costs. Therefore, the Court denies the motion for incentive payments. Again, this Order is without prejudice to a renewed motion upon a proper showing.").

**Tenth Circuit (District Court)**

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *11–13 (D.N.M. 2011) (denying an incentive award because, *inter alia*, the plaintiff "offer[ed] no argument or evidence . . . that other class representative were not forthcoming, and that an incentive award is justified for bringing a representative forward").

**Eleventh Circuit (District Court)**

Grassick v. Avatar Properties, Inc., 2008 WL 5099942, *3 (M.D. Fla. 2008) ("The parties also have failed to establish that the proposed $10,000.00 incentive payment to [the plaintiff] is appropriate. While some

approval to a settlement that includes proposed incentive awards absent documentation, but direct counsel to submit the documentation before the final approval stage.[7]

## § 17:13   Judicial review—Standards of assessment

The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable. In the absence of any reference to incentive awards in Rule 23, courts have fashioned different tests for their review of proposed incentive awards. The Seventh Circuit articulated a three-part

---

courts have approved payments to class representatives to compensate them for costs they incurred during the litigation, there is no showing that [the plaintiff] has incurred any costs.").

[7]Torchia v. W.W. Grainger, Inc., 2014 WL 3966292, *11 n.3 (E.D. Cal. 2014) (preliminarily approving an incentive award but requiring the plaintiff to "provide evidence to support her request for the incentive award" prior to the fairness hearing, including "the number of hours expended, broken down by task").

Chesbro v. Best Buy Stores, L.P., 2014 WL 793362, *4 n.5 (W.D. Wash. 2014) (preliminarily approving an incentive award despite not having "any evidence of the amount of hours [the plaintiff] . . . devoted to the case," but noting that "[t]he court expects that counsel will provide evidence of the amount of time [the plaintiff] invested in this case prior to any fairness hearing").

Michel v. WM Healthcare Solutions, Inc., 2014 WL 497031, *3 (S.D. Ohio 2014) (explaining that the court had, at the preliminary approval stage, "reminded counsel that incentive awards were subject to court approval and that the named Plaintiffs would be expected to provide specific evidence demonstrating their involvement in the case in order to justify the incentive award").

Alberto v. GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008) (requiring that "[o]n or before the date of the fairness hearing, the parties should present or be prepared to present evidence of the named plaintiff's substantial efforts taken as class representative to justify the discrepancy between her award and those of the unnamed plaintiffs" (footnote omitted)).

In re HP Power Plug and Graphic Card Litigation, 2008 WL 2697192, *1, 3 (N.D. Cal. 2008), as corrected, (July 8, 2008) (granting incentive awards only after "plaintiffs' counsel submitted a declaration in support of incentive awards . . . assert[ing] that plaintiffs spoke to counsel in advance of filing their complaint, actively participated in reviewing the pleadings and were kept informed regarding the status of the case" after initially failing to approve the awards due to lack of supporting documentation for the request).

test in a 1998 decision,[1] and the two other circuits that have directly addressed the question—the Eighth[2] and the Ninth[3]—have each cited that test affirmatively. That said, district courts in the Ninth Circuit tend to employ a five-factor test originally set forth in a 1995 decision of the Northern District of California,[4] while courts in New York tend to employ a six-factor test.[5] As no one test has emerged

---

[Section 17:13]

[1]Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an [incentive] award is warranted, relevant factors include [1] the actions the plaintiff has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation.").

[2]In re U.S. Bancorp Litigation, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving $2,000 awards to five representative plaintiffs and citing to the Seventh Circuit's three-factor test from *Cook* in determining these awards to be "appropriate").

[3]Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments. The district court must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.' " (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

[4]Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995) (noting the five factors as: "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation").

[5]In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *2 (S.D.N.Y. 2007) (noting the six factors as: 1) the personal risk (if any) incurred by the named plaintiff in becoming and continuing as a litigant; 2) the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise); 3) any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim; 4) the ultimate recovery; 5) the sums awarded in similar cases; and 6) the named plaintiff's requested sum in comparison to each class member's estimated *pro rata* share of the monetary judgment or settlement).

as particularly salient,[6] the different tests that courts have employed can be broken down by circuit, as in the accompanying footnote.[7]

---

[6]Roberts v. Texaco, Inc., 979 F. Supp. 185, 201–02, 86 Fair Empl. Prac. Cas. (BNA) 1678 (S.D.N.Y. 1997) ("No meaningful guidelines of broad applicability are discernible from the reported decisions as to the appropriate measure for an [incentive] award, the focus being on special circumstances.").

[7]**Second Circuit (District Court)**
    Sanchez v. JMP Ventures, L.L.C., 2015 WL 539506, *5 (S.D.N.Y. 2015) ("Here, [the named plaintiff] requests a service award of $10,000, to be paid from the settlement fund. [The named plaintiff] discussed the case with class counsel and was deposed, but he did not attend mediation or the fairness hearing. We have no doubt that his assistance to class counsel was useful, and for this and his willingness to accept what risks are attendant with being a named plaintiff, we believe he should receive some service award. However, under the facts presented, and in light of the total amount of the settlement fund and the large number of class members to receive payments from that fund, we reduce the amount of the service award to Sanchez to $5,000." (citation omitted)).
    In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *2 (S.D.N.Y. 2007) (noting six relevant factors in adjudicating named plaintiffs' requests for incentive awards: 1) the personal risk (if any) incurred by the named plaintiff in becoming and continuing as a litigant; 2) the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise); 3) any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim; 4) the ultimate recovery; 5) the sums awarded in similar cases; and 6) the named plaintiff's requested sum in comparison to each class member's estimated *pro rata* share of the monetary judgment or settlement).

**Third Circuit (District Court)**
    Fry v. Hayt, Hayt & Landau, 198 F.R.D. 461, 473 (E.D. Pa. 2000) ("[T]o be entitled to an incentive award, plaintiff must show: (1) the risks that the named plaintiff undertook in commencing class action; (2) any additional burdens assumed by named plaintiffs but not unnamed class members; and (3) the benefits generated to class members through named plaintiff's efforts.").

**Fourth Circuit (District Court)**
    Kirven v. Central States Health & Life Co. of Omaha, 2015 WL 1314086, *13 (D.S.C. 2015) ("To determine whether an incentive payment is warranted, the court should consider the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.").
    Smith v. Toyota Motor Credit Corp., 2014 WL 4953751. *1 (D. Md. 2014) ("To determine whether an incentive payment is warranted, the

The widely employed Seventh Circuit test considers three

court should consider 'the actions the plaintiff[s] [have] taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff[s] expended in pursuing the litigation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Decohen v. Abbasi, LLC, 299 F.R.D. 469, 483 (D. Md. 2014) ("To determine whether an incentive payment is warranted, the court should consider 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) )).

**Fifth Circuit (District Court)**

Slipchenko v. Brunel Energy, Inc., 2015 WL 338358, \*13 (S.D. Tex. 2015) ("In deciding whether an incentive award is warranted, courts look to: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the plaintiff expended in pursuing the litigation." (internal quotation marks omitted)).

In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation, 851 F. Supp. 2d 1040, 1089 (S.D. Tex. 2012) (same).

**Sixth Circuit (District Court)**

Kinder v. Dearborn Federal Sav. Bank, 2013 WL 879301, \*3 (E.D. Mich. 2013) ("In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." (internal quotation marks omitted)).

In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, \*9 (E.D. Tenn. 2010) ("District courts in the Sixth Circuit have considered the following factors in determining the propriety of incentive awards in class action cases: (1) the action taken by the Class Representatives to protect the interest of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representatives pursuing the litigation." (citing Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 250 (S.D. Ohio 1991))).

In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 275–76 (S.D. Ohio 1997), order rev'd on other grounds, 24 Fed. Appx. 520 (6th Cir. 2001) ("Courts look to a number of factors in deciding whether to grant named plaintiffs incentive awards. Courts in this circuit assess the following factors: (1) whether the actions of the named plaintiffs protected the interests of the class members and have inured to the substantial benefit of the class members; (2) whether the named plaintiffs have assumed substantial indirect or direct financial risk; and (3) the amount of time and effort expended by the named plaintiffs in pursuing the class action

litigation. Additional criteria courts may consider in determining whether to approve an incentive award include: (1) the risk to the class representative in commencing the suit; (2) the notoriety and personal difficulties encountered by the class representative; (3) the duration of the litigation; (4) the extent of class representative's personal involvement in discovery; (5) the class representative's personal benefit (or lack thereof) purely in his capacity as a member of the class; and (6) the social benefit derived from the suit." (citations omitted)).

**Seventh Circuit**

Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an [incentive] award is warranted, relevant factors include [1] the actions the plaintiff has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation.").

Spicer v. Chicago Bd. Options Exchange, Inc., 844 F. Supp. 1226, 1266 (N.D. Ill. 1993) ("In considering this petition [for incentive awards], we have reviewed the following factors: (1) the actions taken by the class representatives to protect the interests of class members and others; (2) whether those actions resulted in substantial benefit to the class members; and (3) the amount of time and effort spent by the class representatives in pursuing the litigation.").

**Eighth Circuit**

In re U.S. Bancorp Litigation, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving $2,000 awards to five representative plaintiffs and citing to the Seventh Circuit's three-factor test from *Cook* in determining these awards to be "appropriate").

**Ninth Circuit**

Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments. The district court must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Wren v. RGIS Inventory Specialists, 2011 WL 1230826, *32 (N.D. Cal. 2011), order supplemented, 2011 WL 1838562 (N.D. Cal. 2011) ("When considering a request for an incentive payment, the court must evaluate each request individually, taking into account the following factors: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the duration of the litigation and the amount of time and effort the plaintiff expended in pursing it; and (4) the risks to the plaintiff in commencing the litigation, including reasonable fears of workplace retali-

factors:

1) the actions the plaintiff has taken to protect the interests of the class;
2) the degree to which the class has benefitted from those actions; and
3) the amount of time and effort the plaintiff expended in pursuing the litigation.[8]

The five-factor test widely used in California directs courts to consider:

1) the risk to the class representative in commencing suit, both financial and otherwise;
2) the notoriety and personal difficulties encountered by the class representative;
3) the amount of time and effort spent by the class representative;
4) the duration of the litigation; and

---

ation, personal difficulties, and financial risks. Additionally, to ensure that an incentive payment is not excessive, the court must balance the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." (citations omitted) (internal quotation marks omitted)).

**Tenth Circuit (District Court)**

O'Brien v. Airport Concessions, Inc., 2015 WL 232191, *6 (D. Colo. 2015) ("In deciding whether such an award is warranted, 'relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) )).

Shaw v. Interthinx, Inc., 2015 WL 1867861, *8 (D. Colo. 2015) ("[I]ncentive awards are an efficient and productive way to encourage members of a class to become class representatives, and to reward the efforts they make on behalf of the class. The factors to consider in determining an incentive award include: (1) the actions that the class representative took to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the class representative expended in pursuing the litigation." (citation omitted) (internal quotation marks omitted)).

**District of Columbia Circuit (District Court)**

Kifafi v. Hilton Hotels Retirement Plan, 999 F. Supp. 2d 88, 105, 57 Employee Benefits Cas. (BNA) 1941 (D.D.C. 2013) (same).

In re Lorazepam & Clorazepate Antitrust Litigation, 2003-2 Trade Cas. (CCH) ¶ 74134, 2003 WL 22037741, *10 (D.D.C. 2003) (same).

[8]Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

    5)   the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.[9]

The six-factor test widely used in New York directs courts to consider:

    1)   the personal risk (if any) incurred by the named plaintiff in becoming and continuing as a litigant;

    2)   the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise);

    3)   any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course;

    4)   the ultimate recovery;

    5)   the sums awarded in similar cases; and

    6)   the named plaintiff's requested sum in comparison to each class member's estimated *pro rata* share of the monetary judgment or settlement.[10]

What the tests have in common is that they tend to track the rationales for incentive awards, discussed in a prior section,[11] which primarily focus on compensating class representatives for their service to the class and for the risks they took in stepping forward to represent the class. Some of the factors also attempt to guard against disfavored practices such as awards that are larger than normal and/or extravagant compared to each class member's recovery. These disfavored practices are the subject of the succeeding sections.[12]

---

[9]Wren v. RGIS Inventory Specialists, 2011 WL 1230826, *32 n.11 (N.D. Cal. 2011), order supplemented, 2011 WL 1838562 (N.D. Cal. 2011) ("In assessing the reasonableness of an inventive award, several district courts in the Ninth Circuit have applied the five-factor test set forth in *Van Vranken* . . ." (citing Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995))).

[10]In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *2 (S.D.N.Y. 2007).

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[12]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

### § 17:14  Judicial review—Disfavored practices— Generally

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. The Ninth Circuit, for example, has emphasized that trial courts "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."[2] A series of disfavored practices has emerged and can be enumerated as follows:

- awarding incentive payments only to those class representatives who agree to support a settlement;[3]
- contracting in advance to pay incentive awards to class representatives;[4]
- measuring incentive payments as a percentage of the class's recovery;[5] and

---

**[Section 17:14]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013); *see also* Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) ("The Ninth Circuit requires district courts to be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives. Among other things, the concern about incentive awards and the class representative's adequacy is that, when presented with a potential settlement, the class representative may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large. This is particularly salient when the incentive award is disproportionate to the class's recovery, because the disproportionality may eliminate[ ] a critical check on the fairness of the settlement for the class as a whole. In an extreme case, the conditional incentive award may be so large in relation to the judgment or settlement that if awarded it would significantly diminish the amount of damages received by the class. In such circumstances, a class representative would then have a clear conflict of interest." (citations omitted) (internal quotation marks omitted)).

[3]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:15 (5th ed.).

[4]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:16 (5th ed.).

[5]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:17 (5th ed.).

- overpaying class representatives.[6]

As noted, these topics are each addressed in succeeding sections.

## § 17:15    Judicial review—Disfavored practices— Conditional awards

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those disfavored practices is a settlement agreement that purports to reward those class representatives who agree to support the proposed settlement but not those who oppose it. The Ninth Circuit has labeled these "conditional incentive awards," because "the awards were conditioned on the class representatives' support for the settlement."[2] At least two circuits—the Seventh[3] and the Ninth[4]—have prohibited such provisions.

To appreciate the problem with conditional incentive awards, it is important to review the function of the class

---

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

**[Section 17:15]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1161 (9th Cir. 2013).

[3]Eubank v. Pella Corp., 753 F.3d 718, 723, 88 Fed. R. Serv. 3d 920 (7th Cir. 2014) ("Although the judge rightly made incentive awards to the class representatives who had opposed the settlement as well as to those who had approved it, the settlement agreement itself had provided for incentive awards only to the representatives who supported the settlement. This created a conflict of interest: any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative.").

[4]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) ("[T]he incentive awards here corrupt the settlement by undermining the adequacy of the class representatives and class counsel. In approving the settlement agreement, the district court misapprehended the scope of our prior precedents. We once again reiterate that district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives. The conditional incentive awards in this settlement run afoul of our precedents by making the settling class representatives inadequate representatives of the class.").

representative in a class action. A class action is a form of representative litigation in which one or a few members of a class litigate the claims of all of the members of the class in the aggregate.[5] Class counsel are centrally charged with safeguarding the absent class members' interests,[6] but counsel's interests and those of the class members may diverge. The class representative serves as a stand-in "client" for the whole class, monitoring the progress of the litigation and ensuring class counsel do not compromise the class's interests for their own.[7] These principles may be more ideal than practical in that most class representatives lack the expertise and resources to perform this function well.[8] Nonetheless, the principles are carefully safeguarded in the class setting.

From this perspective, conditional incentive agreements that reward only those class representatives who support a proposed settlement are problematic. When a settlement is proposed, the class representative's role is to review the proposal and to inform class counsel of her views on it. A class representative who disagrees with the terms of the settlement and so informs class counsel provides a valuable ser-

---

[5]Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members . . .").

[6]Fed. R. Civ. P. 23(g)(4) (*Duty of Class Counsel*. Class counsel must fairly and adequately represent the interests of the class.").

[7]*See* Rubenstein, 1 **Newberg on Class Actions** § 3:52 (5th ed.) ("In theory, the role played by the class representative in a class action is akin to the role played by an individual client in an individual case—the client tends to seek out the attorney, hire and monitor the attorney, and be the person charged with making the critical decisions about the case's goals, including, most importantly, the settlement decision. Put simply, an individual client is the principal and the attorney is her agent." (footnote omitted)).

[8]*See* Rubenstein, 1 **Newberg on Class Actions** § 3:52 (5th ed.) ("Class representatives rarely serve any of these functions in class suits: in small claims cases they have so little at stake that it would be irrational for them to take more than a tangential interest, while in all cases, including larger claim cases, class representatives generally lack the legal acumen to make key decisions about complex class action litigation, much less to monitor savvy class counsel. It has long been understood that class counsel control class actions, perhaps even selecting the class representatives themselves, thereby reversing, not inscribing, the standard attorney/client relationship. Put simply, class action attorneys are the real principals and the class representative/clients their agents." (footnote omitted)).

vice to the class regardless of whether or not her objections are ultimately validated. *First*, that class representative has exercised her own independent judgment and provided an opinion about the settlement to class counsel, providing information or insight class counsel themselves may not have considered. *Second*, that class representative speaks from a position that class counsel does not—that of the client class— and thus has provided information from a unique perspective. *Third*, that class representative has discharged precisely the duty the law seeks from her: to operate as a monitor or check on class counsel by stating her own independent opinions to class counsel and the court. Given how much class action law generally laments the absence of a meaningful check on class counsel by class representatives, those class representatives who do find the independence and voice to challenge class counsel should be applauded, not punished. A structural provision in a settlement agreement that has the effect of squelching class representatives' ability to adequately represent the class by voicing their concerns is, simply, not in the class's best interests.

The Ninth Circuit embraced these principles in a 2013 decision condemning conditional incentive awards.[9] The case was an action against credit reporting agencies under the Fair Credit Reporting Act (and its state law counterpart) for the manner in which they treated debts that had been discharged in bankruptcy. The parties initially reached an injunctive settlement and later negotiated a proposed monetary settlement. The settlement agreement provided for incentive awards, stating:

> On or before October 19, 2009, Proposed 23(b)(3) Settlement Class Counsel shall file an application or applications to the Court for an incentive award, to each of the Named Plaintiffs

---

[9]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157 (9th Cir. 2013). The Treatise's author testified as an expert witness in opposition to conditional incentive awards in the case. *See* Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1166 (9th Cir. 2013) ("Professor William Rubenstein, a class-action expert, testified before the district court that in his experience such provisions are 'not common' and that his research revealed 'not one' settlement agreement that 'contain[ed] a restriction on an incentive award like the one here that permits incentive awards be sought only for those representatives in support of the settlement.' "). The preceding paragraph is taken from Professor Rubenstein's testimony in the matter.

serving as class representatives *in support of the Settle-ment,* and each such award not to exceed $5,000.00.[10]

Class counsel also informed a plaintiff that he would " 'not be entitled to anything' and that he would 'jeopardize the $5,000 [incentive award he] would receive [under the settle-ment]' if he did not support the settlement,"[11] and class counsel "also told the district court that they had told other plaintiffs that they 'don't see a way for people who don't sup-port the settlement to receive an incentive award.' "[12]

Several of the class representatives objected to the settle-ment, believing the compensation inadequate; settling class counsel did not seek incentive awards for these class representatives as they were not representatives serving "in support of the Settlement." These representatives therefore also objected to the incentive clause itself, arguing it created a conflict of interest between themselves and the class and between class counsel and the class. The trial court rejected their argument, but the Ninth Circuit reversed. The Ninth Circuit held that the conditional incentive awards "them-selves are sufficient to invalidate this settlement,"[13] reason-ing that:

> With the prospect of receiving $5,000 incentive awards only if they supported the settlement, Settling Plaintiffs had very dif-ferent interests than the rest of the class . . . [T]he conditional incentive awards changed the motivations for the class representatives. Instead of being solely concerned about the adequacy of the settlement for the absent class members, the class representatives now had a $5,000 incentive to support the settlement regardless of its fairness and a promise of no reward if they opposed the settlement. The conditional incen-tive awards removed a critical check on the fairness of the class-action settlement, which rests on the unbiased judgment of class representatives similarly situated to absent class

---

[10]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1162 (9th Cir. 2013) (emphasis added).

[11]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013).

[12]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164–65 (9th Cir. 2013).

[13]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

members.[14]

Because of the conflict between the class representatives' interests and those of the class, the Ninth Circuit held that the conditional incentive awards rendered the class representatives inadequate under Rule 23(a)(4).[15] Moreover, the Ninth Circuit held that the "class representatives' lack of adequacy—based on the conditional incentive awards—also made class counsel inadequate to represent the class."[16]

The Seventh Circuit reached a similar conclusion the following year, stating:

> Although the judge rightly made incentive awards to the class representatives who had opposed the settlement as well as to those who had approved it, the settlement agreement itself had provided for incentive awards only to the representatives who supported the settlement. This created a conflict of interest: any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative.[17]

In sum, two separate circuits have found that conditional incentive awards generate a conflict of interest between class representatives and class counsel, on the one hand, and class representatives and the class, on the other. Such conditional incentive awards thereby render the class representatives and class counsel inadequate, dooming class certification and requiring the rejection of any settlement containing such terms.

## § 17:16   Judicial review—Disfavored practices— Percentage-based awards

As the legal basis for incentive awards is uncertain,[1] and

---

[14]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

[15]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

[16]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1167 (9th Cir. 2013).

[17]Eubank v. Pella Corp., 753 F.3d 718, 723, 88 Fed. R. Serv. 3d 920 (7th Cir. 2014).

**[Section 17:16]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions**

as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those disfavored practices is percentage-based incentive awards. When counsel seek, and courts approve, incentive awards, they almost always do so in specific dollar amounts. Often, courts will assess whether the requested dollar-amount award is appropriate by identifying the percentage of the class's recovery that the award represents. If the percentage seems appropriate, courts approve the award;[2] if it is too high, they either reject

---

§ 17:4 (5th ed.).

[2]**Second Circuit (District Court)**

Sanz v. Johny Utah 51 LLC, 2015 WL 1808935, *1 (S.D.N.Y. 2015) (approving incentive awards of $1,000 to three representatives and noting that "the combined payments represent less than one percent of the overall settlement").

Chambery v. Tuxedo Junction Inc., 2014 WL 3725157, *11 (W.D. N.Y. 2014) (approving proposed "enhancement payments" ($10,700) as "reasonable" and noting that this amount constituted "approximately five percent of the total settlement fund").

Gay v. Tri-Wire Engineering Solutions, Inc., 2014 WL 28640, *13–14 (E.D.N.Y. 2014) (approving $7,500 service award and noting that this figure constituted 4% of the total settlement).

Velez v. Novartis Pharmaceuticals Corp., 2010 WL 4877852, *8, 24–27 (S.D.N.Y. 2010) (approving $3,775,000 in service award payments and noting that this represented "only approximately 2.4 percent of the entire monetary award of $152.5 million (or approximately 2.1 percent of the entire value of the settlement of $175 million)" and acknowledging award was "significant . . . but in the overall context of the settlement . . . but a pittance").

**Third Circuit (District Court)**

Johnson v. Community Bank, N.A., 2013 WL 6185607, *6 (M.D. Pa. 2013) (approving total service awards of $10,000 and recognizing this sum as reasonable given that it comprised 0.4% of total $2.5 million settlement fund).

Sullivan v. DB Investments, Inc., 2008 WL 8747721, *37 (D.N.J. 2008) (approving incentive award and noting that it represented 0.0007% of settlement fund).

**Fourth Circuit (District Court)**

Kirven v. Central States Health & Life Co. of Omaha, 2015 WL 1314086, *14 (D.S.C. 2015) (approving incentive award of $7,563.27 and noting this figure constituted "approximately 0.015% of the gross settlement").

DeWitt v. Darlington County, S.C., 2013 WL 6408371, *15 (D.S.C. 2013) (approving service award of $7,500 and recognizing this amount

comprised 3.33% of gross amount of the settlement in the case, with largest proposed amount for lead plaintiff ($2,500) constituting 1.11% of gross settlement amount).

**Fifth Circuit (District Court)**

Jenkins v. Trustmark Nat. Bank, 300 F.R.D. 291, 306 (S.D. Miss. 2014) (approving seven service awards of $5,000 each in part due to recognition that this aggregate sum constituted "less than one percent of the Settlement Fund").

**Sixth Circuit (District Court)**

Shane Group, Inc. v. Blue Cross Blue Shield of Michigan, 2015-1 Trade Cas. (CCH) ¶ 79151, 2015 WL 1498888, *18–19 (E.D. Mich. 2015) (granting $165,000 in incentive awards and noting that these awards were "reasonable" as they constituted 0.55% of settlement fund).

In re Cardizem CD Antitrust Litigation, 218 F.R.D. 508, 535, 2003-2 Trade Cas. (CCH) ¶ 74205 (E.D. Mich. 2003) (approving incentive awards of $160,000 and recognizing these awards to equal just 0.002% of settlement fund).

**Seventh Circuit (District Court)**

Beesley v. International Paper Company, 2014 WL 375432, *4 (S.D. Ill. 2014) (approving seven incentive awards (six of $25,000 and one of $15,000) and noting that "the total award for all of the Named Plaintiffs represents just 0.55 percent of the total Settlement Fund" and that "awards of less than one percent of the fund are well within the ranges that are typically awarded in comparable cases").

In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation, 733 F. Supp. 2d 997, 1016 (E.D. Wis. 2010) (approving incentive awards of $1,000 to each of the 132 class representatives based in part because "the $132,000 total award is only a tiny percentage (0.12%) of the class's overall recovery [of $110.7 million]").

**Eighth Circuit (District Court)**

Sauby v. City of Fargo, 2009 WL 2168942, *3 (D.N.D. 2009) (approving incentive awards totaling $15,000 and noting that this sum constituted only 0.01% of the maximum class recovery).

**Ninth Circuit (District Court)**

Horn v. Bank of America, N.A., 2014 WL 1455917, *7–8 (S.D. Cal. 2014) (approving incentive awards collectively amounting to $50,000 in part because this aggregate figure would constitute "a mere fraction of one percent of the most conservative estimated value of the Settlement").

Williams v. Centerplate, Inc., 2013 WL 4525428, *7 (S.D. Cal. 2013) (approving $5,000 incentive awards for each of three plaintiffs and recognizing this figure as "reasonable" as it comprised "around 2.3% of the common fund").

Cicero v. DirecTV, Inc., 2010 WL 2991486, *7 (C.D. Cal. 2010) (approving two incentive awards totaling $12,500 in part because of court's recognition that this sum constituted "less than one percent of the Settlement").

or reduce the award.[3] This method is similar to a percentage cross-check that a court might utilize in assessing the validity of a lodestar-based fee award.[4] There are therefore many court decisions that discuss incentive awards in percentage terms.

However, there are very, very few cases in which class counsel have sought, and courts have approved, incentive awards that are actually measured as a percentage of the common fund recovery.[5] Percentage-based incentive awards

---

Hopson v. Hanesbrands Inc., 2009 WL 928133, *10 (N.D. Cal. 2009) (approving incentive award of $5,000, constituting approximately 1.25% of the settlement amount, and noting that although this was higher than that awarded in other cases, the award was justified under the particular circumstances of the case).

**Tenth Circuit (District Court)**

Chieftain Royalty Co. v. Laredo Petroleum, Inc., 2015 WL 2254606, *1 (W.D. Okla. 2015) (approving "case contribution award" and recognizing this award as comprising 1% of total settlement amount).

Shaw v. Interthinx, Inc., 2015 WL 1867861, *8 (D. Colo. 2015) (approving multiple $10,000 incentive awards and noting that the total sum would represent "less than 1% of the maximum value of the common fund").

**Eleventh Circuit (District Court)**

Carnegie v. Mutual Sav. Life Ins. Co., 2004 WL 3715446, *24 (N.D. Ala. 2004) (approving incentive awards aggregating $10,000, which the court noted constituted "two-tenths of one percent of the total settlement amount").

**District of Columbia Circuit (District Court)**

In re Lorazepam & Clorazepate Antitrust Litigation, 205 F.R.D. 369, 400, 2002-1 Trade Cas. (CCH) ¶ 73649 (D.D.C. 2002) (approving six separate incentive awards (three worth $25,000 and three worth $10,000) and noting that this aggregate sum represented approximately 0.3% of each class's recovery).

[3]A succeeding section of the Treatise discussing courts' rejection of excessive awards contains a list of cases rejecting awards on the basis that they constitute too great a portion of the class's recovery. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

[4]For a discussion of the percentage cross-check in lodestar fee cases, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:52 (5th ed.).

[5]Chieftain Royalty Co. v. Laredo Petroleum, Inc., 2015 WL 2254606, *4 (W.D. Okla. 2015) ("Class Representative is hereby awarded a Case Contribution Award of one percent (1%) of the $6,651,997.95 Settlement Amount.").

Allapattah Services, Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) ("[T]he Class Representatives are seeking 1.5% of

are disfavored, if not altogether forbidden.

Percentage-based incentive awards may appear appropriate in that they seem to align the class representative's interests with those of the class: the more money the class makes, the higher the percentage award.[6] However, on closer examination, percentage-based incentive awards are problematic. *First*, such awards may skew the class representatives' incentives by encouraging them to hold out for greater recovery (and hence a higher incentive award) when in fact the class's interests would be best served by a settlement. *Second,* relatedly, percentage awards privilege monetary recoveries over other remedies, such as injunctive relief, creating a potential conflict between the interests of the class representative and the class.[7] *Third*, paying the class representatives a portion of the settlement amount

---

the common benefit received by the Class as an incentive award. The basis for the 1.5% request comes from the fact that Class Counsel have reduced their fee from 33 and 1/3% to 31 and 1/3%, and the Class Representatives have sought to maintain their request within the scope of that reduction.").

Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 511 (2011) (affirming district court's award of incentive award equal to "1% of the common fund" ($34,500)).

[6]Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 511 (2011) ("[W]e can find no reason to automatically deny incentive awards that are based upon a percentage of the common fund. We do not consider such awards as antithetical to the interests of the class. To the contrary, the class representative remains aligned with the interests of the class as a whole; the larger the class recovery, the larger the incentive award.").

[7]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959–60, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (noting that *ex ante* incentive agreements between class counsel and class representatives, which tied the requested award to the size of the settlement, "made the contracting class representatives' interests actually different from the class's interests[;]" specifically, "[b]y tying their compensation—in advance—to a sliding scale based on the amount recovered, the incentive agreements disjoined the contingency financial interests of the contracting representatives from the class," because (given a cap on the percentage recovery) "once the threshold cash settlement was met, the agreements created a disincentive to go to trial; going to trial would put their $75,000 at risk in return for only a marginal individual gain even if the verdict were significantly greater than the settlement" and because the "agreements also gave the contracting representatives an interest in a monetary settlement, as distinguished from other remedies, that set them apart from other members of the class").

untethers the award from the services that the representatives provided to the class and the risks they took in doing so. It is true that a court could provide a higher percentage when the service and risks were greater, but scaling those rewards according to the size of the common fund is at best a rough proxy in that the services and risks are not necessarily directly related to the size of the settlement. Thus, *fourth,* percentage awards threaten to be excessive.[8] *Fifth,* paying the class representatives a portion of the settlement fund is simply unseemly: it gives the appearance that the representative is either a professional plaintiff,[9] or a bounty hunter, not a servant for the class.[10]

In a leading decision on incentive awards, the Ninth Circuit held that an agreement between class counsel and the class representatives at the outset of the case that tied the amount class counsel would seek as an incentive award to the class's recovery created a conflict of interest between the class representatives and the class, rendering those class representatives inadequate to represent the class.[11] The decision does not isolate the issue of rewarding class representatives with a percentage-based incentive fee, but its concerns about scaling the incentive award to the class's recovery are pertinent.[12]

In short, class counsel rarely seek incentive awards in per-

---

[8]*Cf.* Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 511 (2011) (rejecting defendant's argument that the percentage approach "provides a disproportionate recovery to that of other class members" but performing "lodestar" type cross-check to confirm reasonableness of proposed percentage incentive award).

[9]*But see* Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 511 (2011) (rejecting defendant's argument that percentage approach "encourages individuals to become professional plaintiffs").

[10]In this sense, the class representative's service, and reward, are distinct from the statutorily based reward structure in *qui tam* cases, where a relator is paid a percentage of the government's recovery for her whistle-blower activities. *See* 31 U.S.C.A. § 3730 (setting forth False Claims Act's *qui tam* provisions).

[11]Rodriguez v. West Publishing Corp., 563 F.3d 948, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009). For a discussion of this case and the concerns it posed, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:17 (5th ed.).

[12]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (noting that incentive agreements tying any potential award to the ultimate recovery

centage terms. Although courts may check a flat award for excessiveness by reference to the percentage of the fund it represents, courts rarely award incentive payments in percentage terms and strongly disfavor such an approach.

## § 17:17   Judicial review—Disfavored practices—*Ex ante* incentive award agreements

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those disfavored practices is an *ex ante* agreement between putative class counsel and putative class representatives containing certain assurances with regard to incentive awards.

The facts of the primary precedent on point[2] are instructive: in 2005, lawyers in California brought an antitrust class action against West Publishing Company alleging that it had engaged in anti-competitive practices with regard to its bar preparation course, BAR/BRI. As may be evident, the class consisted almost exclusively of lawyers.[3] Some of those lawyers/clients shopped for class action counsel to represent them in suing BAR/BRI. In so doing, they appear to have negotiated, up front, for the lawyers to promise to pursue incentive agreements on their behalf at the conclusion of the case. In particular, the putative class representatives negotiated an agreement with putative class counsel whereby counsel promised to seek a higher award for them as the class's recovery increased, up to a certain

---

"put counsel and the contracting class representatives into a conflict from day one").

**[Section 17:17]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Rodriguez v. West Publishing Corp., 563 F.3d 948, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[3]The class consisted of "those who purchased a BAR/BRI course between August 1, 1997 and July 31, 2006." Rodriguez v. West Publishing Corp., 563 F.3d 948, 954, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009). The class would also have included persons who paid for the bar preparation course but either did not sit for the bar, did not pass the bar, or were not admitted to the bar.

cap.[4] This agreement was not revealed to the court at either the class certification stage or the settlement stage, but it came to light after several objectors protested the size of the proposed incentive awards.[5] Without apparently realizing the consequences of their actions, class counsel at that point revealed that they were contractually obligated to seek that level of award. The district court ultimately approved the settlement, but held that the agreements were inappropriate and contrary to public policy for a number of reasons:

> [1] they obligate class counsel to request an arbitrary award not reflective of the amount of work done, or the risks undertaken, or the time spent on the litigation; [2] they create at least the appearance of impropriety; [3] they violate the California Rules of Professional Conduct prohibiting fee-sharing with clients and among lawyers; and [4] they encourage figurehead cases and bounty payments by potential class counsel. [5] The court found it particularly problematic that the incentive agreements correlated the incentive request solely to the settlement or litigated recovery, as the effect was to make the contracting class representatives' interests actually different from the class's interests in settling a case instead of trying it to verdict, seeking injunctive relief, and insisting on compensation greater than $10 million. [6] It further observed that the parties' failure to disclose their agreement to the court, and to the class, violated the contracting representatives' fiduciary duties to the class and duty of candor to the court.[6]

The Ninth Circuit affirmed the settlement's approval because it found that two independently-represented class

---

[4]Rodriguez v. West Publishing Corp., 563 F.3d 948, 957, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) ("The incentive agreements obligated class counsel to seek payment . . . in an amount that slid with the end settlement or verdict amount: if the amount were greater than or equal to $500,000, class counsel would seek a $10,000 award for each of them; if it were $1.5 million or more, counsel would seek a $25,000 award; if it were $5 million or more, counsel would seek $50,000; and if it were $10 million or more, counsel would seek $75,000.").

[5]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (noting that "the incentive agreements came to the fore when Objectors pounced on them in opposing class counsel's motion for incentive awards to the class representatives"). The Treatise's author was an expert witness regarding a fee request that was later filed by some of these objectors' lawyers.

[6]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

representatives did not suffer under the weight of the incentive agreements.[7] However, the Ninth Circuit did agree with the district court that the *ex ante* incentive agreements were contrary to public policy, discussing a host of problems with respect to the agreements:

- *Class representatives suffer conflict of interest.* The Ninth Circuit noted the fact that the agreements "tied the promised request to the ultimate recovery . . . put class counsel and the contracting class representatives into a conflict position from day one."[8] The court found that "[b]y tying their compensation—in advance—to a sliding scale based on the amount recovered, the incentive agreements disjoined the contingency financial interests of the contracting representatives from the class. As the district court observed, once the threshold cash settlement was met, the agreements created a disincentive to go to trial; going to trial would put their $75,000 at risk in return for only a marginal individual gain even if the verdict were significantly greater than the settlement. The agreements also gave the contracting representatives an interest in a monetary settlement, as distinguished from other remedies, that set them apart from other members of the class."[9]

- *Class counsel suffer conflict of interest.* The Ninth Circuit found that class counsel's simultaneous representation of parties with conflicting interests (the class representatives and the class) "implicate California ethics rules that prohibit representation of clients with

_____

[7]Rodriguez v. West Publishing Corp., 563 F.3d 948, 961, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) ("[W]e do not believe the district court was required to reject the settlement for inadequate representation. Only five of the seven class representatives had an incentive agreement. 'The adequacy-of-representation requirement is satisfied as long as one of the class representatives is an adequate class representative.' . . . Accordingly, we conclude that the presence of conflicted representatives was harmless." (citation omitted) (quoting Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 n.2, 17 I.E.R. Cas. (BNA) 796, 143 Lab. Cas. (CCH) P 10958, 50 Fed. R. Serv. 3d 511 (9th Cir. 2001), for additional opinion, see, 7 Fed. Appx. 753 (9th Cir. 2001))).

[8]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[9]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959–60, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

conflicting interests."[10]

- *Class counsel's entitlement to a fee is plausibly barred.*
  The Ninth Circuit, again relying on California ethics
  principles, noted that, "[s]imultaneous representation of
  clients with conflicting interests (and without written
  informed consent) is an automatic ethics violation in
  California and grounds for disqualification" and that
  under California law, "[a]n attorney cannot recover fees
  for such conflicting representation."[11]

- *Lack of transparency.* The Ninth Circuit further noted
  that such agreements must be disclosed at the class
  certification stage of the lawsuit "where it [is] plainly
  relevant" because "the district court would certainly
  have considered its effect in determining whether the
  conflicted plaintiffs . . . could adequately represent the
  class. The conflict might have been waived, or otherwise
  contained, but the point is that uncovering conflicts of
  interest between the named parties and the class they
  seek to represent is a critical purpose of the adequacy
  inquiry."[12]

- *Excessiveness.* Referencing an earlier decision concern-
  ing the potential excessiveness of incentive awards, the
  Ninth Circuit stated that "excess incentive awards may
  put the class representative in a conflict with the class
  and present a 'considerable danger of individuals bring-
  ing cases as class actions principally to increase their
  own leverage to attain a remunerative settlement for
  themselves and then trading on that leverage in the
  course of negotiations.' The danger is exacerbated if the
  named plaintiffs have an advance guarantee that a
  request for a relatively large incentive award will be
  made that is untethered to any service or value they

[10]Rodriguez v. West Publishing Corp., 563 F.3d 948, 960, 2009-1
Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[11]Rodriguez v. West Publishing Corp., 563 F.3d 948, 967–68, 2009-1
Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (quoting
Image Technical Service, Inc. v. Eastman Kodak Co., 136 F.3d 1354, 1358,
1998-1 Trade Cas. (CCH) ¶ 72067 (9th Cir. 1998)) (internal quotation
marks omitted).

[12]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1
Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

will provide to the class."[13]

- *Class Action Abuse*. The Ninth Circuit also stated that "agreements of this sort infect the class action environment with the troubling appearance of shopping plaintiffships. If allowed, ex ante incentive agreements could tempt potential plaintiffs to sell their lawsuits to attorneys who are the highest bidders, and vice-versa."[14]

Summarizing its decision, the Ninth Circuit stated:

> We conclude that incentive agreements, entered into as part of five named plaintiffs' retainer agreement with counsel, created conflicts among them (later certified as class representatives), their counsel (later certified as class counsel), and the rest of the class. It was inappropriate not to disclose these agreements at the class certification stage, because an ex ante incentive agreement is relevant to whether a named plaintiff who is party to one can adequately represent the class.[15]

While there are a variety of moving parts in the *Rodriguez* case, the decision is fairly damning of *ex ante* incentive agreements, *per se*. It is true that much of the court's concern stemmed from the content of the particular agreement—the sliding scale arrangement and the conflicts it created—but counsel's commitment *ex ante* to seek an incentive award for a putative class representative understandably troubled the court: such an award largely turns on the work the representative undertakes and the risks she faces, neither of which can be fully known *ex ante*. A commitment to seek some of the class's money from a potential recovery to serve these purposes therefore creates a conflict between the proposed class representative and the putative class, as well as between contracting class counsel and the putative class. It would thus not be too much of a stretch to read *Rodriguez* as condemning any *ex ante* agreement that counsel would make to pursue an incentive award. At the least, *Rodriguez* stands for the proposition that such an agreement would

---

[13]Rodriguez v. West Publishing Corp., 563 F.3d 948, 960, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (quoting Staton v. Boeing Co., 327 F.3d 938, 976–77, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003)).

[14]Rodriguez v. West Publishing Corp., 563 F.3d 948, 960, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[15]Rodriguez v. West Publishing Corp., 563 F.3d 948, 968, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

have to be disclosed at the class certification stage and the settlement stage of the lawsuit; any lack of transparency about such an agreement would consequently threaten to undermine certification and settlement as well.

## § 17:18 Judicial review—Disfavored practices— Excessive awards

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those practices is excessive incentive awards.

As discussed in a previous section of the Treatise,[2] a primary risk of incentive awards is that they skew the class representative's interests so as to conflict with those of the class she purports to serve. As most class suits are for small amounts of money, a hypothetical case might encompass claims worth $250 per class member with a settlement value of say, $100 per class member. If a settlement is proposed that returns a $20 voucher to each class member, but the class representative is promised a $15,000 incentive award if the settlement is approved, she may forgo resisting the questionable settlement on behalf of the class as she stands to profit so handsomely should it be approved.[3] Courts have therefore long attempted to ensure that the size of potential

---

[Section 17:18]

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[3]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) (noting that in an earlier case, the court had "reversed the district court's approval of a class-action settlement because the settlement provided for disproportionately large payments to class representatives" and explaining that such a settlement "magnified the risks associated with incentive awards because the awards there were much larger than the payments to individual class members, 'eliminat-[ing] a critical check on the fairness of the settlement for the class as a whole' " (quoting Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003))).

Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) ("[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to com-

incentive awards are not excessive, lest the class representative's interests so significantly diverge from those of the class that she ceases to be an adequate representative of the class under Rule 23(a)(4).[4]

The Sixth Circuit explained this rationale in a case involving allegations that a certain diaper caused baby rash.[5] After a study disproved the link between the diaper and the rash, the parties settled for some minor forms of relief,[6] while the named class representatives were promised $1,000 "per af-

---

promise the interest of the class for personal gain." (quoting **Newberg on Class Actions**)).

Sanz v. Johny Utah 51 LLC, 2015 WL 1808935, *1 (S.D.N.Y. 2015) ("Before awarding an incentive payment . . . a court must ensure that the named plaintiffs, as fiduciaries to the class, have not been tempted to receive high incentive awards in exchange for accepting suboptimal settlements for absent class members." (internal quotation marks omitted)).

Partridge v. Shea Mortg. Inc., 2008 WL 5384542, *1 (N.D. Cal. 2008) (denying plaintiffs' motion for an incentive payment in the amount of $15,000 because the plaintiff had not established any of the five factors tending to support incentive payments, and expressing concern that incentive payments might induce class representatives to accept settlements that serve their personal interests rather than the best possible result for the class as a whole).

Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720, Fed. Sec. L. Rep. (CCH) P 94403 (E.D.N.Y. 1989) ("If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

[4]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1161 (9th Cir. 2013) ("Moreover, the conditional incentive awards significantly exceeded in amount what absent class members could expect to get upon settlement approval. Because these circumstances created a patent divergence of interests between the named representatives and the class, we conclude that the class representatives and class counsel did not adequately represent the absent class members, and for this reason the district court should not have approved the class-action settlement.").

[5]In re Dry Max Pampers Litigation, 724 F.3d 713, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013).

[6]In re Dry Max Pampers Litigation, 724 F.3d 713, 716, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("P & G agreed to reinstate, for one year, a refund program that P & G had already made available to its customers from July 2010 to December 2010. The program limits refunds to one box per household, and requires consumers to provide an original receipt and UPC code clipped from a Pampers box. P & G also agreed, for a period of two years, to add to its Pampers box-label a single sentence suggesting that consumers 'consult Pampers.com or call 1-800-Pampers' for 'more in-

fected child" and class counsel was to receive $2.73 million in attorney's fees.[7] The district court approved the settlement with seemingly little review[8] and the Sixth Circuit reversed. The Sixth Circuit explicitly took no position on the propriety of incentive payments in general, but characterized such payments to the class representatives and the payment to the class members as "two separate settlement agreements folded into one,"[9] with the former being so great that the class representatives had "no interest in vigorously prosecuting the [interests of] unnamed class members."[10] Summarizing its position, the court stated:

> The propriety of incentive payments is arguably at its height when the award represents a fraction of a class representative's likely damages; for in that case the class representative is left to recover the remainder of his damages by means of the same mechanisms that unnamed class members must re-

---

formation on common diapering questions such as choosing the right Pampers product for your baby, preventing diaper leaks, diaper rash, and potty training[.]' P & G similarly agreed, for a period of two years, to add to the Pampers website some rudimentary information about diaper rash (*e.g.*, '[d]iaper rash is usually easily treated and improves within a few days after starting treatment') and a suggestion to '[s]ee your child's doctor' if certain severe symptoms develop (*e.g.*, 'pus or weeping discharge'), along with two links to other websites. P & G also agreed to contribute $300,000 to a pediatric resident training program—the recipient program is not identified in the agreement—and $100,000 to the American Academy of Pediatrics to fund a program 'in the area of skin health.' ").

[7]In re Dry Max Pampers Litigation, 724 F.3d 713, 716, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013).

[8]In re Dry Max Pampers Litigation, 724 F.3d 713, 717, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("The district court entered its 'Final Approval Order and Final Judgment' later that afternoon [of the fairness hearing]. With the exception of a few typographical changes, the order was a verbatim copy of a proposed order that the parties had submitted to the court before the hearing. The order was conclusory, for the most part merely reciting the requirements of Rule 23 in stating that they were met. About [a class member's] objections, the order had nothing to say.").

[9]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013); *see also* Women's Committee For Equal Employment Opportunity (WC=EO) v. National Broadcasting Co., 76 F.R.D. 173, 180, 19 Fair Empl. Prac. Cas. (BNA) 1703, 15 Empl. Prac. Dec. (CCH) P 7832, 24 Fed. R. Serv. 2d 359 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

[10]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) (internal quotation marks omitted).

cover theirs. The members' incentives are thus aligned. But we should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief.

This case falls into the latter scenario. The $1000-per-child payments provided a *disincentive* for the class members to care about the adequacy of relief afforded unnamed class members, and instead encouraged the class representatives to compromise the interest of the class for personal gain. The result is the settlement agreement in this case. The named plaintiffs are inadequate representatives under Rule 23(a)(4), and the district court abused its discretion in finding the contrary.[11]

The Sixth Circuit's concern in the *Pampers* case was one of proportionality, comparing the size of the incentive award to the size of each class member's individual reward. The Ninth Circuit has expressed concern, as well, about the number of persons receiving such special payment and the relationship of the total amount of special payments to the total settlement in the case.[12]

Courts have found incentive payments to be excessive in four sets of circumstances:

- when the raw number seems too high;[13]
- when the amount sought is disproportionate to the contributions of the named plaintiffs;[14]
- when the amount of the incentive award is far greater than the amount of compensation each individual class

---

[11]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) (citation omitted) (internal quotation marks omitted).

[12]Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("[T]he different orders of magnitude in the present case concerning the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment—here up to $50,000, with an average of more than $30,000—are obvious.").

[13]In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 277 (S.D. Ohio 1997), order rev'd on other grounds, 24 Fed. Appx. 520 (6th Cir. 2001) (declining to approve a proposed incentive award of $25,000 for prison inmate plaintiffs because, *inter alia*, "the requested $25,000 is extremely disproportionate to the amount an inmate can earn otherwise").

[14]**First Circuit (District Court)**

In re Puerto Rican Cabotage Antitrust Litigation, 815 F. Supp. 2d 448, 469 (D.P.R. 2011) ("While the Court notes the named plaintiffs' involvement in advancing the present litigation, the Court finds that the amount of the incentive award requested is excessive and unreasonable. The Class Representatives did not undertake substantial risk or suffer notoriety or personal hardships by acting as a named plaintiff. There is no indication that [the Class Representatives] assumed a risk or inconvenience not shared by the other class members which is of such magnitude to merit an incentive award, and Plaintiffs do not provide specific evidence of the purported risk's magnitude." (footnote omitted) (international quotation marks omitted)).

**Second Circuit (District Court)**

Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720, Fed. Sec. L. Rep. (CCH) P 94403 (E.D.N.Y. 1989) (rejecting request for $5,000 incentive award because although plaintiff "took time away from his practice to respond to defendant's document request and to be deposed[,] [b]eyond these normal obligations of class representation . . . he did not perform any extraordinary services to the class").

**Third Circuit (District Court)**

In re Laidlaw Securities Litigation, 1992 WL 236899, *3 (E.D. Pa. 1992) ("Plaintiffs' counsel also request that the court grant an incentive award of $10,000, to be paid out of plaintiffs' counsel's awarded fees, to the lead plaintiff, Donald Singleton. This award would be paid to Mr. Singleton in addition to the payment he would receive out of the settlement fund as a class member. The court perceives no reason for treating Mr. Singleton any differently from other members of the class. There is no indication that Mr. Singleton, by acting as the named class representative, has assumed a risk or inconvenience not shared by the other class members which is of such magnitude to merit the award of an additional $10,000. Therefore, the request to grant an incentive award to the named class representative is denied.").

**Ninth Circuit (District Court)**

Krzesniak v. Cendant Corp., 2008 WL 4291539, *1 (N.D. Cal. 2008) ("As to the amount of the incentive award, the Court finds it excessive. First, the Court notes that Plaintiff does not specify the amount of time and effort he spent on this case. Second, in arguing that $15,000 is at the modest end of the incentive award spectrum, he cites to cases that are clearly distinguishable. In [a prior case] the court awarded $20,000 to each of two named plaintiffs, finding that each plaintiff 'spent in excess of 500 hours' time at counsels' request' in the litigation. Here, there is no evidence before the Court that Plaintiff himself spent anywhere near this amount of time on the present case." (quoting Bogosian v. Gulf Oil Corp., 621 F. Supp. 27, 32, 1985-1 Trade Cas. (CCH) ¶ 66510 (E.D. Pa. 1985))).

In re Heritage Bond Litigation, 2005 WL 1594403, *18 (C.D. Cal. 2005) (approving incentive awards to named plaintiffs but reducing the requested sums because, *inter alia,* "no declaration submitted accurately quantifies how Lead Plaintiffs spent their time during this litigation,"

§ 17:18                          NEWBERG ON CLASS ACTIONS

member is entitled to receive; and,[15]

_____

"[t]he Court is only presented with blanket statements as to how Class Representatives participated in this action," and "there is no showing that Lead Plaintiffs' participation placed them at risk of damaged reputation or retaliation").

**Tenth Circuit (District Court)**

In re Sprint Corp. ERISA Litigation, 443 F. Supp. 2d 1249, 1271, 39 Employee Benefits Cas. (BNA) 2810 (D. Kan. 2006) ("As to plaintiffs' request for an award of $15,000 to each of the named plaintiffs . . . the court simply cannot find that such an award is reasonable. The court certainly recognizes that the time these individuals devoted to this lawsuit inured to the common benefit of the class and, to that end, the court believes they are entitled to some type of incentive award above and beyond what the typical class member is receiving. They have performed an important service to the class and the burden of this commitment deserves to be recognized through an award. But, although the aggregate value of the settlement is significant, no class member stands to gain more than $1,000 on an average, per-plaintiff basis. The named plaintiffs devoted approximately 80 hours, on average, to this lawsuit. The court believes that an award of $5,000 adequately compensates each of them for their time.").

[15]**Second Circuit (District Court)**

In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *3 n.10 (S.D.N.Y. 2007) (noting that "the Court concludes that the requested $20,000 per-plaintiff fee would be excessive, especially in light of the indirect, and much smaller, monetary relief accruing to the more than 65,000 absent class members" and stating that the "Court has taken proportionality into account . . . [as] the primary justification offered for the reduction of the incentive award").

Sheppard v. Consolidated Edison Co. of New York, Inc., 2002 WL 2003206, *6 (E.D.N.Y. 2002) ("Although these reasons support an award of incentive payments, I decline to award incentive payments in the extraordinarily high amounts requested. Once again, I find that the amounts sought as incentive awards are grossly disproportionate to the compensation to be paid to the absent class members the plaintiffs seek to represent. In my view, appropriate incentive awards here are one-sixth of the proposed maximum amounts . . .").

**Ninth Circuit**

Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1161, 1165 (9th Cir. 2013) (holding that the "incentive awards significantly exceeded in amount what absent class members could expect to get upon settlement approval" thereby creating a "patent divergence of interests between the named representatives and the class" and stating that "[t]here is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards").

Staton v. Boeing Co., 327 F.3d 938, 946, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("Finally, the decree sets up a two-tiered structure for the

570

- when the aggregate amount of incentive awards constitutes too great a portion of the class's full recovery.[16]

---

distribution of monetary damages, awarding each class representative and certain other identified class members an amount of damages on average sixteen times greater than the amount each unnamed class member would receive. At least one person not a member of the class was provided a damages award. The record before us does not reveal sufficient justification either for the large differential in the amounts of damage awards or for the payment of damages to a nonmember of the class. On this ground as well, the district court abused its discretion in approving the settlement.").

Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) (denying preliminary approval of the settlement because "[t]he $10,000 currently earmarked for [the class representative] is more than 7 percent of the total settlement fund, more than 15 percent of the total amount of the common fund earmarked for the class, and more than 37 times the $269 average net recovery of the unnamed class members").

Wallace v. Countrywide Home Loans, Inc., 22 Wage & Hour Cas. 2d (BNA) 849, 2014 WL 5819870, *4 (C.D. Cal. 2014) (reducing requested incentive awards from $50,000 to $1,500 for each named plaintiff because "individual class members are entitled to receive no more than $1,500 under the settlement," and noting that "[a]n incentive award 33 times greater than the maximum possible recovery of other individual class members creates a 'significant disparity,' " particularly as the named plaintiffs did not appear to have suffered "any particular risks or hardships caused by their participation in this litigation").

**Tenth Circuit (District Court)**

In re Sprint Corp. ERISA Litigation, 443 F. Supp. 2d 1249, 1271, 39 Employee Benefits Cas. (BNA) 2810 (D. Kan. 2006) (reducing requested incentive awards from $15,000 to $5,000 for each named plaintiff, despite multi-million dollar settlement amount, because, *inter alia*, no individual class member stood to recover more than $1,000 from the settlement).

[16]**Second Circuit (District Court)**

Ramirez v. Ricoh Americas Corp., 2015 WL 413305, *5 (S.D.N.Y. 2015) ("The fact that the plaintiff requests $20,000, or 5.71% of the settlement fund, as his service award, and there is absent from the motion record any evidence of the reaction of putative class members to the settlement, are of concern to the Court. The Court finds that this factor does not militate in favor of granting the plaintiff's motion.").

Gortat v. Capala Bros., 949 F. Supp. 2d 374, 378, 22 Wage & Hour Cas. 2d (BNA) 1407 (E.D.N.Y. 2013), aff'd, 568 Fed. Appx. 78, 22 Wage & Hour Cas. 2d (BNA) 1420 (2d Cir. 2014) (declining to grant incentive awards that would have constituted 61.74% of the total award granted to all plaintiffs, calling this amount "breathtaking" and explaining that it would have been "an exercise of discretion inexcusably abused").

Sheppard v. Consolidated Edison Co. of New York, Inc., 2002 WL 2003206, *6 (E.D.N.Y. 2002) ("In awarding these payments as part of a

Among these practices, perhaps the starkest and surely

settlement, a court must ensure that the named plaintiffs, as fiduciaries to the class, have not been tempted to receive high incentive awards in exchange for accepting suboptimal settlements for absent class members. A particularly suspect arrangement exists where the incentive payments are greatly disproportionate to the recovery set aside for absent class members . . .").

Dornberger v. Metropolitan Life Ins. Co., 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (approving incentive awards because, *inter alia,* "these incentive awards are small in relation to the $13 million . . . fund from which the awards will be made").

**Ninth Circuit**

Staton v. Boeing Co., 327 F.3d 938, 948, 978, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (striking settlement and denying incentive awards because, *inter alia*, the named plaintiffs constituted "less than two percent of the class" but would have received "more than half the monetary award").

Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) (denying preliminary approval of settlement because "[t]he $10,000 currently earmarked for [the class representative] is more than 7 percent of the total settlement fund, more than 15 percent of the total amount of the common fund earmarked for the class, and more than 37 times the $269 average net recovery of the unnamed class members").

Bellinghausen v. Tractor Supply Company, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (denying a $15,000 award in part because this would have constituted "2 percent of the gross settlement funds, which is higher than what other courts have found to be acceptable").

Ontiveros v. Zamora, 2014 WL 3057506, *9 (E.D. Cal. 2014) ("An incentive award consisting of one percent of the common fund is unusually high, and some courts have been reticent to approve incentive awards that constituted an even smaller portion of the common fund.").

Daniels v. Aeropostale West, Inc., 22 Wage & Hour Cas. 2d (BNA) 1276, 2014 WL 2215708, *7 (N.D. Cal. 2014) (denying $5,000 incentive award because the request was "excessive" considering that the total proposed settlement amount was $8,645.61).

Ko v. Natura Pet Products, Inc., 2012 WL 3945541, *15 (N.D. Cal. 2012), appeal dismissed, (9th Cir. 12-17296)(Apr. 24, 2013) (reducing incentive award to $5,000 because the requested sum of $20,000 would have been "excessive under the circumstances" as it would have constituted "approximately 1% percent [sic] of the gross settlement amount").

Sandoval v. Tharaldson Employee Management, Inc., 2010 WL 2486346, *10 (C.D. Cal. 2010) (reducing incentive award to $7,500 because this figure constituted "1% of the gross settlement" and noting that the requested sum of $12,500 would have been "excessive under the circumstances").

Krzesniak v. Cendant Corp., 2008 WL 4291539, *2 (N.D. Cal. 2008) (reducing incentive award from $15,000 to $1,500 and noting that approved incentive awards in three other cases represented 0.001%, 0.007%,

the most beguiling is the relationship between the incentive award amount and each class member's individual recovery. The problem is that most class actions are for small amounts of money, on the one hand, while incentive awards are meant to compensate class representatives for their service to the class and for the risks that they encountered in providing that service, on the other. However, there is no obvious connection between the size of each class member's individual claims and the appropriate compensation for the named plaintiff's services. The Ninth Circuit noted in one case that "[t]here is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards."[17] The proposed incentive award was anywhere from 192 to 6 times greater than a class member's recovery. The former number surely serves the Ninth Circuit's point, but does the latter? Moreover, even when the proposed $5,000 incentive award is almost 200 times greater than a class member's recovery, if the class representatives have invested significant amounts of time and, for example, faced retaliation or other risks for their efforts, $5,000 does not seem that extravagant a payment.

It is completely understandable that courts would worry about this disparity and a positive development that they in fact do. But there is an aspect of the disparity that is built into the very nature of the endeavor: in class suits, the claims will almost invariably be small in nature, yet the class representatives most worthy of an award will typically be those who worked the hardest and suffered most.

### §17:19 Incentive awards in securities class actions under the PSLRA

The Private Securities Litigation Reform Act of 1995 ("PSLRA") appears to prohibit incentive awards to class

---

and 0.003% of total payments to class members while $15,000 in the present case would have represented 0.052% of the total payments).

[17]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

representatives in securities class actions,[1] though the actual practices under the PSLRA are more nuanced.[2] With the PSLRA, Congress aimed to transfer control of securities class actions from small-stakes clients (who Congress believed to be controlled by class counsel) to large institutional investors (who Congress thought might better monitor and control class counsel). Imposing limitations on incentive awards was part of that effort, though many critics have noted that if Congress' aim was to encourage institutional involvement, its crackdown on incentive payments may have been counterproductive.[3]

The PSLRA appears to bar incentive awards in two interconnected sections. *First*, 15 U.S.C. § 78u-4(a)(2)(A) requires a plaintiff seeking to serve as a class representative to file a sworn certification with her complaint in which she avers to a series of items, including that she "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's *pro rata* share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." *Second,* 15 U.S.C. § 78u-4(a)(4) states:

> The share of any final judgment or of any settlement that is

---

**[Section 17:19]**

[1]*See* 15 U.S.C.A. § 78u-4(a)(2)(A)(vi), (4) (2010).

[2]In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 2008 WL 2714176, *1 (S.D. Tex. 2008) ("There is a rigorous debate whether it is proper in class actions generally to approve an incentive award to named plaintiffs because these class representatives take risks and perform services that benefit the class." (citing **Newberg on Class Actions**)).

[3]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1347 (2006) ("A flat rule such as the PSLRA's ban on payments to class representatives not only is not clearly supported but may be counterproductive. The large-scale investors that Congress hoped to have serve as class representatives after the PSLRA may be the investors most sensitive to recovering their opportunity and other costs if they do serve. Therefore, to the extent these sought-after representatives are discouraged from serving by the anti-incentive-award rule, the rule may compete with the perhaps more important goal of securing sophisticated and large representative plaintiffs.").

*See generally* Richard A. Nagareda, Restitution, Rent Extraction, and Class Representatives: Implications of Incentive Awards, 53 UCLA L. Rev. 1483 (2006).

awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

Most,[4] though not all,[5] courts have read these provisions as barring incentive awards.

The peculiar aspect of these provisions is that although they appear to bar incentive awards, they simultaneously

---

[4]In re Schering-Plough Corp. Enhance Securities Litigation, 2013 WL 5505744, *37 (D.N.J. 2013), appeal dismissed, (3rd Circ. 13-4328)(Apr. 17, 2014) ("Although the PSLRA specifically prohibits incentive awards or 'bonuses' to Lead Plaintiffs . . .").

Ray v. Lundstrom, Fed. Sec. L. Rep. (CCH) P 97083, 2012 WL 5458425, *3 (D. Neb. 2012) ("Although the PSLRA does not permit incentive awards . . .").

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *17 (D.N.M. 2011) ("Congress has expressed hostility to incentive awards in the [PSLRA] which precludes incentive awards in securities-fraud litigation.").

In re TVIA Inc. Securities Litigation, 2008 WL 2693811, *2 (N.D. Cal. 2008) ("[T]his court has itself previously found that in light of the text of § 78u-4(a)(4), and the clear intention to eliminate financial incentives, bonuses and bounties for serving as lead plaintiff, incentive awards and compensatory awards falling outside the costs and expenses specified by the PSLRA are inconsistent with the express goals of § 78u-4(a) (4)." (citing In re ESS Technology, Inc. Securities Litigation, 2007 WL 3231729, *4 (N.D. Cal. 2007))).

Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P 94205, 2007 WL 1101272, *12 (E.D. Pa. 2007) ("The district courts that have awarded incentive awards or requested amounts without requiring any explanation or detailing of the alleged costs in cases where PSLRA clearly applies, appear to be ignoring the clear language of PSLRA.").

Swack v. Credit Suisse First Boston, LLC, Fed. Sec. L. Rep. (CCH) P 94106, 2006 WL 2987053, *5 (D. Mass. 2006) ("I find that a representative plaintiff is only entitled under the PSLRA to an award of 'reasonable costs and expenses' over and above his or her pro rata share of the recovery, and not to a traditional 'compensation' or 'incentive' award. The representative plaintiff's significant stake in the outcome of the litigation is assumed to be sufficient incentive to remain involved in the litigation and to incur such expenses in the first place.").

[5]In re Heritage Bond Litigation, 2005 WL 1594403, *17 (C.D. Cal. 2005) (stating that "[i]t is within this Court's discretion to award incentive fees to named class representatives in a class action suit" and proceeding to do so).

permit named plaintiffs to be reimbursed for "reasonable
costs and expenses (including lost wages) . . ."[6] Courts
therefore regularly award representative plaintiffs monies
under these sections,[7] and such awards are similar to service
or incentive awards in regular class suits. Where the courts
have split somewhat, however, is in how much documenta-
tion they require.[8] Some courts require little documentation
and hence appear to treat the reimbursement provision as

---

[6]*See* 15 U.S.C.A. § 78u-4(a)(4).

[7]In re Schering-Plough Corp. Enhance Securities Litigation, 2013
WL 5505744, *37 (D.N.J. 2013), appeal dismissed, (3rd Circ. 13-4328)(Apr.
17, 2014) ("Reasonable payments to compensate class representatives for
the time and effort devoted by them have been approved.").

In re American Intern. Group, Inc. Securities Litigation, 2012 WL
345509, *6 (S.D.N.Y. 2012) ("Courts in this Circuit routinely award . . .
costs and expenses both to reimburse the named plaintiffs for expenses
incurred through their involvement with the action and lost wages, as
well as to provide an incentive for such plaintiffs to remain involved in the
litigation and to incur such expenses in the first place." (internal quota-
tion marks omitted)).

In re Giant Interactive Group, Inc. Securities Litigation, 279 F.R.D.
151, 166 (S.D.N.Y. 2011) (awarding incentive awards to four named
plaintiffs and stating that "the Court finds that the lead plaintiffs devoted
substantial effort and time to this case, including reviewing filings, pro-
ducing documents, and travelling to be deposed, making these requests
for awards reasonable").

In re Marsh & McLennan Companies, Inc. Securities Litigation,
2009 WL 5178546, *21 (S.D.N.Y. 2009) (awarding a combined $214,657 to
two institutional lead plaintiffs).

In re American Business Financial Services Inc. Noteholders Ltigia-
tion, Fed. Sec. L. Rep. (CCH) P 95015, 2008 WL 4974782, *19 (E.D. Pa.
2008) (awarding costs and expenses to lead plaintiffs).

Hicks v. Stanley, Fed. Sec. L. Rep. (CCH) P 93,579, 2005 WL
2757792, *10 (S.D.N.Y. 2005) ("Courts in this Circuit routinely award
such costs and expenses both to reimburse the named plaintiffs for expen-
ses incurred through their involvement with the action and lost wages, as
well as to provide an incentive for such plaintiffs to remain involved in the
litigation and to incur such expenses in the first place.").

In re WorldCom, Inc. ERISA Litigation, 33 Employee Benefits Cas.
(BNA) 2291, 59 Fed. R. Serv. 3d 1170 (S.D.N.Y. 2004), order clarified,
2004 WL 2922083 (S.D.N.Y. 2004) (awarding $5,000 to each of the three
named plaintiffs because they had "performed an important service to the
class and the burden of this commitment deserves to be recognized
through an award from the common fund").

[8]In re Enron Corp. Securities, Derivative & "ERISA" Litigation,
2008 WL 2714176, *2 (S.D. Tex. 2008) (noting the "split between courts
which have read the [PSLRA] narrowly and strictly limited reimburse-

quite similar to a flat incentive award.[9] Other courts require

---

ment to actual costs and expenses incurred, many only when proven with detailed evidence, and other courts that have granted lead plaintiffs incentive awards to encourage high quality monitoring and not insisted that alleged costs and expenses to be detailed or even limited to 'costs and expenses directly relating to representation of the class" (footnote omitted) (internal quotation marks omitted)).

[9]In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation, 364 F. Supp. 2d 980, 1000, Fed. Sec. L. Rep. (CCH) P 93239 (D. Minn. 2005) ("Lead plaintiffs here have fully discharged their PSLRA obligations and have been actively involved throughout the litigation. These individuals communicated with counsel throughout the litigation, reviewed counsels' submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws. The court, therefore, awards the $100,000 collectively to the lead plaintiff group to be distributed among the eight lead plaintiffs in a manner that plaintiffs' co-lead counsel shall determine in their discretion.").

Hicks v. Stanley, Fed. Sec. L. Rep. (CCH) P 93,579, 2005 WL 2757792, *10 (S.D.N.Y. 2005) ("Finally, the court approves the reimbursement of expenses to lead plaintiff Nicholson pursuant to plaintiff's motion. Nicholson spent considerable time discharging his responsibilities as lead plaintiff and class representative. The PSLRA permits lead plaintiffs to recover reasonable costs and expenses related to their representation of the class. Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." (citation omitted)).

Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 355, R.I.C.O. Bus. Disp. Guide (CCH) P 10837 (S.D.N.Y. 2005), aff'd in part, vacated in part, remanded, 443 F.3d 253, R.I.C.O. Bus. Disp. Guide (CCH) P 11050 (2d Cir. 2006) ("In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by the plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery.").

In re WorldCom, Inc. ERISA Litigation, 33 Employee Benefits Cas. (BNA) 2291, 59 Fed. R. Serv. 3d 1170 (S.D.N.Y. 2004), order clarified on other grounds, 2004 WL 2922083 (S.D.N.Y. 2004) (awarding the three named plaintiffs $5,000 each because "the three plaintiffs have been intimately involved in every step of the litigation. The named plaintiffs have performed an important service to the class and the burden of this commitment deserves to be recognized through an award from the common fund.").

In re Infospace, Inc., 330 F. Supp. 2d 1203, 1216 (W.D. Wash. 2004) ("Lead Plaintiffs Amir Heshmatpour and Ronald Wyles on behalf of

clear proof of expenses[10] and hence read the provision more

---

Coastline Corporation Ltd. have requested reimbursement of their costs and expenses. A court may award 'reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative serving on behalf of the class.' Amir Heshmatpour requests $5,000, and Ronald Wyles requests $6,600. The Court finds these amounts to be reasonable." (quoting 15 U.S.C.A. § 78U-4(a)(4))).

[10]In re TVIA Inc. Securities Litigation, 2008 WL 2693811, *2 (N.D. Cal. 2008) (finding "no evidence in the conclusory statements provided in [lead plaintiff's] declaration that the compensation he seeks is reimbursement for costs, expenses or lost wages, reasonable or otherwise, as required by the text of § 78u-4(a)(4)" and thus declining to award the requested $15,000 compensation).

Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P 94205, 2007 WL 1101272, *12 (E.D. Pa. 2007) ("The class representative failed to provide this court with any evidence of actual expenses incurred, lost wages, lost vacation time, or lost business opportunities. I conclude that the class representative has failed to demonstrate that he has incurred any 'reasonable costs and expenses' that can be awarded under PSLRA. Thus, the court will not award [named plaintiff] anything beyond his pro rata share of the settlement fund.").

In Re Ntl, Inc. Securities Litigation, 2007 WL 623808, *10 (S.D.N.Y. 2007) ("Lead Plaintiffs have signed certifications pursuant to the PSLRA, but their affidavits fail to explain how they determined their asserted hourly 'lost wages.' Without a better explanation for claims of $200–800 per hour of 'lost wages,' the Court should decline to award such amounts." (citation omitted)).

In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 2007 WL 313474, *25 (S.D.N.Y. 2007) ("Although [the lead plaintiff] claims to have spent time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead plaintiff. Under the PLSRA, it is simply not enough . . . to assert that she took time out of her workday and that her time is conservatively valued at $500 per hour. Accordingly, the Court declines to award reimbursement to [lead plaintiff].").

Swack v. Credit Suisse First Boston, LLC, Fed. Sec. L. Rep. (CCH) P 94106, 2006 WL 2987053, *5 (D. Mass. 2006) ("Since Congress specifically chose to limit recovery in PSLRA cases to reasonable costs and expenses (including lost wages) directly relating to the representation of the class, . . . I find that a representative plaintiff must provide the court with meaningful evidence demonstrating his or her actual costs and expenses (including lost wages) directly relating to the representation of the class . . ." (internal quotation marks omitted)).

Abrams v. Van Kampen Funds, Inc., Fed. Sec. L. Rep. (CCH) P 93,648, 2006 WL 163023, *4 (N.D. Ill. 2006) ("Lead plaintiffs do not contend that any portion of the requested amount represents any actual expenses that either has incurred. They do not claim that they missed any

narrowly. In particular, courts are more accepting of familiar nontaxable costs (such as documented travel expenses and fax, photocopy, and telephone charges)[11] but are more skeptical of lost wages or business opportunities, as the latter are often particularly difficult to document.[12]

---

work or other earning opportunity in order to participate in the litigation. Under the PSLRA, lead plaintiffs cannot be awarded additional compensation. The request for a compensatory award will be denied.").

In re KeySpan Corp. Securities Litigation, Fed. Sec. L. Rep. (CCH) P 93534, 2005 WL 3093399, *21 (E.D.N.Y. 2005) ("Counsel fail to provide *any* basis for determining what reasonable costs and expenses were incurred [by lead plaintiffs]. Counsel have not shown how the time expended by the Class Representative and Lead Plaintiffs resulted in actual losses, whether in the form of diminishment in wages, lost sales commissions, missed business opportunities, use of leave or vacation time or actual expenses incurred. Without any proof or detail in this regard, I recommend that Class Representative and Lead Plaintiffs not be awarded any payment beyond their *pro rata* share of the settlement.").

In re AMF Bowling, 334 F. Supp. 2d 462, 470 (S.D.N.Y. 2004) (finding no congressional intent for undocumented reimbursements under the PSLRA and denying requested reimbursements to class representatives in part because of the lack of such documentation).

[11]For a discussion of what constitute nontaxable costs, *see* Rubenstein, 5 **Newberg on Class Actions** § 16:5 (5th ed.).

[12]In re Genta Securities Litigation, 70 Fed. R. Serv. 3d 931 (D.N.J. 2008) ("This Court accepts [lead plaintiff's] assertion that he incurred $5250 in costs from travel expenses, fax and photocopy expenses, and telephone charges. However, [lead plaintiff] has not submitted any evidence showing that he lost wages or business opportunities due to the time he spent working on the instant litigation. Although [lead plaintiff] estimated that he spent 222.36 hours performing duties related to this action, and established his discounted billing rate as $225 per hour, [he] has failed to show that his contributions to this action foreclosed him from obtaining business opportunities or earning wages.").

Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P 94205, 2007 WL 1101272, *12 (E.D. Pa. 2007) ("The class representative failed to provide this court with any evidence of actual expenses incurred, lost wages, lost vacation time, or lost business opportunities. I conclude that the class representative has failed to demonstrate that he has incurred any 'reasonable costs and expenses' that can be awarded under PSLRA. Thus, the court will not award [named plaintiff] anything beyond his pro rata share of the settlement fund.").

In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 2007 WL 313474, *25 (S.D.N.Y. 2007) ("Although [the lead plaintiff] claims to have spent time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead

Thus, while Congress sought to limit incentive awards in class suits when it enacted the PSLRA, it did allow some payments to be made to class representatives, and courts have awarded such payments. Empirical data on incentive awards, described elsewhere in the Treatise,[13] nonetheless demonstrate that class representatives are least likely to get incentive awards in securities suits than in any other type of case. One study of cases resolved between 1993–2002 (which therefore straddles the enactment of the PSLRA) reported that courts granted incentive awards in 27.8% of all cases but 24.5% of securities cases.[14] A later study of cases resolved between 2006–2011 reported that courts granted incentive awards in 71.3% of all cases but in only 38.7% of securities cases.[15] To be clear, these data are not differentiating between cases in which counsel never applied for awards and those in which the court rejected an award, so the source of the lower award rate is unclear. Yet its existence is not.

The peculiarity about this state of affairs is that in enacting the PSLRA, Congress explicitly wanted class representatives to seize control of securities cases from class counsel. To accomplish that end, it sought to engage institutional investors in the endeavor by holding that the largest shareholder could be named the lead plaintiff in the case and authorized to hire lead counsel. Yet Congress provided very little incentive for those institutions to undertake that work and, in curtailing incentive awards, it destroyed one of the few incentives that did exist. Moreover, as Professor Nagareda argued some years ago, if the point of incentive awards is to reward *quality monitoring*, it seems particularly odd to limit awards in the very cases in which the goal is to

---

plaintiff. Under the PLRSA, it is simply not enough . . . to assert that she took time out of her workday and that her time is conservatively valued at $500 per hour. Accordingly, the Court declines to award reimbursement to [lead plaintiff].").

[13]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:7 to 17:8 (5th ed.).

[14]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1323 tbl.2 (2006).

[15]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

encourage quality monitors:[16]

> The PSLRA hinders the practical achievement of its own ide-
> als for class representatives by confining incentive awards to
> restitution and rejecting complementary notions of reward. By
> limiting awards to "reasonable costs and expenses," the PSLRA
> seeks to fight the proverbial last war—to respond to perceived
> abuses in the pre-PSLRA era rather than to design a legal
> framework for awards under the changed arrangements for
> lead plaintiffs promoted by the PSLRA itself. When it comes to
> service as a PSLRA lead plaintiff, one substantial sticking
> point for many institutional investors appears to be precisely
> the prospect of merely gaining restitution for their efforts,
> without the possibility of reward beyond their pro rata share
> of any class-wide recovery. This result is ironic, to say the
> least, when the law consciously seeks to induce high-quality
> monitoring from persons who devote their professional lives to
> seeking big financial rewards, not just restitution for the costs
> and expenses of their efforts.[17]

In short, the PSLRA sends a mixed message: it aims to
encourage large stake holders to intervene and seize control
of such cases while insisting that they not be compensated
in the normal manner for doing so.

## § 17:20  Incentive awards for objectors

As discussed in a prior section,[1] class members who
provide a service to the class are eligible to apply for an
incentive award from the court. Typically, it is the class rep-
resentative or named plaintiff who is the applicant, as these

---

[16]Richard A. Nagareda, Restitution, Rent Extraction, and Class
Representatives: Implications of Incentive Awards, 53 UCLA L. Rev. 1483,
1491 (2006) ("The embrace of high-quality monitoring as a public policy
goal and the experience with institutional investors in the post-PSLRA pe-
riod, together, highlight the anomaly of awards confined to 'reasonable
costs and expenses.' In this context, the law wants high-quality monitor-
ing to occur but has encountered obstacles in achieving that goal. If
anything, the logic behind installing institutional investors as lead
plaintiffs supports a more—not less—wide-ranging inquiry for incentive
awards in securities litigation.").

[17]Richard A. Nagareda, Restitution, Rent Extraction, and Class
Representatives: Implications of Incentive Awards, 53 UCLA L. Rev. 1483,
1491 (2006).

**[Section 17:20]**

[1]For a discussion of eligibility for incentive awards, *see* Rubenstein,
5 **Newberg on Class Actions** § 17:6 (5th ed.).

parties undertake special functions on behalf of absent class members, sometimes face unique risks in stepping forward to represent the class, and generally serve an important function in enabling a class action by their service to the class.[2] Class members who object to a proposed settlement or fee award and are in some way successful in reshaping the settlement similarly serve an important function in class action practice: because the class representative and class counsel are largely unmonitored agents of the class, those class members who take the time to scrutinize proposed settlements and provide their reactions to the court may assist the court in undertaking its oversight function and serve the class accordingly.[3] Counsel who represent objectors have therefore sought incentive awards on behalf of their objector clients.

Three issues are presented by such proposals: *first,* whether objectors are entitled to seek incentive awards; *second,* if they are, what are the circumstances in which courts should provide such awards; and *third,* if awards are provided, what amount is appropriate.

*Eligibility.* The answer to the first question seems clear: an objector is necessarily a class member and if that class member provides a service to the class, she stands in a similar position to the class representative entitled to an award and should therefore be similarly entitled. Many courts have so held either directly,[4] or indirectly by entertaining objector incentive award petitions, while few courts have held that objectors are never entitled to seek an award.[5] At least one

---

[2]For a discussion of these rationale that underlie incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[3]In re Cardinal Health, Inc. Securities Litigation, 550 F. Supp. 2d 751, 753, Fed. Sec. L. Rep. (CCH) P 94714 (S.D. Ohio 2008) (noting that objectors can "add value to the class-action settlement process by: (1) transforming the fairness hearing into a truly adversarial proceeding; (2) supplying the Court with both precedent and argument to gauge the reasonableness of the settlement and lead counsel's fee request; and (3) preventing collusion between lead plaintiff and defendants").

[4]Hartless v. Clorox Co., 273 F.R.D. 630, 647 (S.D. Cal. 2011), aff'd in part, 473 Fed. Appx. 716 (9th Cir. 2012) (recognizing that incentive awards for objectors are "sometimes available . . . if the objection confers a significant benefit to the class").

[5]Rose v. Bank of America Corp., 2015 WL 2379562, *3 (N.D. Cal.

court has entertained a request from a *pro se* objector.[6] Occasionally, class representatives who later become objectors receive incentive awards, but in granting those awards, the courts have not isolated their service as objectors as independently warranting an award.[7] At least one court has denied an objector incentive award in a PSLRA case on the grounds that incentive awards are barred by that statute.[8]

*Standard of review.* Courts generally will approve an

---

2015) ("Without a legal or factual argument, the Objectors plainly request an incentive award of $2,000 each 'for stepping out to protect and serve the class.' In the absence of legal authority that would allow for such an award to an objector, coupled with the complete lack of an explanation as to why such an award would be justified, this request is denied." (citation omitted)).

    In re Celexa and Lexapro Marketing and Sales Practices Litigation, 2014 WL 4446464, *10 (D. Mass. 2014) (denying objector's request for a $10,000 incentive award because the objector "invoke[d] no authority for her request for an incentive award to a plaintiff who is not a class representative").

    In re classmates.com Consol. Litigation, 2012 WL 3854501, *8–9 (W.D. Wash. 2012) (declining to award an incentive award because "[t]he court is aware of no authority authorizing a 'service award' to an objector" and noting that "[i]f there were such authority, the court assumes that it would treat a participation award to an objector similarly to a participation award to a class representative" but finding that the "objections did not contribute significantly to obtaining any benefit for the class").

[6]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 237-38 (10th Cir. 2009) (entertaining a request for an incentive award but rejecting objector's "invitation to apply to his pro se request for an incentive award the same standards applicable to an objector's request for an attorney fee" because the pro se objector's "position is not parallel to that of an objector seeking payment for his attorney fees").

[7]Martin v. Foster Wheeler Energy Corp., 2008 WL 906472, *9 (M.D. Pa. 2008) (granting incentive awards to two class representatives who later became objectors "for their work as Class Representatives from the inception of the litigation").

    Lazy Oil Co. v. Wotco Corp., 95 F. Supp. 2d 290, 292 (W.D. Pa. 1997), aff'd, 166 F.3d 581, 1999-1 Trade Cas. (CCH) ¶ 72420, 42 Fed. R. Serv. 3d 669 (3d Cir. 1999) (granting incentive award to a class representative for his service to the class before he became an objector, but finding that his efforts opposing the settlement "have not enured to the benefit of class members").

[8]In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 2008 WL 4178151, *8 (S.D. Tex. 2008) (denying incentive award for services as class representatives and objectors because "such incentive awards are contrary to the policy behind the PSLRA").

award for an objector if she can prove that her objections "conferred a benefit on the class."[9] Thus, for example, an "objector whose arguments result in a reduction of attorney-fee and expense awards provides a benefit to the class."[10] However, courts—understandably skeptical of repeat objectors who recycle formulaic objections—tend to be dismissive of many objectors' contentions about their achievements.[11] As the Tenth Circuit has stated, "because the court is charged with protecting the interests of the class, general, garden-variety objections usually are not helpful to the court, nor do they benefit the class."[12] This position is consistent with the manner in which courts approach requests for fees from objectors' counsel.[13] Thus, absent evidence that objectors' work benefited the class or put them at risk, courts

_____

For a discussion of the PSLRA's approach to incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

[9]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 233, 236 (10th Cir. 2009) (affirming the district court's denial of an incentive award to an objector "on the ground that his efforts did not benefit the class").

Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 398–99 (D.N.J. 2012), aff'd, 558 Fed. Appx. 191 (3d Cir. 2014), cert. denied, 135 S. Ct. 231, 190 L. Ed. 2d 135 (2014) ("In deciding whether an objector deserves an incentive award, courts have considered whether: (1) the objector's particular efforts conferred a benefit on the class; (2) the objector incurred personal risk; and/or (3) the objector was substantively involved in the litigation.").

[10]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 236 (10th Cir. 2009).

[11]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 236-37 (10th Cir. 2009) (affirming decision denying incentive award to pro se objector, noting that the lower court had concluded that the "objections did not confer a benefit on the class" because they were "general in nature, largely unsupported by specific citation to the record or to supporting caselaw, and lacking in meaningful analysis" and because "[the objector] had not identified any argument unique to his presentation" and "had not point[ed] to any argument of his that was both asserted in greater detail than other objectors and adopted in substance by the Special Master" (internal quotation marks omitted)).

[12]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 237 (10th Cir. 2009).

[13]*See, e.g.*, Rodriguez v. Disner, 688 F.3d 645, 658–59, 2012-2 Trade Cas. (CCH) ¶ 78006 (9th Cir. 2012) ("Nor is it error to deny fees to objectors whose work is duplicative, or who merely echo each others' arguments and confer no unique benefit to the class."). For a discussion of

deny awards.[14]

---

objectors' entitlement to fees, *see* Rubenstein, 5 **Newberg on Class Actions**
§ 15:60 (5th ed.).

[14]McDonough v. Toys R Us, Inc., 2015-1 Trade Cas. (CCH) ¶ 79040,
2015 WL 263562, *30 (E.D. Pa. 2015) (granting one objector an incentive
award of $1,000 because "[a]lthough [the objector] did not participate in
discovery, nor was he deposed, his objection provided a significant benefit
to the class" but denying incentive awards to two other objectors because
"they have not demonstrated that their objections provided a benefit to
the class").

Gascho v. Global Fitness Holdings, LLC, 2014 WL 3543819, *6
(S.D. Ohio 2014) (denying attorney's fees and incentive awards to objec-
tors because they "have not provided any benefit to the Class").

Fraley v. Facebook, Inc., 2014 WL 806072, *1–2 (N.D. Cal. 2014)
(denying both attorney's fees and incentive award to objector because his
objections did not "contribute materially to the proceeding").

In re classmates.com Consol. Litigation, 2012 WL 3854501, *8–9
(W.D. Wash. 2012) (denying an incentive award because "[t]he court is
aware of no authority authorizing a 'service award' to an objector" and
noting that "[i]f there were such authority, the court assumes that it
would treat a participation award to an objector similarly to a participa-
tion award to a class representative" but finding that the "objections did
not contribute significantly to obtaining any benefit for the class").

Hartless v. Clorox Co., 273 F.R.D. 630, 647 (S.D. Cal. 2011), aff'd in
part, 473 Fed. Appx. 716 (9th Cir. 2012) (denying objector's request for
incentive award because, *inter alia*, her objections "did not confer a benefit
on the class or add anything to this decision").

Parker v. Time Warner Entertainment Co., L.P., 631 F. Supp. 2d
242, 279 (E.D.N.Y. 2009) (denying incentive awards to objectors because
"[t]here is no indication that the [objectors] themselves were put at risk or
inconvenienced in any meaningful way by lending their names to the
objections pursued by their counsel").

Perez v. Asurion Corp., 2007 WL 2591174, *1 (S.D. Fla. 2007) (deny-
ing incentive award to objector because there was no evidence that the
objector "spent a considerable amount of time assisting with the prosecu-
tion of this case").

In re Educational Testing Service Praxis Principles of Learning and
Teaching, Grades 7–12 Litigation, 447 F. Supp. 2d 612, 634, 213 Ed. Law
Rep. 493 (E.D. La. 2006) (denying incentive awards to objectors because
only one of the seven objections offered was meritorious, the court would
have recognized that the attorney's fee award was too high even absent
that objection, and the "objectors' other objections added nothing to the
litigation and, if anything, only prolonged it").

In re Excess Value Ins. Coverage Litigation, 598 F. Supp. 2d 380,
393 (S.D.N.Y. 2005) (denying objectors' request for incentive rewards
because "the Class received relatively little Settlement Value and Objec-
tors' efforts have not been shown appreciably to have benefitted the Class"
and "the Court needed little or no assistance from the Objectors").

*Amount*. Objector incentive awards are modest. Class representatives tend to serve the class for years, undertake a series of tasks in that function, and face specific risks. Empirical evidence shows that incentive awards for those class representatives average between $10,000–$15,000 per class representative.[15] By contrast, objectors tend to do little more than file a single pleading at the conclusion of the case, possibly appear at the fairness hearing, and plausibly pursue an appeal if the objection is denied.[16] Their service is far more limited than that of the class representative and—despite arguments to the contrary[17]—it is unlikely they would face significant risks by making an objection. Courts

---

[15]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1307–08 (2006) (reporting that incentive awards are granted in 28% of class suits and that the average award per class representative is about $16,000, with the median award per class representative being closer to $4,000).

[16]Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766, 813 (N.D. Ohio 2010), on reconsideration in part, (July 21, 2010) ("The Court held that the named class representatives in this case were entitled to a $5,000 incentive award because each submitted an affidavit describing his extensive involvement in the litigation and assistance to Class Counsel. In contrast, there is no evidence that [the objector] devoted substantial time or effort to this case. He correctly notes that he 'voluntarily involved himself in a case impacting over 400,000 class members,' but does not describe any further involvement with this litigation. Based on that nominal contribution, he is entitled to the nominal sum of $500.00 as an incentive award." (citation omitted)).

[17]Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 399 (D.N.J. 2012), aff'd, 558 Fed. Appx. 191 (3d Cir. 2014), cert. denied, 135 S. Ct. 231, 190 L. Ed. 2d 135 (2014) (reporting objectors' argument that "in challenging the approval of the settlement, they incurred a substantial personal risk by: (1) exposing themselves to the risk of harassing discovery and private investigation from the plaintiffs' attorneys, and (2) posting an appeal bond of $25,000" (citation omitted) (internal quotation marks omitted)).

    Park v. Thomson Corp., 633 F. Supp. 2d 8, 14, 2009-2 Trade Cas. (CCH) ¶ 76775 (S.D.N.Y. 2009) (reporting objectors' argument that they were entitled to an award "because they faced the risk of a Rule 11 sanctions motion threatened by Plaintiffs' counsel" but rejecting this argument because "Rule 11 sanctions are a risk borne by all litigants").

    In re Apple Inc. Securities Litigation, Fed. Sec. L. Rep. (CCH) P 96312, 2011 WL 1877988, *4 (N.D. Cal. 2011) (reporting objector's argument that he had "exposed himself to the risk of harassing discovery and quite likely faced private investigation from the plaintiffs' attorneys").

have therefore awarded small sums to successful objectors —$500 in two cases,[18] $1,000 in two others,[19] $1,500 in one[20]—noting that "[t]he amount of the incentive award is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit."[21]

In sum, while objectors are entitled to seek incentive awards, courts are quite wary of providing such awards and do so only in the rare circumstance where the objector's work substantially served the class's interest, and even then only in nominal sums.

---

[18]Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 400 (D.N.J. 2012), aff'd, 558 Fed. Appx. 191 (3d Cir. 2014), cert. denied, 135 S. Ct. 231, 190 L. Ed. 2d 135 (2014) (awarding objectors $500 incentive payments because of "the[ir] willingness to serve as objectors so that their counsel could pursue a legal challenge that ultimately provided a certain benefit to like car owners and lessees warrants some incentive award").

Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766, 813 (N.D. Ohio 2010), on reconsideration in part, (July 21, 2010) (awarding objector a "nominal sum" of $500 for his "nominal contribution" to the case).

[19]McDonough v. Toys R Us, Inc., 2015-1 Trade Cas. (CCH) ¶ 79040, 2015 WL 263562, *30 (E.D. Pa. 2015) (granting one objector an incentive award of $1,000 because "[a]lthough [the objector] did not participate in discovery, nor was he deposed, his objection provided a significant benefit to the class" but denying incentive awards to two other objectors because "they have not demonstrated that their objections provided a benefit to the class").

In re Apple Inc. Securities Litigation, Fed. Sec. L. Rep. (CCH) P 96312, 2011 WL 1877988, *5 (N.D. Cal. 2011) (finding that an incentive payment of $1,000 would "fairly . . . compensate [the objector] for [his] contributions to this litigation").

[20]Sobel v. Hertz Corp., 53 F. Supp. 3d 1319, 1334 n.13 (D. Nev. 2014) (finding that the objectors' work "did contribute to the value of the resulting settlement" as even opponents noted that "the Court did reference the Objectors arguments and briefing in deciding to reject the failed settlement").

[21]Park v. Thomson Corp., 633 F. Supp. 2d 8, 14, 2009-2 Trade Cas. (CCH) ¶ 76775 (S.D.N.Y. 2009) (quoting Fears v. Wilhelmina Model Agency, Inc., 2005-1 Trade Cas. (CCH) ¶ 74783, 2005 WL 1041134, *3 (S.D.N.Y. 2005), aff'd in part, vacated in part, remanded, 473 F.3d 423, 2007-1 Trade Cas. (CCH) ¶ 75542 (2d Cir. 2007)).

## § 17:21   Appellate review of incentive awards

Appellate courts review a district court's award or denial of an incentive award under an abuse of discretion standard.[1] In adopting this standard (in a case involving a *pro se* objector's right to an incentive award), the Tenth Circuit gave three reasons justifying its use: *first*, that the Circuit reviews attorney fee awards in class actions using an abuse of discretion standard;[2] *second*, that "the district court's familiarity with the parties and the proceedings supports an

[Section 17:21]

[1]**Second Circuit**

Lobur v. Parker, 378 Fed. Appx. 63, 65 (2d Cir. 2010) ("We review a district court's grant or denial of incentive awards for the abuse of discretion.").

Silverberg v. People's Bank, 23 Fed. Appx. 46, 48 (2d Cir. 2001) ("The abuse-of-discretion standard of review also applies to the grant or denial of incentive awards for class representatives.").

**Sixth Circuit**

Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) ("Although this circuit has never addressed the issue, we agree with the circuit courts that have concluded that a district court's denial of an incentive award should be reviewed for an abuse of discretion.").

**Seventh Circuit**

Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 408 (7th Cir. 2000) ("Class counsel challenges several aspects of the district court's decisions regarding attorneys' fees, costs, and the requested incentive award for the lead plaintiff. . . . We review the district court's decisions respecting these matters for abuse of discretion, except where counsel challenges the methodology employed by the district court, in which case our review becomes plenary.").

**Ninth Circuit**

In re Mego Financial Corp. Securities Litigation, 213 F.3d 454, 463, Fed. Sec. L. Rep. (CCH) P 90977, 46 Fed. R. Serv. 3d 883 (9th Cir. 2000), as amended, (June 19, 2000) ("[T]he district court did not abuse its discretion in awarding attorney's fees to Class Counsel and in awarding an incentive award to the Class Representatives.").

**Tenth Circuit**

UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 234-35 (10th Cir. 2009) (applying and explaining the circuit's adoption of an abuse of discretion standard).

[2]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009).

abuse-of-discretion standard";[3] and *third*, because incentive awards arise in common fund cases and such cases are equitable in nature, appellate courts "review the district court's exercise of its equitable powers for abuse of discretion."[4]

A district court abuses its discretion when it has "based its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling."[5] Appellate courts that utilize the abuse of discretion standard uphold trial court findings of fact unless they are clearly erroneous, while they review the trial court's legal analysis *de novo*.[6]

---

[3]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009); *see also* Case v. Unified School Dist. No. 233, Johnson County, Kan., 157 F.3d 1243, 1249, 129 Ed. Law Rep. 1003 (10th Cir. 1998) ("We customarily defer to the District Court's judgment [regarding an attorney's fee award] because an appellate court is not well suited to assess the course of litigation and the quality of counsel." (internal quotation marks omitted)).

[4]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009) (internal quotation marks omitted)).

[5]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009) (internal quotation marks omitted)).

[6]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009).

EXHIBIT B

No. 18-12344

# In the United States Court of Appeals
# for the Eleventh Circuit

---

CHARLES T. JOHNSON,
on behalf of himself and others similarly situated,
*Plaintiff–Appellee,*
JENNA DICKENSON,
*Interested Party–Appellant,*

v.

NPAS SOLUTIONS, LLC,
*Defendant–Appellee.*

---

## On Appeal from the United States District Court for the Southern District of Florida

---

## Motion of Professor William B. Rubenstein for Leave to File *Amicus Curiae* Brief in Support of Plaintiff-Appellee's Petition for Rehearing *En Banc*

---

Martin N. Buchanan
Law Office of Martin N. Buchanan, APC
665 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 238-2426
*Counsel for Amicus Curiae*

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *amicus* provides the following Certificate of Interested Persons and Corporate Disclosure Statement.

- Buchanan, Martin N. – Counsel for *Amicus Curiae*

- Davidson, James L. – Counsel for Plaintiff-Appellee

- Davis, John W. – Counsel for Appellant Jenna Dickenson

- Debevoise & Plimpton LLP – Counsel for Defendant-Appellee

- Dickenson, Jenna – Appellant

- Ehren, Michael L. – Counsel for Defendant-Appellee

- Goldberg, Martin B. – Counsel for Defendant-Appellee

- Greenwald Davidson Radbil PLLC – Counsel for Plaintiff-Appellee

- Greenwald, Michael L. – Counsel for Plaintiff-Appellee

- Heinz, Noah S. – Counsel for Plaintiff-Appellee

- Hopkins, Honorable James M. – Magistrate Judge

- Isaacson, Eric Alan – Counsel for Appellant Jenna Dickenson

- Issacharoff, Samuel – Counsel for Plaintiff-Appellee

- Johnson, Charles T. – Plaintiff-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

- Johnson, Jesse S. – Counsel for Plaintiff-Appellee

- Keller, Ashley C. – Counsel for Plaintiff-Appellee

- Keller Lenkner LLC – Counsel for Plaintiff-Appellee

- Lash, Alan David – Counsel for Defendant-Appellee

- Lash & Goldberg LLP – Counsel for Defendant-Appellee

- Law Office of John W. Davis – Counsel for Appellant Jenna Dickenson

- Lenkner, Travis D. – Counsel for Plaintiff-Appellee

- Monaghan, Maura K. – Counsel for Defendant-Appellee

- NPAS Solutions, LLC – Defendant-Appellee

- Nutley, C. Benjamin – Counsel for Appellant Jenna Dickenson

- Postman, Warren D. – Counsel for Plaintiff-Appellee

- Radbil, Aaron D. – Counsel for Plaintiff-Appellee

- Rosenberg, Honorable Robin L. – District Court Judge

- Rubenstein, William B. – *Amicus Curiae*

- Stahl, Jacob W. – Counsel for Defendant-Appellee

- Van Wey, Lorelei Jane – Counsel for Defendant-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

1.      NPAS Solutions, LLC is wholly owned by National Patient Accounts Services, Inc., which is wholly owned by Parallon Business Solutions, LLC. The ultimate parent of Parallon Business Solutions, LLC is HCA Healthcare, Inc., a publicly traded company.

2.      No publicly held corporation owns 10% or more of NPAS Solutions' stock.

Dated:  October 29, 2020          Respectfully submitted,

/s/ *Martin N. Buchanan*
Martin N. Buchanan
*Counsel for Amicus Curiae*

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF REHEARING *EN BANC*

Pursuant to Federal Rule of Appellate Procedure 29(b)(3) and Eleventh Circuit Rule 29-3, Professor William B. Rubenstein respectfully requests leave to file the accompanying *amicus curiae* brief in support of rehearing *en banc* in this matter. In support of this request and in demonstration of good cause, *amicus* states as follows:

1.    *Amicus* is the Bruce Bromley Professor of Law at Harvard Law School and (since 2008) the sole author of *Newberg on Class Actions*, the leading treatise on class action law in the United States.

2.    Professor Rubenstein respectfully submits this brief for three independent reasons. *First*, Professor Rubenstein believes the Panel decision to be of exceptional importance because the vast majority of class action settlements involve incentive awards and they have been approved in every other Circuit in the country. *Second,* the Panel's critical decision cites to and relies on the *Newberg* treatise.  The Panel's discussion of Professor Rubenstein's work could be read to suggest that he opposes the practice of incentive awards. Professor Rubenstein seeks to ensure that the record accurately reflects his position on incentive awards. *Third*, *amicus* addresses issues not covered in the briefing to

1

date by examining (a) the facts underlying *Greenough*; (b) the relevance of Congress's approach to incentive awards in the securities field; and (c) the effect of recent changes to Rule 23 on judicial review of incentive awards.

## CONCLUSION

For these reasons, *amicus* respectfully requests leave to file his *amicus curiae* brief in support of rehearing *en banc*.

Dated: October 29, 2020          Respectfully submitted,


/s/ *Martin N. Buchanan*
Martin N. Buchanan
LAW OFFICE OF MARTIN N. BUCHANAN, APC
665 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 238-2426
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this motion was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2016. *See* Fed. R. App. P. 27(d)(1), 32(g)(1); 11th Cir. R. 29-1. This motion complies with the type-volume limitation of Rule 27(d)(2) because it contains 261 words, excluding the parts exempted under Rule 32(f).

/s/ *Martin N. Buchanan*
Martin N. Buchanan

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2020, a true and correct copy of this motion was served via the Court's CM/ECF system on all counsel of record.

/s/ *Martin N. Buchanan*
Martin N. Buchanan

No. 18-12344

# In the United States Court of Appeals for the Eleventh Circuit

CHARLES T. JOHNSON,
on behalf of himself and others similarly situated,
*Plaintiff–Appellee,*
JENNA DICKENSON,
*Interested Party–Appellant,*

v.

NPAS SOLUTIONS, LLC,
*Defendant–Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

BRIEF OF PROFESSOR WILLIAM B. RUBENSTEIN AS *AMICUS
CURIAE* IN SUPPORT OF REHEARING *EN BANC*

Martin N. Buchanan
LAW OFFICE OF MARTIN N. BUCHANAN, APC
665 W. Broadway, Suite 1700
San Diego, CA 92101
(619) 238-2426
*Counsel for Amicus Curiae*

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *amicus* provides the following Certificate of Interested Persons and Corporate Disclosure Statement.

- Buchanan, Martin N. – Counsel for *Amicus Curiae*

- Davidson, James L. – Counsel for Plaintiff-Appellee

- Davis, John W. – Counsel for Appellant Jenna Dickenson

- Debevoise & Plimpton LLP – Counsel for Defendant-Appellee

- Dickenson, Jenna – Appellant

- Ehren, Michael L. – Counsel for Defendant-Appellee

- Goldberg, Martin B. – Counsel for Defendant-Appellee

- Greenwald Davidson Radbil PLLC – Counsel for Plaintiff-Appellee

- Greenwald, Michael L. – Counsel for Plaintiff-Appellee

- Heinz, Noah S. – Counsel for Plaintiff-Appellee

- Hopkins, Honorable James M. – Magistrate Judge

- Isaacson, Eric Alan – Counsel for Appellant Jenna Dickenson

- Issacharoff, Samuel – Counsel for Plaintiff-Appellee

- Johnson, Charles T. – Plaintiff-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

- Johnson, Jesse S. – Counsel for Plaintiff-Appellee

- Keller, Ashley C. – Counsel for Plaintiff-Appellee

- Keller Lenkner LLC – Counsel for Plaintiff-Appellee

- Lash, Alan David – Counsel for Defendant-Appellee

- Lash & Goldberg LLP – Counsel for Defendant-Appellee

- Law Office of John W. Davis – Counsel for Appellant Jenna Dickenson

- Lenkner, Travis D. – Counsel for Plaintiff-Appellee

- Monaghan, Maura K. – Counsel for Defendant-Appellee

- NPAS Solutions, LLC – Defendant-Appellee

- Nutley, C. Benjamin – Counsel for Appellant Jenna Dickenson

- Postman, Warren D. – Counsel for Plaintiff-Appellee

- Radbil, Aaron D. – Counsel for Plaintiff-Appellee

- Rosenberg, Honorable Robin L. – District Court Judge

- Rubenstein, William B. – *Amicus Curiae*

- Stahl, Jacob W. – Counsel for Defendant-Appellee

- Van Wey, Lorelei Jane – Counsel for Defendant-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

1.    NPAS Solutions, LLC is wholly owned by National Patient Accounts Services, Inc., which is wholly owned by Parallon Business Solutions, LLC. The ultimate parent of Parallon Business Solutions, LLC is HCA Healthcare, Inc., a publicly traded company.

2.    No publicly held corporation owns 10% or more of NPAS Solutions' stock.


Dated:  October 29, 2020          Respectfully submitted,

                                  /s/ *Martin N. Buchanan*    
                                  Martin N. Buchanan
                                  *Counsel for Amicus Curiae*

## RULE 35-5(C) STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves the following question of exceptional importance: Whether the common practice of awarding incentive payments to named plaintiffs to compensate them for their efforts protecting absent class members' interests is *per se* unlawful.


Dated:  October 29, 2020          Respectfully submitted,

                         /s/ *Martin N. Buchanan*
                         Martin N. Buchanan
                         *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

Rule 35-5(c) Statement of Counsel ........................................................i

Table of Contents...................................................................................ii

Table of Citations ............................................................................. iii

Identity and Interest of *Amicus Curiae*....................................................1

Statement of the Issue Warranting *En Banc* Review...............................2

Argument ...............................................................................................3

    The Panel's prohibition on incentive awards is an issue of
    exceptional importance, but its decision failed to consider the
    applicable facts and relevant aspects of federal law and Rule
    23...............................................................................................3

    I. The Panel's decision fails as a matter of equity ...........................3

    II. The Panel's decision fails to account for Congress's approach to
    incentive awards in an analogous setting. ......................................7

    III. The Panel's decision fails to account for relevant 2018
    amendments to Rule 23. ................................................................9

Conclusion.............................................................................................14

Certificate of Compliance .....................................................................15

Certificate of Service .............................................................................15

## TABLE OF CITATIONS

**Cases**                                                                                                    **Page(s)**

*Johnson v. NPAS Sols., LLC,*
    975 F.3d 1244 (11th Cir. 2020) ...........................................3, 6, 7, 10

*Melito v. Experian Mktg. Sols., Inc.,*
    923 F.3d 85 (2d Cir. 2019)...............................................................7

*Sprague v. Ticonic Nat. Bank,*
    307 U.S. 161 (1939) ........................................................................5

*\*Trustees v. Greenough,*
    105 U.S. 527 (1881) ................................................................3, 4, 6

**Statutes**

Private Securities Litigation Reform Act,
    15 U.S.C. §§ 78u-4 et seq. (1995) ..............................................7, 8

**Rules**

\*Fed. R. Civ. P. 23(e)(2)(D)....................................................................3, 11

Fed. R. Civ. P. 23(e)(2), advisory committee's note to
    2018 amendment ....................................................................10, 11

**Legislative Materials**

S. Rep. No. 104-98 (1995) ..........................................................................8

**Secondary Authorities**

\*William B. Rubenstein, *Newberg on Class Actions*
    (5th ed., June 2020 update) ................................................5, 10, 13

## Other Authorities

*Consumer Price Index, 1800-*, Federal Reserve Bank of
    Minneapolis (last visited Oct. 25, 2020), https://www.
    minneapolisfed.org/about-us/monetary-policy/inflation-
    calculator/consumer-price-index-1800- ........................................... 4

*Inflation Calculator*, Federal Reserve Bank of Minneapolis
    (last visited Oct. 25, 2020), https://www.minneapolisfed.
    org/about-us/monetary-policy/inflation-calculator .......................... 5

*Judicial Salaries:  Supreme Court Justices,* Federal Judicial
    Center (last visited Oct. 26, 2020), https://www.fjc.gov/
    history/judges/judicial-salaries-supreme-court-justices ................. 4

*Salary*, Merriam-Webster Online Dictionary, https://www.
    merriam-webster.com/dictionary/salary (last visited
    Oct. 27, 2020) ..................................................................................... 5

### IDENTITY AND INTEREST OF *AMICUS CURIAE*[*]

*Amicus curiae* Professor William Rubenstein is the Bruce Bromley Professor of Law at Harvard Law School and the author of *Newberg on Class Actions*, the leading American class action law treatise. In 2015, Professor Rubenstein wrote treatise Chapter 17, a 98-page treatment of incentive awards. This review encompassed a range of issues including new empirical evidence about incentive awards.

*Amicus* respectfully submits this brief for three reasons. *First*, *amicus* believes the Panel's categorical rejection of incentive awards to be of exceptional importance because most class actions involve such awards and because they have been approved in every other Circuit. *Second,* as the Panel's decision relies on the *Newberg* treatise, *amicus* seeks to ensure that the record accurately reflects his position. *Third*, *amicus* addresses issues not covered in the briefing to date by examining (a) the facts underlying *Greenough*; (b) the relevance of Congress's approach to incentive awards in the securities field; and (c)

---

[*] This brief was not authored in whole or in part by counsel for any party. No party, party's counsel, or person—other than *amicus curiae* or his counsel—contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

the effect of recent changes to Rule 23 on judicial review of incentive awards.

Under Federal Rule of Appellate Procedure 29(b)(2), *amicus* may file this brief only by leave of court. By the accompanying motion, *amicus* has so moved.

### STATEMENT OF THE ISSUE WARRANTING *EN BANC* REVIEW

Plaintiff-Appellee Johnson's petition demonstrates that the Panel's decision is of exceptional importance warranting *en banc* review because it misapplies applicable Supreme Court and Eleventh Circuit precedent, conflicts with the holding of every other Circuit on this question, and, in categorically barring incentive awards, affects every class action in this Circuit.

This brief adds three points: the Panel's decision (1) fails on its own terms (as a matter of equity) because it never compared the ***facts*** in *Greenough* to those in this case or in class actions generally; (2) fails to account for Congress's approach to incentive awards in the Private Securities Litigation Reform Act of 1995, an approach which undermines its holding; and (3) fails to acknowledge 2018 congressionally approved changes to Rule 23 that explicitly require a

court reviewing a proposed settlement to ensure "the proposal treats class members *equitably* relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis added). That amendment squarely places review of incentive awards within Rule 23's settlement approval provision going forward and hence renders the Panel's decision—even if permitted to stand—irrelevant to current class action practice. The Panel stated that "if either the Rules Committee or Congress doesn't like the result we've reached, they are free to amend Rule 23 or to provide for incentive awards by statute," *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1260 (11th Cir. 2020), but it appeared unaware of the actions of Congress and the Rules Committee directly on point.

## ARGUMENT

**The Panel's prohibition on incentive awards is an issue of exceptional importance, but its decision failed to consider the applicable facts and relevant aspects of federal law and Rule 23.**

## I.     The Panel's decision fails as a matter of equity.

The Panel found *Greenough* controlling without a full review of the case's facts. Those show that Vose, the active litigant, sought attorney's fees and expenses amounting to $53,938.30 and an additional $49,628.35 for himself. *See Trustees v. Greenough*, 105 U.S. 527, 530

(1881). Specifically, Vose sought payment of "an allowance of $2,500 a year for ten years of personal services," *id.,* plus $9,625 in interest, as well as another $15,003.35 for "railroad fares and hotel bills." *Id.*

Those numbers are staggering: inflation calculators suggest that $1 in 1881 is worth $26.49 in 2019 dollars.[1] Thus, Vose sought a "salary" of $66,225 per year for 10 years,[2] plus interest—or a total of $917,216—as well as $397,439 for hotel bills and travel expenses. This amounts to roughly $1.31 million current dollars. It was also equivalent to (92% of) his attorney's fees and expenses.

Is it any wonder that equity balked?

Here the named plaintiff seeks $6,000 in total (0.46% of what Vose sought), none of it a yearly salary of any kind, and all of it amounting to about 1.3% of what the attorneys seek. Any true ***equitable*** analysis

---

[1] *See Consumer Price Index, 1800-*, Federal Reserve Bank of Minneapolis (last visited Oct. 25, 2020), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800-.

[2] This $66,225 number is perfectly confirmed by the fact that Vose's $2,500 annual salary constituted 25% of the 1881 Supreme Court justice salary of $10,000, while 25% of a current justice's salary ($265,000) is $66,400. *See Judicial Salaries: Supreme Court Justices,* Federal Judicial Center (last visited Oct. 26, 2020), https://www.fjc.gov/history/judges/judicial-salaries-supreme-court-justices.

would find *Greenough* inapposite on the numbers alone. *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 167 (1939) ("As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility.").

Even if the Panel's decision is read as one of type not degree—limiting "salaries" and "personal expenses" regardless of their level—this factual review nonetheless undermines its logic. Vose truly sought a salary—a fixed regular payment, *see Salary*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/salary (last visited Oct. 27, 2020)—while this incentive award ($6,000) and the typical incentive awards are never a fixed regular payment and they hardly amount to a salary. Professor Rubenstein's empirical analysis shows the average incentive award to be $11,697 in 2011 dollars (or $13,299 in 2019 dollars).[3] *See* 5 William B. Rubenstein, *Newberg on Class Actions* § 17:8 (5th ed., June 2020 update) [hereinafter *Newberg on Class Actions*]. These facts undermine the Panel's declaration that,

---

[3] *See Inflation Calculator*, Federal Reserve Bank of Minneapolis (last visited Oct. 25, 2020), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator.

"It seems to us that the modern-day incentive award for a class representative is ***roughly*** analogous to a salary." *Johnson*, 975 F.3d at 1257 (emphasis added). Far too much rides on the word "roughly" for that analogy to land.

Nor is *Greenough's* objection to the category of Vose's request labelled "personal expenses" particularly apposite—again, those payments were for $397,439 in hotel bills and travel expenses, amounts the Court might rightly have found extravagant and hence "personal." The modest level of the typical modern incentive award belies any sense that the representative is dining out at the class's expense.

These facts render *Greenough's* concern—that it "would present too great a temptation to parties to intermeddle in the management of valuable . . . funds . . . if they could calculate upon the allowance of a salary for their time and of having all their private expenses paid," *Greenough*, 105 U.S. at 1157—inapplicable to the modern incentive award and render nonsensical the Panel's conclusion "that modern-day incentive awards present even more pronounced risks than the salary and expense reimbursements disapproved in *Greenough*," *Johnson*, 975 F.3d at 1258.

* * *

These objector's counsel proffered this same *Greenough* argument to the Second Circuit, but that Court rejected it on the grounds that *Greenough's* facts were inapposite. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir.), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019). The Panel declared itself "unpersuaded by the Second Circuit's position," *Johnson*, 975 F.3d at 1258 n.8, but this review has demonstrated that the Second Circuit got it right and the Panel's conflicting conclusion should be reviewed (and reversed) *en banc*.

## II.     The Panel's decision fails to account for Congress's approach to incentive awards in an analogous setting.

Far closer in context and time than *Greenough*, is Congress's 1995 approach to incentive awards in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 et seq.

With the PSLRA, Congress aimed to transfer control of securities class actions from small-stakes clients to large institutional investors. Limiting excess payments to named plaintiffs was a critical part of that effort. The PSLRA contains several provisions on point. *First*, the PSLRA requires a putative lead plaintiff to aver that it "will not accept any payment for serving as a representative party on behalf of a class

beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." 15 U.S.C. § 78u-4(a)(2)(A)(vi). *Second*, the Act states that the representative's fund allocation "shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class." 15 U.S.C. § 78u-4(a)(4). *Third*, the Act explicitly does ***not*** "limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." *Id.; see also* S. Rep. No. 104-98, at 10 (1995) (explaining that "service as the lead plaintiff may require court appearances or other duties involving time away from work").

These provisions demonstrate three pertinent points:

1. Congress sees incentive awards as a question of fair settlement allocation, not attorney's fees.

2. Congress is aware of incentive awards, knows how to limit them when it wants to do so, and has limited them only in securities cases.

3. Even while limiting incentive awards, Congress acknowledges and permits repayment for lead plaintiffs' efforts.

8

These points undermine the Panel's decision. The majority declined to analyze the incentive award in terms of intra-class equity, as the dissent would have; failed to appreciate that Congress has limited incentive awards only in securities cases; and failed to acknowledge Congress's approval of repayment of expenses, even when otherwise limiting incentive payments.

The PSLRA post-dates *Greenough* by 114 years, and, as a law about modern class action practice, is far closer in context than the trust law at issue in *Greenough*. The Panel should have considered its relevance before holding that *Greenough* categorically bars incentive awards in today's class action.

## III. The Panel's decision fails to account for relevant 2018 amendments to Rule 23.

Quoting Professor Rubenstein's treatise, the Panel held that Rule 23 has nothing to say about incentive awards:

> [The] argument [in support of the incentive award] implies that Rule 23 has something to say about incentive awards, and thus has some bearing on the continuing vitality of *Greenough* and *Pettus*. But it doesn't—and so it doesn't: "Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards." The fact that Rule 23 post-dates *Greenough* and *Pettus*, therefore, is irrelevant.

9

*Johnson,* 975 F.3d at 1259 (quoting *Newberg on Class Actions* § 17:4) (footnote omitted).

Professor Rubenstein wrote that sentence in 2015. Congress subsequently approved amendments to Rule 23 that render the sentence out of date.[4]

Prior to December 1, 2018, Rule 23(e) directed a court reviewing a settlement agreement to ensure that the agreement was "fair, reasonable, and adequate." That was the entire standard, although each Circuit developed factors pertinent to that review. Congress approved amendments to Rule 23(e) in late 2018 that codified elements of the Circuit tests. *See* Fed. R. Civ. P. 23(e)(2), advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

One of the new Rule 23 prongs requires a Court reviewing a settlement to ensure that the proposal "treats class members *equitably*

---

[4] Regardless, the fact that Rule 23 did not mention incentive awards explicitly hardly dictates the Panel's conclusion that the Rule was therefore "irrelevant" in making an equitable evaluation of incentive awards. *See infra* Section III.

relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis added). The Advisory Committee noted that this prong "calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others." Fed. R. Civ. P. 23(e)(2), advisory committee's note to 2018 amendment.

New Rule 23(e)(2)(D) should now govern review of incentive awards. An incentive award constitutes an extra allocation of the settlement fund to the class representative and a court asked to approve a settlement agreement encompassing such an allocation would need to ensure that it nonetheless "treats class members *equitably* relative to each other."

The facts of this case are exemplary. The parties' settlement established a fund (Doc. 37-1 at Pg. 17 ¶5.1), stated how the fund would be allocated (¶5.2), and noted that the "class plaintiff" would seek "an incentive payment (in addition to any pro rata distribution he may receive [from the fund])." (¶6.2). Counsel then sought settlement approval, including of the incentive award, under Rule 23(e) (Docs. 38, 43).

The objector challenged the incentive award, alleging that it exceeded the amounts recovered by the other class members (Doc. 42 at Pg. 15), then argued to the Panel that the incentive award was a "settlement allocation[] that treat[s] the named plaintiffs better than absent class members," App. Br. at 52, and that "the [d]isparity in this case between [the representative's] $6,000 bonus and the relief obtained for the rest of the class . . . casts doubt on . . . the adequacy of the Settlement," *id.* at 53; *see also id.* at 57 (characterizing award as a "disproportionate payment").

Thus, although counsel lodged the request for judicial approval of the incentive award with their fee petition (Doc. 44 at Pgs. 15–16), they were not seeking a fee award governed by Rule 23(h). They were seeking judicial approval of their settlement agreement allocating extra money to the representative—and Rule 23(e)'s settlement approval provisions govern review of that request.

When an incentive award is properly scrutinized as a question of intra-class equity, its fairness comes into focus. Class representatives and absent class members are differently situated with regard to the litigation, as their titles suggest. A court can—indeed should—take

account of that fact in reviewing a proposed settlement. As Professor Rubenstein explains in the *Newberg* treatise:

> Incentive awards surely make it look as if the class representatives are being treated differently than other class members, but . . . [they] are not similarly situated to other class members. They have typically done something the absent class members have not—stepped forward and worked on behalf of the class—and thus to award them only the same recovery as the other class members risks disadvantaging the class representatives by treating these dissimilarly-situated individuals as if they were similarly-situated . . . . In other words, incentive awards may be necessary to ensure that class representatives are treated equally to other class members, rewarded both for the value of their claims (like all other class members) but also for their unique service to the class.

5 *Newberg on Class Actions* § 17:3.

That is not to say that all incentive awards are equitable—an excessive award, such as that sought in *Greenough*, would surely be inequitable. *See id.* at § 17:18. But it is to say that Congress has now given judges the explicit authority to scrutinize the equity of incentive awards through the lens of Rule 23(e).

Thus, even if the Court were inclined to leave in place the Panel's reasoning as to this pre-2018 settlement, the full Circuit should clarify the inapplicability of the holding to judicial review of settlements after December 1, 2018.

## CONCLUSION

For these reasons, the Court should grant the petition for rehearing *en banc*.

Dated:  October 29, 2020                Respectfully submitted,


                                        /s/ *Martin N. Buchanan*
                                        Martin N. Buchanan
                                        LAW OFFICE OF MARTIN N. BUCHANAN, APC
                                        665 W. Broadway, Suite 1700
                                        San Diego, CA 92101
                                        Telephone: (619) 238-2426
                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2016. *See* Fed. R. App. 29(a)(4), 32(g)(1). This brief complies with the type-volume limitation of Eleventh Circuit Rule 29-3 because it contains 2,594 words, excluding the parts exempted under Rule 32(f). *See* Fed. R. App. 29(b)(4).

/s/ *Martin N. Buchanan*
Martin N. Buchanan

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2020, a true and correct copy of this brief was served via the Court's CM/ECF system on all counsel of record.

/s/ *Martin N. Buchanan*
Martin N. Buchanan

15

CERTIFICATE OF SUBMISSION AND SERVICE
AND REQUEST FOR INCLUSION ON THE PUBLIC RECORD

I hereby certify that, on October 11, 2023, I am submitting and serving the foregoing

WRITTEN STATEMENT OF ERIC ALAN ISAACSON OF INTENT TO APPEAR IN

PERSON AT THE OCTOBER 12, 2023, FINAL- APPROVAL HEARING *IN NATIONAL*

*VETERANS LEGAL SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA* by

emailing it to the following email addresses provided for objectors' submissions in the official

long-form Class-Action Settlement Notice in this matter:

DCDPACERFeesSettlement@dcd.uscourts.gov
The Honorable Paul L. Friedman
United States District Court for the District of Columbia 333 Constitution Avenue, NW,
Washington, DC 20001

deepak@guptawessler.com
Gupta Wessler PLLC
2001 K Street, NW, Suite 850 North Washington, DC 20006

brenda.gonzalez.horowitz@usdoj.gov
Brenda Gonzáles Horowitz
Assistant United States Attorney Patrick Henry Building
601 D Street, N.W.
Washington, DC 20530

I further respectfully request that both the forgoing duly served and submitted WRITTEN

STATEMENT OF ERIC ALAN ISAACSON OF INTENT TO APPEAR IN PERSON AT THE

OCTOBER 12, 2023, FINAL- APPROVAL HEARING *IN NATIONAL VETERANS LEGAL*

*SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA* and my previously served

and submitted September 12, 2023, OBJECTION OF ERIC ALAN ISAACSON ) TO

PROPOSED SETTLEMENT IN *NATIONAL VETERANS LEGAL SERVICES ) PROGRAM, ET*

*AL. V. UNITED STATES OF ) AMERICA,* be included in the publicly available PACER-

accessible district-court docket in the foregoing matter.


<div style="text-align: right">

_____

/s/ Eric Alan Isaacson

Eric Alan Isaacson

(pro se)

</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, et al., | ) Civil Action ) No. 16-745 |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) October 12, 2023 |
| | ) 10:12 a.m. |
| Defendant. | ) Washington, D.C. |
| | ) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF SETTLEMENT HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN,
UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>**:**

FOR THE PLAINTIFFS: DEEPAK GUPTA
                    JONATHAN TAYLOR
                    Gupta Wessler LLP
                    2001 K Street, NW, Suite 850 North
                    Washington, DC 20006
                    (202) 888-1741
                    Email: deepak@guptawessler.com

                    JONATHAN E. TAYLOR
                    Gupta Wessler PLLC
                    1900 L Street, NW, Suite 312
                    Washington, DC 20036
                    (202) 888-1741

                    MEGHAN S.B. OLIVER
                    CHARLOTTE LOPER
                    Motley Rice, LLC
                    28 Bridgeside Boulevard
                    Mt. Pleasant, SC 29464
                    (843) 216-9492
                    Email: moliver@motleyrice.com

                    WILLIAM H. NARWOLD
                    1 Corporate Center
                    20 Church Street, 17th Floor
                    Hartford, CT 06103
                    (860) 882-1676
                    Email: bnarwold@motleyrice.com

**(<u>Appearances Continued</u>)**

**<u>APPEARANCES (continued)</u>:**


FOR THE DEFENSE:    BRENDA A. GONZALEZ HOROWITZ
                         DOJ-USAO
                         U.S. Department of Justice
                         601 D Street NW
                         Washington, DC 20530
                         (202) 252-2512
                         Email: brenda.gonzalez.horowitz@usdoj.gov


                         ERIC ALAN ISAACSON, PRO SE
                         6580 Avenida Mirola
                         La Jolla, CA 92037
                         (858) 263-9581


ALSO PRESENT:        WILLIAM MEYERS, General Counsel,
                         Administration Office of the Courts

                         RENEE BURBANK, Director of Litigation
                         National Veterans Legal Services Program

                         STUART ROSSMAN, Director of Litigation
                         National Consumer Law Center

                         DON KOZICH, Objector

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                         Official Court Reporter
                         U.S. Courthouse


This hearing was held via videoconference and/or
telephonically and is, therefore, subject to the limitations
associated with audio difficulties while using technology,
i.e., static interference, etc.


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  This is Civil Action

3     16-745, National Veterans Legal Services Program, et al.

4     versus the United States.

5              Counsel, please step forward to the podium and

6     state your appearances for the record.

7              MR. GUPTA:  Good morning, Your Honor.

8     Deepak Gupta, class counsel for the plaintiffs.

9              THE COURT:  Good morning.

10             Anybody else at counsel table?

11             MR. NARWOLD:  Good morning, Your Honor.

12    Bill Narwold from Motley Rice, also for the class.

13             Meghan Oliver --

14             THE COURT:  Let me just say this.  Since we have

15    people on Zoom, the only way they can hear you is if you

16    speak from a microphone.

17             THE COURTROOM DEPUTY:  Counsel, would you please

18    approach the podium.

19             MR. NARWOLD:  Good morning, Your Honor.

20    Bill Narwold, Motley Rice, also on behalf of the plaintiffs.

21             MS. OLIVER:  Meghan Oliver, also with Motley Rice,

22    on behalf of the plaintiffs.

23             MR. TAYLOR:  Good morning, Your Honor.

24    Jonathan Taylor, Gupta Wessler, also appearing for the

25    plaintiffs.

1          MS. GONZALEZ HOROWITZ:  Good morning, Your Honor.

2     Assistant U.S. Attorney Brenda Gonzalez Horowitz; and with

3     me I have William Meyers, General Counsel of the

4     Administration Office of the Courts, on behalf of the

5     United States.

6          THE COURT:  Good morning to all of you.

7          MR. ISAACSON:  Good morning.

8          THE COURT:  Yes, sir.

9          MR. ISAACSON:  May it please the Court.

10         Good morning.  I am Eric Allan Isaacson.  I am an

11    objector.  I will be speaking after their presentations.

12    Thank you, Your Honor.

13         THE COURT:  Thank you.  Good morning.

14         All right.  So just to set the stage, this case,

15    National Veterans Legal Services Program, National Consumer

16    Law Center, and Alliance for Justice versus the

17    United States of America, which I always refer to as the

18    "Pacer case," was originally handled by my now retired --

19    and I must say quite happily retired colleague, Judge

20    Huvelle.  Judge Ellen Segal Huvelle had this case from its

21    inception in 2016 until she retired, then I took the case

22    over.

23         She considered the arguments of counsel about what

24    services, shall we say, were properly payable through Pacer

25    fees and what were not.  The Pacer fees are fees that are

1    charged, as I understand it, to law firms and lawyers and to

2    others who want to get, through the courts and the court

3    system, information about cases in which they are not

4    counsel.  If you are counsel, you are notified

5    automatically.

6            Now, all of this, of course, is a great thing

7    because when I started as a judge everything was on paper

8    and there was nothing electronic.  Then we put all of the

9    civil stuff on electronic filing, accessed it

10    electronically.  As Mr. Meyers will recall, if he has been

11    around long enough, criminal was a little harder because of

12    concerns about security for defendants and witnesses; but,

13    eventually, we wound up having all civil and all criminal

14    electronic filings; orders accessible electronically.  You

15    can sit in your office and be notified if you are counsel in

16    a case about what is happening in your case.  If it's not

17    your case, and you are interested, you go on Pacer and you

18    pay a fee.

19            Now, the only problem with the system is that it

20    used to be if you didn't get to the courthouse by 4:00 or

21    4:30 you couldn't file.  Now, if it's 11:59 p.m. you are

22    still timely, which makes law clerks' work harder and makes

23    lawyers' work harder.  That's an aside.

24            As I recall, there are seven categories of things

25    that Pacer fees are ultimately used for.  When this was

1    before Judge Huvelle, she considered arguments from the

2    plaintiffs and arguments from the government, the

3    Administrative Office of the Courts, represented by the

4    Justice Department; and she rejected both arguments.  She

5    found a middle ground and concluded that there were a great

6    many things that the Administrative Office of the Courts was

7    charging users for, but there were some things -- that were

8    legitimate, but there were some things that were not.

9         She wrote an opinion, 291 F. Supp. 3d. 123, in

10   which she explained her reasoning under the relevant

11   statutes and legislative history, and the case then went to

12   the federal circuit.

13        In reading their opinion, at 968 Fed 3d. 1340, as

14   I understand it, the parties essentially made the same

15   arguments they had made to Judge Huvelle in the federal

16   Circuit, rejected both sides' arguments; agreed with Judge

17   Huvelle, finding a middle ground.  And like any district

18   judge, I am sure she was delighted to read the first

19   paragraph of the opinion in which the Circuit said:  We

20   conclude that the district court got it just right.  As I

21   tell my friends in the D.C. Circuit, they don't say that

22   often enough.

23        As to the seven categories -- and you-all can

24   correct me if I am wrong on any of this; I just thought it

25   would be useful to try to, on the record, sort of set the

1    stage.  I guess there were six categories.

2            As to the six categories, Judge Huvelle and the

3    Circuit -- well, the first category is funding the operation

4    of Pacer itself, and that was clearly fundable through the

5    fees; then there were six additional categories.  She said

6    that funding the case management and electronic case filing

7    system, which I just talked about, CM/ECF, was legitimate

8    use of the fees; the electronic bankruptcy noticing, called

9    EBM, was legitimate.  There was a study called the "State of

10   Mississippi Study," she said no; it was wrong to use the

11   fees for that.  Violent Crime Control Act notification

12   system, she and the Circuit both said no.  Web-based juror

13   services, E-juror; again, no.  And finally, courtroom

14   technology, as I read it, you can correct me if I'm wrong,

15   the Circuit said mostly no, but there were a few exceptions.

16           They explained the reasoning and why they thought

17   she was right and concluded that Pacer fees, under the

18   statute, are limited to the amount needed to cover expenses

19   incurred and services providing public access to federal

20   court electronic docketing information; and then they sent

21   it back.  They affirmed, and sent it back to Judge Huvelle

22   for further proceedings consistent with their opinion.

23           That's where I come in and that's where you came

24   in.  Because after a lot of -- as I read it -- a lot of

25   effort -- not to prejudge anything, arm's length

1    negotiation, a settlement agreement was reached which sets

2    up, what would seem to me, to be kind of a complicated

3    system but a necessary system to reach all of the users over

4    the relevant years.  And so, on remand, there was a lot less

5    for me to do than might have been the case.  After all was

6    said and done, there was a settlement agreement concluded

7    and filed.

8          Having reviewed that in the filings that you

9    provided with it, I, on May 8, 2023, entered an order

10   granting plaintiffs' revised motion for preliminary approval

11   of class settlement and, then, the process to get us to

12   today, the yin, including the notices sent out; and I am

13   sure there will be some discussion of the adequacy of those

14   notices and whether everybody was properly attempted to be

15   reached and in all of the other things that you need to do

16   to get where we are.  And since then there have been

17   numerous filings by the parties, briefs, affidavits, or

18   declarations, and by some objectors as well.

19          So in scheduling the settlement hearing in Docket

20   No. 112, in my order of October 4, 2023 -- I have earlier

21   orders, too -- but it essentially set up how we were going

22   to do this, and that people -- certain people could appear

23   and speak if they wanted to virtually, and people here could

24   speak in person.  There would also be a public line for

25   anybody who wanted to hear what goes on in these proceedings

1  but not participate.

2         Essentially, what I had set forth in this order

3  was that we would start with the parties, the plaintiffs'

4  class counsel in the United States, having up to 20 minutes

5  to make opening remarks; and then I would hear from

6  objectors.  And anyone who had submitted a written statement

7  and wants to be heard can have ten minutes to talk, and

8  anybody who has not written a submitted written statement

9  can have five minutes to talk if they're here.  Counsel will

10  have time to respond to those objections and to make a

11  closing statement.

12         Then we, separately, will have an argument on

13  attorney's fees, with each side getting 15 minutes to

14  present their positions and to answer questions from me.

15         So unless anybody has anything preliminarily or

16  procedurally you want to say before we dive into it, I guess

17  we can start with the openings.

18         MR. GUPTA:  Good morning, Your Honor.

19         I am Deepak Gupta, class counsel in this matter.

20  It is an honor to be here to present this historic class

21  action settlement for the Court's consideration at the final

22  approval stage.

23         I just want to start by thanking the Court and the

24  court staff for the work that went into arranging this

25  hearing, thoughtfully, and for ensuring that the class

1  representatives, as well as class members, can appear and be

2  heard today, both in person and remotely.  We do have a

3  couple of folks remotely on Zoom.

4         Before we begin, I would just like to recognize

5  the people who are here in the courtroom this morning and

6  remotely as well, without whom we never would have gotten to

7  this point.

8         With me at counsel table, my colleague John Taylor

9  from the Gupta Wessler firm, who was there from the very

10  beginning and every step of this case.  My colleagues Bill

11  Narwold and Meghan Oliver from the Motley Rice firm, with

12  whom we worked hand in glove; and Charlotte Loper as well

13  from the Motley Rice firm.

14         If the Court has questions about the mechanics of

15  notice or class administration, claims administration, my

16  colleagues from Motley Rice, particularly Meghan Oliver, are

17  here to answer those.

18         We also have four people here from the class

19  representatives, both in the courtroom and via Zoom, that I

20  would like to thank for their service in this case and

21  introduce to the Court and indicate who will be speaking

22  here today.

23         In the courtroom we have Jake Faleschini.

24         THE COURT:  Say that more into the microphone,

25  please.

1          MR. GUPTA:   Jake Faleschini, he is the director of

2     justice programs at the Alliance for Justice, and he is

3     going to say a few words on behalf of AFJ in support of the

4     settlement.  Also in the courtroom we have Ryan Kelly, who

5     is a staff attorney with the National Veterans Legal

6     Services Program.

7          And via Zoom we're joined by Renee Burbank.  She

8     is the litigation director at the National Veterans Legal

9     Services Program.  She's sorry she couldn't be here in

10    person today.  She has plenty of experience with class

11    actions; is actually a published expert on illegal exaction

12    claims, of all things.  She, too, will speak briefly in

13    support of the settlement.

14         And finally, last but not least, Stuart Rossman is

15    also joining us via Zoom from Boston; he is the litigation

16    director of the National Consumer Law Center.  He also

17    happens to be a leading expert on class actions and class

18    action settlements.  He will say a few words this morning in

19    support of the settlement.  We will try to keep all of those

20    statements brief.

21         So just a few words on the process first.  Those

22    who are unfamiliar with class actions might wonder why we

23    have a big hearing when a case is settled.  What is there to

24    talk about?  The case is over.  The parties have agreed to

25    settle it.

1           But a class action settlement like this one binds

2     hundreds of thousands of people.  People who haven't been

3     necessarily participating in the litigation.  And so it's

4     essential to the process that the Court ensure for itself

5     that the settlement is fair, that we allow people to have

6     notice and an opportunity to be heard.  And I think it's

7     important not just that the settlement is fair, it's

8     important that the public that will be bound understands

9     that it's fair and that they have had a say in the matter if

10    they want one.

11          So as the Court is well aware and, Judge Friedman,

12    as you discussed earlier, we go through kind of a three-step

13    process.

14          First, preliminary approval, which as you have

15    mentioned, you have already done that.

16          Then the Court directs reasonable notice to all

17    class members who would be bound; that, too, has already

18    occurred here.  We have given individual notice to about

19    500,000 people and publication notice as well.

20          The third step is where we are now, final

21    approval.  We have this hearing, we have objections, a

22    public fairness hearing, and the Court considers whether the

23    settlement meets the criteria spelled out in Rule 23.

24          We think we have extensively briefed all of the

25    factors that the Court considers under Rule 23, so I am not

1    going to belabor them here unless the Court has questions.

2    We believe it's clear that the class representatives and

3    class counsel have vigorously represented the class

4    throughout this long and hard-fought litigation.

5         We believe the settlement is the product of an

6    informed arm's length negotiation; that the settlement

7    relief provided to the class is adequate and, indeed,

8    exceptional, particularly given the costs, risks and delays

9    of potential further litigation which could well have

10   occurred on remand for many more years; and that the

11   settlement treats class members equitably relative to each

12   other.  Of course, the plaintiffs and class counsel support

13   the settlement.

14        I do want to say a few words, if I may, about the

15   unusual nature of this litigation because I think it does

16   bear on the analysis.

17        Pacer fees have long been the subject of

18   widespread criticism because they thwart equal access to

19   justice and inhibit public understanding of the courts.  But

20   until this case was filed, folks who care about this issue

21   just did not see litigation as a realistic path to reform.

22   As I noted in my declaration in support of the final

23   approval portion, I have actually been aware of and focusing

24   on these issues surrounding Pacer fees for a long time,

25   going back two decades to my time as a staff lawyer at the

1    Public Citizen Litigation Group which works on transparency

2    issues.

3              Despite much controversy and criticism, though, it

4    was always assumed that a case like this could never be

5    brought.  First, because the judiciary has statutory

6    authority to charge at least some fees.  So no litigation on

7    its own, just within the four corners of the litigation, was

8    ever going to bring down the Pacer-fee paywall and result in

9    a completely free Pacer system.

10             Second, a few lawyers with the necessary

11   experience in complex litigation, one might say, would be

12   crazy enough to sue the federal judiciary and spend

13   substantial time and money over many years on an endeavor

14   with little hope of payment.

15             Third, even if you could show that the fees were

16   unlawful and excessive and obtain qualified counsel, it was

17   still assumed that this was all beyond the reach of

18   litigation because the judiciary is exempt from the

19   Administrative Procedure Act and so injunctive relief would

20   not be possible.  Previous litigation had been dismissed for

21   lack of jurisdiction.  It was hard to know how there would

22   be an alternative basis for jurisdiction, a cause of action,

23   and a waiver of sovereign immunity.

24             So that is, in part, why this case is so unusual.

25             In the history of American litigation, this case

1   and this settlement are unique.  This is the first-ever

2   certified class action against the judiciary for monetary

3   relief and the first settlement of such a case.

4           When we filed this case seven years ago seeking to

5   hold the judiciary accountable for overcharging people for

6   access to court records, I doubt that anyone in Vegas would

7   have given us good odds.  We were mounting a head-on legal

8   challenge to a fee schedule that was set by the Judicial

9   Conference of the United States, presided over by the Chief

10  Justice.  We were asking that the judiciary fork over

11  millions of dollars to people who paid the fees.

12          But I think it is a testament to our judicial

13  institutions that we could bring this case at all, a case

14  against the federal court system in the federal court

15  system, and that we were not laughed out of court.  I am not

16  sure if there is another nation on earth whose judicial

17  institutions would have been as fair-minded and as open

18  about such litigation.

19          It was not easy.  It was risky.  The

20  Administrative Office was not used to facing litigation or

21  discovery, and the Justice Department put up a strong fight.

22  But we never felt and our clients never felt that our

23  arguments were being ignored and rejected by the courts

24  because of the identity of the defendant.  To the contrary,

25  judges at the trial level and the appellate level heard our

1    arguments, gave them fair consideration, and we think ruled

2    effectively in our favor every step of the way.

3         I think you are right, Judge Friedman.  Judge

4    Huvelle chartered a middle path.  She found liability and so

5    did the federal circuit, unanimously.  We defeated the

6    government's motion to dismiss.  We obtained certification

7    of nationwide class in a case against the judiciary.

8    Through discovery, we were able to shine a light on how the

9    Administrative Office of the U.S. Courts had been using

10   Pacer fees; bringing new facts to life and spurring action

11   in the legislature.  And that discovery, in turn, led to

12   Judge Huvelle's unprecedented decision which, yes, it didn't

13   give us everything that we asked for when we swung for the

14   fences, but it did hold that the AO had violated the law by

15   using Pacer fees to fund certain activities.  Within months,

16   the AO announced that those activities would no longer be

17   funded with Pacer fees.

18        When we went up on appeal, we were able to muster

19   extensive amicus support from retired federal judges,

20   numerous media organizations, technology companies,

21   libraries, civil rights groups.  And the suit also garnered

22   widespread media coverage that brought public awareness to

23   these efforts.

24        Before long, the AO announced that it was doubling

25   the $15 quarterly fee waiver, eliminating Pacer fees for

1    approximately 75 percent of Pacer users.

2         As you mentioned, we secured what we think is a

3    landmark federal circuit opinion unanimously affirming this

4    Court's summary judgment ruling holding that the judiciary

5    had unlawfully overcharged people.

6         I think it's worth noting another thing that the

7    federal circuit said besides that Judge Huvelle got it just

8    right.  The federal circuit also acknowledged the important

9    First Amendment stakes here.  It acknowledged that, as it

10   put it, quote:  "If large swaths of the public cannot afford

11   the fees required to access court records, it will diminish

12   the public's ability to participate and then serve as a

13   check upon the judicial process," which is an essential

14   component in our structure of self-government.

15        So a few words about the settlement itself.

16        After more than seven years, we now have a

17   landmark settlement under which the government must

18   reimburse the vast majority of Pacer users in full; 100

19   cents on the dollar for past Pacer charges.  The settlement

20   creates a common fund of $125 million from which each class

21   member will be automatically reimbursed up to $350 for any

22   Pacer fees paid in the eight-year class period.  And the

23   remainder, those who paid over 350, will receive their

24   pro rata share of any remaining funds.

25        This is notable because, unlike most class

1    actions -- almost every class action I have been involved

2    in -- there is no claims process; the money is distributed

3    automatically to class members.  By any measure, we think

4    this litigation has been an extraordinary achievement and we

5    think more so given the odds that were stacked against it.

6    It has also sparked widespread public interest in the need

7    to reform Pacer fees and has jump-started legislative action

8    that continues until this day.

9          Following the federal circuit's decision, the

10   House of Representatives passed a bipartisan bill, which is

11   not something that happens --

12         THE COURT:  It must have been a few years ago.

13         MR. GUPTA:  It was a few years ago, but it did.

14         It passed just a few years ago.  Even in these

15   times, it passed a bipartisan bill to eliminate Pacer fees,

16   and it really is truly a bipartisan effort; and the measure

17   advanced out of the Senate Judiciary Committee.

18         The Judicial Conference, too, now supports

19   legislation providing for free Pacer access to noncommercial

20   users.  If Congress were to enact such legislation, it would

21   produce an outcome that the plaintiffs had no way of

22   achieving through litigation alone given the jurisdictional

23   limitations.

24         Now, as I mentioned earlier, the purpose of a

25   hearing like this is to hear from class members; and not

1    just the class representatives, but class members who pay

2    may be opposed to the settlement and who wish to be heard.

3    No case is perfect.  Every settlement is a compromise.  And

4    of course, there are always things you wish you could

5    accomplish.  We wish we could have brought down the

6    Pacer-fee paywall entirely, but we couldn't because of the

7    jurisdictional limitations.

8              In any case of this size, with hundreds of

9    thousands of class members, one anticipates at least some

10   substantial number of objections, but this isn't just any

11   class.

12             This is a class that comprises every federal court

13   litigator.  It includes law firms of all stripes, including

14   the world's largest law firms; it includes journalists and

15   media organizations; it includes sophisticated data

16   companies with a lot of money at stake; and it includes a

17   whole lot of pro se litigants.  This is a class of

18   rabble-rousers.

19             In the wake of the settlement, we saw not just

20   extensive press coverage and public interest but, also, many

21   inquiries from individual class members.  Since the

22   settlement, class counsel has responded to over 300 class

23   member calls and emails.

24             THE COURT:  Say that again.  I didn't --

25             MR. GUPTA:  300.

1          THE COURT:  300 what?

2          MR. GUPTA:  300 class member calls and emails.

3    Many of those communications involved multiple

4    communications back and forth.  They came from all manner of

5    class members.

6          The class administrator KCC has received

7    approximately 250 calls through its automated telephone

8    line.  So the objections here, I think, really are the story

9    of the dog that didn't bark.  None of the many

10   organizations --

11         THE COURT:  So they were all, these calls, to

12   class counsel and to KCC?

13         MR. GUPTA:  Correct.

14         THE COURT:  Out of that number or that number

15   plus, how many objections were actually filed?

16         MR. GUPTA:  There were five objections that were

17   actually filed, all of them pro se.  One we may discuss

18   later by someone we believe is not a class member, and I

19   think only two that are appearing today.  I may be wrong

20   about that, we'll see.

21         THE COURT:  One of the things -- and this may not

22   be the appropriate time.

23         I think, in reading your papers, in addition to

24   the five objections, you also mentioned something like 34

25   attempts to opt out, some of which may have come too late.

1   So at some point I hope you will address that or someone

2   will address that.

3          MR. GUPTA:  Yes.

4          Ms. Oliver has the statistics on that.  I think

5   that number is correct.  I think that's the number of valid

6   opt-outs.  We are happy to discuss that.

7          But the point I am making is that there is a dog

8   that didn't bark; no transparency groups, no law firms, no

9   data companies, no groups that represent underrepresented

10  litigants; none of them have come forward.  I think that's a

11  measure of the universal support for the settlement.

12         Of course, we want to hear from those objectors,

13  and they have the right to speak today; and that's an

14  important part of the process.

15         THE COURT:  I have read all of the objections that

16  have been filed thoroughly, including what Mr. Isaacson

17  filed last night.

18         MR. GUPTA:  But first, if I may, Your Honor, I

19  would like to turn things over to the class representatives

20  to just say a few words.

21         THE COURT:  Sure.

22         MR. GUPTA:  We can start with Jake Faleschini from

23  the Alliance for Justice.

24         MR. FALESCHINI:  Good morning, Your Honor.

25         THE COURT:  Mr. Faleschini, good morning.

```
 1              MR. FALESCHINI:  Good morning.

 2         My name is Jake Faleschini.  I am the program

 3    director for the justice team at --

 4              THE COURT:  Could you spell your last name for the

 5    court reporter.

 6              MR. FALESCHINI:  Absolutely.  It's

 7    F-A-L-E-S-C-H-I-N-I.

 8              THE COURT:  Thank you.

 9              MR. FALESCHINI:  I am with the Alliance for

10    Justice.

11         I am happy to say that AFJ supports the proposed

12    class action settlement and the accompanying requests for

13    fees, costs, and service awards.  AFJ is proud to have

14    brought this case.

15         The Alliance for Justice is a national

16    organization and alliance of approximately 150 public

17    interest member organizations that share a commitment to an

18    equitable, just, and free society.

19         Among other things, AFJ works to ensure that the

20    federal judiciary advances core constitutional values and

21    preserves unfettered access to justice for all Americans.

22         Our organization and many of our member

23    organizations regularly use Pacer to access court documents

24    for research on how court cases impact the issues that we

25    care most about.
```

1          When the courts charge exorbitant fees for access

2     to these documents, it puts our organizations at a

3     disadvantage vis-à-vis more wealthy interests.  In practice,

4     it gatekeeps access to important information, public

5     information, and it limits our collective ability to inform

6     the public about those happenings.

7          AFJ served as a named plaintiff in this class

8     action since its filing in April 2016, a period of more than

9     seven years.  For much of that time until his departure for

10    a position at the U.S. Senate last year, AFJ's legal

11    director, Daniel Goldberg, oversaw this litigation on AFJ's

12    behalf.  Among other things, Mr. Goldberg received updates

13    on motion practices and court rulings from class counsel,

14    reviewed draft pleadings, consulted on strategy, and

15    provided a declaration in support of class certification on

16    AFJ's behalf.

17         I understand that counsel will seek a service

18    award for AFJ of $10,000.  We conservatively estimate that

19    the value of the attorney time incurred by AFJ over the

20    seven-year life of this case exceeds that amount when

21    calculated at market rates.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.

24         MR. GUPTA:  Next, Your Honor, if she's available

25    by Zoom, Renee Burbank from the National Veterans Legal

1    Services Program would like to speak.

2               THE COURT:  Yes.  Ms. Burbank.

3               MS. BURBANK:  Good morning.

4               I am on Zoom.  Can you hear me?

5               THE COURT:  We can hear you.  Thank you.

6               MS. BURBANK:  Thank you, Your Honor.

7               As the attorney just said, my name is Renee

8    Burbank; spelled B-U-R-B-A-N-K.  I am the director of

9    litigation at National Veterans Legal Services Program, also

10   known as NVLSP.

11              We're a national nonprofit veterans service

12   organization and we represent all manner of active-duty

13   personnel and veterans when they are seeking benefits from

14   the federal government due to their service and disabilities

15   incurred or made worse through their service.

16              As an organization, NVLSP represents thousands of

17   veterans every year in court cases, including class actions

18   and individual representation; and we provide education and

19   research on the state of the law to advocates all over the

20   country.

21              Veterans overall, however, largely proceed pro se

22   without attorney representation when they go to the courts

23   to obtain benefits from the government.  And in order to

24   understand the state of the law, access to federal public

25   dockets is critical.  Specifically for NVLSP, we spend many

1    hours every year researching the law all over the country

2    and what is happening with veterans' benefits and other

3    Department of Defense-related activities that affect the

4    benefits and recognition that our military and veterans have

5    earned.

6            As you have already been apprised by Alliance for

7    Justice, we strongly support the settlement and the fees and

8    costs that reflect the complexity and unique nature of this

9    litigation.

10           NVLSP, as one of the named plaintiffs in this

11   class action, has spent a considerable amount of time and

12   effort on this case, understanding the filings as they were

13   being drafted, and providing input prior to class

14   certification, and to also understand and be able to tell

15   others about the status of the Pacer litigation.  Because

16   NVLSP is the first-named plaintiff, we have also received

17   some of those inquiries; we forward them to class counsel

18   when we receive them.  But we did get some information or,

19   rather, inquiry from individual class members wanting to

20   know about this important case.

21           The time that we have spent, the approximate

22   amount of billing rates that we would have for the time

23   incurred that NVLSP has spent is reflected in my declaration

24   previously filed with the Court.  And I think that that

25   declaration, as well as Attorney Gupta's explanation today,

1    adequately and accurately explains why the settlement is

2    appropriate in this case.  NVLSP agrees with that

3    assessment, and we support the settlement.

4              Thank you, Your Honor.

5              THE COURT:  Thank you very much, Ms. Burbank.

6              MR. GUPTA:  And finally, Your Honor, Stuart

7    Rossman, the litigation director of the National Consumer

8    Law Center is also with us.

9              MR. ROSSMAN:  Thank you very much, Your Honor.

10   I hope you can hear me.

11             THE COURT:  Yes.

12             MR. ROSSMAN:  I just want to thank you for

13   allowing me to appear from Boston by Zoom.  It's a pleasure

14   to be able to appear before the Court in support of the

15   settlement in this particular case.

16             As it has already been stated, the National

17   Consumer Law Center has been a named class representative in

18   this case from its inception.

19             National Consumer Law Center is a 54-year-old

20   organization, originally partnered with the Legal Services

21   Corporation where we served as the national support center

22   on behalf of legal services in the area of consumer law.

23   Since 1995, we have been a private nonprofit 501(c)(3)

24   organization.

25             We represent the interests of low-income consumers

1    in the areas of consumer finance, affordable home ownership

2    and access to utilities.  As such, there are two areas in

3    which NCLC is highly dependent on access to the federal

4    court records through the Pacer system.  NCLC is the

5    publisher of a 22-set -- volume set of consumer law manuals

6    which rely heavily on federal law, specifically on federal

7    consumer laws, which, obviously, are updated on an annual

8    basis.  At this point we're digital, so they're being

9    uploaded on a daily basis.  And as an organization, we make

10   heavy use of Pacer ourselves in order to be able to maintain

11   our materials.

12          Beyond that, however, working with our primary

13   finance, which is not the direct service for consumers [sic]

14   but the lead services organizations that represent them,

15   legal services and public interest organizations, all rely

16   upon access to Pacer in order to provide representation to

17   their clients under the statutes like the Fair Lending Act,

18   the Fair Credit Reporting Act, Fair Debt Collection

19   Practices Act, Economic Opportunity Act -- I can go on.

20          Virtually all of the consumer laws in the

21   United States are based upon federal statutes that were

22   enacted from 1968 to the present.

23          So, therefore, having access to Pacer, these are

24   nonprofit public-interest organizations and legal services

25   organizations that have limited resources and, therefore,

1    the effort that was put into this case by the attorneys who

2    brought the litigation has direct impact not only on my own

3    organization but the groups that we serve as a national

4    service organization with national resources for legal

5    services organizations.

6         I do want to comment as well in terms of the

7    service award that is being requested on behalf of National

8    Consumer Law Center.  I have been involved in this case

9    since its inception seven and a half years ago.  I must say

10   that I outlasted the judge on the case but I am, in fact,

11   going to be retiring at the end of December of this year --

12        THE COURT:  At the end of when?  When are you

13   retiring?

14        MR. ROSSMAN:  At the end of December.

15        THE COURT:  So you would love me to approve the

16   settlement and approve it before you retire?

17        MR. ROSSMAN:  You know, I would be more than

18   happy.  But since anything that you approve is going to be

19   going to my organization, whatever we receive we would

20   greatly appreciate it.

21        I am looking forward to retirement.  My wife

22   retired two years ago and every morning she reminds me how

23   good retirement is.

24        THE COURT:  You know, I have been a senior judge

25   for some time; and what you just said, I hear that at home a

1    lot.

2            MR. ROSSMAN:  Yes.  There are some vacations and

3    trips that we have not been able to do, along with spending

4    some time with my grandchildren which is something that --

5    actually, what I really want to do is *The New York Times*

6    crossword puzzle the day after --

7            THE COURT:  My wife prefers Friday and Saturday

8    because they're the hardest.

9            MR. ROSSMAN:  I agree, Your Honor.  It is a great

10   motivation (indiscernible).

11           In any event, I have not only reviewed the

12   pleadings in this case.  I filed a declaration to the Court

13   to support class certification.  We provided discovery in

14   this case.  I have gone back and checked my time records on

15   it.  I have spent more than 250 [sic] hours working on this

16   case over the last seven and a half years.  And at my

17   current billing rate in Massachusetts, that would well

18   exceed the amount of the service award that is being

19   requested on behalf of the National Consumer Law Center.

20           I am happy to be able to respond to any questions

21   you have about the work that we have done in this case.

22           I will just finish by saying that over the last 25

23   years as the NCLC litigation director, I have been of

24   counsel or co-counsel in over 150 class action cases.  It's

25   an unusual situation for me to be a client.  It's been an

1   eye-opening experience for me.  I suspect it's been an

2   eye-opening experience for my counsel whom I have challenged

3   on occasions during the course of the last seven and a half

4   years.  But I think they have done an outstanding job in

5   terms of the work that they have done in this case as well

6   as the outcome it has achieved.  We are highly satisfied and

7   we completely endorse the settlement going forward.

8           So I thank you very much for the time that you

9   have given me to speak, Your Honor, and I am happy to answer

10  any questions that you have.

11          THE COURT:  Thank you very much, Mr. Rossman.

12          Mr. Gupta.

13          MR. GUPTA:  That's all we have for our opening

14  representation.  Thank you.

15          THE COURT:  Then I will hear from the government.

16          MS. GONZALEZ HOROWITZ:  Good morning, Your Honor.

17          Thank you for an opportunity to have the parties

18  and the class members appear before the Court today to

19  discuss the settlement approval in this, I think, as

20  Mr. Gupta called it, a landmark class action case.

21          Your Honor, you are aware that your task today is

22  to determine whether the proposed settlement is fair,

23  reasonable, and adequate for the class members.

24          You need not decide that settlement is perfect or

25  that it's even the best possible.  Stated another way, the

1    Court must examine whether the interests of the class are

2    better served by the settlement than by further litigation.

3           In evaluating that, the Court should determine

4    whether the settlement is adequate and reasonable and not

5    whether a better settlement is conceivable.

6           As demonstrated by both parties' filings in the

7    evidence and information that's been provided to you, this

8    settlement is an outstanding result; I think, as Mr. Gupta

9    called it, landmark for the class members and more than

10   meets the legal requirements for final approval.

11          This Court is well aware of the general principle

12   that settlement is always favored, especially in class

13   actions, where the avoidance of formal litigation can save

14   valuable time and resources; the same is certainly true

15   here.  As Mr. Gupta said, no settlement is perfect.

16          The United States concurs with plaintiffs that

17   this Court should grant final approval.  The settlement

18   proposal was negotiated at arm's length, the relief provided

19   for the class is more than adequate, and the proposal treats

20   class members equitably relative to each other.  Although

21   the parties address these factors extensively in their

22   filings, I would like to take a moment to address these

23   today.

24          First, although I was not personally involved in

25   the mediation and negotiation phase of this litigation, the

1   record before the Court amply demonstrates that the

2   settlement proposal was negotiated at arm's length.

3          As noted in the parties' filings, the parties

4   appeared before an experienced mediator with both parties

5   recognizing the litigation risk in moving forward.

6          The government vigorously defended this action

7   from its inception, as the Court mentioned earlier today in

8   its opening remarks and as Mr. Gupta discussed when giving

9   some of the procedural history and background of this case.

10         The Court and, later, the federal circuit upheld

11  certain electronic public access expenditures, while finding

12  that the Administrative Office of the Courts exceeded its

13  statutory authority as to others.  This has been a

14  hard-fought litigation for a significant period of time.

15  The parties engaged in informal discovery prior to

16  settlement discussions and, thus, were well informed.

17         As other judges in this district have noted, in

18  the absence of any evidence or collusion or coercion on the

19  part of the parties, the Court has no reason to doubt that

20  the settlement was the product of legitimate negotiation on

21  both sides; and the Court certainly has no reason to doubt

22  that here.

23         Second, the settlement provides for a common fund

24  of 125 million, and will provide a full recovery of up to

25  $350 to each class member for fees paid during the class

1    period, with the remaining funds to be distributed on a

2    pro rata basis to those class members who paid more than

3    $350 in fees during the class period.  This relief is more

4    than adequate especially considering some of the risks to

5    the class which I will address momentarily.

6              There is nothing inequitable about the plan of

7    allocation and distributing payments pro rata with a

8    guaranteed payment up to a certain amount in a common fund

9    case such as this one is not unusual.

10             As reflected in the parties' filings, the

11   allocation plan was the result of a compromise between the

12   parties and supports the Administrative Office's

13   long-standing policy of access to judicial records.

14             This principle is even more forceful here where

15   the E-Government Act allows for differentiation between

16   individuals.  Consistent with the statutory notes

17   articulated in 28 U.S.C. Section 1913, the statute permits

18   electronic public access fees to, quote:  "Distinguish

19   between classes of persons and shall provide for exempting

20   persons or classes of persons from the fees in order to

21   avoid unreasonable burdens and to promote public access to

22   such information."

23             As one of the objectors recognizes,

24   differentiation between class members can be permissible

25   when it is justified; and in this instance, it is certainly

1    justified considering the Administrative Office's interest

2    in ensuring public access especially to individual and

3    smaller users.

4        The settlement distribution will ensure that the

5    average Pacer user receives full compensation up to $350

6    which, for many users, will result in a full compensation of

7    all fees paid.  In other words, the settlement is consistent

8    with congressional intent.

9        Moreover, efforts taken by the judiciary to ensure

10   that public access fees do not create unnecessary barriers

11   or burdens to the public have resulted in an allocation of

12   the vast majority of Pacer maintenance costs to the system's

13   largest users, which are typically commercial entities that

14   re-sell Pacer data for profit.  That comes from the report

15   of the proceedings of the Judicial Conference of the

16   United States in September of 2019.

17       To address the concerns lodged by objectors that

18   the settlement either favors small users or institutional

19   ones which I think, as the parties have noted, are

20   diametrically opposed objections or does not favor

21   institutional users enough, the settlement is a marriage of

22   the parties' litigating positions which, in the end, is the

23   hallmark of compromise.  The settlement need not be perfect

24   but, rather, reasonable.

25       Finally, Your Honor, I want to address the terms

1     of the settlement in relation to the strength of plaintiffs'

2     case.  It is the government's position that absent a

3     settlement, the class would have faced significant

4     difficulty in demonstrating that the Administrative Office

5     would not have used the funds on otherwise permitted

6     categories.  This was a position that the government took at

7     all stages of the litigation; and as with any litigation, of

8     course, there are risks to both sides if the case were to

9     proceed.  But especially here, the results achieved are

10    extraordinary when compared to the difficulties the class

11    may have if the litigation were to move forward.  That, of

12    course, is without even considering the time, expense,

13    burden, and resources that the parties and, of course, the

14    Court, in turn, would expend if the case were to proceed to

15    additional discovery on damages and later to trial.  These

16    factors only further counsel in favor of approval of the

17    settlement agreement.

18          Because the Court has a lot of time at the end of

19    the hearing to discuss plaintiffs' motion for attorney's

20    fees, service awards, and costs, I will not address that

21    here other than to say that the government, in its response

22    to plaintiffs' motion, raised some questions in general

23    principles for this Court to consider in determining the

24    ultimate award.

25          In sum, Your Honor, we concur with plaintiffs in

1    the class that the Court should approve the settlement.

2    Thank you.

3              THE COURT:  Thank you.

4              So it seems to me now, under the schedule I've

5    set, at some point I want to hear from Ms. Oliver about the

6    opt-out question.  But I think at this point I will hear

7    from Mr. Isaacson who is here and has filed a number of

8    things; one a while ago and one last night.

9              He is here in person to speak to his objections.

10   I am happy to hear from him.  Later I will hear from other

11   people if they want to be heard.

12             So good morning, sir.

13             MR. ISAACSON:  Good morning, Your Honor.

14             May it please the Court.

15             I am Eric Alan Isaacson, a member of the class to

16   be bound by the settlement.  I filed a timely objection on

17   September 12 and in response to this Court's order regarding

18   the hearing.  And preceding the hearing, I filed a written

19   statement that indicated my intent to appear here in person,

20   not remotely, as Mr. Gupta's filing stated.  Also, to

21   address some of the filings that they did, I think that they

22   were after the fact and late when it comes to the

23   requirements of Rule 23.

24             I think that the primary fairness problem with

25   this settlement -- well, I think there are two serious

1    fairness problems with the settlement.  Rule 23 asks whether

2    the settlement treats class members equitably with respect

3    to one another.

4         The big problem is that, as Mr. Gupta says, this

5    class includes the world's largest law firms.  The world's

6    largest law firms are very sophisticated and they did not

7    file an objection.  They didn't file an objection because

8    they know that they got fully reimbursed for their Pacer

9    expenses years ago.  They bill in 30-day cycles.  They pay

10   Pacer bills, and the clients then reimburse them for the

11   Pacer bills.  Class counsel in class actions that almost

12   always settlement, almost always produce a settlement fund

13   from which the class action law firms are fully reimbursed

14   for their Pacer expenses.

15        You have got a class that includes a lot of very

16   large Pacer users that spent a lot on Pacer; they got fully

17   reimbursed for it.  And you have got a claims process --

18   well, it's not a claims process.  They brag that there are

19   going to be no claims made, which means they are not even

20   asking people:  Have you been reimbursed for your Pacer

21   expenses?

22        THE COURT:  So at this point, I take it, is that

23   when the big law firms bill their clients quarterly or

24   whenever they bill, they included -- they say:  In doing

25   legal research for you on this matter, we used Pacer, and it

1    cost X dollars, and we're billing you for that.

2        MR. ISAACSON:  Yes, Your Honor.  That would be my

3    understanding.

4        I worked in a large law firm for about three years

5    at the beginning of my career.  I worked at large

6    plaintiffs' class action firms for the majority of my

7    career.  My understanding is that the law firms that are

8    going to be some of the biggest claimants are going to

9    receive the biggest payments over the pro rata distribution

10   part of this settlement -- have already been fully

11   compensated.

12       Now, one way to address that was the government's

13   position that you had to have a large minimum payment.  You

14   have got a large minimum payment and they ended up getting

15   negotiated down to $350.  If it's a large minimum payment,

16   double that or three times that, you are still dealing with

17   people getting the minimum payment who are members of the

18   public, who are not in a class that have been reimbursed for

19   this stuff; that would be one way to deal with it.  The

20   settlement is unfair if it does not have a larger minimum

21   payment and does not ask large claimants or large payees:

22   Have you been reimbursed?  I think it treats class members

23   inequitably relative to one another.

24       I think it's very ironic that the government, in

25   the settlement negotiations regarding the allocation of the

1    funds, did a better job advocating for the public interest

2    and for the interest of class members who haven't been

3    reimbursed than did class counsel.

4         There may have been arm's length negotiations in

5    the settlement process with respect to the total amount of

6    the settlement.  But when it comes to the allocation of the

7    funds, the government's position was preferable to the

8    plaintiffs' class action lawyers; I think that's most

9    unfortunate.

10        It is, I think, not coincidental that plaintiffs'

11   class action firms like themselves benefit from a low

12   minimum amount and high allocation to the pro rata

13   distribution.

14        I think that the $10,000 service awards are

15   problematic, I think, according to Supreme Court authority,

16   Supreme Court opinion; I addressed that in my papers.

17        With respect to the settlement adequacy as amended

18   in 2018, Federal Rule of Civil Procedure 23 requires the

19   Court, in evaluating adequacy of the settlement to consider,

20   and I quote:  "The terms of any proposed award of attorney's

21   fees."  That's Rule 23(e)(2)(C)(iii).

22        THE COURT:  Hold on one second.

23        Which part of 23?

24        MR. ISAACSON:  Rule 23(e), which deals with

25   settlement approval in class actions.

```
 1                THE COURT:  Right.

 2                MR. ISAACSON:  Subsection (2), Subsection (C),

 3     Subsection (iii).

 4                THE COURT:  So it says that:  If the proposed

 5     class -- only in finding it's fair, reasonable, and adequate

 6     after considering the following.  And (C)(iii) basically

 7     says --

 8                MR. ISAACSON:  Which I think --

 9                THE COURT:  -- that the class represented class

10     counsel -- I'm sorry, that the relief provided for the class

11     is adequate taking into account the terms of any proposed

12     award of attorney's fees including timing of payment.

13                So essentially, as you read this, there are two

14     questions on attorney's fees:  One is, are they entitled to

15     attorney's fees?  And secondly, how much?

16                MR. ISAACSON:  Yes, Your Honor.

17                THE COURT:  And this says that in determining

18     adequacy I have to consider both of those?

19                MR. ISAACSON:  Yes, Your Honor.

20                In considering adequacy of the settlement, you

21     need to consider that.  The reason is because in class

22     actions there is a tendency for class action lawyers to

23     settle cases on terms that guarantee themselves large

24     attorney's fee awards; in this case, four or five and a half

25     times their reasonable hourly billing rates if you look at
```

1    their lodestar -- their claimed lodestar, and compare it to

2    the fee award that they're asking for.

3            This is a case where class counsel has come in and

4    said:  We have got a quarter of the damages in this case --

5    because it's apparently a $500 million case according to

6    their expert Professor Fitzpatrick -- we have got a quarter

7    of the damages in this case, give us four times our billing

8    rates.  I don't think that's appropriate, Your Honor.

9            I think that it's going to be necessary, if you

10   want to approve the settlement, to dramatically reduce the

11   attorney's fees that they're requesting.

12           Now, they didn't document their lodestar; that's a

13   problem.  I think that's designed, quite frankly, to force

14   the Court to choose to do a percentage award rather than a

15   lodestar award.  I don't think that it's ethical for class

16   counsel to do that.  I think they need to provide the data

17   that would be necessary for the Court to make the choice.

18   And all of the circuits except for the District of Columbia

19   Circuit and the Eleventh Circuit have held that that is a

20   choice for the Court to make.

21           THE COURT:  Choice between what?

22           MR. ISAACSON:  Between lodestar award and

23   percentage of the fund award.

24           THE COURT:  What about the federal circuit?

25           MR. ISAACSON:  The federal circuit I think

1   indicates that you can choose between the two, you have

2   discretion.  But it is not something that they can force.

3          I think the recent *Health Care Republic* [sic] case

4   strongly indicates you ought to do a lodestar cross-check.

5          THE COURT:  A lodestar cross-check is different

6   from a lodestar.  In other words, as I understand it -- we

7   are going to talk about this more later.

8          As I understand it, there are cases in which you

9   apply the lodestar.  We used to call it -- I forget what it

10  used to be called, the U.S. Attorney's matrix, the D.C.

11  Attorney General's matrix, the Laffey Matrix.  We have all

12  of these things in this court which applies to certain kinds

13  of cases and in certain cases.  Then there are the common

14  fund cases which, I believe -- and we will talk more about

15  this later.  The case law seems to suggest that a percentage

16  of the fund is more normal than the lodestar, but there is

17  then the discussion of a separate thing called the lodestar

18  cross-check.  So there is the lodestar versus the percentage

19  of the fund, and then there is:  When you do a percentage of

20  the fund do you also do a lodestar cross-check, and is that

21  something judges have the discretion to do or not do to

22  satisfy themselves or to do a, for lack of a better word,

23  cross-check, or is it something that some courts require be

24  done?

25         I don't want to -- you can continue talk about

1      this.  I will let you talk later this morning when we get to

2      the separate discussion of attorney's fees; I will let you

3      get up again and talk some more about that in response to

4      what counsel says.

5              In my mind at least, there is a vast difference

6      between a lodestar and lodestar cross-check; they serve

7      different functions.

8              MR. ISAACSON:  Your Honor, my understanding is the

9      Court is supposed to act as a fiduciary for the class.

10             THE COURT:  I agree.

11             MR. ISAACSON:  If we go back to the earliest

12     common fund cases, the Supreme Court in *Greenough* says the

13     Court needs to act with a zealous regard for the rights of

14     the class.  And you need to -- in evaluating whether to do a

15     percentage award and the amount of the percentage award,

16     consider whether it's going to cause a windfall to class

17     counsel, which I think, in this case, it does because they

18     are saying:  We recovered one quarter of the damages in this

19     case, give us four times our claimed lodestar.  Which they

20     haven't really documented, and they haven't documented the

21     fees.  They end up having supplemental submission from both

22     Fitzpatrick and Rubenstein supporting their fee application

23     on reply.  I think that's inappropriate because Rule 23(h)

24     says that they're supposed to put in the supporting

25     documentation in connection with the motion.  I think it's

1    unfair and improper to put it in on reply both because,

2    ordinarily, you don't get to introduce additional evidence

3    on reply and because Rule 23(h) required them to file that

4    stuff before the objections were due.

5         I think it's also important to realize that even

6    if a judge is not going to go through line by line in their

7    lodestar submissions and billing submissions, even if class

8    members, for the most part, aren't going to be sophisticated

9    enough to go through line by line, if those filings and that

10   evidence is made a part of their public record that other

11   folks may do it.

12        In the *State Street* securities fraud litigation

13   there was settlement in the District of Massachusetts.  A

14   reporter for the Boston Globe went through the fee

15   applications after the district judge had approved the

16   attorney's fees and said:  Hey, there is a guy that gets

17   paid a lot of money but didn't do anything.  What's up?

18   Said:  Hey, there are folks who billed time and they are

19   being compensated more than once for it, more than one law

20   firm they were working for at the same time for the same

21   fees.  It's important for transparency that they have a

22   complete filing of the information.

23        Now, in this case, I think a fee award of five

24   percent would more than cover their claimed lodestar and

25   would be more than adequate and would address the concerns

1    that I have got.

2          When it comes to presumptions with respect to

3    fees, the *Health Republic* case says that you can't presume

4    that the fee application is appropriate.  You have got to be

5    very critical of it.

6          The Supreme Court in *Perdue* said it's

7    presumptively sufficient for class counsel to get an

8    unenhanced lodestar award that presumptively covers the

9    costs and risks of class action litigation and that if they

10   want more than that they need to demonstrate with clear

11   evidence why they need to get more than that.

12          THE COURT:  Okay.

13          MR. ISAACSON:  In this case, I think that goes to

14   fairness of the settlement.

15          Now, if I am going to be able to address the fee

16   issues after they speak about fees --

17          THE COURT:  Yes.

18          MR. ISAACSON:  -- I will wait for that.

19          Thank you very much, Your Honor.

20          THE COURT:  Thank you very much, Mr. Isaacson.

21          Are there any other objectors in the courtroom or

22   on Zoom who want to be heard?  Any objectors?

23          I see someone.

24          MR. KOZICH:  Yes, Your Honor.

25          THE COURT:  Mr. Kozich, yes, sir.  Mr. Kozich has

1    filed a written objection which I have read.  I will hear

2    from you, Mr. Kozich.

3            MR. KOZICH:  Thank you, Your Honor.

4            One of the persons who spoke said there were

5    500,000 users who were actually entitled to some sort of

6    reimbursement for their Pacer fees; and they never had an

7    accounting of who is going to receive what money from the

8    settlement.

9            Now, one of the other attorneys that I know is a

10   class member -- but I am not a class member because --

11   basically saying that I didn't pay Pacer fees in a time that

12   is a class period.

13           I remember that I did pay Pacer fees during that

14   time but I was only able to find invoices that I submitted

15   to the Court.  The Pacer people tried to do a check on me,

16   they couldn't find my account at all.  So I don't know if

17   Pacer purposely lost my account or whatever.  I am claiming

18   that I am a class member and I would like to present my

19   argument now.

20           Now the --

21           THE COURT:  Are you objecting to aspects of the

22   settlement or are you objecting to the fact that you are not

23   being included in the class and getting your fair share, or

24   both?

25           MR. KOZICH:  Both, Your Honor.

1          THE COURT:  Okay.  Go ahead.

2          MR. KOZICH:  Okay.  The government entered into it

3     in December of 2002.  It mandates that Pacer cannot charge

4     beyond the margins -- marginal cost of document production

5     or transmission.  Transmission time is at the speed of

6     light, so at 186,000 miles per second; therefore,

7     transmission time is much less than one second and certainly

8     less than one cent per page to transmit.  All of that money,

9     the pennies that it cost to transmit, they already had the

10    documents, they're just transmitting the documents, it's

11    proper to pay Pacer.

12          The defendant instituted excessive Pacer fees.  I

13    only have two documents; one from August 18th of 2014, and

14    one from April 1st, 2017, which is charging ten cents per

15    page for excessive fees.  So the period of time to then come

16    back before 4/21/10 [sic] because they're charging excessive

17    fees back then too.

18          Ten cents per page is what Office Depot charged

19    before COVID.  It includes costs of copier, toner, drums,

20    paper, electricity, copies.  Pacer did not incur any of

21    these costs, only the cost of transmission, because the

22    document is already there.

23          The lawsuit was filed in 2016.  Class period is

24    from April the 10th, 2010, through May 31st of 2018.  This

25    period is why we cut off so -- just a short period of time

1   at any time before April the 10th or after May 31st of 2018,

2   when Pacer was charging ten cents a page.

3         Who picked the period?  I don't know who picked

4   the period.  Pacer users who pay less than $50 in excessive

5   Pacer fees -- I didn't pay my Pacer fee, but you see $250

6   because I am a disabled veteran.  And I was looking for

7   issues regarding the housing tax credit properties.  I had

8   an issue with the Broward County Housing Authority.  I was

9   researching records of California, Oregon, Washington, and

10  all over the country, actually, for help with my case.  So I

11  didn't pay the Pacer fees because I couldn't afford it, the

12  high fees.  Pacer cut me off from using Pacer, and I am

13  still cut off from Pacer.  I guess Pacer could waive the

14  fees; they haven't done that.

15        And then for the quarter ending for the year

16  ending 2010, Pacer had a net profit of 26,611,000.15 as part

17  of my filing of 163, Exhibit E, extrapolating a period,

18  which is a period of 37 quarters; basically at a net profit

19  for 2010, $984,626,129.

20        If you take over the settlement, there is still a

21  net profit of $859,626,129 [sic].  Net profit.  It's not

22  supposed to be making a profit, they're supposed to be

23  dealing at cost.  That money should be distributed to the

24  users who pay the excessive fees so that they can be made

25  whole.  They are not being made whole by the settlement.

1          I presented evidence that I owed $354.67 in Pacer

2     excessive fees for the period July 1st, 2015, through

3     September 30th, 2015.  My account number is 2792766.

4          I remind the Court that Pacer couldn't find my

5     account.  So I don't know what they did with it; they lost

6     it or something.

7          I am opposed to the settlement because people are

8     not being made whole.  It's the big large law firms, big

9     corporations, and the big nonprofits that are making most of

10    the money because the small guy who you see incur fees is

11    not going to be made whole and maybe deserves to be made

12    whole by the settlement.

13         I am opposed to the settlement.  I would like to

14    know how -- who the money is going to go to before the Court

15    reaches a settlement on the amount that's being distributed.

16    I think the nonprofits and big corporations is taking a big

17    chunk of the money, and the small guy is not being made

18    whole.  Thank you, Judge.

19         THE COURT:  Thank you very much, Mr. Kozich.

20         Are there any other objectors in the courtroom or

21    on Zoom that want to be heard?

22         I don't hear anybody speaking up.

23         As I understand it, and as I have -- I have read

24    all of the objections.  In addition to Mr. Isaacson and

25    Mr. Kozich, there are only three other objectors:  Geoffrey

1    Miller, Alexander Jiggets, and Aaron Greenspan.  I have read

2    their objections, and none of them are here on Zoom or

3    otherwise.  None of them indicated that they wanted to be

4    heard today.

5            So I would suggest that maybe a logical thing to

6    do is to now hear responses to the objections.  You don't

7    need to use the full time, use whatever time you need, the

8    same for the government, and then we'll take a break.  Then

9    I will hear from Ms. Oliver on opt-outs and from whoever is

10   going to speak about attorney's fees.  I think we should

11   deal with the objections, both the written ones and those

12   who spoke today to support their written submissions.

13           Mr. Gupta.

14           MR. GUPTA:  Thank you, Your Honor.

15           I will try to be brief but, of course, I want to

16   be sure I answer any questions the Court has.

17           THE COURT:  Yes.

18           MR. GUPTA:  I do think we have tried to adequately

19   brief the responses to the objections.  I can discuss

20   Mr. Isaacson's objection first.

21           We thought it was interesting that you had two

22   sort of diametrically opposed objections.  You had

23   Mr. Miller's objection.  The complaint there is, we are

24   favoring the small users by compromising with this minimum

25   distribution.  Mr. Miller's complaint was:  We're favoring

1    the little guy over the big guy.

2          Mr. Isaacson's complaint, as I understand it, is

3    precisely the opposite.  He is saying:  You are favoring the

4    big guy over the little guy.  I suppose maybe that's a

5    measure of the fact that it's a compromise and we met

6    somewhere in between with the two positions.

7          I find Mr. Isaacson's objection, in particular, a

8    little difficult to understand because what he is saying is,

9    in his words, is grossly inappropriate was that we advocated

10   for a pro rata distribution of the funds; that was our

11   position in the negotiations with the government.

12          As we say in our reply brief, the Supreme Court

13   has said that a pro rata distribution is the typical measure

14   of fairness, both in modern class actions and in equity.

15   Fair treatment -- the Supreme Court said in *Ortiz* -- is

16   assured by the straightforward pro rata distribution of

17   proceeds from litigation amongst the class.  It's hard to

18   understand how our advocacy for a pro rata distribution

19   somehow ill-served the class or how this structure

20   discriminates against the small users on whose behalf we

21   brought this case.

22          If you look at the class representatives, you can

23   see that the whole point of this case was about access to

24   justice for the little guys, as it were.

25          Mr. Isaacson points out that large law firms often

1   will seek reimbursement from their clients for expenses like

2   Pacer fees.  This is something we gave considerable thought

3   to, both in bringing the case and also in settling the case.

4        I just wanted to draw the Court's attention to a

5   footnote in our reply brief because it can get missed; a

6   footnote at page 5.  We actually found a case.  It's a case

7   from the Northern District of Illinois where a similar kind

8   of objection was made to a class action settlement; the idea

9   being that:  You have this settlement with respect to

10  certain charges but, then, there might be a dispute with

11  other people, a matter with other people who reimburse those

12  charges.

13       What the law has always said here -- and this is a

14  long-standing legal principle that is true in Tucker Act

15  cases as well -- is that the claim is held by the person who

16  was subject to the illegal government charge; in that case,

17  that would be the person who paid the Pacer fees.  Any

18  downstream issues with respect to reimbursement by other

19  people is a matter between those people and those other

20  people.

21       That said, because we expected this issue to occur

22  and because we heard about it in the notice period -- I

23  think, actually, you may recall, Judge Friedman, we

24  mentioned this issue to you before final approval as a

25  potential issue.  We have actually worked with the class

1  administrator.  There is a form on the website that allows

2  people to indicate whether or not they paid Pacer fees for

3  somebody else or whether they are being reimbursed.

4          THE COURT:  Say that again.

5          MR. GUPTA:  There is a form on the website that

6  allows people to indicate whether they paid Pacer fees for

7  someone else.  The attempt there is to try to -- to the

8  extent possible -- resolve those questions so that they

9  don't become a problem in administering the settlement.

10          THE COURT:  Is the way it works -- if you get

11  information through this form, what do you do with the

12  information?

13          MR. GUPTA:  I think Ms. Oliver, who is our liaison

14  in cases, is in a much better position to address this.

15          I just -- I do want to emphasize, though, I think

16  this is a question now -- we're turning to a question of how

17  we're administering the settlement but not -- the certain

18  fairness question in this process.

19          THE COURT:  Wait.  Before I turn to Ms. Oliver, I

20  think what I heard you say is that there is a case law --

21          MR. GUPTA:  Yes.

22          THE COURT:  -- that says that -- in terms of

23  not -- settlement of the class action, that if you -- to

24  paraphrase:  If you are to be reimbursed by some third

25  party, not a member of the class --

1          MR. GUPTA:  Right.

2          THE COURT:  -- it doesn't disqualify you from

3    getting the pro rata; it's between you and those other

4    people.

5          MR. GUPTA:  Correct.  As a legal matter, that's

6    the answer to Mr. Isaacson's question.

7          THE COURT:  That's the legal answer.

8          MR. GUPTA:  That's the legal answer.

9          But we didn't kind of want to stop there because

10   we know that this is a real-world issue.  What Ms. Oliver is

11   now going to tell you about is how we have tried to resolve

12   this as a real-world problem.

13         THE COURT:  Come to the microphone, Ms. Oliver.

14   Thank you.

15         MS. OLIVER:  So there were two forms on the

16   website:  One was a payment notification form and the other

17   was an accountholder notification form.  They do two things.

18   The payment notification form allowed the actual payer of

19   the fees to get onto the website and submit information

20   notifying the administrator that they paid Pacer fees on

21   behalf of someone else.  That can be any scenario.  That can

22   be an employer paying for an employee's Pacer fees; it can

23   be a client who actually paid -- they were passed through

24   the law firm to the client; that can be any particular

25   scenario.  There are not limitations on the website as far

1    as who can submit those notifications.

2         There is also a form that allows accountholders to

3    notify the administrator that somebody else paid their Pacer

4    fees for them.  And although they were the user, somebody

5    else paid the Pacer fees.

6         Once those notifications were submitted -- once

7    the payment notifications, so somebody notifying the

8    administrator that they paid Pacer fees on somebody else's

9    behalf -- once those were submitted to the administrator,

10   the administrator then sent an email to the accountholder

11   associated with that account, that was the subject of the

12   notification saying:  Hey, we have received a notification;

13   somebody has told us that they paid Pacer fees for your

14   account.  If you would like to dispute this, you have this

15   long to dispute it; and you can submit this information,

16   we'll then process the information.

17        Through that process, we have received zero

18   disputes.  We have received hundreds of notifications.  We

19   have received 409 of the payment notifications, and zero

20   disputes to any of those 409 payment notifications.

21        THE COURT:  Thank you.

22        MR. GUPTA:  So that is really all I wanted to say

23   about Mr. Isaacson's fairness objection.

24        Unless the Court has questions.

25        I would like to turn to one other issue that he

1   has raised because it's a legal question.

2           THE COURT:  That he has raised.

3           MR. GUPTA:  That he has raised.

4           He has objected to the service awards for the

5   class representatives.  And the reason I want to mention --

6           THE COURT:  Now, the service awards are the kind

7   of things that the three who spoke earlier on behalf of the

8   named plaintiffs were talking about.

9           MR. GUPTA:  Right.

10          THE COURT:  Which is, as I understand it, their

11  incentive for participating in the -- being up front and

12  being the named plaintiffs, and all of that.  But in

13  addition, they all spoke to the amount of time they, in

14  fact, actually spent, their institutions actually spent --

15          MR. GUPTA:  Right.

16          THE COURT:  So if you viewed it as a pure

17  incentive -- and you can tell me whether I have got the

18  concepts right -- that might be sufficient under the case

19  law.

20          But in addition, they say here:  Even if we had to

21  prove that if I were billing what my ordinary rate is or, as

22  counsel, if I don't have an ordinary rate, the number of

23  hours I spent, it would have added up to more than 10,000

24  anyway, no matter how you slice it.

25          MR. GUPTA:  That's right.  That's right.

1          You have got it exactly right.  Maybe you have

2     just taken the words out of my mouth.

3          The reason we're teeing this up is that

4     Mr. Isaacson has made this objection in many, many class

5     action settlements.  And the legal argument rests on this

6     Supreme Court case from 1882, the *Greenough* case.  It drew

7     this distinction between the expenses that occurred kind of

8     in the fair prosecution of the case, which can be things

9     like attorney time, and something else which was disapproved

10    which was -- I mean, this is a case before class actions;

11    but you had a bondholder who asked for, basically, a

12    personal salary for having handled a case that benefited a

13    lot of people.  And the Supreme Court said no, you can't

14    have that.

15         So Mr. Greenough's [sic] legal argument is that

16    the modern-day incentive award or case contribution award

17    for class representatives, in his view, is impermissible

18    under that case law.  We think he is wrong.  Virtually every

19    court that has addressed the question has disagreed with

20    him, but he has gotten some courts to agree.

21         What we're saying is:  This case does not even tee

22    up that legal question because even if you were to accept

23    the distinction that he is drawing, we fall on the correct

24    side of the line.  In other words, even if 1882, if you want

25    to think about it that way, the time that these class

1    representatives' lawyers have spent on this case more than

2    justifies these modest service awards.  So that's the only

3    reason I wanted to tee that up.

4            I don't want to be presumptuous, but if the Court

5    is going to approve the settlement and write an order, I

6    think it would be helpful to point out that we fall on the

7    correct side of that line.

8            I won't address the attorney's fees issues because

9    I think you said we will address that later.

10            THE COURT:  No.  We will talk about that.

11            MR. GUPTA:  Just on the issue with Mr. Kozich.  We

12    have spent a fair bit of time with the class administrator

13    and with the government's counsel to get to the bottom of

14    this.  It's not the case that Mr. Kozich's account hasn't

15    been found.  His account has been found.  He does, in fact,

16    have a Pacer account and has long had one.

17            It's just the case that during the class period he

18    did not pay any Pacer fees and, therefore, there is nothing

19    to reimburse.  I do have some sympathy for him.  He said he

20    is a disabled veteran who is trying to use court records to

21    solve problems that he has.  It sounds like he is exactly

22    the sort of person on whose behalf the case was brought.  It

23    so happens that if he didn't pay fees during the Pacer fee

24    [sic] he does not have a claim that is compensable here.

25            That is really all I wanted to say, if the Court

1    has questions.

2          THE COURT:  I have one question about something he

3    said which may not apply to him but might apply to others; I

4    would like a response.  It's actually on page 3 of his

5    filing, Docket No. 163.

6          He says:  The settlement refunds only those

7    persons who paid more than $350 in excessive Pacer fees but

8    is paying zero to those to people who paid less than 350.

9    His argument, as I read it, is -- putting aside whether he

10   qualifies.  His argument, as I read it, is:  If I paid $351

11   over time, I would get $350.

12          If you paid $100, you get zero.

13          MR. GUPTA:  And that is just factually incorrect.

14   It's a misreading of the settlement.

15          I would point you to page 6 of the settlement

16   agreement, paragraph 19, which explains how the first

17   distribution works.

18          It says, in the first distribution:  The

19   administrator allocates to each class member a minimum

20   payment amount equal to the lesser of $350 or the total

21   amount paid in Pacer fees by that class member for the use

22   of Pacer during the class period.  So it's either 350 or the

23   lesser.  If you pay $100 or even $1, you are going to get

24   that back.

25          Then, once you do the pro rata distribution, if

```
1    you paid 151, you are going to get that $1 back as well.  I
2    think that is just a misunderstanding.
3              THE COURT:  Okay.  I just wanted to clarify.
4              Let me see if the government has anything they
5    would like to say in response.
6              Mr. Narwold?
7              MR. GUPTA:  Yes.  Would the Court like to hear
8    about any of the other objectors?  I do think we have
9    addressed them in our papers.
10             THE COURT:  I don't have any specific questions.
11             I have read the papers and I have read your
12   responses, and they're standing on their papers.
13             MR. GUPTA:  Thank you.
14             THE COURT:  I will evaluate what they have had to
15   say in view of your responses.
16             MR. GUPTA:  Thank you.
17             MS. GONZALEZ HOROWITZ:  Your Honor, I don't really
18   have much to add beyond what's already been put into the
19   record.
20             We did address this issue of the concern about
21   compensating smaller users in my opening remarks to the
22   Court and how that is consistent with the text of the
23   statute, so I would refer the Court back to that.
24             As to Mr. Kozich, we concur with class counsel.
25   We did some further research as to Mr. Kozich's account.  It
```

```
 1    is true that he has had an account for many years; however,

 2    he did not actually pay any fees during the relevant class

 3    period.  He has incurred fees during that time.  At multiple

 4    points he has been granted the fee waiver which is now --

 5    which was $15 at the time; that has now increased to 30.

 6           He has -- I believe he mentioned on the call that

 7    he has approximately $354 in an outstanding balance but that

 8    has not been paid.  And so under the very terms of the class

 9    definition, he would not fall as a member of the class.  So

10    unless the Court has any other questions for me, we agree

11    with the statements by class counsel as to the responses to

12    the objections.

13           THE COURT:  Good.  Thank you very much.

14           Why don't we take 15 minutes or so.  No more than

15    15 minutes.

16           I think the logical way to proceed, unless you

17    disagree, is to hear from Ms. Oliver on the opt-outs for the

18    34 people who say they are trying to opt out at this state

19    and, then, to hear from counsel on legal fees and

20    Mr. Isaacson on legal fees.  Thank you.

21           (Whereupon, a recess was taken.)

22           THE COURT:  So I have one follow-up question from

23    earlier.  I am not sure whether it's for Mr. Gupta or

24    Ms. Oliver, or both.

25           It has to do with this question of -- the fact
```

1    that some -- let's suppose I am a partner at a law firm and

2    I send out my bills and I include the hours, the hourly

3    rate, and all that stuff; but I also include all of the

4    costs and expenses.  And a portion of it is for the work I

5    did for finding stuff on Pacer.  I am charging my client for

6    it, my client has paid for it.

7            A couple of questions.  One, as I understand it,

8    your argument is -- the legal argument is:  It doesn't

9    matter.

10           The practical answer is that there were notices

11   that were sent out and an administrator received -- sent

12   emails to accountholders, and no one had -- there were a lot

13   of notices sent out; the response was that there were no

14   disputes.

15           A couple of questions.

16           One, are these forms or things that were sent out

17   somewhere in the record here?  Are they exhibits or were

18   they exhibits in prior filings?  If so, where are they?

19           Secondly, what did you or the administrators -- I

20   guess you said that what the administrator did when they got

21   the forms was to reach out by email.  Was anything else done

22   or done with responses?

23           So those are the practical questions.

24           The Rule 23 question is -- you say it's not -- it

25   doesn't matter as a matter of law.  But doesn't it --

1    explain to me why it does or does not affect my evaluation

2    of whether the settlement agreement is fair?

3              So the first few questions are kind of practical.

4    Please help me; explain this to me a little further.

5              The second one is:  My job is to decide all of the

6    Rule 23 issues.  Doesn't this affect fair and adequate?

7              MR. GUPTA:  I think -- so first of all, I will

8    just say:  I think the way you recounted it sounds to me

9    exactly right.  Ms. Oliver can address your practical

10   questions, and then I am happy to speak to the Rule 23

11   question.

12             THE COURT:  Okay.

13             MS. OLIVER:  So on the practical questions, we --

14   you mentioned these notices that were sent out.  So there

15   were hundreds of thousands of actual notices, court-approved

16   notices that were sent out.  This was a different process

17   from that.

18             So there were notification forms on the website.

19   We have not filed those notification forms with the

20   substance of those notification forms with the Court, but we

21   can do so.

22             THE COURT:  I would just like to see them just

23   for my own --

24             MS. OLIVER:  Once those notifications were

25   submitted, in the case of an individual notifying the

```
1     administrator that they had paid Pacer fees on someone

2     else's -- on an accountholder's behalf, then the

3     administrator sent an email and there was no other attempt

4     to contact.  It was by way of email to the accountholder

5     saying:  Someone has filed a notification letting us know

6     that they paid Pacer fees on your behalf.  If you would like

7     to dispute this, here is the process for doing so.  We have

8     not filed the substance of that email either, but we can

9     also do that.

10                THE COURT:  Okay.  Thank you.

11                MS. OLIVER:  And I think --

12                THE COURT:  Nobody had any disputes.

13                MS. OLIVER:  There were no disputes filed as part

14     of that process.

15                THE COURT:  You said something like about 400 came

16     back.

17                MS. OLIVER:  So we had -- there were 409 of the

18     payment notifications filed.  So that's where someone said:

19     I paid Pacer fees on behalf of somebody else.  And then

20     there were 464 accountholder notifications where an

21     accountholder notified the administrator that somebody else

22     had paid their Pacer fees and identifying the payor.

23                THE COURT:  Okay.  Got it.  Thank you.

24                So you file that stuff, and I will at least see

25     what I have got.
```

1            MS. OLIVER:  We will.

2            THE COURT:  Now the question is:  Does all of this

3    or how does all of this affect fairness and adequacy under

4    the rules?

5            MR. GUPTA:  Your Honor, I think what you said

6    earlier is right.  That, as a legal matter, any sort of

7    potential claim that somebody might have for reimbursement

8    against somebody who paid the fees is a matter of law and

9    equity between those people; and that's what the cases we

10   have been able to find where this comes up in a class action

11   context have said.

12           THE COURT:  You mentioned a footnote in your

13   brief.  Is that the only reference in the briefs to this

14   question?

15           MR. GUPTA:  That is the only reference.  We have

16   raised this in response to an objection by Mr. Isaacson.

17           There is a Northern District of Illinois -- I will

18   point out we were actually surprised we were able to find a

19   case precisely on this point; it's a relatively esoteric

20   point.

21           The broader point is one that is well supported in

22   the law; not just in the Tucker Act context but in all sorts

23   of contexts, including an antitrust case that's going back

24   100 years where you have all sorts of complex payment

25   streams.  The question is:  What do you do about some

1    unreasonable charge that was assessed against one person but

2    then it was reimbursed by another person who has the claim?

3         And the general rule is that there is not a kind

4    of passing-off defense, that it's the person who paid the

5    charge that possesses the claim.  That's certainly true

6    under the Little Tucker Act.

7         THE COURT:  On the broader point, is there

8    specific case law you would point us to or anything in

9    Wright & Miller, Professor Rubenstein or in anybody else's

10   treatise on class actions?

11        MR. GUPTA:  Well, I guess I would just point

12   you -- the point that Mr. Isaacson is making about fairness

13   is that he is saying, as I mentioned earlier, that he thinks

14   it was wrong for us to advocate for a pro rata distribution.

15        In fact, the case law says exactly the opposite,

16   right?  I think *Ortiz* is really probably the best case on

17   this.

18        THE COURT:  Which case?

19        MR. GUPTA:  *Ortiz versus Fibreboard*, the Supreme

20   Court's decision.

21        THE COURT:  So it's basically a subset of that

22   point.

23        MR. GUPTA:  That's right.

24        THE COURT:  If you are settling a big class

25   action, I suppose the only other way you would even think

1    about doing it would be having some classes, and this class

2    is treated that way and that class is treated that way.

3            MR. GUPTA:  Right.

4            What is weird about his point is that he is saying

5    that we're favoring the big folks.  But, in fact, the

6    parties bent over backwards to engage in a settlement

7    structure that has this minimum distribution.  So the little

8    guy is -- we are ensuring that the little guy is getting

9    paid.  I think that's the principal point I would make.  I

10   think it's hard to say that this is an unfair settlement for

11   that reason.

12           One last point which is:  There are a lot of

13   really big users in this class who are not law firms, they

14   are data companies, they aggregate the date, and they don't

15   have this reimbursement issue, so it's important that they

16   get to be able to recoup what they have paid.  Thank you.

17           THE COURT:  Does the government have anything to

18   add on this point?

19           MS. GONZALEZ HOROWITZ:  No, Your Honor.  I don't

20   think we have anything to add.

21           MR. KOZICH:  Your Honor.

22           THE COURT:  Yes, sir.

23           MR. KOZICH:  Can I chime in?

24           THE COURT:  On what?

25           Very briefly.  What do you want to talk about,

 1   what we have just been talking about?

 2         MR. KOZICH:  Well, it's related.  The Department

 3   of Justice said that, basically, I have paid Pacer fees.  I

 4   am not part of the class action.  I apologize.  I thought

 5   that the settlement was saying that the people paid less

 6   than 350 are not getting paid; I misread it.  I read it

 7   again.  You are correct.

 8         My point is that I would like the Pacer people to

 9   go in and reopen my account so I can use Pacer.  I will pay

10   the $4 and some cents that I owe that's a requirement; but I

11   would like the Pacer people to reopen my account if we can

12   do that.

13         THE COURT:  All right.  Well, maybe before the

14   hearing is over, the government can tell you who to talk to

15   or who to email, or something like that.  Okay?

16         MR. KOZICH:  Okay.

17         THE COURT:  So back to where we were.

18         I said, before the break, that I was going to ask

19   Ms. Oliver to explain the 34 objectors [sic] and what, if

20   anything, we do about that at this point, and then we'll

21   move on to the attorney's fees questions.

22         MS. OLIVER:  Before I get to the opt-outs --

23         THE COURT:  The opt-outs, I misspoke.  The

24   opt-outs.

25         MS. OLIVER:  Mr. Gupta had mentioned the numerous

1    class member contacts that we have been handling.  This is

2    our internal log (indicating) of those contacts, emails, and

3    phone calls.  I have handled a number of them.  I have

4    reviewed a number of drafts that Ms. Loper and another

5    lawyer back at our office have handled; so we have been

6    personally handling them.  There is no call center and there

7    are no customer service representatives, though, some days,

8    boy, I wish there were because we've spent a lot of time on

9    those.

10         Opt-outs.  In 2023, there have been 33 timely

11    opt-outs.  I believe the number in the filings was 34.  We

12    identified a duplicate entry in there, so it's really 33;

13    the same person with the same claim ID, there were two of

14    those received.  16 additional were untimely.  When I say

15    "untimely," I don't mean they filed 12 hours later; they

16    filed two days late.  They all had an opportunity to opt out

17    in 2017.

18         THE COURT:  Well, they had an opportunity to opt

19    out in 2017.  And then, pursuant to the notice that was sent

20    out, they had a new opportunity to opt out, right?

21         MS. OLIVER:  We did not -- so the new class

22    period --

23         THE COURT:  I see.

24         MS. OLIVER:  They had an opportunity to opt out in

25    2023.  But everybody who was a part of the earlier certified

1    class from April 21, 2010, through April 21, 2016, had an

2    opportunity to opt out in 2017.  They were not given another

3    opportunity to opt out in 2023.

4         There were ten individuals in 2023 who attempted

5    to opt out, they received the incorrect notice.

6         THE COURT:  That's in addition to the ones you

7    have just been talking about?

8         MS. OLIVER:  So there were 33 that were timely

9    and, then, there were 16 that were not timely.  Within the

10    16, 10 of those individuals received the incorrect notice

11    that told them they had an opportunity to opt out.  All 10

12    of those -- three of them were actually federal government

13    employees.  So the 7 who were not federal government

14    employees and received the incorrect notice were then sent a

15    corrective notice saying:  We goofed, you got the wrong

16    notice.  You had an opportunity to opt out in 2017; you no

17    longer have an opportunity to opt out.

18         THE COURT:  Okay.

19         MS. OLIVER:  And then there were an additional 6

20    individuals who received the correct notice in 2023 from the

21    get-go.  And they tried -- they sent in -- so because they

22    were part of that earlier 2017 group, the website would not

23    let them do it in 2023.  They sent in paper forms trying to

24    opt out, but they already had an opportunity to opt out in

25    2017.  So all of the so-called invalid or late opt-outs in

 1    2023 had an opportunity to opt out in 2017.

 2              THE COURT:  So the bottom line is those that were

 3    filed -- it's because the settlement created a new subclass

 4    or new time period --

 5              MS. OLIVER:  That's right.

 6              THE COURT:  -- an additional time period.

 7              MS. OLIVER:  That's right.

 8              THE COURT:  So with respect to the people that got

 9    in because of the new time period, they were considered

10    timely, and they opted out.

11              MS. OLIVER:  Yes.  And there were 33 of those.

12              THE COURT:  Right.

13              With respect to the others, either because they

14    misunderstood from the get-go or because they were

15    inadvertently misled, they were ultimately not allowed to

16    opt out because they missed their opportunity.

17              MS. OLIVER:  Correct.

18              THE COURT:  And that explains the whole thing.

19              MS. OLIVER:  Yes.  I hope so.

20              THE COURT:  It did.

21              MS. OLIVER:  Thank you.

22              THE COURT:  So let's move on to the attorney's

23    fees question which is -- everybody agrees that class

24    counsel is entitled to attorney's fees.

25              The issues, as I understand them, are:  One,

1   lodestar versus percentage with the subset of percentage

2   of -- percentage with lodestar cross-check.  And the other

3   question is:  How much?

4              So I think those are the questions.

5              MR. GUPTA:  I am happy to start, Your Honor, but

6   please jump in if I can help out.

7              So I think, as you said earlier, there are two

8   approaches; there is the percentage approach and the

9   lodestar approach.  The lodestar approach is generally used

10  outside of common fund class actions the federal circuit has

11  recognized; it's used in garden variety fee shifting cases

12  where there is a statutory fee and it comes out of the

13  defendant's pocket.

14             The percentage approach is the prevailing approach

15  in common fund class actions.  So courts in common fund

16  class actions overwhelmingly prefer the percentage of the

17  fund approach.  For reasons that you recognized in your

18  Black farmers case, the reason that courts have gravitated

19  to the percentage approach is that it helps align the

20  interests of the lawyers more closely with those of the

21  parties by discouraging the inflation of attorney hours and

22  promoting efficient prosecution and resolution of litigation

23  which benefits the litigants and the judicial system.

24             So I don't take the government to be quarrelling

25  with the notion that the percentage approach is the

1    appropriate approach here.  I actually don't take them to be

2    quarrelling even with the percentage that we have proposed.

3    There is one objector, Mr. Isaacson, who does quarrel with

4    all of that; we can get into that.

5              I thought it might be helpful -- just in talking

6    about the percentage -- to give you some background here

7    because this is an unusual class action in which there was

8    actually a negotiation between the two parties about the

9    percentage.

10             First, the retainer agreements with the class

11   representatives provide for an attorney fee of 33 percent.

12             THE COURT:  It's contingent.

13             MR. GUPTA:  Correct.  Correct.

14             THE COURT:  So, again, if there was no success --

15             MR. GUPTA:  Correct.

16             THE COURT:  -- even with that retainer agreement,

17   they get zero.

18             MR. GUPTA:  Exactly.  That is the standard kind of

19   contingency fee arrangement in plaintiffs' class action

20   litigation and other kinds of contingency litigation.  So

21   that's -- paragraph 65 of my declaration mentions that.

22             Then the notice that was sent out to class members

23   said:  By participating in this class action, you agree to

24   compensate counsel at 30 percent of the recovery.  That's

25   ECF 43-1 and 44.

1          So we're going from 33 percent down to 30 percent.

2     Then, as I mentioned, we have this unusual negotiation with

3     the government.  In the mind run of class actions -- and

4     Mr. Narwold or Ms. Oliver can speak to this, they have done

5     many, many class actions -- you don't have a cap of this

6     kind, it's just left to the discretion of the Court.  But

7     here --

8          THE COURT:  Even a common fund?

9          MR. GUPTA:  Yes.  The cap is unusual even in a

10    common fund fee where there is already -- before this comes

11    to you in arm's length negotiation about what that cap is,

12    we agreed with the government to cap any fee and expenses at

13    20 percent of the common fund; and then, now what we're

14    requesting is a fee of 19.1 percent.

15         The upshot of all of that is that the percentage

16    that we're requesting is well below the standard one-third

17    recovery and is even below the average for settlements of

18    this range.  Professor Fitzpatrick goes into this in some

19    detail in his declaration, and you will see this at

20    paragraph 19 of his declaration.  For settlements that are

21    within the range of 70 million to 175 million, this

22    percentage is below even the average within that range.

23         Then, as you heard, the government -- this is

24    also, in our experience, quite unusual in a class action.

25    The defendant is coming to you and saying:  This is an

1    outstanding result for the class members; this is a landmark

2    settlement.

3            So we think this is a humbly, I would say, better

4    than average class action and a better than average class

5    action settlement.  Even if you are looking at the average

6    run-of-the-mill class action settlement, the fee that we're

7    requesting is well below the average.

8            Then I think that raises this question of lodestar

9    cross-check.  There has been a lot of ink that's been spilt

10   about precisely how one does the cross-check.  I think I was

11   saying to my friend from the government in the hallway

12   during the break, I think you actually have helped us out.

13   They pointed out some things that we had not provided the

14   Court with that would -- if you choose to do a lodestar

15   cross-check, and it's entirely within the Court's

16   discretion -- that would aid the Court's process in

17   performing that lodestar cross-check and, hopefully, getting

18   some comfort that this is a reasonable fee.  Whether you are

19   looking at it just from a straight percentage standpoint or

20   whether you are looking at it based on the multiplier in the

21   case.  So you have the discretion to do that.  I hope that

22   we have given you the tools necessary that, if you choose to

23   do that --

24           THE COURT:  You will provide additional tools you

25   say?

1          MR. GUPTA:  No, no.  I think we have.

2          THE COURT:  I thought you said she had suggested

3     there were some things she should --

4          MR. GUPTA:  Let me try to say this a little more

5     clearly.

6          What I am saying is that the government's filing,

7     their response, raised a number of questions and issues that

8     were exclusively trained on the question of how one would do

9     the lodestar calculation.  Now, we could have just taken the

10    position that:  Look, all of that is irrelevant because the

11    correct way to do this is it's a percentage fee and our

12    percentage fee is reasonable.  That is our frontline

13    position.

14         But we didn't stop there.  We also provided

15    information and expert reports that I hope show the Court

16    that:  Even if one were to do the cross-check route, that

17    the percentage fee that we're requesting is well within the

18    range of reasonableness.

19         I am happy to answer any questions the Court may

20    have about either the percentage approach or the cross-check

21    but, hopefully, that's a helpful kind of orientation.

22         THE COURT:  As I understand it, the D.C. Circuit

23    may or may not have set out some factors.  The federal

24    circuit -- maybe the D.C. Circuit has and the federal

25    circuits are slightly different, but they are pretty

1    comparable.

2          MR. GUPTA:  They are pretty similar.  And

3    honestly, they are pretty similar across the circuits.  We

4    organized our brief around the federal circuit's factors in

5    the *Health Republic* case.

6          THE COURT:  Do you think, as you read federal

7    circuit's -- not this decision, I don't think.

8          MR. GUPTA:  The *Health Republic* case?

9          THE COURT:  Do you think that that decision

10   requires a lodestar cross-check?

11         MR. GUPTA:  I don't think that it does.  And in

12   fact --

13         THE COURT:  There is some language that suggests

14   it's a little stronger than a recommendation.  I can't find

15   it right now.

16         MR. GUPTA:  The court says:  We are not deciding

17   that question; that's Footnote 2 of the decision.

18         It was an unusual case because the class notice in

19   that case said:  We will do a lodestar cross-check; and then

20   they didn't.

21         So in one sense, it's a very easy case.  The

22   holding of the case is:  When you say you are going to do

23   something, you need to do something.  Right?

24         THE COURT:  Because that's what the class relied

25   upon when they got the notice.

1          MR. GUPTA:  Right.  And I think, also, there were

2     some judicial eyebrows raised because they said they would

3     do this cross-check and, then, the fee was 18 or 19 times

4     the hourly rates.  But the holding -- the holding is one

5     that is inapplicable here, which is:  If you say you are

6     going to do it, you have got to do it.

7          Now, the court said it wasn't deciding the

8     question of whether a lodestar cross-check was required.

9     But in Footnote 2 of the decision -- I just want to be

10    candid about this.  The court points out why a cross-check

11    might be warranted.  And I can see why it was warranted on

12    the facts of that case.  So the federal circuit hasn't

13    decided the question.

14         But if you were to write an opinion that's like

15    your Black farmers' decision that says:  Look, the

16    percentage requested here is reasonable; but, in addition, a

17    lodestar cross-check would only confirm that result.  I

18    think that is something that would probably be greeted well

19    by the federal circuit given the language in this decision.

20         THE COURT:  What are the most -- what are the

21    common fund settlement decisions of the courts that are most

22    comparable to the situation we're facing here.  Don't feel

23    like you have to say "Black farmers."

24         MR. GUPTA:  Well, which aspect of this situation,

25    if I may ask?

1        THE COURT:  Well, I guess only than the Swedish

2   Hospital and Health -- whatever it's called -- in the

3   federal circuit, in my own decision in Black farmers, are

4   there other cases that you say, "Aha!  This one is really a

5   lot like what we're facing here" for whatever reasons?

6        MR. GUPTA:  I mean, you named the ones that I

7   would point to.  And I would say on *Health Republic* I hope I

8   have persuaded you that it's actually super different.

9        THE COURT:  Which one?

10       MR. GUPTA:  The *Health Republic* case is very, very

11   different from this one.  Right?  I think those are the

12   cases that I would point you to.

13       We also cite a number of Court of Federal Claims

14   cases in our submission; the *Moore* case, the *King County*

15   case, *Quimby* case.  The reason we cite those is it -- in

16   effect, when you are a federal district court in the Little

17   Tucker Act case, you are kind of sitting as the Court of

18   Federal Claims, so we think those are analogous.  They are

19   also cases involving large claims against the federal

20   government, so I think they're analogous.

21       THE COURT:  Helpful.  Thank you.

22       I will hear from the government.

23       MR. GUPTA:  Thank you.

24       MS. GONZALEZ HOROWITZ:  Just so it's clear on the

25   record, Mr. Gupta did say to me out in the hallway that, you

1    know, "I think I helped you."  And for the record, my

2    response was, "I know."

3          Your Honor, I am happy to answer any questions you

4    may have.  I think we do agree, as a general principle, that

5    the D.C. Circuit case law appears to be pretty clear that

6    the percentage of the fund method is the preferred approach

7    in a common fund case such as this one; that's from the

8    Swedish hospital case.

9          We have talked at length about the *Health Republic*

10   case.  I think, like this Court identified, it perhaps

11   suggested strongly that not just in situations where it is

12   required in a class notice to conduct a lodestar

13   cross-check, but the Court, as a general matter, may conduct

14   the cross-check anyway just to assure itself that the amount

15   that is requested is reasonable.  Because, ultimately, that

16   is well within the Court's decision, is to determine what is

17   the reasonableness of the fee.

18         The government had raised some concerns in its

19   filing about the initial submission that plaintiffs made

20   with respect to the justification and the declarations about

21   the lodestar.  I think some of those concerns have been

22   remedied by the documentation that was supplied on reply.

23   Ultimately, it's within this Court's discretion to conduct a

24   cross-check.  But plaintiffs have now provided the Court

25   with some additional information, not just about their

1    lodestar at the rates at which they have requested but,

2    also, their lodestar at the Fitzpatrick matrix rates which

3    the government had noted for the Court essentially has been

4    considered by other judges in this district as a baseline in

5    federal complex litigation.  And, of course, as we

6    recognized in our filing, those cases were not class action

7    cases but they are cases that talk extensively about the

8    going market rates in this district and what complex federal

9    litigation looks like.  I am referring there to the *Brackett*

10   *versus Mayorkas* decision by Chief Judge Boasberg and, also,

11   the *J.T.* decision that we cited in our brief by former Chief

12   Judge Howell.

13          Unless the Court has any questions -- actually, I

14   would also point the Court to one additional case that I

15   think I don't believe I heard class counsel mention but I

16   think would be analogous; it is a Court of Federal Claims

17   case.  But that would be the *Mercier versus United States*,

18   and that's 156 Federal Claims, Fed Claim 580.  It's from

19   2021.

20          THE COURT:  I do have one or two questions.

21          In your initial filing, as I understand your

22   position, you agree:  Percentage of the common fund in the

23   common funds case, not lodestar.  And you think that

24   lodestar cross-check is at least a good idea and, possibly,

25   D.C. Circuit has suggested it should be done -- or the

1    federal circuit?

2             MS. GONZALEZ HOROWITZ:  Just to clarify, the

3    federal circuit, I think, has perhaps stated a stronger

4    emphasis on the cross-check than the D.C. Circuit has.

5             I think the D.C. Circuit was perhaps a little less

6    convinced in the Swedish hospital case but, certainly, the

7    decision from the federal circuit is from earlier this year,

8    so I think that would be persuasive to the Court's analysis.

9    But, ultimately, the circuit case law in this District holds

10   that it's within the Court's discretion to conduct the

11   cross-check.

12            THE COURT:  Now, I was going to say the

13   $64 million question but, really, the $23 million question

14   is, in your initial filing, you argue that the 19.1 percent,

15   or whatever it is, that leads to about a $23 million award

16   is too much.  You didn't tell me what you thought was

17   appropriate.

18            So my two questions are:  In view of subsequent

19   filings, do you still think that that is too much in this

20   case.  If so, where does the government come out in terms of

21   a dollar amount or percentage amount?

22            MS. GONZALEZ HOROWITZ:  So I want to be clear,

23   Your Honor, we didn't oppose plaintiffs' request for

24   23.8 million.  I didn't read our filing to mean that we

25   believed that the 19.1 percent was inappropriate or that it

1   should be reduced.  Ultimately, that is well within the

2   Court's discretion as to what to award.  We are not taking a

3   position on whether the 23.8 is reasonable.

4           We believe that there were some holes in the

5   filing that have been addressed by plaintiffs, by class

6   counsel, on reply about how it is that they came to that

7   lodestar and whether the -- taking aside whether the 19.1 is

8   reasonable, I think everyone agrees the case law, in this

9   District at least, has suggested that anything from 15 to 45

10  percent in a common fund case may be appropriate and, of

11  course, that's always depending on the circumstances of the

12  particular case.

13          Ultimately, if the Court found that 19.1 here,

14  which is slightly below the threshold that the parties had

15  negotiated in the settlement agreement, is appropriate, we

16  wanted to ensure that the Court had sufficient information

17  in the record to base its decision in awarding the full

18  amount of fees.  And I think that plaintiffs have done some

19  of the legwork on the back end to address those concerns.

20          So I just want to be clear.  We're not

21  specifically advocating for a reduction, but we had some

22  concerns about how that amount was calculated.

23          Certainly, we also pointed to the case law about

24  the multiplier.  In this case I think, again, the

25  D.C. Circuit has suggested that it can be between 2 to 4

1  percent depending on which lodestar the Court is working off

2  of; the ranges here can be slightly higher.  Of course,

3  there has been some case law in the federal circuit that has

4  suggested that perhaps it should be on the lower end, closer

5  to the 2 percent.  Again, that is within the Court's

6  discretion to determine.

7            THE COURT:  Okay.  Thank you for clarifying your

8  position.  Actually, it's not a clarification.  I think that

9  it's -- your position is about, because the plaintiffs have

10  filed more supporting documentation for what they're

11  requesting.  Thank you.

12            MS. GONZALEZ HOROWITZ:  Thank you.

13            THE COURT:  So I will hear from Mr. Isaacson.

14            Mr. Isaacson, you already made some points with

15  respect to attorney's fees earlier so why don't we -- please

16  try not to say the same things you have already said; I have

17  heard it, we took notes on it.  We have a transcript we are

18  going to look at.  Whatever additional points you want to

19  make about attorney's fees and/or responses to what has been

20  said.

21            MR. ISAACSON:  Absolutely, Your Honor.

22            One of the things that was said was that there

23  were retainer agreements signed for one-third of the

24  recovery, 33 percent.  The retainer agreements do not bind

25  the class and they do not bind this Court.

```
1            THE COURT:  Correct.

2            MR. ISAACSON:  There was a statement that an

3    earlier class notice said:  You agree to 30 [sic] percent if

4    you don't opt out.  I did not agree to 30 percent.

5            I saw that notice and I said to myself:  If they

6    try to enforce that, I am objecting because that is wrong;

7    that is not enforceable.  It was grossly inappropriate.

8            They sent a new notice that supersedes that older

9    notice saying I can appear to object to the attorney's fees.

10   So the notion that there is some kind of binding effect of

11   that first notice is --

12           THE COURT:  I don't think there is a binding

13   effect on me of anything.

14           MR. ISAACSON:  Pardon me?

15           THE COURT:  I don't think there is a binding

16   effect on me of anything.

17           MR. ISAACSON:  That's true.

18           THE COURT:  You have pointed out and we have all

19   read Rule 23(e).  You have specifically pointed out the

20   subpart that talks about how fees are a part of fair and

21   adequate.

22           MR. ISAACSON:  Absolutely, Your Honor.

23           They say that the standard is one-third.  Well,

24   that's in personal injury cases.  Personal injury cases are

25   extremely labor intensive; they don't have the economy scale
```

1   the big class actions do.  One-third is not the appropriate

2   reference.

3        On the question of whether *Health Republic*

4   requires a consideration of the lodestar, I think it does.

5   I think lodestar needs to be considered in determining a

6   reasonable percentage, quite frankly.  It's more appropriate

7   to take the lodestar amount up front to determine the

8   percentage than it is to try to bring it in at the end as

9   merely a cross-check.

10       Now, there are judges like former Chief Judge

11  Vaughn Walker of the Northern District of California who

12  wrote an article saying that judges have an ethical duty to

13  consider the lodestar.  I think it was published in the

14  *Georgetown Journal of Legal Ethics*; there was a co-author

15  whose name escapes me at the moment.

16       The Swedish hospital case was mentioned, that's a

17  D.C. Circuit case which says that:  In common fund cases,

18  attorney's fees must be awarded as a percentage of the fund.

19  The Eleventh Circuit also has held that in a case called

20  Camden I Associates -- *Camden I Condominium Association,*

21  pardon me.  They are the only two circuits that have held

22  that, and their holdings are in conflict with Supreme Court

23  authority.

24       THE COURT:  Which Supreme Court authority in

25  particular?

1           MR. ISAACSON:  The foundational decision

2     established in the common fund doctrine, *Greenough --*

3     *Trustees versus Greenough*; the same one that I rely on with

4     respect to incentive awards.

5           In that case, the court established the common

6     fund doctrine, saying that the class representative could

7     receive compensation from the common fund reimbursing him

8     for his actual outlays incurred.  There was no percentage in

9     that case.

10          The later cases, the Eleventh Circuit in *Camden I*

11    *Condominium Association*, the D.C. Circuit in Swedish

12    hospital -- and I think they both rely on a district court

13    case called *Mashburn*; it might have been out of the District

14    of Alabama.  They all say that *Greenough* was a percent fund

15    case.  It wasn't.  I mean, the trend toward the percent of

16    fund misrepresents the foundational decisions of the Supreme

17    Court.  The first one was not percent of fund.  The second

18    one, *Pettus*, that was percent of fund.  The lower courts

19    awarded 10 percent.  The Supreme Court said that's excessive

20    and cut it to 5 percent.

21          There are cases, I think, from the '20s and '30s

22    where the Supreme Court deals with common fund or equitable

23    fund fee awards.  I don't believe it has ever approved of a

24    common fund fee award or equitable fund fee award that

25    exceeded 10 percent.  So the notion that there is a

1    benchmark of 25 percent or a much higher amount is at odds,

2    again, with the Supreme Court decisions.

3          The *Mercier* case was mentioned.  I think *Mercier*

4    is quite relevant; I mean, it's one of the cases Rubenstein

5    included in his comparators when he deconstructed

6    Fitzpatrick's matrix.  That's a case where there was a

7    65 percent recovery, not 25 percent like in this case.

8    Fitzpatrick was the expert witness in that case and

9    recommended a 30 percent fee award that amounted to a

10   multiplier of 4.4.  The Court said, no, that's way too much;

11   that's a windfall.  I think you need to consider the

12   lodestar in setting the amount of the fee.

13         I think that a reasonable amount of the fee in

14   this case -- 5 percent will more than cover their claimed

15   lodestar.  10 percent would be more than double their

16   lodestar; a multiplier of two.  20 percent is way too much.

17         I also want to note that another case that's often

18   cited as a percent of fund case, the Supreme Court's

19   decision in *Boeing versus Van Gemert,* a 1978 decision.  The

20   fees in that case ultimately were awarded on the lodestar

21   basis; they were not awarded as a percentage of the fund.

22         I spent many years with plaintiffs' class action

23   firms where, quite frankly, the firm management regarded

24   percent of fund fee awards as the way to get paid the most

25   money as quickly as possible.  If you look at a single case

1    and focus only on one case and imagine that is the only case

2    that a law firm is ever going to try then, yeah, it makes

3    sense to think that they're going to try to maximize the

4    recovery in that one case so that they can get a larger -- a

5    percentage of a larger amount; that's not how the Court --

6    how law firms run their practice.  They have a portfolio of

7    cases.

8            In the class action practice, the assumption is

9    that the defendants are going to settle quickly for a

10   fraction of the damages; you can put minimum work in for a

11   fraction of the damages settlement; and based on the minimal

12   hours put in, your percent of fund award will amount to a

13   large multiplier.  That's how you get paid the most.  That

14   is not something that maximizes the interests of classes and

15   recoveries and it, quite frankly, in the long run, does not

16   align the interest of the classes with the interests of

17   counsel.

18           THE COURT:  Okay.  Are you almost done?

19           MR. ISAACSON:  I am almost done.

20           I would also note that when they talk about their

21   projected lodestar for any appeal in the matter, to the

22   extent that an appeal is focusing on attorney's fees,

23   they're not entitled to recover for their work -- applying

24   for or defending attorney's fees in a common fund case.

25           Because Professor Rubenstein and Professor

 1    Fitzpatrick are not here to be cross-examined and because I

 2    think that their opinions submitted in this case are, with

 3    respect to the later ones, untimely and unreliable, I

 4    respectfully move to strike them.  I move to strike them as

 5    hearsay; they are out-of-court statements to be taken for

 6    the truth or falsity of the matters asserted --

 7          THE COURT:  I am not sure whether an objector has

 8    standing to move to strike.  If you want me to disregard

 9    them for the reasons you have --

10          MR. ISAACSON:  I respectfully request you

11    disregard them, Your Honor.  Thank you very much.

12          THE COURT:  Thank you, Mr. Isaacson.

13          Mr. Gupta.

14          MR. GUPTA:  I will try to be brief because it's

15    been a long day, but I do want to make sure that I answer

16    any questions you have.

17          I would just emphasize at the outset that I hope I

18    wasn't misunderstood earlier.  I was not at all suggesting

19    that anything that I was reciting was binding on the Court

20    with respect to those agreements.  I think the Court has

21    absolute discretion and, in fact, a duty to assure itself

22    that the absence --

23          THE COURT:  Somebody said -- I don't know whether

24    it was Mr. Isaacson or one of the parties -- I have

25    fiduciary obligations.

1          MR. GUPTA:  Yes.  The Court acts as a fiduciary on

2     behalf of the absent class members.  And your role here is

3     important because there might not otherwise be adversarial

4     presentation.  And the danger with a class action is that

5     lawyers are going to sell out their clients in exchange for

6     red carpet treatment on attorney's fees, and courts have to

7     be on guard against that.  Now, we don't think this is

8     remotely a case of that kind.

9          You heard what the government said about the

10    quality of settlement, the risks involved.  We're proud of

11    this case.  But I also think that the Court's duty here is

12    important.  I think, just as I mentioned earlier there was a

13    kind of dog that didn't bark, the dog that didn't bark here

14    is you have very sophisticated players in this very, very

15    large class that are paying the fee -- that are going to pay

16    the fee that we're asking and none of them are here

17    objecting.  I think that's notable.

18          The argument that Mr. Isaacson is making about how

19    courts should handle attorney fee applications in reliance

20    on this 1882 case, *Trustees versus Greenough,* is one that,

21    as far as we can tell, has been rejected by every one of the

22    federal circuits, including in many cases in which he has

23    been an objector which he doesn't acknowledge in his

24    objection.

25          If you want to read one of those cases, I might

1    recommend a district court case from a few years back by

2    Judge Ali Nathan in New York; it's the *Bioscrip* case that is

3    cited on page 12.

4            THE COURT:  I mean, without prejudging anything,

5    she's one of the smartest judges I know in the whole

6    country.

7            MR. GUPTA:  Yes.  It won't surprise you to know

8    that it's a pretty darn scholarly opinion and it rejects

9    these arguments, as I have said, as have many other

10   circuits.

11           THE COURT:  What's the cite?  I'm sorry.

12           MR. GUPTA:  That is 273 F. Supp. 3d 474.  You can

13   take a look at page 478 to -89.

14           What she explains is that Mr. Isaacson's argument

15   that there is a presumption against lodestar enhancement in

16   fee shifting cases, that just doesn't apply in the common

17   fund context.  The common fund context is quite different.

18           So I think that that set of arguments has been

19   roundly rejected.  I can't prevent Mr. Isaacson from taking

20   an appeal.  And I don't have -- as I did with the service

21   awards, I don't have a kind of factual argument that will

22   take that issue off the table because his attack is a

23   categorical attack on the way things are done.  He is

24   entitled to make that argument, and I hope he has had a fair

25   hearing.  I don't really have anything else to add unless

1     the Court has questions.

2             I thank the government for pointing out some holes

3     in our filing and causing us to file the things we filed in

4     reply.  I hope that gives the Court the tools it needs to

5     decide this request.  Thank you.

6             MS. GONZALEZ HOROWITZ:  Nothing further by the

7     government.

8             THE COURT:  Well, it seems to me that I have

9     everything I need except for the few things that Ms. Oliver

10    is going to file to edify me about what's going on on the

11    administrative side of things.

12            I know what my responsibilities are.  I think that

13    the filings from both sides in the presentations from

14    counsel this morning, as well as from Mr. Isaacson and

15    Mr. Kozich, have been very, very helpful.  I don't think I

16    need anything more than what I already have, other than

17    those few little educational informative things.  I will try

18    to get to this as soon as I can.  It's an important case.

19            Again, I have to decide whether it's fair and

20    accurate, how significant it is, and the contributions made

21    by counsel and everything.

22            You know, this tool of Pacer and electronic

23    filing, as I said at the beginning, has revolutionized the

24    federal courts in the practice of law.  What we're talking

25    about here is very, very important to a lot of people and

1      institutions.  It involves a lot of money.  But everyone has

2      to be appreciative of whoever developed these technologies,

3      the Administrative Office of the Courts for -- Congress and

4      the Administrative Office of the Courts for making the court

5      system more accessible to the public and to lawyers and to

6      everybody through electronic filings and through Pacer.

7           The AO has done a terrific job and the leadership

8      of the Chief Justices -- I guess it started with Justice

9      Rehnquist and Justice Roberts -- the directors of the

10     Administrative Office, among others, and their staffs.

11          I know that our lives are a lot easier; lawyers'

12     lives are certainly a lot easier.  We need to put this in

13     the perspective of:  We have come a long way, not just since

14     quill pens.  But, frankly -- this is a digression.  It's

15     late in the morning.

16          When I was clerking back here in the old building

17     for Judge Aubrey Robinson, we heard motions hearings.  Now

18     we have an individual calendar system; you know who your

19     judge is from the beginning of the case, unless she retires

20     and dumps things on other judges.

21          We had a master calendar system.  You would look

22     at the docket and you may have seen five, six, seven

23     different judges in a case.  On Wednesdays somebody from the

24     clerk's office would come up with these piles of files --

25     some of you may go back that far -- with these piles of

1   motions and say:  Here are the civil motions for Friday.

2   There might be 30 of them, nothing is electronic; it's all

3   like this (indicating).  Judge Robinson would say:  Okay,

4   you take half, I will take half.  Let's start reading --

5   Judges only had one clerk in those days -- let's start

6   reading; we'll talk on Thursday afternoon.  They may still

7   do it that way in the Eastern District of Virginia; I have

8   argued there.  They decide most things from the bench there.

9   They probably think that we can decide from the bench here

10  more frequently, too, but we don't do that so much anymore.

11  So times have really changed.  That having been said, I am

12  not going to decide this from the bench.  Thank you, all,

13  very much.

14          THE COURTROOM DEPUTY:  This court is adjourned.

15          (Whereupon, the proceeding concludes, 12:49 p.m.)

16                      *  *  *  *  *

17                      **CERTIFICATE**

18          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
    certify that the foregoing constitutes a true and accurate
19  transcript of my stenographic notes, and is a full, true,
    and complete transcript of the proceedings to the best of my
20  ability.

21          This certificate shall be considered null and void
    if the transcript is disassembled and/or photocopied in any
22  manner by any party without authorization of the signatory
    below.
23
        Dated this 15th day of May, 2024.
24
        /s/ Elizabeth Saint-Loth, RPR, FCRR
25      Official Court Reporter

**$**

**$10,000** [2] - 23:18, 39:14
**$100** [2] - 59:12, 59:23
**$125** [1] - 17:20
**$15** [2] - 16:25, 61:5
**$23** - 82:13, 82:15
**$250** [1] - 48:5
**$350** [8] - 17:21, 32:25, 33:3, 34:5, 38:15, 59:7, 59:11, 59:20
**$351** [1] - 59:10
**$354** [1] - 61:7
**$354.67** [1] - 49:1
**$50** [1] - 48:4
**$500** [1] - 41:5
**$64** [1] - 82:13
**$859,626,129** [1] - 48:21
**$984,626,129** [1] - 48:19

**'**

**'20s** [1] - 87:21
**'30s** [1] - 87:21

**/**

**/s** [1] - 95:24

**0**

**06103** [1] - 1:23

**1**

**1** [3] - 1:22, 59:23, 60:1
**10** [5] - 70:10, 70:11, 87:19, 87:25, 88:15
**10,000** [1] - 56:23
**100** [2] - 17:18, 65:24
**10:12** [1] - 1:5
**10th** [2] - 47:24, 48:1
**112** [1] - 8:20
**11:59** [1] - 5:21
**12** [4] - 1:5, 36:17, 69:15, 92:3
**123** [1] - 6:9
**125** [1] - 32:24
**12:49** [1] - 95:15
**1340** [1] - 6:13
**15** [4] - 9:13, 61:14, 61:15, 83:9
**150** [2] - 22:16, 29:24
**151** [1] - 60:1
**156** [1] - 81:18

**15th** [1] - 95:23
**16** [3] - 69:14, 70:9, 70:10
**16-745** [2] - 1:3, 3:3
**163** [2] - 48:17, 59:5
**175** [1] - 74:21
**17th** [1] - 1:23
**18** [1] - 78:3
**186,000** [1] - 47:6
**1882** [3] - 57:6, 57:24, 91:20
**18th** [1] - 47:13
**19** [3] - 59:16, 74:20, 78:3
**19.1** [5] - 74:14, 82:14, 82:25, 83:7, 83:13
**1900** [1] - 1:16
**1913** [1] - 33:17
**1968** [1] - 27:22
**1978** [1] - 88:19
**1995** [1] - 26:23
**1st** [2] - 47:14, 49:2

**2**

**2** [5] - 40:2, 77:17, 78:9, 83:25, 84:5
**20** [4] - 1:23, 9:4, 74:13, 88:16
**20006** [1] - 1:13
**2001** [1] - 1:12
**2002** [1] - 47:3
**20036** [1] - 1:16
**2010** [4] - 47:24, 48:16, 48:19, 70:1
**2014** [1] - 47:13
**2015** [2] - 49:2, 49:3
**2016** [4] - 4:21, 23:8, 47:23, 70:1
**2017** [8] - 47:14, 69:17, 69:19, 70:2, 70:16, 70:22, 70:25, 71:1
**2018** [3] - 39:18, 47:24, 48:1
**2019** [1] - 34:16
**202** [3] - 1:13, 1:17, 2:5
**2021** [1] - 81:19
**2023** [10] - 1:5, 8:9, 8:20, 69:10, 69:25, 70:3, 70:4, 70:20, 70:23, 71:1
**2024** [1] - 95:23
**20530** [1] - 2:4
**21** [2] - 70:1
**216-9492** [1] - 1:20
**22-set** [1] - 27:5
**23** [9] - 12:23, 12:25, 36:23, 37:1, 39:18,

39:23, 62:24, 63:6, 63:10
**23(e** [1] - 39:24
**23(e)** [1] - 85:19
**23(e)(2)(C)(iii)** [1] - 39:21
**23(h** [2] - 43:23, 44:3
**23.8** [2] - 82:24, 83:3
**25** [3] - 29:22, 88:1, 88:7
**250** [2] - 20:7, 29:15
**252-2512** [1] - 2:5
**26,611,000.15** [1] - 48:16
**263-9581** [1] - 2:8
**273** [1] - 92:12
**2792766** [1] - 49:3
**28** [2] - 1:19, 33:17
**291** [1] - 6:9
**29464** [1] - 1:20

**3**

**3** [1] - 59:4
**30** [7] - 61:5, 73:24, 74:1, 85:3, 85:4, 88:9, 95:2
**30-day** [1] - 37:9
**300** [4] - 19:22, 19:25, 20:1, 20:2
**30th** [1] - 49:3
**312** [1] - 1:16
**31st** [2] - 47:24, 48:1
**33** [7] - 69:10, 69:12, 70:8, 71:11, 73:11, 74:1, 84:24
**34** [4] - 20:24, 61:18, 68:19, 69:11
**350** [4] - 17:23, 59:8, 59:22, 68:6
**37** [1] - 48:18
**3d** [3] - 6:9, 6:13, 92:12

**4**

**4** [3] - 8:20, 68:10, 83:25
**4.4** [1] - 88:10
**4/21/10** [1] - 47:16
**400** [1] - 64:15
**409** [3] - 55:19, 55:20, 64:17
**43-1** [1] - 73:25
**44** [1] - 73:25
**45** [1] - 83:9
**464** [1] - 64:20
**474** [1] - 92:17
**478** [1] - 92:13
**4:00** [1] - 5:20

**4:30** [1] - 5:21

**5**

**5** [3] - 52:6, 87:20, 88:14
**500,000** [2] - 12:19, 46:5
**501(c)(3** [1] - 26:23
**54-year-old** [1] - 26:19
**580** [1] - 81:18

**6**

**6** [2] - 59:15, 70:19
**601** [1] - 2:4
**65** [2] - 73:21, 88:7
**6580** [1] - 2:7

**7**

**7** [1] - 70:13
**70** [1] - 74:21
**75** [1] - 17:1

**8**

**8** [1] - 8:9
**843** [1] - 1:20
**850** [1] - 1:12
**858** [1] - 2:8
**860** [1] - 1:24
**882-1676** [1] - 1:24
**888-1741** [2] - 1:13, 1:17
**89** [1] - 92:13

**9**

**92037** [1] - 2:8
**968** [1] - 6:13

**A**

**a.m** [1] - 1:5
**Aaron** [1] - 50:1
**ability** [2] - 17:12, 23:5, 95:20
**able** [12] - 16:8, 16:18, 25:14, 26:14, 27:10, 29:3, 29:20, 45:15, 46:14, 65:10, 65:18, 67:16
**absence** [2] - 32:18, 90:22
**absent** [2] - 35:2, 91:2
**absolute** [1] - 90:21
**absolutely** [2] - 22:6, 84:21, 85:22
**accept** [1] - 57:22

**access** [21] - 7:19, 13:18, 15:6, 17:11, 18:19, 22:21, 22:23, 23:1, 23:4, 24:24, 27:2, 27:3, 27:16, 27:23, 32:11, 33:13, 33:18, 33:21, 34:2, 34:10, 51:23
**accessed** [1] - 5:9
**accessible** [2] - 5:14, 94:5
**accompanying** [1] - 22:12
**accomplish** [1] - 19:5
**according** [2] - 39:15, 41:5
**account** [14] - 40:11, 46:16, 46:17, 49:3, 49:5, 55:11, 55:14, 58:14, 58:15, 58:16, 60:25, 61:1, 68:9, 68:11
**accountable** [1] - 15:5
**accountholder** [5] - 54:17, 55:10, 64:4, 64:20, 64:21
**accountholder's** [1] - 64:2
**accountholders** [2] - 55:2, 62:12
**accounting** [1] - 46:7
**accurate** [2] - 93:20, 95:18
**accurately** [1] - 26:1
**achieved** [2] - 30:6, 35:9
**achievement** [1] - 18:4
**achieving** [1] - 18:22
**acknowledge** [1] - 91:23
**acknowledged** [2] - 17:8, 17:9
**act** [2] - 43:9, 43:13
**Act** [11] - 7:11, 14:19, 27:17, 27:18, 27:19, 33:15, 52:14, 65:22, 66:6, 79:17
**action** [37] - 9:21, 11:18, 12:1, 14:22, 15:2, 16:10, 18:1, 18:7, 22:12, 23:8, 25:11, 29:24, 30:20, 32:6, 37:13, 38:6, 39:8, 39:11, 40:22, 45:9, 52:8, 53:23, 57:5, 65:10, 66:25, 68:4, 73:7, 73:19, 73:23, 74:24, 75:4, 75:5, 75:6, 81:6,

88:22, 89:8, 91:4
**Action** [2] - 1:2, 3:2
**actions** [18] - 11:11,
11:17, 11:22, 18:1,
24:17, 31:13, 37:11,
39:25, 40:22, 51:14,
57:10, 66:10, 72:10,
72:15, 72:16, 74:3,
74:5, 86:1
**active** [1] - 24:12
**active-duty** [1] - 24:12
**activities** [3] - 16:15,
16:16, 25:3
**acts** [1] - 91:1
**actual** [3] - 54:18,
63:15, 87:8
**add** [4] - 60:18, 67:18,
67:20, 92:25
**added** [1] - 56:23
**addition** [6] - 20:23,
49:24, 56:13, 56:20,
70:6, 78:16
**additional** [10] - 7:5,
35:15, 44:2, 69:14,
70:19, 71:6, 75:24,
80:25, 81:14, 84:18
**address** [18] - 21:1,
21:2, 31:21, 31:22,
33:5, 34:17, 34:25,
35:20, 36:21, 38:12,
44:25, 45:15, 53:14,
58:8, 58:9, 60:20,
63:9, 83:19
**addressed** [4] - 39:16,
57:19, 60:9, 83:5
**adequacy** [6] - 8:13,
39:17, 39:19, 40:18,
40:20, 65:3
**adequate** [10] - 13:7,
30:23, 31:4, 31:19,
33:4, 40:5, 40:11,
44:25, 63:6, 85:21
**adequately** [2] - 26:1,
50:18
**adjourned** [1] - 95:14
**administering** [2] -
53:9, 53:17
**Administration** [2] -
2:10, 4:4
**administration** [2] -
10:15
**administrative** [1] -
93:11
**Administrative** [12] -
6:3, 6:6, 14:19,
15:20, 16:9, 32:12,
33:12, 34:1, 35:4,
94:3, 94:4, 94:10
**administrator** [14] -
20:6, 53:1, 54:20,

55:3, 55:8, 55:9,
55:10, 58:12, 59:19,
62:11, 62:20, 64:1,
64:3, 64:21
**administrators** [1] -
62:19
**advanced** [1] - 18:17
**advances** [1] - 22:20
**adversarial** [1] - 91:3
**advocacy** [1] - 51:18
**advocate** [1] - 66:14
**advocated** [1] - 51:9
**advocates** [1] - 24:19
**advocating** [2] - 39:1,
83:21
**affect** [4] - 25:3, 63:1,
63:6, 65:3
**affidavits** [1] - 8:17
**afford** [2] - 17:10,
48:11
**affordable** [1] - 27:1
**AFJ** [7] - 11:3, 22:11,
22:13, 22:19, 23:7,
23:18, 23:19
**AFJ's** [3] - 23:10,
23:11, 23:16
**afternoon** [1] - 95:6
**aggregate** [1] - 67:14
**ago** [8] - 15:4, 18:12,
18:13, 18:14, 28:9,
28:22, 36:8, 37:9
**agree** [4] - 29:9,
43:10, 57:20, 61:10,
73:23, 80:4, 81:22,
85:3, 85:4
**agreed** [3] - 6:16,
11:24, 74:12
**agreement** [7] - 8:1,
8:6, 35:17, 59:16,
63:2, 73:16, 83:15
**agreements** [4] -
73:10, 84:23, 84:24,
90:20
**agrees** [3] - 26:2,
71:23, 83:8
**Aha** [1] - 79:4
**ahead** [1] - 47:1
**aid** [1] - 75:16
**aided** [1] - 2:21
**al** [2] - 1:3, 3:3
**Alabama** [1] - 87:14
**ALAN** [1] - 2:7
**Alan** [1] - 36:15
**Alexander** [1] - 50:1
**Ali** [1] - 92:2
**align** [2] - 72:19, 89:16
**Allan** [1] - 4:10
**alliance** [1] - 22:16

**Alliance** [6] - 4:16,
11:2, 21:23, 22:9,
22:15, 25:6
**allocates** [1] - 59:19
**allocation** [6] - 33:7,
33:11, 34:11, 38:25,
39:6, 39:12
**allow** [1] - 12:5
**allowed** [2] - 54:18,
71:15
**allowing** [1] - 26:13
**allows** [4] - 33:15,
53:1, 53:6, 55:2
**almost** [5] - 18:1,
37:11, 37:12, 89:18,
89:19
**alone** [1] - 18:22
**ALSO** [1] - 2:10
**alternative** [1] - 14:22
**amended** [1] - 39:17
**Amendment** [1] - 17:9
**America** [1] - 4:17
**AMERICA** [1] - 1:5
**American** [1] - 14:25
**Americans** [1] - 22:21
**amicus** [1] - 16:19
**amount** [24] - 7:18,
23:20, 25:11, 25:22,
29:18, 33:8, 39:5,
39:12, 43:15, 49:15,
56:13, 59:20, 59:21,
80:14, 82:21, 83:18,
83:22, 86:7, 88:1,
88:12, 88:13, 89:5,
89:12
**amounted** [1] - 88:9
**amply** [1] - 32:1
**analogous** [2] - 79:18,
79:20, 81:16
**analysis** [2] - 13:16,
82:8
**announced** [2] -
16:16, 16:24
**annual** [1] - 27:7
**answer** [11] - 9:14,
10:17, 30:9, 50:16,
54:6, 54:7, 54:8,
62:10, 76:19, 80:3,
90:15
**anticipates** [1] - 19:9
**antitrust** [1] - 65:23
**anyway** [2] - 56:24,
80:14
**AO** [4] - 16:14, 16:16,
16:24, 94:7
**apologize** [1] - 68:4
**appeal** [4] - 16:18,
89:21, 89:22, 92:20
**appear** [4] - 8:22,
10:1, 26:13, 26:14,

30:18, 36:19, 85:9
**Appearances** [1] -
1:25
**APPEARANCES** [2] -
1:10, 2:1
**appearances** [1] - 3:6
**appeared** [1] - 32:4
**appearing** [2] - 3:24,
20:19
**appellate** [1] - 15:25
**application** [2] -
43:22, 45:4
**applications** [2] -
44:15, 91:19
**applies** [1] - 42:12
**apply** [4] - 42:9, 59:3,
92:16
**applying** [1] - 89:23
**appreciate** [1] - 28:20
**appreciative** [1] - 94:2
**apprised** [1] - 25:6
**approach** [12] - 3:18,
72:8, 72:9, 72:14,
72:17, 72:19, 72:25,
73:1, 76:20, 80:6
**approaches** [1] - 72:8
**appropriate** [10] -
20:22, 26:2, 41:8,
45:4, 73:1, 82:17,
83:10, 83:15, 86:1,
86:6
**approval** [11] - 8:10,
9:22, 12:14, 12:21,
13:23, 30:19, 31:10,
31:17, 35:16, 39:25,
52:24
**approve** [6] - 28:15,
28:16, 28:18, 36:1,
41:10, 58:5
**approved** [3] - 44:15,
63:15, 87:23
**approximate** [1] -
25:21
**April** [6] - 23:8, 47:14,
47:24, 48:1, 70:1
**area** [1] - 26:22
**areas** [2] - 27:1, 27:2
**argue** [1] - 82:14
**argued** [1] - 95:8
**argument** [12] - 9:12,
46:19, 57:5, 57:15,
59:9, 59:10, 62:8,
91:18, 92:14, 92:21,
92:24
**arguments** [10] - 4:23,
6:1, 6:2, 6:4, 6:15,
6:16, 15:23, 16:1,
92:9, 92:18
**arm's** [6] - 7:25, 13:6,
31:18, 32:2, 39:4,

74:11
**arrangement** [1] -
73:19
**arranging** [1] - 9:24
**article** [1] - 86:12
**articulated** [1] - 33:17
**aside** [3] - 5:23, 59:9,
83:7
**aspect** [1] - 78:24
**aspects** [1] - 46:21
**asserted** [1] - 90:6
**assessed** [1] - 66:1
**assessment** [1] - 26:3
**Assistant** [1] - 4:2
**associated** [2] - 2:19,
55:11
**Associates** [1] - 86:20
**Association** [2] -
86:20, 87:11
**assumed** [2] - 14:4,
14:17
**assumption** [1] - 89:8
**assure** [2] - 80:14,
90:21
**assured** [1] - 51:16
**attack** [2] - 92:22,
92:23
**attempt** [2] - 53:7,
64:3
**attempted** [2] - 8:14,
70:4
**attempts** [1] - 20:25
**attention** [1] - 52:4
**attorney** [8] - 11:5,
23:19, 24:7, 24:22,
57:9, 72:21, 73:11,
91:19
**Attorney** [3] - 4:2,
25:25, 42:11
**Attorney's** [1] - 42:10
**attorney's** [22] - 9:13,
35:19, 39:20, 40:12,
40:14, 40:15, 40:24,
41:11, 43:2, 44:16,
50:10, 58:8, 68:21,
71:22, 71:24, 84:15,
84:19, 85:9, 86:18,
89:22, 89:24, 91:6
**attorneys** [2] - 28:1,
46:9
**Aubrey** [1] - 94:17
**audio** [1] - 2:19
**August** [1] - 47:13
**author** [1] - 86:14
**authority** [5] - 14:6,
32:13, 39:15, 86:23,
86:24
**Authority** [1] - 48:8
**authorization** [1] -
95:22

automated [1] - 20:7
automatically [3] -
5:5, 17:21, 18:3
available [1] - 23:24
Avenida [1] - 2:7
average [4] - 34:5,
74:17, 74:22, 75:4,
75:5, 75:7
avoid [1] - 33:21
avoidance [1] - 31:13
award [23] - 23:18,
28:7, 29:18, 35:24,
39:20, 40:12, 41:2,
41:14, 41:15, 41:22,
41:23, 43:15, 44:23,
45:8, 57:16, 82:15,
83:2, 87:24, 88:9,
89:12
awarded [4] - 86:18,
87:19, 88:20, 88:21
awarding [1] - 83:17
awards [11] - 22:13,
35:20, 39:14, 40:24,
56:4, 56:6, 58:2,
87:4, 87:23, 88:24,
92:21
aware [4] - 12:11,
13:23, 30:21, 31:11
awareness [1] - 16:22

**B**

B-U-R-B-A-N-K [1] -
24:8
background [2] -
32:9, 73:6
backwards [1] - 67:6
balance [1] - 61:7
bankruptcy [1] - 7:8
bark [4] - 20:9, 21:8,
91:13
barriers [1] - 34:10
base [1] - 83:17
based [4] - 7:12,
27:21, 75:20, 89:11
baseline [1] - 81:4
basis [5] - 14:22, 27:8,
27:9, 33:2, 88:21
bear [1] - 13:16
become [1] - 53:9
BEFORE [1] - 1:8
begin [1] - 10:4
beginning [4] - 10:10,
38:5, 93:23, 94:19
behalf [18] - 3:20,
3:22, 4:4, 11:3,
23:12, 23:16, 26:22,
28:7, 29:19, 51:20,
54:21, 55:9, 56:7,
58:22, 64:2, 64:6,

64:19, 91:2
belabor [1] - 13:1
below [6] - 74:16,
74:17, 74:22, 75:7,
83:14, 95:22
bench [3] - 95:8, 95:9,
95:12
benchmark [1] - 88:1
benefit [1] - 39:11
benefited [1] - 57:12
benefits [5] - 24:13,
24:23, 25:2, 25:4,
72:23
bent [1] - 67:6
best [3] - 30:25, 66:16,
95:19
better [7] - 31:2, 31:5,
39:1, 42:22, 53:14,
75:3, 75:4
between [15] - 33:11,
33:15, 33:19, 33:24,
41:21, 41:22, 42:1,
43:6, 51:6, 52:19,
54:3, 57:7, 65:9,
73:8, 83:25
beyond [4] - 14:17,
27:12, 47:4, 60:18
big [14] - 11:23, 37:4,
37:23, 49:8, 49:9,
49:16, 51:1, 51:4,
66:24, 67:5, 67:13,
86:1
biggest [2] - 38:8,
38:9
bill [7] - 3:12, 3:20,
18:10, 18:15, 37:9,
37:23, 37:24
Bill [1] - 10:10
billed [1] - 44:18
billing [7] - 25:22,
29:17, 38:1, 40:25,
41:7, 44:7, 56:21
bills [3] - 37:10, 37:11,
62:2
bind [2] - 84:24, 84:25
binding [4] - 85:10,
85:12, 85:15, 90:19
binds [1] - 12:1
Bioscrip [1] - 92:2
bipartisan [3] - 18:10,
18:15, 18:16
bit [1] - 58:12
Black [4] - 72:18,
78:15, 78:23, 79:3
bnarwold@
motleyrice.com [1] -
1:24
Boasberg [1] - 81:10
Boeing [1] - 88:19
bondholder [1] -

57:11
Boston [3] - 11:15,
26:13, 44:14
bottom [2] - 58:13,
71:2
Boulevard [1] - 1:19
bound [3] - 12:8,
12:17, 36:16
boy [1] - 69:8
Brackett [1] - 81:9
brag [1] - 37:18
break [3] - 50:8,
68:18, 75:12
Brenda [1] - 4:2
BRENDA [1] - 2:2
brenda.gonzalez.
horowitz@usdoj.
gov [1] - 2:5
Bridgeside [1] - 1:19
brief [9] - 11:20,
50:15, 50:19, 51:12,
52:5, 65:13, 77:4,
81:11, 90:14
briefed [1] - 12:24
briefly [2] - 11:12,
67:25
briefs [8] - 8:17, 65:13
bring [3] - 14:8, 15:13,
86:8
bringing [2] - 16:10,
52:3
broader [2] - 65:21,
66:7
brought [7] - 14:5,
16:22, 19:5, 22:14,
28:2, 51:21, 58:22
Broward [1] - 48:8
building [1] - 94:16
BURBANK [3] - 2:11,
24:3, 24:6
Burbank [5] - 11:7,
23:25, 24:2, 24:8,
26:5
burden [1] - 35:13
burdens [2] - 33:21,
34:11

**C**

C)(iii [1] - 40:6
CA [1] - 2:8
calculated [2] - 23:21,
83:22
calculation [1] - 76:9
calendar [2] - 94:18,
94:21
California [1] - 48:9,
86:11
Camden [3] - 86:20,
87:10

candid [1] - 78:10
cannot [2] - 17:10,
47:3
cap [4] - 74:5, 74:9,
74:11, 74:12
care [2] - 13:20, 22:25
Care [1] - 42:3
career [2] - 38:5, 38:7
carpet [1] - 91:6
case [147] - 4:14, 4:18,
4:20, 4:21, 5:16,
5:17, 6:11, 7:6, 8:5,
10:10, 10:20, 11:23,
11:24, 13:20, 14:4,
14:24, 14:25, 15:3,
15:4, 15:13, 16:7,
19:3, 19:8, 22:14,
23:20, 25:12, 25:20,
26:2, 26:15, 26:18,
28:1, 28:8, 28:10,
29:12, 29:14, 29:16,
29:21, 30:5, 30:20,
32:9, 33:9, 35:2,
35:8, 35:14, 40:24,
41:3, 41:4, 41:5,
41:7, 42:3, 42:15,
43:17, 43:19, 44:23,
45:3, 45:13, 48:10,
51:21, 51:23, 52:3,
52:6, 52:16, 53:20,
56:18, 57:6, 57:8,
57:10, 57:12, 57:16,
57:18, 57:21, 58:1,
58:14, 58:17, 58:22,
63:25, 65:19, 65:23,
66:8, 66:15, 66:16,
66:18, 72:18, 75:21,
77:5, 77:8, 77:18,
77:19, 77:21, 77:22,
78:12, 79:10, 79:14,
79:15, 79:17, 80:5,
80:7, 80:8, 80:10,
81:14, 81:17, 81:23,
82:6, 82:9, 82:20,
83:8, 83:10, 83:12,
83:23, 83:24, 84:3,
86:16, 86:17, 86:19,
87:5, 87:9, 87:13,
87:15, 88:3, 88:6,
88:7, 88:8, 88:14,
88:17, 88:18, 88:20,
88:25, 89:1, 89:4,
89:24, 90:2, 91:8,
91:11, 91:20, 92:1,
92:2, 93:18, 94:19,
94:23
cases [31] - 5:3, 22:24,
24:17, 29:24, 40:23,
42:8, 42:13, 42:14,
43:12, 52:15, 53:14,

65:9, 72:11, 79:4,
79:12, 79:14, 79:19,
81:6, 81:7, 85:24,
86:17, 87:10, 87:21,
88:4, 89:7, 91:22,
91:25, 92:16
categorical [1] - 92:23
categories [6] - 5:24,
6:23, 7:1, 7:2, 7:5,
35:6
category [1] - 7:3
causing [1] - 93:3
cent [1] - 47:8
center [2] - 26:21,
69:6
Center [9] - 1:22, 2:13,
4:16, 11:16, 26:8,
26:17, 26:19, 28:8,
29:19
cents [5] - 17:19,
47:14, 47:18, 48:2,
68:10
certain [8] - 8:22,
16:15, 32:11, 33:8,
42:12, 42:13, 52:10,
53:17
certainly [8] - 31:14,
32:21, 33:25, 47:7,
66:5, 82:6, 83:23,
94:12
CERTIFICATE [1] -
95:17
certificate [1] - 95:21
certification [4] - 16:6,
23:15, 25:14, 29:13
certified [2] - 15:2,
69:25
certify [1] - 95:18
challenge [1] - 15:8
challenged [1] - 30:2
changed [1] - 95:11
charge [6] - 14:6,
23:1, 47:3, 52:16,
66:1, 66:5
charged [2] - 5:1,
47:18
charges [3] - 17:19,
52:10, 52:12
charging [5] - 6:7,
47:14, 47:16, 48:2,
62:5
Charlotte [1] - 10:12
CHARLOTTE [1] -
1:18
chartered [1] - 16:4
check [28] - 17:13,
42:4, 42:5, 42:18,
42:20, 42:23, 43:6,
46:15, 72:2, 75:9,
75:10, 75:15, 75:17,

76:16, 76:20, 77:10, 77:19, 78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9
**checked** [1] - 29:14
**Chief** [5] - 15:9, 81:10, 81:11, 86:10, 94:8
**chime** [1] - 67:23
**choice** [3] - 41:17, 41:20, 41:21
**choose** [4] - 41:14, 42:1, 75:14, 75:22
**chunk** [1] - 49:17
**Church** [1] - 1:23
**circuit** [18] - 6:12, 16:5, 17:3, 17:7, 17:8, 32:10, 41:24, 41:25, 72:10, 76:24, 78:12, 78:19, 79:3, 82:1, 82:3, 82:7, 82:9, 84:3
**Circuit** [19] - 6:16, 6:19, 6:21, 7:3, 7:12, 7:15, 41:19, 76:22, 76:24, 80:5, 81:25, 82:4, 82:5, 83:25, 86:17, 86:19, 87:10, 87:11
**circuit's** [3] - 18:9, 77:4, 77:7
**circuits** [6] - 41:18, 76:25, 77:3, 86:21, 91:22, 92:10
**circumstances** [1] - 83:11
**cite** [3] - 79:13, 79:15, 92:11
**cited** [3] - 81:11, 88:18, 92:3
**Citizen** [1] - 14:1
**Civil** [3] - 1:2, 3:2, 39:18
**civil** [4] - 5:9, 5:13, 16:21, 95:1
**Claim** [1] - 81:18
**claim** [6] - 52:15, 58:24, 65:7, 66:2, 66:5, 69:13
**claimants** [2] - 38:8, 38:21
**claimed** [4] - 41:1, 43:19, 44:24, 88:14
**claiming** [1] - 46:17
**claims** [7] - 10:15, 11:12, 18:2, 37:17, 37:18, 37:19, 79:19
**Claims** [4] - 79:13, 79:18, 81:16, 81:18
**clarification** [1] - 84:8

**clarify** [2] - 60:3, 82:2
**clarifying** [1] - 84:7
**class** [173] - 3:8, 3:12, 8:11, 9:4, 9:19, 9:20, 9:25, 10:1, 10:15, 10:18, 11:10, 11:17, 11:22, 12:1, 12:17, 13:2, 13:3, 13:7, 13:11, 13:12, 15:2, 16:7, 17:20, 17:22, 17:25, 18:1, 18:3, 18:25, 19:1, 19:9, 19:11, 19:12, 19:17, 19:21, 19:22, 20:2, 20:5, 20:6, 20:12, 20:18, 21:19, 22:12, 23:7, 23:13, 23:15, 24:17, 25:11, 25:13, 25:17, 25:19, 26:17, 29:13, 29:24, 30:18, 30:20, 30:23, 31:1, 31:9, 31:12, 31:19, 31:20, 32:25, 33:2, 33:3, 33:5, 33:24, 35:3, 35:10, 36:1, 36:15, 37:2, 37:5, 37:11, 37:13, 37:15, 38:6, 38:18, 38:22, 39:2, 39:3, 39:8, 39:11, 39:25, 40:5, 40:9, 40:10, 40:21, 40:22, 41:3, 41:15, 43:9, 43:14, 43:16, 44:7, 45:7, 45:9, 46:10, 46:12, 46:18, 46:23, 47:23, 51:14, 51:17, 51:19, 51:22, 52:8, 52:25, 53:23, 53:25, 56:5, 57:4, 57:10, 57:17, 57:25, 58:12, 58:17, 59:19, 59:21, 59:22, 60:24, 61:2, 61:8, 61:9, 61:11, 65:10, 66:10, 66:24, 67:1, 67:2, 67:13, 68:4, 69:1, 69:21, 70:1, 71:23, 72:10, 72:15, 72:16, 73:7, 73:10, 73:19, 73:22, 73:23, 74:3, 74:5, 74:24, 75:1, 75:4, 75:6, 77:18, 77:24, 80:12, 81:6, 81:15, 83:5, 84:25, 85:3, 86:1, 87:6, 88:22, 89:8, 91:2, 91:4, 91:15
**classes** [5] - 33:19, 33:20, 67:1, 89:14, 89:16

**clear** [6] - 13:2, 45:10, 79:24, 80:5, 82:22, 83:20
**clearly** [2] - 7:4, 76:5
**clerk** [1] - 95:5
**clerk's** [1] - 94:24
**clerking** [1] - 94:16
**clerks'** [1] - 5:22
**client** [5] - 29:25, 54:23, 54:24, 62:5, 62:6
**clients** [6] - 15:22, 27:17, 37:10, 37:23, 52:1, 91:5
**closely** [1] - 72:20
**closer** [1] - 84:4
**closing** [1] - 9:11
**CM/ECF** [1] - 7:7
**co** [2] - 29:24, 86:14
**co-author** [1] - 86:14
**co-counsel** [1] - 29:24
**coercion** [1] - 32:18
**coincidental** [1] - 39:10
**colleague** [2] - 4:19, 10:8
**colleagues** [2] - 10:10, 10:16
**Collection** [1] - 27:18
**collective** [1] - 23:5
**collusion** [1] - 32:18
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 41:18
**comfort** [1] - 75:18
**coming** [1] - 74:25
**comment** [1] - 28:6
**commercial** [1] - 34:13
**commitment** [1] - 22:17
**Committee** [1] - 18:17
**common** [25] - 17:20, 32:23, 33:8, 42:13, 43:12, 72:10, 72:15, 74:8, 74:10, 74:13, 78:21, 80:7, 81:22, 81:23, 83:10, 86:17, 87:2, 87:5, 87:7, 87:22, 87:24, 89:24, 92:16, 92:17
**communications** [2] - 20:3, 20:4
**companies** [4] - 16:20, 19:16, 21:9, 67:14
**comparable** [2] - 77:1, 78:22
**comparators** [1] - 88:5
**compare** [1] - 41:1

**compared** [1] - 35:10
**compensable** [1] - 58:24
**compensate** [1] - 73:24
**compensated** [2] - 38:11, 44:19
**compensating** [1] - 60:21
**compensation** [3] - 34:5, 34:6, 87:7
**complaint** [5] - 50:23, 50:25, 51:2
**complete** [2] - 44:22, 95:19
**completely** [2] - 14:9, 30:7
**complex** [4] - 14:11, 65:24, 81:5, 81:8
**complexity** [1] - 25:8
**complicated** [1] - 8:2
**component** [1] - 17:14
**comprises** [1] - 19:12
**compromise** [4] - 19:3, 33:11, 34:23, 51:5
**compromising** [1] - 50:24
**computer** [1] - 2:21
**computer-aided** [1] - 2:21
**conceivable** [1] - 31:5
**concepts** [1] - 56:18
**concern** [1] - 60:20
**concerns** [7] - 5:12, 34:17, 44:25, 80:18, 80:21, 83:19, 83:22
**conclude** [1] - 6:20
**concluded** [2] - 6:5, 7:17, 8:6
**concludes** [1] - 95:15
**concur** [2] - 35:25, 60:24
**concurs** [1] - 31:16
**Condominium** [2] - 86:20, 87:11
**conduct** [4] - 80:12, 80:13, 80:23, 82:10
**Conference** [3] - 15:9, 18:18, 34:15
**confirm** [1] - 78:17
**conflict** [1] - 86:22
**Congress** [2] - 18:20, 94:3
**congressional** [1] - 34:8
**connection** [1] - 43:25
**conservatively** [1] - 23:18
**consider** [7] - 35:23,

39:19, 40:18, 40:21, 43:16, 86:13, 88:11
**considerable** [2] - 25:11, 52:2
**consideration** [3] - 9:21, 16:1, 86:4
**considered** [6] - 4:23, 6:1, 71:9, 81:4, 86:5, 95:21
**considering** [5] - 33:4, 34:1, 35:12, 40:6, 40:20
**considers** [1] - 12:22, 12:25
**consistent** [4] - 7:22, 33:16, 34:7, 60:22
**constitutes** [1] - 95:18
**constitutional** [1] - 22:20
**consulted** [1] - 23:14
**consumer** [5] - 26:22, 27:1, 27:5, 27:7, 27:20
**Consumer** [8] - 2:13, 4:15, 11:16, 26:7, 26:17, 26:19, 28:8, 29:19
**consumers** [2] - 26:25, 27:13
**contact** [1] - 64:4
**contacts** [2] - 69:1, 69:2
**context** [4] - 65:11, 65:22, 92:17
**contexts** [1] - 65:23
**contingency** [2] - 73:19, 73:20
**contingent** [1] - 73:12
**continue** [1] - 42:25
**Continued** [1] - 1:25
**continued** [1] - 2:1
**continues** [1] - 18:8
**contrary** [1] - 15:24
**contribution** [1] - 57:16
**contributions** [1] - 93:20
**Control** [1] - 7:11
**controversy** [1] - 14:3
**convinced** [1] - 82:6
**copier** [1] - 47:19
**copies** [1] - 47:20
**core** [1] - 22:20
**corners** [1] - 14:7
**Corporate** [1] - 1:22
**Corporation** [1] - 26:21
**corporations** [2] - 49:9, 49:16
**correct** [15] - 6:24,

7:14, 20:13, 21:5, 54:5, 57:23, 58:7, 68:7, 70:20, 71:17, 73:13, 73:15, 76:11, 85:1

**corrective** [1] - 70:15

**cost** [5] - 38:1, 47:4, 47:9, 47:21, 48:23

**costs** [9] - 13:8, 22:13, 25:8, 34:12, 35:20, 45:9, 47:19, 47:21, 62:4

**Counsel** [2] - 2:10, 4:3

**counsel** [44] - 3:5, 3:8, 3:10, 3:17, 4:23, 5:4, 5:15, 9:4, 9:9, 9:19, 10:8, 13:3, 13:12, 14:16, 19:22, 20:12, 23:13, 23:17, 25:17, 29:24, 30:2, 35:16, 37:11, 39:3, 40:10, 41:3, 41:16, 43:4, 43:17, 45:7, 56:22, 58:13, 60:24, 61:11, 61:19, 71:24, 73:24, 81:15, 83:6, 89:17, 93:14, 93:21

**country** [4] - 24:20, 25:1, 48:10, 92:6

**County** [2] - 48:8, 79:14

**couple** [3] - 10:3, 62:7, 62:15

**course** [12] - 5:6, 13:12, 19:4, 21:12, 30:3, 35:8, 35:12, 35:13, 50:15, 81:5, 83:11, 84:2

**Court** [87] - 2:15, 2:16, 4:9, 9:23, 10:14, 10:21, 12:4, 12:11, 12:16, 12:22, 12:25, 13:1, 25:24, 26:14, 29:12, 30:18, 31:1, 31:3, 31:11, 31:17, 32:1, 32:7, 32:10, 32:19, 32:21, 35:14, 35:18, 35:23, 36:1, 36:14, 39:15, 39:16, 39:19, 41:14, 41:17, 41:20, 43:9, 43:12, 43:13, 45:6, 46:15, 49:4, 49:14, 50:16, 51:12, 51:15, 55:24, 57:6, 57:13, 58:4, 58:25, 60:7, 60:22, 60:23, 61:10, 63:20, 74:6, 75:14, 76:15, 76:19, 79:13, 79:17, 80:10, 80:13, 80:24,

81:3, 81:13, 81:14, 81:16, 83:13, 83:16, 84:1, 84:25, 86:22, 86:24, 87:17, 87:19, 87:22, 88:2, 88:10, 89:5, 90:19, 90:20, 91:1, 93:1, 93:4, 95:25

**court** [30] - 5:2, 6:20, 7:20, 9:24, 15:6, 15:14, 15:15, 17:11, 19:12, 22:5, 22:23, 22:24, 23:13, 24:17, 27:4, 42:12, 57:19, 58:20, 63:15, 77:16, 78:7, 78:10, 79:16, 87:5, 87:12, 90:5, 92:1, 94:4, 95:14

**COURT** [128] - 1:1, 1:9, 3:9, 3:14, 4:6, 4:8, 4:13, 10:24, 18:12, 19:24, 20:1, 20:11, 20:14, 20:21, 21:15, 21:21, 21:25, 22:4, 22:8, 23:23, 24:2, 24:5, 26:5, 26:11, 28:12, 28:15, 28:24, 29:7, 30:11, 30:15, 36:3, 37:22, 39:22, 40:1, 40:4, 40:9, 40:17, 41:21, 41:24, 42:5, 43:10, 45:12, 45:17, 45:20, 45:25, 46:21, 47:1, 49:19, 50:17, 53:4, 53:10, 53:19, 53:22, 54:2, 54:7, 54:13, 55:21, 56:2, 56:6, 56:10, 56:16, 58:10, 59:2, 60:3, 60:10, 60:14, 61:13, 61:22, 63:12, 63:22, 64:10, 64:12, 64:15, 64:23, 65:2, 65:12, 66:7, 66:18, 66:21, 66:24, 67:17, 67:22, 67:24, 68:13, 68:17, 68:23, 69:18, 69:23, 70:6, 70:18, 71:2, 71:6, 71:8, 71:12, 71:18, 71:20, 71:22, 73:12, 73:14, 73:16, 74:8, 75:24, 76:2, 76:22, 77:6, 77:9, 77:13, 77:24, 78:20, 79:1, 79:9, 79:21, 81:20, 82:12, 84:7, 84:13, 85:1, 85:12, 85:15, 85:18, 86:24, 89:18, 90:7, 90:12, 90:23, 92:4, 92:11, 93:8

**Court's** [15] - 9:21, 17:4, 36:17, 52:4, 66:20, 75:15, 75:16, 80:16, 80:23, 82:8, 82:10, 83:2, 84:5, 88:18, 91:11

**court-approved** [1] - 63:15

**Courthouse** [1] - 2:16

**courthouse** [1] - 5:20

**courtroom** [7] - 7:13, 10:5, 10:19, 10:23, 11:4, 45:21, 49:20

**COURTROOM** [3] - 3:2, 3:17, 95:14

**courts** [14] - 5:2, 13:19, 15:23, 23:1, 24:22, 42:23, 57:20, 72:15, 72:18, 78:21, 87:18, 91:6, 91:19, 93:24

**Courts** [8] - 2:10, 4:4, 6:3, 6:6, 16:9, 32:12, 94:3, 94:4

**cover** [3] - 7:18, 44:24, 88:14

**coverage** [2] - 16:22, 19:20

**covers** [1] - 45:8

**COVID** [1] - 47:19

**crazy** [1] - 14:12

**create** [1] - 34:10

**created** [1] - 71:3

**creates** [1] - 17:20

**Credit** [1] - 27:18

**credit** [1] - 48:7

**Crime** [1] - 7:11

**criminal** [2] - 5:11, 5:13

**criteria** [1] - 12:23

**critical** [2] - 24:25, 45:5

**criticism** [2] - 13:18, 14:3

**cross** [27] - 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 72:2, 75:9, 75:10, 75:15, 75:17, 76:16, 76:20, 77:10, 77:19, 78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9, 90:1

**cross-check** [26] - 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 72:2, 75:9, 75:10, 75:15, 75:17, 76:16, 76:20, 77:10, 77:19,

78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9

**cross-examined** [1] - 90:1

**crossword** [1] - 29:6

**CT** [1] - 1:23

**current** [1] - 29:17

**customer** [1] - 69:7

**cut** [4] - 47:25, 48:12, 48:13, 87:20

**cycles** [1] - 37:9

**D**

**D.C** [12] - 1:6, 6:21, 42:10, 76:22, 76:24, 80:5, 81:25, 82:4, 82:5, 83:25, 86:17, 87:11

**daily** [1] - 27:9

**damages** [6] - 35:15, 41:4, 41:7, 43:18, 89:10, 89:11

**danger** [1] - 91:4

**Daniel** [1] - 23:11

**darn** [1] - 92:8

**data** [5] - 19:15, 21:9, 34:14, 41:16, 67:14

**date** [1] - 67:14

**Dated** [1] - 95:23

**days** [3] - 69:7, 69:16, 95:5

**DC** [3] - 1:13, 1:16, 2:4

**deal** [2] - 38:19, 50:11

**dealing** [2] - 38:16, 48:23

**deals** [2] - 39:24, 87:22

**Debt** [1] - 27:18

**decades** [1] - 13:25

**December** [3] - 28:11, 28:14, 47:3

**decide** [7] - 30:24, 63:5, 93:5, 93:19, 95:8, 95:9, 95:12

**decided** [1] - 78:13

**deciding** [2] - 77:16, 78:7

**decision** [18] - 16:12, 18:9, 66:20, 77:7, 77:9, 77:17, 78:9, 78:15, 78:19, 79:3, 80:16, 81:10, 81:11, 82:7, 83:17, 87:1, 88:19

**decisions** [3] - 78:21, 87:16, 88:2

**declaration** [8] -

78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9

**cross-examined** [1] - 90:1

**crossword** [1] - 29:6

**CT** [1] - 1:23

**current** [1] - 29:17

**customer** [1] - 69:7

**cut** [4] - 47:25, 48:12, 48:13, 87:20

**cycles** [1] - 37:9

13:22, 23:15, 25:23, 25:25, 29:12, 73:21, 74:19, 74:20

**declarations** [2] - 8:18, 80:20

**deconstructed** [1] - 88:5

**Deepak** [2] - 3:8, 9:19

**DEEPAK** [1] - 1:11

**deepak@ guptawessler.com** [1] - 1:14

**defeated** [1] - 16:5

**Defendant** [1] - 1:6

**defendant** [3] - 15:24, 47:12, 74:25

**defendant's** [1] - 72:13

**defendants** [2] - 5:12, 89:9

**defended** [1] - 32:6

**defending** [1] - 89:24

**defense** [1] - 66:4

**DEFENSE** [1] - 2:2

**Defense** [1] - 25:3

**Defense-related** [1] - 25:3

**definition** [1] - 61:9

**delays** [1] - 13:8

**delighted** [1] - 6:18

**demonstrate** [1] - 45:10

**demonstrated** [1] - 31:6

**demonstrates** [1] - 32:1

**demonstrating** [1] - 35:4

**Department** [5] - 2:3, 6:4, 15:21, 25:3, 68:2

**departure** [1] - 23:9

**dependent** [1] - 27:3

**Depot** [1] - 47:18

**DEPUTY** [3] - 3:2, 3:17, 95:14

**deserves** [1] - 49:11

**designed** [1] - 41:13

**despite** [1] - 14:3

**detail** [1] - 74:19

**determine** [5] - 30:22, 31:3, 80:16, 84:6, 86:7

**determining** [3] - 35:23, 40:17, 86:5

**developed** [1] - 94:2

**diametrically** [1] - 34:20, 50:22

**difference** [1] - 43:5

**different** [8] - 42:5,

43:7, 63:16, 76:25, 79:8, 79:11, 92:17, 94:23
**differentiation** [2] - 33:15, 33:24
**difficult** [1] - 51:8
**difficulties** [2] - 2:19, 35:10
**difficulty** [1] - 35:4
**digital** [1] - 27:8
**digression** [1] - 94:14
**diminish** [1] - 17:11
**direct** [2] - 27:13, 28:2
**director** [8] - 11:1, 11:8, 11:16, 22:3, 23:11, 24:8, 26:7, 29:23
**Director** [2] - 2:11, 2:13
**directors** [1] - 94:9
**directs** [1] - 12:16
**disabilities** [1] - 24:14
**disabled** [2] - 48:6, 58:20
**disadvantage** [1] - 23:3
**disagree** [1] - 61:17
**disagreed** [1] - 57:19
**disapproved** [1] - 57:9
**disassembled** [1] - 95:21
**discouraging** [1] - 72:21
**discovery** [6] - 15:21, 16:8, 16:11, 29:13, 32:15, 35:15
**discretion** [10] - 42:2, 42:21, 74:6, 75:16, 75:21, 80:23, 82:10, 83:2, 84:6, 90:21
**discriminates** [1] - 51:20
**discuss** [5] - 20:17, 21:6, 30:19, 35:19, 50:19
**discussed** [2] - 12:12, 32:8
**discussion** [3] - 8:13, 42:17, 43:2
**discussions** [1] - 32:16
**dismiss** [1] - 16:6
**dismissed** [1] - 14:20
**dispute** [4] - 52:10, 55:14, 55:15, 64:7
**disputes** [5] - 55:18, 55:20, 62:14, 64:12, 64:13
**disqualify** [1] - 54:2
**disregard** [2] - 90:8,

90:11
**distinction** [2] - 57:7, 57:23
**distinguish** [1] - 33:18
**distributed** [4] - 18:2, 33:1, 48:23, 49:15
**distributing** [1] - 33:7
**distribution** [13] - 34:4, 38:9, 39:13, 50:25, 51:10, 51:13, 51:16, 51:18, 59:17, 59:18, 59:25, 66:14, 67:7
**District** [9] - 41:18, 44:13, 52:7, 65:17, 82:9, 83:9, 86:11, 87:13, 95:7
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [9] - 6:17, 6:20, 32:17, 44:15, 79:16, 81:4, 81:8, 87:12, 92:1
**dive** [1] - 9:16
**docket** [1] - 94:22
**Docket** [2] - 8:19, 59:5
**docketing** [1] - 7:20
**dockets** [1] - 24:25
**doctrine** [2] - 87:2, 87:6
**document** [3] - 41:12, 47:4, 47:22
**documentation** [3] - 43:25, 80:22, 84:10
**documented** [2] - 43:20
**documents** [5] - 22:23, 23:2, 47:10, 47:13
**dog** [4] - 20:9, 21:7, 91:13
**DOJ** [1] - 2:3
**DOJ-USAO** [1] - 2:3
**dollar** [2] - 17:19, 82:21
**dollars** [2] - 15:11, 38:1
**DON** [1] - 2:14
**done** [16] - 8:6, 12:15, 29:21, 30:4, 30:5, 42:24, 48:14, 62:21, 62:22, 74:4, 81:25, 83:18, 89:18, 89:19, 92:23, 94:7
**double** [2] - 38:16, 88:15
**doubling** [1] - 16:24
**doubt** [3] - 15:6, 32:19, 32:21
**down** [4] - 14:8, 19:5,

38:15, 74:1
**downstream** [1] - 52:18
**draft** [1] - 23:14
**drafted** [1] - 25:13
**drafts** [1] - 69:4
**dramatically** [1] - 41:10
**draw** [1] - 52:4
**drawing** [1] - 57:23
**drew** [1] - 57:6
**drums** [1] - 47:19
**due** [2] - 24:14, 44:4
**dumps** [1] - 94:20
**duplicate** [1] - 69:12
**during** [10] - 30:3, 32:25, 33:3, 46:13, 58:17, 58:23, 59:22, 61:2, 61:3, 75:12
**duty** [4] - 24:12, 86:12, 90:21, 91:11

# E

**E-Government** [1] - 33:15
**E-juror** [1] - 7:13
**earliest** [1] - 43:11
**earned** [1] - 25:5
**earth** [1] - 15:16
**easier** [2] - 94:11, 94:12
**Eastern** [1] - 95:7
**easy** [2] - 15:19, 77:21
**EBM** [1] - 7:9
**ECF** [1] - 73:25
**Economic** [1] - 27:19
**economy** [1] - 85:25
**edify** [1] - 93:10
**education** [1] - 24:18
**educational** [1] - 93:17
**effect** [4] - 79:16, 85:10, 85:13, 85:16
**effectively** [1] - 16:2
**efficient** [1] - 72:22
**effort** [4] - 7:25, 18:16, 25:12, 28:1
**efforts** [1] - 16:23, 34:9
**eight** [1] - 17:22
**eight-year** [1] - 17:22
**either** [5] - 34:18, 59:22, 64:8, 71:13, 76:20
**electricity** [1] - 47:20
**electronic** [11] - 5:8, 5:9, 5:14, 7:6, 7:8, 7:20, 32:11, 33:18, 93:22, 94:6, 95:2

**electronically** [2] - 5:10, 5:14
**Eleventh** [3] - 41:19, 86:19, 87:10
**eliminate** [1] - 18:15
**eliminating** [1] - 16:25
**Elizabeth** [2] - 2:15, 95:24
**ELIZABETH** [1] - 95:18
**Ellen** [1] - 4:20
**email** [6] - 55:10, 62:21, 64:3, 64:4, 64:8, 68:15
**Email** [4] - 1:14, 1:21, 1:24, 2:5
**emails** [4] - 19:23, 20:2, 62:12, 69:2
**emphasis** [1] - 82:4
**emphasize** [2] - 53:15, 90:17
**employee's** [1] - 54:22
**employees** [2] - 70:13, 70:14
**employer** [1] - 54:22
**enact** [1] - 18:20
**enacted** [1] - 27:22
**end** [9] - 28:11, 28:12, 28:14, 34:22, 35:18, 43:21, 83:19, 84:4, 86:8
**endeavor** [1] - 14:13
**ended** [1] - 38:14
**ending** [2] - 48:15, 48:16
**endorse** [1] - 30:7
**enforce** [1] - 85:6
**enforceable** [1] - 85:7
**engage** [1] - 67:6
**engaged** [2] - 32:15
**enhancement** [1] - 92:15
**ensure** [5] - 12:4, 22:19, 34:4, 34:9, 83:16
**ensuring** [3] - 9:25, 34:2, 67:8
**entered** [2] - 8:9, 47:2
**entirely** [2] - 19:6, 75:15
**entities** [1] - 34:13
**entitled** [5] - 40:14, 46:5, 71:24, 89:23, 92:24
**entry** [1] - 69:12
**equal** [2] - 13:18, 59:20
**equitable** [3] - 22:18, 87:22, 87:24
**equitably** [3] - 13:11,

31:20, 37:2
**equity** [2] - 51:14, 65:9
**ERIC** [1] - 2:7
**Eric** [2] - 4:10, 36:15
**escapes** [1] - 86:15
**esoteric** [1] - 65:19
**especially** [4] - 31:12, 33:4, 34:2, 35:9
**essential** [2] - 12:4, 17:13
**essentially** [5] - 6:14, 8:21, 9:2, 40:13, 81:3
**established** [2] - 87:2, 87:5
**estimate** [1] - 23:18
**et** [2] - 1:3, 3:3
**etc** [1] - 2:19
**ethical** [2] - 41:15, 86:12
**Ethics** [1] - 86:14
**evaluate** [1] - 60:14
**evaluating** [3] - 31:3, 39:19, 43:14
**evaluation** [1] - 63:1
**event** [1] - 29:11
**eventually** [1] - 5:13
**evidence** [6] - 31:7, 32:18, 44:2, 44:10, 45:11, 49:1
**exaction** [1] - 11:11
**exactly** [5] - 57:1, 58:21, 63:9, 66:15, 73:18
**examine** [1] - 31:1
**examined** [1] - 90:1
**exceed** [1] - 29:18
**exceeded** [2] - 32:12, 87:25
**exceeds** [1] - 23:20
**except** [2] - 41:18, 93:9
**exceptional** [1] - 13:8
**exceptions** [1] - 7:15
**excessive** [9] - 14:16, 47:12, 47:15, 47:16, 48:4, 48:24, 49:2, 59:7, 87:19
**exchange** [1] - 91:5
**exclusively** [1] - 76:8
**exempt** [1] - 14:18
**exempting** [1] - 33:19
**Exhibit** [1] - 48:17
**exhibits** [2] - 62:17, 62:18
**exorbitant** [1] - 23:1
**expected** [1] - 52:21
**expend** [1] - 35:14
**expenditures** [1] -

32:11
**expense** [1] - 35:12
**expenses** [8] - 7:18,
37:9, 37:14, 37:21,
52:1, 57:7, 62:4,
74:12
**experience** [5] -
11:10, 14:11, 30:1,
30:2, 74:24
**experienced** [1] - 32:4
**expert** [5] - 11:11,
11:17, 41:6, 76:15,
88:8
**explain** [3] - 63:1,
63:4, 68:19
**explained** [2] - 6:10,
7:16
**explains** [4] - 26:1,
59:16, 71:18, 92:14
**explanation** [1] -
25:25
**extensive** [2] - 16:19,
19:20
**extensively** [3] -
12:24, 31:21, 81:7
**extent** [2] - 53:8,
89:22
**extraordinary** [2] -
18:4, 35:10
**extrapolating** [1] -
48:17
**extremely** [1] - 85:25
**eye** [2] - 30:1, 30:2
**eye-opening** [2] -
30:1, 30:2
**eyebrows** [1] - 78:2

## F

**F-A-L-E-S-C-H-I-N-I**
[1] - 22:7
**faced** [1] - 35:3
**facing** [3] - 15:20,
78:22, 79:5
**fact** [11] - 28:10,
36:22, 46:22, 51:5,
56:14, 58:15, 61:25,
66:15, 67:5, 77:12,
90:21
**factors** [5] - 12:25,
31:21, 35:16, 76:23,
77:4
**facts** [2] - 16:10, 78:12
**factual** [1] - 92:21
**factually** [1] - 59:13
**Fair** [3] - 27:17, 27:18
**fair** [16] - 12:5, 12:7,
12:9, 15:17, 16:1,
30:22, 40:5, 46:23,
51:15, 57:8, 58:12,

63:2, 63:6, 85:20,
92:24, 93:19
**fair-minded** [1] -
15:17
**fairness** [9] - 12:22,
36:24, 37:1, 45:14,
51:14, 53:18, 55:23,
65:3, 66:12
**FALESCHINI** [4] -
21:24, 22:1, 22:6,
22:9
**Faleschini** [5] - 10:23,
11:1, 21:22, 21:25,
22:2
**fall** [3] - 57:23, 58:6,
61:9
**falsity** [1] - 90:6
**far** [3] - 54:25, 91:21,
94:25
**farmers** [3] - 72:18,
78:23, 79:3
**farmers'** [1] - 78:15
**favor** [3] - 16:2, 34:20,
35:16
**favored** [1] - 31:12
**favoring** [4] - 50:24,
50:25, 51:3, 67:5
**favors** [1] - 34:18
**FCRR** [3] - 2:15,
95:18, 95:24
**Fed** [2] - 6:13, 81:18
**Federal** [5] - 39:18,
79:13, 79:18, 81:16,
81:18
**federal** [43] - 6:12,
6:15, 7:19, 14:12,
15:14, 16:5, 16:19,
17:3, 17:7, 17:8,
18:9, 19:12, 22:20,
24:14, 24:24, 27:3,
27:6, 27:21, 32:10,
41:24, 41:25, 70:12,
70:13, 72:10, 76:23,
76:24, 77:4, 77:6,
78:12, 78:19, 79:3,
79:16, 79:19, 81:5,
81:8, 82:1, 82:3,
82:7, 84:3, 91:22,
93:24
**fee** [40] - 5:18, 14:8,
15:8, 16:25, 19:6,
40:24, 41:2, 43:22,
44:14, 44:23, 45:4,
45:15, 48:5, 58:23,
64:4, 72:11, 72:12,
73:11, 73:19, 74:10,
74:12, 74:14, 75:6,
75:18, 76:11, 76:12,
76:17, 78:3, 80:17,
87:23, 87:24, 88:9,

88:12, 88:13, 88:24,
91:15, 91:16, 91:19,
92:16
**fees** [96] - 4:25, 5:25,
7:5, 7:8, 7:11, 7:17,
9:13, 13:17, 13:24,
14:6, 14:15, 15:11,
16:10, 16:15, 16:17,
16:25, 17:11, 17:22,
18:7, 18:15, 22:13,
23:1, 25:7, 32:25,
33:3, 33:18, 33:20,
34:7, 34:10, 35:20,
39:21, 40:12, 40:14,
40:15, 41:11, 43:2,
43:21, 44:16, 44:21,
45:3, 45:16, 46:6,
46:11, 46:13, 47:12,
47:15, 47:17, 48:5,
48:11, 48:12, 48:14,
48:24, 49:2, 49:10,
50:10, 52:2, 52:17,
53:2, 53:6, 54:19,
54:20, 54:22, 55:4,
55:5, 55:8, 55:13,
58:8, 58:18, 58:23,
59:7, 59:21, 61:2,
61:3, 61:19, 61:20,
64:1, 64:6, 64:19,
64:22, 65:8, 68:3,
68:21, 71:23, 71:24,
83:18, 84:15, 84:19,
85:9, 85:20, 86:18,
88:20, 89:22, 89:24,
91:6
**felt** [2] - 15:22
**fences** [1] - 16:14
**few** [15] - 7:15, 11:3,
11:18, 11:21, 13:14,
14:10, 17:15, 18:12,
18:13, 18:14, 21:20,
63:3, 92:1, 93:9,
93:17
**Fibreboard** [1] - 66:19
**fiduciary** [3] - 43:9,
90:25, 91:1
**fight** [1] - 15:21
**file** [7] - 5:21, 37:7,
44:3, 64:24, 93:3,
93:10
**filed** [24] - 8:7, 13:20,
15:4, 20:15, 20:17,
21:16, 21:17, 25:24,
29:12, 36:7, 36:16,
36:18, 46:1, 47:23,
63:19, 64:5, 64:8,
64:13, 64:18, 69:15,
69:16, 71:3, 84:10,
93:3
**files** [1] - 94:24

**filing** [16] - 5:9, 7:6,
23:8, 36:20, 44:22,
48:17, 59:5, 76:6,
80:19, 81:6, 81:21,
82:14, 82:24, 83:5,
93:3, 93:23
**filings** [15] - 5:14, 8:8,
8:17, 25:12, 31:6,
31:22, 32:3, 33:10,
36:21, 44:9, 62:18,
69:11, 82:19, 93:13,
94:6
**final** [6] - 9:21, 12:20,
13:22, 31:10, 31:17,
52:24
**finally** [4] - 7:13,
11:14, 26:6, 34:25
**finance** [2] - 27:1,
27:13
**finish** [1] - 29:22
**firm** [9] - 10:9, 10:11,
10:13, 38:4, 44:20,
54:24, 62:1, 88:23,
89:2
**firms** [16] - 5:1, 19:13,
19:14, 21:8, 37:5,
37:6, 37:13, 37:23,
38:6, 38:7, 39:11,
49:8, 51:25, 67:13,
88:23, 89:6
**First** [1] - 17:9
**first** [18] - 6:18, 7:3,
11:21, 12:14, 14:5,
15:1, 15:3, 21:18,
25:16, 31:24, 50:20,
59:16, 59:18, 63:3,
63:7, 73:10, 85:11,
87:17
**first-ever** [1] - 15:1
**first-named** [1] - 25:16
**Fitzpatrick** [6] - 41:6,
43:22, 74:18, 81:2,
88:8, 90:1
**Fitzpatrick's** [1] - 88:6
**five** [9] - 9:9, 20:16,
20:24, 40:24, 44:23,
94:22
**Floor** [1] - 1:23
**focus** [1] - 89:1
**focusing** [2] - 13:23,
89:22
**folks** [5] - 10:3, 13:20,
44:11, 44:18, 67:5
**follow** [1] - 61:22
**follow-up** [1] - 61:22
**following** [2] - 18:9,
40:6
**footnote** [3] - 52:5,
52:6, 65:12
**Footnote** [2] - 77:17,

78:9
**FOR** [3] - 1:1, 1:11,
2:2
**force** [2] - 41:13, 42:2
**forceful** [1] - 33:14
**foregoing** [1] - 95:18
**forget** [1] - 42:9
**fork** [1] - 15:10
**form** [7] - 53:1, 53:5,
53:11, 54:16, 54:17,
54:18, 55:2
**formal** [1] - 31:13
**former** [2] - 81:11,
86:10
**forms** [7] - 54:15,
62:16, 62:21, 63:18,
63:19, 63:20, 70:23
**forth** [2] - 9:2, 20:4
**forward** [7] - 3:5,
21:10, 25:17, 28:21,
30:7, 32:5, 35:11
**fought** [2] - 13:4,
32:14
**foundational** [2] -
87:1, 87:16
**four** [5] - 10:18, 14:7,
40:24, 41:7, 43:19
**fraction** [2] - 89:10,
89:11
**frankly** [5] - 41:13,
86:6, 88:23, 89:15,
94:14
**fraud** [1] - 44:12
**free** [3] - 14:9, 18:19,
22:18
**frequently** [1] - 95:10
**Friday** [2] - 29:7, 95:1
**Friedman** [3] - 12:11,
16:3, 52:23
**FRIEDMAN** [1] - 1:8
**friend** [1] - 75:11
**friends** [1] - 6:21
**front** [2] - 56:11, 86:7
**frontline** [1] - 76:12
**full** [7] - 17:18, 32:24,
34:5, 34:6, 34:6, 50:7,
83:17, 95:19
**fully** [4] - 37:8, 37:13,
37:16, 38:10
**functions** [1] - 43:7
**fund** [43] - 16:15,
17:20, 32:23, 33:8,
37:12, 41:23, 42:14,
42:16, 42:19, 42:20,
43:12, 72:10, 72:15,
72:17, 74:8, 74:10,
74:13, 78:21, 80:6,
80:7, 81:22, 83:10,
86:17, 86:18, 87:2,
87:6, 87:7, 87:14,

87:16, 87:17, 87:18, 87:22, 87:23, 87:24, 88:18, 88:21, 88:24, 89:12, 89:24, 92:17
**fundable** [1] - 7:4
**funded** [1] - 16:17
**funding** [2] - 7:3, 7:6
**funds** [7] - 17:24, 33:1, 35:5, 39:1, 39:7, 51:10, 81:23

## G

**garden** [1] - 72:11
**garnered** [1] - 16:21
**gatekeeps** [1] - 23:4
**Gemert** [1] - 88:19
**General** [2] - 2:10, 4:3
**general** [5] - 31:11, 35:22, 66:3, 80:4, 80:13
**General's** [1] - 42:11
**generally** [1] - 72:7
**Geoffrey** [1] - 49:25
**Georgetown** [1] - 86:14
**get-go** [2] - 70:21, 71:14
**given** [9] - 12:18, 13:8, 15:7, 18:5, 18:22, 30:9, 70:2, 75:22, 78:19
**Globe** [1] - 44:14
**glove** [1] - 10:12
**Goldberg** [2] - 23:11, 23:12
**GONZALEZ** [10] - 2:2, 4:1, 30:16, 60:17, 67:19, 79:24, 82:2, 82:22, 84:12, 93:6
**Gonzalez** [1] - 4:2
**goofed** [1] - 70:15
**Government** [1] - 33:15
**government** [32] - 6:2, 17:14, 17:17, 24:14, 24:23, 30:15, 32:6, 35:6, 35:21, 38:24, 47:2, 50:8, 51:11, 52:16, 60:4, 67:17, 68:14, 70:12, 70:13, 72:24, 74:3, 74:12, 74:23, 75:11, 79:20, 79:22, 80:18, 81:3, 82:20, 91:9, 93:2, 93:7
**government's** [6] - 16:6, 35:2, 38:12, 39:7, 58:13, 76:6
**grandchildren** [1] -

29:4
**grant** [1] - 31:17
**granted** [1] - 61:4
**granting** [1] - 8:10
**gravitated** [1] - 72:18
**great** [3] - 5:6, 6:5, 29:9
**greatly** [1] - 28:20
**Greenough** [6] - 43:12, 57:6, 87:2, 87:3, 87:14, 91:20
**Greenough's** [1] - 57:15
**Greenspan** [1] - 50:1
**greeted** [1] - 78:18
**grossly** [2] - 51:9, 85:7
**ground** [2] - 6:5, 6:17
**Group** [1] - 14:1
**group** [1] - 70:22
**groups** [4] - 16:21, 21:8, 21:9, 28:3
**guarantee** [1] - 40:23
**guaranteed** [1] - 33:8
**guard** [1] - 91:7
**guess** [7] - 7:1, 9:16, 48:13, 62:20, 66:11, 79:1, 94:8
**GUPTA** [60] - 1:11, 3:7, 9:18, 11:1, 18:13, 19:25, 20:2, 20:13, 20:16, 21:3, 21:18, 21:22, 23:24, 26:6, 30:13, 50:14, 50:18, 53:5, 53:13, 53:21, 54:1, 54:5, 54:8, 55:22, 56:3, 56:9, 56:15, 56:25, 58:11, 59:13, 60:7, 60:13, 60:16, 63:7, 65:5, 65:15, 66:11, 66:19, 66:23, 67:3, 72:5, 73:13, 73:15, 73:18, 74:9, 76:1, 76:4, 77:2, 77:8, 77:11, 77:16, 78:1, 78:24, 79:6, 79:10, 79:23, 90:14, 91:1, 92:7, 92:12
**Gupta** [17] - 1:12, 1:15, 3:8, 3:24, 9:19, 10:9, 30:12, 30:20, 31:8, 31:15, 32:8, 37:4, 50:13, 61:23, 68:25, 79:25, 90:13
**Gupta's** [2] - 25:25, 36:20
**guy** [9] - 44:16, 49:10, 49:17, 51:1, 51:4, 67:8

**guys** [1] - 51:24

## H

**half** [6] - 28:9, 29:16, 30:3, 40:24, 95:4
**hallmark** [1] - 34:23
**hallway** [2] - 75:11, 79:25
**hand** [1] - 10:12
**handle** [1] - 91:19
**handled** [4] - 4:18, 57:12, 69:3, 69:5
**handling** [2] - 69:1, 69:6
**happenings** [1] - 23:6
**happily** [1] - 4:19
**happy** [10] - 21:6, 22:11, 28:18, 29:20, 30:9, 36:10, 63:10, 72:5, 76:19, 80:3
**hard** [5] - 13:4, 14:21, 32:14, 51:17, 67:10
**hard-fought** [2] - 13:4, 32:14
**harder** [3] - 5:11, 5:22, 5:23
**hardest** [1] - 29:8
**Hartford** [1] - 1:23
**head** [1] - 15:7
**head-on** [1] - 15:7
**Health** [9] - 42:3, 45:3, 77:5, 77:8, 79:2, 79:7, 79:10, 80:9, 86:3
**hear** [23] - 3:15, 8:25, 9:5, 18:25, 21:12, 24:4, 24:5, 26:10, 28:25, 30:15, 36:5, 36:6, 36:10, 46:1, 49:22, 50:6, 50:9, 60:7, 61:17, 61:19, 79:22, 84:13
**heard** [16] - 9:7, 10:2, 12:6, 15:25, 19:2, 36:11, 45:22, 49:21, 50:4, 52:22, 53:20, 74:23, 81:15, 84:17, 91:9, 94:17
**hearing** [18] - 2:18, 8:19, 9:25, 11:23, 12:21, 12:22, 18:25, 35:19, 36:18, 68:14, 92:25
**HEARING** [1] - 1:8
**hearings** [1] - 94:17
**hearsay** [1] - 90:5
**heavily** [1] - 27:6
**heavy** [1] - 27:10
**held** [5] - 2:18, 41:19,

52:15, 86:19, 86:21
**help** [3] - 48:10, 63:4, 72:6
**helped** [2] - 75:12, 80:1
**helpful** [5] - 58:6, 73:5, 76:21, 79:21, 93:15
**helps** [1] - 72:19
**hereby** [1] - 95:18
**high** [2] - 39:12, 48:12
**higher** [2] - 84:2, 88:1
**highly** [2] - 27:3, 30:6
**historic** [1] - 9:20
**history** [3] - 6:11, 14:25, 32:9
**hold** [3] - 15:5, 16:14, 39:22
**holding** [2] - 17:4, 77:22, 78:4
**holdings** [1] - 86:22
**holds** [1] - 82:9
**holes** [2] - 83:4, 93:2
**home** [2] - 27:1, 28:25
**honestly** [1] - 77:3
**honor** [1] - 9:20
**Honor** [42] - 3:7, 3:11, 3:19, 3:23, 4:1, 4:12, 9:18, 21:18, 21:24, 23:22, 23:24, 24:6, 26:4, 26:6, 26:9, 29:9, 30:9, 30:16, 30:21, 34:25, 35:25, 36:13, 38:2, 40:16, 40:19, 41:8, 43:8, 45:19, 45:24, 46:3, 46:25, 50:14, 60:17, 65:5, 67:19, 67:21, 72:5, 80:3, 82:23, 84:21, 85:22, 90:11
**HONORABLE** [1] - 1:8
**hope** [10] - 14:14, 21:1, 26:10, 71:19, 75:21, 76:15, 79:7, 90:17, 92:24, 93:4
**hopefully** [2] - 75:17, 76:21
**HOROWITZ** [10] - 2:2, 4:1, 30:16, 60:17, 67:19, 79:24, 82:2, 82:22, 84:12, 93:6
**Horowitz** [1] - 4:2
**Hospital** [1] - 79:2
**hospital** [4] - 80:8, 82:6, 86:16, 87:12
**hourly** [3] - 40:25, 62:2, 78:4
**hours** [7] - 25:1, 29:15, 56:23, 62:2, 69:15, 72:21, 89:12

**House** [1] - 18:10
**housing** [1] - 48:7
**Housing** [1] - 48:8
**Howell** [1] - 81:12
**humbly** [1] - 75:3
**hundreds** [4] - 12:2, 19:8, 55:18, 63:15
**Huvelle** [9] - 4:20, 6:1, 6:15, 6:17, 7:2, 7:21, 16:4, 17:7
**Huvelle's** [1] - 16:12

## I

**i.e** [1] - 2:19
**ID** [1] - 69:13
**idea** [2] - 52:8, 81:24
**identified** [2] - 69:12, 80:10
**identifying** [1] - 64:22
**identity** [1] - 15:24
**ignored** [1] - 15:23
**iii** [1] - 40:3
**ill** [1] - 51:19
**ill-served** [1] - 51:19
**illegal** [2] - 11:11, 52:16
**Illinois** [2] - 52:7, 65:17
**imagine** [1] - 89:1
**immunity** [1] - 14:23
**impact** [2] - 22:24, 28:2
**impermissible** [1] - 57:17
**important** [13] - 12:7, 12:8, 17:8, 21:14, 23:4, 25:20, 44:5, 44:21, 67:15, 91:3, 91:12, 93:18, 93:25
**improper** [1] - 44:1
**inadvertently** [1] - 71:15
**inapplicable** [1] - 78:5
**inappropriate** [4] - 43:23, 51:9, 82:25, 85:7
**incentive** [4] - 56:11, 56:17, 57:16, 87:4
**inception** [4] - 4:21, 26:18, 28:9, 32:7
**include** [2] - 62:2, 62:3
**included** [3] - 37:24, 46:23, 88:5
**includes** [7] - 19:13, 19:14, 19:15, 19:16, 37:5, 37:15, 47:19
**including** [7] - 8:12, 19:13, 21:16, 24:17,

40:12, 65:23, 91:22
**income** [1] - 26:25
**incorrect** [4] - 59:13, 70:5, 70:10, 70:14
**increased** [1] - 61:5
**incur** [2] - 47:20, 49:10
**incurred** [6] - 7:19, 23:19, 24:15, 25:23, 61:3, 87:8
**indeed** [1] - 13:7
**indicate** [3] - 10:21, 53:2, 53:6
**indicated** [2] - 36:19, 50:3
**indicates** [2] - 42:1, 42:4
**indicating** [1] - 69:2
**indicating)** [1] - 95:3
**indiscernible)** [1] - 29:10
**individual** [7] - 12:18, 19:21, 24:18, 25:19, 34:2, 63:25, 94:18
**individuals** [4] - 33:16, 70:4, 70:10, 70:20
**inequitable** [1] - 33:6
**inequitably** [1] - 38:23
**inflation** [1] - 72:21
**inform** [1] - 23:5
**informal** [1] - 32:15
**information** [16] - 5:3, 7:20, 23:4, 23:5, 25:18, 31:7, 33:22, 44:22, 53:11, 53:12, 54:19, 55:15, 55:16, 76:15, 80:25, 83:16
**informative** [1] - 93:17
**informed** [2] - 13:6, 32:16
**inhibit** [1] - 13:19
**initial** [3] - 80:19, 81:21, 82:14
**injunctive** [1] - 14:19
**injury** [2] - 85:24
**ink** [1] - 75:9
**input** [1] - 25:13
**inquiries** [2] - 19:21, 25:17
**inquiry** [1] - 25:19
**instance** [1] - 33:25
**instituted** [1] - 47:12
**institutional** [2] - 34:18, 34:21
**institutions** [4] - 15:13, 15:17, 56:14, 94:1
**intensive** [1] - 85:25
**intent** [2] - 34:8, 36:19

**interest** [9] - 18:6, 19:20, 22:17, 27:15, 27:24, 34:1, 39:1, 39:2, 89:16
**interested** [1] - 5:17
**interesting** [1] - 50:21
**interests** [6] - 23:3, 26:25, 31:1, 72:20, 89:14, 89:16
**interference** [1] - 2:19
**internal** [1] - 69:2
**introduce** [2] - 10:21, 44:2
**invalid** [1] - 70:25
**invoices** [1] - 46:14
**involved** [5] - 18:1, 20:3, 28:8, 31:24, 91:10
**involves** [1] - 94:1
**involving** [1] - 79:19
**ironic** [1] - 38:24
**irrelevant** [1] - 76:10
**Isaacson** [6] - 4:10, 21:16, 36:7, 36:15, 45:20, 49:24
**ISAACSON** [24] - 2:7, 4:7, 4:9, 36:13, 38:2, 39:24, 40:2, 40:8, 40:16, 40:19, 41:22, 41:25, 43:8, 43:11, 45:13, 45:18, 84:21, 85:2, 85:14, 85:17, 85:22, 87:1, 89:19, 90:10
**isaacson** [13] - 51:25, 57:4, 61:20, 65:16, 66:12, 73:3, 84:13, 84:14, 90:12, 90:24, 91:18, 92:19, 93:14
**Isaacson's** [1] - 50:20
**isaacson's** [5] - 51:2, 51:7, 54:6, 55:23, 92:14
**issue** [11] - 13:20, 48:8, 52:21, 52:24, 52:25, 54:10, 55:25, 58:11, 60:20, 67:15, 92:22
**issues** [10] - 13:24, 14:2, 22:24, 45:16, 48:7, 52:18, 58:8, 63:6, 71:25, 76:7
**itself** [5] - 7:4, 12:4, 17:15, 80:14, 90:21

### J

**J.T** [1] - 81:11
**Jake** [4] - 10:23, 11:1, 21:22, 22:2

**Jiggets** [1] - 50:1
**job** [4] - 30:4, 39:1, 63:5, 94:7
**John** [1] - 10:8
**joined** [1] - 11:7
**joining** [1] - 11:15
**Jolla** [1] - 2:8
**Jonathan** [1] - 3:24
**JONATHAN** [2] - 1:11, 1:15
**Journal** [1] - 86:14
**journalists** [1] - 19:14
**judge** [7] - 5:7, 6:18, 28:10, 28:24, 44:6, 44:15, 94:19
**JUDGE** [1] - 1:9
**Judge** [20] - 4:19, 4:20, 6:1, 6:15, 6:16, 7:2, 7:21, 12:11, 16:3, 16:12, 17:7, 49:18, 52:23, 81:10, 81:12, 86:10, 92:2, 94:17, 95:3
**Judges** [1] - 95:5
**judges** [10] - 15:25, 16:19, 32:17, 42:21, 81:4, 86:10, 86:12, 92:5, 94:20, 94:23
**judgment** [1] - 17:4
**Judicial** [3] - 15:8, 18:18, 34:15
**judicial** [6] - 15:12, 15:16, 17:13, 33:13, 72:23, 78:2
**Judiciary** [1] - 18:17
**judiciary** [10] - 14:5, 14:12, 14:18, 15:2, 15:5, 15:10, 16:7, 17:4, 22:20, 34:9
**July** [1] - 49:2
**jump** [2] - 18:7, 72:6
**jump-started** [1] - 18:7
**jurisdiction** [2] - 14:21, 14:22
**jurisdictional** [2] - 18:22, 19:7
**juror** [2] - 7:12, 7:13
**Justice** [13] - 2:3, 4:16, 6:4, 11:2, 15:10, 15:21, 21:23, 22:10, 22:15, 25:7, 68:3, 94:8, 94:9
**justice** [5] - 11:2, 13:19, 22:3, 22:21, 51:24
**Justices** [1] - 94:8
**justification** [1] - 80:20
**justified** [2] - 33:25,

34:1
**justifies** [1] - 58:2

### K

**KCC** [2] - 20:6, 20:12
**keep** [1] - 11:19
**Kelly** [1] - 11:4
**kind** [16] - 8:2, 12:12, 52:7, 54:9, 56:6, 57:7, 63:3, 66:3, 73:18, 74:6, 76:21, 79:17, 85:10, 91:8, 91:13, 92:21
**kinds** [2] - 42:12, 73:20
**King** [1] - 79:14
**known** [1] - 24:10
**Kozich** [8] - 45:25, 46:2, 49:19, 49:25, 58:11, 60:24, 93:15
**KOZICH** [9] - 2:14, 45:24, 46:3, 46:25, 47:2, 67:21, 67:23, 68:2, 68:16
**Kozich's** [2] - 58:14, 60:25

### L

**labor** [1] - 85:25
**lack** [2] - 14:21, 42:22
**Laffey** [1] - 42:11
**landmark** [5] - 17:3, 17:17, 30:20, 31:9, 75:1
**language** [2] - 77:13, 78:19
**large** [15] - 17:10, 37:16, 38:4, 38:5, 38:13, 38:14, 38:15, 38:21, 40:23, 49:8, 51:25, 79:19, 89:13, 91:15
**largely** [1] - 24:21
**larger** [3] - 38:20, 89:4, 89:5
**largest** [4] - 19:14, 34:13, 37:5, 37:6
**last** [9] - 11:14, 21:17, 22:4, 23:10, 29:16, 29:22, 30:3, 36:8, 67:12
**late** [5] - 20:25, 36:22, 69:16, 70:25, 94:15
**laughed** [1] - 15:15
**law** [42] - 5:1, 5:22, 16:14, 19:13, 19:14, 21:8, 24:19, 24:24, 25:1, 26:22, 27:5,

27:6, 37:5, 37:6, 37:13, 37:23, 38:4, 38:7, 42:15, 44:19, 49:8, 51:25, 52:13, 53:20, 54:24, 56:19, 57:18, 62:1, 62:25, 65:8, 65:22, 66:8, 66:15, 67:13, 80:5, 82:9, 83:8, 83:23, 84:3, 89:2, 89:6, 93:24
**Law** [8] - 2:13, 4:16, 11:16, 26:8, 26:17, 26:19, 28:8, 29:19
**laws** [2] - 27:7, 27:20
**lawsuit** [1] - 47:23
**lawyer** [2] - 13:25, 69:5
**lawyers** [5] - 5:1, 14:10, 39:8, 40:22, 58:1, 72:20, 91:5, 94:5
**lawyers'** [2] - 5:23, 94:11
**lead** [1] - 27:14
**leadership** [1] - 94:7
**leading** [1] - 11:17
**leads** [1] - 82:15
**least** [7] - 11:14, 14:6, 19:9, 43:5, 64:24, 81:24, 83:9
**led** [1] - 16:11
**left** [1] - 74:6
**legal** [20] - 15:7, 23:10, 26:22, 27:15, 27:24, 28:4, 31:10, 37:25, 52:14, 54:5, 54:7, 54:8, 56:1, 57:5, 57:15, 57:22, 61:19, 61:20, 62:8, 65:6
**LEGAL** [1] - 1:2
**Legal** [9] - 2:12, 3:3, 4:15, 11:5, 11:8, 23:25, 24:9, 26:20, 86:14
**legislation** [2] - 18:19, 18:20
**legislative** [2] - 6:11, 18:7
**legislature** [1] - 16:11
**legitimate** [4] - 6:8, 7:7, 7:9, 32:20
**legwork** [1] - 83:19
**Lending** [1] - 27:17
**length** [7] - 7:25, 13:6, 31:18, 32:2, 39:4, 74:11, 80:9
**less** [7] - 8:4, 47:7, 47:8, 48:4, 59:8,

68:5, 82:5
**lesser** [2] - 59:20, 59:23
**letting** [1] - 64:5
**level** [2] - 15:25
**liability** [1] - 16:4
**liaison** [1] - 53:13
**libraries** [1] - 16:21
**life** [2] - 16:10, 23:20
**light** [2] - 16:8, 47:6
**limitations** [4] - 2:18, 18:23, 19:7, 54:25
**limited** [2] - 7:18, 27:25
**limits** [1] - 23:5
**line** [9] - 8:24, 20:8, 44:6, 44:9, 57:24, 58:7, 71:2
**litigants** [3] - 19:17, 21:10, 72:23
**litigating** [1] - 34:22
**Litigation** [3] - 2:11, 2:13, 14:1
**litigation** [40] - 11:8, 11:15, 12:3, 13:4, 13:9, 13:15, 13:21, 14:6, 14:7, 14:11, 14:18, 14:20, 14:25, 15:18, 15:20, 18:4, 18:22, 23:11, 24:9, 25:9, 25:15, 26:7, 28:2, 29:23, 31:2, 31:13, 31:25, 32:5, 32:14, 35:7, 35:11, 44:12, 45:9, 51:17, 72:22, 73:20, 81:5, 81:9
**litigator** [1] - 19:13
**lives** [2] - 94:11, 94:12
**LLC** [1] - 1:19
**LLP** [1] - 1:12
**lodestar** [49] - 41:1, 41:12, 41:15, 41:22, 42:4, 42:5, 42:6, 42:9, 42:16, 42:17, 42:18, 42:20, 43:6, 43:19, 44:7, 44:24, 45:8, 72:1, 72:2, 72:9, 75:8, 75:14, 75:17, 76:9, 77:10, 77:19, 78:8, 78:17, 80:12, 80:21, 81:1, 81:2, 81:23, 81:24, 83:7, 84:1, 86:4, 86:5, 86:7, 86:13, 88:12, 88:15, 88:16, 88:20, 89:21, 92:15
**lodged** [1] - 34:17
**log** [1] - 69:2
**logical** [2] - 50:5,

61:16
**long-standing** [2] - 33:13, 52:14
**look** [8] - 40:25, 51:22, 76:10, 78:15, 84:18, 88:25, 92:13, 94:21
**looking** [5] - 28:21, 48:6, 75:5, 75:19, 75:20
**looks** [1] - 81:9
**Loper** [2] - 10:12, 69:4
**LOPER** [1] - 1:18
**lost** [2] - 46:17, 49:5
**LOTH** [1] - 95:18
**Loth** [2] - 2:15, 95:24
**love** [1] - 28:15
**low** [2] - 26:25, 39:11
**low-income** [1] - 26:25
**lower** [2] - 84:4, 87:18

## M

**machine** [1] - 2:21
**maintain** [1] - 27:10
**maintenance** [1] - 34:12
**majority** [3] - 17:18, 34:12, 38:6
**management** [2] - 7:6, 88:23
**mandates** [1] - 47:3
**manner** [2] - 20:4, 24:12, 95:22
**manuals** [1] - 27:5
**marginal** [1] - 47:4
**margins** [1] - 47:4
**market** [2] - 23:21, 81:8
**marriage** [1] - 34:21
**Mashburn** [1] - 87:13
**Massachusetts** [2] - 29:17, 44:13
**master** [1] - 94:21
**materials** [1] - 27:11
**matrix** [4] - 42:10, 42:11, 81:2, 88:6
**Matrix** [1] - 42:11
**matter** [14] - 9:19, 12:9, 37:25, 52:11, 52:19, 54:5, 56:24, 62:9, 62:25, 65:6, 65:8, 80:13, 89:21
**matters** [1] - 90:6
**maximize** [1] - 89:3
**maximizes** [1] - 89:14
**Mayorkas** [1] - 81:10
**mean** [7] - 57:10, 69:15, 79:6, 82:24, 87:15, 88:4, 92:4

**means** [1] - 37:19
**measure** [5] - 18:3, 18:16, 21:11, 51:5, 51:13
**mechanics** [1] - 10:14
**media** [3] - 16:20, 16:22, 19:15
**mediation** [1] - 31:25
**mediator** [1] - 32:4
**meets** [2] - 12:23, 31:10
**Meghan** [4] - 3:13, 3:21, 10:11, 10:16
**MEGHAN** [1] - 1:18
**member** [16] - 17:21, 19:23, 20:2, 20:18, 22:17, 22:22, 32:25, 36:15, 46:10, 46:18, 53:25, 59:19, 59:21, 61:9, 69:1
**members** [24] - 10:1, 12:17, 13:11, 18:3, 18:25, 19:1, 19:9, 19:21, 20:5, 25:19, 30:18, 30:23, 31:9, 31:20, 33:2, 33:24, 37:2, 38:17, 38:22, 39:2, 44:8, 73:22, 75:1, 91:2
**mention** [2] - 56:5, 81:15
**mentioned** [15] - 12:15, 17:2, 18:24, 20:24, 32:7, 52:24, 61:6, 63:14, 65:12, 66:13, 68:25, 74:2, 86:16, 88:3, 91:12
**mentions** [1] - 73:21
**Mercier** [3] - 81:17, 88:3
**merely** [1] - 86:9
**met** [1] - 51:5
**method** [1] - 80:6
**MEYERS** [1] - 2:10
**Meyers** [2] - 4:3, 5:10
**microphone** [3] - 3:16, 10:24, 54:13
**middle** [3] - 6:5, 6:17, 16:4
**might** [13] - 8:5, 11:22, 14:11, 52:10, 56:18, 59:3, 65:7, 73:5, 78:11, 87:13, 91:3, 91:25, 95:2
**miles** [1] - 47:6
**military** [1] - 25:4
**mill** [1] - 75:6
**Miller** [2] - 50:1, 66:9
**Miller's** [2] - 50:23, 50:25

**million** [9] - 17:20, 32:24, 41:5, 74:21, 82:13, 82:15, 82:24
**millions** [1] - 15:11
**mind** [2] - 43:5, 74:3
**minded** [1] - 15:17
**minimal** [1] - 89:11
**minimum** [10] - 38:13, 38:14, 38:15, 38:17, 38:20, 39:12, 50:24, 59:19, 67:7, 89:10
**minutes** [6] - 9:4, 9:7, 9:9, 9:13, 61:14, 61:15
**Mirola** [1] - 2:7
**misled** [1] - 71:15
**misread** [1] - 68:6
**misreading** [1] - 59:14
**misrepresents** [1] - 87:16
**missed** [2] - 52:5, 71:16
**Mississippi** [1] - 7:10
**misspoke** [1] - 68:23
**misunderstanding** [1] - 60:2
**misunderstood** [2] - 71:14, 90:18
**modern** [2] - 51:14, 57:16
**modern-day** [1] - 57:16
**modest** [1] - 58:2
**moliver@motleyrice.com** [1] - 1:21
**moment** [2] - 31:22, 86:15
**momentarily** [1] - 33:5
**monetary** [1] - 15:2
**money** [12] - 14:13, 18:2, 19:16, 44:17, 46:7, 47:8, 48:23, 49:10, 49:14, 49:17, 88:25, 94:1
**months** [1] - 16:15
**Moore** [1] - 79:14
**moreover** [1] - 34:9
**morning** [24] - 3:7, 3:9, 3:11, 3:19, 3:23, 4:1, 4:6, 4:7, 4:10, 4:13, 9:18, 10:5, 11:18, 21:24, 21:25, 22:1, 24:3, 28:22, 30:16, 36:12, 36:13, 43:1, 93:14, 94:15
**most** [10] - 17:25, 22:25, 39:8, 44:8, 49:9, 78:20, 78:21, 88:24, 89:13, 95:8
**mostly** [1] - 7:15

**motion** [6] - 8:10, 16:6, 23:13, 35:19, 35:22, 43:25
**motions** [3] - 94:17, 95:1
**motivation** [1] - 29:10
**Motley** [7] - 1:19, 3:12, 3:20, 3:21, 10:11, 10:13, 10:16
**mounting** [1] - 15:7
**mouth** [1] - 57:2
**move** [6] - 35:11, 68:21, 71:22, 90:4, 90:8
**moving** [1] - 32:5
**MR** [103] - 3:7, 3:11, 3:19, 3:23, 4:7, 4:9, 9:18, 11:1, 18:13, 19:25, 20:2, 20:13, 20:16, 21:3, 21:18, 21:22, 21:24, 22:1, 22:6, 22:9, 23:24, 26:6, 26:9, 26:12, 28:14, 28:17, 29:2, 29:9, 30:13, 36:13, 38:2, 39:24, 40:2, 40:8, 40:16, 40:19, 41:22, 41:25, 43:8, 43:11, 45:13, 45:18, 45:24, 46:3, 46:25, 47:2, 50:14, 50:18, 53:5, 53:13, 53:21, 54:1, 54:5, 54:8, 55:22, 56:3, 56:9, 56:15, 56:25, 58:11, 59:13, 60:7, 60:13, 60:16, 63:7, 65:5, 65:15, 66:11, 66:19, 66:23, 67:3, 67:21, 67:23, 68:2, 68:16, 72:5, 73:13, 73:15, 73:18, 74:9, 76:1, 76:4, 77:2, 77:8, 77:11, 77:16, 78:1, 78:24, 79:6, 79:10, 79:23, 84:21, 85:2, 85:14, 85:17, 85:22, 87:1, 89:19, 90:10, 90:14, 91:1, 92:7, 92:12
**MS** [31] - 3:21, 4:1, 24:3, 24:6, 30:16, 54:15, 60:17, 63:13, 63:24, 64:11, 64:13, 64:17, 65:1, 67:19, 68:22, 68:25, 69:21, 69:24, 70:8, 70:19, 71:5, 71:7, 71:11, 71:17, 71:19, 71:21, 79:24, 82:2, 82:22,

84:12, 93:6
**Mt** [1] - 1:20
**multiple** [2] - 20:3, 61:3
**multiplier** [5] - 75:20, 83:24, 88:10, 88:16, 89:13
**must** [6] - 4:19, 17:17, 18:12, 28:9, 31:1, 86:18
**muster** [1] - 16:18

# N

**name** [4] - 22:2, 22:4, 24:7, 86:15
**named** [7] - 23:7, 25:10, 25:16, 26:17, 56:8, 56:12, 79:6
**Narwold** [5] - 3:12, 3:20, 10:11, 60:6, 74:4
**NARWOLD** [3] - 1:22, 3:11, 3:19
**Nathan** [1] - 92:2
**nation** [1] - 15:16
**national** [5] - 22:15, 24:11, 26:21, 28:3, 28:4
**National** [15] - 2:12, 2:13, 3:3, 4:15, 11:5, 11:8, 11:16, 23:25, 24:9, 26:7, 26:16, 26:19, 28:7, 29:19
**NATIONAL** [1] - 1:2
**nationwide** [1] - 16:7
**nature** [2] - 13:15, 25:8
**NCLC** [3] - 27:3, 27:4, 29:23
**necessarily** [1] - 12:3
**necessary** [5] - 8:3, 14:10, 41:9, 41:17, 75:22
**need** [16] - 8:15, 18:6, 30:24, 34:23, 40:21, 41:16, 43:14, 45:10, 45:11, 50:7, 77:23, 88:11, 93:9, 93:16, 94:12
**needed** [1] - 7:18
**needs** [3] - 43:13, 86:5, 93:4
**negotiated** [4] - 31:18, 32:2, 38:15, 83:15
**negotiation** [7] - 8:1, 13:6, 31:25, 32:20, 73:8, 74:2, 74:11
**negotiations** [3] - 38:25, 39:4, 51:11

**net** [4] - 48:16, 48:18, 48:21
**never** [3] - 10:6, 14:4, 15:22, 46:6
**new** [7] - 16:10, 69:20, 69:21, 71:3, 71:4, 71:9, 85:8
**New** [2] - 29:5, 92:2
**next** [1] - 23:24
**night** [2] - 21:17, 36:8
**nobody** [1] - 64:12
**noncommercial** [1] - 18:19
**none** [5] - 20:9, 21:10, 50:2, 50:3, 91:16
**nonprofit** [3] - 24:11, 26:23, 27:24
**nonprofits** [2] - 49:9, 49:16
**normal** [1] - 42:16
**North** [1] - 1:12
**Northern** [3] - 52:7, 65:17, 86:11
**notable** [2] - 17:25, 91:17
**note** [2] - 88:17, 89:20
**noted** [5] - 13:22, 32:3, 32:17, 34:19, 81:3
**notes** [3] - 33:16, 84:17, 95:19
**nothing** [5] - 5:8, 33:6, 58:18, 93:6, 95:2
**notice** [22] - 10:15, 12:6, 12:16, 12:18, 12:19, 52:22, 69:19, 70:5, 70:10, 70:14, 70:15, 70:16, 70:20, 73:22, 77:18, 77:25, 80:12, 85:3, 85:5, 85:8, 85:9, 85:11
**notices** [7] - 8:12, 8:14, 62:10, 62:13, 63:14, 63:15, 63:16
**noticing** [1] - 7:8
**notification** [10] - 7:11, 54:16, 54:17, 54:18, 55:12, 63:18, 63:19, 63:20, 64:5
**notifications** [9] - 55:1, 55:6, 55:7, 55:18, 55:19, 55:20, 63:24, 64:18, 64:20
**notified** [3] - 5:4, 5:15, 64:21
**notify** [1] - 55:3
**notifying** [3] - 54:20, 55:7, 63:25
**noting** [1] - 17:6
**notion** [1] - 72:25,

85:10, 87:25
**null** [1] - 95:21
**number** [13] - 19:10, 20:14, 21:5, 36:7, 49:3, 56:22, 69:3, 69:4, 69:11, 76:7, 79:13
**numerous** [3] - 8:17, 16:20, 68:25
**NVLSP** [7] - 24:10, 24:16, 24:25, 25:10, 25:16, 25:23, 26:2
**NW** [3] - 1:12, 1:16, 2:4

# O

**object** [1] - 85:9
**objected** [1] - 56:4
**objecting** [4] - 46:21, 46:22, 85:6, 91:17
**objection** [12] - 36:16, 37:7, 46:1, 50:20, 50:23, 51:7, 52:8, 55:23, 57:4, 65:16, 91:24
**objections** [18] - 9:10, 12:21, 19:10, 20:8, 20:15, 20:16, 20:24, 21:15, 34:20, 36:9, 44:4, 49:24, 50:2, 50:6, 50:11, 50:19, 50:22, 61:12
**objector** [4] - 4:11, 73:3, 90:7, 91:23
**Objector** [1] - 2:14
**objectors** [11] - 8:18, 9:6, 21:12, 33:23, 34:17, 45:21, 45:22, 49:20, 49:25, 60:8, 68:19
**obligations** [1] - 90:25
**obtain** [2] - 14:16, 14:23
**obtained** [1] - 16:6
**obviously** [1] - 27:7
**occasions** [1] - 30:3
**occur** [1] - 52:21
**occurred** [3] - 12:18, 13:10, 57:7
**October** [2] - 1:5, 8:20
**odds** [3] - 15:7, 18:5, 88:1
**OF** [3] - 1:1, 1:5, 1:8
**Office** [12] - 2:10, 4:4, 6:3, 6:6, 15:20, 16:9, 32:12, 35:4, 47:18, 94:3, 94:4, 94:10
**office** [3] - 5:15, 69:5, 94:24

**Office's** [2] - 33:12, 34:1
**Official** [1] - 2:16
**official** [1] - 95:25
**often** [3] - 6:22, 51:25, 88:17
**old** [1] - 94:16
**older** [1] - 85:8
**OLIVER** [21] - 1:18, 3:21, 54:15, 63:13, 63:24, 64:11, 64:13, 64:17, 65:1, 68:22, 68:25, 69:21, 69:24, 70:8, 70:19, 71:5, 71:7, 71:11, 71:17, 71:19, 71:21
**Oliver** [17] - 3:13, 3:21, 10:11, 10:16, 21:4, 36:5, 50:9, 53:13, 53:19, 54:10, 54:13, 61:17, 61:24, 63:9, 68:19, 74:4, 93:9
**once** [6] - 44:19, 55:6, 55:9, 59:25, 63:24
**one** [67] - 12:1, 12:10, 14:11, 19:9, 20:17, 20:21, 25:10, 33:9, 33:23, 36:8, 37:3, 38:12, 38:19, 38:23, 39:22, 40:14, 43:18, 44:19, 46:4, 46:9, 47:7, 47:8, 47:13, 47:14, 54:16, 55:25, 58:16, 59:2, 61:22, 62:7, 62:12, 62:16, 63:5, 65:21, 66:1, 67:12, 71:25, 73:3, 74:16, 75:10, 76:8, 76:16, 77:21, 78:4, 79:4, 79:9, 79:11, 80:7, 81:14, 81:20, 84:22, 84:23, 85:23, 86:1, 87:3, 87:17, 87:18, 88:4, 89:1, 89:4, 90:24, 91:20, 91:21, 91:25, 92:5, 95:5
**one-third** [4] - 74:16, 84:23, 85:23, 86:1
**ones** [5] - 34:19, 50:11, 70:6, 79:6, 90:3
**open** [1] - 15:17
**opening** [6] - 9:5, 30:1, 30:2, 30:13, 32:8, 60:21
**openings** [1] - 9:17
**operation** [1] - 7:3
**opinion** [8] - 6:9, 6:13,

6:19, 7:22, 17:3, 39:16, 78:14, 92:8
**opinions** [1] - 90:2
**opportunity** [14] - 12:6, 30:17, 69:16, 69:18, 69:20, 69:24, 70:2, 70:3, 70:11, 70:16, 70:17, 70:24, 71:1, 71:16
**Opportunity** [1] - 27:19
**oppose** [1] - 82:23
**opposed** [5] - 19:2, 34:20, 49:7, 49:13, 50:22
**opposite** [2] - 51:3, 66:15
**opt** [27] - 20:25, 21:6, 36:6, 50:9, 61:17, 61:18, 68:22, 68:23, 68:24, 69:10, 69:11, 69:16, 69:18, 69:20, 69:24, 70:2, 70:3, 70:5, 70:11, 70:16, 70:17, 70:24, 70:25, 71:1, 71:16, 85:4
**opt-out** [1] - 36:6
**opt-outs** [9] - 21:6, 50:9, 61:17, 68:22, 68:23, 68:24, 69:10, 69:11, 70:25
**opted** [1] - 71:10
**order** [9] - 8:9, 8:20, 9:2, 24:23, 27:10, 27:16, 33:20, 36:17, 58:5
**orders** [2] - 5:14, 8:21
**ordinarily** [1] - 44:2
**ordinary** [2] - 56:21, 56:22
**Oregon** [1] - 48:9
**organization** [10] - 22:16, 22:22, 24:12, 24:16, 26:20, 26:24, 27:9, 28:3, 28:4, 28:19
**organizations** [11] - 16:20, 19:15, 20:10, 22:17, 22:23, 23:2, 27:14, 27:15, 27:24, 27:25, 28:5
**organized** [1] - 77:4
**orientation** [1] - 76:21
**originally** [2] - 4:18, 26:20
**Ortiz** [3] - 51:15, 66:16, 66:19
**otherwise** [3] - 35:5, 50:3, 91:3
**ought** [1] - 42:4

**ourselves** [1] - 27:10
**out-of-court** [1] - 90:5
**outcome** [2] - 18:21, 30:6
**outlasted** [1] - 28:10
**outlays** [1] - 87:8
**outs** [9] - 21:6, 50:9, 61:17, 68:22, 68:23, 68:24, 69:10, 69:11, 70:25
**outset** [1] - 90:17
**outside** [1] - 72:10
**outstanding** [4] - 30:4, 31:8, 61:7, 75:1
**overall** [1] - 24:21
**overcharged** [1] - 17:5
**overcharging** [1] - 15:5
**oversaw** [1] - 23:11
**overwhelmingly** [1] - 72:16
**owe** [1] - 68:10
**owed** [1] - 49:1
**own** [4] - 14:7, 28:2, 63:23, 79:3
**ownership** [1] - 27:1

**P**

**p.m** [2] - 5:21, 95:15
**Pacer** [88] - 4:18, 4:24, 4:25, 5:17, 5:25, 7:4, 7:17, 13:17, 13:24, 14:8, 14:9, 16:10, 16:15, 16:17, 16:25, 17:1, 17:18, 17:19, 17:22, 18:7, 18:15, 18:19, 19:6, 22:23, 25:15, 27:4, 27:10, 27:16, 27:23, 34:5, 34:12, 34:14, 37:8, 37:10, 37:11, 37:14, 37:16, 37:20, 37:25, 46:6, 46:11, 46:13, 46:15, 46:17, 47:3, 47:11, 47:12, 47:20, 48:2, 48:4, 48:5, 48:11, 48:12, 48:13, 48:16, 49:1, 49:4, 52:2, 52:17, 53:2, 53:6, 54:20, 54:22, 55:3, 55:5, 55:8, 55:13, 55:16, 58:16, 58:18, 58:23, 59:7, 59:21, 59:22, 62:5, 64:1, 64:6, 64:19, 64:22, 68:3, 68:8, 68:9, 68:11, 93:22, 94:6
**Pacer-fee** [2] - 14:8,

19:6
**page** [9] - 47:8, 47:15, 47:18, 48:2, 52:6, 59:4, 59:15, 92:3, 92:13
**paid** [37] - 15:11, 17:22, 17:23, 32:25, 33:2, 34:7, 44:17, 52:17, 53:2, 53:6, 54:20, 54:23, 55:3, 55:5, 55:8, 55:13, 59:7, 59:8, 59:10, 59:12, 59:21, 60:1, 61:8, 62:6, 64:1, 64:6, 64:19, 64:22, 65:8, 66:4, 67:9, 67:16, 68:3, 68:5, 68:8, 88:24, 89:13
**paper** [3] - 5:7, 47:20, 70:23
**papers** [5] - 20:23, 39:16, 60:9, 60:11, 60:12
**paragraph** [4] - 6:19, 59:16, 73:21, 74:20
**paraphrase** [1] - 53:24
**pardon** [2] - 85:14, 86:21
**part** [13] - 14:24, 21:14, 32:19, 38:10, 39:23, 44:8, 44:10, 48:16, 64:13, 68:4, 69:25, 70:22, 85:20
**participate** [2] - 9:1, 17:12
**participating** [3] - 12:3, 56:11, 73:23
**particular** [5] - 26:15, 51:7, 54:24, 83:12, 86:25
**particularly** [2] - 10:16, 13:8
**parties** [18] - 6:14, 8:17, 9:3, 11:24, 30:17, 31:21, 32:3, 32:4, 32:15, 32:19, 33:12, 34:19, 35:13, 67:6, 72:21, 73:8, 83:14, 90:24
**parties'** [4] - 31:6, 32:3, 33:10, 34:22
**partner** [1] - 62:1
**partnered** [1] - 26:20
**party** [2] - 53:25, 95:22
**passed** [4] - 18:10, 18:14, 18:15, 54:23
**passing** [1] - 66:4
**passing-off** [1] - 66:4
**past** [1] - 17:19

**path** [2] - 13:21, 16:4
**PAUL** [1] - 1:8
**pay** [16] - 5:18, 19:1, 37:9, 46:11, 46:13, 47:11, 48:4, 48:5, 48:11, 48:24, 58:18, 58:23, 59:23, 61:2, 68:9, 91:15
**payable** [1] - 4:24
**payees** [1] - 38:21
**payer** [1] - 54:18
**paying** [3] - 54:22, 59:8, 91:15
**payment** [16] - 14:14, 33:8, 38:13, 38:14, 38:15, 38:17, 38:21, 40:12, 54:16, 54:18, 55:7, 55:19, 55:20, 59:20, 64:18, 65:24
**payments** [2] - 33:7, 38:9
**payor** [1] - 64:22
**paywall** [2] - 14:8, 19:6
**pennies** [1] - 47:9
**pens** [1] - 94:14
**people** [35] - 3:15, 8:22, 8:23, 10:5, 10:18, 12:2, 12:5, 12:19, 15:5, 15:11, 17:5, 36:11, 37:20, 38:17, 46:15, 49:7, 52:11, 52:19, 52:20, 53:2, 53:6, 54:4, 57:13, 59:8, 61:18, 65:9, 68:5, 68:8, 68:11, 71:8, 93:25
**per** [4] - 47:6, 47:8, 47:14, 47:18
**percent** [33] - 17:1, 44:24, 73:11, 73:24, 74:1, 74:13, 74:14, 82:14, 82:25, 83:10, 84:1, 84:5, 84:24, 85:3, 85:4, 87:14, 87:15, 87:17, 87:18, 87:19, 87:20, 87:25, 88:1, 88:7, 88:9, 88:14, 88:15, 88:16, 88:18, 88:24, 89:12
**percentage** [35] - 41:14, 41:23, 42:15, 42:18, 42:19, 43:15, 72:1, 72:2, 72:8, 72:14, 72:16, 72:19, 72:25, 73:2, 73:6, 73:9, 74:15, 74:22, 75:19, 76:11, 76:12, 76:17, 76:20, 78:16, 80:6, 81:22, 82:21,

86:6, 86:8, 86:18, 87:8, 88:21, 89:5
**Perdue** [1] - 45:6
**perfect** [4] - 19:3, 30:24, 31:15, 34:23
**performing** [1] - 75:17
**perhaps** [4] - 80:10, 82:3, 82:5, 84:4
**period** [23] - 17:22, 23:8, 32:14, 33:1, 33:3, 46:12, 47:15, 47:23, 47:25, 48:3, 48:4, 48:17, 48:18, 49:2, 52:22, 58:17, 59:22, 61:3, 69:22, 71:4, 71:6, 71:9
**permissible** [1] - 33:24
**permits** [1] - 33:17
**permitted** [1] - 35:5
**person** [12] - 8:24, 10:2, 11:10, 36:9, 36:19, 52:15, 52:17, 58:22, 66:1, 66:2, 66:4, 69:13
**personal** [2] - 57:12, 85:24
**personally** [2] - 31:24, 69:6
**personnel** [1] - 24:13
**persons** [5] - 33:19, 33:20, 46:4, 59:7
**perspective** [1] - 94:13
**persuaded** [1] - 79:8
**persuasive** [1] - 82:8
**Pettus** [1] - 87:18
**phase** [1] - 31:25
**phone** [1] - 69:3
**photocopied** [1] - 95:21
**picked** [2] - 48:3
**piles** [2] - 94:24, 94:25
**plaintiff** [2] - 23:7, 25:16
**Plaintiffs** [1] - 1:3
**plaintiffs** [17] - 3:8, 3:20, 3:22, 3:25, 6:2, 13:12, 18:21, 25:10, 31:16, 35:25, 56:8, 56:12, 80:19, 80:24, 83:5, 83:18, 84:9
**PLAINTIFFS** [1] - 1:11
**plaintiffs'** [11] - 8:10, 9:3, 35:1, 35:19, 35:22, 38:6, 39:8, 39:10, 73:19, 82:23, 88:22
**plan** [2] - 33:6, 33:11
**players** [1] - 91:14

**pleadings** [2] - 23:14, 29:12
**Pleasant** [1] - 1:20
**pleasure** [1] - 26:13
**plenty** [1] - 11:10
**PLLC** [1] - 1:15
**plus** [1] - 20:15
**pocket** [1] - 72:13
**podium** [2] - 3:5, 3:18
**point** [28] - 10:7, 21:1, 21:7, 27:8, 36:5, 36:6, 37:22, 51:23, 58:6, 59:15, 65:18, 65:19, 65:20, 65:21, 66:7, 66:8, 66:11, 66:12, 66:22, 67:4, 67:9, 67:12, 67:18, 68:8, 68:20, 79:7, 79:12, 81:14
**pointed** [4] - 75:13, 83:23, 85:18, 85:19
**pointing** [1] - 93:2
**points** [5] - 51:25, 61:4, 78:10, 84:14, 84:18
**policy** [1] - 33:13
**portfolio** [1] - 89:6
**portion** [2] - 13:23, 62:4
**position** [13] - 23:10, 35:2, 35:6, 38:13, 39:7, 51:11, 53:14, 76:10, 76:13, 81:22, 83:3, 84:8, 84:9
**positions** [3] - 9:14, 34:22, 51:6
**possesses** [1] - 66:5
**possible** [4] - 14:20, 30:25, 53:8, 88:25
**possibly** [1] - 81:24
**potential** [3] - 13:9, 52:25, 65:7
**practical** [5] - 62:10, 62:23, 63:3, 63:9, 63:13
**practice** [4] - 23:3, 89:6, 89:8, 93:24
**Practices** [1] - 27:19
**practices** [1] - 23:13
**preceding** [1] - 36:18
**precisely** [3] - 51:3, 65:19, 75:10
**prefer** [1] - 72:16
**preferable** [1] - 39:7
**preferred** [1] - 80:6
**prefers** [1] - 29:7
**prejudge** [1] - 7:25
**prejudging** [1] - 92:4
**preliminarily** [1] - 9:15
**preliminary** [2] - 8:10,

12:14
**PRESENT** [1] - 2:10
**present** [4] - 9:14, 9:20, 27:22, 46:18
**presentation** [1] - 91:4
**presentations** [2] - 4:11, 93:13
**presented** [1] - 49:1
**preserves** [1] - 22:21
**presided** [1] - 15:9
**press** [1] - 19:20
**presume** [1] - 45:3
**presumption** [1] - 92:15
**presumptions** [1] - 45:2
**presumptively** [2] - 45:7, 45:8
**presumptuous** [1] - 58:4
**pretty** [5] - 76:25, 77:2, 77:3, 80:5, 92:8
**prevailing** [1] - 72:14
**prevent** [1] - 92:19
**previous** [1] - 14:20
**previously** [1] - 25:24
**primary** [2] - 27:12, 36:24
**principal** [1] - 67:9
**principle** [4] - 31:11, 33:14, 52:14, 80:4
**principles** [1] - 35:23
**private** [1] - 26:23
**PRO** [1] - 2:7
**pro** [15] - 17:24, 19:17, 20:17, 24:21, 33:2, 33:7, 38:9, 39:12, 51:10, 51:13, 51:16, 51:18, 54:3, 59:25, 66:14
**problem** [6] - 5:19, 36:24, 37:4, 41:13, 53:9, 54:12
**problematic** [1] - 39:15
**problems** [2] - 37:1, 58:21
**procedural** [1] - 32:9
**procedurally** [1] - 9:16
**Procedure** [2] - 14:19, 39:18
**proceed** [4] - 24:21, 35:9, 35:14, 61:16
**proceeding** [1] - 95:15
**proceedings** [4] - 7:22, 8:25, 34:15, 95:19
**Proceedings** [1] -

2:21
**proceeds** [1] - 51:17
**process** [17] - 8:11, 11:21, 12:4, 12:13, 17:13, 18:2, 21:14, 37:17, 37:18, 39:5, 53:18, 55:16, 55:17, 63:16, 64:7, 64:14, 75:16
**produce** [2] - 18:21, 37:12
**produced** [1] - 2:21
**product** [2] - 13:5, 32:20
**production** [1] - 47:4
**Professor** [5] - 41:6, 66:9, 74:18, 89:25
**profit** [6] - 34:14, 48:16, 48:18, 48:21, 48:22
**PROGRAM** [1] - 1:3
**program** [1] - 22:2
**Program** [7] - 2:12, 3:3, 4:15, 11:6, 11:9, 24:1, 24:9
**programs** [1] - 11:2
**projected** [1] - 89:21
**promote** [1] - 33:21
**promoting** [1] - 72:22
**proper** [1] - 47:11
**properly** [2] - 4:24, 8:14
**properties** [1] - 48:7
**proposal** [3] - 31:18, 31:19, 32:2
**proposed** [6] - 22:11, 30:22, 39:20, 40:4, 40:11, 73:2
**prosecution** [2] - 57:8, 72:22
**proud** [2] - 22:13, 91:10
**prove** [1] - 56:21
**provide** [7] - 24:18, 27:16, 32:24, 33:19, 41:16, 73:11, 75:24
**provided** [10] - 8:9, 13:7, 23:15, 29:13, 31:7, 31:18, 40:10, 75:13, 76:14, 80:24
**provides** [1] - 32:23
**providing** [3] - 7:19, 18:19, 25:13
**Public** [1] - 14:1
**public** [25] - 7:19, 8:24, 12:8, 12:22, 13:19, 16:22, 17:10, 18:6, 19:20, 22:16, 23:4, 23:6, 24:24, 27:15, 27:24, 32:11,

33:18, 33:21, 34:2, 34:10, 34:11, 38:18, 39:1, 44:10, 94:5
**public's** [1] - 17:12
**public-interest** [1] - 27:24
**publication** [1] - 12:19
**published** [2] - 11:11, 86:13
**publisher** [1] - 27:5
**pure** [1] - 56:16
**purpose** [1] - 18:24
**purposely** [1] - 46:17
**pursuant** [1] - 69:19
**put** [10] - 5:8, 15:21, 17:10, 28:1, 43:24, 44:1, 60:18, 89:10, 89:12, 94:12
**puts** [1] - 23:2
**putting** [1] - 59:9
**puzzle** [1] - 29:6

## Q

**qualified** [1] - 14:16
**qualifies** [1] - 59:10
**quality** [1] - 91:10
**quarrel** [1] - 73:3
**quarrelling** [1] - 72:24, 73:2
**quarter** [4] - 41:4, 41:6, 43:18, 48:15
**quarterly** [2] - 16:25, 37:23
**quarters** [1] - 48:18
**questions** [29] - 9:14, 10:14, 13:1, 29:20, 30:10, 35:22, 40:14, 50:16, 53:8, 55:24, 59:1, 60:10, 61:10, 62:7, 62:15, 62:23, 63:3, 63:10, 63:13, 68:21, 72:4, 76:7, 76:19, 80:3, 81:13, 81:20, 82:18, 90:16, 93:1
**quickly** [2] - 88:25, 89:9
**quill** [1] - 94:14
**Quimby** [1] - 79:15
**quite** [8] - 4:19, 41:13, 74:24, 86:6, 88:4, 88:23, 89:15, 92:17
**quote** [3] - 17:10, 33:18, 39:20

## R

**rabble** [1] - 19:18
**rabble-rousers** [1] -

19:18
**raised** [8] - 35:22, 56:1, 56:2, 56:3, 65:16, 76:7, 78:2, 80:18
**raises** [1] - 75:8
**range** [4] - 74:18, 74:21, 74:22, 76:18
**ranges** [1] - 84:2
**rata** [12] - 17:24, 33:2, 33:7, 38:9, 39:12, 51:10, 51:13, 51:16, 51:18, 54:3, 59:25, 66:14
**rate** [4] - 29:17, 56:21, 56:22, 62:3
**rates** [8] - 23:21, 25:22, 40:25, 41:8, 78:4, 81:1, 81:2, 81:8
**rather** [4] - 25:19, 34:24, 41:14
**re** [1] - 34:14
**re-sell** [1] - 34:14
**reach** [3] - 8:3, 14:17, 62:21
**reached** [2] - 8:1, 8:15
**reaches** [1] - 49:15
**read** [17] - 6:18, 7:14, 7:24, 21:15, 40:13, 46:1, 49:23, 50:1, 59:9, 59:10, 60:11, 68:6, 77:6, 82:24, 85:19, 91:25
**reading** [4] - 6:13, 20:23, 95:4, 95:6
**real** [2] - 54:10, 54:12
**real-world** [2] - 54:10, 54:12
**realistic** [1] - 13:21
**realize** [1] - 44:5
**really** [14] - 18:16, 20:8, 29:5, 43:20, 55:22, 58:25, 60:17, 66:16, 67:13, 69:12, 79:4, 82:13, 92:25, 95:11
**reason** [9] - 32:19, 32:21, 40:21, 56:5, 57:3, 58:3, 67:11, 72:18, 79:15
**reasonable** [14] - 12:16, 30:23, 31:4, 34:24, 40:5, 40:25, 75:18, 76:12, 78:16, 80:15, 83:3, 83:8, 86:6, 88:13
**reasonableness** [2] - 76:18, 80:17
**reasoning** [2] - 6:10,

7:16
**reasons** [3] - 72:17, 79:5, 90:9
**receive** [6] - 17:23, 25:18, 28:19, 38:9, 46:7, 87:7
**received** [13] - 20:6, 23:12, 25:16, 55:12, 55:17, 55:18, 55:19, 62:11, 69:14, 70:5, 70:10, 70:14, 70:20
**receives** [1] - 34:5
**recent** [1] - 42:3
**recess** [1] - 61:21
**reciting** [1] - 90:19
**recognition** [1] - 25:4
**recognize** [1] - 10:4
**recognized** [3] - 72:11, 72:17, 81:6
**recognizes** [1] - 33:23
**recognizing** [1] - 32:5
**recommend** [1] - 92:1
**recommendation** [1] - 77:14
**recommended** [1] - 88:9
**record** [9] - 3:6, 6:25, 32:1, 44:10, 60:19, 62:17, 79:25, 80:1, 83:17
**records** [7] - 15:6, 17:11, 27:4, 29:14, 33:13, 48:9, 58:20
**recounted** [1] - 63:8
**recoup** [1] - 67:16
**recover** [1] - 89:23
**recovered** [1] - 43:18
**recoveries** [1] - 89:15
**recovery** [6] - 32:24, 73:24, 74:17, 84:24, 88:7, 89:4
**red** [1] - 91:6
**reduce** [1] - 41:10
**reduced** [1] - 83:1
**reduction** [1] - 83:21
**refer** [2] - 4:17, 60:23
**reference** [3] - 65:13, 65:15, 86:2
**referring** [1] - 81:9
**reflect** [1] - 25:8
**reflected** [2] - 25:23, 33:10
**reform** [2] - 13:21, 18:7
**refunds** [1] - 59:6
**regard** [1] - 43:13
**regarded** [1] - 88:23
**regarding** [3] - 36:17, 38:25, 48:7
**regularly** [1] - 22:23

**Rehnquist** [1] - 94:9

**reimburse** [4] - 17:18, 37:10, 52:11, 58:19

**reimbursed** [11] - 17:21, 37:8, 37:13, 37:17, 37:20, 38:18, 38:22, 39:3, 53:3, 53:24, 66:2

**reimbursement** [5] - 46:6, 52:1, 52:18, 65:7, 67:15

**reimbursing** [1] - 87:7

**rejected** [5] - 6:4, 6:16, 15:23, 91:21, 92:19

**rejects** [1] - 92:8

**related** [2] - 25:3, 68:2

**relation** [1] - 35:1

**relative** [3] - 13:11, 31:20, 38:23

**relatively** [1] - 65:19

**relevant** [4] - 6:10, 8:4, 61:2, 88:4

**reliance** [1] - 91:19

**relied** [1] - 77:24

**relief** [6] - 13:7, 14:19, 15:3, 31:18, 33:3, 40:10

**rely** [4] - 27:6, 27:15, 87:3, 87:12

**remainder** [1] - 17:23

**remaining** [2] - 17:24, 33:1

**remand** [2] - 8:4, 13:10

**remarks** [3] - 9:5, 32:8, 60:21

**remedied** [1] - 80:22

**remember** [1] - 46:13

**remind** [1] - 49:4

**reminds** [1] - 28:22

**remotely** [5] - 10:2, 10:3, 10:6, 36:20, 91:8

**RENEE** [1] - 2:11

**Renee** [3] - 11:7, 23:25, 24:7

**reopen** [2] - 68:9, 68:11

**reply** [8] - 43:23, 44:1, 44:3, 51:12, 52:5, 80:22, 83:6, 93:4

**report** [1] - 34:14

**reported** [1] - 2:21

**reporter** [2] - 22:5, 44:14

**Reporter** [3] - 2:15, 2:16, 95:25

**Reporting** [1] - 27:18

**reports** [1] - 76:15

**represent** [4] - 21:9, 24:12, 26:25, 27:14

**representation** [4] - 24:18, 24:22, 27:16, 30:14

**representative** [2] - 26:17, 87:6

**representatives** [10] - 10:1, 10:19, 13:2, 19:1, 21:19, 51:22, 56:5, 57:17, 69:7, 73:11

**Representatives** [1] - 18:10

**representatives'** [1] - 58:1

**represented** [3] - 6:3, 13:3, 40:9

**represents** [1] - 24:16

**Republic** [8] - 42:3, 45:3, 77:5, 77:8, 79:7, 79:10, 80:9, 86:3

**request** [3] - 82:23, 90:10, 93:5

**requested** [5] - 28:7, 29:19, 78:16, 80:15, 81:1

**requesting** [6] - 41:11, 74:14, 74:16, 75:7, 76:17, 84:11

**requests** [1] - 22:12

**require** [1] - 42:23

**required** [4] - 17:11, 44:3, 78:8, 80:12

**requirement** [1] - 68:10

**requirements** [2] - 31:10, 36:23

**requires** [3] - 39:18, 77:10, 86:4

**research** [4] - 22:24, 24:19, 37:25, 60:25

**researching** [2] - 25:1, 48:9

**resolution** [1] - 72:22

**resolve** [2] - 53:8, 54:11

**resources** [4] - 27:25, 28:4, 31:14, 35:13

**respect** [7] - 37:2, 39:5, 39:17, 45:2, 52:9, 52:18, 71:8, 71:13, 80:20, 84:15, 87:4, 90:3, 90:20

**respectfully** [1] - 90:4, 90:10

**respond** [2] - 9:10, 29:20

**responded** [1] - 19:22

**response** [9] - 35:21, 36:17, 43:3, 59:4, 60:5, 62:13, 65:16, 76:7, 80:2

**responses** [7] - 50:6, 50:19, 60:12, 60:15, 61:11, 62:22, 84:19

**responsibilities** [1] - 93:12

**rests** [1] - 57:5

**result** [6] - 14:8, 31:8, 33:11, 34:6, 75:1, 78:17

**resulted** [1] - 34:11

**results** [1] - 35:9

**retainer** [4] - 73:10, 73:16, 84:23, 84:24

**retire** [1] - 28:16

**retired** [5] - 4:18, 4:19, 4:21, 16:19, 28:22

**retirement** [2] - 28:21, 28:23

**retires** [1] - 94:19

**retiring** [2] - 28:11, 28:13

**reviewed** [4] - 8:8, 23:14, 29:11, 69:4

**revised** [1] - 8:10

**revolutionized** [1] - 93:23

**Rice** [7] - 1:19, 3:12, 3:20, 3:21, 10:11, 10:13, 10:16

**rights** [2] - 16:21, 43:13

**risk** [1] - 32:5

**risks** [5] - 13:8, 33:4, 35:8, 45:9, 91:10

**risky** [1] - 15:19

**Roberts** [1] - 94:9

**Robinson** [2] - 94:17, 95:3

**role** [1] - 91:2

**Rossman** [3] - 11:14, 26:7, 30:11

**ROSSMAN** [7] - 2:13, 26:9, 26:12, 28:14, 28:17, 29:2, 29:9

**roundly** [1] - 92:19

**rousers** [1] - 19:18

**route** [1] - 76:16

**RPR** [3] - 2:15, 95:18, 95:24

**Rubenstein** [4] - 43:22, 66:9, 88:4, 89:25

**rule** [1] - 66:3

**Rule** [13] - 12:23, 12:25, 36:23, 37:1, 39:18, 39:21, 39:24,

43:23, 44:3, 62:24, 63:6, 63:10, 85:19

**ruled** [1] - 16:1

**rules** [1] - 65:4

**ruling** [1] - 17:4

**rulings** [1] - 23:13

**run** [4] - 74:3, 75:6, 89:6, 89:15

**run-of-the-mill** [1] - 75:6

**Ryan** [1] - 11:4

## S

**S.B** [1] - 1:18

**SAINT** [1] - 95:18

**Saint** [2] - 2:15, 95:24

**SAINT-LOTH** [1] - 95:18

**Saint-Loth** [2] - 2:15, 95:24

**salary** [1] - 57:12

**satisfied** [1] - 30:6

**satisfy** [1] - 42:22

**Saturday** [1] - 29:7

**save** [1] - 31:13

**saw** [2] - 19:19, 85:5

**SC** [1] - 1:20

**scale** [1] - 85:25

**scenario** [2] - 54:21, 54:25

**schedule** [2] - 15:8, 36:4

**scheduling** [1] - 8:19

**scholarly** [1] - 92:8

**se** [3] - 19:17, 20:17, 24:21

**SE** [1] - 2:7

**second** [7] - 14:10, 32:23, 39:22, 47:6, 47:7, 63:5, 87:17

**secondly** [2] - 40:15, 62:19

**Section** [1] - 33:17

**secured** [1] - 17:2

**securities** [1] - 44:12

**security** [1] - 5:12

**see** [12] - 13:21, 20:20, 45:23, 48:5, 49:10, 51:23, 60:4, 63:22, 64:24, 69:23, 74:19, 78:11

**seek** [2] - 23:17, 52:1

**seeking** [2] - 15:4, 24:13

**seem** [1] - 8:2

**Segal** [1] - 4:20

**self** [1] - 17:14

**self-government** [1] - 17:14

**sell** [2] - 34:14, 91:5

**Senate** [2] - 18:17, 23:10

**send** [1] - 62:2

**senior** [1] - 28:24

**SENIOR** [1] - 1:9

**sense** [2] - 77:21, 89:3

**sent** [17] - 7:20, 7:21, 8:12, 55:10, 62:11, 62:13, 62:16, 63:14, 63:16, 64:3, 69:19, 70:14, 70:21, 70:23, 73:22, 85:8

**separate** [2] - 42:17, 43:2

**separately** [1] - 9:12

**September** [3] - 34:16, 36:17, 49:3

**serious** [1] - 36:25

**serve** [3] - 17:12, 28:3, 43:6

**served** [4] - 23:7, 26:21, 31:2, 51:19

**service** [17] - 10:20, 22:13, 23:17, 24:11, 24:14, 24:15, 27:13, 28:4, 28:7, 29:18, 35:20, 39:14, 56:4, 56:6, 58:2, 69:7, 92:20

**Services** [8] - 2:12, 3:3, 4:15, 11:6, 11:9, 24:1, 24:9, 26:20

**SERVICES** [1] - 1:3

**services** [8] - 4:24, 7:13, 7:19, 26:22, 27:14, 27:15, 27:24, 28:5

**set** [9] - 4:14, 6:25, 8:21, 9:2, 15:8, 27:5, 36:5, 76:23, 92:18

**sets** [1] - 8:1

**setting** [1] - 88:12

**settle** [3] - 11:25, 40:23, 89:9

**settled** [1] - 11:23

**settlement** [103] - 8:1, 8:6, 8:11, 8:19, 9:21, 11:4, 11:13, 11:19, 12:1, 12:5, 12:7, 12:23, 13:5, 13:6, 13:11, 13:13, 15:1, 15:3, 17:15, 17:17, 17:19, 19:2, 19:3, 19:19, 19:22, 21:11, 22:12, 25:7, 26:1, 26:3, 26:15, 28:16, 30:7, 30:19, 30:22, 30:24, 31:2, 31:4, 31:5, 31:8, 31:12,

31:15, 31:17, 32:2, 32:16, 32:20, 32:23, 34:4, 34:7, 34:18, 34:21, 34:23, 35:1, 35:3, 35:17, 36:1, 36:16, 36:25, 37:1, 37:2, 37:12, 38:10, 38:20, 38:25, 39:5, 39:6, 39:17, 39:19, 39:25, 40:20, 41:10, 44:13, 45:14, 46:8, 46:22, 48:20, 48:25, 49:7, 49:12, 49:13, 49:15, 52:8, 52:9, 53:9, 53:17, 53:23, 58:5, 59:6, 59:14, 59:15, 63:2, 67:6, 67:10, 68:5, 71:3, 75:2, 75:5, 75:6, 78:21, 83:15, 89:11, 91:10

**SETTLEMENT** [1] - 1:8

**settlements** [4] - 11:18, 57:5, 74:17, 74:20

**settling** [2] - 52:3, 66:24

**seven** [10] - 5:24, 6:23, 15:4, 17:16, 23:9, 23:20, 28:9, 29:16, 30:3, 94:22

**seven-year** [1] - 23:20

**shall** [3] - 4:24, 33:19, 95:21

**share** [3] - 17:24, 22:17, 46:23

**shifting** [2] - 72:11, 92:16

**shine** [1] - 16:8

**short** [1] - 47:25

**shorthand** [1] - 2:21

**show** [2] - 14:15, 76:15

**sic** [8] - 27:13, 29:15, 42:3, 47:16, 57:15, 58:24, 68:19, 85:3

**sic]** [1] - 48:21

**side** [4] - 9:13, 57:24, 58:7, 93:11

**sides** [3] - 32:21, 35:8, 93:13

**sides'** [1] - 6:16

**signatory** [1] - 95:22

**signed** [1] - 84:23

**significant** [3] - 32:14, 35:3, 93:20

**similar** [3] - 52:7, 77:2, 77:3

**single** [1] - 88:25

**sit** [1] - 5:15

**sitting** [1] - 79:17

**situation** [3] - 29:25, 78:22, 78:24

**situations** [1] - 80:11

**six** [4] - 7:1, 7:2, 7:5, 94:22

**size** [1] - 19:8

**slice** [1] - 56:24

**slightly** [3] - 76:25, 83:14, 84:2

**small** [5] - 34:18, 49:10, 49:17, 50:24, 51:20

**smaller** [2] - 34:3, 60:21

**smartest** [1] - 92:5

**so-called** [1] - 70:25

**society** [1] - 22:18

**solve** [1] - 58:21

**someone** [8] - 20:18, 21:1, 45:23, 53:7, 54:21, 64:1, 64:5, 64:18

**somewhere** [2] - 51:6, 62:17

**soon** [1] - 93:18

**sophisticated** [4] - 19:15, 37:6, 44:8, 91:14

**sorry** [3] - 11:9, 40:10, 92:11

**sort** [5] - 6:25, 46:5, 50:22, 58:22, 65:6

**sorts** [2] - 65:22, 65:24

**sounds** [2] - 58:21, 63:8

**sovereign** [1] - 14:23

**sparked** [1] - 18:6

**speaking** [3] - 4:11, 10:21, 49:22

**specific** [2] - 60:10, 66:8

**specifically** [4] - 24:25, 27:6, 83:21, 85:19

**speed** [1] - 47:5

**spell** [1] - 22:4

**spelled** [2] - 12:23, 24:8

**spend** [2] - 14:12, 24:25

**spending** [1] - 29:3

**spent** [12] - 25:11, 25:21, 25:23, 29:15, 37:16, 56:14, 56:23, 58:1, 58:12, 69:8, 88:22

**spilt** [1] - 75:9

**spurring** [1] - 16:10

**stacked** [1] - 18:5

**staff** [3] - 9:24, 11:5, 13:25

**staffs** [1] - 94:10

**stage** [3] - 4:14, 7:1, 9:22

**stages** [1] - 35:7

**stake** [1] - 19:16

**stakes** [1] - 17:9

**standard** [3] - 73:18, 74:16, 85:23

**standing** [4] - 33:13, 52:14, 60:12, 90:8

**standpoint** [1] - 75:19

**start** [7] - 9:3, 9:17, 9:23, 21:22, 72:5, 95:4, 95:5

**started** [5] - 5:7, 18:7, 94:8

**State** [2] - 7:9, 44:12

**state** [4] - 3:6, 24:19, 24:24, 61:18

**statement** [5] - 9:6, 9:8, 9:11, 36:19, 85:2

**statements** [3] - 11:20, 61:11, 90:5

**STATES** [3] - 1:1, 1:5, 1:9

**States** [9] - 3:4, 4:5, 4:17, 9:4, 15:9, 27:21, 31:16, 34:16, 81:17

**static** [1] - 2:19

**statistics** [1] - 21:4

**status** [1] - 25:15

**statute** [3] - 7:18, 33:17, 60:23

**statutes** [3] - 6:11, 27:17, 27:21

**statutory** [4] - 14:5, 32:13, 33:16, 72:12

**stenographic** [1] - 95:19

**step** [5] - 3:5, 10:10, 12:12, 12:20, 16:2

**still** [7] - 5:22, 14:17, 38:16, 48:13, 48:20, 82:19, 95:6

**stop** [2] - 54:9, 76:14

**story** [1] - 20:8

**straight** [1] - 75:19

**straightforward** [1] - 51:16

**strategy** [1] - 23:14

**streams** [1] - 65:25

**Street** [5] - 1:12, 1:16, 1:23, 2:4, 44:12

**strength** [1] - 35:1

**strike** [3] - 90:4, 90:8

**stripes** [1] - 19:13

**strong** [1] - 15:21

**stronger** [2] - 77:14, 82:3

**strongly** [3] - 25:7, 42:4, 80:11

**structure** [3] - 17:14, 51:19, 67:7

**Stuart** [2] - 11:14, 26:6

**STUART** [1] - 2:13

**study** [1] - 7:9

**Study** [1] - 7:10

**stuff** [6] - 5:9, 38:19, 44:4, 62:3, 62:5, 64:24

**subclass** [1] - 71:3

**subject** [4] - 2:18, 13:17, 52:16, 55:11

**submission** [3] - 43:21, 79:14, 80:19

**submissions** [1] - 44:7, 50:12

**submit** [3] - 54:19, 55:1, 55:15

**submitted** [7] - 9:6, 9:8, 46:14, 55:6, 55:9, 63:25, 90:2

**subpart** [1] - 85:20

**subsection** [1] - 40:2

**Subsection** [2] - 40:2, 40:3

**subsequent** [1] - 82:18

**subset** [2] - 66:21, 72:1

**substance** [2] - 63:20, 64:8

**substantial** [2] - 14:13, 19:10

**success** [1] - 73:14

**sue** [1] - 14:12

**sufficient** [3] - 45:7, 56:18, 83:16

**suggest** [2] - 42:15, 50:5

**suggested** [6] - 76:2, 80:11, 81:25, 83:9, 83:25, 84:4

**suggesting** [1] - 90:18

**suggests** [1] - 77:13

**suit** [1] - 16:21

**Suite** [2] - 1:12, 1:16

**sum** [1] - 35:25

**summary** [1] - 17:4

**super** [1] - 79:8

**supersedes** [1] - 85:8

**Supp** [2] - 6:9, 92:12

**supplemental** [1] - 43:21

**supplied** [1] - 80:22

**support** [14] - 11:3, 11:13, 11:19, 13:12, 13:22, 16:19, 21:11, 23:15, 25:7, 26:3, 26:14, 26:21, 29:13, 50:12

**supported** [1] - 65:21

**supporting** [3] - 43:22, 43:24, 84:10

**supports** [3] - 18:18, 22:11, 33:12

**suppose** [3] - 51:4, 62:1, 66:25

**supposed** [4] - 43:9, 43:24, 48:22

**Supreme** [16] - 39:15, 39:16, 43:12, 45:6, 51:12, 51:15, 57:6, 57:13, 66:19, 86:22, 86:24, 87:16, 87:19, 87:22, 88:2, 88:18

**surprise** [1] - 92:7

**surprised** [1] - 65:18

**surrounding** [1] - 13:24

**suspect** [1] - 30:1

**swaths** [1] - 17:10

**Swedish** [5] - 79:1, 80:8, 82:6, 86:16, 87:11

**swung** [1] - 16:13

**sympathy** [1] - 58:19

**system** [14] - 5:3, 5:19, 7:7, 7:12, 8:3, 14:9, 15:14, 15:15, 27:4, 72:23, 94:5, 94:18, 94:21

**system's** [1] - 34:12

## T

**table** [3] - 3:10, 10:8, 92:22

**talks** [1] - 85:20

**task** [1] - 30:21

**tax** [1] - 48:7

**TAYLOR** [3] - 1:11, 1:15, 3:23

**Taylor** [2] - 3:24, 10:8

**team** [1] - 22:3

**technologies** [1] - 94:2

**technology** [3] - 2:19, 7:14, 16:20

**tee** [2] - 57:21, 58:3

**teeing** [1] - 57:3

**telephone** [1] - 20:7

**telephonically** [1] - 2:18

**ten** [5] - 9:7, 47:14, 47:18, 48:2, 70:4
**tendency** [1] - 40:22
**terms** [9] - 28:6, 30:5, 34:25, 39:20, 40:11, 40:23, 53:22, 61:8, 82:20
**terrific** [1] - 94:7
**testament** [1] - 15:12
**text** [1] - 60:22
**thanking** [1] - 9:23
**THE** [133] - 1:1, 1:8, 1:11, 2:2, 3:2, 3:9, 3:14, 3:17, 4:6, 4:8, 4:13, 10:24, 18:12, 19:24, 20:1, 20:11, 20:14, 20:21, 21:15, 21:21, 21:25, 22:4, 22:8, 23:23, 24:2, 24:5, 26:5, 26:11, 28:12, 28:15, 28:24, 29:7, 30:11, 30:15, 36:3, 37:22, 39:22, 40:1, 40:4, 40:9, 40:17, 41:21, 41:24, 42:5, 43:10, 45:12, 45:17, 45:20, 45:25, 46:21, 47:1, 49:19, 50:17, 53:4, 53:10, 53:19, 53:22, 54:2, 54:7, 54:13, 55:21, 56:2, 56:6, 56:10, 56:16, 58:10, 59:2, 60:3, 60:10, 60:14, 61:13, 61:22, 63:12, 63:22, 64:10, 64:12, 64:15, 64:23, 65:2, 65:12, 66:7, 66:18, 66:21, 66:24, 67:17, 67:22, 67:24, 68:13, 68:17, 68:23, 69:18, 69:23, 70:6, 70:18, 71:2, 71:6, 71:8, 71:12, 71:18, 71:20, 71:22, 73:12, 73:14, 73:16, 74:8, 75:24, 76:2, 76:22, 77:6, 77:9, 77:13, 77:24, 78:20, 79:1, 79:9, 79:21, 81:20, 82:12, 84:7, 84:13, 85:1, 85:12, 85:15, 85:18, 86:24, 89:18, 90:7, 90:12, 90:23, 92:4, 92:11, 93:8, 95:14
**themselves** [3] - 39:11, 40:23, 42:22
**therefore** [5] - 2:18, 27:23, 27:25, 47:6, 58:18

**thinks** [1] - 66:13
**third** [7] - 12:20, 14:15, 53:24, 74:16, 84:23, 85:23, 86:1
**thoroughly** [1] - 21:16
**thoughtfully** [1] - 9:25
**thousands** [4] - 12:2, 19:9, 24:16, 63:15
**three** [6] - 12:12, 38:4, 38:16, 49:25, 56:7, 70:12
**three-step** [1] - 12:12
**threshold** [1] - 83:14
**throughout** [1] - 13:4
**Thursday** [1] - 95:6
**thwart** [1] - 13:18
**timely** [6] - 5:22, 36:16, 69:10, 70:8, 70:9, 71:10
**timing** [1] - 40:12
**today** [13] - 8:12, 10:2, 10:22, 11:10, 20:19, 21:13, 25:25, 30:18, 30:21, 31:23, 32:7, 50:4, 50:12
**toner** [1] - 47:19
**took** [3] - 4:21, 35:6, 84:17
**tool** [1] - 93:22
**tools** [3] - 75:22, 75:24, 93:4
**total** [2] - 39:5, 59:20
**toward** [1] - 87:15
**trained** [1] - 76:8
**transcript** [4] - 84:17, 95:19, 95:19, 95:21
**TRANSCRIPT** [1] - 1:8
**Transcript** [1] - 2:21
**transcription** [1] - 2:21
**transmission** [4] - 47:5, 47:7, 47:21
**transmit** [2] - 47:8, 47:9
**transmitting** [1] - 47:10
**transparency** [3] - 14:1, 21:8, 44:21
**treated** [1] - 67:2
**treatise** [1] - 66:10
**treatment** [2] - 51:15, 91:6
**treats** [4] - 13:11, 31:19, 37:2, 38:22
**trend** [1] - 87:15
**trial** [2] - 15:25, 35:15
**tried** [4] - 46:15, 50:18, 54:11, 70:21
**trips** [1] - 29:3
**true** [7] - 31:14, 52:14,

61:1, 66:5, 85:17, 95:18, 95:19
**truly** [1] - 18:16
**Trustees** [1] - 87:3, 91:20
**truth** [1] - 90:6
**try** [12] - 6:25, 11:19, 50:15, 53:7, 76:4, 84:16, 85:6, 86:8, 89:2, 89:3, 90:14, 93:17
**trying** [3] - 58:20, 61:18, 70:23
**Tucker** [4] - 52:14, 65:22, 66:6, 79:17
**turn** [4] - 26:11, 21:19, 35:14, 53:19, 55:25
**turning** [1] - 53:16
**two** [20] - 13:25, 20:19, 27:2, 28:22, 36:25, 40:13, 42:1, 47:13, 50:21, 51:6, 54:15, 54:17, 69:13, 69:16, 72:7, 73:8, 81:20, 82:18, 86:21, 88:16
**typical** [1] - 51:13
**typically** [1] - 34:13

**U**

**U.S** [6] - 2:3, 2:16, 4:2, 16:9, 23:10, 42:10
**U.S.C** [1] - 33:17
**ultimate** [1] - 35:24
**ultimately** [8] - 5:25, 71:15, 80:15, 80:23, 82:9, 83:1, 83:13, 88:20
**unanimously** [2] - 16:5, 17:3
**under** [11] - 6:10, 7:17, 12:25, 17:17, 27:17, 36:4, 56:18, 57:18, 61:8, 65:3, 66:6
**underrepresented** [1] - 21:9
**unenhanced** [1] - 45:8
**unfair** [3] - 38:20, 44:1, 67:10
**unfamiliar** [1] - 11:22
**unfettered** [1] - 22:21
**unfortunate** [1] - 39:9
**unique** [2] - 15:1, 25:8
**United** [9] - 3:4, 4:5, 4:17, 9:4, 15:9, 27:21, 31:16, 34:16, 81:17
**UNITED** [3] - 1:1, 1:5, 1:9

**universal** [1] - 21:11
**unlawful** [1] - 14:16
**unlawfully** [1] - 17:5
**unless** [8] - 9:15, 13:1, 55:24, 61:10, 61:16, 81:13, 92:25, 94:19
**unlike** [1] - 17:25
**unnecessary** [1] - 34:10
**unprecedented** [1] - 16:12
**unreasonable** [2] - 33:21, 66:1
**unreliable** [1] - 90:3
**untimely** [3] - 69:14, 69:15, 90:3
**unusual** [9] - 13:15, 14:24, 29:25, 33:9, 73:7, 74:2, 74:9, 74:24, 77:18
**up** [24] - 5:13, 8:2, 8:21, 9:4, 15:21, 16:18, 17:21, 32:24, 33:8, 34:5, 38:14, 43:3, 43:21, 44:17, 49:22, 56:11, 56:23, 57:3, 57:22, 58:3, 61:22, 65:10, 86:7, 94:24
**updated** [1] - 27:7
**updates** [1] - 23:12
**upheld** [1] - 32:10
**uploaded** [1] - 27:9
**upshot** [1] - 74:15
**USAO** [1] - 2:3
**useful** [1] - 6:25
**user** [2] - 34:5, 55:4
**users** [18] - 6:7, 8:3, 17:1, 17:18, 18:20, 34:3, 34:6, 34:13, 34:18, 34:21, 37:16, 46:5, 48:4, 48:24, 50:24, 51:20, 60:21, 67:13
**utilities** [1] - 27:2

**V**

**vacations** [1] - 29:2
**valid** [1] - 21:5
**valuable** [1] - 31:14
**value** [1] - 23:19
**values** [1] - 22:20
**Van** [1] - 88:19
**variety** [1] - 72:11
**vast** [3] - 17:18, 34:12, 43:5
**Vaughn** [1] - 86:11
**Vegas** [1] - 15:6
**versus** [10] - 3:4, 4:16,

42:18, 66:19, 72:1, 81:10, 81:17, 87:3, 88:19, 91:20
**veteran** [2] - 48:6, 58:20
**VETERANS** [1] - 1:2
**Veterans** [7] - 2:12, 3:3, 4:15, 11:5, 11:8, 23:25, 24:9
**veterans** [5] - 24:11, 24:13, 24:17, 24:21, 25:4
**veterans'** [1] - 25:2
**via** [4] - 2:18, 10:19, 11:7, 11:15
**videoconference** [1] - 2:18
**view** [2] - 57:17, 60:15, 82:18
**viewed** [1] - 56:16
**vigorously** [2] - 13:3, 32:6
**violated** [1] - 16:14
**violent** [1] - 7:11
**Virginia** [1] - 95:7
**virtually** [3] - 8:23, 27:20, 57:18
**vis-à-vis** [1] - 23:3
**void** [1] - 95:21
**volume** [1] - 27:5
**vs** [1] - 1:4

**W**

**wait** [2] - 45:18, 53:19
**waive** [1] - 48:13
**waiver** [3] - 14:23, 16:25, 61:4
**wake** [1] - 19:19
**Walker** [1] - 86:11
**wants** [1] - 9:7
**warranted** [2] - 78:11
**Washington** [5] - 1:6, 1:13, 1:16, 2:4, 48:9
**wealthy** [1] - 23:3
**Web** [1] - 7:12
**Web-based** [1] - 7:12
**website** [7] - 53:1, 53:5, 54:16, 54:19, 54:25, 63:18, 70:22
**Wednesdays** [1] - 94:23
**weird** [1] - 67:4
**Wessler** [4] - 1:12, 1:15, 3:24, 10:9
**whole** [10] - 19:17, 48:25, 49:8, 49:11, 49:12, 49:18, 51:23, 71:18, 92:5
**widespread** [3] -

13:18, 16:22, 18:6
**wife** [2] - 28:21, 29:7
**WILLIAM** [2] - 1:22, 2:10
**William** [1] - 4:3
**windfall** [2] - 43:16, 88:11
**wish** [4] - 19:2, 19:4, 19:5, 69:8
**witness** [1] - 88:8
**witnesses** [1] - 5:12
**wonder** [1] - 11:22
**word** [1] - 42:22
**words** [11] - 11:3, 11:18, 11:21, 13:14, 17:15, 21:20, 34:7, 42:6, 51:9, 57:2, 57:24
**works** [4] - 14:1, 22:19, 53:10, 59:17
**world** [2] - 54:10, 54:12
**world's** [3] - 19:14, 37:5
**worse** [1] - 24:15
**worth** [1] - 17:6
**wound** [1] - 5:13
**Wright** [1] - 66:9
**write** [2] - 58:5, 78:14
**written** [7] - 9:6, 9:8, 36:18, 46:1, 50:11, 50:12
**wrote** [2] - 6:9, 86:12

## Y

**year** [8] - 17:22, 23:10, 23:20, 24:17, 25:1, 28:11, 48:15, 82:7
**years** [20] - 8:4, 13:10, 14:13, 15:4, 17:16, 18:12, 18:13, 18:14, 23:9, 28:9, 28:22, 29:16, 29:23, 30:4, 37:9, 38:4, 61:1, 65:24, 88:22, 92:1
**yin** [1] - 8:12
**York** [2] - 29:5, 92:2
**you-all** [1] - 6:23

## Z

**zealous** [1] - 43:13
**zero** [5] - 55:17, 55:19, 59:8, 59:12, 73:17
**Zoom** [11] - 3:15, 10:3, 10:19, 11:7, 11:15, 23:25, 24:4, 26:13, 45:22, 49:21, 50:2