**2024-1757**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE, Plaintiffs-Appellees,

v.

UNITED STATES, Defendant-Appellee.

v.

ERIC ALAN ISAACSON, Interested Party-Appellant

_____

Appeal from the United States District Court
for the District of Columbia
in 1:16-cv-00745-PLF
The Honorable Paul L. Friedman

## CORRECTED APPELLANT'S OPENING BRIEF

ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858) 263-9581
Email: ericalanisaacson@icloud.com

*Pro Se Interested Party-Appellant*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 24-1757

**Short Case Caption** National Veterans Legal Services Prog. v. United State

**Filing Party/Entity** Eric Alan Isaacson, Interested Party-Appellant

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: July 16, 2024

Signature: /s/ Eric Alan Isaacson

Name: Eric Alan Isaacson

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| | ☑ None/Not Applicable | ☑ None/Not Applicable |
| Eric Alan Isaacson | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ...................................................... x

I.    JURISDICTION ........................................................................... 1

    A.    Jurisdiction in the District Court ............................................ 1

    B.    Appellate Jurisdiction ............................................................ 3

II.   ISSUES PRESENTED ................................................................... 4

III.  STATEMENT OF THE CASE ....................................................... 5

    A.    Early Proceedings in the District Court ................................. 5

    B.    Summary Judgment and Interlocutory Appeal ..................... 8

    C.    Settlement on Remand ........................................................ 10

    D.    Final Approval Opinion and Order ...................................... 11

IV.   SUMMARY OF ARGUMENT ..................................................... 12

V.    STANDARDS OF REVIEW ........................................................ 13

VI.   ARGUMENT ............................................................................. 17

    A.    The Little Tucker Act Divested the District Court of
        Jurisdiction Over Class Members Whose Claims
        Exceeded $10,000 Apiece ...................................................... 17

**Page**

  B. The Settlement's *Pro Rata* Allocation of Many Millions of Dollars to the Large PACER Users Who Were Fully Reimbursed by Their Clients or By Court Orders in Other Class Actions is Fundamentally Unfair ..................... 40

  C. The District Court Strayed from Precedent and Abused its Discretion by Accepting Class Counsel's Request for 19.1% of the Settlement Fund, Effectively Compensating Attorneys at Rates Approaching $5,000 an Hour ................................................................................. 47

  D. The Supreme Court's Foundational Common-Fund Precedents Prohibit Paying "Service Awards" to Representative Plaintiffs ....................................................... 67

VII. CONCLUSION ................................................................. 71

ADDENDUM ................................................................................. 72

| Docket Entry | Document | page |
|---|---|---|
| DE169 | Final Approval Opinion .............................. Appx0001 |  |
| DE170 | Final Judgment and Order ....................... Appx0049 |  |

# TABLE OF AUTHORITIES

## Cases

*Aerolineas Argentinas v. United States,*
    77 F.3d 1564 (Fed.Cir.1996)........................................................13

*Alaska Airlines v. Austin,*
    801 F.Supp. 760 (D.D.C.1992), *aff'd in part and*
    *rev'd in part on other grounds sub nom. Alaska Airlines v.*
    *Johnson,* 8 F.3d 791 (Fed.Cir.1993).........................28-29, 31, 34-35

*Alaska Airlines v. Johnson,*
    8 F.3d 791 (Fed.Cir.1993)...............................................31-32, 37-39

*Alyeska Pipeline Serv. Co. v. Wilderness Society,*
    421 U.S. 240 (1975)....................................................................49

*American Airlines v. Austin,*
    778 F.Supp. 72 (D.D.C.1991)........................................28-29, 31-33

*American Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011)....................................................................31

*American Pipe & Construction Co. v. Utah,*
    414 U.S. 538 (1974)....................................................................22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................23

*Barnett v. Equitable Trust Co.,*
    34 F.2d 916 (2d Cir.1929), *aff'd as modified sub nom.*
    *United States v. Equitable Trust Co.,* 283 U.S. 738 (1931)...........51

*Biodex Corp. v. Loredan Biomedical, Inc.,*
    946 F.2d 850 (Fed.Cir.1991).......................................................16

*Blum v. Stenson,*
    465 U.S. 886 (1984)....................................................................61

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)....................................................................49

*In re Broadwing, Inc. ERISA Litig.,*
    252 F.R.D. 369 (S.D. Ohio 2006)......................................................43

*Central Railroad & Banking Co. v. Pettus,*
    113 U.S. 116 (1885).......................................13, 49-51, 56, 62, 68-70

*Charles v. Rice,*
    28 F.3d 1312 (1st Cir.1994)..........................................................24

*China Agritech, Inc. v. Resh,*
    584 U.S. 732 (2018).......................................................................22

*Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,*
    908 F.2d 951 (Fed.Cir.1990).........................................................16

*Chula Vista City School District v. Bennett,*
    824 F.2d 1573 (Fed.Cir.1987).................................2-3, 17-18, 21, 40

*Ciapessoni v. United States,*
    145 Fed.Cl. 564 (2019).................................................................43

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n,*
    357 F.3d 1294 (Fed.Cir.2004).......................................................39

*Crown, Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983).......................................................................22

*DeCastro v. City of New York,*
    No. 16-cv-3850 (RA), 2017 WL 4386372
    (S.D.N.Y. Sept. 30, 2017).............................................................42

*Democratic Central Committee of D.C. v. Washington*
    *Metropolitan Area Transit Comm'n,*
    3 F.3d 1568 (D.C.Cir.1993).....................................................57-59

*Devlin v. Scardelletti,*
    536 U.S. 1 (2002)............................................................................3

*Drazen v. Pinto,*
    101 F.4th 1223 (11th Cir.2024)...............................................14-15

*Eccles v. United States,*
    396 F.Supp. 792 (D.N.D.1975)......................................................27

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,*
  62 F.4th 704 (2023)..........................................................56, 62, 69-70

*Fischel v. Equitable Life Assur. Soc'y,*
  307 F.3d 997 (9th Cir.2002)..........................................................63

*Franklin v. United States,*
  308 U.S. 516 (1939)........................................................................19

*Glaskin v. Klass,*
  996 F.Supp. 67 (D.Mass.1998)........................................................25

*Godson v. Eltman, Eltman, & Cooper, P.C.,*
  328 F.R.D. 35 (W.D.N.Y.2018)...................................................42-43

*Gottlieb v. Barry,*
  43 F.3d 474 (10th Cir.1994).............................................................58

*Goldberger v. Integrated Resources, Inc.,*
  209 F.3d 43 (2d Cir.2000).................................................................58

*Graham v. Henegar,*
  640 F.2d 732 (6th Cir.1981).........................................................19-20

*Haggart v. Woodley,*
  809 F.3d 1336 (Fed.Cir.2016).................13-14, 49, 51-53, 56-57, 60

*Hallmark v. Cohen & Slamowitz, LLP,*
  378 F.Supp.3d 222 (W.D.N.Y.2019)...............................................42

*Harrison v. Perea,*
  168 U.S. 311 (1897)..........................................................................51

*Health Republic Ins. Co. v. United States,*
  58 F.4th 1365 (Fed.Cir.2023)........12, 14-15, 48-49, 53-56, 58, 60-61

*Heisig v. United States,*
  719 F.2d 1153 (Fed.Cir.1983)..........................................................16

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
  572 U.S. 559 (2014).........................................................................14

*Hyland v. Navient Corp.,*
  48 F.4th 110 (2d Cir.2022)........................................................69-70

*Insurance Co. of N. Am. v. United States,*
   561 F.Supp. 106 (E.D.Pa.1983)..................................................25-26

*International Custom Products v. United States,*
   467 F.3d 1324 (Fed.Cir.2006).........................................................13

*Johnson v. NPAS Solutions,*
   975 F.3d 1244 (11th Cir.2020),
   *reh'g denied,* 43 F.4th 1138 (11th Cir.2022).................13, 15, 69-70

*Knight v. United States,*
   982 F.2d 1573 (Fed.Cir.1993)........................................................49

*McMichael v. United States,*
   63 F.Supp. 598 (N.D.Ala.1945).....................................................19

*Melito v. Experian Mktg. Sols. Inc.,*
   923 F.3d 85 (2d Cir.2019)........................................................69-70

*Moore v. United States,*
   63 Fed.Cl. 781 (2005), *overruled by*
   *Haggart v. Woodley,* 809 F.3d 1336 (Fed.Cir.2016).......................57

*Moses v. N.Y. Times Co.,*
   79 F.4th 235 (2d Cir.2023)............................................................70

*NVLSP v. United States,*
   968 F.3d 1340 (Fed.Cir.2020)...................................................x, 8-9

*Otis Elevator Co. v. United States,*
   18 F.Supp. 87 (S.D.N.Y.1937).......................................................19

*Perdue v. Kenny A. ex rel. Winn,*
   559 U.S. 542 (2010).......................................................51-52, 56, 63

*Rawlings v. Prudential-Bache Properties, Inc.,*
   9 F.3d 513 (6th Cir.1993)..............................................................59

*Simanonok v. Simanonok,*
   918 F.2d 947 (Fed.Cir.1990)..........................................1, 18-19, 24

*Skaar v. McDonough,*
   48 F.4th 1323 (Fed.Cir.2022)....................................................2, 18

*Smith v. Orr,*
   855 F.2d 1544 (Fed.Cir.1988)................................................1, 17, 24

*Standard Fire Ins. Co. v. Knowles,*
   568 U.S. 588 (2013)................................................................67

*Sutcliffe Storage and Warehouse Co. v. United States,*
   162 F.2d 849 (4th Cir.1947)....................................................27

*Swedish Hospital Corp. v. Shalala,*
   1 F.3d 1261 (D.C. Cir.1993)..............................................57-59

*Terry v. Principi,*
   367 F.3d 1291 (Fed.Cir.2004)................................................39

*Textile Productions, Inc. v. Mead Corp.,*
   134 F.3d 1481 (Fed.Cir.1998)................................................22

*Trustees v. Greenough,*
   105 U.S. 527 (1882)..................................13, 49-51, 56, 59, 61, 67-70

*United States v. Bormes,*
   568 U.S. 6 (2012).............................................................1-2, 4, 17

*United States v. Equitable Trust Co.,*
   283 U.S. 738 (1931)........................................................51, 56

*United States v. Hohri,*
   482 U.S. 64 (1987)..........................................................1, 4, 17

*United States v. Lindberg Corp.,*
   882 F.2d 1158 (7th Cir.1989)............................................24-25

*United States v. Lindberg Corp.,*
   686 F.Supp. 701 (E.D.Wis.1987), *aff'd,*
   882 F.2d 1158 (7th Cir.1989)................................................25

*United States v. Louisville & Nashville R.R. Co.,*
   221 F.2d 698 (6th Cir.1955)............................................28-31, 33

*United States v. One (1) 1979 Cadillac Coupe DeVille,*
   833 F.2d 994 (Fed.Cir.1987)..............................................16

*United States v. Sherwood,*
    312 U.S. 584 (1941).......................................................................19

*United States v. 255.21 Acres in Anne Arundel County,*
    722 F.Supp. 235 (D.Md.1989)....................................................27

*United States v. Will,*
    449 U.S. 200 (1980).......................................................................2

*Washington v. Udall,*
    417 F.2d 1310 (9th Cir.1969)................................................26-27

*Watson's Estate v. Blumenthal,*
    586 F.2d 925 (2d Cir.1978)..........................................................25

*In re WPPSS Litig.,*
    19 F.3d 1291 (9th Cir.1994)....................................................58-59

**Statutes**

5 U.S.C. §702.................................................................................32, 36

28 U.S.C. §1295(a)(2)......................................................................4, 15

28 U.S.C. §1913 note...................................................................4-5, 45

28 U.S.C. §1331.............................................................................1, 32

28 U.S.C. §1346(a).............................................................................1

28 U.S.C. §1346(a)(2)..........................................................1, 5, 17, 37

28 U.S.C. §1491(a)(1).........................................................................17

28 U.S.C. §2412...................................................................................7

31 U.S.C. §3726(b).............................................................................38

**Rules**

Fed.R.Civ.P. 23...............................................................................15

Fed.R.Civ.P. 23(b)(3).......................................................................14

Fed.R.Civ.P. 23(e)(2)..............................................................40

Fed.R.Civ.P. 23(e)(2)(C).......................................................41

Fed.R.Civ.P. 23(e)(2)(D).......................................................41

Fed.R.Civ.P. 23(h)................................................................56

## Secondary Authorities

John P. Dawson,
  *Lawyers and Involuntary Clients: Attorney Fees from Funds,*
  87 Harv.L.Rev. 1597 (1974)..............................................50

Barbara J. Rothstein & Thomas E. Willging,
  *Managing Class Action Litigation: A Pocket Guide for Judges*
  (Federal Judicial Center, 2005).......................................43

U.S. D.O.J.,
  *Justice Manual: Civil Resource Manual* §47
  (updated Sept. 2013), *available online at*
  https://www.justice.gov/jm/civil-resource-manual-47-court-federal-
  claims-litigation *and at* https://bit.ly/DOJcrm47 *and at*
  https://perma.cc/7ADZ-35CP ........................................19

## Legislative Materials

S.Rep.107–174, 107th Cong., 2d Sess. 23 (2002)................................5, 44

## Other Materials

Brief for Respondents to Whom Allowances Were Made,
  *United States v. Equitable Trust,* 283 U.S. 738
  [Oct. Term 1929 No. 530] (filed April 16, 1930)............................51

Transcript of Record, *Trustees v. Greenough,*
  [Oct. Term 1881 No. 601]................................................59

## STATEMENT OF RELATED CASES

This case is a class action filed by three nonprofit organizations, the National Veterans Legal Services Program (NVLSP), National Consumer Law Center (NCLC), and Alliance for Justice (ALJ), that has previously been before this Court on interlocutory cross-appeals limited to review of a summary-judgment order and accompanying opinion, Appx0388(DE88) (summary-judgment order); Appx0389-0431(DE89) (memorandum opinion), which the U.S. District Court for the District of Columbia certified for interlocutory appeal under 28 U.S.C. §1292(b), *see* Appx0431-0432(DE104) (§1292(b) certification); Appx0433-0440(DE105) (§1292(b) memorandum opinion on §1292(b) certification).[1] This Court granted the parties' motions for permission to appeal. Appx0441-0443(DE107).

The cross appeals were docketed in this Court as *National Veterans Legal Services Program, et al. v. United States,* Nos. 2018-154 & 2018-155 (petitions for leave to appeal), 2019-1081 & 2019-1083 (cross appeals). A panel of this Court consisting of Judges Alan David Lourie, Raymond C. Clevenger, and Todd M. Hughes, decided the cross appeals in a published opinion filed August 6, 2020, and reported as *NVLSP v. United States,* 968 F.3d 1340 (Fed.Cir.2020).

---

[1] Parenthetical references to "DE__" represent the Docket Entry numbers of cited documents on the District Court docket. Page numbers or paragraph numbers within them follow a colon.

- x -

A member of the Class, Michael T. Pines, on December 16, 2021, filed a notice of appeal Appx0460(DE132) to the U.S. Court of Appeals for the District of Columbia Circuit, seeking review of an order of the District Court Appx0450-0459(DE130), denying his motion to intervene. The Pines appeal was docketed by the D.C. Circuit as No.21-5291. It was dismissed for lack of prosecution, by order of the Clerk of the Court, on November 14, 2022. Appx0461-0462(DE143).

# I.    JURISDICTION

## A.    Jurisdiction in the District Court

The District Court was alleged to have subject-matter jurisdiction "under 28 U.S.C. §1331 and the Little Tucker Act, 28 U.S.C. §1346(a)," Appx0110(DE1:4¶5), which authorizes federal district court to exercise jurisdiction over a "civil action or claim against the United States, not exceeding $10,000 in amount." 28 U.S.C. §1346(a)(2); *see United States v. Bormes,* 568 U.S. 6, 10 (2012); *United States v. Hohri,* 482 U.S. 64, 66-67 n.1 (1987).

Even if Little Tucker Act claims as initially pleaded comply with the $10,000 limitation, a district court loses jurisdiction if, over the course of the litigation, they eventually come to exceed $10,000. For "the question is settled—district courts lose their Little Tucker Act jurisdiction once the amount claimed accrues to more than $10,000, even though jurisdiction was previously proper in the district court." *Simanonok v. Simanonok,* 918 F.2d 947, 950-51 (Fed.Cir.1990); *see, e.g., Smith v. Orr,* 855 F.2d 1544, 1552-53 (Fed.Cir.1988).

A class action complies with the Little Tucker Act's jurisdictional limitation only if, throughout the litigation, "the 'claims of individual

members of the clas[s] do not exceed $10,000' apiece." *Bormes,* 568 U.S. at 10 n.1 (quoting *United States v. Will,* 449 U.S. 200, 211 n.10 (1980)). This Court accordingly holds that "[t]he claim of each member of the class must be examined separately to determine whether it meets the jurisdictional requirement," and that any class member for whom complete relief would total over $10,000 must be "dismissed for lack of jurisdiction." *Chula Vista City School District v. Bennett,* 824 F.2d 1573, 1579 (Fed.Cir.1987); *see Skaar v. McDonough,* 48 F.4th 1323, 1332 (Fed.Cir.2022)(citing and parenthetically quoting *Chula Vista*).

The District Court ignored these requirements. Its judgment approving the class-action Settlement in this case fails to exclude from the Settlement all individual Class Members whose claims came to more than $10,000. Most Class Members are short-term small-time users whose Class Period PACER billings totaled less than $350 apiece. Yet many are users whose Class Period PACER expenditures, reimbursed or not, run into the thousands of dollars. A significant number are large law firms, whose Class Period PACER expenditures run into the tens of thousands, or even hundreds of thousands, of dollars. But the District Court did nothing to exclude from this litigation, and from the Settlement

of this case, PACER's heaviest users—including large law firms and class-action lawyers—whose PACER payments for billings over the eight-year Class Period ran into very large amounts and produced claims exceeding the Little Tucker Act's $10,000 jurisdictional maximum. The Little Tucker Act bars jurisdiction over those Class Members' claims, requiring them to be excluded from the Settlement and "dismissed for lack of jurisdiction." *Chula Vista,* 824 F.2d at 1579.

## B.    Appellate Jurisdiction

The District Court entered both its Opinion approving the settlement of this matter, Appx0001-0048(DE169) and its Final Judgment and Order on Final Approval of Class Action Settlement, Attorney's Fees, Costs, and Service Awards, Appx0049-0080(DE170), on March 20, 2024, thereby finally disposing of all claims asserted below. *See* Appx0001-0048(DE169); Appx0049-0080(DE170).

Objector-Appellant Eric Alan Isaacson, a member of the class who timely objected below, and who is bound by the judgment below, filed a timely notice of appeal on April 18, 2024, Appx1013(DE173), thereby exercising his right to appeal under *Devlin v. Scardelletti,* 536 U.S. 1, 14 (2002).

-3-

"[T]he Federal Circuit ... has exclusive jurisdiction 'of an appeal from a final decision of a district court of the United States ... if the jurisdiction of that court was based, in whole or in part, on' the Little Tucker Act." *Bormes,* 568 U.S. at 9 (quoting 28 U.S.C. §1295(a)(2)); *see Hohri,* 482 U.S. at 68-76.

## II.   ISSUES PRESENTED

Did the District Court err by including in the Settlement Class PACER users whose individual expenditures and resulting claims for the eight-year Class Period exceed the Little Tucker Act's $10,000 jurisdictional maximum?

Did the District Court err by approving the Settlement as fair, reasonable, and adequate, when Class Members with some of the largest Class Period PACER expenditures—including large law firms and class-action lawyers—already have been reimbursed for their Class Period PACER expenditures by their clients or through court orders in other class actions?

Did the District Court abuse its discretion by awarding Class Counsel attorney's fees in the amount of $23,863,345.02?

Did the District Court err by focusing on the claimed reasonableness of Class Counsel's request for a $23,863,345.02 fee, rather than starting with its own independent analysis to determine the reasonable attorney's fee award?

Did the District Court err by awarding the three Named Plaintiffs "service awards" or "incentive payments" of $10,000 apiece as compensation for their service as class representatives?

## III.  STATEMENT OF THE CASE

### A.    Early Proceedings in the District Court

Named Plaintiffs filed a class-action Complaint on April 21, 2016, Appx0107-0121(DE1), alleging jurisdiction under the Little Tucker Act, 28 U.S.C. §1346(a)(2). Appx0110(DE1:4¶5) & Appx0120(DE1:14¶33).

The Named Plaintiffs asserted the Administrative Office of the U.S. Courts ["AO"] has been overbilling for access to documents on PACER that Congress determined should be made "freely available to the greatest extent possible." Appx0107(DE1:1) & Appx0112(DE1:6¶12) (both quoting S.Rep.107–174, 107th Cong., 2d Sess. 23 (2002)). In fact, the E-Government Act of 2002 authorizes PACER fees "as a charge for services rendered," but "only to the extent necessary" "to reimburse

-5-

expenses in providing these services." Appx0107(DE1:1) & Appx0112(DE1:6¶12) (both quoting 28 U.S.C. §1913 note).

The Named Plaintiffs alleged that the Government has been violating the legislative mandate by charging excessive fees, proceeds from which are diverted to improper uses, and that "noncompliance with the E-Government Act has inhibited public understanding of the courts and thwarted equal access to justice." Appx0108(DE1:2). They asserted that "the AO has further compounded those harms by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who cannot afford to pay the fees." Appx0108(DE1:2).

Challenging the government's overall fee structure and use of funds, they asked the District Court more "to determine that the PACER fee schedule violates the E-Government Act and to award them a full recovery of past overcharges." Appx0108(DE1:2). They asked the District Court to "[a]ward monetary relief for any PACER fees collected by the defendant in the past six years that are found to exceed the amount authorized by law," and also to "[a]ward the plaintiffs their costs,

-6-

expenses, and attorney's fees under 28 U.S.C. §2412 and/or from a common fund." Appx0121(DE1:15).

The Government moved to dismiss the action arguing that Named Plaintiffs had failed to exhaust remedies under user agreements that required them to "alert the PACER Service Center to any errors in billing within 90 days of the date of the bill." Appx0156-0518(DE11:13-15). The District Court denied the Government's motion, noting that even "if the notification requirement constituted a contractual condition, it would not apply to the plaintiffs' challenges to the legality of the fee schedule." Appx0187(DE25:7). The Government filed its answer on December 19, 2016. Appx0189-0198(DE27).

Even before the Government had entered an appearance, Named Plaintiffs on May 2, 2016, filed a motion to certify the matter as a class action. Appx0122-0143(DE8). Named Plaintiffs described "the relief the plaintiffs are seeking" as "a full refund of excess fees charged within the limitations period, plus a declaration that the fees violate the E-Government Act." Appx0137(DE8:16).

The District Court granted class certification on January 24, 2017. Appx0203-0204(DE32) (order); Appx0205-0223(DE33) (opinion). It

certified a class of "All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities." Appx0203(DE32:1).

## B.    Summary Judgment and Interlocutory Appeal

After both sides moved for summary judgment on liability, Appx0228-0252(DE52), Appx0387(DE73), the District Court denied the Named Plaintiffs' motion and granted the Government's motion only in part. Appx0388(DE88); Appx0389-0430(DE89). The District Court rejected the Named Plaintiffs' contention that PACER fees should be limited to marginal cost, rejected some of Plaintiffs' contentions concerning the appropriate use of PACER proceeds, but rejected the Government's contention that Named Plaintiffs had no claims at all. Appx0389-0430(DE89). The District Court then certified its summary-judgment order for interlocutory appeals under 28 U.S.C. §1292(b), Appx0431-0432(DE104), Appx0433-0434(DE105), making way for both sides to take cross appeals to the Federal Circuit.

This Court affirmed with an opinion reported as *NVLSP v. United States,* 968 F.3d 1340 (Fed.Cir.2020). It held that the E-Government Act

"limits the use of PACER fees to expenses incurred in providing (1) electronic access for members of the public (2) to information stored on a federal court docketing system." *Id.* at 1351-52. It disagreed with Named Plaintiffs' contentions concerning marginal cost, and affirmed the District Court's determination that Named Plaintiffs properly challenged some but not all uses of PACER proceeds. *See id.*

This Court noted in passing that "Plaintiffs alleged that each individual download of a public record for which they were charged gave rise to a separate 'illegal exaction' claim—that is, a claim that money was 'improperly paid, exacted, or taken from the claimant' in violation of law," *NVLSP,* 968 F.3d at 1345-46, but it did not pass on whether each download in fact amounted to a separate claim for purposes of the Little Tucker Act's $10,000 limitation. That issue was neither raised nor contested. This Court noted that the District Court had "certified one class claim: 'that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act.'" *Id.* at 1346.

## C.    Settlement on Remand

On remand the parties negotiated a $125 million common-fund Settlement, for which they sought and received the District Court's Preliminary Approval under Federal Rule of Civil Procedure 23(e). Appx0539-0544(DE153) (Preliminary Approval Order).

In response to an email Class Notice, Isaacson submitted a timely objection, Appx0818-0868(DE166-5), in the manner set out in the Class Notice—by sending it to Class Counsel and emailing it to Judge Friedman on September 12, 2023. Neither Class Counsel nor the District Court placed any Class Members' objections on the public record, until Isaacson on October 11, 2023, submitted a further Written Statement to both Class Counsel and Judge Friedman, objecting to the impropriety of conducting settlement proceedings in secrecy. Appx0869-1012(DE166-6:). Class Counsel filed class members' objections later that day, just one day before the October 12, 2023, Final Approval Hearing. Appx0869-0871(DE166).

Isaacson objected that the Settlement allocated too much money to pro rata distribution reimbursing large users, including law firms and class-action plaintiffs' counsel, who had already been reimbursed by

clients or from settlements in other cases. Appx0821-0825(DE166-5:4-8).

Isaacson also observed that the Little Tucker Act precluded including in

the Settlement Class any Class Members whose PACER expenditures

exceeded $10,000. Appx0825(DE166-5:8). He objected to the amount of

the requested attorney's fees, contending that Class Counsel would be

adequately compensated by an unenhanced lodestar award—for which

they had submitted inadequate documentation. Appx0826-0831(DE166-

5:9-14). Isaacson also objected that "service award" payments of $10,000

apiece to each of the Named Plaintiffs are prohibited by Supreme Court

precedent. Appx0831-0834(DE166-5:14-17).

Isaacson appeared at the October 12, 2023, Final Approval Hearing

to press his objections in person. Appx1050-1059(DE175:36(13)-45(20));

Appx1098-1104(DE175:84(13)-90(12)).

## D.    Final Approval Opinion and Order

On March 20, 2024, the District Court filed an opinion and

judgment overruling Isaacson's objections, approving the Settlement as

fair, reasonable and adequate, and giving Class Counsel and the Named

Plaintiffs exactly what they asked for in attorney's fees and incentive

awards. Appx0001-0048(DE169) (Opinion); Appx0049-0080(DE170) (Judgment).

The District Court "approve[d] the settlement agreement and award[ed] $23,863,345.02 in attorney's fees, $1,106,654.98 in costs, and $30,000 in service awards." Appx0001-0002(DE169:1-2).

Isaacson filed a timely notice of appeal on April 18, 2024, AppxAppx1013(DE173).

## IV. SUMMARY OF ARGUMENT

The District Court plainly exceeded its jurisdiction by including in the Settlement Class PACER users whose Class Period PACER expenditures and resulting claims exceeded $10,000. *Infra* 17-40.

The District Court abused its discretion by allowing a pro rata allocation of many millions of dollars to the largest PACER users, many of which had already been reimbursed by their own clients or from class-action settlements in other cases. *Infra* 40-47.

The District Court abused its discretion by awarding common-fund attorney's fees that compensate Class Counsel at what amount to hourly rates approaching $5,000. This Court's decision in *Health Republic Ins. Co. v. United States,* 58 F.4th 1365 (Fed.Cir.2023), required the District

Court to independently determine a reasonable fee, rather than deferring to Class Counsel's request for $23,863,345.02. *Infra* 47-67.

Finally, the District Court erred by awarding $10,000 apiece to each of the three Named Plaintiffs as "service awards" for their service as representative plaintiffs. The Supreme Court's foundational common-fund precedents condemn such payments to representative plaintiffs as both "decidedly objectionable" and "illegally made." *Trustees v. Greenough,* 105 U.S. 527, 537 (1882); *accord Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 122 (1885); *see Johnson v. NPAS Solutions,* 975 F.3d 1244, 1248, 1255-61, 1264 (11th Cir.2020), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022). *Infra* 67-71.

## V.   STANDARDS OF REVIEW

"Issues of jurisdiction receive plenary review on appeal." *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1572 (Fed.Cir.1996); *see also International Custom Products v. United States,* 467 F.3d 1324, 1326 (Fed.Cir.2006)(jurisdiction reviewed de novo).

This Court reviews orders approving class-action settlements for abuse of discretion. *Haggart v. Woodley,* 809 F.3d 1336, 1346 (Fed.Cir.2016).

-13

This Court "review[s] the determination of reasonable attorney fees for abuse of discretion. ... However, errors of law in the award of attorney fees are corrected without deference." *Haggart,* 809 F.3d at 1354; *see, e.g., Health Republic Ins. Co. v. United States,* 58 F.4th 1365, 1372 (Fed.Cir.2023).

"A court abuses its discretion when it makes 'a clear error of judgment in weighing relevant factors or in basing its decision on an error of law or on clearly erroneous factual findings.'" *Health Republic,* 58 F.4th at 1372 (citations omitted). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. 559, 564 (2014)(citation omitted). Thus, any questions of law underlying a district court's exercise of discretion, whether in approving a settlement or in determining attorney's fees, are subject to de novo review. *Haggart,* 809 F.3d at 1346, 1353 (reviewing "legal holdings de novo").

Moreover, "an abuse would occur in a Rule 23(b)(3) class action when the district court breaches its fiduciary duty to the absent class members." *Drazen v. Pinto,* slip op. at 55 (11th Cir. July 16, 2024)(Tjoflat,

Cir.J., concurring). For "[u]nder Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Drazen,* slip op. at 56 (Tjoflat, Cir.J., concurring). Indeed, this Court holds that when reviewing a class-action settlement, or awarding attorney's fees to class counsel, "the trial court has a 'fiduciary duty' to protect the interests of the class, given the general non-alignment of the interests of class counsel and the class when a common-fund fee is proposed." *Health Republic,* 58 F.4th at 1377.

Whether "Supreme Court precedent prohibits incentive awards" to representative plaintiffs, as the Eleventh Circuit has held, *Johnson v. NPAS Solutions,* 975 F.3d at 1255, presents a question of law subject to de novo review.

Reviewing a District Court's order evaluating the adequacy of a Little Tucker Act Rule 23 class-action settlement, and the accompanying award of attorney's fees, implicates the resolution of claims in proceedings over which this Court exercises exclusive appellate jurisdiction. 28 U.S.C. §1295(a)(2). Thus, all issues in this appeal relating to assertion and settlement of Little Tucker Act claims, and to any attorney's fees or service awards related to the settlement of those Little

Tucker Act claims, are properly governed by Federal Circuit law, rather than by precedents of the regional Circuit in which the District Court sat. "It would contravene the intent of Congress to achieve uniformity in the adjudication of Tucker Act claims ... to apply regional circuit law in appeals from district court Little Tucker Act decisions, since those cases usually involve the same legal issues as do appeals from the Claims Court." *United States v. One (1) 1979 Cadillac Coupe DeVille*, 833 F.2d 994, 998 (Fed.Cir.1987); *see Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 859 (Fed.Cir.1991)(review of sufficiency of evidence); *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,* 908 F.2d 951, 953 (Fed.Cir.1990)("when the question on appeal is one involving substantive matters unique to the Federal Circuit, as in this case, we apply to related procedural issues the law of this circuit); *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983)(review for substantial evidence: "Logic, as well as the express congressional desire for uniformity, dictate that similar standards of review and the precedents of this circuit should obtain in a proceeding in a district court that is substantially identical, except for jurisdictional amount, to one in the Claims Court, and we so hold.").

## VI.   ARGUMENT

### A.   The Little Tucker Act Divested the District Court of Jurisdiction Over Class Members Whose Claims Exceeded $10,000 Apiece

The District Court exceeded the Little Tucker Act's jurisdictional grant by failing to exclude from the Settlement Class all Class Members whose PACER expenditures and resulting claims for the eight-year Class Period exceed $10,000. For while the Tucker Act grants jurisdiction to the U.S. Court of Federal Claims to adjudicate monetary claims against the United States without regard to the amount at issue, 28 U.S.C. §1491(a)(1), the Little Tucker Act strictly limits regional district courts' jurisdictional authority in such matters to a "civil action or claim against the United States, not exceeding $10,000 in amount." 28 U.S.C. §1346(a)(2); *see Hohri,* 482 U.S. at 66-67 n.1; *Smith v. Orr,* 855 F.2d 1544, 1552 (Fed.Cir.1988).

A District Court may exercise jurisdiction over a Little Tucker Act class action only to the extent that "the 'claims of individual members of the clas[s] do not exceed $10,000' apiece." *Bormes,* 568 U.S. at 10 n.1 (quoting *Will*, 449 U.S. at 211 n.10). This Court accordingly holds that "[t]he claim of each member of the class must be examined separately to

17

determine whether it meets the jurisdictional requirement." *Chula Vista City School District v. Bennett,* 824 F.2d 1573, 1579 (Fed.Cir.1987); *see Skaar v. McDonough,* 48 F.4th 1323, 1332 (Fed.Cir.2022) (parenthetically quoting *Chula Vista*). Any class member for whom complete relief would total over $10,000 must be excluded from the class and "dismissed for lack of jurisdiction." *Chula Vista,* 824 F.2d at 1579.

Even if a complaint facially complies with the $10,000 limitation as initially filed, district courts lose their Little Tucker Act jurisdiction to the extent that, over the course of the litigation, the recovery sought on behalf of any plaintiff or class member grows to exceed $10,000. This Court holds "the question is settled—district courts lose their Little Tucker Act jurisdiction once the amount claimed accrues to more than $10,000, even though jurisdiction was previously proper in the district court." *Simanonok v. Simanonok,* 918 F.2d 947, 950-51 (Fed.Cir.1990). As the Department of Justice puts it: "Although the general rule is that jurisdiction is established at the time of filing, a claim which is for $10,000 or less when filed, but is accruing so that it will be for more than

$10,000 at the time of judgment is within the exclusive jurisdiction of the Court of Federal Claims."[2]

This has long been the rule. A district court held in *Otis Elevator Co. v. United States,* 18 F.Supp. 87, 88-89 (S.D.N.Y.1937), for example, that although claims against the United States were for less than $10,000 as originally pleaded, the district court lost its Little Tucker Act jurisdiction when the accumulation of interest on those claims caused the relief ultimately sought to exceed $10,000. Although district court decisions generally lack significant precedential weight, the Supreme Court cited *Otis Elevator* with approval in *Franklin v. United States,* 308 U.S. 516, 516 (1939), and again in *United States v. Sherwood,* 312 U.S. 584, 592 (1941); *see McMichael v. United States*, 63 F.Supp. 598, 600 (N.D.Ala.1945)(observing that *Otis Elevator* "has twice been cited with approval by the Supreme Court"). More recent authorities hold that even the addition of attorney's fees can push asserted claims' aggregate value

---

[2] U.S. D.O.J., *Justice Manual: Civil Resource Manual* §47 (updated Sept. 2013) (favorably citing *Simanonok*), *available online at* https://www.justice.gov/jm/civil-resource-manual-47-court-federal-claims-litigation *and at* https://bit.ly/DOJcrm47 *and at* https://perma.cc/7ADZ-35CP .

over the $10,000 jurisdictional limit. *See, e.g., Graham v. Henegar,* 640 F.2d 732, 733 (6th Cir.1981).

So the question here cannot be whether the District Court had jurisdiction over the Named Plaintiffs' claims when they filed their complaint in 2016, or even in 2017 when the District Court certified a six-year class period, over which each of the Named Plaintiffs claimed to have paid considerably less than $10,000 each in PACER fees.[3] The District Court plainly erred in 2023 when it approved a Settlement—covering an expanded eight-year Class Period—and failed to exclude all Class Members whose claims against the United States for the eight-year period exceed the Little Tucker Act's $10,000 limit. They should have

_____

[3] In declarations supporting certification of the six-year class period, Named Plaintiff National Consumer Law Center (NCLC) claimed to have paid some "$5,863.92 in fees to the PACER Service Center to obtain public court records within the past six years." Appx0201(DE29:1¶2) (Rossman Decl.). Named Plaintiff Alliance for Justice (AFJ) claimed it had paid "$391.40 in fees to the PACER Service Center to obtain public court records within the past six years." Appx0200(DE28:1¶2) (Goldberg Decl.). Named Plaintiff NVLSP's Executive Director attested that "[i]n 2016, NVLSP paid $317 in fees to PACER Service Center to obtain public court records," and "estimate[d] that we paid similar amounts annually over the past six years." Appx0202(DE30:1¶2) (Stichman Decl.).

been excluded from the Settlement Class, and "dismissed for lack of jurisdiction." *Chula Vista,* 824 F.2d at 1579.

Although most PACER registrants for the relevant Class Period were small-time users who paid $350 or less in Class Period PACER billings, the Settlement's class definition, as approved by the District Court, fails to exclude the many large law firms and class-action attorneys whose Class Period PACER billings ran into the tens of thousands or even of hundreds of thousands of dollars.

As a solo-practitioner who opened his own PACER Account (No. 4166698) in March of 2016, Isaacson paid Class Period PACER billings that totaled $3,823.50 over less than three years of the eight-year Class Period. Appx0836-0837(DE166-5:19-20¶¶7-12); Appx0848-0857(DE166-5:ExC[ECFpp31-40). If Isaacson, as a start-up solo-practitioner accrued $3,823.50 in PACER fees over less than three years then many users—including large law firms and plaintiffs' side class-action firms—must have paid Class Period PACER bills totaling tens and even hundreds of thousands of dollars. Appx0825(DE166-5:8). The District Court plainly exceeded its jurisdiction by including them all in the Class to whom the $125 million Settlement will be distributed. Those whose Class Period

PACER expenditures exceeded $10,000 should have been excluded from the Class, and their claims dismissed without prejudice.[4] The filing of this action tolled the limitations period for them to file their own individual actions in the U.S. Court of Federal claims.[5]

Named Plaintiffs chose to file this class action in the U.S. District Court for the District of Columbia, whose jurisdictional authority is limited to Class Members whose claims do not exceed $10,000, rather than in the U.S. Court of Federal Claims which would have had jurisdiction over those with larger claims. They contend that they were justified in doing so because each download from PACER, typically costing $3.00 or less, is far below the Little Tucker Act's $10,000 jurisdictional limit. According to their Complaint, "[e]ach download thus gave rise to a separate claim for illegal exaction in violation of the E-Government Act." Appx0108(DE1:2). Their Complaint then conclusorily

---

[4] *See Textile Productions, Inc. v. Mead Corp.,* 134 F.3d 1481, 1486 (Fed.Cir. 1998)(dismissals for want of subject-matter jurisdiction should be "without prejudice").

[5] *See China Agritech, Inc. v. Resh,* 584 U.S. 732, 736, 739-40, 747 (2018); *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 350 (1983); *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 553 (1974).

asserts: "Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000." Appx0110(DE1:4¶5). Allegations of legal conclusions like these are not to be credited.[6] They cannot be credited here as the remedy sought has always been defined in terms of the aggregate fees that Class Members paid for using PACER.[7] As approved by the District Court's judgment, the Settlement Agreement defines the Class not in terms of Class Period download transactions, but in terms of payments that Class Members made over the course of an expanded eight-year Class Period, "regardless of when such persons or entities used the PACER system." Appx0532(DE149-2:1[ECFp2]) (First Amendment to Settlement Agreement). The Class is explicitly defined in terms of "the

---

[6] *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

[7] The Complaint originally defined the Class as "All individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." Appx0118(DE1:12¶27). It asked the District Court to "Award monetary relief for any PACER fees collected by the defendant in the past six years that are found to exceed the amount authorized by law." Appx0121(DE1:15).

payment of PACER fees in the specified period rather than the use of PACER in the specified period." Appx0532(DE149-2:1[ECFp2]) (First Amendment to Settlement Agreement).

Named Plaintiffs hoped to avoid the Little Tucker Act's limitation on jurisdiction by fragmenting these claims for overbilling over the eight-year Class Period into countless download-by-download subclaims. But as a matter of law, Little Tucker Act plaintiffs cannot evade the $10,000 limitation on jurisdiction by fragmenting claims into subsidiary parts. In backpay cases, for example, plaintiffs cannot be deemed to present a separate "claim" for each pay period, and this Court holds that if, over the course of litigation, the aggregate amount of backpay for additional pay periods grows to exceed $10,000, a district court necessarily loses its Little Tucker Act jurisdiction. *Simanonok v. Simanonok,* 918 F.2d 947, 950-51 (Fed.Cir.1990); *Smith v. Orr,* 855 F.2d 1544, 1552-53 (Fed.Cir.1988); *accord, e.g., Charles v. Rice,* 28 F.3d 1312, 1322 (1st Cir.1994)(following *Smith v. Orr*).

Appellate precedents have long held that claimants against the federal government cannot comply with the Little Tucker Act's $10,000 limit by fragmenting their case into multiple smaller claims. In *United*

*States v. Lindberg Corp.,* 882 F.2d 1158, 1164 (7th Cir.1989), for example, where a vendor to the United States sought recovery for the uncompensated taking of 265 gears. The Seventh Circuit rejected an invitation to consider the taking of each gear as a separate claim: "The appellant's breaking down the total amount to a less-than-$10,000 amount-per-gear is untenable. Any claim that Lindberg seeks to bring against the federal government must be brought in the United States Claims Court." *Id.*

Other courts have held in litigation over bonds that the total value or amount sought is the relevant claim for Tucker Act purposes, not the amount represented by each individual bond. *See, e.g., Watson's Estate v. Blumenthal,* 586 F.2d 925, 926-29 (2d Cir.1978)(suit on bonds of various series that aggregated to claims in excess of $10,000); *Glaskin v. Klass,* 996 F.Supp. 67, 73 (D.Mass.1998)("Each bond involved in this action is a separate contract, but the dispute centers upon the reissuance applications, each of which encompassed multiple bonds," such that "'recovery on each [bond] would rise and fall on the same facts and legal arguments'")(quoting *United States v. Lindberg Corp.,* 686 F.Supp. 701, 705 (E.D.Wis.1987), *aff'd,* 882 F.2d 1158 (7th Cir.1989)); *Insurance Co. of*

25

*N. Am. v. United States,* 561 F.Supp. 106, 117 (E.D.Pa.1983)("The district court does not have the power to sever one claim against the US into multiple civil claims so that no claim is greater than $10,000.").

The precedents similarly reject plaintiffs' attempts, in cases involving real estate, to avoid the $10,000 limit by asserting their claims on a parcel-by-parcel basis, or by segregating damages by the year in which they were incurred, or by whether they are for past or future harm. In *Washington v. Udall,* 417 F.2d 1310, 1311 & 1320-21 (9th Cir.1969), where the State of Washington contested a federal agency's ruling limiting delivery of water to its agricultural properties, the Ninth Circuit rejected contentions "that a controversy involving separate parcels of real property creates inherently separate causes of action." The "same factual and legal issues pertain" to all the parcels affected, the Ninth Circuit explained, *id.* at 1320-21, just as here the Government's liability for PACER billings is based on a single unitary theory—that the PACER

26

billing schedule is unlawful. The principle has been applied many times in the lower courts.[8]

In *Sutcliffe Storage and Warehouse Co. v. United States,* 162 F.2d 849 (4th Cir.1947), to take another example, a landowner lessor filed four separate actions against the United States, purporting to assert in each of them a single claim for less than $10,000, arising from the Government's use of land during each of four separate lease periods. *Id.* at 850-52. Observing that "claims for amounts due on running accounts" ordinarily "must include all amounts due at the time action is brought," *id.* at 851-82, the First Circuit found "no reason why a plaintiff cannot make all his claims on a running account at one time without piecemeal presentation," and held that together the four cases exceeded the Little Tucker Act's $10,000 jurisdictional limitation. *Id.*

In this case too, a suit to recover payments made on running accounts cannot be atomized into countless separate claims based on

---

[8] *See also, e.g., Eccles v. United States*, 396 F.Supp. 792, 794-95 (D.N.D.1975)("Plaintiffs have but one action under several counts, which cannot be divided as to tracts or time to vest the Court with jurisdiction."); *United States v. 255.21 Acres in Anne Arundel County,* 722 F.Supp. 235, 241 (D.Md.1989)(following *Washington v. Udall* and *Eccles*).

individual overcharges, whether on a page-by-page, document-by-document, or download-by-download basis. Each Class Member has a single claim against the Government for PACER billings over the eight-year Class Period. And the heaviest PACER users' claims without question exceed the Little Tucker Act's $10,000 jurisdictional limitation—as Isaacson pointed out below. Appx0824-0825(DE166-5:7-8).

The District Court acknowledged, but rejected, Isaacson's concern that its "common fund allocations to many large-scale claimants are improper because entities whose aggregated claims total over $10,000 fall outside of Little Tucker Act jurisdiction." Appx0026(DE169:26n.9). Citing an earlier, superseded, class-certification order in this case, the District Court asserted:

> "A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Class Certification Op., 235 F.Supp.3d at 38 (citing *Am. Airlines, Inc. v. Austin*, 778 F.Supp. 72, 76-77 (D.D.C.1991); *Alaska Airlines v. Austin,* 801 F.Supp. 760, 762 (D.D.C.1992); *United States v. Louisville & Nashville R.R. Co.,* 221 F.2d 698, 701 (6th Cir.1955)).

Appx0026(DE169:26n.9).

The cited cases, however, are both nonprecedential for this Court, and clearly distinguishable. Each relates to Little Tucker Act claims grounded in, and governed by, the terms of discrete contracts—reflected in individually pleaded bills of lading in the Sixth Circuit's *Louisville* decision, and in individual contracts for airline tickets in the *American Airlines* and *Alaska Airlines* cases. This case, in stark contrast, asserts no similar contract-based claims.

In the *Louisville* case, the Sixth Circuit evaluated whether a district court had jurisdiction over cases "filed under the Tucker Act, 28 U.S.C. [§]1346, for separate amounts less than $10,000 each claimed to be due plaintiff from defendant for numerous shipments made at diverse times, under diverse schedules, between diverse points, and under diverse rates." *Louisville,* 221 F.2d at 700. In essence these were breach-of-contract claims, each governed by the specific terms of a different contract, as reflected in separate bills of lading. One complaint sought "recovery on 74 separate and distinct claims for freight alleged to be due on separate and independent shipments, each separate claim being for an amount less than $10,000," and "[e]ach shipment as set up in the complaint was embodied in a separate count." *Id.* at 701. Because the

case would require proof varying with the terms and facts relating to each of numerous independent contracts, each bill of lading represented a distinctly separate claim. The Sixth Circuit explained:

> The decisive fact is that each claim is founded upon a different contract. The various shipments involved items of different weights, moving between different points, having different routes and under different applicable rates. The evidence, therefore, does not, as contended by defendant, apply equally to all of the separate claims.

*Louisville,* 221 F.2d at 701.

The 74 bills of lading not only constituted 74 distinct contracts, the Sixth Circuit emphasized, "these 74 claims arise out of diverse and separate acts and agreements and totally different evidence is necessary to support them." *Id.* at 702. The Sixth Circuit answered the government's request to lump them all together: "But here there were numerous actions which prayed for different judgments, each one less than $10,000." *Id.*

This case, in stark contrast with *Louisville,* does not involve "numerous actions which prayed for different judgments." *Louisville,* 221 F.2d at 702. The Complaint here presents a unified claim for across-the-board overbilling, rather than separate claims based on independent

contracts, each entered on disparate terms, each of which was set out in a separate count, and every one of which was subject to wholly independent proof, as in *Louisville*. The Sixth Circuit's 1955 *Louisville* decision provides no justification at all for the District Court's exercise of jurisdiction in this case over the claims of those Class Members whose Class Period PACER billings totaled over $10,000.

The District Court placed reliance on two district court rulings from the early 1990s which together significantly extended the Sixth Circuit's *Louisville* decision, concerning bills of lading, to cases concerning the government's liability for purchases of airline tickets: *American Airlines, v. Austin,* 778 F.Supp. 72, 76-77 (D.D.C.1991), and *Alaska Airlines v. Austin,* 801 F.Supp. 760, 762 (D.D.C.1992), *aff'd in part and rev'd in part on other grounds sub nom. Alaska Airlines v. Johnson,* 8 F.3d 791 (Fed.Cir.1993). Appx0026(DE169:26n.9). District court rulings, it may be noted, generally lack significant precedential weight. *American Elec. Power Co. v. Connecticut,* 564 U.S. 410, 428 (2011). Even so, these two decisions applied *Louisville* to operative facts that are dramatically different from this case.

In *American Airlines* the plaintiff airlines sought payment for airline tickets that the United States had contracted to purchase, but for which it had refused to pay on the ground that the tickets were not used. Several airlines filed suit in the U.S. District Court for the District of Columbia seeking declaratory and injunctive relief, relying not on the Little Tucker Act, but instead "relying on the APA's waiver of sovereign immunity" and its provision for "judicial review of agency action to parties seeking nonmonetary relief." *American Airlines,* 778 F.Supp. at 75 & n.4 (citing 5 U.S.C. §702). "Section 702 of the APA was amended in 1976 'to remove the defense of sovereign immunity as a bar to judicial review of federal administrative action' in a federal court," with federal jurisdiction "grounded on 28 U.S.C. §1331." *American Airlines,* 778 F.Supp. at 75 (citation omitted). APA §702 authorized actions against the United States "seeking relief ***other than money damages*** and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," 5 U.S.C. §702 (emphasis added), with 28 U.S.C. §1331 providing federal-question jurisdiction. *See American Airlines,* 778 F.Supp. at 75 & n.4.

The *American Airlines* district court concluded that the Little Tucker Act's jurisdictional limitation nonetheless applied to the extent that the airlines sought monetary relief on the airline tickets as contracts. It held that "plaintiffs' claims here are grounded on the numerous individual ticket contracts between the airlines and the Government. Each ticket represents a separate contract and any rights plaintiffs have to any form of relief flow originally from the existence or non-existence of the contracts." *American Airlines,* 778 F.Supp. at 76 (fn. omitted). On that basis, it ruled "that each ticket represents a separate claim. The airline tickets are analogous to the 74 bills of lading in *U.S. v. Louisville & N.R.R. Co.* that the court found to be 'separate and distinct claims.'" *American Airlines,* 778 F.Supp. at 76 (quoting *Louisville,* 221 F.2d at 701). "Each ticket represents an independent contract between the government and an airline, and therefore each ticket represents an individual claim." *Id.* With the plaintiffs' claims thus "grounded on contracts, jurisdiction is proper in this Court because each contract is for less than $10,000." *Id.* at 76-77.

Of course, this case is ***not*** one based on the variable terms of any individual contracts. Rather than alleging individualized contracts, it

presents a single count captioned: "CLAIM FOR RELIEF: ILLEGAL EXACTION." Appx0120(DE1:14). It presents no contract-based claims. Appx0120(DE1:14¶¶33-34). Its PRAYER FOR RELIEF says nothing about enforcing contractual rights, but instead asks the District Court to "[a]ward monetary relief for any PACER fees collected by defendants in the past six years that are found to exceed the amount authorized by law." Appx0121(DE1:15).

The District Court in this case also cited *Alaska Airlines v. Austin*, 801 F.Supp. at 762, another matter involving airline tickets, in which two of plaintiff airlines' fourteen counts asked for injunctive relief, with many other counts seeking monetary relief based on contractual claims reflected in individual airline tickets. *See id*. The case was one in which "different evidence will be needed to decide each claim for each individual ticket." *Id*. at 762. "Hence," the district court held, "each claim is considered separately for purposes of determining jurisdiction, and the Little Tucker Act, granting jurisdiction to this Court, applies."[9]

---

[9] *Id*. When it proceeded to consider summary-judgment motions on two of the fourteen counts alleged, the district court reiterated that "[f]or the controlled-capacity fare tickets" at issue in the case, "each transaction,

Here, by contrast, the Named Plaintiffs and Class press no contract-based claims—each alleges only an illegal-exaction claim. On that single claim, each seeks "monetary relief for any PACER fees collected by the defendant in the past six years that are found to exceed the amount authorized by law." Appx0121(DE1:15).

After considering jurisdictional issues related to all fourteen counts pleaded, the *Alaska Airlines* district court proceeded to the plaintiffs' two summary-judgment motions, which were limited to two of the fourteen counts as to which jurisdiction was not based on the Little Tucker Act: "one for summary judgment on count one, seeking an injunction enforcing the decisions of the Comptroller General, and one for summary judgment on count two, seeking an injunction preventing further violations of the Administrative Procedure Act." *Alaska Airlines v. Austin,* 801 F.Supp. at 764.

---

gives rise to a separate contract with its own terms." *Alaska Airlines v. Austin,* 801 F.Supp. at 768-69 (footnote omitted). "In the absence of a statute or an over-arching contract giving the government a right to the lowest applicable fare, the circumstances of each ticket purchase transaction establish the rights of the parties." *Id.* at 769

The district court found that "the claims raised in counts one and two," limited to injunctions requiring compliance with the Comptroller General's determinations, "are not primarily contractual in nature and therefore fall outside the ambit of the Tucker Act," which restricts claims seeking monetary relief for breach of contract. *Id.* at 763. With respect to count one, the district court ordered the government to comply with the Comptroller General's decisions concerning its audits, and with respect to count two, it concluded that "the matters remaining under the APA are incidental and can be resolved by agreement between the parties." *Id.* at 770-71.

Noting that "the monetary claims are not the subject of a motion for summary judgment," the district court held that "as part of the injunctive relief" under count one, it "will now order the return of all monies held improperly with the exception of offsets for which the government may have information with respect to particular transactions that proves government travelers did request lower fares, seats were available at those fares, yet tickets were issued at higher fares." *Id.* at 771.

The Government appealed to this Court from the summary-judgment order granting injunctive relief on count one. This Court noted

that the after securing favorable rulings from the Comptroller General, the airlines had

> brought suit in the district court, seeking review of GSA's audit procedures under the Administrative Procedure Act, 5 U.S.C. §702 (1988), and requesting an injunction to compel GSA to comply with the Comptroller General's decisions. ***In the alternative,*** the airlines brought multiple claims based on the contracts inherent in the individual tickets pursuant to the Little Tucker Act, 28 U.S.C. §1346(a)(2) (1988).

*Alaska Airlines v. Johnson,* 8 F.3d at 794 (emphasis added). "The district court agreed with the Comptroller General that GSA's audit procedure was impermissible," *id.*, and entered injunctive relief—thereby obviating any need, in the alternative, to reach the "multiple claims based on the contracts inherent in the individual tickets pursuant to the Little Tucker Act, 28 U.S.C. §1346(a)(2)." *Id.* This Court accordingly had no occasion to reach or to consider the district court's jurisdiction, under the Little Tucker Act, with respect to individual contract claims that neither the lower court, nor this Court, ever had occasion to reach or decide. *See id.*

On appeal, the Government challenged the district court's authority, sitting in equity, to "direct[] the return of all funds withheld by the government because of its illegal audits." *Alaska Airlines v. Johnson,* 8 F.3d at 796. It "challenge[d] the [district] court's authority to

37

order such relief, arguing that the 'return' of money ordered by the court was in fact an award of 'money damages'" that by APA §702's terms cannot be awarded "incident to an injunction where the underlying right to the money arises by contract." *Id.* at 796-97.

This Court flatly rejected the Government's contentions that the injunctive relief amounted to "money damages" on contractual claims: "The relief granted by the district court in our case was not specific performance or even based primarily on contractual obligations; it was based on the statute authorizing post-payment audits, 31 U.S.C. §3726(b)." *Alaska Airlines v. Johnson,* 8 F.3d at 797. The district court had "also declared that because GSA holds funds withheld illegally, funds rightfully belonging to the airlines, to provide complete relief, and based on its conclusion that under the statute the government had no right to the withheld money, that money had to be returned." *Id.* at 797. "Thus," this Court held, "the airlines received money to which they were entitled under the statute, not 'money damages,'" barred by APA §702. *Id.* at 797.

Here, on the other hand, the Named Plaintiffs have disavowed any claim for class-wide injunctive relief under the APA: "The judiciary is

exempt from the Administrative Procedure Act, so injunctive relief is unavailable." Appx0468(DE148:2[ECFp6]). Rather, the Named Plaintiffs

> asked the Court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges—the only relief available to them under the Little Tucker Act. See 28 U.S.C. §1346(a). Because the judiciary is not subject to the APA, 5 U.S.C. §§701(b)(1)(B) & 704, the plaintiffs could not seek injunctive relief requiring the AO to lower PACER fees in the future.

Appx0471(DE140:5[ECFp9]). This Court's holding in *Alaska Airlines v. Johnson,* concerning whether the injunctive relief obtained amounted to "monetary damages" proscribed by the APA accordingly has no relevance here.

In obiter dictum this Court added, without any discussion of this issue: "In this case, the district court had concurrent jurisdiction with the Court of Federal Claims over the contracts." 8 F.3d at 797. Such dictum, concerning claims that were not at issue on appeal, is not a precedential holding.[10] Were it a holding, moreover, it would amount only to an affirmation that the district court had jurisdiction "over the contracts,"

---

[10] *See, e.g., Terry v. Principi,* 367 F.3d 1291, 1295 (Fed.Cir.2004); *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n,* 357 F.3d 1294, 1307-08 (Fed.Cir.2004).

relating to individual airline tickets. *See supra* at 34 & n.9. It provides

no basis at all for the District Court's exercise of jurisdiction in this case,

which involves no contract claims.

The remedy is plain: "The claim of each member of the class must

be examined separately to determine whether it meets the jurisdictional

requirement," and any class member for whom complete relief would

have totaled over $10,000 must be removed from the class governed by

the Settlement, and "dismissed for lack of jurisdiction." *Chula Vista City*

*School District v. Bennett,* 824 F.2d 1573, 1579 (Fed.Cir.1987).

### B.   The Settlement's *Pro Rata* Allocation of Many Millions of Dollars to the Large PACER Users Who Were Fully Reimbursed by Their Clients or By Court Orders in Other Class Actions is Fundamentally Unfair

The District Court plainly abused its discretion by approving the

Settlement as fair, reasonable, and adequate under Federal Rule of Civil

Procedure 23(e)(2).

Rule 23(e)(2) authorizes judicial approval a class-action settlement

only upon "finding that it is fair, reasonable, and adequate after

considering," among other things, whether "(C) the relief provided for the

class is adequate, taking into account ..." "(ii) the effectiveness of any

proposed method of distributing relief to the class, including the method of processing class-member claims," and the "(iii) the terms of any proposed award of attorney's fees," as well as whether "(D) the proposal treats class members equitably relative to each other." Fed.R.Civ.P. 23(e)(2)(C) & (D).

Here, the award of attorney's fees Class Counsel sought under the Settlement Agreement paid the senior attorneys, William Narwold and Deepak Gupta, effective hourly rates approaching $5,000 an hour. That is too much. *See infra* 47-67. The provision of $10,000 "service awards" or "incentive awards" to each of the Named Plaintiffs, moreover, is both illegal and inequitable. *See infra* 67-71.

Even more fundamentally, the Settlement allocates far too much of the cash obtained to the large law firms and plaintiffs' class-action lawyers whose Class Period PACER expenditures already have been reimbursed, whether by their clients, or by Court orders directing payments from the settlements in other cases. The District Court brushed Isaacson's concerns aside, asserting that his "dissatisfaction arises from the amount of the common fund, not its allocation." Appx0025(DE169:25). But that is not so. Isaacson objects that it is

inequitable allocate so much money to PACER's heaviest users who have already been reimbursed by clients or from the settlement of other class actions. Had the $125 million Settlement fund been equitably allocated it could have been appropriately approved under Rule 23(e)(2) as fair and reasonable. But it wasn't.

As Isaacson pointed out below, among the largest users are large law firms or plaintiffs' class-action attorneys, whose Class Period PACER payments were reimbursed by their clients or from class-action settlements in other cases. Appx0821-0826(DE166-5:4-9[ECFpp5-10]) (Isaacson Objection). Many law firms, particularly the larger ones, pass the PACER charges that they incur on to their clients and are reimbursed for them on thirty-day billing cycles.[11] Plaintiffs' side class-action lawyers have to wait a little longer—but they typically are reimbursed for PACER

---

[11] *See Hallmark v. Cohen & Slamowitz, LLP,* 378 F.Supp.3d 222, 236 (W.D.N.Y.2019)(holding PACER fees are among "those ordinarily charged to clients"); *Godson v. Eltman, Eltman, & Cooper, P.C.,* 328 F.R.D. 35, 68 (W.D.N.Y.2018)(holding PACER fees are among "those ordinarily charged to clients"); *DeCastro v. City of New York,* No. 16-cv-3850 (RA), 2017 WL 4386372, at *10 (S.D.N.Y. Sept. 30, 2017)(PACER fees are among the "out-of-pocket expenses ordinarily charged to clients").

charges when class actions settle.[12] And we know that the great majority

of class actions settle.[13] Indeed, Class Counsel's own fee expert conceded

that "the typical class action settles in only three years."

Appx0619(DE158-4:14¶21) (Fitzpatrick decl.). So class-action lawyers,

like those representing the Named Plaintiffs in this matter, generally

receive full reimbursement for their PACER expenditures by court order

when the class actions they litigate quite predictably settle.

It is the smaller users, with Class Period PACER expenditures of

under $10,000 for the eight-year Class Period who are least likely to have

received any such reimbursements. Both Named Plaintiffs and the

Government acknowledged, moreover, that people of limited means—

whose total Class Period expenditures are apt to be far smaller than

---

[12] *See, e.g., Ciapessoni v. United States,* 145 Fed.Cl. 564, 565 (2019); *Godson* 328 F.R.D. at 67-68; *In re Broadwing, Inc. ERISA Litig.,* 252 F.R.D. 369, 382 (S.D.Ohio 2006); *see also* Appx0823(DE166-5:6n.3) (collecting additional cases).

[13] *See* Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 6 (Federal Judicial Center, 2005)(according to a 2005 study, certified class actions settled ninety percent of the time).

those of large law firms—have suffered the most from PACER's illegal billing structure, which the Government continues to use.

The Named Plaintiffs initially purported to litigate this case in the interest of the little user. Their Complaint demanded compliance with Congress' intent that court documents "be 'freely available to the greatest extent possible.'" Appx0107(DE1:1) (quoting S.Rep. 107-174, 107th Cong., 2d Sess. 23 (2002)). They said that excessive PACER fees had "inhibited public understanding of the courts and thwarted equal access to justice," asserting that "the AO has further compounded these harms by discouraging fee waivers, even for pro se litigants," and "by hiring private collection lawyers to sue people who cannot afford to pay the fees." Appx0107(DE1:1-2); *see also* Appx0117(DE1:11¶23); Appx0118 (DE1:12¶25). Named Plaintiff National Consumer Law Center (NCLC) said it "seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans." Appx0109(DE1:3¶2).

Yet when it came time to negotiate a settlement, the Named Plaintiffs abandoned such users—and the public interest—by advocating a purely pro-rata distribution of settlement funds that would favor large institutional users, providing windfalls both to large law firms that long

ago passed their PACER charges on to paying clients, and to plaintiffs-side class-action lawyers who have been reimbursed from settlement funds in other cases.

Class Counsel conceded below that in settlement negotiations with the Government, they and the Named Plaintiffs

> argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers—"to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. §1913 note.

Appx0686(DE158-5:10¶28) (Gupta Decl.); *see also* Appx0575(DE158:23[ECFp31]) ("plaintiffs and class counsel vigorously advocated for a pro-rata approach").

The District Court acknowledged: "Consistent with the judiciary's policy of offering waivers and other pricing mechanisms to make PACER cheaper for some groups of users, the government wanted more of the settlement fund to go to reimbursing those who used PACER less." Appx0024(DE169:24). But the Government eventually gave in to "a compromise of these competing approaches: a minimum payment of

45

$350—the smallest amount that the government would agree to—with a pro rata distribution beyond that amount." Appx0686(DE158-5:10¶28) (Gupta decl.).

The Government was right from the start to oppose a pro rata distribution as fundamentally unfair and inequitable. And the "blend" eventually reached as a compromise still allocates far too much to a pro-rata distribution that unfairly advantages large users and law firms that already have been reimbursed—and who accordingly receive inequitable windfalls under the Settlement.

No portion of the Settlement fund should have been allocated to Class Members for Class Period PACER expenditures that exceeded $10,000. The first distribution, affording smaller users full reimbursement, should have been capped at a much higher level than $350 apiece. Any pro-rata distribution of remaining funds should have been based on Class Members' expenditures only *up to* $10,000 apiece.

Better yet, those Class Members whose Class Period expenditures exceeded the Little Tucker Act's jurisdictional limit of $10,000 apiece should be excluded from the Class and their claims dismissed without prejudice—as argued in the foregoing section on jurisdiction.

46

**C.    The District Court Strayed from Precedent and Abused its Discretion by Accepting Class Counsel's Request for 19.1% of the Settlement Fund, Effectively Compensating Attorneys at Rates Approaching $5,000 an Hour**

Class Counsel requested an award of attorneys' fees, settlement-administration and notice costs, litigation expenses, and service awards for the three class representatives in a total amount equal to 20% of the $125 million common fund. From that, Class Counsel sought approval of $23,863,345.02 in attorneys' fees, which they characterized as a request for 19.1% of the $125 million common fund. Appx0556 (DE158:4). They submitted summary tables listing billing rates and hours billed by attorneys who worked on the case, without any indication of what tasks any of the time was devoted to, let alone why the time was necessary. Appx0698-0699(DE158-5:22-23:¶¶62-64)    (Gupta    Decl.);    Appx0744 (DE158-6:5¶¶12-13) (Oliver Decl.). As it happens, the requested award amounts to a multiple of 3.96 times Class Counsel's "lodestar," calculated by multiplying the hours devoted to the case by their hourly rates—which were themselves quite extravagant, far above those normally charged for complex litigation in the District of Columbia's federal courts. *See*

Appx0751-0752(DE159:5-6) (Government Response to Fee Motion). And the District Court gave them exactly what they wanted.

The District Court plainly abused its discretion by accepting the amount requested by Class Counsel, and then evaluating whether that amount might somehow be deemed reasonable—rather than acting as a fiduciary for the Class and independently calculating a reasonable fee, as it was required to do by this Court's decision in *Health Republic Ins. Co. v. United States,* 58 F.4th 1365, 1376-77 (Fed.Cir.2023).

According to *Health Republic,* a court awarding common-fund attorney's fees cannot "treat the request as presumptively the proper award but must play a more neutral role, characterized as a fiduciary one, in deciding what fee is warranted." *Health Republic,* 58 F.4th at 1378. The result of deviating from the course mandated by *Health Republic* is a fee award that overcompensates Class Counsel, with the leading attorneys on the case being paid nearly $5,000 an hour. William Narwold, who ordinarily bills at $1,250 an hour, Appx0744(DE158-6:5¶12), with his requested 3.96 multiplier rubber-stamped by the District Court, gets $4,950 an hour for his work in this case. Deepak Gupta, who ordinarily bills $1,150 an hour, Appx0698(DE158-5:22¶63),

48

with the 3.96 multiplier, gets paid $4,554 hourly. The District Court's award of Class Counsel's requested attorney's fees should be vacated, with directions to start anew, determining a reasonable fee from scratch, without deference to the fee requested by Class Counsel. *See Health Republic,* 58 F.4th at 1378.

This Court has recognized that the common-fund doctrine was established in the 1880s by two leading Supreme Court decisions:

> The common fund doctrine is rooted in the traditional practice of courts of equity and derives from the equitable power of the courts under the doctrines of *quantum meruit*, *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 128 (1885), and unjust enrichment, *Trustees v. Greenough,* 105 U.S. 527, 532 (188[2]).

*Haggart v. Woodley*, 809 F.3d 1336, 1352 (Fed.Cir.2016). "Since the decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), [the Supreme] Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *see Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 257-58 (1975); *Knight v. United States,* 982 F.2d 1573, 1580 (Fed.Cir.1993)(discussing *Greenough* and

49

*Pettus*); *see generally* John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds,* 87 Harv.L.Rev. 1597, 1601-09 (1974).

Together, *Greenough* and *Pettus* hold that attorney's fees may be awarded from a common fund or equitable fund based either on the attorney's fees reasonably incurred and billed, *see Greenough*, 105 U.S. at 530-31, 537-38, or as a very modest percentage of the fund, *see Pettus,* 113 U.S. at 128 (cutting fee award from 10% to 5%). Here, a common-fund fee award approaching five thousand dollars an hour apiece for Narwold and Gupta cannot be deemed reasonable under the common-fund doctrine of *Greenough* and *Pettus.*

*Greenough* approved of paying a representative plaintiff's reasonable attorney's fees from a common-fund recovery, provided the award is "made with moderation and a jealous regard to the rights of those who are interested in the fund." *Greenough,* 105 U.S. at 536-37. *Pettus* similarly required moderation, cutting a 10% fee award to just 5%. *Pettus,* 113 U.S. at 128. It appears, in fact, that the Supreme Court has

never approved of a common-fund fee award exceeding 10% of the fund.[14]
And its decisions defining a "reasonable attorney's fee" under fee-shifting
statutes plainly establish a "strong presumption" that plaintiffs'
counsel's unenhanced lodestar is sufficient to attract and adequately
compensate competent counsel. *See, e.g., Perdue v. Kenny A. ex rel. Winn,*
559 U.S. 542, 546, 552-53 (2010); *Haggart,* 809 F.3d at 1355 n.19.

If unenhanced lodestar sufficiently compensates lawyers claiming
a statutory entitle to a "reasonable attorney's fee," it is hard to see how a

---

[14] *See, e.g., Harrison v. Perea,* 168 U.S. 311, 325 (1897)(noting with
approval the reduction of a $5,000 fee award (or about 14% of an
equitable fund) to just 10% of the fund); *Pettus,* 113 U.S. at 128 (cutting
10% awarded below to just 5%). In *United States v. Equitable Trust Co.,*
283 U.S. 738 (1931), the Second Circuit reduced a common-fund fee
award to $100,000 (about 15% of the fund) warning that "[t]he allowance
is a payment for legal services, not a speculative interest in a lawsuit."
*Barnett v. Equitable Trust Co.,* 34 F.2d 916, 919 (2d Cir.1929)(Learned
Hand). The plaintiff's lawyers complained to the Supreme Court that
"from a percentage standpoint, the allowance of $100,000 is but slightly
over fifteen per cent," and that "never yet have counsel been cut down to
such a low percentage in any contested case taken upon a contingent
basis." Brief for Respondents to Whom Allowances Were Made, *United
States v. Equitable Trust,* 283 U.S. 738 [Oct. Term 1929 No. 530], at 55-
56 (filed April 16, 1930). But the Supreme Court found even "the
allowance of $100,000 unreasonably high, and that to bring it within the
standard of reasonableness it should be reduced to $50,000," which was
about $7\frac{1}{2}$% of the fund. *Equitable Trust,* 283 U.S. at 746.

District Court acting as a fiduciary on behalf of Class Members could agree to pay nearly four times Class Counsel's claimed lodestar. At nearly four times Class Counsel's claimed hourly rates, and several times the percentages supported by Supreme Court common-fund precedents, *see supra* at 50-51 & n.14, the attorney's fee award that Class Counsel sought—and that the District Court rubber-stamped—is clearly excessive.

It may be worth noting that the Complaint in this case prays for the District Court to "[a]ward the plaintiffs their ... attorney fees under 28 U.S.C. §2412 and/or from a common fund." Appx0121(DE1:15). If unenhanced lodestar would be a reasonable fee for their work on this case under §2412, *see Perdue,* 559 U.S. at 546, 552-53, it is hard to see why Class Counsel should be able to ***quadruple*** that fee award by instead taking the money from the Class's recovery.

In *Haggart v. Woodley,* 809 F.3d 1336, 1357-58 (Fed.Cir.2016), this Court held that in a case where class counsel's efforts produced a common-fund recovery, the lawyers were adequately compensated by an unenhanced lodestar fee paid by the government under the URA, and that they therefore had no equitable claim to receive even a penny more

52

from the common fund. An unenhanced lodestar would have adequately compensated Class Counsel in this case too.

The District Court wound up awarding Narwold and Gupta nearly five thousand dollars an hour, though, because of where its attorney's fee analysis began: by starting with the amount of Class Counsel's fee request itself, and asking whether the request could be deemed reasonable. That approach is reversible error under *Health Republic*.

This Court held in *Health Republic* that the Claims Court erred by starting with the lawyers' fee request, and then evaluating whether it was outside "the realm of reasonableness," rather than making its own independent determination of what a reasonable fee would be. *Health Republic,* 58 F.4th at 1376 (citation omitted). In so doing,

> the Claims Court misconceived its task as one in which the request for fees was presumptively to be granted, subject only to challengers' demonstration that the request is outside the range of reasonableness and must be reduced. In fact, the Claims Court pervasively framed its inquiry that way once it decided to apply the percentage-of-the-fund method. *See, e.g., id.* at 77 (proceeding "to evaluate the reasonableness of ***Class Counsel's requested fee***" (emphasis added)); *id.* (finding "nothing in this category [quality of counsel] that ***justifies a reduction in the requested fee***" (emphasis added)); *id.* at 79 (applying risk factor to "support[ ] [counsel's] fee request"); *id.* at 81 (stating that task is "to evaluate the reasonableness of

***Class Counsel's fee request***," and addressing "why a ***reduction of fees is not justified***" (emphases added)). *Health Republic,* 58 F.4th at 1376 (Court's emphasis). "That approach is improper." *Id.*

The District Court in this case did exactly what *Health Republic* prohibits, by taking Class Counsel's requested fee as the starting point for its analysis, which began: "The Court must independently ***determine the reasonableness of the requested fees***, costs, and service awards." Appx0029(DE169:29). The District Court even captioned its analysis of the appropriate fee award as: "B. ***Reasonableness of Requested Attorney's Fees***." Appx0033(DE169:33). It said: "The Court will first analyze ***the percentage requested*** ... and then will conduct a lodestar cross-check." Appx0034(DE169:34). Here, as in *Health Republic,* the District Court erred by evaluating whether Class Counsel's requested amount fell within the "realm of reasonableness," *Health Republic,* 58 F.4th at 1376, instead of itself calculating a reasonable fee. The question to be decided, the District Court thought, was "the ***reasonableness of Class Counsel's requested fee***." Appx0038(DE169:38). "Furthermore," it found "***the requested percentage*** is around the average for common

funds in the range of the fund created by this settlement." Appx0041(DE169:41). "Because **the requested fee award fits neatly** within the relevant statistical range and aligns with the best case analogues, this factor strongly counsels in favor of approval of the attorney's fees request." Appx0041(DE169:41). "***Class Counsel's requested fee*** award would compensate them at slightly below four times their hourly rates for the work they performed in this case." Appx0045-0046(DE169:44-45). The District Court's conclusion: "***The Court will award the full amount of attorney's fees requested*** by Class Counsel." Appx0045(DE169:45) (all emphasis in this paragraph added).

"That approach is improper," in this case, just as it was in *Health Republic,* 58 F.4th at 1376. Rather that starting with Class Counsel's requested fee as the presumptive award, "***the court's task is to make its own determination of what fee to award***, within the range of reasonable possibilities, considering the relevant principles and precedents addressing comparable facts." *Id.* at 1377 (emphasis added). This the District Court failed to do—with the result that it awarded Class Counsel fees approaching $5,000 an hour.

55

The fee likely would have been very different had the Court started instead with basic principles—that common-fund attorney's fees must be "made with moderation and a jealous regard to the rights of those who are interested in the fund," *Greenough,* 105 U.S. at 536-37, that Class Counsel's unenhanced lodestar is presumptively adequate compensation, *Perdue,* 559 U.S. at 546, 552-53, that a percent-of-fund award ought not be used to overcompensates class counsel,[15] and that a District Judge acting as a fiduciary to the Class will not award a percent-of-fund fee that greatly exceeds the lodestar.[16]

We know why Class Counsel requested fees as a percentage of the common fund. As Judge Jacobs recently observed, awarding "fees based on the percentage of the fund method ... nearly always results in an award that exceeds the lodestar method." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* 62 F.4th 704, 729 (2023)(Jacobs, Cir.J., concurring).

---

[15] *See Equitable Trust,* 283 U.S. at 746; *Pettus,* 113 U.S. at 128; *cf. Haggart,* 809 F.3d at 1357-58.

[16] *See Health Republic,* 58 F.4th at 1374 n.2 ("policies that govern a court's determination of a 'reasonable' percentage-of- the-fund attorney's fee under Rule 23(h) ... might well call for a lodestar cross-check as part of the inquiry at least as a general matter")(dictum).

That suggests courts awarding common-fund fees should be strongly skeptical of requests for percent-of-fund awards. But the District Court in this case, quite possibly influenced by D.C. Circuit law that it is required to apply in other cases, threw caution to the wind—and embraced Class Counsel's request for a percent-of-fund award that it would then only lightly and deferentially "cross-check."

Favorably citing a Court of Claims URA common-fund decision that this Court overruled in *Haggart*, the District Court wrote that "[w]hile courts have discretion to use either method, fee awards in common-fund cases are 'typically based on some percentage of the common fund.'"[17] The District Court then cited the D.C. Circuit's opinions in *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C. Cir.1993), and *Democratic Central Committee of D.C. v. Washington Metropolitan Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C.Cir.1993), which together

---

[17] Appx0030(DE169:30) (quoting *Moore v. United States,* 63 Fed.Cl. 781, 786 (2005)(awarding percent-of-fund fees in URA common-fund case), *overruled by Haggart v. Woodley,* 809 F.3d 1336, 1359 (Fed.Cir.2016) ("The URA provides a reasonable fee," under the lodestar approach, "and thus forecloses application of the common fund doctrine" awarding fees as a percentage of the fund).

mandate that in the U.S. District Court for the District of Columbia attorney's fees in common-fund cases shall be awarded as a percentage of the fund. That, of course, is ***not*** Federal Circuit law, which indulges no systematic preference for percent-of-fund fee awards to the exclusion of fees calculated on the basis of counsel's lodestars. *See Health Republic,* 809 F.3d at 1371 (citing *Haggart,* 809 F.3d at 1355).

In *Swedish Hospital* the D.C. Circuit joined the Eleventh Circuit in "in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases." *Swedish Hospital,* at 1271. But the Eleventh Circuit is an outlier on this issue. Every other Circuit to consider the question has rejected the position, embraced by the D.C. Circuit and the Eleventh Circuit alone, that attorney's fees in common-fund cases must be awarded as a percentage of the fund.[18] And the D.C. Circuit's requirement that fees be

---

[18] *See, e.g., Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir.2000)(refusing to follow "the District of Columbia and Eleventh Circuits [which] mandate the exclusive use of the percentage approach in common fund cases"); *Gottlieb v. Barry,* 43 F.3d 474, 483 (10th Cir.1994)(rejecting "two cited cases, *Swedish Hosp. Corp.* and *Camden I Condominium Ass'n,* [as] the only two circuit decisions explicitly rejecting the use of the lodestar method in common fund cases"); *In re WPPSS*

awarded as a percentage of the fund is quite at odds with Supreme Court precedent. In *Democratic Central Committee,* the D.C. Circuit asserted that "every Supreme Court case that has addressed the issue has determined reasonable fees payable from a common fund on a percentage of the fund basis*." Democratic Central Committee of D.C. v. Washington Metro. Area Transit Comm'n,* 3 F.3d 1568, 1573 (D.C.Cir.1993). But that is not true. The Supreme Court's leading decision is *Greenough,* which awarded common-fund attorney's fees not as a percentage of the fund, but on the basis of itemized attorney's fees actually incurred and paid.[19] Thus, the D.C. Circuit's precedents limiting the U.S. District Court for the District of Columbia to awarding common-fund fees as a percentage of the fund flatly conflict with Supreme Court precedent.

---

*Litig.,* 19 F.3d 1291, 1295 (9th Cir.1994); *Rawlings v. Prudential-Bache Properties, Inc.,* 9 F.3d 513, 515-16 (6th Cir.1993)(also declining to follow *Camden I* and *Swedish Hospital*).

[19] *See Greenough,* 105 U.S. at 530 (citing an itemized "statement of expenditures made by Vose in the cause ... being for fees of solicitors and counsel, costs of court, and sundry small incidental items"); *see also Trustees v. Greenough,* [Oct. Term 1881 No. 601], Transcript of Record at 711-23, 770-78 (original) 228-32, 247-56 (print)(1881)(listing the itemized expenditures).

This Court holds that trial courts must exercise discretion in common-fund cases, choosing on a case-by-case basis, as a fiduciary on the lookout to protect the class's interests, whether attorney's fees should be calculated primarily using counsel's lodestar, or primarily as a percentage of the fund. *Health Republic,* 809 F.3d at 1371 (citing *Haggart,* 809 F.3d at 1355).

Here, Class Counsel precluded a meaningful exercise of that discretion by withholding the information necessary for a court even to begin evaluating their claimed lodestar. All they provided were summary tables with total hours worked by each attorney, multiplied by their claimed hourly rates—with no indication of what they actually worked on, when, or why. Appx0698-0699(DE158-5:22-23:¶¶62-64) (Gupta Decl.); Appx0744(DE158-6:5¶¶12-13) (Oliver Decl.).

That really is not enough for a court to evaluate the claimed lodestar—not even for purposes of a cross-check. "As part of the lodestar cross-check on remand" in *Health Republic* this Court required the Court of Claims to "readdress the Objectors' contentions that Quinn Emanuel has not done enough to justify the lodestar itself," directing that "the Claims Court should provide more explanation ... concerning the

adequacy of Quinn Emanuel's hours and rates." *Health Republic,* 58 F.4th at 1378. *Health Republic* requires a more detailed accounting for Class Counsel's time in this case too.

The District Court nonetheless opted to follow the wayward D.C. Circuit precedents, asserting that "as the D.C. Circuit has noted, 'the latest guidance from the High Court counsels the use of a percentage-of-the-fund methodology.'" Appx0033(DE169:33) (quoting *Swedish Hospital,* 1 F.3d at 1268 (citing *Blum v. Stenson,* 465 U.S. 886, 900 n.16 (1984)). The "latest guidance" was actually a passing obiter dictum in *Blum,* a statutory fee-shifting case, stating in a footnote that the matter before it did not involve a common-fund fee award in which the fee might have been calculated as a percentage of a fund.[20] *Blum* did not purport to overrule *Greenough's* holding that a common-fund award may be based on fees as incurred and billed, let alone to hold that common-fund fee

---

[20] *Blum*'s footnote said that "[u]nlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under §1988 reflects the amount of attorney time reasonably expended on the litigation." *Blum,* 465 U.S. at 900 n.16.

awards generally ***should*** be awarded as a percentage of the fund rather than with reference to attorneys' hours and billing rates.

That common-fund fees ***can*** be calculated as a percentage of the fund has been apparent since the Supreme Court slashed an excessive common-fund fee award from an unreasonable 10% to just 5% of the fund in *Pettus*, 113 U.S. at 128. But the District Court exercised no meaningful discretion when it deferred in this case to Class Counsel's request that they approve their large fee request as a percent-of-fund award. And the percentage that it blessed is far out-of-line with anything the Supreme Court's common-fund precedents have ever approved. Five percent would have been quite sufficient here, as it was in *Pettus*.

Of course, there is a reason why class-action lawyers request percent-of-fund fee awards in mega-fund cases that produce a common fund exceeding $100 million. Again, as Judge Jacobs observed in *Fikes Wholesale*, awarding "fees based on the percentage of the fund method … nearly always results in an award that exceeds the lodestar method." *Fikes Wholesale,* 62 F.4th at 729 (Jacobs, Cir.J., concurring). Thus it would seem that a judge, when acting as a fiduciary on behalf of the Class in cases like this, ought to seriously consider awarding fees using

lawyers' lodestars which—according to the Supreme Court provides the fairest and most objective way to calculate a lawyer's "reasonable fee" under fee-shifting statutes in contingent-fee class-action litigation. *See Perdue,* 559 U.S. at 546, 552-53. Even in common-fund cases, such as this, "[t]here is a 'strong presumption' that the lodestar figure represents a reasonable fee." *Fischel v. Equitable Life Assur. Soc'y*, 307 F.3d 997, 1007 (9th Cir.2002)(citation omitted). But the District Court gave no serious consideration to a lodestar award.

The information concerning Class Counsel's lodestar was inadequate to permit any serious consideration. The Government noted below that "Plaintiffs' counsel do not present any data in support of their claimed rates." Appx0750(DE159:5). Those rates were far above those that their own expert witness had identified as reasonable market rates for compensating counsel in complex litigation before federal forums in the District of Columbia. Class Counsel's own expert on fees, Professor Brian Fitzpatrick, developed a matrix of reasonable "Hourly Rates ($) for

Legal Fees for Complex Federal Litigation in the District of Columbia," widely known as the "Fitzpatrick Matrix."[21]

Professor Fitzpatrick has said his "Fitzpatrick Matrix" is based on research that "allowed us to determine the real hourly rates charged in the market" in complex federal litigation in the District of Columbia. Appx0866(DE166-5ExE:[ECFp49]). Yet in this case, Class Counsel's claimed lodestar was built on billing rates grossly exceeding what the Matrix allows for complex litigation in the District of Columbia. A year 2002 Georgetown graduate, Deepak Gupta's time is billed at $1150 an hour, while 2010 Harvard graduate Jonathan E. Taylor's time is billed at $975 an hour, **APX0698(**DE158-5:22¶63**)**, well over the rates that are reasonable for complex litigation in the District of Columbia. Appx0751(DE159:5) (Government Response with 2023 Fee Matrix rates); Appx0859(DE166-5ExD:[ECFp42]) (2021 Fee Matrix rates). Turning to the Motley Rice lawyers, we find William Narwold billing at $1250 an hour, and Meghan

[21] While Isaacson initially submitted a copy of the Matrix with rates current to 2021, Appx0859(DE166-5:ExD[ECFpp41-51]), the Government provided url links to the 2023 version of the Fitzatrick Matrix, which can be found *online at* https://www.justice.gov/usao-dc/page/file/1504361/dl *and at* https://perma.cc/EVQ5-NNMC and to which the District Court referred in its Final Approval Order. Appx0043(DE169:43).

Oliver at $950 an hour, Appx0744(DE158-5:5¶12), again far higher than the rates on the Matrix. *See* Appx0751-0752(DE159:5-6) (Government Response with 2023 Fee Matrix rates); Appx0859(DE166-5ExD:[ECFp42])) (2021 Fee Matrix rates).

As the Government observed in its response to Class Counsel's fee request:

> Importantly, though Plaintiffs rely on the declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.," ECF No. 158-4) in support of the reasonableness of their fees, they have chosen (with no explanation) not to utilize the U.S. Attorney's Office Fitzpatrick Matrix (created in conjunction with the very same Brian Fitzpatrick). *See* https://www.justice.gov/usao-dc/page/file/1504361/download. This is evident because class counsel seeks compensation for Gupta's 2023 rate of $1,150, which is significantly more than the top of the Fitzpatrick Matrix rate (see id., which indicates $807 per hour for attorneys with over 35 years of practice). Gupta graduated from law school in 2002, making his 2023 rate $742, approximately $408 less per hour than the rate at which he seeks compensation.

Appx0751(DE159:5).

The District Court rejected the Fitpatrick Matrix's relevance on the basis that it was designed for calculating reasonable lodestar fee awards, not lodestar cross-checks of percent-of-fund awards:

> But the Fitzpatrick Matrix was not designed to be used for lodestar cross-checks in common fund class actions; instead, "[t]he matrix is

> intended for use in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees." U.S. ATT'Y'S OFF. FOR D.C., THE FITZPATRICK MATRIX, Explanatory Note 2, www.justice.gov/usao-dc/page/file/1504361/download [https://perma.cc/EVQ5-NNMC]

Appx0043(DE169:43). That is a distinction that makes no sense.

The District Court's analysis is flawed in many other ways. It ruled, for example, that "each class member who was also part of the original class agreed to a contingency fee of up to 30% by declining to opt out." Appx0037(DE169:37). That is nonsense. Class Counsel could not, by slipping a sentence into the Class Notice about a potential 30% fee award, forfeit Class Members' right under Federal Rule of Civil Procedure 23(h)(2) to object to Class Counsel's request for fees. The very attempt was overreaching and unethical. The original Class Notice and Class Certification were, in any event, superseded by the Settlement Class for a longer Class Period, the E-mail Notice for which told Settlement Class Members, including Isaacson, "you may object to any aspect of the proposed settlement." Appx0846(DE166-5ExB:[ECFp29]). The District Court also erred by giving any weight to the fact that Named Plaintiffs' contingency fee agreements allowed for a 33% fee. Named Plaintiffs

66

plainly lacked power to bind the Class. *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013).

The District Court also gave Class Counsel credit for things they never achieved. "As one of the attorneys representing the class describes, before this lawsuit, 'litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime,'" the District Court wrote, overlooking the fact that Class Counsel achieved no meaningful "reform of the PACER fee regime." Appx0035(DE169:35). At the time of this writing, PACER fees remain ten cents a page, just as when this action was filed.

The District Court's award of attorney's fees should be reversed, with instructions first to calculate a reasonable fee independent of the amount that Class Counsel argue is reasonable.

### D. The Supreme Court's Foundational Common-Fund Precedents Prohibit Paying "Service Awards" to Representative Plaintiffs

The District Court erred as a matter of law by paying each of the Named Plaintiffs a "service award" or "incentive award" to reward them for their service as representative plaintiffs in this case.

Although *Greenough* approved of paying a representative plaintiff's reasonable attorney's fees from a common-fund recovery, provided the award is "made with moderation and a jealous regard to the rights of those who are interested in the fund," *Greenough,* 105 U.S. at 536-37, it rejected as "decidedly objectionable" any compensation "for the personal services" rendered by the representative plaintiff in recovering the fund. Id. at 537. Just three years later, the Supreme Court explained in *Pettus*:

> In *Trustees v. Greenough*, 105 U.S. 527, we had occasion to consider the general question as to what costs, expenses, and allowances could be properly charged upon a trust fund brought under the control of court by suits instituted by one or more persons suing in behalf of themselves and of all others having a like interest touching the subject-matter of the litigation. That suit was instituted by the holder of the bonds of a railroad company, on behalf of himself and other bondholders, to save from waste and spoliation certain property in which he and they had a common interest. It resulted in bringing into court or under its control a large amount of money and property for the benefit of all entitled to come in and take the benefit of the final decree. His claim to be compensated, out of the fund or property recovered, for his personal services and private expenses was rejected as unsupported by reason or authority.

*Pettus,* 113 U.S. at 122. Simply put, under the Supreme Court's common-fund precedents, representative plaintiffs' reasonable litigation expenses—including attorney's fees—may be paid from a common-fund

68

recovery that their litigation produces, but they cannot be paid for their own service in a representative capacity. *Id.*

In this case, however, the District Court rejected the holdings of *Greenough* and *Pettus,* to award each of the Named Plaintiffs a "service award" of $10,000. Appx0046(DE169:46). This is reversible error. The Eleventh Circuit has soundly concluded that that "Supreme Court precedent prohibits incentive awards" that compensate litigants for their service as representative plaintiffs. *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1255 (11th Cir.2020), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022).

A panel of the Second Circuit has acknowledged: "The Supreme Court has held that it was 'decidedly objectionable' for cash allowances to be 'made for the personal services and private expenses' of a creditor who brought suit on behalf of himself and other similarly situated bondholders." *Fikes Wholesale,* 62 F.4th at 721. But even if "[s]ervice awards are likely impermissible under Supreme Court precedent," the Second Circuit has continued to sustain them on the authority of its own decisions. *See id.* (following *Melito v. Experian Mktg. Sols. Inc.,* 923 F.3d 85, 96 (2d Cir.2019), and *Hyland v. Navient Corp.,* 48 F.4th 110, 123-24

(2d Cir.2022)); *see also Moses v. N.Y. Times Co.,* 79 F.4th 235, 253 (2d Cir.2023)(following *Melito, Hyland,* and *Fikes Wholesale*).

Discussing the Eleventh Circuit's "thorough and well-reasoned opinion" from *Johnson v. NPAS,* the *Fikes Wholesale* opinion's author, Judge Dennis Jacobs, reiterated in a concurring opinion that the Supreme Court's decisions in *Greenough* and *Pettus* bar paying named plaintiffs for their service as representative plaintiffs. "But this Court has twice come out the opposite way," he lamented, first in *Melito*, which without explanation asserted that *Greenough* and *Pettus* involved different "factual settings," and then in *Hyland* which "over-read *Melito* to hold that "Rule 23 does not per se prohibit service awards like the one at issue here." *Fikes,* 62 F.4th at 729 (Jacobs, Cir.J., concurring).

The truth is that Rule 23 says nothing that can be taken to authorize "incentive awards" or "service awards" to representative plaintiffs in common-fund cases. No statute, rule, or regulation authorized the $10,000 payments to each of the Named Plaintiffs in this case. Under *Greenough* they were "illegally made" and "should be reversed." *Greenough,* 105 U.S. at 538.

The $10,000 "service awards" paid to each of the Named Plaintiffs must be reversed.

## VII.  CONCLUSION

For all the foregoing reasons, the judgment below should be reversed, and the matter remanded with instructions to exclude from the Settlement Class and dismiss without prejudice the claims of all Class Members whose Class Period PACER expenditures exceeded $10,000. If Class Members whose Class Period PACER expenditures exceeded $10,000 are not excluded and dismissed, the District Court's finding that the Settlement is fair, reasonable, and adequate, should be reversed or vacated. The District Court's awards of attorney's fees and service awards both should be vacated.

DATED:  July 16, 2024

/s/ Eric Alan Isaacson
Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037-6213
Telephone: (858) 263-9581
Email: ericalanisaacson@icloud.com

*Pro Se Interested Party-Appellant*

# ADDENDUM

| Docket Entry | Document | page |
|---|---|---|
| DE169 | Final Approval Opinion................................................Appx0001 |
| DE170 | Final Judgment and Order.......................................Appx0049 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

NATIONAL VETERANS LEGAL )
SERVICES PROGRAM, NATIONAL )
CONSUMER LAW CENTER, and )
ALLIANCE FOR JUSTICE, for themselves )
and all others similarly situated, )
)
v. ) Civil Action No. 16-0745 (PLF)
)
UNITED STATES OF AMERICA, )
)
Defendant. )

---

OPINION

For over fifteen years, PACER fees – the per-page fees that the federal judiciary charges the public for online access to court documents – have been a subject of controversy. As a result of the litigation in this case, the United States will return over $100 million of these fees to users of PACER. Today, this litigation substantially comes to a close.

The Court has before it a motion of class representatives National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice (the "Named Plaintiffs") for final approval of a settlement agreement that would resolve the pending claims of hundreds of thousands of plaintiffs and reimburse them for PACER fees that the judiciary unlawfully used to fund certain non-PACER services. Counsel for the Named Plaintiffs also request attorney's fees, costs, and service awards.

After careful consideration of the arguments made by the Named Plaintiffs and by the government, and of the comments and objections by interested persons submitted to the Court and made at the hearing held on October 12, 2023, the Court will approve the settlement

agreement and award $23,863,345.02 in attorney's fees, $1,106,654.98 in costs, and $30,000 in

service awards.[1]

---

[1] The filings and attachments considered by the Court in connection with this matter include: Complaint ("Compl.") [Dkt. No. 1]; Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment ("Mot. to Dismiss") [Dkt. No. 11]; Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents, Exhibit 3 ("Class Cert. Web Notice") [Dkt. No. 42-5]; Notice of Filing of Revised Notice Documents, Exhibit 1 ("Class Cert. Email Notice") [Dkt. No. 43-1]; Plaintiffs' Motion for Summary Judgment as to Liability ("Pls.' Summ. J. Mot.") [Dkt. No. 52]; Declaration of Jonathan E. Taylor, Exhibit B ("1997 AO Report") [Dkt. No. 52-3]; Declaration of Jonathan E. Taylor, Exhibit E ("Jud. Conf. Letter") [Dkt. No. 52-6]; Declaration of Jonathan E. Taylor, Exhibit H ("Lieberman Letter") [Dkt. No. 52-9]; Plaintiffs' Statement of Undisputed Material Facts ("Pls.' Facts") [Dkt. No. 52-16]; Defendant's Cross-Motion for Summary Judgment ("Def.'s Summ. J. Mot.") [Dkt. No. 74]; Declaration of Wendell A. Skidgel Jr. ("Skidgel Decl.") [Dkt. No. 74-2]; Defendant's Statement of Material Facts as to Which There is No Genuine Dispute and Response to Plaintiffs' Statement of Undisputed Material Facts ("Def.'s Facts") [Dkt. No. 74-3]; Declaration of Wendell A. Skidgel Jr. ("2d Skidgel Decl.") [Dkt. No. 81-1]; Notice of Submission of Revised Proposed Order and Revised Notice Documents, Exhibit 5 ("Sett. Web Notice") [Dkt. No. 152-5]; Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Sett. Mot.") [Dkt. No. 158]; Declaration of Renée Burbank ("Burbank Decl.") [Dkt. No. 158-1]; Declaration of Stuart T. Rossman ("Rossman Decl.") [Dkt. No. 158-2]; Declaration of Rakim Brooks ("Brooks Decl.") [Dkt. No. 158-3]; Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.") [Dkt. No. 158-4]; Declaration of Deepak Gupta ("Gupta Decl.") [Dkt. No. 158-5]; Declaration of Meghan S.B. Oliver ("Oliver Decl.") [Dkt. No. 158-6]; Declaration of Gio Santiago Regarding Implementation of Settlement Notice Program ("KCC Decl.") [Dkt. No. 158-7]; Defendant's Response to Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Def.'s Resp.") [Dkt. No. 159]; Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Reply") [Dkt. No. 160]; Supplemental Declaration of Brian T. Fitzpatrick ("Fitzpatrick Supp. Decl.") [Dkt. No. 160-1]; Declaration of William B. Rubenstein in Support of Class Counsel's Motion for Attorneys' Fees ("Rubenstein Supp. Decl.") [Dkt. No. 160-2]; Supplemental Declaration of Deepak Gupta ("Gupta Supp. Decl.") [Dkt. No. 160-3]; Declaration of Meghan S.B. Oliver ("Oliver Supp. Decl.") [Dkt. No. 160-4]; Declaration of Gio Santiago Regarding Settlement Administration Costs ("KCC Supp. Decl.") [Dkt. No. 160-5]; Plaintiff-Class Member Don Kozich's Verified Objections to Settlement and Motion to Appear Telephonically or by Zoom ("Kozich Obj. and Mot.") [Dkt. No. 163]; Plaintiffs' Response to Objection of Don Kozich ("Resp. to Kozich Obj.") [Dkt. No. 165]; and Plaintiffs' Notice of Filing of All Objections Received to Date ("Compiled Objs.") [Dkt. No. 166].

The Court also reviewed the following objections to the settlement agreement: Objection of Aaron Greenspan ("Greenspan Obj.") [Dkt. No. 166-1]; Objection of Alexander Jiggetts ("Jiggetts Obj.") [Dkt. No. 166-2]; Objection of Geoffrey Miller ("Miller Obj.") [Dkt.

## I. BACKGROUND

### A. Origin and History of PACER Fees

Before the late 1980s, federal courts operated on paper.  If members of the public wanted to view court dockets or filings, they had to travel to the courthouses where those records physically existed.  Then, in 1988, the judiciary "authorized an experimental program of electronic access for the public to court information."  Jud. Conf. of the U.S., Report of the Proceedings 83 (Sept. 14, 1988), www.uscourts.gov/file/1642/download [perma.cc/HKS6-4B34].  This experiment gave rise to the Public Access to Court Electronic Records system, or "PACER."  Pls.' Facts ¶ 1.  PACER allows the public to access court documents without the need to review physical records or travel to the courthouse to access them.  25 Years Later, PACER, Electronic Filing Continue to Change Courts, U.S. Cts. (Dec. 9, 2013), www.uscourts.gov/news/2013/12/09/25-years-later-pacer-electronic-filing-continue-change-courts [perma.cc/92NB-8BM7].

Originally, PACER worked via a dial-up phone connection and users were charged fees by the minute.  25 Years Later, PACER, Electronic Filing Continue to Change Courts, supra.  But in 1998, PACER moved online, and the judiciary started charging users on a per-page basis.  See Def.'s Facts ¶ 16.  Around the same time, the judiciary began to use PACER

---

No. 166-3]; Objection of Eric Isaacson ("Isaacson Obj.") [Dkt. No. 166-5]; and Written Statement of Eric Alan Isaacson of Intent to Appeal in Person at the October 12, 2023, Final-Approval Hearing ("Isaacson Stmt.") [Dkt. No. 166-6].

The Court also reviewed the following prior opinions in this case:  Nat'l Veterans Legal Servs. Program v. United States, Civil Action No. 16-0745, 2016 WL 7076986 (D.D.C. Dec. 5, 2016) ("Motion to Dismiss Op."); Nat'l Veterans Legal Servs. Program v. United States, 235 F. Supp. 3d 32 (D.D.C. 2017) ("Class Certification Op."); Nat'l Veterans Legal Servs. Program v. United States, 291 F. Supp. 3d 123 (D.D.C. 2018) ("Summary Judgment Op."); and Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d 1340 (Fed. Cir. 2020) ("Federal Circuit Op.").

fees to pay for programs other than PACER, like Case Management / Electronic Case Filing

("CM/ECF"), a new system that allowed parties to file documents electronically.  See 1997 AO

Report at 36; Pls.' Facts ¶ 9.  By fiscal year 2000, the judiciary was using the fees to pay for

PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN")

costs.  2d Skidgel Decl. ¶ 31; id. tab 30; see Summary Judgment Op., 291 F. Supp. 3d at 131.

   In 2002, Congress passed the E-Government Act, a statute whose broad purpose

was to improve electronic services and processes in government.  See E-Government Act

of 2002, Pub. L. 107-347, 116 Stat. 2899.  As relevant to this litigation, the Act amended the

statutory note to 28 U.S.C. § 1913 ("Section 1913 Note") so that it read:

> COURT FEES FOR ELECTRONIC ACCESS TO INFORMATION
>
> [. . . .]
>
> (a)  The Judicial Conference may, only to the extent necessary,
> prescribe reasonable fees . . . for collection by the courts . . . for
> access to information available through automatic data processing
> equipment.  These fees may distinguish between classes of persons,
> and shall provide for exempting persons or classes of persons from
> the fees, in order to avoid unreasonable burdens and to promote
> public access to such information.   The Director of the
> Administrative Office of the United States Courts, under the
> direction of the Judicial Conference of the United States, shall
> prescribe a schedule of reasonable fees for electronic access to
> information which the Director is required to maintain and make
> available to the public.
>
> (b)  The Judicial Conference and the Director shall transmit each
> schedule of fees prescribed under paragraph (a) to the Congress at
> least 30 days before the schedule becomes effective.  All fees
> hereafter collected by the Judiciary under paragraph (a) as a charge
> for services rendered shall be deposited as offsetting collections . . .
> to reimburse expenses incurred in providing these services.

28 U.S.C. § 1913 note (internal quotation marks omitted); see E-Government Act of 2002,

§ 205(e).  The Senate Governmental Affairs Committee explained:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

S. REP. NO. 107-174 at 23 (June 24, 2002).  At that point, PACER fees were set at $0.07 per page.  See Skidgel Decl. Ex. G at 64.

But PACER fees continued to rise.  Effective January 2005, the Judicial Conference increased fees to $0.08 per page.  Jud. Conf. Letter at 1.  The Director of the Administrative Office of the United States Courts explained that the increase was "predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue to fund CM/ECF operations and maintenance."  Id.

By the end of 2006, the judiciary had accumulated $32.2 million of excess revenue from PACER fees.  Pls.' Facts ¶ 16; Summary Judgment Op., 291 F. Supp. 3d at 134.  For that reason, the judiciary further expanded the categories of programs that would be funded by the fees.  See Summary Judgment Op., 291 F. Supp. 3d at 134-35.  These programs included CM/ECF, EBN, courtroom technology upgrades, an online Jury Management System ("Web Juror"), a Violent Crime Control Act ("VCCA") notification system, and a study to determine the feasibility of providing access to state court documents through CM/ECF (the "State of Mississippi Study").  2d Skidgel Decl. tab 11, tab 12; see Summary Judgment Op., 291 F. Supp. 3d at 135.  In 2012, the judiciary increased PACER fees to $0.10 per page.  Pls.' Facts at ¶ 22.

PACER fees have been controversial since at least 2008.  That year, a group of activists attempted to download significant portions of the court documents available on PACER and make them available for free.  John Schwartz, An Effort to Upgrade a Court Archive System to Free and Easy, N.Y. TIMES (Feb. 12. 2009), www.nytimes.com/2009/02/13/us/13records.html.  These activists, along with scholars and public officials, argued that PACER fees make it difficult for the public to access information integral to understanding our country's law and legal system.  E.g., Timothy B. Lee, The Case Against PACER: Tearing Down the Courts' Paywall, ARSTECHNICA (Apr. 9, 2009), www.arstechnica.com/tech-policy/2009/04/case-against-pacer [perma.cc/X52V-RYQT]; see also Pls.' Sett. Mot. at 5 ("High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts.").

In 2009, Senator Joe Lieberman, sponsor of the E-Government Act, expressed concern that the judiciary may have been violating the Act by collecting PACER fees "well higher than" the cost of funding PACER.  Lieberman Letter at 1.  Still, this trend continued.  From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased from about $102.5 million in 2010 to $146.4 million in 2016.  See Pls.' Facts ¶¶ 28, 46, 62, 80, 98, 116, 134.

## B.  Procedural History

The current litigation began in April 2016, when the Named Plaintiffs filed a class-action lawsuit against the United States alleging that the judiciary had violated the

6

E-Government Act by charging excessive PACER fees.  Compl. ¶¶ 1-3, 34.[2]  The Named

Plaintiffs alleged jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a).  Id. ¶ 33.  The

Named Plaintiffs were, and still are, represented by Gupta Wessler LLP and Motley Rice LLC

("Class Counsel").

        The United States moved to dismiss.  See Mot. to Dismiss.  The government

argued that the Court lacked jurisdiction, id. at 15-19, that the Named Plaintiffs could not sue

without first alerting the PACER Service Center, id. at 13-15, and that other similar class action

lawsuits challenging PACER fees should be litigated first under the "first-to-file rule."  Id.

at 12-13.  This Court denied the motion to dismiss.  See Motion to Dismiss Op., 2016

WL 7076986.  In January 2017, the Court certified a class.  See Class Certification Op., 235 F.

Supp. 3d 32.  The class consisted of "[a]ll individuals and entities who have paid fees for the use

of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and

federal government entities."  Id. at 39.  These class members were given notice and an

opportunity to opt out.  Gupta Decl. ¶ 14; see Order Approving Plan of Class Notice ("1st Notice

Appr.") [Dkt. No. 44].  The parties then engaged in informal discovery, which clarified what

categories of expenses were funded by PACER fees.  Gupta Decl. ¶ 15.

        In August 2017, the Named Plaintiffs filed a motion seeking "summary

adjudication of the defendant's liability, reserving the damages determination for after formal

discovery."  Pls.' Summ. J. Mot. at 1.  The United States then filed a cross-motion for summary

judgment as to liability.  Def.'s Summ. J. Mot. at 1.  In these motions, the parties asked the Court

to decide the central question in the case:  Under the E-Government Act, what categories of

---

[2]     Judge Ellen Segal Huvelle presided over this case until her retirement, at which time the case was reassigned to the undersigned.

expenses may be funded by PACER fees? <u>See</u> <u>id.</u> at 1-2; Pls.' Summ. J. Mot. at 1. The Named Plaintiffs argued that the Act "prohibits the [judiciary] from charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER," so none of the additional categories of expenses were permitted. Pls.' Summ. J. Mot. at 11. The United States urged a broader reading of the statute which would allow the judiciary to "charge fees, as it deems necessary, for the provision of information to the public through electronic means," making all of the additional categories of expenses lawful. Def.'s Summ. J. Mot. at 11.

The Court rejected both positions, holding that the government's interpretation of the E-Government Act was too broad, but that the Named Plaintiffs' interpretation was too narrow. <u>See</u> Summary Judgment Op., 291 F. Supp. 3d at 141-44. The Court concluded that the judiciary "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the expenditures for [c]ourtroom [t]echnology." <u>Id.</u> at 146. Using PACER fees to pay for these expenses was improper because the programs failed to further "the public's ability to access information on the federal court's CM/ECF docketing system." <u>Id.</u> at 150.

The parties cross-appealed to the United States Court of Appeals for the Federal Circuit. In August 2020, the Federal Circuit affirmed this Court's interpretation. <u>See</u> Federal Circuit Op., 968 F.3d at 1359. The Federal Circuit wrote that Judge Huvelle "got it just right" in interpreting the E-Government Act to "limit[] PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." <u>Id.</u> at 1343, 1350. The Named Plaintiffs' interpretation failed because it "combine[d] part of the first sentence of paragraph (a) [of the Section 1913 Note] ('The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . .') with two parts of

8

the last sentence of paragraph (b) ('to reimburse expenses incurred in providing' the 'services rendered,' which plaintiffs construe to mean PACER access), paying little heed to the substantial amount of text in between." Id. at 1350. Instead, the full text of the Section 1913 Note, along with its legislative history, made clear that the E-Government Act "limits the use of PACER fees to expenses incurred in providing (1) electronic access for members of the public (2) to information stored on a federal court docketing system." Id. at 1351-52.[3]

Applying this interpretation to the contested categories of expenses, the Federal Circuit agreed with this Court that it was unlawful for the judiciary to use PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most courtroom technology expenses. Federal Circuit Op., 968 F.3d at 1358. The appellate court declined to decide whether it was lawful for PACER fees to fund all CM/ECF expenditures, holding that the issue was not properly before it and remanding to this Court for further proceedings. Id. at 1358-59.

After remand, the parties began settlement discussions. See Gupta Decl. ¶¶ 23-24. Even after the Federal Circuit ruling, the government took the position that it did not owe damages to class members because the class could not prove that PACER fees would have been lower if the judiciary had refrained from making the unlawful expenditures. Id. ¶ 23. The government also maintained that all CM/ECF expenditures were properly funded by PACER fees. Id. The Named Plaintiffs disagreed with both positions. Id.

In May 2021, the parties engaged in an all-day mediation session with Professor Eric Green. Gupta Decl. ¶ 25. During the mediation, the parties agreed to a common-fund settlement structure and the United States made a "final offer" for the total amount of the fund.

---

[3] The Federal Circuit also held that the Little Tucker Act granted jurisdiction over the lawsuit because the E-Government Act was sufficiently "money-mandating." Federal Circuit Op., 968 F.3d at 1347-49.

9

Id. ¶ 26.  Over the next few weeks, Professor Green continued to mediate, and the parties agreed

on a fund amount of $125 million.  See id. ¶ 27.  Reaching agreement on the remaining sticking

points – including how the fund would be distributed, what would happen to unclaimed money,

and the scope of the release of legal claims – took many months more.  Id. ¶¶ 27-28.  In July

2022, the parties executed a settlement agreement, which they amended once in September 2022

and again in April 2023 (collectively, the "Agreement").  Id. ¶ 28; see id. Ex. A ("Sett.

Agreement"); id. Ex. B ("First Supp. Agreement"); id. Ex. C ("Second Supp. Agreement").

      On May 8, 2023, the Court granted preliminary approval of the Agreement and

scheduled a hearing to consider final approval for October 12, 2023 (the "Settlement Hearing").

See Order Granting Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement

("Prelim. Approval") [Dkt. No. 153] at ¶¶ 1, 3.  At that time, the Court certified a revised

settlement class.  Id. ¶ 7.  The settlement class included all members of the original class who did

not opt out, plus those meeting the same criteria who had paid PACER fees before May 2018 but

after the original class was certified.  Id.  The Court directed that notice of the Agreement and its

terms be provided to the settlement class.  Id. ¶¶ 15, 16, 18.  Using the government's PACER

registration data, the claims administrator identified members of the class to be notified.  Id.

¶ 13; KCC Decl. ¶¶ 5-7.

      In July 2023, the claims administrator sent the court-approved settlement notice,

both through email and through postcards, to over 500,000 PACER account holders.  KCC Decl.

¶¶ 8-11.  These notices provided class members with the settlement amount, an overview of the

litigation, information about opting out and submitting objections, and a link to additional

information and the full Agreement on a website dedicated to the settlement.  Id. Ex. B; see

PACER FEES CLASS ACTION, www.pacerfeesclassaction.com [https://perma.cc/N4L5-AYHS].

Objections could be filed by mailing or emailing Class Counsel and the Court. <u>See</u> Sett. Web Notice at 5. Because some class members already had the opportunity to opt out when the original class was certified, the notice sent to them did not include the option to opt out. KCC Decl. ¶8; <u>see id</u>. Ex. A. The claims administrator also issued publication notice through a widely disseminated press release and a banking newsletter. <u>Id</u>. ¶¶ 12, 13.

There were a few hiccups in the notice process. First, the initial notice omitted some class members who were part of the original class. KCC Decl. ¶ 15. Second, the notice sent to some members of the original class incorrectly indicated that they had another opportunity to opt out. <u>Id</u>. ¶ 16. The settlement administrator corrected both mistakes and sent new notices on August 7, 2023. <u>Id</u>. ¶¶ 15, 16. Thirty-three individuals timely opted out of the settlement class.[4] Five individuals filed objections. <u>See</u> Compiled Objs.[5]

On August 28, 2023, the Named Plaintiffs moved for final approval of the class settlement and for attorney's fees, costs, and service awards. Pls.' Sett. Mot. The Court held the Settlement Hearing on October 12, 2023. Class Counsel, as well as representatives for each of the three Named Plaintiffs, gave statements in support of the Agreement. Two objectors spoke in opposition to the Agreement. Then the Court gave the parties an opportunity to respond to

---

[4]      While the Named Plaintiffs initially stated that thirty-four individuals timely opted out, Pls.' Sett. Mot. at 13, the parties clarified at the Settlement Hearing that they had included a duplicate in their count and that the correct number is thirty-three. In addition, the parties clarified at the Settlement Hearing that sixteen individuals attempted to opt out after the opt out deadline. But none of these sixteen individuals were actually eligible to opt out, as all were either part of the original class and had the opportunity to opt out in 2017, or were federal employees who were never part of the class to begin with. <u>See id</u>.

[5]      These individuals were: Aaron Greenspan, Alexander Jiggetts, Geoffrey Miller, Don Kozich, and Eric Isaacson. Of the written objections, two of the five were timely (Mr. Miller's and Mr. Isaacson's), and one of the three untimely objections was filed by an individual who is likely not a class member (Mr. Kozich). Nevertheless, the Court has considered all five objections filed.

written and oral objections. Finally, the Court heard from the parties and from objectors on the issue of attorney's fees.

## II. THE SETTLEMENT AGREEMENT

The Agreement creates a common fund of $125 million and provides for the distribution of at least 80% of that fund to the hundreds of thousands of persons or entities who paid PACER fees between April 21, 2010 and May 31, 2018 (the "Class Period").

### A. The Settlement Class and Fund

The settlement class includes all persons or entities who paid PACER fees in the period beginning six years before the Named Plaintiffs filed their original complaint (April 22, 2010) and ending on the date the judiciary stopped using PACER fees to fund prohibited expenses (May 31, 2018) – with the exception of those who opted out, of federal agencies, and of Class Counsel. Sett. Agreement ¶ 3; First Supp. Agreement; see Pls.' Sett. Mot. at 11. This class includes at least several hundred thousand members. See Class Certification Op., 235 F. Supp. 3d at 39.

The settlement common fund totals $125 million. Sett. Agreement ¶ 11. From this fund, at least 80%, or $100 million, is to be distributed to class members. Id. ¶ 18. Up to 20%, or $25 million, is to be used for attorney's fees, litigation expenses, and service awards for the class representatives. Id. ¶ 28. As to the attorney's fees and service awards, the Agreement specifies that "the Court will ultimately determine whether the amounts requested are reasonable." Id. The Agreement further specifies that service awards cannot exceed $10,000 per class representative. Id.

## B. *Fund Allocation and Distribution to Class Members*

The Agreement allocates the common fund to class members through a two-step calculation.  See Sett. Agreement ¶ 19.  First, all class members are allocated either $350 or, if they paid less than $350 in PACER fees during the Class Period, the actual amount that they paid.  Id.  Second, class members who paid over $350 receive, in addition to the first $350, a pro rata allocation of the remaining common fund.  Id.  This pro rata allocation compares the amount that a given class member paid over $350 to the amounts that other class members paid over $350, and allots the remaining common fund accordingly.  See id.  To illustrate the calculation, if a class member paid $100 in PACER fees during the Class Period, they will get all of it back.  See id. ¶¶ 19, 20.  But if a class member paid $1000 in PACER fees during the Class Period, they will get $350 plus an amount from the remaining common fund proportional to the additional $650 that they paid.  See id.  If there is unclaimed money after these allocations are distributed to class members, then the rest of the common fund will be distributed to class members who have not been fully reimbursed for the PACER fees they paid during the Class Period and who successfully collected their first distribution.  Id. ¶ 23.

In contrast to most class action settlements, class members will not need to submit claims to get their share of this common fund.  See Pls.' Sett. Mot. at 13.  Instead, the claims administrator will use the information provided to them by the government – which has comprehensive records of PACER registrants and the fees they paid – to identify class members and distribute their payments.  See id.; Sett. Agreement ¶¶ 14, 21, 23; KCC Decl. ¶¶ 5-7.  The claims administrator will disburse the first set of payments within 180 days of receiving the settlement fund from the government, and will distribute any remaining money three months after that.  Second Supp. Agreement ¶ 21; Sett. Agreement ¶ 24.

## III.  FAIRNESS

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be dismissed, settled, or compromised without the approval of the Court.  FED. R. CIV. P. 23(e). Before giving its approval, the Court must direct the provision of adequate notice to all members of the class, conduct a hearing, and find, after notice and a hearing, that the settlement is "fair, reasonable, and adequate."  Id.; see Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998); In re Black Farmers Discrimination Litig., 856 F. Supp. 2d 1, 26 (D.D.C. 2011).  In performing this task, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action.  See WILLIAM B. RUBENSTEIN, 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:40 (6th ed. 2023).

To determine whether a settlement is fair, reasonable, and adequate, the Court "looks to the 'paramount twin elements of procedural and substantive fairness.'"  Mercier v. United States, 156 Fed. Cl. 580, 584 (2021) (quoting Courval v. United States, 140 Fed. Cl. 133, 139 (2018) (internal quotation marks omitted)).  The Federal Rules instruct the Court to consider a variety of factors in doing so.  The first two of these factors are procedural:  whether "(A) the class representatives and class counsel have adequately represented the class; [and] (B) the proposal was negotiated at arm's length."  FED. R. CIV. P. 23(e)(2).  The remaining factors are substantive; the Court is to consider whether:

> (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Id.

14

Having carefully considered the parties' arguments and all of the objections that have been filed with the Court and expressed at the Settlement Hearing, the Court concludes that the settlement is fair, reasonable, and adequate.

### A. Procedural Fairness

The Court finds that the Named Plaintiffs and Class Counsel have more than "adequately represented" the class. See FED. R. CIV. P. 23(e)(2)(A). The Named Plaintiffs are nonprofit organizations who pay PACER fees despite their nonprofit status, and whose members experienced real burdens because of the fees. Class Certification Op., 235 F. Supp. 3d at 42. These characteristics made them "particularly good class representatives." Id. The two law firms representing the class, in tandem, have extensive experience both in class actions and in lawsuits against the federal government. See Gupta Decl. ¶¶ 45-48, 50-55, 59-61; see also infra Section IV.B.1.

The Named Plaintiffs and Class Counsel have vigorously litigated this case for nearly eight years, over seven of them after the class was certified. See Gupta Decl. ¶¶ 11-13. They engaged in informal discovery, argued (and, in part, won) summary judgment, and successfully defended the summary judgment ruling on appeal. See id. ¶¶ 14-21; see also infra Section IV.B.2. After remand, they engaged in extensive settlement negotiations with the government. Gupta Decl. ¶¶ 23-28.

By all accounts, these settlement negotiations happened at "arm's length," indicating no collusion between the parties. See FED. R. CIV. P. 23(e)(2)(B). Negotiations came at a point in the litigation where liability was resolved but there were still significant questions about the possibility, and amount, of damages. The negotiations were thus neither "too early to be suspicious nor too late to be a waste of resources." In re Vitamins Antitrust Litig., 305 F.

15

Supp. 2d 100, 105 (D.D.C. 2004). And because of "significant informal discovery, . . . the parties were well-positioned to mediate their claims." Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 56 (D.D.C. 2010). The negotiations took place over nearly two years but came together "after a lengthy mediation session that was presided over by an experienced mediator," indicating skilled negotiating on both sides. See id. Further evidence that the negotiations were at arm's length and not collusive is provided by the positions taken by the parties during settlement negotiations and the compromises ultimately reached. See infra at 24.

The notice requirements of Rule 23 were also satisfied. When the Court preliminarily approved the settlement, it "direct[ed] notice in a reasonable manner to all class members who would be bound by the proposal." FED. R. CIV. P. 23(e)(1)(B); see Prelim. Approval ¶¶ 15, 16, 18. The Court also found the planned notice to be "the best notice practicable under the circumstances," Prelim. Approval ¶ 21, as was required for the individuals and entities who were not part of the originally certified class. See FED. R. CIV. P. 23(c)(2)(B). The claims administrator adequately executed this notice. Using the government's PACER registration data, it identified over 500,000 potential class members and sent them court-approved notices, both through email and through postcards. KCC Decl. ¶¶ 5-7, 8-11; see Prelim. Approval ¶ 13; see also FED. R. CIV. P. 23(c)(2)(B) (requiring, for new class members, "individual notice to all members who can be identified through reasonable effort"). The claims administrator also issued publication notice. KCC Decl. ¶¶ 12, 13. Each form of notice directed class members to additional information on the dedicated settlement website. See id. Exs. A-H. While there were a few errors in the notice process – the initial notice omitted some class members and gave some class members incorrect information – the claims administrator promptly corrected these errors and gave recipients sufficient time to opt out or object.

16

Id. ¶¶ 15-18.[6]  The notice also satisfied Rule 23's substantive requirements for new class members.  The emails, postcards, and publications, along with the dedicated settlement website:

> clearly and concisely state[d] in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

See FED. R. CIV. P. 23(c)(2)(B).  The Court finds that this notice was more than sufficient and was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Haggart v. Woodley, 809 F.3d 1336, 1348-49 (Fed. Cir. 2016) (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950)).

After class members were given notice, they had over a month (and most had over two months) to file written objections.  See KCC Decl. ¶¶ 10, 15; Prelim. Approval ¶¶ 3, 20.  Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web Notice at 5.  Only five individuals filed written objections.  On October 12, 2023, the Court held the Settlement Hearing.  After the parties' opening statements, the Court heard objections to the settlement.  No one spoke who had not already submitted a written objection.  Then, the Court gave the parties an opportunity to respond to objections.  Finally, the Court heard from the parties and from objectors on the issue of attorney's fees.

---

[6]     Objector Don Kozich contends that he did not receive notice of the settlement.  Kozich Obj. and Mot. at 2.  While no method of notice is perfect, Mr. Kozich's failure to receive notice was likely proper.  Mr. Kozich does not appear to be a member of the class.  He incurred PACER fees during the Class Period, but he did not pay those fees during the Class Period, and thus is ineligible for relief.  Resp. to Kozich Obj. at 1.

Objector Eric Isaacson has questioned a few procedural aspects of the Settlement Hearing. First, he argues that discussing the proper award of attorney's fees after the time scheduled for objectors to speak deprives objectors of due process and runs afoul of the Federal Rules, Isaacson Stmt. at 7, which instruct the Court to consider "the terms of any proposed award of attorney's fees" in evaluating the adequacy of "the relief provided for the class" in the proposed settlement. FED. R. CIV. P. 23(e)(2)(C)(iii). Second, Mr. Isaacson argues that objectors at the hearing should have been given the opportunity to cross-examine declarants who provided support for Class Counsel's requested fees. Isaacson Stmt. at 7.[7]

Both of these arguments overstate an objector's role in the class settlement process. While the Court must consider – and has considered – the arguments of any class member who objects to the settlement, the Court need not give objectors the opportunity to speak at every possible point in the hearing; nor does the Court need to give objectors the opportunity to probe declarations or exhibits through cross-examination or other means. See 4 RUBENSTEIN, supra, § 13:42. Moreover, to assuage Mr. Isaacson's concerns, the Court allowed him to speak during the portion of the hearing addressing attorney's fees, in addition to his opportunity to speak during the portion of the hearing during which the reasonableness of the settlement was discussed.

---

[7] Mr. Isaacson further objects that "the settling parties arranged with the court to keep class members' objections off the public record." Isaacson Stmt. at 3. This objection has no factual basis. Though the objections the Court received through email were not automatically docketed, they were available upon request. In fact, at Mr. Isaacson's request, Class Counsel filed all objections to the public docket. See Compiled Objs.

18

## B. Substantive Fairness

In considering a proposed class action settlement, the Court must compare the benefits afforded to class members under the settlement with the likely recovery that plaintiffs would have realized if they pursued the resolution of their claims through litigation in court. Thomas v. Albright, 139 F.3d at 231; see In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 30. The Court must look at the settlement as a whole and should not reject a settlement merely because individual class members claim that they would have received more by litigating rather than settling. Thomas v. Albright, 139 F.3d at 231. The Court should scrutinize the terms of the settlement carefully, but should also keep in mind "the interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources." Christensen v. United States, 65 Fed. Cl. 625, 629 (2005) (quoting Mayfield v. Barr, 985 F.2d 1090, 1092 (D.C. Cir. 1993)). And "the opinion of 'experienced and informed counsel should be afforded substantial consideration by [the C]ourt in evaluating the reasonableness of a proposed settlement.'" Prince v. Aramark Corp., 257 F. Supp. 3d 20, 26 (D.D.C. 2017) (quoting In re Lorazepam & Clorazepate Antitrust Litig., Civil Action No. 99-0790, 2003 WL 22037741, at *6 (D.D.C. June 16, 2003)).

In its analysis of the Agreement's substantive fairness, the Court is guided by the substantive factors enumerated in the Federal Rules of Civil Procedure: whether "the relief provided for the class is adequate, taking into account" various subfactors, and whether "the proposal treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2).

### 1. Whether the Relief is Adequate

The relief the settlement provides to class members is substantial. The majority of class members will receive a full refund for the PACER fees they paid during the Class

Period.  Gupta Decl. ¶ 43.  Although the minority of class members – those who paid over $350 in fees during the Class Period – will likely not receive a full refund, they may receive substantially more than $350.  See Sett. Agreement ¶ 19.  In addition, the "proposed method of distributing relief to the class" is efficient.  See FED. R. CIV. P. 23(e)(2)(C)(ii).  There are no claims to process, and class members will receive the relief even if they have never contacted Class Counsel or the claims administrator.  See Pls.' Sett. Mot. at 13.

Contrast this substantial relief with the potential "costs, risks, and delay of trial and appeal."  See FED. R. CIV. P. 23(e)(2)(C)(i).  The Federal Circuit's liability ruling in this case found some, but not all, of the PACER fees collected during the Class Period to be unlawful. Federal Circuit Op., 968 F.3d at 1350-51, 1357.  It left open the question of the extent to which it was lawful for the judiciary to fund CM/ECF through PACER fees.  See id. at 1358.  And the ruling effectively set the maximum possible recoverable damages for the class at around $500 million.  Fitzpatrick Decl. ¶ 20.

Even putting aside the costs of trial and potential further appeal, the path to obtaining this $500 million would have been anything but smooth.  "[T]here are several reasons to think a full recovery is unrealistic."  In re APA Assessment Fee Litig., 311 F.R.D. 8, 19 (D.D.C. 2015).  After the Federal Circuit's ruling, the government continued to assert that the class had no claim to damages because class members could not prove that – but for the unlawful expenditures – PACER fees would have been lower.  Gupta Decl. ¶ 23.  Moreover, even if class members would not have had to prove damages with specificity, the amount of potentially recoverable damages still would have been uncertain.  Much of the potential recovery came from fees the judiciary used to pay for CM/ECF services, Fitzpatrick Decl. ¶ 20, and the Federal Circuit explicitly declined to rule on how much of these services were appropriately funded

20

through PACER fees. Federal Circuit Op., 968 F.3d at 1358. The recoverability of a sizable portion of the potential damages was thus an open question at the time of settlement.

In other words, at the point of the litigation at which the parties agreed on the terms of their settlement, it would have been a substantial risk to class members to proceed to trial. Evidence could have shown that <u>all</u> of the judiciary's CM/ECF expenditures were lawful. Or the government could have convinced the Court of its position on damages. In that case, the Named Plaintiffs would have faced the difficult task of proving that the judiciary would have chosen to charge lower PACER fees had its expenditures been limited to the lawful categories. The common fund amount – roughly a quarter of the potential recovery if every legal and factual issue had gone the plaintiffs' way – was impressively large in comparison to the risks of continuing to litigate.

Some objectors see a quarter of the maximum potential recovery as an unimpressive figure. <u>See</u> Isaacson Obj. at 3 (calling the settlement "remarkably mediocre"); Greenspan Obj. at 1 (asserting that the settlement should have fully reimbursed PACER users). These views do not properly account for the formidable arguments that were available to the government if the case had proceeded to trial. In addition, Objector Aaron Greenspan asserts that the common fund amount is too low because the judiciary can only legally charge for the marginal cost of document transmission, and that marginal cost is zero. Greenspan Obj. at 1. But the Court has explicitly rejected an interpretation of the E-Government Act that would limit lawful fees to those necessary to pay the marginal cost of operating PACER. Summary Judgment Op., 291 F. Supp. 3d at 140-43. Instead, the judiciary can use PACER fees to fund the full cost of providing public access to federal court electronic docketing information, including fixed costs. <u>See</u> Federal Circuit Op., 968 F.3d at 1349-52.

Other objectors argue that the Agreement is unreasonable because of its provision regarding attorney's fees, expenses, and service awards.  See Isaacson Obj. at 9-17; Greenspan Obj. at 1-2.  The Court has conducted a full analysis of the proper fee awards below.  See infra Section IV.  For now, it suffices to say that the fees provision of the Agreement is reasonable. See FED. R. CIV. P. 23(e)(2)(C)(iii) (instructing courts to consider the provisions of settlement agreements that relate to attorney's fees).  The Agreement does not fix an amount of attorney's fees or service awards.  Instead, it sets an upper limit on both – Class Counsel was able to request up to 20% of the common fund for attorney's fees, expenses, and service awards, including no more than $10,000 per service award for each class representative.  Sett. Agreement ¶ 28.  The Agreement leaves to the Court the ultimate determinations of how much to award.  Id. Rather than setting an unreasonably high amount of attorney's fees or service awards, the Agreement thus caps the amount the Court has the opportunity to approve as reasonable.

Finally, the relative paucity of objections to the Agreement is a strong indicator of the adequacy of the relief.  See In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 29; Mercier v. United States, 156 Fed. Cl. at 597.  As Class Counsel notes, the settlement class is comprised of hundreds of thousands of PACER users and is "perhaps the most litigious group of people and entities ever assembled in a single class action, . . . including sophisticated data aggregators, federal-court litigators, and law firms of every stripe."  Pls.' Reply at 1.  Of this group, only thirty-three opted out of the class, and only five have objected to the settlement.  In light of the terms of the Agreement and class members' lack of opposition to them, the Court finds the settlement relief adequate.

2. Whether the Settlement Treats Class Members Equitably

The Court concludes that the Agreement "treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D).  While it treats those who paid $350 or less in PACER fees during the Class Period differently from those who paid more than $350, this difference in treatment is fair and justified.

The requirement of intra-class equity exists to ensure that "class counsel ha[s not] sold out some of the class members at the expense of others, or for their own benefit." 4 RUBENSTEIN, supra, § 13:56.  If class counsel prioritizes settling a case over vigorously advocating for all class members' claims, counsel may agree to provide some (more powerful or more vocal) class members more relief than they deserve while giving other class members less than they deserve.  To ensure that class counsel has not done so, it falls upon the Court to determine whether similarly situated class members are treated similarly and whether "dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." Id.

There is absolutely no indication that Class Counsel "sold out" any group of class members in this case.  The Agreement strikes a balance between two competing goals:  First, to give relief to small-scale PACER users – the non-lawyer members of the public and individual law practitioners who were most affected by having to pay unlawful fees; the full reimbursement of all PACER fees paid up to $350 makes it more likely that small-scale users will be wholly compensated.  See Sett. Agreement ¶ 20.  And second, to treat all class members – including large-scale users like law firms – equitably based on what they actually paid.  The pro rata allocation above $350 makes it more likely that the sizable fees paid by large-scale users will be adequately accounted for.  See id.  The Agreement thus does a good job of treating similarly

23

Appx0023

situated class members similarly, while accounting for the differences between dissimilarly situated class members.

The details the parties have provided about the settlement negotiations further support the reasonableness of the Agreement's common fund distribution. As to the allocation of settlement funds, the Named Plaintiffs initially took the position that the fund should be distributed on an exclusively <u>pro rata</u> basis. Gupta Decl. ¶ 28. The government countered that, before the <u>pro rata</u> allocation, class members should first be fully reimbursed up to a large amount. <u>Id</u>. It grounded this position in the E-Government Act's authorization to "'distinguish between classes of persons' in setting PACER fees . . . 'to avoid unreasonable burdens and to promote public access to'" electronic docketing information. <u>Id</u>. (quoting 28 U.S.C. § 1913 note). Consistent with the judiciary's policy of offering waivers and other pricing mechanisms to make PACER cheaper for some groups of users, the government wanted more of the settlement fund to go to reimbursing those who used PACER less. <u>See id</u>. The $350 figure reflected a compromise between the Named Plaintiffs' position and the government's position. Far from "selling out" class members, the different treatment of different groups within the class reflects vigorous negotiation on both sides, and reflects the text of the E-Government Act.

A number of the objectors dispute the reasonableness of the distribution. Mr. Isaacson argues that too much of the common fund is allocated <u>pro rata</u>, unfairly favoring large-scale users over small-scale users. Isaacson Obj. at 4-5. Objector Geoffrey Miller argues that too much of the common fund is allocated to fully reimbursing users who paid $350 or less, unfairly favoring small-scale users over large-scale users. Miller Obj. at 1-2.[8] As Class Counsel

---

[8] Mr. Miller also objects that "[t]he proposed plan of allocation under Federal Rule 23 is in tension with the Rules Enabling Act, 28 U.S.C. §[§] 2071-2077, because, by providing different treatment to litigants with identical legal claims, it arguably abridges their

points out, these arguments cannot both be correct, and the fact that each of them was made indicates, if anything, a good compromise.  <u>See</u> Pls.' Reply at 4.  Moreover, the structure of the distribution is on sound legal footing.  "Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members . . . ."  <u>Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.</u>, 497 F.3d 615, 629 (6th Cir. 2007).  At the same time, courts routinely approve settlements providing for <u>pro rata</u> distributions of common funds because such distributions directly account for the differences in the value of the claims of different class members.  <u>See</u>, <u>e.g.</u>, <u>In re APA Assessment Fee Litig.</u>, 311 F.R.D. at 13; <u>In re Facebook Biometric Info. Priv. Litig.</u>, 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021); <u>In re Telik, Inc. Sec. Litig.</u>, 576 F. Supp. 2d 570, 580-81 (S.D.N.Y. 2008).

   The fact that two objectors (Mr. Isaacson and Mr. Miller) hold these contradictory positions is understandable.  A class member who paid substantially more than $350 in PACER fees, but substantially less than a large-scale user, may look at large-scale users and feel disappointed that these users are getting so much more in absolute dollars.  And a large-scale user may look at a class member who paid $350 or less in PACER fees and find it unfair that that class member is getting fully reimbursed by the Agreement, while the large-scale user is not.  At bottom, however, this dissatisfaction arises from the amount of the common fund, not its allocation.  There is simply not enough money in the common fund to reimburse every class member for all of what they paid in PACER fees – nor should there be, as some of the fees were

---

right to be treated equally before the law."  Miller Obj. at 2.  But the Rules Enabling Act is irrelevant to allocations between class members in common-fund settlements.  Instead, as applied to class actions, the Rules Enabling Act prevents courts from "giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action."  <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 458 (2016).

25

lawful. No settlement is perfect. But the Court finds that the difference in how this settlement treats different class members is justified, fair, and equitable.

Mr. Isaacson raises another issue of equity. He points out that many of the institutional class members are law firms, and that these firms have likely already been reimbursed – by their clients or through settlement agreements in other cases – for PACER fees paid during the Class Period. Isaacson Obj. at 4-7. Because these law firms have already been reimbursed, he argues, it is inequitable to treat them like other class members, particularly like individuals who never received reimbursement. See id. at 4.[9]

This argument makes some sense in the abstract. While a reasonable settlement hypothetically could differentiate between law firm class members who had been reimbursed for their PACER fees and other class members who had not been reimbursed for their PACER fees, there were good reasons not to do so here. First, prior to settlement, the claims of the law firms that had been reimbursed by their clients were just as valid as the claims of other class members. See S. Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533 (1918). In fact, the law firm class members were likely the only plaintiffs who could have brought claims against the government to recover the relevant PACER fees. Their clients could not have brought such claims because damages under the Little Tucker Act are available only to those who paid unlawful fees to the government, to those who paid unlawful fees to others "at the direction of

---

[9]    Mr. Isaacson further argues that the common fund allocations to many large-scale claimants are improper because entities whose aggregated claims total over $10,000 fall outside of Little Tucker Act jurisdiction. Isaacson Obj. at 7-8. This argument misunderstands the law. "A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Class Certification Op., 235 F. Supp. 3d at 38 (citing Am. Airlines, Inc. v. Austin, 778 F. Supp. 72, 76-77 (D.D.C. 1991); Alaska Airlines v. Austin, 801 F. Supp. 760, 762 (D.D.C. 1992); United States v. Louisville & Nashville R.R. Co., 221 F.2d 698, 701 (6th Cir. 1955)).

the government to meet a governmental obligation," see Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed. Cir. 1996), or to those against whom the government took action, related to unlawful fees, that had a "direct and substantial impact." See Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1303 (Fed. Cir. 2004) (quoting Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002)). Because clients who reimbursed law firms for unlawful PACER fees do not appear to fit into any of these categories, it would have been difficult – perhaps impossible – for them to recover anything from the government. Instead, once law firm class members have received their distributions under the Agreement, clients may have claims against them – to recover what the clients paid to the law firms in PACER fees – through sources of law unrelated to class actions, like contract law or state statutes. See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (approving a settlement even though some class members had been reimbursed for unlawful fees). That is between lawyers and their clients and beyond the scope of this litigation.

Second, it makes sense to leave disputes concerning reimbursement to law firm class members and the clients who reimbursed them, rather than to the claims administrator. It is true, as Mr. Isaacson points out, that law firms often bill clients for PACER fees. Isaacson Obj. at 4; see, e.g., Decastro v. City of New York, Civil Action No. 16-3850, 2017 WL 4386372, at *10 (S.D.N.Y. Sept. 30, 2017). But it would be complicated and burdensome for the claims administrator to sort through billing records to determine what happened with respect to each set of PACER fees billed. Sometimes, firms write fees off. Sometimes, clients do not pay. And if a client paid part, but not all, of their bills, it may not even be possible for the claims administrator to figure out what portion of a client's payment went towards PACER charges. On the other

hand, law firm class members are better equipped to determine which of their clients to reimburse for PACER charges, and by how much. If the clients believe the firms to be unlawfully withholding reimbursement, they can sue. More likely, law firms and clients will resolve any disputes over reimbursement out of court. Allowing this process to play out does not make the settlement inequitable.

In short, the benefits offered to class members by the Agreement are substantial, and the likely outcome for the class if the case were to proceed to trial is uncertain. The Court is convinced that the Agreement is fair, reasonable, and adequate.

### IV.  ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). Here, the Agreement authorizes attorney's fees, costs, and services awards, but limits the amount the Court can award for these categories combined to no more than 20% of the common fund, or $25 million. Sett. Agreement ¶ 28. The Agreement further specifies that service awards cannot exceed $10,000 per Named Plaintiff. Id.

Class Counsel effectively requests the maximum amount allowed by the settlement: $1,106,654.98 in costs, $30,000 in service awards ($10,000 for each of the three Named Plaintiffs), and $23,863,345.02 – the difference between the $25 million cap and the

other two amounts – in attorney's fees. Pls.' Sett. Mot. at 4.[10] The government does not oppose their request.[11]

The Court must independently determine the reasonableness of the requested fees, costs, and service awards. After carefully considering the submissions of the parties, the relevant Federal Rule, and the case law, and after considering all of the objections that have been filed with the Court and expressed at the Settlement Hearing, the Court awards the full amount requested by Class Counsel in fees, costs, and service awards.

### A. Legal Background

#### 1. Attorney's Fees

"The 'common fund doctrine' allows an attorney whose efforts created, increased or preserved a fund 'to recover from the fund the costs of his litigation, including attorneys' fees.'" In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 16 (D.D.C. 2003) (quoting Vincent v. Hughes Air West, Inc., 557 F.2d 759, 769 (9th Cir.1977)). In common-fund cases, courts have a duty to "ensure that claims for attorneys' fees are reasonable, in light of the results obtained." Rogers v. Lumina Solar, Inc., Civil Action No. 18-2128, 2020 WL 3402360, at *11 (D.D.C. June 19, 2020) (K.B. Jackson, J.) (quoting In re Black Farmers Discrimination Litig., 953 F. Supp. 2d 82, 87 (D.D.C. 2013)). The Court's independent scrutiny of an award's reasonableness is particularly important in common-fund cases because "the conflict between a class and its

---

[10]     The $1,106,654.98 that Class Counsel requests in costs is comprised of $29,654.98 in attorney expenses and $1,077,000 in settlement-administration and noticing costs. Pls.' Sett. Mot. at 4.

[11]     In its briefs, the government raised concerns about the size of the requested fees. Def.'s Resp. at 4-7. At the Settlement Hearing, however, the government indicated that Class Counsel's reply brief had alleviated their concerns.

attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (quoting Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991)).  Thus, in common-fund cases, the court acts "as fiduciary for the beneficiaries" of the fund "because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set" and because "there is no adversary process that can be relied upon in the setting of a reasonable fee." In re Dep't of Veterans Affs. (VA) Data Theft Litig., 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (quoting Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 251 (1985)).

Courts have identified two approaches to calculating reasonable attorney's fees in common-fund cases. The first is the "percentage-of-the-fund method, through which 'a reasonable fee is based on a percentage of the fund bestowed on the class.'" Health Republic Ins. Co. v. United States, 58 F.4th 1365, 1371 (Fed. Cir. 2023) (quoting Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984)).  The second is the lodestar method, "through which the court calculates the product of reasonable hours times a reasonable rate, and then adjusts that 'lodestar' result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings." Id. (cleaned up).

While courts have discretion to use either method, fee awards in common-fund cases are "typically based on some percentage of the common fund." Moore v. United States, 63 Fed. Cl. 781, 786 (2005).  The lodestar method, by contrast, generally is used in fee-shifting cases. Health Republic Ins. Co. v. United States, 58 F.4th at 1371.  Many courts of appeals have expressed an explicit preference for using the percentage method in common-fund cases. 5 RUBENSTEIN, supra, § 15:64 & n.15; see, e.g., Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261,

1271 (D.C. Cir. 1993); see also In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 17. This is because the percentage method "helps to align more closely the interests of the attorneys with the interests of the parties," Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d at 1573, by discouraging inflation of attorney hours and promoting "efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 205 (D.D.C. 2011) (quoting In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 383 (D.D.C. 2002)). The lodestar method, on the other hand, may give attorneys "an incentive to run up" "the number of hours they have billed," which could "prolong[] litigation unnecessarily and hence defer[] the class's compensation." 5 RUBENSTEIN, supra, § 15:65; see Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268.

When using the percentage-of-the-fund method, the Federal Circuit has identified the following factors to consider:

> (1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award.

Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787). In addition, "as settlement amounts increase in magnitude, the percentage of fees awarded should decrease." Haggart v. United States, 116 Fed. Cl. 131, 147 (2014). This is because "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." Id. (alterations in original) (quoting In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998)).

31

Courts sometimes employ a "lodestar cross-check" when they use the percentage method. <u>See</u> 5 RUBENSTEIN, <u>supra</u>, § 15:85. In a lodestar cross-check, "the reasonableness of a potential percentage-of-the-fund fee is checked by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier, and when this implicit multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." <u>Health Republic Ins. Co. v. United States</u>, 58 F.4th at 1372 (cleaned up). While "the resulting multiplier need not fall within any pre-defined range, . . . courts must take care to explain how the application of a multiplier is justified by the facts of a particular case, . . . [and] must provide sufficient analysis and consideration of multipliers used in comparable cases to justify the award made." <u>Id.</u> at 1375 (cleaned up). That said, lodestar cross-checks "need entail neither mathematical precision nor bean-counting," as "district courts may rely on summaries submitted by the attorneys and need not review actual billing records." <u>In re Rite Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 306-07 (3d Cir. 2005). Although not required, the Federal Circuit has strongly suggested using a lodestar cross-check, "at least as a general matter." <u>Health Republic Ins. Co. v. United States</u>, 58 F.4th at 1374 n.2.

### 2. Costs and Service Awards

Rule 23 contemplates recovery of "nontaxable costs," FED. R. CIV. P. 23(h), the "reasonable expenses normally charged to a fee paying client." 5 RUBENSTEIN, <u>supra</u>, § 16:5; <u>see</u> <u>Quimby v. United States</u>, 107 Fed. Cl. 126, 135 (2012). And "[i]t is well settled that counsel who have created a common fund for the benefit of a class are entitled to be awarded for out-of-pocket costs reasonably incurred in creating the fund." <u>Mercier v. United States</u>, 156 Fed. Cl. at 593. Aside from being reasonable, such expenses must be adequately documented. 5 RUBENSTEIN, <u>supra</u>, § 16:10.

32

Service awards, also known as "incentive" or "case-contribution" awards, are distributions from the common fund to class representatives in recognition of their service to the class and their role in the litigation.  See 5 RUBENSTEIN, supra, § 17:1.  Service awards "recognize the unique risks incurred and additional responsibility undertaken by named plaintiffs in class actions," Mercier v. United States, 156 Fed. Cl. at 589, and also compensate class representatives for expenses and work performed by in-house counsel.  See In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 400.  Service awards must be reasonable and proportionate to class representatives' role in the case.  See 5 RUBENSTEIN, supra, § 17:13.

### B.  Reasonableness of Requested Attorney's Fees

Class Counsel and the government agree that the Court should use the percentage-of-the-fund method to assess the reasonableness of the requested fees.  Pls.' Sett. Mot. at 27; Def.'s Resp. at 8-9.  Mr. Isaacson argues that the Court should use the lodestar method and award fees not exceeding Class Counsel's lodestar.  Isaacson Obj. at 9-10.  He relies primarily on Supreme Court precedent discussing fee-shifting cases and on precedent predating Rule 23 and the modern class action lawsuit.  Id.  But as the D.C. Circuit has noted, "the latest guidance from the High Court counsels the use of a percentage-of-the-fund methodology."  Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268 (citing Blum v. Stenson, 465 U.S. at 900 n.16); see also In re Home Depot Inc., 931 F.3d 1065, 1085 (11th Cir. 2019) ("[T]he Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases does not apply to common-fund cases."); In re BioScrip, Inc. Sec. Litig., 273 F. Supp. 3d 474, 479-89 (S.D.N.Y. 2017) (Nathan, J.) (rejecting similar arguments made by Mr. Isaacson).  For these reasons, and because the percentage method promotes efficiency and ensures that class counsel is compensated primarily based on the result achieved, the Court will use the percentage method.

33

The government urges the Court to also employ a lodestar cross-check. Def.'s Resp. at 7. Class Counsel points out, rightly, that a lodestar cross-check is not required, but it stops short of arguing that the Court should refrain from doing one. Pls.' Sett. Mot. at 35; see id. at 36-37; Pls.' Reply at 10. The Court will add a lodestar cross-check to its percentage-method analysis to confirm that the fee awarded properly accounts for the effort Class Counsel expended to litigate the case. The Court will first analyze the percentage requested using each of the above-described Federal Circuit factors, and then will conduct a lodestar cross-check.

### 1. The Quality of Counsel

As the Court has stated before, "[t]here is no dispute about the competency of class counsel." Class Certification Op., 235 F. Supp. 3d at 43. Gupta Wessler is one of the nation's leading plaintiff and public interest appellate boutiques, and also has extensive experience in complex litigation against the federal government. See Gupta Decl. ¶¶ 46-48, 50-55, 59-61. Motley Rice is a leading class-action law firm. Id. ¶ 45. In dividing case responsibilities, each firm took charge of what it does best – Gupta Wessler led the briefing, argument, research, and legal analysis, and Motley Rice led the case management, discovery, and settlement administration. Id. These two firms have "thoroughly impress[ive] . . . qualifications" and class members undoubtedly "benefit[ted] from the wealth of experience" they brought to the case. Steele v. United States, Civil Action No. 14-2221, 2015 WL 4121607, at *4 (D.D.C. June 30, 2015) (describing groups of attorneys including current members of Class Counsel).

2.   The Complexity and Duration of the Litigation

The litigation was reasonably complex.  As in most class actions, the litigation involved a motion to dismiss, disputes regarding class certification, and cross-motions for summary judgment.  See Motion to Dismiss Op., 2016 WL 7076986; Class Certification Op., 235 F. Supp. 3d 32; Summary Judgment Op., 291 F. Supp. 3d 123.  But unlike most class actions, this case required appellate argument both as to a novel theory of jurisdiction and as to the most important merits issue in the case.  See Federal Circuit Op., 968 F.3d at 1343.  After remand, Class Counsel engaged in lengthy settlement negotiation with the government.  Gupta Decl. ¶¶ 23-28.  And even after the parties reached an agreement, Class Counsel put significant effort into answering class members' questions.  Gupta Supp. Decl. ¶¶ 2, 3.  All told, Class Counsel worked on this case for nearly eight years.  See Gupta Decl. ¶¶ 11, 12.

Mr. Isaacson asserts that this case was easy to litigate because it involved an issue of statutory construction that was ultimately settled by the Federal Circuit.  Isaacson Obj. at 14.  But this argument ignores the fact that it was Class Counsel's very efforts that caused the Federal Circuit to construe the statute in a way that would allow the class to recover.  The unsettled interpretation of the E-Government Act at the outset of the litigation speaks to the complexity of the case, not against it.

3.   The Risk of Nonrecovery

There was an exceptionally high risk of nonrecovery in this case.  As one of the attorneys representing the class describes, before this lawsuit, "litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime" – both because "the judiciary has statutory authority to charge at least some amount in fees" and because "the fees were still assumed to be beyond the reach of litigation."  Gupta Decl. ¶ 7.  He

35

points out correctly that the Administrative Procedure Act – which normally provides jurisdiction and a waiver of sovereign immunity for lawsuits against agencies – explicitly exempts the federal judiciary from its reach.  See id.; 5 U.S.C. § 551(1)(B).

Even after Class Counsel identified their alternative and ultimately successful strategy of arguing that the Little Tucker Act provided the necessary jurisdiction and waiver of sovereign immunity, there was still a significant risk of nonrecovery for class members.  To show illegal exaction under the Little Tucker Act, the Named Plaintiffs had to "demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." Federal Circuit Op., 968 F.3d at 1348 (internal quotation marks omitted) (quoting Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005)).  But the E-Government Act, which Class Counsel argued caused the exaction, "nowhere explicitly requires payment of damages by the government for overcharging users."  Id.  Thus, before even getting to the merits, Class Counsel had to fight an uphill interpretive battle.

On the merits, Class Counsel's argument was similarly difficult.  Take, for example, the one sentence in the E-Government Act that explicitly spoke to PACER fees:  "The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts under those sections for access to information available through automatic data processing equipment."  28 U.S.C. § 1913 note.  As the Federal Circuit acknowledged, far from supporting its ultimate holding, this sentence "supports the government's interpretation, as it authorizes charging fees for electronic access to information without any express restrictions."  Federal Circuit Op., 968 F.3d at 1351.  Nevertheless, Class Counsel persuaded the Federal Circuit that the rest of the statute, and its context, imposed

36

restrictions on the sorts of electronic information dissemination for which the judiciary could use PACER fees.  See id. at 1352-57.

Finally, there was litigation risk even after the Federal Circuit held that the E-Government Act did impose such restrictions.  See supra Section III.B.1.  Whether the judiciary could use PACER fees to pay for all of CM/ECF was still an open question.  See Federal Circuit Op., 968 F.3d at 1358.  And the government made plausible arguments that the class could not recover damages without an additional evidentiary showing.  See Gupta Decl. ¶ 23.  Until the moment the Named Plaintiffs reached a settlement with the government, there was a significant risk of nonrecovery.

4.   The Fee that Likely Would Have Been Negotiated in Similar Cases

The Court is to consider what fee "likely would have been negotiated between private parties in similar cases."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787).  The truth is that there are few "similar cases" with which to compare this case:  a class action lawsuit against the federal judiciary for charging too much in fees that it is explicitly authorized to charge at least in part.  See infra Section IV.B.6.  Still, it is worth noting that the percentage award Class Counsel requests here is below the typical 33% contingency fee.  And as Class Counsel points out, each Named Plaintiff signed a retainer agreement providing for a contingency fee of up to 33% of the common fund, Gupta Decl. ¶ 65, and each class member who was also part of the original class agreed to a contingency fee of up to 30% by declining to opt out.  Class Cert. Email Notice; Class Cert. Web Notice at 7; see 1st Notice Appr.  At the same time, the Court takes these agreements with a grain of salt.  Each plaintiff in a class action "typically has a small interest in the overall controversy" and thus "has no incentive to negotiate a competitive rate with class counsel."

37

5 RUBENSTEIN, supra, § 15:74.  And while one third of the recovery may be the typical fee in cases with relatively few plaintiffs, it is not the standard for large class actions where the size of the class is one of the main determinants of the size of the recovery.  This factor thus has minimal bearing on the reasonableness of Class Counsel's requested fee.  See Mercier v. United States 156 Fed. Cl. at 592 ("Even if some other class members had agreed to a 33.3% contingency fee, they almost certainly would have evaluated the fee's reasonableness in terms of their own recoveries, overlooking the economies of scale that class counsel enjoyed by representing thousands of similarly situated plaintiffs.").

5.  Class Members' Objections to the Settlement Terms or Fees Requested by Class Counsel

Most of the objections to the Agreement or the requested fees have already been discussed in the context of the fairness of the settlement, see supra Section III, or with regard to another fee approval factor.  See supra Section IV.B.2.  Mr. Isaacson raises several additional arguments regarding attorney's fees.  First, Mr. Isaacson argues that the Court should not consider the supplemental declarations of Professor William Rubenstein and Professor Brian Fitzpatrick because Class Counsel submitted these declarations after the deadline for class members to file objections.  Isaacson Stmt. at 3.  Second, Mr. Isaacson quibbles with the content of these supplemental declarations.  Id. at 3-6.

Strictly construed, Mr. Isaacson's first argument lacks merit.  Under the Federal Rules of Civil Procedure, the only relevant requirement is that notice of a motion for attorney's fees must be "directed to class members in a reasonable manner" so that class members "may object to the motion."  FED. R. CIV. P. 23(h).  The Advisory Committee notes that, "[i]n setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion."  Id. advisory committee's note (2003).

Rule 23 thus requires only that class members have sufficient time to respond to the fee <u>motion</u> and accompanying evidence, not to evidence submitted in response or reply. Here, Class Counsel submitted their motion for attorney's fees over two weeks before the objection deadline, giving objectors sufficient time to respond. <u>See</u> Pls.' Sett. Mot.

That said, it is a fair point that class members lack a meaningful opportunity to object to attorney's fees requests if counsel submits declarations raising new bases of support for the requested fees after the objection deadline. And the professors' supplemental declarations do just that. Professor Fitzpatrick's declaration provides information about why the Fitzpatrick Matrix should not be used as Mr. Isaacson suggests. <u>See</u> Fitzpatrick Supp. Decl. ¶¶ 4-6. Professor Rubenstein's declaration examines the data used in the Fitzpatrick Matrix and comes to certain conclusions about reasonable fees based on a subset of that data. <u>See</u> Rubenstein Supp. Decl. ¶¶ 13-26. Neither of these points was raised in the professors' original declarations, which accompanied Class Counsel's fees motion.

Based on Mr. Isaacson's objections, the Court will not rely on the supplemental declarations of Professor Fitzpatrick or Professor Rubenstein in assessing the reasonableness of Class Counsel's requested fees. Because the Court will not rely on the declarations, it need not address Mr. Isaacson's arguments about their content.

### 6. The Percentage Applied in Other Class Actions

Thirty years ago, the D.C. Circuit noted that "a majority of common fund class action fee awards fall between twenty and thirty percent." <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1272. This remains true today. <u>See</u> 5 RUBENSTEIN, <u>supra</u>, § 15:83 (summary of empirical studies on common fund fee awards finding means between 22% and 27% and medians between 24% and 29%). For cases in which the common fund is especially large, fee

awards tend towards the low end of this range.  The latest comprehensive study on class action

fee awards, using data from 2009-2013, reports that the mean percentage awarded from common

funds greater than $67.5 million is 22.3%.  Theodore Eisenberg et al., <u>Attorneys' Fees in Class</u>

<u>Actions: 2009-2013</u>, 92 N.Y.U. L. REV. 937, 948 (2017).

Although it is difficult to locate good comparisons to the settlement in this case,

the comparisons that the Court did find are in line with these statistics.  Two cases involving

insufficient pay by the Department of Veterans Affairs provide the closest analogues.  In

<u>Quimby v. United States</u>, a class of over 40,000 health professionals formerly employed by the

Department alleged that they were deprived of additional pay that they earned for working

undesirable shifts.  <u>Quimby v. United States</u>, 107 Fed. Cl. at 128-29.  As this Court has done in

this case, the Court of Claims granted in part and denied in part cross-motions for summary

judgment on the government's liability.  <u>Id</u>. at 128.  The class ultimately settled with the

government in 2012 – after eleven years of contentious litigation – and the settlement agreement

provided for a common fund of $74 million.  <u>See id</u>. at 133.  The Court of Claims granted class

counsel's request for 30% of the common fund in attorney's fees, <u>id</u>. at 132, 135, reasoning that

the attorneys obtained "excellent results," <u>id</u>. at 133 (quoting <u>Hensley v. Eckerhart</u>, 461 U.S.

424, 435 (1983)), and that "[t]he complexity of this litigation, the government's opposition to the

Court's ruling on the merits, and the absence of controlling precedent concerning many of the

issues presented together indicate that continued litigation would have created substantial

uncertainty for members of the class."  <u>Id</u>.

The plaintiffs in <u>Mercier v. United States</u> brought similar claims.  <u>See</u> <u>Mercier v.</u>

<u>United States</u>, 156 Fed. Cl. 580.  There, a class of over 3,000 nurses and physician assistants

sued the Department of Veterans Affairs, alleging that they were deprived of overtime pay.  <u>Id</u>.

at 583.  The Court of Claims granted the government's motion to dismiss, but was reversed on appeal.  Id.  The litigation continued.  Id.  The class settled with the government in 2021 – after eight years of litigation – and the settlement agreement provided for a common fund of $160 million.  Id. at 583-84.  Class counsel requested 30% of the common fund in attorney's fees.  Id. at 590.  In analyzing the reasonableness of this request, the Court of Claims found that class counsel was skilled and experienced, that the litigation was complex, and that the risk of nonrecovery was substantial.  Id. at 591.  But because the common fund was so large (in part due to the size of the class itself), the court rejected class counsel's request and awarded 20% of the fund instead of the requested 30%.  Id. at 592-93.  The court found that the awarded percentage would "protect[] the interests of the class members but also provide[] ample compensation to counsel for their excellent work in this case" and "encourage other counsel to take on the representation of plaintiffs in similar cases."  Id. at 593.

Here, the requested percentage is 19.1%.  It is smaller than the percentage the Court of Claims awarded in Quimby, a complex case that lasted longer than this one – and where, as here, the government opposed the court's rulings on novel issues of law.  See Quimby v. United States, 107 Fed. Cl. at 128-133.  It is approximately what the Court of Claims awarded in Mercier, another complex case, of similar duration to this one – and where, as here, counsel for the class successfully litigated issues of liability on appeal.  See Mercier v. United States 156 Fed. Cl. at 583-84, 591-93.  Furthermore, according to the most recent comprehensive study on class action fee awards, the requested percentage is around the average for common funds in the range of the fund created by this settlement.  See Eisenberg et al., supra, at 948.  Because the requested fee award fits neatly within the relevant statistical range and aligns with the best case analogues, this factor strongly counsels in favor of approval of the attorney's fees request.

41

### 7. The Size of the Award

The size of the requested fee award – nearly $24 million – is large. But "so is the class members' total recovery." See Raulerson v. United States, 108 Fed. Cl. 675, 680 (2013) (approving fee award of approximately $11 million). Three additional considerations convince the Court that the absolute size of the requested award is not a cause for concern. First, $24 million is nowhere near the highest amounts courts have awarded in attorney's fees in common-fund cases. See, e.g., 52 Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 723-24 (2d Cir. 2023) (affirming fee award of approximately $523 million); In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1281 (11th Cir. 2021) (affirming fee award of $77.5 million); see also Eisenberg et al., supra, at 943-44 (finding yearly average fee awards between $37.9 million and $124 million in common-fund cases with recoveries greater than $100 million). Second, $24 million is close to the absolute size of the fees awarded in the closest comparator cases identified above. See Mercier v. United States 156 Fed. Cl. at 593 (awarding $32 million in fees); Quimby v. United States, 107 Fed. Cl. at 135 (awarding approximately $22 million in fees). And third, the Court's lodestar cross-check, performed below, directly accounts for the size of the fee award by comparing it to the amount of effort that Class Counsel expended in this case. As a result, this factor does not move the needle in either direction.

### 8. Lodestar Cross-Check

The Federal Circuit has noted a "norm of . . . multipliers in the range of 1 to 4" in lodestar cross-checks of reasonable fee requests. Health Republic Ins. Co. v. United States, 58 F.4th at 1375. Statistics show that, between 2009 and 2013, the mean lodestar multiplier was 1.48. Eisenberg et al., supra, at 965 tbl.12. For cases with common funds over $67.5 million, the mean multiplier was 2.72. Id. at 967 tbl.13. Multipliers significantly above this

42

Appx0042

mean may be cause for concern.  In <u>Mercier</u>, for example, the Court of Claims found a multiplier of 4.4 to be too high, but a multiplier of 2.95 to result in "a very generous but reasonable recovery."  <u>Mercier v. United States</u>, 156 Fed. Cl. at 592; <u>see also</u> 5 RUBENSTEIN, <u>supra</u>, § 15:87 ("Empirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1-2 range; this fact counsels in favor of a presumptive ceiling of 4, or slightly above twice the mean.").

Here, Class Counsel estimates their lodestar at $6,031,678.25 based on the hourly rates that the firms' attorneys charge in non-contingency cases.  Gupta Decl. ¶¶ 63, 64; Oliver Decl. ¶¶ 12, 13.  Both the government and Mr. Isaacson suggest that Class Counsel's lodestar should be estimated using the hourly rates in the U.S. Attorney's Office Fitzpatrick Matrix, instead of using Class Counsel's actual rates.  Def.'s Resp. at 5-7; Isaacson Obj. at 12-13.  But the Fitzpatrick Matrix was not designed to be used for lodestar cross-checks in common fund class actions; instead, "[t]he matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees."  U.S. ATT'Y'S OFF. FOR D.C., THE FITZPATRICK MATRIX, Explanatory Note 2, www.justice.gov/usao-dc/page/file/1504361/download [https://perma.cc/EVQ5-NNMC]; <u>see</u>, <u>e.g.</u>, <u>J.T. v. District of Columbia</u>, 652 F. Supp. 3d 11, 26-27, 31-36 (D.D.C. 2023) (using Fitzpatrick Matrix to calculate reasonable attorney's fees under the fee-shifting provision of the Individuals with Disabilities Education Act).  Mr. Isaacson also asserts that the Court should require Class Counsel to submit itemized records of hours billed in order to make "appropriate deductions."  Isaacson Obj. at 12.  But the Court declines to engage in the "bean-counting" that it has been cautioned against, and instead

will "rely on summaries submitted by the attorneys."  In re Rite Aid Corp. Sec. Litig., 396 F.3d at 306-07.[12]

        In addition, the government argues that Class Counsel's use of current billing rates "fail[s] to account [for the fact] that the litigation began in 2016, with class certification in 2017, when rates for both firms presumably were lower."  Def's Resp. at 4.  But courts routinely use current billing rates for lodestar cross-checks, even when the attorneys requesting fees charged lower rates at the outset of litigation.  See, e.g., Bakhtiar v. Info. Res., Inc., Civil Action No. 17-4559, 2021 WL 4472606, at *9 (N.D. Cal. Feb. 10, 2021); In re Apollo Grp. Inc. Sec. Litig., Civil Action No. 04-2147, 2012 WL 1378677, at *7 & n.2 (D. Ariz. Apr. 20, 2012).  Until fees are awarded, class action attorneys work on a case without pay.  Using current billing rates, which are almost always higher than historical rates, accounts for this delay in payment. See James v. District of Columbia, 302 F. Supp. 3d 213, 226-28 (D.D.C. 2018) (citing Perdue v. Kenny A. ex. rel. Winn, 559 U.S. 542, 556 (2010)); cf. Stetson v. Grissom, 821 F.3d 1157, 1166 (9th Cir. 2016) (when calculating attorney's fees using the lodestar method, rather than the percentage-of-the-fund method, in common-fund cases, "[t]he lodestar should be computed either using an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or using historical rates and compensating for delays with a prime-rate enhancement").

        Dividing Class Counsel's requested fees ($23,863,345.02) by their estimated lodestar ($6,031,678.25) results in a multiplier of 3.96.  Put another way, Class Counsel's

---

[12]    The Court agrees with the government, as it represented at the Settlement Hearing, that any concerns about Class Counsel's future time estimate included in their estimated lodestar have been addressed through Class Counsel's supplemental declarations.  See Gupta Supp. Decl. ¶¶ 2-3; Oliver Supp. Decl. ¶¶ 3-5.

requested fee award would compensate them at slightly below four times their hourly rates for the work they performed in this case. This multiplier is within the normal range of one to four – although, admittedly, on the high end of it. The Court believes that a multiplier of this magnitude is warranted due to the risk Class Counsel took on in agreeing to litigate the case. Class Counsel provided exceptional service to the class for over seven years, all the while in danger of being paid nothing (or close to it). And multipliers of this size, or even higher, are by no means unheard of. See 5 RUBENSTEIN, supra, § 15:89 (noting "roughly 70 reported cases with multipliers over 4"); e.g., Kane Cnty., Utah v. United States, 145 Fed. Cl. 15, 20 (2019) (multiplier of 6.13 for attorney's fee award of approximately $6 million, one third of the common fund); Geneva Rock Prod., Inc. v. United States, 119 Fed. Cl. 581, 595 (2015) (multiplier of 5.39 for attorney's fee award of approximately $4 million, 17.5% of the common fund). After all, when counsel in a class action request a reasonable percentage of a common fund, the lodestar cross-check must remain a cross-check of that percentage, and no more. "[T]he point is not to identify the precise outdoor temperature at noon but to know whether or not a coat might be necessary when venturing out for lunch." 5 RUBENSTEIN, supra, § 15:87. Here, the temperature is just fine.

The Court will award the full amount of attorney's fees requested by Class Counsel. In addition to reflecting a reasonable lodestar multiplier, the fees requested reflect a percentage of the fund around the average for common funds of similar size – even though Class Counsel's representation, and the result they achieved for the class, were well above average. Class Counsel did an exceptional job in novel litigation with a high risk of nonrecovery. For these reasons, their fee request is warranted.

45

## C. Expenses and Service Awards

Class Counsel requests $10,000 for each of the three Named Plaintiffs as service awards. Pls.' Sett. Mot. at 40-41. Mr. Isaacson objects that awards of this type are unlawful under nineteenth-century Supreme Court precedent. Isaacson Obj. at 14-15; see Trustees v. Greenough, 105 U.S. 527 (1882); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885). The "overwhelming majority" of circuits disagree with Mr. Isaacson's interpretation of these cases. Moses v. N.Y. Times Co., 79 F.4th 235, 253 (2d Cir. 2023) (collecting cases). Mr. Isaacson urges the Court to adopt the reasoning of the Eleventh Circuit, the one outlier from this modern consensus. See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1255 (11th Cir. 2020). But even the Eleventh Circuit – and the Supreme Court cases on which Mr. Isaacson relies – acknowledges that "[a] plaintiff suing on behalf of a class can be reimbursed for attorneys' fees and expenses incurred in carrying on the litigation." Id. at 1257; see Trustees v. Greenough, 105 U.S. at 537; Cent. R.R. & Banking Co. v. Pettus, 113 U.S. at 122-23. And each Named Plaintiff in this case has expended over $10,000 worth of attorney time and expenses in leading this litigation. See Burbank Decl. ¶ 6; Rossman Decl. ¶ 3; Brooks Decl. ¶ 2. Thus, the Court finds the award to the Named Plaintiffs here appropriate. As one of the attorneys representing the class stated in his declaration:

> [E]xperienced in-house lawyers [for the Named Plaintiffs] performed invaluable work that was necessary to prosecute this case effectively and ethically. Had they not performed that work on the litigation, the same work would have had to be performed by class counsel or, perhaps more likely, by other outside counsel hired by each organization at far greater expense.

Gupta Supp. Decl. ¶ 7.

The Court also approves Class Counsel's request for $29,654.98 in attorney expenses and $1,077,000 in settlement administration costs. Pls.' Sett. Mot. at 40. As documented by Class Counsel, the attorney expense reimbursements requested include travel, food, lodging, court fees, Westlaw/Lexis fees, photocopying, printing, and mail services; they also include the plaintiffs' portion of the cost of mediation services. Oliver Decl. ¶¶ 14-18. The settlement administration amount was calculated based on the noticing expenses, as well as the "not-to-exceed" amount quoted by the settlement administrator. Id. ¶ 19; KCC Supp. Decl. ¶ 4. The Court finds these expenses and administration costs to be reasonable and adequately documented.

## V. CONCLUSION

The Named Plaintiffs and the United States have reached an historic settlement agreement in this case that reimburses PACER users for $100 million of the fees they paid within a period of over eight years. The Agreement reimburses many small-scale PACER users for all of the fees they paid during this period. And it reimburses large-scale users substantially, and in proportion to what they paid. The Court finds the Agreement to be fair, reasonable, and adequate.

Before reaching a settlement in this unique case, Class Counsel impressively litigated for nearly eight years. They took the case from an untested idea, to a certified class action, to a win on partial summary judgment, to a successful appeal. They negotiated with the federal government to deliver to the class much of the recovery the class sought – although, as with any compromise, not all of it. The Court approves Class Counsel's full request for attorney's fees, costs, and service awards.

Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards [Dkt. No. 158] is hereby GRANTED.  The Final Judgment and Order on Final Approval of Class Settlement, Attorney's Fees, Costs, and Service Awards will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3|20|24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant*. | Civil Action No. 1:16-0745 (PLF) |

## FINAL JUDGMENT AND ORDER ON FINAL APPROVAL OF CLASS SETTLEMENT, ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

This matter came before the Court on October 12, 2023 for a hearing pursuant to the Order of this Court, dated May 8, 2023, on the application of the Settling Parties for approval of the Settlement set forth in the Class Action Settlement Agreement, as amended. Due and adequate notice having been given to the Class as required in the Order, the Court having considered all papers filed and proceedings held herein, and for the reasons explained in this Court's Opinion issued today, and good cause having been shown, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. This Judgment incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings as set forth in the Settlement Agreement, unless otherwise stated herein.

2. This Court has jurisdiction over the subject matter of the Litigation and over all parties to the Litigation, including all members of the Class.

3. Excluded from the Class is any person who timely and validly sought exclusion from the Class, as identified in Exhibit 1 hereto.

4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement set forth in the Agreement, and finds that:

a.      in light of the benefits to the Class and the complexity and expense of further litigation, the Settlement Agreement is, in all respects, fair, reasonable, and adequate and in the best interests of the Class;

b.      there was no collusion in connection with the Settlement Agreement;

c.      Class Representatives and Class Counsel had adequately represented the Class;

d.      the Settlement Agreement was the product of informed, arm's-length negotiations among competent, able counsel;

e.      the relief provided for the Class is adequate, having taken into account (i) the costs, risks and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the Class, including the use of billing data maintained by the Administrative Office of the U.S. Courts and the notification and dispute procedures on the class website; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Federal Rule of Civil Procedure 23(e)(3);

f.      the Settlement Agreement treats Class Members equitably relative to each other; and

g.      the record is sufficiently developed and complete to have enabled Class Representatives and Defendant to have adequately evaluated and considered their positions.

5.      Accordingly, the Court authorizes and directs implementation and performance of all the terms and provisions of the Settlement Agreement, as well as the terms and provisions set forth in this Order. Except as to any individual claim of those persons who have validly and

timely requested exclusion from the Class, the Litigation and all claims alleged therein are dismissed with prejudice as to the Class Representatives, and the other Class Members, as defined in the Settlement Agreement.

6.      No person shall have any claim against the Class Representatives, Class Counsel, or the Claims Administrator, or any other person designated by Class Counsel, based on determinations or distributions made substantially in accordance with the Settlement Agreement or order of this Court.

7.      Upon release of the Aggregate Amount of $125,000,000 from the U.S. Department of the Treasury's Judgment Fund, the Class Representatives, and each of the Class Members not timely and validly excluded, shall be deemed to have and by operation of this Judgment shall have, fully, finally, and forever waived, released, discharged, and dismissed as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period, with prejudice on the merits, whether or not the Class Representatives, or each of the Class Members ever obtains any distribution from the Settlement Fund. Claims to enforce the terms of the Stipulation and the Agreement are not released.

8.      The distribution and publication of notice of the settlement as provided for in this Court's Order of May 8, 2023, constituted the best notice practicable under the circumstances, including individual notice to Class Members in the data maintained by the Administrative Office of the U.S. Courts. This notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and due process. No Class Member is relieved from the terms of the Settlement

Agreement, including the releases provided for, based on the contention or proof that such Class Member failed to receive actual or adequate notice. A full opportunity has been offered to the Class Members to object to the proposed Settlement and to participate in the approval hearing. It is hereby determined that all members of the Class are bound by this Judgment, except those persons listed in Exhibit 1 to this Judgment.

9.      Any order entered regarding any fee and expense application, any appeal from any such order, or any reversal or modification of any such order shall not affect or delay the finality of the Final Judgment in this litigation.

10.      Neither the Settlement Agreement, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any released claim, or of any wrongdoing or liability of the United States; or (b) is or may be deemed to be or may be used as an admission or evidence that any claims asserted by plaintiffs were not valid or that the amount recoverable would not have exceeded the Aggregate Amount of $125,000,000 in any civil, criminal, or administrative proceeding in any court, administrative agency or other tribunal. The United States may file the Settlement Agreement or this Judgment in any other action that may be brought against it in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

11.      The United States shall pay $125,000,000 into the PACER Class Action Settlement Trust upon the expiration of the period to appeal from this Order.

12.      Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of the Settlement and any award or

distribution from the Aggregate Amount paid by the United States in settlement of this litigation; (b) disposition of the PACER Class Action Settlement Trust; (c) hearing and determining any fee and expense application; and (d) all parties hereto for the purpose of construing, enforcing and administering the Settlement.

13.    The Court finds that during the course of the Litigation, plaintiffs and the United States, and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

14.    In the event that the settlement does not become effective in accordance with the terms of the Settlement Agreement, then this Judgment shall be rendered null and void and shall be vacated; and in such event, all orders entered and releases delivered in connection with this Order and Final Judgment shall be null and void and shall be vacated, and the parties shall revert to their respective positions in the Litigation as of July 12, 2022.

15.    Plaintiffs ask that the Court grant their request for 20% of the settlement fund to cover attorney's fees, notice and settlement costs, litigation expenses, and service awards. That request is granted. Specifically, the Court hereby (1) awards $10,000 to each class representative, (2) awards $29,654.98 to class counsel to reimburse litigation expenses, (3) orders that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) awards the remaining amount ($23,863,345.02) to class counsel as attorney's fees.

16.    Upon consideration of this submission and the entire record before the Court, and for the reasons stated in the Opinion issued this same day, the Court finds that the attorney's fees, costs and expenses, and service awards, as agreed by the parties, are fair and reasonable pursuant to paragraph VI(A) of the Settlement Agreement and Federal Rule of Civil Procedure 23(e)(2)(C) (iii), (h).

17.     The parties are hereby authorized, without further approval of the Court, to unanimously agree to and adopt in writing amendments, modifications, and expansions of the Settlement Agreement, provided that such amendments, modifications, and expansions of the Settlement Agreement are not materially inconsistent with this Judgment, and do not materially limit the rights of the Members of the Class under the Settlement Agreement.

18.     Without further order of the Court, the parties to the Settlement Agreement may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

19.     The Court directs immediate entry of this Judgment by the Clerk of the Court.

20.     The Court's orders entered during this litigation relating to the confidentiality of information shall survive the settlement and resolution and dismissal of this litigation.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3/20/24

# EXHIBIT 1

| ClaimID | Year First Notice Sent |
|---|---|
| 10034328-7 | 2023 |
| 10035184-0 | 2023 |
| 10037459-0 | 2023 |
| 10040932-6 | 2023 |
| 10041843-0 | 2023 |
| 10049120-0 | 2023 |
| 10049953-8 | 2023 |
| 10061501-5 | 2023 |
| 10065649-8 | 2023 |
| 10066366-4 | 2023 |
| 10083140-0 | 2023 |
| 10084333-6 | 2023 |
| 10085991-7 | 2023 |
| 10095277-1 | 2023 |
| 10113350-2 | 2023 |
| 10116080-1 | 2023 |
| 10118614-2 | 2023 |
| 10132009-4 | 2023 |
| 10133913-5 | 2023 |
| 10141727-6 | 2023 |
| 10147158-0 | 2023 |
| 10152565-6 | 2023 |
| 10173016-0 | 2023 |
| 10176126-0 | 2023 |
| 10182150-6 | 2023 |
| 10185685-7 | 2023 |
| 10189089-3 | 2023 |
| 10192998-6 | 2023 |
| 10196979-1 | 2023 |
| 10197284-9 | 2023 |
| 10203395-1 | 2023 |
| 10016846-9 | 2023 |
| 10052120-7 | 2023 |
| 10133913-5 | 2023 |
| 10000447701 | 2017 |
| 10000707701 | 2017 |
| 10002821401 | 2017 |
| 10005011601 | 2017 |
| 10005499701 | 2017 |
| 10005664701 | 2017 |
| 10006372001 | 2017 |
| 10007313001 | 2017 |
| 10008363801 | 2017 |
| 10008769301 | 2017 |
| 10008798001 | 2017 |
| 10009012601 | 2017 |

| | |
|---|---|
| 10009273101 | 2017 |
| 10010171901 | 2017 |
| 10010221901 | 2017 |
| 10011076901 | 2017 |
| 10011551201 | 2017 |
| 10012220601 | 2017 |
| 10012456201 | 2017 |
| 10013915201 | 2017 |
| 10014611901 | 2017 |
| 10015286701 | 2017 |
| 10016324501 | 2017 |
| 10017909501 | 2017 |
| 10018775401 | 2017 |
| 10018943001 | 2017 |
| 10020415601 | 2017 |
| 10023376401 | 2017 |
| 10026066401 | 2017 |
| 10026930801 | 2017 |
| 10028461901 | 2017 |
| 10028932001 | 2017 |
| 10029603801 | 2017 |
| 10029844801 | 2017 |
| 10032537301 | 2017 |
| 10032704701 | 2017 |
| 10033616401 | 2017 |
| 10035469501 | 2017 |
| 10036014201 | 2017 |
| 10036567001 | 2017 |
| 10037093701 | 2017 |
| 10039315901 | 2017 |
| 10040300101 | 2017 |
| 10041710301 | 2017 |
| 10042162301 | 2017 |
| 10042250001 | 2017 |
| 10043184701 | 2017 |
| 10043617101 | 2017 |
| 10044286901 | 2017 |
| 10044493301 | 2017 |
| 10045532301 | 2017 |
| 10046948601 | 2017 |
| 10048740301 | 2017 |
| 10050286601 | 2017 |
| 10050994001 | 2017 |
| 10053464801 | 2017 |
| 10054856801 | 2017 |
| 10054968801 | 2017 |
| 10057104901 | 2017 |

| | |
|---|---|
| 10058481001 | 2017 |
| 10060415801 | 2017 |
| 10063799101 | 2017 |
| 10063923901 | 2017 |
| 10064479001 | 2017 |
| 10064600101 | 2017 |
| 10065803901 | 2017 |
| 10066151801 | 2017 |
| 10067057001 | 2017 |
| 10067820801 | 2017 |
| 10069992301 | 2017 |
| 10071549701 | 2017 |
| 10071662301 | 2017 |
| 10071925901 | 2017 |
| 10072056001 | 2017 |
| 10072482601 | 2017 |
| 10073102801 | 2017 |
| 10075224001 | 2017 |
| 10075273101 | 2017 |
| 10075352801 | 2017 |
| 10075769801 | 2017 |
| 10077286901 | 2017 |
| 10077932301 | 2017 |
| 10077997901 | 2017 |
| 10078550501 | 2017 |
| 10080612001 | 2017 |
| 10081622801 | 2017 |
| 10082241101 | 2017 |
| 10083173401 | 2017 |
| 10084766301 | 2017 |
| 10085064901 | 2017 |
| 10085996301 | 2017 |
| 10086464801 | 2017 |
| 10087257801 | 2017 |
| 10087762001 | 2017 |
| 10089389201 | 2017 |
| 10089507401 | 2017 |
| 10090051301 | 2017 |
| 10090174801 | 2017 |
| 10090236401 | 2017 |
| 10090480401 | 2017 |
| 10091442101 | 2017 |
| 10092739701 | 2017 |
| 10093180701 | 2017 |
| 10095383901 | 2017 |
| 10095879501 | 2017 |
| 10096283001 | 2017 |

| | |
|---|---|
| 10096482501 | 2017 |
| 10096522201 | 2017 |
| 10097267601 | 2017 |
| 10100271301 | 2017 |
| 10100599401 | 2017 |
| 10101080101 | 2017 |
| 10101868001 | 2017 |
| 10101941501 | 2017 |
| 10102590701 | 2017 |
| 10103010101 | 2017 |
| 10105763501 | 2017 |
| 10105855001 | 2017 |
| 10107851101 | 2017 |
| 10108906501 | 2017 |
| 10111320101 | 2017 |
| 10112826501 | 2017 |
| 10114817301 | 2017 |
| 10115231001 | 2017 |
| 10115433101 | 2017 |
| 10116343501 | 2017 |
| 10117151101 | 2017 |
| 10118423201 | 2017 |
| 10118950301 | 2017 |
| 10119125001 | 2017 |
| 10119759701 | 2017 |
| 10121185501 | 2017 |
| 10121819901 | 2017 |
| 10122205101 | 2017 |
| 10122629901 | 2017 |
| 10123395401 | 2017 |
| 10124592001 | 2017 |
| 10125315101 | 2017 |
| 10125364301 | 2017 |
| 10126285101 | 2017 |
| 10126752601 | 2017 |
| 10126762901 | 2017 |
| 10127924301 | 2017 |
| 10129225901 | 2017 |
| 10131063801 | 2017 |
| 10133388201 | 2017 |
| 10133687101 | 2017 |
| 10133958601 | 2017 |
| 10134825301 | 2017 |
| 10134968301 | 2017 |
| 10135144601 | 2017 |
| 10135756401 | 2017 |
| 10136099001 | 2017 |

| | |
|---|---|
| 10136855001 | 2017 |
| 10137251601 | 2017 |
| 10137528101 | 2017 |
| 10137903101 | 2017 |
| 10139299001 | 2017 |
| 10140073101 | 2017 |
| 10140505401 | 2017 |
| 10140555801 | 2017 |
| 10141339701 | 2017 |
| 10141594101 | 2017 |
| 10141736601 | 2017 |
| 10143024301 | 2017 |
| 10143222701 | 2017 |
| 10143236701 | 2017 |
| 10143458301 | 2017 |
| 10145173801 | 2017 |
| 10147350301 | 2017 |
| 10149014801 | 2017 |
| 10149717901 | 2017 |
| 10149718001 | 2017 |
| 10152536901 | 2017 |
| 10152625801 | 2017 |
| 10153428001 | 2017 |
| 10153618501 | 2017 |
| 10153754201 | 2017 |
| 10153756601 | 2017 |
| 10153779701 | 2017 |
| 10156471501 | 2017 |
| 10157012001 | 2017 |
| 10157124001 | 2017 |
| 10158021601 | 2017 |
| 10158209201 | 2017 |
| 10158298501 | 2017 |
| 10158888401 | 2017 |
| 10159890701 | 2017 |
| 10159891901 | 2017 |
| 10160015001 | 2017 |
| 10160315001 | 2017 |
| 10161686701 | 2017 |
| 10161894301 | 2017 |
| 10161898001 | 2017 |
| 10161944301 | 2017 |
| 10162799301 | 2017 |
| 10163708101 | 2017 |
| 10164776101 | 2017 |
| 10165562901 | 2017 |
| 10167227501 | 2017 |

| | |
|---|---|
| 10171950401 | 2017 |
| 10174000101 | 2017 |
| 10174868101 | 2017 |
| 10175374301 | 2017 |
| 10175548001 | 2017 |
| 10176373601 | 2017 |
| 10176919201 | 2017 |
| 10177057101 | 2017 |
| 10177956201 | 2017 |
| 10178536701 | 2017 |
| 10178913001 | 2017 |
| 10182011201 | 2017 |
| 10182792101 | 2017 |
| 10185798601 | 2017 |
| 10185857701 | 2017 |
| 10185858901 | 2017 |
| 10185874701 | 2017 |
| 10186179501 | 2017 |
| 10188095901 | 2017 |
| 10188321301 | 2017 |
| 10188669001 | 2017 |
| 10190279701 | 2017 |
| 10190402201 | 2017 |
| 10190457501 | 2017 |
| 10190550601 | 2017 |
| 10190625001 | 2017 |
| 10191926801 | 2017 |
| 10192316801 | 2017 |
| 10192357001 | 2017 |
| 10192847601 | 2017 |
| 10192879801 | 2017 |
| 10192963801 | 2017 |
| 10194141901 | 2017 |
| 10197285401 | 2017 |
| 10199679201 | 2017 |
| 10199890901 | 2017 |
| 10204292501 | 2017 |
| 10205252901 | 2017 |
| 10205690001 | 2017 |
| 10206206701 | 2017 |
| 10207278401 | 2017 |
| 10207584001 | 2017 |
| 10207639001 | 2017 |
| 10207782401 | 2017 |
| 10207896801 | 2017 |
| 10208191801 | 2017 |
| 10208513401 | 2017 |

| | |
|---|---|
| 10209552801 | 2017 |
| 10209592901 | 2017 |
| 10209627201 | 2017 |
| 10209638701 | 2017 |
| 10210263601 | 2017 |
| 10210694001 | 2017 |
| 10210945001 | 2017 |
| 10212706201 | 2017 |
| 10212823601 | 2017 |
| 10213182001 | 2017 |
| 10214228201 | 2017 |
| 10214823501 | 2017 |
| 10214922701 | 2017 |
| 10216477001 | 2017 |
| 10217089701 | 2017 |
| 10217396501 | 2017 |
| 10219369101 | 2017 |
| 10219889501 | 2017 |
| 10221713001 | 2017 |
| 10221823701 | 2017 |
| 10222565501 | 2017 |
| 10222645301 | 2017 |
| 10223006701 | 2017 |
| 10224013901 | 2017 |
| 10225094701 | 2017 |
| 10225657301 | 2017 |
| 10225834001 | 2017 |
| 10226300001 | 2017 |
| 10227002801 | 2017 |
| 10229283801 | 2017 |
| 10229428801 | 2017 |
| 10229838501 | 2017 |
| 10230357501 | 2017 |
| 10231975301 | 2017 |
| 10232606001 | 2017 |
| 10234539901 | 2017 |
| 10234608201 | 2017 |
| 10235129601 | 2017 |
| 10236098401 | 2017 |
| 10236449701 | 2017 |
| 10237057601 | 2017 |
| 10237680301 | 2017 |
| 10237912901 | 2017 |
| 10238284001 | 2017 |
| 10238489701 | 2017 |
| 10240243701 | 2017 |
| 10240374001 | 2017 |

| | |
|---|---|
| 10240773301 | 2017 |
| 10241983801 | 2017 |
| 10242752501 | 2017 |
| 10243338001 | 2017 |
| 10243778601 | 2017 |
| 10244498501 | 2017 |
| 10245781501 | 2017 |
| 10247787501 | 2017 |
| 10248160001 | 2017 |
| 10248356501 | 2017 |
| 10249090901 | 2017 |
| 10252117701 | 2017 |
| 10252888301 | 2017 |
| 10253744601 | 2017 |
| 10253873601 | 2017 |
| 10254792001 | 2017 |
| 10254933301 | 2017 |
| 10255719601 | 2017 |
| 10255720201 | 2017 |
| 10256855801 | 2017 |
| 10258835101 | 2017 |
| 10259957901 | 2017 |
| 10260649301 | 2017 |
| 10260794101 | 2017 |
| 10261595001 | 2017 |
| 10261762401 | 2017 |
| 10261872001 | 2017 |
| 10261931101 | 2017 |
| 10264115801 | 2017 |
| 10264948001 | 2017 |
| 10266425001 | 2017 |
| 10266442001 | 2017 |
| 10267627601 | 2017 |
| 10268262801 | 2017 |
| 10270268801 | 2017 |
| 10270866601 | 2017 |
| 10270975001 | 2017 |
| 10271070301 | 2017 |
| 10272628001 | 2017 |
| 10275055501 | 2017 |
| 10275578401 | 2017 |
| 10275752501 | 2017 |
| 10276905901 | 2017 |
| 10276939401 | 2017 |
| 10278126601 | 2017 |
| 10279936201 | 2017 |
| 10280532501 | 2017 |

| | |
|---|---|
| 10280979301 | 2017 |
| 10281698001 | 2017 |
| 10282170701 | 2017 |
| 10283751001 | 2017 |
| 10283870701 | 2017 |
| 10285227301 | 2017 |
| 10285840801 | 2017 |
| 10286029401 | 2017 |
| 10286805001 | 2017 |
| 10290375001 | 2017 |
| 10290479001 | 2017 |
| 10290610501 | 2017 |
| 10290828001 | 2017 |
| 10290963501 | 2017 |
| 10291126501 | 2017 |
| 10292602501 | 2017 |
| 10293085501 | 2017 |
| 10293375301 | 2017 |
| 10293436801 | 2017 |
| 10293529401 | 2017 |
| 10293741201 | 2017 |
| 10293742401 | 2017 |
| 10293743601 | 2017 |
| 10293744801 | 2017 |
| 10293752701 | 2017 |
| 10293754001 | 2017 |
| 10293755201 | 2017 |
| 10293756401 | 2017 |
| 10293767901 | 2017 |
| 10294485401 | 2017 |
| 10294549401 | 2017 |
| 10299634901 | 2017 |
| 10299939901 | 2017 |
| 10302542001 | 2017 |
| 10303226501 | 2017 |
| 10303651901 | 2017 |
| 10303892901 | 2017 |
| 10304105901 | 2017 |
| 10304591001 | 2017 |
| 10304647101 | 2017 |
| 10304775001 | 2017 |
| 10306101001 | 2017 |
| 10307986501 | 2017 |
| 10308360101 | 2017 |
| 10308965201 | 2017 |
| 10309480501 | 2017 |
| 10310113501 | 2017 |

| | |
|---|---|
| 10310527001 | 2017 |
| 10311774001 | 2017 |
| 10314669601 | 2017 |
| 10315147301 | 2017 |
| 10315819401 | 2017 |
| 10316350501 | 2017 |
| 10316465001 | 2017 |
| 10318066701 | 2017 |
| 10318659101 | 2017 |
| 10318663301 | 2017 |
| 10319721701 | 2017 |
| 10319867201 | 2017 |
| 10320106301 | 2017 |
| 10320188901 | 2017 |
| 10320630901 | 2017 |
| 10321188301 | 2017 |
| 10322023901 | 2017 |
| 10322689801 | 2017 |
| 10323321001 | 2017 |
| 10323716101 | 2017 |
| 10323788401 | 2017 |
| 10324271501 | 2017 |
| 10324930801 | 2017 |
| 10325317801 | 2017 |
| 10326900901 | 2017 |
| 10327238001 | 2017 |
| 10331800801 | 2017 |
| 10332566901 | 2017 |
| 10332936501 | 2017 |
| 10333954101 | 2017 |
| 10334751301 | 2017 |
| 10335736101 | 2017 |
| 10335880801 | 2017 |
| 10336323301 | 2017 |
| 10336522901 | 2017 |
| 10336907701 | 2017 |
| 10337218001 | 2017 |
| 10337518101 | 2017 |
| 10337600801 | 2017 |
| 10338330001 | 2017 |
| 10338463701 | 2017 |
| 10340665701 | 2017 |
| 10342676001 | 2017 |
| 10342826401 | 2017 |
| 10343027101 | 2017 |
| 10344487701 | 2017 |
| 10345305201 | 2017 |

| | |
|---|---|
| 10347913201 | 2017 |
| 10352035101 | 2017 |
| 10355032001 | 2017 |
| 10356012901 | 2017 |
| 10358553901 | 2017 |
| 10358696901 | 2017 |
| 10360334701 | 2017 |
| 10362064301 | 2017 |
| 10362238001 | 2017 |
| 10363633001 | 2017 |
| 10363834901 | 2017 |
| 10364037001 | 2017 |
| 10364629201 | 2017 |
| 10364748001 | 2017 |
| 10365380601 | 2017 |
| 10365649201 | 2017 |
| 10366285601 | 2017 |
| 10366975901 | 2017 |
| 10367643001 | 2017 |
| 10369316601 | 2017 |
| 10370723201 | 2017 |
| 10371138701 | 2017 |
| 10371143001 | 2017 |
| 10371370001 | 2017 |
| 10374877501 | 2017 |
| 10375560301 | 2017 |
| 10376252801 | 2017 |
| 10378049001 | 2017 |
| 10378215101 | 2017 |
| 10380385301 | 2017 |
| 10380974001 | 2017 |
| 10381918601 | 2017 |
| 10382676201 | 2017 |
| 10383373001 | 2017 |
| 10385190201 | 2017 |
| 10385642001 | 2017 |
| 10386520201 | 2017 |
| 10388149901 | 2017 |
| 10388499301 | 2017 |
| 10389454801 | 2017 |
| 10390691501 | 2017 |
| 10390736101 | 2017 |
| 10391800001 | 2017 |
| 10392971001 | 2017 |
| 10393677401 | 2017 |
| 10393723701 | 2017 |
| 60000001101 | 2017 |

| | |
|---|---|
| 60000004701 | 2017 |
| 60000005901 | 2017 |
| 60000006001 | 2017 |
| 60000007201 | 2017 |
| 60000008401 | 2017 |
| 60000009601 | 2017 |
| 60000010201 | 2017 |
| 60000011401 | 2017 |
| 60000012601 | 2017 |
| 60000013801 | 2017 |
| 60000014001 | 2017 |
| 60000015101 | 2017 |
| 60000016301 | 2017 |
| 60000017501 | 2017 |
| 60000018701 | 2017 |
| 60000019901 | 2017 |
| 60000020501 | 2017 |
| 60000021701 | 2017 |
| 60000022901 | 2017 |
| 60000023001 | 2017 |
| 60000024201 | 2017 |
| 60000025401 | 2017 |
| 60000026601 | 2017 |
| 60000027801 | 2017 |
| 60000028001 | 2017 |
| 60000029101 | 2017 |
| 60000030801 | 2017 |
| 60000031001 | 2017 |
| 60000032101 | 2017 |
| 60000033301 | 2017 |
| 60000034501 | 2017 |
| 60000035701 | 2017 |
| 60000036901 | 2017 |
| 60000037001 | 2017 |
| 60000038201 | 2017 |
| 60000039401 | 2017 |
| 60000040001 | 2017 |
| 60000041201 | 2017 |
| 60000042401 | 2017 |
| 60000043601 | 2017 |
| 60000045001 | 2017 |
| 60000046101 | 2017 |
| 60000047301 | 2017 |
| 60000048501 | 2017 |
| 60000049701 | 2017 |
| 60000050301 | 2017 |
| 60000051501 | 2017 |

| | |
|---|---|
| 60000052701 | 2017 |
| 60000053901 | 2017 |
| 60000054001 | 2017 |
| 60000055201 | 2017 |
| 60000056401 | 2017 |
| 60000057601 | 2017 |
| 60000058801 | 2017 |
| 60000060601 | 2017 |
| 60000064301 | 2017 |
| 60000065501 | 2017 |
| 60000067901 | 2017 |
| 60000070901 | 2017 |
| 60000071001 | 2017 |
| 60000073401 | 2017 |
| 60000074601 | 2017 |
| 60000075801 | 2017 |
| 60000076001 | 2017 |
| 60000077101 | 2017 |
| 60000078301 | 2017 |
| 60000079501 | 2017 |
| 60000080101 | 2017 |
| 60000081301 | 2017 |
| 60000082501 | 2017 |
| 60000083701 | 2017 |
| 60000084901 | 2017 |
| 60000085001 | 2017 |
| 60000086201 | 2017 |
| 60000087401 | 2017 |
| 60000088601 | 2017 |
| 60000090401 | 2017 |
| 60000091601 | 2017 |
| 60000092801 | 2017 |
| 60000093001 | 2017 |
| 60000094101 | 2017 |
| 60000095301 | 2017 |
| 60000096501 | 2017 |
| 60000097701 | 2017 |
| 60000099001 | 2017 |
| 60000100301 | 2017 |
| 60000101501 | 2017 |
| 60000102701 | 2017 |
| 60000103901 | 2017 |
| 60000104001 | 2017 |
| 60000105201 | 2017 |
| 60000106401 | 2017 |
| 60000107601 | 2017 |
| 60000108801 | 2017 |

| | |
|---|---|
| 60000109001 | 2017 |
| 60000111801 | 2017 |
| 60000112001 | 2017 |
| 60000113101 | 2017 |
| 60000115501 | 2017 |
| 60000116701 | 2017 |
| 60000117901 | 2017 |
| 60000118001 | 2017 |
| 60000119201 | 2017 |
| 60000120901 | 2017 |
| 60000121001 | 2017 |
| 60000122201 | 2017 |
| 60000123401 | 2017 |
| 60000124601 | 2017 |
| 60000126001 | 2017 |
| 60000127101 | 2017 |
| 60000128301 | 2017 |
| 60000129501 | 2017 |
| 60000130101 | 2017 |
| 60000133701 | 2017 |
| 60000134901 | 2017 |
| 60000136201 | 2017 |
| 60000137401 | 2017 |
| 60000138601 | 2017 |
| 60000139801 | 2017 |
| 60000140401 | 2017 |
| 60000141601 | 2017 |
| 60000142801 | 2017 |
| 60000143001 | 2017 |
| 60000144101 | 2017 |
| 60000145301 | 2017 |
| 60000146501 | 2017 |
| 60000147701 | 2017 |
| 60000149001 | 2017 |
| 60000150701 | 2017 |
| 60000152001 | 2017 |
| 60000153201 | 2017 |
| 60000154401 | 2017 |
| 60000155601 | 2017 |
| 60000156801 | 2017 |
| 60000157001 | 2017 |
| 60000158101 | 2017 |
| 60000159301 | 2017 |
| 60000160001 | 2017 |
| 60000161101 | 2017 |
| 60000162301 | 2017 |
| 60000163501 | 2017 |

| | |
|---|---|
| 60000165901 | 2017 |
| 60000166001 | 2017 |
| 60000168401 | 2017 |
| 60000169601 | 2017 |
| 60000170201 | 2017 |
| 60000171401 | 2017 |
| 60000172601 | 2017 |
| 60000173801 | 2017 |
| 60000174001 | 2017 |
| 60000175101 | 2017 |
| 60000176301 | 2017 |
| 60000177501 | 2017 |
| 60000178701 | 2017 |
| 60000179901 | 2017 |
| 60000180501 | 2017 |
| 60000181701 | 2017 |
| 60000182901 | 2017 |
| 60000183001 | 2017 |
| 60000184201 | 2017 |
| 60000186601 | 2017 |
| 60000187801 | 2017 |
| 60000188001 | 2017 |
| 60000189101 | 2017 |
| 60000190801 | 2017 |
| 60000191001 | 2017 |
| 60000192101 | 2017 |
| 60000193301 | 2017 |
| 60000194501 | 2017 |
| 60000195701 | 2017 |
| 60000196901 | 2017 |
| 60000197001 | 2017 |
| 60000198201 | 2017 |
| 60000199401 | 2017 |
| 60000200701 | 2017 |
| 60000202001 | 2017 |
| 60000203201 | 2017 |
| 60000204401 | 2017 |
| 60000205601 | 2017 |
| 60000206801 | 2017 |
| 60000207001 | 2017 |
| 60000208101 | 2017 |
| 60000209301 | 2017 |
| 60000210001 | 2017 |
| 60000211101 | 2017 |
| 60000212301 | 2017 |
| 60000213501 | 2017 |
| 60000215901 | 2017 |

| | |
|---|---|
| 60000216001 | 2017 |
| 60000217201 | 2017 |
| 60000218401 | 2017 |
| 60000219601 | 2017 |
| 60000220201 | 2017 |
| 60000221401 | 2017 |
| 60000223801 | 2017 |
| 60000224001 | 2017 |
| 60000225101 | 2017 |
| 60000228701 | 2017 |
| 60000229901 | 2017 |
| 60000230501 | 2017 |
| 60000231701 | 2017 |
| 60000233001 | 2017 |
| 60000235401 | 2017 |
| 60000236601 | 2017 |
| 60000237801 | 2017 |
| 60000238001 | 2017 |
| 60000239101 | 2017 |
| 60000241001 | 2017 |
| 60000242101 | 2017 |
| 60000243301 | 2017 |
| 60000244501 | 2017 |
| 60000245701 | 2017 |
| 60000246901 | 2017 |
| 60000247001 | 2017 |
| 60000248201 | 2017 |
| 60000249401 | 2017 |
| 60000250001 | 2017 |
| 60000251201 | 2017 |
| 60000252401 | 2017 |
| 60000253601 | 2017 |
| 60000254801 | 2017 |
| 60000255001 | 2017 |
| 60000256101 | 2017 |
| 60000257301 | 2017 |
| 60000258501 | 2017 |
| 60000259701 | 2017 |
| 60000260301 | 2017 |
| 60000261501 | 2017 |
| 60000262701 | 2017 |
| 60000263901 | 2017 |
| 60000264001 | 2017 |
| 60000265201 | 2017 |
| 60000266401 | 2017 |
| 60000267601 | 2017 |
| 60000268801 | 2017 |

| | |
|---|---|
| 60000271801 | 2017 |
| 60000272001 | 2017 |
| 60000273101 | 2017 |
| 60000274301 | 2017 |
| 60000276701 | 2017 |
| 60000277901 | 2017 |
| 60000279201 | 2017 |
| 60000280901 | 2017 |
| 60000281001 | 2017 |
| 60000282201 | 2017 |
| 60000284601 | 2017 |
| 60000287101 | 2017 |
| 60000288301 | 2017 |
| 60000289501 | 2017 |
| 60000290101 | 2017 |
| 60000292501 | 2017 |
| 60000293701 | 2017 |
| 60000294901 | 2017 |
| 60000295001 | 2017 |
| 60000296201 | 2017 |
| 60000297401 | 2017 |
| 60000298601 | 2017 |
| 60000299801 | 2017 |
| 60000300001 | 2017 |
| 60000302401 | 2017 |
| 60000303601 | 2017 |
| 60000305001 | 2017 |
| 60000307301 | 2017 |
| 60000308501 | 2017 |
| 60000310301 | 2017 |
| 60000311501 | 2017 |
| 60000312701 | 2017 |
| 60000313901 | 2017 |
| 60000314001 | 2017 |
| 60000315201 | 2017 |
| 60000316401 | 2017 |
| 60000317601 | 2017 |
| 60000318801 | 2017 |
| 60000319001 | 2017 |
| 60000320601 | 2017 |
| 60000321801 | 2017 |
| 60000322001 | 2017 |
| 60000323101 | 2017 |
| 60000324301 | 2017 |
| 60000325501 | 2017 |
| 60000326701 | 2017 |
| 60000327901 | 2017 |

| | |
|---|---|
| 60000328001 | 2017 |
| 60000329201 | 2017 |
| 60000330901 | 2017 |
| 60000331001 | 2017 |
| 60000332201 | 2017 |
| 60000333401 | 2017 |
| 60000334601 | 2017 |
| 60000335801 | 2017 |
| 60000336001 | 2017 |
| 60000337101 | 2017 |
| 60000338301 | 2017 |
| 60000339501 | 2017 |
| 60000340101 | 2017 |
| 60000341301 | 2017 |
| 60000342501 | 2017 |
| 60000348601 | 2017 |
| 60000349801 | 2017 |
| 60000350401 | 2017 |
| 60000351601 | 2017 |
| 60000352801 | 2017 |
| 60000353001 | 2017 |
| 60000354101 | 2017 |
| 60000356501 | 2017 |
| 60000357701 | 2017 |
| 60000358901 | 2017 |
| 60000359001 | 2017 |
| 60000360701 | 2017 |
| 60000361901 | 2017 |
| 60000362001 | 2017 |
| 60000363201 | 2017 |
| 60000364401 | 2017 |
| 60000366801 | 2017 |
| 60000367001 | 2017 |
| 60000369301 | 2017 |
| 60000370001 | 2017 |
| 60000371101 | 2017 |
| 60000372301 | 2017 |
| 60000373501 | 2017 |
| 60000374701 | 2017 |
| 60000375901 | 2017 |
| 60000378401 | 2017 |
| 60000379601 | 2017 |
| 60000380201 | 2017 |
| 60000381401 | 2017 |
| 60000382601 | 2017 |
| 60000383801 | 2017 |
| 60000384001 | 2017 |

| | |
|---|---|
| 60000385101 | 2017 |
| 60000386301 | 2017 |
| 60000387501 | 2017 |
| 60000388701 | 2017 |
| 60000389901 | 2017 |
| 60000390501 | 2017 |
| 60000391701 | 2017 |
| 60000392901 | 2017 |
| 60000393001 | 2017 |
| 60000394201 | 2017 |
| 60000395401 | 2017 |
| 60000396601 | 2017 |
| 60000397801 | 2017 |
| 60000398001 | 2017 |
| 60000399101 | 2017 |
| 60000400401 | 2017 |
| 60000401601 | 2017 |
| 60000402801 | 2017 |
| 60000403001 | 2017 |
| 60000404101 | 2017 |
| 60000405301 | 2017 |
| 60000406501 | 2017 |
| 60000408901 | 2017 |
| 60000409001 | 2017 |
| 60000410701 | 2017 |
| 60000411901 | 2017 |
| 60000412001 | 2017 |
| 60000413201 | 2017 |
| 60000414401 | 2017 |
| 60000415601 | 2017 |
| 60000416801 | 2017 |
| 60000417001 | 2017 |
| 60000418101 | 2017 |
| 60000419301 | 2017 |
| 60000420001 | 2017 |
| 60000421101 | 2017 |
| 60000422301 | 2017 |
| 60000423501 | 2017 |
| 60000424701 | 2017 |
| 60000425901 | 2017 |
| 60000426001 | 2017 |
| 60000427201 | 2017 |
| 60000428401 | 2017 |
| 60000429601 | 2017 |
| 60000430201 | 2017 |
| 60000431401 | 2017 |
| 60000432601 | 2017 |

| | |
|---|---|
| 60000433801 | 2017 |
| 60000434001 | 2017 |
| 60000435101 | 2017 |
| 60000437501 | 2017 |
| 60000438701 | 2017 |
| 60000439901 | 2017 |
| 60000440501 | 2017 |
| 60000441701 | 2017 |
| 60000442901 | 2017 |
| 60000443001 | 2017 |
| 60000445401 | 2017 |
| 60000446601 | 2017 |
| 60000447801 | 2017 |
| 60000448001 | 2017 |
| 60000449101 | 2017 |
| 60000450801 | 2017 |
| 60000452101 | 2017 |
| 60000453301 | 2017 |
| 60000454501 | 2017 |
| 60000455701 | 2017 |
| 60000456901 | 2017 |
| 60000457001 | 2017 |
| 60000458201 | 2017 |
| 60000459401 | 2017 |
| 60000460001 | 2017 |
| 60000461201 | 2017 |
| 60000462401 | 2017 |
| 60000465001 | 2017 |
| 60000467301 | 2017 |
| 60000468501 | 2017 |
| 60000469701 | 2017 |
| 60000471501 | 2017 |
| 60000472701 | 2017 |
| 60000473901 | 2017 |
| 60000474001 | 2017 |
| 60000475201 | 2017 |
| 60000476401 | 2017 |
| 60000477601 | 2017 |
| 60000478801 | 2017 |
| 60000479001 | 2017 |
| 60000480601 | 2017 |
| 60000482001 | 2017 |
| 60000483101 | 2017 |
| 60000486701 | 2017 |
| 60000487901 | 2017 |
| 60000488001 | 2017 |
| 60000489201 | 2017 |

| | |
|---|---|
| 60000490901 | 2017 |
| 60000491001 | 2017 |
| 60000492201 | 2017 |
| 60000493401 | 2017 |
| 60000494601 | 2017 |
| 60000496001 | 2017 |
| 60000497101 | 2017 |
| 60000498301 | 2017 |
| 60000499501 | 2017 |
| 60000500801 | 2017 |
| 60000501001 | 2017 |
| 60000502101 | 2017 |
| 60000503301 | 2017 |
| 60000504501 | 2017 |
| 60000505701 | 2017 |
| 60000506901 | 2017 |
| 60000507001 | 2017 |
| 60000509401 | 2017 |
| 60000510001 | 2017 |
| 60000511201 | 2017 |
| 60000512401 | 2017 |
| 60000513601 | 2017 |
| 60000514801 | 2017 |
| 60000517301 | 2017 |
| 60000518501 | 2017 |
| 60000519701 | 2017 |
| 60000520301 | 2017 |
| 60000521501 | 2017 |
| 60000522701 | 2017 |
| 60000523901 | 2017 |
| 60000525201 | 2017 |
| 60000526401 | 2017 |
| 60000527601 | 2017 |
| 60000528801 | 2017 |
| 60000529001 | 2017 |
| 60000530601 | 2017 |
| 60000531801 | 2017 |
| 60000532001 | 2017 |
| 60000533101 | 2017 |
| 60000535501 | 2017 |
| 60000536701 | 2017 |
| 60000539201 | 2017 |
| 60000541001 | 2017 |
| 60000544601 | 2017 |
| 60000545801 | 2017 |
| 60000546001 | 2017 |
| 60000547101 | 2017 |

| | |
|---|---|
| 60000548301 | 2017 |
| 60000549501 | 2017 |
| 60000550101 | 2017 |
| 60000551301 | 2017 |
| 60000552501 | 2017 |
| 60000553701 | 2017 |
| 60000554901 | 2017 |
| 60000555001 | 2017 |
| 60000558601 | 2017 |
| 60000559801 | 2017 |
| 60000560401 | 2017 |
| 60000561601 | 2017 |
| 60000562801 | 2017 |
| 60000563001 | 2017 |
| 60000564101 | 2017 |
| 60000565301 | 2017 |
| 60000566501 | 2017 |
| 60000567701 | 2017 |
| 60000568901 | 2017 |
| 60000570701 | 2017 |
| 60000572001 | 2017 |
| 60000573201 | 2017 |
| 60000574401 | 2017 |
| 60000575601 | 2017 |
| 60000576801 | 2017 |
| 60000577001 | 2017 |
| 60000578101 | 2017 |
| 60000580001 | 2017 |
| 60000581101 | 2017 |
| 60000582301 | 2017 |
| 60000583501 | 2017 |
| 60000584701 | 2017 |
| 60000586001 | 2017 |
| 60000587201 | 2017 |
| 60000589601 | 2017 |
| 60000591401 | 2017 |
| 60000592601 | 2017 |
| 60000593801 | 2017 |
| 60000594001 | 2017 |
| 60000595101 | 2017 |
| 60000596301 | 2017 |
| 60000597501 | 2017 |
| 60000598701 | 2017 |
| 60000601301 | 2017 |
| 60000603701 | 2017 |
| 60000605001 | 2017 |
| 60000606201 | 2017 |

| | |
|---|---|
| 60000607401 | 2017 |
| 60000608601 | 2017 |
| 60000609801 | 2017 |
| 60000613001 | 2017 |
| 60000614101 | 2017 |
| 60000615301 | 2017 |
| 60000618901 | 2017 |
| 60000619001 | 2017 |
| 60000621901 | 2017 |
| 60000622001 | 2017 |
| 60000623201 | 2017 |
| 60000624401 | 2017 |
| 60000625601 | 2017 |
| 60000626801 | 2017 |
| 60000627001 | 2017 |
| 60000628101 | 2017 |
| 60000629301 | 2017 |
| 60000630001 | 2017 |
| 60000631101 | 2017 |
| 60000632301 | 2017 |
| 60000633501 | 2017 |
| 60000634701 | 2017 |
| 60000635901 | 2017 |
| 60000636001 | 2017 |
| 60000637201 | 2017 |
| 60000638401 | 2017 |
| 60000639601 | 2017 |
| 60000640201 | 2017 |
| 60000641401 | 2017 |
| 60000642601 | 2017 |
| 60000643801 | 2017 |
| 60000644001 | 2017 |
| 60000645101 | 2017 |
| 60000646301 | 2017 |
| 60000647501 | 2017 |
| 60000648701 | 2017 |
| 60000649901 | 2017 |
| 60000650501 | 2017 |
| 60000651701 | 2017 |
| 60000652901 | 2017 |
| 60000653001 | 2017 |
| 60000654201 | 2017 |
| 60000655401 | 2017 |
| 60000656601 | 2017 |
| 60000657801 | 2017 |
| 60000658001 | 2017 |
| 60000659101 | 2017 |

| | |
|---|---|
| 60000660801 | 2017 |
| 60000663301 | 2017 |
| 60000664501 | 2017 |
| 60000665701 | 2017 |
| 60000668201 | 2017 |
| 60000669401 | 2017 |
| 60000670001 | 2017 |
| 60000671201 | 2017 |
| 60000672401 | 2017 |
| 60000673601 | 2017 |
| 60000674801 | 2017 |
| 60000676101 | 2017 |
| 60000677301 | 2017 |
| 60000679701 | 2017 |
| 60000680301 | 2017 |
| 60000681501 | 2017 |
| 60000682701 | 2017 |
| 60000684001 | 2017 |
| 60000685201 | 2017 |
| 60000686401 | 2017 |
| 60000688801 | 2017 |
| 60000689001 | 2017 |
| 60000690601 | 2017 |
| 60000691801 | 2017 |
| 60000692001 | 2017 |
| 60000693101 | 2017 |
| 60000694301 | 2017 |
| 60000695501 | 2017 |
| 60000696701 | 2017 |
| 60000697901 | 2017 |
| 60000698001 | 2017 |
| 60000699201 | 2017 |
| 60000700501 | 2017 |
| 60000701701 | 2017 |
| 60000702901 | 2017 |
| 60000703001 | 2017 |
| 60000704201 | 2017 |
| 60000705401 | 2017 |
| 60000706601 | 2017 |
| 60000707801 | 2017 |
| 60000708001 | 2017 |
| 60000709101 | 2017 |
| 60000710801 | 2017 |
| 60000711001 | 2017 |
| 60000712101 | 2017 |
| 60000713301 | 2017 |
| 60000714501 | 2017 |

| | |
|---|---|
| 60000715701 | 2017 |
| 60000716901 | 2017 |
| 60000717001 | 2017 |
| 60000718201 | 2017 |
| 60000719401 | 2017 |
| 60000720001 | 2017 |
| 60000721201 | 2017 |
| 60000722401 | 2017 |
| 60000723601 | 2017 |
| 60000724801 | 2017 |
| 60000725001 | 2017 |
| 9000003201 | 2017 |
| 9000004501 | 2017 |
| 9000005801 | 2017 |
| 9000006001 | 2017 |
| 9000007301 | 2017 |
| 9000008601 | 2017 |
| 9000009901 | 2017 |
| 9000010801 | 2017 |
| 10136788001 | 2017 |

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2024-1757

**Short Case Caption:** Nat'l Veterans Legal Servs. Prog. v. US (Isaacson appeal)

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,784__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __July 16, 2024__

Signature: __/s/ Eric Alan Isaacson__

Name: __Eric Alan Isaacson__