# 2024-1757

## Volume I (Appx0001-0544)

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE, Plaintiffs-
Appellees,

v.

UNITED STATES, Defendant-Appellee.

v.

ERIC ALAN ISAACSON, Interested Party-Appellant

_____

Appeal from the United States District Court
for the District of Columbia
in 1:16-cv-00745-PLF
The Honorable Paul L. Friedman

CORRECTED APPENDIX
VOLUME I (Appx0001-0544)

ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858) 263-9581
Email: ericalanisaacson@icloud.com

*Pro Se Interested-Party Appellant*

# TABLE OF CONTENTS

Docket
Entry
(DE__)        Document                                              page

**Volume I**

DE169    Final Approval Opinion...............................................Appx0001

DE170    Final Judgment and Order.......................................Appx0049

**District Court Docket Sheet**...............................Appx0081

DE1      Complaint.................................................................Appx0107

DE8      Plaintiffs' Motion for Class Certification.................Appx0122

DE11     Motion to Dismiss....................................................Appx0144

DE15     Plaintiffs' Opposition to Motion to Dismiss.............Appx0167

DE17     Plaintiffs' Reply in Support of Class Certification...Appx0173

DE24     Order Denying Defendant's Motion to Dismiss........Appx0180

DE25     Memorandum Opinion Denying Motion to
         Dismiss....................................................................Appx0181

DE27     Answer.....................................................................Appx0189

DE28     Declaration of Daniel L. Goldberg............................Appx0200

DE29     Declaration of Stuart Rossman................................Appx0201

DE30     Declaration of Barton F. Stichman ..........................Appx0202

DE32     Order Certifying Class..............................................Appx0203

DE33     Memorandum Opinion on Class Certification..........Appx0205

DE44     Order Granting Unopposed Plan of Class Notice.....Appx0224

DE52     Named Plaintiffs Motion for Summary Judgment...Appx0228

DE52-2   PACER Fee Schedule Effective December 1, 2013...Appx0253

DE52-11  PACER Program Summary.......................................Appx0258

DE52-15  Declaration of Thomas Lee & Michael Lissner........Appx0271

DE52-16  Plaintiffs' Statement of Undisputed Material
         Facts.........................................................................Appx0289

DE59      Reporters Committee Amicus Brief..........................Appx0321

DE61      Law Libraries Amicus Brief....................................Appx0348

DE63      Lieberman & Issa Amicus Brief...............................Appx0376

DE73      Defendant's Motion for Summary Judgment...........Appx0387

DE88      Summary Judgment Order.......................................Appx0388

DE89      Summary Judgment Memorandum Opinion............Appx0389

DE104     Order Certifying for Interlocutory Appeal Under
          28 U.S.C §1292(b)......................................................Appx0431

DE105     Memorandum Opinion on 28 U.S.C. §1292(b)
          Certification.............................................................Appx0433

DE107     Notice of Grant of Permission to Appeal...................Appx0441

DE107-1   Federal Circuit Order Granting Permission to
          Appeal......................................................................Appx0444

DE111     Mandate of the Federal Circuit................................Appx0448

DE111-1   Judgment of the Federal Circuit..............................Appx0449

DE130     Order Denying Michael T. Pines Motion to
          Intervene..................................................................Appx0450

DE132     Michael T. Pines Notice of Appeal...........................Appx0460

DE143     Order of the D.C. Circuit Dismissing
          Michael T. Pines Appeal for Lack of Prosecution.....Appx0461

DE148     Plaintiffs' Revised Motion for Preliminary
          Approval...................................................................Appx0463

DE148-1   Proposed Order Granting Revised Motion
          for Preliminary Approval..........................................Appx0491

DE149     Revised Declaration Deepak Gupta..........................Appx0498

DE149-1   Settlement Agreement...............................................Appx0516

DE149-2   First Amendment to Settlement Agreement............Appx0532

DE149-3   Second Amendment to Settlement Agreement.........Appx0535

DE153     Order Granting Plaintiffs' Revised Motion for
          Preliminary Approval of Class Action Settlement...Appx0539

# Volume II

DE158    Motion for Final Approval of Class Action Settlement....................................................Appx0545

DE158-1    Declaration of Renée Burbank..................................Appx0596

DE158-2    Declaration of Stuart T. Rossman............................Appx0601

DE158-3    Declaration of Rakim Brooks.....................................Appx0604

DE158-4    Declaration of Brian T. Fitzpatrick..........................Appx0606

DE158-5    Declaration of Deepak Gupta....................................Appx0677

DE158-6    Declaration of Meghan S.B. Oliver...........................Appx0740

DE159    Response of the United States to Motion for Final Approval...............................................................Appx0747

DE160    Named Plaintiffs' Reply in Support of Final Approval...............................................................Appx0756

DE161    Order Changing Settlement Hearing Location........Appx0775

DE162    Order Setting Settlement Hearing Procedures........Appx0776

DE166    Plaintiffs' Notice of Filing of Objections to Settlement....................................................Appx0779

DE166-1    Objection of Aaron Greenspan...................................Appx0782

DE166-2    Objection of Alexander Jiggetts Objection...............Appx0784

DE166-3    Objection of Geoffrey Miller......................................Appx0785

DE166-4    Objection of Don Kozich.............................................Appx0788

DE166-5    Objection of Eric Alan Isaacson................................Appx0818

DE166-6    Isaacson Written Statement.......................................Appx0869

DE173    Notice of Appeal (April 18, 2024).............................Appx1013

DE175    Transcript of October 12, 2023, Final Approval Hearing....................................................Appx1015

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
NATIONAL VETERANS LEGAL                         )
SERVICES PROGRAM, NATIONAL                      )
CONSUMER LAW CENTER, and                        )
ALLIANCE FOR JUSTICE, for themselves            )
and all others similarly situated,              )
                                                )
            v.                                  )        Civil Action No. 16-0745 (PLF)
                                                )
UNITED STATES OF AMERICA,                       )
                                                )
            Defendant.                          )
_____         )

OPINION

      For over fifteen years, PACER fees – the per-page fees that the federal judiciary

charges the public for online access to court documents – have been a subject of controversy.  As

a result of the litigation in this case, the United States will return over $100 million of these fees

to users of PACER.  Today, this litigation substantially comes to a close.

      The Court has before it a motion of class representatives National Veterans Legal

Services Program, National Consumer Law Center, and Alliance for Justice (the "Named

Plaintiffs") for final approval of a settlement agreement that would resolve the pending claims of

hundreds of thousands of plaintiffs and reimburse them for PACER fees that the judiciary

unlawfully used to fund certain non-PACER services.  Counsel for the Named Plaintiffs also

request attorney's fees, costs, and service awards.

      After careful consideration of the arguments made by the Named Plaintiffs and by

the government, and of the comments and objections by interested persons submitted to the

Court and made at the hearing held on October 12, 2023, the Court will approve the settlement

agreement and award $23,863,345.02 in attorney's fees, $1,106,654.98 in costs, and $30,000 in service awards.[1]

---

[1]     The filings and attachments considered by the Court in connection with this matter include: Complaint ("Compl.") [Dkt. No. 1]; Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment ("Mot. to Dismiss") [Dkt. No. 11]; Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents, Exhibit 3 ("Class Cert. Web Notice") [Dkt. No. 42-5]; Notice of Filing of Revised Notice Documents, Exhibit 1 ("Class Cert. Email Notice") [Dkt. No. 43-1]; Plaintiffs' Motion for Summary Judgment as to Liability ("Pls.' Summ. J. Mot.") [Dkt. No. 52]; Declaration of Jonathan E. Taylor, Exhibit B ("1997 AO Report") [Dkt. No. 52-3]; Declaration of Jonathan E. Taylor, Exhibit E ("Jud. Conf. Letter") [Dkt. No. 52-6]; Declaration of Jonathan E. Taylor, Exhibit H ("Lieberman Letter") [Dkt. No. 52-9]; Plaintiffs' Statement of Undisputed Material Facts ("Pls.' Facts") [Dkt. No. 52-16]; Defendant's Cross-Motion for Summary Judgment ("Def.'s Summ. J. Mot.") [Dkt. No. 74]; Declaration of Wendell A. Skidgel Jr. ("Skidgel Decl.") [Dkt. No. 74-2]; Defendant's Statement of Material Facts as to Which There is No Genuine Dispute and Response to Plaintiffs' Statement of Undisputed Material Facts ("Def.'s Facts") [Dkt. No. 74-3]; Declaration of Wendell A. Skidgel Jr. ("2d Skidgel Decl.") [Dkt. No. 81-1]; Notice of Submission of Revised Proposed Order and Revised Notice Documents, Exhibit 5 ("Sett. Web Notice") [Dkt. No. 152-5]; Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Sett. Mot.") [Dkt. No. 158]; Declaration of Renée Burbank ("Burbank Decl.") [Dkt. No. 158-1]; Declaration of Stuart T. Rossman ("Rossman Decl.") [Dkt. No. 158-2]; Declaration of Rakim Brooks ("Brooks Decl.") [Dkt. No. 158-3]; Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.") [Dkt. No. 158-4]; Declaration of Deepak Gupta ("Gupta Decl.") [Dkt. No. 158-5]; Declaration of Meghan S.B. Oliver ("Oliver Decl.") [Dkt. No. 158-6]; Declaration of Gio Santiago Regarding Implementation of Settlement Notice Program ("KCC Decl.") [Dkt. No. 158-7]; Defendant's Response to Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Def.'s Resp.") [Dkt. No. 159]; Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Reply") [Dkt. No. 160]; Supplemental Declaration of Brian T. Fitzpatrick ("Fitzpatrick Supp. Decl.") [Dkt. No. 160-1]; Declaration of William B. Rubenstein in Support of Class Counsel's Motion for Attorneys' Fees ("Rubenstein Supp. Decl.") [Dkt. No. 160-2]; Supplemental Declaration of Deepak Gupta ("Gupta Supp. Decl.") [Dkt. No. 160-3]; Declaration of Meghan S.B. Oliver ("Oliver Supp. Decl.") [Dkt. No. 160-4]; Declaration of Gio Santiago Regarding Settlement Administration Costs ("KCC Supp. Decl.") [Dkt. No. 160-5]; Plaintiff-Class Member Don Kozich's Verified Objections to Settlement and Motion to Appear Telephonically or by Zoom ("Kozich Obj. and Mot.") [Dkt. No. 163]; Plaintiffs' Response to Objection of Don Kozich ("Resp. to Kozich Obj.") [Dkt. No. 165]; and Plaintiffs' Notice of Filing of All Objections Received to Date ("Compiled Objs.") [Dkt. No. 166].

    The Court also reviewed the following objections to the settlement agreement: Objection of Aaron Greenspan ("Greenspan Obj.") [Dkt. No. 166-1]; Objection of Alexander Jiggetts ("Jiggetts Obj.") [Dkt. No. 166-2]; Objection of Geoffrey Miller ("Miller Obj.") [Dkt.

2

## I. BACKGROUND

### A. Origin and History of PACER Fees

Before the late 1980s, federal courts operated on paper. If members of the public wanted to view court dockets or filings, they had to travel to the courthouses where those records physically existed. Then, in 1988, the judiciary "authorized an experimental program of electronic access for the public to court information." JUD. CONF. OF THE U.S., REPORT OF THE PROCEEDINGS 83 (Sept. 14, 1988), www.uscourts.gov/file/1642/download [perma.cc/HKS6-4B34]. This experiment gave rise to the Public Access to Court Electronic Records system, or "PACER." Pls.' Facts ¶ 1. PACER allows the public to access court documents without the need to review physical records or travel to the courthouse to access them. 25 Years Later, PACER, Electronic Filing Continue to Change Courts, U.S. CTS. (Dec. 9, 2013), www.uscourts.gov/news/2013/12/09/25-years-later-pacer-electronic-filing-continue-change-courts [perma.cc/92NB-8BM7].

Originally, PACER worked via a dial-up phone connection and users were charged fees by the minute. 25 Years Later, PACER, Electronic Filing Continue to Change Courts, supra. But in 1998, PACER moved online, and the judiciary started charging users on a per-page basis. See Def.'s Facts ¶ 16. Around the same time, the judiciary began to use PACER

---

No. 166-3]; Objection of Eric Isaacson ("Isaacson Obj.") [Dkt. No. 166-5]; and Written Statement of Eric Alan Isaacson of Intent to Appeal in Person at the October 12, 2023, Final-Approval Hearing ("Isaacson Stmt.") [Dkt. No. 166-6].

The Court also reviewed the following prior opinions in this case: Nat'l Veterans Legal Servs. Program v. United States, Civil Action No. 16-0745, 2016 WL 7076986 (D.D.C. Dec. 5, 2016) ("Motion to Dismiss Op."); Nat'l Veterans Legal Servs. Program v. United States, 235 F. Supp. 3d 32 (D.D.C. 2017) ("Class Certification Op."); Nat'l Veterans Legal Servs. Program v. United States, 291 F. Supp. 3d 123 (D.D.C. 2018) ("Summary Judgment Op."); and Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d 1340 (Fed. Cir. 2020) ("Federal Circuit Op.").

fees to pay for programs other than PACER, like Case Management / Electronic Case Filing ("CM/ECF"), a new system that allowed parties to file documents electronically.  See 1997 AO Report at 36; Pls.' Facts ¶ 9.  By fiscal year 2000, the judiciary was using the fees to pay for PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN") costs.  2d Skidgel Decl. ¶ 31; id. tab 30; see Summary Judgment Op., 291 F. Supp. 3d at 131.

In 2002, Congress passed the E-Government Act, a statute whose broad purpose was to improve electronic services and processes in government.  See E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899.  As relevant to this litigation, the Act amended the statutory note to 28 U.S.C. § 1913 ("Section 1913 Note") so that it read:

> COURT FEES FOR ELECTRONIC ACCESS TO INFORMATION
>
> [. . . .]
>
> (a)  The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts . . . for access to information available through automatic data processing equipment.  These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information.  The Director of the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.
>
> (b)  The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective.  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services.

28 U.S.C. § 1913 note (internal quotation marks omitted); see E-Government Act of 2002, § 205(e).  The Senate Governmental Affairs Committee explained:

4

Appx0004

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

S. Rep. No. 107-174 at 23 (June 24, 2002).  At that point, PACER fees were set at $0.07 per page.  See Skidgel Decl. Ex. G at 64.

But PACER fees continued to rise.  Effective January 2005, the Judicial Conference increased fees to $0.08 per page.  Jud. Conf. Letter at 1.  The Director of the Administrative Office of the United States Courts explained that the increase was "predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue to fund CM/ECF operations and maintenance."  Id.

By the end of 2006, the judiciary had accumulated $32.2 million of excess revenue from PACER fees.  Pls.' Facts ¶ 16; Summary Judgment Op., 291 F. Supp. 3d at 134.  For that reason, the judiciary further expanded the categories of programs that would be funded by the fees.  See Summary Judgment Op., 291 F. Supp. 3d at 134-35.  These programs included CM/ECF, EBN, courtroom technology upgrades, an online Jury Management System ("Web Juror"), a Violent Crime Control Act ("VCCA") notification system, and a study to determine the feasibility of providing access to state court documents through CM/ECF (the "State of Mississippi Study").  2d Skidgel Decl. tab 11, tab 12; see Summary Judgment Op., 291 F. Supp. 3d at 135.  In 2012, the judiciary increased PACER fees to $0.10 per page.  Pls.' Facts at ¶ 22.

5

Appx0005

PACER fees have been controversial since at least 2008.  That year, a group of activists attempted to download significant portions of the court documents available on PACER and make them available for free.  John Schwartz, <u>An Effort to Upgrade a Court Archive System to Free and Easy</u>, N.Y. TIMES (Feb. 12. 2009), www.nytimes.com/2009/02/13/us/13records.html.  These activists, along with scholars and public officials, argued that PACER fees make it difficult for the public to access information integral to understanding our country's law and legal system.  <u>E.g.</u>, Timothy B. Lee, <u>The Case Against PACER: Tearing Down the Courts' Paywall</u>, ARSTECHNICA (Apr. 9, 2009), www.arstechnica.com/tech-policy/2009/04/case-against-pacer [perma.cc/X52V-RYQT]; <u>see also</u> Pls.' Sett. Mot. at 5 ("High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts.").

In 2009, Senator Joe Lieberman, sponsor of the E-Government Act, expressed concern that the judiciary may have been violating the Act by collecting PACER fees "well higher than" the cost of funding PACER.  Lieberman Letter at 1.  Still, this trend continued.  From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased from about $102.5 million in 2010 to $146.4 million in 2016.  <u>See</u> Pls.' Facts ¶¶ 28, 46, 62, 80, 98, 116, 134.

### B.  Procedural History

The current litigation began in April 2016, when the Named Plaintiffs filed a class-action lawsuit against the United States alleging that the judiciary had violated the

E-Government Act by charging excessive PACER fees.  Compl. ¶¶ 1-3, 34.[2]  The Named

Plaintiffs alleged jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a).  Id. ¶ 33.  The

Named Plaintiffs were, and still are, represented by Gupta Wessler LLP and Motley Rice LLC

("Class Counsel").

      The United States moved to dismiss.  See Mot. to Dismiss.  The government

argued that the Court lacked jurisdiction, id. at 15-19, that the Named Plaintiffs could not sue

without first alerting the PACER Service Center, id. at 13-15, and that other similar class action

lawsuits challenging PACER fees should be litigated first under the "first-to-file rule."  Id.

at 12-13.  This Court denied the motion to dismiss.  See Motion to Dismiss Op., 2016

WL 7076986.  In January 2017, the Court certified a class.  See Class Certification Op., 235 F.

Supp. 3d 32.  The class consisted of "[a]ll individuals and entities who have paid fees for the use

of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and

federal government entities."  Id. at 39.  These class members were given notice and an

opportunity to opt out.  Gupta Decl. ¶ 14; see Order Approving Plan of Class Notice ("1st Notice

Appr.") [Dkt. No. 44].  The parties then engaged in informal discovery, which clarified what

categories of expenses were funded by PACER fees.  Gupta Decl. ¶ 15.

      In August 2017, the Named Plaintiffs filed a motion seeking "summary

adjudication of the defendant's liability, reserving the damages determination for after formal

discovery."  Pls.' Summ. J. Mot. at 1.  The United States then filed a cross-motion for summary

judgment as to liability.  Def.'s Summ. J. Mot. at 1.  In these motions, the parties asked the Court

to decide the central question in the case:  Under the E-Government Act, what categories of

---

[2]     Judge Ellen Segal Huvelle presided over this case until her retirement, at which
time the case was reassigned to the undersigned.

expenses may be funded by PACER fees?  See id. at 1-2; Pls.' Summ. J. Mot. at 1.  The Named

Plaintiffs argued that the Act "prohibits the [judiciary] from charging more in PACER fees than

is necessary to recoup the total marginal cost of operating PACER," so none of the additional

categories of expenses were permitted.  Pls.' Summ. J. Mot. at 11.  The United States urged a

broader reading of the statute which would allow the judiciary to "charge fees, as it deems

necessary, for the provision of information to the public through electronic means," making all of

the additional categories of expenses lawful.  Def.'s Summ. J. Mot. at 11.

      The Court rejected both positions, holding that the government's interpretation of

the E-Government Act was too broad, but that the Named Plaintiffs' interpretation was too

narrow.  See Summary Judgment Op., 291 F. Supp. 3d at 141-44.  The Court concluded that the

judiciary "properly used PACER fees to pay for CM/ECF and EBN, but should not have used

PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the

expenditures for [c]ourtroom [t]echnology."  Id. at 146.  Using PACER fees to pay for these

expenses was improper because the programs failed to further "the public's ability to access

information on the federal court's CM/ECF docketing system."  Id. at 150.

      The parties cross-appealed to the United States Court of Appeals for the Federal

Circuit.  In August 2020, the Federal Circuit affirmed this Court's interpretation.  See Federal

Circuit Op., 968 F.3d at 1359.  The Federal Circuit wrote that Judge Huvelle "got it just right" in

interpreting the E-Government Act to "limit[] PACER fees to the amount needed to cover

expenses incurred in services providing public access to federal court electronic docketing

information."  Id. at 1343, 1350.  The Named Plaintiffs' interpretation failed because it

"combine[d] part of the first sentence of paragraph (a) [of the Section 1913 Note] ('The Judicial

Conference may, only to the extent necessary, prescribe reasonable fees . . . .') with two parts of

the last sentence of paragraph (b) ('to reimburse expenses incurred in providing' the 'services rendered,' which plaintiffs construe to mean PACER access), paying little heed to the substantial amount of text in between." Id. at 1350. Instead, the full text of the Section 1913 Note, along with its legislative history, made clear that the E-Government Act "limits the use of PACER fees to expenses incurred in providing (1) electronic access for members of the public (2) to information stored on a federal court docketing system." Id. at 1351-52.[3]

Applying this interpretation to the contested categories of expenses, the Federal Circuit agreed with this Court that it was unlawful for the judiciary to use PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most courtroom technology expenses. Federal Circuit Op., 968 F.3d at 1358. The appellate court declined to decide whether it was lawful for PACER fees to fund all CM/ECF expenditures, holding that the issue was not properly before it and remanding to this Court for further proceedings. Id. at 1358-59.

After remand, the parties began settlement discussions. See Gupta Decl. ¶¶ 23-24. Even after the Federal Circuit ruling, the government took the position that it did not owe damages to class members because the class could not prove that PACER fees would have been lower if the judiciary had refrained from making the unlawful expenditures. Id. ¶ 23. The government also maintained that all CM/ECF expenditures were properly funded by PACER fees. Id. The Named Plaintiffs disagreed with both positions. Id.

In May 2021, the parties engaged in an all-day mediation session with Professor Eric Green. Gupta Decl. ¶ 25. During the mediation, the parties agreed to a common-fund settlement structure and the United States made a "final offer" for the total amount of the fund.

---

[3]    The Federal Circuit also held that the Little Tucker Act granted jurisdiction over the lawsuit because the E-Government Act was sufficiently "money-mandating." Federal Circuit Op., 968 F.3d at 1347-49.

Id. ¶ 26.  Over the next few weeks, Professor Green continued to mediate, and the parties agreed

on a fund amount of $125 million.  See id. ¶ 27.  Reaching agreement on the remaining sticking

points – including how the fund would be distributed, what would happen to unclaimed money,

and the scope of the release of legal claims – took many months more.  Id. ¶¶ 27-28.  In July

2022, the parties executed a settlement agreement, which they amended once in September 2022

and again in April 2023 (collectively, the "Agreement").  Id. ¶ 28; see id. Ex. A ("Sett.

Agreement"); id. Ex. B ("First Supp. Agreement"); id. Ex. C ("Second Supp. Agreement").

On May 8, 2023, the Court granted preliminary approval of the Agreement and

scheduled a hearing to consider final approval for October 12, 2023 (the "Settlement Hearing").

See Order Granting Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement

("Prelim. Approval") [Dkt. No. 153] at ¶¶ 1, 3.  At that time, the Court certified a revised

settlement class.  Id. ¶ 7.  The settlement class included all members of the original class who did

not opt out, plus those meeting the same criteria who had paid PACER fees before May 2018 but

after the original class was certified.  Id.  The Court directed that notice of the Agreement and its

terms be provided to the settlement class.  Id. ¶¶ 15, 16, 18.  Using the government's PACER

registration data, the claims administrator identified members of the class to be notified.  Id.

¶ 13; KCC Decl. ¶¶ 5-7.

In July 2023, the claims administrator sent the court-approved settlement notice,

both through email and through postcards, to over 500,000 PACER account holders.  KCC Decl.

¶¶ 8-11.  These notices provided class members with the settlement amount, an overview of the

litigation, information about opting out and submitting objections, and a link to additional

information and the full Agreement on a website dedicated to the settlement.  Id. Ex. B; see

PACER FEES CLASS ACTION, www.pacerfeesclassaction.com [https://perma.cc/N4L5-AYHS].

Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web Notice at 5.  Because some class members already had the opportunity to opt out when the original class was certified, the notice sent to them did not include the option to opt out.  KCC Decl. ¶8; see id. Ex. A.  The claims administrator also issued publication notice through a widely disseminated press release and a banking newsletter.  Id. ¶¶ 12, 13.

There were a few hiccups in the notice process.  First, the initial notice omitted some class members who were part of the original class.  KCC Decl. ¶ 15.  Second, the notice sent to some members of the original class incorrectly indicated that they had another opportunity to opt out.  Id. ¶ 16.  The settlement administrator corrected both mistakes and sent new notices on August 7, 2023.  Id. ¶¶ 15, 16.  Thirty-three individuals timely opted out of the settlement class.[4]  Five individuals filed objections.  See Compiled Objs.[5]

On August 28, 2023, the Named Plaintiffs moved for final approval of the class settlement and for attorney's fees, costs, and service awards.  Pls.' Sett. Mot.  The Court held the Settlement Hearing on October 12, 2023.  Class Counsel, as well as representatives for each of the three Named Plaintiffs, gave statements in support of the Agreement.  Two objectors spoke in opposition to the Agreement.  Then the Court gave the parties an opportunity to respond to

---

[4]     While the Named Plaintiffs initially stated that thirty-four individuals timely opted out, Pls.' Sett. Mot. at 13, the parties clarified at the Settlement Hearing that they had included a duplicate in their count and that the correct number is thirty-three.  In addition, the parties clarified at the Settlement Hearing that sixteen individuals attempted to opt out after the opt out deadline.  But none of these sixteen individuals were actually eligible to opt out, as all were either part of the original class and had the opportunity to opt out in 2017, or were federal employees who were never part of the class to begin with.  See id.

[5]     These individuals were:  Aaron Greenspan, Alexander Jiggetts, Geoffrey Miller, Don Kozich, and Eric Isaacson. Of the written objections, two of the five were timely (Mr. Miller's and Mr. Isaacson's), and one of the three untimely objections was filed by an individual who is likely not a class member (Mr. Kozich).  Nevertheless, the Court has considered all five objections filed.

11

written and oral objections. Finally, the Court heard from the parties and from objectors on the issue of attorney's fees.

## II. THE SETTLEMENT AGREEMENT

The Agreement creates a common fund of $125 million and provides for the distribution of at least 80% of that fund to the hundreds of thousands of persons or entities who paid PACER fees between April 21, 2010 and May 31, 2018 (the "Class Period").

### A. The Settlement Class and Fund

The settlement class includes all persons or entities who paid PACER fees in the period beginning six years before the Named Plaintiffs filed their original complaint (April 22, 2010) and ending on the date the judiciary stopped using PACER fees to fund prohibited expenses (May 31, 2018) – with the exception of those who opted out, of federal agencies, and of Class Counsel. Sett. Agreement ¶ 3; First Supp. Agreement; see Pls.' Sett. Mot. at 11. This class includes at least several hundred thousand members. See Class Certification Op., 235 F. Supp. 3d at 39.

The settlement common fund totals $125 million. Sett. Agreement ¶ 11. From this fund, at least 80%, or $100 million, is to be distributed to class members. Id. ¶ 18. Up to 20%, or $25 million, is to be used for attorney's fees, litigation expenses, and service awards for the class representatives. Id. ¶ 28. As to the attorney's fees and service awards, the Agreement specifies that "the Court will ultimately determine whether the amounts requested are reasonable." Id. The Agreement further specifies that service awards cannot exceed $10,000 per class representative. Id.

### B. Fund Allocation and Distribution to Class Members

The Agreement allocates the common fund to class members through a two-step calculation.  See Sett. Agreement ¶ 19.  First, all class members are allocated either $350 or, if they paid less than $350 in PACER fees during the Class Period, the actual amount that they paid.  Id.  Second, class members who paid over $350 receive, in addition to the first $350, a pro rata allocation of the remaining common fund.  Id.  This pro rata allocation compares the amount that a given class member paid over $350 to the amounts that other class members paid over $350, and allots the remaining common fund accordingly.  See id.  To illustrate the calculation, if a class member paid $100 in PACER fees during the Class Period, they will get all of it back.  See id. ¶¶ 19, 20.  But if a class member paid $1000 in PACER fees during the Class Period, they will get $350 plus an amount from the remaining common fund proportional to the additional $650 that they paid.  See id.  If there is unclaimed money after these allocations are distributed to class members, then the rest of the common fund will be distributed to class members who have not been fully reimbursed for the PACER fees they paid during the Class Period and who successfully collected their first distribution.  Id. ¶ 23.

In contrast to most class action settlements, class members will not need to submit claims to get their share of this common fund.  See Pls.' Sett. Mot. at 13.  Instead, the claims administrator will use the information provided to them by the government – which has comprehensive records of PACER registrants and the fees they paid – to identify class members and distribute their payments.  See id.; Sett. Agreement ¶¶ 14, 21, 23; KCC Decl. ¶¶ 5-7.  The claims administrator will disburse the first set of payments within 180 days of receiving the settlement fund from the government, and will distribute any remaining money three months after that.  Second Supp. Agreement ¶ 21; Sett. Agreement ¶ 24.

## III.  FAIRNESS

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be dismissed, settled, or compromised without the approval of the Court.  FED. R. CIV. P. 23(e). Before giving its approval, the Court must direct the provision of adequate notice to all members of the class, conduct a hearing, and find, after notice and a hearing, that the settlement is "fair, reasonable, and adequate."  Id.; see Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998); In re Black Farmers Discrimination Litig., 856 F. Supp. 2d 1, 26 (D.D.C. 2011).  In performing this task, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action.  See WILLIAM B. RUBENSTEIN, 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:40 (6th ed. 2023).

To determine whether a settlement is fair, reasonable, and adequate, the Court "looks to the 'paramount twin elements of procedural and substantive fairness.'"  Mercier v. United States, 156 Fed. Cl. 580, 584 (2021) (quoting Courval v. United States, 140 Fed. Cl. 133, 139 (2018) (internal quotation marks omitted)).  The Federal Rules instruct the Court to consider a variety of factors in doing so.  The first two of these factors are procedural:  whether "(A) the class representatives and class counsel have adequately represented the class; [and] (B) the proposal was negotiated at arm's length."  FED. R. CIV. P. 23(e)(2).  The remaining factors are substantive; the Court is to consider whether:

> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness
> of any proposed method of distributing relief to the class, including
> the method of processing class-member claims; (iii) the terms of any
> proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each
> other.

Id.

Having carefully considered the parties' arguments and all of the objections that have been filed with the Court and expressed at the Settlement Hearing, the Court concludes that the settlement is fair, reasonable, and adequate.

### A. Procedural Fairness

The Court finds that the Named Plaintiffs and Class Counsel have more than "adequately represented" the class. See FED. R. CIV. P. 23(e)(2)(A). The Named Plaintiffs are nonprofit organizations who pay PACER fees despite their nonprofit status, and whose members experienced real burdens because of the fees. Class Certification Op., 235 F. Supp. 3d at 42. These characteristics made them "particularly good class representatives." Id. The two law firms representing the class, in tandem, have extensive experience both in class actions and in lawsuits against the federal government. See Gupta Decl. ¶¶ 45-48, 50-55, 59-61; see also infra Section IV.B.1.

The Named Plaintiffs and Class Counsel have vigorously litigated this case for nearly eight years, over seven of them after the class was certified. See Gupta Decl. ¶¶ 11-13. They engaged in informal discovery, argued (and, in part, won) summary judgment, and successfully defended the summary judgment ruling on appeal. See id. ¶¶ 14-21; see also infra Section IV.B.2. After remand, they engaged in extensive settlement negotiations with the government. Gupta Decl. ¶¶ 23-28.

By all accounts, these settlement negotiations happened at "arm's length," indicating no collusion between the parties. See FED. R. CIV. P. 23(e)(2)(B). Negotiations came at a point in the litigation where liability was resolved but there were still significant questions about the possibility, and amount, of damages. The negotiations were thus neither "too early to be suspicious nor too late to be a waste of resources." In re Vitamins Antitrust Litig., 305 F.

Supp. 2d 100, 105 (D.D.C. 2004).  And because of "significant informal discovery, . . . the parties were well-positioned to mediate their claims."  Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 56 (D.D.C. 2010).  The negotiations took place over nearly two years but came together "after a lengthy mediation session that was presided over by an experienced mediator," indicating skilled negotiating on both sides.  See id.  Further evidence that the negotiations were at arm's length and not collusive is provided by the positions taken by the parties during settlement negotiations and the compromises ultimately reached.  See infra at 24.

The notice requirements of Rule 23 were also satisfied.  When the Court preliminarily approved the settlement, it "direct[ed] notice in a reasonable manner to all class members who would be bound by the proposal."  FED. R. CIV. P. 23(e)(1)(B); see Prelim. Approval ¶¶ 15, 16, 18.  The Court also found the planned notice to be "the best notice practicable under the circumstances," Prelim. Approval ¶ 21, as was required for the individuals and entities who were not part of the originally certified class.  See FED. R. CIV. P. 23(c)(2)(B).  The claims administrator adequately executed this notice.  Using the government's PACER registration data, it identified over 500,000 potential class members and sent them court-approved notices, both through email and through postcards.  KCC Decl. ¶¶ 5-7, 8-11; see Prelim. Approval ¶ 13; see also FED. R. CIV. P. 23(c)(2)(B) (requiring, for new class members, "individual notice to all members who can be identified through reasonable effort").  The claims administrator also issued publication notice.  KCC Decl. ¶¶ 12, 13.  Each form of notice directed class members to additional information on the dedicated settlement website.  See id. Exs. A-H.  While there were a few errors in the notice process – the initial notice omitted some class members and gave some class members incorrect information – the claims administrator promptly corrected these errors and gave recipients sufficient time to opt out or object.

Id. ¶¶ 15-18.[6]  The notice also satisfied Rule 23's substantive requirements for new class

members.  The emails, postcards, and publications, along with the dedicated settlement website:

> clearly and concisely state[d] in plain, easily understood language:
> (i) the nature of the action; (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses; (iv) that a class member
> may enter an appearance through an attorney if the member so
> desires; (v) that the court will exclude from the class any member
> who requests exclusion; (vi) the time and manner for requesting
> exclusion; and (vii) the binding effect of a class judgment on
> members under Rule 23(c)(3).

See FED. R. CIV. P. 23(c)(2)(B).  The Court finds that this notice was more than sufficient and

was "reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the action and afford them an opportunity to present their objections."  Haggart v.

Woodley, 809 F.3d 1336, 1348-49 (Fed. Cir. 2016) (quoting Mullane v. Cent. Hanover Bank &

Tr. Co., 339 U.S. 306, 314 (1950)).

      After class members were given notice, they had over a month (and most had over

two months) to file written objections.  See KCC Decl. ¶¶ 10, 15; Prelim. Approval ¶¶ 3, 20.

Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web

Notice at 5.  Only five individuals filed written objections.  On October 12, 2023, the Court held

the Settlement Hearing.  After the parties' opening statements, the Court heard objections to the

settlement.  No one spoke who had not already submitted a written objection.  Then, the Court

gave the parties an opportunity to respond to objections.  Finally, the Court heard from the

parties and from objectors on the issue of attorney's fees.

---

[6]     Objector Don Kozich contends that he did not receive notice of the settlement.
Kozich Obj. and Mot. at 2.  While no method of notice is perfect, Mr. Kozich's failure to receive
notice was likely proper.  Mr. Kozich does not appear to be a member of the class.  He incurred
PACER fees during the Class Period, but he did not pay those fees during the Class Period, and
thus is ineligible for relief.  Resp. to Kozich Obj. at 1.

Objector Eric Isaacson has questioned a few procedural aspects of the Settlement Hearing. First, he argues that discussing the proper award of attorney's fees after the time scheduled for objectors to speak deprives objectors of due process and runs afoul of the Federal Rules, Isaacson Stmt. at 7, which instruct the Court to consider "the terms of any proposed award of attorney's fees" in evaluating the adequacy of "the relief provided for the class" in the proposed settlement. FED. R. CIV. P. 23(e)(2)(C)(iii). Second, Mr. Isaacson argues that objectors at the hearing should have been given the opportunity to cross-examine declarants who provided support for Class Counsel's requested fees. Isaacson Stmt. at 7.[7]

Both of these arguments overstate an objector's role in the class settlement process. While the Court must consider – and has considered – the arguments of any class member who objects to the settlement, the Court need not give objectors the opportunity to speak at every possible point in the hearing; nor does the Court need to give objectors the opportunity to probe declarations or exhibits through cross-examination or other means. See 4 RUBENSTEIN, supra, § 13:42. Moreover, to assuage Mr. Isaacson's concerns, the Court allowed him to speak during the portion of the hearing addressing attorney's fees, in addition to his opportunity to speak during the portion of the hearing during which the reasonableness of the settlement was discussed.

---

[7] Mr. Isaacson further objects that "the settling parties arranged with the court to keep class members' objections off the public record." Isaacson Stmt. at 3. This objection has no factual basis. Though the objections the Court received through email were not automatically docketed, they were available upon request. In fact, at Mr. Isaacson's request, Class Counsel filed all objections to the public docket. See Compiled Objs.

18

### B. Substantive Fairness

In considering a proposed class action settlement, the Court must compare the benefits afforded to class members under the settlement with the likely recovery that plaintiffs would have realized if they pursued the resolution of their claims through litigation in court. Thomas v. Albright, 139 F.3d at 231; see In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 30.  The Court must look at the settlement as a whole and should not reject a settlement merely because individual class members claim that they would have received more by litigating rather than settling.  Thomas v. Albright, 139 F.3d at 231.  The Court should scrutinize the terms of the settlement carefully, but should also keep in mind "the interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources."  Christensen v. United States, 65 Fed. Cl. 625, 629 (2005) (quoting Mayfield v. Barr, 985 F.2d 1090, 1092 (D.C. Cir. 1993)).  And "the opinion of 'experienced and informed counsel should be afforded substantial consideration by [the C]ourt in evaluating the reasonableness of a proposed settlement.'"  Prince v. Aramark Corp., 257 F. Supp. 3d 20, 26 (D.D.C. 2017) (quoting In re Lorazepam & Clorazepate Antitrust Litig., Civil Action No. 99-0790, 2003 WL 22037741, at *6 (D.D.C. June 16, 2003)).

In its analysis of the Agreement's substantive fairness, the Court is guided by the substantive factors enumerated in the Federal Rules of Civil Procedure:  whether "the relief provided for the class is adequate, taking into account" various subfactors, and whether "the proposal treats class members equitably relative to each other."  FED. R. CIV. P. 23(e)(2).

### 1.   Whether the Relief is Adequate

The relief the settlement provides to class members is substantial.  The majority of class members will receive a full refund for the PACER fees they paid during the Class

Period.  Gupta Decl. ¶ 43.  Although the minority of class members – those who paid over $350 in fees during the Class Period – will likely not receive a full refund, they may receive substantially more than $350.  See Sett. Agreement ¶ 19.  In addition, the "proposed method of distributing relief to the class" is efficient.  See FED. R. CIV. P. 23(e)(2)(C)(ii).  There are no claims to process, and class members will receive the relief even if they have never contacted Class Counsel or the claims administrator.  See Pls.' Sett. Mot. at 13.

Contrast this substantial relief with the potential "costs, risks, and delay of trial and appeal."  See FED. R. CIV. P. 23(e)(2)(C)(i).  The Federal Circuit's liability ruling in this case found some, but not all, of the PACER fees collected during the Class Period to be unlawful.  Federal Circuit Op., 968 F.3d at 1350-51, 1357.  It left open the question of the extent to which it was lawful for the judiciary to fund CM/ECF through PACER fees.  See id. at 1358.  And the ruling effectively set the maximum possible recoverable damages for the class at around $500 million.  Fitzpatrick Decl. ¶ 20.

Even putting aside the costs of trial and potential further appeal, the path to obtaining this $500 million would have been anything but smooth.  "[T]here are several reasons to think a full recovery is unrealistic."  In re APA Assessment Fee Litig., 311 F.R.D. 8, 19 (D.D.C. 2015).  After the Federal Circuit's ruling, the government continued to assert that the class had no claim to damages because class members could not prove that – but for the unlawful expenditures – PACER fees would have been lower.  Gupta Decl. ¶ 23.  Moreover, even if class members would not have had to prove damages with specificity, the amount of potentially recoverable damages still would have been uncertain.  Much of the potential recovery came from fees the judiciary used to pay for CM/ECF services, Fitzpatrick Decl. ¶ 20, and the Federal Circuit explicitly declined to rule on how much of these services were appropriately funded

20

Appx0020

through PACER fees.  Federal Circuit Op., 968 F.3d at 1358.  The recoverability of a sizable

portion of the potential damages was thus an open question at the time of settlement.

      In other words, at the point of the litigation at which the parties agreed on the

terms of their settlement, it would have been a substantial risk to class members to proceed to

trial.  Evidence could have shown that <u>all</u> of the judiciary's CM/ECF expenditures were lawful.

Or the government could have convinced the Court of its position on damages.  In that case, the

Named Plaintiffs would have faced the difficult task of proving that the judiciary would have

chosen to charge lower PACER fees had its expenditures been limited to the lawful categories.

The common fund amount – roughly a quarter of the potential recovery if every legal and factual

issue had gone the plaintiffs' way – was impressively large in comparison to the risks of

continuing to litigate.

      Some objectors see a quarter of the maximum potential recovery as an

unimpressive figure.  <u>See</u> Isaacson Obj. at 3 (calling the settlement "remarkably mediocre");

Greenspan Obj. at 1 (asserting that the settlement should have fully reimbursed PACER users).

These views do not properly account for the formidable arguments that were available to the

government if the case had proceeded to trial.  In addition, Objector Aaron Greenspan asserts

that the common fund amount is too low because the judiciary can only legally charge for the

marginal cost of document transmission, and that marginal cost is zero.  Greenspan Obj. at 1.

But the Court has explicitly rejected an interpretation of the E-Government Act that would limit

lawful fees to those necessary to pay the marginal cost of operating PACER.  Summary

Judgment Op., 291 F. Supp. 3d at 140-43.  Instead, the judiciary can use PACER fees to fund the

full cost of providing public access to federal court electronic docketing information, including

fixed costs.  <u>See</u> Federal Circuit Op., 968 F.3d at 1349-52.

21

Other objectors argue that the Agreement is unreasonable because of its provision regarding attorney's fees, expenses, and service awards. See Isaacson Obj. at 9-17; Greenspan Obj. at 1-2. The Court has conducted a full analysis of the proper fee awards below. See infra Section IV. For now, it suffices to say that the fees provision of the Agreement is reasonable. See FED. R. CIV. P. 23(e)(2)(C)(iii) (instructing courts to consider the provisions of settlement agreements that relate to attorney's fees). The Agreement does not fix an amount of attorney's fees or service awards. Instead, it sets an upper limit on both – Class Counsel was able to request up to 20% of the common fund for attorney's fees, expenses, and service awards, including no more than $10,000 per service award for each class representative. Sett. Agreement ¶ 28. The Agreement leaves to the Court the ultimate determinations of how much to award. Id. Rather than setting an unreasonably high amount of attorney's fees or service awards, the Agreement thus caps the amount the Court has the opportunity to approve as reasonable.

Finally, the relative paucity of objections to the Agreement is a strong indicator of the adequacy of the relief. See In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 29; Mercier v. United States, 156 Fed. Cl. at 597. As Class Counsel notes, the settlement class is comprised of hundreds of thousands of PACER users and is "perhaps the most litigious group of people and entities ever assembled in a single class action, . . . including sophisticated data aggregators, federal-court litigators, and law firms of every stripe." Pls.' Reply at 1. Of this group, only thirty-three opted out of the class, and only five have objected to the settlement. In light of the terms of the Agreement and class members' lack of opposition to them, the Court finds the settlement relief adequate.

22

## 2. Whether the Settlement Treats Class Members Equitably

The Court concludes that the Agreement "treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D). While it treats those who paid $350 or less in PACER fees during the Class Period differently from those who paid more than $350, this difference in treatment is fair and justified.

The requirement of intra-class equity exists to ensure that "class counsel ha[s not] sold out some of the class members at the expense of others, or for their own benefit." 4 RUBENSTEIN, supra, § 13:56. If class counsel prioritizes settling a case over vigorously advocating for all class members' claims, counsel may agree to provide some (more powerful or more vocal) class members more relief than they deserve while giving other class members less than they deserve. To ensure that class counsel has not done so, it falls upon the Court to determine whether similarly situated class members are treated similarly and whether "dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." Id.

There is absolutely no indication that Class Counsel "sold out" any group of class members in this case. The Agreement strikes a balance between two competing goals: First, to give relief to small-scale PACER users – the non-lawyer members of the public and individual law practitioners who were most affected by having to pay unlawful fees; the full reimbursement of all PACER fees paid up to $350 makes it more likely that small-scale users will be wholly compensated. See Sett. Agreement ¶ 20. And second, to treat all class members – including large-scale users like law firms – equitably based on what they actually paid. The pro rata allocation above $350 makes it more likely that the sizable fees paid by large-scale users will be adequately accounted for. See id. The Agreement thus does a good job of treating similarly

23

situated class members similarly, while accounting for the differences between dissimilarly situated class members.

 The details the parties have provided about the settlement negotiations further support the reasonableness of the Agreement's common fund distribution. As to the allocation of settlement funds, the Named Plaintiffs initially took the position that the fund should be distributed on an exclusively <u>pro rata</u> basis. Gupta Decl. ¶ 28. The government countered that, before the <u>pro rata</u> allocation, class members should first be fully reimbursed up to a large amount. <u>Id</u>. It grounded this position in the E-Government Act's authorization to "'distinguish between classes of persons' in setting PACER fees . . . 'to avoid unreasonable burdens and to promote public access to'" electronic docketing information. <u>Id</u>. (quoting 28 U.S.C. § 1913 note). Consistent with the judiciary's policy of offering waivers and other pricing mechanisms to make PACER cheaper for some groups of users, the government wanted more of the settlement fund to go to reimbursing those who used PACER less. <u>See id</u>. The $350 figure reflected a compromise between the Named Plaintiffs' position and the government's position. Far from "selling out" class members, the different treatment of different groups within the class reflects vigorous negotiation on both sides, and reflects the text of the E-Government Act.

 A number of the objectors dispute the reasonableness of the distribution. Mr. Isaacson argues that too much of the common fund is allocated <u>pro rata</u>, unfairly favoring large-scale users over small-scale users. Isaacson Obj. at 4-5. Objector Geoffrey Miller argues that too much of the common fund is allocated to fully reimbursing users who paid $350 or less, unfairly favoring small-scale users over large-scale users. Miller Obj. at 1-2.[8] As Class Counsel

---

[8] Mr. Miller also objects that "[t]he proposed plan of allocation under Federal Rule 23 is in tension with the Rules Enabling Act, 28 U.S.C. §[§] 2071-2077, because, by providing different treatment to litigants with identical legal claims, it arguably abridges their

24

points out, these arguments cannot both be correct, and the fact that each of them was made indicates, if anything, a good compromise. See Pls.' Reply at 4. Moreover, the structure of the distribution is on sound legal footing. "Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members . . . ." Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 629 (6th Cir. 2007). At the same time, courts routinely approve settlements providing for pro rata distributions of common funds because such distributions directly account for the differences in the value of the claims of different class members. See, e.g., In re APA Assessment Fee Litig., 311 F.R.D. at 13; In re Facebook Biometric Info. Priv. Litig., 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021); In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 580-81 (S.D.N.Y. 2008).

The fact that two objectors (Mr. Isaacson and Mr. Miller) hold these contradictory positions is understandable. A class member who paid substantially more than $350 in PACER fees, but substantially less than a large-scale user, may look at large-scale users and feel disappointed that these users are getting so much more in absolute dollars. And a large-scale user may look at a class member who paid $350 or less in PACER fees and find it unfair that that class member is getting fully reimbursed by the Agreement, while the large-scale user is not. At bottom, however, this dissatisfaction arises from the amount of the common fund, not its allocation. There is simply not enough money in the common fund to reimburse every class member for all of what they paid in PACER fees – nor should there be, as some of the fees were

right to be treated equally before the law." Miller Obj. at 2. But the Rules Enabling Act is irrelevant to allocations between class members in common-fund settlements. Instead, as applied to class actions, the Rules Enabling Act prevents courts from "giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 458 (2016).

lawful. No settlement is perfect. But the Court finds that the difference in how this settlement treats different class members is justified, fair, and equitable.

Mr. Isaacson raises another issue of equity. He points out that many of the institutional class members are law firms, and that these firms have likely already been reimbursed – by their clients or through settlement agreements in other cases – for PACER fees paid during the Class Period. Isaacson Obj. at 4-7. Because these law firms have already been reimbursed, he argues, it is inequitable to treat them like other class members, particularly like individuals who never received reimbursement. See id. at 4.[9]

This argument makes some sense in the abstract. While a reasonable settlement hypothetically could differentiate between law firm class members who had been reimbursed for their PACER fees and other class members who had not been reimbursed for their PACER fees, there were good reasons not to do so here. First, prior to settlement, the claims of the law firms that had been reimbursed by their clients were just as valid as the claims of other class members. See S. Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533 (1918). In fact, the law firm class members were likely the only plaintiffs who could have brought claims against the government to recover the relevant PACER fees. Their clients could not have brought such claims because damages under the Little Tucker Act are available only to those who paid unlawful fees to the government, to those who paid unlawful fees to others "at the direction of

---

[9]    Mr. Isaacson further argues that the common fund allocations to many large-scale claimants are improper because entities whose aggregated claims total over $10,000 fall outside of Little Tucker Act jurisdiction. Isaacson Obj. at 7-8. This argument misunderstands the law. "A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Class Certification Op., 235 F. Supp. 3d at 38 (citing Am. Airlines, Inc. v. Austin, 778 F. Supp. 72, 76-77 (D.D.C. 1991); Alaska Airlines v. Austin, 801 F. Supp. 760, 762 (D.D.C. 1992); United States v. Louisville & Nashville R.R. Co., 221 F.2d 698, 701 (6th Cir. 1955)).

the government to meet a governmental obligation," see Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed. Cir. 1996), or to those against whom the government took action, related to unlawful fees, that had a "direct and substantial impact." See Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1303 (Fed. Cir. 2004) (quoting Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002)). Because clients who reimbursed law firms for unlawful PACER fees do not appear to fit into any of these categories, it would have been difficult – perhaps impossible – for them to recover anything from the government. Instead, once law firm class members have received their distributions under the Agreement, clients may have claims against them – to recover what the clients paid to the law firms in PACER fees – through sources of law unrelated to class actions, like contract law or state statutes. See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (approving a settlement even though some class members had been reimbursed for unlawful fees). That is between lawyers and their clients and beyond the scope of this litigation.

Second, it makes sense to leave disputes concerning reimbursement to law firm class members and the clients who reimbursed them, rather than to the claims administrator. It is true, as Mr. Isaacson points out, that law firms often bill clients for PACER fees. Isaacson Obj. at 4; see, e.g., Decastro v. City of New York, Civil Action No. 16-3850, 2017 WL 4386372, at *10 (S.D.N.Y. Sept. 30, 2017). But it would be complicated and burdensome for the claims administrator to sort through billing records to determine what happened with respect to each set of PACER fees billed. Sometimes, firms write fees off. Sometimes, clients do not pay. And if a client paid part, but not all, of their bills, it may not even be possible for the claims administrator to figure out what portion of a client's payment went towards PACER charges. On the other

hand, law firm class members are better equipped to determine which of their clients to reimburse for PACER charges, and by how much. If the clients believe the firms to be unlawfully withholding reimbursement, they can sue. More likely, law firms and clients will resolve any disputes over reimbursement out of court. Allowing this process to play out does not make the settlement inequitable.

In short, the benefits offered to class members by the Agreement are substantial, and the likely outcome for the class if the case were to proceed to trial is uncertain. The Court is convinced that the Agreement is fair, reasonable, and adequate.

## IV.  ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). Here, the Agreement authorizes attorney's fees, costs, and services awards, but limits the amount the Court can award for these categories combined to no more than 20% of the common fund, or $25 million. Sett. Agreement ¶ 28. The Agreement further specifies that service awards cannot exceed $10,000 per Named Plaintiff. Id.

Class Counsel effectively requests the maximum amount allowed by the settlement: $1,106,654.98 in costs, $30,000 in service awards ($10,000 for each of the three Named Plaintiffs), and $23,863,345.02 – the difference between the $25 million cap and the

other two amounts – in attorney's fees.  Pls.' Sett. Mot. at 4.[10]  The government does not oppose

their request.[11]

        The Court must independently determine the reasonableness of the requested fees,

costs, and service awards.  After carefully considering the submissions of the parties, the relevant

Federal Rule, and the case law, and after considering all of the objections that have been filed

with the Court and expressed at the Settlement Hearing, the Court awards the full amount

requested by Class Counsel in fees, costs, and service awards.

### A.  Legal Background

#### 1.  Attorney's Fees

        "The 'common fund doctrine' allows an attorney whose efforts created, increased

or preserved a fund 'to recover from the fund the costs of his litigation, including attorneys'

fees.'"  In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 16 (D.D.C. 2003) (quoting Vincent v.

Hughes Air West, Inc., 557 F.2d 759, 769 (9th Cir.1977)).  In common-fund cases, courts have a

duty to "ensure that claims for attorneys' fees are reasonable, in light of the results obtained."

Rogers v. Lumina Solar, Inc., Civil Action No. 18-2128, 2020 WL 3402360, at *11 (D.D.C. June

19, 2020) (K.B. Jackson, J.) (quoting In re Black Farmers Discrimination Litig., 953 F. Supp. 2d

82, 87 (D.D.C. 2013)).  The Court's independent scrutiny of an award's reasonableness is

particularly important in common-fund cases because "the conflict between a class and its

---

[10]      The $1,106,654.98 that Class Counsel requests in costs is comprised of
$29,654.98 in attorney expenses and $1,077,000 in settlement-administration and noticing costs.
Pls.' Sett. Mot. at 4.

[11]      In its briefs, the government raised concerns about the size of the requested fees.
Def.'s Resp. at 4-7.  At the Settlement Hearing, however, the government indicated that Class
Counsel's reply brief had alleviated their concerns.

attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (quoting Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991)). Thus, in common-fund cases, the court acts "as fiduciary for the beneficiaries" of the fund "because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set" and because "there is no adversary process that can be relied upon in the setting of a reasonable fee." In re Dep't of Veterans Affs. (VA) Data Theft Litig., 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (quoting Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 251 (1985)).

Courts have identified two approaches to calculating reasonable attorney's fees in common-fund cases. The first is the "percentage-of-the-fund method, through which 'a reasonable fee is based on a percentage of the fund bestowed on the class.'" Health Republic Ins. Co. v. United States, 58 F.4th 1365, 1371 (Fed. Cir. 2023) (quoting Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984)). The second is the lodestar method, "through which the court calculates the product of reasonable hours times a reasonable rate, and then adjusts that 'lodestar' result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings." Id. (cleaned up).

While courts have discretion to use either method, fee awards in common-fund cases are "typically based on some percentage of the common fund." Moore v. United States, 63 Fed. Cl. 781, 786 (2005). The lodestar method, by contrast, generally is used in fee-shifting cases. Health Republic Ins. Co. v. United States, 58 F.4th at 1371. Many courts of appeals have expressed an explicit preference for using the percentage method in common-fund cases. 5 RUBENSTEIN, supra, § 15:64 & n.15; see, e.g., Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261,

1271 (D.C. Cir. 1993); see also In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 17. This is because the percentage method "helps to align more closely the interests of the attorneys with the interests of the parties," Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d at 1573, by discouraging inflation of attorney hours and promoting "efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 205 (D.D.C. 2011) (quoting In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 383 (D.D.C. 2002)). The lodestar method, on the other hand, may give attorneys "an incentive to run up" "the number of hours they have billed," which could "prolong[] litigation unnecessarily and hence defer[] the class's compensation." 5 RUBENSTEIN, supra, § 15:65; see Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268.

When using the percentage-of-the-fund method, the Federal Circuit has identified the following factors to consider:

> (1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award.

Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787). In addition, "as settlement amounts increase in magnitude, the percentage of fees awarded should decrease." Haggart v. United States, 116 Fed. Cl. 131, 147 (2014). This is because "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." Id. (alterations in original) (quoting In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998)).

Courts sometimes employ a "lodestar cross-check" when they use the percentage method.  See 5 RUBENSTEIN, supra, § 15:85.  In a lodestar cross-check, "the reasonableness of a potential percentage-of-the-fund fee is checked by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier, and when this implicit multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (cleaned up).  While "the resulting multiplier need not fall within any pre-defined range, . . . courts must take care to explain how the application of a multiplier is justified by the facts of a particular case, . . . [and] must provide sufficient analysis and consideration of multipliers used in comparable cases to justify the award made."  Id. at 1375 (cleaned up).  That said, lodestar cross-checks "need entail neither mathematical precision nor bean-counting," as "district courts may rely on summaries submitted by the attorneys and need not review actual billing records."  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306-07 (3d Cir. 2005).  Although not required, the Federal Circuit has strongly suggested using a lodestar cross-check, "at least as a general matter."  Health Republic Ins. Co. v. United States, 58 F.4th at 1374 n.2.

## 2.   Costs and Service Awards

Rule 23 contemplates recovery of "nontaxable costs,"  FED. R. CIV. P. 23(h), the "reasonable expenses normally charged to a fee paying client."  5 RUBENSTEIN, supra, § 16:5; see Quimby v. United States, 107 Fed. Cl. 126, 135 (2012).  And "[i]t is well settled that counsel who have created a common fund for the benefit of a class are entitled to be awarded for out-of-pocket costs reasonably incurred in creating the fund."  Mercier v. United States, 156 Fed. Cl. at 593.  Aside from being reasonable, such expenses must be adequately documented. 5 RUBENSTEIN, supra, § 16:10.

32

Service awards, also known as "incentive" or "case-contribution" awards, are distributions from the common fund to class representatives in recognition of their service to the class and their role in the litigation. See 5 RUBENSTEIN, supra, § 17:1. Service awards "recognize the unique risks incurred and additional responsibility undertaken by named plaintiffs in class actions," Mercier v. United States, 156 Fed. Cl. at 589, and also compensate class representatives for expenses and work performed by in-house counsel. See In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 400. Service awards must be reasonable and proportionate to class representatives' role in the case. See 5 RUBENSTEIN, supra, § 17:13.

### B. Reasonableness of Requested Attorney's Fees

Class Counsel and the government agree that the Court should use the percentage-of-the-fund method to assess the reasonableness of the requested fees. Pls.' Sett. Mot. at 27; Def.'s Resp. at 8-9. Mr. Isaacson argues that the Court should use the lodestar method and award fees not exceeding Class Counsel's lodestar. Isaacson Obj. at 9-10. He relies primarily on Supreme Court precedent discussing fee-shifting cases and on precedent predating Rule 23 and the modern class action lawsuit. Id. But as the D.C. Circuit has noted, "the latest guidance from the High Court counsels the use of a percentage-of-the-fund methodology." Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268 (citing Blum v. Stenson, 465 U.S. at 900 n.16); see also In re Home Depot Inc., 931 F.3d 1065, 1085 (11th Cir. 2019) ("[T]he Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases does not apply to common-fund cases."); In re BioScrip, Inc. Sec. Litig., 273 F. Supp. 3d 474, 479-89 (S.D.N.Y. 2017) (Nathan, J.) (rejecting similar arguments made by Mr. Isaacson). For these reasons, and because the percentage method promotes efficiency and ensures that class counsel is compensated primarily based on the result achieved, the Court will use the percentage method.

The government urges the Court to also employ a lodestar cross-check. Def.'s Resp. at 7. Class Counsel points out, rightly, that a lodestar cross-check is not required, but it stops short of arguing that the Court should refrain from doing one. Pls.' Sett. Mot. at 35; see id. at 36-37; Pls.' Reply at 10. The Court will add a lodestar cross-check to its percentage-method analysis to confirm that the fee awarded properly accounts for the effort Class Counsel expended to litigate the case. The Court will first analyze the percentage requested using each of the above-described Federal Circuit factors, and then will conduct a lodestar cross-check.

### 1.  The Quality of Counsel

As the Court has stated before, "[t]here is no dispute about the competency of class counsel." Class Certification Op., 235 F. Supp. 3d at 43. Gupta Wessler is one of the nation's leading plaintiff and public interest appellate boutiques, and also has extensive experience in complex litigation against the federal government. See Gupta Decl. ¶¶ 46-48, 50-55, 59-61. Motley Rice is a leading class-action law firm. Id. ¶ 45. In dividing case responsibilities, each firm took charge of what it does best – Gupta Wessler led the briefing, argument, research, and legal analysis, and Motley Rice led the case management, discovery, and settlement administration. Id. These two firms have "thoroughly impress[ive] . . . qualifications" and class members undoubtedly "benefit[ted] from the wealth of experience" they brought to the case. Steele v. United States, Civil Action No. 14-2221, 2015 WL 4121607, at *4 (D.D.C. June 30, 2015) (describing groups of attorneys including current members of Class Counsel).

### 2.   The Complexity and Duration of the Litigation

The litigation was reasonably complex.  As in most class actions, the litigation involved a motion to dismiss, disputes regarding class certification, and cross-motions for summary judgment.  See Motion to Dismiss Op., 2016 WL 7076986; Class Certification Op., 235 F. Supp. 3d 32; Summary Judgment Op., 291 F. Supp. 3d 123.  But unlike most class actions, this case required appellate argument both as to a novel theory of jurisdiction and as to the most important merits issue in the case.  See Federal Circuit Op., 968 F.3d at 1343.  After remand, Class Counsel engaged in lengthy settlement negotiation with the government.  Gupta Decl. ¶¶ 23-28.  And even after the parties reached an agreement, Class Counsel put significant effort into answering class members' questions.  Gupta Supp. Decl. ¶¶ 2, 3.  All told, Class Counsel worked on this case for nearly eight years.  See Gupta Decl. ¶¶ 11, 12.

Mr. Isaacson asserts that this case was easy to litigate because it involved an issue of statutory construction that was ultimately settled by the Federal Circuit.  Isaacson Obj. at 14.  But this argument ignores the fact that it was Class Counsel's very efforts that caused the Federal Circuit to construe the statute in a way that would allow the class to recover.  The unsettled interpretation of the E-Government Act at the outset of the litigation speaks to the complexity of the case, not against it.

### 3.   The Risk of Nonrecovery

There was an exceptionally high risk of nonrecovery in this case.  As one of the attorneys representing the class describes, before this lawsuit, "litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime" – both because "the judiciary has statutory authority to charge at least some amount in fees" and because "the fees were still assumed to be beyond the reach of litigation."  Gupta Decl. ¶ 7.  He

35

points out correctly that the Administrative Procedure Act – which normally provides jurisdiction and a waiver of sovereign immunity for lawsuits against agencies – explicitly exempts the federal judiciary from its reach. See id.; 5 U.S.C. § 551(1)(B).

Even after Class Counsel identified their alternative and ultimately successful strategy of arguing that the Little Tucker Act provided the necessary jurisdiction and waiver of sovereign immunity, there was still a significant risk of nonrecovery for class members. To show illegal exaction under the Little Tucker Act, the Named Plaintiffs had to "demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." Federal Circuit Op., 968 F.3d at 1348 (internal quotation marks omitted) (quoting Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005)). But the E-Government Act, which Class Counsel argued caused the exaction, "nowhere explicitly requires payment of damages by the government for overcharging users." Id. Thus, before even getting to the merits, Class Counsel had to fight an uphill interpretive battle.

On the merits, Class Counsel's argument was similarly difficult. Take, for example, the one sentence in the E-Government Act that explicitly spoke to PACER fees: "The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts under those sections for access to information available through automatic data processing equipment." 28 U.S.C. § 1913 note. As the Federal Circuit acknowledged, far from supporting its ultimate holding, this sentence "supports the government's interpretation, as it authorizes charging fees for electronic access to information without any express restrictions." Federal Circuit Op., 968 F.3d at 1351. Nevertheless, Class Counsel persuaded the Federal Circuit that the rest of the statute, and its context, imposed

36

restrictions on the sorts of electronic information dissemination for which the judiciary could use PACER fees.  See id. at 1352-57.

Finally, there was litigation risk even after the Federal Circuit held that the E-Government Act did impose such restrictions.  See supra Section III.B.1.  Whether the judiciary could use PACER fees to pay for all of CM/ECF was still an open question.  See Federal Circuit Op., 968 F.3d at 1358.  And the government made plausible arguments that the class could not recover damages without an additional evidentiary showing.  See Gupta Decl. ¶ 23.  Until the moment the Named Plaintiffs reached a settlement with the government, there was a significant risk of nonrecovery.

4.   The Fee that Likely Would Have Been Negotiated in Similar Cases

The Court is to consider what fee "likely would have been negotiated between private parties in similar cases."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787).  The truth is that there are few "similar cases" with which to compare this case:  a class action lawsuit against the federal judiciary for charging too much in fees that it is explicitly authorized to charge at least in part.  See infra Section IV.B.6.  Still, it is worth noting that the percentage award Class Counsel requests here is below the typical 33% contingency fee.  And as Class Counsel points out, each Named Plaintiff signed a retainer agreement providing for a contingency fee of up to 33% of the common fund, Gupta Decl. ¶ 65, and each class member who was also part of the original class agreed to a contingency fee of up to 30% by declining to opt out.  Class Cert. Email Notice; Class Cert. Web Notice at 7; see 1st Notice Appr.  At the same time, the Court takes these agreements with a grain of salt.  Each plaintiff in a class action "typically has a small interest in the overall controversy" and thus "has no incentive to negotiate a competitive rate with class counsel."

37

5 RUBENSTEIN, supra, § 15:74.  And while one third of the recovery may be the typical fee in

cases with relatively few plaintiffs, it is not the standard for large class actions where the size of

the class is one of the main determinants of the size of the recovery.  This factor thus has

minimal bearing on the reasonableness of Class Counsel's requested fee.  See Mercier v. United

States 156 Fed. Cl. at 592 ("Even if some other class members had agreed to a 33.3%

contingency fee, they almost certainly would have evaluated the fee's reasonableness in terms of

their own recoveries, overlooking the economies of scale that class counsel enjoyed by

representing thousands of similarly situated plaintiffs.").

5.  Class Members' Objections to the Settlement Terms or Fees Requested by Class Counsel

Most of the objections to the Agreement or the requested fees have already been

discussed in the context of the fairness of the settlement, see supra Section III, or with regard to

another fee approval factor.  See supra Section IV.B.2.  Mr. Isaacson raises several additional

arguments regarding attorney's fees.  First, Mr. Isaacson argues that the Court should not

consider the supplemental declarations of Professor William Rubenstein and Professor Brian

Fitzpatrick because Class Counsel submitted these declarations after the deadline for class

members to file objections.  Isaacson Stmt. at 3.  Second, Mr. Isaacson quibbles with the content

of these supplemental declarations.  Id. at 3-6.

Strictly construed, Mr. Isaacson's first argument lacks merit.  Under the Federal

Rules of Civil Procedure, the only relevant requirement is that notice of a motion for attorney's

fees must be "directed to class members in a reasonable manner" so that class members "may

object to the motion."  FED. R. CIV. P. 23(h).  The Advisory Committee notes that, "[i]n setting

the date objections are due, the court should provide sufficient time after the full fee motion is on

file to enable potential objectors to examine the motion."  Id. advisory committee's note (2003).

Rule 23 thus requires only that class members have sufficient time to respond to the fee <u>motion</u> and accompanying evidence, not to evidence submitted in response or reply. Here, Class Counsel submitted their motion for attorney's fees over two weeks before the objection deadline, giving objectors sufficient time to respond. <u>See</u> Pls.' Sett. Mot.

   That said, it is a fair point that class members lack a meaningful opportunity to object to attorney's fees requests if counsel submits declarations raising new bases of support for the requested fees after the objection deadline. And the professors' supplemental declarations do just that. Professor Fitzpatrick's declaration provides information about why the Fitzpatrick Matrix should not be used as Mr. Isaacson suggests. <u>See</u> Fitzpatrick Supp. Decl. ¶¶ 4-6. Professor Rubenstein's declaration examines the data used in the Fitzpatrick Matrix and comes to certain conclusions about reasonable fees based on a subset of that data. <u>See</u> Rubenstein Supp. Decl. ¶¶ 13-26. Neither of these points was raised in the professors' original declarations, which accompanied Class Counsel's fees motion.

   Based on Mr. Isaacson's objections, the Court will not rely on the supplemental declarations of Professor Fitzpatrick or Professor Rubenstein in assessing the reasonableness of Class Counsel's requested fees. Because the Court will not rely on the declarations, it need not address Mr. Isaacson's arguments about their content.

### 6. The Percentage Applied in Other Class Actions

   Thirty years ago, the D.C. Circuit noted that "a majority of common fund class action fee awards fall between twenty and thirty percent." <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1272. This remains true today. <u>See</u> 5 Rubenstein, <u>supra</u>, § 15:83 (summary of empirical studies on common fund fee awards finding means between 22% and 27% and medians between 24% and 29%). For cases in which the common fund is especially large, fee

<div align="center">39</div>

awards tend towards the low end of this range. The latest comprehensive study on class action fee awards, using data from 2009-2013, reports that the mean percentage awarded from common funds greater than $67.5 million is 22.3%. Theodore Eisenberg et al., Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. REV. 937, 948 (2017).

Although it is difficult to locate good comparisons to the settlement in this case, the comparisons that the Court did find are in line with these statistics. Two cases involving insufficient pay by the Department of Veterans Affairs provide the closest analogues. In Quimby v. United States, a class of over 40,000 health professionals formerly employed by the Department alleged that they were deprived of additional pay that they earned for working undesirable shifts. Quimby v. United States, 107 Fed. Cl. at 128-29. As this Court has done in this case, the Court of Claims granted in part and denied in part cross-motions for summary judgment on the government's liability. Id. at 128. The class ultimately settled with the government in 2012 – after eleven years of contentious litigation – and the settlement agreement provided for a common fund of $74 million. See id. at 133. The Court of Claims granted class counsel's request for 30% of the common fund in attorney's fees, id. at 132, 135, reasoning that the attorneys obtained "excellent results," id. at 133 (quoting Hensley v. Eckerhart, 461 U.S. 424, 435 (1983)), and that "[t]he complexity of this litigation, the government's opposition to the Court's ruling on the merits, and the absence of controlling precedent concerning many of the issues presented together indicate that continued litigation would have created substantial uncertainty for members of the class." Id.

The plaintiffs in Mercier v. United States brought similar claims. See Mercier v. United States, 156 Fed. Cl. 580. There, a class of over 3,000 nurses and physician assistants sued the Department of Veterans Affairs, alleging that they were deprived of overtime pay. Id.

at 583.  The Court of Claims granted the government's motion to dismiss, but was reversed on appeal.  <u>Id</u>.  The litigation continued.  <u>Id</u>.  The class settled with the government in 2021 – after eight years of litigation – and the settlement agreement provided for a common fund of $160 million.  <u>Id</u>. at 583-84.  Class counsel requested 30% of the common fund in attorney's fees.  <u>Id</u>. at 590.  In analyzing the reasonableness of this request, the Court of Claims found that class counsel was skilled and experienced, that the litigation was complex, and that the risk of nonrecovery was substantial.  <u>Id</u>. at 591.  But because the common fund was so large (in part due to the size of the class itself), the court rejected class counsel's request and awarded 20% of the fund instead of the requested 30%.  <u>Id</u>. at 592-93.  The court found that the awarded percentage would "protect[] the interests of the class members but also provide[] ample compensation to counsel for their excellent work in this case" and "encourage other counsel to take on the representation of plaintiffs in similar cases."  <u>Id</u>. at 593.

Here, the requested percentage is 19.1%.  It is smaller than the percentage the Court of Claims awarded in <u>Quimby</u>, a complex case that lasted longer than this one – and where, as here, the government opposed the court's rulings on novel issues of law.  <u>See</u> <u>Quimby v. United States</u>, 107 Fed. Cl. at 128-133.  It is approximately what the Court of Claims awarded in <u>Mercier</u>, another complex case, of similar duration to this one – and where, as here, counsel for the class successfully litigated issues of liability on appeal.  <u>See</u> <u>Mercier v. United States</u> 156 Fed. Cl. at 583-84, 591-93.  Furthermore, according to the most recent comprehensive study on class action fee awards, the requested percentage is around the average for common funds in the range of the fund created by this settlement.  <u>See</u> Eisenberg et al., <u>supra</u>, at 948.  Because the requested fee award fits neatly within the relevant statistical range and aligns with the best case analogues, this factor strongly counsels in favor of approval of the attorney's fees request.

<div align="center">41</div>

7. The Size of the Award

The size of the requested fee award – nearly $24 million – is large. But "so is the class members' total recovery." See Raulerson v. United States, 108 Fed. Cl. 675, 680 (2013) (approving fee award of approximately $11 million). Three additional considerations convince the Court that the absolute size of the requested award is not a cause for concern. First, $24 million is nowhere near the highest amounts courts have awarded in attorney's fees in common-fund cases. See, e.g., 52 Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 723-24 (2d Cir. 2023) (affirming fee award of approximately $523 million); In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1281 (11th Cir. 2021) (affirming fee award of $77.5 million); see also Eisenberg et al., supra, at 943-44 (finding yearly average fee awards between $37.9 million and $124 million in common-fund cases with recoveries greater than $100 million). Second, $24 million is close to the absolute size of the fees awarded in the closest comparator cases identified above. See Mercier v. United States 156 Fed. Cl. at 593 (awarding $32 million in fees); Quimby v. United States, 107 Fed. Cl. at 135 (awarding approximately $22 million in fees). And third, the Court's lodestar cross-check, performed below, directly accounts for the size of the fee award by comparing it to the amount of effort that Class Counsel expended in this case. As a result, this factor does not move the needle in either direction.

8. Lodestar Cross-Check

The Federal Circuit has noted a "norm of . . . multipliers in the range of 1 to 4" in lodestar cross-checks of reasonable fee requests. Health Republic Ins. Co. v. United States, 58 F.4th at 1375. Statistics show that, between 2009 and 2013, the mean lodestar multiplier was 1.48. Eisenberg et al., supra, at 965 tbl.12. For cases with common funds over $67.5 million, the mean multiplier was 2.72. Id. at 967 tbl.13. Multipliers significantly above this

42

mean may be cause for concern.  In <u>Mercier</u>, for example, the Court of Claims found a multiplier of 4.4 to be too high, but a multiplier of 2.95 to result in "a very generous but reasonable recovery."  <u>Mercier v. United States</u>, 156 Fed. Cl. at 592; <u>see</u> <u>also</u> 5 RUBENSTEIN, <u>supra</u>, § 15:87 ("Empirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1-2 range; this fact counsels in favor of a presumptive ceiling of 4, or slightly above twice the mean.").

Here, Class Counsel estimates their lodestar at $6,031,678.25 based on the hourly rates that the firms' attorneys charge in non-contingency cases.  Gupta Decl. ¶¶ 63, 64; Oliver Decl. ¶¶ 12, 13.  Both the government and Mr. Isaacson suggest that Class Counsel's lodestar should be estimated using the hourly rates in the U.S. Attorney's Office Fitzpatrick Matrix, instead of using Class Counsel's actual rates.  Def.'s Resp. at 5-7; Isaacson Obj. at 12-13.  But the Fitzpatrick Matrix was not designed to be used for lodestar cross-checks in common fund class actions; instead, "[t]he matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees."  U.S. ATT'Y'S OFF. FOR D.C., THE FITZPATRICK MATRIX, Explanatory Note 2, www.justice.gov/usao-dc/page/file/1504361/download [https://perma.cc/EVQ5-NNMC]; <u>see</u>, <u>e.g.</u>, <u>J.T. v. District of Columbia</u>, 652 F. Supp. 3d 11, 26-27, 31-36 (D.D.C. 2023) (using Fitzpatrick Matrix to calculate reasonable attorney's fees under the fee-shifting provision of the Individuals with Disabilities Education Act).  Mr. Isaacson also asserts that the Court should require Class Counsel to submit itemized records of hours billed in order to make "appropriate deductions."  Isaacson Obj. at 12.  But the Court declines to engage in the "bean-counting" that it has been cautioned against, and instead

will "rely on summaries submitted by the attorneys." In re Rite Aid Corp. Sec. Litig., 396 F.3d at 306-07.[12]

In addition, the government argues that Class Counsel's use of current billing rates "fail[s] to account [for the fact] that the litigation began in 2016, with class certification in 2017, when rates for both firms presumably were lower." Def's Resp. at 4. But courts routinely use current billing rates for lodestar cross-checks, even when the attorneys requesting fees charged lower rates at the outset of litigation. See, e.g., Bakhtiar v. Info. Res., Inc., Civil Action No. 17-4559, 2021 WL 4472606, at *9 (N.D. Cal. Feb. 10, 2021); In re Apollo Grp. Inc. Sec. Litig., Civil Action No. 04-2147, 2012 WL 1378677, at *7 & n.2 (D. Ariz. Apr. 20, 2012). Until fees are awarded, class action attorneys work on a case without pay. Using current billing rates, which are almost always higher than historical rates, accounts for this delay in payment. See James v. District of Columbia, 302 F. Supp. 3d 213, 226-28 (D.D.C. 2018) (citing Perdue v. Kenny A. ex. rel. Winn, 559 U.S. 542, 556 (2010)); cf. Stetson v. Grissom, 821 F.3d 1157, 1166 (9th Cir. 2016) (when calculating attorney's fees using the lodestar method, rather than the percentage-of-the-fund method, in common-fund cases, "[t]he lodestar should be computed either using an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or using historical rates and compensating for delays with a prime-rate enhancement").

Dividing Class Counsel's requested fees ($23,863,345.02) by their estimated lodestar ($6,031,678.25) results in a multiplier of 3.96. Put another way, Class Counsel's

---

[12]      The Court agrees with the government, as it represented at the Settlement Hearing, that any concerns about Class Counsel's future time estimate included in their estimated lodestar have been addressed through Class Counsel's supplemental declarations. See Gupta Supp. Decl. ¶¶ 2-3; Oliver Supp. Decl. ¶¶ 3-5.

requested fee award would compensate them at slightly below four times their hourly rates for the work they performed in this case. This multiplier is within the normal range of one to four – although, admittedly, on the high end of it. The Court believes that a multiplier of this magnitude is warranted due to the risk Class Counsel took on in agreeing to litigate the case. Class Counsel provided exceptional service to the class for over seven years, all the while in danger of being paid nothing (or close to it). And multipliers of this size, or even higher, are by no means unheard of. See 5 RUBENSTEIN, supra, § 15:89 (noting "roughly 70 reported cases with multipliers over 4"); e.g., Kane Cnty., Utah v. United States, 145 Fed. Cl. 15, 20 (2019) (multiplier of 6.13 for attorney's fee award of approximately $6 million, one third of the common fund); Geneva Rock Prod., Inc. v. United States, 119 Fed. Cl. 581, 595 (2015) (multiplier of 5.39 for attorney's fee award of approximately $4 million, 17.5% of the common fund). After all, when counsel in a class action request a reasonable percentage of a common fund, the lodestar cross-check must remain a cross-check of that percentage, and no more. "[T]he point is not to identify the precise outdoor temperature at noon but to know whether or not a coat might be necessary when venturing out for lunch." 5 RUBENSTEIN, supra, § 15:87. Here, the temperature is just fine.

The Court will award the full amount of attorney's fees requested by Class Counsel. In addition to reflecting a reasonable lodestar multiplier, the fees requested reflect a percentage of the fund around the average for common funds of similar size – even though Class Counsel's representation, and the result they achieved for the class, were well above average. Class Counsel did an exceptional job in novel litigation with a high risk of nonrecovery. For these reasons, their fee request is warranted.

## C. Expenses and Service Awards

Class Counsel requests $10,000 for each of the three Named Plaintiffs as service awards. Pls.' Sett. Mot. at 40-41. Mr. Isaacson objects that awards of this type are unlawful under nineteenth-century Supreme Court precedent. Isaacson Obj. at 14-15; see Trustees v. Greenough, 105 U.S. 527 (1882); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885). The "overwhelming majority" of circuits disagree with Mr. Isaacson's interpretation of these cases. Moses v. N.Y. Times Co., 79 F.4th 235, 253 (2d Cir. 2023) (collecting cases). Mr. Isaacson urges the Court to adopt the reasoning of the Eleventh Circuit, the one outlier from this modern consensus. See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1255 (11th Cir. 2020). But even the Eleventh Circuit – and the Supreme Court cases on which Mr. Isaacson relies – acknowledges that "[a] plaintiff suing on behalf of a class can be reimbursed for attorneys' fees and expenses incurred in carrying on the litigation." Id. at 1257; see Trustees v. Greenough, 105 U.S. at 537; Cent. R.R. & Banking Co. v. Pettus, 113 U.S. at 122-23. And each Named Plaintiff in this case has expended over $10,000 worth of attorney time and expenses in leading this litigation. See Burbank Decl. ¶ 6; Rossman Decl. ¶ 3; Brooks Decl. ¶ 2. Thus, the Court finds the award to the Named Plaintiffs here appropriate. As one of the attorneys representing the class stated in his declaration:

> [E]xperienced in-house lawyers [for the Named Plaintiffs] performed invaluable work that was necessary to prosecute this case effectively and ethically. Had they not performed that work on the litigation, the same work would have had to be performed by class counsel or, perhaps more likely, by other outside counsel hired by each organization at far greater expense.

Gupta Supp. Decl. ¶ 7.

The Court also approves Class Counsel's request for $29,654.98 in attorney expenses and $1,077,000 in settlement administration costs. Pls.' Sett. Mot. at 40. As documented by Class Counsel, the attorney expense reimbursements requested include travel, food, lodging, court fees, Westlaw/Lexis fees, photocopying, printing, and mail services; they also include the plaintiffs' portion of the cost of mediation services. Oliver Decl. ¶¶ 14-18. The settlement administration amount was calculated based on the noticing expenses, as well as the "not-to-exceed" amount quoted by the settlement administrator. Id. ¶ 19; KCC Supp. Decl. ¶ 4. The Court finds these expenses and administration costs to be reasonable and adequately documented.

## V. CONCLUSION

The Named Plaintiffs and the United States have reached an historic settlement agreement in this case that reimburses PACER users for $100 million of the fees they paid within a period of over eight years. The Agreement reimburses many small-scale PACER users for all of the fees they paid during this period. And it reimburses large-scale users substantially, and in proportion to what they paid. The Court finds the Agreement to be fair, reasonable, and adequate.

Before reaching a settlement in this unique case, Class Counsel impressively litigated for nearly eight years. They took the case from an untested idea, to a certified class action, to a win on partial summary judgment, to a successful appeal. They negotiated with the federal government to deliver to the class much of the recovery the class sought – although, as with any compromise, not all of it. The Court approves Class Counsel's full request for attorney's fees, costs, and service awards.

Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards [Dkt. No. 158] is hereby GRANTED. The Final Judgment and Order on Final Approval of Class Settlement, Attorney's Fees, Costs, and Service Awards will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3|20|24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL SERVICES
PROGRAM, NATIONAL CONSUMER LAW
CENTER, and ALLIANCE FOR JUSTICE, for
themselves and all others similarly situated,
                                *Plaintiffs*,

v.

UNITED STATES OF AMERICA,
                                *Defendant*.

Civil Action No. 1H-0745 (PLF)

## FINAL JUDGMENT AND ORDER ON FINAL APPROVAL OF CLASS SETTLEMENT, ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

This matter came before the Court on October 12, 2023 for a hearing pursuant to the Order of this Court, dated May 8, 2023, on the application of the Settling Parties for approval of the Settlement set forth in the Class Action Settlement Agreement, as amended. Due and adequate notice having been given to the Class as required in the Order, the Court having considered all papers filed and proceedings held herein, and for the reasons explained in this Court's Opinion issued today, and good cause having been shown, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.      This Judgment incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings as set forth in the Settlement Agreement, unless otherwise stated herein.

2.      This Court has jurisdiction over the subject matter of the Litigation and over all parties to the Litigation, including all members of the Class.

3.      Excluded from the Class is any person who timely and validly sought exclusion from the Class, as identified in Exhibit 1 hereto.

4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement set forth in the Agreement, and finds that:

a.      in light of the benefits to the Class and the complexity and expense of further litigation, the Settlement Agreement is, in all respects, fair, reasonable, and adequate and in the best interests of the Class;

b.      there was no collusion in connection with the Settlement Agreement;

c.      Class Representatives and Class Counsel had adequately represented the Class;

d.      the Settlement Agreement was the product of informed, arm's-length negotiations among competent, able counsel;

e.      the relief provided for the Class is adequate, having taken into account (i) the costs, risks and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the Class, including the use of billing data maintained by the Administrative Office of the U.S. Courts and the notification and dispute procedures on the class website; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Federal Rule of Civil Procedure 23(e)(3);

f.      the Settlement Agreement treats Class Members equitably relative to each other; and

g.      the record is sufficiently developed and complete to have enabled Class Representatives and Defendant to have adequately evaluated and considered their positions.

5.      Accordingly, the Court authorizes and directs implementation and performance of all the terms and provisions of the Settlement Agreement, as well as the terms and provisions set forth in this Order. Except as to any individual claim of those persons who have validly and

timely requested exclusion from the Class, the Litigation and all claims alleged therein are dismissed with prejudice as to the Class Representatives, and the other Class Members, as defined in the Settlement Agreement.

6.      No person shall have any claim against the Class Representatives, Class Counsel, or the Claims Administrator, or any other person designated by Class Counsel, based on determinations or distributions made substantially in accordance with the Settlement Agreement or order of this Court.

7.      Upon release of the Aggregate Amount of $125,000,000 from the U.S. Department of the Treasury's Judgment Fund, the Class Representatives, and each of the Class Members not timely and validly excluded, shall be deemed to have and by operation of this Judgment shall have, fully, finally, and forever waived, released, discharged, and dismissed as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period, with prejudice on the merits, whether or not the Class Representatives, or each of the Class Members ever obtains any distribution from the Settlement Fund. Claims to enforce the terms of the Stipulation and the Agreement are not released.

8.      The distribution and publication of notice of the settlement as provided for in this Court's Order of May 8, 2023, constituted the best notice practicable under the circumstances, including individual notice to Class Members in the data maintained by the Administrative Office of the U.S. Courts. This notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and due process. No Class Member is relieved from the terms of the Settlement

Agreement, including the releases provided for, based on the contention or proof that such Class Member failed to receive actual or adequate notice. A full opportunity has been offered to the Class Members to object to the proposed Settlement and to participate in the approval hearing. It is hereby determined that all members of the Class are bound by this Judgment, except those persons listed in Exhibit 1 to this Judgment.

9. Any order entered regarding any fee and expense application, any appeal from any such order, or any reversal or modification of any such order shall not affect or delay the finality of the Final Judgment in this litigation.

10. Neither the Settlement Agreement, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any released claim, or of any wrongdoing or liability of the United States; or (b) is or may be deemed to be or may be used as an admission or evidence that any claims asserted by plaintiffs were not valid or that the amount recoverable would not have exceeded the Aggregate Amount of $125,000,000 in any civil, criminal, or administrative proceeding in any court, administrative agency or other tribunal. The United States may file the Settlement Agreement or this Judgment in any other action that may be brought against it in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

11. The United States shall pay $125,000,000 into the PACER Class Action Settlement Trust upon the expiration of the period to appeal from this Order.

12. Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of the Settlement and any award or

distribution from the Aggregate Amount paid by the United States in settlement of this litigation; (b) disposition of the PACER Class Action Settlement Trust; (c) hearing and determining any fee and expense application; and (d) all parties hereto for the purpose of construing, enforcing and administering the Settlement.

13. The Court finds that during the course of the Litigation, plaintiffs and the United States, and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

14. In the event that the settlement does not become effective in accordance with the terms of the Settlement Agreement, then this Judgment shall be rendered null and void and shall be vacated; and in such event, all orders entered and releases delivered in connection with this Order and Final Judgment shall be null and void and shall be vacated, and the parties shall revert to their respective positions in the Litigation as of July 12, 2022.

15. Plaintiffs ask that the Court grant their request for 20% of the settlement fund to cover attorney's fees, notice and settlement costs, litigation expenses, and service awards. That request is granted. Specifically, the Court hereby (1) awards $10,000 to each class representative, (2) awards $29,654.98 to class counsel to reimburse litigation expenses, (3) orders that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) awards the remaining amount ($23,863,345.02) to class counsel as attorney's fees.

16. Upon consideration of this submission and the entire record before the Court, and for the reasons stated in the Opinion issued this same day, the Court finds that the attorney's fees, costs and expenses, and service awards, as agreed by the parties, are fair and reasonable pursuant to paragraph VI(A) of the Settlement Agreement and Federal Rule of Civil Procedure 23(e)(2)(C) (iii), (h).

17.     The parties are hereby authorized, without further approval of the Court, to unanimously agree to and adopt in writing amendments, modifications, and expansions of the Settlement Agreement, provided that such amendments, modifications, and expansions of the Settlement Agreement are not materially inconsistent with this Judgment, and do not materially limit the rights of the Members of the Class under the Settlement Agreement.

18.     Without further order of the Court, the parties to the Settlement Agreement may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

19.     The Court directs immediate entry of this Judgment by the Clerk of the Court.

20.     The Court's orders entered during this litigation relating to the confidentiality of information shall survive the settlement and resolution and dismissal of this litigation.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3\20\24

6

Appx0054

# EXHIBIT 1

| ClaimID | Year First Notice Sent |
|---|---|
| 10034328-7 | 2023 |
| 10035184-0 | 2023 |
| 10037459-0 | 2023 |
| 10040932-6 | 2023 |
| 10041843-0 | 2023 |
| 10049120-0 | 2023 |
| 10049953-8 | 2023 |
| 10061501-5 | 2023 |
| 10065649-8 | 2023 |
| 10066366-4 | 2023 |
| 10083140-0 | 2023 |
| 10084333-6 | 2023 |
| 10085991-7 | 2023 |
| 10095277-1 | 2023 |
| 10113350-2 | 2023 |
| 10116080-1 | 2023 |
| 10118614-2 | 2023 |
| 10132009-4 | 2023 |
| 10133913-5 | 2023 |
| 10141727-6 | 2023 |
| 10147158-0 | 2023 |
| 10152565-6 | 2023 |
| 10173016-0 | 2023 |
| 10176126-0 | 2023 |
| 10182150-6 | 2023 |
| 10185685-7 | 2023 |
| 10189089-3 | 2023 |
| 10192998-6 | 2023 |
| 10196979-1 | 2023 |
| 10197284-9 | 2023 |
| 10203395-1 | 2023 |
| 10016846-9 | 2023 |
| 10052120-7 | 2023 |
| 10133913-5 | 2023 |
| 10000447701 | 2017 |
| 10000707701 | 2017 |
| 10002821401 | 2017 |
| 10005011601 | 2017 |
| 10005499701 | 2017 |
| 10005664701 | 2017 |
| 10006372001 | 2017 |
| 10007313001 | 2017 |
| 10008363801 | 2017 |
| 10008769301 | 2017 |
| 10008798001 | 2017 |
| 10009012601 | 2017 |

| | |
|---|---|
| 10009273101 | 2017 |
| 10010171901 | 2017 |
| 10010221901 | 2017 |
| 10011076901 | 2017 |
| 10011551201 | 2017 |
| 10012220601 | 2017 |
| 10012456201 | 2017 |
| 10013915201 | 2017 |
| 10014611901 | 2017 |
| 10015286701 | 2017 |
| 10016324501 | 2017 |
| 10017909501 | 2017 |
| 10018775401 | 2017 |
| 10018943001 | 2017 |
| 10020415601 | 2017 |
| 10023376401 | 2017 |
| 10026066401 | 2017 |
| 10026930801 | 2017 |
| 10028461901 | 2017 |
| 10028932001 | 2017 |
| 10029603801 | 2017 |
| 10029844801 | 2017 |
| 10032537301 | 2017 |
| 10032704701 | 2017 |
| 10033616401 | 2017 |
| 10035469501 | 2017 |
| 10036014201 | 2017 |
| 10036567001 | 2017 |
| 10037093701 | 2017 |
| 10039315901 | 2017 |
| 10040300101 | 2017 |
| 10041710301 | 2017 |
| 10042162301 | 2017 |
| 10042250001 | 2017 |
| 10043184701 | 2017 |
| 10043617101 | 2017 |
| 10044286901 | 2017 |
| 10044493301 | 2017 |
| 10045532301 | 2017 |
| 10046948601 | 2017 |
| 10048740301 | 2017 |
| 10050286601 | 2017 |
| 10050994001 | 2017 |
| 10053464801 | 2017 |
| 10054856801 | 2017 |
| 10054968801 | 2017 |
| 10057104901 | 2017 |

| | |
|---|---|
| 10058481001 | 2017 |
| 10060415801 | 2017 |
| 10063799101 | 2017 |
| 10063923901 | 2017 |
| 10064479001 | 2017 |
| 10064600101 | 2017 |
| 10065803901 | 2017 |
| 10066151801 | 2017 |
| 10067057001 | 2017 |
| 10067820801 | 2017 |
| 10069992301 | 2017 |
| 10071549701 | 2017 |
| 10071662301 | 2017 |
| 10071925901 | 2017 |
| 10072056001 | 2017 |
| 10072482601 | 2017 |
| 10073102801 | 2017 |
| 10075224001 | 2017 |
| 10075273101 | 2017 |
| 10075352801 | 2017 |
| 10075769801 | 2017 |
| 10077286901 | 2017 |
| 10077932301 | 2017 |
| 10077997901 | 2017 |
| 10078550501 | 2017 |
| 10080612001 | 2017 |
| 10081622801 | 2017 |
| 10082241101 | 2017 |
| 10083173401 | 2017 |
| 10084766301 | 2017 |
| 10085064901 | 2017 |
| 10085996301 | 2017 |
| 10086464801 | 2017 |
| 10087257801 | 2017 |
| 10087762001 | 2017 |
| 10089389201 | 2017 |
| 10089507401 | 2017 |
| 10090051301 | 2017 |
| 10090174801 | 2017 |
| 10090236401 | 2017 |
| 10090480401 | 2017 |
| 10091442101 | 2017 |
| 10092739701 | 2017 |
| 10093180701 | 2017 |
| 10095383901 | 2017 |
| 10095879501 | 2017 |
| 10096283001 | 2017 |

| | |
|---|---|
| 10096482501 | 2017 |
| 10096522201 | 2017 |
| 10097267601 | 2017 |
| 10100271301 | 2017 |
| 10100599401 | 2017 |
| 10101080101 | 2017 |
| 10101868001 | 2017 |
| 10101941501 | 2017 |
| 10102590701 | 2017 |
| 10103010101 | 2017 |
| 10105763501 | 2017 |
| 10105855001 | 2017 |
| 10107851101 | 2017 |
| 10108906501 | 2017 |
| 10111320101 | 2017 |
| 10112826501 | 2017 |
| 10114817301 | 2017 |
| 10115231001 | 2017 |
| 10115433101 | 2017 |
| 10116343501 | 2017 |
| 10117151101 | 2017 |
| 10118423201 | 2017 |
| 10118950301 | 2017 |
| 10119125001 | 2017 |
| 10119759701 | 2017 |
| 10121185501 | 2017 |
| 10121819901 | 2017 |
| 10122205101 | 2017 |
| 10122629901 | 2017 |
| 10123395401 | 2017 |
| 10124592001 | 2017 |
| 10125315101 | 2017 |
| 10125364301 | 2017 |
| 10126285101 | 2017 |
| 10126752601 | 2017 |
| 10126762901 | 2017 |
| 10127924301 | 2017 |
| 10129225901 | 2017 |
| 10131063801 | 2017 |
| 10133388201 | 2017 |
| 10133687101 | 2017 |
| 10133958601 | 2017 |
| 10134825301 | 2017 |
| 10134968301 | 2017 |
| 10135144601 | 2017 |
| 10135756401 | 2017 |
| 10136099001 | 2017 |

| | |
|---|---|
| 10136855001 | 2017 |
| 10137251601 | 2017 |
| 10137528101 | 2017 |
| 10137903101 | 2017 |
| 10139299001 | 2017 |
| 10140073101 | 2017 |
| 10140505401 | 2017 |
| 10140555801 | 2017 |
| 10141339701 | 2017 |
| 10141594101 | 2017 |
| 10141736601 | 2017 |
| 10143024301 | 2017 |
| 10143222701 | 2017 |
| 10143236701 | 2017 |
| 10143458301 | 2017 |
| 10145173801 | 2017 |
| 10147350301 | 2017 |
| 10149014801 | 2017 |
| 10149717901 | 2017 |
| 10149718001 | 2017 |
| 10152536901 | 2017 |
| 10152625801 | 2017 |
| 10153428001 | 2017 |
| 10153618501 | 2017 |
| 10153754201 | 2017 |
| 10153756601 | 2017 |
| 10153779701 | 2017 |
| 10156471501 | 2017 |
| 10157012001 | 2017 |
| 10157124001 | 2017 |
| 10158021601 | 2017 |
| 10158209201 | 2017 |
| 10158298501 | 2017 |
| 10158888401 | 2017 |
| 10159890701 | 2017 |
| 10159891901 | 2017 |
| 10160015001 | 2017 |
| 10160315001 | 2017 |
| 10161686701 | 2017 |
| 10161894301 | 2017 |
| 10161898001 | 2017 |
| 10161944301 | 2017 |
| 10162799301 | 2017 |
| 10163708101 | 2017 |
| 10164776101 | 2017 |
| 10165562901 | 2017 |
| 10167227501 | 2017 |

| | |
|---|---|
| 10171950401 | 2017 |
| 10174000101 | 2017 |
| 10174868101 | 2017 |
| 10175374301 | 2017 |
| 10175548001 | 2017 |
| 10176373601 | 2017 |
| 10176919201 | 2017 |
| 10177057101 | 2017 |
| 10177956201 | 2017 |
| 10178536701 | 2017 |
| 10178913001 | 2017 |
| 10182011201 | 2017 |
| 10182792101 | 2017 |
| 10185798601 | 2017 |
| 10185857701 | 2017 |
| 10185858901 | 2017 |
| 10185874701 | 2017 |
| 10186179501 | 2017 |
| 10188095901 | 2017 |
| 10188321301 | 2017 |
| 10188669001 | 2017 |
| 10190279701 | 2017 |
| 10190402201 | 2017 |
| 10190457501 | 2017 |
| 10190550601 | 2017 |
| 10190625001 | 2017 |
| 10191926801 | 2017 |
| 10192316801 | 2017 |
| 10192357001 | 2017 |
| 10192847601 | 2017 |
| 10192879801 | 2017 |
| 10192963801 | 2017 |
| 10194141901 | 2017 |
| 10197285401 | 2017 |
| 10199679201 | 2017 |
| 10199890901 | 2017 |
| 10204292501 | 2017 |
| 10205252901 | 2017 |
| 10205690001 | 2017 |
| 10206206701 | 2017 |
| 10207278401 | 2017 |
| 10207584001 | 2017 |
| 10207639001 | 2017 |
| 10207782401 | 2017 |
| 10207896801 | 2017 |
| 10208191801 | 2017 |
| 10208513401 | 2017 |

| | |
|---|---|
| 10209552801 | 2017 |
| 10209592901 | 2017 |
| 10209627201 | 2017 |
| 10209638701 | 2017 |
| 10210263601 | 2017 |
| 10210694001 | 2017 |
| 10210945001 | 2017 |
| 10212706201 | 2017 |
| 10212823601 | 2017 |
| 10213182001 | 2017 |
| 10214228201 | 2017 |
| 10214823501 | 2017 |
| 10214922701 | 2017 |
| 10216477001 | 2017 |
| 10217089701 | 2017 |
| 10217396501 | 2017 |
| 10219369101 | 2017 |
| 10219889501 | 2017 |
| 10221713001 | 2017 |
| 10221823701 | 2017 |
| 10222565501 | 2017 |
| 10222645301 | 2017 |
| 10223006701 | 2017 |
| 10224013901 | 2017 |
| 10225094701 | 2017 |
| 10225657301 | 2017 |
| 10225834001 | 2017 |
| 10226300001 | 2017 |
| 10227002801 | 2017 |
| 10229283801 | 2017 |
| 10229428801 | 2017 |
| 10229838501 | 2017 |
| 10230357501 | 2017 |
| 10231975301 | 2017 |
| 10232606001 | 2017 |
| 10234539901 | 2017 |
| 10234608201 | 2017 |
| 10235129601 | 2017 |
| 10236098401 | 2017 |
| 10236449701 | 2017 |
| 10237057601 | 2017 |
| 10237680301 | 2017 |
| 10237912901 | 2017 |
| 10238284001 | 2017 |
| 10238489701 | 2017 |
| 10240243701 | 2017 |
| 10240374001 | 2017 |

| | |
|---|---|
| 10240773301 | 2017 |
| 10241983801 | 2017 |
| 10242752501 | 2017 |
| 10243338001 | 2017 |
| 10243778601 | 2017 |
| 10244498501 | 2017 |
| 10245781501 | 2017 |
| 10247787501 | 2017 |
| 10248160001 | 2017 |
| 10248356501 | 2017 |
| 10249090901 | 2017 |
| 10252117701 | 2017 |
| 10252888301 | 2017 |
| 10253744601 | 2017 |
| 10253873601 | 2017 |
| 10254792001 | 2017 |
| 10254933301 | 2017 |
| 10255719601 | 2017 |
| 10255720201 | 2017 |
| 10256855801 | 2017 |
| 10258835101 | 2017 |
| 10259957901 | 2017 |
| 10260649301 | 2017 |
| 10260794101 | 2017 |
| 10261595001 | 2017 |
| 10261762401 | 2017 |
| 10261872001 | 2017 |
| 10261931101 | 2017 |
| 10264115801 | 2017 |
| 10264948001 | 2017 |
| 10266425001 | 2017 |
| 10266442001 | 2017 |
| 10267627601 | 2017 |
| 10268262801 | 2017 |
| 10270268801 | 2017 |
| 10270866601 | 2017 |
| 10270975001 | 2017 |
| 10271070301 | 2017 |
| 10272628001 | 2017 |
| 10275055501 | 2017 |
| 10275578401 | 2017 |
| 10275752501 | 2017 |
| 10276905901 | 2017 |
| 10276939401 | 2017 |
| 10278126601 | 2017 |
| 10279936201 | 2017 |
| 10280532501 | 2017 |

| | |
|---|---|
| 10280979301 | 2017 |
| 10281698001 | 2017 |
| 10282170701 | 2017 |
| 10283751001 | 2017 |
| 10283870701 | 2017 |
| 10285227301 | 2017 |
| 10285840801 | 2017 |
| 10286029401 | 2017 |
| 10286805001 | 2017 |
| 10290375001 | 2017 |
| 10290479001 | 2017 |
| 10290610501 | 2017 |
| 10290828001 | 2017 |
| 10290963501 | 2017 |
| 10291126501 | 2017 |
| 10292602501 | 2017 |
| 10293085501 | 2017 |
| 10293375301 | 2017 |
| 10293436801 | 2017 |
| 10293529401 | 2017 |
| 10293741201 | 2017 |
| 10293742401 | 2017 |
| 10293743601 | 2017 |
| 10293744801 | 2017 |
| 10293752701 | 2017 |
| 10293754001 | 2017 |
| 10293755201 | 2017 |
| 10293756401 | 2017 |
| 10293767901 | 2017 |
| 10294485401 | 2017 |
| 10294549401 | 2017 |
| 10299634901 | 2017 |
| 10299939901 | 2017 |
| 10302542001 | 2017 |
| 10303226501 | 2017 |
| 10303651901 | 2017 |
| 10303892901 | 2017 |
| 10304105901 | 2017 |
| 10304591001 | 2017 |
| 10304647101 | 2017 |
| 10304775001 | 2017 |
| 10306101001 | 2017 |
| 10307986501 | 2017 |
| 10308360101 | 2017 |
| 10308965201 | 2017 |
| 10309480501 | 2017 |
| 10310113501 | 2017 |

| | |
|---|---|
| 10310527001 | 2017 |
| 10311774001 | 2017 |
| 10314669601 | 2017 |
| 10315147301 | 2017 |
| 10315819401 | 2017 |
| 10316350501 | 2017 |
| 10316465001 | 2017 |
| 10318066701 | 2017 |
| 10318659101 | 2017 |
| 10318663301 | 2017 |
| 10319721701 | 2017 |
| 10319867201 | 2017 |
| 10320106301 | 2017 |
| 10320188901 | 2017 |
| 10320630901 | 2017 |
| 10321188301 | 2017 |
| 10322023901 | 2017 |
| 10322689801 | 2017 |
| 10323321001 | 2017 |
| 10323716101 | 2017 |
| 10323788401 | 2017 |
| 10324271501 | 2017 |
| 10324930801 | 2017 |
| 10325317801 | 2017 |
| 10326900901 | 2017 |
| 10327238001 | 2017 |
| 10331800801 | 2017 |
| 10332566901 | 2017 |
| 10332936501 | 2017 |
| 10333954101 | 2017 |
| 10334751301 | 2017 |
| 10335736101 | 2017 |
| 10335880801 | 2017 |
| 10336323301 | 2017 |
| 10336522901 | 2017 |
| 10336907701 | 2017 |
| 10337218001 | 2017 |
| 10337518101 | 2017 |
| 10337600801 | 2017 |
| 10338330001 | 2017 |
| 10338463701 | 2017 |
| 10340665701 | 2017 |
| 10342676001 | 2017 |
| 10342826401 | 2017 |
| 10343027101 | 2017 |
| 10344487701 | 2017 |
| 10345305201 | 2017 |

| | |
|---|---|
| 10347913201 | 2017 |
| 10352035101 | 2017 |
| 10355032001 | 2017 |
| 10356012901 | 2017 |
| 10358553901 | 2017 |
| 10358696901 | 2017 |
| 10360334701 | 2017 |
| 10362064301 | 2017 |
| 10362238001 | 2017 |
| 10363633001 | 2017 |
| 10363834901 | 2017 |
| 10364037001 | 2017 |
| 10364629201 | 2017 |
| 10364748001 | 2017 |
| 10365380601 | 2017 |
| 10365649201 | 2017 |
| 10366285601 | 2017 |
| 10366975901 | 2017 |
| 10367643001 | 2017 |
| 10369316601 | 2017 |
| 10370723201 | 2017 |
| 10371138701 | 2017 |
| 10371143001 | 2017 |
| 10371370001 | 2017 |
| 10374877501 | 2017 |
| 10375560301 | 2017 |
| 10376252801 | 2017 |
| 10378049001 | 2017 |
| 10378215101 | 2017 |
| 10380385301 | 2017 |
| 10380974001 | 2017 |
| 10381918601 | 2017 |
| 10382676201 | 2017 |
| 10383373001 | 2017 |
| 10385190201 | 2017 |
| 10385642001 | 2017 |
| 10386520201 | 2017 |
| 10388149901 | 2017 |
| 10388499301 | 2017 |
| 10389454801 | 2017 |
| 10390691501 | 2017 |
| 10390736101 | 2017 |
| 10391800001 | 2017 |
| 10392971001 | 2017 |
| 10393677401 | 2017 |
| 10393723701 | 2017 |
| 60000001101 | 2017 |

| | |
|---|---|
| 60000004701 | 2017 |
| 60000005901 | 2017 |
| 60000006001 | 2017 |
| 60000007201 | 2017 |
| 60000008401 | 2017 |
| 60000009601 | 2017 |
| 60000010201 | 2017 |
| 60000011401 | 2017 |
| 60000012601 | 2017 |
| 60000013801 | 2017 |
| 60000014001 | 2017 |
| 60000015101 | 2017 |
| 60000016301 | 2017 |
| 60000017501 | 2017 |
| 60000018701 | 2017 |
| 60000019901 | 2017 |
| 60000020501 | 2017 |
| 60000021701 | 2017 |
| 60000022901 | 2017 |
| 60000023001 | 2017 |
| 60000024201 | 2017 |
| 60000025401 | 2017 |
| 60000026601 | 2017 |
| 60000027801 | 2017 |
| 60000028001 | 2017 |
| 60000029101 | 2017 |
| 60000030801 | 2017 |
| 60000031001 | 2017 |
| 60000032101 | 2017 |
| 60000033301 | 2017 |
| 60000034501 | 2017 |
| 60000035701 | 2017 |
| 60000036901 | 2017 |
| 60000037001 | 2017 |
| 60000038201 | 2017 |
| 60000039401 | 2017 |
| 60000040001 | 2017 |
| 60000041201 | 2017 |
| 60000042401 | 2017 |
| 60000043601 | 2017 |
| 60000045001 | 2017 |
| 60000046101 | 2017 |
| 60000047301 | 2017 |
| 60000048501 | 2017 |
| 60000049701 | 2017 |
| 60000050301 | 2017 |
| 60000051501 | 2017 |

| | |
|---|---|
| 60000052701 | 2017 |
| 60000053901 | 2017 |
| 60000054001 | 2017 |
| 60000055201 | 2017 |
| 60000056401 | 2017 |
| 60000057601 | 2017 |
| 60000058801 | 2017 |
| 60000060601 | 2017 |
| 60000064301 | 2017 |
| 60000065501 | 2017 |
| 60000067901 | 2017 |
| 60000070901 | 2017 |
| 60000071001 | 2017 |
| 60000073401 | 2017 |
| 60000074601 | 2017 |
| 60000075801 | 2017 |
| 60000076001 | 2017 |
| 60000077101 | 2017 |
| 60000078301 | 2017 |
| 60000079501 | 2017 |
| 60000080101 | 2017 |
| 60000081301 | 2017 |
| 60000082501 | 2017 |
| 60000083701 | 2017 |
| 60000084901 | 2017 |
| 60000085001 | 2017 |
| 60000086201 | 2017 |
| 60000087401 | 2017 |
| 60000088601 | 2017 |
| 60000090401 | 2017 |
| 60000091601 | 2017 |
| 60000092801 | 2017 |
| 60000093001 | 2017 |
| 60000094101 | 2017 |
| 60000095301 | 2017 |
| 60000096501 | 2017 |
| 60000097701 | 2017 |
| 60000099001 | 2017 |
| 60000100301 | 2017 |
| 60000101501 | 2017 |
| 60000102701 | 2017 |
| 60000103901 | 2017 |
| 60000104001 | 2017 |
| 60000105201 | 2017 |
| 60000106401 | 2017 |
| 60000107601 | 2017 |
| 60000108801 | 2017 |

| | |
|---|---|
| 60000109001 | 2017 |
| 60000111801 | 2017 |
| 60000112001 | 2017 |
| 60000113101 | 2017 |
| 60000115501 | 2017 |
| 60000116701 | 2017 |
| 60000117901 | 2017 |
| 60000118001 | 2017 |
| 60000119201 | 2017 |
| 60000120901 | 2017 |
| 60000121001 | 2017 |
| 60000122201 | 2017 |
| 60000123401 | 2017 |
| 60000124601 | 2017 |
| 60000126001 | 2017 |
| 60000127101 | 2017 |
| 60000128301 | 2017 |
| 60000129501 | 2017 |
| 60000130101 | 2017 |
| 60000133701 | 2017 |
| 60000134901 | 2017 |
| 60000136201 | 2017 |
| 60000137401 | 2017 |
| 60000138601 | 2017 |
| 60000139801 | 2017 |
| 60000140401 | 2017 |
| 60000141601 | 2017 |
| 60000142801 | 2017 |
| 60000143001 | 2017 |
| 60000144101 | 2017 |
| 60000145301 | 2017 |
| 60000146501 | 2017 |
| 60000147701 | 2017 |
| 60000149001 | 2017 |
| 60000150701 | 2017 |
| 60000152001 | 2017 |
| 60000153201 | 2017 |
| 60000154401 | 2017 |
| 60000155601 | 2017 |
| 60000156801 | 2017 |
| 60000157001 | 2017 |
| 60000158101 | 2017 |
| 60000159301 | 2017 |
| 60000160001 | 2017 |
| 60000161101 | 2017 |
| 60000162301 | 2017 |
| 60000163501 | 2017 |

| | |
|---|---|
| 60000165901 | 2017 |
| 60000166001 | 2017 |
| 60000168401 | 2017 |
| 60000169601 | 2017 |
| 60000170201 | 2017 |
| 60000171401 | 2017 |
| 60000172601 | 2017 |
| 60000173801 | 2017 |
| 60000174001 | 2017 |
| 60000175101 | 2017 |
| 60000176301 | 2017 |
| 60000177501 | 2017 |
| 60000178701 | 2017 |
| 60000179901 | 2017 |
| 60000180501 | 2017 |
| 60000181701 | 2017 |
| 60000182901 | 2017 |
| 60000183001 | 2017 |
| 60000184201 | 2017 |
| 60000186601 | 2017 |
| 60000187801 | 2017 |
| 60000188001 | 2017 |
| 60000189101 | 2017 |
| 60000190801 | 2017 |
| 60000191001 | 2017 |
| 60000192101 | 2017 |
| 60000193301 | 2017 |
| 60000194501 | 2017 |
| 60000195701 | 2017 |
| 60000196901 | 2017 |
| 60000197001 | 2017 |
| 60000198201 | 2017 |
| 60000199401 | 2017 |
| 60000200701 | 2017 |
| 60000202001 | 2017 |
| 60000203201 | 2017 |
| 60000204401 | 2017 |
| 60000205601 | 2017 |
| 60000206801 | 2017 |
| 60000207001 | 2017 |
| 60000208101 | 2017 |
| 60000209301 | 2017 |
| 60000210001 | 2017 |
| 60000211101 | 2017 |
| 60000212301 | 2017 |
| 60000213501 | 2017 |
| 60000215901 | 2017 |

| | |
|---|---|
| 60000216001 | 2017 |
| 60000217201 | 2017 |
| 60000218401 | 2017 |
| 60000219601 | 2017 |
| 60000220201 | 2017 |
| 60000221401 | 2017 |
| 60000223801 | 2017 |
| 60000224001 | 2017 |
| 60000225101 | 2017 |
| 60000228701 | 2017 |
| 60000229901 | 2017 |
| 60000230501 | 2017 |
| 60000231701 | 2017 |
| 60000233001 | 2017 |
| 60000235401 | 2017 |
| 60000236601 | 2017 |
| 60000237801 | 2017 |
| 60000238001 | 2017 |
| 60000239101 | 2017 |
| 60000241001 | 2017 |
| 60000242101 | 2017 |
| 60000243301 | 2017 |
| 60000244501 | 2017 |
| 60000245701 | 2017 |
| 60000246901 | 2017 |
| 60000247001 | 2017 |
| 60000248201 | 2017 |
| 60000249401 | 2017 |
| 60000250001 | 2017 |
| 60000251201 | 2017 |
| 60000252401 | 2017 |
| 60000253601 | 2017 |
| 60000254801 | 2017 |
| 60000255001 | 2017 |
| 60000256101 | 2017 |
| 60000257301 | 2017 |
| 60000258501 | 2017 |
| 60000259701 | 2017 |
| 60000260301 | 2017 |
| 60000261501 | 2017 |
| 60000262701 | 2017 |
| 60000263901 | 2017 |
| 60000264001 | 2017 |
| 60000265201 | 2017 |
| 60000266401 | 2017 |
| 60000267601 | 2017 |
| 60000268801 | 2017 |

| | |
|---|---|
| 60000271801 | 2017 |
| 60000272001 | 2017 |
| 60000273101 | 2017 |
| 60000274301 | 2017 |
| 60000276701 | 2017 |
| 60000277901 | 2017 |
| 60000279201 | 2017 |
| 60000280901 | 2017 |
| 60000281001 | 2017 |
| 60000282201 | 2017 |
| 60000284601 | 2017 |
| 60000287101 | 2017 |
| 60000288301 | 2017 |
| 60000289501 | 2017 |
| 60000290101 | 2017 |
| 60000292501 | 2017 |
| 60000293701 | 2017 |
| 60000294901 | 2017 |
| 60000295001 | 2017 |
| 60000296201 | 2017 |
| 60000297401 | 2017 |
| 60000298601 | 2017 |
| 60000299801 | 2017 |
| 60000300001 | 2017 |
| 60000302401 | 2017 |
| 60000303601 | 2017 |
| 60000305001 | 2017 |
| 60000307301 | 2017 |
| 60000308501 | 2017 |
| 60000310301 | 2017 |
| 60000311501 | 2017 |
| 60000312701 | 2017 |
| 60000313901 | 2017 |
| 60000314001 | 2017 |
| 60000315201 | 2017 |
| 60000316401 | 2017 |
| 60000317601 | 2017 |
| 60000318801 | 2017 |
| 60000319001 | 2017 |
| 60000320601 | 2017 |
| 60000321801 | 2017 |
| 60000322001 | 2017 |
| 60000323101 | 2017 |
| 60000324301 | 2017 |
| 60000325501 | 2017 |
| 60000326701 | 2017 |
| 60000327901 | 2017 |

| | |
|---|---|
| 60000328001 | 2017 |
| 60000329201 | 2017 |
| 60000330901 | 2017 |
| 60000331001 | 2017 |
| 60000332201 | 2017 |
| 60000333401 | 2017 |
| 60000334601 | 2017 |
| 60000335801 | 2017 |
| 60000336001 | 2017 |
| 60000337101 | 2017 |
| 60000338301 | 2017 |
| 60000339501 | 2017 |
| 60000340101 | 2017 |
| 60000341301 | 2017 |
| 60000342501 | 2017 |
| 60000348601 | 2017 |
| 60000349801 | 2017 |
| 60000350401 | 2017 |
| 60000351601 | 2017 |
| 60000352801 | 2017 |
| 60000353001 | 2017 |
| 60000354101 | 2017 |
| 60000356501 | 2017 |
| 60000357701 | 2017 |
| 60000358901 | 2017 |
| 60000359001 | 2017 |
| 60000360701 | 2017 |
| 60000361901 | 2017 |
| 60000362001 | 2017 |
| 60000363201 | 2017 |
| 60000364401 | 2017 |
| 60000366801 | 2017 |
| 60000367001 | 2017 |
| 60000369301 | 2017 |
| 60000370001 | 2017 |
| 60000371101 | 2017 |
| 60000372301 | 2017 |
| 60000373501 | 2017 |
| 60000374701 | 2017 |
| 60000375901 | 2017 |
| 60000378401 | 2017 |
| 60000379601 | 2017 |
| 60000380201 | 2017 |
| 60000381401 | 2017 |
| 60000382601 | 2017 |
| 60000383801 | 2017 |
| 60000384001 | 2017 |

| | |
|---|---|
| 60000385101 | 2017 |
| 60000386301 | 2017 |
| 60000387501 | 2017 |
| 60000388701 | 2017 |
| 60000389901 | 2017 |
| 60000390501 | 2017 |
| 60000391701 | 2017 |
| 60000392901 | 2017 |
| 60000393001 | 2017 |
| 60000394201 | 2017 |
| 60000395401 | 2017 |
| 60000396601 | 2017 |
| 60000397801 | 2017 |
| 60000398001 | 2017 |
| 60000399101 | 2017 |
| 60000400401 | 2017 |
| 60000401601 | 2017 |
| 60000402801 | 2017 |
| 60000403001 | 2017 |
| 60000404101 | 2017 |
| 60000405301 | 2017 |
| 60000406501 | 2017 |
| 60000408901 | 2017 |
| 60000409001 | 2017 |
| 60000410701 | 2017 |
| 60000411901 | 2017 |
| 60000412001 | 2017 |
| 60000413201 | 2017 |
| 60000414401 | 2017 |
| 60000415601 | 2017 |
| 60000416801 | 2017 |
| 60000417001 | 2017 |
| 60000418101 | 2017 |
| 60000419301 | 2017 |
| 60000420001 | 2017 |
| 60000421101 | 2017 |
| 60000422301 | 2017 |
| 60000423501 | 2017 |
| 60000424701 | 2017 |
| 60000425901 | 2017 |
| 60000426001 | 2017 |
| 60000427201 | 2017 |
| 60000428401 | 2017 |
| 60000429601 | 2017 |
| 60000430201 | 2017 |
| 60000431401 | 2017 |
| 60000432601 | 2017 |

| | |
|---|---|
| 60000433801 | 2017 |
| 60000434001 | 2017 |
| 60000435101 | 2017 |
| 60000437501 | 2017 |
| 60000438701 | 2017 |
| 60000439901 | 2017 |
| 60000440501 | 2017 |
| 60000441701 | 2017 |
| 60000442901 | 2017 |
| 60000443001 | 2017 |
| 60000445401 | 2017 |
| 60000446601 | 2017 |
| 60000447801 | 2017 |
| 60000448001 | 2017 |
| 60000449101 | 2017 |
| 60000450801 | 2017 |
| 60000452101 | 2017 |
| 60000453301 | 2017 |
| 60000454501 | 2017 |
| 60000455701 | 2017 |
| 60000456901 | 2017 |
| 60000457001 | 2017 |
| 60000458201 | 2017 |
| 60000459401 | 2017 |
| 60000460001 | 2017 |
| 60000461201 | 2017 |
| 60000462401 | 2017 |
| 60000465001 | 2017 |
| 60000467301 | 2017 |
| 60000468501 | 2017 |
| 60000469701 | 2017 |
| 60000471501 | 2017 |
| 60000472701 | 2017 |
| 60000473901 | 2017 |
| 60000474001 | 2017 |
| 60000475201 | 2017 |
| 60000476401 | 2017 |
| 60000477601 | 2017 |
| 60000478801 | 2017 |
| 60000479001 | 2017 |
| 60000480601 | 2017 |
| 60000482001 | 2017 |
| 60000483101 | 2017 |
| 60000486701 | 2017 |
| 60000487901 | 2017 |
| 60000488001 | 2017 |
| 60000489201 | 2017 |

| | |
|---|---|
| 60000490901 | 2017 |
| 60000491001 | 2017 |
| 60000492201 | 2017 |
| 60000493401 | 2017 |
| 60000494601 | 2017 |
| 60000496001 | 2017 |
| 60000497101 | 2017 |
| 60000498301 | 2017 |
| 60000499501 | 2017 |
| 60000500801 | 2017 |
| 60000501001 | 2017 |
| 60000502101 | 2017 |
| 60000503301 | 2017 |
| 60000504501 | 2017 |
| 60000505701 | 2017 |
| 60000506901 | 2017 |
| 60000507001 | 2017 |
| 60000509401 | 2017 |
| 60000510001 | 2017 |
| 60000511201 | 2017 |
| 60000512401 | 2017 |
| 60000513601 | 2017 |
| 60000514801 | 2017 |
| 60000517301 | 2017 |
| 60000518501 | 2017 |
| 60000519701 | 2017 |
| 60000520301 | 2017 |
| 60000521501 | 2017 |
| 60000522701 | 2017 |
| 60000523901 | 2017 |
| 60000525201 | 2017 |
| 60000526401 | 2017 |
| 60000527601 | 2017 |
| 60000528801 | 2017 |
| 60000529001 | 2017 |
| 60000530601 | 2017 |
| 60000531801 | 2017 |
| 60000532001 | 2017 |
| 60000533101 | 2017 |
| 60000535501 | 2017 |
| 60000536701 | 2017 |
| 60000539201 | 2017 |
| 60000541001 | 2017 |
| 60000544601 | 2017 |
| 60000545801 | 2017 |
| 60000546001 | 2017 |
| 60000547101 | 2017 |

| | |
|---|---|
| 60000548301 | 2017 |
| 60000549501 | 2017 |
| 60000550101 | 2017 |
| 60000551301 | 2017 |
| 60000552501 | 2017 |
| 60000553701 | 2017 |
| 60000554901 | 2017 |
| 60000555001 | 2017 |
| 60000558601 | 2017 |
| 60000559801 | 2017 |
| 60000560401 | 2017 |
| 60000561601 | 2017 |
| 60000562801 | 2017 |
| 60000563001 | 2017 |
| 60000564101 | 2017 |
| 60000565301 | 2017 |
| 60000566501 | 2017 |
| 60000567701 | 2017 |
| 60000568901 | 2017 |
| 60000570701 | 2017 |
| 60000572001 | 2017 |
| 60000573201 | 2017 |
| 60000574401 | 2017 |
| 60000575601 | 2017 |
| 60000576801 | 2017 |
| 60000577001 | 2017 |
| 60000578101 | 2017 |
| 60000580001 | 2017 |
| 60000581101 | 2017 |
| 60000582301 | 2017 |
| 60000583501 | 2017 |
| 60000584701 | 2017 |
| 60000586001 | 2017 |
| 60000587201 | 2017 |
| 60000589601 | 2017 |
| 60000591401 | 2017 |
| 60000592601 | 2017 |
| 60000593801 | 2017 |
| 60000594001 | 2017 |
| 60000595101 | 2017 |
| 60000596301 | 2017 |
| 60000597501 | 2017 |
| 60000598701 | 2017 |
| 60000601301 | 2017 |
| 60000603701 | 2017 |
| 60000605001 | 2017 |
| 60000606201 | 2017 |

| | |
|---|---|
| 60000607401 | 2017 |
| 60000608601 | 2017 |
| 60000609801 | 2017 |
| 60000613001 | 2017 |
| 60000614101 | 2017 |
| 60000615301 | 2017 |
| 60000618901 | 2017 |
| 60000619001 | 2017 |
| 60000621901 | 2017 |
| 60000622001 | 2017 |
| 60000623201 | 2017 |
| 60000624401 | 2017 |
| 60000625601 | 2017 |
| 60000626801 | 2017 |
| 60000627001 | 2017 |
| 60000628101 | 2017 |
| 60000629301 | 2017 |
| 60000630001 | 2017 |
| 60000631101 | 2017 |
| 60000632301 | 2017 |
| 60000633501 | 2017 |
| 60000634701 | 2017 |
| 60000635901 | 2017 |
| 60000636001 | 2017 |
| 60000637201 | 2017 |
| 60000638401 | 2017 |
| 60000639601 | 2017 |
| 60000640201 | 2017 |
| 60000641401 | 2017 |
| 60000642601 | 2017 |
| 60000643801 | 2017 |
| 60000644001 | 2017 |
| 60000645101 | 2017 |
| 60000646301 | 2017 |
| 60000647501 | 2017 |
| 60000648701 | 2017 |
| 60000649901 | 2017 |
| 60000650501 | 2017 |
| 60000651701 | 2017 |
| 60000652901 | 2017 |
| 60000653001 | 2017 |
| 60000654201 | 2017 |
| 60000655401 | 2017 |
| 60000656601 | 2017 |
| 60000657801 | 2017 |
| 60000658001 | 2017 |
| 60000659101 | 2017 |

| | |
|---|---|
| 60000660801 | 2017 |
| 60000663301 | 2017 |
| 60000664501 | 2017 |
| 60000665701 | 2017 |
| 60000668201 | 2017 |
| 60000669401 | 2017 |
| 60000670001 | 2017 |
| 60000671201 | 2017 |
| 60000672401 | 2017 |
| 60000673601 | 2017 |
| 60000674801 | 2017 |
| 60000676101 | 2017 |
| 60000677301 | 2017 |
| 60000679701 | 2017 |
| 60000680301 | 2017 |
| 60000681501 | 2017 |
| 60000682701 | 2017 |
| 60000684001 | 2017 |
| 60000685201 | 2017 |
| 60000686401 | 2017 |
| 60000688801 | 2017 |
| 60000689001 | 2017 |
| 60000690601 | 2017 |
| 60000691801 | 2017 |
| 60000692001 | 2017 |
| 60000693101 | 2017 |
| 60000694301 | 2017 |
| 60000695501 | 2017 |
| 60000696701 | 2017 |
| 60000697901 | 2017 |
| 60000698001 | 2017 |
| 60000699201 | 2017 |
| 60000700501 | 2017 |
| 60000701701 | 2017 |
| 60000702901 | 2017 |
| 60000703001 | 2017 |
| 60000704201 | 2017 |
| 60000705401 | 2017 |
| 60000706601 | 2017 |
| 60000707801 | 2017 |
| 60000708001 | 2017 |
| 60000709101 | 2017 |
| 60000710801 | 2017 |
| 60000711001 | 2017 |
| 60000712101 | 2017 |
| 60000713301 | 2017 |
| 60000714501 | 2017 |

| | |
|---|---|
| 60000715701 | 2017 |
| 60000716901 | 2017 |
| 60000717001 | 2017 |
| 60000718201 | 2017 |
| 60000719401 | 2017 |
| 60000720001 | 2017 |
| 60000721201 | 2017 |
| 60000722401 | 2017 |
| 60000723601 | 2017 |
| 60000724801 | 2017 |
| 60000725001 | 2017 |
| 9000003201 | 2017 |
| 9000004501 | 2017 |
| 9000005801 | 2017 |
| 9000006001 | 2017 |
| 9000007301 | 2017 |
| 9000008601 | 2017 |
| 9000009901 | 2017 |
| 9000010801 | 2017 |
| 10136788001 | 2017 |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:16–cv–00745–PLF

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM et al v. UNITED STATES OF AMERICA | Date Filed: 04/21/2016 |
| Assigned to: Judge Paul L. Friedman | Jury Demand: None |

NATIONAL VETERANS LEGAL SERVICES PROGRAM et al v. UNITED STATES OF AMERICA
Assigned to: Judge Paul L. Friedman
Case in other court:  USCA–Federal Circuit, 19–01083–SJ
               USCA–Federal Circuit, 18–00154–CP
               USCA –Federal Circuit, 18–00155–CP
               USCA–Federal Circuit, 19–01081–SJ
               USCA–DC Circuit, 21–05291
               USCA–Federal Circuit, 24–01757

Date Filed: 04/21/2016
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

Cause: 28:1346 Tort Claim

**Plaintiff**

| | | |
|---|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM** | represented by | **Jonathan E. Taylor** |

**NATIONAL VETERANS LEGAL SERVICES PROGRAM**

represented by   **Jonathan E. Taylor**
GUPTA WESSLER PLLC
1900 L Sreet, NW
Suite 312
Washington, DC 20036
(202) 888–1741
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meghan S.B. Oliver**
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
843–216–9492
Email: moliver@motleyrice.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William H. Narwold**
1 Corporate Center
20 Church Street
17th Floor
Hartford, CT 06103
860–882–1676
Fax: 860–882–1682
Email: bnarwold@motleyrice.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Smith**
MOTLEY RICE, LLC
401 9th Street, NW
Suite 1001
Washington, DC 20004
(202) 386–9627
Fax: (843) 216–9350
Email: esmith@motleyrice.com
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
GUPTA WESSLER LLP
2001 K Street, NW

Suite 850 North
Washington, DC 20006
202−888−1741
Fax: 202−888−7792
Email: deepak@guptawessler.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL CONSUMER LAW CENTER**

represented by   **Jonathan E. Taylor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meghan S.B. Oliver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William H. Narwold**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALLIANCE FOR JUSTICE**

represented by   **Jonathan E. Taylor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meghan S.B. Oliver**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William H. Narwold**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES OF AMERICA**    represented by    **Brenda A. Gonzalez Horowitz**
DOJ–USAO
U.S. Department of Justice
601 D Street NW
Washington, DC 20530
(202) 252–2512
Email: brenda.gonzalez.horowitz@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Derek S. Hammond**
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, NW
Washington, DC 20581
202–418–5000
Email: dhammond@cftc.gov
*TERMINATED: 07/03/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy S. Simon**
DOJ–USAO
Patrick Henry Building
601 D. Street, N.W.
Washington, DC 20530
(202) 252–2528
Email: jeremy.simon@usdoj.gov
*TERMINATED: 03/29/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Aaron Caplen**
DOJ–USAO
601 D Street, NW
Washington, DC 20530
(202) 252–2523
Email: rcaplen@gmail.com
*TERMINATED: 03/29/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian J. Field**
SCHAERR JAFFE LLP
1717 K Street, NW
Suite 900
Washington, DC 20006
(202) 787–1060
Fax: (202) 776–0136
Email: bfield@schaerr–jaffe.com
*TERMINATED: 06/03/2021*

**William Mark Nebeker**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2536
Fax: (202) 252–2599
Email: mark.nebeker@usdoj.gov
*TERMINATED: 06/02/2021*

V.

**Interested Party**

**ROSEMARIE HOWELL**             represented by   **ROSEMARIE HOWELL**
9504 N.E. 5th Street
Vancouver, WA 98664
(360) 953–0798
PRO SE

**Interested Party**

**ROB RAWSON**             represented by   **ROB RAWSON**
P.O. Box 632
Sanford, FL 32772–0632
PRO SE

**Interested Party**

**TROY LAW, PLLC**             represented by   **John Troy**
TROY LAW, PLLC
41–25 Kissena Boulevard, Suite 110
Flushing, NY 11355
718–762–2332
Email: johntroy@troypllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**ERIC ALAN ISAACSON**             represented by   **ERIC ALAN ISAACSON**
6580 Avenida Mirola
La Jolla, CA 92037
(858) 263–9581
PRO SE

**Movant**

**DON KOZICH**             represented by   **DON KOZICH**
P.O. Box 2032
Fort Lauderdale, FL 33303–2032
(954) 709–0537
Email: dtkctr@gmail.com
PRO SE

**Movant**

**MICHAEL T. PINES**             represented by   **MICHAEL T. PINES**
619–771–5302
PRO SE

**Amicus**

**REPORTERS COMMITTEE FOR**             represented by   **Bruce D. Brown**
**FREEDOM OF THE PRESS**             REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St, NW
Suite 1020
Washington, DC 20005
(202) 795–9301
Fax: (202) 795–9310
Email: bbrown@rcfp.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN ASSOCIATION OF LAW LIBRARIES**

represented by **Sasha Samberg–Champion**
RELMAN COLFAX PLLC
1225 19th Street NW
Suite 600
Washington, DC 20036
202–728–1888
Email: ssamberg–champion@relmanlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**JOSEPH I. LIEBERMAN**

represented by **Mark Bailen**
LAW OFFICES OF MARK I BAILEN
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
(202) 656–0422
Fax: (202) 261–3508
Email: mb@bailenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**AMERICAN SOCIETY OF NEWSPAPER EDITORS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**ASSOCIATED PRESS MEDIA EDITORS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**ASSOCIATION OF ALTERNATIVE NEWS MEDIA**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**CENTER FOR INVESTIGATIVE REPORTING**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**FIRST AMENDMENT COALITION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**FIRST LOOK MEDIA WORKS, INC.**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**INTERNATIONAL DOCUMENTARY ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**INVESTIGATIVE REPORTING WORKSHOP**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**MEDIA CONSORTIUM**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**MPA**
*The Association of Magazine Media*

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**ONLINE NEWS ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**RADIO TELEVISION DIGITAL NEWS ASSOCIATION**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**REPORTERS WITHOUT BORDERS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**SEATTLE TIMES COMPANY**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**SOCIETY OF PROFESSIONAL JOURNALISTS**

represented by **Bruce D. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **TULLY CENTER FOR FREE SPEECH** | represented by | **Bruce D. Brown** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **DEBORAH BEIM** | represented by | **Sasha Samberg–Champion** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **THOMAS BRUCE** | represented by | **Sasha Samberg–Champion** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **PHILLIP MALONE** | represented by | **Sasha Samberg–Champion** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **JONATHAN ZITTRAIN** | represented by | **Sasha Samberg–Champion** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **DARRELL ISSA** *Congressman* | represented by | **Mark Bailen** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 04/21/2016 | 1 | COMPLAINT against All Defendants *United States of America* ( Filing fee $ 400 receipt number 0090–4495374) filed by NATIONAL VETERANS LEGAL SERVICES PROGRAM, ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to United States Attorney General, # 3 Summons to U.S. Attorney for the District of Columbia)(Gupta, Deepak) (Entered: 04/21/2016) |
| 04/21/2016 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Gupta, Deepak) (Entered: 04/21/2016) |
| 04/21/2016 | | Case Assigned to Judge Ellen S. Huvelle. (jd) (Entered: 04/22/2016) |
| 04/22/2016 | 3 | SUMMONS (2) Issued Electronically as to UNITED STATES OF AMERICA, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Consent Forms)(jd) (Entered: 04/22/2016) |

| 04/26/2016 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/26/2016. Answer due for ALL FEDERAL DEFENDANTS by 6/25/2016. (Gupta, Deepak) (Entered: 04/26/2016) |
| --- | --- | --- |
| 04/26/2016 | 5 | NOTICE of Appearance by Elizabeth S. Smith on behalf of All Plaintiffs (Smith, Elizabeth) (Entered: 04/26/2016) |
| 04/26/2016 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– William H. Narwold, :Firm– Motley Rice LLC, :Address– 20 Church Street, 17th Floor, Hartford, CT 06103. Phone No. – 860–882–1676. Fax No. – 860–882–1682 Filing fee $ 100, receipt number 0090–4500590. Fee Status: Fee Paid. by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Smith, Elizabeth) (Entered: 04/26/2016) |
| 04/26/2016 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice: It is hereby ORDERED that the motion for leave to appear pro hac vice is GRANTED; and it is further ORDERED that William H. Narwold is admitted pro hac vice for the purpose of appearing in the above–captioned case. Signed by Judge Ellen S. Huvelle on April 26, 2016. (AG) (Entered: 04/26/2016) |
| 05/02/2016 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 05/02/2016. (Gupta, Deepak) (Entered: 05/02/2016) |
| 05/02/2016 | 8 | MOTION to Certify Class by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration of Deepak Gupta, # 2 Declaration of William Narwold, # 3 Declaration of Jonathan Taylor, # 4 Text of Proposed Order)(Gupta, Deepak) (Entered: 05/02/2016) |
| 05/16/2016 | 9 | NOTICE of Appearance by William Mark Nebeker on behalf of UNITED STATES OF AMERICA (Nebeker, William) (Entered: 05/16/2016) |
| 05/16/2016 | 10 | Unopposed MOTION for Extension of Time to File Response/Reply as to 8 MOTION to Certify Class by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 05/16/2016) |
| 05/17/2016 | | MINUTE ORDER: It is hereby ORDERED that defendant's unopposed 10 Motion for Extension of Time to File Response/Reply is GRANTED, and defendant's Response is due by July 11, 2016. Signed by Judge Ellen S. Huvelle on May 17, 2016. (lcesh2 ) (Entered: 05/17/2016) |
| 06/27/2016 | 11 | MOTION to Dismiss *Or, In The Alternative*, MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit (1 through 5), # 2 Text of Proposed Order)(Nebeker, William) (Entered: 06/27/2016) |
| 07/08/2016 | 12 | Joint MOTION for Extension of Time to File Response/Reply as to 8 MOTION to Certify Class , 11 MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 07/08/2016) |
| 07/08/2016 | | MINUTE ORDER granting 12 Motion for Extension of Time to File Response re 8 MOTION to Certify Class and 11 MOTION to Dismiss: Upon consideration of the parties' joint motion to extend the briefing schedule, it is hereby ORDERED that the motion is GRANTED; it is FURTHER ORDERED that the time within which the defendant may file a memorandum of points and authorities in response to plaintiffs' motion for class certification is further extended though July 25, 2016, and no additional extensions shall be granted; and it isFURTHER ORDERED that the time within which the plaintiffs may file a memorandum of points and authorities in response to defendant's motion to dismiss is initially extended though July 29, 2016. Signed by Judge Ellen S. Huvelle on July 7, 2016. (AG) (Entered: 07/08/2016) |
| 07/25/2016 | 13 | Memorandum in opposition to re 8 MOTION to Certify Class filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Declaration Garcia, # 3 Text of Proposed Order)(Nebeker, William) (Entered: 07/25/2016) |

| 07/26/2016 | 14 | MOTION to Stay *Discovery* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 07/26/2016) |
|---|---|---|
| 07/29/2016 | 15 | RESPONSE re 11 MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Exhibit Govt's MTD in Fisher, # 2 Exhibit Complaint in NVLSP v. USA, # 3 Exhibit Complaint in Fisher)(Gupta, Deepak) (Entered: 07/29/2016) |
| 08/04/2016 | 16 | Unopposed MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 08/04/2016) |
| 08/04/2016 | 17 | REPLY to opposition to motion re 8 MOTION to Certify Class filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 08/04/2016) |
| 08/05/2016 | | MINUTE ORDER granting 16 Unopposed Motion for Extension of Time to File Reply re 11 MOTION to Dismiss *Or, In The Alternative*, MOTION for Summary Judgment : Upon consideration of the Unopposed Motion For An Enlargement Of Time, And Memorandum In Support Thereof, and for the reasons set forth in support thereof, it is hereby ORDERED that the motion is GRANTED; and it is FURTHER ORDERED that the time within which Defendant may file a reply to Plaintiffs' opposition to the pending Motion To Dismiss Or, In The Alternative, For Summary Judgment is enlarged up to and including August 16, 2016. Signed by Judge Ellen S. Huvelle on August 5, 2016. (AG) (Entered: 08/05/2016) |
| 08/09/2016 | 18 | Joint MOTION for Scheduling Order by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Narwold, William) (Entered: 08/09/2016) |
| 08/16/2016 | | MINUTE ORDER: It is hereby ORDERED that the 18 Joint Motion for Scheduling Order is GRANTED. Signed by Judge Ellen S. Huvelle on August 16, 2016. (lcesh2) (Entered: 08/16/2016) |
| 08/16/2016 | | MINUTE ORDER: It is hereby ORDERED that defendant's 14 Motion to Stay is DENIED as moot. Signed by Judge Ellen S. Huvelle on August 16, 2016. (lcesh2) (Entered: 08/16/2016) |
| 08/16/2016 | 19 | SCHEDULING ORDER: The parties' 18 Joint Motion for Proposed Phased Schedule is hereby GRANTED. See Order for details. Signed by Judge Ellen S. Huvelle on August 16, 2016. (lcesh2) (Entered: 08/16/2016) |
| 08/16/2016 | 20 | REPLY to opposition to motion re 11 MOTION to Dismiss *Or, In The Alternative* MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Attachments: # 1 Declaration Second Garcia)(Nebeker, William) (Entered: 08/16/2016) |
| 08/17/2016 | 21 | MOTION for Leave to File *Sur−Reply* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit Sur−Reply, # 2 Statement of Facts, # 3 Text of Proposed Order)(Gupta, Deepak) (Entered: 08/17/2016) |
| 08/17/2016 | 22 | RESPONSE re 21 MOTION for Leave to File *Sur−Reply* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 08/17/2016) |
| 10/01/2016 | 23 | NOTICE OF SUPPLEMENTAL AUTHORITY by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit Opinion in Fisher v. United States)(Gupta, Deepak) (Entered: 10/01/2016) |
| 12/05/2016 | | MINUTE ORDER granting in part and denying in part 21 Plaintiffs' Motion for Leave to File Sur−Reply: It is hereby ORDERED that plaintiffs may file [21−2] Plaintiffs' Concise Statement of Genuine Issues of Material Fact, but plaintiffs may not file |

| | | |
|---|---|---|
| | | [21–1] Plaintiffs' Sur–Reply. A sur–reply is unnecessary because plaintiffs seek to reply to a statement that defendant originally presented in its motion to dismiss. Signed by Judge Ellen S. Huvelle on December 5, 2016. (lcesh2) (Entered: 12/05/2016) |
| 12/05/2016 | 24 | ORDER denying 11 Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment for the reasons stated in the accompanying Memorandum Opinion. Signed by Judge Ellen S. Huvelle on December 5, 2016. (lcesh2) (Entered: 12/05/2016) |
| 12/05/2016 | 25 | MEMORANDUM OPINION in support of 24 Order Denying 11 Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Signed by Judge Ellen S. Huvelle on December 5, 2016. (lcesh2) (Entered: 12/05/2016) |
| 12/05/2016 | 26 | SUPPLEMENTAL MEMORANDUM (Statement of Genuine Issues of Material Fact) to re 11 MOTION to Dismiss *Or, In the Alternative* MOTION for Summary Judgment filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (znmw) (Entered: 12/06/2016) |
| 12/15/2016 | | MINUTE ORDER Setting Hearing on Motion: It is hereby ORDERED that a motion hearing on 8 Plaintiffs' MOTION to Certify Class is set for 1/18/2017 at 02:30 PM in Courtroom 23A before Judge Ellen S. Huvelle. Signed by Judge Ellen S. Huvelle on December 15, 2016. (lcesh2) (Entered: 12/15/2016) |
| 12/19/2016 | 27 | ANSWER to Complaint by UNITED STATES OF AMERICA.(Nebeker, William) (Entered: 12/19/2016) |
| 01/18/2017 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Motion Hearing held on 1/18/2017, re 8 MOTION to Certify Class, heard and taken under advisement. (Court Reporter Scott Wallace) (gdf) (Entered: 01/18/2017) |
| 01/20/2017 | 28 | AFFIDAVIT re 8 MOTION to Certify Class *of Daniel L. Goldberg* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 01/20/2017) |
| 01/20/2017 | 29 | AFFIDAVIT re 8 MOTION to Certify Class *of Stuart Rossman* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 01/20/2017) |
| 01/20/2017 | 30 | AFFIDAVIT re 8 MOTION to Certify Class *of Barton F. Stichman* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 01/20/2017) |
| 01/20/2017 | 31 | AFFIDAVIT re 8 MOTION to Certify Class *of Deepak Gupta (Second)* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Gupta, Deepak) (Entered: 01/20/2017) |
| 01/24/2017 | 32 | ORDER granting 8 Plaintiffs' Motion to Certify Class for the reasons stated in the accompanying Memorandum Opinion. See Order for details. Signed by Judge Ellen S. Huvelle on January 24, 2017. (lcesh2) (Entered: 01/24/2017) |
| 01/24/2017 | 33 | MEMORANDUM OPINION in support of 32 Order Granting 8 Plaintiffs' Motion to Certify Class. Signed by Judge Ellen S. Huvelle on January 24, 2017. (lcesh2) (Entered: 01/24/2017) |
| 01/24/2017 | 34 | SCHEDULING ORDER: See Order for deadlines and details. Signed by Judge Ellen S. Huvelle on January 24, 2017. (lcesh2) (Entered: 01/24/2017) |
| 02/14/2017 | 35 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 1–18–17; Page Numbers: (1–29). Date of Issuance:1–29–17. Court Reporter/Transcriber Scott Wallace, Telephone number 202–354–3196, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court |

|  |  | reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/7/2017. Redacted Transcript Deadline set for 3/17/2017. Release of Transcript Restriction set for 5/15/2017.(Wallace, Scott) (Entered: 02/14/2017) |
|---|---|---|
| 02/21/2017 | 36 | NOTICE of Appearance by Brian J. Field on behalf of All Defendants (Field, Brian) (Entered: 02/21/2017) |
| 02/23/2017 | 37 | Unopposed MOTION For Approval of Plan of Class Notice by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 − Email Notice, # 2 Exhibit 2 − Postcard Notice, # 3 Exhibit 2 − Website Notice, # 4 Text of Proposed Order)(Narwold, William) (Entered: 02/23/2017) |
| 02/28/2017 | 38 | RESPONSE re 37 Unopposed MOTION For Approval of Plan of Class Notice filed by UNITED STATES OF AMERICA. (Nebeker, William) (Entered: 02/28/2017) |
| 03/31/2017 | 39 | NOTICE *of Joint Filing of Proposed Order* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 37 Unopposed MOTION For Approval of Plan of Class Notice (Attachments: # 1 Text of Proposed Order)(Narwold, William) (Entered: 03/31/2017) |
| 03/31/2017 | 40 | Consent MOTION for Protective Order by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Narwold, William) (Entered: 03/31/2017) |
| 04/03/2017 | 41 | STIPULATED PROTECTIVE ORDER granting 40 Motion for Protective Order. Signed by Judge Ellen S. Huvelle on April 3, 2017. (lcesh2) (Entered: 04/03/2017) |
| 04/13/2017 | 42 | Unopposed MOTION for Approval of Revised Plan of Class Notice and Class Notice Documents by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 − Email Notice, # 2 Exhibit 1−A − BLACKLINE Email Notice, # 3 Exhibit 2 − Postcard Notice, # 4 Exhibit 2−A − BLACKLINE Postcard Notice, # 5 Exhibit 3 − Website Notice, # 6 Exhibit 3−A − BLACKLINE Website Notice, # 7 Exhibit 4 − Online Exclusion, # 8 Exhibit 5 − Printable Exclusion, # 9 Exhibit 6 − Proposed Order, # 10 Exhibit 6−A − BLACKLINE Proposed Order)(Narwold, William) (Entered: 04/13/2017) |
| 04/14/2017 | 43 | NOTICE *of Filing of Revised Notice Documents* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 Revised Email Notice, # 2 Exhibit 1A Revised and Blacklined Email Notice, # 3 Exhibit 2 Revised Postcard Notice, # 4 Exhibit 2A Revised and Blacklined Postcard Notice)(Narwold, William) (Entered: 04/14/2017) |
| 04/17/2017 | 44 | ORDER granting 42 Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents: See Order for details. Signed by Judge Ellen S. Huvelle on April 17, 2017. (lcesh2) (Entered: 04/17/2017) |
| 04/17/2017 |  | MINUTE ORDER finding as moot 37 Motion for Approval of Class Notice in light of approval of 42 Motion for Approval of Revised Class Notice. Signed by Judge Ellen S. Huvelle on April 17, 2017. (AG) (Entered: 04/17/2017) |
| 05/22/2017 | 45 | NOTICE to Exclude by ROSEMARIE HOWELL re 44 ORDER granting 42 Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents (jf) (Entered: 05/24/2017) |
| 06/15/2017 | 46 | MOTION for Order for Exclusion by ROB RAWSON. "Let this be filed" signed by Judge Ellen Segal Huvelle on 06/09/2017 (jf) Modified event title on 6/16/2017 |

| | | |
|---|---|---|
| | | (znmw). (Entered: 06/15/2017) |
| 06/15/2017 | | MINUTE ORDER: It is hereby ORDERED that the Clerk shall mail a copy of 46 NOTICE of and MOTION For An Order For Exclusion filed by ROB RAWSON to the PACER Fees Class Action Administrator, P.O. Box 43434, Providence, RI 02940–3434. Signed by Judge Ellen S. Huvelle on June 15, 2017. (lcesh2) (Entered: 06/15/2017) |
| 07/05/2017 | 47 | NOTICE of Change of Address by Deepak Gupta (Gupta, Deepak) (Entered: 07/05/2017) |
| 07/05/2017 | 48 | Unopposed MOTION for Extension of Time to File *Motion for Summary Judgment* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 07/05/2017) |
| 07/05/2017 | | MINUTE ORDER granting 48 Unopposed Motion for Extension of Time to File Motion for Summary Judgment: Upon consideration of the plaintiffs' unopposed motion to extend the briefing schedule, it is hereby ORDERED that the motion is GRANTED; and it is FURTHER ORDERED that the time within which the plaintiffs may file their motion for summary judgment solely on the issue of liability, i.e., whether the fees charged to access records through PACER violate the E–Government Act of 2002, Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C. § 1913 note), is extended through August 28, 2017; and it is FURTHER ORDERED that the defendant shall file its opposition 20 days after this date, on September 18, 2017, and the plaintiffs' reply is due 10 days after that, on September 28, 2017, consistent with this Courts scheduling order entered on January 24, 2017. Signed by Judge Ellen S. Huvelle on July 5, 2017. (AG) (Entered: 07/05/2017) |
| 07/07/2017 | | Set/Reset Deadlines: Plaintiff's Summary Judgment motion due by 8/28/2017. Response to Motion for Summary Judgment due by 9/18/2017. Plaintiff's Reply in support of Motion for Summary Judgment due by 9/28/2017. (hs) (Entered: 07/07/2017) |
| 07/17/2017 | 49 | MOTION for Leave to File Amicus Curiae, MOTION to Appear by Phone, by DON KOZICH (Attachments: # 1 Exhibit Application to Proceed In Forma Pauperis)(jf) Modified text on 7/19/2017 (znmw). (Entered: 07/18/2017) |
| 07/19/2017 | 50 | SUPPLEMENT re 45 NOTICE to Exclude by ROSEMARIE HOWELL re 44 ORDER granting 42 Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents filed by ROSEMARIE HOWELL. (jf) (Entered: 07/19/2017) |
| 08/24/2017 | 51 | NOTICE of Change of Address by Elizabeth S. Smith (Smith, Elizabeth) (Entered: 08/24/2017) |
| 08/28/2017 | 52 | MOTION for Summary Judgment *as to Liability* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration Declaration of Jonathan Taylor, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F, # 8 Exhibit Exhibit G, # 9 Exhibit Exhibit H, # 10 Exhibit Exhibit I, # 11 Exhibit Exhibit J, # 12 Exhibit Exhibit K, # 13 Exhibit Exhibit L, # 14 Exhibit Exhibit M, # 15 Declaration Declaration of Thomas Lee and Michael Lissner, # 16 Statement of Facts Plaintiffs' Statement of Undisputed Material Facts)(Gupta, Deepak) (Entered: 08/28/2017) |
| 09/05/2017 | 53 | MOTION for Leave to File *Amicus Curiae Brief* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Proposed Order, # 3 Certificate of Corporate Disclosure)(Brown, Bruce) (Entered: 09/05/2017) |
| 09/05/2017 | 54 | NOTICE of Appearance by Sasha Samberg–Champion on behalf of AMERICAN ASSOCIATION OF LAW LIBRARIES (Samberg–Champion, Sasha) (Entered: 09/05/2017) |
| 09/05/2017 | 55 | MOTION for Leave to File *Brief Amici Curiae* by AMERICAN ASSOCIATION OF LAW LIBRARIES (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order)(Samberg–Champion, Sasha) (Entered: 09/05/2017) |

| 09/05/2017 | 56 | MOTION for Leave to File *Amicus Curiae Brief* by JOSEPH I. LIEBERMAN (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Bailen, Mark) (Entered: 09/05/2017) |
|---|---|---|
| 09/13/2017 | 57 | MOTION for Extension of Time to File Response/Reply by UNITED STATES OF AMERICA (Field, Brian) (Entered: 09/13/2017) |
| 09/13/2017 | | MINUTE ORDER granting 53 55 56 Movants' Motions for Leave to File Briefs as Amicus Curiae: Upon consideration of the above–referenced motions, plaintiffs' consent and defendant's representation that it will not oppose, it is hereby ORDERED that the motions are GRANTED and movants are granted leave to file briefs as amicus curiae. Signed by Judge Ellen S. Huvelle on September 13, 2017. (AG) (Entered: 09/13/2017) |
| 09/13/2017 | 58 | RESPONSE re 57 MOTION for Extension of Time to File Response/Reply filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/13/2017) |
| 09/13/2017 | 59 | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AMERICAN SOCIETY OF NEWSPAPER EDITORS, ASSOCIATED PRESS MEDIA EDITORS, ASSOCIATION OF ALTERNATIVE NEWS MEDIA, CENTER FOR INVESTIGATIVE REPORTING, FIRST AMENDMENT COALITION, FIRST LOOK MEDIA WORKS, INC., INTERNATIONAL DOCUMENTARY ASSOCIATION, INVESTIGATIVE REPORTING WORKSHOP, MEDIA CONSORTIUM, MPA, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, ONLINE NEWS ASSOCIATION, RADIO TELEVISION DIGITAL NEWS ASSOCIATION, REPORTERS WITHOUT BORDERS, SEATTLE TIMES COMPANY, SOCIETY OF PROFESSIONAL JOURNALISTS, TULLY CENTER FOR FREE SPEECH. (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | 60 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN SOCIETY OF NEWSPAPER EDITORS, ASSOCIATED PRESS MEDIA EDITORS, ASSOCIATION OF ALTERNATIVE NEWS MEDIA, CENTER FOR INVESTIGATIVE REPORTING, FIRST AMENDMENT COALITION, FIRST LOOK MEDIA WORKS, INC., INTERNATIONAL DOCUMENTARY ASSOCIATION, INVESTIGATIVE REPORTING WORKSHOP, MEDIA CONSORTIUM, MPA, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, ONLINE NEWS ASSOCIATION, RADIO TELEVISION DIGITAL NEWS ASSOCIATION, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, REPORTERS WITHOUT BORDERS, SEATTLE TIMES COMPANY, SOCIETY OF PROFESSIONAL JOURNALISTS, TULLY CENTER FOR FREE SPEECH identifying Other Affiliate SYRACUSE UNIVERSITY for TULLY CENTER FOR FREE SPEECH; Other Affiliate AMERICAN UNIVERSITY SCHOOL OF COMMUNICATION for INVESTIGATIVE REPORTING WORKSHOP; Corporate Parent MCCLATCHY COMPANY for SEATTLE TIMES COMPANY. (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | 61 | AMICUS BRIEF by AMERICAN ASSOCIATION OF LAW LIBRARIES, DEBORAH BEIM, THOMAS BRUCE, PHILLIP MALONE, JONATHAN ZITTRAIN. (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | 62 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN ASSOCIATION OF LAW LIBRARIES. (See Docket Entry 61 to view document). (znmw) (Entered: 09/14/2017) |
| 09/13/2017 | 63 | AMICUS BRIEF by JOSEPH I. LIEBERMAN, DARRELL ISSA. (znmw) (Entered: 09/14/2017) |
| 09/14/2017 | | MINUTE ORDER granting in part and denying in part 57 defendant's Motion for Extension of Time to File Response re 52 plaintiffs' MOTION for Summary Judgment *as to Liability*: Upon consideration of defendant's motion, plaintiff's partial consent and partial opposition thereto, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that defendant shall have until November 2, 2017, to file its response to plaintiffs' motion for summary judgment; and it is further ORDERED that plaintiffs reply is due by November 13, 2017. Signed by Judge Ellen S. Huvelle on September 14, 2017. (AG) (Entered: 09/14/2017) |

| | | |
|---|---|---|
| 09/25/2017 | 64 | Verified MOTION For Free Access To Pacer by DON KOZICH (jf) (Entered: 09/27/2017) |
| 09/29/2017 | 65 | RESPONSE re 64 MOTION For Free Access To Pacer filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/29/2017) |
| 10/02/2017 | 66 | ORDER DENYING as moot 64 Motion for Free Access to PACER Until Final Disposition of this Case. Signed by Judge Ellen S. Huvelle on October 2, 2017. (lcesh2,) (Entered: 10/02/2017) |
| 10/10/2017 | 67 | MOTION to Clarify Minute Order dated 09/13/2017 by DON KOZICH (jf) (Entered: 10/13/2017) |
| 10/17/2017 | 68 | ORDER denying 49 Motion for Leave to File Amicus Brief and to Appear Telephonically; denying as moot 67 Motion to Clarify: see Order for details. Signed by Judge Ellen S. Huvelle on October 17, 2017. (lcesh2) (Entered: 10/17/2017) |
| 10/30/2017 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to 52 MOTION for Summary Judgment *as to Liability* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Nebeker, William) (Entered: 10/30/2017) |
| 10/30/2017 | 72 | STRIKEN PURSUANT TO MINUTE ORDER FILED ON 11/9/17.....Verified MOTION with Briefing by ROSEMARIE HOWELL (Attachments: # 1 Appendix 1, # 2 Appendix 2, # 3 Appendix 3)(jf) Modified on 11/12/2017 (zgdf). (Entered: 11/08/2017) |
| 10/31/2017 | | MINUTE ORDER granting 69 Unopposed Motion for Extension of Time to File Response re 52 MOTION for Summary Judgment as to Liability: Upon Consideration of the Unopposed Motion For An Enlargement Of Time, AndMemorandum In Support Thereof in response thereto, and for the reasons set forth in support thereof, it is hereby ORDERED that the motion should be and is hereby GRANTED; and it is FURTHER ORDERED that Defendant file its opposition to Plaintiff's Motion For Summary Judgment As To Liability (ECF No. 52 ) on or before November 17, 2017; and it is FURTHER ORDERED that Plaintiffs may respond to Defendant's filing on or before December 5, 2017. Signed by Judge Ellen S. Huvelle on October 31, 2017. (AG) (Entered: 10/31/2017) |
| 10/31/2017 | 70 | MOTION for Reconsideration re 68 Order on Motion for Miscellaneous Relief, Order on Motion for Leave to File, Order on Motion to Clarify by DON KOZICH (Attachments: # 1 Exhibit)(jf) (Entered: 11/01/2017) |
| 11/06/2017 | 71 | ORDER denying 70 Motion for Reconsideration of October 17, 2017 Order Denying Petitioners Motion for Clarification of September 13, 2017 Order and Denying Petitioners Motion to File Amicus Curiae; and granting Movant access to documents filed in this case. See Order for details. Signed by Judge Ellen S. Huvelle on November 6, 2017. (lcesh2) (Entered: 11/06/2017) |
| 11/09/2017 | | MINUTE ORDER: It is hereby ORDERED that Rosemarie Howell's Verified Motion with Briefing 72 is STRICKEN from the docket as filed without leave of Court; it is further ORDERED that leave to file is denied because Rosemarie Howell has opted out of the class, see ECF 45; and it is further ORDERED that the Clerk shall return the motion to Rosemarie Howell, along with a copy of this Minute Order. Signed by Judge Ellen S. Huvelle on November 9, 2017. (lcesh2) (Entered: 11/09/2017) |
| 11/17/2017 | 73 | Cross MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Declaration Decl. of W. Skidgel, # 3 Statement of Facts, # 4 Text of Proposed Order)(Field, Brian) (Entered: 11/17/2017) |
| 11/17/2017 | 74 | Memorandum in opposition to re 52 MOTION for Summary Judgment *as to Liability* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum in Support, # 2 Declaration Decl. of W. Skidgel, # 3 Statement of Facts, # 4 Text of Proposed Order)(Field, Brian) (Entered: 11/17/2017) |
| 12/05/2017 | 75 | REPLY to opposition to motion re 52 MOTION for Summary Judgment *as to Liability*, filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Statement of Facts Response to Defendant's Statement of Facts)(Gupta, Deepak) Modified to remove link on 12/6/2017 (znmw). (Entered: 12/05/2017) |
| 12/05/2017 | 76 | Memorandum in opposition to re 73 Cross MOTION for Summary Judgment filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (See Docket Entry 75 to view document). (znmw) (Entered: 12/06/2017) |
| 12/08/2017 | 77 | MOTION for Extension of Time to File Response/Reply as to 73 Cross MOTION for Summary Judgment by UNITED STATES OF AMERICA (Field, Brian) (Entered: 12/08/2017) |
| 12/08/2017 | | MINUTE ORDER granting in part and denying in part 77 defendant's opposed Motion for Extension of Time to File Reply re 73 Cross Motion for Summary Judgment: Upon consideration of the above–referenced motion, and the entire record herein, it is hereby ORDERED that the motion is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED that defendant shall have until January 5, 2018, to file its reply in support of its cross–motion for summary judgment. Signed by Judge Ellen S. Huvelle on December 8, 2017. (lcesh2) (Entered: 12/08/2017) |
| 12/12/2017 | 78 | LEAVE TO FILE DENIED– Declaration of Amended Service. This document is unavailable as the Court denied its filing. "Leave To File Denied" Signed by Judge Ellen S. Huvelle on 12/12/2017. (jf) (Entered: 12/15/2017) |
| 01/05/2018 | 79 | REPLY to opposition to motion re 73 Cross MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 01/05/2018) |
| 02/27/2018 | | MINUTE ORDER Setting Hearing on Motions: It is hereby ORDERED that a hearing on 52 plaintiffs' MOTION for Summary Judgment as to Liability and 73 defendant's Cross MOTION for Summary Judgment is set for Monday, March 19, 2017, at 11:00 a.m. in Courtroom 23A before Judge Ellen S. Huvelle. Signed by Judge Ellen S. Huvelle on February 27, 2018. (AG) (Entered: 02/27/2018) |
| 03/01/2018 | 80 | Consent MOTION to Continue *Motions Hearing* by UNITED STATES OF AMERICA (Field, Brian) (Entered: 03/01/2018) |
| 03/02/2018 | | MINUTE ORDER granting in part and denying in part 80 Consent Motion to Continue: Upon consideration of the Consent Motion to Continue, it is hereby ORDERED that the motion is granted in part and denied in part; and it is further ORDERED that the Summary Judgment Motions Hearing presently set for 3/19/2018 is CONTINUED TO 3/21/2018 at 11:00 AM in Courtroom 23A. Signed by Judge Ellen S. Huvelle on March 2, 2018. (AG) (Entered: 03/02/2018) |
| 03/15/2018 | 81 | NOTICE *Of Filing* by UNITED STATES OF AMERICA re 52 MOTION for Summary Judgment *as to Liability*, Order Setting Hearing on Motion, 73 Cross MOTION for Summary Judgment (Attachments: # 1 Exhibit Tabs 1 through 40)(Nebeker, William) (Entered: 03/15/2018) |
| 03/21/2018 | 82 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Meghan Oliver, :Firm– Motley Rice LLC, :Address– 28 Bridgeside Blvd, Mt. Pleasant, SC 29464. Phone No. – 843–216–9492. Fax No. – 843–216–9430 Filing fee $ 100, receipt number 0090–5382765. Fee Status: Fee Paid. by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration of Meghan Oliver, # 2 Text of Proposed Order Proposed Order)(Smith, Elizabeth) (Entered: 03/21/2018) |
| 03/21/2018 | | MINUTE ORDER: It is hereby ORDERED that the hearing on plaintiffs' MOTION for Summary Judgment as to Liability and defendant's Cross MOTION for Summary Judgment is CONTINUED from Wednesday, March 21, 2018, to Friday, March 23, 2018, at 1:30 p.m. in Courtroom 23A before Judge Ellen S. Huvelle. Signed by Judge Ellen S. Huvelle on March 21, 2018. (AG) (Entered: 03/21/2018) |
| 03/21/2018 | | MINUTE ORDER granting 82 Unopposed Motion for Leave to Appear Pro Hac Vice: Upon consideration of the above–referenced motion, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that Meghan Oliver is admitted pro hac vice for the purpose of appearing in the above–captioned case. Signed by Judge Ellen S. Huvelle on March 21, 2018. (AG) (Entered: 03/21/2018) |

| 03/21/2018 | 83 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jonathan Taylor, :Firm– Gupta Wessler PLLC, :Address– jon@guptawessler.com. Phone No. – 2028881741. Fax No. – 2028887792 *Address: 1900 L Street NW, Suite 312, Washington DC 20036* Filing fee $ 100, receipt number 0090–5383035. Fee Status: Fee Paid. by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Declaration of Jonathan Taylor, # 2 Text of Proposed Order)(Gupta, Deepak) (Entered: 03/21/2018) |
|---|---|---|
| 03/21/2018 | | MINUTE ORDER granting 83 Unopposed Motion for Leave to Appear Pro Hac Vice: Upon consideration of the Unopposed MOTION for Leave to Appear Pro Hac Vice, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that Jonathan Taylor is admitted pro hac vice for the purpose of appearing in proceedings in the above–captioned case. Counsel is reminded that pursuant to LCvR 83.2(c)(2) "An attorney who engages in the practice of law from an office located in the District of Columbia must be a member of the District of Columbia Bar and the Bar of this Court to file papers in this Court." Signed by Judge Ellen S. Huvelle on March 21, 2018. (AG) (Entered: 03/21/2018) |
| 03/22/2018 | | Set/Reset Hearings: Motion Hearing set for 3/23/2018 at 1:30 PM in Courtroom 23A before Judge Ellen S. Huvelle. (gdf) (Entered: 03/22/2018) |
| 03/23/2018 | | Minute Entry; for proceedings held before Judge Ellen S. Huvelle: Oral Arguments held on 3/23/2018. Plaintiffs' 52 MOTION for Summary Judgment as to Liability and Defendant's 73 Cross MOTION for Summary Judgment; heard and Taken Under Advisement. (Court Reporter Lisa Griffith) (hs) (Entered: 03/23/2018) |
| 03/24/2018 | 84 | NOTICE by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E, # 6 Exhibit Ex. F, # 7 Exhibit Ex. G)(Field, Brian) (Entered: 03/24/2018) |
| 03/28/2018 | 85 | RESPONSE *to Defendant's supplemental authority* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 84 Notice (Other) (Gupta, Deepak) Modified event title on 3/29/2018 (znmw). (Entered: 03/28/2018) |
| 03/29/2018 | 86 | RESPONSE re 85 Notice (Other) filed by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 03/29/2018) |
| 03/29/2018 | 87 | REPLY re 86 Response to Document filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 03/29/2018) |
| 03/31/2018 | 88 | ORDER denying 52 plaintiffs' Motion for Summary Judgment; granting in part and denying in part 73 defendant's Motion for Summary Judgment; and setting Status Conference for 4/18/2018 at 03:00 PM in Courtroom 23A. Joint status report due by April 16, 2018. Signed by Judge Ellen S. Huvelle on March 31, 2018. (AG) (Entered: 03/31/2018) |
| 03/31/2018 | 89 | MEMORANDUM OPINION accompanying Order, ECF No. 88 , denying 52 plaintiffs' Motion for Summary Judgment and granting in part and denying in part defendant's Cross–Motion for Summary Judgment. Signed by Judge Ellen S. Huvelle on March 31, 2018. (AG) Modified on 4/2/2018 to remove attachment. Attachment docketed separately for opinion posting purposes.(ztnr) (Entered: 03/31/2018) |
| 03/31/2018 | 90 | ATTACHMENT to 89 Memorandum & Opinion Signed by Judge Ellen S. Huvelle on March 31, 2018. (ztnr) (Entered: 04/02/2018) |
| 04/02/2018 | | Set/Reset Deadlines: Joint Status Report due by 4/16/2018. (gdf) (Entered: 04/02/2018) |
| 04/16/2018 | 91 | Joint STATUS REPORT *Proposing a Schedule to Govern Further Proceedings* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 04/16/2018) |
| 04/18/2018 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Status Conference held on 4/18/2018. Status Report due by 5/11/2018. Status Conference set for |

| | | 5/18/2018 at 1:30 PM in Courtroom 23A before Judge Ellen S. Huvelle. (Court Reporter Lisa Griffith) (gdf) (Entered: 04/18/2018) |
|---|---|---|
| 04/18/2018 | 92 | ORDER setting Status Conference for May 18, 2018, at 1:30 p.m. in Courtroom 23A. Joint Status Report due by May 11, 2018. See order for details. Signed by Judge Ellen S. Huvelle on April 18, 2018. (AG) (Entered: 04/18/2018) |
| 04/26/2018 | 93 | MOTION for Extension of Time to *File Status Report*, MOTION to Continue *Status Conference* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Field, Brian) (Entered: 04/26/2018) |
| 04/27/2018 | | MINUTE ORDER denying 93 Motion for Extension of Time to file Status Report; granting in part and denying in part 93 Motion to Continue Status Conference: Upon consideration of defendant's motion, plaintiffs' opposition thereto, and the entire record herein, it is hereby ORDERED that defendant's motion for an extension of time to file a status report is DENIED; and it is further ORDERED that defendant's motion to continue the Status Conference presently set for May 18, 2018, is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED that the Status Conference presently scheduled for May 18, 2018, is RESCHEDULED to May 17, 2018, at 11:00 a.m. in Courtroom 23A. Signed by Judge Ellen S. Huvelle on April 27, 2018. (AG) (Entered: 04/27/2018) |
| 05/11/2018 | 94 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 05/11/2018) |
| 05/17/2018 | 95 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 3–23–18; Page Numbers: 1–121. Date of Issuance:5–17–18. Court Reporter/Transcriber Lisa Griffith, Telephone number (202) 354–3247, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 6/7/2018. Redacted Transcript Deadline set for 6/17/2018. Release of Transcript Restriction set for 8/15/2018.(Griffith, Lisa) (Entered: 05/17/2018) |
| 05/17/2018 | 96 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 4–18–18; Page Numbers: 1–38. Date of Issuance:5–17–18. Court Reporter/Transcriber Lisa Griffith, Telephone number (202) 354–3247, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 6/7/2018. Redacted Transcript Deadline set for 6/17/2018. Release of Transcript Restriction set for 8/15/2018.(Griffith, Lisa) (Entered: 05/17/2018) |
| 05/17/2018 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle on 5/17/18 : Status Conference held. Order to be issued. Joint Status Report due by 7/13/18. Further Status Conference set for 7/18/18 at 12:00 PM in Courtroom 23A before Judge Ellen S. Huvelle. (Court Reporter: Lisa Griffith) (kk) (Entered: 05/17/2018) |
| 05/17/2018 | 97 | ORDER re discovery and future proceedings. Joint Status Report due by 7/13/2018. Status Conference set for 7/18/2018 at 12:00 PM in Courtroom 23A before Judge Ellen S. Huvelle. See order for details. Signed by Judge Ellen S. Huvelle on May 17, |

| | | |
|---|---|---|
| | | 2018. (AG) (Entered: 05/17/2018) |
| 07/13/2018 | 98 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 07/13/2018) |
| 07/13/2018 | 99 | MOTION for Certification for interlocutory appeal, MOTION to Stay by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Field, Brian). Added MOTION to Stay on 7/17/2018 (jf). (Entered: 07/13/2018) |
| 07/18/2018 | | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Status Conference held on 7/18/2018. Parties should submit a report by the C.O.B. on Friday, 7/20/18. (Court Reporter: Scott Wallace) (gdf) (Entered: 07/19/2018) |
| 07/20/2018 | 100 | NOTICE *Regarding Annual Courtroom Technology Expenditures* by UNITED STATES OF AMERICA (Field, Brian) (Entered: 07/20/2018) |
| 07/20/2018 | 101 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 07/20/2018) |
| 07/27/2018 | 102 | RESPONSE re 99 MOTION for Certification for interlocutory appeal MOTION to Stay filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 07/27/2018) |
| 08/02/2018 | 103 | REPLY to opposition to motion re 99 MOTION for Certification for interlocutory appeal MOTION to Stay filed by UNITED STATES OF AMERICA. (Field, Brian) (Entered: 08/02/2018) |
| 08/13/2018 | 104 | ORDER granting in part and denying in part 99 defendant's Motion for to Certify Orders for Interlocutory Appeal; amending Order filed on March 31, 2018, ECF No. 88 , to certify for interlocutory appeal for the reasons stated in an accompanying Memorandum Opinion, ECF No. 105 ; and granting 99 unopposed Motion to Stay. See order for details. Signed by Judge Ellen S. Huvelle on August 13, 2018. (AG) (Entered: 08/13/2018) |
| 08/13/2018 | 105 | MEMORANDUM OPINION accompanying August 13, 2018 Order, ECF No. 104 , re certification of March 31, 2018 Order, ECF No. 88 for interlocutory appeal. Signed by Judge Ellen S. Huvelle on August 13, 2018. (AG) (Entered: 08/13/2018) |
| 08/20/2018 | 106 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 7–18–18; Page Numbers: 1–21. Date of Issuance:7–18–18. Court Reporter/Transcriber Scott Wallace, Telephone number 202–354–3196, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 9/10/2018. Redacted Transcript Deadline set for 9/20/2018. Release of Transcript Restriction set for 11/18/2018.(Wallace, Scott) (Entered: 08/20/2018) |
| 08/23/2018 | | USCA for the Federal Circuit Case Number 18–154–CP (zrdj) (Entered: 08/23/2018) |
| 08/23/2018 | | USCA for the Federal Circuit Case Number 18–155–CP (zrdj) (Entered: 08/23/2018) |
| 10/16/2018 | | USCA for the Federal Circuit Case Number 19–1081–SJ (zrdj) (Entered: 10/18/2018) |
| 10/16/2018 | | USCA for the Federal Circuit Case Number 19–1083–SJ (zrdj) (Entered: 10/18/2018) |
| 11/28/2018 | 107 | NOTICE OF GRANT OF PERMISSION TO APPEAL UNDER 28 U.S.C. § 1292(B)by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. Filing fee $ 505, receipt |

| | | |
|---|---|---|
| | | number 0090–5811958. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 USCA Order)(Narwold, William) Modified on 11/29/2018 to correct docket event/text (jf). (Entered: 11/28/2018) |
| 11/29/2018 | 108 | Transmission of the Notice of Grant of Permission to Appeal Under 28 U.S.C. § 1292(B)and Docket Sheet to Federal Circuit. The appeal fee was paid this date re 107 Notice of Appeal to the Federal Circuit. (jf) (Entered: 11/29/2018) |
| 09/10/2020 | 109 | ENTERED IN ERROR.....Case randomly reassigned to Judge Christopher R. Cooper. Judge Ellen S. Huvelle is no longer assigned to the case. (rj) Modified on 9/11/2020 (rj). (Entered: 09/11/2020) |
| 09/10/2020 | 110 | Case directly reassigned to Judge Paul L. Friedman by consent. Judge Christopher R. Cooper is no longer assigned to the case. (rj) (Entered: 09/11/2020) |
| 09/28/2020 | 111 | MANDATE of USCA as to 107 Notice of Appeal to the Federal Circuit, filed by ALLIANCE FOR JUSTICE, NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER ; USCA Case Number 19–1081, 19–1083. (Attachments: # 1 USCA Judgment)(zrdj) (Entered: 09/29/2020) |
| 12/11/2020 | | MINUTE ORDER: In view of the recent decision by the United States Court of Appeals for the Federal Circuit remanding this case for further proceedings, it is ORDERED that the parties file a joint status report on or before December 23, 2020 addressing how they wish to proceed. Signed by Judge Paul L. Friedman on 12/11/2020. (lceg) (Entered: 12/11/2020) |
| 12/23/2020 | 112 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 12/23/2020) |
| 12/29/2020 | | MINUTE ORDER: In light of the parties joint status report 112 , this matter is STAYED until June 25, 2021. The parties shall file a joint status report on or before June 18, 2021 updating the Court on the status of any mediation. Signed by Judge Paul L. Friedman on 12/29/2020. (lceg) (Entered: 12/29/2020) |
| 12/29/2020 | | Set/Reset Deadlines: Status Report due by 6/18/2021. (tj) (Entered: 12/29/2020) |
| 06/02/2021 | 113 | NOTICE OF SUBSTITUTION OF COUNSEL by Robert Aaron Caplen on behalf of UNITED STATES OF AMERICA Substituting for attorney W. Mark Nebeker (Caplen, Robert) (Entered: 06/02/2021) |
| 06/03/2021 | 114 | NOTICE OF SUBSTITUTION OF COUNSEL by Jeremy S. Simon on behalf of UNITED STATES OF AMERICA Substituting for attorney Brian J. Field (Simon, Jeremy) (Entered: 06/03/2021) |
| 06/16/2021 | 115 | Joint STATUS REPORT by NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 06/16/2021) |
| 06/16/2021 | | MINUTE ORDER: In light of 115 the parties' joint status report, this matter is STAYED until September 23, 2021. The parties shall file a joint status report on or before September 16, 2021, updating the Court on the progress of their discussions. Signed by Judge Paul L. Friedman on June 16, 2021. (lcaf) (Entered: 06/16/2021) |
| 08/26/2021 | 116 | MOTION to Intervene, MOTION to Modify by MICHAEL T. PINES. (Attachments: # 1 Declaration redacted)(ztd);("Leave to file Granted" signed 8/26/2021 by Judge Paul L. Friedman) Modified on 10/1/2021 (znmw). Added MOTION for Sanctions on 10/1/2021 (znmw). (Entered: 08/27/2021) |
| 08/26/2021 | 117 | SEALED DOCUMENT (MOTION FOR INTERVENTION AND LEAVE TO FILE) filed by MICHAEL T. PINES. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration)(ztd);("Leave to File Granted – Document Under Seal" signed 8/26/2021 by Judge Paul L. Friedman) (Entered: 08/27/2021) |
| 08/27/2021 | | MINUTE ORDER: Counsel for the parties are directed to file responses to 116 Mr. Pines' motion to intervene on or before September 10, 2021. Signed by Judge Paul L. Friedman on August 27, 2021. (lcaf) (Entered: 08/27/2021) |

| 09/08/2021 | 118 | MOTION for Extension of Time to *File Response to Motion for Intervention, to Modify Class Certification Order, and for Sanctions* by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order)(Simon, Jeremy) Modified event on 9/9/2021 (ztd). (Entered: 09/08/2021) |
|---|---|---|
| 09/09/2021 | 119 | ORDER granting 118 defendant's motion for extension of time up to and including October 1, 2021 within which to respond to motion for intervention, to modify class certification order and for sanctions. Signed by Judge Paul L. Friedman on September 9, 2021. (MA) (Entered: 09/09/2021) |
| 09/09/2021 | 120 | Memorandum in opposition to re 118 MOTION for Extension of Time to File Response/Reply filed by MICHAEL T. PINES. (ztd) (Entered: 09/10/2021) |
| 09/09/2021 | 121 | NOTICE by MICHAEL T. PINES (ztd) (Entered: 09/10/2021) |
| 09/10/2021 | 122 | RESPONSE re 116 MOTION to Intervene MOTION for Leave to File filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/10/2021) |
| 09/14/2021 |  | MINUTE ORDER: The Court has reviewed 121 Mr. Pines' notice requesting reconsideration of 119 the Court's order granting the government an extension of time up to October 1, 2021 in which to respond to the motion to intervene. The Court concludes that Mr. Pines has not demonstrated that he will suffer prejudice as a result of the extension of time, and the government has established good cause for the extension of time. The Court therefore will not alter the deadline for the government's response to the motion to intervene. The government, in its response to the motion to intervene, is directed to also address the concerns about delay raised in 120 121 Mr. Pines' notices. Signed by Judge Paul L. Friedman on September 14, 2021. (lcaf) (Entered: 09/14/2021) |
| 09/15/2021 | 123 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 09/15/2021) |
| 09/17/2021 |  | MINUTE ORDER: In light of the parties' representations concerning settlement discussions in 123 the joint status report, the stay in this case is extended through November 22, 2021. The parties shall file a joint status report on or before November 15, 2021, notifying the Court of the progress of their discussions. Signed by Judge Paul L. Friedman on September 17, 2021. (lcaf) (Entered: 09/17/2021) |
| 10/01/2021 | 124 | RESPONSE re 116 MOTION to Intervene MOTION for Leave to File filed by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 10/01/2021) |
| 10/12/2021 |  | MINUTE ORDER: The Court has reviewed the parties' briefs 122 124 in opposition to 116 Mr. Pines's Motion for Intervention, Motion to Modify Class Certification Order, and for Sanctions. On or before October 26, 2021, the parties are directed to file supplemental briefs addressing (1) whether, to the parties' knowledge, Mr. Pines is in fact a member of the class in this case; (2) if so, whether Mr. Pines has opted out of the class, and noting any applicable deadlines for opting out; and (3) setting forth the legal standard for a motion for intervention by a class member. Signed by Judge Paul L. Friedman on October 12, 2021. (lcaa) (Entered: 10/12/2021) |
| 10/21/2021 | 125 | Emergency MOTION for Order to Reactivate PACER Account by MICHAEL T. PINES. "Let this be filed," signed by Judge Paul L. Friedman on 10/21/2021. (znmw) (Entered: 10/25/2021) |
| 10/26/2021 | 126 | SUPPLEMENTAL MEMORANDUM to re Order,, *(Supplemental Brief In Response To Court Order Dated October 12, 2021)* filed by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 10/26/2021) |
| 10/26/2021 | 127 | RESPONSE TO ORDER OF THE COURT re Order,, *REGARDING MICHAEL PINESS MOTION FOR INTERVENTION, TO MODIFY THE CLASS DEFINITION, AND FOR SANCTIONS* filed by NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 10/26/2021) |
| 11/01/2021 | 128 | RESPONSE re 125 MOTION for Order *(Defendant's Response to Michael Pines' Motion to Reactivate Pines' PACER Account)* filed by UNITED STATES OF |

| | | |
|---|---|---|
| | | AMERICA. (Simon, Jeremy) (Entered: 11/01/2021) |
| 11/15/2021 | 129 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 11/15/2021) |
| 11/15/2021 | 131 | PER CURIAM ORDER of USCA (certified copy) filed re: petitioner Michael T. Pines, granting motion for in forma pauperis; dismissing petition for writ of mandamus; dismissing as moot motion to reactivate Pacer account; USCA Case Number 21–5204. (znmw) (Entered: 11/16/2021) |
| 11/16/2021 | | MINUTE ORDER: In light of the parties' representations concerning settlement discussions in 129 the Joint Status Report, the stay in this case is extended through January 27, 2022. The parties shall file a further joint status report on or before January 20, 2022 notifying the Court of the progress of their settlement efforts. Signed by Judge Paul L. Friedman on November 16, 2021. (lcaa) (Entered: 11/16/2021) |
| 11/16/2021 | 130 | MEMORANDUM OPINION AND ORDER denying 116 Mr. Pines pro se Motion for Intervention and for Leave to File Complaint in Intervention, Motion to Modify Class Certification Order, and for Sanctions; denying as moot Mr. Pines Motion for Pretrial Conference and to Appoint a Special Master; denying as moot 125 Mr. Pines Emergency Motion for Order to Reactivate PACER Account; and granting Mr. Pines Application to Proceed in District Court Without Prepaying Fees or Costs. The Clerk of the Court is directed to file that application on the docket in this case. Signed by Judge Paul L. Friedman on November 16, 2021. (MA) (Entered: 11/16/2021) |
| 11/16/2021 | | Set/Reset Deadlines: Joint Status Report due by 1/20/2022 (hs) (Entered: 11/16/2021) |
| 12/16/2021 | 132 | NOTICE OF APPEAL as to 130 Memorandum & Opinion by MICHAEL T. PINES. Fee Status: IFP. Parties have been notified. (znmw) Modified fee status on 12/17/2021 (znmw). (Entered: 12/17/2021) |
| 12/17/2021 | 133 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The fee was not paid because it was filed in forma pauperis re 132 Notice of Appeal. (znmw) (Entered: 12/17/2021) |
| 12/27/2021 | | USCA Case Number 21–5291 for 132 Notice of Appeal filed by MICHAEL T. PINES. (zjf) (Entered: 12/27/2021) |
| 01/20/2022 | 134 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Narwold, William) (Entered: 01/20/2022) |
| 01/21/2022 | | MINUTE ORDER: In consideration of the joint status report 134 filed on January 20, 22, it is hereby ORDERED that the parties shall file a further joint status report on or before April 1, 2022, and that the stay of proceedings is extended through April 8, 2022. Signed by Judge Paul L. Friedman on January 21, 2022. (MA) (Entered: 01/21/2022) |
| 04/01/2022 | 135 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 04/01/2022) |
| 05/17/2022 | 136 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 05/17/2022) |
| 05/18/2022 | | MINUTE ORDER: In consideration of the parties' 135 joint status report and 136 joint status report, it is hereby ORDERED that the parties shall file a further joint status report on or before June 30, 2022, and that the stay of proceedings is extended from April 8, 2022 through July 12, 2022. Signed by Judge Paul L. Friedman on May 18, 2022. (lcjr) (Entered: 05/18/2022) |
| 06/29/2022 | 137 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 06/29/2022) |
| 06/30/2022 | | MINUTE ORDER: In consideration of the parties' 137 joint status report, it is hereby ORDERED that the parties shall file a further joint status report on or before August 12, 2022, and that the stay of proceedings is extended from July 12, 2022, to August 26, 2022. Signed by Judge Paul L. Friedman on June 30, 2022. (ATM) (Entered: |

| | | 06/30/2022) |
|---|---|---|
| 08/12/2022 | 138 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 08/12/2022) |
| 08/12/2022 | | MINUTE ORDER: In consideration of the parties' 138 joint status report, it is hereby ORDERED that the plaintiffs shall file a motion for an order approving settlement notice to the class, pursuant to Fed. R. Civ. P. 23(e)(1), on or before September 26, 2022, and that the stay of proceedings is extended from August 12, 2022 to September 26, 2022. Signed by Judge Paul L. Friedman on August 12, 2022. (lcjr) (Entered: 08/12/2022) |
| 09/22/2022 | 139 | Joint STATUS REPORT by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) (Entered: 09/22/2022) |
| 09/22/2022 | | MINUTE ORDER: In consideration of the parties' 139 joint status report, it is hereby ORDERED that the plaintiffs shall file a motion for an order approving settlement notice to the class, pursuant to Fed. R. Civ. P. 23(e)(1), on or before October 15, 2022, and that the stay of proceedings is extended from September 22, 2022 to October 15, 2022. Signed by Judge Paul L. Friedman on September 22, 2022. (ATM) (Entered: 09/22/2022) |
| 10/11/2022 | 140 | MOTION for Settlement *Preliminary Approval* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Text of Proposed Order Proposed Order)(Gupta, Deepak) (Entered: 10/11/2022) |
| 10/11/2022 | 141 | DECLARATION of *Deepak Gupta* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 140 MOTION for Settlement *Preliminary Approval* filed by ALLIANCE FOR JUSTICE, NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER. (Attachments: # 1 Exhibit Settlement Agreement, # 2 Exhibit Supplemental Settlement Agreement, # 3 Exhibit Proposed Notice Plan, # 4 Exhibit KCC (Administrator) Declaration)(Gupta, Deepak) (Entered: 10/11/2022) |
| 10/28/2022 | 142 | RESPONSE re 140 MOTION for Settlement *Preliminary Approval (Defendant's Response to Motion for Preliminary Approval of Class Settlement)* filed by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 10/28/2022) |
| 11/14/2022 | 143 | MANDATE of USCA as to 132 Notice of Appeal to DC Circuit Court filed by MICHAEL T. PINES ; USCA Case Number 21–5291. (Attachment: # 1 USCA Order September 28, 2022)(zjm) (Entered: 11/15/2022) |
| 11/28/2022 | | MINUTE ORDER: The parties shall appear for a status conference on December 6, 2022 at 9:00 a.m. via Zoom videoconference, the details of which will be provided the morning of or in advance of the hearing. Signed by Judge Paul L. Friedman on November 28, 2022. (lceh) (Entered: 11/28/2022) |
| 11/29/2022 | | Set/Reset Hearings: Status Conference set for 12/6/2022 at 9:00 AM before Judge Paul L. Friedman via zoom video. (tj) (Entered: 11/29/2022) |
| 12/06/2022 | | Minute Entry for proceedings held Via Videoconference (ZOOM) before Judge Paul L. Friedman: Status Conference held on 12/6/2022.Parties Updated The Court In Regards To The Current Posture Of This Matter. Parties Will Confer And Contact The Court's Chambers In Regards To the Next Status Conference Date. (Court Reporter TAMMY NESTOR.) (mac) (Entered: 12/06/2022) |
| 12/07/2022 | | MINUTE ORDER: The parties shall appear for a status conference on January 12, 2023 at 10:00 a.m. via Zoom videoconference, the details of which will be provided the morning of or in advance of the hearing. Signed by Judge Paul L. Friedman on December 7, 2022. (lceh) (Entered: 12/07/2022) |
| 12/12/2022 | | Set/Reset Hearings: Status Conference set for 1/12/2023 at 10:00 AM before Judge Paul L. Friedman via zoom video. (tj) (Entered: 12/12/2022) |

| | | |
|---|---|---|
| 01/11/2023 | <u>144</u> | STIPULATION *(Stipulated Supplement to Protective Order)* by UNITED STATES OF AMERICA. (Simon, Jeremy) (Entered: 01/11/2023) |
| 01/11/2023 | | MINUTE ORDER: The status conference scheduled for January 12, 2023 at 10:00 a.m. is hereby VACATED. The Court will reschedule the status conference for a later date. Signed by Judge Paul L. Friedman on January 11, 2023. (lceh) (Entered: 01/11/2023) |
| 01/13/2023 | <u>145</u> | TRANSCRIPT OF PROCEEDINGS before Judge Paul L. Friedman held on 12/6/22; Page Numbers: 1–10. Court Reporter/Transcriber Tammy Nestor, Telephone number 2023543127, Transcripts may be ordered by submitting the <u>Transcript Order Form</u> <br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript m ay be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br>**<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS:</span>** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br>Redaction Request due 2/3/2023. Redacted Transcript Deadline set for 2/13/2023. Release of Transcript Restriction set for 4/13/2023.(Nestor, Tammy) (Entered: 01/13/2023) |
| 01/17/2023 | | MINUTE ORDER: The parties shall appear for a status conference on February 22, 2023 at 11:00 a.m. via Zoom videoconference, the details of which will be provided the morning of or in advance of the hearing. Signed by Judge Paul L. Friedman on January 17, 2023. (lceh) (Entered: 01/17/2023) |
| 02/02/2023 | <u>146</u> | ORDER approving <u>144</u> Stipulated Supplement to <u>41</u> Protective Order. Signed by Judge Paul L. Friedman on February 2, 2023. (lceh) (Entered: 02/02/2023) |
| 02/22/2023 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Status Conference held on 2/22/2023. Parties inform the court of the status of this action with regard to settlement. Next Status Conference is set for 4/5/2023 at 10:00 AM in before Judge Paul L. Friedman via zoom video. (Court Reporter: Sara Wick) (tj) (Entered: 02/22/2023) |
| 03/29/2023 | <u>147</u> | NOTICE OF SUBSTITUTION OF COUNSEL by Derek S. Hammond on behalf of All Defendants Substituting for attorney Jeremy S. Simon and Robert A. Caplen (Hammond, Derek) (Entered: 03/29/2023) |
| 04/05/2023 | | Minute Entry for Zoom Status Conference proceeding held on 4/5/23 before Judge Paul L. Friedman. The parties updated the Court on the status of the case. A revised Motion for Settlement Preliminary Approval due within a week. Court Reporter: Stacy Heavenridge (zgf) (Entered: 04/05/2023) |
| 04/12/2023 | <u>148</u> | Amended MOTION for Settlement *Preliminary Approval* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # <u>1</u> Text of Proposed Order)(Gupta, Deepak) (Entered: 04/12/2023) |
| 04/12/2023 | <u>149</u> | DECLARATION of *Deepak Gupta* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re <u>148</u> Amended MOTION for Settlement *Preliminary Approval* filed by ALLIANCE FOR JUSTICE, NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER. (Attachments: # <u>1</u> Exhibit Settlement Agreement, # <u>2</u> Exhibit First Amendment to Settlement Agreement, # <u>3</u> Exhibit Second Amendment to Settlement Agreement, # <u>4</u> Exhibit Revised Notice Plan & Exhibits 1–6, # <u>5</u> Exhibit KCC Supplemental Declaration)(Gupta, Deepak) (Entered: 04/12/2023) |

| | | |
|---|---|---|
| 04/26/2023 | 150 | RESPONSE re 148 Amended MOTION for Settlement *Preliminary Approval* filed by UNITED STATES OF AMERICA. (Hammond, Derek) (Entered: 04/26/2023) |
| 04/27/2023 | 151 | REPLY to opposition to motion re 148 Amended MOTION for Settlement *Preliminary Approval Reply in Further Support of Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement [ECF No. 148]* filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Proposed Order)(Narwold, William) (Entered: 04/27/2023) |
| 05/08/2023 | 152 | NOTICE *of Submission of Revised Proposed Order and Revised Notice Documents* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM re 148 Motion for Settlement (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Revised Proposed Order)(Narwold, William) (Entered: 05/08/2023) |
| 05/08/2023 | 153 | ORDER granting plaintiffs' 148 Revised Motion for Preliminary Approval of Class Settlement. The Court shall convene a Settlement Hearing on October 12, 2023, at 10:00 a.m. in the Ceremonial Courtroom (Courtroom 20) at the United States District Court for the District of Columbia, 333 Constitution Avenue, NW, Washington, D.C. 20001. See Order for details. Signed by Judge Paul L. Friedman on May 8, 2023. (ATM) (Entered: 05/08/2023) |
| 05/10/2023 | | Set/Reset Hearings: Settlement Conference set for 10/12/2023 at 10:00 AM in Ceremonial Courtroom before Judge Paul L. Friedman. (tj) (Entered: 05/10/2023) |
| 06/07/2023 | 154 | MOTION to Amend/Correct *the Opt−Out Deadline* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Proposed Order)(Narwold, William) (Entered: 06/07/2023) |
| 06/07/2023 | 155 | ORDER granting 154 Motion to Amend the Opt−Out Deadline. See Order for details. Signed by Judge Paul L. Friedman on June 7, 2023. (lceh) (Entered: 06/07/2023) |
| 06/28/2023 | | Set/Reset Deadlines: Opt−Out deadline 8/20/2023. (tj) (Entered: 06/28/2023) |
| 07/03/2023 | 156 | NOTICE OF SUBSTITUTION OF COUNSEL by Brenda A. Gonzalez Horowitz on behalf of UNITED STATES OF AMERICA Substituting for attorney Derek S. Hammond (Gonzalez Horowitz, Brenda) (Entered: 07/03/2023) |
| 08/08/2023 | 157 | NOTICE of Appearance by John Troy on behalf of TROY LAW, PLLC (Troy, John) (Entered: 08/08/2023) |
| 08/28/2023 | 158 | MOTION for Settlement *Final Approval*, MOTION for Attorney Fees *, Costs, and Expenses* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Declaration of NVLSP, # 2 Declaration of NCLC, # 3 Declaration of AFJ, # 4 Declaration of Brian Fitzpatrick, # 5 Declaration of Deepak Gupta, # 6 Declaration of Meghan Oliver, # 7 Declaration of Gio Santiago, # 8 Text of Proposed Order)(Gupta, Deepak) (Entered: 08/28/2023) |
| 09/12/2023 | 159 | RESPONSE re 158 MOTION for Settlement *Final Approval* MOTION for Attorney Fees *, Costs, and Expenses* filed by UNITED STATES OF AMERICA. (Gonzalez Horowitz, Brenda) (Entered: 09/12/2023) |
| 09/21/2023 | | MINUTE ORDER: In light of the 153 Order granting plaintiffs' 148 Revised Motion for Preliminary Approval of Class Settlement, plaintiffs' original 140 Motion for Preliminary Approval of Class Settlement is hereby DENIED AS MOOT. Signed by Judge Paul L. Friedman on September 21, 2023. (lceh) (Entered: 09/21/2023) |
| 10/03/2023 | 160 | REPLY to opposition to motion re 158 MOTION for Settlement *Final Approval* MOTION for Attorney Fees *, Costs, and Expenses* filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Attachments: # 1 Declaration of Brian Fitzpatrick, # 2 Declaration of William Rubenstein, # 3 Declaration of Deepak Gupta, # 4 Declaration of Meghan Oliver, # 5 Declaration of Gio Santiago)(Gupta, Deepak) (Entered: 10/03/2023) |

| 10/04/2023 | 161 | ORDER changing Settlement Hearing location. The Settlement Hearing will be held on October 12, 2023, at 10:00 a.m. (Eastern Daylight Time) in Courtroom 29 in the William B. Bryant Annex to the United States District Court for the District of Columbia, 333 Constitution Avenue N.W., Washington, D.C. 20001. See Order for details. Signed by Judge Paul L. Friedman on October 4, 2023. (lcak) (Entered: 10/04/2023) |
|---|---|---|
| 10/04/2023 | 162 | ORDER setting Settlement Hearing procedures. See Order for details. Signed by Judge Paul L. Friedman on October 4, 2023. (lcak) (Entered: 10/04/2023) |
| 10/06/2023 | 163 | OBJECTION re 162 Order, Memorandum & Opinion filed by DON KOZICH. (Attachments: # 1 Exhibits, # 2 Certificate of Service)(zjm) (Entered: 10/11/2023) |
| 10/06/2023 | 164 | MOTION for Leave to Appear by Telephone or Zoom by DON KOZICH. (See Docket Entry 163 to view document) (zjm) (Entered: 10/11/2023) |
| 10/11/2023 | 165 | RESPONSE re 163 OBJECTION *Final Approval* MOTION for Attorney Fees *, Costs, and Expenses* filed by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM. (Gupta, Deepak) Modified on 10/12/2023 to correct event/ docket link (zjm). (Entered: 10/11/2023) |
| 10/11/2023 | | Set/Reset Hearings: Settlement Hearing set for 10/12/2023 at 10:00 AM in Courtroom 29A– In Person (Audio Line Available) before Judge Paul L. Friedman. (tj) (Entered: 10/11/2023) |
| 10/11/2023 | | MINUTE ORDER granting Don Kozich's 164 Motion to Appear Telephonically or by Zoom. Zoom details will be sent in advance of the Settlement Hearing. Signed by Judge Paul L. Friedman on October 11, 2023. (lcak) (Entered: 10/11/2023) |
| 10/11/2023 | 166 | NOTICE *of Filing of Objections* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit, # 2 Exhibit Greenspan Objection, # 3 Exhibit Jiggetts Objection, # 4 Exhibit Miller Objection, # 5 Exhibit Isaacson Objection, # 6 Exhibit Isaacson Written Statement)(Gupta, Deepak) (Entered: 10/11/2023) |
| 10/12/2023 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Settlement Hearing held on 10/12/2023. The court takes all filings and oral argument under consideration. (Court Reporter: Elizabeth Saint Loth.) (tj) (Entered: 10/12/2023) |
| 10/13/2023 | 167 | NOTICE of Appearance by Meghan S.B. Oliver on behalf of ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Oliver, Meghan) (Entered: 10/13/2023) |
| 10/13/2023 | 168 | NOTICE *Notice of Submission of Payment Notification Forms* by ALLIANCE FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, NATIONAL VETERANS LEGAL SERVICES PROGRAM (Attachments: # 1 Exhibit 1 – Account Holder Notification Form, # 2 Exhibit 2 –Payer Notification Form, # 3 Exhibit 3 – USO Payment Notification – Email Template, # 4 Exhibit 4 – Dispute Form)(Narwold, William) (Entered: 10/13/2023) |
| 03/20/2024 | 169 | OPINION granting Plaintiffs' 158 Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards. See Opinion for details. Signed by Judge Paul L. Friedman on March 20, 2024. (ATM) (Entered: 03/20/2024) |
| 03/20/2024 | 170 | FINAL JUDGMENT AND ORDER granting 158 Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards. See Final Judgment and Order for details. Signed by Judge Paul L. Friedman on March 20, 2024. (ATM) (Entered: 03/20/2024) |
| 04/18/2024 | 171 | ENTERED IN ERROR.....NOTICE OF APPEAL TO DC CIRCUIT COURT as to 170 Memorandum & Opinion,, Order, 169 Memorandum & Opinion by ERIC ALAN ISAACSON. Filing fee $ 605, receipt number 207171. Fee Status: Fee Paid. Parties have been notified. (zjm) Modified on 4/24/2024 (zjm). (Entered: 04/24/2024) |
| 04/24/2024 | 172 | ENTERED IN ERROR.....Transmission of the Notice of Appeal, Order Appealed ( Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 171 Notice of Appeal to DC Circuit Court. (zjm) Modified on 4/24/2024 (zjm). |

| | | |
|---|---|---|
| | | (Entered: 04/24/2024) |
| 04/24/2024 | <u>173</u> | NOTICE OF APPEAL to the Federal Circuit as to <u>170</u> Order, <u>169</u> Opinion by ERIC ALAN ISAACSON. Filing fee $ 605, receipt number 207171. Fee Status: Fee Paid. Parties have been notified. (zjm) (Entered: 04/24/2024) |
| 04/24/2024 | <u>174</u> | Transmission of the Notice of Appeal, Order Appealed ( Opinion), and Docket Sheet to Federal Circuit. The appeal fee was paid re <u>173</u> Notice of Appeal to the Federal Circuit. (zjm) (Entered: 04/24/2024) |
| 04/30/2024 | | USCA Case Number 24–1757 for <u>173</u> Notice of Appeal to the Federal Circuit filed by ERIC ALAN ISAACSON. (znmw) (Entered: 04/30/2024) |
| 05/15/2024 | <u>175</u> | TRANSCRIPT OF PROCEEDINGS, before Judge Paul L. Friedman, held on 10–12–2023; Page Numbers: 1 – 112. Date of Issuance: 5–15–2024. Court Reporter: Elizabeth SaintLoth, Telephone number: 202–354–3242. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br><span style="color:red">**NOTICE RE REDACTION OF TRANSCRIPTS:**</span> The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/15/2024. Release of Transcript Restriction set for 8/13/2024.(Saint–Loth, Elizabeth) (Entered: 05/15/2024) |
| 05/24/2024 | <u>176</u> | TRANSCRIPT OF STATUS CONFERENCE before Judge Paul L. Friedman held on 02/22/2023. Page Numbers: 1–13. Date of Issuance: 05/24/2024. Court Reporter: Sara Wick, telephone number 202–354–3284. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br><span style="color:red">**NOTICE RE REDACTION OF TRANSCRIPTS:**</span> The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/14/2024. Redacted Transcript Deadline set for 6/24/2024. Release of Transcript Restriction set for 8/22/2024.(Wick, Sara) (Entered: 05/24/2024) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, | |
|    1600 K Street, NW | |
|    Washington, DC 20006 | |
| | Case No. _____ |
| NATIONAL CONSUMER LAW CENTER, | |
|    1001 Connecticut Avenue, NW | |
|    Washington, DC 20036 | |
| | |
| ALLIANCE FOR JUSTICE, | CLASS ACTION COMPLAINT |
|    11 Dupont Circle, NW | |
|    Washington, DC 20036, | |
| | |
| for themselves and all others similarly situated, *Plaintiffs*, | |
| | |
|    v. | |
| | |
| UNITED STATES OF AMERICA, | |
|    950 Pennsylvania Avenue, NW | |
|    Washington, DC 20530, | |
|    *Defendant*. | |

**INTRODUCTION**

The Administrative Office of the U.S. Courts (AO) requires people to pay a fee to access records through its Public Access to Court Electronic Records system, commonly known as PACER. This action challenges the legality of those fees for one reason: the fees far exceed the cost of providing the records. In 2002, Congress recognized that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information," and sought to ensure that records would instead be "freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). To that end, the E-Government Act of 2002 authorizes PACER fees "as a charge for services rendered," but "only to the extent necessary" "to reimburse expenses in providing these services." 28 U.S.C. § 1913 note.

Despite this express statutory limitation, PACER fees have twice been increased since the Act's passage. This prompted the Act's sponsor to reproach the AO for continuing to charge fees "well higher than the cost of dissemination"—"against the requirement of the E-Government Act"—rather than doing what the Act demands: "create a payment system that is used only to recover the direct cost of distributing documents via PACER." Instead of complying with the law, the AO has used excess PACER fees to cover the costs of unrelated projects—ranging from audio systems to flat screens for jurors—at the expense of public access.

This noncompliance with the E-Government Act has inhibited public understanding of the courts and thwarted equal access to justice. And the AO has further compounded those harms by discouraging fee waivers, even for *pro se* litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who cannot afford to pay the fees.

The plaintiffs are three national nonprofit organizations that have downloaded public court records from PACER—downloads for which they agreed to incur fees, and were in fact charged fees, in excess of the cost of providing the records. Each download thus gave rise to a separate claim for illegal exaction in violation of the E-Government Act. On behalf of themselves and a nationwide class of those similarly situated, they ask this Court to determine that the PACER fee schedule violates the E-Government Act and to award them a full recovery of past overcharges.[1]

---

[1] This case is the first effort to challenge the PACER fee schedule by parties represented by counsel. A now-dismissed *pro se* action, *Greenspan v. Administrative Office*, No. 14-cv-2396 (N.D. Cal.), did seek to challenge the fees (among a slew of other claims), but it was dismissed on jurisdictional grounds inapplicable here. Last year, two other cases were filed alleging that PACER, in violation of its own terms and conditions, overcharges its users due to a systemic billing error concerning the display of some HTML docket sheets—an issue not raised in this case. *Fisher v. Duff*, 15-5944 (W.D. Wash.), and *Fisher v. United States*, 15-1575C (Ct. Fed. Cl.). Neither case challenges the PACER fee schedule itself, as this case does.

2

**PARTIES**

1.     Plaintiff National Veterans Legal Services Program (NVLSP) is a nonprofit organization founded in 1980 and based in Washington, D.C. It seeks to ensure that American veterans and active-duty personnel receive the full benefits to which they are entitled for disabilities resulting from their military service. Over the years, the organization has represented thousands of veterans in individual court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs. As a result, NVLSP has paid fees to the PACER Service Center to obtain public court records within the past six years.

2.     Plaintiff National Consumer Law Center (NCLC) is a national nonprofit organization that seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans. From its offices in Washington, D.C. and Boston, NCLC pursues these goals through policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates throughout the nation, and does so on a wide range of issues, including consumer protection, unfair and deceptive acts and practices, privacy rights, civil rights, and employment. Among other things, NCLC prepares and publishes 20 different treatise volumes on various consumer-law topics. In the course of its research, litigation, and other activities, NCLC has paid fees to the PACER Service Center to obtain public court records within the past six years.

3.     Plaintiff Alliance for Justice (AFJ) is a nonprofit corporation with its headquarters in Washington, D.C. and offices in Los Angeles, Oakland, and Dallas. It is a national association of over 100 public-interest organizations that focus on a broad array of issues—including civil rights, human rights, women's rights, children's rights, consumer rights, and ensuring legal representation for all Americans. Its members include AARP, the Center for Digital Democracy,

Appx0109

Consumers Union, the National Center on Poverty Law, and the National Legal Aid & Defender Association. On behalf of these groups and the public-interest community, AFJ works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans. AFJ has paid fees to the PACER Service Center to obtain public court records within the past six years.

4.     Defendant United States of America, through the AO and its PACER Service Center, administers PACER and charges fees for access to public court records.

<p align="center">JURISDICTION AND VENUE</p>

5.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a). Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000.

6.     The Court has personal jurisdiction over all parties to this lawsuit, and venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1402(a).

<p align="center">FACTUAL ALLEGATIONS</p>

<p align="center">*How PACER works: A brief overview*</p>

7.      PACER is a decentralized system of electronic judicial-records databases. It is managed by the AO, and each federal court maintains its own database. Any person may access records through PACER by registering for an online account and searching the applicable court database. Before accessing a particular record, however, each person must first agree to pay a specific fee, shown on the computer screen, which says: "To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser." The current fee is $.10 per page (with a maximum of $3.00 per record) and $2.40 per audio file. There is no charge for judicial opinions. Only if the person affirmatively agrees to pay the fee will a PDF of the record appear for downloading and printing. Unless that person obtains a fee waiver or

<p align="center">4</p>

incurs less than $15 in PACER charges in a given quarter, he or she will have a contractual obligation to pay the fees.

### *How we got here: Congress authorizes fees "to reimburse" PACER expenses.*

8.  This system stretches back to the early 1990s, when Congress began requiring the federal judiciary to charge "reasonable fees . . . for access to information available through automatic data processing equipment," including records available through what is now known as PACER. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the amount of the fees to the cost of providing access to the records: "All fees hereafter collected by the Judiciary . . . *as a charge for services rendered* shall be deposited as offsetting collections . . . *to reimburse expenses incurred in providing these services*." *Id.* (emphasis added). When the system moved from a dial-in phone service to an Internet portal in 1998, the AO set the PACER fees at $.07 per page (introducing in 2002 a maximum of $2.10 per request), without explaining how it arrived at these figures. *See* Chronology of the Federal Judiciary's Electronic Public Access (EPA) Program, http://1.usa.gov/1lrrM78.

9.  It soon became clear that these amounts were far more than necessary to recover the cost of providing access to electronic records. But rather than reduce the fees to cover only the costs incurred, the AO instead decided to use the extra revenue to subsidize other information-technology-related projects—a mission creep that only grew worse over time.

### *The AO begins using excess PACER fees to fund ECF.*

10.  The expansion began in 1997, when the judiciary started planning for a new e-filing system called ECF. The AO produced an internal report discussing how the system would be funded. It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." Admin. Office of the U.S. Courts, *Electronic Case Files in the*

*Federal Courts: A Preliminary Examination of Goals, Issues and the Road Ahead* (discussion draft), at 34 (Mar. 1997). Yet, just two pages later, the AO contemplated that the ECF system could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* at 36. The AO believed that these fees could lawfully be used not only to reimburse the cost of providing access to records through PACER, but also for technology-related purposes more broadly, including "electronic filings, electronic documents, use of the Internet, etc." *Id.* The AO did not offer any statutory authority to support this view.

### *Congress responds by passing the E-Government Act of 2002.*

11.    After the AO began charging PACER fees that exceeded the cost of providing access to records, Congress did not respond by relaxing the statutory requirement that the fees be limited to those costs. To the contrary, when Congress revisited the subject of PACER fees a few years later, it amended the statute to *strengthen* this requirement.

12.    Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information*

*available through automatic data processing equipment.* These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(**b**) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services*.

28 U.S.C. § 1913 note (emphasis added).

### *Even after the E-Government Act, the AO increases PACER fees.*

13.     Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Memorandum from Leonidas Ralph Mecham, Director of the Admin. Office, to Chief Judges and Clerks (Oct. 21, 2004). To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund—the account into which PACER fees and other funds (including appropriations) are deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. As before, the AO cited no statutory authority for this increase.

### *The AO finds new ways to spend extra PACER fees as they continue to grow.*

14.     Even expanding the conception of costs to cover ECF did not bring the PACER balance sheet to zero. Far from it: By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. Admin. Office, *Judiciary Information Technology Annual Report for Fiscal Year 2006*, at 8, http://bit.ly/1V5B9p2. But once again, the AO declined to reduce or eliminate PACER fees,

and instead chose to seek out new ways to spend the excess, using it to fund "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance." Quoted in Letter from Sen. Lieberman, Chair, Sen. Comm. on Homeland Security and Governmental Affairs, to Sens. Durban and Collins, Sen. Comm. on Appropriations (Mar. 25, 2010).

15.    Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She explained that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260, 110th Cong. 51 (2008). Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements in the courts' Salaries and Expenses account, thereby reducing our need for appropriated funds." *Id.*

### The E-Government Act's sponsor says that the AO is violating the law.

16.    In early 2009, Senator Joe Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the statute. He noted that the Act's "goal" was "to increase free public access to [judicial] records," yet "PACER [is] charging a higher rate" than it did when the law was passed. Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." He asked the Judicial Conference to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." Letter from Sen. Lieberman to Hon. Lee Rosenthal, Chair, Committee on Rules of Practice and Procedure, Judicial Conf. of the U.S. (Feb. 27, 2009).

17.     The Judicial Conference replied with a letter adhering to the AO's view that it is authorized to use PACER fees to recoup non-PACER-related costs. The letter did not identify any statutory language supporting this view, and acknowledged that the E-Government Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" Letter from Hon. Lee Rosenthal and James C. Duff, Judicial Conf. of the U.S., to Sen. Lieberman, Chair, Sen. Comm. on Homeland Security and Governmental Affairs (Mar. 26, 2009). The letter did not cite any statute that says otherwise. Yet it claimed that Congress, since 1991, has "expand[ed] the permissible use of the fee revenue to pay for other services"—even though Congress has actually done the opposite, enacting the E-Government Act in 2002 specifically to limit any fees to those "necessary" to "reimburse expenses incurred" in providing the records. 28 U.S.C. § 1913 note. The sole support the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said only that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." *Id.* The letter did not provide any support (even from a committee report) for using the fees to recover non-PACER-related expenses beyond ECF.

18.     Later, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." And it has done so for only one reason: so that the AO can fund "initiatives that are unrelated to providing public access via PACER." He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to recover the direct cost of distributing documents via PACER"—not other technology-related projects that "should be funded through direct appropriations." Letter from

Sen. Lieberman, Chair, Sen. Comm. on Homeland Security and Governmental Affairs, to Sens. Durban and Collins, Sen. Comm. on Appropriations (Mar. 25, 2010).

### *The AO again increases PACER fees.*

19.     Undeterred by Senator Lieberman's concerns, the AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the Case Management/Electronic Case Files system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." Admin. Office, *Electronic Public Access Program Summary* 1 (2012), http://1.usa.gov/1Ryavr0. But the AO believed that the fees comply with the E-Government Act because they "are only used for public access, and are not subject to being redirected for other purposes." *Id.* at 10. It did not elaborate.

20.     In a subsequent congressional budget summary, however, the judiciary reported that (of the money generated from "Electronic Public Access Receipts") it spent just $12.1 million on "public access services" in 2012, while spending more than $28.9 million on courtroom technology. *The Judiciary: Fiscal Year 2014 Congressional Budget Summary*, App. 2.4.

### *The AO continues to charge more in fees than the cost of PACER.*

21.     Since the 2012 fee increase, the AO has continued to collect large amounts in PACER fees and to use these fees to fund activities beyond providing access to records. In 2014, for example, the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems. Admin. Office of the U.S. Courts, *The Judiciary Fiscal Year 2016 Congressional Budget Summary* 12.2 (Feb. 2015). When questioned during a House appropriations hearing that same year, representatives from the judiciary acknowledged that "the Judiciary's Electronic

Appx0116

Public Access Program encompasses more than just offering real-time access to electronic records." *Financial Services and General Government Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 113th Cong. 152 (2014).

22.     Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. For example, Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitors. . . . [There have also been] audio enhancements. . . . We spent a lot of money on audio so the people could hear what's going on. . . . This all ties together and it's funded through these [PACER] fees." Hon. William Smith, Panel Discussion on Public Electronic Access to Federal Court Records at the William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), bit.ly/1PmR0LJ.

### *The AO's policy of limiting fee waivers and targeting those who cannot pay the fees*

23.     The judiciary's decision to increase PACER fees to fund these (otherwise unobjectionable) expenses has created substantial barriers to accessing public records—for litigants, journalists, researchers, and others. The AO has compounded these barriers through a policy of discouraging fee waivers, even for journalists, *pro se* litigants, and nonprofits; by prohibiting the transfer of information, even for free, by those who manage to obtain waivers; and by hiring private collection lawyers to sue individuals who cannot pay the fees.

24.     Two examples help illustrate the point: In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Public Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-

checking software and hardware to help federal judges identify situations requiring their recusal,'" and "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes accompanying the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media" or anyone not in one of the specific groups listed. *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

25.      The other example is from five years earlier, when private collection lawyers representing the PACER Service Center brought suit in the name of the United States against "a single mother of two minor children" who had "no assets whatsoever," claiming that she owed $30,330.80 in PACER fees. *See* Compl. in *United States v. Deanna Manning*, No. 07-cv-04595, filed July 3, 2007 (C.D. Cal.); Answer, Dkt. 12, filed Oct. 16, 2007. Representing herself, the woman "admit[ted] to downloading and printing a small amount [of] material from PACER, no more than $80 worth," which "would be 1,000 pages, actually much more than she remembers printing." Answer, Dkt. 12, at 1. But she explained that "[t]here is no way she would have had enough paper and ink to print 380,000 pages as the Complaint alleges," so "[t]his must be a huge mistake." *Id.* She concluded: "Our great and just government would have better luck squeezing blood from a lemon than trying to get even a single dollar from this defendant who can barely scrape up enough money to feed and clothe her children." *Id.* at 2. Only then did the government dismiss the complaint.

## CLASS ACTION ALLEGATIONS

26.      The plaintiffs bring this class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

27.      The plaintiffs seek certification of the following class:

*All individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government.*

28.     The class is so numerous that joinder of all members is impractical. While the exact number and identity of class members is unknown to the plaintiffs at this time and can only be ascertained through appropriate discovery, the plaintiffs believe that the number of class members is approximately 2,000,000. The precise number and identification of the class members will be ascertainable from the defendant's records.

29.     There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

(i)     Are the fees imposed for PACER access excessive in relation to the cost of providing the access—that is, are the fees higher than "necessary" to "reimburse expenses incurred in providing the[] services" for which they are "charge[d]"? 28 U.S.C. § 1913 note.

(ii)     What is the measure of damages for the excessive fees charged?

30.     The plaintiffs' claims are typical of the claims of the class because they, like the class members, paid the uniform fees required by the defendant in order to access PACER.

31.     The plaintiffs will fairly and adequately protect the interests of the class because each of them has paid PACER fees during the class period, their interests do not conflict with the interests of the class, and they have obtained counsel experienced in litigating class actions and matters involving similar or the same questions of law.

32.     The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the plaintiffs' claims. Joinder of all members is impracticable. Furthermore, because the injury suffered by the individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIM FOR RELIEF: ILLEGAL EXACTION

33.     The plaintiffs bring this case under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–74 (Fed. Cir. 1996) (allowing an illegal-exaction claim for excess user fees). Courts have long recognized such an "illegal exaction" claim—a claim that money was "improperly paid, exacted, or taken from the claimant" in violation of a statute, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)—regardless of whether the statute itself creates an express cause of action. As one court has explained, "the lack of express money-mandating language in the statute does not defeat [an] illegal exaction claim" because "otherwise, the Government could assess any fee or payment it wants from a plaintiff acting under the color of a statute that does not expressly require compensation to the plaintiff for wrongful or illegal action by the Government, and the plaintiff would have no recourse." *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015).

34.     Here, each download of a public record for which the plaintiffs agreed to incur a fee, and were in fact charged a fee, gives rise to a separate illegal-exaction claim. The fees charged by the defendant for the use of PACER exceeded the amount that could be lawfully charged, under the E-Government Act of 2002 and other applicable statutory authority, because they did not reasonably reflect the cost to the government of the specific service for which they are charged. The plaintiffs are entitled to the return or refund of the excessive PACER fees illegally exacted or otherwise unlawfully charged.

## PRAYER FOR RELIEF

The plaintiffs request that the Court:

a.   Certify this action as a class action under Federal Rule of Civil Procedure 23(b)(3);

b. Declare that the fees charged for access to records through PACER are excessive;

c. Award monetary relief for any PACER fees collected by the defendant in the past six years that are found to exceed the amount authorized by law;

d. Award the plaintiffs their costs, expenses, and attorney fees under 28 U.S.C. § 2412 and/or from a common fund; and

e. Award all other appropriate relief.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

MICHAEL T. KIRKPATRICK (D.C. Bar No. 486293)
**INSTITUTE FOR PUBLIC REPRESENTATION**
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
*michael.kirkpatrick@law.georgetown.edu*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
*bnarwold@motleyrice.com*

April 21, 2016                      *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, v. UNITED STATES OF AMERICA, *Defendant*. | Case No. 16-745-ESH |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This case challenges the legality of fees charged to access records through the Public Access to Court Electronic Records system, commonly known as PACER. The theory of liability is that these fees—set at the same rate across the judiciary—far exceed the cost of providing the records, and thus violate the E-Government Act, which authorizes fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note. As the Act's sponsor put it: PACER fees are now "well higher than the cost of dissemination" and hence "against the requirement of the E-Government Act," which allows fees "only to recover the direct cost of distributing documents via PACER"—not unrelated projects that "should be funded through direct appropriations." Taylor Decl., Ex. B.

Because this theory of liability applies equally to everyone who has paid a PACER fee within the six-year limitations period, the plaintiffs move to certify the case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class: "All individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government."

## BACKGROUND

PACER is a system that provides online access to federal judicial records and is managed by the Administrative Office of the U.S. Courts (or AO). The AO has designed the system so that, before accessing a particular record, a person must first agree to pay a specific fee, shown on the computer screen, which says: "To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser." Here is an example of what the person sees on the screen:



The current PACER fee is set at $.10 per page (with a maximum of $3.00 per record) and $2.40 per audio file. Only if the person affirmatively agrees to pay the fee will a PDF of the record appear. Unless that person obtains a fee waiver or incurs less than $15 in PACER charges in a given quarter, he or she will incur an obligation to pay the fees.

Each of the named plaintiffs here—the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice—has repeatedly incurred fees to access court records through the PACER system.

***Congress authorizes fees "to reimburse" PACER expenses.*** This system stretches back to the early 1990s, when Congress began requiring the judiciary to charge "reasonable fees" for access to records. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the fees to the cost of providing the records: "All fees hereafter collected by the Judiciary . . . *as a charge for services rendered*

2

shall be deposited as offsetting collections . . . *to reimburse expenses incurred in providing these services*." *Id.* (emphasis added). The AO set the fees at $.07 per page in 1998. *See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program, http://1.usa.gov/1lrrM78.

It soon became clear that this amount was far more than necessary to recover the cost of providing access to records. But rather than reduce the rate to cover only the costs incurred, the AO instead used the extra revenue to subsidize other information-technology-related projects.

***The AO begins using excess PACER fees to fund ECF.*** The expansion began in 1997, when the judiciary started planning for a new e-filing system called ECF. The AO produced an internal report discussing how the system would be funded. It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." AO, *Electronic Case Files in the Federal Courts: A Preliminary Examination of Goals, Issues and the Road Ahead* (discussion draft), at 34 (Mar. 1997), http://bit.ly/1Y3zrX0. Yet, just two pages later, the AO contemplated that ECF could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* at 36. The AO did not offer any statutory authority to support this view.

***Congress responds by passing the E-Government Act of 2002.*** When Congress revisited the subject of PACER fees a few years later, it did not relax the requirement that the fees be limited to the cost of providing access to records. To the contrary, it amended the statute to *strengthen* this requirement. Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this

information is freely available to the greatest extent possible." S. Rep. No. 107–174, 107th Cong., 2d Sess. 23 (2002).

The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

> **(b)** The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services*.

28 U.S.C. § 1913 note (emphasis added).

***Even after the E-Government Act, the AO increases PACER fees.*** Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Memorandum from AO Director Leonidas Ralph Mecham to Chief Judges and Clerks (Oct. 21, 2004). To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund—the account into which PACER fees and other funds (including appropriations) are

Appx0125

deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. *Id.* As before, the AO cited no statutory authority for this increase.

**The AO finds new ways to spend extra PACER fees as they keep growing.** By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. AO, *Judiciary Information Technology Annual Report for Fiscal Year 2006*, at 8, http://bit.ly/1V5B9p2. But once again, the AO declined to reduce or eliminate PACER fees. It instead sought out new ways to spend the excess, using it to cover "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance"—services that relate to those provided by PACER only in the sense that they too concern technology and the courts. Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She admitted that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260, 110th Cong. 51 (2008). Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements . . . , thereby reducing our need for appropriated funds." *Id.*

**The E-Government Act's sponsor says that the AO is violating the law.** In early 2009, Senator Joe Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the law. Taylor Decl., Ex. B (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)). He noted that the Act's "goal" was "to increase free public access to [judicial] records," yet "PACER [is] charging a higher rate" than it did when the law was passed.

*Id.* Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* Invoking the key statutory text, he asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

The Judicial Conference replied with a letter defending the AO's position that it may use PACER fees to recoup non-PACER-related costs. The letter acknowledged that the Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" Letter from Hon. Lee Rosenthal and James C. Duff to Sen. Lieberman (Mar. 26, 2009). Yet the letter claimed that Congress has "expand[ed] the permissible use of the fee revenue to pay for other services," *id.*—even though it actually did the opposite, enacting the E-Government Act specifically to limit any fees to those "necessary" to "reimburse expenses incurred" in providing the records. 28 U.S.C. § 1913 note. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Letter from Rosenthal and Duff to Sen. Lieberman. The letter did not provide any support (even from a committee report) for using fees to recover non-PACER-related expenses beyond ECF.

Later, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins). "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." *Id.* It has done so because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to

6

recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

**The AO again increases PACER fees.** The AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." AO, *Electronic Public Access Program Summary* 1 (2012), http://1.usa.gov/1Ryavr0. But the AO believed that the fees comply with the E-Government Act because they "are only used for public access." *Id.* at 10. It did not elaborate.

Subsequent congressional budget summaries, however, indicate that the PACER revenue at that time was more than enough to cover the costs of providing the service. The judiciary reported that in 2012, of the money generated from "Electronic Public Access Receipts," it spent just $12.1 million on "public access services," while spending more than $28.9 million on courtroom technology. *The Judiciary: Fiscal Year 2014 Congressional Budget Summary*, App. 2.4.

**The AO continues to charge fees that exceed the cost of PACER.** Since the 2012 fee increase, the AO has continued to collect large amounts in PACER fees and to use these fees to fund activities beyond providing access to records. In 2014, for example, the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes, like courtroom technology, websites for jurors, and bankruptcy-notification systems. AO, *The Judiciary Fiscal Year 2016 Congressional Budget Summary* 12.2, App. 2.4 (Feb. 2015).

The chart on the following page—based entirely on data from the published version of the judiciary's annual budget, *see* Taylor Decl. ¶ 3—illustrates the rapid growth in PACER revenue over the past two decades, a period when "technological innovations," including

exponentially cheaper data storage, "should have led to reduced costs." Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins).



For much of this period, the judiciary projected that the annual cost of running the program would remain well under $30 million. AO, *Long Range Plan for Information Technology in the Federal Judiciary: Fiscal Year 2009 Update* 16 (2009).

Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. When questioned during a 2014 House appropriations hearing, representatives from the judiciary admitted that the "Electronic Public Access Program encompasses more than just offering real-time access to electronic records." *Fin. Servs. and General Gov. Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 113th Cong. 152 (2014).[1] And Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding

---

[1] As a percentage of the judiciary's total budget, however, PACER fees are quite small. Based on the judiciary's budget request of $7.533 billion for fiscal year 2016, PACER fees make up less than 2% of the total budget—meaning that the excess fees are a fraction of a fraction. Matthew E. Glassman, *Judiciary Appropriations FY2016*, at 1 (June 18, 2015), http://bit.ly/1QF8enE.

Appx0129

courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitor. . . . [There have also been] audio enhancements. . . . This all ties together and it's funded through these [PACER] fees." Panel Discussion, William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), bit.ly/1PmR0LJ.

## ARGUMENT

### I.    This Court has jurisdiction over the claims of all class members.

Before certifying the class, the Court must first assure itself that it has subject-matter jurisdiction over the claims of all class members. The basis for jurisdiction here is the Little Tucker Act, which waives the federal government's sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1348 (Fed. Cir. 2005) (quoting *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996)). Courts have long recognized such illegal-exaction claims—claims that money was "improperly paid, exacted, or taken from the claimant" in violation of a statute, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)—regardless of whether the statute itself creates an express cause of action.

By its terms, the Little Tucker Act grants district courts "original jurisdiction, concurrent with the United States Court of Federal Claims," over any non-tort, non-tax "claim against the United States, not exceeding $10,000," 28 U.S.C. § 1346(a)(2), while vesting exclusive appellate jurisdiction in the Federal Circuit, *id.* § 1295(a). This means that the Federal Circuit's interpretation of the Act is binding on district courts. And the Federal Circuit has made clear that, in a class action, "there will be no aggregation of claims" for purposes of assessing the $10,000 limit. *Chula Vista City Sch. Dist. v. Bennett*, 824 F.2d 1573, 1579 (Fed. Cir. 1987).

9

The Federal Circuit has also made clear that the Little Tucker Act does not require that each plaintiff's total *recovery* be $10,000 or less. Quite the contrary: Federal Circuit precedent holds that even a single plaintiff seeking millions of dollars may bring suit in federal district court under the Little Tucker Act if the total amount sought represents the accumulation of many separate transactions, each of which gives rise to a separate claim that does not itself exceed $10,000. *See Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 797 (Fed. Cir. 1993).

In the 1990s, airline companies brought two lawsuits in this district seeking to recover what they claimed were illegal exactions by the government. In one case, the General Services Administration (or GSA) deducted roughly $100 million from future payments it owed the airlines after determining that it had overpaid for plane tickets. *Alaska Airlines v. Austin*, 801 F. Supp. 760 (D.D.C. 1992). In the other, GSA "withheld future payments to the airlines to offset" the costs of tickets that were never used. *Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 74 (D.D.C. 1991). The airlines claimed that GSA was "recouping alleged overcharges from them in violation of the law," and sought "return of the funds" that had "been assessed against them unlawfully." *Alaska Airlines*, 801 F. Supp. at 761.

In both cases, the court recognized that each airline was seeking well over $10,000, but determined that the total amount each plaintiff sought "represents the accumulation of disputes over alleged overcharges on thousands of individual tickets." *Id.* at 762. Thus, the court held that the asserted overcharge for each individual ticket constituted its own claim under the Little Tucker Act—even though the airlines paid numerous overcharges at a time through GSA's withholdings, and even though each case presented one "straightforward" legal question. *Id.* Because "[e]ach contested overcharge is based on a single ticket and is for less than $10,000," the district court had jurisdiction. *Id.*; *see Am. Airlines*, 778 F. Supp. at 76. The court explained that "[t]he Government cannot escape [Little Tucker Act] jurisdiction by taking a lump sum offset

10

that totals over $10,000 and then alleging that the claims should be aggregated." *Id.* On appeal, the Federal Circuit agreed, holding that "the district court had concurrent jurisdiction with the Court of Federal Claims." *Alaska Airlines*, 8 F.3d at 797.

Under this binding precedent, each transaction to access a record through PACER in exchange for a certain fee—a fee alleged to be excessive, in violation of the E-Government Act— constitutes a separate claim under the Little Tucker Act. As a result, each class member has multiple individual illegal-exaction claims, none of which exceeds $10,000. Even if a very small percentage of class members might ultimately receive more than $10,000, that amount "represents the accumulation of disputes over alleged overcharges on thousands of individual [transactions]"; it is no bar to this Court's jurisdiction. *Alaska Airlines*, 801 F. Supp. at 762.

Nor does the Little Tucker Act's venue provision pose a barrier to certifying the class here. Although it requires that individual actions be brought "in the judicial district where the plaintiff resides," 28 U.S.C. § 1402(a)(1), it does not alter the general rule in class actions that absent class members "need not satisfy the applicable venue requirements," *Briggs v. Army & Air Force Exch. Serv.*, No. 07–05760, 2009 WL 113387, *6 (N.D. Cal. 2009); *see also Whittington v. United States*, 240 F.R.D. 344, 349 (S.D. Tex. 2006); *Bywaters v. United States*, 196 F.R.D. 458, 463–64 (E.D. Tex. 2000).

Were the law otherwise, the Little Tucker Act would preclude nationwide class actions, instead requiring nearly a hundred mini class actions, one in each federal district, to remedy a widespread, uniform wrong committed by the federal government. That extreme result "simply is not to be found in the text of the Act itself," and "the venue provision would be an awkward vehicle by which to effectuate any anti-class policy." *Briggs*, 2009 WL 113387, at *7. This Court thus has the authority to certify the class if it meets the requirements of Rule 23.

## II.        This Court should certify the class under Rule 23.

Class certification is appropriate where, as here, the plaintiffs can satisfy the requirements of both Rule 23(a) and (b). Rule 23(a) requires a showing that (1) the class is sufficiently numerous to make joinder of all class members impracticable, (2) there are common factual or legal issues, (3) the named plaintiffs' claims are typical of the class, and (4) the named plaintiffs will fairly and adequately protect the interests of the class.

Rule 23(b) requires one of three things. Under subsection (b)(1), the plaintiffs may show that prosecuting separate actions would create a risk of inconsistent results, such as where the defendant is "obliged by law to treat the members of the class alike." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Under (b)(2), the plaintiffs may show that the defendant "has acted or refused to act on grounds that apply generally to the class," such that declaratory or injunctive relief is appropriate. And under (b)(3), the plaintiffs may show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The class in this case satisfies both (b)(1) and (b)(3).

### A.        This case meets Rule 23(a)'s requirements.

#### 1.        The class is sufficiently numerous.

To begin, this case satisfies Rule 23(a)(1)'s requirement that the class be "so numerous that joinder of all members is impracticable." "Courts in this District have generally found that the numerosity requirement is satisfied and that joinder is impracticable where a proposed class has at least forty members," *Cohen v. Warner Chilcott Public Ltd. Co.*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007), and a plaintiff need not "provide an exact number of putative class members in order to satisfy the numerosity requirement," *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998); *see Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 305–06 (D.D.C. 2007)

12

(certifying class of 30 people). Although the plaintiffs do not have access to the defendant's records, and so cannot yet know exactly how many people have paid PACER fees in the past six years, they estimate that the class contains at least several hundred thousand class members. According to documents prepared by the judiciary and submitted to Congress, there are nearly two million PACER accounts, "approximately one-third" of which "are active in a given year." *The Judiciary: Fiscal Year 2016 Congressional Budget Justification*, App. 2.1. Making even the most generous assumptions about how many of these people receive fee waivers or have never incurred more than $15 in charges in a given quarter (and thus have never paid a fee), there can be no serious dispute that this class satisfies Rule 23(a)(1).

### 2. The legal and factual issues are common to the class.

This case likewise easily satisfies Rule 23(a)(2)'s requirement of "questions of law or fact common to the class." This requirement is met if "[e]ven a single common question" exists, *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) (Huvelle, J.), so long as "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, the two most important questions in the case are common: (1) Are the fees imposed for PACER access excessive in relation to the cost of providing the access—that is, are the fees higher than "necessary" to "reimburse expenses incurred in providing the[] services" for which they are "charge[d]"? 28 U.S.C. § 1913 note; and (2) what is the measure of damages for the excessive fees charged? *See* Compl. ¶ 29. These questions "will generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim and the claims of the class as a whole." *Thorpe*, 303 F.R.D. at 146–47.

13

### 3.    The named plaintiffs' claims are typical of the class.

This case also meets Rule 23(a)(3)'s requirement that the named plaintiffs' claims be typical of the class's claims, a requirement that is "liberally construed." *Bynum v. District of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003). When "the named plaintiffs' claims are based on the same legal theory as the claims of the other class members, it will suffice to show that the named plaintiffs' injuries arise from the same course of conduct that gives rise to the other class members' claims." *Id.* at 35. That is the case here. The named plaintiffs' claims are typical of the class because they arise from the same course of conduct by the United States (imposing a uniform PACER fee schedule that is higher than necessary to reimburse the cost of providing the service) and are based on the same legal theory (challenging the fees as excessive, in violation of the E-Government Act). *See* Compl. ¶ 30.

### 4.    The named plaintiffs are adequate representatives.

Rule 23(a)(4) asks whether the named plaintiffs "will fairly and adequately protect the interests of the class," an inquiry that "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. It has two elements: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997); *Thorpe*, 303 F.R.D. at 150. Both are met here.

***a. The named plaintiffs.*** The plaintiffs are three of the nation's leading nonprofit legal advocacy organizations: the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice. Compl. ¶¶ 1–3. They all care deeply about "preserv[ing] unfettered access to the courts," *id.* ¶ 3, and brought this suit to vindicate

Congress's goal in passing the E-Government Act: to ensure that court records are "freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002).

Since 1980, the National Veterans Legal Services Program has represented thousands of veterans in individual court cases, and has worked to ensure that our nation's 25 million veterans and active-duty personnel receive all benefits to which they are entitled for disabilities resulting from their military service. Compl. ¶ 1. Excessive PACER fees impede this mission in numerous ways—including by making it difficult to analyze patterns in veterans' cases, and thus to detect pervasive problems and delays. The organization is concerned that the fees have not only hindered individual veterans' ability to handle their own cases, but have also "inhibited public understanding of the courts and thwarted equal access to justice." *Id.* at 2.

The excessive fees likewise impede access to justice for low-income consumers—like those waging legal battles to try to save their homes from foreclosure—which is why the National Consumer Law Center also brought this suit. The Law Center conducts a wide variety of research, litigation, and other activities on behalf of elderly and low-income consumers, and publishes 20 different treatises that comprehensively report on the development of consumer law in the courts. *Id.* ¶ 2. The organization has incurred PACER fees in carrying out all of these activities, *id.*, and is also concerned about the many *pro se* consumers whose interaction with the judicial system has been made far more difficult by the PACER fee structure.

Finally, the Alliance for Justice is a national association of over 100 public-interest organizations—such as the National Center on Poverty Law and the National Legal Aid & Defender Association—nearly all of whom are affected by excess PACER fees. *Id.* ¶ 3. These organizations also strongly support the judiciary's efforts to obtain whatever resources it needs. They do not aim to deplete the judiciary's budget, nor do they object to the judiciary's quest for

15

increased funding. All they object to is using excess PACER fees to fund unrelated projects that "should be funded through direct appropriations." Letter from Sen. Lieberman to Rosenthal.

Because excess PACER fees are unlawful and significantly impede public access (and yet make up only a fraction of a fraction of the judiciary's budget, as explained in footnote 1), the named plaintiffs will vigorously prosecute this case on behalf of themselves and all absent class members. Each named plaintiff has paid numerous PACER fees in the past six years, and each has the same interests as the unnamed class members. Compl. ¶ 31. And the relief the plaintiffs are seeking—a full refund of excess fees charged within the limitations period, plus a declaration that the fees violate the E-Government Act—would plainly "be desired by the rest of the class." *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 446 (D.D.C. 2002) (Huvelle, J.).

**b. Class counsel.** Proposed co-lead class counsel are Gupta Wessler PLLC, a national boutique based in Washington that specializes in Supreme Court, appellate, and complex litigation; and Motley Rice LLC, one of the nation's largest and most well-respected class-action firms. The firms will also consult with two lawyers with relevant expertise: Michael Kirkpatrick of Georgetown Law's Institute for Public Representation and Brian Wolfman of Stanford Law School. Together, these law firms and lawyers have a wealth of relevant experience.

One of the two co-lead firms, Gupta Wessler, has distinctive experience with class actions against the federal government. Two of its lawyers, Deepak Gupta and Jonathan Taylor, represent a certified class of federal bankruptcy judges and their beneficiaries in a suit concerning judicial compensation, recently obtaining a judgment of more than $56 million. *See* Gupta Decl. ¶¶ 1, 4–8; *Houser v. United States*, No. 13-607 (Fed. Cl.). Mr. Gupta and Mr. Taylor both received the President's Award from the National Conference of Bankruptcy Judges for their work on the case. Gupta Decl. ¶ 8. Just over a month ago, the *American Lawyer* reported on the firm's work, observing that "[i]t's hard to imagine a higher compliment than being hired to represent federal

judges" in this important class-action litigation. *Id.* Mr. Gupta and Mr. Taylor also currently represent (along with Motley Rice) a certified class of tax-return preparers seeking the recovery of unlawful fees paid to the IRS. *See id.* ¶¶ 1, 9–10; *Steele v. United States*, No. 14-1523 (D.D.C.). And Mr. Gupta, who worked at the Consumer Financial Protection Bureau and Public Citizen Litigation Group before founding the firm, has successfully represented a certified class of veterans challenging the government's illegal withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering about $7.4 million in illegal charges. Gupta Decl. ¶¶ 1, 13–16.

The other co-lead firm, Motley Rice, regularly handles class actions and complex litigation in jurisdictions across the U.S., and currently serves as lead or co-lead counsel in over 25 class actions and as a member of the plaintiffs' steering committee in numerous MDL actions. Narwold Decl. ¶ 3. William Narwold, chair of the firm's class-action practice, will play a lead role in prosecuting this case and is also currently class counsel in *Steele v. United States*, the tax-return-preparer case mentioned above. *Id.* ¶¶ 1–3, 6. His colleague Joseph Rice, one of the top class-action and mass-tort-settlement negotiators in American history, will play a lead role in any settlement negotiations. *Id.* ¶ 1. Under their leadership, Motley Rice has secured some of the largest verdicts and settlements in history, in cases involving enormously complex matters. The firm is a member of the plaintiffs' steering committee in the *BP Deepwater Horizon Oil Spill Litigation*, where Mr. Rice served as one of the two lead negotiators in reaching settlements. One of those settlements, estimated to pay out between $7.8 billion and $18 billion to class members, is the largest civil class-action settlement in U.S. history. *Id.* ¶ 6. The firm also served as co-lead trial counsel on behalf of ten California cities and counties against companies that had concealed the dangers of lead paint. In 2014, after a lengthy bench trial, the court entered judgment in favor of the cities and counties for $1.15 billion. *Id.*

**B.      This case meets Rule 23(b)'s requirements.**

**1.      This case satisfies Rule 23(b)(1).**

Rule 23(b)(1) permits class certification if prosecuting separate actions by individual class members would risk "inconsistent or varying adjudications" establishing "incompatible standards of conduct" for the defendant. Because this case seeks equitable relief in addition to return of the excessive PACER fees already paid, the risk of inconsistent results is acute. If there were separate actions for equitable relief, the AO could be "forced into a 'conflicted position,'" Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356, 388 (1967), potentially subjecting it to "incompatible court orders," 2 William B. Rubenstein, *Newberg on Class Actions* § 4.2 (5th ed. 2015). That makes this case the rare one in which a class action is "not only preferable but essential." Rubenstein, *Newberg on Class Actions* § 4.2; *see also* Fed. R. Civ. P. 23(b)(1), 1966 advisory committee note (listing as examples cases against the government "to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment"). Under these circumstances, Rule 23(b)(1) is satisfied.

**2.      This case satisfies Rule 23(b)(3).**

Because this case seeks the return of all excessive PACER fees paid in the last six years, however, the most appropriate basis for certification is Rule 23(b)(3). *See Dukes*, 563 U.S. at 362 ("[I]ndividualized monetary claims belong in Rule 23(b)(3)."). Rule 23(b)(3) contains two requirements, predominance and superiority, both of which are met here.

"The first requirement is that common factual and legal issues predominate over any such issues that affect only individual class members." *Bynum*, 214 F.R.D. at 39. As already explained, the plaintiffs allege that the AO lacks the authority to charge (and in fact charges) PACER fees that exceed the costs of providing the service. The central argument is that the E-

Government Act unambiguously limits any PACER fees "charge[d] for services rendered" to those "necessary" to "reimburse expenses in providing these services"—a limit the AO has failed to heed. 28 U.S.C. § 1913 note. And even if this language were somehow ambiguous, the background rule of administrative law is that user fees may not exceed the cost of the service provided (because then they would become taxes) unless Congress "indicate[d] clearly" an "intention to delegate" its taxing authority. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). The plaintiffs might prevail on their theory; they might not. But either way, these are the common predominant legal questions in this case.

The sole individual issue—calculation of the amount of each class member's recovery, which depends on how many PACER fees they have paid—is ministerial, and hence cannot defeat predominance. The government's "own records . . . reflect the monetary amount that each plaintiff" has paid in fees over the past six years. *Hardy v. District of Columbia*, 283 F.R.D. 20, 28 (D.D.C. 2012). Once the total excess amount is calculated and the measure of damages is determined (both common questions), divvying up the excess on a pro rata basis would "clearly be a mechanical task." *Id.*

"The second requirement of Rule 23(b)(3) is that the Court find that maintaining the present action as a class action will be superior to other available methods of adjudication." *Bynum*, 214 F.R.D. at 40. This requirement, too, presents no obstacle here. Class treatment is most appropriate in cases like this one, "in which the individual claims of many of the putative class members are so small that it would not be economically efficient for them to maintain individual suits." *Id.* The vast majority of class members "stand to recover only a small amount of damages," making it difficult to "entice many attorneys into filing such separate actions." *Id.* Nor are there any concerns that "potential difficulties in identifying the class members and sending them notice will make the class unmanageable." *Id.* To the contrary, this class is manageable

because the government itself has all the information needed to identify and notify every class member, including their names and email addresses. Class counsel can send notice to the email addresses the PACER Service Center has on file for everyone who has paid a fee.

### III.    The Court should approve class counsel's notice proposal.

As required by Local Civil Rule 23.1(c), we propose the following class-notice plan, as reflected in the proposed order filed with this motion. First, we propose that class counsel retain a national, reputable class-action-administration firm to provide class notice. Second, to the extent possible, we propose that email notice be sent to each class member using the contact information maintained by the government for each person or entity who has paid PACER fees over the past six years. Third, we propose that if the PACER Service Center does not have an email address on file for someone, or if follow-up notice is required, notice then be sent via U.S. mail. Class counsel would pay all costs incurred to send the notice, and all responses would go to the class-action-administration firm. We respectfully request that the Court direct the parties to file an agreed-upon proposed form of notice (or, if the parties cannot agree, separate forms of notice) within 30 days of the Court's certification order, and direct that email notice be sent to the class within 90 days of the Court's approval of a form of notice.

Because the government has yet to enter an appearance, we were unable to confer with opposing counsel under Local Civil Rule 7(m) regarding the notice proposal or this motion. We are filing the motion now to toll the limitations period for the class, *see Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and to ensure that class certification is decided at the outset, *cf.* Fed. R. Civ. P. 23 (class certification must be decided "[a]t an early practicable time after a person sues"); Local Civil Rule 23(b) (requiring motion to be filed "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action"). We intend to confer with opposing counsel as soon as they make their appearance.

## CONCLUSION

The plaintiffs' motion for class certification should be granted.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
*bnarwold@motleyrice.com*

MICHAEL T. KIRKPATRICK (D.C. Bar No. 486293)
**INSTITUTE FOR PUBLIC REPRESENTATION**
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
*michael.kirkpatrick@law.georgetown.edu*

May 2, 2016                         *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2016, I filed this class-certification motion through this Court's CM/ECF system. I further certify that, because no counsel for the defendant has yet appeared, I served copies via U.S. mail on the following counsel:

United States Attorney for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

Attorney General of the United States
United States Department of Justice
Room 4400
950 Pennsylvania Avenue, NW
Washington, DC 20530

*/s/ Deepak Gupta*

Deepak Gupta

22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL | ) | |
| SERVICES PROGRAM, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-745 ESH |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

Defendant hereby moves, pursuant to Fed. R. Civ. P. 12(b)(1)

and (6), to dismiss this action for failure to state a claim within

this Court's jurisdiction and under the "first-to-file" rule.  In

the alternative, Defendant moves for summary judgment in its favor,

pursuant to Fed. R. Civ. P. 56, because there is no genuine issue

as to any material fact and the Defendant is entitled to judgment

as a matter of law.

The Court is respectfully referred to the accompanying

memorandum, declarations and statement of material facts which
accompany this motion.

                    Respectfully submitted,


                    CHANNING D. PHILLIPS, DC Bar #415793
                    United States Attorney


                    DANIEL F. VAN HORN, DC Bar #924092
                    Chief, Civil Division


      By: _____ /s/
                    W. MARK NEBEKER, DC Bar #396739
                    Assistant United States Attorney
                    555 4th Street, N.W.
                    Washington, DC  20530
                    (202) 252-2536

-2-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL        )
  SERVICES PROGRAM, et al.,    )
                           )
        Plaintiffs,          )
                           )
     v.                      ) Civil Action No. 16-745 ESH
                           )
UNITED STATES OF AMERICA,     )
                           )
        Defendant.           )
                           )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

     This is the third recent civil action instituted as a class

action challenging the fees charged by the Administrative Office of

United States Courts ("AO") on the theory that it has overcharged

for access to information made available through its Public Access

to Court Electronic Records ("PACER") system.  See Complaint at 2,

fn.1; Fisher v. United States, U.S. Court of Federal Claims Case No.

1:15-cv-01575-TCW; Fisher v. Duff, Case No. C15-5944 BHS (W.D.

Wash).[1]  Accordingly, it should be dismissed under the first-to-file

rule.  In any event, a prerequisite to an action challenging PACER

_____

     [1] On December 28, 2015, Bryndon Fisher ("Fisher") filed a class
action complaint against the United States in the Court of Federal
Claims ("CFC Complaint").  See June 15, 2016 Order in Fisher v. Duff,
Case No. C15-5944 BHS (W.D. Wash) (Exhibit 5) at 1.  In the June
15, 2016 Order, the earlier District Court action was dismissed based
upon the first-to-file rule, because the district court action was
filed after the CFC Complaint and the putative class members could
obtain relief in the Court of Federal Claims suit.  Id.

fees is the requirement that the entity billed for such fees has,

within 90-days of the date of the PACER bill, alerted the PACER

Service Center to any errors in billing.  <u>See</u> Declaration of Anna

Marie Garcia.  Docket No. 18 in <u>Fisher</u> v. <u>Duff</u> (Exhibit 1), ¶¶ 3-4.

As Plaintiffs do not allege that they have satisfied this contractual

obligation, the action should be dismissed for failure to state a

claim.  At a minimum, the claims should be limited to those

plaintiffs who have timely but unsuccessfully attempted to resolve

the alleged overbilling by alerting the PACER Service Center, as

required.[2]

<div align="center">BACKGROUND</div>

PACER is an electronic public access service that allows users

to obtain case and docket information online from federal appellate,

district, and bankruptcy courts, and the PACER Case Locator.  <u>See</u>

Complaint (ECF No. 1), ¶ 7-8; https://www.pacer.gov/.  "PACER is

provided by the Federal Judiciary in keeping with its commitment to

providing public access to court information via a centralized

service."  <u>Id</u>.  To that end, PACER allows users to access Court

documents for $0.10 per page, up to a maximum charge of $3.00 per

---

[2] Moreover, the Plaintiff class members would have to exclude
those PACER users whose downloads exceeded the $3.00 maximum download
charge sufficiently to reduce the per page charge to that deemed
acceptable to Plaintiffs.

<div align="center">-4-</div>

transaction; and PACER fees are waived if a user does not exceed $15 in a quarter.  Id. (Exhibit 4) at 2; Complaint, ¶ 73.

The terms provided to all PACER users during the registration process include a requirement that users "must alert the PACER Service Center to any errors in billing within 90 days of the date of the bill." https://www.pacer.gov/documents/pacer_policy.pdf (PACER Policies).  Similarly, the PACER User Manual states, "If you think there is an error on your bill, you must submit the Credit Request Form.  Requests may also be faxed to the PACER Service Center. . ." https://www.pacer.gov/documents/pacermanual.pdf (PACER User Manual) at 5.  The Credit Request Form requires users to "Complete this form and submit it along with a letter of explanation in support of the credit request."  It also requires users to provide a "detailed explanation in support of the request for credit," a "list of transactions in question" and a "completed refund request form if payment has been made on the account." Plaintiff does not allege that he, or any other member of the purported class, submitted any claim to the PACER Service Center for the overcharges he alleges in his complaint.

On December 28, 2015, Bryndon Fisher instituted a purported class action against the United States based on allegations that he was overcharged by the AO for downloading certain documents from

-5-

PACER. Docket No. 1 in <u>Fisher</u> v. <u>United States</u>, (Exhibit 2), ¶¶ 1-5,
37-45. On May 12, 2016, Mr. Fisher filed an amended Complaint in
the case, but still pursues class action claims that he and the class
he represents (PACER users) were overcharged by the AO and that the
fees were not in compliance with the limitations placed on fees by
the Judicial Appropriations Act of 1992, Pub. L. 102-140, title III,
§ 303, 105 Stat. 810 (1991), and the E-Government Act of 2002, Pub.
L. 107-347, title II, § 205(e), 116 Stat. 2915 (2002). Docket No.
8 (Amended Complaint) in <u>Fisher</u> v. <u>United States</u>, (Exhibit 3) ¶¶
14-16.[3]

Based on what Plaintiffs in the instant action allege are PACER
overcharges, Plaintiffs similarly assert class action claims for
illegal exaction, on one of the theories shared in the <u>Fisher</u>
litigation. Plaintiffs here, like those in <u>Fisher</u>, similarly assert
that the fees charged through PACER are in excess of those authorized
by the E-Government Act of 2002 and its limitation allowing fees "only
to the extent necessary." Complaint, ¶¶ 11-12, 27-29, 33-34;

---

[3] According to the Amended Complaint in <u>Fisher</u> v. <u>United States</u>,
"Congress expressly limited the AO's ability to charge user fees for
access to electronic court information by substituting the phrase
"only to the extent necessary" in place of "shall hereafter" in the
above statute. E-Government Act of 2002, § 205(e). Exhibit 3, ¶ 16.

Exhibit 3, ¶¶ 15, 29-41, 45(E).[4]  The purported class of users in

Fisher v. United States, consists of "All PACER users who, from

December 28, 2009 through present, accessed a U.S. District Court,

U.S. Bankruptcy Court, of the U.S. Court of Federal Claims and were

charged for at least one docket report in HTML format that included

a case caption containing 850 or more characters."  Exhibit 3, ¶ 41.

In the instant action, Plaintiffs seek to certify a class of "All

individuals and entities who have paid for the use of PACER within

the past six years, excluding class counsel and agencies of the

federal government." Complaint, ¶ 27.   Thus, the class in this action

would encompass all Plaintiffs in Fisher.

<div align="center">ARGUMENT</div>

Standard Of Review

     Federal courts are courts of limited jurisdiction.
They possess only that power authorized by Constitution
and statute, see Willy v. Coastal Corp., 503 U.S. 131,
136-137, 112 S.Ct. 1076, 1080, 117 L.Ed.2d 280 (1992);
Bender v. Williamsport Area School Dist., 475 U.S. 534,
541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986), which

---

     [4] Paragraph 45(E)-(F) of the Amended Complaint in Fisher v.
United States posits as an issue common to all of the purported class
members the following: Whether the AO's conduct constituted an
illegal exaction by unnecessarily and unreasonably charging PACER
users more than the AO and the Judicial Conference authorized under
Electronic Public Access Fee Schedule and the E-Government Act of
2002; [and] Whether Plaintiff and the Class have been damaged by the
wrongs alleged and are entitled to compensatory damages."  Exhibit
3, ¶ 45(E)-(F).

<div align="center">-7-</div>

is not to be expanded by judicial decree, American Fire
& Casualty Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed.
702 (1951).  It is to be presumed that a cause lies outside
this limited jurisdiction, Turner v. Bank of North America,
America, 4 U.S. (4 Dall.) 8, 11, 1 L.Ed. 718 (1799), and
the burden of establishing the contrary rests upon the party
party asserting jurisdiction, McNutt v. General Motors
Acceptance Corp., 298 U.S. 178, 182-183, 56 S.Ct. 780, 782,
80 L.Ed. 1135 (1936).

Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377

(1994).

A Rule 12(b)(1) motion to dismiss for lack of jurisdiction may

be presented as a facial or factual challenge.  "A facial challenge

attacks the factual allegations of the complaint that are contained

on the face of the complaint, while a factual challenge is addressed

to the underlying facts contained in the complaint." Al-Owhali v.

Ashcroft, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations

and citations omitted.)  When defendants make a facial challenge, the

the district court must accept the allegations contained in the

complaint as true and consider the factual allegations in the light

most favorable to the non-moving party.  Erby v. United States, 424

F. Supp. 2d 180, 182 (D.D.C. 2006).  With respect to a factual

challenge, the district court may consider materials outside of the

pleadings to determine whether it has subject matter jurisdiction

over the claims.  Jerome Stevens Pharmacy, Inc. v. FDA, 402 F.3d 1249,

1249, 1253 (D.C. Cir. 2005).  The plaintiff bears the responsibility

-8-

of establishing the factual predicates of jurisdiction by a preponderance of evidence. <u>Erby</u>, 424 F. Supp. 2d at 182.

In order to survive a Rule 12(b)(6) motion, the plaintiff must present factual allegations that are sufficiently detailed "to raise a right to relief above the speculative level." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 555 (2007). As with facial challenges to subject-matter jurisdiction under Rule 12(b)(1), a district court is required to deem the factual allegations in the complaint as true and consider those allegations in the light most favorable to the non-moving party when evaluating a motion to dismiss under Rule 12(b)(6). <u>Trudeau</u> v. <u>FTC</u>, 456 F.3d 178, 193 (D.C. Cir. 2006). However, where "a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" <u>Ashcroft</u> <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 557). Further, a "court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Iqbal</u>, 556 U.S. at 679. While "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, [] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Id.</u> at 678-79. Finally,

-9-

Finally, as a general matter, the Court is not to consider matters outside the pleadings, per Rule 12(b), without converting a defendant's motion to a motion for summary judgment.  In interpreting interpreting the scope of this limitation, however, the D.C. Circuit has instructed that the Court may also consider "any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice." EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).  For example, the D.C. Circuit has approved judicial notice of public records on file. In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (statements attached to complaint that undermined inference advocated by plaintiff). Defendant specifically asks that the Court take judicial notice of the documents accompanying this filing. See Fed. R. Evid. 201.

Summary judgment is appropriate when, as here, the pleadings, together with the declarations, demonstrate that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Washington Post Co. v. U.S. Dept. of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989). As the Supreme Court has declared, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every

-10-

action." <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 327 (1986). Summary Summary judgment is appropriate, under Rule 56, if the pleadings on file, as well as the affidavits submitted, evidence that there is no genuine issue of any material fact and that movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see also</u> <u>Mendoza</u> <u>Mendoza</u> v. <u>Drug Enforcement Admin.</u>, 465 F.Supp.2d 5 (D.D.C. 2006).

Courts are required to view the facts and inferences in a light most favorable to the non-moving party. <u>See</u> <u>Flythe</u> v. <u>District of Columbia,</u> 791 F.3d 13, 19 (D.C. Cir. 2015)(<u>citing Scott</u> v. <u>Harris</u>, 550 U.S. 372, 383 (2007). However, the party opposing the motion cannot simply "rest upon the mere allegations or denials of the adverse party's pleading, but. . . must set forth specific facts showing that there is a genuine issue for trial." <u>Mendoza</u>, 465 F.Supp.2d at 9 (quoting Fed R. Civ. P. 56(e). A non-moving party must show more than "that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

In <u>Neal</u> v. <u>Kelly</u>, 963 F.2d 453 (D.C. Cir. 1992), the Court recognized that "any factual assertions in the movants affidavits will be accepted as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the assertion." <u>Lewis</u> v. <u>Faulkner</u>, 689 F.2d 100, 102 (7th Cir. 1982).

-11-

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Since the Court is constrained to "treat the complaint's factual allegations as true", Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000), the facts alleged in the Complaint "must be enough to raise a right to relief above the speculative level." Schuer v. Rhodes, 416 U.S. 232, 236 (1974).

Finally, where the District Court has employed the first-to-file rule, its action has been reviewed on appeal only for abuse of discretion.  See Washington Metro. Area Transit Auth. v. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980)(judge acted within his discretion when he dismissed the action).

First-To-File

Where two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first.  Food Fair Stores v. Square Deal Mkt. Co., 187 F.2d 219, 220-21 (D.C. Cir. 1951).  Relying on principles of comity, the Court of Appeals has affirmed that a District Court acts within its discretion when it dismisses an action under the "first-to-file rule." Washington Metro. Area Transit Auth. v. Ragonese, 617 F.2d at 830-31.

-12-

Just as was the case in <u>Fisher</u> v. <u>Duff</u>, the claims here overlap
with those in the Claims court litigation.  Both cases involve
allegations that the same entities utilized the PACER system and were
charged more for downloading information than is authorized by the
same statutes and agreements.  The class here would include nearly
every class member in <u>Fisher</u>,[5] and the Fisher litigation was filed
first, on December 28, 2015.  Accordingly, this action should be
dismissed to allow the Claims Court litigation to proceed.  <u>See</u>
Docket No. 25 in <u>Fisher</u> v. <u>Duff</u> (Exhibit 5); <u>Food Fair Stores v. Square
Deal Mkt. Co.</u>, 187 F.2d at 220-21; <u>Washington Metro. Area Transit
Auth.</u> v. <u>Ragonese</u>, 617 F.2d at 830-31.

> **Plaintiffs Do Not Allege They Timely
> <u>Alerted The PACER Service Center</u>**

Under their agreements with the Defendant, the Plaintiffs, when
using PACER, agree that if there is an error in the user's PACER bill,
the user "must alert the PACER Service Center to any errors in billing
within 90 days of the date of the bill."  Exhibit 1, ¶ 3.
Essentially, the submission of claims to the PACER Service Center

---

[5] Plaintiffs' Motion For Class Certification recognizes that the
class would be limited to those charged within the six-year
limitations period.  ECF No. 8 at 1; Complaint at 15 (limiting the
demanded monetary recovery to "the past six years that are found to
exceed the amount authorized by law").  Thus, the class would exclude
those whose PACER fees were charged before April 21, 2010.  The
limitations period in <u>Fisher</u> v. <u>United States</u> would presumably go
back six years from the filing of the original complaint on December
28, 2015, an extra few months.

-13-

is, by the plain terms of the agreement between Plaintiffs and the Defendant, a condition precedent to any duty to refund billing errors. See 13 *Williston on Contracts* § 38:7 (4th ed.) ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises."). Because Plaintiffs have not alleged that this condition precedent was performed, they have not stated a claim for relief.

As with exhaustion of statutory administrative remedies, there are sound policy reasons to require the plaintiffs to fulfill their contractual duty to submit any claim to the PACER Service Center. As the Supreme Court noted in McKart v. United States, such reasons "are not difficult to understand." Id., 395 U.S. 185, 193 (1969). Since agency decisions "frequently require expertise, the agency should be given the first chance to . . . apply that expertise." Id. "And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages." Id.; see Thomson Consumer Elecs., Inc. v. United States, 247 F.3d 1210, 1214 (Fed. Cir. 2001) (citing McKart while explaining that administrative remedies are sometimes preferable to litigation because "courts may never have to intervene if the complaining party

-14-

is successful in vindicating his rights" and "the agency must be given a chance to discover and correct its own errors.").

Here, the billing errors at issue are clearly a matter of highly specific expertise.  If Plaintiffs would fulfil their obligations and submit a claim for a specific alleged overcharge to the PACER Service Center, they could engage in a dialog with those at the PACER Service Center and allow the Defendant to exercise its expertise regarding the workings of the PACER system and respond directly to Plaintiffs' concerns about the accuracy of the PACER bill.  Such a result is required by the agreement, and would also be more efficient than testing Plaintiff's theories in Court.

> Plaintiffs Have Not Alleged A Statutory
> Remedy That Supports An Illegal Exaction Claim

> In both the Tucker Act, 28 U.S.C. § 1491, and the Little Tucker Act, 28 U.S.C. § 1346(a)(2), Congress has waived sovereign immunity for certain actions for monetary relief against the United States. United States v. Mitchell, 463 U.S. 206, 212-18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).  The pertinent portions of the Tucker Act and the Little Tucker Act waive sovereign immunity for claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1); id. § 1346(a)(2).  The Little Tucker Act permits an action to be brought in a district court, but only if a claim does not exceed $10,000 in amount; the Tucker Act contains no such monetary restriction but authorizes actions to be brought only in the Court of Federal Claims.

-15-

Doe v. United States, 372 F.3d 1308, 1312 (Fed. Cir. 2004). Because
Plaintiff has relied upon the Little Tucker Act for this Court's
jurisdiction, Complaint, ¶ 5, any review of the final judgment will
likely be in the United States Court of Appeals for the Federal
Circuit. 28 U.S.C. § 1295(a)(2).

To invoke federal court jurisdiction over an illegal exaction
claim, "a claimant must demonstrate that the statute or provision
causing the exaction itself provides, either expressly or by
'necessary implication,' that 'the remedy for its violation entails
a return of money unlawfully exacted.'" Norman v. United States,
429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting Cyprus Amax Coal Co.
v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).[6]

Here, Plaintiffs' illegal exaction claim fails because that
claim expressly recognizes that the liability comes only after an
agreement is reached between the PACER user and the AO. See
Complaint, ¶ 7 ("each person must agree to pay a specific fee"). The
obligations of those using PACER are further set forth in the PACER
User Manual and the policies and procedures promulgated by the AO,

---

[6] Because the allegation of a proper statute or provision is
a jurisdictional issue under the Little Tucker Act, Defendant moves
to dismiss the claim under Fed. R. Civ. p. 12(b)(1). Dismissal is
also warranted under Fed. R. Civ. P. 12(b)(6), because, even if
jurisdiction is present, Plaintiffs have alleged a
statutory/regulatory framework that expressly requires his claims
to be submitted to the PACER Service Center. See Kipple v. United
States, 102 Fed. Cl. 773, 779 (2012).

-16-

which form the basis for Plaintiffs' claim that the user consents 'statute or provision' causing the exaction.  See Complaint ¶ 7-10; Exhibit 1 (Declaration of Anna Marie Garcia), ¶¶ 2-4.  That manual and those regulations, however, require all claims regarding billing errors to be submitted to the PACER Service Center.  The complaint does not allege that the plaintiff took the necessary steps to receive a refund: submitting the requisite paperwork to the PACER Service Center.  Accordingly, Plaintiffs have failed to allege that the statute and associated regulations provide a remedy for the specific exactions they allege.

Plaintiffs cite the "E-Government Act of 2002, the Electronic Public Access Fee Schedule" as well as other policies and procedures promulgated by the AO in the PACER User Manual to suggest that fees adopted and charged are excessive.  See Complaint, ¶ 7-10.  They then allege that these laws and regulations resulted in excessive fees. See Complaint, ¶¶ 11-13, 21.[7]

In fact, Plaintiffs' proposed remedy – the return of all monies (regardless of whether claims are presented to the PACER Service Center) – is contrary to the express terms of the governing

---

[7]   In addition, the statutory authority cited by Plaintiffs they expressly recognize that the PACER Service Center is a part of the regulatory framework, by including "PACER Service Center" fees as part of the "the Electronic Public Access Program"  See Complaint, ¶ 19.

-17-

contractual requirements, namely the AO's policies and procedures and the PACER User Manual.  The framework in place expressly limits the monetary remedy to those claims that are submitted to the PACER Service Center within 90 days of the bill.  Pacer Policy (users "must alert the PACER Service Center to any errors in billing within 90 days of the date of the bill"); Pacer User Manual at 5 ("If you think there is an error on your bill, you must submit the Credit Request Form."); Exhibit 1, ¶¶ 2-4.

Plaintiffs' claim is dependent on the inclusion of the PACER User Manual and other AO policies and procedures, including the PACER Policy, because the cited statutory authority states only that the Director of the AO and the Judicial Conference may "prescribe reasonable fees" for PACER information, 28 U.S.C. § 1913, and that those fees are $0.10 per "page" for docket reports, not to exceed thirty pages.  28 U.S.C. §§ 1913, 1914, 1926, 1930, 1932.  This language, standing alone, is insufficient to create the remedy of return of all possible claims (including those not submitted to the AO).  See Norman, 429 F.3d at 1096 (dismissing claim where law did not "directly result in an exaction").

Instead, the policies and procedures of the AO are a necessary part of the framework supporting Plaintiffs' alleged exaction.

Those same policies and procedures that establish the fees to be paid, however, are fatal to Plaintiffs' exaction claim, because they also require claims to be submitted to the PACER Service Center within 90 days of the date of the bill.  Accordingly, Plaintiffs' illegal exaction claim fails.

<u>CONCLUSION</u>

For the foregoing reasons the Complaint should be dismissed or, in the alternative, summary judgment should be granted in favor of the Defendant based both on to the first-to-file rule and as to any claim that was not presented to the PACER Service Center with alleged errors in billing within 90 days of the date of the bill.

Respectfully submitted,

CHANNING D. PHILLIPS, DC Bar #415793
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: _____ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

-19-

Appx0162

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL          )
  SERVICES PROGRAM, et al.,    )
                        )
        Plaintiffs,       )
                        )
     v.                    ) Civil Action No. 16-745 ESH
                        )
UNITED STATES OF AMERICA,        )
                        )
        Defendant.        )
                        )
_____)

DEFENDANT'S STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), the Defendant hereby provides the following statement of material facts as to which there is no genuine dispute:

1. On December 28, 2015, Bryndon Fisher instituted a purported class action against the United States based on allegations that he was overcharged by the AO for downloading certain documents from PACER. Docket No. 1 in Fisher v. United States, (Exhibit 2), ¶¶ 1-5, 37-45.

2. On May 12, 2016, Mr. Fisher filed an amended Complaint in the case, but still pursues class action claims that he and the class he represents (PACER users) were overcharged by the AO and that the fees were not in compliance with the limitations placed on fees by the Judicial Appropriations Act of 1992, Pub. L. 102-140, title III,

§ 303, 105 Stat. 810 (1991), and the E-Government Act of 2002, Pub. L. 107-347, title II, § 205(e), 116 Stat. 2915 (2002).  Docket No. 8 (Amended Complaint) in <u>Fisher</u> v. <u>United States</u>, (Exhibit 3) ¶¶ 14-16.

3.  According to the Amended Complaint in <u>Fisher</u> v. <u>United States</u>, "Congress expressly limited the AO's ability to charge user fees for access to electronic court information by substituting the phrase "only to the extent necessary" in place of "shall hereafter" in the above statute. E-Government Act of 2002, § 205(e).  Exhibit 3, ¶ 16.

4.  The purported class of users in <u>Fisher</u> v. <u>United States</u>, consists of "All PACER users who, from December 28, 2009 through present, accessed a U.S. District Court, U.S. Bankruptcy Court, of the U.S. Court of Federal Claims and were charged for at least one docket report in HTML format that included a case caption containing 850 or more characters."  Exhibit 3, ¶ 41.

5.  Paragraph 45(E)-(F) of the Amended Complaint in <u>Fisher</u> v. <u>United States</u> posits as an issue common to all of the purported class members the following: Whether the AO's conduct constituted an illegal exaction by unnecessarily and unreasonably charging PACER users more than the AO and the Judicial Conference authorized under Electronic Public Access Fee Schedule and the E-Government Act of

-2-

2002; [and] Whether Plaintiff and the Class have been damaged by the wrongs alleged and are entitled to compensatory damages." Exhibit 3, ¶ 45(E)-(F).

6.   Under their agreements with the Defendant, the Plaintiffs, when using PACER, agree that if there is an error in the user's PACER bill, the user "must alert the PACER Service Center to any errors in billing within 90 days of the date of the bill." Exhibit 1, ¶ 3.

Respectfully submitted,

CHANNING D. PHILLIPS, DC Bar #415793
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: _____ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

-3-

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Motion To Dismiss
Or, In The Alternative, For Summary Judgment, supporting memorandum,
statement of material facts, exhibits and a proposed Order has been
made through the Court's electronic transmission facilities on this
27th day of June, 2016.

                                                        /s/
                            _____
                            W. MARK NEBEKER, DC Bar #396739
                            Assistant United States Attorney
                            555 4th Street, N.W.
                            Washington, DC  20530
                            (202) 252-2536
                            mark.nebeker@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                    *Plaintiffs*,

        v.                                     Case No. 16-745-ESH

UNITED STATES OF AMERICA,
                    *Defendant*.

## PLAINTIFFS' OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

If a friend were to complain that a restaurant is "overpriced," you would know what she means: the prices on the menu are too high. Nobody would think that, if she were to take her complaint to a waiter, he would (or could) lower those prices. The prices were presumably set by the management or, if the restaurant is a chain, by the chain's corporate headquarters.

But it would be a very different story if the friend's complaint were instead that, whenever she orders a glass of a particular type of wine at that restaurant, she is incorrectly billed for the full bottle—because of an error in the restaurant's billing software. This second complaint, unlike the first, is not that the restaurant's prices are too high. Rather, the complaint is that the restaurant is charging a small subset of customers more than the menu price for a particular item. In that scenario, asking the waiter to correct the bill might make perfect sense.

Understanding the distinction between these two types of complaints is all that is needed to dispose of the government's motion to dismiss in this case. That motion—much of it adopted verbatim from the government's motion to dismiss in *Fisher v. United States*, No. 15-1575C, ECF No. 11 (Fed. Cl.) (attached as Exhibit A)—is entirely predicated on the mistaken belief that the

1

plaintiffs here are just like the friend in the second scenario, complaining about a billing error. But, as we made clear in our complaint (at 2 n.1 and throughout), the three nonprofit plaintiffs in this case are actually like the friend in the first scenario: They allege that PACER's fees are set too high, at amounts that far exceed the cost of providing access, in contravention of the E-Government Act of 2002. *See generally* ECF No. 1 (attached as Exhibit B). The government's basic misunderstanding of the nature of the plaintiffs' claims infects all of its arguments for dismissal.

**1. The first-to-file rule is inapplicable.** The government's lead argument (at 12–13) is that the Court should dismiss this case under the "first-to-file rule" because a different case— filed by a different plaintiff in a different court—also involves PACER fees. *See Fisher v. United States*, No. 15-1575C (Fed. Cl.). But that case is nothing like this one. It falls instead into the second scenario mentioned above: a complaint of a "systemic billing error" in a narrow category of transactions. ECF No. 8 in *Fisher* (attached as Exhibit C), at 10; *see id.* at 2 (alleging that "the PACER billing system contains an error").

The plaintiff in *Fisher* challenges a particular aspect of the formula that PACER uses to convert docket reports to billable pages (which is necessary because docket reports, unlike case filings, are in HTML format and not PDF). He claims that the formula miscalculates the number of billable pages by "counting the number [of] bytes in the case caption" more than once, causing everyone who accesses a docket page from a case with a caption of "more than 850 characters" to be billed an extra page or two. *Id.* at 10. He does *not*, however, challenge the PACER fee schedule itself, as our case does. On the contrary, he claims that the government *violated* the fee schedule—and hence its contractual obligations to PACER users—by charging for more pages than permissible to access certain docket reports. That narrow "billing error" theory is wholly distinct from the legal theory in this case.

So the first-to-file rule has no application here. First-to-file rules serve "to prevent copycat litigation," *U.S. ex rel. Heath v. AT&T*, 791 F.3d 112, 123 (D.C. Cir. 2015)—not to force the dismissal of different claims by different parties seeking different relief based on different legal theories. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("[T]he general principle is to avoid duplicative litigation."). If the facts and legal issues do not "substantially overlap," dismissal is improper. *In re Telebrands Corp.*, — F.3d —, 2016 WL 3033331, *2 (Fed. Cir. 2016). Here, neither the facts nor the "core issue" in each case is the same. *Int'l Fidelity Ins. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011). As just explained, *Fisher* focuses on the correctness of the government's formula for converting case captions to billable pages in docket sheets. And should the plaintiff in that case successfully seek class certification, he will, by operation of Court of Federal Claims Rule 23, represent only those people who affirmatively opt in to the class by filing written consent, and who accessed docket sheets in cases with captions of more than 850 characters (assuming they can be easily identified).

This case, by sharp contrast, focuses on whether the PACER fee schedule *itself* violates the E-Government Act and, if so, what the difference is between the aggregate amount the government collects in fees and the aggregate costs it incurs in providing access. *See* Electronic Pubic Access Fee Schedule, *available at* http://bit.ly/2aAPtsq. And the three nonprofit plaintiffs have already moved to certify this case as an opt-out class under Federal Rule of Civil Procedure 23, meaning that (should they be successful) they will represent all PACER users who paid a fee during the statute-of-limitations period and do not affirmatively opt out of the case. Given these enormous differences between the two cases, the first-to-file rule has no bearing here.[1]

---

[1] A third case—brought by the same plaintiff as in *Fisher*, pressing the exact same claims on the exact same legal theories, and seeking to represent a virtually "identical" class—was dismissed on first-to-file grounds. *See Fisher v. Duff*, No. 15-cv-5944, 2016 WL 3280429, *2 (W.D. Wash. June 15, 2016). That case really was *Fisher II*. This one is not.

**2. The contract's billing-error-notification provision is irrelevant.** The government also contends (at 13) that the plaintiffs cannot bring this suit because PACER's own terms and conditions require them to first "alert the PACER Service Center to any error in billing within 90 days of the date of the bill." In the government's view, this is a "condition precedent" that must be satisfied "before a contractual right accrues or a contractual duty arises." Mot. 14. But even assuming that were true, we have not violated any such "contractual obligation," *id.* at 4, because we are not alleging any "billing error" under the PACER fee schedule. We are instead challenging the fee schedule itself. Nor are we alleging that the government has violated any *contractual* duty to ensure that fees charged do not exceed the cost of providing access. Our theory, rather, is that the government has a *statutory* obligation to do so.

The government's contractual-exhaustion argument might make sense in a case alleging a billing error, where the plaintiffs' theory is that the government breached its contractual obligations. In that context, it might very well be reasonable to take the position that, before a party may bring suit based on an alleged violation of a contractual duty, that party must first avail itself of contractual remedies. And indeed, in *Fisher*, the government has pressed an argument of just this stripe. *See* Ex. A, at 7–10. But cut and pasted into *this* case, *see* Mot. 14–15, the argument is not just meritless—it is entirely beside the point.[2]

At any rate, it would be a fool's errand to force the plaintiffs in this case to first bring their claims to the attention of a customer-service representative at the PACER Service Center. *Cf. McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 675 (1963) (students seeking

---

[2] This is not to say that we agree with the government's position in *Fisher* that the billing-error-notification provision is in fact a condition precedent to bringing a contractual claim based on a billing error—a claim, once again, that is not at issue here. As the plaintiffs in *Fisher* argue, the notification provision does not use the kind of clear, unambiguous language that is generally necessary to create a condition precedent. Instead, the provision may simply reflect an internal policy encouraging PACER users to call customer service promptly if they want their bill to be fixed administratively (that is, without filing a lawsuit).

4

school integration need not file complaint with superintendent because exhaustion would be futile where the "Superintendent himself apparently has no power to order corrective action"). Although the government imagines a scenario in which the plaintiffs would "engage in a dialog with those at the PACER Service Center" regarding any "concerns about the accuracy of the PACER bill," *id.* at 15, the plaintiffs do not challenge the "accuracy" of their bill—they challenge the *legality* of it, even if it accurately reflects the fees on the schedule. Even the government does not assert that a call to PACER's customer-service hotline could redress that grievance. Just as a waiter lacks authority to lower menu prices at Ruth's Chris Steakhouse, a representative at the PACER call center lacks authority to overrule a fee schedule adopted by the Administrative Office of the U.S. Courts.

In a last-ditch effort, the government advances a variant of this "exhaustion" requirement at the end of its motion, to no better effect. Again echoing its *Fisher* briefing, it argues (at 16–19) that the plaintiffs have no statutory claim because the remedy is instead provided by PACER's terms and conditions, which "require all claims regarding billing error to be submitted to the PACER Service Center." But to repeat: we are *not* alleging a billing error, so "submitting the requisite paperwork to the PACER Service Center" would accomplish nothing. *Id.* at 17.

## CONCLUSION

The government's motion to dismiss should be denied.

<div align="center">Respectfully submitted,</div>

*/s/ Deepak Gupta*
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

<div align="center">5</div>

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504 / Fax: (202) 232-5513
*bnarwold@motleyrice.com*

July 29, 2016                    *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2016, I filed this opposition brief through this Court's

CM/ECF system, and that all parties required to be served have been thereby served.

*/s/ Deepak Gupta*

Deepak Gupta

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                    *Plaintiffs*,

        v.

UNITED STATES OF AMERICA,
                    *Defendant*.

Case No. 16-745-ESH

**PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION**

This case bears all the hallmarks of a prototypical class action. The plaintiffs challenge the legality of PACER fees, which are set by a single fee schedule that applies nationwide—meaning that anyone who pays a fee pays the rate in that schedule. The plaintiffs allege that these rates violate a statute authorizing fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note. The common liability question is thus whether the plaintiffs are correct: Are the fees higher than necessary to recoup the costs? And the central damages question is likewise common: What should the fees have been? Because every class member paid fees set at the rates determined by the uniform fee schedule, their claims are entirely cohesive: they rise or fall together.

The government nevertheless opposes class certification. Before addressing its objections, it is worth highlighting what the government does not say: It does not deny that this Court has jurisdiction over the nationwide class, that a class action will be both manageable and efficient, that class membership is readily ascertainable, and that class notice can be easily accomplished (mainly through email). Instead, the government offers four objections—two new and two old.

1

Case 1:16-cv-00745-ESH　Document 179　Filed 08/04/16　Page 2 of 7

**1.** First the old: the government contends (at 9–10) that the class is not sufficiently numerous because PACER's terms and conditions require users to alert the PACER Service Center of any "billing errors" within 90 days of receiving their bills, and not enough people have done so. This is a repackaging of the "exhaustion" argument that the government pressed in its motion to dismiss, and it suffers from the same elementary misunderstanding. As we explained in our opposition to that motion, the plaintiffs are *not* alleging a billing error under the fee schedule; they challenge the legality of the schedule itself. *See* ECF No. 15, at 4–5. So the billing-error-notification provision is just as irrelevant here. Hence the class definition requires only that class members have paid PACER fees within the statute of limitations—not that they have first presented their statutory challenge to a customer-service employee. Once the government's meritless "exhaustion" defense is set aside, there is no dispute that the number of class members who meet this definition is large enough to justify treating this case as a class action.

**2.** The government also reaches into the recycling bin for a second argument, suggesting (at 17–19) that the class should not be certified because of the existence of *Fisher v. United States*, No. 15-1575C (Fed. Cl.), a lawsuit challenging the accuracy of the billing algorithm used to calculate the number of pages in certain docket reports (those with case captions of more than 850 characters). This contention—which echoes the government's "first-to-file" argument from its motion to dismiss—fails once again to appreciate the fundamental differences between the two cases. We articulated some of these differences in our opposition to the government's motion, *see* ECF No. 15, at 2–3, and need not repeat them all. But a few points warrant emphasis. Mr. Fisher has not yet moved to certify his case as a class action, and he is now facing a motion to dismiss. If he is able to fend off dismissal and moves for certification, he will have to establish that membership in his proposed class is readily ascertainable. As the government rightly points out (at 5), this means that he must demonstrate an "administratively feasible" way for the court to

2

determine which PACER users accessed docket reports in cases with captions of more than 850 characters. Unlike in this case, where class membership can be easily assessed based on the government's own records (because it keeps track of everyone who pays a fee), it is entirely unclear whether the government's recordkeeping system distinguishes between those who pay for docket sheets with captions of more than 850 characters and those who do not.

That is not all. Even if Mr. Fisher could somehow show ascertainability (and manageability), his class would consist only of those people who elect to fill out a consent form and affirmatively opt in to the class—in stark contrast with this case, which seeks to certify an opt-out class under Federal Rule of Civil Procedure 23. And even for that vanishingly small subset of PACER users, Mr. Fisher's case focuses exclusively on the accuracy of the government's formula for converting case captions in docket reports to billable pages. It will not address the question posed by this case: whether the fee schedule itself violates the E-Government Act. The government cites no authority for the proposition that a court should decline to certify a class that otherwise meets Rule 23's requirements because the plaintiffs in a *different* case, in a *different* court, raising a *different* claim on a *different* theory, seeking *different* relief, might eventually move to have that case certified as a (far narrower) opt-in class action. And although the government vaguely hints at the possibility of "inconsistent judgments" (at 18), that will not happen. The question whether the fee schedule is unlawful is entirely independent of the question whether there is a minor billing error that results in an overbilling of certain docket sheets. One theory can win and the other lose, and vice versa. *Fisher* poses no barrier to class certification here.

**3.** Turning to the two new arguments, the government levies its most sustained attack on the named plaintiffs, questioning whether, as nonprofit organizations, they have the requisite "incentive to pursue fully the claims of the other class members." Opp. 11. By "other class members," the government apparently means the claims of people like the organizations' own

3

Case 1:16-cv-00745-PLF Document 179 Filed 08/04/16 Page 4 of 7

constituents (veterans, consumers, and other everyday Americans who have paid PACER fees). Truth be told, the argument is difficult to follow. But it seems to run thus: Because nonprofits can potentially qualify for fee waivers, they are ill-suited to represent those who have paid fees (and who presumably cannot qualify for waivers)—even if the nonprofits have also paid fees. To restate this argument is to refute it. If PACER fees are excessive, then *anyone* who has paid a fee has paid an excessive fee, and has every incentive to vigorously pursue a claim to recover the excess. That includes the three named plaintiffs here. Like the class they seek to represent, each plaintiff has paid PACER fees claimed to be illegal, and each wants the excess back. The interests of these two groups of people (the representatives and the represented) are thus perfectly aligned.[1]

In making its "nonprofit" argument, the government also seizes on the named plaintiffs' desire to have judicial records made "freely available to the greatest extent possible," *id.* at 11, as Congress intended when it enacted the E-Government Act in 2002. *See* S. Rep. No. 107–174, 107th Cong., 2d Sess. 23 (2002). From this agreement with congressional policy, the government draws the mystifying conclusion (at 15) that the named plaintiffs are somehow interested only in a "favored subset" of PACER users—their fellow nonprofits—as opposed to class members "who

---

[1] The government's argument also reflects a basic misunderstanding of how the PACER fee-waiver policy actually works. Although the government says (at 11) that the plaintiffs "have the ability to request PACER fee exemptions as non-profits," and faults them for not doing so (at 10 n.3), courts grant waivers only very rarely, in their discretion, and when they do the waiver must be "limited in scope" and good only "for a definite period of time." *See* Electronic Pubic Access Fee Schedule § 9, *available at* http://bit.ly/2aAPtsq. The guiding consideration is not whether the requester is a nonprofit, but whether it can prove that "an exemption is necessary in order to avoid unreasonable burdens," *id.*—a standard that the AO has told courts should be "strictly limited" to the situation where there has been "an individualized showing of need and hardship," AO Br. in *In re Application for Exemption from Electronic Public Access Fees by Jennifer Gollan and Shane Shifflett*, No. 12-16373, ECF No. 24, at 22, 24 (9th Cir.). Indeed, when a nonprofit organization challenged the denial of a waiver, the AO defended the denial on appeal as "consistent with" the policy of "stringent application of the waiver requirement." *Id.* at 20, 23. And when the AO produced a summary of the Electronic Public Access Program in December 2012, it listed the types of "users who are exempt from any charge—including indigents, case trustees, academic researchers, CJA attorneys, and *pro bono* attorneys." *Id.* at A11. It did not even mention nonprofit advocacy groups.

4

may not share the goals of providing free access." But these organizations exist to advance the interests of their constituents—some of the most vulnerable people in our society, many of whom come into contact with the legal system and are charged PACER fees. *See* ECF No. 1, at 3–4. The government's insinuation that the organizations would be anything other than zealous in advocating for the best interests of their constituents is, to put it mildly, baseless.

If anything, the plaintiffs' broad public-interest missions make them *better* suited to serve as representatives—it is not a mark against them. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 277 F.R.D. 52, 62 (D. Mass. 2011) (appointing nonprofits as class representatives because they "will provide more vigilant and consistent representation than individual representatives"); *cf. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289–90 (1986) ("[A]n association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital. . . . The very forces that cause individuals to band together in an association will . . . provide some guarantee that the association will work to promote their interests."). Indeed, plaintiff Alliance for Justice is "a national association of over 100 public-interest organizations that focus on a broad array of issues—including civil rights, human rights, women's rights, children's rights, consumer rights, and ensuring legal representation for all Americans." ECF No. 1, at 3. Its members include AARP, the Children's Defense Fund, Disability Rights Education and Defense Fund, and the National Center on Poverty Law. *Id.* at 3–4. It is hard to imagine better class representatives, and the government does not identify any.

**4.** That leaves the government's final objection to certification: the half-formed theory (at 20) that the plaintiffs cannot show that common questions predominate over individual issues because of the AO's uniform policy of charging only for the first 30 pages of a document. But, despite the government's statement to the contrary (at 20), this Court will not have to determine "whether and in what degree" individual class members "were able to secure free pages in excess

5

of the 30 pages" any more than it will have to determine whether class members accessed judicial opinions or incurred less than $15 in a given quarter (both of which result in no charges). The only thing the Court will have to determine is what a lawful fee would have been for the pages that were actually charged to class members. Put another way: This case does not challenge the AO's uniform decision *not* to charge for access to certain pages or records—it challenges the uniform rates that the AO *actually charges*. Should the plaintiffs prevail in that challenge, the damages can be calculated pro rata, based on the total amount each class member paid in fees over the class period. That kind of ministerial calculation is commonplace in large class actions, and is no obstacle to certification. *See, e.g.*, *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 85 (D.D.C. 2015) ("The D.C. Circuit has agreed 'that the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification.'" (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984)); *Hardy v. District of Columbia*, 283 F.R.D 20, 28 (D.D.C. 2012) (Wilkins, J.) (finding that common questions predominated over individualized damages issues because calculating damages "would clearly be a mechanical task"); Rubenstein, *Newberg on Class Actions* § 4:54 (5th ed. 2015) (collecting cases).

## CONCLUSION

The plaintiffs' motion for class certification should be granted.

Respectfully submitted,

/s/ Deepak Gupta
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*
*jon@guptawessler.com*

6

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
*bnarwold@motleyrice.com*

August 4, 2016 *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2016, I filed this opposition brief through this Court's

CM/ECF system, and that all parties required to be served have been thereby served.

*/s/ Deepak Gupta*

Deepak Gupta

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM**, *et al.*,<br><br>                    **Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>                    **Defendant.** | **Civil Action No. 16-745 (ESH)** |

## <u>ORDER</u>

Having considered defendant's motion to dismiss the complaint or, in the alternative, for summary judgment [ECF No. 11], for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendant's motion is **DENIED**.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   December 5, 2016

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*,** Plaintiffs, | |
| **v.** | **Civil Action No. 16-745 (ESH)** |
| **UNITED STATES OF AMERICA,** Defendant. | |

## MEMORANDUM OPINION

Plaintiffs, organizations and individuals who have paid fees to obtain records through the Public Access to Court Electronic Records system (PACER), claim that PACER's fee schedule is higher than necessary to cover the costs of operating PACER and therefore violates the E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (codified as 28 U.S.C § 1913 note). (Compl. at 2, ECF No. 1.) They have brought this class action suit against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), to recover the allegedly excessive fees that they have paid over the last six years. (*Id.* at 14-15, ¶¶ 33-34.) Defendant has moved to dismiss the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), claiming that it is barred by the first-to-file rule and does not state a claim within this Court's jurisdiction under the Little Tucker Act. (Def.'s Mot. Dismiss, ECF. No. 11; *see also* Pls.' Opp., ECF No. 15; Def.'s Reply, ECF No. 20.) For the reasons herein, the Court will deny the motion.[1]

---

[1] Defendant has also moved for summary judgment, but it has not offered any grounds upon which summary judgment should be granted if the motion to dismiss is denied. (*See* Def.'s Mot. at 1, 19.) Therefore, the Court will deny defendant's unsupported motion for summary judgment.

## BACKGROUND

According to plaintiffs, "PACER is a decentralized system of electronic judicial-records databases" operated by the Administrative Office for the U.S. Courts ("AO"). (Compl. at 1, ¶ 7.) "Any person may access records through PACER" but "must first agree to pay a specific fee." (*Id.* at ¶ 7.) Congress has authorized the Judicial Conference that it "may, only to the extent necessary, prescribe reasonable fees . . . for access to information available through automatic data processing equipment." 28 U.S.C. § 1913 note. The fees "shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.*

Plaintiffs allege that the fee was $.07 per page in 1998, with a maximum of $2.10 per request introduced in 2002. (Compl. at ¶ 8.) The AO increased the fee to $.08 per page in 2005 and to $.10 per page in 2012. (*Id.* at ¶¶ 13, 19.) The current fee is $.10 per page, with a maximum of $3.00 per record. (*Id.* at ¶ 7.) Plaintiffs claim that these fees are "far more than necessary to recover the cost of providing access to electronic records." (*Id.* at ¶ 9.) For example, in 2012 the judiciary spent $12.1 million generated from public access receipts on the public access system, while it spent more than $28.9 million of the receipts on courtroom technology. (*Id.* at ¶ 20.) "In 2014 . . . the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems." (*Id.* at ¶ 21.)

Named plaintiffs are nonprofit organizations that have incurred fees for downloading records from PACER. (Compl. at ¶¶ 1-3.) Plaintiff National Veterans Legal Services Program (NVLSP) "has represented thousands of veterans in individual court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs." (*Id.* at ¶ 1.) Plaintiff

National Consumer Law Center (NCLC) conducts "policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates." (*Id.* at ¶ 2.) Plaintiff Alliance for Justice (AFJ) "is a national association of over 100 public-interest organizations that focus on a broad array of issues" and "works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans." (*Id.* at ¶ 3.)

Plaintiffs claim that the fees they have been charged violate the E-Government Act because they exceed the cost of providing the records. (Compl. at 2.) Furthermore, they claim that excessive fees have "inhibited public understanding of the courts and thwarted equal access to justice." (*Id.* at 2.) Based on the alleged violation of the E-Government Act, plaintiffs assert that the Little Tucker Act entitles them to a "refund of the excessive PACER fees illegally exacted." (*Id.* at ¶¶ 33-34.) Plaintiffs seek to pursue this claim on behalf of a class of "all individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (*Id.* at ¶ 27.) "Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000." (*Id.* at ¶ 5.)

## ANALYSIS

Defendant seeks dismissal of plaintiffs' complaint on two grounds. First, defendant argues that this suit is barred because a similar suit was filed first in the Court of Federal Claims. Second, it argues that plaintiffs have failed to state a claim under the Little Tucker Act because they did not first present their challenge to the PACER Service Center. The Court rejects both arguments.

## I.   LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a 12(b)(6) motion, a court may consider the complaint, documents incorporated in the complaint, and matters of which courts may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). To survive a motion to dismiss under Rule 12(b)(1), plaintiffs bear the burden of demonstrating that the Court has subject-matter jurisdiction, and the Court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

## II.   FIRST-TO-FILE RULE

Under the "first-to-file rule," "when two cases are the same or very similar, efficiency concerns dictate that only one court decide both cases." *In re Telebrands Corp.*, 824 F.3d 982, 984 (Fed. Cir. 2016); *see also UtahAmerican Energy, Inc. v. Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) ("[W]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first." (quoting *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980))).[2] The rule reflects concerns that "district courts

---

[2] The Federal Circuit has exclusive jurisdiction over appeals from Little Tucker Act suits, and therefore, the law of the Federal Circuit applies to both the merits of those cases and related procedural issues. 28 U.S.C. § 1295(a)(2); *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952-53 (Fed. Cir. 1990); *United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*, 833 F.2d 994, 997 (Fed. Cir. 1987). Here, the Court would reach the same result on the first-to-file issue under either the Federal Circuit's or the D.C. Circuit's law.

4

would be required to duplicate their efforts" and "twin claims could generate contradictory results." *UtahAmerican*, 685 F.3d at 1124. A judge considering a first-to-file challenge to a suit that was filed second and that raises different claims from the first suit should determine "whether the facts and issues 'substantially overlap.'" *Telebrands*, 824 F.3d at 984-85.

Defendant contends that this suit is barred by *Fisher v. United States*, No. 15-1575C, 2016 WL 5362927 (Fed. Cl. Sept. 26, 2016). According to defendant, both this case and *Fisher* "involve allegations that the same entities utilized the PACER System and were charged more for downloading information than is authorized by the same statutes and agreements." (Def.'s Mot. at 13.) Furthermore, defendant asserts that "[t]he class here would include nearly every class member in *Fisher*." (*Id.*) Plaintiffs respond that "plaintiff in *Fisher* challenges a particular aspect of the formula that PACER uses to convert docket reports to billable pages" but he "does *not* . . . challenge the PACER fee schedule itself, as our case does." (Pls.' Opp. at 2.)

The Court agrees that the first-to-file rule does not apply here. According to the class action complaint in *Fisher*, "PACER claims to charge users $0.10 for each page in a docket report" and calculates pages by equating 4,320 extracted bytes to one page, thus "purporting to charge users $0.10 per 4,320 bytes. But the PACER system actually miscalculates the number of extracted bytes in a docket report, resulting in an overcharge to users." First Am. Class Action Compl. at ¶¶ 2, 37, *Fisher v. United States*, No. 15-1575C (Fed. Cl. May 12, 2016), ECF No. 8. In their illegal exaction claim, the *Fisher* plaintiffs assert that "[t]he Electronic Public Access Fee Schedule only authorizes fees of $0.10 per page," but "[b]y miscalculating the number of bytes in a page, the AO collected charges from Plaintiff and the Class in excess of $0.10 per page . . . ." *Id.* at ¶¶ 73-74. In other words, *Fisher* claims an *error in the application* of the PACER fee schedule to a particular type of request. In contrast, plaintiffs here challenge the

*legality* of the fee schedule.  (Compl. at 2.)  These are separate issues, and a finding of liability in one case would have no impact on liability in the other case.  Therefore, the Court will not dismiss the suit based on the first-to-file rule.

## III.   FAILURE TO STATE A LITTLE TUCKER ACT CLAIM

The Little Tucker Act gives district courts jurisdiction over a "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States."  28 U.S.C. § 1346(a)(2).  Interpreting the identical wording of the Tucker Act, which applies to claims that exceed $10,000, the Federal Circuit has held that a plaintiff can "recover an illegal exaction by government officials when the exaction is based on an asserted statutory power" and "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).  The statute causing the exaction must also provide "either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000)); *see also N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015).

According to defendant, plaintiffs have failed to state a claim under the Little Tucker Act and that failure warrants dismissal under Federal Rules of Civil Procedure 12(b)(6) and also 12(b)(1), because the Little Tucker Act is the source of the Court's jurisdiction.  (Def.'s Mot. at 1, 16 n.6.)  Defendant asks this Court to take judicial notice of the fact that users cannot obtain a

PACER account without agreeing to the PACER policies and procedures, which include a statement that users "must alert the PACER Service Center to any errors in billing within 90 days of the date of the bill." (*Id.* at 10, 13.) On the basis of this policy, defendant argues that (1) plaintiffs have not performed a condition precedent in the contract, which is akin to an administrative exhaustion requirement, and (2) plaintiffs have no statutory remedy when they have failed to fulfill the contractual condition. (Def.'s Mot. at 13-19.) Plaintiffs do not dispute the PACER policy statement or object to this Court's taking judicial notice of it, but they argue that the statement is irrelevant because they are not claiming a billing error. (Pls.' Opp. at 4-5.)

The court in *Fisher* has already rejected defendant's arguments that the PACER notification requirement is a contractual condition or creates an administrative exhaustion requirement. *Fisher*, 2016 WL 5362927, at *3, *5-*6 (reasoning that contractual conditions must be expressly stated in conditional language and that there can be no administrative exhaustion requirement unless the suggested administrative proceeding involves some adversarial process). This Court need not reach those legal issues because, unlike *Fisher*, plaintiffs here do not claim a billing error. Therefore, even if the notification requirement constituted a contractual condition, it would not apply to the plaintiffs' challenges to the legality of the fee schedule. Likewise, even if users were required to exhaust their claims for billing errors, that requirement would not apply to the claim in this case. In sum, the PACER policy statement provides no basis for dismissing this suit.

## CONCLUSION

For the reasons discussed above, defendant's motion to dismiss or, in the alternative, for summary judgment is denied. A separate Order accompanies this Memorandum Opinion.

/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: December 5, 2016

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL          )
  SERVICES PROGRAM, et al.,    )
                        )
         Plaintiffs,          )
                        )
      v.                        ) Civil Action No. 16-745 ESH
                        )
UNITED STATES OF AMERICA,        )
                        )
         Defendant.          )
                        )
_____)

## ANSWER

For its answer to the class action complaint in t5he above action, Defendant admits, denies, and alleges as follows:

### Introduction[1]

The allegations contained in Plaintiffs' opening paragraphs constitute conclusions of law, and Plaintiffs' characterization of its case, to which no answer is required.

1. Defendant denies the allegations contained in first, second and third sentences of paragraph 1 for lack of knowledge or information sufficient to form a belief as to their truth. Denies the allegations contained in the fourth sentence of paragraph 1.

---

[1] Where Defendant has included the headings from Plaintiffs' Complaint, it has done so merely for ease of reference. Defendant does not thereby admit that the headings are accurate.

2.  Defendant denies the allegations contained in the first, second and third sentences of paragraph 2 for lack of knowledge or information sufficient to form a belief as to their truth.  Denies the allegations contained in the fourth sentence of paragraph 2.

3.  Defendant denies the allegations contained in first, second, third and fourth sentences of paragraph 3 for lack of knowledge or information sufficient to form a belief as to their truth.  Denies the allegations contained in the fourth sentence of paragraph 3.

4.  Defendant admits that the AO and the PACER Service Center administer PACER, but denies the allegation that the AO charges fees for access to public records.

### Jurisdiction And Venue

5.  The allegations contained in paragraph 5 constitute conclusions of law to which no answer is required.

6.  The allegations contained in paragraph 6 constitute conclusions of law to which no answer is required.

### Allegations

7.  Denies the allegation contained in the first sentence of paragraph 7.  Admits that PACER is managed by the AO, but denies the other allegations contained in the second sentence of

-2-

paragraph 7.  Denies the allegation contained in the third and fourth sentence of paragraph 7.  Admits that the current court fee is $0.10 per page with a maximum of $3.00 per document or case specific report, (excluding transcripts).  Admits the charge for audio files is $2.40 per audio file and that there is no charge for opinions.  Denies the allegations contained in the seventh sentence of paragraph 7.  The allegations contained in the last sentence of paragraph 7 constitute conclusions of law to which no answer is required.

        8.  Defendant denies the allegations contained in the first sentence of paragraph 8.  The allegations contained in the second sentence of paragraph 8 constitute conclusions of law to which no answer is required; to the extent that they may be deemed allegations of fact, they are denied. Defendant denies the allegations contained in the third sentence of paragraph 8.

        9.  Denied.

        10.  Defendant denies the allegations contained in the first sentence of paragraph 10, and denies the allegations in the second sentence of paragraph 10 that the discussion paper was an internal report on how the ECF system would be funded. Defendant denies the allegations contained in the third sentence of paragraph 10 with regard to any principles being emphasized.

-3-

Defendant denies the allegations contained in the fourth
sentence of paragraph 10 that the AO contemplated how ECF could
be funded.

11.  Defendant denies the allegations contained in the
first sentence of paragraph 11.  The allegations contained in
the second sentence of paragraph 11 constitute conclusions of
law to which no answer is required; to the extent that it may be
deemed an allegation of fact, it is denied.

12.  Defendant admits the allegations of paragraph 12 to
the extent supported by the source cited, which is the best
evidence of its contents; otherwise the allegations are denied
and the Court is respectfully referred to the cited document for
a full, fair and accurate account of its contents.

13.  Defendant Admits the allegations contained in the
first sentence of paragraph 13 to the extent supported by the
source cited, which is the best evidence of its contents;
otherwise the allegations are denied and the Court is
respectfully referred to the cited document for a full, fair and
accurate account of its contents.  Defendant denies the
allegations contained in the remaining sentences of paragraph
13.

-4-

14.   The allegations contained in the first sentence of paragraph 14 constitute Plaintiffs' characterization of the case, to which no answer is required; to the extent that it may be deemed an allegation of fact, it is denied.  Defendant admits the allegations contained in the second sentence of paragraph 14 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

15.   Defendant admits the allegations contained in paragraph 15 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

16.   Defendant admits the allegations contained in paragraph 16 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

17.   Defendant admits the allegations contained in paragraph 17 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations

-5-

are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

18.  Defendant admits the allegations contained in paragraph 18 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

19.  Defendant denies the allegation contained in the first sentence of paragraph 19.  Admits the allegations contained in the second sentence of paragraph 18 to the extent supported by the source cited, which is the best evidence of its contents; otherwise denies the allegations; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents. Defendant denies the allegations contained in the remaining sentences of paragraph 19.

20.  Defendant admits the allegations contained in paragraph 20 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

-6-

21.  Defendant denies the allegations contained in the first sentence of paragraph 21, and admits the allegations contained in the second and third sentence of paragraph 21 to the extent supported by the sources cited, which are the best evidence of their contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

22.  Admits the allegations contained in paragraph 22 to the extent supported by the source cited, which is the best evidence of its contents; otherwise denies the allegations.

23.  Denied.

24.  The allegations contained in the last sentence of paragraph 24 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact they are denied.  Defendant admits the allegations contained in the rest of paragraph 24 to the extent supported by the sources cited, which are the best evidence of their contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

25.  The allegations in the first sentence of paragraph 25 relate to a 10-year-old complaint that is not available on PACER

-7-

and are denied for lack of knowledge or information sufficient to form a belief as to their truth. The allegation contained in the last sentence of paragraph 25 constitutes a conclusion of law to which no response is required. Defendant admits the allegations contained in the other sentences in paragraph 25 to the extent supported by the source cited, which is the best evidence of its contents; otherwise the allegations are denied and the Court is respectfully referred to the cited document for a full, fair and accurate account of its contents.

26. The allegation contained in paragraph 26 constitutes a conclusion of law to which no response is required.

27. The allegation contained in paragraph 27 constitutes a restatement of Plaintiffs' case to which no response is required; to the extent that it may be deemed an allegation of fact, it is denied.

28. The allegations contained in paragraph 28 constitute conclusions of law to which no answer is required; to the extent that it may be deemed an allegation of fact, it is denied.

29. The allegations contained in paragraph 29, including parts i and ii, constitute conclusions of law to which no answer is required; to the extent that they may be deemed allegations of fact, they are denied.

-8-

30-34.  The allegations contained in paragraphs 30 to 34 constitute conclusions of law to which no answer is required; to the extent that they may be deemed an allegation of fact, they are denied.

The remainder of the Complaint is Plaintiffs' prayer for relief.  Defendant denies that Plaintiffs are entitled to the relief set forth in the prayer for relief or to any relief whatsoever.

Defendant denies each and every allegation not previously admitted or otherwise qualified.

<u>Affirmative Defense(s)</u>

Plaintiffs have failed timely to exhaust administrative remedies that were available to them and which they agreed to employ to contest their billings, and, as a result, they have also failed to mitigate damages.

-9-

WHEREFORE, defendant requests that the Court enter judgment in its favor, order that the complaint be dismissed, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CHANNING D. PHILLIPS, DC Bar #415793
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: _____ /s/
    W. MARK NEBEKER, DC Bar #396739
    Assistant United States Attorney
    555 4th Street, N.W.
    Washington, DC  20530
    (202) 252-2536
    mark.nebeker@usdoj.gov

-10-

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing Answer has been made through the Court's electronic transmission facilities on this 19th day of December, 2016.

                                                        /s/
                                    _____
                                    W. MARK NEBEKER, DC Bar #396739
                                    Assistant United States Attorney
                                    555 4th Street, N.W.
                                    Washington, DC  20530
                                    (202) 252-2536
                                    mark.nebeker@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.
*Plaintiffs,*

v.

UNITED STATES OF AMERICA,
*Defendant.*

Case No. 16-745

## DECLARATION OF DANIEL L. GOLDBERG

I, Daniel L. Goldberg, declare as follows:

1.      I am the Legal Director of the Alliance for Justice (AFJ), a national association of over 100 public-interest organizations that focus on a broad array of issues—including civil rights, human rights, women's rights, children's rights, consumer rights, and ensuring legal representation for all Americans. On behalf of these groups and the public-interest community, AFJ works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans.

2.      AFJ has paid at least $391.40 in fees to the PACER Service Center to obtain public court records within the past six years. AFJ has never sought exemptions from PACER fees at any time during the class period given the financial-hardship and other requirements that would have applied. In 2015, AFJ's annual revenues were $4.02 million, our expenses were $4.50 million, and our net assets were $4.36 million.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

*/s/ Daniel L. Goldberg*

Executed on January 19, 2017.       _____

Daniel L. Goldberg

Case: 24-1757     Document: 15-1     Page: 205     Filed: 07/16/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.
*Plaintiffs,*

v.

UNITED STATES OF AMERICA,
*Defendant.*

Case No. 16-745

## DECLARATION OF STUART ROSSMAN

I, Stuart T. Rossman, declare as follows:

1.      I am the Litigation Director of the National Consumer Law Center (NCLC), a national nonprofit organization that seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans. NCLC pursues these goals through policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates throughout the nation.

2.      In the course of its research, litigation, and other activities, NCLC has paid at least $5,863.92 in fees to the PACER Service Center to obtain public court records within the past six years. NCLC has never sought exemptions from PACER fees at any time during the class period given the financial-hardship and other requirements that would have applied. In 2015, NCLC's annual revenues were $11.49 million, our expenses were $11.72 million, and our net assets were $17.97 million.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on January 19, 2017.

Stuart T. Rossman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.
*Plaintiffs,*

v.

UNITED STATES OF AMERICA,
*Defendant.*

Case No. 16-745

## DECLARATION OF BARTON F. STICHMAN

I, Barton F. Stichman, declare as follows:

1.    I am Joint Executive Director of the National Veterans Legal Services Program (NVLSP), a nonprofit organization that seeks to ensure that American veterans and active-duty personnel receive the full benefits to which they are entitled for disabilities resulting from their military service. Over the years, the organization has represented thousands of veterans in court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs.

2.    In 2016, NVLSP paid $317 in fees to the PACER Service Center to obtain public court records. I estimate that we paid similar amounts annually over the past six years. NVLSP has never sought exemptions from PACER fees during the class period given the financial-hardship requirements that would have applied. In 2014, NVLSP had revenues of $3.75 million, expenses of $3.72 million, and net assets of $3.86 million.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on January 19, 2017.

_____
Barton F. Stichman

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*, Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 16-745 (ESH) |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' motion for class certification [ECF No. 8] is **GRANTED**; and it is further

**ORDERED** that pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), a class is certified that consists of:

> All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities.

It is further **ORDERED** that the Court certifies one class claim: that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act; it is further

**ORDERED** that Gupta Wessler PLLC and Motley Rice LLC are appointed as co-lead class counsel; and it is further

**ORDERED** that within 30 days of the date of this Order, the parties shall file an agreed-

upon proposed form of class notice.  If the parties cannot agree on a proposed form of class

notice, then they shall file separate proposed forms within 20 days of the date of this Order.

After a form of class notice has been determined by the Court, class counsel shall ensure that

individual notice is provided to all absent class members who can be identified through

reasonable efforts using the records maintained by defendant, as required by Fed. R. Civ. P.

23(c)(2), within 90 days of the Court's order approving the form of notice.  Class counsel shall

pay all costs incurred to provide notice.

It is further **ORDERED** that the parties shall proceed according to the Scheduling Order

issued on January 24, 2017.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   January 24, 2017

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM,** *et al.*, **Plaintiffs,** v. **UNITED STATES OF AMERICA,** **Defendant.** | **Civil Action No. 16-745 (ESH)** |

## MEMORANDUM OPINION

Plaintiffs, organizations and individuals who have paid fees to obtain records through the Public Access to Court Electronic Records system (PACER), claim that PACER's fee schedule is higher than necessary to cover the costs of operating PACER and therefore violates the E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (codified as 28 U.S.C § 1913 note). (Compl. at 2, ECF No. 1.) They have brought this class action against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), to recover the allegedly excessive fees that they have paid over the last six years. (*Id.* at 14-15, ¶¶ 33-34.) Plaintiffs have moved to certify a class of "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (Pls.' Mot. Class Certif., ECF No. 8.) The proposed class representatives are three nonprofit legal advocacy organizations: the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice. (*Id.* at 14.) Defendant opposes class certification primarily on the ground that the named plaintiffs are not adequate representatives because they are eligible to apply for PACER fee exemptions, while some other

class members are not.  (Def.'s Opp., ECF. No. 13)  For the reasons herein, the Court will grant

plaintiffs' motion and certify a class under Rule 23(b)(3).

## BACKGROUND

PACER is an online electronic records system provided by the Federal Judiciary that

allows public access to case and docket information from federal courts.  PACER,

https://www.pacer.gov (last visited Jan. 23, 2017).  Congress has authorized the Judicial

Conference that it "may, only to the extent necessary, prescribe reasonable fees . . . for access to

information available through automatic data processing equipment."  28 U.S.C. § 1913 note.

The fees "shall be deposited as offsetting collections . . . to reimburse expenses incurred in

providing these services."  *Id.*  Plaintiffs allege that the fee to use PACER was $.07 per page in

1998, with a maximum of $2.10 per request introduced in 2002.  (Compl. at ¶ 8.)  The fee

increased to $.08 per page in 2005 and to $.10 per page in 2012.  (*Id.* at ¶¶ 13, 19.)

The current PACER fee schedule issued by the Judicial Conference sets forth both the

access fees and the conditions for exemption from the fees.  *Electronic Public Access Fee*

*Schedule*, PACER, https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013).

The current fee is $.10 per page, with a maximum of $3.00 per record for case documents but no

maximum for transcripts and non-case specific reports.  *Id.*  There is no fee for access to judicial

opinions, for viewing documents at courthouse public access terminals, for any quarterly billing

cycle in which a user accrues no more than $15.00 in charges, or for parties and attorneys in a

case to receive one free electronic copy of documents filed in that case.  *Id.*  As a matter of

discretion, courts may grant fee exemptions to "indigents, bankruptcy case trustees, *pro bono*

attorneys, *pro bono* alternative dispute resolution neutrals, Section 501(c)(3) not-for-profit

organizations, and individual researchers associated with educational institutions," but only if

2

they "have demonstrated that an exemption is necessary in order to avoid unreasonable burdens and to promote public access to information." *Id.* "Courts should not . . . exempt individuals or groups that have the ability to pay the statutorily established access fee." *Id.* "[E]xemptions should be granted as the exception, not the rule," should be granted for a definite period of time, and should be limited in scope. *Id.*

Plaintiffs claim that the fees they have been charged violate the E-Government Act because they are "far more than necessary to recover the cost of providing access to electronic records." (Compl. at 2, ¶ 9.) For example, in 2012 the judiciary spent $12.1 million generated from public access receipts on the public access system, while it spent more than $28.9 million of the receipts on courtroom technology. (*Id.* at ¶ 20.) "In 2014 . . . the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems." (*Id.* at ¶ 21.) Furthermore, plaintiffs claim that excessive fees have "inhibited public understanding of the courts and thwarted equal access to justice." (*Id.* at 2.) Based on the alleged violation of the E-Government Act, plaintiffs assert that the Little Tucker Act entitles them to a "refund of the excessive PACER fees illegally exacted." (*Id.* at ¶¶ 33-34.) "Each plaintiff and putative class member has multiple individual illegal-exaction claims against the United States, none of which exceeds $10,000." (*Id.* at ¶ 5.)

Named plaintiffs are nonprofit organizations that have incurred fees for downloading records from PACER. (Compl. at ¶¶ 1-3.) Plaintiff National Veterans Legal Services Program (NVLSP) "has represented thousands of veterans in individual court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules and policies of the U.S. Department of Veterans Affairs." (*Id.* at ¶ 1; Stichman

3

Appx0207

Decl. ¶ 1, ECF No. 30.)  Plaintiff National Consumer Law Center (NCLC) conducts "policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates." (Compl. at ¶ 2; Rossman Decl. ¶ 1, ECF No. 29.)  Plaintiff Alliance for Justice (AFJ) "is a national association of over 100 public-interest organizations that focus on a broad array of issues" and "works to ensure that the federal judiciary advances core constitutional values, preserves unfettered access to the courts, and adheres to the even-handed administration of justice for all Americans."  (Compl. at ¶ 3; Goldberg Decl. ¶ 1, ECF No. 28.)

During the six years covered by this lawsuit, named plaintiffs regularly paid fees to use PACER.  NVLSP paid $317 in PACER fees in 2016 and estimates that it has paid similar amounts annually over the past six years.  (Stichman Decl. ¶ 2.)  NCLC paid at least $5,863 in fees during the past six years.  (Rossman Decl. ¶ 2; Mot. Hr'g Tr. 2, Jan. 18, 2017.)  AFJ paid at least $391 in fees during the past six years.  (Goldberg Decl. ¶ 2; Tr. 3.)  None of the three named plaintiffs asked for exemptions from PACER fees, because they could not represent to a court that they were unable to pay the fees.  (Tr. 3-4.)  The reason for this is that each organization has annual revenue of at least $3 million.  (*Id.*; Stichman Decl. ¶ 2; Rossman Decl. ¶ 2; Goldberg Decl. ¶ 2.)

In a prior opinion, this Court denied defendant's motion to dismiss the suit.  *See National Veterans Legal Services Program v. United States*, No. 16-cv-745, 2016 WL 7076986 (D.D.C. Dec. 5, 2016).  First, the Court held that the first-to-file rule did not bar this suit because it concerns the legality of the PACER fee schedule, whereas the plaintiffs in *Fisher v. United States*, No. 15-1575C (Fed. Cl. May 12, 2016), claim an error in the application of the fee schedule.  *Id.* at *3.  Second, the Court held that plaintiffs were not required to alert the PACER Service Center about their claims as a prerequisite to bringing suit under the Little Tucker

Act.  *Id.*

In the current motion, plaintiffs have asked this Court to certify a class under Rule 23(b)(3) or, in the alternative, 23(b)(1).  (Pls.' Mot. at 18.)  Their motion proposed a class of "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government."  (*Id.* at 1.)  In opposition to class certification, defendant argues that (1) plaintiffs have failed to demonstrate that they satisfy the numerosity requirement, because they have not established the number of users who raised their concerns with the PACER Service Center or the number of potential plaintiffs who are nonprofit organizations; (2) the class representatives fail the typicality and adequacy requirements, because their nonprofit status makes them eligible to request fee exemptions, which not all class members can do; (3) the Court should not allow this suit to proceed as a class action, because it could produce results that conflict with those in *Fisher*; and (4) individual questions predominate, because the Court would need to determine whether each user received free pages in excess of the 30 charged pages, such that the user's per page cost did not violate the E-Government Act.  (Def.'s Opp. at 9-22.)

**ANALYSIS**

**I.      JURISDICTION**

Although defendant has not raised any jurisdictional arguments in its opposition to class certification, courts must assure themselves that they have jurisdiction.  Plaintiffs have brought this case under the Little Tucker Act, which gives district courts jurisdiction over a "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any

express or implied contract with the United States." 28 U.S.C. § 1346(a)(2).[1]  Interpreting the identical wording of the Tucker Act, which applies to claims that exceed $10,000, the Federal Circuit has held that a plaintiff can "recover an illegal exaction by government officials when the exaction is based on an asserted statutory power" and "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).[2]

    In their complaint, plaintiffs request "monetary relief for any PACER fees collected by the defendant in the past six years that are found to exceed the amount authorized by law." (Compl. at 14-15.)  A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000.  *Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 76-77 (D.D.C. 1991); *Alaska Airlines v. Austin*, 801 F. Supp. 760, 762 (D.D.C. 1992), *aff'd*

---

[1] The Federal Circuit has exclusive jurisdiction over appeals from Little Tucker Act suits, and therefore, the law of the Federal Circuit applies to both the merits of those cases and related procedural issues.  28 U.S.C. § 1295(a)(2); *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952-53 (Fed. Cir. 1990); *United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*, 833 F.2d 994, 997 (Fed. Cir. 1987).  This Court refers to Federal Circuit precedent when it exists.

[2] For the Court to have jurisdiction over an illegal exaction claim under the Little Tucker Act, the statute causing the exaction must also provide "either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000)).  The Court of Federal Claims has taken an expansive view of the phrase "necessary implication" because "[o]therwise, the Government could assess any fee or payment it wants from a plaintiff acting under the color of a statute that does not expressly require compensation to the plaintiff for wrongful or illegal action by the Government, and the plaintiff would have no recourse for recouping the money overpaid."  *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015).

6

*in relevant part by Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 797 (Fed. Cir. 1993); *United States v. Louisville & Nashville R.R. Co.*, 221 F.2d 698, 701 (6th Cir. 1955). Plaintiffs assert that no class member has a claim exceeding $10,000 for a single PACER transaction, and defendant does not dispute this. (Pls.' Mot. at 11; Tr. 22-23.) Therefore, plaintiffs' monetary claim does not exceed the jurisdictional limitation of the Little Tucker Act.

## II.   CLASS CERTIFICATION

Rule 23 sets forth two sets of requirements for a suit to be maintained as a class action. Fed. R. Civ. P. 23. First, under Rule 23(a), all class actions must satisfy the four requirements of numerosity, commonality, typicality, and adequacy. Second, the suit must fit into one of the three types of class action outlined in Rule 23(b)(1), (b)(2), and (b)(3). The Court finds that this suit satisfies the 23(a) requirements and that a class should be certified under 23(b)(3).

### A. Class Definition

In their motion for class certification, plaintiffs propose a class of "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government." (Pls.' Mot. at 1.) At the motion hearing, plaintiffs suggested that it would actually only be necessary to exclude federal executive branch agencies, because their concern was that the Justice Department could not both defend the suit and represent executive branch agency plaintiffs. (Tr. 5-7.) The Court shares plaintiffs' concern but finds that the issue is not limited to executive branch agencies. "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General." 28 U.S.C. § 516. Many independent agencies lack independent litigating authority and are instead represented by the Justice Department, at least on some issues or in

7

some courts.  *See* Neal Devins, *Unitariness and Independence: Solicitor General Control over Independent Agency Litigation*, 82 Cal. L. Rev. 255, 263-80 (1994); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 799-804 (2013).  Some commentators consider independent regulatory commissions and boards to be on the boundary between the executive and legislative branches, and yet the Solicitor General typically controls their litigation before the Supreme Court.  Anne Joseph O'Connell, *Bureaucracy at the Boundary*, 162 U. Pa. L. Rev. 841, 867, 920-21 (2014).  To avoid individualized questions about the litigating authority of federal entities, the Court will exclude from the class all federal government entities, not only executive branch agencies.

For the sake of clarity, the Court will make two additional minor modifications to the proposed class definition before analyzing the requirements of Rule 23.  First, the class definition that plaintiffs introduced in their complaint and repeated in their motion for class certification defines the class in terms of those "who have paid fees for the use of PACER within the past six years," but that language is unclear when it is no longer associated with the dated complaint.  Thus, the Court will substitute the actual dates for the six-year period ending on the date of the complaint—April 21, 2016.  (Compl. at 15.)  Second, rather than stating that the definition excludes "class counsel," the Court will state that it excludes "class counsel in this case."  Plaintiffs' counsel stated at the motion hearing that they were excluding only themselves, not all PACER users who have acted as counsel in class actions.  (*See* Tr. 7.).  The modified class definition is: "All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities."

**B. Rule 23(a) Requirements**

Under Rule 23(a), a suit may be maintained as a class action "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

**1. Numerosity**

Plaintiffs claim that the joinder of all members of their proposed class would be impracticable because they estimate that the class contains at least several hundred thousand members. (Pls.' Mot. at 12-13.) Defendant raises two arguments to challenge this contention. First, defendant argues that "[p]laintiffs have failed to establish that there exist sufficient numbers of would-be class members who may pursue viable claims for alleged overpayment of PACER fees, because all PACER users agree that they will raise any concerns with their PACER bills with the PACER Service Center within 90 days of receiving their bills." (Def.'s Opp. at 9.) In denying defendant's motion to dismiss, this Court has already held that plaintiffs were not required to alert the PACER Service Center about their claims as a prerequisite to bringing suit under the Little Tucker Act. *NVLSP*, 2016 WL 7076986, at *3. Therefore, defendant is wrong to count only potential class members who have alerted the PACER Service Center.

Second, defendant argues that "[p]laintiffs are only able adequately to represent the

9

interests of non-profit PACER users" and "named Plaintiffs have made no attempt to identify the number of non-profit organizations who would share their claims."  (Def.'s Opp. at 10.)  As defendant's own language suggests, defendant's argument is actually about adequacy of representation, not about numerosity.  When the Court reaches the adequacy requirement below, it will address plaintiffs' ability to represent entities other than nonprofit organizations.

Defendant does not dispute that it would be impracticable to join all members of the class that plaintiffs have proposed: "[a]ll individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government."  (Pls.' Mot. at 1; Def.'s Opp. at 9-10.)  In 2012 the Judiciary reported that there were currently more than 1.4 million user accounts, and there had been 325,000 active users in 2009.  *Electronic Public Access Program Summary*, PACER (Dec. 2012), https://www.pacer.gov/documents/epasum2012.pdf.  Accepting the Judiciary's estimate that approximately 65-75 percent of active users are exempt from fees in at least one quarter during a typical fiscal year, *id.*, there remain a very large number of users paying fees in a typical year.  Although the parties have not presented any precise data about the size of the class, there is no question that the class satisfies the numerosity requirement.

### 2.  Commonality

A common question is a question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  Plaintiffs argue that the two most important questions presented by their suit are common: (1) "Are the fees imposed for PACER access excessive in relation to the cost of providing the access . . . ?" and (2) "[W]hat is the measure of damages for the excessive fees charged?"  (Pls.'

Mot. at 13.)  Defendant has not argued that plaintiffs' proposed class fails to satisfy the

commonality requirement (*see* Def.'s Opp. at 8),[3] and this Court agrees that the legality of the

PACER fee schedule and the formula for measuring any damages are common questions.

### 3. Typicality

A class representative's "'claim is typical if it arises from the same event or practice or

course of conduct that gives rise to a claim of another class member's where his or her claims are

based on the same legal theory.'" *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003)

(quoting *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C.1996)).  A leading treatise on class

actions has explained that "typicality focuses on the similarities between the class

representative's claims and those of the class while adequacy focuses on evaluating the

incentives that might influence the class representative in litigating the action, such as conflicts

of interest."  William B. Rubenstein, *Newberg on Class Actions* § 3:32 (5th ed. 2016).

According to named plaintiffs, their claims "are typical of the class because they arise

from the same course of conduct by the United States (imposing a uniform PACER fee schedule

that is higher than necessary to reimburse the cost of providing the service) and are based on the

same legal theory (challenging the fees as excessive, in violation of the E-Government Act)."

(Pls.' Mot. at 14.).  In response, defendant argues that named plaintiffs are "unlike other PACER

users, in that they have the ability to request PACER fee exemptions as non-profits."  (Def.'s

Opp. at 11.)  According to defendant, named plaintiffs' claims are not typical because they

"appear unwilling to push to reduce those fees beyond the limit that would affect free access to

their favored sub-set of PACER users."  (*Id.* at 13.)

---

[3] Defendant stated on the first page of its filing that "Plaintiffs have failed to establish . . . a
commonality of claims."  (Def.'s Opp. at 1.)  However, it omitted commonality from a later list
of challenges, *see id.* at 8, and failed to raise any argument about commonality.

Contrary to defendant's argument, plaintiffs satisfy the typicality requirement. Named plaintiffs and all class members are challenging the PACER fee schedule on the theory that it violates the E-Government Act by generating revenue that exceeds the costs of providing PACER. Defendant's objection focuses not on differences between named plaintiffs' claims and those of other class members but on incentives that could affect how named plaintiffs would pursue the litigation. Thus, the Court will address defendant's objection under the rubric of adequacy, which is the crux of defendant's opposition.

### 4. Adequacy

"'Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel.'" *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575-76 (D.C. Cir. 1997) (quoting *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)). Conflicts of interest prevent named plaintiffs from satisfying the adequacy requirement only if they are "fundamental to the suit and . . . go to the heart of the litigation." *Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 216 (D.D.C. 2015) (quoting *Newberg* § 3:58); *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012). Furthermore, conflicts will not defeat the adequacy requirement if they are speculative or hypothetical. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003). "[P]otential conflicts over the distribution of damages . . . will not bar a finding of adequacy at the class certification stage." *Newberg* § 3:58.

According to defendant, named plaintiffs are not adequate representatives because "[t]heir interests in free PACER access for their favored subset of PACER users diverge from the

12

Appx0216

interests of those PACER [users] seeking to minimize their costs of PACER use." (Def.'s Opp. at 15.) Defendant argues that named plaintiffs' nonprofit status gives them "the ability to request PACER fee exemptions." (*Id.* at 11.) Defendant further asserts that named plaintiffs are "interest[ed] in free PACER access to their groups of veterans, elderly and low-income consumers, and other public interest organizations of concern to the named Plaintiffs." (*Id.* at 12.) As a result, defendant reasons, "Plaintiffs appear unwilling to push to reduce those fees beyond the limit that would affect free access to their favored sub-set of PACER users." (*Id.* at 13.)

Defendant greatly exaggerates the relevance of named plaintiffs' nonprofit status. It is true that "a court may consider exempting . . . Section 501(c)(3) not-for-profit organizations" from payment of PACER fees. *Electronic Public Access Fee Schedule*. However, the Fee Schedule also instructs courts that applicants must "have demonstrated that an exemption is necessary in order to avoid unreasonable burdens and to promote public access to information." *Id.* "Courts should not . . . exempt individuals or groups that have the ability to pay the statutorily established access fee." *Id.* "[E]xemptions should be granted *as the exception*, not the rule." *Id.* (emphasis added). Courts grant exemptions only for access to their own district's records, and some districts are more willing than others to grant exemptions. *See* Christina L. Boyd & Jacqueline M. Sievert, *Unaccountable Justice? The Decision Making of Magistrate Judges in the Federal District Courts*, 34 Just. Sys. J. 249, 255 & n.1 (2013). This Court has found examples where courts granted exemptions to nonprofit organizations for purposes of litigation, but those organizations had claimed that payment of PACER fees was a financial hardship. *See, e.g.*, Orders Granting Request for Exemption, *PACER Service Center Exemption Requests & Orders*, No. 3:02-mc-00006 (D. Or. 2015), ECF Nos. 33, 35.

13

Appx0217

Named plaintiffs are not exempt from PACER fees and thus share with the other class members an interest in reducing the fees. The PACER fees that named plaintiffs have paid are low relative to their annual revenue and other costs of litigation. Because of their multimillion dollar annual budgets, named plaintiffs have averred that they cannot represent that they are unable to pay PACER fees, and as a result, they cannot qualify for exemptions. (Tr. 3-4.) Thus, named plaintiffs must pay PACER fees and accordingly have an interest in reducing those fees.

In fact, the nonprofit organizations who are named plaintiffs in this case make particularly good class representatives. They are interested in reducing PACER fees not only for themselves but also for their constituents. As nonprofit organizations, named plaintiffs exist to advocate for consumers, veterans, and other public-interest causes. (Compl. at ¶¶ 1-3.) The Alliance for Justice is an association of over 100 public-interest organizations, many of whom may face the same barriers as named plaintiffs to obtaining fee exemptions. Individual consumers and veterans may be eligible to apply for exemptions if they are indigent. *Electronic Public Access Fee Schedule*. However, courts frequently deny exemptions even to plaintiffs who have *in forma pauperis* status. *See, e.g.*, *Oliva v. Brookwood Coram I, LLC*, No. 14–cv–2513, 2015 WL 1966357, at *2 (E.D.N.Y. April 30, 2015); *Emrit v. Cent. Payment Corp.*, No. 14–cv–00042, 2014 WL 1028388, at *3 (N.D. Cal. Mar. 13, 2014); *Scott v. South Carolina*, Civ. No. 6:08-1684, 2009 WL 750419, at *1-*2 (D.S.C. March 18, 2009). Thus, named plaintiffs have dual incentives to reduce PACER fees, both for themselves and for the constituents that they represent. In addition, "organizational representatives with experience" can "provide more vigilant and consistent representation than individual representatives." *In re Pharm. Indus. Average Wholesale Price Litig.*, 277 F.R.D. 52, 62 (D. Mass. 2011).

In an attempt to argue that named plaintiffs' commitment to increasing public PACER

14

access actually disqualifies them from being representatives in this suit, defendant asserts that "[p]laintiffs appear unwilling to push to reduce those fees beyond the limit that would affect free access to their favored sub-set of PACER users." (Def.'s Opp. at 13.) This argument assumes the existence of some class members who would argue that the E-Government Act requires the Judicial Conference to eliminate exemptions and charge paying users only the fees that are necessary to provide PACER to them. Not only is such a claim based on sheer speculation, it also lacks viability given that Congress has explicitly directed the Judicial Conference that the "fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information." 28 U.S.C. § 1913 note. Even if a claim to eliminate exemptions were viable and not speculative, it would not create a conflict of interest that would prevent named plaintiffs from being adequate representatives, for a claim to eliminate exemptions would be independent from the claim in this case (i.e., that the E-Government Act prevents the Judiciary from collecting PACER fees that are not necessary to fund PACER). Named plaintiffs' pursuit of this class action will not interfere with other plaintiffs' ability to pursue a claim for elimination of exemptions. For all of these reasons, whether named plaintiffs lack interest in challenging the current exemption policy is irrelevant to their ability to serve as representatives in this suit.

Regarding the adequacy of class counsel, defendant argues only that the divergence in interests between named plaintiffs and other class members prevents named plaintiffs' counsel from adequately representing all class members. (Def.'s Opp. at 15.) The Court rejects this argument for the same reasons that it has already rejected defendant's argument that named plaintiffs have a conflict of interest with other class members. There is no dispute about the

competency of class counsel. (*See* Pls.' Mot., Attachments 1-3; Def.'s Opp. at 15.) In sum, named plaintiffs and their counsel satisfy the adequacy requirement.

### C. Rule 23(b) Requirements

Rule 23(b) describes three types of class action and requires every class action to match one or more of the three types. Fed. R. Civ. P. 23(b); *Newberg* § 4:1. Plaintiffs argue that their proposed class can be certified under 23(b)(1) or 23(b)(3).

### 1. Rule 23(b)(1)

In a 23(b)(1) class action, "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1). According to the Advisory Committee notes to Rule 23, an action "to compel or invalidate an assessment" is the type of class action contemplated in Rule 23(b)(1). Fed. R. Civ. P. 23(b)(1) advisory committee's note to 1966 amendment.

In their motion, plaintiffs argue that Rule 23(b)(1) permits certification of this class action because plaintiffs' complaint "seeks equitable relief," and inconsistent results in separate actions for equitable relief could force the Judiciary into a conflicted position. (Pls.' Mot. at 18.) Plaintiffs' complaint does ask the Court to "[d]eclare that the fees charged for access to records through PACER are excessive." (Compl. at 15.) However, at the motion hearing, plaintiffs stated that the declaration they are requesting is merely a step on the way to granting monetary relief, it is "not . . . equitable relief," and it "wouldn't bind anyone." (Tr. 12-13.) Indeed,

16

plaintiffs acknowledged that they "couldn't seek equitable relief" under the Little Tucker Act. (*Id.*; *see also Doe v. United States*, 372 F.3d 1308, 1312-14 (Fed. Cir. 2004); *Bobula v. U.S. Dep't of Justice*, 970 F.2d 854, 859 (Fed. Cir. 1992).) Therefore, the Court will not certify the class under Rule 23(b)(1).

### 2. Rule 23(b)(3)

To certify a class under Rule 23(b)(3), a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs argue that "[t]he sole individual issue—calculation of each class member's recovery . . . is ministerial" and therefore the common legal questions predominate. (Pls.' Mot. at 19.) In opposition, defendant contends that "the Court will have to assess whether and in what degree the individual Plaintiffs were able to secure free pages in excess of the 30 pages for which they were charged for lengthy documents. If the individual plaintiff's downloads of these documents operate to decrease the per page cost to below that sought by Plaintiffs, then there will be no liability to the class-member." (Def.'s Opp. at 20.) The Court does not share defendant's concern, because plaintiffs' theory of liability is that the fee schedule itself violated the E-Government Act, not that charges to individual plaintiffs violated the Act when they amounted to more than the cost of distribution to those particular plaintiffs. (*See* Pls.' Reply at 6, ECF No. 17.) If plaintiffs prevail on their common legal theory that the Judiciary was required to set a lower rate that corresponded to PACER's funding needs, defendant would be liable to any class member who paid the illegal higher rate. Calculating the amount of damages would be ministerial because it would be proportional to the fees that plaintiffs paid, rather than dependent upon the types of

documents that they obtained.  Therefore, the Court finds that common questions predominate.

Although defendant does not use the word "superiority," it also objects that "class action litigation was not intended to facilitate *two* class actions, which would result if this case proceeds as a class and the *Fisher* case is similarly prosecuted."  (Def.'s Opp. at 21.)  This Court has already rejected the argument that *Fisher* should bar this suit, explaining that the suits make different claims.  *NVLSP*, 2016 WL 7076986, at *3.  Besides, defendant's argument has nothing to do with the superiority of the class action vehicle, as opposed to individual actions.[4]

Allowing this action to proceed as a class action is superior to requiring individual actions, both for reasons of efficiency and to enable individuals to pursue small claims.  As the Supreme Court has explained, "'[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

In sum, the Court will certify the class under Rule 23(b)(3), but it in no way resolves the merits of plaintiffs' challenge to the PACER fee schedule.

### III.    NOTICE TO CLASS MEMBERS

"For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  In their motion for class certification, plaintiffs proposed a class-notice plan involving "email notice . . . to each class member using the contact information maintained by the government" for PACER users.  (*See* Pls.' Mot. at 20.)  Plaintiffs "request that the Court direct the parties to file an agreed-upon

---

[4] Furthermore, the plaintiff in *Fisher* has not yet moved for class certification.  (Tr. 9.)

proposed form of notice (or, if the parties cannot agree, separate forms of notice) within 30 days of the Court's certification order, and direct that email notice be sent to the class within 90 days of the Court's approval of a form of notice." (*Id.*) With no opposition from defendant, the Court will grant this request.

## CONCLUSION

Plaintiffs' motion for class certification is granted, with minor modifications to the proposed class definition. A separate Order accompanies this Memorandum Opinion.

/s/    *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 24, 2017

19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                    *Plaintiffs*,

                                                    Civil Action No. 16-745 ESH

        v.

UNITED STATES OF AMERICA,
                    *Defendant*.

## ORDER APPROVING PLAN OF CLASS NOTICE

WHEREAS, on January 24, 2017, this Court certified the following Class:

> All individuals and entities who have paid fees for the use of
> PACER between April 21, 2010, and April 21, 2016, excluding class
> counsel in this case and federal government entities.

Therefore, pursuant to Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure, and based upon

the record and Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and

Class Notice Documents ("Plaintiffs' Motion," dkt. #42);

**IT IS HEREBY ORDERED THAT:**

1.      Plaintiffs' Motion is GRANTED.

2.      The Revised Email Notice of Pendency of Class Action Lawsuit ("Email

Notice"); the Revised Postcard Notice of Pendency of Class Action Lawsuit ("Postcard

Notice"); the long-form Notice of Pendency of Class Action available online ("Long-Form

Notice"); the printable Exclusion Form; and the online Exclusion Form are hereby approved as

to form. *See* Exhibits 1 and 2 to Notice of Filing of Revised Notice Documents ("Notice of

Filing," dkt. #43); Exhibits 3, 4, and 5 to Plaintiffs' Motion.

3.      To the extent they are not already produced, Defendant shall produce to Plaintiffs'
counsel under the terms of the Stipulated Protective Order (dkt. #41) the available names, postal
addresses, email addresses, phone numbers, and PACER-assigned account numbers of all
individuals and entities who have paid PACER fees ("PACER Fee Database") during the class
period. For purposes of this paragraph, "individuals and entities" is defined as all PACER users
except the following: (1) any user who, during the quarter billed, is on the master Department of
Justice list for that billing quarter; (2) any user with an @uscourts.gov email address extension; or
(3) any user whose PACER bill is sent to and whose email address extension is shared with a
person or entity that receives PACER bills for more than one account, provided that the shared
email address extension is one of the following:   @oig.hhs.gov, @sol.doi.gov, @state.gov,
@bop.gov, @uspis.gov, @cbp.dhs.gov, @usss.dhs.gov, @irscounsel.treas.gov, @dol.gov,
@ci.irs.gov, @ice.dhs.gov, @dhs.gov, @ssa.gov, @psc.uscourts.gov, @sec.gov, @ic.fbi.gov,
@irs.gov, and @usdoj.gov.[1]

4.      On or before the later of (a) thirty days after entry of this Order or (b) thirty days
after Plaintiffs receive the PACER Fee Database from Defendant, KCC LLC (the "Claims
Administrator") shall cause the Email Notice to be disseminated, in substantially the same form
attached as Exhibit 1 to the Notice of Filing, by sending it out via email to potential class
members. The Email Notice shall direct potential class members to a website maintained by
the Claims Administrator. The sender of the email  shall appear to recipients as "PACER Fees
Class Action Administrator," and the subject line of  the email will be "PACER Fees – Notice
of Class Action Lawsuit."

---

[1] For example, accounting@dol.gov at 200 Constitution Avenue, NW, Washington, DC 20210
receives bills for johndoe1@dol.gov, johndoe2@dol.gov, and janedoe1@dol.gov.  None of those
email address (accounting@dol.gov, johndoe1@dol.gov, johndoe2@dol.gov, and
janedoe1@dol.gov) would receive notice.

3

5.      On or before the later of (a) thirty days after entry of this Order or (b) thirty days after Plaintiffs receive the PACER Fee Database from Defendant, the Claims Administrator shall make available to potential class members automated telephone support to handle any inquiries from potential class members.

6.      On or before the later of (a) thirty days after entry of an Order approving this Plan, or (b) thirty days after Plaintiffs receive the PACER Fee Database from Defendant, Plaintiffs, through KCC, will establish and maintain a website in order to respond to inquiries by potential class members. The website shall include the complete text of the Long-Form Notice attached to Plaintiffs' Motion as Exhibit 3, the printable Exclusion Request form, the online Exclusion Request form,  this Order, Plaintiffs' Class Action Complaint (dkt. #1), Defendant's Answer (dkt. #27), the Order on the Motion for Class Certification (dkt. #32), the Memorandum Opinion on the Motion for Class Certification (dkt. #33), and other relevant documents.

7.      On or before the later of (a) forty-five days after entry of this Order or (b) forty-five days after Plaintiffs receive the PACER Fee Database from Defendant, the Claims Administrator shall cause the Postcard Notice to be disseminated, in substantially the same form attached as Exhibit 2 to the Notice of Filing, by sending it out via U.S. mail to all potential class members (1) without an email address and (2) for whom email delivery was unsuccessful. The  Postcard Notice shall direct potential class members to the website maintained by the Claims  Administrator.

8.      On the later of (a) ninety days after entry of this Order or (b) ninety days after Plaintiffs receive the PACER Fee Database from Defendant, the opt-out period shall expire.

9.     The Court finds that the dissemination of the Notice under the terms and in the format provided for in Plaintiffs' Motion and this Order constitutes the best notice practicable under the circumstances, that it is due and sufficient notice for all purposes to all persons entitled to such notice, and that it fully satisfies the requirements of due process and all other applicable laws.

**IT IS SO ORDERED.**

Dated:  April 17, 2017                          /s/   *Ellen Segal Huvelle*
                                                The Honorable Ellen Segal Huvelle
                                                United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
               *Plaintiffs*,

    v.

UNITED STATES OF AMERICA,
               *Defendant*.

Case No. 16-745-ESH

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

<br>

Deepak Gupta
Jonathan E. Taylor
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

William H. Narwold
Meghan S.B. Oliver
Elizabeth Smith
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 232-5504
*bnarwold@motleyrice.com*

August 28, 2017

*Counsel for Plaintiffs National Veterans Legal Services
Program, National Consumer Law Center, Alliance for
Justice and the Class*

**TABLE OF CONTENTS**

Table of authorities ...................................................................................................................... ii

Introduction ................................................................................................................................... 1

Background ..................................................................................................................................... 3

   A.   Overview of PACER fees ......................................................................................... 3

   B.   History of PACER fees ............................................................................................ 3

   C.   Use of PACER fees within the class period ......................................................... 8

   D.   This case .................................................................................................................. 10

Argument ...................................................................................................................................... 11

   I.   The E-Government Act prohibits the AO from charging more in PACER
          fees than is necessary to recoup the total marginal cost of operating PACER. ....... 11

   II.   The AO has violated the E-Government Act by charging more in PACER
          fees than is necessary to recoup the total marginal cost of operating PACER. ....... 17

Conclusion ................................................................................................................................... 20

# TABLE OF AUTHORITIES*

## Cases

\* *Citizens Action Group v. Powers,*
  723 F.2d 1050 (2d Cir. 1983) ............................................................................ 2, 15

*Conyers v. Merit Systems Protection Board,*
  388 F.3d 1380 (D.C. Cir. 2004) .............................................................................. 11

*Cox v. New Hampshire,*
  312 U.S. 569 (1941) .................................................................................................... 15

*Engine Manufacturers Association v. EPA,*
  20 F.3d 1177 (D.C. Cir. 1994) .......................................................................... 12, 13

*Federal Power Commission v. New England Power Co.,*
  415 U.S. 345 (1974) .................................................................................................... 12

*Fernandes v. Limmer,*
  663 F.2d 619 (5th Cir. 1981) .................................................................................... 15

*Florida Power & Light Co. v. United States,*
  846 F.2d 765 (D.C. Cir. 1988) .................................................................................. 13

*Gomez v. United States,*
  490 U.S. 858 (1989) .................................................................................................... 13

*Jesse E. Brannen, III, P.C. v. United States,*
  682 F.3d 1316 (11th Cir. 2012) ................................................................................ 13

*Murdock v. Pennsylvania,*
  319 U.S. 105 (1943) .............................................................................................. 2, 14

*National Awareness Foundation v. Abrams,*
  50 F.3d 1159 (2d Cir. 1995) ...................................................................................... 15

*National Association of Broadcasters v. FCC,*
  554 F.2d 1118 (D.C. Cir. 1976) ................................................................................ 13

\* *National Cable Television Association, Inc. v. United States,*
  415 U.S. 336 (1974) ................................................................................ 12, 13, 17, 18

*Peretz v. United States,*
  501 U.S. 923 (1991) .................................................................................................... 16

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) .................................................................................................... 14

*Seafarers International Union of North America v. U.S. Coast Guard,*
  81 F.3d 179 (D.C. Cir. 1996) .................................................................................... 13

\* *Skinner v. Mid-America Pipeline Co.,*
  490 U.S. 212 (1989) .............................................................................................. 2, 13

---

\* Authorities upon which we chiefly rely are marked with asterisks.

ii

* *Sullivan v. City of Augusta*,
    511 F.3d 16, 38 (1st Cir. 2007) ................................................................. 2, 14, 15

**Statutes**

28 U.S.C. § 612(c)(1) ............................................................................................. 5

* 28 U.S.C. § 1913 note,
    Pub. L. No. 107–347, § 205(e), 116 Stat. 2899 (Dec. 17, 2002)........................ passim

31 U.S.C. § 9701(a) ............................................................................................. 12

31 U.S.C. § 9701(b)............................................................................................. 12

5 U.S.C. § 552 (a)(4)(A)(iv)................................................................................ 19

Judiciary Appropriations Act, 1991,
    Pub. L. No. 101–515, § 404, 104 Stat. 2129.................................................... 3

**Other Authorities**

Antonin Scalia & Bryan Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012)................................. 16

David Ardia,
    *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017),
    https://ssrn.com/abstract=2883231 ................................................................ 16

*Financial Services and General Government Appropriations for 2015, Part 6: Hearings Before a
    Subcommittee of the House Committee on Appropriations*, 113th Cong. (2014)..................... 10

Government Accountability Office,
    *Principles of Federal Appropriations Law* (3d ed. 2008) ................................ 14

Matthew E. Glassman, Congressional Research Service,
    *Judiciary Appropriations FY2016* (June 18, 2015), https://goo.gl/R8QARr................ 8

N. Gregory Mankiw,
    *Principles of Economics* (6th ed. 2012) ........................................................ 4

Office of the Law Revision Counsel, U.S. House of Representatives,
    *Detailed Guide to the United States Code*, http://uscode.house.gov/detailed_guide.xhtml. ............ 11

Panel Discussion,
    William and Mary Law School Conference on Privacy and Public
    Access to Court Records (Mar. 4–5, 2010), https://goo.gl/5g3nzo. ...................... 10

Stephen Schultze,
    *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic Public Court Records*
    (Aug. 25, 2017) (draft), http://ssrn.com/abstract=3026779 ................................ 16

Subcommittee on Privacy & Public Access to Electronic Case Files, Judicial Conference
    of the U.S., *Report of the Judicial Conference Committee on Court Administration and Case Management
    on Privacy and Public Access to Electronic Case Files* (2001), https://goo.gl/G8n6qM .................... 14

## INTRODUCTION

This class action challenges the legality of the fees that the federal judiciary charges people to access its Public Access to Court Electronic Records system, known as PACER. The plaintiffs contend that the fees far exceed the cost of providing the records and thus violate the E-Government Act of 2002, which authorizes fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note.

Now that the Court has certified this case as a class action and denied the government's motion to dismiss, two key questions remain: Has the Administrative Office of the U.S. Courts (or AO) violated the E-Government Act by charging more than necessary to recoup the total marginal cost of providing access to records through PACER? And if so, by how much? This motion addresses only the first question. It seeks summary adjudication of the defendant's liability, reserving the damages determination for after formal discovery.

The liability question is straightforward and ripe for resolution. In 2002, Congress found that PACER fees (then set at \$.07 per page) were "higher than the marginal cost of disseminating the information." Taylor Decl., Ex. D, at 5. Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, the E-Government Act prohibits the imposition of fees that are not "necessary" to "reimburse expenses in providing" access to the records. 28 U.S.C. § 1913 note. The only permissible reading of this language is that it bars the judiciary from charging more in PACER fees, in the aggregate, than the reasonable costs of administering the PACER system.

Despite the E-Government Act's express limitation, PACER fees have twice been *increased* since the Act's passage in 2002. This prompted the Act's sponsor, Senator Joe Lieberman, to reproach the AO for continuing to charge fees "well higher than the cost of dissemination"—"against the requirement of the E-Government Act"—rather than doing what the Act demands:

1

"create a payment system that is used only to recover the direct cost of distributing documents via PACER." Taylor Decl., Exs. G & H. Instead of complying with the law, the AO has used PACER fees to fund projects far removed from the costs of providing records upon request. For example, it has used the money to buy flat-screen TVs for jurors, to send required notices to bankruptcy creditors, and even to fund a study by the State of Mississippi for its own court system. This is more than enough to establish liability. Although the AO's violations are much more extensive than these isolated examples, this Court need not determine the full extent of the overcharge at this stage. Because PACER fees exceed the marginal costs of providing records, in violation of the E-Government Act, summary adjudication on liability is warranted.

Any other result would not only run afoul of the E-Government Act's text and contravene its purpose but would also raise two serious constitutional problems. The first is reflected in the background law limiting user fees throughout the federal government: Because only *Congress* may constitutionally impose taxes, the general rule is a user fee may not exceed the cost of providing the service "inuring directly to the benefit" of the person who pays that fee—unless Congress has "indicate[d] clearly its intention to delegate" its taxing power. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). Here, Congress has done the opposite.

The second concern flows from the First Amendment right to access court records. "The Supreme Court has held that a government cannot profit from imposing" a fee "on the exercise of a First Amendment right." *Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943)). Hence, the general rule is that "fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose." *Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983). There is no reason for a more fee-friendly rule here, where Congress has imposed the same limitation ("only to the extent necessary") by statute.

2

# BACKGROUND

## A.    Overview of PACER fees

PACER is a system that provides online access to federal judicial records and is managed by the AO. Pls.' Statement of Undisputed Material Facts (Statement) ¶ 1. The current fee to access records through PACER is set at $.10 per page (with a maximum of $3.00 for "any case document, docket sheet, or case-specific report") and $2.40 per audio file. *Id.* ¶¶ 2–4. Unless a person obtains a fee waiver or incurs less than $15 in PACER charges in a given quarter, he or she will incur an obligation to pay the fees. *Id.* ¶ 5.

## B.    History of PACER fees

***Congress authorizes fees "to reimburse" PACER expenses.*** This system stretches back to the early 1990s, when Congress began requiring the judiciary to charge "reasonable fees" for access to records. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the fees to the cost of providing the records: "All fees hereafter collected by the Judiciary . . . as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.* The AO set the fees at $.07 per page in 1998. Statement ¶ 10.

It soon became clear that this amount was far more than necessary to recover the cost of providing access to records. But rather than reduce the rate to cover only the costs incurred, the AO instead used the extra revenue to subsidize other information-technology-related projects.

***The AO begins using excess PACER fees to fund ECF.*** The expansion began in 1997, when the judiciary started planning for a new Electronic Case Filing system, known as ECF. *Id.* ¶ 9. The staff of the AO produced a paper discussing how the system would be funded. *Id.* It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing

3

a particular service." *Id.* Yet, just two pages later, the AO staff contemplated that ECF could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* The paper did not offer any statutory authority or legal reasoning to support this view.

**Congress responds by passing the E-Government Act of 2002.** When Congress revisited the subject of PACER fees a few years later, it did not relax the requirement that the fees be limited to the cost of providing access to records. To the contrary, it amended the statute to *strengthen* this requirement.

Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); *see* Statement ¶ 11.[1]

The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of

---

[1] In the language of economics, marginal cost means "the increase in total cost that arises from an extra unit of production." N. Gregory Mankiw, *Principles of Economics* 268 (6th ed. 2012).

reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(**b**) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services.*

28 U.S.C. § 1913 note (emphasis added).

**Even after the E-Government Act, the AO increased PACER fees.** Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Statement ¶ 15. To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund (or JITF)—the account into which PACER fees and other funds (including "funds appropriated to the judiciary" for "information technology resources") are deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. *See id.*; Taylor Decl., Ex. E (Memorandum from Leonidas Ralph Mecham, Director of the Admin. Office, to Chief Judges & Clerks (Oct. 21, 2004)); *see also* Taylor Decl., Ex. I, at 3 (Letter from AO Director James Duff explaining: "The JITF finances the IT requirements of the entire Judiciary and is comprised primarily of 'no-year' appropriated funds which are expected to be carried forward each year."). As before, the AO cited no statutory authority for this increase.

**The AO finds new ways to spend extra PACER fees as they keep growing.** By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. Statement ¶ 16. But once again, the AO did not reduce or eliminate PACER fees. *Id.* ¶ 17. It instead sought out new ways to spend the excess, using it to cover "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance"—services that relate to those

5

provided by PACER only in the sense that they too concern technology and the courts. *Id.*; Taylor Decl., Ex. G, at 3 (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She admitted that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Statement ¶ 18. Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements . . . , thereby reducing our need for appropriated funds." *Id.*

***The E-Government Act's sponsor says that the AO is violating the law.*** In early 2009, Senator Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the law. Taylor Decl., Ex. H, at 1 (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)); *see* Statement ¶ 19. He noted that the Act's "goal" was "to increase free public access to [judicial] records"—allowing fees to be charged only to recover "the marginal cost of disseminating the information"—yet "PACER [is] charging a higher rate" than it did when the law was passed. Taylor Decl., Ex. H, at 1. Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* Invoking the key statutory text, he asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

The AO's Director replied with a letter defending the AO position that it may use PACER fees to recoup non-PACER-related costs. Taylor Decl., Ex. I. The letter acknowledged that the Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" *Id.* at 1; *see* Statement ¶ 20. Yet the letter claimed that

6

Congress has "expand[ed] the permissible use of the fee revenue to pay for other services," Taylor Decl., Ex. I, at 2—when in fact it enacted the E-Government Act to do the opposite. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Taylor Decl., Ex. I, at 2. The letter did not provide any support (even from a committee report) for using fees to recover non-PACER-related expenses beyond ECF.

The following year, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Taylor Decl., Ex. G, at 2.; Statement ¶ 21. "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." *Id.* It has done so because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

***The AO again increases PACER fees.*** The AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. Statement ¶ 22. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." *Id.* But the AO claimed that the fees comply with the E-Government Act because they "are only used for public access." *Id.* It did not elaborate.

7

## C.    Use of PACER fees within the class period

From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected over $920 million in PACER fees, with the total annual amount collected increasing from $102.5 million in 2010 to $146.4 million in 2016. *Id.* ¶¶ 28, 46, 62, 80, 98, 116, 134.

The chart below—based entirely on data from the published version of the judiciary's annual budget, *see* ECF No. 8-3, and confirmed by documents provided by the AO in this litigation—illustrates the rapid growth in PACER revenue over the past two decades, a period when "technological innovations," including exponentially cheaper data storage, "should have led to reduced costs." Taylor Decl., Ex. G, at 3; *see also* Lee and Lissner Decl. ¶ 16 (explaining that the cost per gigabyte of storage fell by 99.9%—from $65.37 to $0.028—over this period).[2]



Appx0239

Indeed, the costs of operating the "Electronic Public Access Program"—according to the AO's own records—steeply declined over this period, going from nearly $19 million for fiscal

---

[2] As a percentage of the judiciary's total budget, however, PACER fees are quite small. Based on the judiciary's budget request of $7.533 billion for fiscal year 2016, PACER fees make up less than 2% of the total budget—meaning that the excess fees are a fraction of a fraction. Matthew E. Glassman, CRS, *Judiciary Appropriations FY2016*, at 1 (June 18, 2015), https://goo.gl/R8QARr.

year 2010 to less than $1 million for fiscal year 2016. Statement ¶¶ 29 & 135. Even including all other expenses designated by the AO as part of the costs of providing "Public Access Services"—including "[d]evelopment and [i]mplementation costs for CM/ECF," "expenses for CM/ECF servers," "costs associated with the support of the uscourts.gov website," and "[c]osts associated with managing the non-technical portion of the PACER Service Center"—the total annual expenses of providing these services ranged between $12 and $24 million over this period. *Id.* ¶¶ 29, 47–48, 63–64, 81–82, 99–100, 117–18, 135–36; *see* Taylor Decl., Ex. L.

The excess PACER fees have been used to fund a variety of programs beyond administering PACER itself. To highlight just a few, the AO used PACER fees to fund the following programs from fiscal year 2010 to 2016:

- $185 million on courtroom technology, Statement ¶¶ 31, 50, 66, 84, 102, 120, 138;

- $75 million to send notices to creditors in bankruptcy proceedings, *id.* ¶¶ 37, 54, 72, 90, 108, 126, 144;

- $9.5 million to provide web-based services to jurors, *id.* ¶¶ 70, 88, 106, 124, 142;

- $3.5 million to send notices to local law-enforcement agencies under the Violent Crime Control Act, *id.* ¶¶ 33, 52, 68, 86, 104, 122, 140; and

- $120,000 for the State of Mississippi study on "the feasibility of sharing the Judiciary's CM/ECF filing system at the state level," *id.* ¶ 35.

Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. When questioned during a 2014 House appropriations hearing, representatives from the judiciary admitted that the "Electronic Public Access Program encompasses more than just offering real-time access to electronic records." *Fin. Servs. and Gen. Gov. Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations,*

113th Cong. 152 (2014). And Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitor. . . . [There have also been] audio enhancements. . . . This all ties together and it's funded through these [PACER] fees." Panel Discussion, William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), https://goo.gl/5g3nzo; *see* Statement ¶ 26.

## D.    This case

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this suit on behalf of themselves and a nationwide class of those similarly situated, asking this Court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges.

The Court denied a motion to dismiss in December 2016, rejecting the argument that the suit is barred because a different case had been brought based on PACER fees, and because the plaintiffs did not first present their challenge to the PACER Service Center. *See* ECF No. 25.

In January 2017, this Court certified this case as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. The Court certified the following class: "All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities." ECF Nos. 32 & 33. The Court further certified one class claim: "that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under

the Little Tucker Act." *Id.* The class notice period has now ended, and this motion follows the

Court's scheduling order of January 24, 2017, *see* ECF No. 34, as modified on July 5, 2017.

## ARGUMENT

### I.    The E-Government Act prohibits the AO from charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER.

**A.** The E-Government Act authorizes the AO to impose PACER fees "as a charge for

services rendered"—meaning, as a charge "for electronic access to information" through

PACER. 28 U.S.C. § 1913 note. But the AO may do so "only to the extent necessary" "to

reimburse expenses in providing these services." *Id.*[3]

The best reading of this statutory language is that it prohibits the AO from charging more

than is necessary to recoup the total marginal cost of providing access to records through

PACER. That reading is supported not only by the plain text of the law, but also by its statutory

history—Congress's decision to amend the law in 2002 to allow fees "only to the extent

necessary." And the legislative history makes clear that Congress added this language because it

sought to prevent the AO from "charg[ing] fees that are higher than the marginal cost of

disseminating the information," as it had been doing for several years, so that records would be

"freely available to the greatest extent possible." Statement ¶ 11.

Post-enactment history confirms this straightforward reading. The Act's sponsor has

repeatedly expressed his view, in correspondence with the AO's Director, that the law permits

the AO to charge fees "only to recover the direct cost of distributing documents via PACER,"

---

[3] "It is "of no moment" that this law was "codified as a statutory note," rather than as section text. *Conyers v. Merit Sys. Prot. Bd.* 388 F.3d 1380, 1382 n.2 (D.C. Cir. 2004). As noted on the website for the United States Code: "A provision of a Federal statute is the law whether the provision appears in the Code as section text or as a statutory note . . . The fact that a provision is set out as a note is merely the result of an editorial decision and has no effect on its meaning or validity." Office of the Law Revision Counsel, *Detailed Guide to the United States Code*, at IV(E), http://uscode.house.gov/detailed_guide.xhtml.

and that the AO is violating the Act by charging more in PACER fees than is necessary for providing access to "records using the PACER system." *Id.* ¶¶ 19, 21; 28 U.S.C. § 1913 note. In light of the fact that the Act's text, purpose, and history all point in the same direction, the statute cannot reasonably be read to authorize fees that exceed the costs of administering PACER.

**B.** Any doubt on this score is dispelled by the background law on federal user fees. Although courts have not yet interpreted the key language in the E-Government Act, there is a long line of cases interpreting an analogous statute: the Independent Offices Authorities Act (or IOAA). This statute authorizes agencies to charge a user fee for "each service or thing of value provided by [the] agency." 31 U.S.C. § 9701(a). Like the E-Government Act, the IOAA's goal is to make agency programs conferring benefits on recipients "self-sustaining to the extent possible." *Id.* It is not to turn them into profit centers to fund agency activities more broadly.

The IOAA's text requires that user fees be "fair" and "based on" four factors: (1) "the costs to the Government," (2) "the value of the service or thing to the recipient," (3) "public policy or interest served," and (4) "other relevant facts." *Id.* § 9701(b). Notwithstanding this potentially limitless language—which is far broader than that found in the E-Government Act— the Supreme Court has declined to read the Act "literally," and has instead interpreted it to forbid agencies from charging fees that exceed the costs of providing the service. *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341 (1974); *see Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345 (1974). As the Court reasoned: "It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read [the IOAA] narrowly as authorizing not a 'tax' but a 'fee.'" *Nat'l Cable Television*, 415 U.S. at 341.

To keep a "fee" from becoming a tax, it must be imposed only "for a service that confers a specific benefit upon an identifiable beneficiary." *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1180

(D.C. Cir. 1994). That is, "a user fee will be justified under the IOAA if there is a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 182–83 (D.C. Cir. 1996). This means that the "agency may not charge more than the reasonable cost it incurs to provide [that] service." *Engine Mfrs. Ass'n*, 20 F.3d at 1180; *see Seafarers*, 81 F.3d at 185 ("[T]he measure of fees is the cost to the government of providing the service.").

The reason for this limitation is constitutional. *See Nat'l Cable Television*, 415 U.S. at 342 ("read[ing] the Act narrowly to avoid constitutional problems"). The IOAA permits "agencies to levy fees based on services rendered but not levy taxes, which is the exclusive domain of the legislature." *Jesse E. Brannen, III, P.C. v. United States*, 682 F.3d 1316, 1317 (11th Cir. 2012); *see Nat'l Ass'n of Broadcasters v. FCC*, 554 F.2d 1118, 1129 n.28 (D.C. Cir. 1976) ("Once agency charges exceed their reasonable attributable cost they cease being fees and become taxes levied, not by Congress, but by an agency," which is "prohibited."). Although Congress may constitutionally delegate its taxing authority, it "must indicate clearly its intention to delegate to the Executive [or the Judiciary] the discretionary authority to recover administrative costs not inuring directly to the benefit" of those paying the costs. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989); *see also Fla. Power & Light Co. v. United States*, 846 F.2d 765 (D.C. Cir. 1988).

Here, of course, Congress did not "indicate clearly" any "intention to delegate" taxing authority when it enacted the E-Government Act. If anything, it did the opposite: The Act's text shows that Congress passed the law to *eliminate* excessive PACER fees, not to authorize them. So even if the statutory text were somehow ambiguous, or if Congress could have used even clearer language to express its intention, any ambiguity should be resolved against interpreting the statute in a way that would raise constitutional questions. *See Gomez v. United States*, 490 U.S. 858,

864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.").

When Congress passed the E-Government Act in 2002, it was familiar with the IOAA's background rule of appropriations, as interpreted by the courts.[4] "Unless there is something in the statute or its legislative history to compel a different result," the settled approach is to read the more specific user-fees statute together with the IOAA as "part of an overall statutory scheme," and "look to the body of law developed under the IOAA for guidance in construing the other statute." 3 GAO, *Principles of Federal Appropriations Law* 12-172 (3d ed. 2008). There is nothing here to indicate that Congress intended a more permissive rule to apply to PACER fees. Quite the contrary, the Act's plain language, statutory history, and legislative history all demonstrate that Congress clearly intended for fees to be restricted to the costs of providing the service for which they are charged—providing access to court records upon demand—and nothing more.

**C.** This reading is further bolstered by a second constitutional principle: the First Amendment right of access to the courts, and access to court records more specifically. On top of the general limitations on user fees, courts have a special obligation not to assess fees that "unduly burden access to the judicial process." *Id.* 12-157. The Judicial Conference has itself recognized that "public access to federal court case files" implicates these "constitutional principles." Subcomm. on Privacy & Pub. Access to Electronic Case Files, Judicial Conference of the U.S., *Report of the Judicial Conference Committee on Court Administration and Case Management on Privacy and Public Access to Electronic Case Files* (2001), https://goo.gl/G8n6qM (App. A-3) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–78 (1980)). And "[t]he Supreme Court has held that a government cannot profit from imposing" a fee "on the exercise of a First

---

[4] So was the AO: In a 1997 paper, it emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." Statement ¶ 9.

14

Amendment right." *Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943)). When the imposition of a fee implicates First Amendment interests, "fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose." *Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983); *see also Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981) (citing cases invalidating fees "in excess of costs of administration"). Notably, this First Amendment jurisprudence on fees mirrors the E-Government Act ("only to the extent necessary").

Thus, for example, when a state imposed a $200 fee "to use a particular piece of state property as a forum for political expression," the Second Circuit held that the "fee [could not] be sustained" because there was "no evidence that the administrative fee charged" was "equal to the cost incurred" for "processing plaintiffs' request to use the property." *Powers*, 723 F.2d at 1056; *see also Sullivan*, 511 F.3d at 38 (finding that a fee exceeded "the actual administrative expenses" and invalidating "the excessive amount charged"); *Fernandes*, 663 F.2d at 633 & n.11 (invalidating a fee for a permit because it exceeded the amount "needed to defray the costs of operating the permit system"). By contrast, the Supreme Court has upheld a parade-permit fee because it was "not a revenue tax," but was instead "limited" to what was necessary "to meet the expense incident to the administration of the [permit] and to the maintenance of public order" during the parade. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *see also Nat'l Awareness Found. v. Abrams*, 50 F.3d 1159, 1165 (2d Cir. 1995) ("[F]ees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible.").

Like the IOAA jurisprudence—and every relevant tool of statutory construction—this First Amendment precedent cuts against interpreting the E-Government Act to allow fees that exceed the marginal cost of providing access to records through PACER. Adopting such an

15

interpretation would raise serious constitutional concerns, because while the public has a First Amendment interest in accessing the courts, the AO has no legitimate interest in hindering access to court records by imposing an excessive fee in order to pay for other things that should be funded through the appropriations process. *See generally* Stephen Schultze, *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic Public Court Records* (Aug. 25, 2017) (draft), http://ssrn.com/abstract=3026779; David Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017), https://ssrn.com/abstract=2883231. Indeed, excessive PACER fees inhibit public understanding of the courts and thwart equal access to justice, erecting a financial barrier that many ordinary citizens are unable to clear. As a result, it is hard to see how excess fees are anything other than an undue burden on public access to courts.

This does not necessarily mean that a statute would actually *be* unconstitutional if it were to expressly allow the judiciary to recoup more than the costs of administering PACER. It is enough that this reading of the E-Government Act would "raise[] a substantial constitutional question." *Peretz v. United States*, 501 U.S. 923, 930 (1991); *see* Antonin Scalia & Bryan Garner, *Reading Law* 247–48 (2012) ("[The constitutional-doubt canon] militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality.").

Rather than interpret the statute in a way that would raise multiple constitutional questions—and run headlong into two walls of precedent—this Court should follow the text and apply the law in the way that Congress intended: to prohibit the AO from "charg[ing] fees that are higher than the marginal cost of disseminating the information." Statement ¶ 11.

16

## II. The AO has violated the E-Government Act by charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER.

There is no doubt that the AO is charging more in fees than is necessary to administer PACER and provide access to records to those who use the system. Congress made this observation when it enacted the E-Government Act, finding that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information." Taylor Decl., Ex. D, at 5. This is even more true today. Since 1998, "the cost of a gigabyte of storage" has fallen "from $65.37 to $0.028, a reduction of over 99.9%," while "PACER's per-page fees increased 43%, from $0.07 to $0.10." Lee & Lissner Decl. ¶ 16. As Senator Lieberman has remarked: "[D]espite the technological innovations that should have led to reduced costs in the past eight years," the "cost for these documents has gone up" because the AO has used the fees to fund "initiatives that are unrelated to providing public access via PACER." Statement ¶ 21. Doing so is "against the requirement of the E-Government Act." *Id.* Indeed, our technical experts estimate that the true cost of retrieving a document from PACER—including the cost of data storage through a secure service used by many federal agencies—should be $0.0000006 per page (about one half of one ten-thousandth of a penny), meaning that the current fees actually collected by PACER could cover the costs associated with "215,271,893,258,900 requests, or approximately 1,825 pages per day for every person in the United States." Lee & Lissner Decl. ¶ 29.

During the class period, the AO has used PACER fees to: (1) upgrade courtroom technology, Statement ¶¶ 31, 50, 66, 84, 102, 120, 138; (2) send notices to creditors in bankruptcy proceedings, *id.* ¶¶ 37, 54, 72, 90, 108, 126, 144; (3) send notices to law-enforcement agencies under the Violent Crime Control Act, *id.* ¶¶ 33, 52, 68, 86, 104, 122, 140; (4) provide online services to jurors, *id.* ¶¶ 70, 88, 106, 124, 142; (5) cover "costs associated with the support of the uscourts.gov website," ¶ 118; and (6) fund a state-court study in Mississippi, *id.* ¶ 35.

None of these projects is remotely part of the marginal cost of making records available through PACER. None "bestows a benefit" on a PACER user that is "not shared by other members of society." *Nat'l Cable Television Ass'n*, 415 U.S. at 341 (interpreting the IOAA). Instead, each of these projects exists to benefit the public at large, or some other group of people. And the AO has admitted as much, asserting in this litigation that the costs of sending bankruptcy notices, for example, are recoverable through PACER because "[e]lectronic bankruptcy noticing improves the overall quality of electronic service *to the public*." Taylor Decl., Ex. M, at 45 (emphasis added); *see also id.* at 50 (attempting to justify spending PACER fees on law-enforcement notices under the Violent Crime Control Act because that program "improves the overall quality of electronic service *to the public* via an enhanced use of the Internet"); *id.* (same, for "E-Juror service"); *id.* at 42 (same, for uscourts.gov website); *id.* at 51 (attempting to justify spending PACER fees on courtroom technology on the theory that better technology "improves the ability to share case evidence with *the public in the courtroom* during proceedings"); *id.* at 53 (attempting to justify spending PACER fees on the Mississippi state-court study because "the costs associated with improving the overall quality of service *to the public* by studying whether CM/ECF could be shared with a state court").

As worthwhile as these projects may be, they "should be funded through direct appropriations," as Senator Lieberman has explained; they may not be funded by PACER users. Taylor Decl., Ex. G, at 3. Allowing the AO to make PACER users fund the judiciary's general electronic operations— including programs that confer no specific and direct benefit on those PACER users—takes the AO "far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House." *Nat'l Cable Television*, 415 U.S. at 341. Congress did not pass the E-Government Act to delegate taxing power to the Administrative Office.

What about the other categories of expenses on which the judiciary spends PACER fees, such as CM/ECF, infrastructure and telecommunications expenses, and "court allotments"? There is a short answer and a long answer. The short answer is that this Court need not decide these questions now because they go to damages rather than liability. The long answer is that the AO has thus far provided only very general information about these programs. Without more detailed information, it is impossible to say whether any of these costs may be recoverable through PACER fees. Some of these costs might be attributable to providing records through PACER, while many will not be. Formal discovery will reveal which expenses fall into the latter category, and which (if any) fall into the former.

For what it is worth, however, the principles we have laid out strongly indicate that CM/ECF and its associated costs may not be funded with PACER fees. To see why, consider an example from before the existence of the Internet. Suppose that the judiciary wanted to allow the public to access court records in the early 1900s, and to charge fees for providing such access. Under a fees-only-to-the-extent-necessary regime, the judiciary could charge fees as necessary to reimburse the costs of searching the files and providing copies of the records, as well as the labor costs associated with these specific services. But the judiciary could not charge fees to reimburse the costs of accepting documents for filing and storing them with the court in the first place, or overhead costs that are not part of the marginal cost of providing public access to the records (much like an agency, in responding to a public-records request today, may not charge a fee that exceeds "the direct costs of search, duplication, or review," 5 U.S.C. § 552 (a)(4)(A)(iv)). These expenses would exist irrespective of whether the records were made publicly accessible, because courts can only function as courts if they have a system for accepting and storing case filings. And the same is true of CM/ECF.

But this is for another day. For now, the only question is whether the AO is charging more than necessary to recoup the costs of operating PACER. The answer is plainly yes. Under even the most permissive conception of what the AO is permitted to charge under the E-Government Act, it is not charging "reasonable fees" "to the extent necessary" to make records available upon request. 28 U.S.C. § 1913 note. As an illustration of just how unreasonable PACER fees are, our experts Tom Lee and Mike Lissner calculate that, if the AO were to use the market leader for data storage, the "total yearly estimate for storing and serving PACER's dataset" (based on very generous estimates of the size of that dataset) would be "$227,399.84, or 0.16% of PACER's reported 2016 fee revenue." Lee & Lissner Decl. ¶ 28. Charging more than 600 times that amount is unreasonable and excessive under any standard.

## CONCLUSION

This Court should grant the plaintiffs' motion for summary judgment as to liability.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Jonathan E. Taylor
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

William H. Narwold
Meghan S.B. Oliver
Elizabeth Smith
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 232-5504

August 28, 2017

*Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class*

20

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2017, I electronically filed this motion for summary judgment through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Deepak Gupta*

Deepak Gupta

Case 1:16-cv-00745-ESH   Document 52-2   Filed 08/28/17   Page 1 of 5

# EXHIBIT  A



# Electronic Public Access Fee Schedule

*(Issued in accordance with 28 U.S.C. § 1913, 1914, 1926, 1930, 1932)*

**Effective December 1, 2013**

The fees included in the Electronic Public Access Fee Schedule are to be charged for providing electronic public access to court records.

**Fees for Public Access to Court Electronic Records (PACER)**

(1) Except as provided below, for electronic access to any case document, docket sheet, or case-specific report via PACER: $0.10 per page, not to exceed the fee for thirty pages.

(2) For electronic access to transcripts and non-case specific reports via PACER (such as reports obtained from the PACER Case Locator or docket activity reports): $0.10 per page.

(3) For electronic access to an audio file of a court hearing via PACER: $2.40 per audio file.

**Fees for Courthouse Electronic Access**

(4) For printing copies of any record or document accessed electronically at a public terminal in a courthouse: $0.10 per page.

**PACER Service Center Fees**

(5) For every search of court records conducted by the PACER Service Center: $30 per name or item searched.

(6) For the PACER Service Center to reproduce on paper any record pertaining to a PACER account, if this information is remotely available through electronic access: $0.50 per page.

(7) For any payment returned or denied for insufficient funds: $53.

**Free Access and Exemptions**

(8) Automatic Fee Exemptions

- No fee is owed for electronic access to court data or audio files via PACER until an account holder accrues charges of more than $15.00 in a quarterly billing cycle.

- Parties in a case (including *pro se* litigants) and attorneys of record receive one free electronic copy, via the notice of electronic filing or notice of docket activity, of all documents filed electronically, if receipt is required by law or directed by the filer.

- No fee is charged for access to judicial opinions.

- No fee is charged for viewing case information or documents at courthouse public access terminals.

(9)  Discretionary Fee Exemptions:

- Courts may exempt certain persons or classes of persons from payment of the user access fee.  Examples of individuals and groups that a court may consider exempting include: indigents, bankruptcy case trustees, *pro bono* attorneys, *pro bono* alternative dispute resolution neutrals, Section 501(c)(3) not-for-profit organizations, and individual researchers associated with educational institutions. Courts should not, however, exempt individuals or groups that have the ability to pay the statutorily established access fee. Examples of individuals and groups that a court should not exempt include: local, state or federal government agencies, members of the media, privately paid attorneys or others who have the ability to pay the fee.

- In considering granting an exemption, courts must find:

  o  that those seeking an exemption have demonstrated that an exemption is necessary in order to avoid unreasonable burdens and to promote public access to information;

  o  that individual researchers requesting an exemption have shown that the defined research project is intended for scholarly research, that it is limited in scope, and that it is not intended for redistribution on the internet or for commercial purposes.

- If the court grants an exemption:

  o  the user receiving the exemption must agree not to sell the data obtained as a result, and must not transfer any data obtained as the result of a fee exemption, unless expressly authorized by the court; and

  o  the exemption should be granted for a definite period of time, should be limited in scope, and may be revoked at the discretion of the court granting the exemption.

- Courts may provide local court information at no cost (e.g., local rules, court forms, news items, court calendars, and other information) to benefit the public.

**<u>Applicability to the United States and State and Local Governments</u>**

(10)  Unless otherwise authorized by the Judicial Conference, these fees must be charged to the United States, except to federal agencies or programs that are funded from judiciary appropriations (including, but not limited to, agencies, organizations, and individuals providing services authorized by the Criminal Justice Act [18 U.S.C. § 3006A], and bankruptcy administrators).

(11)  The fee for printing copies of any record or document accessed electronically at a public terminal ($0.10 per page) described in (4) above does not apply to services rendered on behalf of the United States if the record requested is not remotely available through electronic access.

(12)  The fee for local, state, and federal government entities, shall be $0.08 per page until April 1, 2015, after which time, the fee shall be $0.10 per page.

Appx0256

3

## Judicial Conference Policy Notes

The Electronic Public Access (EPA) fee and its exemptions are directly related to the requirement that the judiciary charge user-based fees for the development and maintenance of electronic public access services. The fee schedule provides examples of users that may not be able to afford reasonable user fees (such as indigents, bankruptcy case trustees, individual researchers associated with educational institutions, 501(c)(3) not-for-profit organizations, and court-appointed pro bono attorneys), but requires those seeking an exemption to demonstrate that an exemption is limited in scope and is necessary in order to avoid an unreasonable burden. In addition, the fee schedule includes examples of other entities that courts should not exempt from the fee (such as local, state or federal government agencies, members of the media, and attorneys). The goal is to provide courts with guidance in evaluating a requestor's ability to pay the fee.

Judicial Conference policy also limits exemptions in other ways. First, it requires exempted users to agree not to sell the data they receive through an exemption (unless expressly authorized by the court). This prohibition is not intended to bar a quote or reference to information received as a result of a fee exemption in a scholarly or other similar work. Second, it permits courts to grant exemptions for a definite period of time, to limit the scope of the exemptions, and to revoke exemptions. Third, it cautions that exemptions should be granted as the exception, not the rule, and prohibits courts from exempting all users from EPA fees.

# EXHIBIT J

## Electronic Public Access Program Summary
December 2012

**Program Overview**

The Electronic Public Access program provides public access to court information through electronic means in accordance with federal statutes, Judiciary policies, and user needs. The Internet-based PACER (Public Access to Court Electronic Records) service provides courts, litigants, and the public with access to dockets, case reports, and over 500 million documents filed in federal courts through the Case Management and Electronic Case Files (CM/ECF) system. In other words, PACER is a portal to CM/ECF, which in turn, is integral to public access.

A PACER account is obtained by registering with the PACER Service Center, the Judiciary's centralized registration, user support and billing center. Registration information can be submitted via fax or the Internet, and there is no registration fee. At present, there are more than 1.4 million user accounts, with approximately 13,000 new accounts added each month. In fiscal year 2012 alone, PACER processed over 500 million requests for information.

As mandated by Congress, the public access program is funded entirely through user fees set by the Judicial Conference of the United States. The fees are published in the Electronic Public Access Fee Schedule, available on www.uscourts.gov and www.pacer.gov. Funds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the Case Management/Electronic Case Files system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology.

**Court Websites**

Each federal court uses its website, funded by fee revenue, to provide the public with access to information well beyond that which is required by the E-Government Act of 2002, such as court locations, contact information, local rules, standing or general orders, docket information, written opinions, and documents filed electronically. The courts are also using their websites to disclose information about judges' attendance at privately-funded seminars, orders issued on judicial conduct and disability complaints, and digital audio recordings of oral arguments heard by the court. Additionally, court websites provide general information concerning court operations, filing instructions, courthouse accessibility, interpreter services, job opportunities, jury information, and public announcements. Court websites are used to interact directly with the public through PACER, CM/ECF, on-line jury questionnaires, *pro se* filing tools, forms, and court calendars.

**CM/ECF and the Next Generation**

Implementation of the federal Judiciary's Case Management/Electronic Case Files system (CM/ECF) began in 2001 in the bankruptcy courts after several years of pilot programs in bankruptcy and district courts.  CM/ECF not only replaced the courts' old electronic docketing and case management systems, but it also enabled courts to maintain case file documents in electronic format and to accept filings from court practitioners via the Internet.  The CM/ECF system is now in use in all of the federal appellate, district, and bankruptcy courts, the Court of International Trade, and the Court of Federal Claims.  Nearly 43 million cases are on CM/ECF, and more than 600,000 attorneys and others have filed documents over the Internet.

Attorneys are able to file documents directly with any federal court over the Internet.  There are no added fees for filing documents using CM/ECF.  The CM/ECF system uses standard office computer hardware, an Internet connection and a browser, and accepts documents in portable document format (PDF).  The system is easy to use – filers prepare a document using conventional word processing software, then save it as a PDF file.  After logging onto the court's web site with a court-issued CM/ECF password, and acknowledging that the filing complies with the redaction rules, the filer enters basic information relating to the case and document being filed, attaches the document, and submits it to the court.  A notice verifying court receipt of the filing is generated automatically and immediately.  All electronically filing parties[1] in the case automatically receive immediate e-mail notification of the filing.

Work on the Next Generation of CM/ECF (Next Gen) is well underway.  The project is currently transitioning from its first phase – requirements definition – to its second phase – design and development.  As part of the requirements definition phase, the Judiciary gathered extensive information from stakeholders both inside and outside the court system.  The NextGen project included an Additional Stakeholders Functional Requirements Group (ASFRG) that focused on how the federal courts interact with others in the legal system.  The group's 24 members included representatives from the Judiciary, the Department of Justice, the American Bar Association, the Internal Revenue Service, the Association of American Law Schools, and the National Association of Bankruptcy Trustees.

The group reached out to more than 60 constituent groups in a variety of ways, such as focus group meetings, interviews, conferences, surveys, and elicitation sessions at the courts and the Administrative Office.  In all, more than 7,000 individual stakeholders provided input, most of which focused on the same core requirements sought in NextGen.

---

[1] Those parties who are not electronic filers receive notification via U.S. mail.

These core requirements include single sign-on, enhanced search capabilities, batch-filing features, and customizable reports. Nearly 500 of the ASFRG's requirements have been adopted and incorporated into the functional requirements documents being used to design NextGen. The final report of the ASFRG is available to the public on www.uscourts.gov.

The first releases of the Next Generation of CM/ECF are expected in 2014 and 2015, and the requirements prioritized for those releases are associated with time-saving and/or cost-saving functionality. The Next Generation of CM/ECF will also enable additional improvements to the PACER service, including an updated user interface.

**Access to Court Records**
Registered PACER account holders can use a court's website or the PACER Case Locator to access court documents. The PACER Case Locator is a tool for locating court records that reside in U.S. district, bankruptcy, and appellate court CM/ECF databases across the country. Usage of the Case Locator continues to grow, with over 200,000 searches daily. Links to all courts and the PACER case locator are located at www.pacer.gov. Each court maintains its own CM/ECF database with case information. As a result, querying information from each court is comparable; however, the format and content from each court may differ slightly.

The Judiciary continues to seek to improve electronic public access to its records, and a number of initiatives have been put into place to broaden public access, including:

> *Public Access Terminals* – Every courthouse has public access terminals in the clerk's office to provide access to PACER[2] and other services, such as credit counseling.

> *Digital Audio* – At its March 2010 meeting, the Judicial Conference endorsed a proposal from the Committee on Court Administration and Case Management to allow judges, who use digital audio recording as the official means of taking the record, to provide, at their discretion, access to digital audio recordings of court proceedings via PACER. The digital audio initiative, also known as CourtSpeak, continues to be successful, both in terms of public and court interest. Presently, nineteen bankruptcy courts and two district courts have implemented digital audio, and an additional 23 bankruptcy courts, five district courts, and the Court of

---

[2] Viewing court records at a public access terminal is free. Printing copies of documents from a public access terminal is $0.10 per page.

Federal Claims have begun implementation.  The fee for an audio file is $2.40, regardless of the length of the recording.

*Training and Education Program* – In September 2010, the Judicial Conference approved a recommendation from the Committee on Court Administration and Case Management to establish a program involving the Government Printing Office (GPO), the American Association of Law Libraries (AALL), and the Administrative Office, that would provide training and education to the public about the PACER service, and would exempt from billing the first $50 of quarterly usage by a library participating in the program.  The GPO and the AALL worked with the Administrative Office to develop three levels of training classes: training for trainers, training for library staff, and training for the public.  There are currently 12  libraries participating in the program.  In some instances, libraries are providing on-the-spot individual training.  All training classes include instructions on *How to Create a PACER Account* and *How to Monitor PACER Usage*.  Although some patrons expressed disappointment that they were not being allowed to use the library's PACER account, but instead had to use their own accounts, they did report being satisfied with the instructions provided.  The AALL and the GPO continue to publicize the program to their communities.

*PACER Training Application* – The training site dcecf.psc.uscourts.gov enables the public to learn how to use PACER without registering or incurring any fees.  In March 2012, the Administrative Office also launched video tutorials to assist the public in learning how to use PACER.

*RSS* – In addition to PACER access, which allows users to "pull" information from the courts, approximately 50 district courts and 80 bankruptcy courts are using a common, free internet tool, RSS, to "push" notification of docket activity to users who subscribe to their RSS feeds, much like a Congressional committee might notify its RSS subscribers of press releases, hearings, or markups.

*Pro Se Bankruptcy Pathfinder* – In August 2010, the CM/ECF Subcommittee of the Committee on Court Administration and Case Management approved a proposal to undertake a bankruptcy *pro se* pathfinder initiative, which is designed to assist *pro se* litigants in preparing the filings required at case opening, to reduce the time required to process *pro se* bankruptcy filings, to increase the quality of the data collected, and to employ new development tools today, which are selected for future federal Judiciary use.  Three bankruptcy courts currently serve as beta courts: Central District of California, District of New Jersey, and District of New Mexico.  It is anticipated that this software will be available for use by filers later this year.

*Opinion Initiative with the Government Printing Office* – In September 2012, the Judicial Conference of the United States approved national implementation of the program to provide access to court opinions via the Government Printing Office's Federal Digital System (FDSys) and agreed to encourage all courts, at the discretion of the chief judge, to participate in the program. Twenty-nine pilot courts are live, with over 600,000 individual court opinions available on FDSys. This has proved to be extremely popular with the public. Federal court opinions are one of the most utilized collections on FDsys, which includes the Federal Register and Congressional bills and reports. Access to FDSys is available free of charge via the Internet at www.gpo.gov. Registration is not required.

**PACER Users**

PACER has a diverse user population, including: lawyers; *pro se* filers; government agencies; trustees; bulk collectors; researchers; educational institutions; commercial enterprises; financial institutions; the media; and the general public. The chart below is a breakdown of the PACER user population. The majority of "other" users are background investigators.



The largest user is the Department of Justice. Virtually all of the other high volume users are major commercial enterprises or financial institutions that collect massive amounts of data, typically for aggregation and resale.

**Electronic Public Access Service Assessment**
A comprehensive assessment of PACER services was completed in May 2010. The assessment provided insight into who uses PACER, areas that provide the highest level of satisfaction for those users, and areas that could be improved. The initial assessment was also used to inform the work of the Additional Stakeholders Functional Requirements Group (ASFRG) as it began identifying requirements for the Next Generation of CM/ECF. An on-line satisfaction survey was made available to all 325,000 active PACER users in late 2009. User types giving the highest overall satisfaction scores to PACER included creditors and service providers to the legal sector, followed by commercial businesses. Users in the legal sector and litigants—the two largest groups of PACER users—are also among the most satisfied. Users at educational and research institutions gave the lowest overall satisfaction rating. These are small groups of less-frequent users. The survey indicated that satisfaction rates climb steadily as frequency of use increases.

In addition to assessing satisfaction with the on-line component of PACER, users were asked to rate help-desk services provided by the PACER Service Center. Satisfaction was very high; over 95 percent of respondents who contacted the center during the study period indicated they are "satisfied" or "very satisfied" overall. However, about one-third of PACER users were not aware that the PACER Service Center is available to provide help with PACER. The assessment also revealed that 75 percent of users were satisfied with the value for the money they paid for PACER access, 15 percent were neutral, and 10 percent were dissatisfied.

As a result of the assessment, a number of short- and mid-term activities were implemented to improve user satisfaction with electronic public access services. These included:

- creating a new PACER Case Locator with expanded search capabilities to replace the U.S. Party/Case Index;
- redesigning the pacer.gov web page to include video tutorials;
- embarking on a program to provide public access to judicial opinions via the Government Printing Office's Internet-based FDSys Application;
- partnering with law libraries to provide training on the efficient and effective use of PACER;
- creating a free PACER training application, which is populated with actual court cases and case reports from the New York Western District Court;
- promoting the use of RSS feeds to "push" information to users;
- creating a mobile PACER application;
- redesigning the PACER bill and providing a tool to better manage billing for large organizations; and

- providing access to some audio recordings of judicial proceedings through PACER.

In April 2012, an initiative was undertaken to refresh the results from the initial assessment. This initiative is on track to meet its scheduled completion date of March 2013.

**Basis and History of Fees**

In 1988, the Judiciary sought funding through the appropriations process to provide electronic public access services. Rather than appropriate funds for this purpose, Congress specifically directed the Judiciary to fund electronic public access services through the collection of user fees. As a result, the electronic public access program relies exclusively on fee revenue. The statutory language specifically requires that the fees be used "to reimburse expenses incurred in providing these services."[3]

A study of policies and practices regarding use, release, and sale of data, recommended that the level of fees for a service should sustain the cost of the service. In 1991, a fee of $1.00 per minute for access to electronic information, via a dial-up bulletin board service, was set for the district and bankruptcy courts. Four years later, the fee was reduced to $0.75 per minute, and one year after that it was reduced to $0.60 per minute. The revenue generated from these fees was used exclusively to fund the full range of Electronic Public Access services, including PACER, the Appellate Bulletin Board system, the Voice Case Information System. The Voice Case Information System provided case information free of charge. Fee revenue also provided each court with hardware and software necessary to support public access services. This included more than 700 regular telephone lines, more than 200 toll-free telephone lines, and a personal computer for free public access at the front counter of all clerks' offices with 10 or more staff.

In 1997, the Judiciary addressed three issues pertaining to providing electronic public access to court information via the Internet. These issues were: (1) the establishment of an appropriate fee for Internet access to court electronic records; (2) the types of information for which a fee should be assessed; and (3) the technical approach by which PACER information should be provided over the Internet. An application of Internet technologies to the Judiciary's public access program was viewed as a way to make court and case information more widely available and to offer the opportunity to add additional information (local rules, court forms, court calendars and hours of operation) and services.

---

[3] Judiciary Appropriations Act, 1991, Pub. L. No. 101-515,Title IV, § 404, 104 Stat. 2102 and Judiciary Appropriations Act, 1992, Pub. L. No. 102-140, Title III, § 303, 105 Stat. 782.

The Judiciary's analysis focused on finding the fairest, most easily understood, and most consistent method for charging. In 1998, the Judicial Conference adopted a per-page fee, as it was determined to be the simplest and most effective method for charging for public access via the Internet. The $0.07 per page electronic access fee[4] was calculated to produce comparable fees for large users in both the Internet and dial-up applications and thus maintain the then current public access revenue level while introducing new technologies to expand public accessibility to the PACER information. For infrequent PACER users, costs were reduced considerably by using the Internet.

In 2003, in the Congressional conference report that accompanied the Judiciary's FY 2004 appropriations act, Congress expanded the permitted uses of EPA funds to include Case Management/Electronic Case Files (CM/ECF) system costs. In order to provide sufficient revenue to fully fund currently identified CM/ECF system costs, in September 2004, the Judicial Conference approved an increase in the electronic public access fee from $0.07 to $0.08 per page, effective January 1, 2005.

Based on a recommendation from the Committee on Court Administration and Case Management, in September 2011, the Judicial Conference approved an increase in the fee from $0.08 to $0.10 per page, effective April 1, 2012, in order to give users adequate notice. The Committee noted that the fee had not been increased since 2005 and that, for the previous three fiscal years, the public access program's obligations had exceeded its revenue. The fee increase is being used to fund the Next Generation of CM/ECF and PACER. The Committee also recommended that the waiver of fees of $10 or less in a quarterly billing cycle be changed to $15 or less per quarter, so that approximately 75 percent of users would still receive fee waivers. Finally, in recognition of the current fiscal austerity for government agencies, the Committee recommended that the fee increase be suspended for local, state, and federal government entities for a period of three years. The Conference adopted all of the Committee's recommendations.

The Judiciary takes its responsibility to set the EPA fee very seriously. Since well before the E-Government Act, it has been the Judicial Conference's policy to set the electronic

---

[4]The per-page charge applies to the number of pages that result from any search, including a search that yields no matches (one page for no matches). In the current PACER systems, billable pages are calculated in one of two ways: a formula is used to determine the number of pages for an HTML formatted report. Any information extracted from the CM/ECF database, such as the data used to create a docket sheet, is billed using a formula based on the number of bytes extracted (4320 Bytes). For a PDF document, the actual number of pages is counted to determine the number of billable pages.

public access fee to be commensurate with the costs of providing and enhancing services related to public access. Before the one-cent-per-page increase in 2004, the Conference had a history of lowering the fee, and Congressional appropriations to the Judiciary have never provided funding for the public access program. In 2001, the Judicial Conference established a fee of $0.10 per page to print copies of documents from public access terminals in the clerks' office. That fee has never been raised. A fee is not charged to view PACER documents from the public access terminals in federal courthouses. Finally, the per page fee has been capped at the charge for 30 pages (or $3.00) for documents, docket sheets, and case-specific reports.[5]

**Free Information and Exemptions**

There is a high cost to providing electronic public access, and as described above, Congress decided in 1991 that the funds needed to improve electronic access to court information were to be provided by the users of this information through reasonable fees rather than by all tax payers through appropriated funds. It is also important to note, however, that the public access program does provide a great deal of federal court information to the American public for no charge. For example:

- The Judiciary does not charge for access to judicial opinions;

- Parties to a court case receive a copy of filings in the case at no charge;

- The $0.10 per page fee is not charged for viewing case information or documents on PACER at the public access terminals in the courthouses;

- If an individual account does not reach $15 quarterly, no fee is charged at all; and in a given fiscal year, approximately 65-to-75 percent of active users have fee waivers for at least one quarter. Most of these users are litigants and their attorneys who are involved in a specific case;

- Consistent with Judicial Conference policy, courts may grant exemptions for payment of electronic public access fees. Approximately 20 percent of all PACER usage is performed by users who are exempt from any charge – including indigents, case trustees, academic researchers, CJA attorneys, and *pro bono* attorneys.

---

[5]The 30 page fee cap does not apply to non case-specific reports such as docket activity reports that include multiple cases and reports from the PACER Case Locator.

The vast majority (95 percent) of PACER accounts incur less than $500 in fees – or no fee at all – over the course of the year. This is a long-established pattern. Additionally, the public access program also provides free access to court case information through VCIS (Voice Case Information System), an automated voice response system that provides a limited amount of bankruptcy case information directly from the court's database in response to telephone inquiries.

**Benefits of a Fee**

In order to maintain the level of service presently provided through the public access program, the Judiciary would need appropriated funds to replace the fee revenue, and in this fiscal climate increased appropriations are not available. Fee revenue allows the Judiciary to pursue new technologies for providing public access, develop prototype programs to test the feasibility of new public access technologies, and develop enhancements to existing systems. By authorizing the fee, Congress has provided the Judiciary with revenue that is dedicated solely to promoting and enhancing public access. These fees are only used for public access, and are not subject to being redirected for other purposes. The fee, even a nominal fee, also provides a user with a tangible, financial incentive to use the system judiciously and efficiently, and in the absence of a fee the system can be abused.

**Privacy**

The Judiciary is committed to protecting private information in court filings from public access. It has been over a decade since the Judicial Conference began consideration of – and subsequently formulated – a privacy policy for electronic case files, and over four years since the enactment of Federal Rules of Appellate, Bankruptcy, Civil, and Criminal Procedure requiring that certain personal data identifiers not be included in court filings. These policies and rules have been integral to the success of the Judiciary's electronic public access program. Adherence to these policies and rules by litigants and attorneys is essential to ensure that personal identifier information is appropriately redacted from court filings. The Judicial Conference examined how the privacy rules were working in practice and found that overall the Judiciary's implementation of the privacy rules has been a tremendous success.

In 2001, the Judicial Conference adopted a policy on privacy and public access to electronic case files that allowed Internet-based access to civil and bankruptcy case filings; the policy required filers, however, to redact certain personal information (i.e., Social Security numbers, financial account numbers, names of minor children, and dates of birth). Following a pilot program and a Federal Judicial Center study on criminal case files, the Conference approved electronic access to criminal case files, with similar redaction requirements. The redaction requirements of the Conference's privacy policy were largely incorporated into the Federal Rules, effective December 1, 2007.

-10-

As noted above, a key tenet of these rules (as well as the precursor Conference policy) is that the redaction of personal identifiers lies with the filing party. The Advisory Committee Note accompanying Federal Rule of Civil Procedure 5.2 states: "The clerk is not required to review documents filed with the court for compliance with this rule. The responsibility to redact filings rests with counsel and the party or non-party making the filing." Nonetheless, the Judicial Conference and the Administrative Office are obviously interested in ensuring that these privacy rules are adequate and appropriately followed. To this end, two Judicial Conference Committees – the Court Administration and Case Management Committee, and the Committee on Rules of Practice & Procedure – have worked jointly with the Federal Judicial Center to monitor and study the operation of the privacy rules and related policies and to address new issues that have arisen since their implementation. In addition, the Administrative Office took a number of steps to ensure that the privacy protections established in the federal rules can be more easily followed, including the establishment of a task force that developed a notice for the current CM/ECF system reminding litigants of their obligation under the law to redact personal identifier information and to require filers to affirm that they must comply with the redaction rules.

The Administrative Office continues to encourage courts to stress the rules' redaction requirements with those who file in the court. Options for informing the filers include various, readily available communications vehicles, such as the court's public website, newsletters, listserves, and Continuing Legal Education programs. Further, Judicial Conference Committees and the Administrative Office have asked individual courts to share information on actions they have taken to ensure compliance with the privacy rules, including promulgation of local rules or standing orders, modifications to local CM/ECF applications, and outreach efforts to the public and bar informing them of the redaction requirements. This type of information will assist the Administrative Office, as well as the Conference Committees, to be better informed of the scope of any non-compliance. Thus far, the Administrative Office has received an impressive response from the courts, which are addressing the privacy rules in a variety of ways, ranging from conducting education and awareness campaigns to issuing judicial orders to redact noncompliant filings.

### E-Government Act Compliance

It is important to emphasize the effort and seriousness with which the Judiciary has implemented the E-Government Act's requirements. Section 205(d) of the Act directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filings, decisions and rulings in each case to be obtained from the docket sheet of the case." The Judiciary has gone much further than "exploring" such a system. It designed and has now implemented that system in all courts, providing more than 1.4 million PACER users with access to over 500 million case file documents at a

Appx0269

Case 24-1757 Document 15-1 Page 274 Filed 07/16/2024

reasonable fee – and, frequently, free of any charge at all. The EPA program was developed as an alternative to going to the courthouse during business hours and making copies at the cost of $0.50 per page. This service saves litigants/lawyers and the public time and money by allowing them to file from any computer and also to download and review case information electronically, with all the attendant benefits.

Very few state courts have electronic access systems, and none provides as much information as PACER. Many state courts charge several dollars for a single records search. No other court system in the world provides as much information to as many people in as efficient a manner. State court officials and court administrators from other countries contact the federal Judiciary frequently about our electronic public access model.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs,* v. UNITED STATES OF AMERICA, *Defendant.* | Case No. 16-745 |

## DECLARATION OF THOMAS LEE AND MICHAEL LISSNER

Thomas Lee and Michael Lissner hereby declare as follows:

*Thomas Lee Background and Experience*

1.      Thomas Lee is a software developer and technologist with a background in federal government transparency issues. He currently develops software for a large venture-backed software company. In this capacity he uses cloud-based storage and computation services on a daily basis and assists in cost estimation, planning and optimization tasks concerning those services.

2.      Before taking on his current private-sector role in 2014, Mr. Lee spent six years working at the Sunlight Foundation, serving four of those years as the Director of Sunlight Labs, the Foundation's technical arm. The Sunlight Foundation is a research and advocacy

1

organization focused on improving government transparency. Sunlight Labs' work focused on the modernization of government information technology and improving the distribution of government data. This work included technical project management, budgeting, media appearances and testimony before Congress, among other tasks.

3. Prior to joining the Sunlight Foundation, Mr. Lee built websites for large nonprofits, the U.S. Navy, and the offices of individual members and committees within the U.S. Senate and House of Representatives. Mr. Lee's resume is attached to this declaration.

*Michael Lissner Background and Experience*

4. Michael Lissner is the executive director of Free Law Project, a nonprofit organization established in 2013 to provide free, public, and permanent access to primary legal materials on the internet for educational, charitable, and scientific purposes to the benefit of the general public and the public interest. In this capacity he provides organizational management, publishes advocacy materials, responds to media inquiries, and writes software.

5. Since 2009, Free Law Project has hosted RECAP, a free service that makes PACER resources more widely available. After installing a web browser extension, RECAP users automatically

Appx0272

contribute PACER documents they purchase to a central repository. In return, when using PACER, RECAP users are notified if a document exists in the RECAP central repository. When it does, they may download it directly from the RECAP repository, avoiding the need to pay PACER fees.

6.    In the course of maintaining and improving RECAP, Mr. Lissner has become extensively familiar with PACER. During this time RECAP's archive of PACER documents has grown to more than 1.8 million dockets containing more than 40 million pages of PACER documents.

7.    Mr. Lissner has conducted extensive research on the operation and history of the PACER system. Among other topics, this research has focused on the costs of PACER content and the history of PACER fees. This research is available on the Free Law Project website.[1] Mr. Lissner's resume is attached to this declaration.

*Expert Assignment and Materials Reviewed*

8.    We have been asked by the plaintiffs' counsel in this case to evaluate the reported fee revenue and costs of the PACER system in light of our knowledge of existing information technology and data-storage costs, our specific knowledge of the PACER system, and our background in federal government information systems.

---

[1] https://free.law/pacer-declaration/

3

9.      Specifically, the plaintiffs' counsel have asked us to offer an opinion on whether the Administrative Office of the U.S. Courts (AO) is charging users more than the marginal cost of disseminating records through the PACER system—in other words, to use the language of the E-Government Act of 2002, the "expenses incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered."

10.      In forming our opinion, we have reviewed the Plaintiffs' Statement of Undisputed Material Facts and some of the materials cited in that statement, including a spreadsheet provided to the plaintiffs' counsel in discovery (Taylor Decl., Ex. L) and the Defendant's Response to Plaintiffs' First Set of Interrogatories (Taylor Decl., Ex. M).

11.      We also rely upon our accumulated experience as technologists and government transparency advocates.

*Reasoning and Conclusions on Marginal Cost*

12.      As we explain in detail below, it is overwhelmingly likely that the PACER system, as operated by the Administrative Office of the Courts (AO), collects fees far in excess of the costs associated with providing the public access to the records it contains.

13.      The following calculations are intended to convey fair but approximate estimates rather than precise costs.

4

14.    The marginal cost of providing access to an electronic record consists of (a) the expenses associated with detecting and responding to a request for the record; (b) the bandwidth fees associated with the inbound and outbound transmissions of the request and its response; and (c) the pro rata expense associated with storing the records in a durable form between requests.

15.    As a point of comparison we use the published pricing of Amazon Web Services (AWS). AWS leads the market for cloud computing services[2] and counts organizations including Netflix, Adobe Systems, and NASA among its customers. Like most cloud providers, AWS pricing accounts for complex considerations such as equipment replacement, technical labor, and facilities costs. Although the division is profitable, AWS prices are considered highly competitive. AWS services are organized into regions, each of which represents a set of data centers in close geographic and network proximity to one another.

16.    For our evaluation, we first consider the cost of storage. Researcher Matthew Komorowski[3] and data storage firm BackBlaze[4] have published storage cost time series that when combined cover the period dating from the PACER system's 1998 debut to the present.

---

[2] https://www.srgresearch.com/articles/leading-cloud-providers-continue-run-away-market.

[3] http://www.mkomo.com/cost-per-gigabyte

[4] https://www.backblaze.com/blog/hard-drive-cost-per-gigabyte/

5

During this time their data shows the cost of a gigabyte of storage falling from \$65.37 to \$0.028, a reduction of over 99.9%. During this same time period PACER's per-page fees increased 43%, from \$0.07 to \$0.10.

17.   The effect of economies of scale makes it difficult to assemble comparable time series for bandwidth and computing costs. We are therefore unable to easily compare PACER fees' growth rate to the change in bandwidth and computing costs from 1998 to the present.

18.   Fortunately, it is possible to compare recent PACER fee revenue totals to reasonable contemporary costs for the technical functionality necessary to perform PACER's record retrieval function. The AWS Simple Storage Service (S3) provides this necessary data storage and retrieval functionality and publishes straightforward and transparent pricing for it. S3 costs vary by region. Using the prices published on August 27, 2017 for the "GovCloud" region, which is designed for U.S. government users, we find storage prices of \$0.039 per gigabyte[5] per month for the first 50 terabytes, \$0.037 per gigabyte per month for the next 450 terabytes, and \$0.0296 per gigabyte per month for the next 500 terabytes. Retrieving an item from the

---

[5] The quantity of data contained in a terabyte/gigabyte/megabyte/kilobyte varies slightly according to which of two competing definitions is used. Our analysis employs the definitions used by Amazon Web Services. c.f. https://docs.aws.amazon.com/general/latest/gr/glos-chap.html

Appx0276

GovCloud region currently costs $0.004 per 10,000 requests, plus data transmission at $0.01 per gigabyte.

19.     Determining how these prices might apply to PACER's needs requires knowledge of the PACER system's size. We are not aware of a current and authoritative source for this information. Instead, we employ an estimate based on two sources from 2014: that year's Year-End Report on the Federal Judiciary,[6] and an article published in the *International Journal for Court Administration*.[7] The former states that PACER "currently contains, in aggregate, more than one billion retrievable documents." The latter states that the PACER "databases contain over 47,000,000 cases and well over 600,000,000 legal documents; approximately 2,000,000 new cases and tens of millions of new documents are entered each year." Although the large difference in document counts makes it unlikely that both of these estimates are correct, they provide an order of magnitude with which to work. For the sake of our estimate we double the larger of these numbers and make the generous assumption that PACER now contains two billion documents.

20.     Mr. Lissner's custodianship of the RECAP archive allows us to make estimates of the typical properties of PACER documents.

---

[6] https://www.supremecourt.gov/publicinfo/year-end/2014year-endreport.pdf
[7] Brinkema, J., & Greenwood, J.M. (2015). E-Filing Case Management Services in the US Federal Courts: The Next Generation: A Case Study. International Journal for Court Administration, 7(1). Vol. 7, No. 1, 2015.

21.    The RECAP Archive contains the most-requested documents from PACER, making them appropriate for our analysis.

22.    Mr. Lissner finds an average document size of 254 kilobytes and 9.1 pages, and therefore an average page size of 27.9 kilobytes. Assuming a PACER database size of two billion documents and the prices recorded above, we calculate that annual storage costs of the the PACER database on S3 would incur fees totaling $226,041.60.

23.    This leaves the task of estimating the costs incurred by the retrieval of documents. To do this we must estimate the total number of requests served by PACER each year. The PACER fee revenue reported for 2016 in the spreadsheet provided to the plaintiffs' counsel in discovery is $146,421,679. The per-page PACER fee in 2016 was $0.10. Simple arithmetic suggests that approximately 1,464,216,790 pages were retrieved from PACER in 2016.

24.    This calculation does not reflect the 30 page/$3.00 per-document cap on fees built into PACER's price structure; nor the fact that some of the revenue comes from search results, which are also sold by the page; nor any other undisclosed discounts.

25.    The RECAP dataset's 9.1 page average document length suggests that the fee cap might not represent a substantial discount to users in practice.

8

27.     Out of an abundance of caution against underestimating costs, we account for these inaccuracies by rounding the estimated request count up to two billion for the following calculations.

28.     Using aforementioned S3 prices for retrieving an item from storage, this volume of annual requests would incur $800 in fees. An additional $558.24 in bandwidth costs would also be incurred. This yields a total yearly estimate for storing and serving PACER's dataset using AWS S3's GovCloud region of $227,399.84, or 0.16% of PACER's reported 2016 fee revenue.

29.     The tremendous disparity between what the judiciary actually charges in PACER fees and what is reasonably necessary to charge is illustrated by two alternative calculations. The first considers what the per page fee could be if PACER was priced according to our calculations. Including storage costs, we estimate that the per page cost of retrieving a document from PACER could cost $0.0000006 (about one half of one ten-thousandth of a penny). The second alternate calculation considers how many requests PACER could serve if the fees it currently collects were used exclusively and entirely for providing access to its records. Assuming no change in the size of the dataset and using the storage costs calculated in association with that size, $146,195,637.40 in fee revenue remains to cover document requests and bandwidth. At the previously cited rates, this would

9

cover the costs associated with serving 215,271,893,258,900 requests, or approximately 1,825 pages per day for every person in the United States.

*Reasoning and Conclusions on Reasonableness of Costs*

30.    We offer the preceding analysis with three caveats. First, at the time of PACER's design and implementation, cloud computing services were not widely available and the cost savings associated with their scale could not be achieved. It is therefore reasonable to assume that PACER's costs could be artificially high due to the time in which it was built, although effective ongoing maintenance and modernization should attenuate this effect. Second, although the Administrative Office of the Courts could directly use the Amazon Web Services we discuss, it would not be uncommon or unreasonable to purchase those services through a reseller who increases their price by some amount. Third, it is important to note that as outside analysts with limited information, we cannot anticipate or account for all of the costs that could conceivably be associated with access to PACER records.

31.    But it is noteworthy that PACER fees increased during a period of rapidly declining costs in the information technology sector. Even after taking the preceding caveats into account, we are unable to offer a reasonable explanation for how PACER's marginal cost for

10

serving a record could be many orders of magnitude greater than the contemporary cost of performing this function.

32.　It is overwhelmingly likely that the PACER system, as administered by the AO, collects fees far in excess of the costs associated with providing the public access to the records it contains.

33.　We declare under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2017.

_____
Thomas Lee

_____
Michael Lissner



hard drive cost per gigabyte (USD)

source: http://www.mkomo.com/cost-per-gigabyte



source: https://www.backblaze.com/blog/hard-drive-cost-per-gigabyte/

Appx0283

# Thomas Lee

understanding / making / explaining technology
https://www.linkedin.com/in/tom-lee-a2112387/

50 Q St NE #2
Washington, DC 20002
**(703) 944-7654**
thomas.j.lee@gmail.com
https://github.com/sbma44

## EXPERIENCE

### Mapbox — *Geocoding Lead*

JUNE 2010 - PRESENT

Guided Mapbox's location search team through a period of fast growth and into commercial success. Also performed a variety of legal, security and hardware tasks.

– Oversaw growth of geocoding business from 1% to 21% of revenue by line item, 39% to 71% by related-deal revenue. Shipped code, performed sales engineering, led hiring, participated in enterprise support, evaluated & managed compliance for licensed data.

– Managed federal government relations, including Congressional lobbying & testimony, agency meetings & writing op-eds on behalf of leadership. Liaised with relevant open data communities.

– Coordinated outside counsel during patent defense.

– Designed and implemented royalty tracking pipeline and mobile SDK battery test methodology. Assisted in design of mobile telemetry security systems. Authored first version of security protocols for participation in infosec events with hostile networks.

### Sunlight Foundation — *CTO*

DECEMBER 2008 - JUNE 2010

Managed Sunlight Labs' twenty-two person technology department during its prime years of influence and size.

– Conceived, planned and executed mission-oriented technology projects.

– Represented Sunlight's positions on various government transparency measures in Congressional testimony, speaking engagements, writing, and media appearances.

– Expanded historically web dev-focused team to include political scientists, journalists, data analysts & mobile app developers.

– Primary author of grants and reports for bulk of Sunlight funding.

– Evaluated grant applications for potential funding. Managed relationships with peer organizations, funders and grantees.

## SKILLS

writing · team management · software development · data analysis · speaking · system administration · information security · embedded systems

## TECHNOLOGIES

*Expert*
Javascript / Node.js · Python / Django / Flask · SQL / PostgreSQL · bash / GNU · Docker · AWS / EC2 / ECS / CloudFormation / DynamoDB / ElastiCache / Kinesis / S3 · PHP / Drupal / Wordpress · AVR / Arduino · QGIS · GDAL · PostGIS · Mapbox

*Productive*
Perl · Ruby · HTML5 · CSS

*Tourist*
C · C++ · Swift/XCode · three.js

## ORGANIZATIONS

OpenAddresses · FLOC · HacDC · DCist

**EchoDitto —** *Sr. Software Architect*

DECEMBER 2005 - DECEMBER 2008

Designed & implemented LAMP applications for campaigns and large nonprofits, primarily using the Drupal and WordPress frameworks.

- Assisted in requirement-gathering, copy editing and writing, strategy brainstorming, customer interaction and visual design.

- Developed variety of reporting mechanisms (SQL/Perl/Ruby).

- Launched, maintained and generated bulk of content for developer-focused EchoDitto Labs site.

**Competitive Innovations —** *Software Developer*

August 2002 - DECEMBER 2005

Created ASP.NET/Microsoft CMS-backed websites for committees and member offices in the U.S. House of Representatives; the U.S. Navy; George Washington University Law School; Miami Dade Community College; and the Corporate Executive Board.

- Interviewed, evaluated, trained and participated in the management of junior technical staff.

- Possessed security clearance as of December 2005.

SELECTED CLIPS

What Everyone Is Getting Wrong About Healthcare.gov
*Wonkblog, Washington Post*
http://www.washingtonpost.com/blogs/wonkblog/wp/2013/10/07/what-everyone-is-getting-wrong-about-healthcare-gov/

The Cost of Hashtag Revolution
*The American Prospect*
http://prospect.org/article/cost-hashtag-revolution

The Deleted Tweets of Politicians Find a New Home
*Tell Me More (NPR)*
http://www.npr.org/2012/06/06/154432624/the-deleted-tweets-of-politicians-find-a-new-home

Enhancing Accountability and Increasing Financial Transparency
*U.S. Senate Committee on the Budget*
https://www.budget.senate.gov/hearings/enhancing-accountability-and-increasing-financial-transparency

EDUCATION

**University of Virginia —** *BA, Cognitive Science*

1998-2002

Concentration in neuroscience, with work in the Levy Computational Neuroscience Lab. Computer Science minor. Echols Scholar.

# MICHAEL JAY LISSNER

[mike@free.law](mailto:mike@free.law)  •  (909) 576-4123  •  2121 Russell St., Suite B, Berkeley, CA 94705

EXPERIENCE

**Executive Director and Lead Developer**                     **2013-Present**
**Free Law Project**                                                       **Emeryville, CA**
Founded Free Law Project as a 501(c)(3) non-profit. My responsibilities as founder/director include identifying and pursuing grants and contracts, handling the marketing and accounting needs of the organization, and developing solutions for our stakeholders.

Free Law Project has been awarded grants or contracts from Columbia University, Georgia State University, University of Baltimore School of Law, and The John S. and James L. Knight Foundation, and has partnered with Google, Inc. and the Center for Internet and Technology Policy at Princeton University.

I am the lead developer for several of Free Law Project's biggest initiatives, including:
- The first ever full-text search interface for documents from the PACER system, containing nearly 20M records;
- The creation of the largest archive of American oral argument recordings, consisting of nearly one million minutes of recordings;
- The development of a comprehensive database of American judges;
- The curation of 4M court opinions, which are available via a powerful search interface, as bulk data, or via the first ever API for legal opinions;
- The creation of a web scraping infrastructure that has gathered more than 1M documents from court websites.

This work has enabled a number of research papers, made legal research more competitive, provided a useful resource to journalists, and helped innumerable people to engage in the legal system.

**New Product Designer/Developer**                           **2012-2013**
**Recommind, Inc.**                                                    **San Francisco, CA**
- Worked with the new products team to design and develop new enterprise-class products for AMLAW-50 law firms.
- Led design of new API-driven document sharing platform from initial concept to final specification, seeking stakeholder approval from upper management, sales, product management, and development teams. This process was guided by the creation of paper prototypes and low fidelity wireframe diagrams, culminating in high fidelity mock-ups and a written specification.

**Solutions Developer**                                                **2010-2012**
**Recommind, Inc.**                                                    **San Francisco, CA**
- Designed and developed new features, products and processes for internal team of technical consultants.
- Implemented distributed search systems for top international law firms.
- Collaborated with internal and external stakeholders to gather requirements and scope work.
- Developed custom crawlers and search indexes for systems with millions of records.

**Technology Intern**                                   **Summer, 2009**
**Center for Democracy and Technology**        **San Francisco, CA**
Wrote design specification and began implementation of location privacy enhancements for the new Android operating system.

**Systems Analyst and Community Researcher**           **2005-2008**
**Community Services Bureau**                  **Contra Costa County**
- Designed and implemented system for reporting educational outcomes and program metrics to senior management.
- Researched and wrote federally-mandated annual assessment of community needs.
- Worked with contractors to administer departmental databases and systems.
- Discovered and responsibly-disclosed security vulnerabilities in department systems, protecting tens of thousands of child and parent records.
- Tracked and reported daily enrollment of more than 2,000 children.

E D U C A T I O N

**School of Information, UC Berkeley**                  **2008-2010**
- Masters in Information Management and Systems (MIMS), with a focus on Internet Law and Policy and a certificate in Management of Technology from Haas School of Business
- Theoretical coursework in information privacy, policy and economics, intellectual property law, and technology strategy
- Technical coursework in security, networking, programming paradigms, distributed computing, API design, and information architecture
- Taught Web Architecture summer seminar to class of twenty undergraduates including fundamentals of networking, dynamic websites, and browsers

**University of California, Berkeley Extension**           **2005-2008**
- Unix/Linux fundamentals
- System administration programming, with focus on shell scripting and Python
- Advanced Java programming

**Pitzer College, Claremont, California**                  **2000-2004**
- Bachelor of Arts in English and World Literature with a minor in Spanish Language and Literature
- Coursework in economics, mathematics and C++ programming

P R O J E C T S &
R E S E A R C H

**CourtListener.com**
My capstone project at UC Berkeley and now a core initiative of Free Law Project, CourtListener.com is an open-source legal research tool that provides daily awareness and raw data to users via custom email alerts, Atom feeds, podcasts, a RESTful API, and bulk data. CourtListener currently:
- Hosts the RECAP Archive, a collection of nearly 20M PACER documents;
- Has 4M Boolean-searchable opinions in its corpus;
- Has more nearly 700 days of oral argument audio;
- Has a comprehensive database of American judges;
- Receives thousands of API hits per day;
- Tracks every high court in the country, adding their opinions as they published.

https://www.courtlistener.com | https://github.com/freelawproject/courtlistener

**Seal Rookery**

The Free Law Project Seal Rookery is a small project to collect and distribute all government seals in the United States. Currently, the project has more than 200 judicial seals.

https://github.com/freelawproject/seal-rookery

**Selected Policy, Legal and Security Papers**

- CourtListener.com: A platform for researching and staying abreast of the latest in the law
- Wikipedia.org: Jacobsen v. Katzer, Zeran v. AOL
- The Layered FTC Approach to Online Behavioral Advertising
- Technology Revolution and the Fourth Amendment
- Transparent Panacea: Why Open Email is Fraught with Problems
- Proactive Methods for Secure Design
- Breaking reCAPTCHA
- Facebook's Battle Sign: A Security Analysis

http://michaeljaylissner.com/projects-and-papers/

**Additional Websites and Projects**

michaeljaylissner.com | free.law | github.com/freelawproject

A D D I T I O N A L

**Distance Travel**

- **Summer, 2013-2014:** Completed south-bound thru-hike of Te Araroa Trail in New Zealand (2,000 miles). The Te Araroa Trail is considered one of the most-challenging long-distance trails in the world.

- **Summer, 2010:** Completed south-bound bike tour of California coast (1,000 miles).

- **Summer, 2005:** Completed north-bound thru-hike of Pacific Crest Trail from Mexico to Canada via Sierra and Cascade mountains (2,500 miles).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*, *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant*. | Case No. 16-745-ESH |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

As required by Local Rule 7(h)(1), the plaintiffs provide the following statement of material facts as to which they contend there is no genuine issue[1]:

## I.    Overview of PACER fees

1.    The Public Access to Court Electronic Records system, commonly known as PACER, is a system that provides online access to federal judicial records and is managed by the Administrative Office of the U.S. Courts (or AO). *See* ECF No. 27 (Answer) ¶ 7.

2.    The current fee "for electronic access to any case document, docket sheet, or case-specific report via PACER [is] $0.10 per page, not to exceed the fee for thirty pages." *Electronic Public Access Fee Schedule* (Taylor Decl., Ex. A); *see* Answer ¶ 7.

3.    The current fee "[f]or electronic access to transcripts and non-case specific reports via PACER (such as reports obtained from the PACER Case Locator or docket activity reports) [is] $0.10 per page." Taylor Decl., Ex. A; *see* Answer ¶ 7.

---

[1] Much of what follows is based on documents produced by the government for purposes of this litigation. These documents set forth the amount of money collected in PACER fees since fiscal year 2010, which programs that money has been used to fund, and the government's description of the programs. Although the plaintiffs do not challenge the truthfulness of any of this information in moving for summary judgment on the issue of liability, they reserve the right to do so at a later stage. In addition, the words "judiciary" and "Administrative Office" or "AO" are used interchangeably when referring to the Judicial Branch's administrative action.

1

4.    The current fee "[f]or electronic access to an audio file of a court hearing via PACER [is] $2.40 per audio file." Taylor Decl., Ex. A; *see* Answer ¶ 7.

5.    Anyone who accesses records through PACER will incur an obligation to pay fees unless she obtains a fee waiver or incurs less than $15 in fees in a given quarter. Taylor Decl., Ex. A.

## II.    History of PACER fees

### A.    The creation of PACER

8.    In 1990, Congress began requiring the judiciary to charge "reasonable fees . . . for access to information available through automatic data processing equipment," including records available through what is now known as PACER. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress provided that "[a]ll fees hereafter collected by the Judiciary . . . as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.*

9.    Later in the decade, the judiciary started planning for a new e-filing system called ECF. The staff of the AO produced a paper "to aid the deliberations of the Judicial Conference" in this endeavor. *Electronic Case Files in the Federal Courts: A Preliminary Examination of Goals, Issues and the Road Ahead* (Mar. 1997) (Taylor Decl., Ex. B). The paper discussed, among other things, how the ECF system could be funded. *Id.* at 34–36. The AO staff wrote that "there is a long-standing principle" that, when imposing user fees, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." *Id.* at 34. But, two pages later, the staff contemplated that the ECF system could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* at 36.

10.    The Judicial Conference set PACER fees at $.07 per page beginning in 1998. *See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program (Taylor Decl., Ex. C).

2

**B.      The E-Government Act of 2002**

11.      Four years after that, Congress enacted the E-Government Act of 2002. According to a report prepared by the Committee on Governmental Affairs, Congress found that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002) (Taylor Decl., Ex. D, at 23). With the E-Government Act, "[t]he Committee intend[ed] to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." *Id.*; *see also* ECF No. 1 (Compl.) ¶ 12; Answer ¶ 12.

12.      The E-Government Act amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C. § 1913 note).

13.      The full text of 28 U.S.C. § 1913 note, as amended by the E-Government Act, is as follows:

> (a) The Judicial Conference may, only to the extent necessary, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections for access to information available through automatic data processing equipment. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

> (b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) to reimburse expenses incurred in providing these services.

3

**C.      The AO's Response to the E-Government Act**

14.      The Judicial Conference did not reduce or eliminate PACER fees following the

enactment of the E-Government Act. *See* Compl. ¶ 13; Answer ¶ 13.

15.      To the contrary, in September 2004 the Judicial Conference increased fees to $.08

per page, effective on January 1, 2005. Memorandum from Leonidas Ralph Mecham, Director

of the Admin. Office, to Chief Judges & Clerks (Oct. 21, 2004) (Taylor Decl., Ex. E). In a letter

announcing the increase to the chief judges and clerks of each federal court, the AO's Director

wrote: "The fee increase will enable the judiciary to continue to fully fund the Electronic Public

Access Program, in addition to CM/ECF implementation costs until the system is fully deployed

throughout the judiciary and its currently defined operations and maintenance costs thereafter."

*Id.* The letter does not mention the E-Government Act. *See* Compl. ¶ 13; Answer ¶ 13.

16.      By the end of 2006, the Judiciary Information Technology Fund had accumulated

a surplus of $146.6 million—$32.2 million of which was from PACER fees. Admin. Office,

Judiciary Information Technology Annual Report for Fiscal Year 2006, at 8, (Taylor Decl., Ex.

F). According to the AO, these fees had "result[ed] from unanticipated revenue growth

associated with public requests for case information." *Id.*

17.      Despite the surplus, the AO still did not reduce or eliminate PACER fees, but

instead began "examining expanded use of the fee revenue." *Id.* It started using the excess

PACER revenue to fund "courtroom technology allotments for installation, cyclical replacement

of equipment, and infrastructure maintenance." Letter from Sen. Lieberman, Chair, Sen.

Comm. on Homeland Security and Governmental Affairs, to Sens. Durbin and Collins, Sen.

Comm. on Appropriations (Mar. 25, 2010) (Taylor Decl., Ex. G); *see* Compl. ¶ 14; Answer ¶ 14.

4

18.     Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House of Representatives. She explained that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260, 110th Cong. 51 (2008). Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements in the courts' Salaries and Expenses account, thereby reducing our need for appropriated funds." *Id.*; *see* Compl. ¶ 15; Answer ¶ 15.

19.     In early 2009, Senator Joe Lieberman (the E-Government Act's sponsor) wrote a letter to the Judicial Conference "to inquire if [it] is complying" with the statute. Letter from Sen. Lieberman to Hon. Lee Rosenthal, Chair, Committee on Rules of Practice and Procedure, Judicial Conf. of the U.S. (Feb. 27, 2009) (Taylor Decl., Ex. H). He noted that "[t]he goal of this provision, as was clearly stated in the Committee report that accompanied the Senate version of the E-Government Act, was to increase free public access to [judicial] records." *Id.* He also noted that "PACER [is] charging a higher rate" than it did when the law was passed, and that "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* He asked the Judicial Conference to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*; *see* Compl. ¶ 16; Answer ¶ 16.

20.     The AO's Director replied with a letter acknowledging that the E-Government Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible,'" but taking the position that "the Judiciary [was] charging PACER fees only to the extent necessary." Letter from Hon. Lee Rosenthal and James C. Duff to Sen. Lieberman (Mar. 26, 2009) (Taylor Decl., Ex. I). The sole support the letter offered for this view

was a sentence in a conference report accompanying the 2004 appropriations bill, which said only that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." *Id.* The letter did not provide any support (even from a committee report) for using the fees to recover non-PACER-related expenses beyond ECF. *See* Compl. ¶ 17; Answer ¶ 17.

21.    The following year, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Taylor Decl., Ex. G. "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up" so that the AO can fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to recover the direct cost of distributing documents via PACER"—not other technology-related projects that "should be funded through direct appropriations." *Id.*; *see also* Compl. ¶ 18; Answer ¶ 18.

22.    The AO did not lower PACER fees in response to Senator Lieberman's concerns, and instead increased them to $.10 per page beginning in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the Case Management/Electronic Case Files system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." Admin. Office, Electronic Public Access Program Summary 1 (2012), (Taylor Decl., Ex. J). But the AO took the position that the fees comply with the E-Government Act because they "are only used for public access, and are not subject to being redirected for other purposes." *Id.* at 10; *see* Compl. ¶ 19; Answer ¶ 19.

6

23.     In a subsequent congressional budget summary, however, the judiciary reported that (of the money generated from "Electronic Public Access Receipts") it spent just $12.1 million on "public access services" in 2012, while spending more than $28.9 million on courtroom technology. *Part 2: FY 2014 Budget Justifications, Financial Services and General Government Appropriations for 2014, Hearings Before a Subcommittee of the House Committee on Appropriations*, 113th Cong. 538, App. 2.4 (2013) (Taylor Decl., Ex. K).

24.     Since the 2012 fee increase, the AO has continued to collect large amounts in PACER fees. In 2014, for example, the judiciary collected nearly $145 million in fees, much of which was earmarked for other purposes such as courtroom technology, websites for jurors, and bankruptcy notification systems. Admin. Office of the U.S. Courts, *The Judiciary Fiscal Year 2016 Congressional Budget Summary*, App. 2.3 & 2.4 (Feb. 2015) (ECF No. 31-1, at 647−48).

25.     When questioned during a House appropriations hearing that same year, representatives from the judiciary acknowledged that "the Judiciary's Electronic Public Access Program encompasses more than just offering real-time access to electronic records." *Financial Services and General Government Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 113th Cong. 152 (2014); *see* Compl. ¶ 21; Answer ¶ 21.

26.     Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has said that PACER fees "also go to funding courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat- screen monitors. . . . [There have also been] audio enhancements. . . . We spent a lot of money on audio so the people could hear what's going on. . . . This all ties together and it's funded through these [PACER] fees." Hon. William Smith, Panel Discussion on Public Electronic Access to Federal Court Records at the William

and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), https://goo.gl/5g3nzo; *see* Compl. ¶ 22; Answer ¶ 22.

## III.   Use of PACER fees within the class period

### A.  Fiscal year 2010

28.    The judiciary collected $102,511,199 in PACER fees for fiscal year 2010 and carried forward $34,381,874 from the previous year. Public Access and Records Management Division, *Summary of Resources* (Taylor Decl., Ex. L).

29.    The cost of the Electronic Public Access Program for fiscal year 2010 was $18,768,552. *Id.* According to the government, "[t]he EPA program provided electronic public access to court information; developed and maintained electronic public access systems in the judiciary; and, through the PACER [] Service Center, provided centralized billing. It also included funding the technical elements to the PACER program, including, but not limited to, the PACER Service Center [] technical costs, contracts, technical training, uscourts.gov website, and program office technical costs." Def.'s Resp. to Pls.' First Set of Interrogs., at 2 (Taylor Decl., Ex. M).

30.    Beyond the cost of the EPA program, the AO used PACER fees to fund the following programs in fiscal year 2010:

31.    ***Courtroom technology.*** The AO spent $24,731,665 from PACER fees on "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts." Taylor Decl., Ex. L; Ex. M, at 5.

32.    At least some of the money spent to upgrade courtroom technology, such as purchasing flat screens for jurors, is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in

providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

33.     ***Violent Crime Control Act Notification.*** The AO spent $332,876 from PACER fees on a "program [that] electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." Taylor Decl., Ex. L; Ex. M, at 5.

34.     Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

35.     ***State of Mississippi.*** The AO spent $120,988 from PACER fees on a "Mississippi state three year study on the feasibility of sharing the Judiciary's CM/ECF filing system at the state level." Taylor Decl., Ex. L; Ex. M, at 5. The government says that "[t]his provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents." *Id.*

36.     Paying the State of Mississippi is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

37.     ***Electronic Bankruptcy Noticing.*** The AO spent $9,662,400 from PACER fees on a system that "produces and sends court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. M, at 3. (A "341 meeting" is a meeting of creditors and equity security holders in a bankruptcy under 11 U.S.C. § 341.)

9

38.     Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

39.     **CM/ECF.** The AO spent $23,755,083 from PACER fees on CM/ECF (short for Case Management/Electronic Case Files), the e-filing and case-management system that "provides the ability to store case file documents in electronic format and to accept filings over the internet." Taylor Decl., Ex. L; Ex. M, at 3. There is no fee for filing a document using CM/ECF. PACER, *FAQs*, https://www.pacer.gov/psc/efaq.html#CMECF.

40.     The CM/ECF costs for fiscal year 2010 consisted of the following: $3,695,078 for "Development and Implementation" of the CM/ECF system; $15,536,212 for "Operations and Maintenance" of the system; $3,211,403 to "assess[] the judiciary's long term case management and case filing requirements with a view to modernizing or replacing the CM/ECF systems" (which the government calls "CM/ECF Futures"); $144,749 for "Appellate Operational Forum," which "is an annual conference at which judges, clerks of court, court staff, and AO staff exchange ideas and information about operational practices and policies related to the Appellate CM/ECF system"; $674,729 for "District Operational Forum," which is a similar conference for the "District CM/ECF system"; and $492,912 for "Bankruptcy Operational Forum," a similar conference for the "Bankruptcy CM/ECF system," Taylor Decl., Ex. L; Ex. M, at 2–3.

41.     At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

10

42.  **Telecommunications.** The AO spent $13,847,748 from PACER fees on what it calls "DCN and Security Services." Taylor Decl., Ex. L. DCN stands for "Data Communications Network"—"a virtual private network that allows access only to those resources that are considered part of the uscourts.gov domain." Taylor Decl., Ex. M, at 33. "This DCN cost [was] split between appropriated funds and Electronic Public Access (EPA) funds," and covered the "costs associated with network circuits, routers, switches, security, optimization, and management devices along with maintenance management and certain security services to support the portion of the Judiciary's WAN network usage associated with CM/ECF." *Id.* at 4. The government also spent $10,337,076 on PACER-Net, the network that "allows courts to post court information on the internet in a secure manner" and hosts both "[t]he public side of CM/ECF as well as court websites." Taylor Decl., Ex. L; Ex. M, at 2–3.

43.  At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

44.  **Court Allotments.** Finally, the AO spent $9,428,820 from PACER fees on payments to the federal courts, which consisted of the following:

- $7,605,585 for "CM/ECF Court Allotments," which the governments says were "funds provided as the CM/ECF contribution/portion of the IT Infrastructure Formula, and funds for attorney training on CM/ECF";

- $1,291,335 for "Court Allotments" to fund "public terminals, internet web servers, telephone lines, paper and toner at public printers, digital audio, McVCIS" (short for "Multi-court Voice Case Information System," which "provides bankruptcy case information" to "the public over the phone"), and "grants for the courts";

11

- $303,527 for "Courts/AO Exchange Program," which "fund[ed] participants in the IT area, related to the Next Gen program" ("the next iteration of CM/ECF"); and

- $228,373 for "Court Staffing Additives," which covered the costs of staffing people who "worked on projects like the development of [McVCIS]."

Taylor Decl., Ex. L; Ex. M, at 4, 30.

45.    At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

**B. Fiscal year 2011**

46.    The judiciary collected $113,770,265 in PACER fees for fiscal year 2011 and carried forward $26,051,473 from the previous year. Taylor Decl., Ex. L.

47.    The cost of the Electronic Public Access Program for fiscal year 2011 was $3,363,770. *Id.*

48.    Beyond the cost of the EPA program, the judiciary spent $10,339,444 from PACER fees on what it calls "EPA Technology Infrastructure & applications," *id.*, which is the "[d]evelopment and implementation costs for CM/ECF," and $4,318,690 on what it calls "EPA Replication," which "cover[ed] expenses for CM/ECF servers and replication and archive services." Taylor Decl., Ex. L; Ex. M, at 5–6.

49.    The AO also used PACER fees to fund the following programs in fiscal year 2011:

50.    ***Courtroom technology.*** The AO spent $21,542,457 from PACER fees on "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts." Taylor Decl., Ex. L; Ex. M, at 8.

51.     At least some of the money spent to upgrade courtroom technology is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

52.     ***Violent Crime Control Act Notification.*** The AO spent $508,903 from PACER fees on a "program [that] electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." Taylor Decl., Ex. L; Ex. M, at 8.

53.     Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

54.     ***Electronic Bankruptcy Noticing.*** The AO spent $11,904,000 from PACER fees to "produce[] and send[] court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. L; Ex. M, at 7.

55.     Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

56.     ***CM/ECF.*** The AO spent $22,540,928 from PACER fees on CM/ECF. Taylor Decl., Ex. L. These costs consisted of the following: $5,400,000 for "Development and Implementation"; $11,154,753 for "Operations and Maintenance"; $4,582,423 for "CM/ECF Futures"; $176,198 for "Appellate Operational Forum"; $705,054 for "District Operational Forum"; and $522,500 for "Bankruptcy Operational Forum." *Id.*; *see* Taylor Decl., Ex. M, at 6.

57.     At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

58.     ***Telecommunications.*** The AO spent $23,528,273 from PACER fees on telecommunications costs. Taylor Decl., Ex. L. These costs consisted of the following: $9,806,949 for "DCN and Security Services," which covered the "[c]osts associated with the FTS 2001 and Networx contracts with the PACER-Net"; $4,147,390 for "PACER-Net & DCN," which was "split between appropriated funds and Electronic Public Access (EPA) funds," and which covered the "costs associated with network circuits, routers, switches, security, optimization, and management devices along with maintenance management and certain security services to support the portion of the Judiciary's WAN network usage associated with CM/ECF"; $9,221,324 for PACER-Net; and $352,610 for "Security Services," which covered the "costs for security services associated with the PACER-Net." Taylor Decl., Ex. L; Ex. M, at 7.

59.     At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

60.     ***Court allotments.*** Finally, the AO spent $10,618,805 from PACER fees on payments to the courts. Taylor Decl., Ex. L. These costs consisted of: $7,977,635 for "CM/ECF Court Allotments"; $769,125 for "Courts/AO Exchange Program"; $1,403,091 for "Court Allotments"; and $468,954 for "Court Staffing Additives." Taylor Decl., Ex. L; Ex. M, at 7–8.

61.     At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an

"expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

### C. Fiscal year 2012

62.     The judiciary collected $124,021,883 in PACER fees for fiscal year 2012 and carried forward $31,320,278 from the previous year. Taylor Decl., Ex. L.

63.     The cost of the Electronic Public Access Program for fiscal year 2012 was $3,547,279. *Id.*

64.     Beyond the cost of the EPA program, the judiciary also used PACER fees to fund $5,389,870 in "[d]evelopment and implementation costs for CM/ECF" (under the category of "EPA Technology Infrastructure & applications"); and $3,151,927 in "expenses for CM/ECF servers and replication and archive services" (under the category of "EPA Replication"). Taylor Decl., Ex. L; Ex. M, at 9.

65.     The AO also used PACER fees to fund the following programs in fiscal year 2012:

66.     ***Courtroom Technology.*** The AO spent $28,926,236 from PACER fees on courtroom technology. Taylor Decl., Ex. L; *see* Taylor Decl., Ex. M, at 11–12.

67.     At least some of the money spent to upgrade courtroom technology is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

68.     ***Violent Crime Control Act Notification.*** The AO spent $1,030,922 from PACER fees on a "program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision"—$480,666 in development costs and $550,256 in operation and maintenance costs. Taylor Decl., Ex. L; Ex. M, at 11.

69. Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

70. ***Web-based Juror Services.*** The AO spent $744,801 from PACER fees to cover "[c]osts associated with E-Juror software maintenance, escrow services, and scanner support. E-Juror provides prospective jurors with electronic copies of courts documents regarding jury service. Taylor Decl., Ex. L; Ex. M, at 11.

71. Providing services to jurors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

72. ***Electronic Bankruptcy Noticing***. The AO spent $13,789,000 from PACER fees to "produce[] and send[] court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. L; Ex. M, at 10.

73. Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

74. ***CM/ECF.*** The AO spent $26,398,495 from PACER fees on CM/ECF. Taylor Decl., Ex. L. These costs consisted of: $8,006,727 for "Operations and Maintenance"; $164,255 for "Appellate Operational Forum"; $817,706 for "District Operational Forum"; and $531,162 for "Bankruptcy Operational Forum." *Id.* The costs also consisted of: $5,491,798 for "testing CM/ECF"; $6,095,624 to "fund[] positions that perform duties in relation to the CM/ECF

16

system" (which the government labels "CM/ECF Positions"); and $5,291,223 to "assess[] the judiciary's long term case management and case filing requirements with a view to modernizing or replacing the CM/ECF systems" (which the government labels "CM/ECF Next Gen."). Taylor Decl., Ex. L; Ex. M, at 9.

75.     At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

76.     ***Communications Infrastructure, Services and Security.*** The AO spent $26,580,994 from PACER fees on these costs, which consisted of $22,128,423 for "PACER Net DCN" and $4,452,575 for "security services associated with PACER and CM/ECF." Taylor Decl., Ex. L; Ex. M, at 10.

77.     At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

78.     ***Court Allotments***. Finally, the AO spent $10,617,242 from PACER fees on payments to the courts. Taylor Decl., Ex. L. These costs consisted of: $8,063,870 for "CM/ECF Court Allotments"; $890,405 for "Courts/AO Exchange Program"; and $1,662,967 for "Court Staffing Additives/Allotments." Taylor Decl., Ex. L; Ex. M, at 10–11.

79.     At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

17

### D. Fiscal year 2013

80.     The judiciary collected $147,469,581 in PACER fees for fiscal year 2013 and carried forward $36,049,102 from the previous year. Taylor Decl., Ex. L.

81.     The cost of the Electronic Public Access Program for fiscal year 2013 was $4,652,972. *Id.*

82.     Beyond the cost of the EPA program, the AO also spent $5,139,937 from PACER fees on "[d]evelopment and implementation costs for CM/ECF" (under the category of "EPA Technology Infrastructure & Applications"), and $10,462,534 from PACER fees on "expenses for CM/ECF servers and replication and archive services" (under the category of "EPA Replication"). Taylor Decl., Ex. L; Ex. M, at 12.

83.     The AO also used PACER fees to fund the following programs in fiscal year 2013.

84.     ***Courtroom Technology.*** The AO spent $31,520,316 from PACER fees on courtroom technology. Taylor Decl., Ex. L; *see* Taylor Decl., Ex. M, at 15.

85.     At least some of the money spent to upgrade courtroom technology is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

86.     ***Violent Crime Control Act Notification.*** The AO spent $681,672 from PACER fees on a "program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision"—$254,548 in development costs and $427,124 in operation and maintenance costs. Taylor Decl., Ex. L; Ex. M, at 14.

87.     Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d

Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

88.    ***Web-based Juror Services.*** The AO spent $2,646,708 from PACER fees on "E-Juror maintenance and operation." Taylor Decl., Ex. L; Ex. M, at 14.

89.    Providing services to jurors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

90.    ***Electronic Bankruptcy Noticing***. The AO spent $12,845,156 from PACER fees to "produce[] and send[] court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. L; Ex. M, at 13.

91.    Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

92.    ***CM/ECF.*** The AO spent $32,125,478 from PACER fees on CM/ECF. Taylor Decl., Ex. L. These costs consisted of: $4,492,800 for testing the system; $7,272,337 for "CM/ECF Positions," $6,091,633 for "Operations and Maintenance," $13,416,708 for "CM/ECF Next Gen.," $800,000 for the "District Court Forum," and $52,000 for the "Bank[ruptcy] Court" forum. Taylor Decl., Ex. L; Ex. M, at 12–13.

93.    At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

19

94.    ***Communications Infrastructure, Services and Security.*** The AO spent $27,500,711 from PACER fees on these costs, which consisted of $23,205,057 for "PACER Net DCN" and $4,295,654 for "security services associated with PACER and CM/ECF." Taylor Decl., Ex. L; Ex. M, at 13.

95.    At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

96.    ***Court Allotments***. Finally, the AO spent $15,754,031 from PACER fees on payments to the courts. Taylor Decl., Ex. L. These costs consisted of: $12,912,897 for "CM/ECF Court Allotments"; $578,941 for "Courts/AO Exchange Program"; and $2,262,193 for "Court Staffing Additives/Allotments." Taylor Decl., Ex. L; Ex. M, at 14.

97.    At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

**E.  Fiscal year 2014**

98.    The judiciary collected $144,612,517 in PACER fees for fiscal year 2014 and carried forward $39,094,63 from the previous year. Taylor Decl., Ex. L.

99.    The cost of the Electronic Public Access Program for fiscal year 2014 was $4,262,398, plus $667,341 in "[c]osts associated with managing the non-technical portion of the PACER Service Center i.e., rent, billing process costs, office equipment and supplies." Taylor Decl., Ex. L; Ex. M, at 15.

100.    Beyond the cost of the EPA program, the AO also spent $6,202,122 from PACER fees on "[d]evelopment and implementation costs for CM/ECF" (under the category of "EPA Technology Infrastructure & Applications"), and $4,367,846 on "expenses for CM/ECF servers" and "support for CM/ECF Infrastructure" (under the category of "EPA Replication"). *Id.*

101.    The AO also used PACER fees to fund the following programs in fiscal year 2014:

102.    ***Courtroom Technology.*** The AO spent $26,064,339 from PACER fees on courtroom technology. Taylor Decl., Ex. L; *see* Taylor Decl., Ex. M, at 18.

103.    At least some of the money spent to upgrade courtroom technology is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

104.    ***Violent Crime Control Act Notification.*** The AO spent $474,673 from PACER fees on a "program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." Taylor Decl., Ex. L; Ex. M, at 18.

105.    Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

106.    ***Web-based Juror Services.*** The AO spent $2,450,096 from PACER fees on "E-Juror maintenance and operation." Taylor Decl., Ex. L; Ex. M, at 18.

107.    Providing services to jurors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

21

108.    ***Electronic Bankruptcy Noticing***. The AO spent $10,005,284 from PACER fees to "produce[] and send[] court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. L; Ex. M, at 17.

109.    Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

110.    ***CM/ECF.*** The AO spent $39,246,201 from PACER fees on CM/ECF. Taylor Decl., Ex. L. These costs consisted of $8,210,918 for "CM/ECF Positions" and $7,925,183 for "CM/ECF Next Gen." Taylor Decl., Ex. L; Ex. M, at 16. The costs also included: $12,938,052 in "costs associated with SDSO support services for [CM/ECF], CM/ECF NextGen Development and Legacy [CM/ECF] systems," including "function and technical support desk services, release, distribution, installation support services, communications services, and written technical documentation material"; $6,640,397 in "expenses for CM/ECF servers" and "support for CM/ECF Infrastructure"; $3,328,417 for "tasks related to the operation and maintenance of the [Enterprise Data Warehouse] and other integration services, enhancement and/or migration services that are required to support technology advancement or changing business needs," which were designed to support CM/ECF by providing "on-line analytics, reports, dashboards, as well as seamless integration with other judiciary systems through web services and other application programming interfaces"; and $75,000 for the "CSO Combined Forum," which "is a conference at which judges, clerks of court, court staff, and AO staff exchange ideas and information about operations practices and policies related to the CM/ECF system." *Id.*

111.    At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an

"expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

112. ***Communications Infrastructure, Services and Security.*** The AO spent $38,310,479 from PACER fees on these costs, which consisted of $33,022,253 for "PACER Net DCN" and $5,288,226 for "security services associated with PACER and CM/ECF." Taylor Decl., Ex. L; Ex. M, at 17.

113. At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

114. ***Court Allotments***. Finally, the AO spent $10,754,305 from PACER fees on payments to the courts. Taylor Decl., Ex. L. These costs consisted of: $7,698,248 for "CM/ECF Court Allotments"; $367,441 for "Courts/AO Exchange Program"; and $2,688,616 for "Court Staffing Additives/Allotments." Taylor Decl., Ex. L; Ex. M, at 17.

115. At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

**F. Fiscal year 2015**

116. The judiciary collected $144,911,779 in PACER fees for fiscal year 2015 and carried forward $41,876,991 from the previous year. Taylor Decl., Ex. L.

117. The cost of the Electronic Public Access Program for fiscal year 2015 was $2,575,977, plus $642,160 in "[c]osts associated with managing the non-technical portion of the

PACER Service Center i.e., rent, billing process costs, office equipment and supplies." Taylor Decl., Ex. L; Ex. M, at 18.

118.    Beyond the cost of the EPA program, the judiciary also used PACER fees to fund the following: $3,345,593 in "[d]evelopment and implementation costs for CM/ECF" (under the category of "EPA Technology Infrastructure & Applications"); $13,567,318 in "expenses for CM/ECF servers" and "support for CM/ECF Infrastructure" (under the category of "EPA Replication"); and $1,295,509 in "costs associated with the support of the uscourts.gov website." Taylor Decl., Ex. L; Ex. M, at 18–19.

119.    The AO also used PACER fees to fund the following programs in fiscal year 2015:

120.    **Courtroom Technology.** The AO spent $27,383,325 from PACER fees on courtroom technology. Taylor Decl., Ex. L; *see* Taylor Decl., Ex. M, at 22.

121.    At least some of the money spent to upgrade courtroom technology is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

122.    **Violent Crime Control Act Notification.** The AO spent $508,433 from PACER fees on a "program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." Taylor Decl., Ex. L; Ex. M, at 21.

123.    Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

124.    **Web-based Juror Services.** The AO spent $1,646,738 from PACER fees on "E-Juror maintenance and operation." Taylor Decl., Ex. L; Ex. M, at 21.

24

125.     Providing services to jurors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

126.     ***Electronic Bankruptcy Noticing***. The AO spent $8,090,628 from PACER fees to "produce[] and send[] court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. L; Ex. M, at 20–21.

127.     Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

128.     ***CM/ECF.*** The AO spent $34,193,855 from PACER fees on CM/ECF. Taylor Decl., Ex. L. These costs consisted of $6,622,167 for "CM/ECF Positions" and $10,169,819 for "CM/ECF Next Gen." Taylor Decl., Ex. L; Ex. M, at 19. The costs also consisted of: $1,727,563 for "providing curriculum design and training for legal CM/ECF and NextGen," which "include[d] the scheduling of classes to meet court staff turnover (operational and technical staff) and to provide training on new features provided by NextGen"; $2,730,585 for "JENIE Branch and Information Services Branch support of CM/ECF and CM/ECF NextGen development on the JENIE platforms," including "[e]ngineering efforts for NextGen utilizing the JENIE environment"; $3,336,570 in "costs associated with SDSO support services for [CM/ECF], CM/ECF NextGen Development and Legacy [CM/ECF] systems"; $4,574,158 for testing the system; $3,244,352 for "tasks related to the operation and maintenance of the [Enterprise Data Warehouse] and other integration services, enhancement and/or migration services that are required to support technology advancement or changing business needs";

$1,680,128 for the "CSO Combined Forum"; and $108,513 for a "CM/ECF NextGen project working group." *Id.* at 19–20.

129. At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

130. ***Communications Infrastructure, Services and Security.*** The AO spent $43,414,189 from PACER fees on these costs, which consisted of $36,035,687 for "PACER Net DCN" and $7,378,502 for "security services associated with PACER and CM/ECF." Taylor Decl., Ex. L; Ex. M, at 21.

131. At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

132. ***Court Allotments***. Finally, the AO spent $11,059,019 from PACER fees on payments to the courts. Taylor Decl., Ex. L. These costs consisted of: $7,964,723 for "CM/ECF Court Allotments"; $1,343,993 for "Courts/AO Exchange Program"; and $1,064,956 for "Court Staffing Additives/Allotments." Taylor Decl., Ex. L; Ex. M, at 21.

133. At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

### G. Fiscal year 2016

134.    The judiciary collected $146,421,679 in PACER fees for fiscal year 2016 and carried forward $40,254,853 from the previous year. Taylor Decl., Ex. L.

135.    The cost of the Electronic Public Access Program for fiscal year 2016 was $748,495, plus $2,443,614 in "[c]osts associated with managing the non-technical portion of the PACER Service Center i.e., rent, billing process costs, office equipment and supplies." Taylor Decl., Ex. L; Ex. M, at 22–23.

136.    Beyond the cost of the EPA program, the judiciary also used PACER fees to fund the following: $6,282,055 in "[d]evelopment and implementation costs for CM/ECF"; $10,364,682 in "expenses for CM/ECF servers" and "support for CM/ECF Infrastructure"; $2,046,473 to fund "positions that perform duties in relation to the CM/ECF system"; $678,400 in "[c]osts associated with an Agile team, staffed by contractors, with the purpose of re-designing and implementing an entirely new centralized product for access to all CM/ECF case data"; $1,241,031 in "costs associated with the support of the uscourts.gov website"; and $67,605 in "Information Technology support for PACER Development Branch and PACER Services Branch Staff." *Id.*

137.    The AO also used PACER fees to fund the following programs in fiscal year 2016:

138.    ***Courtroom Technology.*** The AO spent $24,823,532 from PACER fees on courtroom technology. Taylor Decl., Ex. L; *see* Taylor Decl., Ex. M, at 26.

139.    At least some of the money spent to upgrade courtroom technology is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

140. ***Violent Crime Control Act Notification.*** The AO spent $113,500 from PACER fees on a "program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." Taylor Decl., Ex. L; Ex. M, at 26.

141. Notifying law enforcement under the Violent Crime Control Act is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

142. ***Web-based Juror Services.*** The AO spent $1,955,285 from PACER fees on "E-Juror maintenance and operation." Taylor Decl., Ex. L; Ex. M, at 26.

143. Providing services to jurors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

144. ***Electronic Bankruptcy Noticing***. The AO spent $7,069,408 from PACER fees to "produce[] and send[] court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases." Taylor Decl., Ex. L; Ex. M, at 25.

145. Notifying bankruptcy creditors is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107−174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

146. ***CM/ECF.*** The AO spent $39,745,955 from PACER fees on CM/ECF. Taylor Decl., Ex. L. These costs consisted of $6,290,854 for "CM/ECF Positions" and $11,415,754 for "CM/ECF Next Gen." Taylor Decl., Ex. L; Ex. M, at 23. The costs also include: $1,786,404 for "providing curriculum design and training for legal CM/ECF and NextGen"; $3,785,177 for

"JENIE Branch and Information Services Branch support of CM/ECF and CM/ECF NextGen development on the JENIE platforms"; $2,422,404 in "costs associated with SDSO support services for [CM/ECF], CM/ECF NextGen Development and Legacy [CM/ECF] systems"; $6,182,547 for testing the system; $3,645,631 for "tasks related to the operation and maintenance of the [Enterprise Data Warehouse] and other integration services, enhancement and/or migration services that are required to support technology advancement or changing business needs"; $1,680,128 for the "CSO Combined Forum," which "is a conference at which judges, clerks of court, court staff, and AO staff exchange ideas and information about operations practices and policies related to the CM/ECF system"; $134,093 for a "CM/ECF NextGen project working group"; $635,520 for "CM/ECF Implementation," which funds "new contractors" and covers travel funds for "660 trips per year to support 60 courts implementing NextGen CM/ECF"; and $1,649,068 to fund a "CM/ECF Technical Assessment" to review and analyze the "performance of the Next GEN CM/ECF system." Taylor Decl., Ex. L; Ex. M, at 23–25.

147.    At least some of the money spent on CM/ECF is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

148.    ***Communications Infrastructure, Services and Security.*** The AO spent $45,922,076 from PACER fees on these costs, which consisted of $36,577,995 for "PACER Net DCN" and $9,344,081 for "security services associated with PACER and CM/ECF." Taylor Decl., Ex. L; Ex. M, at 25.

149.    At least some of the money spent on telecommunications is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d

Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

150.  ***Court Allotments***. Finally, the AO spent $7,312,023 from PACER fees on payments to the courts. Taylor Decl., Ex. L. These costs consisted of: $6,588,999 for "CM/ECF Court Allotments"; $1,069,823 for "Courts/AO Exchange Program"; and −$346,799 for "Court Staffing Additives/Allotments." Taylor Decl., Ex. L; Ex. M, at 26.

151.  At least some of the money given to courts is not part of the "marginal cost of disseminating" records through PACER, S. Rep. 107–174, 107th Cong., 2d Sess. 23—*i.e.*, an "expense[] incurred in providing" access to such records for which it is "necessary" to charge a fee "for [the] services rendered." 28 U.S.C. § 1913 note.

## IV.  The decrease in the cost of data storage

152.  Researcher Matthew Komorowski and data-storage firm BackBlaze have published storage-cost-time series that when combined cover the period dating from the PACER system's 1998 debut to the present. During this time their data shows the cost of a gigabyte of storage falling from $65.37 to $0.028, a reduction of over 99.9%. During this same time period PACER's per-page fees increased 43%, from $0.07 to $0.10. Lee & Lissner Decl. ¶ 16.

<div style="text-align:right">

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
Phone: (202) 888-1741
*deepak@guptawessler.com*

WILLIAM H. NARWOLD
MEGHAN S.B. OLIVER

</div>

ELIZABETH SMITH
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com*

August 28, 2017                    *Attorneys for Plaintiffs*

Appx0319

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2017, I filed the foregoing statement through this Court's CM/ECF system, and that all parties required to be served have been thereby served.

*/s/ Deepak Gupta*
Deepak Gupta

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.,

        Plaintiffs,

v.

UNITED STATES OF AMERICA,

        Defendant.

Civil Action No. 16-745 (ESH)

## PROPOSED BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

———————————

Bruce D. Brown (D.C. Bar No. 457317)
*Counsel of record for Amicus Curiae*
Caitlin Vogus (D.C. Bar No. 988826)
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
(202) 795-9301

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ..................................... 1

SUMMARY OF ARGUMENT ............................................................................................ 2

ARGUMENT ................................................................................................................... 4

   I.   The public and the press benefit from unfettered access to electronic court records. ........ 4

     A.   The news media uses electronic court records to inform the public about matters of public concern. ................................................................................................. 4

     B.   Ready access to electronic court records prompts fairness and accuracy in reporting... 7

   II.   The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with First Amendment values. ....................................................... 9

   III.   PACER fees in excess of those authorized by the E-Government Act of 2002 hinders journalists and members of the public from accessing court records. ............................. 12

CONCLUSION ................................................................................................................ 15

Appx0322

## TABLE OF AUTHORITIES

**Cases**

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ............................................................. 7

**Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) ............................. 9, 10

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) .......................................................... 11

*In re Application for Exemption from Electronic Public Access Fees by Gollan & Shifflet*,
728 F.3d 1033 (9th Cir. 2013) ............................................................................... 11, 14

*In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*,
585 F. Supp. 2d 83 (D.D.C. 2008) ............................................................................. 10

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) ......... 11

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ................................................. 11

**Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589 (1978) ........................................... 9, 10

**Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ........................................ 9, 10

**Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ........................................... 9, 10

**Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ............................. 9, 10, 12

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) .................................................................. 11

**United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) ..................................... 9, 10

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ................................................ 9

**Statutes**

**E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17,
2002) (28 U.S.C § 1913 note) ................................................................................... 1

**Other Authorities**

*About the Herald Investigation*, Miami Herald, July 20, 2008,
https://perma.cc/6M9D-HB8D ....................................................................................... 6

Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, Pew Research Center, June 15,
2016, https://perma.cc/5ZPF-Q3H5 ............................................................................. 12

Anne Urda, *Mother Blasts Crib Company in Court*, Law360, Sept. 26, 2007,
https://perma.cc/2ZNY-EYR9 ........................................................................................ 4

Brad Heath, *ATF uses fake drugs, big bucks to snare suspects*, USA TODAY (June 27, 2013),
https://perma.cc/U5LF-JZGV .......................................................................................... 5

Craig Silverman, *Show the reporting and sources that support your work*, American Press
Institute, Sept. 24, 2014, https://perma.cc/M8UU-H6E5 ............................................... 8

Danny Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed
Documents*, N.Y. Times, Mar. 14, 2017, http://nyti.ms/2mLxYuW ............................. 4

Dylan Byers, *Time Inc. cuts 300 positions*, CNNMoney.com, June 13, 2017,
https://perma.cc/UA3K-G99G ...................................................................................... 12

Electronic Public Access Fee Schedule, PACER,
    https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013) ........... 11, 13, 14

Erik Sass, *Signs of the Times: More Local Newspapers Closing*, MediaPost, Feb. 10, 2017,
    https://perma.cc/LE6H-UWAG ................................................................................................ 12

Harlan Yu & Stephen Schultze, *Using Software to Liberate U.S. Case Law*, 18 ACM XRDS 12
    (2011), *available at* https://perma.cc/7FPD-NL4E .................................................................. 13

Howard Berkes, Anna Boiko-Weyrauch, & Robert Benincasa, *Coal Mines Keep Operating
    Despite Injuries, Violation And Millions In Fines*, NPR, Nov. 12, 2014, http://n.pr/1zkB86v  13

Jack Dolan, Rob Barry, & Matthew Haggman, *Ex-convicts active in mortgage fraud*, Miami
    Herald, July 20, 2008, https://perma.cc/8AXS-7C4C .................................................................. 6

Janet Roberts, *Data for Criminal Justice Stories*, Investigative Reporters and Editors Conference
    (2008), *available at* http://bit.ly/2vlRf7I ................................................................................... 7

Jeff Sturgeon, *Former Giles County doctor, stripped of license, faces federal criminal probe*,
    Apr. 18, 2017, https://perma.cc/2PFX-6BX5 ............................................................................ 13

Joe Palazzolo & Devlin Barrett, *Roots of Apple-FBI Standoff Reach Back to 2008 Case*, Wall
    Street J., Apr. 7, 2016, http://on.wsj.com/2x82QMe ................................................................... 6

Joel Rose & Jessica Taylor, *DOJ Files Brief In Appeals Court, Defending Trump's Immigration
    Executive Order*, NPR, Feb. 6, 2017, http://n.pr/2kM3J6w ....................................................... 8

Jonathan D. Silver, *Defaulting developer is target of fraud probe*, Pittsburgh Post-Gazette, Feb.
    14, 2009, http://bit.ly/2wpfFAX ................................................................................................ 13

Joseph Cox, *Unsealed Court Docs Show FBI Used Malware Like 'A Grenade'*, Motherboard,
    Nov. 7, 2016, http://bit.ly/2uMX2XH ......................................................................................... 5

Josh Gerstein, *Legal fight breaks out over deposition of Trump dossier author Christopher Steel*,
    Politico, Aug. 10, 2017, http://politi.co/2iewDfK ....................................................................... 8

Kate Willson, *How to Search Federal Court Records*, International Consortium of Investigative
    Journalists, Mar. 30, 2012, http://bit.ly/2vG6Miw ...................................................................... 6

Keith J. Kelly, *NY Times will cut budget and staff to reach digital demands*, N.Y. Post, Jan. 17,
    2017, https://perma.cc/ALG4-8TNR .......................................................................................... 12

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse
    Reporter*, 9 J. App. Prac. & Process 299 (Fall 2007) ................................................................. 7

Matt Apuzzo, *A.T.F. Filled Secret Bank Account With Millions From Shadowy Cigarette Sales*,
    N.Y. Times, Feb. 22, 2017, https://nyti.ms/2lurrCq .................................................................... 6

Michael Calderone, *The Guardian Continues to Pare U.S. Edition*, HuffPost, Mar. 22, 2017,
    **h**ttps://perma.cc/6YN5-U2QG ................................................................................................... 12

Michael Harriot, *Everything You Think You Know About the Death of Mike Brown Is Wrong, and
    the Man Who Killed Him Admits It*, TheRoot, Mar. 15, 2017, **https://perma.cc/2L6D-BB53** . 5

Robert Snell, *Feds use anti-terror tool to hunt the undocumented*, Detroit News, May 18, 2017,
    https://perma.cc/86TB-D245 ..................................................................................................... 12

Susan E. Seager, *Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40 Years Ago*, Comm. Law, Spring 2016 ..................................................... 7

Toni Locy, *Covering America's Courts* (2013) ............................................................ 8

Wesley Lowery, *Darren Wilson told attorneys he and other Ferguson officers used the n-word*, Wash. Post, Mar. 14, 2017, https://perma.cc/6RQS-52A5 ......................................... 5

Zoe Tillman, *Lawsuit Accuses Baton Rouge Police Of Excessive Force During Protests Over Alton Sterling's Death*, BuzzFeed, July 10, 2017, http://bzfd.it/2wYaF3X .............................. 8

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

*Amici curiae* are the Reporters Committee for Freedom of the Press and American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, The Center for Investigative Reporting, First Amendment Coalition, First Look Media Works, Inc., International Documentary Assn., Investigative Reporting Workshop at American University, The Media Consortium, MPA - The Association of Magazine Media, National Press Photographers Association, Online News Association, Radio Television Digital News Association, Reporters Without Borders, The Seattle Times Company, Society of Professional Journalists, and Tully Center for Free Speech. A supplemental statement of identity and interest of *amici* is included below as Appendix A. Pursuant to Local Civ. R. 7(o), *amici* have submitted a motion for leave to file their brief as *amici curiae*.[1]

As representatives and members of the news media, *amici* have a strong interest in ensuring that the press and the public have ready access to court documents. Members of the news media frequently use court records to report on matters of public concern, and such records serve as the foundation for reporting on the justice system, including important criminal and civil proceedings. Because the news media serves as a conduit through which the public receives information, when reporters cannot access court records, it is the public that loses.

The E-Government Act of 2002 permits the Judicial Conference to charge reasonable fees for electronic access to court records "only to the extent necessary." Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C § 1913 note) (hereinafter "E-

---

[1] Counsel for *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than *amici*, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

1

Government Act of 2002"). Charging fees through the Public Access to Court Electronic Records system ("PACER") which are higher than the cost of dissemination impinges on access to court records by journalists and members of the public. Independent journalists and local news media, in particular, cannot afford to pay excessive fees. It is vital that access to these important records is not inhibited by fees in excess of what the E-Government Act of 2002 permits. *Amici* write to emphasize the importance of unfettered access to court records by all members of the press and the public.

## SUMMARY OF ARGUMENT

Access to court records is essential to the public's understanding of our judicial system. Court records shed light on the actions of parties, counsel, and the judiciary, as well as the basis for judicial decisions and orders. Access to court records discourages corruption and obfuscation—the eradication of which is essential to a democracy. The news media frequently relies on court records to report on criminal and civil cases, and media coverage permits the public to engage in meaningful discussion about the judicial system and the allegations made or issues raised in particular cases. Unfettered and inexpensive access to court documents promotes accuracy and fairness in the news media's reporting and, therefore, the public's knowledge.

Ready access to court records is also consistent with First Amendment values. The U.S. Supreme Court and U.S. Court of Appeals for the D.C. Circuit have recognized that the First Amendment and common law create presumptions of access to judicial proceedings and judicial records and that such access is essential to a healthy democracy and judicial system. The E-Government Act of 2002's limitation on fees for access to court records through PACER to cover only the cost of dissemination is consonant with the constitutional and common law presumptions of access to court records.

In contrast, imposing fees for access to court records higher than the cost of dissemination—and higher than what the E-Government Act of 2002 permits—erects an improper barrier to public access.  The impact will be felt throughout the broad community of PACER users but particularly at news organizations.  As news outlets' budgets shrink, even large media companies are daunted by higher fees for court records.  Independent journalists and community news media companies are even less able to pay such fees.  Thus, charging fees for court records beyond the cost of dissemination not only violates the E-Government Act of 2002, but also inhibits the press from producing original reporting about cases of public importance.  It is also out of step with vast benefits to judicial administration brought on by digitization.

Because the government is charging fees for access to judicial records that are not authorized by the E-Government Act of 2002 and such charges harm the press and public's ability to access court records, *amici* urge this Court to grant Plaintiffs' motion for summary judgment as to liability.

## ARGUMENT

**I.    The public and the press benefit from unfettered access to electronic court records.**

    A.    The news media uses electronic court records to inform the public about matters of public concern.

A wide variety of news organizations use PACER to access electronic records in the federal district and appellate courts and to report on a broad array of topics important to the public interest.  Journalists routinely rely on electronic court records to report on matters concerning public safety, government misconduct, and public controversy and to conduct in-depth investigations on matters of public concern.

News organizations have used court records available through PACER to report on civil disputes that implicate public safety.  For example, in March of 2017, *The New York Times* relied on federal court documents that raised questions about the safety of certain pesticides manufactured by Monsanto to report on those concerns.  *See, e.g.*, Danny Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents*, N.Y. Times, Mar. 14, 2017, http://nyti.ms/2mLxYuW.  The records also revealed disagreement within the Environmental Protection Agency over its safety assessment of the pesticide's main ingredient, a possible carcinogen.  *Id.*  Similarly, in 2007, Law360 reported on a putative class action lawsuit against a crib manufacturer that accused the company of negligence after its crib allegedly caused the death of at least one infant.  Anne Urda, *Mother Blasts Crib Company in Court*, Law360, Sept. 26, 2007, https://perma.cc/2ZNY-EYR9.  The report quoted from the complaint's description of the crib's defects, explaining that the crib could develop "'a dangerous gap leading to a child falling through and being trapped between the side rail and the mattress.'"  *Id.*

In addition, reporters have used court records available on PACER to inform the public about possible government misconduct or controversial government activities.  In 2016, for

example, Motherboard used federal court records to report that the FBI may have illegally

exceeded the scope of search warrants that authorized them to use a form of malware against

specific users of the email service TorMail.  Joseph Cox, *Unsealed Court Docs Show FBI Used*

*Malware Like 'A Grenade'*, Motherboard, Nov. 7, 2016, http://bit.ly/2uMX2XH.  According to

one expert, the FBI delivered the malware to "innocent TorMail users" and did not inform the

federal court "about the extent to which they botched the TorMail operation." *Id.*  In another

example, in 2013, USA TODAY reported on controversial sting operations conducted by the

U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives.  Brad Heath, *ATF uses fake drugs,*

*big bucks to snare suspects*, USA TODAY (June 27, 2013), https://perma.cc/U5LF-JZGV.  USA

TODAY reporters reviewed "thousands of pages of court records" to "tell the story of how an

ATF strategy meant to target armed and violent criminals has regularly used risky and expensive

undercover stings to ensnare low-level crooks." *Id.*

Court records available through PACER also shed light on ongoing matters of public

debate.  After the shooting of Michael Brown by a Ferguson, Missouri police officer, *The*

*Washington Post* relied on federal court records to report that the officer had made a sworn

admission that he and other officers had used a racial slur to describe black people.  Wesley

Lowery, *Darren Wilson told attorneys he and other Ferguson officers used the n-word*, Wash.

Post, Mar. 14, 2017, https://perma.cc/6RQS-52A5.  This report, and the court records upon

which it was based, informed public discussion concerning Mr. Brown's shooting, which

prompted nationwide protests.  *Id.*; *see also* Michael Harriot, *Everything You Think You Know*

*About the Death of Mike Brown Is Wrong, and the Man Who Killed Him Admits It*, TheRoot,

Mar. 15, 2017, https://perma.cc/2L6D-BB53 (discussing competing interpretations of the court

records reported by *The Washington Post*).  In addition, after the Department of Justice sought to

compel Apple Inc. to unlock a smartphone belonging to the man who shot and killed 14 people in San Bernardino in December 2015, reporters from *The Wall Street Journal* used federal court records to report about the first case, in 2008, in which a federal judge ordered Apple to assist the government in unlocking a phone. Joe Palazzolo & Devlin Barrett, *Roots of Apple-FBI Standoff Reach Back to 2008 Case*, Wall Street J., Apr. 7, 2016, http://on.wsj.com/2x82QMe.

Investigative journalists, too, routinely rely on court records available through PACER to uncover stories important to the public interest. *See* Kate Willson, *How to Search Federal Court Records*, International Consortium of Investigative Journalists, Mar. 30, 2012, http://bit.ly/2vG6Miw. For example, *New York Times* reporter Matt Apuzzo used court records from a federal racketeering lawsuit, some of which were available on PACER, to write an in-depth report revealing that agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives "used a web of shadowy cigarette sales to funnel tens of millions of dollars into a secret bank account." Matt Apuzzo, *A.T.F. Filled Secret Bank Account With Millions From Shadowy Cigarette Sales*, N.Y. Times, Feb. 22, 2017, https://nyti.ms/2lurrCq. In addition, *The Miami Herald* won the Gerald Loeb Award for a series of stories that relied on federal court records and other documents to report lapses by Florida regulators that allowed thousands of convicted felons to work in the state's mortgage industry, some of whom went on the steal millions of dollars from lenders and borrowers. *See* Jack Dolan, Rob Barry, & Matthew Haggman, *Ex-convicts active in mortgage fraud*, Miami Herald, July 20, 2008, https://perma.cc/8AXS-7C4C; *About the Herald Investigation*, Miami Herald, July 20, 2008, https://perma.cc/6M9D-HB8D. Reliance on PACER is so routine that organizations for investigative journalists even provide training on how to use the system to unearth important news stories. Willson, *supra*; *see also* Janet Roberts, *Data for Criminal Justice Stories*,

Investigative Reporters and Editors Conference (2008), *available at* http://bit.ly/2vlRf7I

(directing reporters to PACER for federal court records in criminal cases).

> B.      Ready access to electronic court records prompts fairness and accuracy in
>         <u>reporting.</u>

Court records are among the most reliable sources of information for reporting on

lawsuits and matters of public concern.  As official, primary sources, court records are essential

to reporters' ability to report the news accurately and completely.  As longtime U.S. Supreme

Court correspondent Lyle Denniston has noted:

> No courthouse reporter can do his or her work without prompt——
> sometimes, virtually immediate—access to original documents. . . .
> News reporters and editors are fond of saying that a reporter is only
> as good as his or her sources.  For the courthouse reporter—indeed,
> for any reporter who would undertake to cover the law, possibly at
> any level—there is no source equal to, and certainly none superior
> to, an actual document.

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse*

*Reporter*, 9 J. App. Prac. & Process 299, 299–300 (Fall 2007).

Reporting on legal disputes is most authoritative and accurate when court records are

readily available for inspection, copying, and reference by members of the news media.  Indeed,

many states have recognized the reliability of reporting based on official records by adopting a

common law or statutory fair report privilege that shields reporters from liability when they

accurately report material from official meetings, records, or statements.  *See* Susan E. Seager,

*Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair*

*Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40*

*Years Ago*, Comm. Law, Spring 2016, at 1 n.1 (noting that "[a]t least 47 states and the District of

Columbia have adopted either a common law or statutory fair report privilege"); *see also Cox*

*Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975) (stating that "[g]reat responsibility is . . .

placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations").

Reporters and their readers benefit tremendously when news reports can reference and quote directly from court documents.  In a textbook on legal news reporting, professor and veteran journalist Toni Locy stresses this point.  *See* Toni Locy, *Covering America's Courts* 61–67 (2013)**Error! Bookmark not defined.** (focusing on the theme that, when reporting on courts, "reading is fundamental").  Locy advises reporters not to rely solely on press releases and statements given by attorneys and instead to "review[] court filings or other public records," among other things, to determine whether and how a fact or allegation should be reported.  *Id*. at 3–4, 9.

Moreover, in the digital age, when media outlets are no longer constrained by space in the same way they once were in print, many choose to publish the court records behind a report by posting them alongside a story or linking to them.  *See* Craig Silverman, *Show the reporting and sources that support your work*, American Press Institute, Sept. 24, 2014, https://perma.cc/M8UU-H6E5; *see also, e.g.*, Joel Rose & Jessica Taylor, *DOJ Files Brief In Appeals Court, Defending Trump's Immigration Executive Order*, NPR, Feb. 6, 2017, http://n.pr/2kM3J6w (reporting on and embedding DOJ brief filed in the Ninth Circuit); Josh Gerstein, *Legal fight breaks out over deposition of Trump dossier author Christopher Steel*, Politico, Aug. 10, 2017, http://politi.co/2iewDfK (reporting on and linking to motion to intervene to oppose a deposition and opposition filed in response in the Southern District of Florida); Zoe Tillman, *Lawsuit Accuses Baton Rouge Police Of Excessive Force During Protests Over Alton Sterling's Death*, BuzzFeed, July 10, 2017, http://bzfd.it/2wYaF3X (reporting on and linking to

complaint filed in the Middle District of Louisiana).

In short, access to court records makes reporting more accurate, fair, and transparent. Reporters with access to primary source materials are more likely to get the story right when reporting on legal news. And publication of court records alongside such stories enhances readers' trust by allowing readers to read the documents themselves and hold reporters accountable for the facts underlying a story. These benefits of access to court records can accrue, however, only if news organizations can afford to access them.

## II.    The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with First Amendment values.

The common law provides a broad presumptive right of access to judicial documents. *See Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents"); *United States v. Hubbard*, 650 F.2d 293, 314 (D.C. Cir. 1980) (recognizing "this country's common law tradition of public access to records of a judicial proceeding"). In addition, the U.S. Supreme Court has recognized a First Amendment right of access to criminal proceedings. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press–Enterprise II*"); *Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press–Enterprise I*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). The D.C. Circuit has also found that the First Amendment "guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Wash. Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991).

These presumptions of access arise from the public's interest in observing matters before the federal courts. *See Globe Newspaper Co*, 457 U.S. at 606. Public access to judicial

proceedings and records "permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Id.*; *Hubbard*, 650 F.2d at 314–15 (explaining that "access to records serves the important functions of ensuring the integrity of judicial proceedings in particular"). As the U.S. Supreme Court has explained, "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed[.]" *Press-Enterprise I*, 464 U.S. at 508. Thus, "[i]n addition to ensuring actual fairness, the openness of judicial proceedings helps ensure the appearance of fairness." *In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 90 (D.D.C. 2008).

Indeed, the public's interest in obtaining information contained within judicial documents plays a key role in determining whether access is allowed under both the common law and First Amendment. The common law test requires courts to "weigh[] the interests advanced by the parties in light of the public interest and the duty of the courts." *Nixon*, 435 U.S. at 602. The First Amendment standard employs the well-established "experience and logic" test, examining both whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II*, 478 U.S. at 8.

Although the presumptions of access apply to all members of the public, access to court records by the news media is especially important because the press serves as a conduit of information for the public. *See Richmond Newspapers, Inc.*, 448 U.S. at 573 (stating that members of the press often "function[] as surrogates for the public" by, for example, attending proceedings, reviewing court documents, and reporting on judicial matters to the public at large). The American people rely on the news media for information. "'[A]n untrammeled press [is] a

vital source of public information,' . . . and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. Am. Press Co*., 297 U.S. 233, 250 (1936) (alterations in original)); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) (writing that "the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. . . .The press was protected so that it could bare the secrets of government and inform the people"). The U.S. Supreme Court has recognized that the news media plays a vital role in facilitating public monitoring of the judicial system, in particular. As the Court has noted:

> A responsible press has always been regarded the handmaiden of effective judicial administration, especially in the criminal field. . . . The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

The E-Government Act of 2002's authorization of the judiciary to prescribe "reasonable fees" for access to electronic court records "only to the extent necessary" is consistent with the presumption of access found in the First Amendment and common law. In addition, the Electronic Public Access Fee Schedule's fee waiver provision, which was implemented at the direction of Congress and applies when a requester demonstrates a waiver "is necessary. . . to avoid unreasonable burdens and *to promote public access to information*," is also in accord with the constitutional and common law presumptions of access. *See* Electronic Public Access Fee Schedule, PACER, https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013) (emphasis added); *In re Application for Exemption from Electronic Public Access Fees by Gollan & Shifflet*, 728 F.3d 1033, 1035 (9th Cir. 2013) ("*In re Application for Exemption*")

(stating that "Congress directed to the Judicial Conference to provide for exempting persons or classes or persons for whom fees would be an unreasonable burden" (internal quotation marks omitted)). These provisions, if followed, promote the openness that is "an indispensable attribute" of the judicial system. *Richmond Newspapers*, 448 U.S. at 569.

**III.   PACER fees in excess of those authorized by the E-Government Act of 2002 hinders journalists and members of the public from accessing court records.**

The news media today faces serious financial stresses. "Eight years after the Great Recession sent the U.S. newspaper industry into a tailspin, the pressures facing America's newsrooms have intensified to nothing less than a reorganization of the industry itself." Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, Pew Research Center, June 15, 2016, https://perma.cc/5ZPF-Q3H5. In response, many newsrooms have cut jobs; the newspaper workforce has shrunk by nearly 40% in the last twenty years, and cuts continue to occur. *See id.* at 9 (Michael Barthel, *Newspapers: Fact Sheet*); *see also, e.g.*, Keith J. Kelly, *NY Times will cut budget and staff to reach digital demands*, N.Y. Post, Jan. 17, 2017, https://perma.cc/ALG4-8TNR; Dylan Byers, *Time Inc. cuts 300 positions*, CNNMoney.com, June 13, 2017, https://perma.cc/UA3K-G99G; Michael Calderone, *The Guardian Continues to Pare U.S. Edition*, HuffPost, Mar. 22, 2017, https://perma.cc/6YN5-U2QG.

As newsrooms across the country, and their budgets, continue to shrink, substantial fees for court records are a burden to even established news organizations. *See* Mitchell & Holcomb, *supra.* Local and freelance journalists who lack institutional support are even less likely to be able to pay high PACER fees. *See, e.g.*, Erik Sass, *Signs of the Times: More Local Newspapers Closing*, MediaPost, Feb. 10, 2017, https://perma.cc/LE6H-UWAG. If they cannot afford to access to court records, these community news outlets will lose a valuable source of information for informing the public on local events. *See, e.g.*, Robert Snell, *Feds use anti-terror tool to hunt*

*the undocumented*, Detroit News, May 18, 2017, https://perma.cc/86TB-D245 (using court

records from Eastern District of Michigan to report government's use of cellphone tracking to

track undocumented immigrants in Michigan); Jonathan D. Silver, *Defaulting developer is target*

*of fraud probe*, Pittsburgh Post-Gazette, Feb. 14, 2009, http://bit.ly/2wpfFAX (reporting about

the local targets of a federal mortgage fraud conspiracy probe using federal court records); Jeff

Sturgeon, *Former Giles County doctor, stripped of license, faces federal criminal probe*, Apr.

18, 2017, https://perma.cc/2PFX-6BX5 (relying on federal court records "posted to the online

federal case management system" to report about a local doctor being investigated by federal

authorities following drug overdose deaths of 20 of his patients); Howard Berkes, Anna Boiko-

Weyrauch, & Robert Benincasa, *Coal Mines Keep Operating Despite Injuries, Violation And*

*Millions In Fines*, NPR, Nov. 12, 2014, http://n.pr/1zkB86v (reporting results of joint

investigation by NPR and *Mine Safety & Health News*, a legal reporting service for the U.S.

mining industry, that used federal court records and other government documents to show that

thousands of mine operators fail to pay safety penalties).

PACER fees in excess of those authorized by the E-Government Act of 2002 may also be

prohibitively expensive for investigative journalists, who often need to look at court documents

in the aggregate for large-scale analysis. *See* Harlan Yu & Stephen Schultze, *Using Software to*

*Liberate U.S. Case Law*, 18 ACM XRDS 12 (2011), *available at* https://perma.cc/7FPD-NL4E

(noting that users such as academics and journalists "who want to study large quantities of court

documents are effectively shut out" because of PACER fees).  Because PACER charges a user

by the page for certain activities like downloading a PDF or making a search query, *see*

Electronic Public Access Fee Schedule, *supra*, the larger the data set the user seeks, the higher

the cost.  As aggregate data analysis has become an increasingly important tool for investigative

journalists, PACER fees have become palpably more burdensome.  *See, e.g.*, *In re Application for Exemption*, 728 F.3d at 1035–36 (affirming denial of temporary PACER fee waiver sought by two reporters so they could "comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identifying situations requiring their recusal'" and publish their findings).

Moreover, members of the news media are often unable to obtain fee waivers for PACER fees, even when reporting on stories of public interest.  The Electronic Public Access Fee Schedule expressly states that courts "should not exempt . . . members of the media" from payment of PACER fees.  Electronic Public Access Fee Schedule, *supra*.  Even if non-profit media organizations may, in some cases, be granted fee waivers, *see In Re Application for Exemption*, 728 F.3d at 1040 n.5, the vast majority of news organizations are for-profit and therefore unable to obtain waivers of PACER fees, even if they cannot afford them.

In short, newsgathering is substantially hindered by PACER fees in excess of the cost of dissemination, which is the amount authorized by the E-Government Act of 2002, and members of the news media are generally not eligible for fee waivers.  Charging PACER fees greater than those permitted by law negatively impacts the news media's—and therefore the public's—right to access court records and impinges upon the distribution of information necessary to informed communities and a healthy democracy.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully request that this Court grant

judgment in favor of Plaintiffs.

<div align="right">

Respectfully submitted,

/s/ *Bruce D. Brown*

Bruce D. Brown
*Counsel for Amici Curiae*
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

</div>

Dated: September 5, 2017

Appx0340

## CERTIFICATE OF COMPLIANCE

I, Bruce Brown, do hereby certify: (1) Brief of *Amici Curiae* complies with the type-volume limitation Fed. R. App. P. 29(a)(5) because it contains 4,220 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); (2) Brief of *Amici Curiae* complies with Local Civ. R. 7(o)(4) because it does not exceed 25 pages; and (3) Brief of *Amici Curiae* complies with the typeface requirements of Local Civ. R. 5(d) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 12-point Times New Roman.

Dated: September 5, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Bruce Brown, hereby certify that on September 5, 2017, I electronically filed the

foregoing document with United States Court of Appeals for the District of Columbia by using

the CM/ECF system. I certify that the following parties or their counsel of record are registered

as ECF filers and that they will be served through the CM/ECF system.

Dated: September 5, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

## APPENDIX A

### SUPPLEMENTAL STATEMENT OF IDENTITY OF *AMICI CURIAE*

**The Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas.  ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders.  Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press Media Editors** is a nonprofit, tax-exempt organization of newsroom leaders and journalism educators that works closely with The Associated Press to promote journalism excellence.  APME advances the principles and practices of responsible journalism; supports and mentors a diverse network of current and emerging newsroom leaders; and champions the First Amendment and promotes freedom of information.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**The Center for Investigative Reporting** (CIR) believes journalism that moves citizens to action is an essential pillar of democracy. Since 1977, CIR has relentlessly pursued and revealed injustices that otherwise would remain hidden from the public eye.  Today, we're upholding this legacy and looking forward, working at the forefront of journalistic innovation to produce important stories that make a difference and engage you, our audience, across the aisle, coast to coast and worldwide.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people.  The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy.  To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**First Look Media Works, Inc.** is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

**The International Documentary Association** (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

**The Investigative Reporting Workshop**, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**The Media Consortium** is a network of the country's leading, progressive, independent media outlets. Our mission is to amplify independent media's voice, increase our collective clout, leverage our current audience and reach new ones.

**MPA - The Association of Magazine Media**, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**Online News Association** ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reporters Without Borders** has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## APPENDIX B

### ADDITIONAL COUNSEL FOR *AMICI CURIAE*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*
*Counsel for Association of Alternative Newsmedia*

Judy Alexander
Chief Legal Counsel
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, California 94608

David Snyder
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

James Cregan
Executive Vice President
MPA - The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Laura R. Handman
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Thomas R. Burke
Davis Wright Tremaine LLP
Suite 800
500 Montgomery Street
San Francisco, CA 94111
*Counsel for Online News Association*

A-4

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                *Plaintiffs,*

v.

UNITED STATES OF AMERICA,
                *Defendant*.

Case No. 16-745-ESH

Judge Ellen S. Huvelle

---

**Proposed Brief *Amici Curiae* by The American Association of Law Libraries, et al.,
<u>In Support of Plaintiffs' Motion for Summary Judgment</u>**

Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5) of this Court, which requires compliance with the

requirements of Rule 29(a)(4)(A)) and Rule 26.1 of the Federal Rules of Appellate Procedure:

I, the undersigned, counsel of record for *amici curiae*, certify that to the best of my knowledge

and belief, the American Association of Law Libraries has no parent corporation and no publicly

held corporation holds 10% or more of its stock.

Dated: September 5, 2017

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

</div>

i

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................... iii

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................... 1

ARGUMENT ...................................................... 2

I.   CURRENT PACER FEES PREVENT SCHOLARS FROM DOING
     DEMOCRATICALLY IMPORTANT WORK .................................... 4
     A.  Building Systems For Accessing, Teaching, And Practicing The Law .................... 4

     B.  Diagnosing Societal Issues By Examining The Legal Record ................................. 6

     C.  Studying And Contributing To Jurisprudential Development ............................... 9

II.  PACER FEES PREVENT LAW LIBRARIES FROM PROVIDING PUBLIC
     ACCESS TO LEGAL INFORMATION .................................... 13
     A.  PACER Fees Harm Patron Access And Legal Research Instruction ................... 14

     B.  PACER Fees Impede Law Libraries' Responsibility To Preserve
         Legal Materials .................................... 16

III. THIS COURT MUST ENFORCE CONGRESS'S REQUIREMENT THAT THE
     FEDERAL COURTS MAKE FEDERAL ELECTRONIC COURT RECORDS
     "FREELY AVAILABLE TO THE GREATEST EXTENT POSSIBLE,"
     BECAUSE COURT ADMINISTRATORS HAVE PROVEN UNWILLING TO
     DO SO VOLUNTARILY .................................... 17

CONCLUSION .................................... 21

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Ashcroft v. Iqbal*, 55 U.S. 662 (2009) ...........................................................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 11

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)........................................... 2

*Richmond Newspapers v. Virginia*, 448 U.S. 555, 567 (1980) ......................................2

**Other Authorities**

Administrative Office of the United States Courts, *Electronic Public Access at 10*, The
    Third Branch, September 2000 ..................................................................................... 3

Civil Rights Litigation Clearinghouse, https://www.clearinghouse.net/about.php ....................... 6

CodeX, The Stanford Center for Legal Informatics, http://codex.stanford.edu/ ........................... 5

Clifford J. Carrubba and Tom S. Clark, *Rule Creation in a Political Hierarchy*, 106 AM.
    Pol. Sci. R. 622, 634 (2012) ...................................................................................... 10

Cornell Legal Information Institute, https://www.law.cornell.edu/................................................. 4

Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. OF POL. 591 (2017)............................ 10

Digital Public Library of America, https://dp.la/ ..........................................................................17

Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016)................................... 19

Elizabeth Warren, *Bankrupt Children*, 86 MINN. L. REV. 1003 (2002).........................................7

Erika Wayne, *PACER Spending Survey*, Legal Research Plus (Aug. 28, 2009),
    https://perma.cc/4CEC-Z7JT ................................................................................. 15

HathiTrust Digital Library, https://www.hathitrust.org/................................................................ 17

Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach
    to the Problems of Inconsistency and Bias in Adjudication* (October 21, 2016)
    (working paper), https://ssrn.com/abstract=2694326 ...................................................... 12

Iain Carmichael, James Wudel, Michael Kim, and James Jushchuk, Comment, *Examining
    the Evolution of Legal Precedent through Citation Network Analysis*, 96
    N.C. L. REV. (forthcoming 2017)................................................................................. 10

J. Michael Greenwood & John Brinkema, *E-Filing Case Management Services in the US
    Federal Courts: The Next Generation: A Case Study*, 7 Int'l J. for Ct. Admin. 3, 3
    (2015), https://perma.cc/33S9-XW3Z ..........................................................................18

Jay Lawrence Westbrook, *Empirical Research in Consumer Bankruptcy*, 80 Tex. L. Rev. 2123, 2148 (2002) ......................................................................................... 7

Jennifer Mascott, *Who are "Officers of the United States"?* 70 Stanford L. Rev. (forthcoming 2017) ................................................................................................11

Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (2011) ......................................................................................... 12

*Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property  and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017) .......................................................................... 3

Judith Cobb & Joan Allen-Hart, *Preserving Legal Materials in Digital Formats* (prepared for the Legal Information Preservation Alliance) (Feb. 4 2005) ..................... 16

Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record (Apr. 26, 2017) (working paper), https://ssrn.com/abstract=3019494 ................................................................... 11

Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Reps. Issa and Nadler, H. Comm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary (Feb. 10, 2017), https://perma.cc/BT6M-4J56 ................... 20

Letter from Professor Elizabeth Warren, Harvard Law School to The Honorable John J. Thomas, U.S Bankr. Court, Middle District of Pa. (Jan. 4, 2008), https://perma.cc/P2D7-9UV6 .......................................................................... 7

Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 Writings of James Madison 103, 103 (Hunt ed., 1910) ......................................................................... 2

Library Innovation Lab at Harvard University, http://lil.law.harvard.edu/ .................................. 5

Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions To Dismiss*, 6 FED. CTS. L. REV. 1 (2011)............................. 12

Lynn M. LoPucki, *Court-System Transparency,* 94 IOWA L. REV. 481, 515 (2009)................... 21

Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 Texas L. Rev. 2161 (2002)................................................................................................. 8

Media Freedom and Information Access Clinic, https://law.yale.edu/mfia/ ............................... 5

NARA Records Disposition Schedule N1-021-10-2 ................................................................16

Paul Conway, *Preservation in the Age of Google: Digitization, Digital Preservation, and Dilemmas*, 80 Libr. Quarterly 61 (2010) ................................................................16

Appx0352

Peter W. Martin, *District Court Opinions that Remain Hidden Despite a Longstanding Congressional Mandate of Transparency – The Result of Judicial Autonomy and Systemic Indifference* (working paper) (Aug. 17, 2017) ..................................................19

Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to Patterns*, 53 VILL. L. REV. 855, 864 (2008) ...........................................17

*Preservation Policy*, AALL, https://perma.cc/UKH7-M2GL ....................................16

Rebecca Kunkel, *Law Libraries and the Future of Public Access to Born-Digital Government Information*, 109 LAW LIBR. J. 67 (2017) ...................................................16

S. Rep. No. 107-174, at 23 (2002) ........................................................................ 3

Sara S. Greene, Parina Patel, and Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 Minn. L. Rev. 1031 (2017) ..................8

Teresa A. Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *As We Forgive Our Debtors: Bankruptcy and Consumer Credit in America* (1989)...................6

Teresa A. Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *Persistence of Local Legal Culture: Twenty Years of Evidence from the Federal Bankruptcy Courts*, 17 Harv. J. L. & Pub. Pol'y 801 (1994).....................................................6

Thomas Lee & Stephen Mouritsen, Judging Ordinary Meaning, 127 Yale L.J. (forthcoming 2017)........................................................................... 11

Thomas Lee & Stephen Mouritsen, The Path Forward for Law and Corpus Linguistics, Volokh Conspiracy (Aug. 11, 2017), http://wapo.st/2vVWG19 ...................... 11

William M. Landes & Richard A. Posner, Legal Precedent: A Theoretical and Empirical Analysis, 19 J.L. & Econ. 249 (1976) ..............................................................9

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

**The American Association of Law Libraries** (AALL) is the only national association dedicated to the legal information profession and its professionals. Founded in 1906 on the belief that people—lawyers, judges, students, and the public—need timely access to relevant legal information to make sound legal arguments and wise legal decisions, its nearly 4,500 members are problem solvers of the highest order.

**Deborah Beim** is an **Assistant Professor of Political Science** at **Yale University**. Her work focuses on "learning in the judicial hierarchy," probing the ways in which law develops. She and her colleagues across the country seek to explain the development of the law using empirical methods that rely on fulsome legal corpuses and refinement of theoretical models.

**Thomas Bruce** is **Director and Co-founder** of **Cornell Legal Information Institute.** He co-founded LII (the first legal information web site) in 1992 with Peter Martin, former Dean of Cornell Law School. The LII publishes electronic versions of core materials in many areas of the law, relying on the government to provide reasonable access to primary legal sources.

**Phillip Malone** is a **Professor of Law** at **Stanford Law School**. He is Director of the Juelsgaard Intellectual Property and Innovation Clinic, serving clients by advocating for greater opportunities for innovation and generativity. His work focuses on legal innovation, increased access to justice, and facilitating open access to information and online expression.

---

[1] Counsel for amici declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than amici, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief. The named individuals sign this brief in their individual, not representational, capacity. Their professional affiliations are listed for identification and contextual purposes only.

1

**Jonathan Zittrain** is the **George Bemis Professor of International Law** and **Professor of Computer Science** at **Harvard University**. He is Director of the Harvard Law Library, which houses the Library Innovation Lab (LIL). LIL seeks to make electronic case law available for free; to confront archival challenges of the legal record; and to improve tools for teaching the law.

## ARGUMENT

*Popular government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.*[2] — James Madison

As Madison knew, our democracy's success requires that the people know how the governmental apparatus exerts its power. Public access to federal court proceedings and records is essential to this knowledge. Accordingly, while *amici* submit that plaintiffs' construction of the E-Government Act provision at issue on this motion is correct as a matter of pure textual analysis and legislative history, they urge this Court also to take into account that adopting plaintiffs' position is likewise consistent with the fulfillment of basic democratic principles.

It is by now well-established that fundamental democratic ideals underpin the common law, constitutional, and statutory mandates for public access to court proceedings. *See, e.g.*, *Richmond Newspapers v. Virginia*, 448 U.S. 555, 567 (1980) (describing the "unbroken, uncontradicted history" of common-law access to court proceedings when presented with a judge-ordered closure of courthouse doors, and further locating such a right in the First Amendment); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (recognizing the same for written records maintained by the clerk). Justice Brennan observed a "special solicitude for

---

[2] Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 WRITINGS OF JAMES MADISON 103, 103 (Hunt ed., 1910).

2

the public character of judicial proceedings." *Richmond*, 448 U.S. at 592 (Brennan, J.,
concurring in judgment).  Such solicitude is due because public access to proceedings is
foundational to popular justice.  Access guarantees, especially to trial court records, are
"bottomed upon a keen appreciation of the structural interest served in opening the judicial
system to public inspection." *Id.*

Congress clearly intended that the E-Government Act help ensure that the adoption of e-
filing would make the federal court system more accessible to the public, rather than becoming a
profit center for the federal courts.  Administrative Office of the United States Courts, *Electronic
Public Access at 10*, THE THIRD BRANCH, September 2000, at 3-4 (describing PACER as
allowing the public to "surf to the courthouse door on the Internet"); S. Rep. No. 107-174, at 23
(2002) (expressing the intent to make PACER access "freely available to the greatest extent
possible"); *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts,
Intellectual Property and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14,
2017) (statement of Rep. Darrell Issa, Chairman) (expressing concern at the "tidy profit" that
PACER continues to make).

This brief describes how PACER's fees have prevented scholars and libraries from
protecting and promoting essential public access benefits.  Scholars and libraries play a critical
role in creating, protecting, and amplifying the democratic benefits that flow from public access
to court records.  Whereas litigants may interact with court records only with respect to
individual cases, libraries and scholars need the ability to use those records to examine our
judicial system more systemically—a task that, in many cases, requires access to the full body of
PACER records and the ability to share those records.

3

## I.  Current PACER Fees Prevent Scholars from Doing Democratically Important Work

Scholars, academic institutions, and legal clinics amplify the benefits of public access to court records, and their work suffers when access is restricted.  They rely on access to court records in various ways to enhance the effectiveness of our legal system as a whole and ensure greater public access to justice.  Scholars, academic institutions, and legal clinics: 1) build systems for accessing, teaching, and practicing the law, 2) diagnose societal issues by examining the legal record, and 3) study and contribute to jurisprudential development.  Each of these components of their missions is hampered by the excessive PACER fees they currently must pay.

### A.  Building systems for accessing, teaching, and practicing the law

Scholars are responsible for creating many of the innovative platforms that provide greater public access to the law and greater ability to analyze and understand it.  These platforms frequently find more use than do government sources of legal information: indeed, they are used every day by practitioners, students, and the public.

For example, the Cornell Legal Information Institute (LII) is perhaps best known as the first result in any web search for the United States Code or the Code of Federal Regulations.  The organization's simple vision is that "everyone should be able to read and understand the laws that govern them, without cost."[3]  To that end, LII publishes the law online for free (when it is obtainable), creates materials that help people to understand the law, and develops tools that make it easier for people to find and to understand the law.

LII is not alone.  The Harvard Law Library Innovation Lab is working to make all reported U.S. case law freely accessible online.  It also is providing tools for educators to assign

---

[3] CORNELL LEGAL INFORMATION INSTITUTE, https://www.law.cornell.edu/.

4

and excerpt raw legal materials as part of free, next-generation casebooks and is permanently

archiving online materials that are cited in court filings, opinions, and articles.[4]

Meanwhile, Stanford's Center for Legal Informatics brings together researchers, lawyers,

entrepreneurs, and technologists in order to enhance legal efficiency, court transparency, and

access to legal systems and services.[5]  For example, it "incubated" Lex Machina, an innovative

tool for analyzing intellectual property jurisprudence that mines data from millions of pages of

litigation documents, many from PACER. The project was spun off as a for-profit and acquired

by LexisNexis.  Unfortunately, the underlying data that powers Lex Machina—court records

derived from PACER—is expensive, driving up the cost of the service. Major law firms and

well-compensated practitioners can afford the benefits of this system; others cannot. Many

public-minded efforts to make federal trial court records more accessible to all, not just those

with ample resources, suffer the same limitation: PACER is prohibitively expensive.

Scholars do more than make information available and conduct research.  They also

develop the next generation of practitioners through hands-on experience. Law school clinics

teach aspiring legal professionals; like the lead plaintiffs in the instant case, they also enhance

the public's access to justice by directly serving the public.  Yale's Media Freedom and

Information Access Clinic (MFIA) helps clients to enforce their constitutional and statutory

rights of access to government information—often in federal court.[6]

Yet, one of the most difficult-to-access bodies of government information is the corpus of

federal district court records.  While individual records are reasonably obtainable (if not always

reasonably findable) via PACER, securing any significant portion of these records is fiscally

---

[4] LIBRARY INNOVATION LAB AT HARVARD UNIVERSITY, http://lil.law.harvard.edu/.
[5] CODEX, THE STANFORD CENTER FOR LEGAL INFORMATICS, http://codex.stanford.edu/.
[6] MEDIA FREEDOM AND INFORMATION ACCESS CLINIC, https://law.yale.edu/mfia/.

impossible.  Efforts like the University of Michigan's Civil Rights Litigation Clearinghouse have

limited resources, so the supervising faculty simply directs patrons seeking additional

information to PACER.[7]  Because it is impossible to obtain a substantial corpus of PACER data,

both clinic work in general and the specific public access work of entities like MFIA can be

difficult or impractical.  Access to information about the workings of the courts suffers, as does

the public's access to justice.

### B.  Diagnosing societal issues by examining the legal record

Beyond providing access to the law, scholars also seek to understand how other social

phenomena manifest in legal proceedings.  These endeavors, too, have been frustrated by the

high price of obtaining records through PACER.

For decades, a group of preeminent scholars has examined bankruptcy through the best

available lens: bankruptcy court records.  The Consumer Bankruptcy Project gathered records

first in 1981, fueling scholarship by this group for more than twenty years.  *See, e.g.*, Teresa A.

Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *As We Forgive Our Debtors:*

*Bankruptcy and Consumer Credit in America* (1989); Teresa A. Sullivan, Elizabeth Warren, and

Jay Lawrence Westbrook, P*ersistence of Local Legal Culture: Twenty Years of Evidence from*

*the Federal Bankruptcy Courts*, 17 HARV. J. L. & PUB. POL'Y 801 (1994).  In 2002, on the heels

of their second major data gathering effort, these scholars realized that their work could be at a

turning point.  They had been laboriously gathering court records through manual photocopying,

but one of the scholars predicted that "empirical work in the bankruptcy field will be

revolutionized over the next few years by the arrival around the country of Case

Management/Electronic Case Filing ('CM/ECF')."  Jay Lawrence Westbrook, *Empirical*

---

[7]  CIVIL RIGHTS LITIGATION CLEARINGHOUSE, https://www.clearinghouse.net/about.php.

*Research in Consumer Bankruptcy*, 80 TEX. L. REV. 2123, 2148 (2002). One scholar warned

that the PACER fee structure could extinguish this hope, but the optimists advocated for a policy

"that permits the broadest possible access to data." *Id.* at 2150.

    While promoting the "broadest possible access" may have been the policy intended by

Congress when it passed the E-Government Act that same year, it was not the approach adopted

by the Administrative Office of the United States Courts ("AO"). In the following years, the

researchers were forced to make do by applying for fee waivers individually at each bankruptcy

court. *See, e.g.*, Letter from Professor Elizabeth Warren, Harvard Law School to The Honorable

John J. Thomas, U.S Bankr. Court, Middle District of Pa. (Jan. 4, 2008), https://perma.cc/P2D7-

9UV6 (requesting reinstatement of an expired fee waiver and describing the patchwork of

agreements with different courts). Behind the scenes, an army of research assistants tried to keep

the waivers up-to-date, and the scholars promised not to share the public court records with the

public. *Id.* This jury-rigged arrangement held up long enough to allow the Consumer

Bankruptcy Project team to research the rise in bankruptcies in the mid-2000's, and to apply the

data in new domains such as medical research.[8]

    Then-Professor Elizabeth Warren sought to use empirical bankruptcy data as a "sort of

pathology laboratory for data and insights about other social issues." Westbrook, *supra*, at 2125.

Through the legal record, she and her colleagues sought to explore economic fractures in

American society. *See, e.g.*, Elizabeth Warren, *Bankrupt Children*, 86 MINN. L. REV. 1003

---

[8] PACER fee waivers are entirely discretionary, may be revoked at any time for any reason, must be applied for individually at each court, and must be limited in time. No PACER documents obtained as a result of a fee waiver may be redistributed—presumably because the AO has the economic incentive to require others to engage in otherwise unnecessary downloading so that they will have pay for the same documents. Collectively, these limitations not only hinder the *gathering* of data but expressly prohibit *redistribution* of the data underlying any study—a core requirement of rigorous scholarship.

(2002).  However, the perpetual need to renegotiate fee waivers and restrictions on distributing source data made the work unsustainable.  Nothing has since filled the void: today's consumer bankruptcy empiricists are stuck working with decade-old data.  *See, e.g.*, Sara S. Greene, Parina Patel, and Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 Minn. L. Rev. 1031 (2017).

The lack of fresh data for this badly needed research into how our bankruptcy system works in practice is not for want of capability of PACER.  Indeed, the Department of Justice, by contrast, appears to receive free nightly updates of bankruptcy data from PACER.  *See* Memorandum of Understanding Between the Admin. Office of the United States Courts and the Exec. Office for United States Trs. Concerning the Bankruptcy Data Download (Dec. 14, 2009), https://perma.cc/UFA9-UA3X.  Yet this information is not made available to the general public, and the AO's policies preclude researchers from replicating it.

Nor is it for want of creativity and effort from researchers, who have always gone to remarkable lengths to acquire necessary data. Consider the backstory of the Consumer Bankruptcy Project's data gathering phases in 1981 and 2001, as described by Professor Lynn LoPucki.  *See* Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 Texas L. Rev. 2161 (2002).  In 1981, the team "bought photocopy machines, flew the copiers air freight to the cities where they would collect the data, and rolled them into the clerks' offices on dollies." *Id*. at 2166-2167.  With the consent of the courts, they copied the records for a tenth of the rate mandated by the public access fee schedule under the formal process.

In 2001, the team followed much the same process for courts that would allow it, despite considerable advances in technology in the intervening years. The most significant improvement they were able to make was paying moonlighting clerks to make copies using the courts' existing

photocopiers. PACER was available in many courts by 2001, but the electronic fee schedule made it far more expensive than relying on 20-year-old technology.

### C. Studying and contributing to jurisprudential development

Research enabled by public access touches the core of the common law—jurisprudential development. In 1976, Landes and Posner set out a method for systematically analyzing development of the law by mapping citation history. William M. Landes & Richard A. Posner, *Legal Precedent: A Theoretical and Empirical Analysis*, 19 J.L. & ECON. 249 (1976). They described what lawyers and judges already knew to be true—the accretion of citations to a given judicial opinion could, over time, forge legal rules. In short, they described precedent.

Landes and Posner proposed that, by quantitatively examining networks of citations, they could document—and perhaps even shape or predict—the development of the law. In classic Chicago School style, they characterized precedents as "capital stock that yields a flow of information services." *Id.* at 250-51. The currency of our judiciary is legal precedent, and any precedent's value depends upon knowledge of and citation to it. Transaction costs in this legal economy serve only to devalue the informational commodity and reduce efficiency.

Landes and Posner's work infused empirical approaches into legal practice in a way that presaged our contemporary electronic research tools. It also indicated that efficient service by our justice system was bound up—figuratively and literally—with efficient access to judicial information.

In the following 40 years, citation analysis of published opinions has flourished in scholarship and legal research, providing lawyers and judges with far better tools for understanding and interpreting the law. Published opinions—at least for federal Supreme Court and circuit court decisions—are readily available. Law students now collaborate with computer

science students in order to discover algorithmic approaches drawn from network science that

better explain how rules of law develop. *See, e.g.*, Iain Carmichael, James Wudel, Michael Kim,

and James Jushchuk, Comment, *Examining the Evolution of Legal Precedent through Citation

Network Analysis*, 96 N.C. L. REV. (forthcoming 2017).[9]

     Empirical scholarship that moves beyond citation-based analysis of our higher courts,

however, has been made difficult by lack of access to court records. For example, Yale political

science professor Deborah Beim studies what she and her colleagues call "learning in the judicial

hierarchy." Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. OF POL. 591 (2017). She

set out to examine the development of rules of law not simply by looking at citations, but also by

examining the actual language used by jurists at every level of the judicial hierarchy. She sought

to answer questions such as, "how and how often do terms or phrases used by district court

judges become adopted by circuit court judges or by the Supreme Court?" Her research ended

before it began because district court opinions are not accessible as a coherent electronic

corpus.[10] Colleagues in her field build models of judicial "rule creation" that theoretically apply

to the whole judiciary, but these scholars can only test their hypotheses against corpuses of

Supreme Court and circuit court opinions. *See, e.g.*, Clifford J. Carrubba and Tom S. Clark, *Rule

Creation in a Political Hierarchy*, 106 AM. POL. SCI. R. 622, 634 (2012).

---

[9] The authors of that forthcoming piece explained to *amici* that their work had focused solely on
Supreme Court and circuit court opinions because there were no accessible electronic corpuses
of federal trial court opinions or established scholarly citation networks. Even though law
students and faculty generally have free access to major commercial electronic databases, they
do not have the ability to download and process the public data contained therein. Nor do those
databases contain much of the relevant non-opinion data about cases.
[10] Even PACER's per-court "free opinions report" gives wildly inconsistent and inadequate
results, making any systematic study impractical.

The emerging field of "corpus linguistics" analyzes language's meaning by studying how it is actually used in a large body of writing over time—an exercise with obvious utility to the legal profession. Last month, a Utah Supreme Court judge and his clerk explained, "we see corpus linguistic analysis playing a central role in legal interpretation going forward." Thomas Lee & Stephen Mouritsen, *The Path Forward for Law and Corpus Linguistics*, Volokh Conspiracy (Aug. 11, 2017), http://wapo.st/2vVWG19. In a forthcoming article in the *Yale Law Journal*, they explain one application—interpreting "ordinary meaning." Thomas Lee & Stephen Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. (forthcoming 2017). The use of corpus linguistics for legal scholarship and practice is promising indeed. *See, e.g.*, Jennifer L. Mascott, *Who are "Officers of the United States"?*, 70 STANFORD L. REV. (forthcoming 2017); *see also* Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record (Apr. 26, 2017) (working paper), https://ssrn.com/abstract=3019494.

But for all of its promise, corpus-based analysis fails without a corpus. PACER fees artificially limit access to a vast body of federal case law (the opinions themselves) and the likewise-important case record documents and data.

Without public access to the raw material that collectively constitutes our body of precedent, scholars cannot effectively study many of the pressing questions facing litigants and judges. For example, the most important recent change to federal trial practice may be the Supreme Court's alteration of the pleading-sufficiency standard via *Towmbly* and *Iqbal*. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 55 U.S. 662 (2009). The effect of these decisions has been as unclear as it is controversial, and the high price of PACER documents has hindered relevant research.

11

With respect to the study of *Twombly* and *Iqbal*, the Judicial Conference has acknowledged the value of empirical research based on judicial records. It has taken the position that the federal court system itself—relying on its unique access to PACER records—should authoritatively study the issue and make policy recommendations, even as outside scholars are deprived of the information necessary to conduct similar analysis. The Federal Judicial Center (FJC) conducted an extensive study of the decisions' empirical effects. Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (2011). Scholar Lonny Hoffman explained that the FJC's study benefited from data that had eluded all others. Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions To Dismiss*, 6 FED. CTS. L. REV. 1 (2011). The FJC had direct access to all records in PACER, rather than having to rely, as most scholars must, on whatever is available via searches of commercial electronic databases. *Id.* at 10. That is to say, the FJC had monopoly access to the best information about the most important evolution to federal trial practice in recent history. Whatever one's take on the FJC's conclusions in this study, it is difficult to dispute that the federal judiciary would benefit from the insight of creative and innovative research by the nation's best scholars. Indeed, Hoffman identified some potentially significant methodological issues with the FJC study. *Id.* at 31-35. Citing the same concerns that Professor LoPucki had raised a decade earlier, he observed that thorough empirical examination of these questions was made impossible because scholars lacked access to data. *Id.* at 9 n. 18.

12

When scholars have direct electronic access to public records, they can buttress the integrity and efficiency of the justice system.[11]  For example, Berkeley Law doctoral students developed a method for detecting possible problems of inconsistency and bias using data from the California Board of Parole.  Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach to the Problems of Inconsistency and Bias in Adjudication* (October 21, 2016) (working paper), https://ssrn.com/abstract=2694326.  The systemic study of federal trial court records has untapped potential to similarly detect and remedy instances of individual injustice.  This is where data can fuel innovation.  The next generation of legal scholars will stand not just on the shoulders of their forbears, but—hopefully—on the structural foundation created by access to the electronic public record.  When they "surf to the courthouse door," they should find it open.

## II.    PACER Fees Prevent Law Libraries from Providing Public Access to Legal Information

Law librarians are committed to providing the greatest possible public access to court records.  Academic law librarians also support the scholarly work of faculty and students, conduct their own scholarly work, and teach effective legal research skills. The PACER charges at issue here limit law libraries' ability to provide effective patron access and equitable legal research instruction. They also hinder law librarians' ability to fulfill their responsibility to preserve and provide access to legal materials.

---

[11] It should go without saying that many other entities would likewise contribute to these ends, including the press, public interest organizations, government employees, and practicing attorneys.

**A.  PACER fees harm patron access and legal research instruction**

Because PACER fees are so high, academic law libraries have been forced to limit patron access. The majority of law libraries require students (and sometimes faculty) to approach a research librarian for access to PACER documents, which the librarian provides by logging into a central library account.  Others libraries limit their assistance to helping users set up their own personal accounts.  Few give the library's PACER password directly to students and faculty. Most libraries' PACER passwords are kept confidential to limit "overuse" of the library's account.

This controlled access limits the usefulness of PACER to researchers.  Research through PACER may only be conducted during library hours, in the library.  Given that much of the modern academic's and law student's research is done outside of the physical library using the library's subscription databases and other electronic resources, this is a major impediment to conducting legal research.

Even with controlled access, libraries that allow patrons to use their PACER passwords cannot predict how much they will spend on PACER fees in any given month, making effective budgeting impossible.  PACER bills are entirely dependent on the interest and activity of library users.  Supporting a budget item with such unpredictability is difficult to justify, so many libraries no longer provide direct access.

PACER fees also lead to inequitable access: wealthier schools are able to provide greater access.  In 2009, Erika Wayne, then a law librarian at Stanford Law School, conducted a survey of law libraries and their spending on PACER.  The survey found that private law school libraries spent nearly twice as much as public law school libraries on PACER, indicating that private law schools can afford to provide students with greater access.  Wayne wrote that

14

academic law librarians reported that they "were very concerned about the costs" of PACER, with some commenting that "there is no way to limit costs"; "it gets expensive rather quickly"; and "if PACER were cheaper . . . we would use PACER more frequently." Erika Wayne, *PACER Spending Survey*, Legal Research Plus (Aug. 28, 2009), https://perma.cc/4CEC-Z7JT. Wayne concluded that "[t]he unknown/potential costs of using PACER hold back most law school libraries from letting their patrons fully utilize PACER . . . We need to train our students and equip our patrons with access to this important resource, but we can't afford to do so." *Id.*

Law libraries' concerns are valid, because costs can mount quickly. In order to view the Docket, Complaint, Motion for Summary Judgment, and accompanying records in the instant case, a user would incur a charge of $25.40. For ordinary users, PACER waives fees for users that do not accumulate more than $15 in charges per quarter. Thus, the quarterly allowance would be void and the full amount would be due once a user looked at *basic documents* in a *single pending case*. If patrons viewed additional relevant documents in this docket, they would easily exceed the $50 quarterly limit.

PACER fees also hinder the ability of academic law librarians to teach law students how to conduct effective research. Many law courses, including legal research courses taught by law librarians, are simulation-based. Students use resources as they would in real life. And yet, students cannot use PACER freely because it is impractical to give the entire class the library's PACER password. Instead, instructors choose to demonstrate PACER usage rather than permitting their students to use the system. Thus, emerging lawyers graduate from law school without any hands-on experience with the authoritative source of federal court records.

15

## B.  PACER fees impede law libraries' responsibility to preserve legal materials

Digital government information must be preserved to ensure its equitable, permanent, and public accessibility.  *See Preservation Policy*, AALL, https://perma.cc/UKH7-M2GL.  PACER fees impede law libraries' efforts to provide permanent public access to legal information and to develop next-generation resources to serve their patrons.  Law libraries have become acutely aware of the challenges to digital preservation, including an inability to fulfill their obligation to preserve our digital legal record.  *See, e.g.*, Rebecca Kunkel, *Law Libraries and the Future of Public Access to Born-Digital Government Information*, 109 LAW LIBR. J. 67 (2017); Paul Conway, *Preservation in the Age of Google: Digitization, Digital Preservation, and Dilemmas*, 80 LIBR. QUARTERLY 61 (2010); Judith Cobb & Joan Allen-Hart, *Preserving Legal Materials in Digital Formats* (prepared for the Legal Information Preservation Alliance) (Feb. 4 2005). While law librarians are familiar with the difficulty of archiving digital information held in proprietary commercial databases—a subject of great concern to institutions traditionally built on physical preservation—they are frustrated that PACER makes it impossible to archive public government records.  Furthermore, court administrators have failed to send any electronic court records to the National Archives and Records Administration as laid out in records disposition schedules with the courts.[12]

---

[12] NARA External Affairs Liason Meg Phillips confirmed this fact in an email to Emily Feltren, Director of Government Relations, AALL, on September 1, 2017.  The reality appears to be that the U.S. Courts have repeatedly established disposition schedules with NARA, only to put them on indefinite hold.  *See, e.g.,* NARA Records Disposition Schedule N1-021-10-2. (signed by the AO on June 29, 2010) (requiring deposit of electronic records within 3 years of close of case), https://perma.cc/U6K7-6RK9. Ms. Phillips' email stated that the relevant current disposition schedules now bear the following disclaimer: "The Judiciary is in the process of reviewing internal requirements to establish an effective national policy concerning the future transmission of electronic records to NARA. The completion of the requirement analysis, clearance, and implementation of said policy is a prerequisite to the transmission of electronic records included in this and similar proposed schedules."  The court administrators' failure to ever provide NARA

With greater access to PACER, law libraries could also contribute to large-scale cooperative digital libraries and related organizations, such as the Digital Public Library of America[13] or HathiTrust.[14]  Libraries could expand on projects like Perma.cc, a service created by Harvard's Library Innovation Lab that archives digital records that are cited in briefs, opinions, and articles—generating a permanent link to an archived record.  Law libraries could mine PACER dockets and provide digital access to and preservation of materials on a local or regional issue, or on a substantive topic.  With greater access to PACER, opportunities abound for librarians to curate and preserve the raw legal materials that are important to students, scholars, and society.

### III. This Court Must Enforce Congress's Requirement that the Federal Courts Make Federal Electronic Court Records "Freely Available to the Greatest Extent Possible," Because Court Administrators Have Proven Unwilling to Do So Voluntarily

The E-Government Act of 2002 was intended to reorient the federal courts' electronic access policies from serving primarily the interests of the courts to instead focusing on the needs of the public.  As LII co-founder Peter Martin explains, "[t]he federal courts did not establish computer-based case management systems or subsequent electronic filing and document management systems in order to provide the public with better access to court records.  Those systems were created because they offered major gains for judges and court administrators."  Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to*

---

with any electronic court records is a longstanding problem that could be ameliorated by allowing institutions such as libraries to help archive electronic records for posterity.

[13] DIGITAL PUBLIC LIBRARY OF AMERICA, https://dp.la/.

[14] HATHITRUST DIGITAL LIBRARY, https://www.hathitrust.org/.

17

*Patterns*, 53 VILL. L. REV. 855, 864 (2008).  This conclusion is supported by the detailed

retelling of CM/ECF and PACER development by the system architects.[15]

    While the potential for PACER to provide heightened public access soon became clear,

the court system's financial dependency on PACER fees has always hamstrung its willingness to

take steps that would be in the public interest.  Indeed, "[o]therwise-beneficial arrangements that

might have threatened the willingness of the commercial sector to pay PACER fees have not

been treated as realistic options."  Martin, *Online Access*, *supra*, at 870.  Put simply, the AO has

a perverse incentive to maintain artificially high PACER fees and to limit functionality.

    AALL has a long history of working with the AO to move it toward a model of no-fee

access. In the early 2000s, the Association worked closely with Senator Lieberman on language

that was added to the E-Government Act of 2002 to direct the Judicial Conference to charge fees

"only to the extent necessary." For the next decade, the AALL encouraged the AO to promote

public access and partnered with the AO to expand access to PACER at law libraries. These

attempts at partnership have not succeeded in providing anything resembling full public access to

court records.

    In 2006, the AALL Executive Board approved a Resolution on No-Fee FDLP Access to

PACER, which was likewise endorsed by the American Library Association (ALA). This

resolution helped motivate the Government Publishing Office (GPO) to work with the AO on a

---

[15] The court administrators' myopic focus on CM/ECF improvements is evident from the extensive list of features slated for CM/ECF, and the lack of PACER improvements promised as part of the "NextGen" effort.  *See* J. Michael Greenwood & John Brinkema, *E-Filing Case Management Services in the US Federal Courts: The Next Generation: A Case Study*, 7 Int'l J. for Ct. Admin. 3, 3 (2015), https://perma.cc/33S9-XW3Z. The authors also note the high cost, delays, and budget overruns on "NextGen" due to "serious management issues that have adversely affected the project and pose a serious risk to its eventual completion." *Id*. at 11.  In short, PACER fees have supported an expensive and mismanaged project, with little benefit to PACER itself.

<div align="center">18</div>

pilot project to make PACER available at no cost to users of federal depository libraries.  A

three-year pilot project was launched in 2007 at 17 federal depository libraries, 10 of which were

law libraries.  This very modest experiment, which gave free PACER access to those few people

who lived near a participating library, was ended prematurely and never reinstated.

Then, in 2011, the AO and GPO announced plans to make PACER opinions available to

the public.  AALL applauded the decision to make opinions available through GPO's FDsys,

which provides access to authentic electronic information from all three branches of government.

This program, however, has turned out to be no substitute for PACER access.

One fundamental flaw in the program is the limited set of documents made available.

Only *some* courts transmit *some* opinions to the GPO for free distribution online.  Each court's

participation in the system is voluntary.  Each judge's determination of what constitutes an

opinion is discretionary.  The result is wildly inconsistent publication that is useless for most

purposes.  *See* Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016); Peter W.

Martin, *District Court Opinions that Remain Hidden Despite a Longstanding Congressional*

*Mandate of Transparency – The Result of Judicial Autonomy and Systemic Indifference* (working

paper) (Aug. 17, 2017).

And even if *all* courts transmitted *all* opinions—and they currently do not—the outcome

would be far inferior to the treasure trove that is buried inside PACER.  Only opinions are

transmitted to the GPO, and so no other case documents are made available through this

program; indeed, there is no record at all of ongoing cases or cases for which there was no

opinion.  The opinions often are stripped of obviously relevant data—such as the presiding

19

judge—without which they are of much less use for research purposes as well as for general public access.[16]

In 2012, AALL, GPO, and the AO established the "PACER: Access and Education Program" with the aim of increasing use of PACER at federal depository libraries, public law libraries, and public libraries. Participating libraries, which are asked to create PACER educational materials and training guides, are exempt from the first $50 of quarterly usage charges. The program has experienced low participation from libraries, with approximately 15 participating as of 2017.[17]

After more than a decade of attempting to work collaboratively with the AO to increase no-fee access to PACER, the inescapable conclusion is that there is little progress to be made through voluntary arrangements. Even as digital storage and transmission costs have plummeted, PACER fees have increased. The goals of the E-Government Act are frustrated by this increasing divergence between PACER fees and the costs that purportedly justify them, particularly when the AO declines to take measures that would reduce costs still further or even eliminate them. For example, the Internet Archive—a well-respected partner of many forward-thinking law libraries—has offered to host all PACER content for public access for free, forever. *See* Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Reps. Issa and Nadler, H. Comm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary (Feb. 10, 2017), https://perma.cc/BT6M-4J56.

---

[16] The name of the presiding judge might be useful, for example, for research on potential bias or sentencing trends.

[17] It has been difficult to determine the exact participation from libraries. This estimate was provided by Robert Lowney, manager of the Electronic Public Access Program, AO, in an email to Emily Feltren, Director of Government Relations, AALL, May 10, 2017.

20

Professor Lynn LoPucki warned in 2002 that the field of empirical legal research as a whole was destined to remain small and insular because of an artificial limitation created by court administrators—access fees. Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 TEXAS L. REV. 2161 (2002). LoPucki surmised that PACER's anachronistic fees were motivated at least in part by judges' desire to limit scrutiny of themselves. *Id.* at 2170 (noting that the annual summary databases produced by the Federal Judicial Center are stripped of judge names prior to public release).[18] Whether his hypothesis was correct or if the longstanding over-charging is instead motivated by court administrators' desire to subsidize unrelated costs with PACER revenues, the fee schedule seems patently at odds with principles of public access and the mandates of the E-Government Act. It is time for this Court to step in and enforce Congress's clear direction that unreasonable PACER fees unrelated to actual costs must stop.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.

Dated: September 5, 2017

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)

</div>

---

[18] Years later, Professor LoPucki noted that the fee waiver system that ostensibly relieved some burden for researchers was both ineffective and might encourage perverse outcomes: "One problem is that the courts may grant, deny, or condition them in ways that encourage researchers to portray the courts in a positive light." Lynn M. LoPucki, *Court-System Transparency*, 94 IOWA L. REV. 481, 515 (2009) (describing how one court denied his request for waiver renewal after he published research critical of that court).

21

RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

22

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> *Defendant*. | Case No. 16-745-ESH |

**BRIEF OF AMICI CURIAE SENATOR JOSEPH I. LIEBERMAN AND CONGRESSMAN DARRELL ISSA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

September 5, 2017

*Of counsel:*

Michael K. Farrell
Michael D. Meuti
BakerHostetler LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214
Telephone:  (216) 621-0200
mfarrell@bakerlaw.com
mmeuti@bakerlaw.com

Mark I. Bailen (D.C. Bar No. 459623)
BakerHostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5304
Telephone:  (202) 861-1500
mbailen@bakerlaw.com

*Counsel for Amici Curiae Senator Joseph I. Lieberman and Congressman Darrell Issa*

# TABLE OF CONTENTS

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* ...............................1

SUMMARY OF ARGUMENT ...............................................................................2

ARGUMENT ...................................................................................................3

A.  The E-Government Act was intended to prohibit the AO from charging more in PACER fees than is necessary to recoup the cost of operating PACER. ............3

1.  Congress' intent in passing the E-Government Act of 2002. .................3

2.  Plaintiffs' reading of the Act is confirmed by its sponsor, Senator Lieberman. ...........................................................................4

B.  Since 2002, the AO has continually violated the E-Government Act. ...............6

CONCLUSION .................................................................................................8

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes**

28 U.S.C. 612(c)(1)(A) ...................................................................................................4

28 U.S.C. § 612(c)(1) ....................................................................................................6

28 U.S.C. § 1913 note .........................................................................................2, 3, 4, 7

Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129,
    2132–33 ...........................................................................................................3

**Rules**

Local Civ. R. 7(o) ........................................................................................................1

**Other Authorities**

S. Rep. No. 107–174, 2d Sess. (2002) ....................................................................1, 4,7

611257290.1

Appx0378

**STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE***

*Amicus curiae* Senator Joseph Lieberman served as United States Senator from Connecticut from 1989 until his retirement from Congress in 2013. Senator Lieberman served as Chair of the United States Senate Committee on Homeland Security and Governmental Affairs and in that capacity was the sponsor of the E-Government Act of 2002—the legislation upon which this lawsuit turns.

Given his experience, Senator Lieberman is uniquely situated to confirm that plaintiffs' reading of the E-Government Act accurately reflects Congress' intent in passing that Act and to confirm that the judiciary's practice of charging "PACER" fees for access to public information that far exceed the cost of providing that information is contrary to the intent of the Act.

*Amicus curiae* Congressman Darrell Issa is a member of the United States House of Representatives, representing the 49th District of California. As Chairman of the House Judiciary Subcommittee on Courts, Intellectual Property, and the Internet, he has examined PACER fees. He also co-founded of the Congressional Transparency Caucus, based on the simple idea that all Americans have the right to know exactly what their government is doing.

He is also a lifelong technophile with a passion for open, accountable government. The Congressman co-founded the OpenGov Foundation, an apolitical 501(c)(3), which supports free software solutions that help citizens to access government information and give them a voice in governance.

Pursuant to Local Civ. R. 7(o), *amici* have submitted a motion for leave to file this brief as *amici curiae*.[1]

---

[1] Counsel for *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief;

1

## SUMMARY OF ARGUMENT

In 2002, Congress found that PACER fees were "higher than the marginal cost of disseminating the information" accessed through that system. Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); Plaintiffs' Statement of Undisputed Material Facts ¶ 11.[2] To correct this, and to ensure that court records be "freely available to the greatest extent possible," the E-Government Act prohibits the imposition of fees that are not "necessary" to "reimburse expenses in providing" access to the records. *Id.;* 28 U.S.C. § 1913 note. The purpose and intent of including this language in the Act was to prevent the judiciary from charging PACER fees that, in the aggregate, exceed the reasonable costs of administering the PACER system.

Despite passage of the Act, PACER fees have only increased since 2002. Those fees now greatly exceed the cost of providing the records, and with the excess being used to fund projects that are entirely unrelated to PACER. As a result, Senator Lieberman, as sponsor of the Act and Chairman of the Senate Homeland Security and Governmental Affairs Committee, twice challenged the imposition by the Administrative Office of the U.S. Courts ("AO") of PACER fees that are "well higher than the cost of dissemination" and urged it to adopt "a payment system that is used only to recover the direct cost of distributing documents via PACER." Taylor Decl., Exs. G & H. The AO, however, continues to charge PACER fees that exceed the costs of providing records and violate the E-Government Act. As Congressman Issa has observed, the courts earn a "tidy profit" from PACER in a way that "circumvent[s] appropriations." *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property and the Internet of*

---

and no person—other than *amicus* or his counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2] In the interest of brevity, Plaintiffs' Statement of Undisputed Material Facts ("Statement") is incorporated by reference herein and citations herein are to the evidence and exhibits submitted therewith.

2

*the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017). For these reasons, Senator Lieberman and Congressman Issa urge this Court to grant Plaintiffs' Motion for Summary Judgment As to Liability, and thus vindicate the purpose of the Act and ensure that it is enforced as Congress intended.

## ARGUMENT

**A. The E-Government Act was intended to prohibit the AO from charging more in PACER fees than is necessary to recoup the cost of operating PACER.**

On its face, the E-Government Act allows the AO to impose PACER fees only "as a charge for services rendered" in providing "electronic access to information" through PACER, and "only to the extent necessary" to "reimburse expenses" incurred in providing that service. 28 U.S.C. § 1913 note.   In other words, the Act prohibits the AO from charging more for PACER than the cost of providing access to records through PACER.  Moreover, the statutory history of the Act and the interpretation of it by its sponsor, Senator Lieberman, confirm that that is exactly what Congress intended to do.

### 1.    Congress' intent in passing the E-Government Act of 2002.

Before PACER, Congress required the judiciary to charge "reasonable fees" to access court records, including those now available through PACER. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33.  Congress also sought to limit those fees to break-even levels. *Id.*; Plaintiffs' Statement of Undisputed Material Facts (Statement) ¶ 10.

During PACER's early years, it became clear that PACER fees exceeded the amount necessary to recover the cost of providing access to those records, and that the AO was using the extra revenue to subsidize other information-technology-related projects. Statement ¶¶ 8-11. Recognizing this, Congress enacted the E-Government Act of 2002 "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported

Appx0381

primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); *see* Statement ¶ 11.

The E-Government Act of 2002 amended language requiring the imposition of fees to remove the mandatory phrase "shall prescribe" and replace it with language permitting fees to be charged "only to the extent necessary" "to reimburse expenses in providing these services." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note).  Congress added this language specifically to prevent the AO from "charg[ing] fees that are higher than the marginal cost of disseminating the information." Statement ¶ 11.

With these critical changes, the full statute reads as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

> **(b)** The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services*.

28 U.S.C. § 1913 note (emphasis added).

### 2.     Plaintiffs' reading of the Act is confirmed by its sponsor, Senator Lieberman.

Senator Lieberman's commitment to the E-Government Act and its intended effects, did not end with its passage.  For example, in early 2009, Senator Lieberman wrote the AO "to

inquire if [it] is complying" with the Act. Taylor Decl., Ex. H, at 1 (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)); *see* Statement ¶ 19. This letter noted that although the Act was intended "to increase free public access to" judicial records by limiting fees to "the marginal cost of disseminating the information," PACER fees were higher than when the law was passed and that the revenue from them was "still well higher than the cost of dissemination." Taylor Decl., Ex. H, at 1. Invoking the statute's text, the senator then asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

Despite the fact that the E-Government Act was enacted to do the opposite, the AO responded by claiming that Congress had "expand[ed] the permissible use of the fee revenue to pay for other services," which permitted it to use PACER fees to pay non-PACER costs. Taylor Decl., Ex. I, at 2. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Taylor Decl., Ex. I, at 2.

The next year, Senator Lieberman again expressed concerns about the AO's interpretation of the Act in his annual letter to the Appropriations Committee. Taylor Decl., Ex. G, at 2; Statement ¶ 21. He wrote: "despite the technological innovations that should have led to reduced costs in the past eight years," the "cost for these documents has gone up" because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* Significantly, Senator Lieberman also reiterated his understanding that, as plaintiffs argue here, this is "against the requirement of the E-Government Act," because it permits "a payment system that is used only to

5

Appx0383

recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

Nonetheless, the AO then raised PACER fees again, to $.10 per page, in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." Statement ¶ 22.

Moreover, the apparent backdoor-appropriations scheme is troubling as a constitutional and policy matter. As Congressman Issa observed, "when it comes to the taxation of the American people, which includes fees; when it comes to transparency, meaning American citizens and others' right to know; when it comes to the ethics of the judiciary, we have an obligation." *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017). Congress has made this statute clear, but it is up to the courts to say what the law is—even to the most powerful and democratically devoted holders of government power.

**B.    Since 2002, the AO has continually violated the E-Government Act.**

By the end of 2006, the judiciary's information-technology fund—the account into which PACER fees and other funds are deposited--had a surplus of nearly $150 million. Of that $150 million, at least $32 million was from PACER fees. 28 U.S.C. § 612(c)(1); Statement ¶ 16. Rather than reduce PACER fees, the AO sought out new ways to spend the excess on things unrelated to PACER, like "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance." *Id.*; Taylor Decl., Ex. G, at 3 (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

6

From 2010 through 2016, the judiciary collected over $920 million in PACER fees, and the annual fees increased from $102.5 million to $146.4 million. *Id.* ¶¶ 28, 46, 62, 80, 98, 116, 134. PACER revenue grew dramatically during this period despite "technological innovations," including exponentially cheaper data storage, that "should have led to reduced costs." Taylor Decl., Ex. G, at 3; *see also* Lee and Lissner Decl. ¶ 16 (explaining that cost per gigabyte of storage fell by 99.9% during this period).

According to the AO's own records, the costs of operating the "Electronic Public Access Program" declined significantly over this same period, going from nearly $19 million for fiscal year 2010 to less than $1 million for fiscal year 2016. Statement ¶¶ 29 & 135. Even including all other expenses that the AO includes as costs of providing "Public Access Services"—including "[d]evelopment and [i]mplementation costs for CM/ECF," "expenses for CM/ECF servers," "costs associated with the support of the uscourts.gov website," and "[c]osts associated with managing the non-technical portion of the PACER Service Center"—the total annual expenses of providing these services ranged between $12 and $24 million over this period. *Id.* ¶¶ 29, 47–48, 63–64, 81–82, 99–100, 117–18, 135–36; *see* Taylor Decl., Ex. L.

Thus, undisputed evidence submitted by plaintiffs shows that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information." Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); *see* Statement ¶ 11. That evidence also shows that during the class period, the AO has used PACER fees to: (1) upgrade courtroom technology, Statement ¶¶ 31, 50, 66, 84, 102, 120, 138; (2) send notices to creditors in bankruptcy proceedings, *id.* ¶¶ 37, 54, 72, 90, 108, 126, 144; (3) send notices to law-enforcement agencies under the Violent Crime Control Act, *id.* ¶¶ 33, 52, 68, 86, 104, 122, 140; (4) provide online services to jurors, *id.*

¶¶ 70, 88, 106, 124, 142; (5) cover "costs associated with the support of the uscourts.gov website," ¶ 118; and (6) fund a state-court study in Mississippi, *id.* ¶ 35.

Worthy or not, none of these things is part of the marginal cost of making records available through PACER and, as Senator Lieberman has explained, such projects "should be funded through direct appropriations," not by overcharging PACER users. Taylor Decl., Ex. G, at 3.

## CONCLUSION

Under any fair reading of the E-Government Act, the AO is not charging PACER fees only "to the extent necessary" to make records available through that system. For this reason and those set forth above, *amici curiae* Senator Lieberman and Congressman Issa urge this Court to grant the plaintiffs' motion for summary judgment as to liability.

Respectfully submitted,

September 5, 2017

*/s/ Mark I. Bailen*
Mark I. Bailen
BakerHostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036-5304
Telephone: (202) 861-1500
mbailen@bakerlaw.com

*Of counsel*

Michael K. Farrell
Michael D. Meuti
BakerHostetler LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: (216) 621-0200
mfarrell@bakerlaw.com
mmeuti@bakerlaw.com

*Counsel for Amicus Curiae Senator Joseph I. Lieberman*

8

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES, et al.,

*Plaintiffs*,

v.

UNITED STATES OF AMERICA

*Defendant*.

Civil Action No. 16-745 (ESH)

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant, by and through the undersigned counsel, respectfully moves this Court to grant summary judgment in its favor as to liability in this matter. The grounds for the requested relief are set forth in the accompanying memorandum in support, the statement of material facts as to which there is no genuine dispute, and the accompanying exhibits.

November 17, 2017        Respectfully submitted,

<div style="margin-left:40%">

JESSIE K. LIU
D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Chief, Civil Division

By:     */s/ W. Mark Nebeker*
      W. MARK NEBEKER (D.C. Bar #396739)
      BRIAN J. FIELD (D.C. Bar #985577)
      Assistant United States Attorneys
      555 4th Street, N.W.
      Washington, D.C. 20530
      (202) 252-2536
      mark.nebeker@usdoj.gov

</div>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM,** *et al.*, **Plaintiffs,** v. **UNITED STATES OF AMERICA,** **Defendant.** | **Civil Action No. 16-745 (ESH)** |

## ORDER

For the reasons stated in an accompanying Memorandum Opinion, ECF No. 89, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment as to liability, ECF No. 52, is **DENIED**; and it is further

**ORDERED** that defendant's cross-motion for summary judgment as to liability, ECF No. 73, is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that the parties shall confer and file a Joint Status Report with a proposed schedule for further proceedings by **April 16, 2018**; and it is further

**ORDERED** that a Status Conference is scheduled for **April 18, 2018, at 3:00 p.m.** in Courtroom 23A.

/s/  *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:  March 31, 2018

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 16-745 (ESH) |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The federal judiciary's Public Access to Court Electronic Records ("PACER") system, which is managed by the Administrative Office of the United States Courts ("AO"), provides the public with online access to the electronic records of federal court cases. The fees for using PACER are established by the Judicial Conference of the United States Courts and set forth in the judiciary's Electronic Public Access ("EPA") Fee Schedule. In this class action, users of the PACER system contend that the fees charged from 2010 to 2016 violated federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)). Before the Court are the parties' cross-motions for summary judgment as to liability. (*See* Pls.' Mot. Summ. J., ECF No. 52; Def.'s Cross-Mot. Summ. J., ECF No. 73.) For the reasons stated herein, the Court will deny plaintiffs' motion and grant in part and deny in part defendant's motion.

# BACKGROUND

## I.   FACTUAL BACKGROUND

Although the present litigation is a dispute over whether, during the years 2010–2016, the PACER fees charged violated 28 U.S.C. § 1913 note, the relevant facts date back to PACER's creation.[1]

### A.   Origins of PACER and the Judiciary's Electronic Public Access ("EPA") Fee Schedule

In September 1988, the Judicial Conference "authorized an experimental *program of electronic access for the public to court information* in one or more district, bankruptcy, or appellate courts in which the experiment can be conducted at nominal cost, and delegated to the Committee [on Judicial Improvements] the authority to establish access fees during the pendency of the program."  (Rep. of Proceedings of the Jud. Conf. of the U.S. ("Jud. Conf. Rep.") at 83 (Sept. 18, 1988) (emphasis added) (Ex. A to the Decl. of Wendell Skidgel, Nov. 11, 2017, ECF No. 73-2 ("Skidgel Decl.")); *see also* Def.'s Statement Facts ¶¶ 1-2, ECF No. 73-3 ("Def.'s Facts")).  The following year, the Federal Judicial Center initiated pilot PACER programs in several bankruptcy and district courts.  (*See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program at 1 ("EPA Chronology") (Ex. C to the Decl. of Jonathan Taylor, Aug. 28, 2017, ECF No. 52-1 ("Taylor Decl.")).)

In February 1990, during a hearing on judiciary appropriations for 1991, a subcommittee of the House Committee on Appropriations took up the judiciary's "request[] [for] authority to collect fees for access to information obtained through automation."  *Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1991: Hearing Before*

---

[1] The facts set forth herein are undisputed.

*a Subcomm. of the H. Comm. on Appropriations*, 101st Cong. 323 (1990) ("1990 Hrg.").  It

asked a representative for the judiciary whether there were "any estimates on how much you will

collect and will this fee help offset some of your automation costs."  *Id*. at 324.  The response

from the judiciary was that "estimates of the revenue that will be generated from these fees are

not possible due to the lack of information on the number of attorneys and individuals who have

the capability of electronic access," but that there "ha[d] been a great deal of interest expressed"

and it was "anticipated that the revenue generated will offset a portion of the Judiciary's cost of

automation."  *Id*.  The Senate Report on 1991 appropriations bill noted that it "included language

which authorizes the Judicial Conference to prescribe reasonable fees for public access to case

information, *to reimburse the courts for automating the collection of the information*."  S. Rep.

No. 101-515, at 86 (1990) ("1990 S. Rep.") (emphasis added).

In March 1990, "barring congressional objection," the Judicial Conference "approved an

initial rate schedule for electronic public access to court data [in the district and bankruptcy

courts] via the PACER system."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990) (Skidgel Decl. Ex. C);

Def.'s Facts ¶ 5.)[2]

Then, in November 1990, Congress included the following language in the Judiciary

Appropriations Act of 1991:

> (a) The Judicial Conference shall prescribe reasonable fees, pursuant to sections
> 1913, 1914, 1926, and 1930 of title 28, United States Code, for collection by the
> courts under those sections for access to information available through automatic
> data processing equipment.  These fees may distinguish between classes of
> persons, and shall provide for exempting persons or classes of persons from the

---

[2] At that time, "PACER allow[ed] a law firm, or other organization or individual, to use a
personal computer to access a court's computer and extract public data in the form of docket
sheets, calendars, and other records."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990).)  The initial fee
schedule included a Yearly Subscription Rate ($60 per court for commercial users; $30 per court
for non-profits) and a Per Minute Charge ($1 per minute for commercial users; 50 cents per
minute for non-profits).  (*Id*.)

fees, in order to avoid unreasonable burdens and to promote public access to such information.  The Director, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective.  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) to reimburse expenses incurred in providing these services.

Pub. L. 101-515, § 404, 104 Stat. 2101 (Nov. 5, 1990) (codified at 28 U.S.C. § 1913 note).[3]

Three aspects of this law are relevant to this litigation: (1) the Judicial Conference was given the authority (indeed, it was required) to charge reasonable fees for "access to information available through automatic data processing equipment,"[4] which covered its newly-developed PACER

---

[3]  The statutory sections referenced authorize the federal courts to charge certain fees. *See* 28 U.S.C. § 1913 (fees for courts of appeals); *id* § 1914 (fees for district courts); *id*. § 1926 (fees for Court of Federal Claims); *id*. § 1930 (fees for bankruptcy courts).

[4]  The term "automatic data processing equipment" is not defined in 28 U.S.C. § 1913 note, but it was defined in 28 U.S.C. § 612 as having "the meaning given that term in section 111(a)(2)(A) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(a)(2)(A))," which at that time defined it as:

. . . any equipment or interconnected system or subsystems of equipment that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching interchange, transmission, or reception, of data or information—

. . .

(B) Such term includes—

(i)      computers;
(ii)     ancillary equipment;
(iii)    software, firmware, and similar procedures;
(iv)    services, including support services; and
(v)     related resources as defined by regulations issued by the Administrator for General Services.

system; (2) the Director of the AO was required to publish a "schedule of reasonable fees for electronic access to information"; and (3) the fees collected by the judiciary pursuant to that fee schedule were to be deposited in the Judiciary Automation Fund[5] "to reimburse expenses incurred in providing these services." *Id.*

In the summer of 1992, the House Committee on Appropriations issued a report that "note[d] that the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media" and "request[ed] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so." H.R. Rep. No. 102-709, at 58 (July 23, 1992) ("1992 H.R. Rep.") (report accompanying appropriations bill for the judiciary for fiscal year ("FY") 1993).[6]

---

[5] Congress had established the Judiciary Automation Fund ("JAF") in 1989 to be "available to the Director [of the AO] without fiscal year limitation for the procurement (by lease, purchase, exchange, transfer, or otherwise) of automatic data processing equipment for the judicial branch of the United States" and "for expenses, including personal services and other costs, for the effective management, coordination, operation, and use of automatic data processing equipment in the judicial branch." *See* Pub. L. 101-162, 103 Stat 988 (1989) (codified at 28 U.S.C. § 612(a)). Before 28 U.S.C. § 1913 note was enacted, PACER fees were required to be deposited in the U.S. Treasury. (*See* Jud. Conf. Rep. at 20 (Mar. 14, 1989) (Skidgel Decl. Ex. B).) In 1989, the Judicial Conference, "[o]bserving that such fees could provide significant levels of new revenues at a time when the judiciary face[d] severe funding shortages," had "voted to recommend that Congress credit to the judiciary's appropriations account any fees generated by providing public access to court records"; determined that it would try to change that. (*See id.*; Def.'s Facts ¶ 3; *see also* Jud. Conf. Rep. at 21 (Mar. 13, 1990) (noting that the FY 1990 appropriations act provided that the judiciary was "entitled to retain the fees collected for PACER services in the bankruptcy courts," and that the Conference would "seek similar legislative language to permit the judiciary to retain the fees collected for district court PACER services").)

[6] According to this report, the Committee believed that "more than 75 courts are providing this service, most of them at no charge to subscribers"; that "approximately a third of current access to court records is by non-Judiciary, governmental agencies" and that "fees for access in these instances are desirable"; and that it was "aware that a pilot program for the collection of fees ha[d] been successfully implemented in the Courts and encourage[d] the Judiciary to assess charges in all courts, in accordance with the provisions of section 404(a) of P.L. 101-515[.]"

In 1993, the Judicial Conference amended the fee schedules for the Courts of Appeals to include a "fee for usage of electronic access to court data" for "users of PACER and other similar electronic access systems," while deciding not to impose fees for another "very different electronic access system" then in use by the appellate courts. (Jud. Conf. Rep. at 44–45 (Sept. 20, 1993) (Skidgel Decl. Ex. D).)[7] In 1994, the Judicial Conference approved a "fee for usage of electronic access to court data" for the Court of Federal Claims. (Jud. Conf. Rep. at 16 (Mar. 15, 1994) (Skidgel Decl. Ex. E).) Finally, in March 1997, it did the same for the Judicial Panel on Multidistrict Litigation. (Jud. Conf. Rep. at 20 (Mar. 11, 1997)[8]; Def.'s Facts ¶ 13.)

## B. EPA Fees Before the E-Government Act (1993–2002)

As the Judicial Conference was adding EPA fees to the fee schedules for additional courts, it became apparent that the "income accruing from the fee[s] w[ould] exceed the costs of providing the service." (Jud. Conf. Rep. at 13–14 (Mar. 14, 1995).) Accordingly, after noting that this revenue "is to be used to support and enhance the electronic public access systems," the Judicial Conference reduced the fee from $1.00 to 75 cents per minute in 1995. (*Id.*) In 1996, after noting that the previous reduction had been "to avoid an ongoing surplus," it "reduce[d] the

---

1992 H.R. Rep. at 58.

[7] The Judicial Conference Report explained that:

> Some appellate courts utilize a very different electronic access system called Appellate Court Electronic Services (ACES) (formerly known as Electronic Dissemination of Opinions System (EDOS)). The Committee determined that, at this time, the costs of implementing and operating a billing and fee collection system for electronic access to the ACES/EDOS system would outweigh the benefit of the revenues to be generated.

(Jud. Conf. Rep. at 44 (Sept. 20, 1993).)

[8] Legislation authorizing the Judicial Conference to establish a fee schedule for the Judicial Panel on Multidistrict Litigation was enacted in 1996. *See* Pub. L. No. 104-317 (1996) § 403(b), Oct. 19, 1996, 110 Stat. 3854 (codified at 28 U.S.C. § 1932).

6

fee for electronic public access further," from 75 to 60 cents per minute.  (Jud. Conf. Rep. at 16

(Mar. 13, 1996) (Skidgel Decl. Ex. F); *see also* EPA Chronology at 1; Def.'s Facts ¶ 14.)

Shortly after the 1996 fee reduction, the House and Senate Appropriations Committees

issued reports that included commentary on the judiciary's EPA fees.  The House Report stated:

> The Committee supports the ongoing efforts of the Judiciary to improve and
> expand information made available in electronic form to the public.  Accordingly,
> the Committee expects the Judiciary to utilize available balances derived from
> electronic public access fees in the Judiciary Automation Fund to make
> information and services more accessible to the public through improvements to
> enhance the availability of electronic information.  *The overall quality of service
> to the public will be improved with the availability of enhancements such as
> electronic case documents, electronic filings, enhanced use of the Internet, and
> electronic bankruptcy noticing.*

H.R. Rep. No. 104-676, at 89 (July 16, 1996) (emphasis added) ("1996 H.R. Rep.").  The Senate

Report stated that:

> The Committee supports efforts of the judiciary to make electronic information
> available to the public, and expects that available balances from public access fees
> in the judiciary automation fund will be used to enhance availability of public
> access.

S. Rep. No. 104-353, at 88 (Aug. 27, 1996) ("1996 S. Rep.").

Soon thereafter, "the judiciary started planning for a new e-filing system called ECF

[Electronic Case Filing]." (Pls.' Statement Facts ¶ 9, ECF No. 52-16 ("Pls.' Facts").)  In March

1997, the staff of the AO prepared a paper, entitled "Electronic Case Files in the Federal Courts:

A Preliminary Examination of Goals, Issues and the Road Ahead," "to aid the deliberations of

the Judicial Conference in this endeavor," which would allow courts to maintain complete

electronic case files.  (Taylor Decl. Ex. B, at 36 ("1997 AO Paper").)  In discussing how the ECF

system could be funded, the paper discussed the possibility of charging a separate fee for ECF,

but also opined that "[s]tarting with fiscal year 1997, the judiciary has greater freedom in the use

of revenues generated from electronic public access fees" because "the [1996] House and Senate

7

appropriations committee reports . . . include[d] language expressly approving use of these monies for electronic filings, electronic documents, use of the Internet, etc." (1997 AO Paper at 36; *see* Pls.' Facts ¶ 9; *see also* Second Decl. of Wendell Skidgel, March 14, 2018, ECF 81-1 ("2d Skidgel Decl."), Tab 1 ("FY 2002 Budget Request") ("Fiscal year 1997 appropriations report language expanded the judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").) In the summer of 1998, the Senate Appropriations Committee reiterated its view that it "support[ed] efforts of the judiciary to make information available to the public electronically, and expect[ed] that available balances from public access fees in the judiciary automation fund will be used to enhance the availability of public access." S. Rep. No. 105-235, at 114 (July 2, 1998) ("1998 S. Rep.").

At some point, "a web interface was created for PACER" and the Judicial Conference prescribed the first Internet Fee for Electronic Access to Court Information, charging 7 cents per page "for public users obtaining PACER information through a federal judiciary Internet site." (Jud. Conf. Rep. at 64 (Sept. 15, 1998) (Skidgel Decl. Ex. G); *see* EPA Chronology at 1.) The Judicial Conference stated in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services. With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue while introducing new technologies to expand public accessibility to PACER information.

(Jud. Conf. Rep. at 64 (Sept. 15, 1998).)[9]

---

[9] At the same time, the Judicial Conference "addressed the issue of what types of data or information made available for electronic public access should have an associated fee and what types of data should be provided at no cost." (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998).) It concluded that while it "prescribed a fee for access to court data obtained electronically from the

8

In March 2001, the Judicial Conference eliminated the EPA fees from the court-specific miscellaneous fee schedules and replaced them with "an independent miscellaneous EPA fee schedule that would apply to all court types." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001) (Skidgel Decl. Ex. H); *see also* EPA Chronology at 1.) At the same time, it amended the EPA fee schedule to provide: (1) that attorneys of record and parties in a case would receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer, which could then be printed and saved to the recipient's own computer or network; (2) that no fee is owed by a PACER user until charges of more than $10 in a calendar year are accrued; (3) a new fee of 10 cents per page for printing paper copies of documents through public access terminals at clerks' offices; and (4) a new PACER Service Center search fee of $20.[10] (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).) In 2002, the Judicial Conference further amended the EPA fee schedule "to cap the charge for accessing any single document via the Internet at the fee for 30 pages."[11] (Jud. Conf. Rep. at 11 (Mar. 13, 2002) (Skidgel Decl. Ex. I).)

Starting no later than fiscal year 2000,[12] the judiciary was using its EPA fees to pay for

---

public dockets of individual case records in the court," courts should be allowed to "provide other local court information at no cost," such as local rules, court forms, news items, court calendars, opinions designated by the court for publication, and other information—such as court hours, court location, telephone listings—determined locally to benefit the public and the court." (*Id.*)

[10] At the time, "[t]he PACER Service Center provide[d]s registration, billing, and technical support for the judiciary's EPA systems and receive[d] numerous requests daily for particular docket sheets from individuals who d[id] not have PACER accounts." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).)

[11] The Judicial Conference took this step because otherwise "the fee is based upon the total number of pages in a document, even if only one page is viewed, because the case management/electronic case files system (CM/ECF) software cannot accommodate a request for a specific range of pages from a document," which "can result in a relatively high charge for a small usage." (Jud. Conf. Rep. at 11 (Mar. 13, 2002).)

[12] The record does not include any specifics as to the use of EPA fees prior to FY 2000.

9

PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN").[13]

(*See* 2d Skidgel Decl. ¶¶ 31–33 & Tabs 30–32 ("expenditures relating to the Judiciary's Electronic Public Access Program" for FY 2000–2002).)

### C.     E-Government Act of 2002

In December 2002, Congress passed the E-Government Act of 2002.  Section 205 pertained to the "Federal Courts.  Subsection (a) required all courts to have "individual court websites" containing certain specified information or links to websites that include such information (e.g., courthouse location, contact information, local rules, general orders, docket information for all cases, access to electronically filed documents, written opinions, and any other information useful to the public)"; subsection (b) provided that "[t]he information and rules on each website shall be updated regularly and kept reasonably current; subsection (c), entitled "Electronic Filings," provided that, with certain exceptions for sealed documents and privacy and security concerns, "each court shall make any document that is filed electronically publicly available online"; subsection (d), entitled "Dockets with links to documents" provided that "[t]he Judicial Conference of the United States shall explore the feasibility of technology to post online dockets with links allowing all filings, decisions, and rulings in each case to be obtained from the docket sheet of that case"; and subsections (f) and (g) address the time limits for courts to comply with the above requirements.  E-Government Act of 2002, § 205(a)–(d), (f), and (g) (codified at 44 U.S.C. § 3501 note).  Subsection (e), entitled Cost of Providing Electronic Docketing Information, "amend[ed] existing law regarding the fees that the Judicial Conference prescribes for access to electronic information" by amending the first sentence of 28 U.S.C. §

---

[13]  A line item amount expended from EPA fees for Electronic Bankruptcy Noticing appears in AO's accounting of EPA fees for FY 2000, but not for 2001 or 2002.  (*See* 2d Skidgel Decl. Tabs 30–32.)

1913 note to replace the words "shall hereafter" with "may, only to the extent necessary." E-Government Act of 2002, § 205(e). The E-Government Act left the remainder of 28 U.S.C. § 1913 note unchanged.

> The Senate Governmental Affairs Committee Report describes Section 205 as follows:
>
> Section 205 requires federal courts to provide greater access to judicial information over the Internet. Greater access to judicial information enhances opportunities for the public to become educated about their legal system and to research case-law, and it improves access to the court system. The mandates contained in section 205 are not absolute, however. Any court is authorized to defer compliance with the requirements of this section, and the Judicial Conference of the United States is authorized to promulgate rules to protect privacy and security concerns.

S. Rep. No. 107-174, at 23 (June 24, 2002) ("2002 S. Rep.") (Taylor Decl. Ex. D). As to the amending language in subsection 205(e), the report stated:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

2002 S. Rep. at 23.

### D. EPA Fees After the E-Government Act

#### 1. 2003–2006

After the passage of the E-Government Act, the judiciary continued to use EPA fees for the development of its CM/ECF system. (*See* Taylor Decl. Ex. F (FY 2006 Annual Report for the Judiciary Information Technology Fund ("JITF") (formerly the "Judiciary Automation Fund")[14] ("The entire development costs for the Case Management/Electronic Case Files

---

[14] In 2005, 28 U.S.C. § 612 had been amended to substitute "Judiciary Information Technology

11

(CM/ECF) project have been funded solely through EPA collections.").)

In 2003, a report from the House Appropriations Committee stated that: "The Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs." H.R. Rep. No. 108-221, at 116 (July 21, 2003) ("2003 H.R. Rep."). The Senate Appropriations Committee also expressed its enthusiasm for CM/ECF:

> The Committee fully supports the Judiciary's budget request for the Judiciary Information Technology Fund [JITF]. The Committee would like to see an even greater emphasis on automation in the local courts. To this end, the Committee expects the full recommended appropriation for the JITF, as reflected in the budget request, be deposited into this account. The Committee lauds the Judicial Committee on Information Technology (IT Committee) and their Chairman for their successes helping the Courts run more efficiently through the use of new automation. Of particular note, the Committee is impressed and encouraged by the new Case Management/Electronic Case File system [CM/ECF]. This new and innovative system allows judges, their staffs, the bar and the general public to work within the judicial system with greater efficiency. This new system is currently implemented in many bankruptcy and district courts and will soon begin implementation in the appellate courts. The CM/ECF system is already showing its potential to revolutionize the management and handling of case files and within the next few years should show significant cost savings throughout the Judiciary. The Committee on Appropriations expects a report on the savings generated by this program at the earliest possible date.

S. Rep. No. 108-144, at 118 (Sept. 5, 2003) ("2003 S. Rep."). The associated Conference Committee report "adopt[ed] by reference the House report language concerning Electronic Public Access fees." *See* 149 Cong Rec. H12323, at H12515 (Nov. 23, 2003) ("2003 Conf. Rep.").

In September 2004, the Judicial Conference, "[i]n order to provide sufficient revenue to fully fund currently identified case management/electronic case files system costs," "increase[d]

---

Fund" for "Judiciary Automation Fund" and "information technology" for "automatic data processing."

the fee for public users obtaining information through a federal judiciary Internet site from seven to eight cents per page." (Jud. Conf. Rep. at 12 (Sept. 21, 2004) (Skidgel Decl. Ex. J); *see also* EPA Chronology at 2; Taylor Decl. Ex. E (Oct. 21, 2004 AO memorandum) ("This increase is predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue to fund CM/ECF operations and maintenance. The fee increase will enable the judiciary to continue to fully fund the EPA Program, in addition to CM/ECF implementation costs until the system is fully deployed throughout the judiciary and its currently defined operations and maintenance costs thereafter.").)

> The judiciary's Financial Plan for fiscal year 2006 described its EPA program at the time:

> The judiciary's Electronic Public Access (EPA) program provides for the development, implementation and enhancement of electronic public access systems in the federal judiciary. The EPA program provides centralized billing, registration and technical support services for PACER (Public Access to Court Electronic Records), which facilitates Internet access to data from case files in all court types, in accordance with policies set by the Judicial Conference. The increase in fiscal year 2006 EPA program operations includes one-time costs associated with renegotiation of the Federal Telephone System (FTS) 2001 telecommunications contract.

> Pursuant to congressional directives, the program is self-funded and collections are used to fund information technology initiatives in the judiciary related to public access. Fee revenue from electronic access is deposited into the Judiciary Information Technology Fund. Funds are used first to pay the expenses of the PACER program. Funds collected above the level needed for the PACER program are then used to fund other initiatives related to public access. The development and implementation costs for the CM/ECF project have been funded through EPA collections. Beginning last year, in accordance with congressional direction, EPA collections were used to support CM/ECF operations and maintenance as well. In fiscal year 200[6], the judiciary plans to use EPA collections to continue PACER operations, complete CM/ECF development and implementation, and operate and maintain the installed CM/ECF systems in the various courts across the country.

(2d Skidgel Decl. Tab 9 (FY 2006 Financial Plan at 45).)

### 2. 2006–2009

In July 2006, the Senate Appropriations Committee issued a report pertaining to the 2007

13

appropriations bill in which it stated: "The Committee supports the Federal judiciary sharing its case management electronic case filing system at the State level and urges the judiciary to undertake a study of whether sharing such technology, including electronic billing processes, is a viable option." S. Rep. No. 109-293, at 176 (July 26, 2006) ("2006 S. Rep.") (2d Skidgel Decl. Tab 38).

By the end of 2006, "resulting from unanticipated revenue growth associated with public requests for case information," the judiciary found that its EPA fees fully covered the costs of its "EPA Program" and left it with an "unobligated balance" of $32.2 million from EPA fees in the JITF. (FY 2006 JITF Annual Rep. at 8; Pls.' Facts ¶ 16.) In light of this "unobligated balance," the judiciary reported that it was "examining expanded use of the fee revenue in accordance with the authorizing legislation." (FY 2006 JITF Annual Rep. at 8.)

In March 2007, the judiciary submitted its financial plan for fiscal year 2007 to the House and Senate Appropriations Committees. (Def.'s Facts ¶ 27.) In the section of the plan that covered the JITF, it proposed using EPA fees "first to pay the expenses of the PACER program" and then "to fund other initiatives related to public access." (Skidgel Decl. Ex. K (FY 2007 Financial Plan at 45).) It identified the "public access initiatives" that it planned to fund with EPA fees as CM/ECF Infrastructure and Allotments; EBN; Internet Gateways; and Courtroom Technology Allotments for Maintenance/Technology Refreshment. (*Id*.) With respect to Courtroom Technology, the plan requested "expanded authority" to use EPA fees for that purpose:

> Via this financial plan submission, the Judiciary seeks authority to expand use of Electronic Public Access (EPA) receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance. The Judiciary seeks this expanded authority as an appropriate use of EPA receipts to improve the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically

14

through electronic public access services when it is presented electronically and becomes an electronic court record.

(FY 2007 Financial Plan at 43, 46.)  With no specific reference to EPA fees, the plan also sought

spending authority to implement a Memorandum of Agreement with the State of Mississippi to undertake a three-year study of the feasibility of sharing the Judiciary's case management electronic case filing system at the state level, to include electronic billing processes. The estimated cost of this three year pilot will not exceed $1.4 million.

(*Id*. at 41.)  In May 2007, the FY 2007 Financial Plan was approved by the House and Senate Appropriations Committees, with the approval letter signed on May 2, 2007, by the Chairman and the Ranking Member of the Subcommittee on Financial Services and General Government, stating that there was no objection to "the expanded use of Electronic Public Access Receipts" or "a feasibility study for sharing the Judiciary's case management system with the State of Mississippi."  (Skidgel Decl. Ex. L ("FY 2007 Senate Approval Letter"); *id*. Ex. M ("FY 2007 House Approval Letter").)

The judiciary began using EPA fees to pay for courtroom technology expenses in 2007, "to offset some costs in [its] information technology program that would otherwise have to be funded with appropriated funds."  (Pls.' Facts ¶ 18; 2d Skidgel Decl. Tab 35 (FY 2007–08 EPA Expenditures); *Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260*, 110th Cong. 51 (2008) (testimony of the chair of the Judicial Conference's Comm. on the Budget) ("[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements in the courts' Salaries and Expenses account, thereby reducing our need for appropriated funds").)

In its fiscal year 2008 financial plan, the judiciary indicated that it intended to use EPA fees for Courtroom Technology ($24.8 million) and two new programs: a Jury Management System ("JMS") Web Page ($2.0 million) and a Violent Crime Control Act ("VCCA")

15

Notification.  (2d Skidgel Decl. Tab 11 (FY 2008 Financial Plan at 11).)  Actual expenditures for fiscal year 2008 included spending on those programs.  (*Id.* Tab 35 (FY 2008 EPA Expenditures) ($24.7 million spent on Courtroom Technology; $1.5 million spent on the JMS Web Page; $1.1 million spent on the VCCA Notification).)  Its fiscal year 2009 financial plan included a third new expense category: a CM/ECF state feasibility study ($1.4 million)—this was previously described in the 2007 financial plan as the State of Mississippi study, albeit not in the section related to EPA fee use.  (*Id.* Tab 12 (FY 2009 Financial Plan at 45).)  The judiciary also projected spending $25.8 million on Courtroom Technology; $200,000 on the JMS Public Web Page; and $1 million on VCCA Notification.  (*Id.*)  Again, actual expenditures for fiscal year 2009 included each of these programs.  *(Id.* Tab 36 (FY 2009 EPA Expenditures) ($160,000 spent on the State of Mississippi study; $24.6 million spent on Courtroom Technology; $260,000 spent on Web-Based Juror Services (replacing line item for JMS); and $69,000 spent on VCCA Notification).)

In February 2009, Senator Lieberman, in his capacity as Chair of the Senate Committee on Homeland Security and Government Affairs, sent a letter to the Chair of the Judicial Conference Committee on Rules of Practice and Procedure, inquiring whether the judiciary was complying with the E-Government Act.  (*See* Taylor Decl. Ex. H.)  According to Senator Lieberman, the "goal of this provision . . . was to increase free public access to [court] records." (*Id.*)  Given that PACER fees had increased since 2002, and that "the funds generated by these fees [were] still well higher than the cost of dissemination," he asked the Judicial Conference to "explain whether the Judicial Conference is complying with Section 205(e) of the E-Government Act, how PACER fees are determined, and whether the Judicial Conference is only charging 'to the extent necessary' for records using the PACER system."  (*Id.*)

16

On behalf of the Judicial Conference and its Rules Committee, the Committee Chair and the Director of the AO responded that the judiciary was complying with the law because EPA fees are "used only to fund public access initiatives," such as "CM/ECF, the primary source of electronic information on PACER," and the "EBN system, which "provides access to bankruptcy case information to parties listed in the case by eliminating the production and mailing of traditional paper notices and associated postage costs, while speeding public service." (Taylor Decl. Ex. I ("3/26/2009 AO Letter").)

In March 2010, Senator Lieberman raised his concerns in a letter to the Senate Appropriations Committee. (*See* Taylor Decl. Ex. G.) In addition, he specifically questioned the use of EPA receipts for courtroom technology, acknowledging that the Appropriations Committees had approved this use in 2007, but expressing his opinion that this was "an initiative that [was] unrelated to providing public access via PACER and against the requirement of the E-Government Act." (*Id.* at 3.)

In 2011, the Judicial Conference, "[n]oting that . . . for the past three fiscal years the EPA program's obligations have exceeded its revenue," again amended the PACER fee schedule, raising the per-page cost from 8 to 10 cents. (Jud. Conf. Rep. at 16 (Sept. 13, 2011) (Skidgel Decl. Ex. N).) At the same time, it increased the fee waiver amount from $10 to $15 per quarter. (*Id.*)

### 3. 2010–2016[15]

From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased

---

[15] These are the years that are relevant to the present litigation because there is a six-year statute of limitation on plaintiffs' claims.

from about $102.5 million in 2010 to $146.4 million in 2016.[16] (*See* Pls.' Facts ¶¶ 28, 46, 62, 80, 98, 116, 134; Taylor Decl. Ex. L; *see also* Attachment 1 hereto.[17])

During that time, PACER fees were used to pay for the costs of PACER, CM/ECF, EBN, the State of Mississippi study, Web-Based Juror Services, VCCA Notification, and Courtroom Technology. In its internal accounting, the judiciary divided these costs into Program Requirements and Congressional Priorities. (Taylor Decl. Ex. L.)

Under Program Requirements, there are five categories: (1) Public Access Services; (2) CM/ECF System; (3) Telecommunications (2010–11) or Communications Infrastructure, Services and Security (2012–16); (4) Court Allotments; and (5) EBN. (*Id.*) The Public Access Services category includes only expenses that relate directly to PACER. (*See* Taylor Decl. Ex. M, at 22-23 ("Def.'s Resp. to Pls.' Interrogs."); 3/23/18 Tr. at __.) From 2010 to 2016, the judiciary spent nearly $129.9 million on Public Access Services. (*Id.*) The next three categories, CM/ECF System, Telecommunications/Communications Infrastructure, and Court Allotments, include only expenses that relate to CM/ECF or PACER. (*See* 3/23/18 Tr. at __[18]; *see also* Def.'s Resp. to Pls.' Interrogs. at 22–26.) From 2010 to 2016, the judiciary spent $217.9 million on the CM/ECF System; $229.4 million on Telecommunications/ Communications Infrastructure; and $74.9 million on Court Allotments. (Taylor Decl. Ex. L (FY 2010-2016 EPA

---

[16] This number does not include print fee revenues, which are also collected pursuant to the EPA fee schedule.

[17] The document submitted to the Court as Exhibit L to the Taylor Declaration is defendant's internal accounting of PACER revenues and the use of PACER fees from FY 2010 through FY 2016. (*See* Taylor Decl. Ex. L; 3/23/18 Tr. at __.) While the contents of this document are described in this Memorandum Opinion, for the reader's benefit, an example of this internal accounting for the year 2010 is appended hereto as Attachment 1 in order to demonstrate how the judiciary has described and categorized the expenditures that were paid for by PACER fees.

[18] The official transcript from the March 23, 2018 motions hearing is not yet available. The Court will add page citations once it is.

18

Expenditures).)  The final category, Electronic Bankruptcy Noticing, refers to the system which "produces and sends court documents (bankruptcy notices, including notices of 341 meetings) electronically to creditors in bankruptcy cases."  (Def.'s Resp. to Pls.' Interrogs. at 10.)  From 2010 to 2016, the judiciary spent a total of $73.3 million on EBN.  (Taylor Decl. Ex. L.)

Under Congressional Priorities, there are four categories: (1) State of Mississippi; (2) VCCA Victim Notification; (3) Web-Based Juror Services; and (4) Courtroom Technology. (*Id.*)  The State of Mississippi category refers to a study which "provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  In 2010— the only year this category appears between 2010 and 2016—the judiciary spent a total of $120,988 for the State of Mississippi study.  (Taylor Decl. Ex. L.)  The next category is Victim Notification (Violent Crime Control Act), which refers to "[c]osts associated with the program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  Via this program, "[l]aw enforcement officers receive electronic notification of court documents that were previously sent to them through the mail."  (*Id.*)  From 2010 to 2016, the judiciary spent $3.7 million on the VCCA victim notification program.  The third category, Web-Based Juror Services, refers to "[c]osts associated with E-Juror software maintenance, escrow services, and scanner support." (*Id.* at 26.)  "E-Juror provides prospective jurors with electronic copies of courts documents regarding jury service."  (*Id.*)  From 2010 to 2016, the judiciary spent $9.4 million on Web-Based Juror Services.  (Taylor Decl. Ex. L.)  Finally, the category labeled Courtroom Technology funds "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 26.)  From 2010 to 2016, the judiciary spent

19

$185 million on courtroom technology.  (Taylor Decl. Ex. L.)

## II.    PROCEDURAL HISTORY

On April 21, 2016, three national nonprofit organizations, National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice, on behalf of themselves and a nationwide class of similarly-situated PACER users, filed suit against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), claiming that the PACER fees charged by the Administrative Office of the United States Courts "exceeded the amount that could be lawfully charged, under the E-Government Act of 2002" and seeking "the return or refund of the excessive PACER fees."  (Compl. ¶¶ 33–34.)

After denying defendant's motion to dismiss (*see* Mem. Op. & Order, Dec. 5, 2016, ECF Nos. 24, 25), the Court granted plaintiffs' motion for class certification (*see* Mem. Op. & Order, Jan. 24, 2017, ECF Nos. 32, 33).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court certified a class consisting of: "[a]ll individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities" and "certifie[d] one class claim: that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act."  (Order, Jan. 24, 2017, ECF No. 32.)

On August 28, 2017, plaintiffs filed a motion seeking "summary adjudication of the defendant's liability," while "reserving the damages determination for after formal discovery." (Pls.' Mot. at 1.)  On November 17, 2017, defendant filed a cross-motion for summary judgment as to liability.  The Court permitted the filing of three amicus briefs.[19]  The cross-motions for

---

[19] Amicus briefs were filed by the Reporters Committee for Freedom of the Press, *et al.*, ECF No. 59, the American Association of Law Libraries, *et al.*, ECF No. 61, and Senator Joseph

summary judgment on liability are fully-briefed and a hearing on the motions was held on March

23, 2018.

## ANALYSIS

The parties' cross-motions for summary judgment on liability present the following

question of statutory interpretation:  what restrictions does 28 U.S.C. § 1913 note place on the

amount the judiciary may charge in PACER fees?

In relevant part, 28 U.S.C. § 1913 note reads:

Court Fees for Electronic Access to Information

 (a) The Judicial Conference may, only to the extent necessary, prescribe
reasonable fees . . . for collection by the courts . . . for access to information
available through automatic data processing equipment.

. . .

The Director, under the direction of the Judicial Conference of the United States,
shall prescribe a schedule of reasonable fees for electronic access to information
which the Director is required to maintain and make available to the public.

(b) . . .  All fees hereafter collected by the Judiciary under paragraph (a) as a
charge for services rendered shall be deposited as offsetting collections to the
Judiciary Automation Fund . . . to reimburse expenses incurred in providing these
services.

28 U.S.C. § 1913 note.

## I.    LEGAL STANDARD

Statutory interpretation "begins with the language of the statute."  *Esquivel-Quintana v.*

*Sessions*, 137 S. Ct. 1562, 1569 (2017).  This means examining "'the language itself, the specific

context in which that language is used, and the broader context of the statute as a whole'" to

determine if it has a "'plain and unambiguous meaning with regard to the particular dispute in

the case.'"  *United States v. Wilson*, 290 F.3d 347, 352–53 (D.C. Cir. 2002) (quoting *Robinson v.*

---

Lieberman and Congressman Darrell Issa, ECF No. 63.

*Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (statutory interpretation "requires examination of the statute's text in light of context, structure, and related statutory provisions"). A statutory term that is neither a term of art nor statutorily defined is customarily "construe[d] . . . in accordance with its ordinary or natural meaning," frequently derived from the dictionary. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

Where statutory language does not compel either side's interpretation, the Court may "look to the statute's legislative history to determine its plain meaning." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 146 (D.D.C. 2015) (citing *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text."). The fact that a statute can be read in more than one way does not demonstrate that it lacks "plain meaning." *United States v. Hite*, 896 F. Supp. 2d 17, 25 (D.D.C. 2012); *see, e.g., Abbott v. United States,* 562 U.S. 8, 23 (2010).

A statute's legislative history includes its "statutory history," a comparison of the current statute to its predecessors and differences between their language and structure, *see, e.g., Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 231–32 (2007), along with relevant committee reports, hearings, or floor debates. In general, "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1289 n.26 (D.C. Cir. 1983) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)). But even though, "[t]he view of a later Congress cannot control the interpretation of an earlier enacted statute," *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996), in certain narrow circumstances, "'congressional

22

acquiescence to administrative interpretations of a statute'" may "inform the meaning of an earlier enacted statute." *U.S. Ass'n of Reptile Keepers*, 103 F. Supp. 3d at 153 & 154 n.7 (D.D.C. 2015) (quoting *O'Gilvie*, 519 U.S. at 90); *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001)). Such a situation may be where Congress has amended the relevant provisions without making any other changes. *See, e.g.*, *Barnhart v. Walton*, 535 U.S. 212, 220 (2002). However, "[e]xpressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 191 (1978).

## II.    APPLICATION

Applying the "ordinary principles of statutory construction," the parties arrive at starkly different interpretations of this statute. Plaintiffs take the position that the statute "prohibits the AO from charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER." (Pls.' Mot. at 12.) Under plaintiffs' interpretation, defendant's liability is established because with the exception of the category of expenditures labeled Public Access Services (*see* Attachment 1), most, if not all, of the other expenditures covered by PACER fees are not part of the "'marginal cost of disseminating records' through PACER." (*See* Pls.' Mot. at 17; *see also*, *e.g.*, Pls.' Facts ¶¶ 32, 34, 36, 38, 41, 43, 45 (fiscal year 2010).) Defendant readily admits that PACER fees are being used to cover expenses that are not part of the "marginal cost" of operating PACER (*see, e.g.*, Def.'s Resp. to Pls.' Facts ¶¶ 32, 34, 36, 38, 41, 43, 45), but it rejects plaintiffs' interpretation of the statute. Instead, defendant reads the statute broadly to mean that the Judicial Conference "may charge [PACER] fees in order to fund the dissemination of information through electronic means." (3/23/18 Tr. at __; *see also* Def.'s Mot. at 11 (Judicial Conference may "charge fees, as it deems necessary, for the provision of

information to the public through electronic means").) Under defendant's interpretation, it is not liable because "every single expenditure . . . [is] tied to disseminating information through electronic means." (3/23/18 Tr. at ___.)

If the Court agreed with either proposed interpretation, the ultimate question of defendant's liability would be relatively straightforward. If PACER fees can only be spent to cover the "marginal cost" of operating PACER, defendant is liable most expenditures.[20] If PACER fees can be spent on any expenditure that involves "the dissemination of information through electronic means," defendant is not liable. But the Court rejects the parties' polar opposite views of the statute, and finds the defendant liable for certain costs that post-date the passage of the E-Government Act, even though these expenses involve dissemination of information via the Internet.

### A. Does the E-Government Act Limit PACER Fees to the Marginal Cost of Operating PACER?

As noted, plaintiffs interpret the statute as prohibiting the AO "from charging more in

---

[20] The Court would still have to determine the meaning of "marginal cost" and whether any of the expenditures beyond those in the category of Public Access Services are part of that cost, since plaintiffs only expressly challenged "some" of the expenditures in several important categories, and defendant has only admitted that "some" of the expenditures in those categories are not part of the marginal cost. (*See, e.g.*, Pls.' Facts ¶¶ 41 (CM/ECF), 43 (Telecommunications), 45 (Court Allotments); Def.'s Resp. to Pls.' Facts ¶¶ 41, 43, 45.) The categories that plaintiffs argue should be examined as part of a determination of damages (as opposed to liability), since they may include PACER-related costs, are CM/ECF, Telecommunications/Communications Infrastructure, and Court Allotments. (Pls.' Mot. at 19; *see also* Attachment 1.)

Defendant, on the other hand, responds that even though only some of the costs associated with these categories involve PACER-related expenses, all of the expenses related to PACER and/or CM/ECF. (3/23/18 Tr. at ___.)

However these costs are categorized, the Court rejects plaintiffs' suggestion that the issue is one to be decided as part of a determination of damages, for the issue as to liability necessarily requires a determination of whether these costs are proper expenditures under the E-Government Act.

PACER fees than is necessary to recoup the total marginal cost of operating PACER." (Pls.'
Mot. at 12.) Plaintiffs concede, as they must, that this is not what the text of the statute actually
says. But they argue that this is the best reading of the statutory language in light of its "plain
language," its "history," and the need to "avoid[] two serious constitutional concerns that would
be triggered by a broader reading." (*See* Pls.' Reply at 1.)

Plaintiffs first argue that it is clear from the text that the words "these services" in the last
sentence of subparagraph (b), where it provides that the fees collected must be used "to
reimburse expenses incurred in providing *these* services," include only the services that the AO
is actually charging fees for as set forth in the EPA Fee Schedule, i.e., the PACER system, the
PACER Service Center, and the provision of printed copies of documents "accessed
electronically at a public terminal in a courthouse." (Pls.' Reply at 3–4; 3/23/18 Tr. at __.) The
Court does not agree that the text dictates this constraint. The term "these services" could also
mean any service that provides "access to information available through automatic data
processing equipment," whether or not it is expressly part of the EPA fee schedule.

Plaintiffs' next argument is based on the legislative history of the 2002 amendment,
which consists of the following single paragraph in a Senate Committee Report:

> The Committee intends to encourage the Judicial Conference to move from a fee
> structure in which electronic docketing systems are supported primarily by user
> fees to a fee structure in which this information is freely available to the greatest
> extent possible. For example, the Administrative Office of the United States
> Courts operates an electronic public access service, known as PACER, that allows
> users to obtain case and docket information from Federal Appellate, District and
> Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law,
> users of PACER are charged fees that are higher than the marginal cost of
> disseminating the information.

2002 S. Rep. at 23. Plaintiffs argue that this paragraph "makes clear that Congress added this
language because it sought to prevent the AO from 'charg[ing] fees that are higher than the
marginal cost of disseminating the information,'" as it had been doing for several years, and that

25

"although the E-Government Act does not refer to PACER by name, Congress clearly had PACER in mind when it passed the Act." (Pls.' Mot. at 11 (quoting 2002 S. Rep. at 23).)

The Court finds this argument unconvincing for several reasons. First, there is no mention in the statute of PACER or its "marginal cost," and in the 2002 Senate Report, the reference to PACER and "marginal cost" follows the words "For example," suggesting that the amendment was not intended to apply only to PACER. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 649 (1990) ("[T]he language of a statute—particularly language expressly granting an agency broad authority—is not to be regarded as modified by examples set forth in the legislative history."). And, in fact, the 2002 Senate Report recognizes that PACER is only a subset of a larger system when it stated: "[t]he Committee intends to encourage the Judicial Conference to move from a structure in which *electronic docketing systems* are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." 2002 S. Rep. at 23 (emphasis added). The use of the phrase "electronic docketing systems" appears to envision more than just PACER, and to at least encompass CM/ECF, given that it, unlike PACER, is an electronic docketing system.

Second, a single committee's report reflects only what the committee members might have agreed to, not the "intent" of Congress in passing the law. As the Supreme Court observed, "[u]nenacted approvals, beliefs, and desires are not laws." *P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988). As the Supreme Court observed in rejecting reliance on "excerpts" said to reflect congressional intent to preempt state law, "we have never [looked for] congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text." *Id*.

Perhaps most tellingly, the E-Government Act changed only one phrase in the first

sentence of the first paragraph—replacing "shall hereafter" with "may, only to the extent

necessary." It did not alter the third sentence of paragraph (b), which is the part of the statute

that governs what expenses can be reimbursed by PACER fees. Thus, even though the 2002

Senate Report correctly observes that PACER fees exceeded the marginal cost of operating

PACER, the amendment to the statute did not address which services could be reimbursed, but

only the amount of fees for services that could be charged. In addition, at the time the E-

Government Act was passed, CM/ECF had been in operation for at least four years, PACER fees

were already being used to pay for non-PACER costs, such as EBN and CM/ECF (*see* 2d

Skidgel Decl. Tabs 30–32), and there is nothing in the statute's text or legislative history to

suggest that Congress intended to disallow the use of PACER fees for those services. In the end,

a single sentence in a committee report, which has been taken out of context, is not enough to

persuade the Court that Congress intended the E-Government Act to impose a specific limitation

on the judiciary's collection and use of EPA fees to the operation of only PACER.

Plaintiffs also point to "[p]ost-enactment history"—the letters from the E-Government

Act's sponsor, Senator Joseph Lieberman, in 2009 and 2010. (Pls.' Mot. at 11–12 ("The Act's

sponsor has repeatedly expressed his view, in correspondence with the AO's Director, that the

law permits the AO to charge fees 'only to recover the direct cost of distributing documents via

PACER,' and that the AO is violating the Act by charging more in PACER fees than is necessary

for providing access to 'records using the PACER system.'").) But, as plaintiffs essentially

conceded during the motions hearing, the post-enactment statements of a single legislator carry

no legal weight when it comes to discerning the meaning of a statute. (3/23/18 Tr. at __); *see*

*Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J. concurring) ("the views of a

legislator concerning a statute already enacted are entitled to no more weight than the views of a

judge concerning a statute not yet passed"); *see also Consumer Prod. Safety Comm'n*, 447 U.S. at 117–18 ("even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history").

Plaintiffs' final argument is that the "constitutional doubt" canon of construction requires their interpretation because any other interpretation would raise a question as to whether Congress had unconstitutionally delegated its taxing authority because the statute does not clearly state its intention to do so. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) ("Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties."). Assuming *arguendo* that this doctrine applies with equal force to unregulated parties, an issue not addressed by the parties, the Court does not find plaintiffs' argument persuasive. First, this canon of construction has a role only where the statute is ambiguous, which, as explained herein, the Court concludes is not the case. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."). Second, the canon can only be applied where there is a "reasonable alternative interpretation," *Gomez v. United States*, 490 U.S. 858, 864 (1989), but the Court has already explained that it does not find plaintiffs' proposed interpretation to be a reasonable alternative interpretation. Finally, as will be discussed in Section C, *infra*, the Court finds that the statute does clearly state that the judiciary has the authority to use its PACER fees for services that may not directly benefit a particular PACER user. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153–54 (2013) ("This is not to say that Congress must incant magic words in order to speak

28

clearly.  We consider context . . . as probative of [Congress' intent].").

For these reasons, the Court will not adopt plaintiffs' interpretation of the statute as limiting PACER fees to the total marginal cost of operating PACER.

> **B.**      **Does the E-Government Act Allow PACER Fees to Fund Any "Dissemination of Information Through Electronic Means"?**

Defendant's interpretation of the statute embraces the other extreme, positing that the statute allows PACER fees to be used for any expenditure that is related to "disseminating information through electronic means."  (3/23/18 Tr. at __; *see* Def.'s Mot. at 11.)  It is not entirely clear to the Court how the defendant arrived at this definition.  Most of the reasons defendant gives to justify its interpretation are really just arguments against plaintiffs' interpretation, such as (1) the authority to charge EPA fees and use them to reimburse "services" predated the E-Government Act and that language was not changed by the Act; (2) there is no mention of PACER or "marginal cost" in the 2002 amendment; and (3) the legislative history discussed PACER only as an "example."  As for defendant's affirmative arguments, addressed below, none demonstrates that defendant's conclusion is correct.

Defendant's first argument is based on the fact that the text of the statute requires that EPA fees be deposited in the JITF, which is the fund that the judiciary is allowed to use for "broad range of information technology expenditures."  (Def.'s Mot. at 10.)  According to defendant, the fact that EPA fees are deposited in this fund "informs how Congress intended the fees received from PACER access to be spent."  (*Id*.)  However, while the statute provides that PACER fees are to be deposited in the JITF, it also directs that they are to be used to "reimburse expenses incurred" in providing "access to information available through data processing equipment."  That statutory language cannot be ignored as defendant attempts to do.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its

29

provisions, so that no part will be inoperative or superfluous, void or insignificant."). Notably, it is clear that the judiciary has never treated its EPA fees in the JITF as fungible with the rest of the money in the JAF. (*See* FY 2006 JITF Annual Report; FY 2007 Financial Plan; 3/26/2009 AO Letter at 3-4 ("While fee collections from the EPA program are also deposited into the JITF, they are used only to fund electronic public access initiatives and account for only a small portion of its balance.").)

Defendant's main argument is that its interpretation of the statute has been accepted by Congress because the Appropriations Committees, either explicitly or implicitly, endorsed, mandated, or approved every request pertaining to the use of EPA fees. For example, defendant points out that the 1996 House Report stated that the Committee "expect[ed] available balances from public access fees" to be used for electronic bankruptcy noticing and electronic case filing, 1996 H.R. Rep. at 89; the 2003 House and Senate Committee Reports "expressly directed the AO to use PACER fees to update the CM/ECF system," 2003 H.R. Rep. at 116; 2003 S. Rep. at 118; those same Committees endorsed the Judiciary's FY 2007 Financial Plan, which set forth the AO's plan "to use receipts from PACER fees to fund courtroom technology and to perform infrastructure maintenance consistent with Congressional actions" (FY 2007 Financial Plan at 45; FY 2007 Senate Approval Letter; FY 2007 House Approval Letter); and the 2006 Senate Report, which urged the judiciary to undertake a study about the feasibility of sharing CM/ECF technology with states, *see* 2006 S. Rep. at 176, which the judiciary then did via its State of Mississippi study (FY 2009 EPA Expenditures). (*See* Def.'s Mot. at 17–18.) More generally, and applicable at least as to the expenditures that post-date the passage of the E-Government Act, congressional approval is reflected by the fact that after the judiciary submitted its proposed budget to Congress and Congress appropriated money to the judiciary, the judiciary was then

required to submit its proposed financial plan, which included its intended use of EPA fees, to the House and Senate Appropriations Committees for approval. (Def.'s Reply at 3; 3/23/18 Tr. at __.) Looking at this entire process as a "totality," defendant argues, establishes that by implicitly approving certain expenditures, Congress agreed with the Judicial Conference's interpretation of the statute. (3/23/18 Tr. at __ ("[W]e have 26 years where the only legislative history that has gone to the judicial conference, but for Senator Lieberman's letter, says the judicial conference's interpretation is correct. The judicial conference's interpretation of that language that PACER fees may be used more broadly is correct.").)

For a number of reasons, defendant's argument is flawed. First, the record does not reflect meaningful congressional approval of each category of expenditures. Each so-called "approval" came from congressional committees, which is not the same as approval by Congress "as a whole." *See Tenn. Valley Auth.*, 437 U.S. at 192.[21] Moreover, the Court questions whether it is even possible to infer approval of a specific expenditure based solely on committee-approval of the judiciary's financial plans, where the record does not show any particular attention was paid to this itemization of intended uses of EPA fees. For almost of all the years for which defendant has included copies of approvals, the "approvals" consist of a mere line in an email or letter that indicates, without any elaboration or specification, that the Appropriations Committee has "no objection."[22] (*See, e.g.*, 2d Skidgel Decl. Tab 16 (2010); *see also id.* Tabs 15, 17, 20–27

---

[21] Despite having the opportunity to respond to the holding of *Tennessee Valley Authority v. Hill*, defendant has failed to cite any legal support for its use of approvals by the Committee on Appropriations.

[22] The one exception was courtroom technology. In response to the judiciary's request in its FY 2007 Financial Plan to use PACER fees for Courtroom Technology, the Chairman and Ranking Member of the Subcommittee on Financial Services and General Government wrote on May 2, 2007: "We have reviewed the information included and have no objection to the financial plan including . . . the expanded use of Electronic Public Access Receipts." (2007 Senate Approval Lettter; *see also id.* 2007 House Approval Letter.)

31

(2011, 2013–2016).)  In 2009 and 2012, there are letters from the Appropriations Committees which reflect a closer analysis of some parts of the financial plan, but neither mentions the judiciary's planned uses of PACER fees.  (*Id*. Tabs 14, 18–19.)  By contrast, in July 2013, the AO sent an email to the Senate Appropriation Committee at 1:02 p.m. noting that "[i]n looking through our records we don't seem to have approval of our FY 2013 financial plan.  Would you be able to send us an email or something approving the plan?  The auditors ask for it so we like to have the House and Senate approvals on file." (2d Skidgel Decl. Tab 20.)  Less than an hour later, at 1:47 p.m., an email came from a staff member on the Senate Appropriations Committee stating "Sorry about that and thanks for the reminder.  We have no objection."  (*Id*.)

   Second, even if the record established approval of the various uses of EPA fees, there is nothing to support the leap from approval of specific expenditures to defendant's contention that the Appropriations Committees were cognizant and approved of the Judicial Conference's "interpretation."  (*See* 3/23/18 Tr. at __).  In fact, the AO never used the definition defendant now urges the Court to adopt—the "dissemination of information through electronic means"—to explain its use of EPA fees for more than PACER.  Rather, it used terms like "public access initiatives" to describe these expenditures.  (*See* FY 2007 Financial Plan ("collections are used to fund information technology initiatives in the judiciary related to public access"); 2d Skidgel Decl. Tab 12 (FY 2009 Financial Plan at 45) (EPA revenues "are used to fund IT projects related to public access"); Taylor Decl. Ex. J at 10 (AO document, entitled Electronic Public Access Program Summary, December 2012, stating that EPA revenue "is dedicated solely to promoting and enhancing public access").)

Finally, as defendant acknowledges, the post-enactment action of an appropriations committee cannot alter the meaning of the statute, which is what controls what expenditures are

permissible. *See Tenn. Valley Auth.*, 437 U.S. at 191 ("Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress.").[23] Thus, the fact that appropriations committees expressly or implicitly endorsed the use of EPA fees for certain expenditures cannot establish that those expenditures are permissible uses of EPA fees.

For these reasons, the Court is not persuaded that the statute permits the collection of EPA fees to fund any expense that involves the "dissemination of information through electronic means."

### C. What Limitation Did the E-Government Act Place on the Use of PACER Fees?

Having rejected the parties' diametrically opposed interpretations, the Court must embark on its own analysis to determine whether defendant's use of PACER fees between 2010 and 2016 violated the E-Government Act. The Court concludes that defendant properly used PACER fees to pay for CM/ECF[24] and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the expenditures for Courtroom

---

[23] Even an appropriations Act passed by Congress cannot alter the meaning of statute. *See Tenn. Valley Auth.*, 437 U.S. at 190–91 ("We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. [This] would lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation . . . .").

[24] It is undisputed that the expenses in the categories now labeled CM/ECF, Court Allotments and Telecommunication/Communications Infrastructure include only expenses that are directly related to PACER or CM/ECF. (*See* 3/23/18 Tr. at __; *see also* Skidgel Decl. ¶ 19 ("through court allotments, "courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server)" and "[f]unding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors"; Def.'s Resp. to Pls.' Interrogs. at 22–26.)

Technology.  (*See* Attachment 1.)

The statutory language in 28 U.S.C. § 1913 note is clear that, to be paid for with PACER

fees, a "service" must be one that provides the public with "access to information available

through automatic data processing equipment."  An examination of this statutory provision's

history—dating from its enactment in 1990 and culminating in its amendment by the E-

Government Act in 2002—resolves any ambiguity in its meaning and allows the Court to

determine which expenditures between 2010 and 2016 were properly funded by PACER fees.

When the 28 U.S.C. § 1913 note was first enacted in 1989, s*ee* Pub. L. 101-515, § 404,

PACER was in its infancy, but it was operational, and the statute clearly applied to it.  (*See* Jud.

Conf. Rep. at 83 (Sept. 14, 1988); EPA Chronology at 1; Jud. Conf. Rep. at 19 (Mar. 14, 1989);

Jud. Conf. Rep. at 21 (Mar. 13, 1990); 1990 S. Rep. at 86.)  Yet, there was no mention of

PACER in the statute, nor was there any suggestion that the judiciary was precluded from

recouping expenses beyond the cost of operating PACER.  In fact, it is apparent that Congress

recognized the possibility that fees would cover the costs of making court records available to

the public electronically.  *See* 1990 S. Rep. at 86 ("language  . . .  authorizes the Judicial

Conference to prescribe reasonable fees for public access to case information, to reimburse the

courts for automating the collection of the information"); *see also* 1992 H.R. Rep. at 58 (noting

that "the Judiciary's investments in automation have resulted in enhanced service to the public

and to other Government agencies in making court records relating to litigation available by

electronic media" and "request[ing] that the Judiciary equip all courts, as rapidly as is feasible,

with the capability for making such records available electronically and for collecting fees for

doing so").

The first federal court experiment with electronic case filing began in the Northern

District of Ohio in 1996.  (1997 AO Paper at 4.)  Later that year, both the House and Senate

Appropriations Committees made clear that they expected the judiciary to use its EPA fee

collections for more than just paying for the cost of PACER.  (1996 H.R. Rep. at 89 ("The

Committee supports the ongoing efforts of the Judiciary to improve and expand information

made available in electronic form to the public. Accordingly, the Committee expects the

Judiciary to utilize available balances derived from electronic public access fees in the Judiciary

Automation Fund to make information and services more accessible to the public through

improvements to enhance the availability of electronic information.  The overall quality of

service to the public will be improved with the availability of enhancements such as *electronic

case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy

noticing.*") (emphasis added); 1996 S. Rep. at 88 ("The Committee supports efforts of the

judiciary to make electronic information available to the public, and expects that available

balances from public access fees in the judiciary automation fund will be used to enhance

availability of public access.").)

While these statements in the reports of the Committee on Appropriations predated the

passage of the E-Government Act, they are not dispositive in terms of discerning what Congress

intended the statute to mean.  They are part of a bigger picture and an important backdrop to the

passage of the E-Government Act.  Contemporaneously with Congress's prompting the judiciary

to use EPA fees to pay for public access to electronically-stored case documents "[t]he transition

towards electronic case files ("ECF") in the federal courts [wa]s underway" by March 1997.

(1997 AO Paper at v.)  Over the next few years, relying expressly on the 1996 House and Senate

Reports relating to fiscal year 1997 appropriations, the judiciary began using EPA fees to fund

the development of a national case management and electronic case filing system, CM/ECF,

which would allow federal courts to maintain complete electronic files. (*See, e.g.*, FY 2002 Budget Request ("Fiscal year 1997 appropriations report language expanded the Judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").) The judiciary anticipated that CM/ECF would "produce an impressive range of benefits . . . including . . . public access to case file information." (1997 AO Paper at v.) For instance, in 1998, the Judicial Conference created a web interface for PACER and added a per page fee for accessing case dockets and electronic filings via the Internet. (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998); EPA Chronology at 1.) At that time, the Judicial Conference noted in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services. With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue *while introducing new technologies to expand public accessibility to PACER information.*

(Jud. Conf. Rep. at 64–65 (Sept. 15, 1998) (emphasis added).) By no later than fiscal year 2000, the judiciary was spending substantial sums of money, derived from EPA fees, on CM/ECF and EBN. (2d Skidgel Decl. Tab 30 (FY 2000 EPA Expenditures).) In fact, over $10 million was spent on case management/electronic case files, infrastructure and electronic bankruptcy noticing in 2000. (*Id.*)

Then in 2002, Congress passed the E-Government Act. This Act encompassed far more than § 205(e)'s limitation on the charging of fees. The overall purpose of the section pertaining to the judiciary was to "require federal courts to provide greater access to judicial information over the Internet." 2002 S. Rep. at 23. To that end, the Act mandated that the judiciary expand the public's access to electronically stored information that was accessible via PACER:

- § 205(a), "Individual Court Websites," "require[d] the Supreme Court, each circuit court,

36

each district court, and each bankruptcy court of a district to establish a website that would include public information such as location and contact information for courthouses, local rules and standing orders of the court, docket information for each case, and access to written opinions issued by the court, in a text searchable format." 2002 S. Rep. at 22.

- § 205(b), "Maintenance of Data Online," required that "[t]he information and rules on each website . . . be updated regularly and kept reasonably current."

- § 205(c), "Electronic Filings," required, subject to certain specified exceptions, that courts provide public access to all electronically filed documents and all documents filed in paper that the court converts to electronic form.

  and

- § 205(d), "Dockets with Links to Documents," directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filing, decision, and rulings in each case to be obtained from the docket sheet of that case."

Subsection 205(e), entitled "Cost of Providing Electronic Docketing Information," changed the language that required the judiciary to charge fees ("shall, hereafter") to make its decision to charge fees discretionary and to limit those fees "to the extent necessary." Even though the judiciary was already using EPA fees to pay for the costs of CM/ECF and EBN, no changes were made to the last sentence of subparagraph (b), which defined the scope of services that can be reimbursed with EPA fees.

As is clear from the E-Government Act, Congress intended in 2002 for the judiciary to expand its capability to provide access to court information, including public information relating to the specific court and docket information for each case, including filings and court opinions. With certain exceptions, documents filed electronically were to be made available publicly, and the judiciary was to explore the possibility of providing access to the underlying contents of the docket sheets through links to filings, decisions and rulings. This ambitious program of providing an electronic document case management system was mandated by Congress, although no funds were appropriated for these existing and future services, but

Congress did provide that fees could be charged even though the fees could be "only to the extent necessary."

Consistent with this view the Appropriations Committees reiterated their support for allowing EPA fees to be spent on CM/ECF in 2003. 2003 H.R. Rep. at 116; 2003 S. Rep. at 118; 2003 Conf. Rep. at H12515.

Although congressional "acquiescence" as an interpretative tool is to be viewed with caution, the Court is persuaded that when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of EPA fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and EBN. Accordingly, the Court concludes that the E-Government Act allows the judiciary to use EPA fees to pay for the categories of expenses listed under Program Requirements: CM/ECF, EBN, Court Allotments and Telecommunications/Communications Infrastructure.[25] (*See* Attachment 1.)

However, Congress' endorsement of the expenditures being made in 2002, in conjunction with the statutory language, the evolution of the E-Government Act, and the judiciary's practices as of the date of the Act's passage, leads the Court to conclude that the E-Government Act and its predecessor statute imposed a limitation on the use of PACER fees to expenses incurred in providing services, such as CM/ECF and EBN, that are part of providing the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system. This interpretation recognizes that PACER cannot be divorced from CM/ECF, since

_____

[25] Plaintiffs' recent supplemental filing after the motions hearing suggested for the first time that the CM/ECF category might require closer examination to determine whether the expenditures therein, in particular CM/ECF NextGen, were all appropriately treated as "public access services." (*See* Pls.' Resp. to Def.'s Supp. Authority at 3, ECF No. 85.) But plaintiffs made no such argument in response to defendant's motion for summary judgment. (*See* Pls.' Reply at 6 (raising no challenge to CM/ECF if the statute authorizes "PACER fees to cover all costs necessary for providing PACER access and other public access services").)

PACER is merely the portal to the millions of electronically-filed documents that are housed by the judiciary on CM/ECF and are available to the public via the Internet only because of CM/ECF.

With this understanding, the Court will consider whether the judiciary properly used PACER fees for the remaining categories of expenses, which the judiciary now identifies as Congressional Priorities: Courtroom Technology, the State of Mississippi study, Web-Juror, and VCCA. (*See* Attachment 1.)

The judiciary only began using EPA fees for these expenses five or more years after the E-Government Act. Defendant's first attempt to justify the use of EPA fees for each of these categories focused almost exclusively on purported congressional approvals. As previously discussed, post-enactment legislative history as a general rule is of limited use in statutory interpretation, particularly when the action comes from a committee—especially an appropriations committee—rather than Congress as a whole. Compounding that problem here, also as previously noted (with the exception of courtroom technology, *see* supra note 22), is the questionable substance of the congressional approvals for several of these expenditures with the exception of courtroom technology.

Even if defendant could rely on congressional approvals, the Court would still have to decide whether the expenses fit within the definition of permissible expenses.

*State of Mississippi*: The category labeled "State of Mississippi" is described by defendant as a study that "provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents." (Def.'s Resp. to Pls.' Interrogs. at 5.) It is apparent from this description that this study was not a permissible expenditure since it was unrelated to providing access to electronic

information on the federal courts' CM/ECF docketing system.

*VCCA*: The category labeled Victim Notification (Violent Crime Control Act) refers to "[c]osts associated with the program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." (Def.'s Resp. to Pls.' Interrogs. at 11.) Via this program, "[l]aw enforcement officers receive electronic notification of court documents that were previously sent to the through the mail." (*Id.*) Defendant first defended the use of EPA fees to pay for this program on the ground that it "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 34, 53, 69, 87, 105, 123, 141.) Defendant has also argued that this program benefits the public because by sharing this information electronically, the information gets to law enforcement agencies more quickly, and they in turn may be able to revoke supervision, if warranted, more quickly. (*See* 3/23/18 Tr. at __.) But neither of these justifications establishes that VCCA is a permissible expenditure of PACER funds. While this program disseminates federal criminal case information, and its outcome may indirectly have some benefit to the public, it does not give the public access to any electronically stored CM/ECF information.

*Web-Juror*: The category labeled Web-Based Juror Services refers to the costs associated with E-Juror, a juror management system. (Def.'s Resp. to Pls.' Interrogs. at 11.) It "provides prospective jurors with electronic copies of court documents regarding jury service." (*Id.*) Defendant's justification for using EPA fees to pay for these costs is that the E-Juror program "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 71, 89, 107, 125, 143.) Again, whether a program "improves the overall quality of electronic service to the public via an enhanced use of the Internet" does not establish that it is permissible use of EPA fees where there is no nexus to the

public's ability to access information on the federal court's CM/ECF docketing system.

*Courtroom Technology*:  The category labeled "Courtroom Technology" funds "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 11.)  The expenses in this category include "the costs of repairs and maintenance for end user IT equipment in the courtroom; obligations incurred for the acquisition and replacement of digital audio recording equipment in the courtroom; costs for audio equipment in the courtroom, including purchase, design, wiring and installation; and costs for video equipment in the courtroom, including purchase, design, wiring and installation."  (Def.'s Resp. to Pls.' Interrogs. at 32.)  Defendant argues that EPA fees are appropriately used for courtroom technology because "it improves the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically through electronic public access services when it is presented electronically and becomes an electronic court record."  (FY 2007 Financial Report at 46.)  Again, there is a lack of nexus with PACER or CM/ECF.  From the existing record, it would appear that the only courtroom technology expenditure that might be a permissible use of EPA fees is the "digital audio equipment" that allows digital audio recordings to be made during court proceedings and then made part of the electronic docket accessible through PACER.  (*See* Taylor Decl. Ex. A (2013 EPA Fee Schedule) (charging $2.40 "for electronic access to an audio file of a court hearing via PACER").)  But, the Court does not see how flat-screen TVs for jurors or those seated in the courtroom, which are used to display exhibits or other evidence during a court proceeding, fall within the statute as they do not provide the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system.

Accordingly, with the exception of expenses related to digital audio equipment that is

41

used to create electronic court records that are publicly accessible via PACER, the Court

concludes that the expenses in the categories listed as Congressional Priorities are not a

permissible use of EPA fees.[26]

## CONCLUSION

For the reasons stated above, the Court will deny plaintiffs' motion for summary

judgment as to liability and will grant in part and deny in part defendant's cross-motion for

summary judgment as to liability. A separate Order, ECF No. 88, accompanies this

Memorandum Opinion.

/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: March 31, 2018

---

[26] The Court urges the parties to confer prior to the next status conference to determine for the years 2010 to 2016 the amount of courtroom technology expenditures that cannot be paid with PACER fees.

42

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 16-745 (ESH) |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## <u>ORDER</u>

Before the Court is defendant's Motion to Certify the Court's Orders of December 5, 2016, and March 31, 2018 for Interlocutory Appeal and to Stay Proceedings Pending Appeal (ECF No. 99).  Plaintiffs advised the Court during a status conference on July 18, 2018, that they opposed certification of the December 5, 2016 Order, but otherwise consented to defendant's motion.  Upon consideration of the motion, plaintiffs' partial consent thereto, and the entire record herein, and for the reasons stated in open court on July 18, 2018, and in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the defendant's motion is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) For the reasons stated in open court on July 18, 2018, the motion is **DENIED** as to the December 5, 2016 Order (ECF No. 24).

(2) For the reasons stated in an accompanying Memorandum Opinion, ECF No. 105, the motion is **GRANTED** as to the Court's Order of March 31, 2018 (ECF No. 88).

(3) The motion to stay further proceedings pending appeal is **GRANTED** and all proceedings in this matter are hereby **STAYED** pending further order from this Court.

It is further **ORDERED** that the Court's Order of March 31, 2018 (ECF No. 88) is **AMENDED** to add the following statement:

> It is further **ORDERED** that this Order is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because it involves "a controlling question of law as to which there is substantial ground for difference of opinion" and because "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).  A separate Memorandum Opinion issued today sets out in greater detail the basis for the Court's decision to certify this Order.

**SO ORDERED**.



ELLEN S. HUVELLE
United States District Judge

DATE:  August 13, 2018

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM, *et al.*,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 16-745 (ESH)** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

The Court issues this Memorandum Opinion in further support of its Order granting defendant's Motion to Certify the Court's Order of March 31, 2018 for Interlocutory Appeal. (*See* Order, ECF No. 104; Defs.' Mot. to Certify, ECF No. 99; March 31, 2018 Order, ECF No 88.)

## BACKGROUND

This case concerns the lawfulness of the fees charged by the federal judiciary for the use of its Public Access to Court Electronic Records (PACER) system.  Plaintiffs are PACER users who contend that the fees charged from 2010 to 2016 exceeded the amount allowed by federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)).  They brought suit under the Little Tucker Act, seeking monetary relief from the excessive fees.

On December 5, 2016, the Court denied defendants' motion to dismiss (*see* Order, ECF

No. 24), and, on January 24, 2017, it granted plaintiffs' motion for class certification (*see* Order,

ECF No. 32).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court certified a class

consisting of:

> All individuals and entities who have paid fees for the use of PACER between
> April 21, 2010, and April 21, 2016, excluding class counsel in this case and
> federal government entities.

The parties then filed cross-motions for summary judgment on liability, which, they

agreed, depended on a single and novel question of statutory interpretation: "what restrictions

does 28 U.S.C. § 1913 note place on the amount the judiciary may charge in PACER fees?"

*Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 138 (D.D.C. 2018).

The parties advocated for starkly different interpretations of the statute, *id*. at 139-40, neither of

which the Court found persuasive.  In the end, it arrived at its own interpretation, which led to

the denial of plaintiffs' motion and the granting in part and denying in part of defendant's

motion.  (*See* Order, ECF No. 89.)

At the first status conference after deciding the cross-motions for summary judgment, the

Court asked the parties to consider whether the March 31, 2018 Order should be certified for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b), given the fact that the exact determination

of damages would likely require a lengthy period of fact and expert discovery, additional

summary judgment briefing and potentially a bench trial.  (*See* Tr., Apr. 18, 2018, at 5, 6, 13, 20;

*see also* Joint Status Report Proposing a Schedule to Govern Further Proceedings, ECF No. 91

(proposing an additional five months of fact discovery, then five months for expert discovery, to

be followed by summary judgment briefing or a bench trial).)  Plaintiffs readily agreed that

certification would be appropriate and desirable.  (*Id*. at 21.)  The government indicated that it

needed additional time to respond in order to seek the necessary approval from the Solicitor

General.  (*Id*. at 20.)

On July 13, 2018, the parties filed a joint status report advising the Court that "the Solicitor General has authorized interlocutory appeal in this case."  (Joint Status Report at 2, ECF No. 98.)  That same day, defendant filed the pending motion to certify the March 31, 2018 Order.[1]  At the status conference on July 18, 2018, and in their written response filed on July 27, 2018, plaintiffs noted their continued belief that the March 2018 Order should be certified.  (*See* Pls.' Resp., ECF No. 102.)

## ANALYSIS

A district judge may certify a non-final order for appeal if it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see Z St. v. Koskinen*, 791 F.3d 24, 28 (D.C. Cir. 2015).  The decision whether to certify a case for interlocutory appeal is within the discretion of the district court.  *In re Kellogg Brown & Root, Inc*., 756 F.3d 754, 761 (D.C. Cir. 2014).  If the district court finds that each requirement is met, it "shall so state in writing in such order," and the party seeking to appeal must then file an application with the Court of Appeals "within ten days after the entry of the order."  28 U.S.C. § 1292(b).

Although the statute does not expressly require the Court to do anything more than state that each of these requirements is met in the order itself, the general rule is that "[a] district court order certifying a § 1292(b) appeal should state the reasons that warrant appeal," and "a

---

[1] Defendants' motion also sought certification of the December 5, 2016 Order denying their motion to dismiss.  The Court explained in open court during the status conference on July 18, 2018, why it would not certify that Order, but noted that defendant was free to raise a challenge to the Court's subject matter jurisdiction at any time.  (*See* Tr., July 18, 2018.)

thoroughly defective attempt may be found inadequate to support appeal." 16 Wright & Miller,

Federal Practice & Procedure § 3929 (3d ed. 2008).  Accordingly, the Court sets forth herein the

basis for its conclusion that the March 31, 2018 Order satisfies each of the three requirements of

§ 1292(b).

### 1.    Controlling Question of Law

The first requirement for § 1292(b) certification is that the order involve a "controlling

question of law."  "[A] 'controlling question of law is one that would require reversal if decided

incorrectly or that could materially affect the course of litigation with resulting savings of the

court's or the parties' resources.'" *APCC Servs. v. Sprint Communs. Co.*, 297 F. Supp. 2d 90, 95–

96 (D.D.C. 2003) (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp.

2d 16, 19 (D.D.C. 2002)).  The March 31, 2018 Order involves a controlling question of law

under either prong.

The parties' cross-motions for summary judgment presented the Court with a pure legal

issue -- the proper interpretation of 28 U.S.C. § 1913 note.  That statute provides, in relevant

part:

> The Judicial Conference may, only to the extent necessary, prescribe reasonable
> fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United
> States Code, for collection by the courts under those sections for access to
> information available through automatic data processing equipment. These fees
> may distinguish between classes of persons, and shall provide for exempting
> persons or classes of persons from the fees, in order to avoid unreasonable
> burdens and to promote public access to such information. The Director of the
> Administrative Office of the United States Courts, under the direction of the
> Judicial Conference of the United States, shall prescribe a schedule of reasonable
> fees for electronic access to information which the Director is required to
> maintain and make available to the public.
>
> (b) The Judicial Conference and the Director shall transmit each schedule of fees
> prescribed under paragraph (a) to the Congress at least 30 days before the
> schedule becomes effective. All fees hereafter collected by the Judiciary under
> paragraph as a charge for services rendered shall be deposited as offsetting

4

collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A)
to reimburse expenses incurred in providing these services.

Plaintiffs took the position that the statute prohibits the government from charging more in

PACER fees "than is necessary to recoup the total marginal cost of operating PACER,'" and that

the government is liable for fees it has charged in excess of this amount.  *Nat'l Veterans Legal*

*Servs. Program*, 291 F. Supp. 3d at 139.  The government "readily admit[ted] that PACER fees

are being used to cover expenses that are not part of the 'marginal cost' of operating PACER,"

but countered that the statute allows the government to "charge [PACER] fees in order to fund

the dissemination of information through electronic means," which was exactly what it had done.

*Id.* at 140.  The Court adopted neither view, concluding the statute did not preclude the use of

PACER fees to cover certain expenses beyond the marginal cost of operating PACER, but that

certain uses of PACER fees were impermissible.  *Id.* at 140-150.  Thus, if the Court's

interpretation is incorrect, the March 31, 2018 Order would require reversal – one of the prongs

of the definition of a "controlling question of law."

In addition, regardless of which of these three interpretations of the statute is correct, the

answer will "materially affect the course of [the] litigation."  If the Federal Circuit were to

reverse and adopt defendant's view, there would be no liability and the case would be over.  If it

were to reverse and adopt plaintiffs' view or affirm this Court, the case would continue, but the

nature of what would follow would differ significantly.  If the Circuit were to adopt plaintiffs'

interpretation, the government would be liable for the difference between the approximately

$923 million in PACER user fees collected from 2010 to 2016 and the "marginal cost" of

operating PACER.  Therefore, the main issue would be determining the marginal cost of

operating PACER.  Plaintiffs concede that at least $129 million was part of the "marginal cost"

of operating PACER, while defendant admits that at least $271 million was not,[2] and as to the remaining $522 million the parties agree "at least some" is not part of the "marginal cost," but there is no agreement as to how much of that $522 million is part of the marginal cost.[3]  On the other hand, if the Federal Circuit affirms this Court's Order, there will be no need to determine the marginal cost of operating PACER, for the only issue unresolved by the Court's opinion is the precise amount spent from PACER fees on impermissible expenditures.[4]  These vastly different possible outcomes lead to the conclusion that immediate review of the March 31, 2018 Order will materially affect the course of this litigation with resulting savings of time and resources.

Accordingly, the March 31, 2018 Order involves a "controlling question of law."

### 2.    Substantial ground for difference of opinion

The second requirement for § 1292(b) certification is that there must "exist a substantial ground for difference of opinion."  "A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits."  *APCC Servs.*, 297 F. Supp. 2d at 97.  Here, there is a complete absence of any precedent from any jurisdiction.  In addition, although the Court ultimately found the arguments

---

[2] Defendant admits that none of the money spent on EBN, the State of Mississippi study, the VCCA Notification System, and Web-Based Juror Services was part of the "marginal cost" of operating PACER,

[3] Defendant admits that "at least some of the money" spent on CM/ECF, Telecommunications, Court Allotments, and Courtroom Technology is not part of the "marginal cost" of operating PACER.

[4] Based on the current record, that amount is approximately $192 million.  This number reflects the total expenditures from 2010 to 2016 for the State of Mississippi study ($120,998); the Violent Crime Control Act notification system ($3,650,979); Web-Based Juror Services ($9,443,628); and Courtroom Technology ($185,001,870), less the expenditures made for digital audio equipment, including software ($6,052,647).

6

in favor of each parties' position unpersuasive, this Court's opinion made clear that these arguments are not without merit and that "the issue is truly one on which there is a substantial ground for dispute." *APCC Servs.*, 297 F. Supp. 2d at 98; *see also Molock v. Whole Foods Mkt. Grp.*, 2018 WL 2926162, at *3 (D.D.C. June 11, 2018). Accordingly, the Court concludes that there exists a substantial ground for difference of opinion on the issue resolved by the March 31, 2018 Order.

### 3.        Materially advance the litigation

The third requirement for § 1292(b) certification is that an immediate appeal will "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "To satisfy this element a movant need not show that a reversal on appeal would actually end the litigation. Instead, the relevant inquiry is whether reversal would hasten or at least simplify the litigation in some material way, such as by significantly narrowing the issues, conserving judicial resources, or saving the parties from needless expense." *Molock*, 2018 WL 2926162, at *3 (citing *APCC Servs.*, 297 F. Supp. 2d at 100). Here, there is no question that this requirement is satisfied. As previously explained, if the Court's Order is reversed in the government's favor, the litigation will be over. If it is reversed in plaintiffs' favor, it would significantly alter the issues to be addressed. Either outcome now, instead of later, would conserve judicial resources and save the parties from needless expenses. Thus, before proceeding to a potentially lengthy and complicated damages phase based on an interpretation of the statute that could be later reversed on appeal, it is more efficient to allow the Federal Circuit an opportunity first to determine what the statute means. Accordingly, the Court concludes that an immediate appeal will "materially advance the ultimate termination of the litigation."

7

**CONCLUSION**

Having concluded that the March 31, 2018 Order satisfies all three requirements for

§1292(b) certification, the Court will exercise its discretion and certify that Order for immediate

appeal.  A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

DATE:  August 13, 2018

Appx0440

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
              *Plaintiffs*,

        v.                                    Case No. 16-745-ESH

UNITED STATES OF AMERICA,
              *Defendant*.

**NOTICE OF GRANT OF PERMISSION TO APPEAL UNDER 28 U.S.C. § 1292(B)**

Notice is hereby given on this 28 day of November, 2018, that the plaintiffs' petition for permission to appeal the order entered on March 31, 2018 (ECF. No. 88) was granted by the United States Court of Appeals for the Federal Circuit. Both parties filed petitions for permission to appeal on August 22, 2018 (Fed. Cir. Nos. 18-154, 18-155), which were granted on October 16, 2018 (Fed. Cir. Nos. 19-1081, 19-1083). The order granting permission to appeal is attached.

Pursuant to Fed. R. App. P. Rule 5(d), plaintiffs file this notice to effect payment of the filing fee for the appeal.

Respectfully submitted,

*/s/ Meghan S.B. Oliver*
Meghan S.B. Oliver (D.C. Bar No. 493416)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
*moliver@motleyrice.com*

1

Deepak Gupta (D.C. Bar No. 495451)
Jonathan E. Taylor (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*
*jon@guptawessler.com*

William H. Narwold (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1681
*bnarwold@motleyrice.com*

Elizabeth Smith (D.C. Bar No. 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 1001
Washington, DC 20004
(202) 232-5504

November 28, 2018                *Attorneys for Plaintiffs*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2018, I filed this notice through this Court's CM/ECF system, and that all parties required to be served have been thereby served.

*/s/ Meghan S.B. Oliver*
Meghan S.B. Oliver

NOTE: This order is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE,**
*Plaintiffs-Respondents*

**v.**

**UNITED STATES,**
*Defendant-Petitioner*

---

2018-154

---

On Petition for Permission to Appeal pursuant to 28 U.S.C. Section 1292(b) from the United States District Court for the District of Columbia in No. 1:16-cv-00745-ESH, Judge Ellen S. Huvelle.

--------------------------------------------------------------------------------

**NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE,**
*Plaintiffs-Petitioners*

**v.**

**UNITED STATES,**
*Defendant-Respondent*

---

NVLSP v. US

2018-155

_____

On Petition for Permission to Appeal pursuant to 28 U.S.C. Section 1292(b) from the United States District Court for the District of Columbia in No. 1:16-cv-00745-ESH, Judge Ellen S. Huvelle.

_____

## ON PETITION
_____

Before PROST, *Chief Judge*, NEWMAN and LOURIE, *Circuit Judges*.

LOURIE, *Circuit Judge.*

## O R D E R

The parties both petition for permission to appeal an order of the United States District Court for the District of Columbia concerning the extent to which fee revenue generated by the federal judiciary's Public Access to Court Electronic Records ("PACER") system may be used for purposes other than the operation of PACER.

This case arises out of a class action brought by National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice (collectively, "the plaintiffs") against the United States, alleging that fees charged for using PACER from 2010 to 2016 violated 28 U.S.C. § 1913 note, as amended by the E-Government Act of 2002. That provision states, in relevant part, "[t]he Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts . . . for access to information available through automatic data processing equipment. . . . [These fees] shall be deposited as offsetting collections to the Judiciary Automation fund . . . to reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note.

After the district court denied the United States' motion to dismiss the complaint for failing to establish a cognizable claim for damages under the Little Tucker Act, 28 U.S.C. § 1346(a), the parties filed cross-motions for summary judgment of liability. The plaintiffs argued that the E-Government Act barred the judiciary from using PACER fees for anything other than the marginal cost of operating PACER. The government asserted that PACER fees can be spent on any expenditure involving the dissemination of information through electronic means.

The district court adopted neither party's position. Instead, it determined that revenue from the PACER system may be used only for "expenses incurred in providing services . . . that are part of providing the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system." *Nat'l Veterans Legal Servs. Program v. United States,* 291 F. Supp. 3d 123, 149 (D.D.C. Mar. 31, 2018). On this basis, the district court ruled that several categories of the judiciary's expenditures were impermissible but also rejected the plaintiffs' position that the class was entitled to fees paid in excess of the amount necessary to recoup the total marginal cost of operating PACER.

At the request of both parties, the district court certified its summary judgment order for interlocutory appeal and stayed further proceedings. The district court noted that the issue to be appealed was a purely legal one, that the issue was one of first impression, and that interlocutory appeal would materially advance the litigation because "before proceeding to a potentially lengthy and complicated damages phase based on an interpretation of the statute that could be later reversed on appeal, it is more efficient to allow the Federal Circuit an opportunity first to determine what the statute means."

Under 28 U.S.C. § 1292(b), a district court may certify that an order that is not otherwise appealable is one involving a controlling question of law as to which there is

4                                    NVLSP v. US

substantial ground for difference of opinion and for which
an immediate appeal may materially advance the ulti-
mate termination of the litigation.  Ultimately, this court
must exercise its own discretion in deciding whether it
will grant permission to appeal an interlocutory order.
*See In re Convertible Rowing Exerciser Patent Litig.*, 903
F.2d 822, 822 (Fed. Cir. 1990).  Having considered the
petitions, we agree with the parties and the district court
that interlocutory review is appropriate here.

    Accordingly,

    IT IS ORDERED THAT:

    The petitions are granted.

                 FOR THE COURT

                 /s/ Peter R. Marksteiner
                 Peter R. Marksteiner
                 Clerk of Court

s25

# United States Court of Appeals for the Federal Circuit

---

**NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE,**

*Plaintiffs-Appellants*

v.

**UNITED STATES,**

*Defendant-Cross-Appellant*

---

2019-1081, 2019-1083

---

Appeal from the United States District Court for the District of Columbia in No. 1:16-cv-00745-ESH, Judge Ellen S. Huvelle.

---

## MANDATE

---

In accordance with the judgment of this Court, entered August 6, 2020, and pursuant to Rule 41 of the Federal Rules of Appellate Procedure, the formal mandate is hereby issued.

FOR THE COURT

September 28, 2020

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

# United States Court of Appeals
# for the Federal Circuit

———————————

**NATIONAL VETERANS LEGAL SERVICES
PROGRAM, NATIONAL CONSUMER LAW
CENTER, ALLIANCE FOR JUSTICE,**
*Plaintiffs-Appellants*

v.

**UNITED STATES,**
*Defendant-Cross-Appellant*

———————————

2019-1081, 2019-1083

———————————

Appeals from the United States District Court for the District of Columbia in No. 1:16-cv-00745-ESH, Judge Ellen S. Huvelle.

———————————

## JUDGMENT

———————————

THIS CAUSE having been considered, it is

ORDERED AND ADJUDGED:

**AFFIRMED AND REMANDED**

ENTERED BY ORDER OF THE COURT

August 6, 2020          /s/ Peter R. Marksteiner
                        Peter R. Marksteiner
                        Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 16-0745 (PLF)

MEMORANDUM OPINION AND ORDER

The Court has before it a pro se Motion for Intervention and for Leave to File Complaint in Intervention, Motion to Modify Class Certification Order, and for Sanctions ("Pines Mot.") [Dkt. No. 116], filed by putative plaintiff-intervenor Michael T. Pines. Plaintiffs National Veterans Legal Services Program, et al., and defendant the United States oppose the motion. See Plaintiffs' Response to Michael Pines's Motion for Intervention, to Modify the Class Definition, and for Sanctions ("Pl. Opp.") [Dkt. No. 122]; Defendant's Response to Michael Pines's Motion for Intervention, to Modify the Class Certification Order, and for Sanctions ("Def. Opp.") [Dkt. No. 124]. Upon careful consideration of the parties' papers, the relevant rules, and the applicable case law, the Court will deny Mr. Pines's motion in all respects.

Mr. Pines has also submitted via email to the Clerk's Office several additional requests for relief, which he suggests are related to this case. Because the Court concludes that Mr. Pines is not entitled to intervene, it will deny as moot his other requests, with the exception of his application to proceed without prepaying fees or costs, which the Court will grant.

## I. BACKGROUND

This case is proceeding as a class action on behalf of "[a]ll individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities." Nat'l Veterans Legal Servs. Program v. United States ("NVLSP Class Cert. Op."), 235 F. Supp. 3d 32, 39 (D.D.C. 2017). The United States confirms that Mr. Pines paid PACER fees during the class period and therefore is a member of the class. Defendant's Supplemental Brief in Response to Court Order Dated October 12, 2021 ("Def. Suppl.") [Dkt. No. 126] at 1. Plaintiffs represent that "[c]lass notice was successfully sent to the email address associated with Michael Pines's PACER account on May 19, 2017," and that Mr. Pines did not opt out by the deadline provided in that notice. Plaintiffs' Supplemental Brief in Response to This Court's Order ("Pl. Suppl.") [Dkt. No. 127] at 1-2.

Mr. Pines asserts that he learned of the class action sometime in August of 2020. Pines Mot. at 10, 12. He seeks to intervene because, he says, he "was precluded from negotiations so any settlement based on previous discussions would be improper as not negotiated fairly," id. at 10, and "the class action attorneys will not even allow him to participate in discussions outside of court or cooperate in other ways," id. at 12. He expresses concern that if the Court approves a class settlement, he may face "questions regarding res judicata and the scope of the class release" if he "raises similar claims – or claims based on similar facts – in a subsequent case." Id. at 9. Mr. Pines asserts that he is entitled to intervene as of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, and in the alternative, that the Court should authorize permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. Id. at 11-12.

Mr. Pines also seeks to modify the class certification order, arguing that a class action is not "superior to other types of actions" in this case, Pines Mot. at 5, because "[t]he obvious way to calculate damages in light of court rulings to date," id. at 3, "would not result in

2

the class members receiving appropriate compensation," id. at 4. He further argues that "potential plaintiffs may have all kinds of claims against the government related to the operation of Pacer, and . . . there is not even a way to calculate the type of damages the class action seeks." Id. at 10. Finally, Mr. Pines asks the Court to award $25,000 in sanctions "against both plaintiff and defense counsel," because he was not "given the opportunity to participate when he demanded it in August 2020," and as a result, "he will have to spend large amounts of time" getting up to speed on the case. Id. at 13.

## II. DISCUSSION

### A. Intervention of Right

Rule 24(a)(2) of the Federal Rules of Civil Procedure grants a right of intervention to a party who, upon timely motion, "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a)(2). Courts consider four factors in deciding whether a party has a right to intervene: (1) the timeliness of the motion; (2) whether the party claims an interest relating to the subject of the action; (3) whether disposition of the action without the party may impair or impede the applicant's ability to protect that interest; and (4) whether the party's interest is adequately represented by the existing parties. Fund for Animals, Inc. v. Norton, 322 F.3d 728, 731-32 (D.C. Cir. 2003).

When a class member moves to intervene in a class action, the issue is "correctly framed . . . as whether the would-be intervenors [a]re adequately represented." Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997); see also In re Cmty. Bank of N. Va., 418 F.3d 277, 314 (3d Cir. 2005) ("In the class action context, the second and third prongs of

Appx0452

the Rule 24(a)(2) inquiry [concerning interest in the litigation and impairment of that interest] are

satisfied by the very nature of Rule 23 representative litigation.").  To prevail, therefore, Mr. Pines

must show that "the named plaintiffs cannot [adequately] represent his interests," <u>Barnes v.</u>

<u>District of Columbia</u>, 274 F.R.D. 314, 319 (D.D.C. 2011), either because they "have antagonistic

or conflicting interests with the unnamed members of the class" or because they do not "appear

able to vigorously prosecute the interests of the class through qualified counsel," <u>Twelve John</u>

<u>Does v. District of Columbia</u>, 117 F.3d at 575.

Mr. Pines has not made such a showing.  "When the Court certified the class in this

case [], it necessarily found that 'the representative parties will fairly and adequately protect the

interests of the class.'" <u>Barnes v. District of Columbia</u>, 274 F.R.D. at 316 (quoting FED. R. CIV.

P. 23(a)(4)).  Judge Huvelle, who presided over this case prior to her retirement, concluded that

"the nonprofit organizations who are named plaintiffs in this case make particularly good class

representatives," because "[t]hey are interested in reducing PACER fees not only for themselves

but also for their constituents . . . . [they] exist to advocate for consumers, veterans, and other

public-interest causes . . . . [and] organizational representatives with experience can provide more

vigilant and consistent representation than individual representatives." <u>NVLSP Class Cert.</u>

<u>Op.</u>, 235 F. Supp. 3d at 42 (quotation marks omitted).

These characteristics remain salient to representing the interests of the class today.

The class representatives have vigorously and effectively advocated on behalf of the class during

the course of this litigation.  They obtained a finding of liability against the United States in this

Court, which the Federal Circuit affirmed on appeal.  <u>See</u> <u>Nat'l Veterans Legal Servs. Program v.</u>

<u>United States</u>, 291 F. Supp. 3d 123, 140 (D.D.C. 2018) ("[T]he Court . . . finds the defendant

liable for certain costs that post-date the passage of the E-Government Act."); <u>Nat'l Veterans</u>

<u>Legal Servs. Program v. United States</u>, 968 F.3d 1340, 1357 (Fed. Cir. 2020) ("[W]e agree with

Appx0453

the district court's determination that the government is liable for the amount of [PACER] fees

used to cover [certain categories of] expenses."). The parties now are engaged in settlement

discussions and recently represented that they "have reached an agreement in principle on

proposed terms to resolve the matter, subject to Defendant obtaining approval of the proposed

terms of settlement from the United States Department of Justice." Nov. 15, 2021 Joint Status

Report [Dkt. No. 129] at 1. Nothing in Mr. Pines's submissions indicates that the named plaintiffs

are in any way failing to fulfill their role on behalf of the class.

       Mr. Pines's motion focuses instead on his desire to provide input on settlement

negotiations and case strategy. Mr. Pines asserts that he "has been trying to work with counsel"

and has "tried to discuss [a] settlement," but that "the class action attorneys will not even allow

him to participate in discussions outside of court or cooperate in other ways." Pines Mot. at 12;

see also Declaration of Michael T. Pines in Support of Motions to Modify Class Certification and

to Intervene and for Sanctions ("Pines Decl.") [Dkt. No. 116-1] ¶ 96 ("Had I been permitted to be

involved in settlement discussions, I had some ideas that might have been helpful."). As a class

member, Mr. Pines is entitled to receive certain information about the class action, including

information about opting out of the class and about any settlement or compromise. See FED. R.

CIV. P. 23(c)(2), (e)(1). Mr. Pines "will have the right to object to any settlement [that] the parties

may reach." Pl. Opp. at 3; see also FED. R. CIV. P. 23(e)(5). He is not, however, entitled to "work

with counsel," Pines Mot. at 12, or "be involved in settlement discussions," Pines Decl. ¶ 96. The

fact that Mr. Pines may disagree with class counsel's approach does not mean that class

representation is inadequate, because a class action by its nature entails delegating certain

litigation functions to class representatives and class counsel.

       Mr. Pines also appears to disagree with the scope of the claims being pursued,

noting that "people have suffered other types of damages caused by Pacer which the action docs

not seek to redress." Pines Mot. at 2; see also id. at 8.  Yet Judge Huvelle certified a single class claim in this case:  "that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act."  Jan. 24, 2017 Order [Dkt. No. 32] at 1.  The fact that class counsel have not pursued other arguments that go beyond the certified claim does not suggest that their representation is deficient.

Even if Mr. Pines could show that class counsel and the named plaintiffs do not adequately represent his interests in this case, his motion is not timely.  "A nonparty must timely move for intervention once it becomes clear that failure to intervene would jeopardize her interest in the action."  Harrington v. Sessions (In re Brewer), 863 F.3d 861, 872 (D.C. Cir. 2017). According to plaintiffs, "[c]lass notice was successfully sent to the email address associated with Michael Pines's PACER account on May 19, 2017."  Mr. Pines therefore should have been aware of this class action more than four years before he moved to intervene.

Mr. Pines asserts that he "only found out about this action in August 2020."  Pines Mot. at 12.  Even if Mr. Pines could show that he was not properly notified on May 19, 2017, he still allowed a year to elapse before seeking to intervene on August 11, 2021.  He suggests that when he "heard nothing" from counsel, Pines Decl. ¶ 54, he "decided to take a new legal approach," id. ¶ 55, implying that he moved to intervene after it became apparent that he would not achieve his desired result by contacting class counsel.  This does not justify a twelve-month delay while the case progressed and the parties engaged in settlement negotiations.  See In re Lorazepam & Clorazepate Antitrust Litig. v. Mylan Labs ("In re Lorazepam"), 205 F.R.D. 363, 368 (D.D.C. 2001) (finding motion to intervene untimely where the purported intervenor "waited nine months to file th[e] motion, pointing to Class Counsel's [] refusals to cooperate as its only explanation for doing so"); Allen v. Bedolla, 787 F.3d 1218, 1222 (9th

6

Appx0455

Cir. 2015) (finding a motion to intervene untimely that was "filed after four years of ongoing litigation, on the eve of settlement, and threatened to prejudice settling parties by potentially derailing settlement talks").

Mr. Pines is not entitled to intervene as of right under Rule 24(a)(2) because he has not demonstrated that his interests are inadequately represented and because his motion to intervene is not timely.

### B. Permissive Intervention

Pursuant to Rule 24(b)(1)(B) of the Federal Rules of Civil Procedure, a court has discretion to permit a party to intervene upon timely motion where the intervening party "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(B). The D.C. Circuit has articulated three requirements that a putative intervenor ordinarily must meet: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998); see also Envt'l. Defense v. Leavitt, 329 F. Supp. 2d 55, 66 (D.D.C. 2004). A court's decision pursuant to Rule 24(b) is discretionary and a district court may "deny a motion for permissive intervention even if the movant establishe[s]" all three of these requirements. E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d at 1048. In exercising its discretion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(3).

The Court concludes that permissive intervention is not warranted under Rule 24(b). First, Mr. Pines's motion is not timely for the reasons set forth above. Second, while Mr. Pines's submission may share some "question[s] of law or fact in common with the main

7

Appx0456

action," E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d at 1046, he also raises numerous issues and arguments that that go far beyond the scope of the class claim. See Pines Mot. at 8 ("[P]laintiffs who have claims against Pacer might have many varied claims . . . . They should have all their fees reimbursed."); Pines Decl. ¶ 94 (seeking $10,000 for each time Mr. Pines logged into PACER during the class period); Pines Decl. ¶¶ 3-6 ("I have been exposing bad conduct by the 'Too Big To Fail Banks' and the complicity of the federal and state governments since about 2010 . . . . As a result, I was disbarred, put in jail, prison, and mental hospitals but was innocent of any wrongdoing. The proposed legal action concerns this."); see also id. ¶¶ 39-42 (describing eviction action and subsequent court proceedings).

In addition, allowing Mr. Pines to intervene could seriously disrupt the settlement discussions, which may resolve this case, and therefore could derail a final resolution of the parties' rights. In the context of a motion to intervene in a class action, "the Court must strike [] a 'balance between keeping class litigation manageable and allowing affected parties to be adequately heard.'" In re Lorazepam, 205 F.R.D. at 367 (quoting Twelve John Does v. Disrict of Columbia, 117 F.3d at 575). As plaintiffs explain, this case has proceeded through class certification, summary judgment on liability, and an appeal to the Federal Circuit, and the parties are now engaged in mediation toward "a potential global settlement." Pl. Opp. at 1-2. Mr. Pines "now asks the Court to undo all this," id. at 2, by seeking to modify the class certification order despite "not identify[ing] any defect in the class definition or class claim," id. at 3.

Mr. Pines "has already shown [] willingness . . . to delay the proceedings," including by moving to decertify the class, seek sanctions, and raise factual issues and legal arguments outside the scope of the class claim. Barnes v. District of Columbia, 274 F.R.D. at 319 (finding that intervention would "unduly delay the adjudication of the original parties' rights" where the putative intervenor had filed a motion for declaratory judgment, a motion to stay

8

proceedings pending adjudication of his motions, and had requested "essentially all of the discovery" in the case). Mr. Pines suggests that if allowed to intervene he would "subpoena any and all emails by and among counsel to find out what they have said and what has happened," and acknowledges that "[i]t is difficult for Pines to determine what amount of excess costs and expenses he will incur." Pines Mot. at 13. He also suggests that he "intend[s] to object to any settlement and [counsel] might be wasting time and energy trying to settle until after the court heard the motion to decertify." Pines Decl. ¶ 52.

Given the advanced posture of this case, the nature of the intervention that Mr. Pines states that he intends to pursue, and the fact that Mr. Pines has not established that he is inadequately represented, the Court concludes that the "balance between keeping class litigation manageable and allowing affected parties to be adequately heard," In re Lorazepam, 205 F.R.D. at 367, weighs against intervention. The Court therefore will deny Mr. Pines's request.

### C. Modification of Class Certification Order, Sanctions, and Other Relief

Because the Court concludes that Mr. Pines may not intervene in this case, it will deny as moot his requests to modify the class certification order and for sanctions.

Mr. Pines also submitted via email to the Clerk's Office a Motion for Pretrial Conference and to Appoint a Special Master, an Application to Proceed in District Court Without Prepaying Fees or Costs, and an Emergency Motion for Order to Reactivate PACER Account [Dkt. No. 125], which the Court granted leave to be filed on the docket. Because the Court denies Mr. Pines's motion to intervene, and Mr. Pines therefore is not a party to this case, it also denies as moot the motion for pretrial conference and to appoint a special master, and the motion to reactivate PACER account.

Appx0458

The Court will grant Mr. Pines's application to proceed without prepaying costs and will direct the Clerk's Office to file that application on the docket. That application would not be moot if Mr. Pines seeks to appeal this order. In addition, the Court finds that Mr. Pines has shown that he is unable to pay the filing fees in the court of appeals. See 28 U.S.C. § 1915(a)(1).

III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Mr. Pines's pro se Motion for Intervention and for Leave to File Complaint in Intervention, Motion to Modify Class Certification Order, and for Sanctions [Dkt. No. 116] is DENIED; it is

FURTHER ORDERED that Mr. Pines's Motion for Pretrial Conference and to Appoint a Special Master is DENIED as moot; it is

FURTHER ORDERED that Mr. Pines's Emergency Motion for Order to Reactivate PACER Account [Dkt. No. 125] is DENIED as moot; and it is

FURTHER ORDERED that Mr. Pines's Application to Proceed in District Court Without Prepaying Fees or Costs is GRANTED and the Clerk of the Court is directed to file that application on the docket in this case.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE: 11/16/21

Michael T. Pines
12303 Harbour Pointe Blvd.
#N-203
Mukilteo, WA  98275
619-771-5302
magicalmichael100@gmail.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, et. al.<br><br>Plaintiffs<br><br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant | Case No.  1:16-cv-00745-PLF<br><br><br><br>**NOTICE OF APPEAL** |

Michael  T. Pines appeals to the United States Court of Appeals for the District of

Columbia from the order denying the Motions to Intervene and For Leave To File A Complaint In

Intervention, Motion to Modify Class Certification Order, and for Sanctions entered on

November 16, 2021.



Dated:  December 16, 2021                          /s/ Michael T. Pines

**1**

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 21-5291                                                September Term, 2022

1:16-cv-00745-PLF

Filed On: November 14, 2022 [1973453]

National Veterans Legal Services Program,
et al.,

        Appellees

    v.

United States of America,

        Appellee

Michael T. Pines,

        Appellant

## **M A N D A T E**

    In accordance with the order of September 28, 2022, and pursuant to Federal Rule of Appellate Procedure 41, this constitutes the formal mandate of this court.

                      **FOR THE COURT:**
                      Mark J. Langer, Clerk

            BY:   /s/
                      Daniel J. Reidy
                      Deputy Clerk

Link to the order filed September 28, 2022

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-5291**                                  **September Term, 2022**

1:16-cv-00745-PLF

**Filed On: September 28, 2022** [1966506]

National Veterans Legal Services Program,
et al.,

        Appellees

    v.

United States of America,

        Appellee

Michael T. Pines,

        Appellant

**O R D E R**

By order filed July 22, 2022, appellant was directed to file their initial submissions by August 22, 2022. To date, no initial submissions have been received from appellant. Upon consideration of the foregoing, it is

**ORDERED** that this case be dismissed for lack of prosecution. See D.C. Cir. Rule 38.

The Clerk is directed to issue the mandate in this case by November 14, 2022.

                        **FOR THE COURT:**
                        Mark J. Langer, Clerk

            BY:   /s/
                  Laura M. Morgan
                  Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,

<div align="center"><em>Plaintiffs</em>,</div>

v.

UNITED STATES OF AMERICA,

<div align="center"><em>Defendant</em>.</div>

Case No. 16-745-PLF

## PLAINTIFFS' REVISED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

Deepak Gupta
Jonathan E. Taylor
GUPTA WESSLER PLLC
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
jon@guptawessler.com

William H. Narwold
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
bnarwold@motleyrice.com

Meghan S.B. Oliver
Charlotte E. Loper
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
moliver@motleyrice.com
cloper@motleyrice.com

*Counsel for Plaintiffs*
*National Veterans Legal Services Program,*
*National Consumer Law Center, Alliance for Justice, and the Class*

April 12, 2023

# TABLE OF CONTENTS

Table of authorities .......................................................................................................ii

Introduction ................................................................................................................. 1

Background .................................................................................................................. 4

    A.    Factual and procedural background ................................................................ 4

    B.    Mediation and settlement negotiations ......................................................... 8

    C.    Overview of the settlement agreement ......................................................... 9

Argument ................................................................................................................... 15

    I.    The Court should certify the settlement class. ........................................... 15

    II.    Because the settlement provides an exceptional recovery for the class, the Court should find that approval of the settlement is likely and direct that notice be provided to class members under Rule 23(e)(1). ...................................... 15

        A.    The class representatives and class counsel have vigorously represented the class throughout this litigation. ........................................... 17

        B.    The settlement is the product of informed, arm's-length negotiations. ........................................................................................ 18

        C.    The settlement relief provided to class members is exceptional— particularly given the costs, risks, and delays of further litigation .............. 18

        D.    The settlement agreement treats class members equitably relative to each other. ............................................................................ 20

        E.    The plaintiffs and class counsel support the settlement. ........................... 22

    III.    The notice and notice programs will provide class members the best notice practicable under the circumstances. ................................................................ 22

Conclusion .................................................................................................................. 23

i

# TABLE OF AUTHORITIES

**Cases**

*Abraha v. Colonial Parking, Inc.*,
2020 WL 4432250 (D.D.C. July 31, 2020) ................................................................. 23

*Aerolineas Argentinas v. United States*,
77 F.3d 1564 (Fed. Cir. 1996) ................................................................. 2

*Blackman v. District of Columbia*,
454 F. Supp. 2d 1 (D.D.C. 2006) ................................................................. 20, 21

*Cobell v. Salazar*,
679 F.3d 909 (D.C. Cir. 2012) ................................................................. 23

*Cohen v. Chilcott*,
522 F.Supp.2d 105 (D.D.C. 2007) ................................................................. 24

*In re Black Farmers Discrimination Litigation*,
953 F. Supp. 2d 82 (D.D.C. 2013) ................................................................. 22

*In re Domestic Airline Travel Antitrust Litigation*,
378 F. Supp. 3d 10 (D.D.C. 2019) ................................................................. 17, 18, 21

*Kinard v. E. Capitol Family Rental, L.P.*,
331 F.R.D. 206 (D.D.C. 2019) ................................................................. 20

*Mullane v. Central Hanover Bank Trust Co.*,
339 U.S. 306 (1950) ................................................................. 24

*National Veterans Legal Services Program v. United States*,
291 F. Supp. 3d 123 (D.D.C. 2018) ................................................................. 7

*Prince v. Aramark Corp.*,
257 F. Supp. 3d 20 (D.D.C. 2017) ................................................................. 24

*Radosti v. Envision EMI, LLC*,
717 F. Supp. 2d 37 (D.D.C. 2010) ................................................................. 20

*Radosti v. Envision EMI, LLC*,
760 F. Supp. 2d 73 (D.D.C. 2011) ................................................................. 23

*Richardson v. L'Oréal USA, Inc.*,
951 F. Supp. 2d 104 (D.D.C. 2013) ................................................................. 18

*Ross v. Lockheed Martin Corp.*,
267 F. Supp. 3d 174 (D.D.C. 2017) ................................................................. 16, 17

ii

*Stephens v. Farmers Restaurant Group,*
   329 F.R.D. 476 (D.D.C. 2019)...................................................................... 17, 18

*Trombley v. National City Bank,*
   759 F. Supp. 2d 20 (D.D.C. 2011) ...................................................................... 20

*United States v. MTU America Inc.,*
   105 F. Supp. 3d 60 (D.D.C. 2015) ...................................................................... 18

**Statutes**

5 U.S.C. § 701.................................................................................................................5

5 U.S.C. § 704.................................................................................................................5

28 U.S.C. § 1346(a) .......................................................................................................5

28 U.S.C. § 1913 note .................................................................................................. 4

**Rules**

Fed. R. Civ. P. 23 ...........................................................................................15, 16, 18, 22

Fed. R. Civ. P. 23, Advisory Committee Note, 2018 Amendments ................................. 16

**Other authorities**

Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019,
   https://perma.cc/LN5E-EBE9 ........................................................................... 3, 7

*Manual for Complex Litigation* § 21.632 (4th ed. updated 2022).................................15

*Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7 .............3

S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002) ........................................................ 4

William B. Rubenstein, *Newberg on Class Actions* § 13:1 (5th ed. updated 2022)....................................15

## INTRODUCTION

In the history of American litigation, this case is unique: a certified class action against the federal judiciary. The plaintiffs challenged the fees that the judiciary charges for access to records through its Public Access to Court Electronic Records system, or PACER. They sought to vindicate a single claim: that the judiciary violated the law by charging fees that exceeded the cost of providing the records. And they sought one form of relief: refunds.

After more than six years of hard-fought litigation, the plaintiffs have now secured a historic settlement under which the government must reimburse the vast majority of PACER users in full—100 cents on the dollar—for past PACER charges. The settlement creates a common fund of $125 million from which each class member will automatically be reimbursed up to $350 for any PACER fees paid between April 21, 2010, and May 31, 2018. Those who paid over $350 in fees during that period will receive their pro rata share of the remaining settlement funds. Any unclaimed funds after this initial distribution will be allocated evenly to all class members who collected their initial payment (subject to the caveat that no class member may receive more than the total fees that she paid). In addition to this remarkable monetary relief, the case has spurred the judiciary to eliminate fees for 75% of users going forward and prompted action in Congress to abolish the fees altogether.

By any measure, this litigation has been an extraordinary achievement—and even more so given the odds stacked against it. PACER fees have long been the subject of widespread criticism because they thwart equal access to justice and inhibit public understanding of the courts. But until this case was filed, litigation wasn't seen as a realistic path to reform. That was for three reasons. First, the judiciary has statutory authority to charge at least *some* fees, so litigation alone could never result in a free PACER system. Second, few lawyers experienced in complex federal litigation would be willing to sue the federal judiciary—and spend considerable time and resources challenging decisions made by the Judicial Conference of the United States—with little hope of

1

payment. Third, even if PACER fees could be shown to be excessive and qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. A lawsuit challenging PACER fees had been dismissed for lack of jurisdiction, and advocates had been unable for years to identify an alternative basis for jurisdiction, a cause of action, and a statutory waiver of sovereign immunity. So they devoted their efforts to other strategies: making some records freely available in a separate database, downloading records in bulk, and mounting public-information campaigns.

These efforts were important, but they didn't alter the PACER fee system. Despite public criticism—and despite being reproached in 2009 and 2010 by Senator Joe Lieberman, the sponsor of a 2002 law curtailing the judiciary's authority to charge fees—the Administrative Office of the U.S. Courts did not reduce PACER fees. To the contrary, the AO *increased* fees in 2012.

There things stood until 2016, when three nonprofits filed this suit under the Little Tucker Act, a post-Civil-War-era statute that "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because the Act provides jurisdiction only for claims seeking money for past overpayments, the plaintiffs could not demand that the judiciary lower PACER fees going forward. They could seek only retroactive monetary relief.

Even with this limitation, this lawsuit has been a resounding success at every step. The plaintiffs defeated a motion to dismiss and obtained certification of a nationwide class by early 2017. Through discovery, they were then able to shine a light on how the AO had used the fees. Many things funded by the fees—such as flat screens for jurors—had nothing to do with PACER. This discovery in turn led to an unprecedented decision: In March 2018, this Court held that the AO had violated the law by using PACER fees to fund certain activities. Within months, the judiciary announced that these activities would "no longer be funded" with PACER fees. Gupta Decl. ¶ 18.

Success continued on appeal. In the Federal Circuit, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups, and the sponsor of the 2002 law"—all detailing the harms of high PACER fees. *See* Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019, https://perma.cc/LN5E-EBE9. Media outlets published editorials championing the lawsuit. *See, e.g.*, *Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7. And before long, the AO announced that it was doubling the quarterly fee waiver for PACER, eliminating fees for approximately 75% of PACER users. Gupta Decl. ¶ 20. Then the plaintiffs secured a landmark Federal Circuit opinion unanimously affirming this Court's decision. *NVLSP v. United States*, 968 F.3d 1340 (Fed. Cir. 2020).

The litigation sparked widespread public interest in the need to reform PACER fees and jumpstarted legislative action that continues to this day. Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support recently advanced out of the Senate Judiciary Committee. Gupta Decl. ¶ 22. The Judicial Conference, too, now supports legislation providing for free PACER access to noncommercial users. *Id.* Were Congress to enact such legislation into law, it would produce an outcome that the plaintiffs had no way of achieving through litigation alone.

As for fees already paid—the claims at issue here—they will be refunded. Under the settlement, the average PACER user will be fully reimbursed for all PACER fees paid during the class period. And class members will not need to submit a claim to be paid.

This is an extraordinarily favorable result for the class, and it easily satisfies Rule 23(e)(2)'s criteria. As we will explain, the plaintiffs ask the Court to enter an order (1) finding that settlement approval is likely and certifying the expanded settlement class, (2) approving the revised notice plan and directing that notice be provided, and (3) scheduling a hearing to consider final approval and a forthcoming request for fees, costs, and service awards for the class representatives.

3

# BACKGROUND

**A.     Factual and procedural background**

**1.     The legal framework for PACER fees**

By statute, the judiciary has long had authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then $.07 per page) were "higher than the marginal cost of disseminating the information," creating excess fee revenue that the judiciary had begun using to fund other projects. S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.*

To this end, Congress passed the E-Government Act of 2002, which amended the statute by adding the words "only to the extent necessary." 28 U.S.C. § 1913 note. Despite this limitation, the AO twice increased PACER fees in the years after the E-Government Act's passage—first to $.08 per page, and then to $.10 per page—during a time when the costs of electronic data storage plunged exponentially. Gupta Decl. ¶ 4. This widening disparity prompted the Act's sponsor, Senator Lieberman, to reproach the AO for charging fees that were "well higher than the cost of dissemination," "against the requirement of the E-Government Act." ECF Nos. 52-8 & 52-9.

Excessive PACER fees have inflicted harms on litigants and the public alike. Whereas the impact of excess fees on the judiciary's $7-billion annual budget is slight, these harms are anything but: High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts. And the AO had further compounded the harmful effects of high fees in recent years by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

4

## 2. District court proceedings

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this lawsuit. From the start, the plaintiffs were represented by an expert team drawn from the law firms of Gupta Wessler PLLC, a litigation boutique with experience bringing complex cases against the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. The plaintiffs asked the Court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges—the only relief available to them under the Little Tucker Act. *See* 28 U.S.C. § 1346(a). Because the judiciary is not subject to the APA, 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek injunctive relief requiring the AO to lower PACER fees in the future.

This Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF No. 24 & 25. A month later, in January 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid PACER fees between April 21, 2010 and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' illegal-exaction Little Tucker Act claim for classwide treatment and appointed Gupta Wessler and Motley Rice as co-lead class counsel. *Id.*

The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (or KCC) as claims administrator. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, only about 1,100 opted out of the class. Gupta Decl. ¶ 14.

Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only what the judiciary labeled as "Public Access Services," but also "Case Management/Electronic Case Files System" (or CM/ECF); "Electronic Bankruptcy Notification"; "Communications Infrastructure, Services,

5

and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi."

Based on this discovery, the parties filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to disseminating information through electronic means.

In March 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [PACER] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

In the months that followed, the AO took steps "to implement the district court's ruling" and "reduce potential future legal exposure." Gupta Decl. ¶ 18. It announced in July 2018 that these four categories would "no longer be funded" with PACER fees. *Id.* "The Judiciary will instead seek appropriated funds for those categories," as it does for over 98% of its budget. *Id.* A year later, the AO announced that it was doubling the quarterly fee waiver for PACER—from $15 to $30—which had the effect of eliminating PACER fees for approximately 75% of PACER users. *Id.* ¶ 20.

6

### 3.    Appellate proceedings

Both parties sought permission for an interlocutory appeal from this Court's decision, and the Federal Circuit accepted both appeals. The parties adhered to their same interpretations of the statute on appeal. The plaintiffs' position was supported by a broad array of amici curiae—a group of prominent retired federal judges, Senator Lieberman, media organizations, legal-technology firms, and civil-liberties groups from across the ideological spectrum—detailing the harms caused by high PACER fees. *See* Liptak, *Attacking a Pay Wall that Hides Public Court Filings*. In response, the government defended the full amount of PACER fees, while strenuously arguing that the court lacked jurisdiction under the Little Tucker Act.

The Federal Circuit rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP*, 968 F.3d at 1350. It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (those not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was a "potential source of liability" because the court could not confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The Federal Circuit left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

Following the Federal Circuit's decision, federal lawmakers swung into action. The House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support recently advanced out of the Senate Judiciary Committee. Gupta Decl. ¶ 22.

## B.     Mediation and settlement negotiations

On remand, the case was reassigned to Judge Friedman, and the parties came together to discuss the path forward. They understood that litigating the case to trial would entail significant uncertainty and delay. *Id.* ¶ 23. Years of protracted litigation lay ahead. And the range of potential outcomes was enormous: On one side, the government argued that it owed zero damages because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower (a litigating position that also made it difficult for the judiciary to lower fees while the case remained pending). *Id.* On the other side, the plaintiffs maintained that liability had been established for four categories of expenses and that some portion of the CM/ECF expenditures were likely improper as well. *Id.*

Hoping to bridge this divide and avoid a lengthy delay, the parties were able to agree on certain structural aspects of a potential settlement and then agreed to engage in mediation on the amount and details. *Id.* ¶ 24. On December 29, 2020, at the parties' request, this Court stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation. *Id.*

Over the next few months, the parties exchanged information and substantive memoranda, which provided a comprehensive view of the strengths and weaknesses of the case. *Id.* ¶ 25. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, an experienced and accomplished mediator agreed upon by the parties. *Id.*

With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. *Id.* ¶ 26. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-made settlement, and the plaintiffs' agreed to consider the government's final offer concerning the total amount of that fund. *Id.* But by the time the session ended, the parties still hadn't agreed on the total amount of the common fund or other important terms—including how the money would

8

be distributed, what to do with any unclaimed funds after the initial distribution, and the scope of the release. *Id.* ¶ 27 Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were ultimately able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. *Id.* The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed. *Id.*

Further progress was slow, and at times the parties reached potentially insurmountable impasses. *Id.* ¶ 28. But over a period of many months, they were able to resolve their differences and reach an agreement, the final version of which was executed on July 27, 2022. *Id.* ¶ 28; Gupta Decl. Ex. A ("Agreement"). The parties executed a supplemental agreement in September 2022 making certain technical modifications to the agreement. Gupta Decl. Ex. B ("Supp. Agreement"). The parties executed a second supplemental agreement in April 2023, allowing for additional time that the administrator may need for distribution. Gupta Decl. Ex. C ("Second Supp. Agreement").

## C.     Overview of the settlement agreement

### 1.     The settlement class

As clarified by the supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the Class Period"), excluding opt-outs, federal agencies, and class counsel. Agreement ¶ 3; Supp. Agreement. The Class Period does not go beyond May 31, 2018 because the AO stopped using PACER fees to fund the four categories of prohibited expenses after this date.

This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Agreement ¶ 4. Because this second group of people are not part of the original class, they did not

9

receive notice or a right to opt out when the original class was certified. For that reason, under the settlement, these additional class members will receive notice and an opportunity to opt out. *Id.*

### 2.    The settlement relief

The settlement provides for a total common-fund payment by the United States of $125 million, which covers the monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11.

Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust. *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16.

### 3.    The released claims

In exchange for the relief provided by the settlement, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the Class Period. *Id.* ¶ 13. This release does not cover any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.), the only other pending PACER-fee related lawsuit of which the AO is aware. Agreement ¶ 13. The amount of settlement funds disbursed to any class member in this case, however, will be deducted from any recovery that the class member may receive in *Fisher*. *Id.*[1]

### 4.    Notice to settlement class

Within 30 days of an order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, whichever is later), KCC will provide

---

[1] The individual plaintiff in *Fisher* alleges that PACER, in violation of its own terms and conditions, overcharges its users due to a systemic billing error concerning the display of some HTML docket sheets—an issue not raised in this case. The case did not challenge the PACER fee schedule itself, and it is not a certified class action.

notice via publication and email to all class members for whom the AO has an email address on file. *Id.* ¶ 29; Gupta Decl. Ex. D, Revised Proposed Notice Plan ("Proposed Notice Plan") ¶¶ 2-3. Within 45 days of the order approving settlement notice, KCC will send postcard notice via U.S. mail to all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Agreement ¶ 29; Proposed Notice Plan ¶ 6. KCC will also provide the relevant case documents on a website it has maintained that is dedicated to the settlement (www.pacerfeesclassaction.com). Agreement ¶ 29; Proposed Notice Plan ¶ 4. The notice will include information on how accountholders can notify KCC that an entity paid PACER fees on their behalf; information on how payers can notify KCC that they paid PACER fees on an accountholder's behalf; an explanation of the procedures for allocating and distributing the trust funds; the date upon which the Court will hold a fairness hearing under Rule 23(e); and the date by which class members must file their written objections, if any, to the settlement. Agreement ¶ 29; Proposed Notice Plan at 2.

### 5. Opt-out rights for the April 22, 2016 to May 31, 2018 class members

The notice sent to the additional class members—those who paid fees only between April 22, 2016 and May 31, 2018, and thus are not part of the class already certified—will also inform them of their right to opt out and the procedures through which they may exercise that right. Proposed Notice Plan ¶ 7. The opt-out period for these additional class members will be 90 days. *Id.*

### 6. Allocation and payment

Under the settlement, class members will not have to submit a claim to receive their payment. Agreement ¶ 16. Instead, KCC will use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.*

The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18. KCC

11

will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to at least $100 million.

**First distribution.** KCC will distribute the Remaining Amount to class members using the following formula: It will first allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the Class Period. *Id.* ¶ 19. Next, KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* KCC will then deduct this Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the Class Period. *Id.*

Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the Class Period will receive a payment equal to the total amount of PACER fees paid by that class member during the Class Period; and (b) each class member who paid more than $350 in PACER fees during the Class Period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

KCC will complete disbursement of each class member's share of the recovery within 180 days of receiving the $125 million from the United States, or within 180 days of receiving the necessary information from AO, whichever is later. Second. Supp. Agreement ¶ 21. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates,

and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. Agreement ¶ 22.

 **Second distribution.** If, despite these efforts, unclaimed or undistributed funds remain in the settlement trust 180 days after KCC has made the distribution described in paragraph 21 of the Second Supplemental Agreement, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. Second Supp. Agreement ¶ 23. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the Class Period and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the Class Period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. *Id.* Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. Agreement ¶ 24. If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

### 7. Service awards, attorneys' fees, and costs

 The plaintiffs intend to apply to this Court for a service award of up to $10,000 per class representative and for an award of attorneys' fees and expenses. *Id.* ¶ 28. The total amount

requested in service awards, fees, and expenses will not exceed 20% of the total common fund. *Id.* Approval of the settlement is not contingent on the Court granting these requests, and any amounts awarded by the Court will be paid out of the common fund. *Id.* As required by Rule 23(h), Class Members will receive notice of the motion for attorneys' fees and a right to object. *Id.*

### 8. Further settlement-related proceedings

Any class member may express her views to the Court supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Agreement ¶ 30. Counsel for the parties may respond to any objection within 21 days of receiving the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32; Proposed Notice Plan ¶ 8.

After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing, during which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Agreement ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.* The parties will request that the Court schedule the fairness hearing no later than 150 days after entry of the Court's order approving settlement notice to the class. *Id.*

Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, along with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41) and the February 2, 2023 stipulated supplemental protective order entered by this Court (ECF No. 146). After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

# ARGUMENT

## I. The Court should certify the settlement class.

The settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010 and May 31, 2018, excluding opt-outs, federal agencies, and class counsel. *Id.* ¶ 3 & Supp. Agreement. The vast majority of this class—anyone who paid PACER fees between April 21, 2010 and April 21, 2016—are members of the class certified by this Court in 2017. ECF No. 32. These class members have already received notice of the litigation and an opportunity to opt out.

A small subset of the class, however, has not. Settlement class members who paid PACER fees between April 22, 2016 and May 18, 2018, but not at any point in the six years prior, were not part of the original class certified by this Court. So they have not yet received notice or a chance to opt out. The plaintiffs therefore request that this Court certify, for settlement purposes only, an additional class that encompasses everyone who falls under this definition. This class meets the requirements of Rule 23(a) and 23(b)(3) for the same reasons as the original class. *See* ECF No. 33.

## II. Because the settlement provides an exceptional recovery for the class, the Court should find that approval of the settlement is likely and direct that notice be provided to class members under Rule 23(e)(1).

Rule 23(e) requires court approval of a class-action settlement. This entails a "three-stage process, involving two separate hearings." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 189–90 (D.D.C. 2017) (cleaned up). Before the Court may approve a class-action settlement, it "must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(e)(2), in turn, requires that the settlement be "fair, reasonable, and adequate."

The first stage, then, is for the Court to "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms," *Ross*, 267 F. Supp. 3d at 194—a process

often referred to as preliminary approval. *See Manual for Complex Litig.* § 21.632 (4th ed. updated 2022). If the Court preliminarily approves the settlement, the next stage is to direct that notice be "sent to the class describing the terms of the proposed settlement and explaining class members' options with respect to the settlement agreement . . . including the right to object to the proposed settlement." *Ross*, 267 F. Supp. 3d at 190; *see* William B. Rubenstein, *Newberg on Class Actions* § 13:1 (5th ed. updated 2022). The final stage involves a fairness hearing during which the Court examines the settlement and any objections to it, followed by a decision on whether to approve the settlement. *Id.*

This case is at the preliminary-approval stage. "Whether to preliminarily approve a proposed class action settlement lies within the sound discretion of the district court." *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 482 (D.D.C. 2019). That discretion, however, "is constrained by the principle of preference favoring and encouraging settlement in appropriate cases." *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 16 (D.D.C. 2019); *see also id.* ("Class action settlements are favored as a matter of public policy."); *United States v. MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015) ("Settlement is highly favored."). When a case settles early in the litigation, before any class has been certified, "the agreement requires closer judicial scrutiny than settlements that are reached after class certification." *Stephens*, 329 F.R.D. at 482 (cleaned up). But where, as here, a class has already been certified and the settlement follows years of hard-fought litigation, "[c]ourts will generally grant preliminary approval of a class action settlement if it appears to fall within the range of possible approval and does not disclose grounds to doubt its fairness or other obvious deficiencies." *Id.*; *see Richardson v. L'Oréal USA, Inc.*, 951 F. Supp. 2d 104, 106 (D.D.C. 2013).

The criteria guiding the preliminary-approval determination are supplied by Rule 23(e)(2), which requires consideration of whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

provided for the class is adequate"; and "(D) the proposal treats class members equitably relative to each other." In considering these factors, the Court will also look to "the opinion of experienced counsel." *Stephens*, 329 F.R.D. at 486; *see also* Fed. R. Civ. P. 23, Advisory Committee Note, 2018 Amendments (observing that the Rule's enumerated factors were not intended to "to displace any factor" rooted in the case law). Each of these factors strongly supports preliminary approval here.

### A. The class representatives and class counsel have vigorously represented the class throughout this litigation.

The first factor examines the adequacy of representation. In certifying the class in January 2017, this Court found that the three named plaintiffs are "particularly good class representatives" and that "[t]here is no dispute about the competency of class counsel"—Gupta Wessler, a litigation boutique with deep (and rare) experience in complex cases seeking monetary relief against the federal government, and Motley Rice, one of the nation's leading class-action firms. ECF No. 33 at 14–16.

That is no less true today. Since this Court's finding of adequate representation, the named plaintiffs and class counsel have spent nearly six years vigorously representing the class. They did so first in this Court, obtaining informal discovery from the judiciary that paved the way for an unprecedented decision concluding that the AO had violated the law with respect to PACER fees. They continued to do so on appeal, attracting a remarkable set of amicus briefs and favorable press coverage, and ultimately securing a landmark Federal Circuit opinion affirming this Court's decision and rejecting arguments made by the Appellate Staff of the U.S. Department of Justice's Civil Division. And they did so finally in mediation, spending months negotiating the best possible settlement for the class. In short, the representation here is not just adequate, but exemplary.

**B.      The settlement is the product of informed, arm's-length negotiations.**

The next factor examines the negotiation process. It asks whether the negotiations were made at arm's length or whether there is instead some indication that the settlement could have been the product of collusion between the parties.

Here, "both sides negotiated at arms-length and in good faith," and "the interests of the class members were adequately and zealously represented in the negotiations." *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 9 (D.D.C. 2006) (Friedman, J.). The plaintiffs were represented by class counsel, while lawyers at the Department of Justice and the AO appeared for the government. "Although the mediation occurred before formal fact discovery began," there had been "significant informal discovery," which ensured that "the parties were well-positioned to mediate their claims." *Radosti v. Envision EMI, LLC*, 717 F.Supp.2d 37, 56 (D.D.C. 2010); *see also Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 26 (D.D.C. 2011) (explaining that "formal discovery is not . . . required even for final approval of a proposed settlement" if "significant factual investigation [had been] made prior to negotiating a settlement"). "[T]he parties reached a settlement only after a lengthy mediation session that was presided over by an experienced mediator," *Radosti*, 717 F.Supp.2d at 56, and the settlement was approved by DOJ leadership and the judiciary's administrative body. Even in the ordinary case, where a settlement is "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery," without government involvement, there is a "presumption of fairness, adequacy, and reasonableness." *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019). The presumption here is at least as strong.

**C.      The settlement relief provided to class members is exceptional—particularly given the costs, risks, and delays of further litigation.**

The third and "most important factor" examines "how the relief secured by the settlement compares to the class members' likely recovery had the case gone to trial." *Blackman*, 454 F. Supp.

18

2d at 9–10. This factor focuses in particular on "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2); *see also In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d at 16.

The relief provided to class members is remarkable. The total value of the settlement is $125 million, and every class member will be fully reimbursed, up to $350, for all PACER fees that they paid during the Class Period. Those who paid more than $350 in fees during the Class Period will receive a payment of $350 plus their pro rata share of the remaining settlement funds. Further, any unclaimed funds after this initial distribution will be allocated evenly to all class members who collected their initial payment (capped at the total amount of fees that each class member paid during the Class Period). Because most class members paid less than $350 during the Class Period, the average class member will receive a full refund of all fees paid. This relief will also be provided in a highly efficient manner—through a common-fund settlement in which class members will not have to submit any claim or make any attestation to receive payment. Agreement ¶ 16.

This would be an excellent outcome for the class even if it were achieved after trial, but it is especially good given the significant costs, risks, and delays posed by pursuing further litigation against the federal court system. The $125 million common fund represents nearly 70% of the total expenditures determined by the Federal Circuit to have been unlawfully funded with PACER fees during the Class Period. Without a settlement, the case would be headed for years of litigation and likely another appeal, with no guarantee that the class would wind up with any recovery given the government's remaining argument against liability (that the plaintiffs could not prove that PACER fees would have been lower—or by how much—but for the unlawful expenditures). Although the plaintiffs and class counsel believe that the government's argument is incorrect (and further, that

19

the AO should be liable for some portion of the CM/ECF expenses), the uncertainty and complete lack of case law on this issue counsel in favor of compromise. Add to that the benefits provided by avoiding protracted litigation and time-and-resource-intensive discovery into the remaining issues, and this is a superb recovery for the class.

The settlement's provision for attorneys' fees and service awards is also reasonable. The settlement provides that the total amount requested in service awards, administrative costs, and attorneys' fees will be no more than 20% of the aggregate amount of the common fund; and that "the Court will ultimately determine whether the amounts requested are reasonable." *Id.* ¶¶ 18, 28. The settlement further provides that the plaintiffs will request service awards of no more than $10,000 per class representative. *Id.* ¶ 28.

This Court will have the opportunity to assess the reasonableness of any requested award once it is made. For now, it is enough to note that these provisions ensure that class counsel will request an amount in fees that is reasonable relative to the relief they obtained for the class. *See In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98 (D.D.C. 2013) (Friedman, J.) ("[A] majority of common fund class action fee awards fall between twenty and thirty percent," and "even in megafund cases involving recoveries of $100 million or more, fees of fifteen percent are common.").

### D.   The settlement agreement treats class members equitably relative to each other.

The fourth factor examines whether the settlement treats class members equitably vis-à-vis one other. The settlement here does so. It reimburses every class member for up to $350 in fees paid during the Class Period and distributes the remaining funds in a way that is proportional to the overcharges paid by each class member. This formula for calculating payments is reasonable under the circumstances of this case. It advances the AO's longstanding policy goal of expanding public access for the average PACER user and, in doing so, approximates how the AO likely would

have chosen to reduce PACER fees during the Class Period had it been acting under a proper understanding of the law. Indeed, following this Court's summary-judgment decision, the AO doubled the size of the quarterly fee waiver, from $15 to $30. Gupta Decl. ¶ 20. Had it done the same over the Class Period, the total fee waiver available to all PACER users would have increased by $480. Reimbursing every PACER user for up to $350 in fees paid, with pro rata distributions to any users who paid more than that amount, is therefore fully in keeping with the AO's fee policy and a reasonable allocation of damages. The minimum payments also make it likelier that class members will collect their payments, thereby maximizing recovery to the class.

In addition, the settlement is equitable in allowing the class representatives to seek service awards of up to $10,000, while recognizing that this Court has discretion to award a smaller amount (or no award at all). *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012); *Abraha v. Colonial Parking, Inc.*, 2020 WL 4432250, at *6 (D.D.C. July 31, 2020) (preliminarily approving settlement where "all parties will receive payments according to the same distribution plan and formulas, except for a relatively small additional payment" of $15,000 per named plaintiff "to compensate them for their time and effort in this litigation"). Service awards "are not uncommon in common-fund-type class actions and are used to compensate plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011). The three nonprofits that prosecuted this case have been actively engaged in the litigation for more than six years—preparing declarations, receiving case updates, spending countless hours reviewing drafts and giving substantive feedback, and weighing in throughout the negotiation process, helping to produce a better outcome for all class members. Given their extraordinary contributions, it would be inequitable *not* to compensate them for their service.

### E.   The plaintiffs and class counsel support the settlement.

The final relevant factor is not enumerated in the text of Rule 23, but it is well-settled in the case law. Under this Court's cases, "the opinion of experienced and informed counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *Prince v. Aramark Corp.*, 257 F. Supp. 3d 20, 26 (D.D.C. 2017). Counsel for both parties "are clearly of the opinion that the settlement in this action is fair, adequate, and reasonable," which only further confirms its reasonableness. *Cohen v. Chilcott*, 522 F.Supp.2d 105, 121 (D.D.C. 2007).

### III.   The notice and notice programs will provide class members the best notice practicable under the circumstances.

Due process requires that notice to class members be "reasonably calculated, under all the circumstances, to apprise [them] of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank Tr. Co.*, 339 U.S. 306, 314 (1950). Rule 23(e)(1) similarly requires that notice be directed in a "reasonable manner to all class members who would be bound by the proposal." The proposed notice meets these requirements. It describes the lawsuit in plain English, including the key terms of the settlement, the procedures for objecting to it, and the date of the fairness hearing. Agreement ¶ 29. The notice sent to the additional class members— those who paid fees only between April 22, 2016 and May 31, 2018—will also inform them of their right to opt out and the procedures through which they may exercise that right. Proposed Notice Plan ¶ 7. Further, the notices will be distributed in a way that is designed to reach all class members: publication notice in the electronic newsletters of American Bankers Association, *Banking Journal*, *The Slant*, and a press release distributed via Cision PR Newswire; email notice to all class members for whom the AO has an email address on file; and postcard notice to all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Agreement

¶ 29; Proposed Notice Plan ¶¶ 2, 3, 6. Relevant case documents will also be available on the settlement website. Agreement ¶ 29; Proposed Notice Plan ¶ 4.

## CONCLUSION

This Court should grant the revised motion for preliminary approval and enter the proposed order.

Respectfully submitted,

*/s/ Deepak Gupta*
Deepak Gupta
Jonathan E. Taylor
GUPTA WESSLER PLLC
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*
*jon@guptawessler.com*

William H. Narwold
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
*bnarwold@motleyrice.com*

Meghan S.B. Oliver
Charlotte E. Loper
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
*moliver@motleyrice.com*
*cloper@motleyrice.com*

April 12, 2023

*Counsel for Plaintiffs National Veterans Legal Services*
*Program, National Consumer Law Center, Alliance for*
*Justice, and the Class*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2023, I electronically filed this motion for preliminary approval through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

<div align="right">

/s/ Deepak Gupta

Deepak Gupta

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL SERVICES
PROGRAM, NATIONAL CONSUMER
LAW CENTER, and ALLIANCE FOR
JUSTICE, for themselves and all others
similarly situated,

                *Plaintiffs*,

    v.

UNITED STATES OF AMERICA,
                *Defendant*.

Case No. 1:16-cv-00745-PLF

## [PROPOSED] ORDER GRANTING PLAINTIFFS' REVISED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

After considering Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement ("Plaintiffs' Motion"),

**IT IS HEREBY ORDERED THAT:**

1.      Plaintiffs' Motion is GRANTED.

2.      After a preliminary review, the Settlement appears to be fair, reasonable, and adequate. The Settlement: (a) resulted from arm's-length negotiations between experienced counsel overseen by an experienced mediator; (b) eliminates the risk, costs, delay, inconvenience, and uncertainty of continued litigation; (c) involves the previously certified Class of individuals and entities who paid PACER fees between April 21, 2010 and April 21, 2016, but also a proposed additional Settlement Class of individuals and entities who paid PACER fees between April 22, 2016 and May 31, 2018; (d) does not provide undue preferential treatment to Class Representatives or to segments of the Class; (e) does not provide excessive compensation to counsel for the Class;

1

and (f) is therefore sufficiently fair, reasonable, and adequate to warrant providing notice of the Settlement to the Class. Accordingly, the Court preliminarily approves the Settlement, subject to further consideration at the Settlement Hearing described below.

3.　A hearing (the "Settlement Hearing") shall be held before this Court on _____, at ___:___ __.m, 150 days from the date of this order, at the United States District Court for the District of Columbia, 333 Constitution Avenue N.W., Washington D.C. 20001 for the following purposes:

a.　to determine whether the Settlement is fair, reasonable, and adequate, and should be approved by the Court;
b.　to determine whether judgment should be entered, dismissing the Complaint on the merits and with prejudice;
c.　to consider the fee and expense application;
d.　to consider Class Members' objections to the Settlement, or the application for fees and expenses, if any;
e.　to rule upon such other matters as the Court may deem appropriate.

4.　The Court may adjourn the Settlement Hearing without further notice to the members of the Class, and reserves the right to approve the Settlement with such modifications as may be agreed upon or consented to by the parties and without further notice to the Class where to do so would not impair Class Members' rights in a manner inconsistent with Rule 23 and due process of law. The Court further reserves the right to enter its judgment approving the Settlement, and dismissing the Complaint on the merits and with prejudice regardless of whether it has approved the fee and expense application.

5.　The Court will consider comments or objections to the Settlement or the request for fees and expenses, only if such comments or objections and any supporting papers are submitted to the Court at least thirty days prior to the Settlement Hearing according to the

2

procedure described in the website notice. Attendance at the Settlement Hearing is not necessary, but any person wishing to be heard orally in opposition to the Settlement is required to indicate in their written objection whether they intend to appear at the Settlement Hearing.

6.      All opening briefs and documents in support of the Settlement and any fee and expense application, shall be filed no later than forty-five days before the Settlement Hearing. Replies to any objections shall be filed at least nine days prior to the Settlement Hearing.

7.      The revised Settlement Class satisfies Rule 23 and is certified for the same reasons set forth in the Court's prior class certification order. The Settlement Class is defined as:

> All persons or entities who paid PACER Fees
> between April 21, 2010 and May 31, 2018, excluding
> persons or entities that have already opted out,
> federal agencies, and Class Counsel.

8.      The notice documents advising the previously certified Class Members ("Initial Class Members") of the Settlement are hereby approved as to form and content. Exhibit 1 (2010-2016 email notice); Exhibit 3 (2010-2016 postcard notice).

9.      The notice documents advising the Additional Class Members of the Settlement and providing for opt-out rights are hereby approved as to form and content. Exhibit 2 (2016-2018 email notice); Exhibit 4 (2016-2018 postcard notice).

10.     The long-form website notice advising the Class Members of the Settlement and providing for opt-out rights for the Additional Class Members is hereby approved as to form and content. Exhibit 5.

11. The publication notice advising the Class Members of the Settlement and providing for opt-out rights for the Additional Class Members is hereby approved as to form and content. Exhibit 6.

12. The firm of KCC Class Action Services LLC ("KCC" or "Administrator") is appointed to supervise and administer the notice procedure.

13. To the extent they are not already produced, within fourteen days from the entry of this order, Defendant shall produce to Plaintiffs the names, postal addresses, email addresses, phone numbers, PACER-assigned account numbers, and firm name of all individuals or entities with a PACER account that paid PACER fees during the class period ("Notice Data"). For purposes of this paragraph, "individuals and entities" is defined as all PACER users except the following: (1) any user who, during the quarter billed, is on the master Department of Justice list for that billing quarter; (2) any user with an @uscourts.gov email address extension; or (3) any user whose PACER bill is sent to and whose email address extension is shared with a person or entity that received PACER bills for more than one account, provided that the shared email address extension is one of the following: @oig.hhs.gov, @sol.doi.gov, @state.gov, @bop.gov, @uspis.gov, @cbp.dhs.gov, @ussss.dhs.gov, @irscounsel.treas.gov, @dol.gov, @ci.irs.gov, @ice.dhs.gov, @ssa.gov, @psc.uscourts.gov, @sec.gov, @ic.fbi.gov, @irs.gov, and @usdoj.gov.[1]

14. Within thirty days from the later of (a) the date of this order, or (b) Plaintiffs' receipt of the Notice Data from Defendant, the Administrator shall provide the publication notice, in

---

[1] For example, accounting@dol.gov at 200 Constitution Avenue, NW, Washington, DC 20210 receives bills for johndoe1@dol.gov, johndoe2@dol.gov, and janedoe1@dol.gov. None of those email addresses (accounting@dol.gov, johndoe1@dol.gov, johndoe2@dol.gov, and janedoe1@dol.gov) would receive notice.

4

substantially the same form as Exhibit 6, to American Bankers Association ("ABA"), *Banking Journal, The Slant,* and Cision PR Newswire for publication.

15. Within thirty days from the later of (a) the date of this order, or (b) Plaintiffs' receipt of the Notice Data from Defendant, the Administrator shall cause the email notices to be disseminated, in substantially the same form as Exhibits 1 and 2, by sending them out via email to all Class Members. The Initial Class Members will be emailed Exhibit 1. The Additional Class Members will be emailed Exhibit 2. The email notices shall direct Class Members to a website maintained by the Administrator. The sender of the email shall appear to recipients as "PACER Fees Class Action Administrator," and the subject line of the email shall be "PACER Fees – Notice of Class Action Settlement."

16. Contemporaneous with the emailing of the notices and continuing through the date of the Settlement Hearing, the Administrator shall display on the internet website dedicated to this case, www.pacerfeesclassaction.com, the long-form notice in substantially the same form as Exhibit 5. The Administrator shall continue to maintain the website and respond to inquiries by Class Members as necessary. The website will include the printable Exclusion Request form, the online Exclusion Request form, Plaintiffs' Class Action Complaint, Defendant's Answer, the Order on the Motion for Class Certification, the Memorandum Opinion on the Motion for Class Certification, the District Court's summary judgment opinion, the Federal Circuit's summary judgment opinion, the Settlement Agreement, this order, and any other relevant documents. The website will include the ability for Class Members to check the status of their refund check if the Court grants final approval of the settlement and update their mailing address. The website will also allow accountholders to notify the Administrator that an entity paid PACER fees on their behalf, and

will allow payers to notify the Administrator that they paid PACER fees on an accountholder's behalf. These changes must be made on the website no later than 60 days after dissemination of email notice.

17.    Within thirty days from the entry of this order, the Administrator shall make available to Class Members telephone support to handle any inquiries from Class Members.

18.    Within forty-five days from the later of (a) the date of this order, or (b) Plaintiffs' receipt of the Notice Data from Defendant, the Administrator shall cause the postcard notices to be disseminated, in substantially the same form as Exhibits 3 and 4 by sending them out via U.S. mail to all Class Members: (1) without an email address; or (2) for whom email delivery was unsuccessful. The Initial Class Members will be mailed Exhibit 3. The Additional Class Members will be mailed Exhibit 4. The postcard notices will direct Class Members to the website maintained by the Administrator.

19.    Additional Class Members can ask to be excluded from the settlement by: (1) sending an Exclusion Request in the form of a letter; (2) completing and submitting the online Exclusion Request form; or (3) sending an Exclusion Request form by mail. Ninety days after the entry of this order, the opt-out period for the Additional Class Members will expire.

20.    Class Members can object to the Settlement or the request for fees and expenses by submitting their comments or objections and any supporting papers to the United States District Court for the District of Columbia according to the procedure described in the website notice. Such comments or objections must be submitted at least thirty days prior to the settlement hearing.

21.    The Court finds that the dissemination of the notice under the terms and in the forms provided for constitutes the best notice practicable under the circumstances, that it is due and

sufficient notice for all purposes to all persons entitled to such notice, and that it fully satisfies the

requirements of due process and all other applicable laws.

**IT IS SO ORDERED.**


_____                                   _____

Date                                              The Honorable Paul L. Friedman
                                                  Senior United States District Judge

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant*. | Case No. 16-745 |

## REVISED DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.  I am the founding principal of Gupta Wessler PLLC, one of the two law firms appointed as lead class counsel by this Court on January 24, 2017. *See* ECF Nos. 32 & 33. Along with my partner Jonathan E. Taylor and our co-counsel at Motley Rice LLC, I have represented the plaintiffs throughout this litigation. I submit this declaration in support of the plaintiffs' revised motion for preliminary approval of a class-action settlement in this case. The declaration is accompanied by five exhibits: (1) a copy of the executed settlement agreement (Exhibit A); (2) a copy of the executed supplemental agreement (Exhibit B); (3) a copy of the executed second amendment to the settlement agreement (Exhibit C); (4) a revised proposed notice plan (Exhibit D); and (5) a supplemental declaration by KCC Class Action Services, the claims administrator (Exhibit E).

### *Background on PACER Fees*

2.  The Administrative Office of the U.S. Courts (AO) requires people to pay fees to access records through its Public Access to Court Electronic Records system, commonly known as

PACER. This lawsuit was brought to challenge the lawfulness of those fees for one reason: the fees far exceed the cost of providing the records.

3.      By statute, the federal judiciary has long had the authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then set at $.07 per page) were "higher than the marginal cost of disseminating the information." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, Congress passed the E-Government Act of 2002, which amended the statute by authorizing fees "only to the extent necessary." 28 U.S.C. § 1913 note.

4.      Despite this statutory limitation designed to *reduce* PACER fees, the AO twice *increased* PACER fees in the years after the E-Government Act's passage—first to $.08 per page and then to $.10 per page. And it did so over a period when the costs of electronic data storage plunged exponentially.

5.      The result has been a widely unpopular PACER fee regime that has hindered equal access to justice, imposed serious barriers for low-income and *pro se* litigants, discouraged academic research and journalism, and thus inhibited public understanding of the courts. And the AO has further compounded those harms by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

6.       I first became aware of the practical problems and dubious legality of PACER fees, and first considered whether litigation could be brought to address the issue, when I was a staff attorney at the nonprofit Public Citizen Litigation Group between 2005 and 2011. Government transparency was among the group's specialties, and I followed the efforts of Carl Malamud of

Public.Resource.org, who led a sustained campaign to draw public attention to PACER fees and persuade the AO to make PACER free.

7.     Until this case was filed, litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime, for at least three main reasons. First, the judiciary has statutory authority to charge at least *some* amount in fees, so litigation alone could never result in a free PACER system—the ultimate goal of reformers. Second, few practicing litigators, let alone those who specialize in complex federal litigation, were likely to be eager to sue the federal judiciary and challenge policy decisions made by the Judicial Conference of the United States. They were even less likely to commit considerable time and resources to litigation when the prospect of recovery was so uncertain. Third, even if PACER fees could be shown to be excessive and even if qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. And advocates were unable to identify an alternative basis for jurisdiction, a cause of action, and a waiver of sovereign immunity to challenge PACER fees in court.

8.     I am aware of only one previous lawsuit directly challenging the PACER fee schedule; that suit was dismissed for lack of jurisdiction. *See Greenspan v. Administrative Office*, No. 14-cv-2396 (N.D. Cal.). I am also aware of one previous effort to challenge the AO's policy on fee waivers, which also foundered on jurisdiction. In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Public Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identify situations requiring their recusal,'" and they "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes

accompanying the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media." *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

9. With litigation seemingly unavailable as a pathway, advocates for PACER reform had largely devoted their efforts to grassroots and technological strategies: making certain records available in an online database that could be accessed for free, downloading records in bulk, or mounting public-information campaigns to expand access. At one point, for example, when the judiciary initiated a free trial of PACER at several libraries, Carl Malamud encouraged activists "to push the court records system into the 21st century by simply grabbing enormous chunks of the database and giving the documents away." John Schwartz, *An Effort to Upgrade a Court Archive System to Free and Easy*, N.Y. Times, Feb. 12, 2009. An enterprising 22-year-old activist named Aaron Swartz managed to download millions of documents before the AO responded by pulling the plug on the free trial and calling in the FBI to investigate Swartz. *Id.* This heavy-handed response was seen by many as motivated by a desire to protect fee revenue at the expense of public access. Today, the Free Law Project and the Center for Information Technology Policy at Princeton University operate a searchable collection of millions of PACER documents and dockets that were gathered using their RECAP software, which allows users to share the records they download.

10. These efforts have been important in raising public awareness, and ameliorating the effects of PACER fees, but they have not eliminated or reduced the fees themselves. To the contrary, the fees have only continued on their seemingly inexorable—and indefensible—rise.

### *Overview of this Litigation*

11. Then came this case. On April 21, 2016, three nonprofit organizations filed this lawsuit, asking this Court to declare that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges during the limitations period. They sued under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides

jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because that Act provides jurisdiction only for claims seeking monetary relief based on past overcharges, and because the judiciary is not subject to the APA, *see* 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek any injunctive relief or other relief requiring the judiciary to lower PACER fees going forward. They therefore limited their requested relief to retroactive monetary relief.

12.      From the start, the plaintiffs were represented by a team of lawyers at our firm, Gupta Wessler PLLC, a litigation boutique with experience bringing complex cases involving the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. By the time our firms filed this lawsuit together (as further detailed in my declaration in support of class certification, ECF No. 8-1), we were able to draw from a considerable body of collective experience successfully bringing class actions for monetary relief against the federal government—a relatively rare form of litigation. Among other things, I had successfully represented (along with my colleague Mr. Taylor) a nationwide certified class of all of the nation's federal bankruptcy judges and their surviving spouses, estates, and beneficiaries, resulting in a judgment against the United States for $56 million in illegally withheld judicial pay and benefits. While still at Public Citizen, I had successfully represented a nationwide class of veterans challenging the Army Air Force Exchange Service's withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering $7.4 million in illegal charges. And, together with Motley Rice, we were already representing a recently certified class of tax-return prepares in this Court, seeking the recovery of millions of dollars in unlawfully excessive fees paid to the IRS. In each one of these cases, the claims sought recovery of illegal exactions from the federal government on a class basis, with jurisdiction premised on the Tucker Act or the Little Tucker Act.

13.     This Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, on January 24, 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' Little Tucker Act illegal-exaction claim for classwide treatment and appointed my firm and Motley Rice as co-lead class counsel. *Id.*

14.     The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (KCC) as claims administrator. ECF Nos. 37 & 42. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, about 1,100 opted out of the class.

15.     Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only a category labeled by the judiciary as "Public Access Services," but also the following categories of expenses: "Case Management/Electronic Case Files System" (CM/ECF); "Electronic Bankruptcy Notification" (EBN); "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under the heading "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi."

16.     The parties subsequently filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees

paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to "disseminating information through electronic means." ECF No. 89 at 24.

17.   On March 31, 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [such] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

18.   Within months, the judiciary took steps "to implement the district court's ruling" and "to begin transitioning disallowed expenditures from the [PACER] program to courts' Salaries and Expenses appropriated funding." *See FY 2018 Judiciary Report Requirement on PACER, July 2018*, at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018), https://perma.cc/CP8S-XRVQ. In July 2018, the AO's Director informed the House Appropriations Committee that, "beginning in FY 2019, Courtroom Technology, Web-based Juror Services, and Violent Crime Control Act Notification categories will no longer be funded" with PACER fees, "to reduce potential future legal exposure." *Id.* "The Judiciary will instead seek appropriated funds for those categories." *Id.*

19.   Meanwhile, both parties sought permission for an interlocutory appeal from this Court's decision, and the Federal Circuit accepted both appeals to decide the scope of the statutory authorization to charge fees. The parties adhered to their same interpretations of the statute on appeal. In addition, the government argued that the court lacked jurisdiction, so the class was not entitled to damages even assuming that the AO had violated the statute.

20.     On appeal, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups," the "sponsor of the 2002 law," and legal-technology firms—all detailing the practical harms caused by excessive PACER fees. Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019, https://perma.cc/LN5E-EBE9. Prominent media outlets, like the *New York Times*, published editorials championing the lawsuit. *See Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7. And by the end of 2019, the judiciary announced that it was doubling the quarterly fee waiver for PACER from $15 to $30, which had the effect of eliminating PACER fees for approximately 75% of PACER users. *See* Kimberly Robinson, *Judiciary Doubles Fee Waiver for PACER Access to Court Records*, Bloomberg Law (Sept. 17, 2019), https://perma.cc/CHF3-XVTT; Theresa A. Reiss, Cong. Research Serv., LSB10672, *Legislative & Judicial Developments Affecting Public Access to Court Electronic Records (PACER)* 1 (Feb. 1, 2022), https://perma.cc/WT8K-G64X.

21.     In August 2020, the Federal Circuit unanimously rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (specifically, those that were not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was "one other potential source of liability," because the court was not able to confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The court left it to this Court's "discretion whether to permit additional argument and discovery

8

regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

22.    Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support recently advanced out of the Senate Judiciary Committee. *See* Reiss, *Legislative & Judicial Developments Affecting PACER* at 1–2; Senate Judiciary Committee, *Judiciary Committee Advances Legislation to Remove PACER Paywall, Increase Accessibility to Court Records*, Dec. 9, 2021, https://perma.cc/8WBB-FTDY; Nate Raymond, *Free PACER? Bill to end fees for online court records advances in Senate*, Reuters, Dec. 9, 2021, https://perma.cc/H29N-C52M. Notes from a closed March 2022 meeting showed that "[t]he Judicial Conference of the United States [also now] supported offering free public access to the federal court records system for noncommercial users." Craig Clough, *Federal Judiciary Policy Body Endorses Free PACER Searches*, Law360, May 31, 2022, https://perma.cc/YP8M-Q5CK.

### The Settlement Negotiations

23.    On remand, the case was reassigned to Judge Friedman, and the parties came together to discuss the path forward. They understood that, were the case to remain on a litigation track, there would be significant uncertainty and delay. Years of protracted litigation lay ahead, including a lengthy formal discovery process that could require the judiciary to painstakingly reconstruct line-item expenses and likely a second appeal. And the range of potential outcomes was enormous: On one side, the government maintained that it owed *no* damages because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower—a litigating position that also makes it difficult for the judiciary to lower fees during the pendency of the litigation. The government further maintained that, in any event, the full category of CM/ECF was properly funded with PACER fees. On the other side, the plaintiffs maintained that liability had been established, and that some portion of CM/ECF was likely improper.

24.     Hoping to bridge this divide and avoid years of litigation, the parties were able to agree on certain structural aspects of a potential settlement, and they agreed to engage in mediation on the amount and details. On December 29, 2020, at the parties' request, Judge Friedman stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation.

25.     Over the next few months, the parties prepared and exchanged information and substantive memoranda, with detailed supporting materials, which together provided a balanced and comprehensive view of the strengths and weaknesses of the case. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, a retired Boston University law professor and one of the nation's most experienced and accomplished mediators.

26.     With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-made settlement, and the plaintiffs' agreed to consider the government's final offer concerning the total amount of that fund, inclusive of all settlement costs, attorneys' fees, and service awards.

27.     But by the time the session had ended, the parties still hadn't reached agreement on the total amount of the settlement or several other key terms—including how the funds would be distributed, what to do with any unclaimed funds after the initial distribution, and the scope of the release. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed.

28.     Further progress was slow, and at times the parties reached what could have been insurmountable impasses. But over a period of many months, during which there were many calls

and email exchanges between counsel, the parties were able to resolve their differences and come to an agreement, the final version of which was executed on July 27, 2022. *See* Ex. A. The parties executed a supplemental agreement on September 29, 2022, which made certain technical modifications to the settlement agreement. *See* Ex. B. The parties then executed a second amendment to the settlement agreement on April 12, 2023 which provided additional time for distribution. *See* Ex. C.

### *The Parties' Settlement*

29.     As clarified by the supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the Class Period"), excluding opt-outs, federal agencies, and class counsel. Ex. A ¶ 3 & Ex. B. This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Ex. A ¶ 4. Because this second group of people are not part of the original class, they did not receive notice or an opportunity to opt out when the original class was certified. For that reason, under the settlement, these additional class members will receive notice and an opportunity to opt out. *Id.*

30.     The settlement provides for a total common-fund payment by the United States of $125 million, which covers monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11. Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust (to be called the "PACER Class Action Settlement Trust"). *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16. In exchange for their payments, class members agree to release all claims

that they have against the United States for overcharges related to PACER usage during the Class Period. *Id.* ¶ 13. This release does not cover any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.), the only pending PACER-fee related lawsuit of which the AO is aware. Ex. A ¶ 13. The amount of settlement funds disbursed to any class member in this case, however, will be deducted from any monetary recovery that the class member may receive in *Fisher*. *Id.*

31. Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, and with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41) and the February 2, 2023 stipulated supplemental protective order entered by this Court (ECF No. 146). Ex. A ¶ 15. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.* ¶16.

32. Under the settlement, class members will not have to submit a claim to receive their payment. *Id.* Instead, KCC will use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.*

33. The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to at least $100 million.

34.    **First distribution.** KCC will distribute the Remaining Amount to class members like so: It will allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the Class Period. *Id.* ¶ 19. KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* It will then deduct this Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the Class Period. *Id.*

35.    Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the Class Period will receive a payment equal to the total amount of PACER fees paid by that class member during the Class Period; and (b) each class member who paid more than $350 in PACER fees during the Class Period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

36.    KCC will complete disbursement of each class member's share of the recovery within 180 days of receiving the $125 million from the United States, or within 180 days of receiving the necessary information from AO, whichever is later. Ex. C ¶ 21. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. Ex. A ¶ 22.

37.    **Second distribution.** If, despite these efforts, unclaimed or undistributed funds remain in the trust 180 days after KCC has made the distribution described in paragraph 21 of

Exhibit C, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. Ex. C ¶ 23. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the Class Period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. *Id.* Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. Ex. A ¶ 24. If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

38.     ***Fairness hearing.*** The agreement further provides that, within 75 days of its execution—that is, by October 11, 2022—the plaintiffs will submit to the Court a motion for an Order Approving Settlement Notice to the Class under Rule 23(e). *Id.* ¶ 27, Ex. B. By filing their motion on October 11, 2022, the plaintiffs have complied with this provision.

39.     The plaintiffs intend to apply to this Court for an award of attorneys' fees and reimbursement of litigation expenses, and for service awards for the class representatives in amounts not to exceed $10,000 per representative. Ex. A ¶ 28. As noted above, these awards will be paid out of the settlement trust and will not exceed 20% of the $125 million paid by the United

States. *Id.* The motion for an award of attorneys' fees and litigation expenses is subject to this Court's approval, and notice of that motion will be provided to class members informing them of the request and their right to object to the motion, as required by Rule 23(h). *Id.*

40.     Within 30 days of an order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, if later), KCC will provide publication notice via American Bankers Association, *Banking Journal, The Slant*, and a press release distributed via Cision PR Newsire. Ex. D ¶ 2. Within 30 days of an order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, if later), KCC will provide notice via email to all class members for whom the AO has an email address. Ex. A ¶ 29; Ex. D ¶ 3. Within 45 days of the order approving settlement notice, KCC will send postcard notice via U.S. mail to all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Ex. D ¶ 6. KCC will also provide the relevant case documents on a website it has maintained that is dedicated to the settlement (www.pacerfeesclassaction.com). Ex. A ¶ 29; Ex. D ¶ 4. The website will also allow account-holders to notify the Administrator that an entity paid PACER fees on their behalf, and will allow payers to notify the Administrator that they paid PACER fees on an account-holder's behalf. Ex. D ¶ 4. The notice will include an explanation of the procedures for allocating and distributing the trust funds, the date upon which the Court will hold a fairness hearing under Rule 23(e), and the date by which class members must file their written objections, if any, to the settlement. Ex. A ¶ 29. The notice sent to the additional class members—those who are not part of the class already certified by this Court—will also inform them of their right to opt out and the procedures through which they may exercise that right. Ex. D ¶ 7. The opt-out period for these additional class members will be 90 days. *Id.*

41.     Any class member may express their views supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Ex. A ¶ 30. Counsel for the parties may respond to any objection within 21 days after receipt of the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32; Ex. D ¶ 8.

42.     After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing at which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Ex. A ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.* The parties will request that the Court schedule the fairness hearing no later than 150 days after entry of the Court's order approving settlement notice to the class. *Id.*

*     *     *

43.     This settlement is the result of more than a year of careful negotiation by the parties. It is, in my view and the view of the three class representatives, an excellent settlement for the class. Before this case was filed, there was no historical precedent for bringing suit against the federal judiciary—*in* the federal judiciary—based on fees charged *by* the federal judiciary. Now there is. If approved, the settlement will deliver real relief to every single class member: a full refund of up to $350 for any PACER fees that each class member paid during the Class Period, plus additional amounts for class members who paid more than $350 in PACER fees during that period. According to data provided by the government, this means that the vast majority of class members will receive a full refund—100 cents on the dollar—for all PACER fees that they paid during the class period.

44.     And the settlement will provide this relief quickly. Whereas litigating the case to a final judgment would take years—with no guarantee of *any* recovery for class members given the

government's legal position—the settlement will produce a final judgment in a matter of months. Moreover, although the settlement does not include injunctive relief, that is only because this relief is unavailable against the judiciary. After this litigation was filed, however, Congress began taking steps to eliminate PACER fees, and there is now a Federal Circuit decision that interprets (and imposes limits on) the statute authorizing fees, while making clear that PACER users have a cause of action to challenge such fees in the future. It is hard to imagine a better result for the class.

  I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC, on April 12, 2023   */s/ Deepak Gupta*
                    Deepak Gupta

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,

*Plaintiffs*,

v.

UNITED STATES OF AMERICA,

*Defendant*.

Civ. A. No. 16-0745 (PLF)

## CLASS ACTION SETTLEMENT AGREEMENT

For the purpose of disposing of the plaintiffs' claims in this case without any further judicial proceedings on the merits and without there being any trial or final judgment on any issue of law or fact, and without constituting an admission of liability on the part of the defendant, and for no other purpose except as provided herein, the parties stipulate and agree as follows:

### Background and Definitions

1.      The plaintiffs challenge the lawfulness of fees charged by the federal government to access to records through the Public Access to Court Electronic Records program or "PACER." The lawsuit claims that the fees are set above the amount permitted by statute and seeks monetary relief under the Little Tucker Act, 28 U.S.C. § 1346(a) in the amount of the excess fees paid. The government contends that all such fees are lawful.

2.      The complaint was filed on April 21, 2016. ECF No. 1. On January 24, 2017, this Court certified a nationwide class under Federal Rule of Civil Procedure ("Rule") 23(b)(3) and a single class claim alleging that PACER fees exceeded the amount authorized by statute and seeking

recovery of past overpayments. ECF Nos. 32, 33. The Court also appointed Gupta Wessler PLLC and Motley Rice LLC (collectively, "Class Counsel") as co-lead class counsel. *Id.*

3.      "Plaintiffs" or "Class Members," as used in this agreement, are defined to include all persons or entities who paid PACER fees between April 22, 2010, and May 31, 2018 ("the Class Period"). Excluded from that class are: (i) entities that have already opted out; (ii) federal agencies; and (iii) Class Counsel.

4.      The class originally certified by this Court consists only of individuals and entities who paid fees for use of PACER between April 21, 2010, and April 21, 2016 (with the same three exceptions noted in the previous paragraph). Plaintiffs who were not included in that original class definition—that is to say, PACER users who were not included in the original class and who paid fees for use of PACER between April 22, 2016, and May 31, 2018—shall be provided with notice of this action and an opportunity to opt out of the class.

5.      On April 17, 2017, the Court entered an order approving the plaintiffs' proposed plan for providing notice to potential class members. ECF No. 44. The proposed plan designated KCC as Class Action Administrator ("Administrator"). Notice was subsequently provided to all Class Members included in the original class, and they had until July 17, 2017, to opt out of the class, as explained in the notice and consistent with the Court's order approving the notice plan. The notice referenced in paragraph 4 above shall be provided by the Administrator.

6.      On March 31, 2018, the Court issued an opinion on the parties' cross-motions for summary judgment on liability. ECF No. 89; *see Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 126 (D.D.C. 2018). While briefing cross-motions on liability, the parties "reserv[ed] the damages determination for" a later point "after formal discovery." *Id.* at 138.

7.      On August 13, 2018, the Court certified its March 31, 2018, summary-judgment decision for interlocutory appeal to the Federal Circuit under 28 U.S.C. § 1292(b). ECF Nos. 104,

Appx0517

105; *see Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018).

8.  On August 6, 2020, the Federal Circuit affirmed this Court's decision on the parties' motions for summary judgment and remanded the case to this Court for further proceedings. *See Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1343 (Fed. Cir. 2020).

9.  Following the Federal Circuit's decision, the parties agreed to engage in mediation to discuss the possibility of settling Plaintiffs' claims. On December 29, 2020, this Court stayed the proceedings through June 25, 2021, and it has repeatedly extended that stay since then as the parties have made progress on negotiating a global settlement.

10.  On May 3, 2021, the parties participated in a day-long private mediation session in an attempt to resolve Plaintiffs' claims. Since then, the parties have engaged in numerous follow-up conversations via phone and email to come to an agreement on resolving the claims.

**Common Fund Payment and Release**

11.  Plaintiffs have offered to settle this action in exchange for a common-fund payment by the United States in the total amount of one hundred and twenty-five million dollars ($125,000,000.00) (the "Aggregate Amount") inclusive of monetary relief for Plaintiffs' claims, interest, attorney fees, litigation expenses, administration costs, and any service awards to Class Representatives. Subject to this Court's approval, as set forth in paragraph 33, Plaintiffs' offer has been accepted by the United States.

12.  Following the Court's order granting final approval of the settlement, as described in the "Fairness Hearing" portion of this agreement, and only after the appeal period for that order has expired, the United States shall pay the Aggregate Amount to the Administrator for deposit in the Settlement Trust, as referenced in paragraph 16.

13. Upon release of the Aggregate Amount from the U.S. Department of the Treasury's Judgment Fund, Plaintiffs and all Class Members release, waive, and abandon, as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period. This release does not cover any claims based on PACER usage after May 31, 2018, nor any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). But the amount of settlement funds disbursed to any Class Member in this case shall be deducted in full from any monetary recovery that the Class Member may receive in *Fisher*. The Administrative Office of the U.S. Courts ("Administrative Office") represents that, apart from *Fisher*, it is aware of no other pending PACER-fee lawsuit pertaining to claims based on PACER usage on or before May 31, 2018.

**Information**

14. Within 30 days of a final order approving the settlement, Class Counsel shall provide to the Administrative Office the PACER account numbers of Class Counsel and all individuals who have opted out of the Class. Within 90 days of a final order approving the settlement, the Administrative Office shall make available to the Administrator the records necessary to determine the total amount owed to each Class Member, and the last known address or other contact information of each Class Member contained in its records. Should the Administrative Office need more than 90 days to do so, it will notify the Administrator and Class Counsel and provide the necessary information as quickly as reasonably possible. The Administrator shall bear sole responsibility for making payments to Class Members, using funds drawn from the Settlement Trust, as provided below. In doing so, the Administrator will use the data that the Administrative Office

currently possesses for each Class Member, and the United States shall be free of any liability based on errors in this data (*e.g.*, inaccurate account information, incorrect addresses, etc.).

15. The PACER account information provided in accordance with the previous paragraph shall be provided pursuant to the terms of the Stipulated Protective Order issued in this lawsuit on April 3, 2017 (ECF No. 41) as modified to encompass such information and shall be subject to the terms of the Stipulated Protective Order. The parties agree to jointly request that the Court extend the Stipulated Protective Order to encompass such information prior to the 90-day period set forth in the previous paragraph.

### Disbursement of the Aggregate Amount

16. The Administrator shall establish a Settlement Trust, designated the "PACER Class Action Settlement Trust," to disburse the proceeds of the settlement. The administration and maintenance of the Settlement Trust, including responsibility for distributing the funds to Class Members using methods that are most likely to ensure that Class Members receive the payments, shall be the sole responsibility of the Administrator. Class Members will not be required to submit a claim form or make any attestation to receive their payments. The only obligation of the United States in connection with the disbursement of the Aggregate Amount will be: (i) to transfer the Aggregate Amount to the Administrator once the Court has issued a final order approving the settlement and the appeal period for that order has expired, and (ii) to provide the Administrator with the requisite account information for PACER users, as referenced in paragraph 14. The United States makes no warranties, representations, or guarantees concerning any disbursements that the Administrator makes from the Settlement Trust, or fails to make, to any Class Member. If any Class Member has any disagreement concerning any disbursement, the Class Member shall resolve any such concern with the Administrator.

17. The Settlement Trust is intended to be an interest-bearing Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1. The Administrator shall be solely responsible for filing all informational and other tax returns as may be necessary. The Administrator shall also be responsible for causing payments to be made from the Settlement Trust for any taxes owed with respect to the funds held by the Settlement Trust. The Administrator shall timely make all such elections and take such other actions as are necessary or advisable to carry out this paragraph.

18. As approved by the Court, the Administrator shall disburse the proceeds of the settlement as follows: The Administrator shall retain from the Settlement Trust all notice and administration costs actually and reasonably incurred, which includes actual costs of publication, printing, and mailing the notice, as well as the administrative expenses actually incurred and fees reasonably charged by the Administrator in connection with providing notice and processing the submitted claims. The Administrator shall distribute any service awards approved by the Court to the named plaintiffs, and any attorney fees and costs approved by the Court to Class Counsel, as set forth in the "Fairness Hearing" portion of this agreement. After the amounts for attorney fees, expenses, service awards, and notice and administration costs have been paid from the Aggregate Amount, the remaining funds shall be distributed to the class ("Remaining Amount"). The Remaining Amount shall be no less than 80% of the Aggregate Amount, or $100,000,000.

19. *First Distribution.* The Administrator shall allocate the Remaining Amount among Class Members as follows: First, the Administrator shall allocate to each Class Member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that Class Member for use of PACER during the Class Period. Second, the Administrator shall add together each minimum payment amount for each Class Member, which will produce the Aggregate Minimum Payment Amount. Third, the Administrator shall then deduct the Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata (based on the

amount of PACER fees paid in excess of $350 during the Class Period) to all Class Members who paid more than $350 in PACER fees during the Class Period.

20.     Thus, under the formula for the initial allocation: (a) each Class Member who paid a total amount less than or equal to $350 in PACER fees for use of PACER during the Class Period would receive a payment equal to the total amount of PACER fees paid by that Class Member for PACER use during the Class Period; and (b) each Class Member who paid more than $350 in PACER fees for use of PACER during the Class Period would receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount.

21.     The Administrator shall complete disbursement of each Class Member's individual share of the recovery, calculated in accordance with the formula set forth in the previous two paragraphs, within 90 days of receipt of the Aggregate amount, or within 21 days after receiving from the Administrative Office the information set forth in paragraph 14 above, whichever is later. The Administrator shall complete disbursement of the amounts for attorney fees and litigation expenses to Class Counsel, and service awards to the named plaintiffs, within 30 days of the receipt of the Aggregate Amount.

22.     The Administrator shall keep an accounting of the disbursements made to Class Members, including the amounts, dates, and outcomes (*e.g.*, deposited, returned, or unknown) for each Class Member, and shall make all reasonable efforts, in coordination with Class Counsel, to contact Class Members who do not deposit their payments within 90 days of the payment being made to them.

23.     ***Second Distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the Settlement Trust one year after the United States has made the payment set forth in paragraph 12, those funds ("the Remaining Amount After First Distribution") shall be distributed to

Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed following one year after the United States has made the payment set forth in paragraph 12 shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

If to the Administrative Office's Court Services Office:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Court Services Office
One Columbus Circle, N.E., Ste. 4-500
Washington, DC 20544

If to the Administrative Office's Office of General Counsel:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Office of General Counsel

Appx0523

One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

24.     Class Members who are eligible to receive a second distribution shall have three months from the time of the distribution to deposit or otherwise collect their payments. If, after this three-month period expires, unclaimed or undistributed funds remain in the Settlement Trust, those funds shall revert unconditionally to the U.S. Department of the Treasury. Upon expiration of this three month period, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the addresses referenced in paragraph 23 of this reverter. Instructions to effectuate the reverter will be provided to the Administrator following receipt of such notice, and the Administrator agrees to promptly comply with those instructions.  The three-month period will run for all Class Members eligible to receive a second distribution from the date the earliest distribution is made of a second distribution to any Class Member eligible for such a distribution. Upon request, the Administrator will notify the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office of the date the three-month period commenced. To the extent a payment in connection with the Second Distribution is made to a Class Member by the Administrator by check, any check that remains uncashed following this three-month period shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for reverter to the United States.

25.     The Class Representatives have agreed to a distribution structure that may result in a reverter to the U.S. Treasury for purposes of this settlement only.

26.     Neither the parties nor their counsel shall be liable for any act or omission of the Administrator or for any mis-payments, overpayments, or underpayments of the Settlement Trust by the Administrator.

**Fairness Hearing**

27.     As soon as possible and in no event later than 60 days after the execution of this agreement, Class Counsel shall submit to the Court a motion for an Order Approving Settlement Notice to the Class under Rule 23(e). The motion shall include (a) a copy of this settlement agreement, (b) the proposed form of the order, (c) the proposed form of notice of the settlement to be mailed to Class Members and posted on an internet website dedicated to this settlement by the Administrator, and (d) the proposed form of notice to be mailed to Class Members who were not included in the original class definition certified by the Court on January 24, 2017, as discussed in paragraph 4, and posted on the same website, advising them of their right to opt out. The parties shall request that a decision on the motion be made promptly on the papers or that a hearing on the motion be held at the earliest date available to the Court.

28.     Under Rule 54(d)(2), and subject to the provisions of Rule 23(h), Plaintiffs will apply to the Court for an award of attorney fees and reimbursement of litigation expenses, and for service awards for the three Class Representatives in amounts not to exceed $10,000 per representative. These awards shall be paid out of the Aggregate Amount. When combined, the total amount of attorney fees, service awards, and administrative costs shall not exceed 20% of the Aggregate Amount. With respect to the attorney fees and service awards, the Court will ultimately determine whether the amounts requested are reasonable. The United States reserves its right, upon submission of Class Counsel's applications, to advocate before the Court for the use of a lodestar cross-check in determining the fee award, and for a lower service award for the Class Representatives should Plaintiffs seek more than $1,000 per representative. Plaintiffs' motion for an award of attorney fees and litigation expenses shall be subject to the approval of the Court and notice of the motion shall be provided to Class Members informing them of the request and their right to object to the motion, as required by Rule 23(h).

Appx0525

29.     Within 30 days of the Court's entry of the Order Approving Settlement Notice to the Class, the Administrator shall mail or cause to be mailed the Notice of Class Action Settlement by email or first-class mail to all Class Members. Contemporaneous with the mailing of the notice and continuing through the date of the Fairness Hearing, the Administrator shall also display on an internet website dedicated to the settlement the relevant case documents, including the settlement notice, settlement agreement, and order approving the notice. The Notice of Class Action Settlement shall include an explanation of the procedures for allocating and distributing funds paid pursuant to this settlement, the date upon which the Court will hold a "Fairness Hearing" under Rule 23(e), and the date by which Class Members must file their written objections, if any, to the settlement.

30.     Any Class Member may express to the Court his or her views in support of, or in opposition to, the fairness, reasonableness, and adequacy of the proposed settlement. If a Class Member objects to the settlement, such objection will be considered only if received no later than the deadline to file objections established by the Court in the Order Approving Settlement Notice to the Class. The objection shall be filed with the Court, with copies provided to Class Counsel and counsel for the United States, and the objection must include a signed, sworn statement that (a) identifies the case number, (b) describes the basis for the objection, including citations to legal authority and evidence supporting the objection, (c) contains the objector's name, address, and telephone number, and if represented by counsel, the name, address, email address, and telephone number of counsel, and (d) indicates whether objector intends to appear at the Fairness Hearing.

31.     Class Counsel and counsel for the United States may respond to any objection within 21 days after receipt of the objection.

32.     Any Class Member who submits a timely objection to the proposed settlement may appear in person or through counsel at the Fairness Hearing and be heard to the extent allowed by the Court. Any Class Members who do not make and serve written objections in the manner

provided in paragraph 30 shall be deemed to have waived such objections and shall forever be foreclosed from making any objections (by appeal or otherwise) to the proposed settlement.

33.     After the deadlines for filing objections and responses to objections have lapsed, the Court will hold the Fairness Hearing at which it will consider any timely and properly submitted objections made by Class Members to the proposed settlement. The Court will decide whether to approve the settlement and enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. The parties shall request that the Court schedule the Fairness Hearing no later than 150 days after entry of the Court's Order Approving Settlement Notice to the Class.

34.     If this settlement is not approved in its entirety, it shall be void and have no force or effect.

**Miscellaneous Terms**

35.     This agreement is for the purpose of settling Plaintiffs' claims in this action without the need for further litigation, and for no other purpose, and shall neither constitute nor be interpreted as an admission of liability on the part of the United States.

36.     Each party fully participated in the drafting of this settlement agreement, and thus no clause shall be construed against any party for that reason in any subsequent dispute.

37.     In the event that a party believes that the other party has failed to perform an obligation required by this settlement agreement or has violated the terms of the settlement agreement, the party who believes that such a failure has occurred must so notify the other party in writing and afford it 45 days to cure the breach before initiating any legal action to enforce the settlement agreement or any of its provisions.

38.     The Court shall retain jurisdiction for the purpose of enforcing the terms of this settlement agreement.

39.     Plaintiffs' counsel represent that they have been and are authorized to enter into this agreement on behalf of Plaintiffs and the class.

40.     Undersigned defense counsel represents that he has been authorized to enter into this agreement by those within the Department of Justice with appropriate settlement authority to authorize the execution of this agreement.

41.     This document constitutes a complete integration of the agreement between the parties and supersedes any and all prior oral or written representations, understandings, or agreements among or between them.

**<REMAINDER OF PAGE LEFT BLANK; SIGNATURES PAGES TO FOLLOW>**

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
Meghan S.B. Oliver (D.C. Bar No. 493416)
Elizabeth Smith (D.C. Bar No. 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 1001
Washington, DC 20004
(202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 07/27/2022

14

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____       7-12-22

JEREMY S. SIMON, D.C. BAR #447956          Dated
Assistant United States Attorney
601 D. Street, NW
Washington, DC 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Attorneys for the United States of America

Appx0530

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. 16-0745 (PLF) |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| *Defendant.* | ) ) | |
| _____ | ) | |

## STIPULATION AND FIRST AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Amendment, the parties agree to the following modification to the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July 27, 2022 and counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 3 of the Agreement shall be replaced with the following language:

3.  "Plaintiffs" or "Class Members," as used in this agreement, are defined to include all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the Class Period") regardless of when such persons or entities used the PACER system. Excluded from that class are: (i) persons or entities that have already opted out; (ii) federal agencies; and (iii) Class Counsel.

In addition, the parties agree that the phrases "who paid PACER fees between [date x] and [date y]" and "who paid fees for use of PACER between [date x] and [date y]," as used in paragraphs 3 and 4 of the Agreement, refer to the payment of PACER fees in the specified period rather than the use of PACER in the specified period. The parties further agree that each specified period in those paragraphs includes both the start and end dates unless otherwise specified.

Finally, in paragraph 27 of the Agreement, the parties agree that the reference to "60 days" shall be changed to "75 days."

The remainder of Agreement remains unchanged by this Stipulation and Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

_____

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C. Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: ___September 29, 2022___

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____   9-29-22
     JEREMY S. SIMON, D.C. Bar No. 447956       Dated
     Assistant United States Attorney
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2528
     Jeremy.Simon@usdoj.gov

*Attorneys for the United States of America*

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 16-0745 (PLF) |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| *Defendant*. | ) ) | |
| _____ | ) | |

## STIPULATION AND SECOND AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Second Amendment, the parties agree to the following

modification to the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July

27, 2022 and counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 21 of the Agreement shall be replaced with the following language:

21.     The Administrator shall complete disbursement of each Class Member's individual
        share of the recovery, calculated in accordance with the formula set forth in the
        previous two paragraphs, within 180 days of receipt of the Aggregate amount, or
        within 180 days after receiving from the Administrative Office the information set
        forth in paragraph 14 above, whichever is later. The Administrator shall complete
        disbursement of the amounts for attorney fees and litigation expenses to Class
        Counsel, and service awards to the named plaintiffs, within 30 days of the receipt
        of the Aggregate Amount.

Paragraph 23 of the Agreement shall be replaced with the following language:

23.     ***Second Distribution.*** If, despite these efforts, unclaimed or undistributed funds
        remain in the Settlement Trust 180 days after the Administrator has made the
        distribution described in paragraph 21, those funds ("the Remaining Amount After

1

Appx0536

First Distribution") shall be distributed to Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed 180 days after the Administrator has made the distribution described in paragraph 21, shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

If to the Administrative Office's Court Services Office:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Court Services Office
One Columbus Circle, N.E., Ste. 4-500
Washington, DC 20544

If to the Administrative Office's Office of General Counsel:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Office of General Counsel
One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

The remainder of Agreement remains unchanged by this Stipulation and Second Amendment.

Appx0537

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 04-12-23

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:

4-11-23
Dated

DEREK S. HAMMOND, D.C. Bar No. 1017784
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
(202) 252-2511
Derek.Hammond@usdoj.gov

*Attorneys for the United States of America*

3

Appx0538

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, v. UNITED STATES OF AMERICA, *Defendant*. | Case No. 1:16-cv-00745-PLF |

### ORDER GRANTING PLAINTIFFS' REVISED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

After considering Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement ("Plaintiffs' Motion"),

**IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion is GRANTED.

2. After a preliminary review, the Settlement appears to be fair, reasonable, and adequate. The Settlement: (a) resulted from arm's-length negotiations between experienced counsel overseen by an experienced mediator; (b) eliminates the risk, costs, delay, inconvenience, and uncertainty of continued litigation; (c) involves the previously certified Class of individuals and entities who paid PACER fees between April 21, 2010 and April 21, 2016, but also a proposed additional Settlement Class of individuals and entities who paid PACER fees between April 22, 2016 and May 31, 2018; (d) does not provide undue preferential treatment to Class Representatives or to segments of the Class; (e) does not provide excessive compensation to counsel for the Class; and (f) is therefore sufficiently fair, reasonable, and adequate to warrant providing notice of the Settlement

1

to the Class. Accordingly, the Court preliminarily approves the Settlement, subject to further consideration at the Settlement Hearing described below.

3.      A hearing (the "Settlement Hearing") shall be held before this Court on October 12, 2023, at 10:00 a.m. in the Ceremonial Courtroom (Courtroom 20) at the United States District Court for the District of Columbia, 333 Constitution Avenue NW, Washington D.C. 20001 for the following purposes:

    a.    to determine whether the Settlement is fair, reasonable, and adequate, and should be approved by the Court;

    b.    to determine whether judgment should be entered, dismissing the Complaint on the merits and with prejudice;

    c.    to consider the fee and expense application;

    d.    to consider Class Members' objections to the Settlement, or the application for fees and expenses, if any;

    e.    to rule upon such other matters as the Court may deem appropriate.

4.      The Court may adjourn the Settlement Hearing without further notice to the members of the Class, and reserves the right to approve the Settlement with such modifications as may be agreed upon or consented to by the parties and without further notice to the Class where to do so would not impair Class Members' rights in a manner inconsistent with Rule 23 and due process of law. The Court further reserves the right to enter its judgment approving the Settlement, and dismissing the Complaint on the merits and with prejudice regardless of whether it has approved the fee and expense application.

5.      The Court will consider comments or objections to the Settlement or the request for fees and expenses, only if such comments or objections and any supporting papers are submitted to the Court at least thirty days prior to the Settlement Hearing according to the procedure described in the website notice. Attendance at the Settlement Hearing is not necessary, but any person wishing to be heard orally in opposition to the Settlement is required to indicate in their written objection whether they intend to appear at the Settlement Hearing.

6.     All opening briefs and documents in support of the Settlement and any fee and expense application, shall be filed no later than forty-five days before the Settlement Hearing. Replies to any objections shall be filed at least nine days prior to the Settlement Hearing.

7.     The revised Settlement Class satisfies Rule 23 and is certified for the same reasons set forth in the Court's prior class certification order. The Settlement Class is defined as:

> All persons or entities who paid PACER Fees between April 21, 2010 and May 31, 2018, excluding persons or entities that have already opted out, federal agencies, and Class Counsel.

8.     The notice documents advising the previously certified Class Members ("Initial Class Members") of the Settlement are hereby approved as to form and content. Exhibit 1 (2010-2016 email notice); Exhibit 3 (2010-2016 postcard notice).

9.     The notice documents advising the Additional Class Members of the Settlement and providing for opt-out rights are hereby approved as to form and content. Exhibit 2 (2016-2018 email notice); Exhibit 4 (2016-2018 postcard notice).

10.     The long-form website notice advising the Class Members of the Settlement and providing for opt-out rights for the Additional Class Members is hereby approved as to form and content. Exhibit 5.

11.     The publication notice advising the Class Members of the Settlement and providing for opt-out rights for the Additional Class Members is hereby approved as to form and content. Exhibit 6.

12.     The firm of KCC Class Action Services LLC ("KCC" or "Administrator") is appointed to supervise and administer the notice procedure.

13.     To the extent they are not already produced, within fourteen days from the entry of this order, Defendant shall produce to Plaintiffs the names, postal addresses, email addresses, phone

numbers, PACER-assigned account numbers, and firm name of all individuals or entities with a PACER account that paid PACER fees during the class period ("Notice Data"). For purposes of this paragraph, "individuals and entities" is defined as all PACER users except the following: (1) any user who, during the quarter billed, is on the master Department of Justice list for that billing quarter; (2) any user with an @uscourts.gov email address extension; or (3) any user whose PACER bill is sent to and whose email address extension is shared with a person or entity that received PACER bills for more than one account, provided that the shared email address extension is one of the following: @oig.hhs.gov, @sol.doi.gov, @state.gov, @bop.gov, @uspis.gov, @cbp.dhs.gov, @ussss.dhs.gov, @irscounsel.treas.gov, @dol.gov, @ci.irs.gov, @ice.dhs.gov, @ssa.gov, @psc.uscourts.gov, @sec.gov, @ic.fbi.gov, @irs.gov, and @usdoj.gov.[1]

14.     Within thirty days from the later of (a) the date of this order, or (b) Plaintiffs' receipt of the Notice Data from Defendant, the Administrator shall provide the publication notice, in substantially the same form as Exhibit 6, to American Bankers Association ("ABA"), *Banking Journal, The Slant,* and Cision PR Newswire for publication.

15.     Within thirty days from the later of (a) the date of this order, or (b) Plaintiffs' receipt of the Notice Data from Defendant, the Administrator shall cause the email notices to be disseminated, in substantially the same form as Exhibits 1 and 2, by sending them out via email to all Class Members. The Initial Class Members will be emailed Exhibit 1. The Additional Class Members will be emailed Exhibit 2. The email notices shall direct Class Members to a website maintained by the Administrator. The sender of the email shall appear to recipients as "PACER

---

[1] For example, accounting@dol.gov at 200 Constitution Avenue, NW, Washington, DC 20210 receives bills for johndoe1@dol.gov, johndoe2@dol.gov, and janedoe1@dol.gov. None of those email addresses (accounting@dol.gov, johndoe1@dol.gov, johndoe2@dol.gov, and janedoe1@dol.gov) would receive notice.

4

Fees Class Action Administrator," and the subject line of the email shall be "PACER Fees – Notice of Class Action Settlement."

16. Contemporaneous with the emailing of the notices and continuing through the date of the Settlement Hearing, the Administrator shall display on the internet website dedicated to this case, www.pacerfeesclassaction.com, the long-form notice in substantially the same form as Exhibit 5. The Administrator shall continue to maintain the website and respond to inquiries by Class Members as necessary. The website will include the printable Exclusion Request form, the online Exclusion Request form, Plaintiffs' Class Action Complaint, Defendant's Answer, the Order on the Motion for Class Certification, the Memorandum Opinion on the Motion for Class Certification, the District Court's summary judgment opinion, the Federal Circuit's summary judgment opinion, the Settlement Agreement, this order, and any other relevant documents. The website will include the ability for Class Members to check the status of their refund check if the Court grants final approval of the settlement and update their mailing address. The website will also allow accountholders to notify the Administrator that an entity paid PACER fees on their behalf, and will allow payers to notify the Administrator that they paid PACER fees on an accountholder's behalf. These changes must be made on the website no later than 60 days after dissemination of email notice.

17. Within thirty days from the entry of this order, the Administrator shall make available to Class Members telephone support to handle any inquiries from Class Members.

18. Within forty-five days from the later of (a) the date of this order, or (b) Plaintiffs' receipt of the Notice Data from Defendant, the Administrator shall cause the postcard notices to be disseminated, in substantially the same form as Exhibits 3 and 4 by sending them out via U.S. mail to all Class Members: (1) without an email address; or (2) for whom email delivery was unsuccessful. The Initial Class Members will be mailed Exhibit 3. The Additional Class Members will be mailed

Exhibit 4. The postcard notices will direct Class Members to the website maintained by the Administrator.

19.    Additional Class Members can ask to be excluded from the settlement by: (1) sending an Exclusion Request in the form of a letter; (2) completing and submitting the online Exclusion Request form; or (3) sending an Exclusion Request form by mail. Ninety days after the entry of this order, the opt-out period for the Additional Class Members will expire.

20.    Class Members can object to the Settlement or the request for fees and expenses by submitting their comments or objections and any supporting papers to the United States District Court for the District of Columbia according to the procedure described in the website notice. Such comments or objections must be submitted at least thirty days prior to the settlement hearing. Any response by the United States to Plaintiffs' request for fees and expenses, as reserved in paragraph 28 of the Settlement Agreement, must be submitted at least thirty days prior to the settlement hearing.

21.    The Court finds that the dissemination of the notice under the terms and in the forms provided for constitutes the best notice practicable under the circumstances, that it is due and sufficient notice for all purposes to all persons entitled to such notice, and that it fully satisfies the requirements of due process and all other applicable laws.

**IT IS SO ORDERED.**

5/8/23
Date

The Honorable Paul L. Friedman
Senior United States District Judge

Appx0544