# 2024-1757
# Volume II (Appx0545-1126)

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE, Plaintiffs-Appellees,

v.

UNITED STATES, Defendant-Appellee.

v.

ERIC ALAN ISAACSON, Interested Party-Appellant

_____

Appeal from the United States District Court
for the District of Columbia
in 1:16-cv-00745-PLF
The Honorable Paul L. Friedman

## CORRECTED APPENDIX
## VOLUME II (Appx0545-1126)

ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858) 263-9581
Email: ericalanisaacson@icloud.com

*Pro Se Interested-Party Appellant*

# TABLE OF CONTENTS

| Docket Entry (DE__) | Document | page |
|---|---|---|

**Volume I**

DE169    Final Approval Opinion...............................................Appx0001

DE170    Final Judgment and Order......................................Appx0049

**District Court Docket Sheet**................................Appx0081

DE1    Complaint...................................................................Appx0107

DE8    Plaintiffs' Motion for Class Certification.................Appx0122

DE11    Motion to Dismiss....................................................Appx0144

DE15    Plaintiffs' Opposition to Motion to Dismiss.............Appx0167

DE17    Plaintiffs' Reply in Support of Class Certification...Appx0173

DE24    Order Denying Defendant's Motion to Dismiss........Appx0180

DE25    Memorandum Opinion Denying Motion to Dismiss........................................................................Appx0181

DE27    Answer.......................................................................Appx0189

DE28    Declaration of Daniel L. Goldberg............................Appx0200

DE29    Declaration of Stuart Rossman................................Appx0201

DE30    Declaration of Barton F. Stichman ..........................Appx0202

DE32    Order Certifying Class..............................................Appx0203

DE33    Memorandum Opinion on Class Certification..........Appx0205

DE44    Order Granting Unopposed Plan of Class Notice.....Appx0224

DE52    Named Plaintiffs Motion for Summary Judgment...Appx0228

DE52-2    PACER Fee Schedule Effective December 1, 2013...Appx0253

DE52-11    PACER Program Summary.......................................Appx0258

DE52-15    Declaration of Thomas Lee & Michael Lissner........Appx0271

DE52-16    Plaintiffs' Statement of Undisputed Material Facts..........................................................................Appx0289

DE59     Reporters Committee Amicus Brief............................Appx0321

DE61     Law Libraries Amicus Brief.....................................Appx0348

DE63     Lieberman & Issa Amicus Brief...............................Appx0376

DE73     Defendant's Motion for Summary Judgment...........Appx0387

DE88     Summary Judgment Order........................................Appx0388

DE89     Summary Judgment Memorandum Opinion............Appx0389

DE104    Order Certifying for Interlocutory Appeal Under
28 U.S.C §1292(b)......................................................Appx0431

DE105    Memorandum Opinion on 28 U.S.C. §1292(b)
Certification...............................................................Appx0433

DE107    Notice of Grant of Permission to Appeal...................Appx0441

DE107-1  Federal Circuit Order Granting Permission to
Appeal.........................................................................Appx0444

DE111    Mandate of the Federal Circuit................................Appx0448

DE111-1  Judgment of the Federal Circuit...............................Appx0449

DE130    Order Denying Michael T. Pines Motion to
Intervene....................................................................Appx0450

DE132    Michael T. Pines Notice of Appeal............................Appx0460

DE143    Order of the D.C. Circuit Dismissing
Michael T. Pines Appeal for Lack of Prosecution.....Appx0461

DE148    Plaintiffs' Revised Motion for Preliminary
Approval......................................................................Appx0463

DE148-1  Proposed Order Granting Revised Motion
for Preliminary Approval...........................................Appx0491

DE149    Revised Declaration Deepak Gupta..........................Appx0498

DE149-1  Settlement Agreement................................................Appx0516

DE149-2  First Amendment to Settlement Agreement............Appx0532

DE149-3  Second Amendment to Settlement Agreement.........Appx0535

DE153    Order Granting Plaintiffs' Revised Motion for
Preliminary Approval of Class Action Settlement...Appx0539

# Volume II

DE158 Motion for Final Approval of Class Action Settlement....................................................Appx0545

DE158-1 Declaration of Renée Burbank...................................Appx0596

DE158-2 Declaration of Stuart T. Rossman............................Appx0601

DE158-3 Declaration of Rakim Brooks....................................Appx0604

DE158-4 Declaration of Brian T. Fitzpatrick..........................Appx0606

DE158-5 Declaration of Deepak Gupta....................................Appx0677

DE158-6 Declaration of Meghan S.B. Oliver...........................Appx0740

DE159 Response of the United States to Motion for Final Approval...............................................................Appx0747

DE160 Named Plaintiffs' Reply in Support of Final Approval...............................................................Appx0756

DE161 Order Changing Settlement Hearing Location........Appx0775

DE162 Order Setting Settlement Hearing Procedures........Appx0776

DE166 Plaintiffs' Notice of Filing of Objections to Settlement....................................................Appx0779

DE166-1 Objection of Aaron Greenspan...................................Appx0782

DE166-2 Objection of Alexander Jiggetts Objection...............Appx0784

DE166-3 Objection of Geoffrey Miller......................................Appx0785

DE166-4 Objection of Don Kozich.............................................Appx0788

DE166-5 Objection of Eric Alan Isaacson................................Appx0818

DE166-6 Isaacson Written Statement......................................Appx0869

DE173 Notice of Appeal (April 18, 2024).............................Appx1013

DE175 Transcript of October 12, 2023, Final Approval Hearing....................................................Appx1015

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
*Plaintiffs,*

v.

UNITED STATES OF AMERICA,
*Defendant.*

Case No. 16-745-PLF

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
jon@guptawessler.com

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
bnarwold@motleyrice.com

MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
moliver@motleyrice.com
cloper@motleyrice.com

*Counsel for Plaintiffs National Veterans Legal Services Program,
National Consumer Law Center, Alliance for Justice, and the Class*

August 28, 2023

# TABLE OF CONTENTS

Table of authorities ...................................................................................................iv

Introduction .............................................................................................................. 1

Background ................................................................................................................5

    A.   Factual and procedural background ...........................................................5

        1.   The legal framework for PACER fees ......................................5

        2.   District court proceedings .................................................... 6

        3.   Appellate proceedings ...........................................................8

    B.   Mediation and settlement negotiations ................................................... 9

    C.   Overview of the settlement agreement .................................................. 11

        1.   The settlement class ............................................................ 11

        2.   The settlement relief ........................................................... 11

        3.   The released claims............................................................. 12

        4.   Notice to settlement class and requests for exclusion..................12

        5.   Allocation and payment ......................................................13

        6.   Service awards, attorneys' fees, and costs ..............................15

        7.   Further settlement-related proceedings ................................ 16

Argument ................................................................................................................16

    I.   Because the settlement provides an exceptional recovery for the class, the Court should approve the settlement...................................... 16

        A.   The class representatives and class counsel have vigorously represented the class throughout this litigation..........................18

        B.   The settlement is the product of informed, arm's-length negotiations. ..........................................................................19

        C.   The settlement relief provided to class members is exceptional—particularly given the costs, risks, and delays of further litigation. ...................................................................20

Appx0546

D.    The settlement agreement treats class members equitably relative to each other.........................................................................21

E.    The plaintiffs and class counsel support the settlement. ..........................24

II.    The notice and notice programs provided class members with the best notice practicable under the circumstances.....................................................24

III.    The requested attorneys' fee award is reasonable.................................................. 25

A.    This Court should use the percentage-of-the-fund approach to assess the reasonableness of class counsel's fee request.........................25

B.    A fee of 19.1% of the common fund is reasonable. .................................27

1.    The quality of counsel supports the requested fee. ........................28

2.    The complexity and duration of the case supports the requested fee. ............................................................................29

3.    The risk of nonrecovery supports the award. ................................30

4.    The fee that likely would have been negotiated between private parties in similar cases supports the requested fee. ...........................................................................31

5.    The reaction of class members to date supports the requested fee. ............................................................................ 32

6.    The percentage awarded in other cases supports the requested fee. ............................................................................33

7.    The size of the award supports the requested fee. .........................34

C.    A lodestar cross-check, although not required, would only confirm the reasonableness of the requested fee........................................35

IV.    The Court should award each of the three class representatives $10,000 for their contributions to the case. .......................................................... 40

Conclusion ............................................................................................................................41

**Attachments**

1. Declaration of Renee Burbank, National Veterans Legal Services Program

2. Declaration of Stuart T. Rossman, National Consumer Law Center

3. Declaration of Rakim Brooks, Alliance for Justice

ii

4.  Declaration of Brian Fitzpatrick

5.  Declaration of Deepak Gupta, Gupta Wessler LLP

6.  Declaration of Meghan Oliver, Motley Rice LLC

7.  Declaration of Gio Santiago, KCC Class Action Services

8.  Proposed Order

# TABLE OF AUTHORITIES

**Cases**

*Aerolineas Argentinas v. United States,*
  77 F.3d 1564 (Fed. Cir. 1996) ........................................................................................... 2

*Applegate v. United States,*
  52 Fed. Cl. 751 (2002) ........................................................................................................ 25

*Blackman v. District of Columbia,*
  454 F. Supp. 2d 1 (D.D.C. 2006) .................................................................................19, 20

*Cobell v. Salazar,*
  679 F.3d 909 (D.C. Cir. 2012) ........................................................................................... 23

*Cohen v. Chilcott,*
  522 F.Supp.2d 105 (D.D.C. 2007).................................................................................... 24

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,*
  62 F.4th 704 (2d Cir. 2023) ............................................................................................... 37

*Gaskill v. Gordon,*
  160 F.3d 361 (7th Cir. 1998) ............................................................................................. 31

*Geneva Rock Products, Inc. v. United States,*
  119 Fed. Cl. 581 (2015) ..................................................................................................... 38

*Health Republic Insurance Co. v. United States,*
  58 F.4th 1365 (Fed. Cir. 2023) .........................................25, 26, 27, 28, 35, 36, 37, 39

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ........................................................................................................... 34

*Houser v. United States,*
  114 Fed. Cl. 576 (2014) ..................................................................................................... 28

*In re Automotive Parts Antitrust Litigation,*
  2019 WL 7877812 (E.D. Mich. Dec. 20, 2019) .............................................................. 23

*In re Black Farmers Discrimination Litigation,*
  953 F. Supp. 2d 82 (D.C.C. 2013) .......................................26, 28, 29, 31, 34, 36, 37, 39

*In re Domestic Airline Travel Antitrust Litigation,*
  378 F. Supp. 3d 10 (D.D.C. 2019)................................................................................ 17, 20

*In re Equifax Inc. Customer Data Security Breach Litigation,*
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020) .................................................................... 38

Appx0549

*In re Equifax Inc. Customer Data Security Breach Litigation,*
    999 F.3d 1247 (11th Cir. 2021) ................................................................................ 27, 33

*In re Federal National Mortgage Association Securities, Derivative, & "ERISA" Litigation,*
    4 F. Supp. 3d 94 (D.D.C. 2013) ........................................................ 29, 30, 33, 38, 40

*In re Rite Aid Corp. Securities Litigation,*
    396 F.3d 294 (3d Cir. 2005) ......................................................................... 26, 27, 36

*In re Synthroid Marketing Litigation,*
    264 F.3d 712 (7th Cir. 2001) ............................................................................... 31, 34

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation,*
    56 F.3d 295 (1st Cir. 1995) ........................................................................................ 27

*In re Vitamins Antitrust Litigation,*
    2001 WL 34312839 (D.D.C. July 16, 2001) ............................................................. 33

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation,*
    746 Fed. App'x 655 (9th Cir. 2018) ........................................................................ 38

*Kane County v. United States,*
    145 Fed. Cl. 15 (2019) ...........................................................................27, 32, 33, 37, 40

*Kinard v. E. Capitol Family Rental, L.P.,*
    331 F.R.D. 206 (D.D.C. 2019) ................................................................................. 20

*Little v. Washington Metropolitan Area Transit Authority,*
    313 F. Supp. 3d 27 (D.D.C. 2018) ............................................................................ 17

*Martin v. Toyota Motor Credit Corp.,*
    2022 WL 17038908 (C.D. Cal. Nov. 15, 2022) ....................................................... 38

*Mercier v. United States,*
    156 Fed. Cl. 580 (2021) ................................................................. 27, 28, 33, 40, 41

*Milliron v. T-Mobile USA, Inc.,*
    423 F. App'x 131 (3d Cir. 2011) .......................................................................... 37, 38

*Moore v. United States,*
    63 Fed. Cl. 781 (2005) ............................................................... 25, 27, 28, 33

*Mullane v. Central Hanover Bank Trust Co.,*
    339 U.S. 306 (1950) ................................................................................................... 24

*Nunez v. BAE Systems San Diego Ship Repair Inc.,*
    292 F. Supp. 3d 1018 (S.D. Cal. 2017) .................................................................... 26

v

*NVLSP v. United States*,
　291 F. Supp. 3d 123 (D.D.C. 2018) ................................................................................ 7

*NVLSP v. United States*,
　968 F.3d 1340 (Fed. Cir. 2020) .............................................................................. 3, 30

*Prince v. Aramark Corp.*,
　257 F. Supp. 3d 20 (D.D.C. 2017) ............................................................................. 24

*Quimby v. United States*,
　107 Fed. Cl. 126 (2012) .......................................................... 27, 32, 33, 34, 40

*Radosti v. Envision EMI, LLC*,
　717 F.Supp.2d 37 (D.D.C. 2010) ............................................................................. 19

*Radosti v. Envision EMI, LLC*,
　760 F. Supp. 2d 73 (D.D.C. 2011) ........................................................................... 23

*Rogers v. Lumina Solar, Inc.*,
　2020 WL 3402360 (D.D.C. June 19, 2020) ............................................................. 17

*Ross v. Lockheed Martin Corp.*,
　267 F. Supp. 3d 174 (D.D.C. 2017) ......................................................................... 17

*Sabo v. United States*,
　102 Fed. Cl. 619 (2011) ............................................................................................ 32

*Silverman v. Motorola Solutions, Inc.*,
　739 F.3d 956 (7th Cir. 2013) ................................................................................... 30

*Steele v. United States*,
　2015 WL 4121607 (D.D.C. June 30, 2015) ............................................................. 28

*Swedish Hospital Corp. v. Shalala*,
　1 F.3d 1261 (D.C. Cir. 1993) ............................................................................. 25, 27

*Trombley v. National City Bank*,
　759 F. Supp. 2d 20 (D.D.C. 2011) ........................................................................... 19

*United States v. MTU America Inc.*,
　105 F. Supp. 3d 60 (D.D.C. 2015) ........................................................................... 17

*Voulgaris v. Array Biopharma, Inc.*,
　60 F.4th 1259 (10th Cir. 2023) ................................................................................ 26

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
　396 F.3d 96 (2d Cir. 2005) ...................................................................................... 26

vi

*Williams v. Rohm & Haas Pension Plan,*
  658 F.3d 629 (7th Cir. 2011) ......................................................................... 36

**Rules**

Fed. R. Civ. P. 23 ...........................................................................17, 20, 24, 25, 40

Fed. R. Civ. P. 23, Advisory Committee Note, 2018 Amendments ................................. 18

**Statutes**

28 U.S.C. § 1913 note.......................................................................................... 5

**Other Authorities**

Adam Liptak,
  *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019 ............................ 3, 8

Brian T. Fitzpatrick,
  *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151
  (2021) ..................................................................................................... 26

Brian T. Fitzpatrick,
  *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical
  Legal Studies 811 (2010)................................................................................. 34

*Manual for Complex Litigation* § 14.121 (4th ed. 2004) ......................................... 26

*Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019 ............................... 3

S. Rep. 107-174 (2002) ...................................................................................... 5

# INTRODUCTION

The plaintiffs ask the Court to grant final approval of this historic class-action settlement. Since the Court granted preliminary approval on May 8, 2023, the claims administrator has carried out the Court-approved notice program, sending individualized notice to approximately 500,000 class members and providing publication notice as well. The reception so far has been almost universally positive: As of this filing, the administrator has received only one objection and 34 valid opt-out requests. *See* KCC Decl. ¶ 21. The plaintiffs will update the Court on the number of opt-outs and objections, and respond to any additional objections, no later than October 3.

This settlement brings to an end a case that has generated more than seven years of hard-fought litigation, and that is unique in American history: a certified class action against the federal judiciary, concerning the fees that the judiciary charges for access to records through the Public Access to Court Electronic Records system, or PACER. Under the settlement, the government must reimburse the vast majority of PACER users in full—100 cents on the dollar—for past PACER charges. The settlement creates a common fund of $125 million from which each class member will automatically be reimbursed up to $350 for any PACER fees paid between April 21, 2010, and May 31, 2018. Those who paid over $350 in fees during that period will receive their pro rata share of the remaining settlement funds. Any unclaimed funds after this initial distribution will be allocated evenly to all class members who collected their initial payment (subject to the caveat that no class members may receive more than the total fees that they actually paid). In addition to this remarkable monetary relief, the case has spurred the judiciary to eliminate fees for 75% of users going forward and prompted action in Congress to abolish the fees altogether.

By any measure, this litigation has been an extraordinary achievement—and even more so given the odds stacked against it. PACER fees have long been the subject of widespread criticism because they thwart equal access to justice and inhibit public understanding of the courts. But until

1

this case was filed, litigation wasn't seen as a realistic path to reform. That was for three reasons. First, the judiciary has statutory authority to charge at least *some* fees, so litigation alone could never result in a free PACER system. Second, few lawyers experienced in complex federal litigation would be willing to sue the federal judiciary—and spend considerable time and resources challenging decisions made by the Judicial Conference of the United States—with little hope of payment. Third, even if PACER fees could be shown to be excessive and qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. A lawsuit challenging PACER fees had been dismissed for lack of jurisdiction, and advocates had been unable for years to identify an alternative basis for jurisdiction, a cause of action, and a statutory waiver of sovereign immunity. So they devoted their efforts to other strategies: making some records freely available in a separate database, downloading records in bulk, and mounting public-information campaigns.

These efforts were important, but they didn't challenge the lawfulness of PACER fees. Despite public criticism—and despite being reproached in 2009 and 2010 by Senator Lieberman, the sponsor of a 2002 law curtailing the judiciary's authority to charge fees—the Administrative Office of the U.S. Courts did not reduce PACER fees. Instead, the AO *increased* fees in 2012.

There things stood until 2016, when three nonprofits filed this suit under the Little Tucker Act, a post-Civil-War-era statute that "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because the Act provides jurisdiction only for claims seeking money for past overpayments, the plaintiffs could not demand that the judiciary lower PACER fees going forward. They could seek only retroactive monetary relief.

Even with this built-in jurisdictional limitation, this lawsuit has been a resounding success. The plaintiffs defeated a motion to dismiss and obtained certification of a nationwide class by early

2017. Through discovery, they were then able to shine a light on how the AO had used the fees. Many things funded by the fees—such as flat screens for jurors—had nothing to do with PACER. This discovery in turn led to an unprecedented decision: In March 2018, this Court held that the AO had violated the law by using PACER fees to fund certain activities. Within months, the AO announced that these activities would "no longer be funded" with PACER fees. Gupta Decl. ¶ 18.

Success continued on appeal. In the Federal Circuit, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups, and the sponsor of the 2002 law"—all detailing the harms of high PACER fees. *See* Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019, https://perma.cc/LN5E-EBE9. Media outlets published editorials championing the lawsuit. *See, e.g.*, *Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7. And before long, the AO announced that it was doubling the $15 quarterly fee waiver for PACER, eliminating fees for approximately 75% of PACER users. Gupta Decl. ¶ 20. Then the plaintiffs secured a landmark Federal Circuit opinion unanimously affirming this Court's decision. *NVLSP v. United States*, 968 F.3d 1340 (Fed. Cir. 2020).

The litigation sparked widespread public interest in the need to reform PACER fees and jumpstarted legislative action that continues to this day. Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. Gupta Decl. ¶ 22. The Judicial Conference, too, now supports legislation providing for free PACER access to noncommercial users. *Id.* Were Congress to enact such legislation into law, it would produce an outcome that the plaintiffs had no way of achieving through litigation alone.

As for fees already paid—the claims at issue here—they will be refunded. Under the settlement, the average PACER user will be reimbursed for all PACER fees paid during the class period. And no class member will need to submit a claim to be paid.

This is an extraordinarily favorable result for the class, and it easily satisfies Rule 23(e)(2)'s criteria. This Court has already found that, on "a preliminary review," the settlement "appears to be fair, reasonable, and adequate" because it "(a) resulted from arm's-length negotiations between experienced counsel overseen by an experienced mediator; (b) eliminates the risks, costs, delay, inconvenience, and uncertainty of continued litigation; (c) involves the previously certified Class" and an "additional Settlement Class"; "(d) does not provide undue preferential treatment to Class Representatives or to segments of the Class"; and "(e) does not provide excessive compensation to counsel for the Class." ECF No. 153 at 1. Because a final review only confirms these findings, the plaintiffs respectfully request that the Court enter an order giving final approval to the settlement.

In addition, as authorized by the settlement, this motion seeks an award of attorneys' fees, settlement-administration and notice costs, litigation expenses, and service awards for the three class representatives in a total amount equal to 20% of the $125 million common fund. This request should be granted in full. The specific amounts sought are as follows: The motion seeks $29,654.98 in expenses because class counsel actually and reasonably incurred that amount to prosecute the case and achieve the settlement. The motion seeks $1,077,000 in settlement-administration and notice costs because the administrator initially agreed to perform its services for $977,000, and an additional $100,000 is needed due to unanticipated complexities. And the motion seeks an award of $10,000 per class representative to compensate them for their time working on the case and the responsibility that they have shouldered. Each of these requested amounts is reasonable. Class counsel seeks the remainder ($23,863,345.02) in attorneys' fees. This amount is approximately 19.1% of the common fund, which is below the average percentage fee awarded for funds of this size. Fitzpatrick Decl. ¶ 19. And the other factors that courts look to in assessing the reasonableness of a requested fee—including the degree of complexity and risk involved in the case, as well as the results obtained for the class—would, if anything, support a greater-than-average percentage here.

4

## BACKGROUND

**A.**     **Factual and procedural background**

    **1.**     **The legal framework for PACER fees**

By statute, the judiciary has long had authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then $.07 per page) were "higher than the marginal cost of disseminating the information," creating excess fee revenue that the judiciary had begun using to fund other projects. S. Rep. 107-174, at 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.*

To this end, Congress passed the E-Government Act of 2002, which amended the statute by adding the words "only to the extent necessary." 28 U.S.C. § 1913 note. Despite this limitation, the AO twice increased PACER fees in the years after the E-Government Act's passage—first to $.08 per page, and then to $.10 per page—during a time when the costs of electronic data storage plunged exponentially. Gupta Decl. ¶ 4. This widening disparity prompted the Act's sponsor, Senator Lieberman, to reproach the AO for charging fees that were "well higher than the cost of dissemination," "against the requirement of the E-Government Act." ECF No. 52-8 at 3; ECF No. 52-9 at 1.

Excessive PACER fees have inflicted harms on litigants and the public alike. Whereas the impact of excess fees on the judiciary's $7-billion annual budget is slight, these harms are anything but: High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts. And the AO had further compounded the harmful effects of high fees in recent years by discouraging fee waivers, even for pro se litigants, journalists,

5

researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

###    2.    District court proceedings

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this lawsuit. From the start, the plaintiffs were represented by an expert team drawn from the law firms of Gupta Wessler LLP, a litigation boutique with experience bringing complex cases against the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. The plaintiffs asked the Court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges—the only relief available to them under the Little Tucker Act. *See* 28 U.S.C. § 1346(a). Because the judiciary is not subject to the APA, 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek injunctive relief requiring the AO to lower PACER fees in the future.

This Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, in January 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid PACER fees between April 21, 2010 and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' illegal-exaction Little Tucker Act claim for classwide treatment and appointed Gupta Wessler and Motley Rice as co-lead class counsel. *Id.*

The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (or KCC) as claims administrator. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, only about 1,100 opted out of the class. Gupta Decl. ¶ 14.

Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only what the judiciary

6

labeled as "Public Access Services," but also "Case Management/Electronic Case Files System" (or CM/ECF); "Electronic Bankruptcy Notification"; "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi [Study]."

Based on this discovery, the parties filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to disseminating information through electronic means.

In March 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [PACER] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

In the months that followed, the AO took steps "to implement the district court's ruling" and "reduce potential future legal exposure." Gupta Decl. ¶ 18. It announced in July 2018 that these four categories would "no longer be funded" with PACER fees. *Id.* "The Judiciary will instead seek appropriated funds for those categories," as it does for over 98% of its budget. *Id.* A year later, the

AO announced that it was doubling the quarterly fee waiver for PACER—from $15 to $30—which had the effect of eliminating PACER fees for approximately 75% of PACER users. *Id.* ¶ 20.

### 3.   Appellate proceedings

Both parties sought permission for an interlocutory appeal from this Court's decision, and the Federal Circuit accepted both appeals. The parties adhered to their same interpretations of the statute on appeal. The plaintiffs' position was supported by a broad array of amici curiae—a group of prominent retired federal judges, Senator Lieberman, media organizations, legal-technology firms, and civil-liberties groups from across the ideological spectrum—detailing the harms caused by high PACER fees. *See* Liptak, *Attacking a Pay Wall that Hides Public Court Filings*. In response, the government defended the full amount of PACER fees, while strenuously arguing that the court lacked jurisdiction under the Little Tucker Act.

The Federal Circuit rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP*, 968 F.3d at 1350. It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (those not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was a "potential source of liability" because the court could not confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The Federal Circuit left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

8

Appx0560

Following the Federal Circuit's decision, federal lawmakers swung into action. The House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. Gupta Decl. ¶ 22.

## B. Mediation and settlement negotiations

On remand, the case was reassigned to Judge Friedman, and the parties came together to discuss the path forward. They understood that litigating the case to trial would entail significant uncertainty and delay. Gupta Decl. ¶ 23. Years of protracted litigation lay ahead. And the range of potential outcomes was enormous: On one side, the government argued that it owed zero damages to the class because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower (a litigating position that also made it difficult for the judiciary to lower fees while the case remained pending). *Id.* On the other side, the plaintiffs maintained that liability had already been established for four categories of expenses and that some portion of the CM/ECF expenditures were likely improper as well. *Id.*

Hoping to bridge this divide and avoid a lengthy delay, the parties were able to agree on certain structural aspects of a potential settlement and then agreed to engage in mediation on the amount and details. *Id.* ¶ 24. On December 29, 2020, at the parties' request, this Court stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation. *Id.*

Over the next few months, the parties exchanged information and substantive memoranda, which provided a comprehensive view of the strengths and weaknesses of the case. *Id.* ¶ 25. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, an experienced and accomplished mediator agreed upon by the parties. *Id.*

With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. *Id.* ¶ 26. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-

made settlement, and the plaintiffs agreed to consider the government's final offer concerning the total amount of that fund. *Id.* But by the time the session ended, the parties still hadn't agreed on the total amount of the common fund or other important terms—including how the money would be allocated and distributed to class members, what to do with any unclaimed funds after the initial distribution, and the scope of the release. *Id.* ¶ 27. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were ultimately able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. *Id.* The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed. *Id.*

Further progress was slow, and at times the parties reached potentially insurmountable impasses. *Id.* ¶ 28. A particular sticking point concerned the allocation of settlement funds. *Id.* Consistent with the parties' litigating positions, the plaintiffs argued that funds should be distributed pro rata to class members, while the government argued for a large minimum amount per class member, which it maintained was in keeping with the AO's statutory authority (and longstanding policy) to "distinguish between classes of persons" in setting PACER fees "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note; Gupta Decl. ¶ 28. Over a period of many months, the parties were able to resolve their differences and reach a compromise on these competing approaches: a minimum payment of $350—the smallest amount the government would agree to—with a pro rata distribution beyond that amount. *Id.*

The final version of the settlement was executed on July 27, 2022. *Id.* ¶ 28; Gupta Decl. Ex. A ("Agreement"). The parties executed an amendment in September 2022 making certain technical modifications to the agreement, and a second amendment in April 2023 making further technical modifications. Gupta Decl. Ex. B ("First Supp. Agreement") & Ex. C ("Second Supp. Agreement").

**C.      Overview of the settlement agreement**

**1.      The settlement class**

As clarified by the first supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the class period"), excluding opt-outs, federal agencies, and class counsel. Agreement ¶ 3; First Supp. Agreement. The class period does not go beyond May 31, 2018 because the AO stopped using PACER fees to fund the four categories of prohibited expenses after this date.

This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Agreement ¶ 4. Because people in this second group are not part of the original class, they did not receive notice or a right to opt out when the original class was certified. For that reason, under the settlement, these additional class members received notice and a right to opt out in 2023. *Id.*

**2.      The settlement relief**

The settlement provides for a total common-fund payment by the United States of $125 million, which covers the monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11.

Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust. *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16.

### 3. The released claims

In exchange for the relief provided by the settlement, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the class period. *Id.* ¶ 13.[1]

### 4. Notice to settlement class and requests for exclusion

Over the past two months, KCC has sent court-approved settlement notice to over 500,000 PACER accountholders. KCC Decl. ¶¶ 8, 15. On July 6, it sent an initial batch of more than 336,000 email notices and over 100,000 postcard notices to those for whom email notice was not possible or successful. *Id.* ¶¶ 8–10. On August 7, KCC sent notice to an additional 184,478 accountholders who were inadvertently omitted from the first batch of notices. *Id.* ¶ 15. These 184,478 people were not prejudiced by the delay because they all received notice and opt-out rights in 2017, so they were not entitled to opt out of the settlement in 2023. Further, they all have 36 days to object to the settlement and 29 days to notify KCC that someone else paid PACER fees on their behalf. KCC also sent corrective notice on August 7 to an additional 53,446 accountholders who had received the wrong notice in the initial batch based on a data error. Instead of receiving notice providing only an opportunity to object to the settlement, and not also to opt out (which each of these accountholders had already been given in 2017), these accountholders received notice that mentioned an opportunity to opt out of the settlement. The corrective notice informed them of the mistake and included the court-approved text of the correct notice. *Id.* ¶ 16, Ex. G.

---

[1] This release excluded the claims that were then pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). Agreement ¶ 13. That unrelated case—which was voluntarily dismissed with prejudice on July 24, 2023—alleged that PACER overcharges users due to a systemic billing error concerning the display of some HTML docket sheets. The case did not challenge the PACER fee schedule and was not certified as a class action.

Of the approximately 500,000 PACER accountholders to whom settlement notice was sent, approximately 100,000 had an opportunity to request exclusion from the settlement class. *Id.* ¶¶ 8, 10. KCC has received a total of 50 exclusion requests (16 of which were invalid because they were submitted by individuals who had already a chance to opt out in 2017 or are federal employees who are excluded from the class definition). *Id.* ¶¶ 17, 21. Thirty-one of the 34 valid opt-out requests were received via the class website, while three were received by mail. *Id.* ¶ 21.

KCC also published notice in the *ABA Banking Journal eNewsletter* and distributed it via Cision PR Newswire. *Id.* ¶¶ 12–13. The press release has been posted in full 380 times online and on social media; has appeared on broadcast media, newspaper, and online news websites; and has also been posted on the class website at www.pacerfeesclassaction.com. *Id.* ¶¶ 12, 18.

### 5. Allocation and payment

Under the settlement, class members will not have to submit a claim to receive their payment. Agreement ¶¶ 4, 16. Instead, KCC will use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.* These efforts include (1) sending checks to class members using PACER payment data maintained by the government; (2) allowing class members to notify KCC that someone else paid PACER fees on their behalf and is the proper recipient of any settlement funds; and (3) allowing individuals or entities to notify KCC that they paid PACER fees on behalf of someone else and are the proper recipients of settlement funds. Agreement ¶¶ 3, 19; KCC Decl. ¶¶ 18, 22.

The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. Agreement ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class

13

members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to a total of $100 million.

    ***First distribution.*** KCC will distribute the Remaining Amount to class members using the following formula: It will first allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. *Id.* ¶ 19. Next, KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* KCC will then deduct this Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the class period. *Id.*

    Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the class period will receive a payment equal to the total amount of PACER fees paid by that class member during the class period; and (b) each class member who paid more than $350 in PACER fees during the class period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

    KCC will complete disbursement of each class member's share of the recovery within 180 days of receiving the $125 million from the United States, or within 180 days of receiving the necessary information from AO, whichever is later. Second Supp. Agreement. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. Agreement ¶ 22.

14

***Second distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the settlement trust one year after the $125 million payment by the United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. Second Supp. Agreement. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the class period and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the class period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. Agreement ¶ 24. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

### 6.  Service awards, attorneys' fees, and costs

As noted, the settlement authorizes the plaintiffs to request service awards of up to $10,000 per class representative and an award of attorneys' fees and litigation expenses, and for KCC to retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18, 28. The total amount requested in service awards, fees, expenses, and costs does not exceed 20% of the total common fund. *Id.* Any amounts awarded by the Court will be paid out of the common fund. *Id.* As required by Rule 23(h), Class Members have the right to object these requests. *Id.*

### 7.    Further settlement-related proceedings

Any class member may express her views to the Court supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Agreement ¶ 30. Counsel for the parties may respond to any objection within 21 days of receiving the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32.

After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing, during which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Agreement ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.* The Court has scheduled the fairness hearing for October 12, 2023.

Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, along with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41), the extension of which the parties will be jointly requesting from this Court. Agreement ¶ 14. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

## ARGUMENT

### I.    Because the settlement provides an exceptional recovery for the class, the Court should approve the settlement.

Rule 23(e) requires court approval of a class-action settlement. This entails a "three-stage process, involving two separate hearings." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 189–90

(D.D.C. 2017) (cleaned up). Before the Court may approve a class-action settlement, it "must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(e)(2), in turn, requires that the settlement be "fair, reasonable, and adequate."

The settlement in this case has advanced past the first and second stages, with this Court having preliminarily approved it and notice having now been provided to the class. The third stage involves a fairness hearing during which the Court examines the settlement and any objections to it, followed by a decision on whether to approve the settlement. *Ross*, 267 F. Supp. 3d at 190.

In considering whether to give final approval to a settlement, the court's discretion is constrained by the "long-standing judicial attitude favoring class action settlements" and "the principle of preference favoring and encouraging settlement in appropriate cases." *Rogers v. Lumina Solar, Inc.*, 2020 WL 3402360, at *4 (D.D.C. June 19, 2020) (Brown, J.); see *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 16 (D.D.C. 2019) ("Class action settlements are favored as a matter of public policy."); *United States v. MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015) ("Settlement is highly favored."); *Ciapessoni v. United States*, 145 Fed. Cl. 685, 688 (2019) ("Settlement is always favored, especially in class actions where the avoidance of formal litigation can save valuable time and resources.").

The criteria guiding the final-approval determination are supplied by Rule 23(e)(2), which requires consideration of whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate"; and "(D) the proposal treats class members equitably relative to each other." In considering these factors, the Court will also look to "the opinion of experienced counsel." *Little v. Wash. Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 37 (D.D.C. 2018); *see also* Fed. R. Civ. P. 23,

17

Advisory Committee Note, 2018 Amendments (observing that the Rule's enumerated factors are not indented to "displace any factor" rooted in the case law). Because these are the same factors considered at the preliminary-approval stage, "settlement proposals enjoy a presumption of fairness afforded by a court's preliminary fairness determination." *Ciapessoni*, 145 Fed. Cl. at 688.

In its preliminary-approval order, this Court found that the settlement "appears to be fair, reasonable, and adequate" because it "(a) resulted from arm's-length negotiations between experienced counsel overseen by an experienced mediator; (b) eliminates the risks, costs, delay, inconvenience, and uncertainty of continued litigation; (c) involves the previously certified Class" and an "additional Settlement Class"; "(d) does not provide undue preferential treatment to Class Representatives or to segments of the Class"; and "(e) does not provide excessive compensation to counsel for the Class." ECF No. 153 at 1. Nothing has happened in the three-and-a-half months since this Court made those preliminary findings that would justify a contrary conclusion. Quite the opposite: Closer examination only confirms that each factor strongly supports final approval.

### A. The class representatives and class counsel have vigorously represented the class throughout this litigation.

The first factor examines the adequacy of representation. In certifying the class in 2017, this Court found that the three named plaintiffs are "particularly good class representatives" and that "[t]here is no dispute about the competency of class counsel"—Gupta Wessler, a litigation boutique with deep (and rare) experience in complex cases seeking monetary relief from the federal government, and Motley Rice, one of the nation's leading class-action firms. ECF No. 33 at 14–16.

That is no less true today. Since this Court's finding of adequate representation, the named plaintiffs and class counsel have spent nearly seven years vigorously representing the class. They did so first in this Court, obtaining informal discovery from the judiciary that paved the way for an unprecedented decision concluding that the AO had violated the law with respect to PACER fees.

18

They continued to do so on appeal, attracting an impressive set of amicus briefs and favorable press coverage, and ultimately securing a landmark Federal Circuit opinion affirming this Court's decision and rejecting arguments made by the Appellate Staff of the U.S. Department of Justice's Civil Division. And they did so finally in mediation, spending months negotiating the best possible settlement for the class. In short, the representation here is not just adequate, but exemplary.

### B.   The settlement is the product of informed, arm's-length negotiations.

The next factor examines the negotiation process. It asks whether the negotiations were made at arm's length or whether there is instead some indication that the settlement could have been the product of collusion between the parties.

Here, "both sides negotiated at arms-length and in good faith," and "the interests of the class members were adequately and zealously represented in the negotiations." *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 9 (D.D.C. 2006) (Friedman, J.). The plaintiffs were represented by class counsel, while lawyers at the Department of Justice and the AO appeared for the government. "Although the mediation occurred before formal fact discovery began," there had been "significant informal discovery," which ensured that "the parties were well-positioned to mediate their claims." *Radosti v. Envision EMI, LLC*, 717 F.Supp.2d 37, 56 (D.D.C. 2010); *see also Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 26 (D.D.C. 2011) (explaining that "formal discovery is not . . . required even for final approval of a proposed settlement" if "significant factual investigation [had been] made prior to negotiating a settlement"). "[T]he parties reached a settlement only after a lengthy mediation session that was presided over by an experienced mediator," *Radosti*, 717 F.Supp.2d at 56, and the settlement was approved by DOJ leadership and the judiciary's administrative body. Even in the ordinary case, where a settlement is "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery," without government involvement, there is a

19

Appx0571

"presumption of fairness, adequacy, and reasonableness." *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019). The presumption here is at least as strong.

### C. The settlement relief provided to class members is exceptional— particularly given the costs, risks, and delays of further litigation.

The third and "most important factor" examines "how the relief secured by the settlement compares to the class members' likely recovery had the case gone to trial." *Blackman*, 454 F. Supp. 2d at 9–10. This factor focuses in particular on "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2); *see also In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d at 16.

The relief provided to class members is extraordinary. The total value of the settlement is $125 million, and class members will be fully reimbursed, up to $350, for all PACER fees that they paid during the class period. Those who paid more than $350 in fees during the class period will receive a payment of $350 plus their pro rata share of the remaining settlement funds. Further, any unclaimed funds after this initial distribution will be allocated evenly to all class members who collected their initial payment (capped at the total amount of fees that each class member paid during the class period). Because most class members paid less than $350 during the class period, the average class member will receive a full refund of all fees paid. This relief will also be provided in a highly efficient manner—through a common-fund settlement in which class members will not have to submit any claim or make any attestation to receive payment. Agreement ¶ 4.

This would be an excellent outcome for the class even if it were achieved after trial, but it is especially good given the significant costs, risks, and delays posed by pursuing further litigation against the federal court system. The $125 million common fund represents nearly 70% of the total

expenditures determined by the Federal Circuit to have been unlawfully funded with PACER fees during the class period. Without a settlement, the case would be headed for years of litigation and likely another appeal, with no guarantee that the class would wind up with any recovery given the government's remaining argument against liability (that the plaintiffs could not prove that PACER fees would have been lower—or by how much—but for the unlawful expenditures). Although the plaintiffs and class counsel believe that the government's argument is incorrect (and further, that the AO should be liable for some portion of the CM/ECF expenses), the uncertainty and complete lack of case law on this issue counsel in favor of compromise. Add to that the benefits provided by avoiding protracted litigation and time-and-resource-intensive discovery into the remaining issues, and this is a superb recovery for the class.

The settlement's provision for attorneys' fees and service awards is also reasonable, as we discuss in more detail later. The settlement provides that the total amount requested in service awards, litigation expenses, administrative costs, and attorneys' fees will be no more than 20% of the aggregate amount of the common fund; and that "the Court will ultimately determine whether the amounts requested are reasonable." *Id.* ¶¶ 18, 28. The settlement further provides that the plaintiffs will request service awards of no more than $10,000 per class representative. *Id.* ¶ 28.

### D. The settlement agreement treats class members equitably relative to each other.

The fourth factor examines whether the settlement treats class members equitably vis-à-vis one other. The settlement here does so. It reimburses every class member for up to $350 in fees paid during the class period and distributes the remaining funds in a way that is proportional to the overcharges paid by each class member. This formula for calculating payments is reasonable under the circumstances. It advances the AO's longstanding policy goal of expanding public access for the average PACER user and, in doing so, approximates how the AO likely would have chosen

21

to reduce PACER fees during the class period had it been acting under a proper understanding of the law. Indeed, following this Court's summary-judgment decision, the AO doubled the size of the quarterly fee waiver, from $15 to $30. Gupta Decl. ¶ 20. Had it done the same over the class period, the total fee waiver available to all PACER users would have increased by $480. Reimbursing every PACER user for up to $350 in fees paid, with pro rata distributions to any users who paid more than that amount, is therefore fully in keeping with the AO's fee policy and a reasonable allocation of damages. The minimum payments also make it likelier that class members will collect their payments, thereby maximizing recovery to the class.

One class member has nevertheless objected to the settlement's plan of allocation—the only objection received to date. *See* Aug. 8, 2023 Letter from G. Miller. After emphasizing that he has "no problem with the total cash compensation or with the proposed maximum of 20% of the common fund for attorney fees, expenses, [service] awards," and costs, the objector takes issue with the formula for distribution because it "discriminates between larger and smaller claimants." *Id.* at 1. He acknowledges that such an approach is permissible when it can be justified. *Id.* at 1–2. Yet he contends that the line drawn in this case ($350) is substantively unfair and "seems based … on a wish to favor smaller users," which he derides as a "[r]edistribution of wealth." *Id.* at 2.

It is understandable that some class members may wonder why settlement funds are not distributed on a purely pro rata basis. But the objector is mistaken in assuming that there are no "valid reasons" for this. *Id.* To the contrary, there are at least three good reasons: *First*, the text of the E-Government Act—the statute on which the claims here are based—expressly authorizes the judiciary to "distinguish between classes of persons" in setting PACER fees "to avoid unreasonable burdens and to promote public access to such information." 28 U.S.C. § 1913 note. And the AO has long had a policy of doing just that. *Second*, the government's litigating position—and its position during the negotiation process—was that the plaintiffs, in order to prove liability and damages,

22

would need to show what PACER fees would have been in a but-for world in which the AO complied with the law. The government further maintained that, in keeping with the statutory text and longstanding AO policy, the Judicial Conference of the United States would have used the funds to increase the size of the fee waiver or otherwise expand public access to people burdened by the fees. Although the plaintiffs took a very different position—that liability had been established and damages should be calculated pro rata—the settlement reasonably reflects a blend of these approaches. It is partially pro rata. But, because settlement involves compromise, it is not exclusively pro rata. *Third*, the government insisted on the $350 initial payment as a condition of the settlement. Gupta Decl. ¶ 28. During negotiations, the plaintiffs and class counsel vigorously advocated for a pro-rata approach, and they were able to convince the government to reduce the minimum number to $350, but the government was unwilling to go further. *Id.* Faced with the choice between compromising and walking away, the plaintiffs chose to compromise. There was nothing unreasonable or unfair about doing so. To the contrary, courts routinely recognize that "a Plan of Allocation providing for a minimum payment, to incentivize claims distribution and avoid *de minimis* settlement payments, can be fair and reasonable." *In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812, at *2 (E.D. Mich. Dec. 20, 2019).

In addition, as we explain later, the settlement is equitable in allowing the class representatives to seek service awards of up to $10,000, while recognizing that this Court has discretion to award a smaller amount (or no award at all). *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012). Service awards "are not uncommon in common-fund-type class actions and are used to compensate plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011). The three nonprofits that prosecuted this case have been actively engaged in the litigation for more than seven years—preparing declarations, receiving case updates, spending countless hours

reviewing drafts and giving substantive feedback, and weighing in throughout the negotiation process, helping to produce a better outcome for all class members. Given their extraordinary contributions, it would be inequitable *not* to compensate them for their service.

### E. The plaintiffs and class counsel support the settlement.

The final relevant factor is not enumerated in the text of Rule 23, but it is well-settled in the case law. Under this Court's cases, "the opinion of experienced and informed counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *Prince v. Aramark Corp.*, 257 F. Supp. 3d 20, 26 (D.D.C. 2017). Counsel for both parties "are clearly of the opinion that the settlement in this action is fair, adequate, and reasonable," which only further confirms its reasonableness. *Cohen v. Chilcott*, 522 F.Supp.2d 105, 121 (D.D.C. 2007); *see also* Burbank Decl. ¶¶ 7–8 (Director of Litigation at the National Veterans Legal Services Program setting forth her strong support for the settlement); Rossman Decl. ¶¶ 4–5 (Litigation Director of the National Consumer Law Center setting forth his strong support for the settlement).

## II. The notice and notice programs provided class members with the best notice practicable under the circumstances.

Due process requires that notice to class members be "reasonably calculated, under all the circumstances, to apprise [them] of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank Tr. Co.*, 339 U.S. 306, 314 (1950). Rule 23(e)(1) similarly requires that notice be directed in a "reasonable manner to all class members who would be bound by the proposal." The notice here meets these requirements. It described the lawsuit in plain English, including the key terms of the settlement, the procedures for objecting to it, and the date of the fairness hearing. Agreement ¶ 29; *see* ECF No. 153. The notice sent to the additional class members—those who paid fees only between April 22, 2016 and May 31, 2018—also informed them of their right to opt out and the procedures through which they may exercise that right. KCC

Appx0576

Decl. ¶ 8. Further, the notices were distributed in a way that was designed to reach all class members: email notice to all class members for whom the AO has an email address on file; postcard notice to all class members for whom the AO does not have an email address on file, or for whom email delivery was unsuccessful; and publication notice designed to reach individuals and entities whose contact information may not be in the AO's accountholder data. KCC Decl. ¶¶ 5, 8, 10, 12, 13, 15, 16. Relevant case documents are also available on the settlement website. KCC Decl. ¶ 18.

## III. The requested attorneys' fee award is reasonable.

### A. This Court should use the percentage-of-the-fund approach to assess the reasonableness of class counsel's fee request.

In class actions, "class counsel may request an award of fees from the common fund on the equitable notion that lawyers are entitled to reasonable compensation for their professional services from those who accept the fruits of their labors." *Moore v. United States*, 63 Fed. Cl. 781, 786 (2005); *see* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."); *Applegate v. United States*, 52 Fed. Cl. 751, 755 (2002) ("For more than a century, … courts have awarded fees to an attorney who succeeds in creating, protecting or enhancing a common fund from which members of a class are compensated for a common injury."); *see also Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1371 (Fed. Cir. 2023). The district court has a "duty to ensure that [any such request] for attorneys' fees [is] reasonable." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993).

Courts have identified two approaches for assessing the reasonableness of class counsel's fee request. The first is the "percentage-of-the-fund method, through which a reasonable fee is based on a percentage of the fund bestowed on the class." *Health Republic*, 58 F.4th at 1371 (cleaned up). The second is the "lodestar" method, "through which the court calculates the product of

reasonable hours times a reasonable rate and then adjusts that lodestar result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings." *Id.* (cleaned up).

As between these two approaches, courts overwhelmingly prefer the percentage-of-the-fund approach in common-fund cases. *See* Fitzpatrick Decl. ¶ 10 (noting that this approach is used in about 90% of common-fund cases); *Manual for Complex Litig.* § 14.121 (4th ed. 2004) ("[T]he vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases."); *see also, e.g.*, *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1263 (10th Cir. 2023) ("We have … express[ed] a preference for the percentage-of-the-fund approach."). The lodestar method, in contrast, is "used generally outside the common-fund context," *Health Republic*, 58 F.4th at 1371, such as when a defendant is obligated to pay fees under a fee-shifting statute.

Courts use the percentage-of-the-fund approach for good reason. It replicates the market, is easy to apply, and "helps to align more closely the interests of the attorneys with the interests of the parties by discouraging inflation of attorney hours and promoting efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 88 (D.C.C. 2013) (Friedman, J.) (cleaned up); *see Little*, 313 F. Supp. 3d at 38 (making same points); Fitzpatrick Decl. ¶¶ 9–12 (expanding on these points); Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151, 1159–63 (2021); *see also, e.g.*, *Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1055 (S.D. Cal. 2017) ("Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class."); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in

this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," whereas "the lodestar [method] creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." (cleaned up)); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995) ("[U]se of the POF method in common fund cases is the prevailing praxis" due to its "distinct advantages.").

The preference for the percentage-of-the-fund approach is so strong that some circuits, like the D.C. Circuit, have essentially mandated its use in common-fund cases. *See Swedish Hosp.*, 1 F.3d at 1271 ("[A] percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1278 (11th Cir. 2021) ("[I]n common fund settlements like this one, an attorney's fee award shall be based upon a reasonable percentage of the fund established for the benefit of the class.") (cleaned up); *Rite Aid*, 396 F.3d at 306 ("[T]he percentage of common fund approach is the proper method of awarding attorneys' fees."). Although the Federal Circuit has not gone this far, *see Health Republic*, 58 F.4th at 1371, fee awards in the circuit are "typically based on some percentage of the common fund." *Moore*, 63 Fed. Cl. at 786; *see, e.g.*, *Mercier v. United States*, 156 Fed. Cl. 580, 591 (2021) (awarding fees as a percentage); *Kane Cnty. v. United States*, 145 Fed. Cl. 15, 18–20 (2019) (same); *Quimby v. United States*, 107 Fed. Cl. 126, 133–35 (2012) (same). This case calls for the same approach.

### B.    A fee of 19.1% of the common fund is reasonable.

The next question is whether the requested fee constitutes a reasonable percentage of the common fund. To help answer this question, courts within the Federal Circuit have devised a multifactor test, under which seven factors are relevant: "(1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been

negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award." *Health Republic*, 58 F.4th at 1372 (quoting *Moore*, 63 Fed. Cl. at 787).

Here, each factor supports the requested fee. A thorough application of the multifactor test thus only confirms this Court's preliminary finding that the settlement—which authorizes class counsel to seek fees of up to 20% of the common fund (minus the amounts for expenses and service awards)—"does not provide excessive compensation to counsel for the Class." ECF No. 153 at 1.

       **1.**      **The quality of counsel supports the requested fee.**

On the first factor, there can be "little question about the skill and efficiency demonstrated by class counsel in this case." *Black Farmers*, 953 F. Supp. 2d at 92. Class counsel are a small team of lawyers from two preeminent law firms: Gupta Wessler, a litigation boutique with significant experience in complex cases seeking monetary relief against the federal government, and Motley Rice, a leading class-action firm. *See* Gupta Decl. ¶¶ 12, 45–48; Oliver Decl. ¶ 2. This Court has already recognized that these lawyers are "experienced," ECF No. 153 at 1, and that "[t]here is no dispute about the[ir] competency," ECF No. 33 at 15–16. Other courts have agreed. *See, e.g.*, *Steele v. United States*, 2015 WL 4121607, at *4 (D.D.C. June 30, 2015) (finding the same lawyers to be "accomplished attorneys" who have "demonstrated significant experience in handling class actions, including class actions … against the government," and appointing them as class counsel in an illegal-exaction case against the United States, while emphasizing that "the Court is thoroughly impressed by the[ir] qualifications"); *Mercier*, 156 Fed. Cl. at 591 (finding that Motley Rice "has extensive experience litigating class actions" and has "vigorously prosecuted" class actions against the federal government, achieving "excellent result[s]"); *Houser v. United States*, 114 Fed. Cl. 576 (2014) (certifying class of all federal bankruptcy judges represented by the same two Gupta Wessler lawyers, who later obtained a $56 million judgment).

28

Further, class counsel faced a formidable group of lawyers from the Department of Justice, who tenaciously defended this case on every possible ground, from jurisdiction to class certification to the merits. The government did so not only in this Court, but also in the Federal Circuit, where it presented arguments from the Civil Division's Appellate Staff. Defeating all of these arguments—and then successfully negotiating a historic settlement—"called for a host of skills by class counsel." *Black Farmers*, 953 F. Supp. 2d at 92; *see* Burbank Decl. ¶¶ 5, 7–8 (testifying to the quality and skill of class counsel's work); Rossman Decl. ¶¶ 2, 4 (same); Brooks Decl. ¶ 3 (same); Fitzpatrick Decl. ¶¶ 8, 20–21 (same); *see also In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 112 (D.D.C. 2013) ("[T]he best testament to their effectiveness was their ability to successfully resolve this exceedingly complex case and secure the … settlement … while battling opposing counsel at the very top of the defense bar."). The first factor thus strongly supports the requested fee.

2. **The complexity and duration of the case supports the requested fee.**

So does the second factor. Class counsel have been litigating this case for over seven years. They defeated a motion to dismiss, obtained certification of a nationwide class of hundreds of thousands of people, engaged in informal discovery, secured an unprecedented ruling from this Court on liability, successfully defended that ruling on appeal (both as to jurisdiction and liability), negotiated a historic settlement on remand, obtained preliminary approval of the settlement, and assisted class members with an unusually large and complex set of questions about the settlement-administration process—a process that is ongoing and that will only intensify once the settlement is administered. Moreover, the legal and practical questions that they have confronted have been extraordinarily complex and challenging. *See* Gupta Decl. ¶¶ 6–9 (detailing complexity of legal issues); Fitzpatrick Decl. ¶ 20 (same); Burbank Decl. ¶¶ 3, 8 (same, with a focus on illegal-exaction issues); Oliver Decl. ¶¶ 5–7 (detailing complexity of settlement-administration issues); KCC Decl.

¶¶ 15–17 (same). By any measure, then, the second factor supports the requested fee. *See Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 105 ("[T]he settlement certainly 'does not come too early to be suspicious.' Nor does it come 'too late to be a waste of resources.'").

### 3. The risk of nonrecovery supports the award.

Now for the third factor: litigation risk. When lawyers take a case on contingency, their percentage fee must compensate them "for the risk of nonpayment." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). "The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Id.*

To say that this case was "unusually risky" is an understatement. *Id.* It involved a challenge to a fee schedule promulgated by the Judicial Conference of the United States, presided over by the Chief Justice. The challenge concerned a statute that had "never [been] interpreted by a court," *Black Farmers*, 953 F. Supp. 2d at 93, and that "nowhere explicitly requires payment of damages by the government for overcharging users," *NVLSP*, 968 F.3d at 1348; *see* ECF No. 105 at 5–7 (authorizing appeal because "there is a complete absence of any precedent from any jurisdiction," the government's argument "is not without merit," and "there would be no liability and the case would be over" if the argument were correct). The contours of the "relatively obscure cause of action" on which the plaintiffs relied had "remained unresolved in the courts" when the case was filed. Burbank Decl. ¶ 8. And, because the judiciary is not subject to the Administrative Procedure Act and bringing individual claims would not have been economically rational, the plaintiffs had to pursue a class action for money damages against the judiciary, which had no historical precedent. *See* Fitzpatrick Decl. ¶ 20 ("In all my years of studying class actions and litigation against the federal government, I am not aware of any previous class action that has successfully been brought against the federal judiciary."). All the while, class counsel went about their work, devoting thousands of hours to the case without receiving any compensation, or any guarantee of future

compensation. If this case doesn't carry with it a considerable risk of nonrecovery, it is hard to imagine a case that would.

As Professor Fitzpatrick puts it: "[E]very step of this lawsuit required a new trail to be cut. Not only procedurally—Did the Court have jurisdiction? Was there a cause of action? Did the judiciary have sovereign immunity?—but also on the merits—How should the E-Government Act be interpreted? How can any violation of it be proved? None of these questions were even 50-50 propositions for the class when this litigation began. People had been complaining about high PACER fees for years, but no one had invented a legal solution to the problem until class counsel did." Fitzpatrick Decl. ¶ 20. As this Court explained in a different class action against the federal government that also carried considerable risk: "The prospect of such litigation is daunting, and many attorneys would not have undertaken it." *Black Farmers*, 953 F. Supp. 2d at 93.

Of course, now that the "legal solution" that had escaped so many for so long is clear, Fitzpatrick Decl. ¶ 20, it might be easy to forget how risky this case was at the start. But that is only because "hindsight alters the perception of the suit's riskiness." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). Properly understood, this factor emphatically supports the requested fee.

### 4. The fee that likely would have been negotiated between private parties in similar cases supports the requested fee.

The next factor only further confirms the fee's reasonableness. A contingency fee of 19.1% is a much smaller percentage than what the private market would bear. *See* Fitzpatrick Decl. ¶ 14 ("The request here is about 19% of the settlement. It is well known that this is well below what private parties negotiate when they hire lawyers on contingency."). For contingency cases, it is "typical" to have a fee arrangement "between 33 and 40 percent." *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998). That is exactly what the three named plaintiffs agreed to here. Before the case was filed, each signed a retainer agreement with class counsel that provided for a contingency fee

Appx0583

of up to 33% of the common fund. Gupta Decl. ¶ 65; *see Kane Cnty.*, 145 Fed. Cl. at 19 ("A fee of one third the total recovery is consistent with the fee that likely would have been negotiated by private parties. In fact, that was the fee negotiated between class counsel and the lead plaintiff.").

More importantly, when the class was certified in 2017, the notice informed class members: "By participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." *See* ECF Nos. 43-1 & 44. The notice also informed them of their right to opt out of the class. "A contingent fee that is reached by the free consent of private parties should be respected as fair as between them." *Quimby*, 107 Fed. Cl. at 134. That is all the more true here, where class members agreed to "a fee request *even greater* than" the 19.1% fee now sought by class counsel, and where many class members are "sophisticated parties like lawyers and large institutions." Fitzpatrick Decl. ¶ 26; *see Quimby*, 107 Fed. Cl. at 134 (relying on similar language and reasoning that, by choosing to participate in the class, "each member effectively accepted the offer of representation for a thirty percent contingency fee, and presumably concluded that a better deal could not be reached with their own counsel").

> **5. The reaction of class members to date supports the requested fee.**

"The free consent of class members to a thirty percent fee perhaps explains the absence of objections" to date—the fifth factor. *See Quimby*, 107 Fed. Cl. at 134. Indeed, as of the filing of this motion, none of the hundreds of thousands of class members has signaled any objection to the settlement's fee provision (or for that matter, to the amount of the common fund). *See id.* (approving fee where "only one class member has objected to the [settlement's] terms related to attorneys' fees"); *Sabo v. United States*, 102 Fed. Cl. 619, 628–29 (2011) (explaining that a relative lack of objections "weigh[s] in favor of approv[al]"). And the class representatives fully support the fee request. *See*

Burbank Decl. ¶ 7; Rossman Decl. ¶ 5; Brooks Decl. ¶ 3. The lack of objections to the fee provision is particularly relevant here because, as just noted, class members are disproportionately likely to read and pay attention to legal filings, and to be aware of their legal rights. Thus, while it is possible that objections will be forthcoming, as of now, this factor provides additional support for the fee.

### 6. The percentage awarded in other cases supports the requested fee.

The sixth factor—comparing the percentage fee to other class actions—further supports the fee request. Generally speaking, a contingency fee of "one-third is a typical recovery." *Moore*, 63 Fed. Cl. at 787; *see, e.g., Kane Cnty.*, 145 Fed. Cl. at 19 ("[A]n award equal to one third of the common fund is commensurate with attorney fees awarded in other class action common fund cases."); *Quimby*, 107 Fed. Cl. at 133 ("A fee equal to thirty percent of the common fund totaling nearly $74 million is … within the typical range of acceptable attorneys' fees."); *Moore*, 63 Fed. Cl. at 787 (awarding 34% as "well within the acceptable range"); *Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 111 ("Both nationally and in this Circuit, 'a majority of common fund class action fee awards fall between twenty and thirty percent.'"); *see also* Fitzpatrick Decl. ¶ 15 (providing statistical averages).

A fee award of 19.1% is well within the norm for settlements of this size. It is "actually below the average percentage … for settlements between $69.6 and $175.5 million" (19.4%). Fitzpatrick Decl. ¶ 19; *see Equifax*, 999 F.3d at 1281 ("20.36 percent is well within the percentages permitted in other common fund cases, and even in other megafund cases"); *see also, e.g., Mercier*, 156 Fed. Cl. at 592 (20% of $160 million fund); *Fed. Nat'l Mortg.*, 4 F. Supp. 3d at 112 (19% of $153 million fund); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *12 (D.D.C. July 16, 2001) (33% of $365 million fund). And the reasonableness of the percentage becomes even clearer when the amounts of older funds are adjusted for inflation. *See, e.g., Quimby*, 107 Fed. Cl. at 133 (30% award of fund equal to $100 million in today's dollars according to the U.S. Bureau of Labor Statistics' CPI Inflation Calculator,

33

https://perma.cc/TEE4-BAJX). Professor Fitzpatrick's study, for example, analyzed data from 2006 to 2007 and found that, for settlements of between $72.5 million and $100 million—or about $110 million to $150 million today—the average award was 23.9%. *See* Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811, 839 (2010). An award of 19.1% of the common fund thus "clearly would be reasonable" in a typical case involving a $125-million fund today. *Black Farmers*, 953 F. Supp. 2d at 99. And, as already discussed, the "considerations … that reveal this case to be dissimilar" to the typical case would justify a *higher* percentage—not a lower one. *Id.*[2]

### 7. The size of the award supports the requested fee.

That leaves the last factor. Although the requested fee award is sizable ($23,863,345.02), it pales in comparison to the relief obtained for the class. And because "[t]he result is what matters" most in the end, when "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983); *see also Quimby*, 107 Fed. Cl. at 133.

As explained earlier, the relief that the settlement provides to class members is remarkable. The total value of the settlement is $125 million, and every class member will be reimbursed, up to

---

[2] A decade ago, this Court described a "megafund" as a recovery of "$100 million or more." *Black Farmers*, 953 F. Supp. 2d at 98. That amount would equal more than $140 million in today's dollars, so this case wouldn't qualify as a megafund even under that definition. Moreover, as Professor Fitzpatrick explains, lowering the percentage simply because the common fund is over $100 million could "actually make class counsel *better off* by resolving a case for less rather than more if it is not done only on the margin (e.g., only for the *portion* above $100 million)." Fitzpatrick Decl. ¶ 17. This case provides an example. If the common fund were $99 million instead of $125 million, the same requested fee would be about 24% of the fund—well within the typical range. It would be irrational to punish class counsel for doing better by the class. *See Synthroid*, 264 F.3d at 718 ("This means that [class] counsel … could have received [more] fees" had they not "obtained an extra $14 million for their clients … Why there should be such a notch is a mystery. Markets would not tolerate that effect."). In any event, as this Court observed (and as the data shows), "even in megafund cases involving recoveries of $100 million or more, fees of fifteen percent are common." *Black Farmers*, 953 F. Supp. 2d at 98 (cleaned up).

$350, for PACER fees that they paid between April 21, 2010 and May 31, 2018. Those who paid more than $350 in fees during that period will receive $350 plus their pro rata share of the remaining settlement funds. And the relief will be provided in a highly efficient manner. This would be a terrific outcome for the class even if it were achieved after trial, but it is especially good given the substantial costs, risks, and delays presented by pursuing further litigation against the federal judiciary—including the very real risk that the plaintiffs would ultimately not prevail at all. As compared to this result for the class, the requested fee is fair and reasonable.

### C. A lodestar cross-check, although not required, would only confirm the reasonableness of the requested fee.

Courts sometimes use a "lodestar cross-check" to further inform the reasonableness of a percentage fee. *See Health Republic*, 58 F.4th at 1372, 1374 n.2; Fitzpatrick Decl. ¶ 22 (noting that a "significant minority of courts" do so). Such a cross-check is not required by D.C. Circuit or Federal Circuit precedent. The danger with the lodestar cross-check is that it "brings through the backdoor all of the bad things the lodestar method used to bring through the front door. Not only does the court have to concern itself again with class counsel's timesheets, but, more importantly, it reintroduces the very same misaligned incentives that the percentage method was designed to correct in the first place." Fitzpatrick Decl. ¶ 23. To illustrate, Professor Fitzpatrick hypothesizes a case in which "a lawyer had incurred a lodestar of $1 million in a class action case. If that counsel believed that a court would not award him a 25% fee if it exceeded twice his lodestar, then he would be *rationally indifferent* between settling the case for $8 million and $80 million (or any number higher than $8 million). Either way he will get the same $2 million fee. Needless to say, the incentive to be indifferent as to the size of the settlement is not good for class members." Fitzpatrick Decl. ¶ 24. 25.

When courts nevertheless elect to conduct a cross-check, they do so "by dividing the proposed fee award by a lodestar calculation, resulting in a lodestar multiplier." *Health Republic*, 58 F.4th at 1372 (cleaned up). Because the multiplier "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work," *Rite Aid*, 396 F.3d at 306, courts that elect to perform a lodestar cross-check should "take care to explain how the application of a multiplier is justified by the facts of a particular case," while also considering the "multipliers used in comparable cases," *Health Republic*, 58 F.4th at 1375.

At the same time, courts must keep in mind that "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *Rite Aid*, 396 F.3d at 307. This general principle has two relevant corollaries: The first is that the "multiplier need not fall within any pre-defined range." *Health Republic*, 58 F.4th at 1375; *see Rite Aid*, 396 F.3d at 307 ("[T]he resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award."); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (rejecting the argument "that any percentage fee award exceeding a certain lodestar multiplier is excessive"). Were it otherwise, and the multiplier could serve to cap fees, it would "eliminate counsel's incentive to press for a higher settlement" in many cases, *Williams*, 658 F.3d at 636 (cleaned up)—and thus "reintroduce[] the very same misaligned incentives that the percentage method was designed to correct in the first place," Fitzpatrick Decl. ¶ 23. The second corollary is that "mathematical precision" is not required in a cross-check. *Rite Aid*, 396 F.3d at 306. "Requiring the Court to examine and evaluate [] detailed" time records "would defeat one of the primary benefits of the 'percentage of the fund' method"—conserving 'judicial resources" and preventing "delay in distribution of the common fund to the class." *Black Farmers*, 953 F. Supp. 2d at 101 n.8. Heeding these two corollary principles helps to ensure that the lodestar cross-check is used truly as a cross-check—and not just a way of "bring[ing] through the backdoor all of the bad things the lodestar

36

method used to bring through the front door." *See* Fitzpatrick Decl. ¶¶ 23–25 ; *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 729 (2d Cir. 2023) (Jacobs, J., concurring) (noting that the cross-check, if it operates as a hard cap on fees, can provide "an incentive for counsel to prolong litigation and maximize billable hours to arrive at a lodestar that does not operate as a cap on a percentage award").

In this case, class counsel's lodestar is $6,031,678.25, yielding a lodestar multiplier of less than 3.96. *See* Gupta Decl. ¶ 64; Oliver Decl. ¶ 13. That is in line with a standard multiplier. *See* Fitzpatrick Dec. ¶ 27. As the Federal Circuit recently remarked, a multiplier of up to four is the "norm." *Health Republic*, 58 F.4th at 1375; *see also Black Farmers*, 953 F. Supp. 2d at 102 ("Multiples ranging up to four are frequently awarded in common fund cases when the lodestar method is applied." (cleaned up)); *Kane Cnty.*, 145 Fed. Cl. at 20 ("[A] multiplier of approximately 6.13 … is within the range courts have approved in common fund cases."); *Geneva Rock Prods.*, 119 Fed. Cl. at 595 ("[A]n award 5.39 times the lodestar is reasonable … given the complexity of the litigation, the diligent and skillful work by class counsel, and the pendency of the case for over six years."); *Milliron v. T-Mobile USA, Inc.*, 423 F. App'x 131, 135 (3d Cir. 2011) ("Although the lodestar multiplier need not fall within any pre-defined range, we have approved a multiplier of 2.99 in a relatively simple case." (cleaned up)). And a higher multiplier may be justified by the circumstances of a "particular case," including "the risk of nonpayment," the lack of significant "object[ion] to the award," and whether the notice indicated an "agreement by the class to a specified percentage." *Health Republic*, 58 F.4th at 1375–77.[3]

---

[3] This total figure includes $3,271,090.25 and $1,860,588.00 in lodestar incurred to date by Gupta Wessler and Motley Rice, respectively, as well as projected future work that will produce an additional lodestar of about $900,000. Gupta Decl. ¶ 62 ($400,000 for Gupta Wessler); Oliver Decl. ¶ 9 ($500,000 for Motley Rice). The past lodestar figures, standing alone, are "incomplete," *Black Farmers*, 953 F. Supp. 2d at 102, because they do not include work that class counsel will perform

All these features are present in this case. As one judge on this Court has explained: "The flaw with comparisons to fees in other cases, of course, is that they inevitably tend to focus on averages and medians and ranges. This case, however, was anything but average." *Fed. Nat'l Mortgage Ass'n*, 4 F. Supp. 3d at 112. The same point applies here. *Id.* Far from being a "relatively simple case," *Milliron*, 423 F. App'x at 135, "there is no question that this litigation was lengthy, highly complex, and vigorously contested," *Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 112. The "complexity and duration of the case," "high risk of nonpayment," and "skill and performance of the attorneys" distinguish this case from the ordinary case, justifying an above-average multiplier. *Id.* And the lack of significant "object[ion] to the award," and the notice language signaling an "agreement by the class to a specified percentage" that greatly *exceeds* the fee requested here, only

---

going forward—including responding to inquiries from class members about legal issues, damages calculations, and the mechanics of the settlement; responding to potential objections and filing any replies in support of the settlement; preparing for and participating in the fairness hearing; handling any appeal; assisting class members during the settlement-administration process and ensuring that it is carried out properly; and addressing any unanticipated issues that may arise. *See Geneva Rock Prods., Inc. v. United States*, 119 Fed. Cl. 581, 595 (2015), *rev'd on other grounds sub nom. Longnecker Prop. v. United States*, 2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) ("When cross-checking an award," the lodestar "must be augmented … to reflect the additional time that has been and will be spent by class counsel on the request for the court's approval of the settlement, the fairness hearing and supplemental submissions, and further settlement obligations"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 746 Fed. App'x 655, 659 (9th Cir. 2018) (finding it appropriate for cross-check to "compar[e] the fee award to a lodestar that included projected work," such as work "defend[ing] against appeals and assist[ing] in implementing the settlement"). The projected figures here are based in part on an extrapolation of the settlement-related work performed in recent months and are appropriately included as part of the lodestar. *See, e.g., Martin v. Toyota Motor Credit Corp.*, 2022 WL 17038908, at *14 (C.D. Cal. Nov. 15, 2022) ("Class Counsel additionally estimate they will incur at least an additional $600,000 in fees … . Although this is merely a projection, the Court finds that projected fees are appropriate considerations in lodestar cross-checks." (cleaned up)); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *40 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*, 999 F.3d 1247, 1278 (11th Cir. 2021) (explaining that a "reasonable estimate" of future time—there, 10,000 hours—may properly be included in conducting a lodestar cross-check, because, "[i]f the fee was lodestar-based, class counsel would be entitled to file supplemental applications for future time"; "[e]xcluding such time thus would misapply the lodestar methodology and needlessly penalize class counsel").

drive the point home. *Health Republic*, 58 F.4th at 1375–77; *see* Fitzpatrick Decl. ¶ 26 ("[A]t the outset of the litigation, would class members have objected to paying class counsel 19% of whatever was recovered here? We do not have to guess at the answer: despite the opportunity to opt out when they received the class certification notice advising them of a fee request *even greater* than this one, the original class—which … are largely sophisticated parties like lawyers and large institutions— decided not to opt out. … [N]ew class members are currently being given the same chance.").

In fact, "the risk of nonpayment" alone justifies the multiplier. *Health Republic*, 58 F.4th at 1375. A simple math exercise shows why. To "properly incentivize … contingency representation," a multiplier would have to at least be "the inverse of the riskiness of the case." Fitzpatrick Decl. ¶ 28. Here, there were at least three novel, fiercely contested, and independently case-dispositive issues: Is there jurisdiction (including a cause of action and waiver of sovereign immunity) for this claim? Can a class action for monetary relief be certified against the federal judiciary? And did the judiciary violate the statute, and do so in a way that created liability? If the government prevailed on even just one of these issues, there would no classwide liability and therefore no attorneys' fees. So if the government had even a 40% chance of prevailing on any of these independent issues, that would meant that the plaintiffs had little more than a 20% chance of obtaining any classwide relief when the case was filed—fully justifying a multiplier of five. And, if Professor Fitzpatrick were right that "[n]one of these questions were even 50-50 propositions for the class when this litigation began," the multiplier would have to be over eight to account for the risk. *Id.* ¶ 20. Hence his conclusion that, "in light of the extreme risks involved here," the multiplier is "below what would have been needed to properly incentivize this contingency representation." *Id.* ¶ 28.

"Applying a lodestar cross-check, therefore, confirms that the award sought by class counsel is neither unusual nor unreasonable." *Black Farmers*, 953 F. Supp. 2d at 102. To the contrary, the cross-check "yields an award consistent with the one derived from the application of the percentage

[method]," confirming the reasonableness of the requested fee. *Kane Cnty.*, 145 Fed. Cl. at 20. The litigation and settlement-administration expenses incurred by class counsel were reasonable and should be reimbursed from the common fund.

"In addition to being entitled to reasonable attorneys' fees, class counsel in common fund cases are also entitled to reasonable litigation expenses from that fund." *Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 113; *see Mercier*, 156 Fed. Cl. at 593 ("It is well settled that counsel who have created a common fund for the benefit of a class are entitled to be awarded for out-of-pocket costs reasonably incurred in creating the fund."); Fed. R. Civ. P. 23(h); *see also, e.g.*, *Kane Cnty.*, 145 Fed. Cl. at 20–21.

Here, class counsel incurred $29,654.98 in expenses. Many of these expenses were for hiring the mediator and for travel costs, and each expense was actually and reasonably incurred. *See* Oliver Decl. ¶¶ 14–19. Accordingly, class counsel should be reimbursed for these reasonable, out-of-pocket expenses. *See Quimby*, 107 Fed. Cl. at 135.

In addition, the settlement authorizes KCC to retain from the common fund all notice and administration costs actually and reasonably incurred. KCC originally provided class counsel with a total not-to-exceed amount of $977,000, which we have revised to include an additional $100,000 to account for previously unanticipated complexities. *See* Oliver Decl. ¶ 19. We ask that this amount be set aside to cover current and "future administrative fees and costs." *Quimby*, 107 Fed. Cl. at 135.

## IV.    The Court should award each of the three class representatives $10,000 for their contributions to the case.

Finally, class counsel seeks service awards (also known as case-contribution awards) for each class representative. "Case contribution awards recognize the unique risks incurred and additional responsibility undertaken by named plaintiffs in class actions." *Mercier*, 156 Fed. Cl. at 589 (awarding $20,000 per representative). This Court has already recognized that "the nonprofit organizations who are named plaintiffs in this case make particularly good class representatives" because they

"have dual incentives to reduce PACER fees, both for themselves and for the constituents that they represent." ECF No. 33 at 14. It should now recognize that their service justifies a modest award.

The three named plaintiffs here took on considerable risk and responsibility when they agreed to serve as class representatives. They all "consulted regularly with counsel throughout the litigation and were actively involved in all material aspects of the lawsuit." *Mercier*, 156 Fed. Cl. at 589; *see* Rossman Decl. ¶¶ 2–3; Burbank Decl. ¶¶ 4–6; Brooks Decl. ¶ 2. In fact, the individuals at each organization who participated in the case are themselves lawyers, and they estimate that, for each organization, the full requested award may be justified based solely on the amount of attorney time spent working on the case. *See* Rossman Decl. ¶ 3; Burbank Decl. ¶ 6; Brooks Decl. ¶ 2.

Yet there is another reason to grant the requested awards here. Just as "it takes courage to be the public face of litigation against one's employer," *Mercier*, 156 Fed. Cl. at 589, it also takes courage for legal-advocacy organizations to be the public face of litigation against the federal-court system. *See* Rossman Decl. ¶ 2; Burbank Decl. ¶ 5. Thus, whether the Court wants to focus on "the contributions of the named representatives" or "the risks they bore," both were "unique." *Mercier*, 156 Fed. Cl. at 590. And together, they undoubtedly justify an award of $10,000 per representative.

## CONCLUSION

This Court should grant the motion and enter the proposed order. In addition to approving the settlement, the Court should award 20% of the settlement fund to cover attorneys' fees, notice and settlement costs, litigation expenses, and service awards. Specifically, the Court should (1) award $10,000 to each class representative, (2) award $29,654.98 to class counsel to reimburse litigation expenses, (3) order that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) award the remainder (19.1% of the settlement fund, or $23,863,345.02) to class counsel as attorneys' fees.

41

Respectfully submitted,

_/s/ Deepak Gupta_____
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
_deepak@guptawessler.com_
_jon@guptawessler.com_

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
_bnarwold@motleyrice.com_

MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
_moliver@motleyrice.com_
_cloper@motleyrice.com_

August 28, 2023

_Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class_

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2023, I electronically filed this motion and related documents through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Deepak Gupta
Deepak Gupta

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.
*Plaintiffs,*

v.

UNITED STATES OF AMERICA,
*Defendant.*

Case No. 16-745

## DECLARATION OF RENÉE BURBANK

I, Renée Burbank, declare as follows:

1.    I am the Director of Litigation at the National Veterans Legal Services Program (NVLSP), a national nonprofit organization that seeks to ensure that American veterans and active-duty personnel receive the full benefits to which they are entitled for disabilities resulting from their military service. Over the years, the organization has represented thousands of veterans in court cases, educated countless people about veterans-benefits law, and brought numerous class-action lawsuits challenging the legality of rules, practices, and policies of the U.S. Department of Veterans Affairs and U.S. Department of Defense. NVLSP believes firmly in the importance of ensuring that veterans who are navigating the federal court system—like unrepresented or under-represented litigants in general—should have free and open access to judicial records.

2.    Before joining NVLSP in July 2021, I was a Clinical Lecturer and Robert M. Cover Clinical Teaching Fellow at Yale Law School, teaching and supervising students in both the Veterans Legal Services Clinic and the Peter Gruber Rule of Law Clinic.  In that capacity, I supervised advocacy on behalf of veterans and oversaw class-action litigation. While at Yale, I wrote a comprehensive article on illegal-exaction claims against the federal

Appx0596

government, *Illegal Exactions*, 87 TENN. L. REV. 315 (2020). The article has been cited multiple times in published decisions by the U.S. Court of Federal Claims. Before teaching at Yale, I was a litigator in the U.S. Department of Justice, where I worked on complex commercial litigation at both the trial and appellate levels. In that capacity, I served as lead or co-counsel on a variety of class actions brought against the federal government, including the landmark illegal-exaction case *Starr Int'l Co. v. United States*, 121 Fed. Cl. 428 (2015), *affirmed in part and vacated in part*, 856 F.3d 953 (Fed. Cir. 2017). I am a graduate of Harvard Law School (J.D., *cum laude*, 2009) and the University of Chicago (B.A., Honors in the College, 2004) and clerked for the Honorable David B. Sentelle of the U.S. Court of Appeals for the D.C. Circuit.

3. In my capacity as Director of Litigation of NVLSP, I have advised many veterans on their legal rights, including in disputes with the federal government over fees and other payments, and I am quite familiar with the difficulties in obtaining monetary relief against the United States in court. In all, I have served as counsel in over two dozen class-action cases in my career—all of them involving claims against the federal government—and am familiar with the resources, time, and money required to successfully pursue class-action claims. I offer this declaration in support of the plaintiffs' motion for final approval of the class-action settlement in this case, including the plaintiffs' request for attorneys' fees and a service award for NVLSP.

4. NVLSP has actively served as a named plaintiff in this class action for more than seven years, since it was filed. When I joined NVLSP, the parties had already begun settlement discussions and made significant headway toward an eventual resolution, but they had not yet reached an agreement. Although I was already familiar with the public filings in the case because of my academic research on illegal-exaction law, I had to spend time getting

up to speed on additional developments so I could advise NVLSP on the negotiations and improve any eventual settlement for the benefit of the organization, its clients, and all PACER users. In addition to reviewing case filings and other relevant materials, I had several calls with class counsel, where I made suggestions that improved the terms of the settlement.

5.      Before I joined NVLSP, Barton Stichman, our former Executive Director, reviewed and commented on draft pleadings, consulted on litigation strategy, provided a declaration in support of class certification, participated in discovery, received updates on motion practice and court rulings from class counsel, and actively engaged in the class-action settlement process. Mr. Stichman also engaged in substantial due diligence before deciding that NVSLP would join this litigation as a named plaintiff. As an organization that often represents others in litigation before the federal courts, the decision to sue the federal court system was not a decision NVLSP made lightly. The organization was well aware, at the time it decided to sue, that it would be challenging a fee structure set by the Judicial Conference of the United States, the judiciary's policymaking body. NVLSP would not have authorized its participation in this lawsuit had it not been convinced that class counsel were particularly skilled and that the aims of the litigation were in the public interest.

6.      Since the settlement in this case was announced, NVLSP has received numerous inquiries from potential class members, possibly because NVLSP is listed first on the case caption, which has required additional attorney and administrative staff time. All told, I estimate that my attorney colleagues and I have spent more than 25 hours working on this litigation on NVLSP's behalf during the seven years that the case has been pending, with several more hours spent by non-attorney administrative staff. I understand that counsel will seek a service award for NVLSP of $10,000. At our market billing rates, the value of attorney time incurred by NVLSP greatly exceeds that amount.

7.        Based on my active participation in this litigation and my expertise in illegal-exaction cases and class actions against the government, I am convinced that the proposed settlement in this case is fair, adequate, and reasonable. And, in light of the considerable risk, expense, and seven-year duration of this litigation, and the impressive results achieved, I find class counsel's request for attorneys' fees comprising about 19% of the common-fund to be reasonable under the circumstances. NVLSP fully supports the motion for final approval and the motion for fees, costs, and awards.

8.        This was a uniquely risky and difficult case—a nationwide class action against the federal judiciary, seeking millions of dollars on the basis of an entirely novel legal theory, invoking a statute whose meaning had never been litigated, and based upon a relatively obscure cause of action. When this case was filed, many aspects of illegal-exaction claims remained unresolved in the courts, including basic concepts about the required elements of a claim, how damages are calculated, and even the legal basis for such claims. *See generally Illegal Exactions*, 87 TENN. L. REV. at 340–45 (describing areas of illegal-exaction case law still unresolved as of 2020). Class counsel, however, displayed exceptional tenacity and litigation skill in navigating these murky waters. Against all odds, the litigation succeeded at every turn. It sparked public interest in the need to reform PACER fees, spurred legislative action, and delivered a landmark settlement to which NVLSP is proud to have contributed. We are hopeful that this litigation will serve as a blueprint for holding the judiciary accountable and, over the long term, will contribute to transparency and openness in the federal courts.

Appx0599

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on August 18, 2023.

/s/ *Renee Burbank*

_____

Renée Burbank

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, et al.<br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>*Defendant*. | Case No. 16-745 |

## DECLARATION OF STUART T. ROSSMAN

I, Stuart T. Rossman, declare as follows:

1.        I am the Litigation Director of the National Consumer Law Center (NCLC), a national nonprofit organization that seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans through policy analysis, advocacy, litigation, expert-witness services, and training for consumer advocates throughout the nation. I am also the co-editor of NCLC's treatise, *Consumer Class Actions*, and for many years coordinated NCLC's annual symposium on class actions. In addition, I am a past Co-Chair of the Board of the National Association of Consumer Advocates, which publishes the *Standards and Guidelines for Litigating and Settling Consumer Class Actions*, 299 F.R.D. 160, first published in 1998 and updated most recently in 2023. I am a graduate of Harvard Law School (J.D., *cum laude*, 1978) and the University of Michigan (B.A. *magna cum laude*, 1975) and a visiting lecturer at the University of Michigan Law School, where I have regularly taught a seminar on class actions. In my capacity as Litigation Director of the NCLC, I have co-counseled with and advised many attorneys on class-action cases around the country and am well acquainted with the resources, time and money required to successfully pursue class-action claims. I offer this declaration in support of the plaintiffs'

motion for final approval of the class-action settlement in this case, including the plaintiffs' request for a service award for NCLC.

2.      NCLC has actively served as a named plaintiff in this class action for more than seven years, since the inception of the case. As an organization that often participates in litigation before the federal courts, we did not make the decision to sue the federal judiciary lightly. We were well aware, at the time we decided to sue, that we would be challenging a fee structure set by the Judicial Conference of the United States, presided over by the Chief Justice. We would not have decided to authorize suit had we not been convinced that class counsel were exceptionally skilled and that the aims of the litigation were worthwhile and in the public interest. Before recommending that NCLC join this litigation, I led NCLC's extensive due diligence to determine the risks, obstacles, and merits of the case, in collaboration with NCLC's Litigation Steering Committee. This included an independent review of legal memoranda, detailed questions for class counsel, and careful consideration of the implications for pro se individuals and the intricacies of the PACER, ECF, and Next Gen systems, among other things.

3.      Throughout this litigation, I reviewed and commented on draft pleadings, consulted on litigation strategy, provided a declaration in support of class certification, participated in discovery, received updates on motion practice and court rulings from class counsel, and actively engaged in the class-action settlement process. Over the past seven years, I have spent more than 25 hours working on this litigation on NCLC's behalf. I understand that counsel will seek a service award for NCLC of $10,000. At my current billing rates, the amount of attorney time incurred by NCLC greatly exceeds that amount.

4.      This was a uniquely risky and difficult case—a nationwide class action against the federal judiciary, seeking millions of dollars on the basis of an entirely novel

legal theory, invoking a statute whose meaning had never been litigated. But class counsel were equal to the task and the tenacity and litigation skill they displayed was uniquely strong. Against all odds, the litigation succeeded at every turn. It sparked public interest in the need to reform PACER fees, spurred legislative action, and delivered a landmark settlement of which we are proud to have contributed.

5. In my view, based on my active participation in this litigation and my decades of experience with class-action settlements, the proposed settlement in this case is fair, adequate, and reasonable. I understand that class counsel is seeking a fee equal to about 19% of the common fund. In light of the considerable risk, expense, and duration of this litigation, and the impressive results achieved against all odds, I find the request to be reasonable under the circumstances and fully support it.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on August 14, 2023.                          */s/ Stuart T. Rossman*

                                            _____

                                            Stuart T. Rossman, BBO No. 430640

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.
*Plaintiffs*,

v.

UNITED STATES OF AMERICA,
*Defendant*.

Case No. 16-745

### DECLARATION OF RAKIM BROOKS

I, Rakim Brooks, declare as follows:

1.     I am the President of Alliance for Justice, a national alliance of approximately 150 public-interest member organizations that share a commitment to an equitable, just, and free society. Among other things, AFJ works to ensure that the federal judiciary advances core constitutional values and preserves unfettered access to justice for all Americans. I previously served as Campaign Manager for the ACLU's Systemic Equality Campaign and as an associate attorney at Susman Godfrey. I was also a member of the Biden-Harris Transition Team and previously served as a policy advisor for the U.S. Department of the Treasury during the Obama administration. I hold an A.B. from Brown University; an M.Phil in Politics from the University of Oxford, where I was a Rhodes Scholar; and a J.D. and M.B.A. from Yale Law School and the Yale School of Management. I clerked for Justice Edwin Cameron on the Constitutional Court of South Africa and on the U.S. Court of Appeals for the Ninth Circuit and the D.C. Circuit.

2.     AFJ has served as a named plaintiff in this class action since its filing in April 2016, a period of more than seven years. For much of that time period, until his departure for a position at the U.S. Senate last year, AFJ's Legal Director Daniel Goldberg oversaw this litigation on AFJ's behalf. Among other things, Mr. Goldberg received updates on

motion practice and court rulings from class counsel, reviewed draft pleadings, consulted on strategy, and provided a declaration in support of class certification on AFJ's behalf. I understand that counsel will seek a service award for AFJ of $10,000. Although our organization did not keep formal time records, it is reasonable to estimate that the value of the attorney time incurred by AFJ over the seven-year life of this case exceeds that amount when calculated at market rates.

3.     AFJ supports the proposed class-action settlement and accompanying request for fees, costs, and service awards. Almost by definition, this was a difficult, risky, and ambitious case: a first-ever nationwide class action for monetary relief against the federal judiciary. AFJ would never have decided to sue the federal judiciary lightly. But class counsel were equal to the task and the tenacity and litigation skill they displayed were impressive. Through this seven-year litigation battle, the plaintiffs and class counsel decreased barriers to information about the judicial system, brought information about the PACER paywall to light, spurred ongoing legislative action, created a blueprint for holding the judiciary accountable through litigation, and delivered a landmark monetary settlement to which AFJ is proud to have contributed.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on August 17, 2023.          */s/ Rakim Brooks*
                                       Rakim Brooks

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*National Veterans Legal Services Program v. United States of America*

No. 16-745

## **DECLARATION OF BRIAN T. FITZPATRICK**

I.  My background and qualifications

1.       I am the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1.  I speak only for myself and not for Vanderbilt.

2.       My teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, the Fordham Law Review, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, 2017, 2019, and 2023; the Annual Conference of the ABA's

1

Litigation Section in 2021; and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to the membership of the American Law Institute. In 2021, I became the co-editor (with Randall Thomas) of THE CAMBRIDGE HANDBOOK ON CLASS ACTIONS: AN INTERNATIONAL SURVEY.

3.      In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007).  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  Since then, this study has

been relied upon regularly by a number of courts, scholars, and testifying experts.[1]  I have attached this study as Exhibit 2 and will draw upon it in this declaration.

4.　　In addition to my empirical works, I have also published many law-and-economics papers on the incentives of attorneys and others in class action litigation.  *See, e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev.

---

[1] *See, e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Kuhr v. Mayo Clinic Jacksonville*, No. 3:19-cv-453-MMH-MCR, 2021 WL 1207878, at *12-13 (M.D. Fla. Mar. 30, 2021) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, at *3 (S.D.N.Y. Nov. 24, 2020) (same); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-cv-815-PPS-MGG, 2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2020 WL 1786159, at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, No. CV 11-10230-MLW, 2020 WL 949885, 2020 WL 949885, at *52 (D. Mass. Feb. 27, 2020), *appeal dismissed sub nom. Arkansas Tchr. Ret. Sys. v. State St. Corp.*, No. 20-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, No. 14-1374, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, No. 15-3509, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11-cv-4462, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11-cv-4462, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (same); *Tennille v. W. Union Co.*, No. 09-cv-00938-JLK-KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod. Liab. Litig.*, No. 11-1546, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

3

1151 (2021) (hereinafter "*A Fiduciary Judge*"); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "*Class Action Lawyers*"); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009). Much of this work was discussed in a book published by the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS (2019). The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively, and that courts should provide proper incentives to encourage such private attorney general behavior. I will also draw upon this work in this declaration.

5.    I have been asked by class counsel to opine on whether the attorneys' fees they have requested here are reasonable in light of the empirical studies and research on economic incentives in class action litigation. In order to formulate my opinion, I reviewed a number of documents; I have attached a list of these documents in Exhibit 3 (and describe there how I refer to them herein). As I explain, based on my study of settlements across the country, I believe the request here is within the range of reason.

II. Case background

6.    This is a novel lawsuit against a novel defendant. The defendant is the federal judiciary and the lawsuit alleged that the judiciary was overcharging citizens for access to electronic court records. The lawsuit was filed in 2016. It survived a motion to dismiss and class certification and then prevailed at summary judgment and before an interlocutory appeal in the Federal Circuit. In lieu of a trial on damages, the parties reached a class-wide settlement. The court certified a revised class and preliminarily approved the settlement on May 8, 2023. The parties are now asking the court to grant final approval of the settlement and class counsel is seeking a fee award.

4

7.     The revised class includes, with minor exceptions, "all persons or entities who paid PACER fees between April 22, 2010, and May 31, 2018." Settlement Agreement ¶ 3. The class will release the defendant from "any and all claims, known or unknown, that were brought or could have been brought . . . for purported overcharges of any kind arising from their use of PACER during the Class Period" except any for any claims now pending in Fisher v. United States, No. 15-1575 (Fed. Cl.). *Id.* at ¶ 13. In exchange, the defendant will pay $125,000,000 in cash. *See id.* at ¶ 11. After deducting various transaction costs including attorneys' fees and expenses, the balance of this money will be distributed without claim forms in the following manner: first, class members will be repaid all of their PACER fees during the class period up to $350; then, the remaining monies will be divided *pro rata* relative to the amount of PACER fees each class member paid fees in excess of $350. *See id.* at ¶¶ 19-22. If payments go uncashed, they will be divided evenly among check-cashing class members who paid in excess of $350 in PACER fees during the class period; any uncashed monies thereafter will revert back to the defendant. *See id.* at ¶¶ 23-26.

8.     Class counsel have now moved the court for an award of attorneys' fees equal to roughly 19% of the cash settlement. It is my opinion that the fee request is more than reasonable in light of the empirical studies and research on economic incentives in class action litigation, especially given the novelty, complexity, and risk of the litigation; the outstanding results obtained; and the high quality and creativity of class counsel's legal work.

III. Percentage versus lodestar method

9.     When a class action reaches settlement or judgment and no fee shifting statute is triggered and the defendant has not agreed to pay class counsel's fees, class counsel is paid by the class members themselves pursuant to the common law of unjust enrichment. This is sometimes

called the "common fund" or "common benefit" doctrine.  It requires the court to decide how much of their class action proceeds it is fair to ask class members to pay to class counsel.

10.     At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach.  *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers").  Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors.  *See id.*  Over time, however, the lodestar approach fell out of favor in common fund class actions.  It did so largely for two reasons.  First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar; courts had to review voluminous time records and the like.  Second—and more importantly—courts came to dislike the lodestar method because it did not align the interests of class counsel with the interests of the class; class counsel's recovery did not depend on how much the class recovered, but, rather, on how many hours could be spent on the case.  *See id.* at 2051-52.  According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is entirely or almost entirely injunctive in nature.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of class action settlements).  The other large-scale academic study of class action fees, authored over time by Geoff Miller and the late Ted Eisenberg, agrees with my findings.  *See* Theodore Eisenberg et al., *Attorneys' Fees in Class Action Settlements: 2009-2013*, 92 N.Y.U. L. Rev. 937, 945 (2017) ("Eisenberg-Miller 2017") (finding lodestar method used less than 7% of the time since 2009); Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action*

6

*Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 267 (2010) ("Eisenberg-Miller 2010") (finding lodestar method used only 13.6% of the time before 2002 and less than 10% of the time thereafter and before 2009).

11.    The more common method of calculating attorneys' fees today is known as the "percentage" method.  Under this approach, courts select a percentage of the settlement fund that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product.  The percentage approach has become the preferred method for awarding fees to class counsel in common fund cases precisely because it corrects the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers.  *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052. These same reasons also drive private parties that hire lawyers on contingency—including sophisticated corporations—to use the percentage method over the lodestar method.  *See, e.g.,* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012); Herbert M. Kritzer, RISKS, REPUTATIONS, AND REWARDS 39-40 (1998).

12.    Although for many of these reasons the lodestar method has all but been abandoned in common fund cases in the D.C. Circuit, *see Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("[W]e join . . . others . . . in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases."), any appeals from this litigation go to the Federal Circuit and courts there still have discretion to use either the lodestar method or the percentage method, *see, e.g., Health Republic Ins. Co. v. United States*, 58 F.4th 63 1365, 1371 (2023) ("We have recognized that the Claims Court has discretion to decide what method to use.").  Nonetheless, in light of the well-recognized disadvantages of the

7

lodestar method and the well-recognized advantages of the percentage method, it is my opinion that the percentage method should be used whenever the value of the settlement or judgment can be reliably calculated; the lodestar method should be used only where the value cannot be reliably calculated and the percentage method is therefore not feasible or when the method is required by law, such as by a fee-shifting statute. This is not just my view, but the view of other leading class action scholars. *See* Principles of the Law of Aggregate Litigation § 3.13 (2010) (cmt. b) ("Although many courts in common-fund cases permit use of either a percentage-of-the-fund approach or a lodestar . . . most courts and commentators now believe that the percentage method is superior."). Because this settlement consists of all cash, in my opinion the percentage method should be used here. I will therefore proceed under that method.

<u>IV. Selecting the percentage</u>

13. Courts usually examine a number of factors to select the right percentage under the percentage method. *See* Fitzpatrick, *Empirical Study, supra,* at 832. Neither the D.C. Circuit nor the Federal Circuit has "enumerated what facts must be considered when this method is used," but the Federal Circuit has cited the following factors that are commonly used by the Claims Court: "(1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award." *Health Republic*, 58 F.4th at 1372. These factors are similar to those examined in this Court, *see, e.g., In re Baan Co. Securities Litig.*, 288 F.Supp.2d 14, 17 (D.D.C. 2003); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *11 (D.D.C. July 16, 2001), and I will therefore use them here. In my opinion,

the fee request is reasonable because it is supported by all the relevant factors that can be determined at this time.[2]

14.    Consider first factors "(4) the fee that likely would have been negotiated between private parties in similar cases"; "(6) the percentage applied in other class actions"; and "(7) the size of the award." The request here is about 19% of the settlement. It is well known that this is well below what private parties negotiate when they hire lawyers on contingency. *See, e.g.,* Kritzer, SUPRA, at 39-40 (finding most percentages at one-third). Professor Kritzer's data is largely drawn from personal injury cases, but, even when sophisticated corporations hire lawyers on contingency for complex litigation like patent cases, they agree to pay more than 19%. *See, e.g.,* Schwartz, *supra*, at 360 (2012) (finding the average fixed percentage to be 38.6% and the average escalating percentage to rise from 28% upon filing to 40.2% through appeal).

15.    Although fee percentages tend to be lower in class actions than in individual litigation, the request here is below even what is typical in class actions. According to my empirical study, the most common percentages awarded by federal courts nationwide using the percentage method were 25%, 30%, and 33%, with a mean award of 25.4% and a median award of 25%. *See* Fitzpatrick, *Empirical Study, supra,* at 833-34, 838. This can be seen graphically in Figure 1, which shows the distribution of all of the percentage-method fee awards in my study.[3] In particular, the figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis). The request here would fall into the bar depicted by the red arrow. Tallying up the other bars shows that *over 80%* of all percentage method fee awards

---

[2] The fifth factor—"(5) class members' objections to the settlement terms or fees requested by class counsel"—is not yet applicable because the deadline to file an objection has not yet passed.

[3] Although it would normally be instructive to examine fee awards within the circuit as well as those nationwide, no circuit sees fewer class actions than the D.C. and Federal Circuits. *See* Fitzpatrick, *Empirical Study, supra* at 822. Thus, in my opinion, intracircuit analysis would not be meaningful here.

were greater than or equal to the request here (and often much greater). This means that, if the request here is granted, it would fall into the *bottom fifth* of fees awarded by federal courts. My numbers largely agree with the other large-scale academic studies of class action fee awards, which, if anything, show even higher typical awards in more recent years. *See Eisenberg-Miller 2010, supra,* at 260 (finding mean and median of 24% and 25%, respectively through 2008); *Eisenberg-Miller 2017, supra,* at 951 (finding mean and median of 27% and 29% respectively, from 2009 to 2013). Thus, in my opinion, these factors clearly support the fee request.



**Figure 1: Percentage-method fee awards among all federal courts, 2006-2007**

16.     But it should be noted that the settlement here is unusually large. Less than 10% of class action settlements total over $100 million in any given year. *See* Fitzpatrick, *Empirical Study, supra,* at 839. This is notable because some federal courts award lower percentages in cases where settlements are larger. *See id.* at 838, 842-44 (finding relationship statistically significant);

*Eisenberg-Miller 2017, supra*, at 947-48 (same); *Eisenberg-Miller 2010*, *supra*, at 263-65 (same). For several reasons, this does not change my opinion that this factor weighs in favor of the fee request.

17.     First, I think the entire endeavor of lowering fee percentages simply because a settlement is large is misguided: it creates terrible incentives for class counsel.  Indeed, it can actually make class counsel *better off* by resolving a case for less rather than more if it is not done only on the margin (e.g., only for the *portion* above $100 million).  *See, e.g.*, *In re Synthroid I*, 264 F.3d 712, 718 (7th Cir. 2001) (Easterbrook, J.) ("This means that counsel for the consumer class could have received [more] fees had they settled for [less] but were limited . . . in fees because they obtained an extra $14 million for their clients . . . .  Why there should be such a notch is a mystery.  Markets would not tolerate that effect . . . .").  Consider the following example: if courts award class action attorneys 25% of settlements in cases that settle for less than $100 million, but 18% of settlements when they are over $100 million (the averages I found in my study, see below), then rational class action attorneys will prefer to settle cases for $90 million (*i.e.*, a $22.5 million fee award) than for $110 million (*i.e.*, a $19.8 million fee award).  As Judge Easterbrook noted above, rational clients who want to maximize their own recoveries would never agree to such an arrangement.  This is why studies even of sophisticated corporate clients do not report any such practice among them when they hire lawyers on contingency, even in the biggest cases like patent litigation.  *See, e.g.,* Schwartz, *supra,* at 360; Fitzpatrick, *A Fiduciary Judge*, *supra*, at 1159-63.  In my opinion, courts should not force a fee arrangement on class members that they would never choose themselves.  To the contrary: courts are supposed to be serving as fiduciaries for absent class members.  *See* William B. Rubenstein, Newberg and Rubenstein on Class Actions § 13.40 (6th ed. 2022) ("[T]he law requires the judge to act as a fiduciary" for class members).  This is all

11

Appx0616

the more imperative in the Federal Circuit in light of factor (4): "the fee that likely would have been negotiated between private parties in similar cases." Private parties simply do not pay worse percentages for better results.

18.     Second, while some courts have awarded lower fee percentages as settlement sizes increase, many other courts do not follow this practice. *See, e.g.*, *Allapattah Srvcs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit . . . . . By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (quoting *Allapattah*); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS, 2013 WL 12327929, at 17 n. 16 (C.D. Cal., Jun. 17, 2013) ("The Court also agrees with … other courts, e.g., *Allapattah Servs.*, 454 F. Supp. 2d at 1213, which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class"). Nothing in Federal Circuit or D.C. Circuit case law requires district courts to lower fee percentages because class counsel did a better job and recovered more for the class. Accordingly, it is my humble opinion that the Court should not exercise its discretion to do so here.

19.     Nonetheless, if the Court wishes to go down this path, it is my opinion that the percentage requested here is still in line with those awarded in other class action cases. The settlement range from my study that this settlement falls into is the range between $100 million and $250 million (inclusive). According to my study, the mean and median fee percentages

awarded in settlements in this range were 17.9% and 16.9%, respectively. *See* Fitzpatrick, *Empirical Study, supra*, at 839. The fee request here is only slightly above these numbers and well within one standard deviation (5.2%, *see id.*) of the mean. Moreover, the fee request is actually below the average percentage from the Eisenberg-Miller studies in the relevant range used there, which is better centered around the fee request here. *See Eisenberg-Miller 2010, supra*, at 265 (finding mean of 19.4% and median of 19.9% for settlements between $69.6 and $175.5. million). In my opinion, this makes the request here a mainstream one even among settlements of the same size. Thus, no matter how you slice it, it is my opinion that these factors support the fee request.

20.     Consider next the factors that go to the results obtained by class counsel in light of the risks presented by the litigation: "(1) the quality of counsel," "(2) the complexity and duration of the litigation," and "(3) the risk of nonrecovery." As I noted, the recovery here is very large, but whether or not it is a good recovery depends on the underlying damages the class might have recovered at trial discounted by the risks the class faced. According to class counsel, the absolute maximum possible recoverable damages here following the Federal Circuit's decision were around $500 million. Moreover, that total consists largely of expenditures for CM/ECF, which is a highly uncertain category of potential damages after the Federal Circuit's decision. Further, the defendant took the position that no damages of *any* kind had been established or could be established at trial. Thus, the class is recovering 25% of what they might have received at trial had everything gone their way. In my opinion, this recovery is outstanding in light of the risks the class faced from the very beginning of this litigation and continued to face going forward. As I noted at the outset, this was a novel lawsuit against a novel defendant. I am very familiar with the challenges that lawyers face when they try to sue the federal government for money. I teach a unit on it every year in Federal Courts. As I tell my students (and paraphrasing *The Great Gatsby*): the federal government

Appx0618

is very different from you and me. The federal government has defenses that no one else has. But even that understates what class counsel was up against here. When I teach Federal Courts, I teach suing the Executive branch. Suing the Judicial branch is almost unheard of. In all my years of studying class actions and litigation against the federal government, I am not aware of any previous class action that has successfully been brought against the federal judiciary. Thus, every step of this lawsuit required a new trail to be cut. Not only procedurally—Did the Court have jurisdiction? Was there a cause of action? Did the judiciary have sovereign immunity?—but also on the merits—How should the E-Government Act be interpreted? How can any violation of it be proved? None of these questions were even 50-50 propositions for the class when this litigation began. People had been complaining about high PACER fees for years, but no one had invented a legal solution to the problem until class counsel did. In my opinion, recovering 25% of the class's maximum possible losses in the face of these risks is nothing short of remarkable.

21.     Truth be told, all of the above, as impressive as it is, understates class counsel's success here. Shortly after class counsel won their appeal, the government eliminated PACER fees for 75% of users and Congress reinvigorated efforts to make PACER free. Yet, class counsel is not seeking any percentage of those benefits. Moreover, few class action lawyers are willing to litigate their cases through summary judgment and an appeal; the typical class action settles in only three years. *See* Fitzpatrick, *Empirical Study, supra*, at 820. Yet, class counsel is seeking a typical-to-less-than-typical fee percentage. Thus, all these factors, too, clearly support class counsel's fee request.

### V. The lodestar crosscheck?

22.     Class counsel's lodestar is not one of the factors listed above. Nonetheless, a significant minority of courts use the so-called "lodestar crosscheck" with the percentage method,

Appx0619

*see* Fitzpatrick, *Empirical Study*, *supra*, at 833 (finding that only 49% of courts consider lodestar when awarding fees with the percentage method); *Eisenberg-Miller 2017*, *supra*, at 945 (finding percent method with lodestar crosscheck used 38% of the time versus 54% for percent method without lodestar crosscheck), and the Federal Circuit recently hinted that its courts might want to do it, too. *See Health Republic*, 58 F.4th at 1374 n.2 ("We need not decide whether a lodestar cross-check would be required . . . had there been no class notices requiring it. It is evident, however, that the policies that govern [a] percentage-of-the-fund attorney's fee . . . might well call for a lodestar cross-check . . . as a general matter."). As such, I wish to say a few words about it.

23.     To begin with, in my opinion, economic theory shows that the lodestar crosscheck is a mistake. It brings through the backdoor all of the bad things the lodestar method used to bring through the front door. Not only does the court have to concern itself again with class counsel's timesheets, but, more importantly, it reintroduces the very same misaligned incentives that the percentage method was designed to correct in the first place. *See* Fitzpatrick, *A Fiduciary Judge*, *supra*, at 1167.

24.     Consider the following examples. Suppose a lawyer had incurred a lodestar of $1 million in a class action case. If that counsel believed that a court would not award him a 25% fee if it exceeded twice his lodestar, then he would be *rationally indifferent* between settling the case for $8 million and $80 million (or any number higher than $8 million). Either way he will get the same $2 million fee. Needless to say, the incentive to be indifferent as to the size of the settlement is not good for class members. Or suppose counsel believed that the most he could wring from the defendant in this example was $16 million. In order to reap the maximum 25% fee with the lodestar crosscheck, he would have to generate an additional $1 million in lodestar before agreeing

to the settlement; this would give him incentive to *drag the case out* before sealing the deal.  Again, dragging cases along for nothing is not good for class members.

25.　　This is why the marketplace does not use the lodestar crosscheck when they hire lawyers on contingency.  Professor Schwartz did not report any crosscheck agreements in his study of patent litigation.  Professor Kritzer has never reported any in his studies of contingency fees more broadly.  The Seventh Circuit thinks it is so irrational it has all but banned the practice for the same reason it banned the bigger-recovery-begets-smaller-fee practice I discussed above.  *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (holding that "a lodestar check is not . . . required methodology" because "[t]he . . . argument . . . that any percentage fee award exceeding a certain lodestar multiplier is excessive . . . echoes the 'megafund' cap we rejected in *Synthroid*").  To the extent the court should be guided by factor (4)—"the fee that likely would have been negotiated between private parties in similar cases"—it should therefore not be guided by the lodestar crosscheck.

26.　　I nonetheless understand the very human temptation to use the lodestar crosscheck.  When class action lawyers generate significant returns on their time—what some courts, in hindsight, call "windfalls"—it invites public and media scrutiny.  But when other entrepreneurs and investors succeed in their ventures, no one asks them: How many hours did you spend on this venture?  What effective hourly rate did you earn?  Should we take some of it away from you because it is "too high"?  Class action lawyers are investors just like any others; they just invest their time and resources for others (the class members) with no hope of payment unless they achieve some form of success for those others.  In my opinion, courts should not bow to the pressure and ask these questions of class counsel, either.  Rather, courts should only ask what is best for class counsel's incentives vis-à-vis class members.  For example, at the outset of this

16

Appx0621

litigation, would class members have objected to paying class counsel 19% of whatever was recovered here?  We do not have to guess at the answer: despite the opportunity to opt out when they received the class certification notice advising them of a fee request *even greater* than this one, the original class—which, it should be noted, are largely sophisticated parties like lawyers and large institutions—decided not to opt out: "By participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." *See* ECF Nos. 43-1, 44.  And the new class members are currently being given the same chance.

27.     But because class counsel put their lodestar into the record, I will briefly address whether class counsel would reap some sort of "windfall" if their fee request were granted.  Class counsel's lodestar has thus far summed to some $5.13 million.  Based on the complexity of the case and the large number of questions already received from class members about the settlement, as well as the possibility of responding to objections and handling a potential appeal therefrom, they anticipate another $900,000 in time to get through the end of the settlement distribution, resulting in a total estimated lodestar of about $6.03 million.  If the fee request is granted, class counsel would therefore receive a multiplier of around 3.9.  Although this would be above average, *see* Fitzpatrick, *Empirical Study, supra*, at 834; *Eisenberg-Miller 2010, supra*, at 274, it would be well within the range of previous cases.  *See Health Republic*, 58 F.4th at 1374 ("A number of courts have surveyed relevant fee awards and noted a norm of implicit multipliers in the range of 1 to 4."); *see also, e.g.*, *Lloyd v. Navy Fed. Credit Union*, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019) (awarding fee even though "[t]he Court is aware that a lodestar cross-check would likely result in a multiplier of around 10.96"); *In re Doral Financial Corp. Securities Litigation*, No. 05-cv-04014-RO (S.D.N.Y. Jul. 17, 2007) (ECF 65) (same with 10.26 multiplier); *Beckman*

*v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC*, No. 11-cv-00011 (D.N.J., Jan. 26, 2015) (awarding fee with 8.91 multiplier); *Raetsch v. Lucent Tech., Inc.*, No. 05-cv-05134 (D.N.J., Nov. 8., 2010) (same with 8.77 multiplier); *Thacker v. Chesapeake Appalachia, L.L.C.*, No. 07-cv-00026 (E.D.Ky. Mar. 3, 2010) (same with 8.47 multiplier); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (same with 8.3 multiplier); *Hainey v. Parrott*, 2007 WL 3308027, at *1 (S.D. Ohio Nov. 6, 2007) (same with 7.47 multiplier); *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 732 (3rd Cir.2001) (same with of 7 multiplier); *In re Rite Aid Corp. Sec. Litig.*, 362 F.Supp.2d 587 (E.D.Pa.2005) (same with 6.96 multiplier); *Steiner v. American Broadcasting Co.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) (affirming fee with 6.85 multiplier); *In re IDB Communication Group, Inc., Sec. Litig.*, No. 94-3618 (C.D.Cal. Jan. 17, 1997) (awarding fee with 6.2 multiplier); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (same with 6 multiplier); *In re RJR Nabisco*, 1992 WL 210138 (same); *In re Charter Communications, Inc., Securities Litigation*, 2005 WL 4045741, *18 (E.D.Mo. 2005) (same with 5.61 multiplier); *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 197 (S.D.N.Y.1997) (same with 5.5 multiplier); *Di Giacomo v. Plains All Am. Pipeline*, 2001 WL 3463337 at *10 (S.D.Tex. Dec.18, 2001) (same with 5.3 multiplier).

28.     Moreover, in light of the extreme risks involved here, the multiplier that would result here would actually be below what would have been needed to properly incentivize this contingency representation; that number is the inverse of the riskiness of the case. *See* William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class-Action Litigation*,

23 J. Legal Stud. 185, 209 & n.18 (1994) ("[T]he multiplier must be [divided by] p*, the probability of winning an efficiently prosecuted case . . . ."). Finally, it bears noting that class counsel have been litigating this case for seven years without any payment at all. It is hardly a "windfall" to work seven years without payment only then to end up paid less than the multiple that would be justified by the risks you successfully surmounted during those seven years. Thus, in my opinion, even the lodestar crosscheck supports class counsel's fee request.

VI. Conclusion

29. For all these reasons, it is my opinion that class counsel's fee request is reasonable in light of the empirical studies and research on economic incentives.

30. My compensation in this matter is a flat fee in no way dependent on the outcome of class counsel's fee petition.

August 28, 2023

_____

Brian T. Fitzpatrick

Nashville, TN

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Milton R. Underwood Chair in Free Enterprise*, 2020 to present
- *FedEx Research Professor*, 2014-2015
- *Professor of Law*, 2012 to present
- *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

1

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (Cambridge University Press 2021) (ed., with Randall Thomas)

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press 2019) (winner of the Pound Institute's 2022 Civil Justice Scholarship Award)

## BOOK CHAPTERS

*Climate Change and Class Actions* in CLIMATE LIBERALISM: PERSPECTIVES ON LIBERTY, PROPERTY, AND POLLUTION (Jonathan Adler, ed., Palgrave Macmillan 2023)

*How Many Class Actions are Meritless?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021) (with Randall Thomas)

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC ARTICLES

*Distributing Attorney Fees in Multidistrict Litigation*, 13 J. Leg. Anal. 558 (2021) (with Ed Cheng & Paul Edelman)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORD. L. REV. 1151 (2021)

*Many Minds, Many MDL Judges*, 84 L. & Contemp. Problems 107 (2021)

2

*Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORD. L. REV. 437 (2020)

*Why Class Actions are Something* both *Liberals* and *Conservatives Can Love*, 73 VAND. L. REV. 1147 (2020)

*Deregulation and Private Enforcement*, 24 LEWIS & CLARK L. REV. 685 (2020)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 NW. J. INT'L L. & BUS. 203 (2020) (with Randall Thomas)

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017)

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

3

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

*Strict Scrutiny of Facially Race-Neutral State Action and the Texas Ten Percent Plan*, 53 Baylor L. Rev. 289 (2001)

## ACADEMIC PRESENTATIONS

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, University of Florida Law School, Gainesville, FL (Feb. 6, 2023)

*Entrapment of the Little Guy: Resisting the Erosion of Investor, Employee and Consumer Protections,* Institute for Law and Economic Policy, San Diego, CA (Jan. 27, 2023)

*A New Source of Data for Non-Securities Class Actions,* William & Mary Law School, Williamsburg, VA (Nov. 10, 2022)

*Can Courts Avoid Politicization in a Polarized America?*, American Bar Association Annual Meeting, Chicago, IL (Aug. 5, 2022) (panelist)

*A New Source of Data for Non-Securities Class Actions,* Seventh Annual Civil Procedure Workshop, Cardozo Law School, New York, NY (May 20, 2022)

*Resolution Issues in Class Actions and Mass Torts,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Mar. 11, 2022) (panelist)

*Developments in Discovery Reform*, George Mason Law & Economics Center Fifteenth Annual Judicial Symposium on Civil Justice Issues, Charleston, SC (Nov. 16, 2021) (panelist)

*Locality Litigation and Public Entity Incentives to File Lawsuits: Public Interest, Politics, Public Finance or Financial Gain?*, George Mason Law & Economics Center Symposium on Novel Liability Theories and the Incentives Driving Them, Nashville, TN (Oct. 25, 2021) (panelist)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, University of California Hastings College of the Law, San Francisco, CA (Nov. 3, 2020)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, The Judicial Role in Professional Regulation, Stein Colloquium, Fordham Law School, New York, NY (Oct. 9, 2020)

*Objector Blackmail Update: What Have the 2018 Amendments Done?,* Institute for Law and Economic Policy, Fordham Law School, New York, NY (Feb. 28, 2020)

*Keynote Debate: The Conservative Case for Class Actions,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Jan. 24, 2020)

*The Future of Class Actions,* National Consumer Law Center Class Action Symposium, Boston, MA (Nov. 16, 2019) (panelist)

4

*The Conservative Case for Class Actions,* Center for Civil Justice, NYU Law School, New York, NY (Nov.11, 2019)

*Deregulation and Private Enforcement,* Class Actions, Mass Torts, and MDLs: The Next 50 Years, Pound Institute Academic Symposium, Lewis & Clark Law School, Portland, OR (Nov. 2, 2019)

*Class Actions and Accountability in Finance,* Investors and the Rule of Law Conference, Institute for Investor Protection, Loyola University Chicago Law School, Chicago, IL (Oct. 25, 2019) (panelist)

*Incentivizing Lawyers as Teams,* University of Texas at Austin Law School, Austin, TX (Oct. 22, 2019)

*"Dueling Pianos": A Debate on the Continuing Need for Class Actions,* Twenty Third Annual National Institute on Class Actions, American Bar Association, Nashville, TN (Oct. 18, 2019) (panelist)

*A Debate on the Utility of Class Actions,* Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Oct.16, 2019) (panelist)

*Litigation Funding,* Forty Seventh Annual Meeting, Intellectual Property Owners Association, Washington, DC (Sep. 26, 2019) (panelist)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* International Class Actions Conference, Vanderbilt Law School, Nashville, TN (Aug. 24, 2019)

*A New Source of Class Action Data,* Corporate Accountability Conference, Institute for Law and Economic Policy, San Juan, Puerto Rico (April 12, 2019)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, FL (Dec. 7, 2018) (panelist)

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (Nov. 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (Oct. 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (Sep. 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

5

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, ABA National Institute on Class Actions, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*: Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

7

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Racial Preferences Won't Go Easily*, WALL ST. J. (June 1, 2023)

*Memo to Mitch: Repeal the Republican Tax Increase*, THE HILL (July 17, 2020)

*The Right Way to End Qualified Immunity*, THE HILL (June 25, 2020)

*I Still Remember*, 133 HARV. L. REV. 2458 (2020)

*Proposed Reforms to Texas Judicial Selection*, 24 TEX. R. L. & POL. 307 (2020)

*The Conservative Case for Class Actions?*, NATIONAL REVIEW (Nov. 13, 2019)

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

**OTHER PRESENTATIONS**

10

*Abstention*, Tennessee Attorney General's Office Continuing Legal Education, Nashville, TN (Apr. 13, 2022)

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, Louisiana (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

## PROFESSIONAL ASSOCIATIONS

Member, American Law Institute
Referee, Journal of Legal Studies
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Referee, Supreme Court Economic Review
Reviewer, Aspen Publishing
Reviewer, Cambridge University Press
Reviewer, University Press of Kansas
Reviewer, Palgrave Macmillan
Reviewer, Oxford University Press
Reviewer, Routledge
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association, 2012-2022
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia & California (inactive)

## COMMUNITY ACTIVITIES

Board of Directors, Beacon Center, 2018-present; Board of Directors, Nashville Ballet, 2011-2017 & 2019-2022; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

*Journal of Empirical Legal Studies*
Volume 7, Issue 4, 811–846, December 2010

# An Empirical Study of Class Action Settlements and Their Fee Awards

*Brian T. Fitzpatrick\**

This article is a comprehensive empirical study of class action settlements in federal court. Although there have been prior empirical studies of federal class action settlements, these studies have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). By contrast, in this article, I attempt to study every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first attempt to collect a complete set of federal class action settlements for any given year. I find that district court judges approved 688 class action settlements over this two-year period, involving nearly $33 billion. Of this $33 billion, roughly $5 billion was awarded to class action lawyers, or about 15 percent of the total. Most judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Fee percentages were strongly and inversely associated with the size of the settlement. The age of the case at settlement was positively associated with fee percentages. There was some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located, with lower percentages in securities cases and in settlements from the Second and Ninth Circuits. There was no evidence that fee percentages were associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.

## I. Introduction

Class actions have been the source of great controversy in the United States. Corporations fear them.[1] Policymakers have tried to corral them.[2] Commentators and scholars have

———

*Vanderbilt Law School, 131 21st Ave. S., Nashville, TN 37203; email: brian.fitzpatrick@vanderbilt.edu.

Research for this article was supported by Vanderbilt's Cecil D. Branstetter Litigation & Dispute Resolution Program and Law & Business Program. I am grateful for comments I received from Dale Collins, Robin Effron, Ted Eisenberg, Deborah Hensler, Richard Nagareda, Randall Thomas, an anonymous referee for this journal, and participants at workshops at Vanderbilt Law School, the University of Minnesota Law School, the 2009 Meeting of the Midwestern Law and Economics Association, and the 2009 Conference on Empirical Legal Studies. I am also grateful for the research assistance of Drew Dorner, David Dunn, James Gottry, Chris Lantz, Gary Peeples, Keith Randall, Andrew Yi, and, especially, Jessica Pan.

[1]See, e.g., Robert W. Wood, Defining Employees and Independent Contractors, Bus. L. Today 45, 48 (May–June 2008).

[2]See Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); Class Action Fairness Act of 2005, 28 U.S.C. §§ 1453, 1711–1715 (2006).

suggested countless ways to reform them.[3] Despite all the attention showered on class actions, and despite the excellent empirical work on class actions to date, the data that currently exist on how the class action system operates in the United States are limited. We do not know, for example, how much money changes hands in class action litigation every year. We do not know how much of this money goes to class action lawyers rather than class members. Indeed, we do not even know how many class action cases are resolved on an annual basis. To intelligently assess our class action system as well as whether and how it should be reformed, answers to all these questions are important. Answers to these questions are equally important to policymakers in other countries who are currently thinking about adopting U.S.-style class action devices.[4]

This article tries to answer these and other questions by reporting the results of an empirical study that attempted to gather all class action settlements approved by federal judges over a recent two-year period, 2006 and 2007. I use class action settlements as the basis of the study because, even more so than individual litigation, virtually all cases certified as class actions and not dismissed before trial end in settlement.[5] I use federal settlements as the basis of the study for practical reasons: it was easier to identify and collect settlements approved by federal judges than those approved by state judges. Systematic study of class action settlements in state courts must await further study;[6] these future studies are important because there may be more class action settlements in state courts than there are in federal court.[7]

This article attempts to make three contributions to the existing empirical literature on class action settlements. First, virtually all the prior empirical studies of federal class action settlements have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). In this article, by contrast, I attempt to collect every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first to attempt to collect a complete set of federal class action settlements for

───────

[3]See, e.g., Robert G. Bone, Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness, 83 B.U.L. Rev. 485, 490–94 (2003); Allan Erbsen, From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions, 58 Vand. L. Rev. 995, 1080–81 (2005).

[4]See, e.g., Samuel Issacharoff & Geoffrey Miller, Will Aggregate Litigation Come to Europe?, 62 Vand. L. Rev. 179 (2009).

[5]See, e.g., Emery Lee & Thomas E. Willing, Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions 11 (Federal Judicial Center 2008); Tom Baker & Sean J. Griffith, How the Merits Matter: D&O Insurance and Securities Settlements, 157 U. Pa. L. Rev. 755 (2009).

[6]Empirical scholars have begun to study state court class actions in certain subject areas and in certain states. See, e.g., Robert B. Thompson & Randall S. Thomas, The Public and Private Faces of Derivative Suits, 57 Vand. L. Rev. 1747 (2004); Robert B. Thompson & Randall S. Thomas, The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions, 57 Vand. L. Rev. 133 (2004); Findings of the Study of California Class Action Litigation (Administrative Office of the Courts) (First Interim Report, 2009).

[7]See Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain 56 (2000).

any given year.[8] As such, this article allows us to see for the first time a complete picture of the cases that are settled in federal court. This includes aggregate annual statistics, such as how many class actions are settled every year, how much money is approved every year in these settlements, and how much of that money class action lawyers reap every year. It also includes how these settlements are distributed geographically as well as by litigation area, what sort of relief was provided in the settlements, how long the class actions took to reach settlement, and an analysis of what factors were associated with the fees awarded to class counsel by district court judges.

Second, because this article analyzes settlements that were approved in both published and unpublished opinions, it allows us to assess how well the few prior studies that looked beyond securities cases but relied only on published opinions capture the complete picture of class action settlements. To the extent these prior studies adequately capture the complete picture, it may be less imperative for courts, policymakers, and empirical scholars to spend the considerable resources needed to collect unpublished opinions in order to make sound decisions about how to design our class action system.

Third, this article studies factors that may influence district court judges when they award fees to class counsel that have not been studied before. For example, in light of the discretion district court judges have been delegated over fees under Rule 23, as well as the salience the issue of class action litigation has assumed in national politics, realist theories of judicial behavior would predict that Republican judges would award smaller fee percentages than Democratic judges. I study whether the political beliefs of district court judges are associated with the fees they award and, in doing so, contribute to the literature that attempts to assess the extent to which these beliefs influence the decisions of not just appellate judges, but trial judges as well. Moreover, the article contributes to the small but growing literature examining whether the ideological influences found in published judicial decisions persist when unpublished decisions are examined as well.

In Section II of this article, I briefly survey the existing empirical studies of class action settlements. In Section III, I describe the methodology I used to collect the 2006–2007 federal class action settlements and I report my findings regarding these settlements. District court judges approved 688 class action settlements over this two-year period, involving over \$33 billion. I report a number of descriptive statistics for these settlements, including the number of plaintiff versus defendant classes, the distribution of settlements by subject matter, the age of the case at settlement, the geographic distribution of settlements, the number of settlement classes, the distribution of relief across settlements, and various statistics on the amount of money involved in the settlements. It should be noted that despite the fact that the few prior studies that looked beyond securities settlements appeared to oversample larger settlements, much of the analysis set forth in this article is consistent with these prior studies. This suggests that scholars may not need to sample unpublished as well as published opinions in order to paint an adequate picture of class action settlements.

———

[8]Of course, I cannot be certain that I found every one of the class actions that settled in federal court over this period. Nonetheless, I am confident that if I did not find some, the number I did not find is small and would not contribute meaningfully to the data reported in this article.

In Section IV, I perform an analysis of the fees judges awarded to class action lawyers in the 2006–2007 settlements. All told, judges awarded nearly $5 billion over this two-year period in fees and expenses to class action lawyers, or about 15 percent of the total amount of the settlements. Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method and, unsurprisingly, the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Using regression analysis, I confirm prior studies and find that fee percentages are strongly and inversely associated with the size of the settlement. Further, I find that the age of the case is positively associated with fee percentages but that the percentages were not associated with whether the class action was certified as a settlement class. There also appeared to be some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all other areas, and district courts in some circuits—the Ninth and the Second (in securities cases)—awarded lower fee percentages than courts in many other circuits. Finally, the regression analysis did not confirm the realist hypothesis: there was no association between fee percentage and the political beliefs of the judge in any regression.

## II. Prior Empirical Studies of Class Action Settlements

There are many existing empirical studies of federal securities class action settlements.[9] Studies of securities settlements have been plentiful because for-profit organizations maintain lists of all federal securities class action settlements for the benefit of institutional investors that are entitled to file claims in these settlements.[10] Using these data, studies have shown that since 2005, for example, there have been roughly 100 securities class action settlements in federal court each year, and these settlements have involved between $7 billion and $17 billion per year.[11] Scholars have used these data to analyze many different aspects of these settlements, including the factors that are associated with the percentage of

―――――

[9] See, e.g., James D. Cox & Randall S. Thomas, Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions, 106 Colum. L. Rev. 1587 (2006); James D. Cox, Randall S. Thomas & Lynn Bai, There are Plaintiffs and . . . there are Plaintiffs: An Empirical Analysis of Securities Class Action Settlements, 61 Vand. L. Rev. 355 (2008); Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after *Goldberger v. Integrated Resources, Inc.*, 29 Wash. U.J.L. & Pol'y 5 (2009); Michael A. Perino, Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions (St. John's Legal Studies, Research Paper No. 06-0034, 2006), available at <http://ssrn.com/abstract=870577> [hereinafter Perino, Markets and Monitors]; Michael A. Perino, The Milberg Weiss Prosecution: No Harm, No Foul? (St. John's Legal Studies, Research Paper No. 08-0135, 2008), available at <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133995> [hereinafter Perino, Milberg Weiss].

[10] See, e.g., RiskMetrics Group, available at <http://www.riskmetrics.com/scas>.

[11] See Cornerstone Research, Securities Class Action Settlements: 2007 Review and Analysis 1 (2008), available at <http://securities.stanford.edu/Settlements/REVIEW_1995-2007/Settlements_Through_12_2007.pdf>.

the settlements that courts have awarded to class action lawyers.[12] These studies have found that the mean and median fees awarded by district court judges are between 20 percent and 30 percent of the settlement amount.[13] These studies have also found that a number of factors are associated with the percentage of the settlement awarded as fees, including (inversely) the size of the settlement, the age of the case, whether a public pension fund was the lead plaintiff, and whether certain law firms were class counsel.[14] None of these studies has examined whether the political affiliation of the federal district court judge awarding the fees was associated with the size of awards.

There are no comparable organizations that maintain lists of nonsecurities class action settlements. As such, studies of class action settlements beyond the securities area are much rarer and, when they have been done, rely on samples of settlements that were not intended to be representative of the whole. The two largest studies of class action settlements not limited to securities class actions are a 2004 study by Ted Eisenberg and Geoff Miller,[15] which was recently updated to include data through 2008,[16] and a 2003 study by Class Action Reports.[17] The Eisenberg-Miller studies collected data from class action settlements in both state and federal courts found from court opinions published in the Westlaw and Lexis databases and checked against lists maintained by the CCH Federal Securities and Trade Regulation Reporters. Through 2008, their studies have now identified 689 settlements over a 16-year period, or less than 45 settlements per year.[18] Over this 16-year period, their studies found that the mean and median settlement amounts were, respectively, $116 million and $12.5 million (in 2008 dollars), and that the mean and median fees awarded by district courts were 23 percent and 24 percent of the settlement, respectively.[19] Their studies also performed an analysis of fee percentages and fee awards. For the data through 2002, they found that the percentage of the settlement awarded as fees was associated with the size of the settlement (inversely), the age of the case, and whether the

───────

[12]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 17–24, 28–36; Perino, Markets and Monitors, supra note 9, at 12–28, 39–44; Perino, Milberg Weiss, supra note 9, at 32–33, 39–60.

[13]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 17–18, 22, 28, 33; Perino, Markets and Monitors, supra note 9, at 20–21, 40; Perino, Milberg Weiss, supra note 9, at 32–33, 51–53.

[14]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 14–24, 29–30, 33–34; Perino, Markets and Monitors, supra note 9, at 20–28, 41; Perino, Milberg Weiss, supra note 9, at 39–58.

[15]See Theodore Eisenberg & Geoffrey Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004).

[16]See Theodore Eisenberg & Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008, 7 J. Empirical Legal Stud. 248 (2010) [hereinafter Eisenberg & Miller II].

[17]See Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (Mar.–Apr. 2003).

[18]See Eisenberg & Miller II, supra note 16, at 251.

[19]Id. at 258–59.

district court went out of its way to comment on the level of risk that class counsel had assumed in pursuing the case.[20] For the data through 2008, they regressed only fee awards and found that the awards were inversely associated with the size of the settlement, that state courts gave lower awards than federal courts, and that the level of risk was still associated with larger awards.[21] Their studies have not examined whether the political affiliations of the federal district court judges awarding fees were associated with the size of the awards.

The Class Action Reports study collected data on 1,120 state and federal settlements over a 30-year period, or less than 40 settlements per year.[22] Over the same 10-year period analyzed by the Eisenberg-Miller study, the Class Action Reports data found mean and median settlements of $35.4 and $7.6 million (in 2002 dollars), as well as mean and median fee percentages between 25 percent and 30 percent.[23] Professors Eisenberg and Miller performed an analysis of the fee awards in the Class Action Reports study and found the percentage of the settlement awarded as fees was likewise associated with the size of the settlement (inversely) and the age of the case.[24]

## III. Federal Class Action Settlements, 2006 and 2007

As far as I am aware, there has never been an empirical study of all federal class action settlements in a particular year. In this article, I attempt to make such a study for two recent years: 2006 and 2007. To compile a list of all federal class settlements in 2006 and 2007, I started with one of the aforementioned lists of securities settlements, the one maintained by RiskMetrics, and I supplemented this list with settlements that could be found through three other sources: (1) broad searches of district court opinions in the Westlaw and Lexis databases,[25] (2) four reporters of class action settlements—*BNA Class Action Litigation Report*, *Mealey's Jury Verdicts and Settlements*, *Mealey's Litigation Report*, and the *Class Action World* website[26]—and (3) a list from the Administrative Office of Courts of all district court cases

––––––

[20]See Eisenberg & Miller, supra note 15, at 61–62.

[21]See Eisenberg & Miller II, supra note 16, at 278.

[22]See Eisenberg & Miller, supra note 15, at 34.

[23]Id. at 47, 51.

[24]Id. at 61–62.

[25]The searches consisted of the following terms: ("class action" & (settle! /s approv! /s (2006 2007))); (((counsel attorney) /s fee /s award!) & (settle! /s (2006 2007)) & "class action"); ("class action" /s settle! & da(aft 12/31/2005 & bef 1/1/2008)); ("class action" /s (fair reasonable adequate) & da(aft 12/31/2005 & bef 1/1/2008)).

[26]See <http://classactionworld.com/>.

coded as class actions that terminated by settlement between 2005 and 2008.[27] I then removed any duplicate cases and examined the docket sheets and court orders of each of the remaining cases to determine whether the cases were in fact certified as class actions under either Rule 23, Rule 23.1, or Rule 23.2.[28] For each of the cases verified as such, I gathered the district court's order approving the settlement, the district court's order awarding attorney fees, and, in many cases, the settlement agreements and class counsel's motions for fees, from electronic databases (such as Westlaw or PACER) and, when necessary, from the clerk's offices of the various federal district courts. In this section, I report the characteristics of the settlements themselves; in the next section, I report the characteristics of the attorney fees awarded to class counsel by the district courts that approved the settlements.

## A. Number of Settlements

I found 688 settlements approved by federal district courts during 2006 and 2007 using the methodology described above. This is almost the exact same number the Eisenberg-Miller study found over a *16*-year period in both federal *and* state court. Indeed, the number of annual settlements identified in this study is *several times* the number of annual settlements that have been identified in any prior empirical study of class action settlements. Of the 688 settlements I found, 304 were approved in 2006 and 384 were approved in 2007.[29]

## B. Defendant Versus Plaintiff Classes

Although Rule 23 permits federal judges to certify either a class of plaintiffs or a class of defendants, it is widely assumed that it is extremely rare for courts to certify defendant classes.[30] My findings confirm this widely held assumption. Of the 688 class action settlements approved in 2006 and 2007, 685 involved plaintiff classes and only three involved

———

[27]I examined the AO lists in the year before and after the two-year period under investigation because the termination date recorded by the AO was not necessarily the same date the district court approved the settlement.

[28]See Fed. R. Civ. P. 23, 23.1, 23.2. I excluded from this analysis opt-in collective actions, such as those brought pursuant to the provisions of the Fair Labor Standards Act (see 29 U.S.C. § 216(b)), if such actions did not also include claims certified under the opt-out mechanism in Rule 23.

[29]A settlement was assigned to a particular year if the district court judge's order approving the settlement was dated between January 1 and December 31 of that year. Cases involving multiple defendants sometimes settled over time because defendants would settle separately with the plaintiff class. All such partial settlements approved by the district court on the same date were treated as one settlement. Partial settlements approved by the district court on different dates were treated as different settlements.

[30]See, e.g., Robert H. Klonoff, Edward K.M. Bilich & Suzette M. Malveaux, Class Actions and Other Multi-Party Litigation: Cases and Materials 1061 (2d ed. 2006).

defendant classes. All three of the defendant-class settlements were in employment benefits cases, where companies sued classes of current or former employees.[31]

## C. Settlement Subject Areas

Although courts are free to certify Rule 23 classes in almost any subject area, it is widely assumed that securities settlements dominate the federal class action docket.[32] At least in terms of the number of settlements, my findings reject this conventional wisdom. As Table 1 shows, although securities settlements comprised a large percentage of the 2006 and 2007 settlements, they did not comprise a majority of those settlements. As one would have

Table 1: The Number of Class Action Settlements Approved by Federal Judges in 2006 and 2007 in Each Subject Area

| Subject Matter | *Number of Settlements* | |
| --- | --- | --- |
| | *2006* | *2007* |
| Securities | 122 (40%) | 135 (35%) |
| Labor and employment | 41 (14%) | 53 (14%) |
| Consumer | 40 (13%) | 47 (12%) |
| Employee benefits | 23 (8%) | 38 (10%) |
| Civil rights | 24 (8%) | 37 (10%) |
| Debt collection | 19 (6%) | 23 (6%) |
| Antitrust | 13 (4%) | 17 (4%) |
| Commercial | 4 (1%) | 9 (2%) |
| Other | 18 (6%) | 25 (6%) |
| Total | 304 | 384 |

Note: Securities: cases brought under federal and state securities laws. Labor and employment: workplace claims brought under either federal or state law, with the exception of ERISA cases. Consumer: cases brought under the Fair Credit Reporting Act as well as cases for consumer fraud and the like. Employee benefits: ERISA cases. Civil rights: cases brought under 42 U.S.C. § 1983 or cases brought under the Americans with Disabilities Act seeking nonworkplace accommodations. Debt collection: cases brought under the Fair Debt Collection Practices Act. Antitrust: cases brought under federal or state antitrust laws. Commercial: cases between businesses, excluding antitrust cases. Other: includes, among other things, derivative actions against corporate managers and directors, environmental suits, insurance suits, Medicare and Medicaid suits, product liability suits, and mass tort suits.

Sources: Westlaw, PACER, district court clerks' offices.

———

[31]See Halliburton Co. v. Graves, No. 04-00280 (S.D. Tex., Sept. 28, 2007); Rexam, Inc. v. United Steel Workers of Am., No. 03-2998 (D. Minn. Aug. 29, 2007); Rexam, Inc. v. United Steel Workers of Am., No. 03-2998 (D. Minn. Sept. 17, 2007).

[32]See, e.g., John C. Coffee, Jr., Reforming the Security Class Action: An Essay on Deterrence and its Implementation, 106 Colum. L. Rev. 1534, 1539–40 (2006) (describing securities class actions as "the 800-pound gorilla that dominates and overshadows other forms of class actions").

expected in light of Supreme Court precedent over the last two decades,[33] there were almost no mass tort class actions (included in the "Other" category) settled over the two-year period.

Although the Eisenberg-Miller study through 2008 is not directly comparable on the distribution of settlements across litigation subject areas—because its state and federal court data cannot be separated (more than 10 percent of the settlements were from state court[34]) and because it excludes settlements in fee-shifting cases—their study through 2008 is the best existing point of comparison. Interestingly, despite the fact that state courts were included in their data, their study through 2008 found about the same percentage of securities cases (39 percent) as my 2006–2007 data set shows.[35] However, their study found many more consumer (18 percent) and antitrust (10 percent) cases, while finding many fewer labor and employment (8 percent), employee benefits (6 percent), and civil rights (3 percent) cases.[36] This is not unexpected given their reliance on published opinions and their exclusion of fee-shifting cases.

## D. Settlement Classes

The Federal Rules of Civil Procedure permit parties to seek certification of a suit as a class action for settlement purposes only.[37] When the district court certifies a class in such circumstances, the court need not consider whether it would be manageable to try the litigation as a class.[38] So-called settlement classes have always been more controversial than classes certified for litigation because they raise the prospect that, at least where there are competing class actions filed against the same defendant, the defendant could play class counsel off one another to find the one willing to settle the case for the least amount of money.[39] Prior to the Supreme Court's 1997 opinion in *Amchem Products, Inc. v. Windsor*,[40] it was uncertain whether the Federal Rules even permitted settlement classes. It may therefore be a bit surprising to learn that 68 percent of the federal settlements in 2006 and 2007 were settlement classes. This percentage is higher than the percentage found in the Eisenberg-Miller studies, which found that only 57 percent of class action settlements in

———

[33]See, e.g., Samuel Issacharoff, Private Claims, Aggregate Rights, 2008 Sup. Ct. Rev. 183, 208.

[34]See Eisenberg & Miller II, supra note 16, at 257.

[35]Id. at 262.

[36]Id.

[37]See Martin H. Redish, Settlement Class Actions, The Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process, 73 U. Chi. L. Rev. 545, 553 (2006).

[38]See Amchem Prods., Inc v Windsor, 521 U.S. 591, 620 (1997).

[39]See Redish, supra note 368, at 557–59.

[40]521 U.S. 591 (1997).

state and federal court between 2003 and 2008 were settlement classes.[41] It should be noted that the distribution of litigation subject areas among the settlement classes in my 2006–2007 federal data set did not differ much from the distribution among nonsettlement classes, with two exceptions. One exception was consumer cases, which were nearly three times as prevalent among settlement classes (15.9 percent) as among nonsettlement classes (5.9 percent); the other was civil rights cases, which were four times as prevalent among nonsettlement classes (18.0 percent) as among settlements classes (4.5 percent). In light of the skepticism with which the courts had long treated settlement classes, one might have suspected that courts would award lower fee percentages in such settlements. Nonetheless, as I report in Section III, whether a case was certified as a settlement class was not associated with the fee percentages awarded by federal district court judges.

*E.  The Age at Settlement*

One interesting question is how long class actions were litigated before they reached settlement. Unsurprisingly, cases reached settlement over a wide range of ages.[42] As shown in Table 2, the average time to settlement was a bit more than three years (1,196 days) and the median time was a bit under three years (1,068 days). The average and median ages here are similar to those found in the Eisenberg-Miller study through 2002, which found averages of 3.35 years in fee-shifting cases and 2.86 years in non-fee-shifting cases, and

Table 2:  The Number of Days, 2006–2007, Federal Class Action Cases Took to Reach Settlement in Each Subject Area

| Subject Matter | Average | Median | Minimum | Maximum |
|---|---|---|---|---|
| Securities | 1,438 | 1,327 | 392 | 3,802 |
| Labor and employment | 928 | 786 | 105 | 2,497 |
| Consumer | 963 | 720 | 127 | 4,961 |
| Employee benefits | 1,162 | 1,161 | 164 | 3,157 |
| Civil rights | 1,373 | 1,360 | 181 | 3,354 |
| Debt collection | 738 | 673 | 223 | 1,973 |
| Antitrust | 1,140 | 1,167 | 237 | 2,480 |
| Commercial | 1,267 | 760 | 163 | 5,443 |
| Other | 1,065 | 962 | 185 | 3,620 |
| All | 1,196 | 1,068 | 105 | 5,443 |

Source: PACER.

---

[41]See Eisenberg & Miller II, supra note 16, at 266.

[42]The age of the case was calculated by subtracting the date the relevant complaint was filed from the date the settlement was approved by the district court judge. The dates were taken from PACER. For consolidated cases, I used the date of the earliest complaint. If the case had been transferred, consolidated, or removed, the date the complaint was filed was not always available from PACER. In such cases, I used the date the case was transferred, consolidated, or removed as the start date.

medians of 4.01 years in fee-shifting cases and 3.0 years in non-fee-shifting cases.[43] Their study through 2008 did not report case ages.

The shortest time to settlement was 105 days in a labor and employment case.[44] The longest time to settlement was nearly 15 years (5,443 days) in a commercial case.[45] The average and median time to settlement varied significantly by litigation subject matter, with securities cases generally taking the longest time and debt collection cases taking the shortest time. Labor and employment cases and consumer cases also settled relatively early.

### F. The Location of Settlements

The 2006–2007 federal class action settlements were not distributed across the country in the same way federal civil litigation is in general. As Figure 1 shows, some of the geographic circuits attracted much more class action attention than we would expect based on their docket size, and others attracted much less. In particular, district courts in the First, Second, Seventh, and Ninth Circuits approved a much larger share of class action settlements than the share of all civil litigation they resolved, with the First, Second, and Seventh Circuits approving nearly double the share and the Ninth Circuit approving one-and-one-half times the share. By contrast, the shares of class action settlements approved by district courts in the Fifth and Eighth Circuits were less than one-half of their share of all civil litigation, with the Third, Fourth, and Eleventh Circuits also exhibiting significant underrepresentation.

With respect to a comparison with the Eisenberg-Miller studies, their federal court data through 2008 can be separated from their state court data on the question of the geographic distribution of settlements, and there are some significant differences between their federal data and the numbers reflected in Figure 1. Their study reported considerably higher proportions of settlements than I found from the Second (23.8 percent), Third (19.7 percent), Eighth (4.8 percent), and D.C. (3.3 percent) Circuits, and considerably lower proportions from the Fourth (1.3 percent), Seventh (6.8 percent), and Ninth (16.6 percent) Circuits.[46]

Figure 2 separates the class action settlement data in Figure 1 into securities and nonsecurities cases. Figure 2 suggests that the overrepresentation of settlements in the First and Second Circuits is largely attributable to securities cases, whereas the overrepresentation in the Seventh Circuit is attributable to nonsecurities cases, and the overrepresentation in the Ninth is attributable to both securities and nonsecurities cases.

It is interesting to ask why some circuits received more class action attention than others. One hypothesis is that class actions are filed in circuits where class action lawyers

_____

[43]See Eisenberg & Miller, supra note 15, at 59–60.

[44]See Clemmons v. Rent-a-Center W., Inc., No. 05-6307 (D. Or. Jan. 20, 2006).

[45]See Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006).

[46]See Eisenberg & Miller II, supra note 16, at 260.

*Figure 1:*  The percentage of 2006–2007 district court civil terminations and class action settlements in each federal circuit.



<small>Sources: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (available at <http://www.uscourts.gov/stats/index.html>).</small>

believe they can find favorable law or favorable judges. Federal class actions often involve class members spread across multiple states and, as such, class action lawyers may have a great deal of discretion over the district in which file suit.[47] One way law or judges may be favorable to class action attorneys is with regard to attorney fees. In Section III, I attempt to test whether district court judges in the circuits with the most over- and undersubscribed class action dockets award attorney fees that would attract or discourage filings there; I find no evidence that they do.

Another hypothesis is that class action suits are settled in jurisdictions where defendants are located. This might be the case because although class action lawyers may have discretion over where to file, venue restrictions might ultimately restrict cases to jurisdic-

---

[47]See Samuel Issacharoff & Richard Nagareda, Class Settlements Under Attack, 156 U. Pa. L. Rev. 1649, 1662 (2008).

*Figure 2:* The percentage of 2006–2007 district court civil terminations and class action settlements in each federal circuit.



SOURCES: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (available at <http://www.uscourts.gov/stats/index.html>).

tions in which defendants have their corporate headquarters or other operations.[48] This might explain why the Second Circuit, with the financial industry in New York, sees so many securities suits, and why other circuits with cities with a large corporate presence, such as the First (Boston), Seventh (Chicago), and Ninth (Los Angeles and San Francisco), see more settlements than one would expect based on the size of their civil dockets.

Another hypothesis might be that class action lawyers file cases wherever it is most convenient for them to litigate the cases—that is, in the cities in which their offices are located. This, too, might explain the Second Circuit's overrepresentation in securities settlements, with prominent securities firms located in New York, as well as the

—————

[48]See 28 U.S.C. §§ 1391, 1404, 1406, 1407. See also Foster v. Nationwide Mut. Ins. Co., No. 07-04928, 2007 U.S. Dist. LEXIS 95240 at *2–17 (N.D. Cal. Dec. 14, 2007) (transferring venue to jurisdiction where defendant's corporate headquarters were located). One prior empirical study of securities class action settlements found that 85 percent of such cases are filed in the home circuit of the defendant corporation. See James D. Cox, Randall S. Thomas & Lynn Bai, Do Differences in Pleading Standards Cause Forum Shopping in Securities Class Actions?: Doctrinal and Empirical Analyses, 2009 Wis. L. Rev. 421, 429, 440, 450–51 (2009).

overrepresentation of other settlements in some of the circuits in which major metropolitan areas with prominent plaintiffs' firms are found.

### G. *Type of Relief*

Under Rule 23, district court judges can certify class actions for injunctive or declaratory relief, for money damages, or for a combination of the two.[49] In addition, settlements can provide money damages both in the form of cash as well as in the form of in-kind relief, such as coupons to purchase the defendant's products.[50]

As shown in Table 3, the vast majority of class actions settled in 2006 and 2007 provided cash relief to the class (89 percent), but a substantial number also provided in-kind relief (6 percent) or injunctive or declaratory relief (23 percent). As would be

Table 3:  The Percentage of 2006 and 2007 Class Action Settlements Providing Each Type of Relief in Each Subject Area

| Subject Matter | Cash | In-Kind Relief | Injunctive or Declaratory Relief |
|---|---|---|---|
| Securities | 100% | 0% | 2% |
| ($n = 257$) | | | |
| Labor and employment | 95% | 6% | 29% |
| ($n = 94$) | | | |
| Consumer | 74% | 30% | 37% |
| ($n = 87$) | | | |
| Employee benefits | 90% | 0% | 34% |
| ($n = 61$) | | | |
| Civil rights | 49% | 2% | 75% |
| ($n = 61$) | | | |
| Debt collection | 98% | 0% | 12% |
| ($n = 42$) | | | |
| Antitrust | 97% | 13% | 7% |
| ($n = 30$) | | | |
| Commercial | 92% | 0% | 62% |
| ($n = 13$) | | | |
| Other | 77% | 7% | 33% |
| ($n = 43$) | | | |
| All | 89% | 6% | 23% |
| ($n = 688$) | | | |

NOTE: Cash: cash, securities, refunds, charitable contributions, contributions to employee benefit plans, forgiven debt, relinquishment of liens or claims, and liquidated repairs to property. In-kind relief: vouchers, coupons, gift cards, warranty extensions, merchandise, services, and extended insurance policies. Injunctive or declaratory relief: modification of terms of employee benefit plans, modification of compensation practices, changes in business practices, capital improvements, research, and unliquidated repairs to property.

SOURCES: Westlaw, PACER, district court clerks' offices.

———

[49] See Fed. R. Civ. P. 23(b).

[50] These coupon settlements have become very controversial in recent years, and Congress discouraged them in the Class Action Fairness Act of 2005 by tying attorney fees to the value of coupons that were ultimately redeemed by class members as opposed to the value of coupons offered class members. See 28 U.S.C. § 1712.

expected in light of the focus on consumer cases in the debate over the anti-coupon provision in the Class Action Fairness Act of 2005,[51] consumer cases had the greatest percentage of settlements providing for in-kind relief (30 percent). Civil rights cases had the greatest percentage of settlements providing for injunctive or declaratory relief (75 percent), though almost half the civil rights cases also provided some cash relief (49 percent). The securities settlements were quite distinctive from the settlements in other areas in their singular focus on cash relief: every single securities settlement provided cash to the class and almost none provided in-kind, injunctive, or declaratory relief. This is but one example of how the focus on securities settlements in the prior empirical scholarship can lead to a distorted picture of class action litigation.

## H. Settlement Money

Although securities settlements did not comprise the majority of federal class action settlements in 2006 and 2007, they did comprise the majority of the money—indeed, the *vast majority* of the money—involved in class action settlements. In Table 4, I report the total amount of ascertainable value involved in the 2006 and 2007 settlements. This amount

Table 4:   The Total Amount of Money Involved in Federal Class Action Settlements in 2006 and 2007

| Subject Matter | *Total Ascertainable Monetary Value in Settlements (and Percentage of Overall Annual Total)* | | | |
|---|---|---|---|---|
| | *2006 (n = 304)* | | *2007 (n = 384)* | |
| Securities | $16,728 | 76% | $8,038 | 73% |
| Labor and employment | $266.5 | 1% | $547.7 | 5% |
| Consumer | $517.3 | 2% | $732.8 | 7% |
| Employee benefits | $443.8 | 2% | $280.8 | 3% |
| Civil rights | $265.4 | 1% | $81.7 | 1% |
| Debt collection | $8.9 | <1% | $5.7 | <1% |
| Antitrust | $1,079 | 5% | $660.5 | 6% |
| Commercial | $1,217 | 6% | $124.0 | 1% |
| Other | $1,568 | 7% | $592.5 | 5% |
| Total | $22,093 | 100% | $11,063 | 100% |

NOTE: Dollar amounts are in millions. Includes all determinate payments in cash or cash equivalents (such as marketable securities), including attorney fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.

SOURCES: Westlaw, PACER, district court clerks' offices.

———

[51]See, e.g., 151 Cong. Rec. H723 (2005) (statement of Rep. Sensenbrenner) (arguing that consumers are "seeing all of their gains go to attorneys and them just getting coupon settlements from the people who have allegedly done them wrong").

includes all determinate[52] payments in cash or cash equivalents (such as marketable securities), including attorney fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.[53] I did not attempt to assign a value to any relief that was not valued by the district court (even if it may have been valued by class counsel). It should be noted that district courts did not often value in-kind or injunctive relief—they did so only 18 percent of the time—and very little of Table 4—only $1.3 billion, or 4 percent—is based on these valuations. It should also be noted that the amounts in Table 4 reflect only what defendants *agreed to pay*; they do not reflect the amounts that defendants *actually paid* after the claims administration process concluded. Prior empirical research has found that, depending on how settlements are structured (e.g., whether they awarded a fixed amount of money to each class member who eventually files a valid claim or a pro rata amount of a fixed settlement to each class member), defendants can end up paying much less than they agreed.[54]

   Table 4 shows that in both years, around three-quarters of all the money involved in federal class action settlements came from securities cases. Thus, in this sense, the conventional wisdom about the dominance of securities cases in class action litigation is correct. Figure 3 is a graphical representation of the contribution each litigation area made to the total number and total amount of money involved in the 2006–2007 settlements.

   Table 4 also shows that, in total, over $33 billion was approved in the 2006–2007 settlements. Over $22 billion was approved in 2006 and over $11 billion in 2007. It should be emphasized again that the totals in Table 4 understate the amount of money defendants agreed to pay in class action settlements in 2006 and 2007 because they exclude the unascertainable value of those settlements. This understatement disproportionately affects litigation areas, such as civil rights, where much of the relief is injunctive because, as I noted, very little of such relief was valued by district courts. Nonetheless, these numbers are, as far as I am aware, the first attempt to calculate how much money is involved in federal class action settlements in a given year.

   The significant discrepancy between the two years is largely attributable to the 2006 securities settlement related to the collapse of Enron, which totaled $6.6 billion, as well as to the fact that seven of the eight 2006–2007 settlements for more than $1 billion were approved in 2006.[55] Indeed, it is worth noting that the eight settlements for more than $1

---

[52]For example, I excluded awards of a fixed amount of money to each class member who eventually filed a valid claim (as opposed to settlements that awarded a pro rata amount of a fixed settlement to each class member) if the total amount of money set aside to pay the claims was not set forth in the settlement documents.

[53]In some cases, the district court valued the relief in the settlement over a range. In these cases, I used the middle point in the range.

[54]See Hensler et al., supra note 7, at 427–30.

[55]See In re Enron Corp. Secs. Litig., MDL 1446 (S.D. Tex. May 24, 2006) ($6,600,000,000); In re Tyco Int'l Ltd. Multidistrict Litig., MDL 02-1335 (D.N.H. Dec. 19, 2007) ($3,200,000,000); In re AOL Time Warner, Inc. Secs. & "ERISA" Litig., MDL 1500 (S.D.N.Y. Apr. 6, 2006) ($2,500,000,000); In re: Diet Drugs Prods. Liab. Litig., MDL 1203 (E.D. Pa. May 24, 2006) ($1,275,000,000); In re Nortel Networks Corp. Secs. Litig. (Nortel I), No. 01-1855 (S.D.N.Y. Dec. 26, 2006) ($1,142,780,000); In re Royal Ahold N.V. Secs. & ERISA Litig., 03-1539 (D. Md. Jun. 16, 2006)

*Figure 3:* The percentage of 2006–2007 federal class action settlements and settlement money from each subject area.



SOURCES: Westlaw, PACER, district court clerks' offices.

billion accounted for almost $18 billion of the $33 billion that changed hands over the two-year period. That is, a mere 1 percent of the settlements comprised over 50 percent of the value involved in federal class action settlements in 2006 and 2007. To give some sense of the distribution of settlement size in the 2006–2007 data set, Table 5 sets forth the number of settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards (605 out of the 688 settlements). Nearly two-thirds of all settlements fell below $10 million.

Given the disproportionate influence exerted by securities settlements on the total amount of money involved in class actions, it is unsurprising that the average securities settlement involved more money than the average settlement in most of the other subject areas. These numbers are provided in Table 6, which includes, again, only the settlements

———

($1,100,000,000); Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) ($1,075,000,000); In re Nortel Networks Corp. Secs. Litig. (Nortel II), No. 05-1659 (S.D.N.Y. Dec. 26, 2006) ($1,074,270,000).

Table 5: The Distribution by Size of 2006–2007 Federal Class Action Settlements with Ascertainable Value

| Settlement Size (in Millions) | Number of Settlements |
| --- | --- |
| [$0 to $1] | 131 |
| | (21.7%) |
| ($1 to $10] | 261 |
| | (43.1%) |
| ($10 to $50] | 139 |
| | (23.0%) |
| ($50 to $100] | 33 |
| | (5.45%) |
| ($100 to $500] | 31 |
| | (5.12%) |
| ($500 to $6,600] | 10 |
| | (1.65%) |
| Total | 605 |

NOTE: Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
SOURCES: Westlaw, PACER, district court clerks' offices.

Table 6: The Average and Median Settlement Amounts in the 2006–2007 Federal Class Action Settlements with Ascertainable Value to the Class

| Subject Matter | Average | Median |
| --- | --- | --- |
| Securities ($n = 257$) | $96.4 | $8.0 |
| Labor and employment ($n = 88$) | $9.2 | $1.8 |
| Consumer ($n = 65$) | $18.8 | $2.9 |
| Employee benefits ($n = 52$) | $13.9 | $5.3 |
| Civil rights ($n = 34$) | $9.7 | $2.5 |
| Debt collection ($n = 40$) | $0.37 | $0.088 |
| Antitrust ($n = 29$) | $60.0 | $22.0 |
| Commercial ($n = 12$) | $111.7 | $7.1 |
| Other ($n = 28$) | $76.6 | $6.2 |
| All ($N = 605$) | $54.7 | $5.1 |

NOTE: Dollar amounts are in millions. Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
SOURCES: Westlaw, PACER, district court clerks' offices.

with an ascertainable value beyond fee, expense, and class-representative incentive awards. The average settlement over the entire two-year period for all types of cases was almost $55 million, but the median was only $5.1 million. (With the $6.6 billion Enron settlement excluded, the average settlement for all ascertainable cases dropped to $43.8 million and, for securities cases, dropped to $71.0 million.) The average settlements varied widely by litigation area, with securities and commercial settlements at the high end of around $100

million, but the median settlements for nearly every area were bunched around a few million dollars. It should be noted that the high average for commercial cases is largely due to one settlement above $1 billion;[56] when that settlement is removed, the average for commercial cases was only $24.2 million.

Table 6 permits comparison with the two prior empirical studies of class action settlements that sought to include nonsecurities as well as securities cases in their purview. The Eisenberg-Miller study through 2002, which included both common-fund and fee-shifting cases, found that the mean class action settlement was $112 million and the median was $12.9 million, both in 2006 dollars,[57] more than double the average and median I found for all settlements in 2006 and 2007. The Eisenberg-Miller update through 2008 included only common-fund cases and found mean and median settlements in federal court of $115 million and $11.7 million (both again in 2006 dollars),[58] respectively; this is still more than double the average and median I found. This suggests that the methodology used by the Eisenberg-Miller studies—looking at district court opinions that were published in Westlaw or Lexis—oversampled larger class actions (because opinions approving larger class actions are, presumably, more likely to be published than opinions approving smaller ones). It is also possible that the exclusion of fee-shifting cases from their data through 2008 contributed to this skew, although, given that their data through 2002 included fee-shifting cases and found an almost identical mean and median as their data through 2008, the primary explanation for the much larger mean and median in their study through 2008 is probably their reliance on published opinions. Over the same years examined by Professors Eisenberg and Miller, the Class Action Reports study found a smaller average settlement than I did ($39.5 million in 2006 dollars), but a larger median ($8.48 million in 2006 dollars). It is possible that the Class Action Reports methodology also oversampled larger class actions, explaining its larger median, but that there are more "mega" class actions today than there were before 2003, explaining its smaller mean.[59]

It is interesting to ask how significant the $16 billion that was involved annually in these 350 or so federal class action settlements is in the grand scheme of U.S. litigation. Unfortunately, we do not know how much money is transferred every year in U.S. litigation. The only studies of which I am aware that attempt even a partial answer to this question are the estimates of how much money is transferred in the U.S. "tort" system every year by a financial services consulting firm, Tillinghast-Towers Perrin.[60] These studies are not directly

---

[56]See Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) (approving $1,075,000,000 settlement).

[57]See Eisenberg & Miller, supra note 15, at 47.

[58]See Eisenberg & Miller II, supra note 16, at 262.

[59]There were eight class action settlements during 2006 and 2007 of more than $1 billion. See note 55 supra.

[60]Some commentators have been critical of Tillinghast's reports, typically on the ground that the reports overestimate the cost of the tort system. See M. Martin Boyer, Three Insights from the Canadian D&O Insurance Market: Inertia, Information and Insiders, 14 Conn. Ins. L.J. 75, 84 (2007); John Fabian Witt, Form and Substance in the Law of

comparable to the class action settlement numbers because, again, the number of tort class action settlements in 2006 and 2007 was very small. Nonetheless, as the tort system no doubt constitutes a large percentage of the money transferred in all litigation, these studies provide something of a point of reference to assess the significance of class action settlements. In 2006 and 2007, Tillinghast-Towers Perrin estimated that the U.S. tort system transferred $160 billion and $164 billion, respectively, to claimants and their lawyers.[61] The total amount of money involved in the 2006 and 2007 federal class action settlements reported in Table 4 was, therefore, roughly 10 percent of the Tillinghast-Towers Perrin estimate. This suggests that in merely 350 cases every year, federal class action settlements involve the same amount of wealth as 10 percent of the entire U.S. tort system. It would seem that this is a significant amount of money for so few cases.

## IV. Attorney Fees in Federal Class Action Settlements, 2006 and 2007

### A. *Total Amount of Fees and Expenses*

As I demonstrated in Section III, federal class action settlements involved a great deal of money in 2006 and 2007, some $16 billion a year. A perennial concern with class action litigation is whether class action lawyers are reaping an outsized portion of this money.[62] The 2006–2007 federal class action data suggest that these concerns may be exaggerated. Although class counsel were awarded some $5 billion in fees and expenses over this period, as shown in Table 7, only 13 percent of the settlement amount in 2006 and 20 percent of the amount in 2007 went to fee and expense awards.[63] The 2006 percentage is lower than the 2007 percentage in large part because the class action lawyers in the Enron securities settlement received less than 10 percent of the $6.6 billion corpus. In any event, the percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33 percent.[64] Lawyers received less than 33 percent of settlements in fees and expenses in virtually every subject area in both years.

––––––

Counterinsurgency Damages, 41 Loy. L.A.L. Rev. 1455, 1475 n.135 (2008). If these criticisms are valid, then class action settlements would appear even more significant as compared to the tort system.

[61]See Tillinghast-Towers Perrin, U.S. Tort Costs: 2008 Update 5 (2008). The report calculates $252 billion in total tort "costs" in 2007 and $246.9 billion in 2006, id., but only 65 percent of those costs represent payments made to claimants and their lawyers (the remainder represents insurance administration costs and legal costs to defendants). See Tillinghast-Towers Perrin, U.S. Tort Costs: 2003 Update 17 (2003).

[62]See, e.g., Brian T. Fitzpatrick, Do Class Action Lawyers Make Too Little? 158 U. Pa. L. Rev. 2043, 2043–44 (2010).

[63]In some of the partial settlements, see note 29 supra, the district court awarded expenses for all the settlements at once and it was unclear what portion of the expenses was attributable to which settlement. In these instances, I assigned each settlement a pro rata portion of expenses. To the extent possible, all the fee and expense numbers in this article exclude any interest known to be awarded by the courts.

[64]See, e.g., Herbert M. Kritzer, The Wages of Risk: The Returns of Contingency Fee Legal Practice, 47 DePaul L. Rev. 267, 284–86 (1998) (reporting results of a survey of Wisconsin lawyers).

Table 7: The Total Amount of Fees and Expenses Awarded to Class Action Lawyers in Federal Class Action Settlements in 2006 and 2007

| Subject Matter | Total Fees and Expenses Awarded in Settlements (and as Percentage of Total Settlement Amounts) in Each Subject Area | |
| --- | --- | --- |
| | 2006 (n = 292) | 2007 (n = 363) |
| Securities | $1,899 (11%) | $1,467 (20%) |
| Labor and employment | $75.1 (28%) | $144.5 (26%) |
| Consumer | $126.4 (24%) | $65.3 (9%) |
| Employee benefits | $57.1 (13%) | $71.9 (26%) |
| Civil rights | $31.0 (12%) | $32.2 (39%) |
| Debt collection | $2.5 (28%) | $1.1 (19%) |
| Antitrust | $274.6 (26%) | $157.3 (24%) |
| Commercial | $347.3 (29%) | $18.2 (15%) |
| Other | $119.3 (8%) | $103.3 (17%) |
| Total | $2,932 (13%) | $2,063 (20%) |

NOTE: Dollar amounts are in millions. Excludes settlements in which fees were not (or at least not yet) sought (22 settlements), settlements in which fees have not yet been awarded (two settlements), and settlements in which fees could not be ascertained due to indefinite award amounts, missing documents, or nonpublic side agreements (nine settlements).

SOURCES: Westlaw, PACER, district court clerks' offices.

It should be noted that, in some respects, the percentages in Table 7 overstate the portion of settlements that were awarded to class action attorneys because, again, many of these settlements involved indefinite cash relief or noncash relief that could not be valued.[65] If the value of all this relief could have been included, then the percentages in Table 7 would have been even lower. On the other hand, as noted above, not all the money defendants agree to pay in class action settlements is ultimately collected by the class.[66] To the extent leftover money is returned to the defendant, the percentages in Table 7 understate the portion class action lawyers received relative to their clients.

## B. Method of Awarding Fees

District court judges have a great deal of discretion in how they set fee awards in class action cases. Under Rule 23, federal judges are told only that the fees they award to class counsel

―――――

[65]Indeed, the large year-to-year variation in the percentages in labor, consumer, and employee benefits cases arose because district courts made particularly large valuations of the equitable relief in a few settlements and used the lodestar method to calculate the fees in these settlements (and thereby did not consider their large valuations in calculating the fees).

[66]See Hensler et al., supra note 7, at 427–30.

must be "reasonable."[67] Courts often exercise this discretion by choosing between two approaches: the lodestar approach or the percentage-of-the-settlement approach.[68] The lodestar approach works much the way it does in individual litigation: the court calculates the fee based on the number of hours class counsel actually worked on the case multiplied by a reasonable hourly rate and a discretionary multiplier.[69] The percentage-of-the-settlement approach bases the fee on the size of the settlement rather than on the hours class counsel actually worked: the district court picks a percentage of the settlement it thinks is reasonable based on a number of factors, one of which is often the fee lodestar (sometimes referred to as a "lodestar cross-check").[70] My 2006–2007 data set shows that the percentage-of-the-settlement approach has become much more common than the lodestar approach. In 69 percent of the settlements reported in Table 7, district court judges employed the percentage-of-the-settlement method with or without the lodestar cross-check. They employed the lodestar method in only 12 percent of settlements. In the other 20 percent of settlements, the court did not state the method it used or it used another method altogether.[71] The pure lodestar method was used most often in consumer (29 percent) and debt collection (45 percent) cases. These numbers are fairly consistent with the Eisenberg-Miller data from 2003 to 2008. They found that the lodestar method was used in only 9.6 percent of settlements.[72] Their number is no doubt lower than the 12 percent number found in my 2006–2007 data set because they excluded fee-shifting cases from their study.

*C. Variation in Fees Awarded*

Not only do district courts often have discretion to choose between the lodestar method and the percentage-of-the-settlement method, but each of these methods leaves district courts with a great deal of discretion in how the method is ultimately applied. The courts

───────

[67]Fed. R. Civ. P. 23(h).

[68]The discretion to pick between these methods is most pronounced in settlements where the underlying claim was not found in a statute that would shift attorney fees to the defendant. See, e.g., In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995) (permitting either percentage or lodestar method in common-fund cases); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (same); Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993) (same). By contrast, courts typically used the lodestar approach in settlements arising from fee-shifting cases.

[69]See Eisenberg & Miller, supra note 15, at 31.

[70]Id. at 31–32.

[71]These numbers are based on the fee method described in the district court's order awarding fees, unless the order was silent, in which case the method, if any, described in class counsel's motion for fees (if it could be obtained) was used. If the court explicitly justified the fee award by reference to its percentage of the settlement, I counted it as the percentage method. If the court explicitly justified the award by reference to a lodestar calculation, I counted it as the lodestar method. If the court explicitly justified the award by reference to both, I counted it as the percentage method with a lodestar cross-check. If the court calculated neither a percentage nor the fee lodestar in its order, then I counted it as an "other" method.

[72]See Eisenberg & Miller II, supra note 16, at 267.

that use the percentage-of-the-settlement method usually rely on a multifactor test[73] and, like most multifactor tests, it can plausibly yield many results. It is true that in many of these cases, judges examine the fee percentages that other courts have awarded to guide their discretion.[74] In addition, the Ninth Circuit has adopted a presumption that 25 percent is the proper fee award percentage in class action cases.[75] Moreover, in securities cases, some courts presume that the proper fee award percentage is the one class counsel agreed to when it was hired by the large shareholder that is now usually selected as the lead plaintiff in such cases.[76] Nonetheless, presumptions, of course, can be overcome and, as one court has put it, "[t]here is no hard and fast rule mandating a certain percentage . . . which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case."[77] The court added: "[i]ndividualization in the exercise of a discretionary power [for fee awards] will alone retain equity as a living system and save it from sterility."[78] It is therefore not surprising that district courts awarded fees over a broad range when they used the percentage-of-the-settlement method. Figure 4 is a graph of the distribution of fee awards as a percentage of the settlement in the 444 cases where district courts used the percentage method with or without a lodestar cross-check and the fee percentages were ascertainable. These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district court's order or counsel's motion for fees and expenses (which was 96 percent of the time). The awards ranged from 3 percent of the settlement to 47 percent of the settlement. The average award was 25.4 percent and the median was 25 percent. Most fee awards were between 25 percent and 35 percent, with almost no awards more than 35 percent. The Eisenberg-Miller study through 2008 found a slightly lower mean (24 percent) but the same median (25 percent) among its federal court settlements.[79]

It should be noted that in 218 of these 444 settlements (49 percent), district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded. In 204 of these settlements, the lodestar multiplier resulting

―――――

[73]The Eleventh Circuit, for example, has identified a nonexclusive list of 15 factors that district courts might consider. See Camden I Condo. Ass'n, Inc. v. Dunkle, 946 F.2d 768, 772 n.3, 775 (11th Cir. 1991). See also In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 265 (D.N.H. 2007) (five factors); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (six factors); Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) (seven factors); In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 385 (D. Md. 2006) (13 factors); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988) (12 factors); In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (seven factors).

[74]See Eisenberg & Miller, supra note 15, at 32.

[75]See Staton v. Boeing Co., 327 F.3d 938, 968 (9th Cir. 2003).

[76]See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 282 (3d Cir. 2001).

[77]*Camden I Condo. Ass'n*, 946 F.2d at 774.

[78]*Camden I Condo. Ass'n*, 946 F.2d at 774 (alterations in original and internal quotation marks omitted).

[79]See Eisenberg & Miller II, supra note 16, at 259.

834     *Fitzpatrick*

*Figure 4:*  The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.



SOURCES:  Westlaw, PACER, district court clerks' offices.

from the fee award could be ascertained. The lodestar multiplier in these cases ranged from 0.07 to 10.3, with a mean of 1.65 and a median of 1.34. Although there is always the possibility that class counsel are optimistic with their timesheets when they submit them for lodestar consideration, these lodestar numbers—only one multiplier above 6.0, with the bulk of the range not much above 1.0—strike me as fairly parsimonious for the risk that goes into any piece of litigation and cast doubt on the notion that the percentage-of-the-settlement method results in windfalls to class counsel.[80]

Table 8 shows the mean and median fee percentages awarded in each litigation subject area. The fee percentages did not appear to vary greatly across litigation subject areas, with most mean and median awards between 25 percent and 30 percent. As I report later in this section, however, after controlling for other variables, there were statistically significant differences in the fee percentages awarded in some subject areas compared to others. The mean and median percentages for securities cases were 24.7 percent and 25.0 percent, respectively; for all nonsecurities cases, the mean and median were 26.1 percent and 26.0 percent, respectively. The Eisenberg-Miller study through 2008 found mean awards ranging from 21–27 percent and medians from 19–25 percent,[81] a bit lower than the ranges in my

———

[80]It should be emphasized, of course, that these 204 settlements may not be representative of the settlements where the percentage-of-the-settlement method was used without the lodestar cross-check.

[81]See Eisenberg & Miller II, supra note 16, at 262.

Table 8: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Subject Matter | Percentage of Settlement Awarded as Fees | |
| | *Mean* | *Median* |
| --- | --- | --- |
| Securities | 24.7 | 25.0 |
| (*n* = 233) | | |
| Labor and employment | 28.0 | 29.0 |
| (*n* = 61) | | |
| Consumer | 23.5 | 24.6 |
| (*n* = 39) | | |
| Employee benefits | 26.0 | 28.0 |
| (*n* = 37) | | |
| Civil rights | 29.0 | 30.3 |
| (*n* = 20) | | |
| Debt collection | 24.2 | 25.0 |
| (*n* = 5) | | |
| Antitrust | 25.4 | 25.0 |
| (*n* = 23) | | |
| Commercial | 23.3 | 25.0 |
| (*n* = 7) | | |
| Other | 24.9 | 26.0 |
| (*n* = 19) | | |
| All | 25.7 | 25.0 |
| (*N* = 444) | | |

SOURCES: Westlaw, PACER, district court clerks' offices.

2006–2007 data set, which again, may be because they oversampled larger settlements (as I show below, district courts awarded smaller fee percentages in larger cases).

In light of the fact that, as I noted above, the distribution of class action settlements among the geographic circuits does not track their civil litigation dockets generally, it is interesting to ask whether one reason for the pattern in class action cases is that circuits oversubscribed with class actions award higher fee percentages. Although this question will be taken up with more sophistication in the regression analysis below, it is worth describing here the mean and median fee percentages in each of the circuits. Those data are presented in Table 9. Contrary to the hypothesis set forth in Section III, two of the circuits most oversubscribed with class actions, the Second and the Ninth, were the only circuits in which the mean fee awards were *under* 25 percent. As I explain below, these differences are statistically significant and remain so after controlling for other variables.

The lodestar method likewise permits district courts to exercise a great deal of leeway through the application of the discretionary multiplier. Figure 5 shows the distribution of lodestar multipliers in the 71 settlements in which district courts used the lodestar method and the multiplier could be ascertained. The average multiplier was 0.98 and the median was 0.92, which suggest that courts were not terribly prone to exercise their discretion to deviate from the amount of money encompassed in the lodestar calculation. These 71

Table 9: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Circuit | Percentage of Settlement Awarded as Fees | |
|---|---|---|
| | *Mean* | *Median* |
| First (n = 27) | 27.0 | 25.0 |
| Second (n = 72) | 23.8 | 24.5 |
| Third (n = 50) | 25.4 | 29.3 |
| Fourth (n = 19) | 25.2 | 28.0 |
| Fifth (n = 27) | 26.4 | 29.0 |
| Sixth (n = 25) | 26.1 | 28.0 |
| Seventh (n = 39) | 27.4 | 29.0 |
| Eighth (n = 15) | 26.1 | 30.0 |
| Ninth (n = 111) | 23.9 | 25.0 |
| Tenth (n = 18) | 25.3 | 25.5 |
| Eleventh (n = 35) | 28.1 | 30.0 |
| DC (n = 6) | 26.9 | 26.0 |

SOURCES: Westlaw, PACER, district court clerks' offices.

settlements were heavily concentrated within the consumer (median multiplier 1.13) and debt collection (0.66) subject areas. If cases in which district courts used the percentage-of-the-settlement method with a lodestar cross-check are combined with the lodestar cases, the average and median multipliers (in the 263 cases where the multipliers were ascertainable) were 1.45 and 1.19, respectively. Again—putting to one side the possibility that class counsel are optimistic with their timesheets—these multipliers appear fairly modest in light of the risk involved in any piece of litigation.

*D. Factors Influencing Percentage Awards*

Whether district courts are exercising their discretion over fee awards wisely is an important public policy question given the amount of money at stake in class action settlements. As shown above, district court judges awarded class action lawyers nearly $5 billion in fees and expenses in 2006–2007. Based on the comparison to the tort system set forth in Section III, it is not difficult to surmise that in the 350 or so settlements every year, district court judges

Case 1:24-cv-00745-PLF   Document 15-2   Page 125 of 71   Filed 07/16/2024
Case 1:24-cv-00745-PLF   Document 15-2   Page 125 of 71   Filed 07/16/2024

*Class Action Settlements and Fee Awards*     *837*

*Figure 5:*   The distribution of lodestar multipliers in 2006–2007 federal class action fee awards using the lodestar method.



<small>Sources:  Westlaw, PACER, district court clerks' offices.</small>

are awarding a significant portion of all the annual compensation received by contingency-fee lawyers in the United States. Moreover, contingency fees are arguably the engine that drives much of the noncriminal regulation in the United States; unlike many other nations, we regulate largely through the ex post, decentralized device of litigation.[82] To the extent district courts could have exercised their discretion to award billions more or billions less to class action lawyers, district courts have been delegated a great deal of leeway over a big chunk of our regulatory horsepower. It is therefore worth examining how district courts exercise their discretion over fees. This examination is particularly important in cases where district courts use the percentage-of-the-settlement method to award fees: not only do such cases comprise the vast majority of settlements, but they comprise the vast majority of the money awarded as fees. As such, the analysis that follows will be confined to the 444 settlements where the district courts used the percentage-of-the-settlement method.

As I noted, prior empirical studies have shown that fee percentages are strongly and inversely related to the size of the settlement both in securities fraud and other cases. As shown in Figure 6, the 2006–2007 data are consistent with prior studies. Regression analysis, set forth in more detail below, confirms that after controlling for other variables, fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all nonsecurities cases.

———

<small>[82]See, e.g., Samuel Issacharoff, Regulating after the Fact, 56 DePaul L. Rev. 375, 377 (2007).</small>

*Figure 6:*   Fee awards as a function of settlement size in 2006–2007 class action cases using the percentage-of-the-settlement method with or without lodestar cross-check.



S̲ources̲:  Westlaw, PACER, district court clerks' offices.

As noted above, courts often look to fee percentages in other cases as one factor they consider in deciding what percentage to award in a settlement at hand. In light of this practice, and in light of the fact that the size of the settlement has such a strong relationship to fee percentages, scholars have tried to help guide the practice by reporting the distribution of fee percentages across different settlement sizes.[83] In Table 10, I follow the Eisenberg-Miller studies and attempt to contribute to this guidance by setting forth the mean and median fee percentages, as well as the standard deviation, for each decile of the 2006–2007 settlements in which courts used the percentage-of-the-settlement method to award fees. The mean percentages ranged from over 28 percent in the first decile to less than 19 percent in the last decile.

It should be noted that the last decile in Table 10 covers an especially wide range of settlements, those from $72.5 million to the Enron settlement of $6.6 billion. To give more meaningful data to courts that must award fees in the largest settlements, Table 11 shows the last decile broken into additional cut points. When both Tables 10 and 11 are examined together, it appears that fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent, and by the time $500 million was reached, they plunged well below 15 percent, with most awards at that level under even 10 percent.

───────

[83]See Eisenberg & Miller II, supra note 16, at 265.

Table 10: Mean, Median, and Standard Deviation of Fee Awards by Settlement Size in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
|---|---|---|---|
| [$0 to $0.75] (*n* = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (*n* = 44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (*n* = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (*n* = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (*n* = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (*n* = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (*n* = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (*n* = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (*n* = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6,600] (*n* = 45) | 18.4% | 19.0% | 7.9% |

Sources: Westlaw, PACER, district court clerks' offices.

Table 11: Mean, Median, and Standard Deviation of Fee Awards of the Largest 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
|---|---|---|---|
| ($72.5 to $100] (*n* = 12) | 23.7% | 24.3% | 5.3% |
| ($100 to $250] (*n* = 14) | 17.9% | 16.9% | 5.2% |
| ($250 to $500] (*n* = 8) | 17.8% | 19.5% | 7.9% |
| ($500 to $1,000] (*n* = 2) | 12.9% | 12.9% | 7.2% |
| ($1,000 to $6,600] (*n* = 9) | 13.7% | 9.5% | 11% |

Sources: Westlaw, PACER, district court clerks' offices.

Prior empirical studies have not examined whether fee awards are associated with the political affiliation of the district court judges making the awards. This is surprising because realist theories of judicial behavior would predict that political affiliation would influence fee decisions.[84] It is true that as a general matter, political affiliation may influence district court judges to a lesser degree than it does appellate judges (who have been the focus of most of the prior empirical studies of realist theories): district court judges decide more routine cases and are subject to greater oversight on appeal than appellate judges. On the other hand, class action settlements are a bit different in these regards than many other decisions made by district court judges. To begin with, class action settlements are almost never appealed, and when they are, the appeals are usually settled before the appellate court hears the case.[85] Thus, district courts have much less reason to worry about the constraint of appellate review in fashioning fee awards. Moreover, one would think the potential for political affiliation to influence judicial decision making is greatest when legal sources lead to indeterminate outcomes and when judicial decisions touch on matters that are salient in national politics. (The more salient a matter is, the more likely presidents will select judges with views on the matter and the more likely those views will diverge between Republicans and Democrats.) Fee award decisions would seem to satisfy both these criteria. The law of fee awards, as explained above, is highly discretionary, and fee award decisions are wrapped up in highly salient political issues such as tort reform and the relative power of plaintiffs' lawyers and corporations. I would expect to find that judges appointed by Democratic presidents awarded higher fees in the 2006–2007 settlements than did judges appointed by Republican presidents.

The data, however, do not appear to bear this out. Of the 444 fee awards using the percentage-of-the-settlement approach, 52 percent were approved by Republican appointees, 45 percent were approved by Democratic appointees, and 4 percent were approved by non-Article III judges (usually magistrate judges). The mean fee percentage approved by Republican appointees (25.6 percent) was slightly *greater* than the mean approved by Democratic appointees (24.9 percent). The medians (25 percent) were the same.

To examine whether the realist hypothesis fared better after controlling for other variables, I performed regression analysis of the fee percentage data for the 427 settlements approved by Article III judges. I used ordinary least squares regression with the dependent variable the percentage of the settlement that was awarded in fees.[86] The independent

---

[84]See generally C.K. Rowland & Robert A. Carp, Politics and Judgment in Federal District Courts (1996). See also Max M. Schanzenbach & Emerson H. Tiller, Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence, and Reform, 75 U. Chi. L. Rev. 715, 724–25 (2008).

[85]See Brian T. Fitzpatrick, The End of Objector Blackmail? 62 Vand. L. Rev. 1623, 1640, 1634–38 (2009) (finding that less than 10 percent of class action settlements approved by federal courts in 2006 were appealed by class members).

[86]Professors Eisenberg and Miller used a square root transformation of the fee percentages in some of their regressions. I ran all the regressions using this transformation as well and it did not appreciably change the results. I also ran the regressions using a natural log transformation of fee percentage and with the dependent variable natural log of the fee amount (as opposed to the fee percentage). None of these models changed the results

variables were the natural log of the amount of the settlement, the natural log of the age of the case (in days), indicator variables for whether the class was certified as a settlement class, for litigation subject areas, and for circuits, as well as indicator variables for whether the judge was appointed by a Republican or Democratic president and for the judge's race and gender.[87]

The results for five regressions are in Table 12. In the first regression (Column 1), only the settlement amount, case age, and judge's political affiliation, gender, and race were included as independent variables. In the second regression (Column 2), all the independent variables were included. In the third regression (Column 3), only securities cases were analyzed, and in the fourth regression (Column 4), only nonsecurities cases were analyzed.

In none of these regressions was the political affiliation of the district court judge associated with fee percentage in a statistically significant manner.[88] One possible explanation for the lack of evidence for the realist hypothesis is that district court judges elevate other preferences above their political and ideological ones. For example, district courts of both political stripes may succumb to docket-clearing pressures and largely rubber stamp whatever fee is requested by class counsel; after all, these requests are rarely challenged by defendants. Moreover, if judges award class counsel whatever they request, class counsel will not appeal and, given that, as noted above, class members rarely appeal settlements (and when they do, often settle them before the appeal is heard),[89] judges can thereby virtually guarantee there will be no appellate review of their settlement decisions. Indeed, scholars have found that in the vast majority of cases, the fees ultimately awarded by federal judges are little different than those sought by class counsel.[90]

Another explanation for the lack of evidence for the realist hypothesis is that my data set includes both unpublished as well as published decisions. It is thought that realist theories of judicial behavior lose force in unpublished judicial decisions. This is the case because the kinds of questions for which realist theories would predict that judges have the most room to let their ideologies run are questions for which the law is ambiguous; it is

───────

appreciably. The regressions were also run with and without the 2006 Enron settlement because it was such an outlier ($6.6 billion); the case did not change the regression results appreciably. For every regression, the data and residuals were inspected to confirm the standard assumptions of linearity, homoscedasticity, and the normal distribution of errors.

[87]Prior studies of judicial behavior have found that the race and sex of the judge can be associated with his or her decisions. See, e.g., Adam B. Cox & Thomas J. Miles, Judging the Voting Rights Act, 108 Colum. L. Rev. 1 (2008); Donald R. Songer et al., A Reappraisal of Diversification in the Federal Courts: Gender Effects in the Courts of Appeals, 56 J. Pol. 425 (1994).

[88]Although these coefficients are not reported in Table 8, the gender of the district court judge was never statistically significant. The race of the judge was only occasionally significant.

[89]See Fitzpatrick, supra note 85, at 1640.

[90]See Eisenberg & Miller II, supra note 16, at 270 (finding that state and federal judges awarded the fees requested by class counsel in 72.5 percent of settlements); Eisenberg, Miller & Perino, supra note 9, at 22 ("judges take a light touch when it comes to reviewing fee requests").

*842   Fitzpatrick*

Table 12:   Regression of Fee Percentages in 2006–2007 Settlements Using Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Independent Variable | Regression Coefficients (and Robust t Statistics) | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| Settlement amount (natural log) | −1.77 | −1.76 | −1.76 | −1.41 | −1.78 |
| | (−5.43)** | (−8.52)** | (−7.16)** | (−4.00)** | (−8.67)** |
| Age of case (natural log days) | 1.66 | 1.99 | 1.13 | 1.72 | 2.00 |
| | (2.31)** | (2.71)** | (1.21) | (1.47) | (2.69)** |
| Judge's political affiliation (1 = Democrat) | −0.630 | −0.345 | 0.657 | −1.43 | −0.232 |
| | (−0.83) | (−0.49) | (0.76) | (−1.20) | (−0.34) |
| Settlement class | | 0.150 | 0.873 | −1.62 | 0.124 |
| | | (0.19) | (0.84) | (−1.00) | (0.15) |
| 1st Circuit | | 3.30 | 4.41 | 0.031 | 0.579 |
| | | (2.74)** | (3.32)** | (0.01) | (0.51) |
| 2d Circuit | | 0.513 | −0.813 | 2.93 | −2.23 |
| | | (0.44) | (−0.61) | (1.14) | (−1.98)** |
| 3d Circuit | | 2.25 | 4.00 | −1.11 | — |
| | | (1.99)** | (3.85)** | (−0.50) | |
| 4th Circuit | | 2.34 | 0.544 | 3.81 | — |
| | | (1.22) | (0.19) | (1.35) | |
| 5th Circuit | | 2.98 | 1.09 | 6.11 | 0.230 |
| | | (1.90)* | (0.65) | (1.97)** | (0.15) |
| 6th Circuit | | 2.91 | 0.838 | 4.41 | — |
| | | (2.28)** | (0.57) | (2.15)** | |
| 7th Circuit | | 2.55 | 3.22 | 2.90 | −0.227 |
| | | (2.23)** | (2.36)** | (1.46) | (−0.20) |
| 8th Circuit | | 2.12 | −0.759 | 3.73 | −0.586 |
| | | (0.97) | (−0.24) | (1.19) | (−0.28) |
| 9th Circuit | | — | — | — | −2.73 |
| | | | | | (−3.44)** |
| 10th Circuit | | 1.45 | −0.254 | 3.16 | — |
| | | (0.94) | (−0.13) | (1.29) | |
| 11th Circuit | | 4.05 | 3.85 | 4.14 | — |
| | | (3.44)** | (3.07)** | (1.88)* | |
| DC Circuit | | 2.76 | 2.60 | 2.41 | — |
| | | (1.10) | (0.80) | (0.64) | |
| Securities case | | — | | | — |
| Labor and employment case | | 2.93 | | — | 2.85 |
| | | (3.00)** | | | (2.94)** |
| Consumer case | | −1.65 | | −4.39 | −1.62 |
| | | (−0.88) | | (−2.20)** | (−0.88) |
| Employee benefits case | | −0.306 | | −4.23 | −0.325 |
| | | (−0.23) | | (−2.55)** | (−0.26) |
| Civil rights case | | 1.85 | | −2.05 | 1.76 |
| | | (0.99) | | (−0.97) | (0.95) |
| Debt collection case | | −4.93 | | −7.93 | −5.04 |
| | | (−1.71)* | | (−2.49)** | (−1.75)* |
| Antitrust case | | 3.06 | | 0.937 | 2.78 |
| | | (2.11)** | | (0.47) | (1.98)** |

Table 12   *Continued*

| Independent Variable | Regression Coefficients (and Robust t Statistics) | | | | |
| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Commercial case | | −0.028 | | −2.65 | 0.178 |
| | | (−0.01) | | (−0.73) | (0.05) |
| Other case | | −0.340 | | −3.73 | −0.221 |
| | | (−0.17) | | (−1.65) | (−0.11) |
| Constant | 42.1 | 37.2 | 43.0 | 38.2 | 40.1 |
| | (7.29)** | (6.08)** | (6.72)** | (4.14)** | (7.62)** |
| N | 427 | 427 | 232 | 195 | 427 |
| $R^2$ | .20 | .26 | .37 | .26 | .26 |
| Root MSE | 6.59 | 6.50 | 5.63 | 7.24 | 6.48 |

NOTE: **significant at the 5 percent level; *significant at the 10 percent level. Standard errors in Column 1 were clustered by circuit. Indicator variables for race and gender were included in each regression but not reported.
SOURCES: Westlaw, PACER, district court clerks' offices, Federal Judicial Center.

thought that these kinds of questions are more often answered in published opinions.[91] Indeed, most of the studies finding an association between ideological beliefs and case outcomes were based on data sets that included only published opinions.[92] On the other hand, there is a small but growing number of studies that examine unpublished opinions as well, and some of these studies have shown that ideological effects persisted.[93] Nonetheless, in light of the discretion that judges exercise with respect to fee award decisions, it hard to characterize *any* decision in this area as "unambiguous." Thus, even when unpublished, I would have expected the fee award decisions to exhibit an association with ideological beliefs. Thus, I am more persuaded by the explanation suggesting that judges are more concerned with clearing their dockets or insulating their decisions from appeal in these cases than with furthering their ideological beliefs.

In all the regressions, the size of the settlement was strongly and inversely associated with fee percentages. Whether the case was certified as a settlement class was not associated

———

[91]See, e.g., Ahmed E. Taha, Data and Selection Bias: A Case Study, 75 UMKC L. Rev. 171, 179 (2006).

[92]Id. at 178–79.

[93]See, e.g., David S. Law, Strategic Judicial Lawmaking: Ideology, Publication, and Asylum Law in the Ninth Circuit, 73 U. Cin. L. Rev. 817, 843 (2005); Deborah Jones Merritt & James J. Brudney, Stalking Secret Law: What Predicts Publication in the United States Courts of Appeals, 54 Vand. L. Rev. 71, 109 (2001); Donald R. Songer, Criteria for Publication of Opinions in the U.S. Courts of Appeals: Formal Rules Versus Empirical Reality, 73 Judicature 307, 312 (1990). At the trial court level, however, the studies of civil cases have found no ideological effects. See Laura Beth Nielsen, Robert L. Nelson & Ryon Lancaster, Individual Justice or Collective Legal Mobilization? Employment Discrimination Litigation in the Post Civil Rights United States, 7 J. Empirical Legal Stud. 175, 192–93 (2010); Denise M. Keele et al., An Analysis of Ideological Effects in Published Versus Unpublished Judicial Opinions, 6 J. Empirical Legal Stud. 213, 230 (2009); Orley Ashenfelter, Theodore Eisenberg & Stewart J. Schwab, Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes, 24 J. Legal Stud. 257, 276–77 (1995). With respect to criminal cases, there is at least one study at the trial court level that has found ideological effects. See Schanzenbach & Tiller, supra note 81, at 734.

with fee percentages in any of the regressions. The age of the case at settlement was associated with fee percentages in the first two regressions, and when the settlement class variable was removed in regressions 3 and 4, the age variable became positively associated with fee percentages in nonsecurities cases but remained insignificant in securities cases. Professors Eisenberg and Miller likewise found that the age of the case at settlement was positively associated with fee percentages in their 1993–2002 data set,[94] and that settlement classes were not associated with fee percentages in their 2003–2008 data set.[95]

Although the structure of these regressions did not permit extensive comparisons of fee awards across different litigation subject areas, fee percentages appeared to vary somewhat depending on the type of case that settled. Securities cases were used as the baseline litigation subject area in the second and fifth regressions, permitting a comparison of fee awards in each nonsecurities area with the awards in securities cases. These regressions show that awards in a few areas, including labor/employment and antitrust, were more lucrative than those in securities cases. In the fourth regression, which included only nonsecurities cases, labor and employment cases were used as the baseline litigation subject area, permitting comparison between fee percentages in that area and the other nonsecurities areas. This regression shows that fee percentages in several areas, including consumer and employee benefits cases, were lower than the percentages in labor and employment cases.

In the fifth regression (Column 5 of Table 12), I attempted to discern whether the circuits identified in Section III as those with the most overrepresented (the First, Second, Seventh, and Ninth) and underrepresented (the Fifth and Eighth) class action dockets awarded attorney fees differently than the other circuits. That is, perhaps district court judges in the First, Second, Seventh, and Ninth Circuits award greater percentages of class action settlements as fees than do the other circuits, whereas district court judges in the Fifth and Eighth Circuits award smaller percentages. To test this hypothesis, in the fifth regression, I included indicator variables only for the six circuits with unusual dockets to measure their fee awards against the other six circuits combined. The regression showed statistically significant association with fee percentages for only two of the six unusual circuits: the Second and Ninth Circuits. In both cases, however, the direction of the association (i.e., the Second and Ninth Circuits awarded *smaller* fees than the baseline circuits) was opposite the hypothesized direction.[96]

———

[94]See Eisenberg & Miller, supra note 15, at 61.

[95]See Eisenberg & Miller II, supra note 16, at 266.

[96]This relationship persisted when the regressions were rerun among the securities and nonsecurities cases separately. I do not report these results, but, even though the First, Second, and Ninth Circuits were oversubscribed with securities class action settlements and the Fifth, Sixth, and Eighth were undersubscribed, there was no association between fee percentages and any of these unusual circuits except, again, the inverse association with the Second and Ninth Circuits. In nonsecurities cases, even though the Seventh and Ninth Circuits were oversubscribed and the Fifth and the Eighth undersubscribed, there was no association between fee percentages and any of these unusual circuits except again for the inverse association with the Ninth Circuit.

Case 1:24-cv-05745-PDE Document 15-2 Page: 133 Filed: 07/16/2024
Case: 24-1075 Document: 15-2 Page: 133 Filed: 07/16/2024 71

*Class Action Settlements and Fee Awards*    845

The lack of the expected association with the unusual circuits might be explained by the fact that class action lawyers forum shop along dimensions other than their potential fee awards; they might, for example, put more emphasis on favorable class-certification law because there can be no fee award if the class is not certified. As noted above, it might also be the case that class action lawyers are unable to engage in forum shopping at all because defendants are able to transfer venue to the district in which they are headquartered or another district with a significant connection to the litigation.

It is unclear why the Second and Ninth Circuits were associated with lower fee awards despite their heavy class action dockets. Indeed, it should be noted that the Ninth Circuit was the baseline circuit in the second, third, and fourth regressions and, in all these regressions, district courts in the Ninth Circuit awarded smaller fees than courts in many of the other circuits. The lower fees in the Ninth Circuit may be attributable to the fact that it has adopted a presumption that the proper fee to be awarded in a class action settlement is 25 percent of the settlement.[97] This presumption may make it more difficult for district court judges to award larger fee percentages. The lower awards in the Second Circuit are more difficult to explain, but it should be noted that the difference between the Second Circuit and the baseline circuits went away when the fifth regression was rerun with only nonsecurities cases.[98] This suggests that the awards in the Second Circuit may be lower *only* in securities cases. In any event, it should be noted that the lower fee awards from the Second and Ninth Circuits contrast with the findings in the Eisenberg-Miller studies, which found no intercircuit differences in fee awards in common-fund cases in their data through 2008.[99]

## V. Conclusion

This article has attempted to fill some of the gaps in our knowledge about class action litigation by reporting the results of an empirical study that attempted to collect all class action settlements approved by federal judges in 2006 and 2007. District court judges approved 688 class action settlements over this two-year period, involving more than $33 billion. Of this $33 billion, nearly $5 billion was awarded to class action lawyers, or about 15 percent of the total. District courts typically awarded fees using the highly discretionary percentage-of-the-settlement method, and fee awards varied over a wide range under this method, with a mean and median around 25 percent. Fee awards using this method were strongly and inversely associated with the size of the settlement. Fee percentages were positively associated with the age of the case at settlement. Fee percentages were not associated with whether the class action was certified as a settlement class or with the

―――――

[97]See note 75 supra. It should be noted that none of the results from the previous regressions were affected when the Ninth Circuit settlements were excluded from the data.

[98]The Ninth Circuit's differences persisted.

[99]See Eisenberg & Miller II, supra note 16, at 260.

political affiliation of the judge who made the award. Finally, there appeared to be some variation in fee percentages depending on subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all of the other litigation areas, and district courts in the Ninth Circuit and in the Second Circuit (in securities cases) awarded lower fee percentages than district courts in several other circuits. The lower awards in the Ninth Circuit may be attributable to the fact that it is the only circuit that has adopted a presumptive fee percentage of 25 percent.

EXHIBIT 3

<u>Documents reviewed:</u>

- Memorandum Opinion (document 25, filed 12/5/16)

- Memorandum Opinion (document 33, filed 1/24/17)

- Memorandum Opinion (document 89, filed 3/31/18)

- Opinion, No. 19-1081 (Fed. Cir., Aug. 6, 2020)

- Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement (document 148, filed 4/12/23)

- Revised Declaration of Deepak Gupta (document 149, filed 4/12/23), including Exhibit A ("Settlement Agreement")

- Order Granting Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement (document 153, filed 5/8/23)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated,<br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>*Defendant*. | Case No. 16-745 |

## DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.      I am the founding principal of Gupta Wessler LLP, one of the two law firms appointed as lead class counsel by this Court on January 24, 2017. *See* ECF Nos. 32 & 33. Along with my partner Jonathan E. Taylor and our co-counsel at Motley Rice LLC, I have represented the plaintiffs throughout this litigation. I am submitting this declaration in support of the plaintiffs' motion for final approval of the class settlement and for attorneys' fees, costs, and service awards. This declaration is accompanied by four exhibits: a copy of the executed settlement agreement (Exhibit A), a copy of the executed supplemental agreement (Exhibit B), a copy of a second amendment making further technical modifications (Exhibit C), a copy of my law firm biographical page (Exhibit D), and a copy of my colleague Jonathan Taylor's biographical page (Exhibit E).

### *Background on PACER Fees*

2.      The Administrative Office of the U.S. Courts (AO) requires people to pay fees to access records through its Public Access to Court Electronic Records system, commonly known as

PACER. This lawsuit was brought to challenge the lawfulness of those fees for one reason: the fees far exceed the cost of providing the records.

3.      By statute, the federal judiciary has long had the authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then set at $.07 per page) were "higher than the marginal cost of disseminating the information." S. Rep. 107-174, at 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, Congress passed the E-Government Act of 2002, which amended the statute by authorizing fees "only to the extent necessary." 28 U.S.C. § 1913 note.

4.      Despite this statutory limitation designed to *reduce* PACER fees, the AO twice *increased* PACER fees in the years after the E-Government Act's passage—first to $.08 per page and then to $.10 per page. And it did so over a period when the costs of electronic data storage plunged exponentially.

5.      The result has been a widely unpopular PACER fee regime that has hindered equal access to justice, imposed serious barriers for low-income and *pro se* litigants, discouraged academic research and journalism, and thus inhibited public understanding of the courts. And the AO has further compounded those harms by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

6.       I first became aware of the practical problems and dubious legality of PACER fees, and first considered whether litigation could be brought to address the issue, when I was a staff attorney at the nonprofit Public Citizen Litigation Group between 2005 and 2011. Government transparency was among the group's specialties, and I followed the efforts of Carl Malamud of Public.Resource.org, who led a sustained campaign to draw public attention to PACER fees and

2

persuade the AO to make PACER free. As I recall, my colleagues and I considered the possibility of bringing litigation to challenge PACER fees but were unable to identify a viable legal path.

7.      Until this case was filed, litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime, for at least three main reasons. First, the judiciary has statutory authority to charge at least *some* amount in fees, so litigation alone could never result in a free PACER system—the ultimate goal of reformers. Second, few practicing litigators, let alone those who specialize in complex federal litigation, were likely to be eager to sue the federal judiciary and challenge policy decisions made by the Judicial Conference of the United States. They were even less likely to commit considerable time and resources to litigation when the prospect of recovery was so uncertain. Third, even if PACER fees could be shown to be excessive and even if qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. And advocates were unable to identify an alternative basis for jurisdiction, a cause of action, and a waiver of sovereign immunity to challenge PACER fees in court.

8.      I am aware of only one previous lawsuit directly challenging the PACER fee schedule; that suit was dismissed for lack of jurisdiction. *See Greenspan v. Admin. Office*, No. 14-cv-2396 (N.D. Cal.). I am also aware of one previous effort to challenge the AO's policy on fee waivers, which also foundered on jurisdiction. In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Pub. Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identify situations requiring their recusal,'" and they "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes accompanying

the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media." *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

9.      With litigation seemingly unavailable as a pathway, advocates for PACER reform had largely devoted their efforts to grassroots and technological strategies: making certain records available in an online database that could be accessed for free, downloading records in bulk, or mounting public-information campaigns to expand access. At one point, for example, when the judiciary initiated a free trial of PACER at several libraries, Carl Malamud encouraged activists "to push the court records system into the 21st century by simply grabbing enormous chunks of the database and giving the documents away." John Schwartz, *An Effort to Upgrade a Court Archive System to Free and Easy*, N.Y. Times (Feb. 12, 2009). An enterprising 22-year-old activist named Aaron Swartz managed to download millions of documents before the AO responded by pulling the plug on the free trial and calling in the FBI to investigate Swartz. *Id.* This heavy-handed response was seen by many as motivated by a desire to protect fee revenue at the expense of public access. Today, the Free Law Project and the Center for Information Technology Policy at Princeton University operate a searchable collection of millions of PACER documents and dockets that were gathered using their RECAP software, which allows users to share the records they download.

10. These efforts have been important in raising public awareness, and ameliorating the effects of PACER fees, but they have not eliminated or reduced the fees themselves. To the contrary, the fees have only continued on their seemingly inexorable—and indefensible—rise.

### *Overview of this Litigation*

11.      Then came this case. On April 21, 2016, three nonprofits filed this lawsuit, asking this Court to declare that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges during the limitations period. They sued under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an

illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because that Act provides jurisdiction only for claims seeking monetary relief based on past overcharges, and because the judiciary is not subject to the APA, *see* 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek any injunctive relief or other relief requiring the judiciary to lower PACER fees going forward. They therefore limited their requested relief to retroactive monetary relief.

12.     From the start, the plaintiffs were represented by a team of lawyers at our firm, Gupta Wessler LLP, a litigation boutique with experience bringing complex cases involving the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. By the time that we filed this lawsuit together (as further detailed in my declaration in support of class certification, ECF No. 8-1, and as described further below), the two law firms together had an unparalleled combination of experience and expertise in prosecuting class claims for monetary relief against the federal government.

13.     In its first year, the litigation met with early success when this Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, on January 24, 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' Little Tucker Act illegal-exaction claim for classwide treatment and appointed my firm and Motley Rice as co-lead class counsel. *Id.*

14.     The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (KCC) as claims administrator. ECF Nos. 37 & 42. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, about 1,100 opted out of the class.

15.     Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only a category labeled by the judiciary as "Public Access Services," but also the following categories of expenses: "Case Management/Electronic Case Files System" (CM/ECF); "Electronic Bankruptcy Notification" (EBN); "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under the heading "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi."

16.     The parties subsequently filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to "disseminating information through electronic means." ECF No. 89 at 24.

17.     On March 31, 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [such] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

18.     Within months, the judiciary took steps "to implement the district court's ruling" and "to begin transitioning disallowed expenditures from the [PACER] program to courts' Salaries

Appx0682

and Expenses appropriated funding." *See FY 2018 Judiciary Report Requirement on PACER, July 2018,* at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018), https://perma.cc/CP8S-XRVQ. In July 2018, the AO's Director informed the House Appropriations Committee that, "beginning in FY 2019, Courtroom Technology, Web-based Juror Services, and Violent Crime Control Act Notification categories will no longer be funded" with PACER fees, "to reduce potential future legal exposure." *Id.* "The Judiciary will instead seek appropriated funds for those categories." *Id.*

19.     Meanwhile, both parties sought permission for an interlocutory appeal from this Court's decision, and the U.S. Court of Appeals for the Federal Circuit accepted both appeals to decide the scope of the statutory authorization to charge fees. The parties adhered to their same interpretations of the statute on appeal. In addition, the government argued that the court lacked jurisdiction, so the class was not entitled to damages even assuming that the AO had violated the statute.

20.     On appeal, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups," the "sponsor of the 2002 law" (Senator Joseph Lieberman) and legal-technology firms—all detailing the practical harms caused by excessive PACER fees. Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times (Feb. 4, 2019), https://perma.cc/LN5E-EBE9. Prominent media outlets, like the *New York Times,* published editorials championing the lawsuit. *See Public Records Belong to the Public,* N.Y. Times (Feb. 7, 2019), https://perma.cc/76P8-WFF7. And by the end of 2019, the judiciary announced that it was doubling the quarterly fee waiver for PACER from $15 to $30, which had the effect of eliminating PACER fees for approximately 75% of PACER users. *See* Kimberly Robinson, *Judiciary Doubles Fee Waiver for PACER Access to Court Records,* Bloomberg Law (Sept. 17, 2019), https://perma.cc/CHF3-XVTT; Theresa A. Reiss, Cong. Research Serv., LSB10672, *Legislative & Judicial Developments*

*Affecting Public Access to Court Electronic Records (PACER)* 1 (Feb. 1, 2022), https://perma.cc/WT8K-G64X.

21.    In August 2020, the Federal Circuit unanimously rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (specifically, those that were not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was "one other potential source of liability," because the court was not able to confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The court left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

22.    Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. *See* Reiss, *Legislative & Judicial Developments Affecting PACER* at 1–2; Senate Judiciary Committee, *Judiciary Committee Advances Legislation to Remove PACER Paywall, Increase Accessibility to Court Records* (Dec. 9, 2021), https://perma.cc/8WBB-FTDY; Nate Raymond, *Free PACER? Bill to end fees for online court records advances in Senate*, Reuters (Dec. 9, 2021), https://perma.cc/H29N-C52M. Notes from a closed March 2022 meeting showed that "[t]he Judicial Conference of the United States [also now] supported offering free public access to the

federal court records system for noncommercial users." Craig Clough, *Federal Judiciary Policy Body Endorses Free PACER Searches*, Law360 (May 31, 2022), https://perma.cc/YP8M-Q5CK.

### *The Settlement Negotiations*

23.     On remand, the case was reassigned to Judge Paul Friedman, and the parties came together to discuss the path forward. They understood that, were the case to remain on a litigation track, there would be significant uncertainty and delay. Years of protracted litigation lay ahead, including a lengthy formal discovery process that could require the judiciary to painstakingly reconstruct line-item expenses and likely a second appeal and a trial on damages. And the range of potential outcomes was enormous: On one side, the government maintained that it owed *no* damages because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower—a litigating position that also made it difficult for the judiciary to lower fees during the pendency of the litigation. The government further maintained that, in any event, the full category of CM/ECF was properly funded with PACER fees. On the other side, the plaintiffs maintained that liability had been established, and that some portion of CM/ECF was likely improper.

24.     Hoping to bridge this divide and avoid years of litigation, the parties were able to agree on certain structural aspects of a potential settlement, and they agreed to engage in mediation on the amount and details. On December 29, 2020, at the parties' request, Judge Friedman stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation.

25.     Over the next few months, the parties prepared and exchanged information and substantive memoranda, with detailed supporting materials, which together provided a balanced and comprehensive view of the strengths and weaknesses of the case. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, a retired Boston University law professor and one of the nation's most experienced and accomplished mediators.

26.     With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-made settlement, and the plaintiffs agreed to consider the government's final offer concerning the total amount of that fund, inclusive of all settlement costs, attorneys' fees, and service awards.

27.     But by the time the session had ended, the parties still hadn't reached agreement on the total amount of the settlement or several other key terms—including how the funds would be distributed, what to do with any unclaimed funds after the initial distribution, and the scope of the release. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed.

28.     Further progress was slow, and at times the parties reached what could have been insurmountable impasses. A particular sticking point concerned the allocation of settlement funds. Consistent with the parties' starkly differing litigating positions on both liability and damages, the plaintiffs argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers— "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note. Over a period of many months, the parties were able to resolve their differences and reach a compromise of these competing approaches: a minimum payment of $350—the smallest amount that the government would agree to—with a pro rata distribution beyond that amount.

Appx0686

The final version of the agreement was executed on July 27, 2022. *See* Ex. A. The parties later executed two supplemental agreements making certain technical modifications to the agreement. *See* Ex. B & C.

### The Parties' Settlement

29.     As clarified by the supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the class period"), excluding opt-outs, federal agencies, and class counsel. Ex. A ¶ 3 & Ex. B. This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Ex. A ¶ 4. Because this second group of people are not part of the original class, they did not receive notice or an opportunity to opt out when the original class was certified. For that reason, under the settlement, these additional class members will receive notice and an opportunity to opt out. *Id.*

30.     The settlement provides for a total common-fund payment by the United States of $125 million, which covers monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11. Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust (to be called the "PACER Class Action Settlement Trust"). *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16. In exchange for their payments, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the class period. *Id.* ¶ 13. This release does not cover any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.), the only pending PACER-fee related lawsuit of which the AO is aware. Ex.

A ¶ 13. The amount of settlement funds disbursed to any class member in this case, however, will be deducted from any monetary recovery that the class member may receive in *Fisher*. *Id.*

31.    Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, and with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41), the extension of which the parties will be jointly requesting from this Court. Ex. A ¶ 14. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

32.    Under the settlement, class members will not have to submit a claim or to receive their payment. *Id.* Instead, KCC has and will continue to use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.*

33.    The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to at least $100 million.

34.    ***First distribution.*** KCC will distribute the Remaining Amount to class members like so: It will allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. *Id.* ¶ 19. KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* It will then deduct this Aggregate Minimum Payment

Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the class period. *Id.*

35.     Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the class period will receive a payment equal to the total amount of PACER fees paid by that class member during the class period; and (b) each class member who paid more than $350 in PACER fees during the class period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

36.     KCC will complete disbursement of each class member's share of the recovery within 90 days of receiving the $125 million from the United States, or within 21 days after receiving the necessary information from AO, whichever is later. *Id.* ¶ 21. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. *Id.* ¶ 22.

37.     ***Second distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the trust one year after the $125 million payment by the United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. *Id.* ¶ 23. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the class period, and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After

First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the class period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. *Id.* ¶ 24. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

38. **Fairness hearing.** The agreement further provides that, within 75 days of its execution—that is, by October 11, 2022—the plaintiffs will submit to the Court a motion for an order approving settlement notice to the class under Rule 23(e). *Id.* ¶ 27, Ex. B.

39. Consistent with the agreement, the plaintiffs are applying to this Court for an award of attorneys' fees and reimbursement of litigation expenses, and for service awards for the class representatives in amounts not to exceed $10,000 per representative. Ex. A ¶ 28. As noted above, these awards will be paid out of the settlement trust and will not exceed 20% of the $125 million paid by the United States. *Id.* The motion for an award of attorneys' fees and litigation expenses is subject to this Court's approval, and class members have the right to object to the motion. *Id.*

40. Within 30 days of the order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, if later), KCC provided notice via email to class members for whom the AO has an email address. *Id.* ¶ 29; Ex. C ¶ 2. Within 45 days of the order approving settlement notice, KCC sent postcard notice via U.S. mail to all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Ex. A ¶ 29; Ex. C ¶ 5. KCC has also provided the relevant case documents on a

website it has maintained that is dedicated to the settlement (www.pacerfeesclassaction.com). Ex. A ¶ 29; Ex. C ¶ 3. The notice included an explanation of the procedures for allocating and distributing the trust funds, the date upon which the Court will hold a fairness hearing under Rule 23(e), and the date by which class members must file their written objections, if any, to the settlement. Ex. A ¶ 29. The notice sent to the additional class members—those who are not part of the class already certified by this Court—also informed them of their right to opt out and the procedures through which they may exercise that right. Ex. C ¶ 6. The opt-out period for these additional class members is 90 days. *Id.*

41.     Any class member may express their views supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Ex. A ¶ 30. Counsel for the parties may respond to any objection within 21 days after receipt of the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32; Ex. C ¶ 7.

42.     After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing at which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Ex. A ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.*

*          *          *

43.     This settlement is the result of more than seven years of hard-fought litigation, including more than a year of careful negotiation by the parties. It is, in my view and the view of the three class representatives, an excellent settlement for the class. Before this case was filed, there was no historical precedent for bringing suit against the federal judiciary—*in* the federal judiciary—

based on fees charged *by* the federal judiciary. Now there is. If approved, the settlement will deliver real relief to every single class member: a full refund of up to $350 for any PACER fees that each class member paid during the class period, plus additional amounts for class members who paid more than $350 in PACER fees during that period. According to data provided by the government, this means that the vast majority of class members will receive a full refund—100 cents on the dollar—for the PACER fees that they paid during the class period.

44.     And the settlement will provide this relief quickly. Whereas litigating the case to a final judgment would take years—with no guarantee of *any* recovery for class members given the government's legal position—the settlement will produce a final judgment in a matter of months. Moreover, although the settlement does not include injunctive relief, that is only because this relief is unavailable against the judiciary. After this litigation was filed, however, Congress began taking steps to eliminate PACER fees, and there is now a Federal Circuit decision that interprets (and imposes limits on) the statute authorizing fees, while making clear that PACER users have a cause of action to challenge such fees in the future. It is hard to imagine a better result for the class.

### *Class Counsel's Experience and Qualifications*

45.     Throughout the seven years of this hard-fought litigation, the plaintiffs were represented by two law firms appointed by the Court as lead class counsel: Gupta Wessler LLP and Motley Rice LLC. The firms worked together on all aspects of the litigation, with our team at Gupta Wessler taking the lead role on briefing, argument, research, and legal analysis, and Motley Rice taking a lead role in case management, discovery, and settlement administration.

46.     I am the founding principal of Gupta Wessler LLP, a boutique law firm that focuses on Supreme Court, appellate, and complex litigation on behalf of plaintiffs and public-interest clients. I am also a Lecturer on Law at Harvard Law School, where I teach the Harvard Supreme Court Litigation Clinic and regularly teach courses on the American civil-justice system. I am a

public member of the American Law Institute and an elected member of the Administrative Conference of the United States. Over more than two decades, I have led high-stakes litigation before the U.S. Supreme Court, all thirteen federal circuits, and numerous state and federal courts nationwide. I have also testified before the U.S. Senate, the U.S. House of Representatives, and the Presidential Commission on the Supreme Court. Much of my advocacy has focused on ensuring access to justice for consumers, workers, and communities injured by corporate or governmental wrongdoing. My biographical page is attached as Exhibit D.

47. My colleague Jonathan Taylor played a key role on all aspects of this litigation, from conceptualizing the case with me at the outset, to presenting oral argument on summary judgment in the district court, to putting the finishing touches on the motion for final approval. When the case was filed, Mr. Taylor was an associate at the firm; he is now a principal. Mr. Taylor is a graduate of Harvard Law School who clerked for a federal circuit judge before joining Gupta Wessler. He has presented oral argument in the majority of federal circuits and has been the principal author of dozens of briefs filed in the U.S. Supreme Court and all levels of the state and federal judiciaries. His law firm biography is attached as Exhibit E.

48. Class actions and litigation involving the federal government are a particular focus of my work and my firm's work. Mr. Taylor and I have both argued numerous appeals on class-action issues at all levels of the federal courts, and much of our firm's docket is occupied by appeals arising from class actions. Our firm also initiates select class-action cases, like this one, from the ground up—typically in collaboration with large, sophisticated class-action firms like Motley Rice.

49. By the time that Gupta Wessler and Motley Rice filed this lawsuit together, we were able to draw from a considerable body of collective experience successfully bringing class actions for monetary relief against the federal government—a relatively rare form of litigation. Among other things, my colleague Jonathan Taylor and I had successfully represented a nationwide

certified class of all of the nation's federal bankruptcy judges and their surviving spouses, estates, and beneficiaries, resulting in a judgment against the United States for $56 million in illegally withheld judicial pay and benefits. *Houser v. United States*, No. 13–607C (Fed. Cl.). While still at Public Citizen, I had successfully represented a nationwide class of veterans challenging the Army Air Force Exchange Service's withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering $7.4 million in illegal charges. *Briggs v. Army & Air Force Exchange Service*, No. C 07–05760 (N.D. Cal.). And, together with Motley Rice, we were already representing a recently certified class of tax-return prepares in this Court, seeking the recovery of millions of dollars in unlawfully excessive fees paid to the IRS. In each one of these cases, the claims sought recovery of illegal exactions from the federal government on a class basis, with jurisdiction premised on the Tucker Act or the Little Tucker Act. *Steele v. United States*, No. 14-cv-01523-RCL (D.D.C.). This experience is further detailed below.

50.     ***Bankruptcy Judges' Compensation Litigation.*** In November 2012, I was approached by the National Conference of Bankruptcy Judges about whether I would agree to represent the nation's federal bankruptcy judges in preparation for class-action litigation over salary and benefits that the United States allegedly owed to the judges and their beneficiaries. Over a number of years, Congress had violated the U.S. Constitution's Compensation Clause with respect to the salaries of federal district judges. The bankruptcy judges wanted to explore potential statutory claims, under the Tucker Act, arising from those constitutional violations. The Conference had appointed members of a litigation committee, led by Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas (herself a former experienced complex litigator).

51.     This committee of federal bankruptcy judges conducted a nationwide search for the counsel most qualified to represent them. They sought lawyers experienced in both litigation with the federal government and class actions, and capable of handling any appellate proceedings. After

soliciting recommendations and interviewing several firms, they chose our firm to represent them and asked me to serve as lead counsel.

52. As a result, our firm served as sole counsel to a certified nationwide class of current and former federal bankruptcy judges and their surviving spouses, life-insurance beneficiaries, and estates in *Houser v. United States*, No. 13–607C (Fed. Cl.)—one of the few certified class actions of federal judges in U.S. history. We litigated the case from start to finish, ultimately securing a judgment of approximately $56 million in November 2014 in the Court of Federal Claims, and working thereafter to administer a comprehensive claims process.

53. I served as lead class counsel in *Houser*, working closely with Jonathan Taylor. The case required us to interact on a constant basis with our counterparts at the Department of Justice. Our formal litigation work eventually included successful briefing and argument on the government's motion to dismiss, cross-motions for summary judgment on liability, a motion for class certification, and a class-notice plan. Our work did not end with the certification of a class and the court's determination of liability. To the contrary, we retained damages experts, vetted the government's damages calculations, continued to respond to class members' inquiries, and negotiated with the government over a stipulated judgment and a class-claims process that delivered our clients one hundred cents on the dollar.

54. In recognition of our successful efforts in the litigation, Mr. Taylor and I both received the President's Award from the National Conference of Bankruptcy Judges. On March 22, 2016, *The American Lawyer* reported on our role in this litigation, observing that "[i]t's hard to imagine a higher compliment than being hired to represent federal judges" in this important class-action litigation against the United States.

55. ***IRS Tax Preparer Fees Litigation.*** We currently serve as co-counsel for the plaintiffs in *Steele v. United States*, No. 14-cv-01523-RCL (D.D.C.), another case in this Court with

many similarities to this litigation. In that case, we represent a certified nationwide class of tax-return preparers suing the federal government under the Little Tucker Act for excessive user fees.

56.     As in the litigation here, the plaintiffs in *Steele* bring an illegal-exaction claim against the government. A team from the national class-action firm Motley Rice LLC (co-lead in this case) serves as lead counsel in *Steele*, and brought us into the case because of our relevant expertise with litigation involving the federal government. On June 30, 2015, Judge Lamberth issued a decision appointing our team as interim class counsel in *Steele*. In his decision, he noted that he was "thoroughly impressed by the qualifications" of counsel—including previous work on "class actions against the government" and "illegal exaction claims." *Steele*, Dkt. 37, at 7. On February 9, 2016, Judge Lamberth certified a nationwide class and named us class counsel. *Steele*, Dkt. 54

57.     ***Experience Defending the Federal Government in Litigation.*** Before founding Gupta Wessler in 2012, I served as Senior Litigation Counsel in the U.S. Department of the Treasury, setting up the new Consumer Financial Protection Bureau (CFPB), and then in the Office of the General Counsel at the CFPB, where I successfully defended the agency in litigation. That work included serving as lead counsel in a successful defense in this Court—against an APA and Fifth Amendment challenge—of federal regulations that established nationwide licensing and regulation of mortgage brokers for the first time. *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112 (D.D.C. 2012). I was also responsible for setting up the new agency's appellate litigation and amicus programs and working with the Office of the Solicitor General on cases before the U.S. Supreme Court. Finally, my duties included advising senior government officials on issues of constitutional and administrative law, including issues related to the launch of the new federal agency. *See* Deepak Gupta, *The Consumer Protection Bureau and the Constitution*, 65 ADMIN. L. REV. 945 (2013).

58.     Before my stint in government service (and following my federal judicial clerkship), I spent seven years at Public Citizen Litigation Group in Washington, DC—one of the nation's preeminent public-interest organizations. There, as a staff attorney and director of the Consumer Justice Project, I focused on litigating cutting-edge class actions and appeals nationwide. I also spent my first year at the organization as the Alan Morrison Supreme Court Fellow, working on litigation before the U.S. Supreme Court.

59.     ***Veterans' Withholding Litigation.*** Much of my litigation at Public Citizen involved the federal government. In *Briggs v. Army & Air Force Exchange Service*, No. C 07–05760, 2009 WL 113387 (N.D. Cal. Jan. 16, 2009), for example, I successfully represented a nationwide class of veterans challenging the government's illegal withholding of federal benefits to collect old debts arising out of purchases of military uniforms. I took the lead in briefing and arguing several issues relevant to this litigation—including Little Tucker Act jurisdiction, and the interaction between the class-action device and the special venue rules applicable to the federal government. My co-counsel and I ultimately obtained a $7.4 million settlement for our clients.

60.     I also served as lead counsel for three national consumer groups in a successful and groundbreaking APA unreasonable-delay suit against the U.S. Department of Justice, resulting in the creation and implementation of the National Motor Vehicle Title Information System. *See Pub. Citizen, et al v. Mukasey*, 2008 WL 4532540 (N.D. Cal.).

61.     Finally, I served as co-counsel in a case in which we successfully represented survivors of Hurricanes Katrina and Rita in an APA and constitutional due-process challenge to FEMA's denial of federal disaster assistance. *See Ass'n of Comty. Orgs. for Reform Now v. Fed. Emergency Mgmt. Agency*, 463 F. Supp. 2d 26 (D.D.C. 2006).

### *Class Counsel's Hours, Lodestar, and Multiplier*

62. The information in this declaration regarding the time spent on the case by Gupta Wessler LLP attorneys and other professional support staff is based on contemporaneous daily time records regularly prepared and maintained by the firm. I reviewed these time records in connection with the preparation of this declaration. The purpose of this review was to confirm both the accuracy of the time entries as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation.

63. Below is a summary lodestar chart which lists (1) the name of each timekeeper in my firm who worked on this case; (2) their title or position (e.g., principal, associate, paralegal) in the firm; (3) the total number of hours they worked on the case from its inception through and including August 28, 2023; (4) their current hourly rate; and (5) their lodestar (not including projected future work on class-action settlement administration). The chart also includes a projected $400,000 that we conservatively estimate for time that will be incurred address post-settlement issues and inquiries.

| Name | Title | Total Hours | Current Rate | Total Lodestar |
|---|---|---|---|---|
| Deepak Gupta | Principal | 1497.5 | 1150 | $1,722,125.00 |
| Jonathan E. Taylor | Principal | 1519 | 975 | $1,481,025.00 |
| Rachel Bloomekatz | Principal | 5.73 | 875 | $5,013.75 |
| Peter Romer-Friedman | Principal | 3.00 | 875 | $2,625.00 |
| Daniel Wilf-Townsend | Associate | 12.60 | 700 | $8,820.00 |
| Joshua Matz | Associate | 6.40 | 700 | $4,480.00 |
| Neil Sawhney | Associate | 3.30 | 700 | $2,310.00 |
| Robert Friedman | Associate | 2.60 | 700 | $1,820.00 |
| Stephanie Garlock | Paralegal | 27.55 | 350 | $9,642.50 |

| | | | | |
|---|---|---|---|---|
| Mahek Ahmad | Paralegal | 52.75 | 350 | $18,462.50 |
| Rana Thabata | Paralegal | 24.62 | 350 | $8,617.00 |
| Nabila Abdallah | Paralegal | 17.57 | 350 | $6,149.50 |
| Total Past Lodestar | | | | $3,271,090.25 |
| Gupta Wessler Projected Post-Settlement Lodestar | | | | $400,000 |
| Total Gupta Wessler Lodesar | | | | $3,671,090.25 |
| Total Lodestar for Both Law Firms | | | | $6,031,678.25 |

64.    Our firm's total lodestar is thus $3,671,090.25. As reflected in the contemporaneously filed Declaration of Meghan S.B. Oliver, Motley Rice calculates $1,860,588.00 in lodestar plus future projected lodestar of $500,000, for a total of $2,360,588. The total lodestar for both firms is thus $6,031,678.25. Because we are seeking a total fee award of $23,863,345.02—the amount equal to 20% of the $125 million common fund, minus the requested costs, expenses, and service awards— the multiplier in this case is approximately 3.956.

65.    Before this case was filed, each named plaintiff signed a retainer agreement with class counsel that provided for a contingency fee of up to 33% of the common fund.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC, on August 28, 2023.          _/s/ Deepak Gupta_____
                                                          Deepak Gupta

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,

               *Plaintiffs,*

    v.

UNITED STATES OF AMERICA,

               *Defendant.*

Civ. A. No. 16-0745 (PLF)

## CLASS ACTION SETTLEMENT AGREEMENT

For the purpose of disposing of the plaintiffs' claims in this case without any further judicial proceedings on the merits and without there being any trial or final judgment on any issue of law or fact, and without constituting an admission of liability on the part of the defendant, and for no other purpose except as provided herein, the parties stipulate and agree as follows:

### Background and Definitions

1.      The plaintiffs challenge the lawfulness of fees charged by the federal government to access to records through the Public Access to Court Electronic Records program or "PACER." The lawsuit claims that the fees are set above the amount permitted by statute and seeks monetary relief under the Little Tucker Act, 28 U.S.C. § 1346(a) in the amount of the excess fees paid. The government contends that all such fees are lawful.

2.      The complaint was filed on April 21, 2016. ECF No. 1. On January 24, 2017, this Court certified a nationwide class under Federal Rule of Civil Procedure ("Rule") 23(b)(3) and a single class claim alleging that PACER fees exceeded the amount authorized by statute and seeking

recovery of past overpayments. ECF Nos. 32, 33. The Court also appointed Gupta Wessler PLLC and Motley Rice LLC (collectively, "Class Counsel") as co-lead class counsel. *Id.*

3.      "Plaintiffs" or "Class Members," as used in this agreement, are defined to include all persons or entities who paid PACER fees between April 22, 2010, and May 31, 2018 ("the Class Period"). Excluded from that class are: (i) entities that have already opted out; (ii) federal agencies; and (iii) Class Counsel.

4.      The class originally certified by this Court consists only of individuals and entities who paid fees for use of PACER between April 21, 2010, and April 21, 2016 (with the same three exceptions noted in the previous paragraph). Plaintiffs who were not included in that original class definition—that is to say, PACER users who were not included in the original class and who paid fees for use of PACER between April 22, 2016, and May 31, 2018—shall be provided with notice of this action and an opportunity to opt out of the class.

5.      On April 17, 2017, the Court entered an order approving the plaintiffs' proposed plan for providing notice to potential class members. ECF No. 44. The proposed plan designated KCC as Class Action Administrator ("Administrator"). Notice was subsequently provided to all Class Members included in the original class, and they had until July 17, 2017, to opt out of the class, as explained in the notice and consistent with the Court's order approving the notice plan. The notice referenced in paragraph 4 above shall be provided by the Administrator.

6.      On March 31, 2018, the Court issued an opinion on the parties' cross-motions for summary judgment on liability. ECF No. 89; *see Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 126 (D.D.C. 2018). While briefing cross-motions on liability, the parties "reserv[ed] the damages determination for" a later point "after formal discovery." *Id.* at 138.

7.      On August 13, 2018, the Court certified its March 31, 2018, summary-judgment decision for interlocutory appeal to the Federal Circuit under 28 U.S.C. § 1292(b). ECF Nos. 104,

105; *see Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018).

8.    On August 6, 2020, the Federal Circuit affirmed this Court's decision on the parties' motions for summary judgment and remanded the case to this Court for further proceedings. *See Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1343 (Fed. Cir. 2020).

9.    Following the Federal Circuit's decision, the parties agreed to engage in mediation to discuss the possibility of settling Plaintiffs' claims. On December 29, 2020, this Court stayed the proceedings through June 25, 2021, and it has repeatedly extended that stay since then as the parties have made progress on negotiating a global settlement.

10.    On May 3, 2021, the parties participated in a day-long private mediation session in an attempt to resolve Plaintiffs' claims. Since then, the parties have engaged in numerous follow-up conversations via phone and email to come to an agreement on resolving the claims.

**Common Fund Payment and Release**

11.    Plaintiffs have offered to settle this action in exchange for a common-fund payment by the United States in the total amount of one hundred and twenty-five million dollars ($125,000,000.00) (the "Aggregate Amount") inclusive of monetary relief for Plaintiffs' claims, interest, attorney fees, litigation expenses, administration costs, and any service awards to Class Representatives. Subject to this Court's approval, as set forth in paragraph 33, Plaintiffs' offer has been accepted by the United States.

12.    Following the Court's order granting final approval of the settlement, as described in the "Fairness Hearing" portion of this agreement, and only after the appeal period for that order has expired, the United States shall pay the Aggregate Amount to the Administrator for deposit in the Settlement Trust, as referenced in paragraph 16.

13.     Upon release of the Aggregate Amount from the U.S. Department of the Treasury's Judgment Fund, Plaintiffs and all Class Members release, waive, and abandon, as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period. This release does not cover any claims based on PACER usage after May 31, 2018, nor any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). But the amount of settlement funds disbursed to any Class Member in this case shall be deducted in full from any monetary recovery that the Class Member may receive in *Fisher*. The Administrative Office of the U.S. Courts ("Administrative Office") represents that, apart from *Fisher*, it is aware of no other pending PACER-fee lawsuit pertaining to claims based on PACER usage on or before May 31, 2018.

**Information**

14.     Within 30 days of a final order approving the settlement, Class Counsel shall provide to the Administrative Office the PACER account numbers of Class Counsel and all individuals who have opted out of the Class. Within 90 days of a final order approving the settlement, the Administrative Office shall make available to the Administrator the records necessary to determine the total amount owed to each Class Member, and the last known address or other contact information of each Class Member contained in its records. Should the Administrative Office need more than 90 days to do so, it will notify the Administrator and Class Counsel and provide the necessary information as quickly as reasonably possible. The Administrator shall bear sole responsibility for making payments to Class Members, using funds drawn from the Settlement Trust, as provided below. In doing so, the Administrator will use the data that the Administrative Office

4

currently possesses for each Class Member, and the United States shall be free of any liability based on errors in this data (*e.g.*, inaccurate account information, incorrect addresses, etc.).

15.     The PACER account information provided in accordance with the previous paragraph shall be provided pursuant to the terms of the Stipulated Protective Order issued in this lawsuit on April 3, 2017 (ECF No. 41) as modified to encompass such information and shall be subject to the terms of the Stipulated Protective Order. The parties agree to jointly request that the Court extend the Stipulated Protective Order to encompass such information prior to the 90-day period set forth in the previous paragraph.

### Disbursement of the Aggregate Amount

16.     The Administrator shall establish a Settlement Trust, designated the "PACER Class Action Settlement Trust," to disburse the proceeds of the settlement. The administration and maintenance of the Settlement Trust, including responsibility for distributing the funds to Class Members using methods that are most likely to ensure that Class Members receive the payments, shall be the sole responsibility of the Administrator. Class Members will not be required to submit a claim form or make any attestation to receive their payments. The only obligation of the United States in connection with the disbursement of the Aggregate Amount will be: (i) to transfer the Aggregate Amount to the Administrator once the Court has issued a final order approving the settlement and the appeal period for that order has expired, and (ii) to provide the Administrator with the requisite account information for PACER users, as referenced in paragraph 14. The United States makes no warranties, representations, or guarantees concerning any disbursements that the Administrator makes from the Settlement Trust, or fails to make, to any Class Member. If any Class Member has any disagreement concerning any disbursement, the Class Member shall resolve any such concern with the Administrator.

17.     The Settlement Trust is intended to be an interest-bearing Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1. The Administrator shall be solely responsible for filing all informational and other tax returns as may be necessary. The Administrator shall also be responsible for causing payments to be made from the Settlement Trust for any taxes owed with respect to the funds held by the Settlement Trust. The Administrator shall timely make all such elections and take such other actions as are necessary or advisable to carry out this paragraph.

18.     As approved by the Court, the Administrator shall disburse the proceeds of the settlement as follows: The Administrator shall retain from the Settlement Trust all notice and administration costs actually and reasonably incurred, which includes actual costs of publication, printing, and mailing the notice, as well as the administrative expenses actually incurred and fees reasonably charged by the Administrator in connection with providing notice and processing the submitted claims. The Administrator shall distribute any service awards approved by the Court to the named plaintiffs, and any attorney fees and costs approved by the Court to Class Counsel, as set forth in the "Fairness Hearing" portion of this agreement. After the amounts for attorney fees, expenses, service awards, and notice and administration costs have been paid from the Aggregate Amount, the remaining funds shall be distributed to the class ("Remaining Amount"). The Remaining Amount shall be no less than 80% of the Aggregate Amount, or $100,000,000.

19.     ***First Distribution.*** The Administrator shall allocate the Remaining Amount among Class Members as follows: First, the Administrator shall allocate to each Class Member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that Class Member for use of PACER during the Class Period. Second, the Administrator shall add together each minimum payment amount for each Class Member, which will produce the Aggregate Minimum Payment Amount. Third, the Administrator shall then deduct the Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata (based on the

amount of PACER fees paid in excess of $350 during the Class Period) to all Class Members who paid more than $350 in PACER fees during the Class Period.

20.     Thus, under the formula for the initial allocation: (a) each Class Member who paid a total amount less than or equal to $350 in PACER fees for use of PACER during the Class Period would receive a payment equal to the total amount of PACER fees paid by that Class Member for PACER use during the Class Period; and (b) each Class Member who paid more than $350 in PACER fees for use of PACER during the Class Period would receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount.

21.     The Administrator shall complete disbursement of each Class Member's individual share of the recovery, calculated in accordance with the formula set forth in the previous two paragraphs, within 90 days of receipt of the Aggregate amount, or within 21 days after receiving from the Administrative Office the information set forth in paragraph 14 above, whichever is later. The Administrator shall complete disbursement of the amounts for attorney fees and litigation expenses to Class Counsel, and service awards to the named plaintiffs, within 30 days of the receipt of the Aggregate Amount.

22.     The Administrator shall keep an accounting of the disbursements made to Class Members, including the amounts, dates, and outcomes (*e.g.*, deposited, returned, or unknown) for each Class Member, and shall make all reasonable efforts, in coordination with Class Counsel, to contact Class Members who do not deposit their payments within 90 days of the payment being made to them.

23.     ***Second Distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the Settlement Trust one year after the United States has made the payment set forth in paragraph 12, those funds ("the Remaining Amount After First Distribution") shall be distributed to

Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed following one year after the United States has made the payment set forth in paragraph 12 shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

> If to the Administrative Office's Court Services Office:
>
> Administrative Office of the U.S. Courts
> Thurgood Marshall Federal Judiciary Building
> Court Services Office
> One Columbus Circle, N.E., Ste. 4-500
> Washington, DC 20544
>
> If to the Administrative Office's Office of General Counsel:
>
> Administrative Office of the U.S. Courts
> Thurgood Marshall Federal Judiciary Building
> Office of General Counsel

One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

24.    Class Members who are eligible to receive a second distribution shall have three months from the time of the distribution to deposit or otherwise collect their payments. If, after this three-month period expires, unclaimed or undistributed funds remain in the Settlement Trust, those funds shall revert unconditionally to the U.S. Department of the Treasury. Upon expiration of this three month period, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the addresses referenced in paragraph 23 of this reverter. Instructions to effectuate the reverter will be provided to the Administrator following receipt of such notice, and the Administrator agrees to promptly comply with those instructions.  The three-month period will run for all Class Members eligible to receive a second distribution from the date the earliest distribution is made of a second distribution to any Class Member eligible for such a distribution. Upon request, the Administrator will notify the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office of the date the three-month period commenced. To the extent a payment in connection with the Second Distribution is made to a Class Member by the Administrator by check, any check that remains uncashed following this three-month period shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for reverter to the United States.

25.    The Class Representatives have agreed to a distribution structure that may result in a reverter to the U.S. Treasury for purposes of this settlement only.

26.    Neither the parties nor their counsel shall be liable for any act or omission of the Administrator or for any mis-payments, overpayments, or underpayments of the Settlement Trust by the Administrator.

### Fairness Hearing

27.     As soon as possible and in no event later than 60 days after the execution of this agreement, Class Counsel shall submit to the Court a motion for an Order Approving Settlement Notice to the Class under Rule 23(e). The motion shall include (a) a copy of this settlement agreement, (b) the proposed form of the order, (c) the proposed form of notice of the settlement to be mailed to Class Members and posted on an internet website dedicated to this settlement by the Administrator, and (d) the proposed form of notice to be mailed to Class Members who were not included in the original class definition certified by the Court on January 24, 2017, as discussed in paragraph 4, and posted on the same website, advising them of their right to opt out. The parties shall request that a decision on the motion be made promptly on the papers or that a hearing on the motion be held at the earliest date available to the Court.

28.     Under Rule 54(d)(2), and subject to the provisions of Rule 23(h), Plaintiffs will apply to the Court for an award of attorney fees and reimbursement of litigation expenses, and for service awards for the three Class Representatives in amounts not to exceed $10,000 per representative. These awards shall be paid out of the Aggregate Amount. When combined, the total amount of attorney fees, service awards, and administrative costs shall not exceed 20% of the Aggregate Amount. With respect to the attorney fees and service awards, the Court will ultimately determine whether the amounts requested are reasonable. The United States reserves its right, upon submission of Class Counsel's applications, to advocate before the Court for the use of a lodestar cross-check in determining the fee award, and for a lower service award for the Class Representatives should Plaintiffs seek more than $1,000 per representative. Plaintiffs' motion for an award of attorney fees and litigation expenses shall be subject to the approval of the Court and notice of the motion shall be provided to Class Members informing them of the request and their right to object to the motion, as required by Rule 23(h).

29.     Within 30 days of the Court's entry of the Order Approving Settlement Notice to the Class, the Administrator shall mail or cause to be mailed the Notice of Class Action Settlement by email or first-class mail to all Class Members. Contemporaneous with the mailing of the notice and continuing through the date of the Fairness Hearing, the Administrator shall also display on an internet website dedicated to the settlement the relevant case documents, including the settlement notice, settlement agreement, and order approving the notice. The Notice of Class Action Settlement shall include an explanation of the procedures for allocating and distributing funds paid pursuant to this settlement, the date upon which the Court will hold a "Fairness Hearing" under Rule 23(e), and the date by which Class Members must file their written objections, if any, to the settlement.

30.     Any Class Member may express to the Court his or her views in support of, or in opposition to, the fairness, reasonableness, and adequacy of the proposed settlement. If a Class Member objects to the settlement, such objection will be considered only if received no later than the deadline to file objections established by the Court in the Order Approving Settlement Notice to the Class. The objection shall be filed with the Court, with copies provided to Class Counsel and counsel for the United States, and the objection must include a signed, sworn statement that (a) identifies the case number, (b) describes the basis for the objection, including citations to legal authority and evidence supporting the objection, (c) contains the objector's name, address, and telephone number, and if represented by counsel, the name, address, email address, and telephone number of counsel, and (d) indicates whether objector intends to appear at the Fairness Hearing.

31.     Class Counsel and counsel for the United States may respond to any objection within 21 days after receipt of the objection.

32.     Any Class Member who submits a timely objection to the proposed settlement may appear in person or through counsel at the Fairness Hearing and be heard to the extent allowed by the Court. Any Class Members who do not make and serve written objections in the manner

11

provided in paragraph 30 shall be deemed to have waived such objections and shall forever be foreclosed from making any objections (by appeal or otherwise) to the proposed settlement.

33.    After the deadlines for filing objections and responses to objections have lapsed, the Court will hold the Fairness Hearing at which it will consider any timely and properly submitted objections made by Class Members to the proposed settlement. The Court will decide whether to approve the settlement and enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. The parties shall request that the Court schedule the Fairness Hearing no later than 150 days after entry of the Court's Order Approving Settlement Notice to the Class.

34.    If this settlement is not approved in its entirety, it shall be void and have no force or effect.

### Miscellaneous Terms

35.    This agreement is for the purpose of settling Plaintiffs' claims in this action without the need for further litigation, and for no other purpose, and shall neither constitute nor be interpreted as an admission of liability on the part of the United States.

36.    Each party fully participated in the drafting of this settlement agreement, and thus no clause shall be construed against any party for that reason in any subsequent dispute.

37.    In the event that a party believes that the other party has failed to perform an obligation required by this settlement agreement or has violated the terms of the settlement agreement, the party who believes that such a failure has occurred must so notify the other party in writing and afford it 45 days to cure the breach before initiating any legal action to enforce the settlement agreement or any of its provisions.

38.    The Court shall retain jurisdiction for the purpose of enforcing the terms of this settlement agreement.

39.     Plaintiffs' counsel represent that they have been and are authorized to enter into this agreement on behalf of Plaintiffs and the class.

40.     Undersigned defense counsel represents that he has been authorized to enter into this agreement by those within the Department of Justice with appropriate settlement authority to authorize the execution of this agreement.

41.     This document constitutes a complete integration of the agreement between the parties and supersedes any and all prior oral or written representations, understandings, or agreements among or between them.

**<REMAINDER OF PAGE LEFT BLANK; SIGNATURES PAGES TO FOLLOW>**

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
Meghan S.B. Oliver (D.C. Bar No. 493416)
Elizabeth Smith (D.C. Bar No. 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 1001
Washington, DC 20004
(202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 07/27/2022

14

Appx0714

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____   7-12-22

JEREMY S. SIMON, D.C. BAR #447956          Dated
Assistant United States Attorney
601 D. Street, NW
Washington, DC 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Attorneys for the United States of America

Appx0715

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL ) 
SERVICES PROGRAM, NATIONAL ) 
CONSUMER LAW CENTER, and ) 
ALLIANCE FOR JUSTICE, for themselves ) 
and all others similarly situated, ) 
                                   ) 
             *Plaintiffs*, )     Civil Action No. 16-0745 (PLF)
                                     ) 
    v. ) 
                                       ) 
UNITED STATES OF AMERICA, ) 
                                       ) 
            *Defendant*. ) 
_____)

## STIPULATION AND FIRST AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Amendment, the parties agree to the following modification to

the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July 27, 2022 and

counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 3 of the Agreement shall be replaced with the following language:

3.    "Plaintiffs" or "Class Members," as used in this agreement, are defined to
include all persons or entities who paid PACER fees between April 21, 2010,
and May 31, 2018 ("the Class Period") regardless of when such persons or
entities used the PACER system. Excluded from that class are: (i) persons or
entities that have already opted out; (ii) federal agencies; and (iii) Class
Counsel.

In addition, the parties agree that the phrases "who paid PACER fees between [date x] and

[date y]" and "who paid fees for use of PACER between [date x] and [date y]," as used in paragraphs

3 and 4 of the Agreement, refer to the payment of PACER fees in the specified period rather than

the use of PACER in the specified period. The parties further agree that each specified period in

those paragraphs includes both the start and end dates unless otherwise specified.

Finally, in paragraph 27 of the Agreement, the parties agree that the reference to "60 days" shall be changed to "75 days."

The remainder of Agreement remains unchanged by this Stipulation and Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C. Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: ___September 29, 2022___

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:                                                             9-29-22
             JEREMY S. SIMON, D.C. Bar No. 447956            Dated
             Assistant United States Attorney
             601 D Street, NW
             Washington, DC 20530
             (202) 252-2528
             Jeremy.Simon@usdoj.gov

*Attorneys for the United States of America*

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL )
SERVICES PROGRAM, NATIONAL )
CONSUMER LAW CENTER, and )
ALLIANCE FOR JUSTICE, for themselves )
and all others similarly situated, )
)
          *Plaintiffs*, )      Civil Action No. 16-0745 (PLF)
)
  v. )
)
UNITED STATES OF AMERICA, )
)
          *Defendant*. )
_____)

## STIPULATION AND SECOND AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Second Amendment, the parties agree to the following

modification to the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July

27, 2022 and counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 21 of the Agreement shall be replaced with the following language:

21.     The Administrator shall complete disbursement of each Class Member's individual
share of the recovery, calculated in accordance with the formula set forth in the
previous two paragraphs, within 180 days of receipt of the Aggregate amount, or
within 180 days after receiving from the Administrative Office the information set
forth in paragraph 14 above, whichever is later. The Administrator shall complete
disbursement of the amounts for attorney fees and litigation expenses to Class
Counsel, and service awards to the named plaintiffs, within 30 days of the receipt
of the Aggregate Amount.

Paragraph 23 of the Agreement shall be replaced with the following language:

23.     ***Second Distribution.*** If, despite these efforts, unclaimed or undistributed funds
remain in the Settlement Trust 180 days after the Administrator has made the
distribution described in paragraph 21, those funds ("the Remaining Amount After

1

First Distribution") shall be distributed to Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed 180 days after the Administrator has made the distribution described in paragraph 21, shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

If to the Administrative Office's Court Services Office:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Court Services Office
One Columbus Circle, N.E., Ste. 4-500
Washington, DC 20544

If to the Administrative Office's Office of General Counsel:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Office of General Counsel
One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

The remainder of Agreement remains unchanged by this Stipulation and Second Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 04-12-23

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: 

DEREK S. HAMMOND, D.C. Bar No. 1017784          4-11-23
Assistant United States Attorney                                Dated
601 D Street, NW
Washington, D.C. 20530
(202) 252-2511
Derek.Hammond@usdoj.gov

*Attorneys for the United States of America*

3

Appx0723

# EXHIBIT D

Case 1:24-cv-05745-PKC Document 15-2 Page Filed 07/16/2024 Page 1 of 63

# Gupta / Wessler

Browse: **Home** » **People** » Deepak Gupta

## DEEPAK GUPTA

**deepak@guptawessler.com**

**202.888.1741** | 2001 K Street, NW, Suite 850 North, Washington, DC 20006

Legal Assistant: Mahek Ahmad, mahek@guptawessler.com



**Deepak Gupta** is the founding principal of Gupta Wessler, where his practice focuses on Supreme Court, appellate, and complex litigation on behalf of plaintiffs and public-interest clients. He is also a Lecturer at Harvard Law School, where he teaches the Harvard Supreme Court Litigation Clinic and seminars on forced arbitration, the civil justice system, and public interest entrepreneurship.

Over more than two decades, Deepak has led high-stakes litigation before the U.S. Supreme Court, all thirteen federal circuits, and state supreme courts from Alaska to West Virginia. He has also testified before the U.S. Senate, the U.S. House of Representatives, and the Presidential Commission on the Supreme Court. Much of Deepak's advocacy has focused on ensuring access to justice for consumers, workers, and communities injured by corporate or governmental wrongdoing. His varied clients have included national nonprofits, labor unions, state and local governments, public officials ranging from federal judges to members of Congress, professional athletes, distinguished artists and scientists, and people from all walks of life.

Appx0725

Deepak is "known as a skilled appellate lawyer" (*New York Times*) and "an all-star progressive Supreme Court litigator" (*Washington Post*) and has been described as "one of the emerging giants of the appellate and the Supreme Court bar," a "heavy hitter," a "principled" and "incredibly talented lawyer" (*Law 360*), and a "progressive legal rock star." *(New York Law Journal). Chambers USA* cites his "impressive" and "highly rated appellate practice," describing him as "an incredible oral advocate" who "writes terrific briefs" and maintains a "vibrant appellate practice focused on public interest cases and plaintiff-side representations." Deepak is consistently ranked as one of the "Best Lawyers" for Supreme Court cases by *Washingtonian* magazine; he is the only non-corporate lawyer on that list. Fastcase has honored Deepak as "one of the country's top litigators," noting that "what sets him apart" is his legal creativity. The *National Law Journal* has singled out Deepak's "calm, comfortable manner that conveys confidence" in oral argument. And *Empirical SCOTUS* cited one of Deepak's briefs as the single most readable in a recent U.S. Supreme Court term.

Deepak's Supreme Court and appellate advocacy has been recognized with several national awards, including the 2022 Appellate Advocacy Award from the National Civil Justice Institute, which "recognizes excellence in appellate advocacy in America," the Steven J. Sharpe Award for Public Service from the American Association for Justice, and the President's Award from the National Conference of Bankruptcy Judges.

Deepak is a veteran advocate before the U.S. Supreme Court, where he has filed over one hundred briefs and regularly presents oral argument. Highlights include:

- Deepak recently argued and won a landmark victory for access to justice in *Ford Motor Co. v. Montana Eighth Judicial District*, 141 S. Ct. 1017 (2021), in which the Supreme Court ruled that people injured by mass-market products can establish personal jurisdiction to sue out-of-state corporations where their injury occurred, bucking a trend of jurisdiction-limiting decisions stretching back four decades.

- In *Smith v. Berryhill,* 139 S.Ct. 1285 (2019), Deepak argued at the Court's invitation in support of a judgment left undefended by the Solicitor General. He is the first Asian-American to be appointed by the U.S. Supreme Court to argue a case.

Appx0726

- In 2017, Deepak's firm was counsel for parties in three argued merits cases before the Court; he was lead counsel in two, prevailing in both. In *Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144 (2017), he successfully argued a First Amendment challenge to a law designed to keep consumers in the dark about the cost of credit cards. And in *Hernández v. Mesa*, 137 S.Ct. 2003 (2017), he represented the family of a Mexican teenager killed in a cross-border shooting by a border patrol agent, successfully obtaining reversal of the Fifth Circuit's 15-0 en banc ruling that the officer was entitled to qualified immunity.

- Deepak argued *AT&T Mobility v. Concepcion*, 131 S.Ct. 1740 (2011), a watershed case on corporations' use of forced arbitration to prevent consumers and workers from banding together to seek justice.

As an appellate advocate, Deepak is frequently sought out by trial lawyers to defend their most consequential victories or resurrect worthy claims on appeal—often after years of hard-fought litigation. He is currently defending several nine-figure and eight-figure verdicts on appeal, including $275-million and $185-million verdicts against Monsanto (over toxic chemical exposure), and a $200-million verdict against UnitedHealth (over insurance bad faith). He also serves as outside counsel to the American Association for Justice.

In addition to his appellate advocacy, Deepak designs and prosecutes class actions and other legal challenges from the ground up. Highlights include:

- In *National Veterans Legal Services Program v. United States*, Deepak is lead counsel in a nationwide class action in which he persuaded the Federal Circuit that the federal judiciary has been charging people millions of dollars in unlawful fees for online access to court records. The case recently culminated in a $125 million settlement that reimburses the majority of PACER users by 100 cents on the dollar.

- In another one-of-a-kind class action, Deepak represented all of the nation's bankruptcy judges, recovering $56 million in back pay for Congress's violation of the Judicial Compensation Clause. *The American Lawyer* observed: "it's

Appx0727

hard to imagine a higher compliment than being hired to represent federal judges."

Deepak also frequently leads high-stakes administrative and constitutional cases involving the federal government. In recent years, he has:

- persuaded the D.C. Circuit to issue a rare emergency injunction halting an attempted government takeover of the Open Technology Fund, an internet-freedom nonprofit;

- represented environmental groups in a successful procedural challenge to a midnight rule that would have crippled the ability of the incoming EPA leadership to rely on science in setting public-health standards;

- obtained a ruling striking down the Trump Administration's decision to halt IRS collection of nonprofit donor information by dark-money groups;

- established that the Acting Director of the Bureau of Land Management had been serving unlawfully for 424 days; and

- persuaded the Second Circuit, in *Citizens for Responsibility and Ethics v. Trump*, that President Trump's competitors in the hotel and restaurant industry had standing to sue him for accepting payments in violation of the Constitution's Emoluments Clauses.

Before founding his law firm in 2012, Deepak was Senior Counsel for Litigation and Senior Counsel for Enforcement Strategy at the newly created Consumer Financial Protection Bureau. As the first appellate litigator hired under Elizabeth Warren's leadership, he launched the new agency's amicus program, defended its regulations, and worked with the Solicitor General's office on Supreme Court cases.

For seven years previously, Deepak was an attorney at Public Citizen Litigation Group, where he founded and directed the Consumer Justice Project and was the Alan Morrison Supreme Court Assistance Project Fellow. Before that, Deepak worked on voting rights at the Civil Rights Division of the U.S. Department of Justice; prisoners' rights at the ACLU's National Prison Project; and religious freedom at Americans United for Separation of Church and State. He clerked for Judge Lawrence K. Karlton of the

Appx0728

U.S. District Court for the Eastern District of California and studied law at Georgetown, Sanskrit at Oxford, and philosophy at Fordham.

Deepak is a member of the American Law Institute and the Administrative Conference of the United States. He sits on the boards of the National Consumer Law Center, the Alliance for Justice, the Open Markets Institute, the Lawyers' Committee for Civil Rights Under Law, the People's Parity Project, the Civil Justice Research Initiative at UC Berkeley, the Biden Institute, and the Institute for Consumer Antitrust Studies. He is a judge of the American Constitution Society's Annual Richard D. Cudahy Writing Competition on Regulatory and Administrative Law.

Deepak's publications include *Arbitration as Wealth Transfer*, 5 Yale L. & Pol'y Rev. 499 (2017) (with Lina Khan), *Leveling the Playing Field on Appeal: The Case for a Plaintiff-Side Appellate Bar*, 54 Duq. L. Rev. 383 (2016), and *The Consumer Protection Bureau and the Constitution*, 65 Admin L. Rev. 945 (2013), as well as shorter pieces for *The New York Times*, SCOTUSblog, and *Trial* magazine. He has appeared in broadcast and print media including CNN, MSNBC, FOX News, ABC's *World News* and *Good Morning America*, NPR's *All Things Considered* and *Marketplace*, and *The New York Times*, *Washington Post*, *Los Angeles Times*, *Wall Street Journal*, and *USA Today*.

---

Copyright © 2023 Gupta Wessler LLP

Powered by WordPress and Origin

Appx0729

# EXHIBIT E

# Gupta / Wessler

Browse: **Home** » Jonathan E. Taylor

# JONATHAN E. TAYLOR

**jon@guptawessler.com**

**202.888.1741** | 2001 K Street, NW, Suite 850 North, Washington, DC 20006

Twitter: **@jontaylor1** | Legal Assistant: **Abbe Murphy**, **abbe@guptawessler.com**



**Jonathan E. Taylor** is a principal at Gupta Wessler, where he represents plaintiffs and public-interest clients in Supreme Court, appellate, and constitutional litigation.

Since joining the firm a few months after it was founded in 2012, Jon has presented oral argument in the majority of federal circuits and has been the principal author of dozens of briefs filed in the U.S. Supreme Court and all levels of the state and federal judiciaries.

In 2021, Jon served as counsel of record in the U.S. Supreme Court in *Lombardo v. City of St. Louis*, in which he successfully obtained an unheard-of opinion summarily vacating a pro-officer decision on the merits of a police-excessive-force case. Jon was awarded the 2021 National Law Journal Rising Star award for his stellar appellate advocacy.

Among Jon's recent arguments are a Ninth Circuit appeal defending a $102 million class-action judgment against Walmart for violations of California labor law; a D.C. Circuit appeal for a certified class of tax-return preparers challenging the legality of

Appx0731

over \$250 million in IRS-imposed fees; Third and Seventh Circuit appeals resulting in landmark decisions expanding the availability of paid-military leave; a summary-judgment hearing for a nationwide class of PACER users challenging the judiciary's fee structure for accessing court filings; a First Circuit appeal successfully defending Boston and Brookline's public-carry restrictions against a Second Amendment challenge; an Eighth Circuit appeal upholding a punitive-damages award against a constitutional attack; an Eighth Circuit appeal successfully reinstating a a jury's finding of negligence by GM in the design of a seat-belt system, and ordering a new trial on damages only; and an Eighth Circuit appeal successfully defeating a claim of immunity in a constitutional challenge to a city's "pay-to-play" system, in which people arrested for minor infractions are jailed if they can't afford to pay fees.

As these cases illustrate, Jon's work has spanned a wide range of topics—including the First Amendment, Second Amendment, Fourth Amendment, due process, Article III standing, personal jurisdiction, class certification, civil rights, administrative law, and a broad array of issues involving consumers' and workers' rights. He has represented classes of consumers and workers, tort victims, federal judges, members of Congress, national nonprofits, military reservists, former NFL players, retail merchants, and the families of people killed by police violence. Jon was also part of the litigation team that sued Donald Trump for violating the Constitution's Emoluments Claims.

Jon is from St. Louis, Missouri, and is a *cum laude* graduate of Harvard Law School. He joined the firm following his clerkship with Judge Ronald Lee Gilman of the U.S. Court of Appeals for the Sixth Circuit. In 2014, Jon received the President's Award from the National Conference of Bankruptcy Judges for his work helping to obtain a \$56 million judgment on behalf of a nationwide class of federal bankruptcy judges.

Jon's experience at the firm includes the following significant matters:

- Jon presented oral argument in the Eighth Circuit and prepared the firm's successful briefing in *Bavlsik v. General Motors*, an appeal from a district court order vacating a jury's finding of negligence by General Motors in the design of a seat-belt system, following a rollover collision that left the plaintiff quadriplegic. After obtaining reversal in the Eighth

Circuit—which reinstated the jury's negligence finding and ordered a new trial on damages only—Jon served as counsel of record for the firm's brief in opposition in the U.S. Supreme Court, defeating GM's petition for certiorari. Brief in Opposition | Eighth Circuit Opinion | Eighth Circuit Opening Brief | Reply Brief | Oral Argument Audio

- Jon presented oral argument in the D.C. Circuit on behalf of a certified class of tax-return preparers challenging the legality of fees imposed by the IRS. The district court invalidated the fees—which total more than $250 million—as unauthorized. The case is *Montrois v. United States*, and the firm represents the class along with co-counsel from Motley Rice. D.C. Circuit Brief | Oral Argument Audio | Opinion Granting Summary Judgment | Motion for Summary Judgment | Opinion Granting Motion for Reconsideration | Motion for Reconsideration | Class Certification Opinion | Motion for Class Certification | Amended Complaint

- Jon presented oral argument in the First Circuit on behalf of the Town of Brookline, Massachusetts, successfully defending against a Second Amendment challenge to its restrictions on the public carry of firearms. He was also a principal author of the firm's appellate brief, which argues that the restrictions are constitutional because they rest on a seven-century Anglo-American tradition of public-carry regulations. First Circuit Brief

- Jon presented argument and was a principal author of the firm's briefing in *National Veterans Legal Services Program v. United States* (District Court for the District of Columbia), a certified nationwide class action challenging the federal judiciary's PACER fee structure as excessive. In March 2018, the court had a three-hour summary-judgment hearing in which Jon presented argument for the class. Shortly after the hearing, the court held that the judiciary had misused PACER fees during the class period, exceeding the scope of its statutory authorization to charge fees "only to the extent necessary" to recoup the costs of providing records through PACER. Our firm has been appointed class counsel in the case, along with co-counsel from Motley Rice. The lead plaintiffs are three nonprofit legal organizations (National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice). Summary-Judgment Opinion | Motion for Summary Judgment | Reply in Support

of Motion for Summary Judgment | Opinion Certifying
Class | Class-Certification Motion | Class-Certification Reply |
Opinion Denying Motion to Dismiss | Opposition to Motion to
Dismiss | Complaint

- Jon played a lead role in *Houser v. United States* (U.S. Court
  of Federal Claims), in which the firm represented a class of
  current and former federal bankruptcy judges and their
  beneficiaries in a suit against the federal government under
  the Constitution's Judicial Compensation Clause. His work
  helped obtain class certification and a $56 million judgment
  on behalf of his clients. Jon also took the lead in coordinating
  the administration of the class claims process with the
  Department of Justice. The National Conference of
  Bankruptcy Judges presented Jon with its President's Award
  for his work on the case. Summary Judgment Brief |
  Complaint

- Jon presented oral argument in the Eighth Circuit and
  prepared the firm's appellate brief in *Webb v. City of
  Maplewood*, concerning a constitutional challenge to a
  Missouri city's "pay-to-play" system, in which people arrested
  for minor municipal infractions are placed in jail if they can't
  afford to pay fees. Along with co-counsel from ArchCity
  Defenders and Tycko & Zavareei, the firm successfully
  defeated the city's claim to immunity in an interlocutory
  appeal to the Eighth Circuit. Eighth Circuit Opinion | Eighth
  Circuit Brief | Oral Argument Audio

- Jon has been a principal brief writer in all of the firm's First
  Amendment challenges to state credit-card surcharge laws
  brought in the wake of a $7 billion swipe-fee antitrust
  settlement with the major credit-card companies, including
  the firm's successful briefing in the U.S. Supreme Court in
  *Expressions Hair Design v. Schneiderman*. Jon's work helped
  obtain victories in California, Florida, and New York, where
  courts struck down the laws as unconstitutional. The cases are
  *Expressions Hair Design* (U.S. Supreme Court, Second
  Circuit), *Dana's Railroad Supply v. Bondi* (Eleventh Circuit),
  *Rowell v. Pettijohn* (Fifth Circuit), and *Italian Colors v.
  Harris* (Ninth Circuit). Petitioners' Brief (Expressions) |
  Petitioners' Reply (Expressions) | Supreme Court Opinion
  | Petition for Certiorari (Expressions)| Petition for Certiorari
  (Rowell) | Second Circuit Brief | Eleventh Circuit Brief |
  Eleventh Circuit Reply | Eleventh Circuit Opinion | Fifth

Appx0734

Circuit Brief | Fifth Circuit Reply | Ninth Circuit Brief | Ninth Circuit Opinion | More Filings in These Matters

- Jon was one of the lead authors of the firm's briefing in the U.S. Supreme Court in *Hernández v. United States*, a case arising out of a close-range, cross-border shooting of an unarmed Mexican teenager by a U.S. border patrol agent standing on U.S. soil. After granting the firm's petition, a unanimous Supreme Court reversed the en banc Fifth Circuit's 15-0 holding that the border guard was entitled to qualified immunity. Supreme Court Opinion | Petitioners' Brief | Petitioners' Reply | Petition for Certiorari | Reply Brief | Supplemental Brief

- Jon is part of the litigation team that has sued Donald Trump in two cases for violating the Constitution's Foreign and Domestic Emoluments Clauses. The first case, brought on behalf of businesses who compete with Trump for governmental patrons, is *Citizens for Responsibility and Ethics in Washington v. Trump* and is currently on appeal to the Second Circuit. The second case, brought on behalf of Maryland and the District of Columbia, is *District of Columbia v. Trump* and is currently proceeding in the District of Maryland, where the district court has denied Trump's motion to dismiss for lack of standing and held that the case is justiciable. Second Circuit Brief | Opinion on Justiciability (Maryland) | Opposition to Motion to Dismiss (Maryland) | More Filings in These Matters

- Jon played a leading role in the firm's briefing in *Chevron v. Donziger* (Second Circuit), a RICO action brought by Chevron in an effort to avoid paying an $8.6 billion Ecuadorian judgment holding the company accountable for decades of pollution of the Amazon rainforest. Petition for Certiorari | Petition for Rehearing | Opening brief | Reply Brief | Post-Argument Letter Brief | Motion for Judicial Notice | Motion to Dismiss for Lack of Subject Matter Jurisdiction | Reply in Support of Motion to Dismiss | More Filings in This Matter

- Jon played a key role in the firm's representation of 34 former NFL players currently challenging the proposed global settlement of all claims against the NFL related to brain injuries caused by professional football. He was a primary author of the firm's petition for certiorari in the U.S. Supreme

Court. The case is *In re National Football League Players Concussion Injury Litigation* (U.S. Supreme Court, Third Circuit). Petition for Certiorari | Petitioners' Reply Brief | Third Circuit Opening Brief | Third Circuit Reply Brief

- Jon has written *amicus* briefs on behalf of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, in more than half a dozen Second Amendment cases threatening common-sense gun laws, including *Peruta v. San Diego County*, in which the en banc Ninth Circuit adopted the firm's historical analysis, as well as *Wrenn v. District of Columbia* (D.C. Circuit), *Grace v. District of Columbia* (D.C. Circuit), *Kolbe v. Hogan* (en banc Fourth Circuit), *Silvester v. Harris* (Ninth Circuit), *Peña v. Lindley* (Ninth Circuit), and *Norman v. Florida* (Florida Supreme Court). The briefs in these cases oppose challenges to public-carry regulations in California and the District of Columbia, as well as Maryland's assault-weapons ban and California's 10-day waiting period and "microstamping" law. Peruta Amicus Brief | Peruta En Banc Opinion | Grace Amicus Brief | Wrenn Amicus Brief | Kolbe Amicus Brief (en banc) | Kolbe Amicus Brief (petition stage) | Kolbe En Banc Opinion | Silvester Amicus Brief | Silvester Opinion | Peña Amicus Brief | Norman Opinion

- Jon has written two U.S. Supreme Court *amicus* briefs on behalf of the co-sponsors of the Fair Housing Act of 1968 and other current and former Members of Congress, explaining why Congress intended the Act to permit disparate-impact liability. His work was quoted in a New Yorker article discussing the issue. In June 2015, the Supreme Court issued a surprise opinion upholding disparate-impact liability, in which Justice Kennedy adopted the firm's historical analysis. Texas Department of Housing Amicus Brief | Mount Holly Amicus Brief | U.S. Supreme Court Opinion in Texas Department of Housing

- Jon played a key role in the firm's high-profile petition for en banc review in *Carrera v. Bayer* (Third Circuit), a controversial class-action case about the ascertainability requirement. Jon's efforts helped persuade four judges to dissent from the denial of en banc review and to call on the Federal Rules Committee to examine the issue. Jon has continued to focus on ascertainability issues since *Carrera*, most recently successfully opposing a petition filed by former

Appx0736

Solicitor General Paul Clement in *Soutter v. Equifax* (Fourth Circuit). Carrera Petition | Soutter Answer to Interlocutory Appeal Petition

- Jon has been the lead author of briefs filed in a number of important appeals concerning workers' and consumers' rights, including *Alaska Trustee v. Ambridge* (Supreme Court of Alaska), in which he successfully obtained a ruling that the Fair Debt Collection Practices Act covers foreclosures, and *Mais v. Gulf Coast Collection Bureau* (Eleventh Circuit), concerning the meaning of the Telephone Consumer Protection Act's "prior express consent" requirement. He presented oral argument in both cases. He also presented argument before the Ninth Circuit in *Koby v. ARS National Services*, in which he argued a novel question of class-action jurisdiction, successfully objecting to a nationwide class-action settlement that sought to extinguish millions of claims in exchange for nothing. Ambridge Brief | Alaska Supreme Court Opinion in Ambridge | Oral Argument Video in Ambridge | Mais Brief | Mais Answer to Interlocutory Appeal Petition | Objector's Brief in Koby | Objector's Reply Brief in Koby | Ninth Circuit Opinion in Koby | Oral Argument Video in Koby

- Jon was also a principal drafter in several other cases concerning workers' and consumers' rights, such as *Brady v. Deloitte & Touche* (Ninth Circuit), an appeal from decertification of a class of unlicensed audit employees at Deloitte & Touche who allege overtime violations; *Kingery v. Quicken Loans* (Fourth Circuit), an appeal addressing what it means for a credit-reporting agency to "use" a credit score for purposes of the Fair Credit Reporting Act; *Cole v. CRST* (Ninth Circuit), a petition involving the application of the Supreme Court's *Tyson Foods* decision to California wage-and-hour class actions; and *Dreher v. Experian* (Fourth Circuit), in which Jon twice helped defeat petitions for interlocutory review raising questions of Article III standing, class certification is statutory-damages cases, and application of the Supreme Court's decision in *Safeco v. Burr*. Brady Reply Brief (other briefing in this case filed under seal) | Cole Rule 23(f) Petition | Kingery Opening Brief | Kingery Reply Brief | Dreher Answer to Rule 23(f) Petition | Dreher Answer to § 1292(b) Petition

Appx0737

- Jon was the primary draftsman of the firm's brief opposing certiorari in *American Express v. Italian Colors* (U.S. Supreme Court), a major antitrust case asking whether courts must enforce arbitration even when doing so would preclude the plaintiffs from vindicating their federal statutory rights. Jon also assisted the firm's co-counsel, former Solicitor General Paul Clement, in writing the merits brief and helped coordinate amicus briefs in support of the respondents filed by the United States, 22 States, and various scholars, trade groups, and public-interest organizations. Brief in Opposition

- Jon was a primary drafter of *amicus* briefs filed on behalf of leading nonprofit organizations in two important Supreme Court cases. The first is *Tyson Foods v. Bouaphakeo*, in which the Supreme Court adopted the firm's argument for why the Court should not decertify a class of workers at a slaughterhouse seeking overtime compensation improperly denied to them. The second is *Sheriff v. Gillie*, in which the firm represents three consumer-advocacy groups supporting a challenge to debt-collecting law firms' misleading practice of using Attorney General letterhead to collect debts owed to the state constituted clear violations of the Fair Debt Collection Practices Act. Brief of Nonprofit Organizations in Tyson | U.S. Supreme Court Opinion in Tyson | Brief of Consumer-Advocacy Groups in Gillie

- Jon wrote an *amicus* brief on behalf of former Congressman Patrick Kennedy, the author and lead sponsor of the Mental Health Parity and Addiction Equity Act, in an important test case concerning the Act's scope, in which the Second Circuit held that the Act applies to claims administrators. The case is called *New York State Psychiatric Association v. UnitedHealth* (Second Circuit). Amicus Brief of Former Congressman Kennedy | Second Circuit Opinion

- Jon helped draft the firm's merits briefing in *McBurney v. Young* (U.S. Supreme Court), a constitutional challenge under the Privileges and Immunities Clause and dormant Commerce Clause to a provision of the Virginia Freedom of Information Act denying non-residents the same right of access to public records that Virginia affords its own citizens. Merits Brief for Petitioners | Merits Reply for Petitioners

Appx0738

Before his judicial clerkship, Jon spent a year at Public Citizen Litigation Group on a Redstone Fellowship from Harvard. While there, Jon worked with Deepak Gupta to prepare for his Supreme Court argument in *AT&T Mobility v. Concepcion*, served as principal author of a Supreme Court amicus brief concerning the False Claims Act, wrote a Ninth Circuit brief in a consumer case, and helped advise a public-health nonprofit on federal preemption of food-labeling laws. Jon also worked as an intern at Public Citizen during law school, where he worked with Deepak Gupta and Brian Wolfman on their successful Supreme Court merits brief in *Mohawk Industries v. Carpenter* and assisted with the brief filed on behalf of Senators John McCain and Russell Feingold in *Citizens United v. Federal Election Commission*.

Jon has previously worked on microfinance and antipoverty issues in Ethiopia, studied Spanish in Chile, and helped prepare a Medicaid fraud case against drug companies as an intern in the Missouri Attorney General's Office. During law school, he helped teach legal writing as a member of the Board of Student Advisers, competed in the Upper-Level Ames Moot Court Competition, and had the Best Appellee Brief in his first-year legal writing section. Jon received his undergraduate degree, *magna cum laude*, from the University of Southern California, where he was elected to Phi Beta Kappa, was awarded a Presidential Scholarship, and was a National Merit Scholar. He is a member of the bar of the District of Columbia and the Supreme Court of the United States.

Copyright © 2023 Gupta Wessler LLP

Powered by WordPress and Origin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                          *Plaintiffs*,

Case No. 1:16-cv-00745-PLF

v.

UNITED STATES OF AMERICA,
                          *Defendant*.

## **DECLARATION OF MEGHAN S.B. OLIVER**

I, Meghan S.B. Oliver, declare as follows:

1.      I am a member of the law firm of Motley Rice LLC ("Motley Rice"). I submit this declaration in support of Class Counsel's application for an award of attorneys' fees in connection with services rendered in the above-captioned class action, as well as for reimbursement of expenses incurred by my firm in connection with the action. I have personal knowledge of the matters set forth herein, based upon my active participation in all pertinent aspects of this litigation, my review of the firm's litigation files, and consultation with other Motley Rice personnel who worked on this case. I could and would testify competently to matters set forth herein if called upon to do so.

2.      Motley Rice has served as counsel in this litigation since it was filed on April 21, 2016, and has served as Co-Class Counsel since its appointment on January 24, 2017. In this capacity, my firm (often in conjunction with Co-Class Counsel) performed the following tasks,

among others: conducted a factual and legal investigation of the claims asserted; reviewed, drafted, and assisted with district-court and appellate filings; assisted in preparation for district-court and appellate oral arguments; participated in hearings; conducted limited formal and informal discovery; drafted notice documents; participated in mediation; negotiated the settlement; supervised all notice, notification, and dispute procedures implemented by the class administrator, KCC; and responded to hundreds of contacts and inquiries from class members.

3.      The information in this declaration regarding the time spent on the case by Motley Rice attorneys and other professional support staff is based on contemporaneous daily time records regularly prepared and maintained by my firm. The information in this declaration regarding expenses is based on the records of my firm, which are regularly prepared and maintained in the ordinary course of business. These records are prepared from expense vouchers, check records, and other source materials that are an accurate record of the expenses incurred. I reviewed these time and expense records in connection with the preparation of this declaration.

4.      The purpose of this review was to confirm both the accuracy of the time entries and expenses as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation. Time billed by any timekeeper who spent fewer than 20 hours working on the case has been excluded from my firm's lodestar.

5.      The administration of this settlement to date has been novel and complex, and has required more attorney work than is typical in a class-action settlement. This settlement differs in a number of ways from typical class-action settlements. First, there is no claims procedure. Notice has been made using PACER billing data maintained by the Administrative Office of the U.S. Courts (the AO), and settlement payments also will be made based on that data in order to maximize distribution of settlement funds. This has proved to be a complicated process. For

example, the class members are the *payers* of the PACER fees, but the data maintained by the government reflects accountholder information. Sometimes the accountholders did not pay the PACER fees themselves. The most common scenario where that mismatch occurs is an employer (e.g., a law firm or corporation) directly paying its employees' PACER fees.

6.      To make every effort to ensure that class members receive proper proceeds from the settlement, my firm worked with KCC to design a website that permits (1) someone who paid PACER fees on someone else's behalf (e.g., a law firm paying PACER fees incurred by its attorneys) to so notify the claims administrator (Category 1 Notification); and (2) someone whose PACER fees were paid by someone else (e.g., a lawyer at a law firm that paid its attorneys' PACER fees) to so notify the claims administrator (Category 2 Notification). Category 1 Notifications trigger a dispute procedure. For example, if a law firm submits a Category 1 Notification on the class website that it paid PACER fees for a dozen specified accounts held by individual attorneys at the firm, each of those dozen attorneys will receive an email informing them that someone has notified the claims administrator that they paid that individual's PACER fees. Those individuals will then have 10 days to dispute the accuracy of that notification. Those disputes will be resolved before any distribution of settlement proceeds. As of August 24, 2023, we have received 33 Category 1 Notifications, 386 Category 2 Notifications, and 1 dispute. The website will accept notifications through September 5, 2023.

7.      Class Counsel has learned through this notification process that PACER account identifiers changed in 2014 from alphanumeric identifiers (e.g., AB1234) to seven-numeric-digit identifiers (e.g., 1234567). The data initially provided by the government did not include any alphanumeric identifiers. This presents a problem for some payers (i.e., employers who paid on behalf of their employees) whose accounting records from 2010 – 2014 reflect only alphanumeric

identifiers. We modified the website to permit submission of alphanumeric identifiers, and the government agreed in mid-August to provide a cross-walk reference permitting former alphanumeric account numbers to be linked to the replacement seven-digit account identifiers. They have not yet provided that data.

8.      Last, given the nature of the claims in this case—that public access to court records should be free to the greatest extent possible—Class Counsel have made every effort to make nearly all of the filings in this case available at no cost on the class website.

9.      To account for what is expected to be extensive attorney work in the coming months, handling class member contacts, notifications and disputes, I expect that my firm will spend roughly an additional 750 hours over the next six months, or roughly $500,000 in lodestar. That estimate is based on the nature of the work and time spent on these tasks since notice was sent in July.

10.     As a result of this review, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as set forth in this declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation.

11.     The current hourly rates for the attorneys and professional support staff in my firm are the usual and customary rates set by the firm in complex litigation. These hourly rates are the same as, or comparable to, the rates accepted by courts in other complex class-action litigation. My firm's rates are set based on, among other factors, periodic analysis of rates charged by firms performing comparable work and that have been approved by courts. Different timekeepers within the same employment category (e.g., members, associates, staff attorneys, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year

Case: 24-1757     Document: 15-2     Page: 204     Filed: 07/16/2024

in the current position (e.g., years as a member), relevant experience, and the rates of similarly experienced peers at our firm or other firms. For personnel who are no longer employed by my firm, the "current rate" used in the lodestar calculation is based upon the rate for that individual in his or her final year of employment at Motley Rice.

### Hours and Lodestar Information

12. Below is a summary lodestar chart which lists (1) the name of each timekeeper in my firm who devoted more than 20 hours to the case; (2) their title or position (e.g., member, associate, paralegal); (3) the total number of hours they worked on the case from its inception through and including August 17, 2023; (4) their current hourly rate; and (5) their lodestar (at both current and historical rates).

| Name | Title | Total Hours | Current Rate | Total Lodestar |
|---|---|---|---|---|
| Narwold, William | Member | 714.75 | $1,250 | $893,437.50 |
| Oliver, Meghan | Member | 570.45 | $950 | $541,927.50 |
| Tinkler, William | Associate | 139.15 | $550 | $76,532.50 |
| Loper, Charlotte | Associate | 348.40 | $525 | $182,910.00 |
| Bobbitt, Ebony | Associate | 86.90 | $525 | $45,622.50 |
| Rublee, Laura | Staff Attorney | 184.20 | $500 | $92,100.00 |
| Janelle, Alice | Legal Secretary | 48.60 | $380 | $18,468.00 |
| Shaarda, Lynn | Paralegal | 27.40 | $350 | $9,590.00 |

13. The total number of hours expended by Motley Rice in this case from inception through August 17, 2023 is 2,119.85 hours. The total resulting lodestar for my firm is $1,860,588.00 based on current rates.

## Expense Information

14.     My firm's lodestar figures are based on the firm's hourly rates, which do not include charges for expense items. Expense items are billed separately, and such charges are not duplicated in my firm's hourly rates.

15.     My firm seeks an award of $29,654.98 for expenses and charges incurred in connection with the prosecution of the case from its inception through August 17, 2023.

16.     **Mediator:** $9,925.00. Motley Rice paid Resolutions LLC for the plaintiffs' portion of mediation services, specifically provided by Professor Eric D. Green.

17.     **Travel, Food, and Lodging Expenses:** In connection with the prosecution of this case, my firm spent a total of $8,496.86 on out-of-town travel, including travel costs such as airfare, lodging, and meals while traveling.

18.     **Other Expenses:** The following is additional information about certain other categories of expenses:

a.     Court Fees: $938.40 were paid to the Federal Circuit for my attorney admission fee, and for *pro hac vice* applications to this Court.

b.     Online Legal and Factual Research: $7,605.08 was paid to Westlaw and Lexis/Nexis for online legal research and cite-checking of briefs.

c.     Photocopying and Printing: $2,464.24. This includes copies and binders made in-house for hearings and the everyday prosecution of this case. It also includes the cost of a professional printer for the appellate filings in this case.

d.     Telephone: $146.35. These charges were for long-distance telephone and conference calling.

e.     Postage & Express Mail: $79.05.

Appx0745

19.     In addition to the expenses incurred by my firm, Class Counsel seeks an award of $977,000 for notice and distribution of the settlement fund. This is based on notice expenses already incurred, and an estimate provided by KCC in late 2022 for settlement notice and distribution. Given complications experienced to date, we seek an additional $100,000 to account for unexpected complexities in the notification and dispute process and distribution of the settlement fund.

Dated: August 28, 2023

Respectfully submitted,

Meghan S.B. Oliver

7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 16-0745 (PLF) |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

The United States files this response to Plaintiffs' motion for final approval of class settlement and for attorneys' fees, costs, and service awards.[1] In short, while the United States concurs that this Court should grant final approval to the preliminary settlement and bring this long-running litigation against the federal judiciary to a close, the Court should exercise its discretion in determining attorneys' fees, costs, and service awards to Plaintiffs' and Plaintiffs' counsel. *See Hensley v. Eckhart*, 461 U.S. 424 (1983) (holding that a trial court enjoys substantial discretion in making reasonable fee determinations); *see Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993). Herein, the United States provides some context and further information to aid the Court in its determination as to fees, costs, and service awards.

---

[1]     Paragraph 20 of the Court's Order (ECF No. 153) provides the United States the ability to respond to Plaintiffs' motion for fees "thirty days" prior to the Settlement Hearing, which is scheduled for October 12, 2023. ECF No. 153 at 6.

## I.     The Settlement is Fair and Reasonable

First, the United States offers its concurrence that the settlement be approved. As noted by Plaintiffs, there are four factors established by Federal Rule of Civil Procedure 23(e)(2) that govern final approval.  These factors consider whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate"; and "(D) the proposal treats class members equitably relative to each other."  Although the United States offers no position on the first prong (*i.e.*, the class representatives and class counsel have adequately represented the class), the Government concurs that the proposal was negotiated at arm's length, that the relief provided for the class is adequate, and that the proposal treats class members equitably relative to each other.  The United States will focus its response on the last two factors.

The Government agrees that the relief provided for the class is more than adequate, as described by Plaintiffs, "extraordinary." Pls.' Mot. at 28.  The total value of the settlement is $125 million, and class members will be fully reimbursed, up to $350, for all PACER fees that they paid during the class period. Those who paid more than $350 in fees during the class period will receive a payment of $350 plus their pro rata share of the remaining settlement funds.  As discussed further below, this division is in line with the judiciary's long-standing policy of access to judicial records.  As to the requested amount in attorneys' fees, costs, and service awards, the United States addresses that *infra* Section II.

Further, the proposal treats class members equitably relative to each other. On this particular point, the United States offers a couple considerations.  First, although there was one objection by a class member regarding the payment threshold of $350, there is nothing inherently inequitable about distributing payments *pro rata* with a minimum cut-off, particularly in a

common fund case. For example, in *In re Automotive Parts Antitrust Litig.*, No. 12-md-02311, 2019 WL 7877812, at *2 (E.D. Mich. Dec. 20, 2019), the district court approved a pro rata distribution up to $100 then distributed the remaining funds to all class members whose weighted pro rata allocation exceeds $100 (subject to their being sufficient funds for each class member claimant to receive at least $100). *See also Downes v. Wis. Energy Corp. Ret. Account Plan*, No. 09–C–0637, 2012 WL 1410023, at *3 (E.D. Wis. April 20, 2012) (overruling an objector's objection to the plan of allocation and approving a $250 guaranteed minimum net settlement to each class member). Second, this position is consistent with the E-Government Act, 28 U.S.C. § 1913, which permits electronic public access fees to "distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information." It is also consistent with "efforts undertaken by the judiciary to ensure that public access fees do not create unnecessary barriers or burdens to the public have resulted in an allocation of the vast majority of PACER maintenance costs to the system's largest users (typically commercial entities that resell PACER data for profit)." Report of the Proceedings of the Judicial Conference of the United States, Sept. 2019 at 10, https://www.uscourts.gov/sites/default/files/judicial_conference_report_of_the_proceedings_september_2019_0.pdf (last accessed Sept. 12, 2023).

In sum, the United States concurs with this Court approving the proposed settlement. Counsel for both parties "are clearly of the opinion that the settlement in this action is fair, adequate, and reasonable," which only further confirms its reasonableness. *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 121 (D.D.C. 2007).

3

## II.    **Attorneys' Fees, Costs, and Service Awards**

Through their motion ("Pls.' Mot.", ECF No. 158), class counsel requests an attorneys' fees award of over $23 million, which amounts to slightly less than 20% of the common fund ($125 million).[2]  This amount includes approximately $900,000 in work that has not yet occurred and may or may not occur.  *See* Pls.' Mot., Gupta Decl. ¶¶ 63-64, ECF No. 158-5 at 22 (noting approximately $400,000 in anticipated fees by Gupta Wessler LLP and $500,000 by Motley Rice "for time that will be incurred to address post-settlement issues and inquiries.").  The Court may wish to inquire as to how counsel came to that approximation, as the declarations provided in support of Plaintiffs' motion provide little, if any, explanation for these estimates.

In addition, the declarations submitted in support of Plaintiffs' motion calculate the lodestar with 2023 hourly rates, but fail to account that the litigation began in 2016, with class certification in 2017, when rates for both firms presumably were lower.  *See e.g.*, Gupta Decl. ¶ 22 (noting Gupta's "current rate" as $1,150 per hour); *see also* Oliver Decl. ¶ 12, ECF No. 158-6 at 5 (identifying William Narwold's hourly rate as $1,250 and Meghan Oliver's hourly rate as $950). In assessing whether to award current or historical rates, courts may consider, among other factors, whether the delay in payment was "unusually long [ ] or attributable to the defendant's dilatory or stalling conduct."  *West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013).  Such is not the case here. The Supreme Court and lower courts have held that where payment is delayed in fee-shifting cases, a court may compensate for the time value of money by either using historic billing rates plus interest or by using present-day rates.  *See Missouri v. Jenkins*, 491 U.S. 274, 283–84 (1989);

---

[2]     The parties' agreed that "when combined, the total amount of attorney fees, service awards, and administrative costs shall not exceed 20% of the Aggregate Amount. With respect to the attorney fees and service awards, the Court will ultimately determine whether the amounts requested are reasonable."  *See* Mot. Prelim. Approval, Settle. Agmt. ¶ 28, ECF No. 141-1 at 11.

4

*Mathur v. Bd. of Tr. of S. Illinois Univ.*, 317 F.3d 738, 744–45 (7th Cir.2003). However, a significant number of those cases, including *Missouri v. Jenkins*, dealt specifically with fee shifting under 42 U.S.C. § 1988 in protracted civil rights litigation. This case cannot be compared to those cases, and Plaintiffs' counsel do not present any data in support of their claimed rates. *See In re LivingSocial Mktg. & Sales Pracs. Litig.*, 298 F.R.D. 1, 21-22 (D.D.C. 2013). Furthermore, as courts in this jurisdiction have noted, "[t]he market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms—presumably because of their greater resources and investments, such as attorneys, librarians, researchers, support staff, information technology, and litigation services." *Id.* (citing *Heller v. District of Columbia,* 832 F. Supp. 2d 32, 46-48 (D.D.C. 2011)). Though Motley Rice appears to fall above this threshold, Gupta Wessler LLP does not.

Importantly, though Plaintiffs rely on the declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.," ECF No. 158-4) in support of the reasonableness of their fees, they have chosen (with no explanation) not to utilize the U.S. Attorney's Office Fitzpatrick Matrix (created in conjunction with the very same Brian Fitzpatrick). *See* https://www.justice.gov/usao-dc/page/file/1504361/download. This is evident because class counsel seeks compensation for Gupta's 2023 rate of $1,150, which is significantly more than the top of the Fitzpatrick Matrix rate (*see id.*, which indicates $807 per hour for attorneys with over 35 years of practice). Gupta graduated from law school in 2002, making his 2023 rate $742, approximately $408 less per hour than the rate at which he seeks compensation. *See* https://www.linkedin.com/in/deepakguptalaw (last accessed Sept. 6, 2023). Similarly, Jonathan Taylor, also a principal at Gupta Wessler LLP, seeks compensation at a rate of $935 per hour (Gupta Decl. ¶ 63), even though public records indicate that Taylor graduated law school in 2010, and his 2023 Fitzpatrick Matrix rate is

significantly lower, at $664 per hour.  *See* https://www.linkedin.com/in/jonathan-taylor-071b61b.

As for the Gupta Wessler firm, the lowest amount billed for an associate is $700, which is

appropriate for an attorney with more than fifteen years of experience under the Fitzpatrick Matrix.

https://www.justice.gov/usao-dc/page/file/1504361/download.  Yet the associates identified in the

Gupta Declaration range from law school graduation years of 2013 through 2015, and do not have

anywhere near the 17 years' experience to justify an hourly rate of $700.

Along the same vein, the rates sought by Motley Rice are significantly above those

contemplated by the Fitzpatrick Matrix.  Mr. Narwold has been practicing the longest at

approximately 44 years, but his 2023 rates are $807 per the Fitzpatrick Matrix, almost $450 less

*per hour* than his requested rate.  Oliver Decl. ¶ 12 (seeking $1,250 per hour).  Oliver's rates are

also higher; she is a 2004 law school graduate with approximately 19 years of experience, billing

more than $150 per hour more for rates reserved for attorneys practicing over 35 years.  *See*

https://www.justice.gov/usao-dc/page/file/1504361/download  (establishing 2023 rates for

attorneys with 19 years' experience at $726 per hour).

Though not in the class action context, other judges in this District have reasoned that the

Fitzpatrick Matrix "presumptively applies" in federal complex litigation.  In the published opinions

in this district in which the Fitzpatrick Matrix has been juxtaposed against the LSI Matrix, the

Fitzpatrick Matrix has won out.  *See J.T. v. District of Columbia*, Civ. A. No. 19-989 (BAH), 2023

WL 355940, at *14-15 (D.D.C. Jan. 23, 2023); *Louise Trauma Ctr. LLC v. Dep't of Homeland

Sec.*, Civ. A. No. 20-1128 (TNM), 2023 WL 3478479, at *4 (D.D.C. May 16, 2023) (explaining

that "Fitzpatrick Matrix rates presumptively apply" in complex federal litigation and citing *J.T.*);

*see also Brackett v. Mayorkas*, Civ. A. No. 17-0988 (JEB), 2023 WL 5094872, at *4-5 (D.D.C.

Aug. 9, 2023) (in employment discrimination case, reasoning that it was appropriate to apply

Fitzpatrick Matrix rates across the board and rejecting plaintiff's challenges to the Fitzpatrick Matrix and attempts to obtain even higher than LSI Matrix, attorney-specific rates); *see also Hartman v. Pompeo*, Civ. A. No. 77-2019 (APM), 2020 WL 6445873, at *19 (D.D.C. Nov. 3, 2020) (before availability of Fitzpatrick Matrix, noting in class action context that it would not be unduly burdensome to apply the LSI-adjusted matrix or "something similar," finding that plaintiffs failed to meet their burden to establish propriety of attorney-specific rates and that the court lacked the information necessary to "adjust the attorney's hourly rate in accordance with specific proof linking the attorney's ability to a prevailing market rate"). In light of Plaintiffs' failure to satisfy their burden to establish that above-market rates are appropriate in this case, *Winston & Strawn LLP v. FDIC*, 894 F. Supp. 2d 115, 130 (D.D.C. 2012) (citing *Perdue v. Kenny A.*, 559 U.S. 542 (2010)), the Court may wish to inquire as to the basis for counsels' rates, and determine whether a reduction in line with prevailing market rates pursuant to the Fitzpatrick Matrix rate is appropriate.

Plaintiffs also request payment of over $1 million to the class Administrator, including approximately $100,000 for work not yet performed. Pls.' Mot. at 48; Oliver Decl. ¶ 19. Importantly, Plaintiffs seek an extra $100,000 beyond what was originally contemplated, due to "unexpected complexities in the notification and dispute process," but do not provide any further details as to those complexities. *Id.* The Court may wish to seek further detail from Plaintiffs' as to these estimated amounts, and exercise its discretion in determining whether Plaintiffs' have adequately demonstrated that such payments are likely and/or reasonable.

Finally, the Court may wish to apply a lodestar cross-check to determine the reasonableness of the sought-after fee.[3] *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 101

---

[3] The United States reserved its right to request that the Court apply a lodestar crosscheck in the parties' settlement agreement. Settle. Agmt. ¶ 28, ECF No. 141-1 at 11.

(D.D.C. 2013). Plaintiffs indicate that their total lodestar (without inclusion of estimated future fees) is approximately $5.13 million. Gupta Decl. ¶ 63; *see also* Fitzpatrick Decl. ¶ 27, ECF No. 158-4 at 17. Plaintiffs seek over $23.8 million as compensation, which results in a multiplier of approximately 4.65 percent. With Plaintiffs' inchoate "anticipated future fees," this number drops to a multiplier of approximately 3.9 percent. Gupta Decl. ¶ 64. Regardless of the multiplier used, as the Fitzpatrick declaration concedes, this multiplier is "above average." Fitzpatrick Decl. ¶ 27; *see In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d at 19–20 (reviewing counsel's reported lodestar and finding "that a multiplier of 2.0 or less falls well within a range that is fair and reasonable"); *see also Swedish Hosp. Corp.*, 1 F.3d at 1272 (approving fee award approximately 3.3 times the lodestar amount).

In sum, "once it is determined that the attorneys are entitled to be paid from the common fund, it is the duty of the court to determine the appropriate amount," based on "reasonableness under the circumstances of a particular case." *Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993). The Court's independent scrutiny of an award's reasonableness is particularly important in common fund cases, because "the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." *Id.* (quotation omitted); *see Swedish Hosp. Corp.*, 1 F.3d at 1265. "[W]here the settlement agreement creates a common fund against which individual plaintiffs may make claims," the Court must "'act as fiduciary for the beneficiaries'" of the fund "'because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set'" and because "'there is no adversary process that can be relied upon in the setting of a reasonable fee.'" *In re Dep't of Veterans Affairs Data Theft Litig.*, 653 F. Supp. 2d 58, 60 (D.D.C. 2009). Defendant does not take issue with the

8

general approach of awarding Plaintiffs' counsel a percentage of the common fund in this case, but there are indicia—including above-market hourly rates that Plaintiffs' counsel have not shown to be reasonable and inadequately explained predictions of future work—that the common fund may be excessively depleted, to the detriment of class members, if Plaintiffs' counsel are awarded the percentage of the common fund that they have requested.  The Court should carefully examine this fee matter to ensure that class members' rights and recovery are appropriately safeguarded.

Dated:  September 12, 2023
      Washington, DC

                                    Respectfully submitted,

                                    MATTHEW M. GRAVES, D.C. Bar #481052
                                    United States Attorney

                                    BRIAN P. HUDAK
                                    Chief, Civil Division

                                By: /s/ *Brenda González Horowitz*
                                      BRENDA GONZÁLEZ HOROWITZ
                                      Assistant United States Attorney
                                      601 D Street, NW
                                      Washington, DC 20530
                                      (202) 252-2512

                                    *Attorneys for the United States of America*

9

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                              *Plaintiffs*,

v.                                                            Case No. 16-745-PLF

UNITED STATES OF AMERICA,
                              *Defendant*.

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND FOR FEES, COSTS, AND SERVICE AWARDS

The Court should grant final approval of the settlement. Although this case involves perhaps the most litigious group of people and entities ever assembled in a single class action, the reception to the settlement continues to be almost universally positive. Out of a nationwide class of hundreds of thousands—including sophisticated data aggregators, federal-court litigators, and law firms of every stripe—we have received just three objections, all of them *pro se*. This reply addresses those objections and the government's response and is being filed within nine days of the hearing, as directed by the Court's preliminary-approval order. ECF No. 153 ¶ 6. It is accompanied by several supporting declarations that update the information provided with the motion, including declarations from counsel, the class administrator, and two experts (Professor Brian Fitzpatrick of Vanderbilt Law School and Professor William Rubenstein of Harvard Law School).

**I. The objections regarding the settlement's fairness are misplaced.** We begin by summarizing the position of the government and that of each objector regarding the settlement's overall fairness. The government agrees that the settlement is fair and "concurs that the proposal

was negotiated at arm's length, that the relief provided for the class is adequate, and that the proposal treats class members equitably relative to each other." Gov. Resp. 2. The three *pro se* objectors complain that the settlement is unfair—but in different and even contradictory ways.

**A. Aaron Greenspan's objection.** Mr. Greenspan notes that he "was the plaintiff in one of the only lawsuits—if not the only lawsuit—to ever challenge the PACER fee structure, prior to this one." Greenspan Obj. 1. He contends that, because he "should not have had to pay a single penny to the federal government for fees that were unlawfully charged in the first place," "all of that money should be refunded in full." *Id.* ("I want my money—stolen by the courts—back. All of it. And I want the Administrative Office staff and the judges who approved this held accountable, by name."). Mr. Greenspan believes that "the judiciary has scammed the American public." *Id.* In his view, "the plaintiffs [were] 100% right, the government [was] 100% wrong," and so any "legal limitations" on the refund of all fees paid are "manifestly unjust." *Id.* His objection was filed two days late; he has not indicated an intent to appear at the hearing.

**B. Eric Alan Isaacson's objection.** Mr. Isaacson, a serial class-action objector, contends that this is a "run-of-the-mill settlement" and that class counsel has "achieved a remarkably mediocre result." Isaacson Obj. 3. In his assessment, this first-ever class action against the federal judiciary "was obviously an easy one to litigate" and an "easy one to settle." *Id.* at 14. Mr. Isaacson objects to the requested fees and service awards, objections that we address separately below. With respect to the settlement's overall fairness, his complaint is that class counsel disserved the class "by advocating a purely pro-rata distribution of settlement funds"—an approach that, in his view, "favor[s] large institutional users." *Id.* at 5 ("Named Plaintiffs' advocacy for pro-rata distribution was grossly inappropriate. The 'blend' reached as a compromise allocates far too much to a pro rata distribution that unfairly advantages large users and law firms[.]"). His objection was timely; he says that he intends to appear remotely.

**C. Geoffrey Miller's objection.** Mr. Miller's objection is exactly the opposite: Whereas Mr. Isaacson believes that class counsel's sin was to "favor large institutional users," *id.*, Mr. Miller thinks the settlement "favor[s] smaller users." Miller Obj. 2. And while Mr. Isaacson believes that counsel advocated too vigorously for a pro rata distribution, Mr. Miller contends they didn't do so vigorously enough. He derides the settlement's allocation plan—which reimburses every PACER user for up to $350 in fees paid, with a pro rata distribution to users who paid more—as a "[r]edistribution of wealth." *Id.* Mr. Miller does not contend that he himself is an allegedly disfavored large institutional user. And no large institutional users have seen fit to object, despite their presumed access to sophisticated legal counsel. Mr. Miller "has no problem with the total cash compensation or with the proposed maximum of 20% of the common fund for" fees and service awards. *Id.* at 1. His objection was timely; he does not plan to appear.[1]

**D. Class counsel's responses to the objections.** Mr. Greenspan's frustration is perhaps understandable. But his demand for a perfect settlement overlooks the fact that any settlement is necessarily a compromise—one that must be reached within the bounds of the law. Here, that law included a Federal Circuit decision holding that some of the PACER fees that were charged by the federal judiciary during the class period were lawful because they covered "expenses incurred in services providing public access to federal court docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). Mr. Greenspan's preferred settlement, one that would reimburse every penny paid during the class period, would be impossible in light of that ruling. He also ignores the fact that, under *this* settlement, the vast majority of class members will

---

[1] In addition to these three objections, the Court received an email on September 26, 2023 from Alexander Jiggetts, indicating that he "oppose[s] the settlement" because he was "the first person to complain about Pacer Fees" and has not been credited for his efforts. Mr. Jiggetts's submission is without merit. Although untimely, class counsel has no objection to the Court's consideration of this submission on its merits.

3

in fact receive a full refund—one hundred cents on the dollar—of PACER fees that they paid during the class period.

Mr. Isaacson's and Mr. Miller's objections are diametrically opposed. They cannot both be correct. That is, it cannot simultaneously be true that the settlement both unfairly *advantages* and unfairly *disadvantages* large institutional users. Our motion (at 21–24) already responds to Mr. Miller's objection in detail; we will not repeat all those points here. In a nutshell: The plan of allocation reflects a reasonable compromise between, on the one hand, the plaintiffs' strong advocacy for a purely pro rata distribution and, on the other, the government's longstanding policy of expanding public access for the average PACER user, the E-Government Act's express authorization that the judiciary may "distinguish between classes of persons" to "avoid unreasonable burdens and promote public access," 28 U.S.C. § 1913 note, and the government's litigating and negotiating positions. The government makes similar points in its response. Gov. Resp. 2–3.

Mr. Isaacson's objection is much harder to fathom. He identifies no authority for the puzzling notion that it was "grossly inappropriate" for the class representatives to advocate for a pro rata distribution. Isaacson Obj. 5. Although Rule 23 does not *require* a pro rata distribution, *see UAW v. GM*, 497 F.3d 615, 629 (6th Cir. 2007), it has always been true—both in modern class actions and at equity—that "fair treatment" is "assured by straightforward pro rata distribution of proceeds of litigation amongst the class." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999); *see id.* at 840–41 (explaining that, historically, "the simple equity of a pro rata distribution provid[ed] the required fairness"). Much of Mr. Isaacson's objection also rests on a basic misunderstanding of the jurisdictional framework for this case. He wrongly asserts (at 7–9) that this class action, and hence this settlement, can't include entities whose claims total more than $10,000. Not so. As this Court explained when it certified the class, "[a] suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate

4

transactions for which the claims do not individually exceed $10,000," as is the case here. ECF No. 33 at 6; *see also* ECF No. 8 at 9–11. Mr. Isaacson's jurisdictional arguments are simply mistaken.[2]

**II. The percentage fee requested (19.1%) is reasonable.** The government and Mr. Isaacson also opine on various aspects of class counsel's fee request. Although their points differ in many respects, they all suffer from the same basic flaw: They treat this case as if it were a standard fee-shifting case, where fees are sought from a defendant under a fee-shifting statute (an exception to the "American rule" that each party must pay its own fees), rather than a "fee-spreading" case, where fees are sought from a common fund created for the benefit of the class (consistent with the American rule). *See In re Home Depot Inc.*, 931 F.3d 1065, 1079 n.12 (11th Cir. 2019).

**A. The government's response.** The government does not object to using the percentage-of-the-fund approach to determine the fee in this case—the approach used in the overwhelming majority of common-fund cases. *See* Mot. 25–27; *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("[A] percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases."). Nor does the government deny that a fee of 19.1% is reasonable in this case and is reasonable for funds of this size. *See* Mot. 33–34 (citing

---

[2] Mr. Isaacson also contends that large institutional class members, like law firms, have "suffered no injury" to the extent that they have passed on PACER charges to their clients, so any recovery for them is an "unfair windfall." Isaacson Obj. 4–5. This, too, is mistaken. The law has long held that, if plaintiffs are harmed "in the first instance by paying [an] unreasonable charge," they may recover the full amount of the overcharges even if they have "pass[ed] on the damage" to others. *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918). Indeed, damages under the Little Tucker Act are available *only* to those who paid the unlawful fee to the government—not to third-parties. *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1303 (Fed. Cir. 2004). Thus, as other courts have recognized, subsequent reimbursement by third parties poses no barrier to the settlement. *See AT&T Mobility Wireless Data Services Sales Tax Litigation*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (rejecting objections to a class-action settlement on this ground because, "[i]f third-party employers subsequently reimbursed Class Members for the pertinent tax charges, then the question whether such Class Members must in turn reimburse their employers is a separate matter involving a question of law and equity between the employer and employee").

cases). As our motion explains, a fee award of 19.1% is well below the standard one-third recovery and is even "below the average percentage … for settlements between $69.6 and $175.5 million." *Id.* (quoting Fitzpatrick Decl. ¶ 19).

Instead, proceeding as if this were an ordinary fee-shifting case, the government directs its attention almost exclusively to the details of the lodestar calculation. But this "discussion of the lodestar and how it is calculated is an unnecessary sideshow." Fitzpatrick Supp. Decl. ¶ 2. Again, the lodestar is not the basis of the fee request, and it is relevant only to the extent that the Court believes that a cross-check is necessary. Regardless, none of the issues raised by the government require any lodestar reduction, nor provide any basis for reducing the percentage fee requested.

*1. Future time.* The government first correctly notes that the lodestar includes an estimate for work that had not yet been performed when the lodestar was calculated ($400,000 for Gupta Wessler and $500,000 for Motley Rice). The government does not deny that an estimate for future work is appropriate and that precision is not required. *See* Mot. 37–38 n.3 (citing cases). But, without acknowledging the relevant case law, the government asserts that there has been "little, if any, explanation for these estimates." Gov. Resp. 4. As explained in the motion, however (at 37–38 n.3), the estimates include projections for "responding to inquiries from class members about legal issues, damages calculations, and the mechanics of the settlement; responding to potential objections and filing any replies in support of the settlement; preparing for and participating in the fairness hearing; handling any appeal; assisting class members during the settlement-administration process and ensuring that it is carried out properly; and addressing any unanticipated issues that may arise." Further, Motley Rice's projection was extrapolated from the "time spent on [class-administration] tasks since notice was sent in July." Oliver Decl. ¶ 9.

Nevertheless, class counsel have prepared supplemental declarations that provide additional support for their estimates. *See* Gupta Supp. Decl. ¶¶ 2–3; Oliver Supp. Decl. ¶¶ 3–5.

Class counsel note, for example, that the time they have spent working on the case since calculating the lodestar only confirms the reasonableness of their estimates. *Id.* And while only three class members have filed objections, the possibility of an appeal is very real given that Mr. Isaacson touts himself as "a prominent appellate litigator" who has objected to many class-action settlements and who has pursued appeals after his objections were overruled. Gupta Supp. Decl. ¶ 3.

    **2. *Current versus historical rates.*** The government next contends that the lodestar should not include class counsel's current billing rates but should instead use their historical rates. Gov. Resp. 4–5. But even in fee-shifting cases (which can raise sovereign-immunity questions not present here), courts "generally" compensate for the delay "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Perdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542, 556 (2010); *see, e.g., James v. District of Columbia*, 302 F. Supp. 3d 213, 226–28 (D.D.C. 2018) (explaining that courts "routinely" use this approach and apply "current rates when calculating the lodestar" "to account for a delay in payment," because "it is only fair to award attorneys the present value of the services that they rendered"); *Thomas v. District of Columbia*, 908 F. Supp. 2d 233, 248–49 (D.D.C. 2012) (same). In common-fund cases, some courts go so far as to mandate use of "one of [these] two delay-compensation methods," holding that "failure to do so is an abuse of discretion." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016). Because class counsel have been working on this case for nearly eight years without compensation, it is appropriate for their lodestar to reflect their current rates to account for this delay.

    **3. *The Fitzpatrick Matrix.*** The government suggests that the Court "inquire as to the basis for [class counsel's] rates" and consider using rates from "the U.S. Attorney's Office Fitzpatrick Matrix." Gov. Resp. 5–7. But as the matrix's creator himself explains, the government misunderstands its purpose. By its own terms, the Fitzpatrick Matrix is for cases "in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees." *See* Fitzpatrick

Appx0762

Matrix, Explanatory Note 2, https://perma.cc/EVQ5-NNMC. Even then, the matrix is only "a settlement tool, designed 'to minimize fee disputes' with the Department [of Justice]" because the government has "agreed not to oppose any fee-shifting request based on the rates in the Matrix." Fitzpatrick Supp. Decl. ¶ 5 (quoting Explanatory Note 10); *see* Explanatory Note 3. For these reasons, the matrix is "irrelevant to this fee request." Fitzpatrick Supp. Decl. ¶ 5

"Nothing about the matrix precludes" counsel from seeking higher rates. *Id.* ¶ 5. That is particularly true because the matrix represents rates found in the *middle* of data from a potpourri of cases, including individual employment and FOIA matters. *Id.* ¶ 6. The rates "ranged from $100 to $1250." *Id.* As Professor Fitzpatrick explains: "Above-average lawyers commanded rates at the high end of the range and below-average lawyers at the low end. Class counsel here include some of the best class action lawyers not just in the District of Columbia, but in the entire United States of America. It is not surprising that their rates fall at the high end of the range. What is surprising is that class counsel's rates do not exceed the range altogether given that the range was drawn from data from several years ago." *Id.*

In fact, an examination of the data used in the matrix, once filtered for class-action cases, strongly supports the fee request here. As Professor William Rubenstein of Harvard Law School points out, the data underlying the Fitzpatrick Matrix is drawn largely from garden-variety fee-shifting cases and contains few class actions. Professor Rubenstein "reviewed the entire PACER docket in each of [the] 84 cases" in the Fitzpatrick dataset and "found that only 8 were class action cases and that many of the remaining 76 cases were routine fee-shifting matters." Rubenstein Decl. ¶ 21. He found, further, that "the rates in the Matrix's 8 class action cases are on average 43.98% higher than the rates in its 74 non-class action cases." *Id.* ¶ 22. "[W]hen the proposed rates in this case are plotted against the class action rates in the Fitzpatrick Matrix," Professor Rubenstein found that "the rates in this case are, on average, precisely the same as (only .65% above) the

Matrix's class action rates. What this means is that the *relevant* data that underlie the Matrix actually provide strong empirical evidence *in support of* the rates that Class Counsel propose here." *Id.* ¶ 23.

Professor Rubenstein provides additional "empirical evidence" showing that class counsel's rates "are in line with rates found in fee petitions approved by District of Columbia (and Court of Federal Claims) judges overseeing large fund class actions." *Id.* ¶ 19. He "created a database of approved fee petitions filed in large fund class actions in the District of the District of Columbia and in the Court of Federal Claims (for District of Columbia cases) since 2010, and then delved into those petitions to find the hourly rates that lawyers were billing." *Id.* ¶ 14. He "reviewed the lodestar submissions," "extracted 185 individual hourly rates of partners and associates (partnership-track attorneys)," "obtained the year of admission to the bar for each," and "adjusted all these rates to 2023 dollars." *Id.* This produced a scatterplot showing that "Class Counsel are charging rates roughly comparable to the norm" (just 9.3% above it on average), which in his view is "impressive" given that they "are among the leading class action law and plaintiff-side firms in the United States, and the lawyers who worked on this case possess years of experience, have track records of success, and can be counted among the elite of the profession generally and this area of law specifically." *Id.* ¶ 18. And class counsel's rates are, in Gupta Wessler's case, "rates that [the] firm actually charges to paying clients." Gupta Suppl. Decl. ¶ 5. The government gives no reason why this Court should ignore those rates and the empirical evidence supporting them, and instead use a fee matrix created for settlement purposes in fee-shifting cases against the federal government—"a formula that takes into account only a single factor ([] years since admission to the bar)," which "does not adequately measure [every] attorney's true market value." *See Perdue*, 559 U.S. at 554–55.

To the contrary, even in the fee-shifting context, the Federal Circuit has held that "it would be an abuse of discretion for a court to blindly use [a fee] matrix without considering all the relevant facts and circumstances." *Biery v. United States*, 818 F.3d 704, 714 (Fed. Cir. 2016). That makes sense.

When sophisticated clients shop for legal services, they look for more than just the year a lawyer passed the bar. They also consider credentials, skill level, quality of work, relevant experience, track record, and so on. It is only fitting that the rates would reflect these other variables.

In any event, even if rates from the Fitzpatrick Matrix were used, the requested fee award would still be fully justified. If the Court were to conduct a lodestar cross-check using these rates, it would show that the multiplier would still be just 5.53. *See* Gupta Supp. Decl. ¶ 6. That "is still well within the range of multipliers that resulted from previous percentage-method fee awards," and "still does not suggest there will be any windfall here: the risk this case would yield nothing far outstrips even the adjusted multiplier." Fitzpatrick Supp. Decl. ¶ 7.

*4. **Lodestar cross-check***. Finally, the government vaguely states (at 8) that the Court "may wish" to conduct a lodestar cross-check. But the government addresses none of the points made in our motion or in Professor Fitzpatrick's declaration, which identify the problems when courts rely on lodestar calculations for common-fund fees. *See* Mot. 25–27, 35–37. If anything, the government's quibbles only underscore these problems, suggesting that the Court and counsel perform additional (and unnecessary) work to address details that have little bearing on the appropriateness of the fee. *See* Fitzpatrick Supp. Decl. ¶ 3 ("The ink that has already been spilled over class counsel's hourly rates shows why a focus on the lodestar defeats one of the principal virtues of the percentage method for setting attorneys' fees in class actions.").

But again, even if the Court were to apply a lodestar cross-check, it would simply confirm the reasonableness of the requested fee here. As explained in the motion (at 37), a multiplier of up to four is the "norm." *Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1375 (Fed. Cir. 2023); *see also In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 102 (D.D.C. 2013) (Friedman, J.) ("Multiples ranging up to four are frequently awarded in common fund cases when the lodestar method is applied." (cleaned up)); *Kane Cnty. v. United States*, 145 Fed. Cl. 15, 20 (2019) (approving a

multiplier of 6.13 and collecting cases approving or referencing multipliers between 5.39 and 19.6); *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020) (approving a 10.15 multiplier). A higher multiplier may be justified by the circumstances of a "particular case," including "the risk of nonpayment," the lack of significant "object[ion] to the award," and whether the notice indicated an "agreement by the class to a specified percentage." *Health Republic*, 58 F.4th at 1375–77.

The motion explains why each of these factors is present here, and the government does not contend otherwise. *See* Mot. 35–39. The government does not deny that the risks of suing the federal judiciary in this case were sky high, while the results achieved are exceptional. Gov. Resp. 2 (agreeing that the relief here is "extraordinary"). Although the government suggests (at 9) that the requested fee could be "to the detriment of class members," it does not explain what is unfair about an arrangement in which class members (1) owe no legal fees in the event that they do not prevail, (2) receive eight years of high-quality representation in a complex, risky, and novel class action, and (3) ultimately share in a $125 million settlement that (at a minimum) makes them whole up to $350, while paying less than 20% of that total in fees. Class members themselves apparently saw no unfairness in that arrangement. They were informed that, "[b]y participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." ECF Nos. 43-1 & 44. And each named plaintiff signed a retainer agreement with class counsel providing for a contingency fee of up to 33% of the common fund. Gupta Decl. ¶ 65. This is evidence of "the market value for class counsel's services" and "certainly supports a fee award [at a smaller percentage]." *Black Farmers*, 953 F. Supp. 2d at 99–100. In fact, only one class member has objected to a fee award of 19.1%—an objection to which we now turn.

**B. Mr. Isaacson's fee objection.** Like the government, Mr. Isaacson urges the Court to calculate class counsel's lodestar using the Fitzpatrick Matrix (an argument that is no more

11

Appx0766

persuasive in his filing than in the government's). *See* Isaacson Obj. 13. But his principal contention is far more ambitious. He takes the position that fees in a class action should be presumptively limited to class counsel's lodestar—a position that is not the law in any circuit. For support, he cites the Supreme Court's decision in *Perdue* (which interprets language in a fee-shifting statute) and several 19th-century cases that predate Rule 23. *Id.* at 9–11. As courts have recognized in rejecting this argument and approving other settlements to which Mr. Isaacson has objected, "the *Perdue* presumption against a lodestar enhancement does not apply when a court awards fees from a common fund created after a [class-action] settlement" and no fee-shifting statute is available. *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 478–89 (S.D.N.Y. 2017) (Nathan, J.) (cleaned up); *see Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 67–72 (2d Cir. 2019) (rejecting same argument by Isaacson). Every circuit to have addressed the question has held that "Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases" and "restricting the use of multipliers in statutory fee-shifting cases does not apply to common-fund cases." *Home Depot*, 931 F.3d at 1085; *see Fresno Cnty.*, 925 F.3d at 67–72; *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 564–65 (7th Cir. 1994); *Staton v. Boeing Co.*, 327 F.3d 938, 967–69 (9th Cir. 2003).

Mr. Isaacson does not cite or acknowledge any of these cases (not even the ones in which he was an objector). Nor does he cite or acknowledge the Federal Circuit's decision earlier this year reaffirming that the "percentage-of-the-fund method" is a permissible way to set fees in a common-fund class action. *Health Republic*, 58 F.4th at 1371. Nor does he have anything to say about the reasons *why* courts overwhelmingly turned away from the lodestar method in favor of the percentage approach, detailed by the D.C. Circuit in *Shalala* and by Professor Fitzpatrick in his original declaration. *See* Mot. 26. As this Court has noted, the percentage approach replicates the market, is easy to apply, and "helps to align more closely the interests of the attorneys with the interests of the parties by discouraging inflation of attorney hours and promoting efficient

prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *Black Farmers*, 953 F. Supp. 2d at 88. As against these virtues, Mr. Isaacson identifies no countervailing considerations—or any benefits at all—in favor of his preferred approach.

And his approach is quite wrong. The market for plaintiff-side services rewards results, not hours. Even if that weren't so, and plaintiffs paid their counsel by the hour, there would quite naturally be a stiff premium on the hourly rate for any arrangement in which the client (1) would not have to pay anything in legal fees in the event of a loss, (2) would never owe more than a modest percentage of their recovery in the case, and (3) would make no payments along the way.

Mr. Isaacson has no rebuttal to any of these points. He simply asserts, without support, that no multiplier at all would be warranted because the case "was obviously an easy one to litigate" and "an easy one to settle" and the results are "remarkably mediocre." Isaacson Obj. 3, 9–14. The evidence in the record, however, shows the opposite. Professor Fitzpatrick—an expert not only on class actions, but on litigation against the federal government—has set forth his view that this case was exceptionally difficult to litigate, resulting in a remarkable recovery for the class. *See* Fitzpatrick Decl. ¶¶ 20–21. And the class representatives—themselves experts on class-action settlements and litigation against the federal government (including the esoteric area of user-fee jurisprudence)—testified to the same. *See* Burbank Decl. ¶¶ 3, 5, 7–8; Rossman Decl. ¶¶ 1–2, 4–5.[3]

---

[3] Elsewhere, Mr. Isaacson declares that a fee of 5% of the common fund would be "wholly appropriate here" because that was what the Supreme Court found reasonable 140 years ago in *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885). Isaacson Obj. 12. Yet he does not grapple with the governing framework for assessing a reasonable fee under the percentage approach, or with the data showing that, even if this case were really just a "run-of-the-mill settlement," *id.* at 3, a fee of 19.1% of the common fund would be a "run-of-the-mill" percentage—indeed, a *lower*-than-average percentage—for a settlement of this size. *See* Mot. 33; Fitzpatrick Decl. ¶ 19.

In fact, even if the lodestar method were used to determine the fee in this case, as opposed to the percentage-of-the-fund approach, the record would still fully support the fee request. Using class counsel's current rates would compensate them for the years-long *delay* in payment. Using their actual rates would reflect the *quality* of their work. And applying a multiplier of under four would account for the high *risk* of nonpayment in this litigation and be fully consistent with the language in the class notice, the retainers with the named representatives, and the paucity of objections. The only difference would be that the court would have to sift through class counsel's time records and examine them line by line—a waste of judicial resources that is not required even if the Court were to conduct a lodestar cross-check. *See* Mot. 36; *Black Farmers*, 953 F. Supp. 2d at 101 n.8; *contra* Isaacson Obj. 12 (complaining that the lodestar is "inadequately documented").

**III. The proposed service awards are reasonable.** Finally, Mr. Isaacson objects to the requested $10,000 payments for the National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice. Courts in the D.C. and Federal Circuits routinely award such payments—known variously as service, incentive, or case-contribution awards—to class representatives. *See, e.g., Keepseagle v. Perdue*, 856 F.3d 1039, 1056 (D.C. Cir. 2017); *Cobell v. Jewell*, 802 F.3d 12, 24–25 (D.C. Cir. 2015); *Mercier v. United States*, 156 Fed. Cl. 580, 590 (2021). And courts have specifically approved of service awards for organizations where, as here, they have "provided in-house counsel" who aided in the prosecution of the case and "direct[ed] class counsel in settling the case." *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002).

Mr. Isaacson asks this Court to depart from settled practice and conclude that *all* service awards are categorically barred on the basis of two 19th-century cases, *see Trustees v. Greenough*, 105 U.S. 527 (1882); *Pettus*, 113 U.S. 116 (1885), both of which predate the modern class action. But "neither *Greenough* nor *Pettus* prohibits incentive awards in class actions," and an "overwhelming majority"

14

of circuits "have concluded that district courts are permitted to grant incentive awards." *Moses v. N.Y. Times Co.*, 79 F.4th 235, 256 (2d Cir. 2023).[4]

Mr. Isaacson does not acknowledge this contrary authority—even though much of it comes from recent appeals in which he has unsuccessfully pressed this issue. Nor does he acknowledge the Supreme Court's recent recognition that, in a typical class action, "[t]he class representative might receive a share of class recovery above and beyond her individual claim"—for example, through a "$25,000 incentive award." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 n.7 (2018). Because it discusses incentive awards in Rule 23 class actions, *China Agritech*—not *Greenough* or *Pettus*—is the more relevant source for guidance on the Supreme Court's view of incentive awards. And it is consistent with the prevailing view that, as the Supreme Court put it, "[t]he plaintiff who" does the work "to lead the class" may get an "attendant financial benefit." *Id.* at 1810–11.

Even if this Court were free to set aside all modern practice and precedent, this case wouldn't present the abstract legal question that Mr. Isaacson is trying to tee up under the 19th-century cases. *Greenough* allowed a bondholder, whose suit benefited others, to recover his "reasonable costs, counsel fees, charges, and expenses incurred in the fair prosecution of the suit," but held that he couldn't recover a large annual salary for his "personal services" or recoup all of his "private expenses." 105 U.S. at 537; *see Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1257 (11th Cir. 2020) (drawing this same line). Because the requested payments here fall on the right side of this

---

[4] *Accord Hyland v. Navient Corp.*, 48 F.4th 110, 123–24 (2d Cir. 2022); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785–86 (9th Cir. 2022); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 353 (1st Cir. 2022); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017); *Pelzer v. Vassalle*, 655 F. App'x 352, 361 (6th Cir. 2016); *Tennille v. W. Union Co.*, 785 F.3d 422, 434–35 (10th Cir. 2015); *Berry v. Schulman*, 807 F.3d 600, 613–14 (4th Cir. 2015); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001).

15

line—that is, because they cover time by "counsel" "incurred in the fair prosecution of the suit"—this case doesn't present a suitable vehicle for a crusade against service awards.

Although Isaacson makes sweeping legal arguments about service awards in general, he is silent on the evidence supporting the requested awards in this case—evidence that would *fully justify the exact same awards* if relabeled as attorneys' fees. As the class representatives explained in their declarations, the market value of the in-house attorney time incurred by each organization greatly exceeded the $10,000 in claimed service awards. *See* Rossman Decl. ¶ 3; Burbank Decl. ¶ 6; Brooks Decl. ¶ 2. Over seven years, experienced lawyers at each organization "performed invaluable work" that could otherwise have been performed by "outside counsel hired by each organization at far greater expense." Gupta Supp. Decl. ¶ 7. "The requested awards here are thus entirely unlike typical incentive awards: They are not for the personal services or private expenses of an individual class representative nor do they reflect any sort of personal 'salary' or 'bounty.' They instead reflect a bargain price for work that was actually performed by experienced in-house counsel and that was necessary to carry out the prosecution of this suit." *Id.*[5] Put differently: If the National Veterans Legal Services Program had hired an outside law firm to perform the same work, and had sought payment from the common fund for that work, there would be no question that it would be compensable. Indeed, it would have been compensable in full, at market rates, even if this were a

---

[5] Mr. Isaacson makes two other points, both belied by the evidence. *First*, he contends (at 16) that the named plaintiffs had all the incentive they needed because they had "substantial claims of their own." But the claims were for much less than the value of the in-house attorney time they expended over seven years. *See* ECF Nos. 28, 29, 30. *Second*, he complains (at 17) that the plaintiffs haven't documented their request. But, again, he ignores the fact that each organization submitted a declaration indicating that the amount of attorney time it incurred greatly exceeded $10,000 at market rates. *See* Rossman Decl. ¶ 3; Burbank Decl. ¶ 6; Brooks Decl. ¶ 2.

16

garden-variety statutory fee-shifting case.[6] Mr. Isaacson has no explanation for why the non-profit class representatives here should be denied a more modest payment to compensate them for their substantial contributions to this groundbreaking litigation over the past seven years.

## CONCLUSION

This Court should grant the motion and enter the proposed order. In addition to approving the settlement, the Court should award 20% of the settlement fund to cover attorneys' fees, notice and settlement costs, litigation expenses, and service awards. Specifically, the Court should (1) award $10,000 to each of the three class representatives, (2) award $29,654.98 to class counsel to reimburse litigation expenses, (3) order that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) award the remainder (19.1% of the settlement fund, or $23,863,345.02) to class counsel as attorneys' fees.

---

[6] *See, e.g.*, *Kay v. Ehrler*, 499 U.S. 432, 436 n.7 (1991) (observing that, under 42 U.S.C. § 1988, "Congress intended organizations to receive an attorney's fee even when they represented themselves"); *Blum v. Stenson*, 465 U.S. 886 (1984) (holding that, under section 1988, a non-profit legal services organization is entitled to an attorneys' fee based on prevailing market rates rather than its own in-house cost in providing the service); *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 929 (Fed. Cir. 2000) (en banc) (holding that time spent on litigation by a labor union's in-house staff counsel should be compensated at market rates under a fee-shifting statute); *PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1569 (Fed. Cir. 1988) (awarding attorneys' fees by statute for time spent on litigation by in-house counsel).

17

Respectfully submitted,

/s/ Deepak Gupta
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
jon@guptawessler.com

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
bnarwold@motleyrice.com

MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
moliver@motleyrice.com
cloper@motleyrice.com

October 3, 2023

Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class

18

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2023, I electronically filed this reply and related documents through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Deepak Gupta*
Deepak Gupta

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL )
SERVICES PROGRAM, NATIONAL )
CONSUMER LAW CENTER, and )
ALLIANCE FOR JUSTICE, for themselves )
and all others similarly situated, )
)
        Plaintiffs, )
)
      v. )         Civil Action No. 16-0745 (PLF)
)
UNITED STATES OF AMERICA, )
)
        Defendant. )
)

ORDER CHANGING SETTLEMENT HEARING LOCATION

      On May 8, 2023, the Court scheduled a hearing (the "Settlement Hearing") to

determine whether to grant final approval to the parties' Class Action Settlement Agreement and

enter judgment in this action, and to decide other remaining issues. Order Granting Plaintiffs'

Revised Motion for Preliminary Approval of Class Settlement [Dkt. No. 153] ¶ 3. The

Settlement Hearing was to be held in the Ceremonial Courtroom (Courtroom 20). Id. In view of

the parties' representations as to the number of attendees they expect at the hearing, that location

has been changed. The Settlement Hearing will be held on October 12, 2023, at 10:00 a.m.

(Eastern Daylight Time) in Courtroom 29 in the William B. Bryant Annex to the United States

District Court for the District of Columbia, 333 Constitution Avenue N.W., Washington, D.C.

20001.

      SO ORDERED.

                                _____
                                PAUL L. FRIEDMAN
                                United States District Judge

DATE: 10/4/23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 16-0745 (PLF) |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## ORDER SETTING SETTLEMENT HEARING PROCEDURES

On May 8, 2023, the Court granted preliminary approval of the parties' Class

Action Settlement Agreement (the "Settlement") in this action. Order Granting Plaintiffs'

Revised Motion for Preliminary Approval of Class Settlement [Dkt. No. 153].[1] The Court

scheduled a hearing (the "Settlement Hearing") to determine whether to grant final approval to

the Settlement and enter judgment, and to decide other remaining issues. Id. ¶ 3. On October 4,

2023, the Court moved the location of the hearing from Courtroom 20, the Ceremonial

Courtroom, to Courtroom 29. Order Changing Settlement Hearing Location [Dkt. No. 161].

The Settlement Hearing is scheduled for October 12, 2023, at 10:00 a.m. (Eastern Daylight

Time) in Courtroom 29 in the William B. Bryant Annex to the United States District Court for

the District of Columbia, 333 Constitution Avenue N.W., Washington, D.C. 20001. It is hereby

---

[1]     The parties are the National Veterans Legal Services Program and the Alliance for
Justice (collectively, the "Class Plaintiffs"), and the United States.

ORDERED that the Settlement Hearing will adhere to the following procedures:

1.  Virtual attendance at or participation in the Settlement Hearing will be permitted only for the parties and for any Class Members that have submitted written statements to the Court in advance of the hearing.  Zoom videoconference information will be made available to those individuals upon request by the Courtroom Deputy Clerk, Tanya Johnson, who can be contacted at Tanya_Johnson@dcd.uscourts.gov.  Due to technology constraints, those participating virtually will not be able to present any exhibits or demonstratives to the Court or view any that are physically displayed in the courtroom during the hearing.  Virtual attendance at the Settlement Hearing will <u>not</u> be permitted for any Class Member that has not submitted a written statement to the Court in advance of the hearing.  Any such Class Members may attend in person or listen to the hearing via the public telephone line: 877-848-7030 (access code 8204797).

2.  During the Settlement Hearing, the following procedures shall apply:

    a.  Opening Statement.  The Class Plaintiffs and the United States will each be given twenty minutes to present opening remarks in support of the Settlement.

    b.  Objections.

        i.  Class Members that have submitted a written statement.  If a Class Member has submitted a written statement and wishes to be heard at the Settlement Hearing, the Class Member shall be allocated ten minutes to make their presentation.

2

      ii.   <u>Class Members that have not submitted a written statement</u>. If a Class Member has not submitted a written statement but wishes to be heard at the Settlement Hearing, the Class Member shall be allocated five minutes to make their presentation.

  c.  Responses to Objections. After all objections have been made by Class Members, the parties shall each have an opportunity to respond to the objections raised at the Settlement Hearing and in the written submissions. The time allotted to the parties for responding to objections will be determined by the Court at the hearing.

  d.  Closing Statement. The Class Plaintiffs and the United States shall each be given twenty minutes to present closing remarks in support of the Settlement.

  e.  Attorney Fees Argument. After closing remarks regarding the Settlement, the Class Plaintiffs and the United States shall each be given fifteen minutes to present their position, and to answer questions from the Court, regarding the amount of attorney fees that should be awarded to class counsel.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 10/4/23

3

Appx0778

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
*Plaintiffs*,

v.

UNITED STATES OF AMERICA,
*Defendant*.

Case No. 16-745-PLF

**PLAINTIFFS' NOTICE OF FILING OF ALL OBJECTIONS RECEIVED TO DATE**

On the eve of the fairness hearing, Objector Eric Alan Isaacson has filed a seven-page "written statement" with several new procedural objections to the final-approval process. Among other things, he complains that documents—including the Court's orders, the plaintiffs' reply and supporting material, and others' objections—were "not served on [him] by the Court or by any party." But the Court's orders and the reply are available on the public docket, are posted (for free) on the PACER Fees Class Action website, and were emailed via CM-ECF to anyone who filed a notice of appearance. To ensure full transparency, this notice attaches all objections of which the settling parties have been made aware, timely or untimely, filed by the following individuals: Aaron Greenspan, Alexander Jiggets, Geoffrey Miller, Don Kozich, and Eric Alan Isaacson. To ensure free access, each objection is also being posted on the PACER Fees Class Action website.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North

1

Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*
*jon@guptawessler.com*

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
*bnarwold@motleyrice.com*

MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
*moliver@motleyrice.com*
*cloper@motleyrice.com*

October 11, 2023

*Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2023, I electronically filed this notice through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Deepak Gupta
Deepak Gupta



**Deepak Gupta <deepak@guptawessler.com>**

---

## Objection to PACER Class Action Settlement

**Aaron Greenspan** <aarong@thinkcomputer.com>                          Thu, Sep 14, 2023 at 12:33 AM
To: DCD_PACERFeesSettlement@dcd.uscourts.gov
Cc: Deepak Gupta <deepak@guptawessler.com>, Brenda Gonzalez Horowitz <brenda.gonzalez.horowitz@usdoj.gov>

**Civil Action No. 16-745-PLF: Objection to Proposed Settlement in National Veterans Legal Services Program, et al. v. United States of America**

To The Parties and the Court:

I hereby object to the class-action settlement on behalf of myself as an individual, Think Computer Corporation, and the now closed Think Computer Foundation (the "Think entities"). I realize that I am a day late (as it is still September 13th here in California where I am writing from). I apologize. I'd point out that the Court and the parties took something on the order of seven years to reach this point in the litigation, and then gave barely any notice to object to the proposed settlement. Then you scheduled your deadline three days **before** the corporate tax deadline of September 15th for those with an extension. Three days after would have been much easier to comply with.

Through my company, I run PlainSite (https://www.plainsite.org). PlainSite hosts over 15 million federal and state legal dockets, as well as various other government materials. Not every document that should be available is—because of the unlawful PACER fee structure, which somehow still persists today even as the courts have acknowledged its unlawfulness and pledged to move away from it at some unspecified date, at this rate will likely outlast my lifetime.

As referenced in ECF No. 158-5 at 3 (paragraph 8), which I only became aware of this evening, I was the plaintiff in one of the only lawsuits—if not the only lawsuit—to ever challenge the PACER fee structure, prior to this one. Generally, my objection to the settlement in this action is that I and the Think entities, which have each amassed significant PACER fees over the years in order to serve the public (see https://www.plainsite.org/about/jointventure.html), should not have had to pay a single penny to the federal government for fees that were unlawfully charged in the first place. Accordingly, all of that money should be refunded in full, and the Administrative Office of the United States Courts should reimburse class counsel's attorney's fees and costs separately from any settlement fund.

I am not naive. I realize that different statutes authorize various types of relief, subject to certain limits, etc. I realize that the Little Tucker Act has a $10,000 statutory limit.

I don't care. Not because I don't care about the rule of law, but because I am incensed.

For years the judiciary has scammed the American public with this obscene scheme, and that is separate and apart from the fact that the judiciary is presently controlled by partisan hacks who wear robes for a living, as recently proven beyond a shadow of a doubt by ProPublica's investigative reporting. See https://www.propublica.org/topics/courts. Put simply, it is clearer than ever that the courts and the Judicial Conference are run by corrupt judges. That's "judges," plural, starting with the Chief Justice. See https://www.nytimes.com/2023/01/31/us/john-roberts-jane-sullivan-roberts.html. To insist (for years) on various legal limitations and restrictions when victims of the judiciary's elaborate scam seek relief (and to be clear, this is not the only or even the largest elaborate scam perpetrated on the public by the courts)—but to have tossed all of that aside as the judiciary carried out the scam for years under the color of law in the first place—is manifestly unjust. Surely, the parties want to move on and counsel would like to proceed onward to more exciting cases. I'm sorry, but none of that matters to me. I want my money—stolen by the courts—back. All of it. And I want the Administrative Office staff and the judges who approved this held accountable, by name, starting with Michel Ishakian.

After more than a decade of observing our justice system through PlainSite, I have lost track of the number of cases where judges, sadly having little to no understanding of modern technology, have made the wrong decision because they were not properly informed and frankly didn't care to be. This case is no different. The settlement here ignores the fundamental fact, which did arise in the plaintiffs' briefing, that the marginal cost of document transmission for PACER is **zero**. By zero, I mean $0.00. Whatever up-front costs CM/ECF and PACER required to develop, those were fully funded ages ago. The E-Government Act of 2002 specifically mandates that the courts cannot charge beyond their marginal cost, and since their marginal cost is zero, that means **they cannot charge**. As I recall, Senator Lieberman even weighed in himself to say so. Yet this went ignored.

I will not belabor this point further, especially since I fear that my objection will not even be considered. Suffice it to say that the plaintiffs are 100% right, the government is 100% wrong, and a settlement that takes $23 million, or any amount,

out of the victims' pool for attorney's fees, when the courts themselves are behind a scam of this magnitude, is completely unjust. PACER, to this day, continues to charge $0.10 per page for error messages. It continues to charge for judicial opinions that have been improperly coded (which is most of them). Any judge who has had anything to do with approving this outrage should be required to pay victims out of their government salaries personally, judicial immunity be damned.

I see what you are all doing, I see what you have done, and I do not approve. I object.

Aaron Greenspan
San Francisco, California



**Aaron Greenspan**
President & CEO
Think Computer Corporation

*telephone* +1 415 670 9350
*fax* +1 415 373 3959
*e-mail* aarong@thinkcomputer.com
*web* http://www.thinkcomputer.com

| | |
|---|---|
| **From:** | ALEXANDER JIGGETTS |
| **To:** | DCD PACER Fees Settlement |
| **Subject:** | Oppose settlement |
| **Date:** | Tuesday, September 26, 2023 11:04:15 PM |

**CAUTION - EXTERNAL:**

I Alexander Jiggetts oppose the settlement for I am the first person to complain about Pacer Fees and I petitioned in the United States District Court for Maryland and with the Administrative office of the courts about overcharging persons for Pacer and it should be with not a fee I should at least get one million for telling what is going on these attorneys who are getting at least $25,000,000 million took over what I was doing and wanted to give me $350 so I told them.not to email me or call me I represent myself in this issue and I did not enter into a client privilege with them so they just want make cash and be in everyone's business.
Please email me about this matter.
With much respect to this court they just want to have access to my 137 cases that I filed and have rights to my cases with not paying for my name and likeness I did business with the United States government when I was going through some rough things I did not do business with these attorneys abd corporations that download the cases and sell them for billions with not asking the persons who filed the cases and name and likeness they use do they want any compensation that is all they want is to sell persons cases that is what they want I have warned companies about selling persons cases and not giving them nothing a cases is mot for profit when someone uses it is to a note when filing a case but these attorneys and business sell persons cases to billionaires while the lower case get nothing.
I oppose the settlement because I need something for what I done.
Also those attorneys assigned to the case are harrassers.
Alexander Jiggetts
Jiggettsalexander@aol.com
410-596-8404
9/26/2023

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Geoffrey Miller**
**216 SE Atlantic Drive**
**Lantana, Florida 33462-1902**
**917-575-5656**
**geoffreypmiller@gmail.com**

August 8, 2023

Honorable Paul L. Friedman
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001
DCD_PACERFeesSettlement@dcd.uscourts.gov

In re: Civil Action No. 16-745-PLF: Objection to Proposed Settlement in National Veterans Legal Services Program, et. al. v. United States of America

Dear Judge Friedman:

I am a member of the class in the above-referenced action (Account ID 1033281). I write to object to the proposed settlement.

I have no problem with the total cash compensation or with the proposed maximum of 20% of the common fund for attorney fees, expenses, representative plaintiff awards and claims administration. I do object, however, to the proposed plan of allocation.

As I understand it, each class member will receive a minimum payment from the net settlement fund equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. The remainder of the fund will be allocated pro rata to class members who paid more than $350 in PACER fees.

This formula for distribution discriminates between two subparts of the class otherwise identically situated: class members who paid $350 or less in PACER fees and class members who paid more than $350 in fees. The former will receive the full amount of the fees; the latter will receive some (presumably significantly lower) percentage of their fees.

This discrimination between larger and smaller claimants cannot be justified on grounds of administrative necessity. In other cases, processing of small claims can be infeasible because of the administrative costs of making small distributions. This is not the case here because the

1

settlement contemplates that small claimants will be paid in full – even if they have only a few dollars or pennies in charges.

Nor can the discrimination be justified on the ground that small claimants are unlikely to file claim forms. As I understand this settlement, claim forms will not be required because the defendant has the necessary information on class members and the amounts of their claims.

The rationale for discriminating between larger and smaller claims seems based, rather, on a wish to favor smaller users or a sense of what is likely to receive a positive reception in the public eye. Neither of these is a valid basis for favoring one set of litigants over another when both are identically situated in all respects other than the size of their claims.

The class action is designed to conserve on litigation costs and provide access to justice for people with small claims. The proposed plan of allocation has nothing to do with these objectives because all class members have received access to justice and a more equal plan of distribution would have no impact on litigation costs.

Plaintiffs' counsel faced a conflict of interest as soon as they began to negotiate a settlement that discriminated between class members based on the size of their claims. Interclass conflicts can be tolerated when there are valid reasons for proceeding – but here it appears that there was no reason to structure the settlement this way other than an intention to distribute the benefits of the settlement on a basis other than legal entitlement. Redistribution of wealth may be admirable from an ethical perspective, but is not a valid reason for the court to approve a settlement that invidiously discriminates between class members otherwise identically situated.

The proposed plan of allocation under Federal Rule 23 is in tension with the Rules Enabling Act, 28 U.S.C. § 2071-2077, because, by providing different treatment to litigants with identical legal claims, it arguably abridges their right to be treated equally before the law.

I do not know the size of the overcharges I have incurred through my use of PACER during the class period, and therefore do not know whether I am in the favored or disfavored part of the class. Even if I fall in the favored category, I believe I have standing to object to the settlement. Rule 23(e)(5)(A) provides that "*any class member* may object to the proposal if it requires court approval under this subdivision (e)." There is no requirement that a class member must be harmed by the provision of a settlement to which the class member objects. If there were such a bar, and if I fall in the favored group, then I request that this objection be treated as that of a friend of the court.

2

In light of the foregoing, I request that this Court consider sending the proposed settlement back to the parties with instructions to work towards a negotiated resolution that does not invidiously discriminate between larger and smaller claimants.

Sincerely,

Geoffrey Miller

Cc: Gupta Wessler PLLC
2001 K Street, N.W.
Suite 850 North
Washington, D.C. 20006
deepak@guptawessler.com

Derek Hammond
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Derek.Hammond@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM , et al

    Plaintiffs

v.

UNITED STATES OF AMERICA

    Defendant(s)

CASE NO. 1:16-cv-00745-PLF
J: Paul L. Friedman

-------------------------------

DON KOZICH, Individually
    Plaintiff-Class Member,
v.
UNITED STATES OF AMERICA
    Defendant(s)

-------------------------------

### PLAINTIFF-CLASS MEMBER DON KOZICH'S
### VERIFIED OBJECTIONS TO SETTLEMENT
### AND MOTION TO APPEAR TELEPHONICALLY OR BY ZOOM

Pursuant to Fed.R.Civ.P. 24 and LCvR 7(j), and 28 USC § 1331 and 1346(a), the

Plaintiff-Class Member Don Kozich submits his Verified Objections to Settlement and

Motion to Appear Telephonically or by ZOOM, and under penalty of perjury, declares

that he has read the Motion, and that the facts stated in it are true, and in support of this

motion states,

### I. KOZICH'S EXHIBITS (Exhibit "____")

For this Verified Motion, Kozich relies on the attached Exhibits.

1

Appx0788

## II. STANDING

The complaint and any pending settlement are limited in scope and appear to address only some but not all of those PACER users who have **paid** excessive PACER user fees but do not address all of those PACER users who have paid excessive PACER fees or those PACER users who have **not** paid or are delinquent in the payment of excessive user fees or have been cut-off from utilizing PACER and their account put into illegal collection, or all.

Kozich is before this court because he is a Class Member but is not listed as a class member by the Defendant because the Defendant with its blinders on purposely never listed Kozich as a class member because the Defendant allegedly could not find where Kozich ever paid PACER fees (Exhibit "D", pg 8). But Kozich paid PACER fees (Exhibit "A"). Kozich believes the Defendant purposely never listed Kozich as a class member that paid excessive PACER fees because doing so would open a Pandora's box and makes the Defendant liable for untold additional millions of dollars in excessive fees that unidentified class members have paid.

Additionally besides paying excessive PACER fees for copy costs, Kozich also paid excessive fees in searching Federal Cases outside of the Southern District of Florida. PACER charged Kozich excessive fees because he was searching cases throughout the country, i.e. Washington, Oregon, California, etc., having to do with federally subsidized Low Income Housing Tax Credit (LIHTC) apartment communities.

2

For the quarter FY 2010 PACER had a Net Profit of $26,611,517 (Exhibit E) and for the period 4/21/10-5/31/18 (a total of 37 quarters) had a Net Profit of $984,626.129 (37 X $26,611,517). The Settlement of $125,000,000 is a mere drop in the bucket compared to PACER's $981,626,120 net profit for charging excessive user fees. Moreover, with the $125,000,000 Settlement the Defendant just received a slap on the wrist. The compound interest alone on the $984,626,129 in net profits received by PACER for charging excessive user fees that the Defendant earned far exceed the $125,000,000 settlement.

As it now stands the $125,000,000 Settlement is one-sided. It is refunding only those persons who paid more than $350 in excessive PACER fees but is not paying those persons who paid less than $350 in excessive PACER fees. The settlement only benefits the large corporations, large law offices and large non-profits that spent large amounts paying excessive PACER fees but does nothing for the small or medium size corporation, law firm or non-profit. The old bur still true adage comes into play, "Large Corporations control the world." i.e. Microsoft, Monsanto, Apple, Amazon, eBay, etc. Kozich has not seen an accounting of how much money the Defendant should refund to persons who paid less than $350 in excessive PACER fees or for that matter what is the time frame or quarters that the Defendant has been charging excessive PACER fees. Kozich is certain the time frame far exceeds 37 quarters.

The Settlement should be much higher to include those who paid less than $350 in excessive Pacer fees and to act as a deterrent and the Defendant should be paying

3

Appx0790

interest and penalties for knowingly charging excessive fees which monies should go to the users. Otherwise the Defendant will knowingly just continue to charge excessive user fees.

Therefore, Kozich has standing to object to the settlement as Plaintiff and a Class Member in this case.

### III. RELIEF SOUGHT

Kozich is before this court as a Limited Class Member and Amicus:

a. As a class member because he utilized PACER and paid excessive PACER user fees (Exhibit "A").

b. As a limited class member because PACER closed Kozich's account and put it into collection because he had an outstanding balance of $354.60 plus $94.26 in illegal collection fees for a total of $448.86 (Exhibit "B") owed to PACER resulting from PACER overcharging excessive fees, and not allowing free looks and copy and paste to pro se persons while allowing attorneys free looks and free copy and paste.

**A. Pursuant to LCvR 7(o):**

1. **The Nature of Kozich's interest:** The complaint and any pending settlement are limited in scope and appear to **address only some but not all** of those PACER users who paid PACER excessive user fees but do not address **all** of those PACER users who have paid excessive PACER user fees or have **not** paid or are delinquent in the payment of excessive user

4

Appx0791

fees or have been cut-off from utilizing PACER and their account put into collection, or all.

2. **Reason(s) Why Kozich's And Similarly Situated Persons' Position are Not Adequately Represented by a Party:** The complaint and any pending settlement are limited in scope and appear to **address only some but not all** of those PACER users who paid excessive PACER user fees and do not address those PACER users who have **not** paid or are delinquent in the payment of excessive PACER user fees or have been cut-off from utilizing PACER and their account put into collection, or all

3. **Reason(s) Why the Matters Asserted Are Relevant to the Disposition of the Case:** The case cannot be fully and fairly adjudicated without including those PACER users who have paid and those who have **not** paid or are delinquent in the payment of excessive user fees or have been cut-off from utilizing PACER and their account put into collection, or all

4. **Statement of Position of Each Party As to the Amicus:** All parties are opposed to the Amicus. The Plaintiffs because it requires the Plaintiffs to open the class to PACER users who have paid and those who have **not** paid or are delinquent in the payment of excessive user fees or have been cut-off from utilizing PACER and their account put into collection, or all. The Defendant naturally because opening the class to include users who have paid and those who have **not** paid the excessive PACER user fees opens

the Defendant to higher damages.

## B. Motion to Appear Telephonically or by ZOOM:

1. Kozich is before this court pro se and IFP, and resides in Fort Lauderdale, FL.

2. Kozich requests telephonic appearance or ZOOM to explain, clarify and answer any questions that the court may have regarding the facts and circumstance surrounding PACER fees.

## C. Motion to Deem date of Service to be Date of Filing:

Because he does not have access to ECF, Kozich also requests that with all of his filings, that the court deem the date of service to be the date of filling.

## IV. ARGUMENT

The complaint and any pending settlement are limited in scope and appear to address only some but not all of those PACER users who have **paid** excessive PACER user fees but do not address all of those PACER users who have paid excessive PACER fees or those PACER users who have **not** paid or are delinquent in the payment of excessive user fees or have been cut-off from utilizing PACER and their account put into illegal collection, or all.

For the quarter FY 2010 PACER had a Net Profit of $26,611,517 (Exhibit E) and for the period 4/21/10-5/31/18 (a total of 37 quarters) had a Net Profit of $984,626.129 (37 X $26,611,517). The Settlement of $125,000,000 is a mere drop in the bucket compared to PACER's $981,626,120 net profit for charging excessive user

6

fees. Moreover, with the $125,000,000 Settlement the Defendant just received a slap on the wrist. The compound interest alone on the $984,626,129 in net profits received by PACER for charging excessive user fees that the Defendant earned far exceed the $125,000,000 settlement.

As it now stands the $125,000,000 Settlement is one-sided. It is refunding only those persons who paid more than $350 in excessive PACER fees but is not paying those persons who paid less than $350 in excessive PACER fees. The settlement only benefits the large corporations, large law offices and large non-profits that spent large amounts paying excessive PACER fees but does nothing for the small or medium size corporation, law firm or non-profit. The old bur still true adage comes into play, "Large Corporations control the world." i.e. Microsoft, Monsanto, Apple, Amazon, eBay, etc. Kozich has not seen an accounting of how much money the Defendant should refund to persons who paid less than $350 in excessive PACER fees or for that matter what is the time frame or quarters that the Defendant has been charging excessive PACER fees. Kozich is certain that the time frame for PACER charging excessive fees far exceeds 37 quarters.

The Settlement should be much higher to include those who paid less than $350 in PACER excessive fees and to act as a deterrent and the Defendant should be paying interest and penalties for knowingly charging excessive fees which monies should go to the users. Otherwise the Defendant will knowingly just continue to charge excessive user fees.

7

Appx0794

Kozich also objects to the settlement because the Defendant has purposely not included as a class member or disclosed all persons, such as Kozich, who paid excessive PACER fees so as to evade reimbursing millions of dollars in excessive PACER fees.

Motley Rice LLC relied on the Defendant to identify Class Members which is like having a fox watch the henhouse. Naturally the Defendant is going to minimize its liability and provide a list of Class Members that will produce the least amount of liability.

Kozich requests the Court deny or set aside the settlement, reopen the case and require that the Defendant include as a class member and disclose all persons, including Kozich, who paid excessive PACER fees and disclose the total amount that PACER charged in excessive fees and the time frame or quarters that it charged excessive fees. .

## PRESERVATION OF CLAIMS, DEFENSES, COUNTERCLAIMS AND RESERVATION OF RIGHTS

With the filing of this Motion, Kozich does not waive any claims, defenses or counterclaims which may be available to him and reserves all rights and privileges available to him.

## V. CONCLUSION

**WHEREFORE**, Kozich respectfully requests an order of court,

1. Granting his Verified Objection to the Settlement, deny or set aside the settlement, reopen the case and require that the Defendant disclose all persons, including Kozich, who paid PACER excessive fees and disclose the total amount it charged in excessive fees and the time frame or quarters that PACER charged excessive fees.

8

Appx0795

**2.** That the court deem the date of service of Kozich's papers to be the date of

filling.

**3.** That the court grant Kozich's Motion to Appear telephonically or by ZOOM.

4. Or such further and other relief deemed just and equitable.

### VERIFICATION DECLARATION

I DECLARE under penalty of perjury that the statements made in this motion are true and correct to the best of my knowledge.

/S/ Don Kozich
Don Kozich, Plaintiff-Class Member

I HEREBY CERTIFY that the foregoing was filed with the court on 10/6/23.

/S/ Don Kozich
Don Kozich, Plaintiff-Class Member

Case Administrator
202.354.3174
202.354.3190

dcd_intake@dcd.uscourts.gov

PO Box 2032
Fort Lauderdale, FL 33303
954.709.0537
dtkctr@gmail.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel or parties of record in accordance with the Service List attached.

/S/ Don Kozich
Don Kozich, Plaintiff-Class Member



David R. Stone
Chief, PACER Support Branch

(800) 676-6856
FAX: (210) 301-6441

**PACER SERVICE CENTER**
**P.O. Box 780549**
**San Antonio, TX 78278-0549**

01/25/2023

To: Don Kozich
Don Kozich
Pob 2032
Ft. Lauderdale, FL 33303

Account number: 2792766

Subject:     Receipt of Payment

This letter is to confirm that payment in the amount of _____ $38.80 _____ was received at the
PACER Service Center on _____ 08/08/2009 _____ and applied to account _____ 2792766 _____.

Thank you for making a payment on this account[1]. If you have any questions, please call the
PACER Service Center at (800) 676-6856 and a representative will assist you.

Thank you.

PACER Service Center

_____

[1]Per the *Guide to Judiciary Policies and Procedures* Chapter VII Part C.Para 2.1.8; "...the
receipt of an instrument other than cash does not itself discharge the payer's debt or obligation to
pay. Only when the instrument has been cleared by the depositary is payment actually complete.
Therefore, checks or instruments which are rejected or returned unpaid by the depository will
require certain action by the court." Additional fees may also apply.





David R. Stone
Chief, PACER Support Branch

(800) 676-6856
FAX: (210) 301-6441

**PACER SERVICE CENTER**
**P.O. Box 780549**
**San Antonio, TX 78278-0549**

01/25/2023

To: Don Kozich
Don Kozich
Pob 2032
Ft. Lauderdale, FL 33303

Account number: 2792766

Subject:    Receipt of Payment

This letter is to confirm that payment in the amount of _____ $13.36 _____ was received at the
PACER Service Center on _____ 10/29/2009 _____ and applied to account _____ 2792766 _____ .

Thank you for making a payment on this account . If you have any questions, please call the
PACER Service Center at (800) 676-6856 and a representative will assist you.

Thank you,

PACER Service Center

[1] Per the *Guide to Judiciary Policies and Procedures* Chapter VII Part C Para 2.1.8; "...the
receipt of an instrument other than cash does not itself discharge the payer's debt or obligation to
pay. Only when the instrument has been cleared by the depositary is payment actually complete.
Therefore, checks or instruments which are rejected or returned unpaid by the depositary will
require certain action by the court." Additional fees may also apply.

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY

Appx0798





David R. Stone
Chief, PACER Support Branch

(800) 676-6856
FAX: (210) 301-6441

### PACER SERVICE CENTER
P.O. Box 780549
San Antonio, TX 78278-0549

01/25/2023

To: Don Kozich
Don Kozich
Pob 2032
Ft. Lauderdale, FL 33303

Account number: 2792766

Subject:     Receipt of Payment

This letter is to confirm that payment in the amount of _____ $21.92 _____ was received at the
PACER Service Center on _____ 02/04/2010 _____ and applied to account _____ 2792766

Thank you for making a payment on this account. If you have any questions, please call the
PACER Service Center at (800) 676-6856 and a representative will assist you.

Thank you.

PACER Service Center

---

[1] Per the *Guide to Judiciary Policies and Procedures* Chapter VII Part C Para 2.1.8; "... the
receipt of an instrument other than cash does not itself discharge the payer's debt or obligation to
pay. Only when the instrument has been cleared by the depositary is payment actually complete.
Therefore, checks or instruments which are rejected or returned unpaid by the depository will
require certain action by the court." Additional fees may also apply.

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY





# INVOICE

**Public Access to Court Electronic Records**

Invoice Date: 10/07/2015

Usage From: 07/01/2015    to: 09/30/2015

## Account Summary

| | |
|---|---|
| **Pages:** | 1,803 |
| Rate: | $0.10 |
| Subtotal: | $180.30 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $180.30 |
| **Previous Balance:** | $174.30 |
| Current Balance: | $354.60 |

**Total Amount Due:**  $354.60

| | |
|---|---|
| Account #: | 2792766 |
| **Invoice #:** | 2792766-Q32015 |
| **Due Date:** | 11/09/2015 |
| **Amount Due:** | $354.60 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

### NextGen CM/ECF

In August, the Kansas District and Alaska Bankruptcy courts implemented the next generation (NextGen) CM/ECF system. Throughout fall 2015, several other courts plan to convert to the new system. monitor your court's website for additional information. To learn more about NextGen CM/ECF, and how it may affect you and your firm/office, visit the NextGen information page at pacer.gov/nextgen.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 2792766 | 11/09/2015 | $354.60 |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

*Visit pacer.gov for address changes.*

Don Kozich
Don Kozich
619 No. Andrews Avenue, #408
Ft. Lauderdale, FL 33311

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364



Appx0800

 Gmail

don kozich <dtkctr@gmail.com>

## PACER Fees Class Action
2 messages

**Rublee, Laura** <lrublee@motleyrice.com>
To: "dtkctr@gmail.com" <dtkctr@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Mon, Sep 11, 2023 at 3:37 PM

Mr. Kozich,

Thank you for speaking with me today. I understand that you have not received a notice of the settlement of this matter. If you would like the claims administrator to check to see if you are a member of the class, please send your PACER account number and the associated email address to pacerlitigation@motleyrice.com. It would also be useful to include the mailing addresses, both current and present.

Information about the settlement, as well as a link to the email address I just provided, can be found at https://www.pacerfeesclassaction.com/Home.aspx. As I explained, class members do not have to file a claim. If the Court approves the proposed Settlement and Plan of Allocation, checks will be automatically sent to class members based on PACER billing records of the Administrative Office of the United States Courts.

As we discussed, we cannot help you with your individual complaint that PACER cut off access to your account for non-payment or with reopening your PACER account. The class action focused only on the excessiveness of the fees, which is the difference in the amount of the fees collected and the actual cost of running the PACER system, that affected all class members, i.e., those who paid PACER fees during the class period.

Regards,

Laura Rublee

 MotleyRice

**Laura Rublee** Attorney at Law

28 Bridgeside Blvd . Mt. Pleasant, SC 29464

o. 843.216.9192

lrublee@motleyrice.com

Appx0801



Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies--electronic, paper or otherwise--which you may have of this communication.

**don kozich** <dtkctr@gmail.com>
To: "Rublee, Laura" <lrublee@motleyrice.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Mon, Sep 11, 2023 at 9:50 PM

---------- Forwarded message ----------

From: **Rublee, Laura** <lrublee@motleyrice.com>
Date: Mon, Sep 11, 2023 at 3:37 PM
Subject: PACER Fees Class Action
To: dtkctr@gmail.com <dtkctr@gmail.com>

Mr. Kozich,

Thank you for speaking with me today. I understand that you have not received a notice of the settlement of this matter. If you would like the claims administrator to check to see if you are a member of the class, please send your PACER account number and the associated email address to pacerlitigation@motleyrice.com. It would also be useful to include the mailing addresses, both current and present.

Information about the settlement, as well as a link to the email address I just provided, can be found at https://www.pacerfeesclassaction.com/Home.aspx. As I explained, class members do not have to file a claim. If the Court approves the proposed Settlement and Plan of Allocation, checks will be automatically sent to class members based on PACER billing records of the Administrative Office of the United States Courts.

As we discussed, we cannot help you with your individual complaint that PACER cut off access to your account for non-payment or with reopening your PACER account. The class action focused only on the excessiveness of the fees, which is the difference in the amount of the fees collected and the actual cost of running the PACER system, that affected all class members, i.e., those who paid PACER fees during the class period.

Regards,

Laura Rublee



Appx0802

**Laura Rublee** Attorney at Law

28 Bridgeside Blvd., Mt. Pleasant, SC 29464

o. 843.216.9192

lrublee@motleyrice.com

Please see attached for my PACER billing.
My current mail address is: POB 2032, Fort Lauderdale, FL 33303
My current residence address is: 4537 Poinciana St., Fort Lauderdale, FL 33308
My phine number is: 9547090537
My email address is: dtkctr@gmail.com
I appreciate your prompt attention to this matter.
Thanks
Don Kozich

[Quoted text hidden]

3 attachments


image001.png
5K


image001.png
5K

230911 PACER FEES $354.60 TO MOTLEY-RICE.pdf
215K



don kozich <dtkctr@gmail.com>

## PACER ACCOUNT

12 messages

**don kozich <dtkctr@gmail.com>**
To: pacerlitigation@motleyrice.com

Mon, Sep 11, 2023 at 9:55 PM

Thank you for speaking with me today. I understand that you have not received a notice of the settlement of this matter. If you would like the claims administrator to check to see if you are a member of the class, please send your PACER account number and the associated email address to pacerlitigation@motleyrice.com. It would also be useful to include the mailing addresses, both current and present.

Please see attached for my PACER billing.

My current mail address is: POB 2032, Fort Lauderdale, FL 33303

My current residence address is: 4537 Poinciana St., Fort Lauderdale, FL 33308

My phone number is: 9547090537

My email address is: dtkctr@gmail.com

I appreciate your prompt attention to this matter.

Thanks

Don Kozich

📄 **230911 PACER FEES $354.60 TO MOTLEY-RICE.pdf**
215K

**Rublee, Laura <lrublee@motleyrice.com>**
To: don kozich <dtkctr@gmail.com>, PACER Litigation <pacerlitigation@motleyrice.com>

Thu, Sep 14, 2023 at 9:55 AM

Dear Mr. Kozich,

I received your voicemail this morning and am following up. I had forwarded your information to the claims administrator. They searched by name, address and account number, but you are not showing up in the data as a member of the class.

Please let me know if you have any additional questions.

Regards,

Laura Rublee

**Laura Rublee** Attorney at Law

28 Bridgeside Blvd., Mt. Pleasant, SC 29464



o. 843.216.9192

lrublee@motleyrice.com

**From:** don kozich <dtkctr@gmail.com>
**Sent:** Monday, September 11, 2023 9:56 PM
**To:** PACER Litigation <pacerlitigation@motleyrice.com>
**Subject:** PACER ACCOUNT

CAUTION:EXTERNAL

[Quoted text hidden]

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies—electronic, paper or otherwise—which you may have of this communication.

**don kozich** <dtkctr@gmail.com>                                      Thu, Sep 14, 2023 at 10:14 AM
To: "Rublee, Laura" <lrublee@motleyrice.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Laura,
Why am I not showing up as a member of the class?
I paid PACER previous billings.
I want to submit a claim. How do I accomplish submitting a claim?
Please let me know what you find out.
Thanks
Don Kozich
[Quoted text hidden]



2 attachments

 image001.png
5K

 image001.png
5K

---

**Rublee, Laura** <lrublee@motleyrice.com>
To: don kozich <dtkctr@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Fri, Sep 15, 2023 at 5:02 PM

Dear Mr. Kozich,

I wanted to let you know that we are following up with the administrator and we will get back to you as soon as possible.

Regards,

Laura



**Laura Rublee** Attorney at Law

28 Bridgeside Blvd., Mt. Pleasant, SC 29464

o. 843.216.9192

lrublee@motleyrice.com

**From:** don kozich <dtkctr@gmail.com>
**Sent:** Thursday, September 14, 2023 10:15 AM
**To:** Rublee, Laura <lrublee@motleyrice.com>
**Cc:** PACER Litigation <pacerlitigation@motleyrice.com>
**Subject:** Re: PACER ACCOUNT

CAUTION:EXTERNAL

[Quoted text hidden]
[Quoted text hidden]

---

**Rublee, Laura** <lrublee@motleyrice.com>                    Tue, Sep 19, 2023 at 11:35 AM
To: don kozich <dtkctr@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Dear Mr. Zorich,

We are continuing to look into this matter, but hope that you can provide us with some additional information about your PACER account history. Can you call me at your earliest convenience? My direct number is 843-216-9192.

Thank you.

[Quoted text hidden]
[Quoted text hidden]

---

**Rublee, Laura** <lrublee@motleyrice.com>                    Tue, Sep 19, 2023 at 11:50 AM
To: don kozich <dtkctr@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Mr. Kozich, I am so sorry that I misspelled your name! In any event, I would appreciate a call.

[Quoted text hidden]
[Quoted text hidden]

---

**don kozich** <dtkctr@gmail.com>                    Fri, Sep 22, 2023 at 7:04 AM
To: "Rublee, Laura" <lrublee@motleyrice.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Laura,
What is the status of your checking on my account and payment with PACER?
Thanks
Don Kozich
[Quoted text hidden]

E-0
4/12

4 attachments



MotleyRice.uc
ATTORNEYS AT LAW

image001.png
5K

MotleyRice.uc
ATTORNEYS AT LAW

image001.png
5K



MotleyRice.uc
ATTORNEYS AT LAW

image001.png
5K



MotleyRice.uc
ATTORNEYS AT LAW

image001.png
5K

---

**Rublee, Laura** <lrublee@motleyrice.com>                                     Fri, Sep 22, 2023 at 8:38 AM
To: don kozich <dtkcir@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Dear Mr. Kozich,

We are still looking into your account and why you are not included in the class member data, but we must work with the government to get answers to your questions and, unfortunately, getting answers will take some time.

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

> Quoted text hidden]
> Quoted text hidden]
> [Quoted text hidden]

> > [Quoted text hidden]

> > **Laura Rublee** Attorney at Law

> > 28 Bridgeside Blvd., Mt. Pleasant, SC 29464

o. 843.

lrublee@motleyrice.com

**From:** don kozich <dtkctr@gmail.com>
**Sent:** Monday, September 11, 2023 9:56 PM
**To:** PACER Litigation <pacerlitigation@motleyrice.com>
**Subject:** PACER ACCOUNT

CAUTION:EXTERNAL

Thank you for speaking with me today. I understand that you have not received a notice of the settlement of this matter. If you would like the claims administrator to check to see if you are a member of the class, please send your PACER account number and the associated email

address to pacerlitigation@motleyrice.com. It would also be useful to include the mailing addresses, both current and present.

Please see attached for my PACER billing.
My current mail address is: POB 2032, Fort Lauderdale, FL 33303
My current residence address is: 4537 Poinciana St., Fort Lauderdale, FL 33308
My phone number is: 9547090537
My email address is: dtkctr@gmail.com
I appreciate your prompt attention to this matter.
Thanks
Don Kozich

E.
6/12

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies—electronic, paper or otherwise—which you may have of this communication.

Continental & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies—electronic, paper or otherwise—which you may have of this communication.

[Quoted text hidden]

**don kozich** <dtkctr@gmail.com>                                    Thu, Sep 28, 2023 at 8:10 AM
To: "Rublee, Laura" <lrublee@motleyrice.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Laura,
What is the status of your checking on my account and payment with PACER?
Do I need to file my objection to the settlement?
Thanks
Don Kozich

[Quoted text hidden]

2 attachments


image001.png
5K


image001.png
5K

**Rublee, Laura** <lrublee@motleyrice.com>                          Thu, Sep 28, 2023 at 9:15 AM
To: don kozich <dtkctr@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Dear Mr. Kozich,



Appx0810

We have heard from the government after asking about your account. We were concerned because you had received notice of the class action in 2017, but you were not in the 2023 class member data. The data provided by the government used for sending notices in 2017 had been pulled from the government's billing records using "billed amount" as a parameter. Not all those who received a notice of this class action in 2017 had actually paid PACER fees; they had just been billed for PACER fees. The 2023 data, on the other hand, were pulled from the billing records using "paid amount" as a parameter, so only those who had paid PACER fees were included in that data. As you are aware, class members are those who actually paid PACER fees during the class period. The claims administrator could not locate you in the 2023 data because you had not actually paid PACER fees during the class period. This also explains why you had not received notice of the settlement.

Please let me know if you have any questions.

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

**Laura Rublee** Attorney at Law

28 Bridgeside Blvd., Mt. Pleasant, SC 29464

o. 843.216.9192

lrublee@motleyrice.com

**From:** Rublee, Laura <lrublee@motleyrice.com>
**Sent:** Tuesday, September 19, 2023 11:36 AM
**To:** don kozich <dtkctr@gmail.com>
**Cc:** PACER Litigation <pacerlitigation@motleyrice.com>
**Subject:** RE: PACER ACCOUNT



Appx0811

Dear Mr. Zorich,

We are continuing to look into this matter, but hope that you can provide us with some additional information about your PACER account history. Can you call me at your earliest convenience? My direct number is 843-216-9192.

Thank you.

Laura

**Laura Rublee** Attorney at Law

28 Bridgeside Blvd., Mt. Pleasant, SC 29464

o. 843.216.9192

lrublee@motleyrice.com

**From:** Rublee, Laura <lrublee@motleyrice.com>
**Sent:** Friday, September 15, 2023 5:02 PM
**To:** don kozich <dtkctr@gmail.com>
**Cc:** PACER Litigation <pacerlitigation@motleyrice.com>
**Subject:** RE: PACER ACCOUNT

Dear Mr. Kozich,

I wanted to let you know that we are following up with the administrator and we will get back to you as soon as possible.

Regards,

Laura



Appx0812

**Laura Rublee** Attorney at Law

[Quoted text hidden]

o. 843.216.9192

lrublee@motleyrice.com

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

---

**don kozich** <dtkctr@gmail.com>
To: "Rublee, Laura" <lrublee@motleyrice.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Thu, Sep 28, 2023 at 10:04 AM

Laura
The government is wrong, I paid PACER fees.
Therefore I will file my objections to the settlement.
Please provide the name and address of the court to where I file my objections and the
email address of all persons to be served?
Thanks
Don Kozich
[Quoted text hidden]

---

2 attachments



image001.png
5K

image001.png
5K



Appx0813



**MotleyRice** LLC

ATTORNEYS AT LAW

---

**Rublee, Laura** <lrublee@motleyrice.com>
To: don kozich <dtkctr@gmail.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>

Thu, Sep 28, 2023 at 10:24 AM

Mr. Kozich,

Please see the attached notice of the settlement which contains the information you have requested.

Laura



**Laura Rublee** Attorney at Law

28 Bridgeside Blvd., Mt. Pleasant, SC 29464

o. 843.216.9192

lrublee@motleyrice.com

---

From: don kozich <dtkctr@gmail.com>
Sent: Thursday, September 28, 2023 10:06 AM
To: Rublee, Laura <lrublee@motleyrice.com>
Cc: PACER Litigation <pacerlitigation@motleyrice.com>
Subject: Re: PACER ACCOUNT

Appx0814

CAUTION:EXTERNAL

# Laura

[Quoted text hidden]


[Quoted text hidden]


[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]


[Quoted text hidden]

**Laura Rublee**  Attorney at Law

[Quoted text hidden]

o. 843.216.9192

lrublee@motleyrice.com


[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

 **PACER Fees Class Action Notice.pdf**
191K



NATIONAL VETERANS LEGAL SERVICES PROGRAM et al v. UNITED STATES OF AMERICA
Case 1:16-cv-00745-ESH Document 52-13 Filed 06/28/17 Page 2 of 20
Case 1:24-cv-00745-PLF Document 15-2166 Page 2761 of Filed 07/16/2024 30
Doc. 89 Att. 1

Public Access and Records Management Division

AVAILABLE RESOURCES:

Summary of Resources QTRLY Rprt

FY 2010

Actuals

YB

| | | | |
|---|---|---|---:|
| 1 | PACER Fee Revenue - Prior Year Carry Forward (OXEEPAC) | $ | 34,381,874 |
| 2 | PACER Fee Revenue - Current Year Receipts (OXEEPAC) | $ | 102,511,199 |
| 3 | Print Fee Revenue - Prior Year Carry Forward (OXEEPAP) | $ | 516,534 |
| 4 | Print Fee Revenue - Current Year Receipts (OXEEPAP) | $ | 187,118 |
| 5 | **Total Available Resources** | $ | 137,596,725 |
| 6 | **PROGRAM REQUIREMENTS:** | | |
| 7 | **Public Access Services and Applications** | | |
| 8 | EPA Program (OXEEPAX) | $ | 18,768,552 |
| 9 | EPA Technology Infrastructure & Applications (OXEPTAX) | $ | - |
| 10 | EPA Replication (OXEPARX) | $ | - |
| 11 | **Public Access Services and Applications** | $ | 18,768,552 |
| 12 | **Case Management/Electronic Case Files System** | | |
| 13 | Development and Implementation (OXEECFP) | $ | 3,695,078 |
| 14 | Operations and Maintenance (OXEECFO) | $ | 15,536,212 |
| 15 | CM/ECF Futures (OXECMFD) | $ | 3,211,403 |
| 16 | Appellete Operational Forum (OXEAOPX)changed from OXEACAX | $ | 144,749 |
| 17 | District Operational Forum (OXEDCAX) | $ | 674,729 |
| 18 | Bankruptcy Operational Forum (OXEBCAX) | $ | 492,912 |
| 19 | **Subtotal, Case Management/Electronic Case Files System** | $ | 23,755,083 |
| 20 | **Electronic Bankruptcy Noticing:** | | |
| 21 | Electronic Bankruptcy Noticing (OXEBNCO) | $ | 9,662,400 |
| 22 | **Subtotal, Electronic Bankruptcy Noticing** | $ | 9,662,400 |
| 23 | **Telecommunications (PACER-Net & DCN)** | | |
| 24 | PACER-Net (OXENETV) | $ | 10,337,076 |
| 25 | DCN and Security Services (OXENETV) | $ | 13,847,748 |
| 26 | PACER-Net & DCN (OXDPANV) | $ | - |

Dockets.Justia.com

| 27 | Security Services (OXDSECV) | $ | – |
|---|---|---|---|
| 28 | Subtotal, Telecommunications (PACER-Net & DCN) | $ | 24,184,824 |
| 29 | **Court Allotments** | | |
| 30 | Court Staffing Additives(OXEEPAA) | $ | 228,373 |
| 31 | Court Allotments (OXEEPAA) [incl. in program areas prior to FY 09] | $ | 1,291,335 |
| 32 | CM/ECF Court Allotments (OXEECFA) | $ | 7,605,585 |
| 33 | Courts/AO Exchange Program (OXEXCEX) | $ | 303,527 |
| 34 | **Subtotal, Court Allotments** | $ | 9,428,820 |
| 35 | **Total Program Requirements** | $ | 85,799,679 |
| 36 | *Congressional Priorities:* | | |
| 37 | **Victim Notification (Violent Crime Control Act)** | | |
| 38 | Violent Crime Control Act Notification (OXJVCCD & OXJVCCO) | $ | 332,876 |
| 39 | **Subtotal, Victim Notification (Violent Crime Control Act)** | $ | 332,876 |
| 40 | **Web-based Juror Services** | | |
| 41 | Web Based E-Juror Services O&M (OXEJMEO) | $ | – |
| 42 | **Subtotal, Web-based Juror Services** | $ | – |
| 43 | **Courtroom Technology (OXHCRTO-3000)** | | |
| 44 | Courtroom Technology (OXHCRTO-3000) | $ | 24,731,665 |
| 45 | **Subtotal, Courtroom Technology Program** | $ | 24,731,665 |
| 46 | **State of Mississippi (OXEMSPX)** | | |
| 47 | State of Mississippi (OXEMSPX) | $ | 120,988 |
| 48 | **Subtotal, Mississippi State Courts** | $ | 120,988 |
| 49 | **Total Congressional Priorities** | $ | 25,185,529 |
| 50 | **Total Program & Congressional Priorities** | $ | 110,985,208 |
| 51 | **Total EPA Carry Forward (Revenue less Disbursement)** | $ | (26,611,517) |
| 52 | PACER FEE (OXEEPAC) Carry Forward | $ | 26,051,473 |
| 53 | PRINT FEE (OXEEPAP) Carry Forward | $ | – |
| 54 | **Total EPA Carry Forward** | $ | 26,051,473 |
| 55 | Total Print Fee Revenue | $ | 703,652 |
| 56 | Disbursed in (OXEEPAA) Allotments | $ | 143,608 |
| 57 | PRINT FEE (OXEEPAP) Carry Forward | $ | 560,044 |

Ex E
2/2

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>                      Defendant. | Civil No. 16-745-PLF<br><br>OBJECTION OF ERIC ALAN ISAACSON TO PROPOSED SETTLEMENT IN *NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA* |

## OBJECTION OF ERIC ALAN ISAACSON TO PROPOSED SETTLEMENT IN *NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA*

As set forth in his accompanying declaration, Eric Alan Isaacson is a Class Member who would be bound by the Proposed Settlement of this matter. As set forth in his declaration, Isaacson opened his own PACER Account (No. 4166698) in March of 2016. He has paid quarterly PACER bills ever since. Isaacson's class-period PACER billings totaled $3,823.50. He has received reimbursement for only $171.80 of that amount. Thus, Isaacson's unreimbursed Class Period PACER expenditures come to $3,651.70. Isaacson expects no further reimbursements for those Class Period PACER charges.

For reasons set forth below, Isaacson respectfully objects to the Proposed Settlement and to the proposed attorney's fees and incentive awards.

## I.        INTRODUCTION

Rule 23(e)(2) permits the District Court to approve the Proposed Settlement "only on finding that it is fair, reasonable, and adequate after considering whether," among other things, "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment." Fed.R.Civ.P. 23(e)(2)(C). The Court also must consider whether "the proposal treats class members equitably relative to each other." Fed.R.Civ.P. 23(e)(2)(D).

Here the Settlement is objectionable because it treats Class Members inequitably, allocating far too much to a pro rata distribution on the basis of institutional PACER users and law firms whose Class Period PACER expenditures were reimbursed by their clients, from class-action settlement funds. *See infra* at 4-9. It also is inequitable because it allocates $10,000 apiece to the Named Plaintiffs as special bonuses in this, a Little Tucker Act case in which the Court's jurisdiction is limited to claims for $10,000 or less. *See* 28 U.S.C. §1346(a)(2). The special payments are, moreover, prohibited by decisions of the Supreme Court, sitting in equity, which hold that the equitable common-fund doctrine permits representative plaintiffs to recover their reasonable litigation expenses from a common-fund recovery, but which flatly prohibit any payment compensating litigants for their service as class representatives.

"Since the decisions in *Trustees v. Greenough,* 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v.* Pettus, 113 U.S. 116 (1885), [the Supreme] Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). But any additional payment to compensate representative plaintiffs for their own "personal services" on behalf of a class is both "decidedly objectionable" and "illegally made." *Greenough,* 105 U.S. at 537-38. A representative plaintiff's "claim to be compensated, out of the fund ... for his personal services" the Supreme Court "rejected as

unsupported by reason or authority." *Pettus,* 113 U.S. at 122. "Supreme Court precedent prohibits incentive awards."[1] *See infra* at 14-17.

Even more problematic, the Settlement allocates far too much to Class Counsel as attorney's fees. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. ... The result is what matters." *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983). But here Class Counsel have achieved a remarkably mediocre result. "According to class counsel, the absolute maximum possible recoverable damages here following the Federal Circuit's decision were around $500 million." DE158-4¶20 (Fitzpatrick decl.). Their fee expert, Brian Fitzpatrick, concludes that "the class is recovering 25% of what they might have received at trial had everything gone their way." DE158-4:13¶20 (Fitzpatrick decl.). That is exactly what large-stakes class actions can be expected to settle for without regard to the merits of the underlying claims. *See* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan. L.Rev. 497, 500 (1991)(finding that securities class actions "settled at an apparent 'going rate' of approximately one quarter of the potential damages"). It is, in the end, a run-of-the-mill settlement that does not justify the award of attorney's fees that Class Counsel seeks. It appears likely, quite frankly, that Class Counsel have sacrificed the Class's interests in order to obtain clearly extravagant attorney's fees for themselves of nearly four times their claimed lodestar—which lodestar is itself inadequately documented and unsupported. Their claimed billing rates far exceed those that their own expert has found should prevail in complex federal cases like this. *See infra* at 9-14.

---

[1] *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1255 (11th Cir.2020), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022); *accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247, 1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("such service awards are foreclosed by Supreme Court precedent"); *cf. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* 62 F.4th 704, 721 (2d Cir.2023)("Service awards are likely impermissible under Supreme Court precedent.").

## II.   THE SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE

Named Plaintiffs have not demonstrated by a preponderance of the evidence that Rule 23's requirements are satisfied. First and foremost, they have failed to demonstrate that the Proposed Settlement is fair, reasonable, and adequate as required by Fed.R.Civ.P. 23(e)(2). They have not shown that relief provided for the class is adequate, taking into account the method of distributing relief to the class, and the request for Class Counsel to be compensated at nearly four times their reasonable hourly rates, Fed.R.Civ.P. 23(e)(2)(C)(ii), (iii), and they certainly have not shown that the proposal treats class members equitably relative to one another. Fed.R.Civ.P. 23(e)(D).

### A.   The Settlement Allocates Far Too Much Too Large PACER Users, Including Institutional Users Such as the Named Plaintiffs, Large Law Firms That Have Been Reimbursed by Their Clients, and Class-Action Lawyers Who Have Been Reimbursed from Class-Action Settlement Funds

Named Plaintiffs concede that they pushed for a purely pro-rata allocation among members, under which Class Members who spent the most on PACER during the Class Period would take the lion's share of the Settlement proceeds. But the largest users include large law firms, which themselves suffered no injury because they long ago passed most of the PACER charges that they paid on to their clients. The largest users also likely include plaintiffs-side class-action firms (like those representing Named Plaintiffs in this very action), which generally are reimbursed for PACER expenses when class actions settle. To the extent that the funds in this case are allocated to such class members, they constitute a windfall—at the expense of class members, such as Isaacson, whose Class Period PACER expenses were, in greatest part, neither passed on to clients nor otherwise reimbursed.

The Named Plaintiffs have purported to litigate this case in the interest of the little user. Their Complaint demanded compliance with Congress' intent that court documents "be 'freely available to the greatest extent possible.'" DE1:1 (quoting S.Rep. 107–174, 107th Cong., 2d Sess. 23 (2002)). They said that excessive PACER fees had "inhibited public understanding of the courts and thwarted equal access to justice," asserting that "the AO has further compounded these harms by discouraging fee waivers, even for *pro se* litigants," and "by hiring private collection lawyers

to sue people who cannot afford to pay the fees." DE1:1-2; *see also* DE1:11¶23; DE1:12¶25. Plaintiff National Consumer Law Center said it "seeks to achieve consumer justice and economic security for low-income and other disadvantaged Americans." DE1: 3¶2.

Yet when it came time to negotiate a settlement, the Named Plaintiffs abandoned such users—and the public interest—by advocating a purely pro-rata distribution of settlement funds that would favor large institutional users such as themselves, and that provides windfalls to large law firms that long ago passed their PACER charges on to paying clients, and to plaintiffs-side class-action lawyers (such as those representing the Named Plaintiffs) who have been fully reimbursed from settlement funds in other cases. Class Counsel concedes that in settlement negotiations with the government, Named Plaintiffs

> argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers—"to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. §1913 note.

DE158-5:10¶28 (Gupta decl.); *see also* DE158:23[ECFp31] ("plaintiffs and class counsel vigorously advocated for a pro-rata approach").

The government was right. Named Plaintiffs' advocacy for pro-rata distribution was grossly inappropriate. The "blend" reached as a compromise allocates far too much to a pro rata distribution that unfairly advantages large users and law firms that already have been reimbursed— and who accordingly receive inequitable windfalls under the Settlement.

The pro-rata portion of the distribution is calculated to produce unfair windfalls. Many law firms, particularly the larger ones, pass the PACER charges that they incur on to their clients and are reimbursed for them on thirty-day billing cycles.[2] Class-action lawyers have to wait a little

---

[2] *See Hallmark v. Cohen & Slamowitz, LLP,* 378 F. Supp. 3d 222, 236 (W.D.N.Y. 2019)(holding PACER fees are among "those ordinarily charged to clients"); *Godson v. Eltman, Eltman, & Cooper, P.C.,* 328 F.R.D. 35, 68 (W.D.N.Y. 2018)(holding PACER fees are among "those ordinarily charged to clients"); *Decastro v. City of New York,* No. 16-cv-3850 (RA), 2017 WL

longer—but they typically are reimbursed for PACER charges when class actions settle.[3] And we know that the great majority of class actions settle.[4] Indeed, Class Counsel's own fee expert

---

4386372, at *10 (S.D.N.Y. Sept. 30, 2017)(no contest that PACER fees are among the "out-of-pocket expenses ordinarily charged to clients").

[3] *See, e.g., Ciapessoni v. United States,* 145 Fed. Cl. 564, 565 (2019); *Godson v. Eltman, Eltman, & Cooper, P.C.,* 328 F.R.D. 35, 67 (W.D.N.Y. 2018); *In re Broadwing, Inc. ERISA Litig.,* 252 F.R.D. 369, 382 (S.D. Ohio 2006); *Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-0762 JLT EPG, 2023 WL 4134656, at *30 (E.D. Cal. June 22, 2023); *Stechert v. Travelers Home & Marine Ins. Co.,* No. CV 17-0784-KSM, 2022 WL 2304306, at *15 (E.D. Pa. June 27, 2022); *In re Wawa, Inc. Data Sec. Litig.,* No. CV 19-6019, 2022 WL 1173179, at *12 (E.D. Pa. Apr. 20, 2022); *Yanez v. HL Welding, Inc.,* No. 20CV1789-MDD, 2022 WL 788703, at *13 (S.D. Cal. Mar. 15, 2022); *Karl v. Zimmer Biomet Holdings, Inc.,* No. C 18-04176 WHA, 2022 WL 658970, at *6 (N.D. Cal. Mar. 4, 2022); *Curry v. Money One Fed. Credit Union,* No. CV DKC 19-3467, 2021 WL 5839432, at *6 (D. Md. Dec. 9, 2021); *Kudatsky v. Tyler Techs., Inc.,* No. C 19-07647 WHA, 2021 WL 5356724, at *5 (N.D. Cal. Nov. 17, 2021); *Espinal v. Victor's Cafe 52nd St., Inc.,* No. 16-CV-8057 (VEC), 2019 WL 5425475, at *5 (S.D.N.Y. Oct. 23, 2019); *Ott v. Mortg. Invs. Corp. of Ohio, Inc.,* No. 3:14-CV-00645-ST, 2016 WL 54678, at *6 (D. Or. Jan. 5, 2016); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.,* No. CIV. 6:12-1609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015); *Jenkins v. Trustmark Nat. Bank,* 300 F.R.D. 291, 310 (S.D. Miss. 2014); *Hargrove v. Ryla Teleservices, Inc.,* No. 2:11CV344, 2013 WL 1897027, at *7 (E.D. Va. Apr. 12, 2013), *report and recommendation adopted,* 2013 WL 1897110 (E.D. Va. May 3, 2013); *Beard v. Dominion Homes Fin. Servs., Inc.,* No. C2 06 137, 2009 WL 10710409, at *7 (S.D. Ohio June 3, 2009); *In re Kirby Inland Marine, L.P.,* No. CIVA 04-611-SCR, 2008 WL 4642616, at *4 (M.D. La. Oct. 16, 2008), aff'd sub nom. In re Kirby Inland Marine LP, 333 F.App'x 872 (5th Cir.2009); *Rankin v. Rots,* No. 02-CV-71045, 2006 WL 1791377, at *3 (E.D. Mich. June 27, 2006); *Jordan v. Michigan Conf. of Teamsters Welfare Fund,* No. 96-73113, 2000 WL 33321350, at *6 (E.D. Mich. Sept. 28, 2000).

[4] *See* Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 6 (Federal Judicial Center, 2005)(according to a 2005 study, certified class actions settled ninety percent of the time); *Redman v. RadioShack Corp.,* 768 F.3d 622, 638 (7th Cir.2014)(noting, in connection with the settlement of a consumer class action, that "very few class actions are tried"); *West v. Prudential Sec., Inc.,* 282 F.3d 935, 937 (7th Cir.2002)("very few securities class actions are litigated to conclusion"); *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 52 (2d Cir.2000)("'there appears to be no appreciable risk of non-recovery" in securities class actions, because 'virtually all cases are settle[]'")(quoting Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan.L.Rev. 497, 578 (1991)); *In re Copley Pharm., Inc.,* 161 F.R.D. 456, 466 (D.Wyo.1995)("most class actions settle and few go to trial"); *see also* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan. L.Rev. 497, 578 (Feb.1991)(arguing that a multiplier designed to address the contingency factor in securities class actions is unnecessary since "there appears to be no appreciable risk of nonrecovery, for virtually all cases are settled"). "When the potential liability created by a lawsuit is very great, even though the probability that the plaintiff will succeed in establishing liability is slight, the defendant will be under pressure to settle rather than to bet the

concedes that "the typical class action settles in only three years." DE158-4:14¶21 (Fitzpatrick decl.). So class-action law firms, like those representing the Named Plaintiffs in this matter, generally receive full reimbursement for their PACER expenditures when the class actions they litigate quite predictably settle.

What this means is that many, if not most, of the class members with the largest Class Period PACER expenditures have already been wholly compensated for all or most of what they spent on PACER. That is a powerful reason for this Court to endorse what Named Plaintiffs report was the government's position: that small users should receive full reimbursement. *See* DE158:21-22. Class Counsel Deepak Gupta explains:

> plaintiffs argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers— "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note.

DE158-5:10¶28.

The government was correct. Public access to court records is critical to American Democracy. Small-scale users should be fully compensated. No significant portion of the Settlement fund should be allocated to the pro-rata distribution advocated by the Named Plaintiffs.

Including large claimants in a pro-rata distribution is problematic, moreover, because the Class cannot be defined to include any entities with claims totaling more than $10,000. Doing so would violate the Little Tucker Act. The Settlement's allocation appears to include, and to distribute Settlement funds to, entities whose claims exceed the Tucker Act's $10,000 jurisdictional limit. "District courts have jurisdiction under the Little Tucker Act to hear claims 'against the United States, **not exceeding** $10,000[.]'" *Nat'l Veterans Legal Servs. Program v.*

---

company, even if the betting odds are good." *Kohen v. Pacific Inv. Mgmt. Co. LLC,* 571 F.3d 672, 678 (7th Cir.2009).

*United States,* 968 F.3d 1340, 1347 (Fed.Cir.2020)(emphasis added)(quoting *Corr v. Metro. Washington Airports Auth.,* 702 F.3d 1334, 1336 (Fed.Cir.2012)(quoting 28 U.S.C. §1346(a)(2))).

If Isaacson, as a start-up solo-practitioner who paid PACER fees for less than three years of the eight-year class period, paid $3,823.50 in PACER fees, then many users—particularly institutional users, large law firms, and plaintiffs-side class-action firms—must have run up Class Period PACE bills totaling tens and even hundreds of thousands of dollars. This Court lacks jurisdiction to include them, and their claims, in the Class to whom the Settlement will be distributed. For by now "the question is settled—district courts lose their Little Tucker Act jurisdiction once the amount claimed accrues to more than $10,000, even though jurisdiction was previously proper in the district court." *Simanonok v. Simanonok,* 918 F.2d 947, 950-51 (Fed.Cir.1990). The Federal Circuit has held "the amount of a claim against the United States for back pay is the total amount of back pay the plaintiff stands ultimately to recover in the suit and is not the amount of back pay accrued at the time the claim is filed." *Smith v. Orr,* 855 F.2d 1544, 1553 (Fed.Cir.1988)(following *Chabal v. Reagan,* 822 F.2d 349 (3d Cir.1987); *see Simanonok,* 918 F.2d at 950-51; *see also Shaw v. Gwatney,* 795 F.2d 1351 (8th Cir.1986); *Goble v. Marsh,* 684 F.2d 12 (D.C.Cir.1982)). Clearly, then, Class Members whose claims exceed $10,000 are beyond this Court's Little Tucker Act jurisdiction.

"In a class action such as this, jurisdiction thereunder turns, not upon the aggregate amount of the claims [of all] the members of the class, but upon the amounts claimed individually by those members." *March v. United States,* 506 F.2d 1306, 1309 n.1 (D.C.Cir.1974); *see Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981); *Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11, 25 (3d Cir.1975). Yet Little Tucker Act jurisdiction ultimately covers a class action only if, and to the extent that, "the individual claim of each class member does not exceed $10,000.00." *Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981).

There is one way, of course, to preserve Little Tucker Act jurisdiction with respect to Class Members whose individual claims exceed $10,000. It is well established that "a plaintiff may pursue such a claim in a district court if the plaintiff waives his right to recover the amount

exceeding $10,000." *Smith v. Orr,* 855 F.2d 1544, 1552–53 (Fed. Cir.1988). That can be accomplished by abandoning the notion that large claimants have the right to a pro-rata distribution based on large claims that would place them beyond the jurisdictional limitation. No portion of the Settlement fund should be allocated on the basis of Class Members' PACER expenditures after the first $10,000 they paid during the Class Period. The first distribution should be capped at a much higher level than $350 apiece, and any pro-rata distribution of remaining funds should be based on Class Members' expenditures ***up to*** $10,000 apiece, thereby waiving Class Members' larger claims in order both to preserve Tucker Act jurisdiction, and also to achieve a more equitable distribution of the Settlement Fund.

### B. The Attorney's Fees Sought Are Grossly Excessive

Class Counsel's expert, Professor Brian Fitzpatrick, says "that the fee request is more than reasonable." DE158-4:5¶8 (Fitzpatrick decl.).

It is, in fact, several times what the Supreme Court's precedents hold is a reasonable attorney's fee to fully compensate class plaintiffs' counsel in contingent class-action litigation that settles. For while the Supreme Court holds that class counsel ordinarily are adequately compensated with an unenhanced lodestar award, *see Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 546 (2010), Class Counsel here ask for roughly ***four times*** that amount. And while the Supreme Court has never approved a common-fund fee award exceeding ten percent of the common fund, Class Counsel in this case demand twice that. It appears that the driving concern in this settlement is Class Counsel's desire to capture an extravagant fee.

The Supreme Court holds that attorney's fees may be awarded from a common fund or equitable fund based either on the attorney's fees reasonably incurred and billed, *see Trustees v. Greenough,* 105 U.S. 527, 530-31, 537-38 (1882), or as a modest percentage of the fund, *see Central RR & Banking Co. v. Pettus,* 113 U.S. 116, 128 (1885)(cutting fee award from 10% to 5%). At ***four times*** Class Counsel's claimed hourly rates, and more than twice the percentage supported by Supreme Court common-fund precedents, the attorney's fee award sought by Class Counsel is clearly excessive.

Class Counsel claim a lodestar of $6,031,678.25. DE158-5:22-23¶¶63-64 (Gupta decl.). Supreme Court precedent mandates "a strong presumption that the lodestar is sufficient," without any enhancement, to compensate plaintiffs' counsel when a contested class action settles. *Perdue,* 559 U.S. at 546 (2010); *see Haggart v. Woodley,* 809 F.3d 1336, 1355 n.19 (Fed.Cir.2016). Even in common-fund cases, such as this, "[t]here is a 'strong presumption' that the lodestar figure represents a reasonable fee." *Fischel v. Equitable Life Assur. Soc'y,* 307 F.3d 997, 1007 (9th Cir.2002)(citation omitted). "Because of [that] 'strong presumption that the lodestar is sufficient,' a multiplier is warranted only in 'rare and exceptional circumstances.'" *Chambers v. Whirlpool Corp.,* 980 F.3d 645, 665 (9th Cir.2020)(quoting *Perdue,* 559 U.S. at 546-52, and reversing a 1.68 lodestar multiplier).

"There is a 'strong presumption' that the lodestar figure represents a reasonable attorney's fee, [*Perdue,* 559 U.S. at 546], because '"the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee."'" *Heller v. District of Columbia,* 832 F. Supp. 2d 32, 37 (D.D.C. 2011)(quoting *Perdue,* 559 U.S. at 543(quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 566 (1986)). "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant, *Perdue,* 559 U.S. at 553, who "must produce 'specific evidence'" supporting the enhancement. *Perdue,* 559 U.S. at 553. And, as *Perdue* itself emphasizes, "factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar." *Perdue,* 559 U.S. at 546.

Class Counsel have not demonstrated by a preponderance of the evidence that they are entitled to nearly four times their claimed lodestar. Acting as a fiduciary to the Class, this Court should not grant such an extravagant award.

Class Counsel contend that such a windfall is justified if only the attorney's fee is awarded as a percentage of the $125 million megafund settlement. After all, they say, they only want 19% of the fund. Yet the Supreme Court has never approved a percent-of-fund common-fund fee award exceeding ten percent of the fund.

In *Pettus,* for example, the Supreme Court slashed a common-fund award from ten percent to just five percent of the fund. The Court "consider[ed] whether the sum allowed appellees was too great. We think it was. The decree gave them an amount equal to ten per cent." Pettus, 113 U.S. at 128. "One-half the sum allowed was, under all the circumstances, sufficient." *Id.; see also Harrison v. Perea,* 168 U.S. 311, 325 (1897)(noting with approval the reduction of a $5,000 fee award (or about 14% of an equitable fund) to just 10% of the fund).

In *United States v. Equitable Trust Co.,* 283 U.S. 738 (1931), the Supreme Court rejected the notion that counsel whose efforts secure a fund may receive more than necessary to compensate them adequately for their time. The Second Circuit already had rejected the district court's conclusion that counsel were entitled to a quarter to a third of the fund, cutting the attorney's fee award to just $100,000 (about 15% of the fund) and warning that "[t]he allowance is a payment for legal services, not a speculative interest in a lawsuit." *Barnett v. Equitable Trust Co.*, 34 F.2d 916, 919 (2d Cir.1929)(Learned Hand). The attorneys then complained to the Supreme Court that "from a percentage standpoint, the allowance of $100,000 is but slightly over fifteen per cent," and that "never yet have counsel been cut down to such a low percentage in any contested case taken upon a contingent basis."[5] But the Supreme Court found even "the allowance of $100,000 unreasonably high, and that to bring it within the standard of reasonableness it should be reduced to $50,000," which was about $7\frac{1}{2}$% of the fund. *Equitable Trust,* 283 U.S. at 746. Those are old decisions, to be sure. But the Supreme Court's common-fund precedents remain controlling authority. *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980)(applying common-fund doctrine rooted in *Greenough* and *Pettus*); *Haggart v. Woodley,* 809 F.3d 1336, 1352 (Fed.Cir.2016)(favorably citing *Greenough* and *Pettus*).

And with the development of computerized research, automated document review, and digital storage and retrieval of documents, the difficulty and expense of litigation has surely fallen.

---

[5] Brief for Respondents to Whom Allowances Were Made, *United States v. Equitable Trust,* 283 U.S. 738 [Oct. Term 1929 No. 530], at 55-56 (filed April 16, 1930).

Given the tremendous economies of scale afforded by the class-action device in recovering the $125 million megafund in this case, the five percent of the fund found reasonable in *Pettus* would be wholly appropriate here too. Its reasonableness is, moreover, confirmed by a cross-check against Class Counsel's claimed lodestar. For five percent of the megafund is $6,250,000, and Class Counsel's claimed lodestar is only $6,031,678.25. DE158-5:22-23¶¶63-64 (Gupta decl.). A five-percent award gives Class Counsel something more than their lodestar which, according to *Perdue,* is presumptively sufficient to compensate them for their work on a settling contingent-fee class action.

Of course, that assumes that Class Counsel's lodestar is proper. It is not. Their lodestar is inadequately documented. Class Counsel submitted a summary declaration, giving total hours and billing rates, with no further itemization or explanation of the hours billed, or of the basis for the billing rates. That is not enough to support Class Counsel's purported lodestar.[6] Were appropriate deductions made, their lodestar would be much lower, and the multiplier for their requested fee award doubtless would exceed four.

The claimed lodestar amount is plainly excessive. Class Counsel's paid expert on fees, Professor Brian Fitzpatrick, has developed a matrix of reasonable "Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia." *See* Isaacson Decl. Ex.D

---

[6] *Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984)("The affidavit here was little more than a tally of hours and tasks relative to the case as a whole."); *McDonald v. Pension Plan,* 450 F.3d 91, 96 (2d Cir.2006)("In order to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records."); *Cadena v. Pacesetter Corp.,* 224 F.3d 1203, 1215 (10th Cir.2000)("'[I]f [prevailing parties] intend to seek attorney's fees ... [their attorneys] must keep meticulous, contemporaneous time records [.]'"); *Harper v. City of Chicago Heights,* 223 F.3d 593, 605 (7th Cir.2000 ("[I]t is within a district court's power to reduce a fee award because the petition was not supported by contemporaneous time records."); In re Olson, 884 F.2d 1415, 1428 (D.C.Cir.1989 (disallowing entries that failed to identify the subject of a meeting, conference, or phone call and requiring contemporaneous records proving the reasonableness of hours and rates); *Grendel's Den v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984)("in cases involving fee applications ... the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award, or in egregious cases, disallowance"); *Savin ex rel. Savin v. Sec'y of Health & Hum. Servs.,* 85 Fed.Cl. 313, 317 & n.5 (2008).

[https://www.justice.gov/usao-dc/page/file/1189846/download].  Professor Fitzpatrick says his "Fitzpatrick Matrix" is based on research that "allowed us to determine the real hourly rates charged in the market" in complex federal litigation lilke this case. *See* Isaacson Decl. Ex.E. The highest reasonable 2021 billing rate for a lawyer with 35+ years' experience, according to Professor Fitzpatrick's official matrix, is $736 an hour. *See id.* Yet in this case, Class Counsel's lodestar is built on billing rates that grossly exceed what Fitzpatrick deemed reasonable for complex litigation in the District of Columbia. A 2002 Georgetown graduate, Deepak Gupta's time is billed at $1150 an hour, while 2010 Harvard graduate Jonathan E. Taylor's time is billed at $975 an hour—well over the rates deemed reasonable for complex litigation in the District of Columbia. DE158-5:22¶63. Turning to the Motley Rice lawyers, we find William Narwold billing at $1250 an hour, and Meghan Oliver at $950 an hour. DE158-5:5¶12.

Class Counsel have offered adequate justifications neither for their billing rates, nor for the hours claimed. Not even their own expert, Professor Brian Fitzpatrick, has opined that they are reasonable.

Neither have Class Counsel demonstrated that they should be entitled to any multiplier of their inadequately documented lodestar, or to a percentage fee of more than the five percent that the Supreme Court applied to a common-fund fee application in *Pettus,* which would more than adequately compensate them for their efforts.

Class Counsel's fee expert urges a dramatic upward departure from the attorney's fees supported by Supreme Court precedents—based on his own survey of nonprecedential published, and even unpublished district court rulings. Fitzpatrick ignores the fact that "[i]n the vast majority of cases, Class counsel appears before the court to request a big percentage of the settlement fund, cooperative settling Defendants offer no opposition, and class members rarely oppose the request." *In re Quantum Health Res., Inc.,* 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "The situation is a fundamental conflict of interest and is inherently collusive. The lack of opposition to a proposed fee award gives a court the sometimes false impression of reasonableness, and the court might simply approve a request for fees without adequate inquiry or comment." *In re Quantum Health*

*Res., Inc.,* 962 F. Supp. 1254, 1256 (C.D. Cal. 1997)(footnote omitted). Fitzpatrick's survey thus is of minimal value.

Factors cited by Class Counsel and their expert do not justify the large fee. The case, though somewhat novel, was obviously an easy one to litigate. The central contest was on an issue of statutory construction. After the Federal Circuit clarified the law, *see National Veterans Legal Servs. Program v. United States,* 968 F.3d 1340, 1349 (Fed.Cir.2020), the case was an easy one to settle. And that, of course, eliminated any risk of nonpayment that Class Counsel might have faced had they taken the case to trial.

Named Plaintiffs and Class Counsel together seek "an award of attorneys' fees, settlement-administration and notice costs, litigation expenses, and service awards for the three class representatives in a total amount equal to 20% of the $125 million common fund." DE158:4[ECFp13]. Their motion also seeks "an award of $10,000 per class representative to compensate them for their time working on the case and the responsibility that they have shouldered" while Class counsel seeks "$23,863,345.02 in attorneys' fees," or nearly four times their claimed lodestar. DE158:4[ECFp13].

This Court should not award an attorney's fee amounting to more than Class Counsel's unenhanced lodestar recalculated at the rates set forth in their own fee expert's "Fitzpatrick Matrix."

### C. The $10,000 Apiece Service Awards Named Plaintiffs Seek are Inequitable and Unlawful

The Supreme Court's foundational common-fund class-action precedents hold that payments compensating litigants for their service as class representatives are inequitable and illegal. *See Trustees v. Greenough,* 105 U.S. 527, 537 (1882); *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 122 (1885). The Eleventh Circuit thus soundly holds that "Supreme Court precedent prohibits incentive awards."[7] And the Second Circuit recently conceded: "Service

---

[7] *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1255 (11th Cir.2020), *reh'g denied,* 43 F.4th 1138 (11th Cir.2022); *accord, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.,* 999 F.3d 1247,

awards are likely impermissible under Supreme Court precedent." *Fikes Wholesale v. HSBC Bank USA,* 62 F.4th 704, 721 (2d Cir.2023).

So "any service award in a class action is at best dubious under *Greenough.*" *Fikes Wholesale,* 62 F.4th at 723; *see also id.* at 729 (Jacobs, Cir.J., concurring). The Second Circuit nonetheless chooses to follow its own decisions sustaining incentive awards—rather than the Supreme Court's decisions banning them:

> But practice and usage seem to have superseded Greenough (if that is possible). *See Melito v. Experian Mktg. Sols. Inc.,* 923 F.3d 85, 96 (2d Cir.2019); *Hyland v. Navient Corp.,* 48 F.4th 110, 123-24 (2d Cir.2022). And even if (as we think) practice and usage cannot undo a Supreme Court holding, *Melito* and *Navient* are precedents that we must follow.

*Fikes Wholesale,* 62 F.4th at 721.

Supreme Court precedent cannot be superseded by lower courts' contrary practice and usage. Lower courts are not at liberty to reject Supreme Court precedents as obsolescent. In fact, "the strength of the case for adhering to such decisions grows in proportion to their 'antiquity.'" *Gamble v. United States,* 139 S.Ct. 1960, 1969 (2019)(citing *Montejo v. Louisiana,* 556 U.S. 778, 792 (2009). Even if a Supreme Court precedent was "'unsound when decided'" and even if it over time becomes so "'inconsistent with later decisions'" as to stand upon "'increasingly wobbly, moth-eaten foundations,'" it remains the Supreme Court's "prerogative alone to overrule one of its precedents."[8] The Supreme Court holds: "If a precedent of this Court has direct application in a

---

1257 (11th Cir.2021)("such awards are prohibited"); *Medical & Chiropractic Clinic, Inc. v. Oppenheim,* 981 F.3d 983, 994 n.4 (11th Cir.2020)("such service awards are foreclosed by Supreme Court precedent").

[8] *State Oil Co. v. Khan,* 522 U.S. 3, 9, 20 (1997)(quoting *Khan v. State Oil Co.,* 93 F.3d 1358, 1363 (7th Cir.1996)(Posner, J.)); *accord, e.g., Payne v. Taslimi,* 998 F.3d 648, 654 (4th Cir.2021); *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.,* 817 F.3d 755, 770 (Fed.Cir.2016)(O'Malley, Cir.J., concurring).

case," as *Greenough* does here, a lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989); *accord, e.g., Mallory v. Norfolk S. Ry. Co.,* 143 S. Ct. 2028, 2038 (2023).

But even if *Greenough* and *Pettus* do not altogether bar incentive awards, such payments are appropriate only when actually necessary. The Ninth Circuit in *In re Apple Inc. Device Performance Litig.,* 50 F.4th 769, 786 (9th Cir.2022), for example, construed *Greenough* not as a decision that prohibits incentive awards in general, but as one that prohibits incentive awards unless they are necessary to induce the named plaintiffs to pursue the case:

> While private plaintiffs who recover a common fund are entitled to "an extra reward," they are limited to "that which is deemed 'reasonable' under the circumstances." *Id. Greenough,* for example, prohibited recovery for the plaintiff's "personal services and private expenses" because the private plaintiff was a creditor who needed no inducement to bring suit. *Greenough,* 105 U.S. at 537.

*In re Apple Inc. Device Performance Litig.,* 50 F.4th 769, 786 (9th Cir.2022).

The Seventh Circuit similarly holds that incentive awards are appropriate only when "'necessary to induce an individual to participate in the suit.'"[9]

But here, as in *Greenough,* the Named Plaintiffs had substantial claims of their own, and they clearly "needed no inducement to bring suit." *Apple Device,* 50 F.4th at 786. This Court has recognized that they already had "dual incentives to reduce PACER fees, both for themselves and for the constituents that they represent." DE33:14. Named Plaintiffs presented their missions as

---

[9] *Camp Drug Store v. Cochran Wholesale Pharmaceutical,* 897 F.3d 825, 834 (7th Cir.2018)(citation omitted); *see also In re Synthroid Mktg. Litig.,* 264 F.3d 712, 722 (7th Cir.2001)("Incentive awards are justified when necessary to induce individuals to become named representatives."); *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 410 (7th Cir.2000)("Incentive awards are appropriate if compensation would be necessary to induce an individual to become a named plaintiff in the suit.").

nonprofits as their motivations to pursue this litigation. They never needed special $10,000 payments to induce them to file suit.

Finally, anyone who seeks an incentive award must document their time on the case. As the Sixth Circuit has held:

> The settlement agreement provides for incentive awards of up to $10,000 per individual named plaintiff .... Class counsel argues in conclusory terms that the awards compensate the named plaintiffs for their time spent on the case. To ensure that these amounts are not in fact a bounty, however, counsel must provide the district court with specific documentation—in the manner of attorney time sheets—of the time actually spent on the case by each recipient of an award.

*Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan,* 825 F.3d 299, 311 (6th Cir.2016). "Otherwise the district court has no basis for knowing whether the awards are in fact 'a disincentive for the [named] class members to care about the adequacy of relief afforded unnamed class members[.]'" *Id.* (quoting *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir.2013)(emphasis in original).

Named Plaintiffs neither kept, nor presented, the required documentation. *See, e.g.,* DE158:2¶2 (Rossman decl.)("our organization did not keep formal time records"). That is another reason that the payments should be denied.

## III.   CONCLUSION

Although Named Plaintiffs insist that they "'enjoy a presumption of fairness afforded by [this] court's preliminary fairness determination,'" DE158:18[ECFp26] (quoting *Ciapessoni v. United States,* 145 Fed. Cl. 685, 688 (2019)), and also that any settlement "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery" similarly enjoys a "'presumption of fairness, adequacy, and reasonableness,'" DE158:19-20 (quoting *Kinard v. E. Capitol Fam. Rental, L.P.,* 331 F.R.D. 206, 215 (D.D.C.2019)), Rule 23 neither authorizes nor permits any such presumptions. In fact, "Rule 23(e)(2) assumes that a class action settlement is invalid." *Briseno v. Henderson,* 998 F.3d 1014, 1030 (9th Cir.2021).

The Settling Parties have not carried their burden of demonstrating by a preponderance of the evidence that this one is fair, reasonable, and adequate. It is not. Named Plaintiffs seek to

allocate far too much of the Settlement fund to their lawyers, as attorney's fees, and to themselves in special $10,000 incentive awards, and with a further pro-rata distribution that favors large users and that awards windfalls to large law firms and to class-action plaintiffs' counsel.

DATED: September 12, 2023

Respectfully Submitted,

Eric Alan Isaacson

LAW OFFICE OF ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858)263-9581
Email: ericalanisaacson@icloud.com

## DECLARATION OF ERIC ALAN ISAACSON

I, Eric Alan Isaacson, declare and state as follows:

1.      I am over the age of eighteen, make this declaration based on my personal knowledge and, if called as a witness, would testify competently as to the facts stated herein.

2.      I make this declaration in support of my objection to approval of the proposed class-action settlement, award of attorney's fees, and of service awards, in *National Veterans Legal Services Program, et al. v. United States of America,* Civil No. 16-745-PLF, which is pending in the United States District Court for the District of Columbia.

3.      A 1982 baccalaureate graduate of Ohio University, I hold a 1985 J.D. with high honors from the Duke University School of Law, and in May of 2022 I graduated from the Harvard Divinity School with a Master of Religion and Public Life.

4.      Continuing my graduate studies, I recently enrolled in the Harvard Extension School, where am working toward a Master of Liberal Arts in Extension Studies in the field of History.

5.      I have been a member in good standing of the bar of the State of California (No. 120584) since 1985.

6.      I was a founding partner of the law firm of Robbins, Geller, Rudman & Dowd LLP (f.k.a. Lerach Coughlin Stoia Geller Rudman & Robbins LLP), where I practiced law from May 1, 2004 to March 15, 2016.

7.      Since March of 2016, I have practiced law from the LAW OFFICE OF ERIC ALAN ISAACSON, 6580 Avenida Mirola, La Jolla, CA 92037.

8.      I am informed and believe I am a member of the Class who would be bound by the proposed Settlement in this matter because I paid PACER bills during the Class Period, and I received an email notice of the Class Action Settlement.

9.      In March of 2016, I opened my own PACER account (No. 4166698), for which I have paid quarterly the PACER bills ever since.

10.     A true and correct of copy my short-form curriculum vita is attached as Exhibit A hereto.

11.     A true and correct copy of the email Class Notice that I received concerning this matter is attached as Exhibit B hereto.

12.     My Class Period PACER billings under that account totaled $3,823.50, as evidenced by invoices and emails attached as Exhibit C hereto.

13.     Attached as Exhibit D hereto is a true and correct copy of "The Fitzpatrick Matrix," a document "prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students," and "Published by the U.S. Attorney's Office for the District of Columbia, Civil Division," that I downloaded today from https://www.justice.gov/usao-dc/page/file/1189846/download, and for which I have prepared the following bitly link: https://bit.ly/USAOfitz

14.     Attached as Exhibit E hereto is a true and correct copy of *Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court,*" Feb.7, 2023, that I downloaded today from https://law.vanderbilt.edu/news/fee-matrix-developed-by-professor-brian-fitzpatrick-and-brooke-levy-22-adopted-by-federal-court/ and for which I have prepared the following bitly link: https://bit.ly/463kPjs

15.     I have received reimbursement (from a client) for only $171.80 of the foregoing $3,823.50 Class Period PACER expenditures. Thus, my total unreimbursed Class Period PACER expenditures come to $3,651.70.

16.     I seldom seek reimbursement from clients for my PACER expenditures, and I have not had occasion to seek reimbursement for any of my Class Period PACER expenditures from the settlement fund in any court proceeding.

17.     I do not expect to seek or receive any further reimbursement of my remaining $3,651.70 in unreimbursed Class Period PACER expenditures.

18.     A substantial portion of my Class Period PACER expenditures reflect research in connection with my own personal scholarship in matters of law and economics.

19.     A substantial portion of my legal practice during the Class Period was devoted to pro bono matters in which I incurred and paid expenses for documents downloaded from PACER for which I did not seek, and never will seek, reimbursement. These included, for example:

•     *EEOC v. R.G. & G.R. Harris Funeral Homes,* 884 F.3d 560 (6th Cir.2018) – Briefed for amicus curiae Unitarian Universalist Association, supporting the EEOC and defending a transgender employee's right not to be subjected to religiously motivated workplace discrimination. (Amicus brief filed April 28, 2017);

•     *Janus v. AFSCME, Council 31,* 585 U.S. __, 138 S.Ct. 2584 (June 27, 2018) – Counsel of Record for amici curiae Faith in Public Life, religious organizations, and faith leaders supporting respondent labor union and the need for labor-union fair-share agency fees. (Amicus brief filed January 19, 2018);

•     *Voice of the Ex-offender v. Louisiana,* 249 So.3d 857 (La.Ct.App. 1st Cir.2018), *cert. denied,* 255 So.3d 575 (La.2018)(Chief Justice Johnson dissenting) – Co-counsel for amici curiae of historians Walter C. Stern, et al., supporting the right of released ex-offenders to vote. (Amicus brief filed February 21, 2018).

20.     I object to the proposed Settlement in *National Veterans Legal Services Program, et al. v. United States of America,* Civil No. 16-745-PLF, and in particular to the requested attorney's fee award, and the requested service awards, for reasons stated in the Objection of Eric Alan Isaacson that this declaration accompanies.

21.     I have pressed objections in other class actions, but have always done so with the objective of improving the quality of class-action settlements and of developing what I regard as sound principles of law.

22.     Both during the Class Period and after I have sought, with some success, to improve class-action practice in the United States. *See, e.g., Moses v. New York Times Co*., No. 21-2556-CV, __F.4th__, 2023 WL 5281138, at *1 (2d Cir. Aug. 17, 2023)("we agree with Isaacson that the

district court exceeded its discretion when it approved the settlement based on the wrong legal standard in contravention of Rule 23(e)"); *Murray v. Grocery Delivery E-Servs. USA Inc.,* 55 F.4th 340, 342 (1st Cir.2022)("we vacate [settlement] approval because the absence of separate settlement counsel for distinct groups of class members makes it too difficult to determine whether the settlement treated class members equitably"); *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1248 (11th Cir.2020)("We find that, in approving the settlement here, the district court repeated several errors that, while clear to us, have become commonplace in everyday class-action practice. ... [I]t handled the class-action settlement here in pretty much exactly the same way that hundreds of courts before it have handled similar settlements. But familiarity breeds inattention, and it falls to us to correct the errors in the case before us."); *Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917 (11th Cir.2020)(en banc)(sustaining objection that a representative plaintiff who suffered no injury lacked Article III standing to represent and compromise the interests of the class); *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.,* 888 F.3d 455, 458 (10th Cir.2017) (reversing $17.3 million class-action attorney's fee award).

23.     None of my objections to class-action settlements or attorney's fee awards have been found to be frivolous, and none have been made for improper purposes.

24.     I have never pressed an objection in order to extract a payment in return for the objection's withdrawal, or for the dismissal of any resulting appeal.

25.     I will not accept any payment in return for withdrawing my objection in this case, for foregoing an appeal, or for dismissing any appeal.

26.     I am, moreover, willing to be bound by a court order absolutely prohibiting any such payment in this case.

27.     I desire to be heard at the October 12, 2023, Final Approval Hearing in the above-captioned matter, either in person or remotely by means of telephone or video conferencing.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on September 12, 2023, at La Jolla, California.

Eric Alan Isaacson

Eric Alan Isaacson
Law Office of Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037-6231
(858)263-9581
ericalanisaacson@icloud.com

# EXHIBIT A

**ERIC ALAN ISAACSON**

LAW OFFICE OF ERIC ALAN ISAACSON – https://www.ericalanisaacson.com
6580 Avenida Mirola, La Jolla, CA 92037-6231
ericalanisaacson@icloud.com, eri628@g.harvard.edu
(858) 263-9581

**EDUCATION**:

• Harvard Extension School, working toward a Master of Liberal Arts (ALM) in Extension Studies, field of History

• Harvard Divinity School, M.R.P.L. 2022

• Duke University School of Law, J.D. with high honors, 1985; Order of the Coif; *Duke Law Journal* (Member 1983-1984 & Note Editor 1984-1985); Research Assistant to Prof. William A. Reppy, Jr. (summer 1983)

• Ohio University, A.B. with high honor, 1982

**PROFESSIONAL EMPLOYMENT:**

• Law Office of Eric Alan Isaacson (March 16, 2016 to present); Robbins Geller Rudman & Dowd LLP, f.k.a. Lerach Coughlin Stoia Geller Rudman & Robbins LLP (founding partner, May 1, 2004 to March 15, 2016)

• Milberg Weiss Bershad Hynes & Lerach LLP (partner, January 1994 through April 2004; associate, November 1989 through December 1993); • O'Melveny & Myers, Los Angeles (associate, 1986-1989)

• U.S. Court of Appeals for the Ninth Circuit  (law clerk to Hon. J. Clifford Wallace, 1985-1986)

**BAR ADMISSIONS**:

California (1985); Supreme Court of the United States (1995); also admitted to practice before the U.S. Courts of Appeals for the First through Eleventh Circuits, Federal Circuit, and D.C. Circuit, and before all federal district courts in California and Oklahoma

**SELECTED PUBLICATIONS**:

• *A Real-World Perspective on Withdrawal of Objections to Class-Action Settlements and Attorneys' Fee Awards: Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(e)(5),* 10 ELON L. REV. 35 (2018) [https://bit.ly/3fKYLB8]

• *The Roberts Court and Securities Class Actions: Reaffirming* Basic *Principles,* 48 AKRON L. REV. 923 (2015) [https://bit.ly/33mWZRJ]

• *Free Exercise for Whom? – Could the Religious-Liberty Principle that Catholics Established in* Perez v. Sharp *Also Protect Same-Sex Couples' Right to Marry?,* 92 U. DET. MERCY L. REV. 29 (2015) [https://bit.ly/3fJnZjs]

• Goodridge *Lights A Nation's Way to Civic Equality,* BOSTON BAR J., Nov. 15, 2013 [https://bit.ly/33qHiZS]

• *Are Same-Sex Marriages Really a Threat to Religious Liberty?,* 8 STANFORD J. CIV. RTS. & CIV. LIBERTIES 123 (2012) [https://bit.ly/2Vr3Fu5]

• *Assaulting America's Mainstream Values: Hans Zeiger's* Get Off My Honor: The Assault on the Boy Scouts of America, 5 PIERCE L. REV. 433 (2007) [https://bit.ly/3q3P3P8]

• *Traditional Values, or a New Tradition of Prejudice?  The Boy Scouts of America vs. the Unitarian Universalist Association of Congregations,* 17 GEO. MASON U. CIV. RTS. L.J. 1 (2006) [https://bit.ly/3li1yTI]

- (with Patrick J. Coughlin & Joseph D. Daley) *What's Brewing in* Dura v. Broudo*? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and its Import for Securities-Fraud Litigation,* 37 LOYOLA U. CHICAGO L. J. 1 (2005) [https://bit.ly/3lhnf6u]
- (with William S. Lerach) *Pleading Scienter Under Section 21D(b)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness and the Private Securities Litigation Reform Act of 1995,* 33 SAN DIEGO L. REV. 893 (1996) [https://bit.ly/3wLmgBY]
- *The Flag Burning Issue: A Legal Analysis and Comment,* 23 LOYOLA L.A. L. REV. 535 (1990) [https://bit.ly/3qkKYX8]

**VOLUNTEER SERVICE**:

- Skinner House Books, Editorial Board member, June 2016 to present;
- American Constitution Society, San Diego Lawyer Chapter, Steering Committee Member ,January 2008 to August 2009, and Board Member, August 2009 to present
- First Unitarian Universalist Church of San Diego, youth leader, September 2019 to June 2020; children's religious-education leader, September 2004 to June 2019; delegate to Unitarian Universalist Association General Assemblies of 2019, 2018, 2017, 2015, 2014 & 2009; Worship Welcome Team, member, May 2008 to May 2011

**SELECTED PRO BONO *AMICUS CURIAE* BRIEFS**:

- *Janus v. AFSCME, Council 31,* 138 S.Ct. 2448 (2018), brief for *amici curiae* Faith in Public Life, *et al.*, supporting public employees' labor-union fair-share agency fees [http://bit.ly/2KohwKr]
- *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,* 884 F.3d 560 (6th Cir. 2018), brief for *amicus curiae* Unitarian Universalist Association, supporting transgender employee's right not to be subjected to religiously motivated workplace discrimination [http://bit.ly/2yKxm0z]
- *Obergefell v. Hodges,* 576 U.S. 644 (2015), brief for *amici curiae* California Council of Churches, *et al.*, supporting same-sex couples' right to marry [https://bit.ly/34KqJJL]
- *Hollingsworth v. Perry,* 570 U.S. 693 (2013), brief for *amici curiae* California Council of Churches, *et al.*, supporting same-sex couples' right to marry [https://bit.ly/2HNQr79]
- *Pickup v. Brown,* 740 F.3d 1208 (9th Cir. 2014), brief for *amici curiae* California Faith for Equality, *et al.*, supporting California legislation barring healthcare professionals from subjecting minors to "Sexual Orientation Change Efforts" [https://bit.ly/2HCINwD]
- *Log Cabin Republicans v. United States,* 658 F.3d 1162 (9th Cir. 2011), brief for *amici curiae* Forum on the Military Chaplaincy, *et al.*, supporting the Log Cabin Republicans' challenge to "Don't Ask Don't Tell" [https://bit.ly/3mCXiiS]
- *Perry v. Brown,* 52 Cal. 4th 1116, 265 P.3d 1002 (2011), brief for *amici* California Faith for Equality, *et al.*, on questions certified to the California Supreme Court [https://bit.ly/2JkT6pu]
- *Perry v. Brown,* 671 F.3d 1052 (9th Cir. 2012), brief for *amici curiae* California Faith for Equality, et al., supporting same-sex couples' challenge to California Proposition 8's ban on same-sex marriages [https://bit.ly/37OtnQu]
- *Perry v. Schwarzenegger,* 704 F.Supp.2d 921 (N.D. Cal. 2010), brief for *amici curiae* Unitarian Universalist Legislative Ministry California, *et al.* [https://bit.ly/3mwYQuD]
- *Strauss v. Horton,* 46 Cal. 4th 364, 377-78, 207 P.3d 48, 93 Cal. Rptr. 3d 591 (2009), brief for *amici curiae* California Council of Churches, *et al.,* opposing California's Proposition 8 [https://bit.ly/3mtYpRE]

- *In re Marriage Cases,* 43 Cal.4th 757, 183 P.3d 384, 76 Cal.Rptr.3d 683 (2008), on team filing *amicus curiae* brief for the Unitarian Universalist Association, *et al.*, supporting the right of same-sex couples to marry [https://bit.ly/2VdpcpL]
- *In re Marriage Cases,* 49 Cal.Rptr.3d 675 (Cal. App. 1st Dist. 2006), on team filing *amicus curiae* brief for the General Synod of the United Church of Christ, *et al.*, supporting the right of same-sex couples to marry [https://bit.ly/3miFMR6]

**AWARDS**:

- American Constitution Society San Diego Lawyer Chapter's third annual *Roberto Alvarez Award*, January 29, 2014
- San Diego Democrats for Equality *Eleanor Roosevelt Award for Community Service,* November 17, 2012
- Unitarian Universalist Association *President's Annual Award for Volunteer Service*, June 28, 2009 [https://bit.ly/3GzRT6K]

# EXHIBIT B



**From:** **PACER Fees Class Action Administrator** donotreply@pacerfeesclassaction.com
**Subject:** PACER Fees – Notice of Class Action Settlement
**Date:** July 6, 2023 at 8:34 PM
**To:** ericalanisaacson@icloud.com

Account ID: 10176234
PIN: 328319

**If you paid fees to access federal court records on PACER at any time between
April 21, 2010 and May 31, 2018, a proposed class action settlement may affect your rights.**

Nonprofit groups filed this lawsuit against the United States, claiming that the government has unlawfully charged users of PACER (the Public Access to Court Electronic Records system) more than necessary to cover the cost of providing public access to federal court records. The lawsuit, *National Veterans Legal Services Program, et al. v. United States*, Case No. 1:16-cv-00745-PLF, is pending in the U.S. District Court for the District of Columbia. This notice is to inform you that the parties have decided to settle the case for $125,000,000. This amount is referred to as the common fund. The settlement has been preliminarily approved by the Court.

**Why am I receiving this notice?** You are receiving this notice because you may have first paid PACER fees between April 22, 2016 and May 31, 2018. This notice explains that the parties have entered into a proposed class action settlement that may affect you. You may have legal rights and options that you may exercise before the Court decides to grant final approval to the settlement.

**What is this lawsuit about?** The lawsuit alleges that federal courts have been charging unlawfully excessive PACER fees. It alleges that Congress has authorized the federal courts to charge PACER fees only to the extent necessary to cover the costs of providing public access to federal court records, and that the fees for use of PACER exceed its costs. The lawsuit further alleges that the excess PACER fees have been used to pay for projects unrelated to PACER. The government denies these claims and contends that the fees are lawful. The parties have agreed to settle.

**Who represents me?** The Court has appointed Gupta Wessler PLLC and Motley Rice LLC to represent the Class as Class Counsel. You do not have to pay Class Counsel or anyone else to participate. Class Counsel's fees and expenses will be deducted from the common fund. By participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court. You may hire your own attorney, if you wish, at your own expense.

**What are my options?**

**OPTION 1. Do nothing. Stay in the settlement.** By doing nothing, you remain part of this class action settlement. If you are an accountholder and directly paid your own PACER fees, you do not have to do anything further to receive money from the settlement. You will be legally bound by all orders and judgments of this Court, and will automatically receive a check for your share of the common fund assuming the Court grants final approval of the settlement. By doing nothing you give up any rights to sue the United States government separately about the same claims in this lawsuit. If someone directly paid PACER fees on your behalf, you should direct your payment to that individual or entity at www.pacerfeesclassaction.com no later than Tuesday, September 5th, 2023. If you accept payment of any settlement proceeds, you are verifying that you paid the PACER fees and are the proper recipient of the settlement funds.

**OPTION 2. Exclude yourself from the settlement.** Alternatively, you have the right to not be part of this settlement by excluding yourself or "opting out" of the settlement and Class. If you exclude yourself, you cannot get any money from the settlement, but you will keep your right to separately sue the United States government over the legal issues in this case. If you do not wish to stay in the Class, you must request exclusion in one of the following ways:

1. Send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *National Veterans Legal Services Program, et al. v. United States,* Case No. 1:16-cv-00745-PLF. Be sure to include your name, address, telephone number, email address, and signature. You must mail your Exclusion Request, **postmarked by Sunday, August 20th, 2023** to: PACER Fees Class Action Administrator, P.O. Box 301134, Los Angeles, CA 90030-1134.

2. Complete and submit online the Exclusion Request form found here by Sunday, August 20th, 2023.

3. Send an "Exclusion Request" Form, available here, by mail. You must mail your Exclusion Request form, **postmarked by Sunday, August 20th, 2023** to: PACER Fees Class Action Administrator, P.O. Box 301134, Los Angeles, CA 90030-1134.

If you choose to exclude yourself from the lawsuit, you should decide soon whether to pursue your own case because your claims may be subject to a statute of limitations which sets a deadline for filing the lawsuit within a certain period of time.

**OPTION 3. Stay in the Class and object or go to a hearing.** If you paid PACER fees and do not opt out of the settlement, you may object to any aspect of the proposed settlement. Your written objection must be **sent by Tuesday, September 12th, 2023** and submitted as set out in the *Notice of Proposed Class Action Settlement* referred to below. You also may

request in writing to appear at the Fairness Hearing on Thursday, October 12th, 2023.

**How do I get more information?** This is only a summary of the proposed settlement. For a more detailed *Notice of Proposed Class Action Settlement*, additional information on the lawsuit and proposed settlement, and a copy of the Settlement Agreement, visit www.pacerfeesclassaction.com, call 866-952-1928, or write to: PACER Fees Class Action Administrator, P.O. Box 301134, Los Angeles, CA 90030-1134.

If ericalanisaacson@icloud.com should not be subscribed or if you need to change your subscription information for KCC/USO, please use this preferences page.

EXHIBIT C



# INVOICE

Invoice Date: 04/07/2016

Usage From: 01/01/2016    to: 03/31/2016

## Account Summary

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q12016 |
| **Due Date:** | 05/10/2016 |
| **Amount Due:** | $95.80 |

| | |
|---|---|
| **Pages:** | 958 |
| Rate: | $0.10 |
| Subtotal: | $95.80 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $95.80 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$95.80** |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

| **Total Amount Due:**  | **$95.80** |
|---|---|

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

## PACER Website, Manage My Account Updates

Over the past few months, PACER has made some updates to create a more helpful and efficient experience for users. The following list provides details on the improvements:

· **BrowseAloud:** This screen reader program is available on pacer.gov, the PACER Case Locator (PCL), and the Case Search Sign In page. It assists users with a wide range of needs by reading website text out loud.
· **Setting a Default in Manage My Account:** Users no longer need to select an icon (P, F, or A) to designate a default or autobilling method of payment. Instead, two new links (Set autobill and Set default) make the selection simpler and easier.
· **Checking E-File Status:** This link (under the Maintenance tab in Manage My Account) now automatically provides a list of the courts in which you have registered instead of requiring the user to select from a drop-down list.

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

---

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 05/10/2016 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing.  The total amount due, $95.80, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

Invoice Date: 07/05/2016

Usage From: 04/01/2016    to: 06/30/2016

## Account Summary

| | |
|---|---|
| **Pages:** | 4,751 |
| Rate: | $0.10 |
| Subtotal: | $475.10 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $475.10 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$475.10** |

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q22016 |
| **Due Date:** | 08/10/2016 |
| **Amount Due:** | $475.10 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

---

## Total Amount Due:  $475.10

---

### Preparing for NextGen CM/ECF

Over the past year, several appellate, district, and bankruptcy courts throughout the country have implemented the next generation (NextGen) CM/ECF system. While most courts have not yet set a date for when they will switch to NextGen, you can begin preparing now by upgrading your PACER account. To learn more, visit the NextGen information page at pacer.gov/nextgen.

· **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
· **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
· **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions

Questions about the invoice?
Visit **pacer.gov/billing**

---

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 08/10/2016 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $475.10, will be charged to the credit card on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

**Public Access to Court Electronic Records**

Invoice Date: 10/05/2016

Usage From: 07/01/2016    to: 09/30/2016

Account Summary

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q32016 |
| **Due Date:** | 11/10/2016 |
| **Amount Due:** | $893.70 |

| | |
|---|---|
| **Pages:** | 8,937 |
| Rate: | $0.10 |
| Subtotal: | $893.70 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $893.70 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$893.70** |

## Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

**Total Amount Due:**  $893.70

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

## Preparing for NextGen CM/ECF

In recent months, as more courts throughout the country have implemented the next generation (NextGen) CM/ECF system, some users have encountered issues that can affect account access and registration. The resources listed below can help you avoid many of these issues, creating a smooth transition when your court converts. Check your court's website for updates on when it will implement NextGen.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

---

*Please detach the coupon below and return with your payment.* **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 11/10/2016 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $893.70, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# PACER
## Public Access to Court Electronic Records

# INVOICE

Invoice Date: 01/09/2017

Usage From: 10/01/2016     to: 12/31/2016

## Account Summary

| | |
|---|---|
| **Pages:** | 3,794 |
| Rate: | $0.10 |
| Subtotal: | $379.40 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $379.40 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$379.40** |

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q42016 |
| **Due Date:** | 02/10/2017 |
| **Amount Due:** | $379.40 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

## Total Amount Due:  $379.40

### Preparing for NextGen CM/ECF

In recent months, as more courts throughout the country have implemented the next generation (NextGen) CM/ECF system, some users have encountered issues that can affect account access and registration. The resources listed below can help you avoid many of these issues, creating a smooth transition when your court converts. Check your court's website for updates on when it will implement NextGen.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

---

*Please detach the coupon below and return with your payment.* **Thank you!**



# PACER
## Public Access to Court Electronic Records

| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 02/10/2017 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $379.40, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# INVOICE

Invoice Date:  04/05/2017

Usage From:  01/01/2017      to: 03/31/2017

## Account Summary

| | |
|---|---|
| Account #: | 4166698 |
| Invoice #: | 4166698-Q12017 |
| Due Date: | 05/10/2017 |
| Amount Due: | $360.70 |

**Pages:** 3,607
Rate: $0.10
Subtotal: $360.70

**Audio Files:** 0
Rate: $2.40
Subtotal: $0.00

**Current Billed Usage:** $360.70

**Previous Balance:** $0.00

Current Balance: **$360.70**

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

Questions about the invoice?
Visit **pacer.gov/billing**

## Total Amount Due:  $360.70

### Eighth Circuit Converts to NextGen

In January, the Eighth Circuit Court of Appeals implemented the next generation (NextGen) CM/ECF system. To date, a total of 10 courts have converted, and more courts will follow in the coming months. See the following websites for what to do when your court announces it will make the transition.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

---

*Please detach the coupon below and return with your payment.*  **Thank you!**



| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 05/10/2017 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing.  The total amount due, $360.70, will be charged to the credit card on file up to 7 days before the due date.
Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037



# PACER
### Public Access to Court Electronic Records

# INVOICE

Invoice Date: 07/06/2017

Usage From: 04/01/2017     to: 06/30/2017

## Account Summary

| | |
|---|---|
| **Account #:** | 4166698 |
| **Invoice #:** | 4166698-Q22017 |
| **Due Date:** | 08/10/2017 |
| **Amount Due:** | $644.70 |

| | |
|---|---|
| **Pages:** | 6,447 |
| Rate: | $0.10 |
| Subtotal: | $644.70 |
| **Audio Files:** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| **Current Billed Usage:** | $644.70 |
| **Previous Balance:** | $0.00 |
| Current Balance: | **$644.70** |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 8 am - 6 pm CT M-F
pacer@psc.uscourts.gov

## Total Amount Due:  $644.70

See pacer.gov/billing for detailed billing transactions, instructions for disputing transactions, FAQs, and more.

It's quick and easy to pay your bill online with a credit card. Visit the **Manage My Account** section of the PACER Service Center website at pacer.gov.

The PACER Federal Tax ID is:
**74-2747938**

### Tenth Circuit Converts to NextGen

In May, the Tenth Circuit Court of Appeals implemented the next generation (NextGen) CM/ECF system. To date, a total of 11 courts have converted, and more courts will follow in the coming months. See the following websites for what to do when your court announces it will make the transition.

- **NextGen Help** (pacer.gov/nextgen): Provides general information about NextGen conversion
- **Electronic Learning Modules** (pacer.gov/ecfcbt/cso/index.html): Provides user training for new NextGen features
- **NextGen CM/ECF FAQs** (pacer.gov/psc/hfaq.html): Answers common NextGen-related questions
- **Court Links** (pacer.gov/psco/cgi-bin/links.pl): Shows which courts have converted

Questions about the invoice?
Visit **pacer.gov/billing**

---

*Please detach the coupon below and return with your payment.* **Thank you!**



# PACER
### Public Access to Court Electronic Records

| Account # | Due Date | Amount Due |
|---|---|---|
| 4166698 | 08/10/2017 | Auto Bill |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

This account is registered for automatic billing. The total amount due, $644.70, will be charged to the credit card on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR.

*Visit pacer.gov for address changes.*

PACER Service Center
P.O. Box 71364
Philadelphia, PA 19176-1364

Law Office of Eric Alan Isaacson
Eric Alan Isaacson
6580 Avenida Mirola
La Jolla, CA 92037

Appx0854

**From:** do_not_reply@psc.uscourts.gov 
**Subject:** 4166698 October 2017 PACER Quarterly Invoice
**Date:** October 14, 2017 at 4:40 AM
**To:** ericalanisaacson@icloud.com



| Account Number: | 4166698 |
|---|---|
| Account Contact: | Eric Alan Isaacson |
| Balance Due: | $288.70 |
| Due Date: | 11/09/2017 |
| | This account is registered for automatic billing. The tot amount due, $288.70, will be charged to the credit car on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR. |

To access the statement:

- Log in to Manage My Account.
- From the **Usage** tab, select **View Quarterly Invoice/Statement of Account**.

Go to Billing for detailed billing transactions, instructions on disputing charges, FAQs, and more.

NOTE: *Please do not reply to this message. If you have questions or comments, please email them to PACER or call us at (800) 676-6856.*

**From:** do_not_reply@psc.uscourts.gov 
**Subject:** 4166698 January 2018 PACER Quarterly Invoice
**Date:** January 13, 2018 at 1:48 AM
**To:** ericalanisaacson@icloud.com



| Account Number: | 4166698 |
|---|---|
| Account Contact: | Eric Alan Isaacson |
| Balance Due: | $280.60 |
| Due Date: | 02/09/2018 |
| | This account is registered for automatic billing. The total amount due, $280.60, will be charged to the credit card on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR. |

To access the statement:

- Log in to Manage My Account.
- From the **Usage** tab, select **View Quarterly Invoice/Statement of Account**.

Go to Billing for detailed billing transactions, instructions on disputing charges, FAQs, and more.

NOTE: *Please do not reply to this message. If you have questions or comments, please email them to PACER or call us at (800) 676-6856.*

**From:** do_not_reply@psc.uscourts.gov 
**Subject:** 4166698 April 2018 PACER Quarterly Invoice
**Date:** April 14, 2018 at 1:44 AM
**To:** ericalanisaacson@icloud.com



| | |
|---|---|
| Account Number: | 4166698 |
| Account Contact: | Eric Alan Isaacson |
| Balance Due: | $404.80 |
| Due Date: | 05/10/2018 |
| | This account is registered for automatic billing. The tot amount due, $404.80, will be charged to the credit car on file up to 7 days before the due date. Charges will appear on your credit card statement as: PACER 800-676-6856 IR. |

To access the statement:

- Log in to Manage My Account.
- From the **Usage** tab, select **View Quarterly Invoice/Statement of Account**.

Go to Billing for detailed billing transactions, instructions on disputing charges, FAQs, and more.

NOTE: *Please do not reply to this message. If you have questions or comments, please email them to PACER or call us at (800) 676-6856.*

# EXHIBIT D

### THE FITZPATRICK MATRIX

Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia

| Years Exp. / Billing Yr. | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| 35+ | 535 | 563 | 591 | 619 | 647 | 675 | 703 | 731 | 736 |
| 34 | 534 | 562 | 590 | 618 | 646 | 674 | 702 | 729 | 734 |
| 33 | 532 | 560 | 588 | 616 | 644 | 672 | 700 | 728 | 733 |
| 32 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 726 | 730 |
| 31 | 527 | 555 | 583 | 611 | 639 | 667 | 695 | 723 | 728 |
| 30 | 524 | 552 | 580 | 608 | 636 | 664 | 692 | 720 | 725 |
| 29 | 521 | 549 | 577 | 605 | 633 | 661 | 689 | 717 | 721 |
| 28 | 517 | 545 | 573 | 601 | 629 | 657 | 685 | 713 | 717 |
| 27 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 708 | 713 |
| 26 | 508 | 536 | 564 | 592 | 620 | 648 | 676 | 704 | 708 |
| 25 | 502 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 703 |
| 24 | 497 | 525 | 553 | 581 | 609 | 637 | 665 | 693 | 697 |
| 23 | 491 | 519 | 547 | 575 | 603 | 630 | 658 | 686 | 691 |
| 22 | 484 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 684 |
| 21 | 477 | 505 | 533 | 561 | 589 | 617 | 645 | 673 | 677 |
| 20 | 470 | 498 | 526 | 553 | 581 | 609 | 637 | 665 | 670 |
| 19 | 462 | 490 | 518 | 546 | 574 | 602 | 630 | 658 | 662 |
| 18 | 453 | 481 | 509 | 537 | 565 | 593 | 621 | 649 | 653 |
| 17 | 445 | 473 | 500 | 528 | 556 | 584 | 612 | 640 | 645 |
| 16 | 435 | 463 | 491 | 519 | 547 | 575 | 603 | 631 | 635 |
| 15 | 426 | 454 | 482 | 510 | 538 | 566 | 593 | 621 | 626 |
| 14 | 416 | 443 | 471 | 499 | 527 | 555 | 583 | 611 | 615 |
| 13 | 405 | 433 | 461 | 489 | 517 | 545 | 573 | 601 | 605 |
| 12 | 394 | 422 | 450 | 478 | 506 | 534 | 562 | 590 | 594 |
| 11 | 382 | 410 | 438 | 466 | 494 | 522 | 550 | 578 | 582 |
| 10 | 371 | 399 | 427 | 455 | 483 | 510 | 538 | 566 | 570 |
| 9 | 358 | 386 | 414 | 442 | 470 | 498 | 526 | 554 | 558 |
| 8 | 345 | 373 | 401 | 429 | 457 | 485 | 513 | 541 | 545 |
| 7 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 528 | 532 |
| 6 | 319 | 347 | 375 | 403 | 431 | 458 | 486 | 514 | 518 |
| 5 | 305 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 504 |
| 4 | 290 | 318 | 346 | 374 | 402 | 430 | 458 | 486 | 489 |
| 3 | 275 | 303 | 331 | 359 | 387 | 415 | 443 | 471 | 474 |
| 2 | 260 | 287 | 315 | 343 | 371 | 399 | 427 | 455 | 458 |
| 1 | 244 | 272 | 300 | 328 | 356 | 384 | 412 | 439 | 442 |
| 0 | 227 | 255 | 283 | 311 | 339 | 367 | 395 | 423 | 426 |
| P* | 130 | 140 | 150 | 160 | 169 | 179 | 189 | 199 | 200 |

* = Paralegals/Law Clerks

## Explanatory Notes

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia. It has been developed to provide "a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," as the United States Court of Appeals for the District of Columbia Circuit urged. *DL v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019). The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components.

2. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees. *E.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b). A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The matrix is not intended for use in cases in which the hourly rate is limited by statute. *E.g.*, 28 U.S.C. § 2412(d).

3. For matters in which a prevailing party agrees to payment pursuant to this fee matrix, the United States Attorney's Office will not request that a prevailing party offer the additional evidence that the law otherwise requires. *See, e.g., Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for similar services'")).

4. The years in the column on the left refer to an attorney's years of experience practicing law. Normally, an attorney's experience will be calculated based on the number of years since an attorney graduated from law school. If the year of law school graduation is unavailable, the year of bar passage should be used instead. Thus, an attorney who graduated from law school in the same year as the work for which compensation is sought has 0 years of experience. For all work beginning on January 1 of the calendar year following graduation (or bar admission), the attorney will have 1 year of experience. (For example, an attorney who graduated from law school on May 30 will have 0 years of experience until December 31 of that same calendar year. As of January 1, all work charged will be computed as performed by an attorney with 1 year of experience.) Adjustments may be necessary if an attorney did not follow a typical career progression or was effectively performing law clerk work. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate).

5. The data for this matrix was gathered from the dockets of cases litigated in the U.S. District Court for the District of Columbia using the following search in Bloomberg Law: keywords ("motion n/5 fees AND attorney!" under "Dockets Only") + filing type ("brief," "motion," or "order") + date ("May 31, 2013 – May 31, 2020" under "Entries (Docket Key Only)"). This returned a list of 781 cases. Of those, cases were excluded if there was no motion for fees filed, the motions for fees lacked necessary information, or the motions involved fees not based on hourly rates, involved rates explicitly or implicitly based on an existing fee matrix, involved rates explicitly or implicitly subject to statutory fee caps (e.g., cases subject to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)), or used lower rates prescribed by case law (*e.g., Eley*, 793 F.3d at 105 (Individuals with Disabilities in Education Act

Appx0860

cases)).  After these excisions, 86 cases, many of which included data for multiple billers (and 2 of which only provided hourly rate data for paralegals), remained.

6.  The cases used to generate this matrix constitute complex federal litigation—which caselaw establishes as encompassing a broad range of matters tried in federal court.  *E.g.*, *Reed v. District of Columbia*, 843 F.3d 517, 527-29 (D.C. Cir. 2016) (Tatel, J., concurring) (noting that cases arising under the Freedom of Information Act, Title VII, the Americans with Disabilities Act, Constitutional Amendments, antitrust statutes, and others have been deemed complex, and even "relatively small" cases can constitute complex federal litigation, as they too require "specialized legal skills" and can involve "complex organizations," such as "large companies"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 14-16, 17 (D.D.C. 2008) (prevailing market rates for complex federal litigation should be determined by looking to "a diverse range of cases").  That the attorneys handling these cases asked the court to award the specified rates itself demonstrates that the rates were "'adequate to attract competent counsel, [while] not produc[ing] windfalls to attorneys.'"  *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)).  As a consequence, the resulting analysis yields the "prevailing market rate[] in the relevant community" for complex litigation undertaken in federal courts in the District of Columbia.  *See Blum*, 465 U.S. at 895.

7.  From these 86 complex federal cases, the following information was recorded for 2013 and beyond: hourly rate, the calendar year the rate was charged, and the number of years the lawyer was out of law school when the rate was charged (or, if law school graduation year was unavailable, years since bar passage), as defined above.  If the graduation or bar passage year was not stated in a motion or its exhibits, then the lawyer's biography was researched on the internet.  Although preexisting fee matrices for the District of Columbia provide for mid-year rate changes, very few lawyers in the data submitted rates that changed within a calendar year.  For this reason, the matrix was modeled using one rate for each calendar year.  On the occasions when a lawyer expressed an hourly rate as a range or indicated the rate had increased during the year, the midpoint of the two rates was recorded for that lawyer-year.

8.  The matrix of attorney rates is based on 675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases.  The lawyer-year data points spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years.

9.  Paralegal/law clerk rates were also recorded.  The following titles in the fee motions were included in the paralegal/law clerk data: law clerk, legal assistant, paralegal, senior legal assistant, senior paralegal, and student clerk.  The paralegal/law clerk row is based on 108 paralegal-year data points from 42 unique cases.  They spanned from 2013 to 2019 and from $60 to $290.  (It is unclear how many unique persons are in the 108 data points because paralegals were not always identified by name.)

10. The matrix was created with separate regressions for the lawyer data and the paralegal data.  For the paralegal data, simple linear least-squares regression was used with the dependent variable hourly rate and the independent variable the year the rate was charged subtracted from 2013; years were

combined into one variable and subtracted from 2013 rather than modeled as separate indicator variables to constrain annual inflation to a constant, positive number. The resulting regression formula was rate = 129.8789 + 9.902107 * (year-2013). For the lawyer data, least-squares regression was used with the dependent variable hourly rate and independent variables the year the rate was charged and the number of years of experience of the lawyer when the rate was charged. The year the rate was charged was subtracted from 2013 and modeled linearly as with the paralegal data. The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (e.g., faster growth earlier in one's career than at the end of one's career). *See, e.g.*, Jacob Mincer, *Schooling, Experience, and Earnings* (1974). The resulting regression formula was rate = 227.319 + 16.54492 * experience - 0.2216217 * experience ^ 2 + 27.97634 * (year-2013). Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected here; in order to minimize fee disputes, these models were therefore rejected in favor of the more generous untransformed, fixed-effect model. Rates from one case comprised 20% of the data; the regression was also run without that case, but the resulting rates were mostly lower and therefore rejected, again to minimize fee disputes.

11. The data collected for this matrix runs through 2020. To generate rates in 2021, an inflation adjustment (rounded to the nearest whole dollar) was added. The United States Attorney's Office determined that, because courts and many parties have employed the legal services index of the Consumer Price Index to adjust attorney hourly rates for inflation, this matrix will do likewise. *E.g., Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015); *Eley*, 793 F.3d at 101-02; *DL*, 924 F.3d at 589-90.

12. This matrix was researched and prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students.

# EXHIBIT E

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court | Vanderbilt University

Case 1:21-cv-01751-PLF Document 15-2 Page 334 Filed 07/16/2024 51

9/12/23, 10:29 AM



Home (/) / News (/news/)

# Recent News (/news)

Ingrid Brunk Testifies to European Central Bank at ECB Legal Conference 2023 (https://law.vanderbilt.edu/news/ingrid-brunk-testifies-to-european-central-bank-at-ecb-legal-conference-2023/)

James F. Blumstein Files Amicus Brief in Robinson v. Ardoin

# Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court

## Feb 7, 2023

The Chief Judge of the U.S. District Court for the District of Columbia, Beryl A. Howell, ordered a plaintiff to recalculate and resubmit her claim for attorneys' fees using the so-called "Fitzpatrick Matrix (https://law.vanderbilt.edu/files/publications/usao_matrix_2015_-_2020.pdf)" on Jan. 23, marking the successful launch of a new tool developed for the Department

Appx0864

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court | News | Law School | Vanderbilt University

Case 4:24-cv-01744-DMR Document 15-2 Filed 07/16/2024 Page 325 of 51

9/12/23, 10:29 AM

(https://law.vanderbilt.edu/news/james-f-blumstein-files-amicus-brief-in-robinson-v-ardoin/)

First Amendment Clinics Advocate for Right to Access Government Social Media Accounts (https://law.vanderbilt.edu/news/first-amendment-clinics-advocate-for-right-to-access-government-social-media-accounts/)

A Novel Approach to Teaching Technology Law (https://law.vanderbilt.edu/news/a-novel-approach-to-teaching-technology-law/)

Vanderbilt Law Students and Graduates Secure 39 Clerkships in the 2022-23 Academic Year (https://law.vanderbilt.edu/news/vanderbilt-law-students-and-graduates-secure-39-clerkships-in-the-2022-23-academic-year/)

of Justice by complex litigation expert Brian Fitzpatrick (https://law.vanderbilt.edu/bio/brian-fitzpatrick), who holds the Milton R. Underwood Chair in Free Enterprise at Vanderbilt Law School.



Brian Fitzpatrick

Fitzpatrick has published research on attorney compensation and fee awards throughout his career and often provided expert-witness testimony in cases where fee awards are at issue. In 2020, Peter C. Pfaffenroth of the U.S. Attorney's Office for the District of Columbia asked him to take on a daunting task for which Pfaffenroth believed Fitzpatrick was uniquely qualified: Update the venerable Laffey Matrix (http://www.laffeymatrix.com/), a chart that successful federal litigants had used to calculate and claim reimbursement for their legal fees in the District of Columbia since 1983.

"If you sue the federal government and win, you may be able to file a claim to be reimbursed for your attorneys' fees," Fitzpatrick explains. "But the matrix they were using to calculate these fee awards was 40 years old. Most law firms weren't even

## Publications

Appx0865

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court | News | Law School | Vanderbilt University

Case 4:24-cv-00745-P Document 15-2 Filed 07/16/24 Page 326 of 51

9/12/23, 10:29 AM

Vanderbilt Law Review
(http://www.vanderbiltlawreview.org/)

Journal of Transnational Law
(http://www.vanderbilt.edu/jotl/)

Environmental Law & Policy
Annual Review (ELPAR)
(/academics/academic-
programs/environmental-
law/environmental-law-policy-
annual-review/index.php)

Journal of Entertainment &
Technology Law
(http://jetlaw.org/)

Apply Now (/prospective-students/admissions/apply/)

Make a Gift (https://vanderbilt.alumniq.com/giving/to/vanderbilt-law-news)

using computers in 1983 when the Laffey Matrix was developed, but for years it and another matrix from the 1980s were the only games in town for calculating fee awards. I was asked to develop an updated matrix that reflected modern realities."

Fitzpatrick volunteered to do the work pro bono if the DOJ would fund a research assistant. He hired **Brooke Levy '22**, to conduct a comprehensive audit of recent fee petitions in the D.C. District Court.

"Brooke went into the federal courts' electronic docketing system and examined every fee petition filed between 2013 and 2020. In cases where lawyers put in the hourly rates they actually charged the client for their work, we pulled that out and put it in a spreadsheet," he said. "That allowed us to determine the real hourly rates charged in the market."

Fitzpatrick presented the updated matrix to the Department of Justice in late 2021. The chart, which provides fees for attorneys according to their years of experience as well as hourly rates for law clerks and paralegals, was promptly dubbed the "Fitzpatrick Matrix" by DOJ staff.

"My goal was to develop a reliable assessment of fees charged for complex federal litigation that both plaintiffs and judges could use to evaluate fee claims," he said.

The advantage of having a modern, objective tool to calculate attorney's fees is clear in the order (https://law.justia.com/cases/federal/district-courts/district-of-columbia/dcdce/1:2019cv00989/206139/68/) Chief Judge Howell handed down, in which she ordered a plaintiff to use the Fitzpatrick Matrix to calculate the attorneys' fees she was owed. The plaintiff had filed a claim for fees of approximately $415,000, but according to Judge Howell's calculations, "reasonable fees" at the hourly rates set forth in the Fitzpatrick Matrix indicated a fee award of approximately $245,000.

Attorneys representing the government wrote in a court filing that the Fitzpatrick Matrix is "accurate and reliable," noting that since the DOJ adopted it, "disputes about hourly rates have been minimized, both in settlement discussions and in fee

Appx0866

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by federal court | News | Law School | Vanderbilt University

9/12/23, 10:29 AM

petitions."

Fitzpatrick hopes his new matrix will streamline the process for such claims in the future. "The matrix provides objective criteria for determining attorneys' fees based on prevailing rates and the attorneys' experience, so it should simplify the process for filing claims and require less judicial review," he said.

While the Fitzpatrick Matrix can be adjusted upward for inflation, Fitzpatrick recommends that it be more comprehensively updated every five years. "We shouldn't wait another 40 years to update this tool," he said.

---

**Alumni** (https://law.vanderbilt.edu/news/section/alumni/)
**Branstetter Litigation and Dispute Resolution Program**
(https://law.vanderbilt.edu/news/section/branstetter/) **Faculty News**
(https://law.vanderbilt.edu/news/section/faculty-news/) **General News**
(https://law.vanderbilt.edu/news/section/general-news/) **Home Page News**
(https://law.vanderbilt.edu/news/section/home-page-news/) **L&G News and Events**
(https://law.vanderbilt.edu/news/section/law-government/)



**V** Law School

131 21st Ave. South
Nashville, TN 37203-1181
615-322-2615 (or by Skype)

Appx0867

Fee matrix developed by Professor Brian Fitzpatrick and Brooke Levy '22 adopted by Federal Court | News | Law School | Vanderbilt University

Case 4:24-cv-00575-P Document 15-21 Page 328 Filed 07/16/2024 Page 5 of 51

9/12/23, 10:29 AM



© (https://law.vanderbilt.edu/news/manage/wp-login.php) 2023 Vanderbilt University · Nashville, Tennessee 37240 · (615) 322-7311 · Contact Us (/co
Communications (https://web.vanderbilt.edu/)
Vanderbilt University is committed to principles of equal opportunity and affirmative action.
Vanderbilt®, Vanderbilt University®, V Oak Leaf Design©, and Star V Design are trademarks of The Vanderbilt University. ©2016 Vanderbilt University. A

Appx0868

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) ) ) | Civil No. 16-745-PLF<br><br>STATEMENT OF ERIC ALAN ISAACSON OF INTENT TO APPEAR IN PERSON AT THE OCTOBER 12, 2023, FINAL-APPROVAL HEARING IN *NATIONAL* |
| Plaintiffs, | ) ) | *VETERANS LEGAL SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA* |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

WRITTEN STATEMENT OF ERIC ALAN ISAACSON
OF INTENT TO APPEAR IN PERSON AT THE OCTOBER 12, 2023,
FINAL-APPROVAL HEARING IN
*NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.*
*V. UNITED STATES OF AMERICA*

I am a class member in the above-captioned action who on September 12, 2023, timely served and submitted my Objection of Eric Alan Isaacson to Proposed Settlement in *National Veterans Legal Services Program, et al. v. United States of America.*

On October 3, 2023, Class Counsel filed, but did not serve on me, Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Fees, Costs and Service Awards. DE160. Class Counsel's reply states that I have said I "intend[] to appear remotely" at the October 12, 2023, hearing. DE160:2. That is not accurate. The Objection and Declaration that I submitted on September 12, 2023, states that "I desire to be heard at the October 12, 2023, Final Approval

Hearing in the above-captioned matter, either in person or remotely by means of telephone or video conference." DE160:22¶27.

This Court's Order Setting Settlement Hearing Procedures, DE162, which was filed on October 4, 2023, but was not served on me by the Court or by any party, makes clear that I will need to appear at the hearing in person. That Order states that "[d]ue to technology constraints, those participating virtually will not be able to present any exhibits or demonstratives to the Court or view any that are physically displayed in the courtroom during the hearing." DE162:2¶1. That Order further states that "[i]f a Class Member has submitted a written statement and wishes to be heard at the Settlement Hearing, the Class Member shall be allocated ten minutes to make their presentation," DE162:2¶2.b.i., while any Class Member who "has not submitted a written statement but wishes to be heard at the Settlement Hearing," will be allocated only "five minutes to make their presentation." DE162:3¶2.ii.

I am accordingly submitting this written statement, and am hereby give notice that I will be appearing in person. In addition to expanding on the points made in the Objection and supporting Declaration that I submitted on September 12, 2023, I intend to make the following points:

I will object that class members, such as myself, who submitted timely objections have not been served by the Court or by the Settling Parties with Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Fees, Costs and Service Awards, DE160, or with this Court's orders changing the location of the Final Approval Hearing, DE161, and imposing limitations and additional requirements on those who seek to participate in that hearing. DE162.

I will further object that class members' objections and supporting documentation have not, to date, been placed on the District Court's docket as part of the public record in this case. Although I timely served and submitted my Objection and supporting Declaration as directed in the class notice, both sending it both by email and by U.S. Postal Service Express Mail addressed to the Honorable Paul L. Friedman, my Objection has never been filed on the District Court's

public PACER-accessible docket for this case. Neither have the objections of any other class members.

In my decades of legal practice connected with class actions and their settlement, I have never before witnessed a case in which the settling parties arranged with the court to keep class members' objections off the public record. This is a gross violation of the First Amendment and common-law rights of public access to court records. "[I]n class actions—where by definition 'some members of the public are also parties to the [case]'—the standards for denying public access to the record 'should be applied ... with particular strictness.'" *Shane Grp., Inc. v. Blue Cross Blue Shield,* 825 F.3d 299, 305 (6th Cir.2016)(quoting *In re Cendant Corp.,* 260 F.3d 183, 194 (3d Cir. 2001)). It also amounts to a denial of due process, obviously impairing objecting class members' ability to seek appellate review.

I also will object to Class Counsel's submission of supplemental expert declarations supporting their fee application as a violation of Rule 23(h), which required them to file their fee motion with supporting affidavits and evidence well before the deadline for class members to file objections. *See* Fed.R.Civ.P. 23(h); *Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244, 1252 (11th Cir. 2020); *Redman v. RadioShack Corp.,* 768 F.3d 622, 638 (7th Cir. 2014); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir.2010). This breach implicates fundamental due-process concerns. *See Lawler v. Johnson,* 253 So.3d 939, 948-51 (Ala. 2017).

The Declaration of William Rubenstein, DE160-2, was submitted on October 3, 2023, well after both the August 28, 2023, deadline this Court set for Class Counsel's attorney's fee application, and weeks after the September 12, 2023, deadline for filing objections. Although I had submitted a timely objection, to which Professor Rubenstein's declaration responds, the Rubenstein declaration was not even served on me. Rubenstein's new declaration provides foundational evidence for Class Counsel's fee request long after the relevant deadlines: "I provide the Court with empirical data which would enable it to find that Class Counsel's proposed billing rates are reasonable." DE160-2:¶1.

Rubenstein's analysis not only comes too late, it is plainly unreliable.

Deconstructing Fitzpatrick's Matrix, Professor Rubenstein says that "[t]he 8 class actions" the Fitzpatrick Matrix includes "had, on average, more than 12 times as many docket entries as the non-class action cases." DE160-2:2¶1. He fails to observe that this makes them a poor comparison for this case, in which the docket entries totaled only 141 with the filing of the Settling Parties' proposed Settlement on October 11, 2022. DE141. According to Rubenstein, the great majority of the cases in the Fitzpatrick Matrix are inapposite, because "in the 74 non-class action cases, the mean" number of docket entries "is 100 entries per case." DE160-2:15-16¶21. "By contrast," Rubenstein says, "the average number of docket entries in the 8 class action cases is 1,207, with the median at 884." DE160-2:16¶21. It should be clear, however, that this case—with around 160 docket entries—is much closer to the relatively simple cases that Rubenstein contends warrant lower attorney's fees, than it is to the class actions that Rubenstein contends warranted higher fees.

"Most importantly," Rubenstein adds, the hourly rates in the Matrix's 8 class action cases were roughly 44% higher than the hourly rates in its non-class action cases." DE160-2. Rubenstein does not, however, explain why class members should have to pay so much more. If anything, Rubenstein's presentation suggests that class-action lawyers are systematically overpaid. Yet Rubenstein contends that Class Counsel in this case should receive nearly ten percent more than do counsel in other, genuinely complex, large-fund class actions: "Class Counsel's trend line is on average 9.3% above the trend line for rates in fee petitions approved in other large fund class actions." DE160-2:13-14¶18.

The cases that Rubenstein selects as comparators are obviously inapposite. In *Cobdell v. Salazar,* for example, the district court conducted a full bench trial, and the Final Order Approving Settlement was docket entry 3850. *Cobell v. Jewell,* 234 F. Supp. 3d 126, 130 (D.D.C. 2017), *aff'd sub nom. Cobell v. Zinke,* 741 F.App'x 811 (D.C. Cir. 2018). In *Mercier v United States,* Fed.Cl. No. 1:12-cv-00920, moreover, the plaintiffs' lawyers achieved a far better result than the meagre 25% recovery in this case: "The Gross Settlement Fund of $160,000,000, according to Plaintiffs' damages expert, represents slightly more than 65% of the maximum amount Plaintiffs could have recovered if they had prevailed at trial." *Mercier v. United States,* 156 Fed.Cl. 580, 584 (2021).

Plaintiffs' expert in *Mercier,* Brian T. Fitzpatrick, recommended a 30% fee award, but the Court of Claims concluded that was far too much: "An award of 30% ... yields a windfall to counsel, is not necessary to attract competent counsel to similar cases, and would necessarily be at the expense of the class members." *Mercier v. United States,* 156 Fed. Cl. 580, 592 (2021). The Court of Claims explained that "[t]he fees class counsel requests are approximately 4.4 times the estimated lodestar amount ($10,831,372)." *Id.* That was simply too much. *See id.* Thus, even the cases relied on by Professor Rubenstein demonstrate that the percentage fee award sought by Class Counsel in this case, producing a multiplier of four or 5.5 times their lodestar, amounts to an impermissible windfall.

The Supplemental Declaration of Brian T. Fitzpatrick, DE160-1, also was submitted on October 3, 2023, well after both the August 28, 2023, deadline this Court set for Class Counsel's attorney's fee application, and the September 12, 2023, deadline for submitting objections. Although I had submitted a timely objection, to which Professor Fitzpatrick's supplemental declaration responds, his supplemental declaration was not even served on me.

Remarkably, the untimely declaration signed by Professor Rubenstein attacks the reliability of Professor Fitzpatrick's methodology in constructing the Fitzpatrick Matrix, implicitly suggesting that Professor Fitzpatrick fits his conclusions to the desires of those who pay him. *See, e.g.,* DE160-2:19¶25&n.29. That is a practice with which Professor Rubenstein is very familiar. His treatise on class actions not so long ago recognized that incentive awards were created of "whole cloth," and that "incentive awards threaten to generate a conflict between the representative's own interests and those of the class she purports to represent." 5 William B. Rubenstein, *Newberg on Class Actions* §17:1 at 492 (5th ed. 2015). The Eleventh Circuit naturally quoted Rubenstein's treatise to strike down incentive awards as contrary to law: "'Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards.'" *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244, 1259 (11th Cir. 2020)(quoting Rubenstein, *supra,* § 17:4.). But the class-action plaintiffs' lawyers who frequently pay him to submit favorable declarations complained, and Professor Rubenstein swiftly changed his tune—

submitting an amicus brief supporting en banc rehearing in *Johnson v. NPAS Solutions* that in effect repudiated his own treatise. Professor Rubenstein then rewrote the treatise to suit their ends. Compare 5 William B. Rubenstein, *Newberg on Class Actions* §17:1 at 492 (5th ed. 2015), attached as Exhibit A hereto, which is sensibly hostile to incentive awards, with Professor Rubenstein's amicus brief in *Johnson v. NPAS Solutions,* attached as Exhibit B hereto, and with the newly minted Sixth Edition of Rubenstein's treatise, now arguing for incentive awards.

In a similar vein, I doubt that Professor Fitzpatrick has ever come across a class-action plaintiffs' attorney's fee application that he would characterize as excessive. His position is well known. In one of his law-review articles, Fitzpatrick argues that "class action lawyers not only do not make too much, but actually make too little. Indeed, I argue that in perhaps the most common class action—the so-called 'small stakes' class action—it is hard to see, as a theoretical matter, why the lawyers should not receive everything and leave nothing for class members at all." Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?,* 158 U.Pa.L.Rev. 2043, 2044 (2010). Professor Fitzpatrick explains:

> I assert that we should not be concerned about compensating class members in small-stakes class actions and, instead, should be concerned only with fully incentivizing class action lawyers to bring as many cost-justified actions as possible. That is, the deterrence-insurance theory of civil litigation suggests that the optimal award of fees to class action lawyers in small-stakes actions is 100% of judgments. It is for this reason that I believe class action lawyers are not only not making too much, but, rather, making too little—far too little.

Fitzpatrick, *Do Class Action Lawyers Make Too Little?,* 158 U.Pa.L.Rev. at 2047. Professor Fitzpatrick writes that "even if judges cannot award 100% of settlements to class action lawyers due to political or legal constraints," he believes "they should award fee percentages as high as they can." Fitpatrick, *Do Class Action Lawyers Make Too Little?,* 158 U.Pa.L.Rev. at 2048.

With that, I respectfully submit, the Fitzpatrick and Rubenstein declarations should be rejected as biased, unreliable, and at odds with Rule 23 principles. To place reliance on their conclusions would be to breach this Court's fiduciary duty to the Class.

I also wish to express concerns about this Court's October 4, 2023, Order Setting Settlement Hearing Procedures, which was not served on me, but which I have downloaded from PACER. First, I note that the Order is structured to have settlement approval presented first, with objectors given only a brief opportunity to speak, with only the parties, and not the objectors, then given an opportunity to address attorney's fees. *See* DE162:2-3. This suggests that the Court regards settlement approval as a *fait accompli*. The assumption that objecting class members need not be heard on the subject of attorney's fees also ignores the fact that 2018 amendments to Rule 23(e) make the consideration of attorney's fees a critical element to be considered in connection with whether to approve a settlement in the first place. The current Rule 23(e)(2) says the Court may approve a class-action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether … (C) the relief provided for the class is adequate, taking into account … (iii) the terms of any proposed award of attorney's fees, including timing of payment." Fed.R.Civ.P. 23(e)(2)(C)(iii). Considering attorney's fees only after considering settlement approval, and excluding objectors from commenting in the portion of the hearing concerning attorney's fees, is inconsistent with Rule 23 itself, as well as with principles of fundamental due process.

Also of concern, the schedule in the October 4 Order appears to give objectors no opportunity to cross examine Class Counsel's expert witnesses, Professors Fitzpatrick and Rubenstein. If their opinions are not tested by cross examination, their declarations not only should be discounted as unreliable, they should be stricken as untested and inadmissible hearsay.

On whole, it does not appear that the proceedings are structured to comply with the due-process requirement that objectors receive a full opportunity to be heard. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985).


DATED: October 11, 2023          Respectfully submitted,

Eric Alan Isaacson

LAW OFFICE OF ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858)263-9581
Email: ericalanisaacson@icloud.com

# EXHIBIT A

# NEWBERG

## ON CLASS ACTIONS

### FIFTH EDITION

**Volume 5**
**Chapters 15 to 17**

## William B. Rubenstein

Sidley Austin Professor of Law
Harvard Law School



THOMSON REUTERS™

*For Customer Assistance Call 1-800-328-4880*

Mat #41621726

© 2015 Thomson Reuters

For authorization to photocopy, please contact the **Copyright Clearance Center** at 222 Rosewood Drive, Danvers, MA 01923, USA (978) 750-8400; fax (978) 646-8600 or **West's Copyright Services** at 610 Opperman Drive, Eagan, MN 55123, fax (651) 687-7551. Please outline the specific material involved, the number of copies you wish to distribute and the purpose or format of the use.

This publication was created to provide you with accurate and authoritative information concerning the subject matter covered; however, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

Nothing contained herein is intended or written to be used for the purposes of 1) avoiding penalties imposed under the federal Internal Revenue Code, or 2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Acknowledgment

I continue to be blessed by the assistance of remarkable Harvard Law students, without whom this Treatise endeavor would not be possible. Three graduating students—Todd Logan, Rachel Miller-Ziegler, and Shiyu (Vic) Xu, all Harvard Law School Class of 2015, a veritable "dream team" of research assistants—spent much of the spring of their 3L year helping me finish this volume, each contributing unique talents. Three rising 3Ls—Ephraim McDowell, Albert Rivero, and Ben Schwartz, all Harvard Law School Class of 2016 —continued to help in numerous ways throughout their 2L year. And two 1Ls—John Bailey and Mengjie Zou, Harvard Law School Class of 2017—spent portions of their 1L spring and summer helping me put the finishing touches on this volume. If all that were not blessing enough, Kyle Dandelet, Harvard Law School Class of 2010, came out of retirement to assist with the editing of Volume 5. Numerous other students undertook research and writing that is acknowledged throughout the volume.

Harvard Law School continues to support my scholarship with funding for research assistants and summer writing. I am grateful for that support, as well as for the continuing intellectual companionship of so many of my colleagues, but especially that of my Dean, Martha Minow, and colleagues Noah Feldman, Jerry Frug, and John Goldberg. Carol Bateson provides great support.

I remain grateful to my father, and to my friends Peter Eliasberg and Seana Shiffrin, who—without complaint— hear far more about class action law than life should require.

William B. Rubenstein
Cambridge, Massachusetts
July 2015

iii

# Chapter 17

# **Incentive Awards**[*]

§ 17:1    Incentive awards—Generally
§ 17:2    History and nomenclature of incentive awards
§ 17:3    Rationale for incentive awards
§ 17:4    Legal basis for incentive awards
§ 17:5    Source of incentive awards
§ 17:6    Eligibility for incentive awards
§ 17:7    Frequency of incentive awards
§ 17:8    Size of incentive awards
§ 17:9    Judicial review—Generally
§ 17:10   —Timing of motion
§ 17:11   —Burden of proof
§ 17:12   —Documentation requirement
§ 17:13   —Standards of assessment
§ 17:14   —Disfavored practices—Generally
§ 17:15   — —Conditional awards
§ 17:16   — —Percentage-based awards
§ 17:17   — —*Ex ante* incentive award agreements
§ 17:18   — —Excessive awards
§ 17:19   Incentive awards in securities class actions under the PSLRA
§ 17:20   Incentive awards for objectors
§ 17:21   Appellate review of incentive awards

> **KeyCite®:** Cases and other legal materials listed in KeyCite Scope can be researched through the KeyCite service on Westlaw®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

---

[*]Professor Rubenstein thanks Shiyu (Vic) Xu, Harvard Law School Class of 2015; Ephraim McDowell, Harvard Law School Class of 2016; and John Bailey and Mengjie Zou, Harvard Law School Class of 2017, for their help in editing this unit.

491

## § 17:1  Incentive awards—Generally

A class action lawsuit is a form of representative litigation—one or a few class members file suit on behalf of a class of absent class members and pursue the class's claims in the aggregate.[1] At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class.[2] Most courts call that payment an "incentive award," though some courts label it a "service award" or "case contribution award."[3] The names capture the sense that the payments aim to compensate class representatives for their service to the class and simultaneously serve to incentivize them to perform this function. Empirical evidence shows that incentive awards are now paid in most class suits and average between $10–15,000 per class representative.[4]

Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth, yet both judges—and Congress—have expressed concerns about them. The concerns center on the fact that incentive awards have the potential to interfere with a class representative's ability to perform her job adequately. That job is to safeguard the interests of the absent class members. But with the promise of a significant award upon settlement of a class suit, the representative might prioritize securing that payment over serving the class. Thus, incentive awards threaten to generate a conflict between the representative's own interests and those of the class she purports to represent.

Accordingly, the propriety of incentive awards to named

---

[Section 17:1]

[1]Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members . . .").

[2]Other class members may also be eligible for such awards. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[3]For a discussion of the history and nomenclature of incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[4]For a discussion of empirical data on the frequency and size incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 17:7 to § 17:8 (5th ed.).

492

plaintiffs has been rigorously debated[5] and the law concerning incentive awards is surprisingly nuanced. The following sections of the Treatise attempt to untangle the issues. They proceed to cover the following issues:

- the history and nomenclature of incentive awards;[6]
- the rational for incentive awards;[7]
- the legal basis for incentive awards;[8]
- the source of incentive awards;[9]
- the eligibility requirements for incentive awards;[10]
- the frequency[11] and size of incentive awards;[12]
- the judicial review process, including the timing of the motion;[13] the burden of proof;[14] documentation requirements;[15] standards by which courts assess proposed awards;[16] and disfavored practices with regard to incentive awards, including conditional incentive awards,[17] percentage-based incentive awards,[18] *ex ante* incentive awards agreements,[19] and excessive incentive awards;[20]
- the Private Securities Litigation Reform Act of 1995

---

[5]Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) (quoting **Newberg on Class Actions**).

Lane v. Page, 862 F. Supp. 2d 1182, 1237, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) (quoting **Newberg on Class Actions**).

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *6 (D.N.M. 2011) (quoting **Newberg on Class Actions**).

Estep v. Blackwell, 2006 WL 3469569, *6 (S.D. Ohio 2006) (quoting **Newberg on Class Actions**).

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[7]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[8]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[9]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:5 (5th ed.).

[10]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:7 (5th ed.).

[12]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:8 (5th ed.).

[13]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:10 (5th ed.).

[14]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:11 (5th ed.).

[15]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:12 (5th ed.).

[16]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[17]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:15 (5th ed.).

[18]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:16 (5th ed.).

[19]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:17 (5th ed.).

[20]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

493

(PSLRA)'s approach to incentive awards;[21]
- the availability of incentive awards for objectors;[22] and
- the process for appellate review of incentive awards.[23]

## § 17:2   History and nomenclature of incentive awards

Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth. The threads initially appear in the reported case law in the late 1980s:[1] a 1987 decision of a federal court in Philadelphia appears to be the first to employ the term "incentive award."[2] That court stated the following:

> In addition to the petition for attorneys fees, plaintiffs counsel have requested that the court award incentive payments to the named plaintiffs, in this litigation in excess of their recovery as class plaintiffs in recognition of their role as private attorneys general in this litigation. Counsel has indicated that the named plaintiffs . . . have helped to effectuate the policies underlying the federal securities laws by instituting this litigation, by monitoring the progress of the litigation and undertaking the other responsibilities attendant upon serving as class representatives. Plaintiffs brought to the attention of counsel the existence of facts which culminated in this law suit and have sought through counsel and obtained substantial compensation for the alleged injuries suffered as a result of the alleged wrongful acts of the defendants. Plaintiffs' counsel have provided numerous citations in this district, in this circuit and elsewhere, in which substantial incentive pay-

---

[21]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

[22]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:20 (5th ed.).

[23]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:21 (5th ed.).

**[Section 17:2]**

[1]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1310–11 (2006) ("Courts once tended to limit incentive awards to cases where the representative plaintiff had provided special services to the class—for example, providing financial or logistical support to the litigation or acting as an expert consultant. Beginning around 1990, however, awards for representative plaintiffs began to find readier acceptance . . . By the turn of the century, some considered these awards to be 'routine.'" (footnotes omitted) (quoting Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001))).

[2]Re Continental/Midlantic Shareholders Litigation, 1987 WL 16678 (E.D. Pa. 1987).

494

ments to named plaintiffs in securities class action cases have been made. I believe that such payments are appropriate in this case as well, and will award $10,000.00 payments to both named plaintiffs.[3]

This passage is remarkable in three regards. *First*, as noted, it is the first reference to incentive awards in the reported case law, yet the court states that counsel had provided "numerous citations . . ." in which substantial incentive payments to named plaintiffs in securities class action have been made." This implies that a practice of incentive awards pre-dated courts' references to such awards. There are, in fact, smatterings of earlier cases providing special awards to plaintiffs without labeling them incentive awards.[4] *Second*, the $10,000 payment in 1987, when adjusted to 2002 dollars to accord with an empirical study on point, shows the award to be about $15,830, which the empirical study reports is almost precisely the average incentive award 15 years later.[5] *Third*, although labeling the payment an "incentive award," the rationale that the court employs speaks more to compensation than incentive, suggesting that the class representatives are being paid for their service to the class, not so as to ensure that class members will step forward in the future.

Perhaps for that reason, some courts refer to the awards as "service awards."[6] The first appearance of this term oc-

---

[3] Re Continental/Midlantic Shareholders Litigation, 1987 WL 16678, *4 (E.D. Pa. 1987).

[4] See, e.g., Bryan v. Pittsburgh Plate Glass Co. (PPG Industries, Inc.), 59 F.R.D. 616, 617, 6 Fair Empl. Prac. Cas. (BNA) 925, 6 Empl. Prac. Dec. (CCH) P 8935 (W.D. Pa. 1973), judgment aff'd, 494 F.2d 799, 7 Fair Empl. Prac. Cas. (BNA) 822, 7 Empl. Prac. Dec. (CCH) P 9269 (3d Cir. 1974) (approving settlement that provided "special awards in the aggregate amount of $17,500 to those members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class").

[5] Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1308 (2006) (reporting average award per class representative is $15,992 in inflation adjusted 2002 dollars).
For a discussion of how the magnitude of incentive awards has varied over time, see Rubenstein, 5 Newberg on Class Actions § 17:8 (5th ed.).

[6] Viafara v. MCIZ Corp., 2014 WL 1777438, *16 (S.D.N.Y. 2014) ("Ser-

Appx0885
Case 3:16-cv-00745-PLR Document 266 Filed 07/06/2024 Page 345 of 586 144

curs around 2002[7] and there are about 250 uses of it in federal case law thereafter,[8] though only one by an appellate court.[9] By contrast, about 1,000 district and appellate decisions employ the term "incentive award."[10] The courts appear to utilize the terms interchangeably.

Other courts refer to incentive awards as "case contribution awards."[11] The first case utilizing this term in the reported case law is a 2003 decision of the United States District Court for the Northern District of California. Therein, the court stated that:

> In order to compensate Class Representatives for their time and efforts with respect to this Action, the Class Representatives . . . hereby are awarded Case Contribution Compensation in the amount of $2,000 each, to be paid from the Settlement Fund.[12]

No court employed the case contribution locution again for

---

vice awards are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs.").

[7] In re Sorbates Direct Purchaser Antitrust Litigation, 2002 WL 31651591, *3 (N.D. Cal. 2002) ("Service awards to Class Representatives Nutri-Shield, Inc., Ohio Chemical Services, Inc., Chem/Serv, Inc., Universal Preservachem, Inc., Kraft Chemical Company Nutrishield etc. in the amount of $7,500 each shall be paid from the Settlement Funds.").

[8] A Westlaw search in the federal courts database for <adv: "service award!" /p ("class representative!" or "named plaintiff!")> returned 258 cases on June 1, 2015.

[9] Rodriguez v. National City Bank, 726 F.3d 372, 375, 86 Fed. R. Serv. 3d 414 (3d Cir. 2013) (noting that "the [settlement] agreement provided a service award of $7,500 to each of the named plaintiffs, $200 to each class payee, $75,000 to two organizations that would provide counseling and other services to the settlement class, and $2,100,000 in attorneys' fees").

[10] A Westlaw search in the federal courts database for <adv: "incentive award!" /p ("class representative!" or "named plaintiff!")> returned 930 cases on June 1, 2015.

[11] Joseph v. Bureau of Nat. Affairs, Inc., 2014 WL 5471125, *4 (E.D. Va. 2014) ("The Court finds that Case Contribution Awards of $5,000.00 each to Class Representatives . . . are just and reasonable, and fairly account for their contributions to the pursuit of this Action on behalf of the Settlement Class.").

[12] In re Providian Financial Corp., 2003 WL 22005019, *3 (N.D. Cal. 2003).

496

three years[13] and indeed that form is less often utilized than the phrase "incentive award." There are about 40 reported cases using a "case contribution" phrase[14] (again compared to close to 1,000 cases employing the term "incentive award") and no appellate court decisions utilizing that term. The courts appear to utilize the terms "incentive awards" and "case contribution awards" interchangeably, with no apparent difference in courts' treatment of the concept based on the utilization of one term or the other.

## § 17:3 Rationale for incentive awards

At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class.[1] Most courts call that payment an "incentive award," though some courts label it a "service award" or "case contribution award."[2] The names capture the sense that the payments aim to compensate class representatives for their service to the class and simultaneously serve to incentivize them to perform this function. Incentive awards for class representatives seem problematic because they appear to treat the class representative differently than the other members of the class. This is a problem for class action law because, generally speaking, a class representative is not entitled to be treated differently than any other class member in the settlement of the class suit.[3] As the Ninth Circuit explained in the context of a settlement that awarded

---

[13]In re Westar Energy, Inc. Erisa Litigation, 2006 WL 6909134, *4 (D. Kan. 2006) ("Each of the Named Plaintiffs is also awarded $1,000.00 for their case contribution.").

In re ADC Telecommunications ERISA Litigation, 2006 WL 6617080, *3 (D. Minn. 2006) (preliminarily approving proposed class action settlement that proposed "payment of the Named Plaintiffs' Case Contribution Compensation").

[14]A Westlaw search in the federal courts database for <adv: "case contribution" /p ("class representative!" or "named plaintiff!")> returned 39 cases on June 1, 2015.

[Section 17:3]

[1]Other class members may also be eligible for such awards. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[2]For a discussion of the history and nomenclature of incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[3]Indeed, a class can only be certified if the class representative's claims are typical of those of the rest of the class. Fed. R. Civ. P. 23(a)(3).

497

some present plaintiffs more money than most absent class members:

> [S]pecial rewards for [class] counsel's individual clients are not permissible when the case is pursued as a class action. . . . [W]hen a person joins in bringing an action as a class action he has disclaimed any right to a preferred position in the settlement. Were that not the case, there would be considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations.[4]

Courts fear that a class representative can be induced by a special payment to sell out the class's interests.[5] Such payments are therefore suspect and the suspicion is sometimes policed by ensuring that the class representative's remuneration from the settlement is the same as that of other class

---

[4]Staton v. Boeing Co., 327 F.3d 938, 976, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (citation omitted) (internal quotation marks omitted).

[5]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("[W]e have expressed a 'sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.' " (quoting Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003))).

Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) ("Yet applications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." (citing **Newberg on Class Actions**)).

In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116, 120 (E.D. Pa. 1994) (characterizing class representatives as "fiduciaries" of absent class members and stating that "[t]his fiduciary status introduces concerns about whether the payment of any 'awards' can be reconciled with the punctilio of fairness the fiduciary owes to the beneficiary").

Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720, Fed. Sec. L. Rep. (CCH) P 94403 (E.D.N.Y. 1989) ("A class representative is a fiduciary to the class. If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

Women's Committee For Equal Employment Opportunity (WC=EO) v. National Broadcasting Co., 76 F.R.D. 173, 180, 19 Fair Empl. Prac. Cas. (BNA) 1703, 15 Empl. Prac. Dec. (CCH) P 7832, 24 Fed. R. Serv. 2d 359 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

498

members.[6]

Given this emphasis, it is somewhat surprising that incentive awards have proliferated. The Sixth Circuit has observed that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design."[7] Yet courts have, in fact, given some attention to the rationale for incentive awards, noting that they work "[1] to compensate class representatives for work done on behalf of the class, [2] to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, [3] to recognize their willingness to act as a private attorney general."[8] Many courts have also noted a fourth rationale for incentive payments: that such payments do precisely what their name hopes they will—incentivize class members to step forward on behalf of the class. Courts regularly reference these four rationales behind incentive awards.

*Compensation.* Most courts state that an incentive award to the class representatives is meant to compensate those entities for the service that they provided to the class.[9] Generally, these services are the time and effort the class representatives invest in the case. Class representatives

---

[6]Lane v. Page, 862 F. Supp. 2d 1182, 1238, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) ("Courts 'have denied preferential allocation on the grounds that the named plaintiff may be tempted to settle an action to the detriment of the class or come to expect a 'bounty' for bringing suit.' " (quoting **Newberg on Class Actions**)).

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *8 (D.N.M. 2011) (quoting **Newberg on Class Actions**) (same).

[7]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013).

[8]Rodriguez v. West Publishing Corp., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (numbers added).

*See also* Sullivan v. DB Investments, Inc., 667 F.3d 273, 333, 2011-2 Trade Cas. (CCH) ¶ 77736, 81 Fed. R. Serv. 2d 580 (3d Cir. 2011) ("The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation and to reward the public service of contributing to the enforcement of mandatory laws." (citations omitted) (internal quotation marks omitted)).

[9]**First Circuit (District Court)**

Nilsen v. York County, 400 F. Supp. 2d 265 (D. Me. 2005) (approving "incentive awards to compensate the three class representatives and

seventeen class member who spent time working with class counsel to achieve the settlement").

**Second Circuit (District Court)**

In re American Intern. Group, Inc. Securities Litigation, 2012 WL 345509, *6 (S.D.N.Y. 2012) ("Courts . . . routinely award . . . costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." (citation omitted) (internal quotation marks omitted)).

**Third Circuit (District Court)**

In re Schering-Plough Corp. Enhance Securities Litigation, 2013 WL 5505744, *37 (D.N.J. 2013), appeal dismissed, (3rd Circ. 13-4328) (Apr. 17, 2014) ("Reasonable payments to compensate class representatives for the time and effort devoted by them have been approved.").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) ("The Court will compensate the class representatives for the time they spent on matters connected to the litigation in this case.").

Pozzi v. Smith, 952 F. Supp. 218, 227, Fed. Sec. L. Rep. (CCH) P 99422 (E.D. Pa. 1997) (awarding class representative fee of $1,600 to compensate the class representative for her actual time and expenses).

Lake v. First Nationwide Bank, 900 F. Supp. 726, 737 (E.D. Pa. 1995) (awarding class representative fee of $500 to both class representatives to compensate them for their actual time and expenses).

**Fifth Circuit (District Court)**

Burford v. Cargill, Inc., 2012 WL 5471985, *6 (W.D. La. 2012) ("[T]he Court finds that each named Plaintiff is entitled to an enhancement award to compensate him or her for the time and effort expended in representing the settlement class during this action.").

Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 868, 52 Employee Benefits Cas. (BNA) 1427 (S.D. Tex. 2011) ("Incentive awards are discretionary and 'are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and sometimes to recognize their willingness to act as private attorney general.'" (quoting Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009))).

**Sixth Circuit (District Court)**

Swigart v. Fifth Third Bank, 2014 WL 3447947, *7 (S.D. Ohio 2014) ("The modest class representative award requests of $10,000 to each of the two Class Representatives have been tailored to compensate each Class Representative in proportion to his or her time and effort in prosecuting the claims asserted in this action.").

**Seventh Circuit**

Eubank v. Pella Corp., 753 F.3d 718, 723, 88 Fed. R. Serv. 3d 920 (7th Cir. 2014) (reversing the settlement approval but noting that the

500

lower court "awarded [named plaintiffs] compensation (an 'incentive award,' as it is called) for their services to the class of either $5,000 or $10,000, depending on their role in the case. Saltzman, being the lead class representative, was slated to be a $10,000 recipient").

**Eighth Circuit (District Court)**

In re Zurn Pex Plumbing Products Liability Litigation, 2013 WL 716460, *2 (D. Minn. 2013) ("Service award payments are regularly made to compensate class representatives for their help to a class.").

Sauby v. City of Fargo, 2009 WL 2168942, *3 (D.N.D. 2009) ("Incentive awards serve to compensate class representatives for work done on behalf of the class.").

**Ninth Circuit**

In re Online DVD-Rental Antitrust Litigation, 779 F.3d 934, 943, 2015-1 Trade Cas. (CCH) ¶ 79083 (9th Cir. 2015) ("[I]ncentive awards that are intended to compensate class representatives for work undertaken on behalf of a class 'are fairly typical in class action cases.'" (quoting Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009))).

Rodriguez v. West Publishing Corp., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (stating that incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general").

**Tenth Circuit (District Court)**

Chieftain Royalty Co. v. Laredo Petroleum, Inc., 2015 WL 2254606, *4 (W.D. Okla. 2015) ("Case contribution awards are meant to 'compensate class representatives for their work on behalf of the class, which has benefited from their representation.'" (quoting In re Marsh ERISA Litigation, 265 F.R.D. 128, 150 (S.D.N.Y. 2010))).

**Eleventh Circuit (District Court)**

Burrows v. Purchasing Power, LLC, 2013 WL 10167232, *4 (S.D. Fla. 2013) ("[T]he Court finds that the Class Representative is not being treated differently than the Settlement Class members. Although the Class Representative seeks an incentive award, the incentive award is not to compensate the Class Representatives for damages but to reward him for his efforts on behalf of the Settlement Class.").

Morefield v. NoteWorld, LLC, 2012 WL 1355573, *4 (S.D. Ga. 2012) ("Service awards compensate class representatives for services provided and risks incurred during the class action litigation on behalf of other class members.").

**District of Columbia Circuit (District Court)**

Cobell v. Jewell, 29 F. Supp. 3d 18, 25 (D.D.C. 2014) ("[A]n incentive award is 'intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willing-

perform certain functions that arise in most cases, such as monitoring class counsel, being deposed by opposing counsel, keeping informed of the progress of the litigation, and serving as a client for purposes of approving any proposed settlement with the defendant.[10] Class representatives sometimes

ness to act as a private attorney general.' " (quoting Rodriguez v. West Publishing Corp., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009))).

[10]Lilly v. Jamba Juice Company, 2015 WL 2062858, *7 (N.D. Cal. 2015) (Granting incentive award because: "Named Plaintiffs have been substantially involved in the course of the litigation spanning two years. Plaintiff Lilly and Plaintiff Cox invested considerable time in the litigation and prepared for and gave deposition testimony. Plaintiff Cox took time off from work to participate in the litigation. Plaintiffs have also taken efforts to protect the interests of the class by discussing acceptable settlement terms with counsel.") (citations omitted).

Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 469, 58 Employee Benefits Cas. (BNA) 2084 (D. Md. 2014) ("In the final approval motion, Plaintiffs represent that this award is justified because each Named Plaintiff spent a considerable amount of time over the past four years contributing to the litigation and benefiting the class by reviewing the relevant documents; staying apprised of developments in the case and making themselves available to class counsel; providing class counsel extensive information and materials regarding their Plan investments; responding to Defendants' document requests; and reviewing and ultimately approving the terms of the settlement.").

Singleton v. Domino's Pizza, LLC, 976 F. Supp. 2d 665, 691 (D. Md. 2013) ("In the final approval motion, Plaintiffs represent that this award is justified because both Named Plaintiffs spent a considerable amount of time 'meeting and communicating with counsel, reviewing pleadings and correspondence, gathering documents' and participating in the mediation, all done in furtherance of the interests of the Settlement Classes.").

Heekin v. Anthem, Inc., 2012 WL 5878032, *1 (S.D. Ind. 2012), appeal dismissed, (7th Cir. 12-3786, 12-3871)(May 17, 2013) (approving award because class representatives "committed considerable time and effort over the seven years of litigation" and "[b]oth have conferred and participated with Class Counsel to make key litigation decisions, traveled to Indianapolis to attend hearings, and reviewed the Settlement to ensure it was a fair recovery for the Class") (citation omitted).

Been v. O.K. Industries, Inc., 2011 WL 4478766, *12 (E.D. Okla. 2011), report and recommendation adopted, 2011 WL 4475291 (E.D. Okla. 2011) ("The Court finds . . . that the five Class Representatives devoted substantial time and energy representing the interests of the Class . . . [Class Representative] testified that, for the nine years of litigation, each of the Class Representatives was actively involved in this case, including communicating with Class Counsel, communicating with Class Members, giving depositions, attending and representing the Class in settlement conferences, assisting with preparation for and attending trial, testifying

502

serve additional functions specific to the particular case.[11] In some cases, particularly securities cases litigated under the PSLRA which approach incentive awards in a distinct fashion,[12] courts have compensated class representatives directly for these services, for instance on an hourly basis,[13] but more

---

or being available to testify at trial, and continuously reviewing and commenting on copies of the filings made by the parties in this Court and in the Tenth Circuit.").

[11]In re Zurn Pex Plumbing Products Liability Litigation, 2013 WL 716460, *2 (D. Minn. 2013) ("The service payments sought under the settlement reflect the efforts by the class representatives to gather and communicate information to counsel and act as the public face of the litigation. The class representatives opened their homes up to inspection and testing, some of them more than once. Each assisted with the investigation and preparation of these suits, gathered documents for production, and helped class counsel.").

Burford v. Cargill, Inc., 2012 WL 5471985, *6 (W.D. La. 2012) ("Here, each plaintiff initially participated in telephone conferences with counsel, completed an intake questionnaire, discussed the questionnaire responses with counsel, and signed a contract of representation. As the litigation continued and as part of the discovery process, each plaintiff was required to fill out a detailed questionnaire regarding their use of Cargill feed and damages. To answer the two questions, plaintiffs were generally required to go through years of their business records. They were also required to produce hundreds of pages of records ranging from milk production records to tax returns. Therefore, the record supports enhancement awards in this case as all of the named Plaintiffs have provided valuable services to the class.") (citations omitted).

[12]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

[13]Ontiveros v. Zamora, 303 F.R.D. 356, 366 (E.D. Cal. 2014) ("The court finds that a downward departure from the award proposed by parties from $73.80 per hour to $50 per hour fairly compensates the named plaintiff for his time and incorporates an extra incentive to participate in litigation. Multiplying that rate by the 271 hours the named plaintiff spent on litigation, the court finds he would be entitled to an award of $13,550.").

In re Stock Exchanges Options Trading Antitrust Litigation, 2006 WL 3498590, *13 (S.D.N.Y. 2006) ("The Court will award these named plaintiffs $100 per hour they sat in deposition; those that did not even sit for deposition will receive no incentive . . .").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) ("Pursuant to the Court's request, class representative Frank Seidman has furnished the Court with an adequate accounting that the time he spent working on matters related to this litigation is approximately thirty-two hours. Based on the time records and the representations made by counsel as to the activities undertaken by Frank

often courts simply acknowledge these functions as serving as the basis for the incentive award.

*Risks.* Courts often premise incentive awards on the risks that the class representatives undertook in stepping forward to represent the class.[14] These risks are at least two-fold: in some circumstances, the class representative could be liable for the costs of the suit,[15] while in other circumstances, a class representative might face retaliation.[16] Where the risks are specific and substantial, courts may increase the incen-

---

Seidman on behalf of the class, the Court shall award him a class representative fee totaling $1280 (32 hours at a rate of $40.00 per hour) from the D & T settlement fund as compensation for the actual time which he spent on this litigation.").

[14]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235-36 (10th Cir. 2009) ("[A] class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class.").

Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 430, 2007-1 Trade Cas. (CCH) ¶ 75542 (2d Cir. 2007) ("The Court noted that incentive awards were related to the individual's personal risk and additional efforts to benefit the lawsuit.").

[15]Espenscheid v. DirectSat USA, LLC, 688 F.3d 872, 876–77, 19 Wage & Hour Cas. 2d (BNA) 798, 162 Lab. Cas. (CCH) P 36058 (7th Cir. 2012) ("And a class action plaintiff assumes a risk; should the suit fail, he may find himself liable for the defendant's costs or even, if the suit is held to have been frivolous, for the defendant's attorneys' fees. The incentive reward is designed to compensate him for bearing these risks, as well as for any time he spent sitting for depositions and otherwise participating in the litigation as any plaintiff must do. The plaintiff's duties are not onerous and the risk of incurring liability is small; a defendant is unlikely to seek a judgment against an individual of modest means (and how often are wealthy people the named plaintiffs in class action suits?). The incentive award therefore usually is modest—the median award is only $4,000 per class representative.") (citations omitted).

Fraley v. Facebook, Inc., 966 F. Supp. 2d 939, 947 n.13, 86 Fed. R. Serv. 3d 572 (N.D. Cal. 2013), appeal dismissed, (9th Circ. 13-17097)(Dec. 3, 2013) (finding incentive payments justified because, *inter alia*, "[t]he named plaintiffs here also at least theoretically were at risk of an attorney fee award being entered against them if Facebook prevailed, under the fee-shifting provisions of Civil Code § 3344").

[16]DeLeon v. Wells Fargo Bank, N.A., 2015 WL 2255394, *7 (S.D.N.Y. 2015) (approving $15,000 service award and noting that it, *inter alia,* "recognizes the risks that the named-Plaintiff faced by participating in a lawsuit against her former employer").

Parker v. Jekyll and Hyde Entertainment Holdings, L.L.C., 2010 WL 532960, *1 (S.D.N.Y. 2010) (approving $15,000 enhancement awards because, *inter alia*, "[A]s employees suing their current or former

504

tive award accordingly.[17]

*Private attorneys general.* Courts have often stated that class representatives perform a public function and may be rewarded accordingly. That function is to ensure enforcement of certain laws. As explained elsewhere in the Treatise,[18] one of the functions of the class action is to incentivize private parties to enforce certain laws such that the government is not required to undertake all law enforcement alone. Class action lawyers are often, therefore, labelled "private attorneys general."[19] But since class counsel need class representatives to pursue a class suit, courts have also dubbed the latter with the same moniker[20]—and acknowledged their public service through provision of an incentive

---

employer, the plaintiffs face the risk of retaliation. The current employees risk termination or some other adverse employment action, while former employees put in jeopardy their ability to depend on the employer for references in connection with future employment. The enhancement awards provide an incentive to seek enforcement of the law despite these dangers.").

Frank v. Eastman Kodak Co., 228 F.R.D. 174, 187 (W.D. N.Y. 2005) (recognizing that service awards are "particularly appropriate in the employment context" given the risk of retaliation by a current or former employer).

In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 276 (S.D. Ohio 1997), order rev'd on other grounds, 24 Fed. Appx. 520 (6th Cir. 2001) (noting in prison inmate case that "incentive awards are also justified upon the grounds that the class representatives have . . . assumed the risk of retaliation and/or threats by acting as leaders in an unpopular lawsuit").

[17]Been v. O.K. Industries, Inc., 2011 WL 4478766, *12–13 (E.D. Okla. 2011), report and recommendation adopted, 2011 WL 4475291 (E.D. Okla. 2011) (describing specific forms of retaliation class representatives suffered and justifying $100,000 award in part on this basis).

[18]*See* Rubenstein, 1 **Newberg on Class Actions** § 1:8 (5th ed.).

[19]Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 566, 130 S. Ct. 1662, 176 L. Ed. 2d 494, 109 Fair Empl. Prac. Cas. (BNA) 1, 93 Empl. Prac. Dec. (CCH) P 43877 (2010) ("The upshot is that the plaintiffs' attorneys did what the child advocate could not do: They initiated this lawsuit. They thereby assumed the role of a "private attorney general'" by filling an enforcement void in the State's own legal system, a function 'that Congress considered of the highest priority.'" (quoting Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263, 1 Empl. Prac. Dec. (CCH) P 9834 (1968) (per curiam))).

*See generally,* William B. Rubenstein, On What A "Private Attorney General" Is—And Why it Matters, 57 Vand. L. Rev. 2129 (2004).

[20]U.S. Parole Commission v. Geraghty, 445 U.S. 388, 100 S. Ct. 1202,

505

award.[21]

---

63 L. Ed. 2d 479, 29 Fed. R. Serv. 2d 20 (1980) ("[T]he Federal Rules of Civil Procedure give the proposed class representative the right to have a class certified if the requirements of the Rules are met. This 'right' is more analogous to the private attorney general concept than to the type of interest traditionally thought to satisfy the 'personal stake' requirement.").

Cameron-Grant v. Maxim Healthcare Services, Inc., 347 F.3d 1240, 1246, 9 Wage & Hour Cas. 2d (BNA) 1, 149 Lab. Cas. (CCH) P 34781, 57 Fed. R. Serv. 3d 69 (11th Cir. 2003) ("In essence, the named plaintiff who seeks to represent a class under Rule 23 acts in a role that is analogous to the private attorney general.") (internal quotation marks omitted).

*Cf.* Fox v. Vice, 131 S. Ct. 2205, 2213, 180 L. Ed. 2d 45, 94 Empl. Prac. Dec. (CCH) P 44197 (2011) (noting, in non-class suit that "[w]hen a plaintiff succeeds in remedying a civil rights violation . . . he serves 'as a "private attorney general," vindicating a policy that Congress considered of the highest priority' " (quoting Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263, 1 Empl. Prac. Dec. (CCH) P 9834 (1968) (per curiam))).

*Cf.* Fogerty v. Fantasy, Inc., 510 U.S. 517, 524, 114 S. Ct. 1023, 127 L. Ed. 2d 455, 29 U.S.P.Q.2d 1881 (1994) (noting, in non-class suit that "[o]ftentimes, in the civil rights context, impecunious 'private attorney general' plaintiffs can ill afford to litigate their claims against defendants with more resources").

*See generally*, Daniel J. Meltzer, Deterring Constitutional Violations By Law Enforcement Officials: Plaintiffs and Defendants as Private Attorneys General, 88 Colum. L. Rev. 247 (1988).

[21]In re Linerboard Antitrust Litigation, 2004-1 Trade Cas. (CCH) ¶ 74458, 2004 WL 1221350, *18 (E.D. Pa. 2004), order amended, 2004 WL 1240775 (E.D. Pa. 2004) (noting that incentive payments were "particularly appropriate in this case because there was no preceding governmental action alleging a conspiracy").

In re Cendant Corp., Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (stating that incentive "awards are granted to reward the public service performed by lead plaintiffs in contributing to the vitality and enforcement of securities laws").

In re Plastic Tableware Antitrust Litigation, 1995-2 Trade Cas. (CCH) ¶ 71192, 1995 WL 723175, *2 (E.D. Pa. 1995) (noting that class representative incentive payments "may also be treated as a reward for public service").

In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116, 121 (E.D. Pa. 1994) ("In securities class actions, incentive payments are also thought to encourage the enforcement of federal securities laws.").

In re SmithKline Beckman Corp. Securities Litigation, 751 F. Supp. 525, 535, Fed. Sec. L. Rep. (CCH) P 95,686 (E.D. Pa. 1990) ("[T]he Court agrees that special awards to the class representatives are appropriate. First, they have rendered a public service by contributing to the vitality of the federal Securities Acts. Private litigation aids effective enforcement of the securities laws because private plaintiffs prosecute violations that

506

Case 3:85-cv-00345-PLC Document 4566 Page 357 of 2024 07/06/2024 144

Appx0897

*Incentives.* Courts have held that incentive awards are justified as a means for encouraging class members to step forward to represent the class. The Seventh Circuit stated in 1998 that: "[b]ecause a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit."[22] Courts in nearly every circuit have embraced the argument, often directly citing the Seventh Circuit's locution.[23] Typically, courts will simply identify this purpose might otherwise go undetected due to the SEC's limited resources." (citation omitted) (internal quotation marks omitted).

[22]Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

**First Circuit (District Court)**[23]

Baptista v. Mutual of Omaha Ins. Co., 859 F. Supp. 2d 236, 244 (D.R.I. 2012) ("An incentive award to a named plaintiff can be appropriate to encourage or induce an individual to participate in a class action." (quoting In re Puerto Rican Cabotage Antitrust Litigation, 815 F. Supp. 2d 448 (D.P.R. 2011))).

In re Puerto Rican Cabotage Antitrust Litigation, 815 F. Supp. 2d 448, 468 (D.P.R. 2011) ("'Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit.'" (quoting In re Compact Disc Minimum Advertised Price Antitrust Litigation, 292 F. Supp. 2d 184, 189, 2004-1 Trade Cas. (CCH) ¶ 74293 (D. Me. 2003))).

**Fourth Circuit (District Court)**

Smith v. Toyota Motor Credit Corp., 2014 WL 4953751, *1 n.5 (D. Md. 2014) ("'Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 468, 58 Employee Benefits Cas. (BNA) 2084 (D. Md. 2014) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

**Fifth Circuit (District Court)**

Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 869, 52 Employee Benefits Cas. (BNA) 1427 (S.D. Tex. 2011) ("Moreover, '[b]ecause a named plaintiff is an essential ingredient of any class action an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

**Sixth Circuit**

In re Dry Max Pampers Litigation, 724 F.3d 713, 723, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) (Cole, J., dissenting) ("Where claims are

507

in approving an incentive award. Occasionally, however, a court will attend to the full meaning of the Seventh Circuit's

---

worth very little, as in this case, even a recovery in the full amount may not be enough to induce anyone to serve as a named plaintiff.").

Bickel v. Sheriff of Whitley County, 2015 WL 1402018, *7 (N.D. Ind. 2015) ("Incentive awards are justified when necessary to induce individuals to become named representatives." (quoting In re Synthroid Marketing Litigation, 264 F.3d 712, 722, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001))).

**Seventh Circuit**

In re Synthroid Marketing Litigation, 264 F.3d 712, 722, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001) ("Incentive awards are justified when necessary to induce individuals to become named representatives.").

Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 410 (7th Cir. 2000) ("Incentive awards are appropriate if compensation would be necessary to induce an individual to become a named plaintiff in the suit.").

Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.").

**Eighth Circuit (District Court)**

Sauby v. City of Fargo, 2009 WL 2168942, *1 (D.N.D. 2009) ("Incentive awards are not intended to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action on behalf of others similarly situated.").

**Ninth Circuit (District Court)**

Barbosa v. MediCredit, Inc., 2015 WL 1966911, *9 (C.D. Cal. 2015) ("An incentive award is appropriate 'if it is necessary to induce an individual to participate in the suit.'" (quoting In re Cellphone Fee Termination Cases, 186 Cal. App. 4th 1380, 1394, 113 Cal. Rptr. 3d 510 (1st Dist. 2010), as modified, (July 27, 2010))).

In re Toys R Us-Delaware, Inc.—Fair and Accurate Credit Transactions Act (FACTA) Litigation, 295 F.R.D. 438, 470, 87 Fed. R. Serv. 3d 968 (C.D. Cal. 2014) ("[I]t is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions.").

**Tenth Circuit**

UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009) ("'Incentive awards [to class representatives] are justified when necessary to induce individuals to become named representatives,' but there is no need for such an award 'if at least one [class member] would have stepped forward without the lure of an incentive award.'" (quoting In re Synthroid Marketing Litigation, 264 F.3d 712, 722–23, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001))).

508

statement—that an award is appropriate *if* it is necessary to induce an individual to serve as a class representative—and in so doing, the court will scrutinize whether the incentive award truly induced the class representative's service.[24]

Incentive awards surely make it look as if the class representatives are being treated differently than other class members, but the justifications for the awards help illuminate the fact that the class representatives are not similarly situated to other class members. They have typically done something the absent class members have not—

---

O'Brien v. Airport Concessions, Inc., 2015 WL 232191, *6 (D. Colo. 2015) ("The Court agrees that some award would be necessary to incentivize a plaintiff to come forward on behalf of the class in this case, and that the class has benefitted from his actions.").

Fankhouser v. XTO Energy, Inc., 2012 WL 4867715, *3 (W.D. Okla. 2012) ("Counsel also seek incentive awards for the named class representatives . . . Such awards 'are justified when necessary to induce individuals to become named representatives,' but there is no need for such an award 'if at least one [class member] would have stepped forward without the lure of an 'incentive award.' " (quoting In re Synthroid Marketing Litigation, 264 F.3d 712, 722–23, 2001-2 Trade Cas. (CCH) ¶ 73407, 51 Fed. R. Serv. 3d 736 (7th Cir. 2001))).

In re Motor Fuel Temperature Sales Practices Litigation, 271 F.R.D. 263, 293 (D. Kan. 2010) ("Courts have found that incentive awards to class representatives are justified if necessary to induce individuals to become named representatives, or to compensate them for personal risk incurred or additional effort and expertise provided for the benefit of the class.").

Droegemueller v. Petroleum Development Corp., 2009 WL 961539, *5 (D. Colo. 2009) ("Numerous courts have recognized that incentive awards are an efficient and productive way of encouraging members of a class to become class representatives, and in rewarding individual efforts taken on behalf of the class.").

[24]Fouks v. Red Wing Hotel Corp., 2013 WL 6169209, *2 (D. Minn. 2013) ("Plaintiffs quote, but fail to satisfy, the prerequisite expressed in those cases that 'an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' . . . Here, Plaintiffs have put forth no evidence or argument that persuades the Court that they required any enticement beyond their potential statutory recovery to bring this case, or that their actions in prosecuting it are deserving of a reward." (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Kinder v. Dearborn Federal Sav. Bank, 2013 WL 879301, *3 (E.D. Mich. 2013) ("[Plaintiff] has not provided evidence of any other factors the court should consider with respect to an incentive award. Moreover, in light of [plaintiff's] pursuit of several of these types of cases, the court finds that no additional incentive is necessary beyond the $100 in statutory damages already awarded.").

509

stepped forward and worked on behalf of the class—and thus to award them only the same recovery as the other class members risks disadvantaging the class representatives by treating these dissimilarly-situated individuals as if they were similarly-situated to other class members. In other words, incentive awards may be necessary to ensure that class representatives are treated equally to other class members, rewarded both for the value of their claims (like all other class members) but also for their unique service to the class.[25]

While the central cost of incentive awards is the risk that the class representative's interests will diverge from or conflict with those of the class, courts have addressed a host of other problems that arise in the implementation of incentive awards. These are discussed elsewhere in this unit of the Treatise.[26]

## § 17:4   Legal basis for incentive awards

It might be most apt to leave this section of the Treatise blank as Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards. The judiciary has created these awards out of whole cloth. In doing so, courts have explained the rationale for incentive awards, as discussed in the preceding section;[1] but few courts have paused to consider the legal authority for incentive awards. The Sixth Circuit's observation that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design"[2] therefore accurately describes the judiciary's attention to the legal basis

---

[25]In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *4 (S.D.N.Y. 2007).

*See also* Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("A balance must be struck so that a class representative does not view his prospect for rewards as materially different from other members of the class, yet is not disadvantaged by his service in pursuing worthy claims.").

[26]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

**[Section 17:4]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[2]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R.

510

for making incentive awards.

There are only a few scattered references in the reported case law to the legal basis for incentive awards, with no court addressing the question head on. The few references that exist suggest that courts generally treat incentive awards as somewhat analogous to attorney's fee awards. In common fund cases, the presence of a fund under the court's supervision serves as both the source of the award and, in a sense, as the source of authority for an award.[3] In fee-shifting cases, courts must look to the underlying statute for authority to tax a defendant for an incentive award.[4] Because no statutes do authorize such awards, incentive awards are rare in fee-shifting cases, absent a defendant's agreement to pay such awards.

On the common fund side, restitution supports a *fee* award: if the class representative alone is responsible for paying for class counsel's services, the other class members will be unjustly enriched by virtue of receiving the benefit of their services without paying for them; or, if class counsel is not compensated, they will not have realized the fair value of their services.[5] The argument for an incentive award proceeds by analogy: if the class representative provides a service to the class without the class paying for it, the class members will be unjustly enriched by virtue of receiving these services for free, and/or the class representatives are not realizing the full value of their services.[6] This analogy is not quite right, however. The basic rule of unjust enrich-

---

Serv. 3d 216 (6th Cir. 2013).

[3]For a discussion of common fund fee awards, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 15:53 to 15:107 (5th ed.).

[4]For a discussion of statutory fee-shifting, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 15:25 to 15:52 (5th ed.).

[5]For a discussion of the rationale for common fund fee awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:53 (5th ed.).

[6]In re Linerboard Antitrust Litigation, 2004-1 Trade Cas. (CCH) ¶ 74458, 2004 WL 1221350, *18 (E.D. Pa. 2004), order amended, 2004 WL 1240775 (E.D. Pa. 2004) ("Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly.").

In re Plastic Tableware Antitrust Litigation, 1995-2 Trade Cas. (CCH) ¶ 71192, 1995 WL 723175, *2 (E.D. Pa. 1995) ("Payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court. They may also be treated as a reward for

ment is that a person's unsought provision of services generates no entitlement to payment; the common fund fee award is an exception to that rule but an exception typically justified by the fact that class counsel are providing professional (legal) services to the class.[7] Because the class representative is not providing professional services, her situation is best captured not by the exception for attorney's fees but by Judge Posner's summary of the basic rule of unjust enrichment: "If you dive into a lake and save a drowning person, you are entitled to no fee."[8]

A few courts have considered the possibility that incentive payments to the class representatives might be conceptualized as a "cost" or "expense" of the lawsuit that class counsel are entitled to pass on to the class.[9] The Seventh Circuit has speculated that: "Since without a named plaintiff there can be no class action, such compensation as may be necessary to induce [the class representative] to participate in the suit

---

public service and for the conferring of a benefit on the entire class." (citation omitted)).

Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1313 (2006) ("From a doctrinal perspective, incentive awards have been justified as a form of restitution for a benefit conferred on others." (citing Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992))).

[7]Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992) (distinguishing right to fees from right to incentive awards in noting that "the law of restitution (excepting salvage in admiralty) generally confines the right to restitution to professionals, such as doctors and lawyers" (citing 2 George E. Palmer, The Law of Restitution, ch. 10 (1978))).

In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116, 122 (E.D. Pa. 1994) ("We agree with Judge Posner that we cannot equate these investors with professionals 'such as doctors and lawyers.' The value of doctors' and lawyers' contributions are subject to readily available and objective benchmarks of reasonableness that the market supplies a court. No such objective referent exists for 10b-5 heroes. They are therefore not entitled to fees for lay service considerably less dangerous than diving into a lake to save a drowning victim." (discussing Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992))).

[8]Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992).

[9]For a discussion of recoverable costs in class action cases, see Rubenstein, 5 **Newberg on Class Actions** §§ 16:1 to 16:11 (5th ed.).

512

could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable."[10] The Ninth Circuit suggested that any active class members' actual expenses might be compensated as costs and/or that services rendered to class counsel might be re-paid by class counsel.[11] But the Sixth Circuit, in a decision interpreting the word "expenses" in a settlement agreement, stated:

> Incentive awards, moreover, do not fit comfortably within the commonly accepted meaning of "expenses." Webster's Third New International Dictionary (1981) defines an expense as, alternatively, "something that is expended in order to secure a benefit or bring about a result;" "the financial burden involved typically in a course of action or manner of living;" "the charges that are incurred by an employee in connection with the performance of his duties and that typically include transportation, meals, and lodging while traveling;" "an item of outlay incurred in the operation of a business enterprise allocable to and chargeable against revenue for a specific period;" and "loss, injury, or detriment as the necessary price of something gained or as the inevitable result or penalty of an action." The idea common to these definitions is that of a pecuniary cost or necessary price.

> Under the facts of this case, at least, incentive awards bestowed on class representatives as a matter of grace after the

---

[10]Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992); *see also* Tiffany v. Hometown Buffet, Inc., 2005 WL 991982, *3 (N.D. Cal. 2005) (holding potential incentive payments not part of amount-in-controversy for jurisdictional purposes because jurisdictional inquiry looks only at "claims for special and general damages, attorneys' fees and punitive damages" and incentive payments "do not fall within any of these four categories" but "are more analogous to costs, which are excluded from the calculation of the amount in controversy" (citing Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992) (incentive payments to the class representative "could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable"))).

[11]Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (stating, in the context of denying incentive payments to group of non-class representatives, that "class members can certainly be repaid from any cost allotment for their substantiated litigation expenses, and identifiable services rendered to the class directly under the supervision of class counsel can be reimbursed as well from the fees awarded to the attorneys").

513

completion of the representatives' services do not constitute the "necessary price" of such services. Neither do the awards cover pecuniary costs. The district court justified the awards not on the basis of any monetary expenditures made by the named plaintiffs, but on the basis of these plaintiffs' non-pecuniary risks and their long-time leadership roles and communication functions. At oral argument, similarly, plaintiffs' counsel pointed to the valuable public service these men were said to have provided in lowering the risk of a recurrence of rioting at the Southern Ohio Correctional Facility. It does not seem to us that rewarding such a service with a cash payment can properly be equated with the reimbursement of "expenses" in any traditional sense of the word.[12]

Each of these three circuit decisions only touched upon the topic of incentive awards and none generated a legal basis supporting—or rejecting—incentive awards in common fund cases.

On the fee-shifting side, at least one court has held that there is no statutory basis for such an award (under Nevada fee-shifting law);[13] there are, however, scattered reports of defendants being ordered to pay incentive awards in fee-shifting cases.[14] More often, defendants may agree to pay such awards in settling fee-shifting cases and courts have

---

[12]In re Southern Ohio Correctional Facility, 24 Fed. Appx. 520, 528-29 (6th Cir. 2001).

[13]Sobel v. Hertz Corp., 53 F. Supp. 3d 1319, 1332 (D. Nev. 2014) (finding incentive awards appropriate but finding no authority to shift cost to defendant under applicable state statute, which provided for equitable relief and for the prevailing party to recover "reasonable attorney's fees and costs," since that provision "most assuredly does not encompass the requested incentive awards," but granting request "to be paid out of the common fund").

[14]Karraker v. Rent-A-Center, Inc., 492 F.3d 896, 899–900, 19 A.D. Cas. (BNA) 737 (7th Cir. 2007) (noting, in context of ascertaining prevailing party status for purposes of fee-shifting entitlement, that court approved $5,000 incentive award to named plaintiff and because "there is no settlement fund . . . the $5,000 is a direct payment from [defendant] to [plaintiff]").

Sauby v. City of Fargo, 2009 WL 2168942, *4 (D.N.D. 2009) ("It is neither improper for the class representatives to receive an award of a different amount as compared to other class members, nor does the Court find it would be improper to require the City to bear the burden of paying the incentive awards. The City's request for a pro rata reduction in each class member's refund improperly shifts the burden and unduly complicates the settlement. Consequently, the Court finds the City is to pay the incentive award from the $1.5 million common fund, with no correspond-

514

then approved the payments in providing general approval to the settlement itself;[15] consistently, when the settlement agreement does not so provide, courts have rejected requests for incentive awards on that basis.[16] Summarizing this situation, the Sixth Circuit stated in 2003:

> [I]ncentive awards are usually viewed as extensions of the common-fund doctrine, a doctrine that holds that a litigant who recovers a common fund for the benefit of persons other than himself is entitled to recover some of his litigation expenses from the fund as a whole . . . Without a common fund, however, there is no place from which to draw an incentive award. Unsurprisingly, we are unable to find any case where a claim for an incentive award that is not authorized in a settlement agreement has been granted in the absence of a common fund.

> Here there is neither authorization in the consent decree for this incentive award nor a common fund from which it could be drawn. As a result, it is plainly inappropriate to grant an incentive award . . . Forcing the defendants to pay the incentive award is certainly an additional expenditure, and it is

---

ing reduction of the refunds to be provided to participating class members." (citations omitted)).

[15]Equal Rights Center v. Washington Metropolitan Area Transit Authority, 573 F. Supp. 2d 205, 210 (D.D.C. 2008) (reporting that defendant agreed to pay incentive awards (of $5,000 to named plaintiffs and $1,000 to class members who were deposed but not named in the complaint) as part of settlement agreement in fee-shifting case brought under 42 U.S.C. § 1983).

Bynum v. District of Columbia, 412 F. Supp. 2d 73, 80–81 (D.D.C. 2006) (reporting that defendant agreed to pay incentive awards (totaling $200,000) as part of settlement agreement in fee-shifting case brought under 42 U.S.C. § 1983).

FitFitzgerald v. City of Los Angeles, 2003 WL 25471424, *1–2 (C.D. Cal. 2003) (reporting that defendant agreed to pay incentive awards ($3,500 to named plaintiff and $3,500 to declarant for the damages class) as part of settlement agreement in fee-shifting case brought under 42 U.S.C. § 1983).

[16]In re Southern Ohio Correctional Facility, 24 Fed. Appx. 520, 522, 529 n.4 (6th Cir. 2001) (reversing award of incentive payments by defendant in non-common fund case because settlement agreement did not provide for them).

Estep v. Blackwell, 2006 WL 3469569, *7 (S.D. Ohio 2006) (denying incentive award because, in absence of common fund, payment would have to come from defendant and settlement agreement did not provide for defendant to make such a payment).

515

therefore impermissible.[17]

Given that incentive awards are relatively common in class action practice, their legal basis is surprisingly thin. However, as most class suits settle, the parties typically agree to pay the class representatives some incentive award. The only adversarial challenge to this would come from objectors. Absent class members are generally unlikely to object to such awards because even if they were successful, the money would simply remain in the common fund to be distributed to the class and the single member's share of it would be negligible.[18] These dynamics have created few occasions in which courts have been required to consider seriously the legal basis for paying the class representatives from the class's recovery.

## § 17:5  Source of incentive awards

As discussed in the preceding section of the Treatise,[1] the legal basis for incentive awards may vary depending on the fee structure of a class action. In common fund cases, fees are paid out of the common fund; in fee-shifting cases, fees are paid by the defendant. So too incentive awards, though occasionally courts have implied that incentive awards may be paid out of the attorney's fees or re-paid as recoverable costs.

*Common fund.* Courts have generally approved incentive awards that are withdrawn from the common fund at the conclusion of the common fund case. Taking incentive awards from the common fund means that the class members are paying the incentive awards.[2] This is consistent with one legal theory loosely underlying such awards, discussed in

---

[17]Hadix v. Johnson, 322 F.3d 895, 897–99, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003).

[18]*Cf.* Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 573–74 (7th Cir. 1992), as amended on denial of reh'g, (May 22, 1992) (discussing the awarding of attorney's fees and noting that "[n]o class member objected either—but why should he have? His gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule. So the lawyers had no opponent in the district court and they have none here.").

**[Section 17:5]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157,

the prior section:[3] that class members would be unjustly enriched if they were able to secure the services of the class representatives at no cost.

*Defendant.* If a case does not create a common fund, the defendant may be required by a fee-shifting statute to pay a prevailing party's legal fees;[4] if such a case settles, the defendant will typically agree to pay class counsel's legal fees as part of the settlement. In such settlements, a defendant will often agree to pay the class representatives an incentive award, subject to court approval. In the absence of such an agreement, counsel would have to petition the court to order the defendant to pay the incentive awards. As discussed in the prior section of the Treatise,[5] there is no statutory basis for such an award and courts have rejected awards on that basis, although there are a few scattered reports of defendants being ordered to pay incentive awards in fee-shifting cases.

*Attorney's fees.* In some rare cases, courts have alluded to the idea that incentive awards may be are paid by class counsel out of their fees and expenses.[6] However, if counsel give a portion of their fees to their clients, the payment

---

1163 (9th Cir. 2013) ("In cases where the class receives a monetary settlement, the [incentive] awards are often taken from the class's recovery.").

    Shane Group, Inc. v. Blue Cross Blue Shield of Michigan, 2015-1 Trade Cas. (CCH) ¶ 79151, 2015 WL 1498888, *18 (E.D. Mich. 2015) ("Payment of incentive awards to class representatives is a reasonable use of settlement funds." (citing Moulton v. U.S. Steel Corp., 581 F.3d 344, 351, 74 Fed. R. Serv. 3d 918 (6th Cir. 2009))).

    [3]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

    [4]For a discussion of fee-shifting statutes, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 15:25 to 15:52 (5th ed.).

    [5]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

    [6]In re Southern Ohio Correctional Facility, 24 Fed. Appx. 520, 532 n.4(6th Cir. 2001) (reversing a district court's approval of an incentive award and noting that court's "conclusion is in no way affected by the district court's stipulation that the incentive awards were to be deducted from the approximately $1.659 million already set aside for attorney fees and expenses").

    In re Cendant Corp., Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) ("Lead Counsel seeks permission to make an incentive payment . . . out of the proposed attorneys' fees . . . An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.").

would likely violate the ethical prohibition on a lawyer sharing a fee with a non-lawyer,[7] as well as the prohibition on a lawyer going into business with her client.[8] It would also create bad policy.[9]

---

In re Presidential Life Securities, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) ("Plaintiffs' counsels' request for permission to make incentive payments of $2,000 each to five of the individual class representatives is approved as set forth in the order. The matter of payments of incentives to the individual plaintiffs who acted as class representatives need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees awarded to plaintiffs' counsel. The interests of the class, of the public, and of the defendant are not directly affected.").

*Cf.* In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *7 (E.D. Tenn. 2010) (noting, in shareholder derivative suit, that requested incentive awards "would be paid out of the attorney's fees and expenses awarded to Plaintiffs' counsel," but discussing problems with that approach and then holding that "these considerations suggest that it is generally best for incentive awards to be paid out of a common fund or by defendants, rather than by plaintiffs' counsel").

[7]Model Rules of Professional Conduct (ABA), Rule 5.4(a) ("A lawyer or law firm shall not share legal fees with a nonlawyer . . .").

Campbell v. Fireside Thrift Co., 2004 WL 49708, *11 (Cal. App. 1st Dist. 2004), unpublished/noncitable (holding that "funding the incentive award by offsetting it against Class Counsel's fees would constitute sharing fees with a non-lawyer, which is prohibited by rule 1-320 of the State Bar Rules of Professional Conduct").

*But see* In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *8 (E.D. Tenn. 2010) (finding incentive award paid from attorney's fees inappropriate despite concluding that "there is no ethical concern" with such an arrangement because the "Tennessee Rules of Professional Conduct prohibit lawyers from sharing fees with nonlawyers except, *inter alia*, 'a lawyer may share a court-awarded fee with a client represented in the matter for which the fee was awarded'" (quoting Tenn. Sup. Ct. R. 8, RPC 5.4(a)(4))).

In re Presidential Life Securities, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (noting that when incentive awards were to be paid out of counsel's fees, the "sole reason for seeking judicial approval appears to be Code of Professional Responsibility DR 3-102 which bars splitting of legal fees with non-lawyers with exceptions not pertinent here" but approving award).

[8]Model Rules of Professional Conduct (ABA), Rule 1.8(a) ("A lawyer shall not enter into a business transaction with a client . . .").

[9]In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *8 (E.D. Tenn. 2010) ("The scarcity of incentive awards paid from counsel's fees may be indicative of their problematic nature. Because the incentive award will come directly from attorney's fees, Plaintiffs' counsel is asking for the opportunity to pay the named plaintiffs. This puts Plaintiffs'

518

costs.

*Expense.* To the extent that the incentive award is conceptualized as a litigation cost or expense, as a few courts have suggested,[10] then it could be recovered from the fund or the defendant according to any applicable costs provision.[11] That said, few courts regard such payments as recoverable costs.

## § 17:6    Eligibility for incentive awards

At the conclusion of a class action, the class representatives are eligible for incentive awards in recognition of their service to the class. The rationales for incentive awards, discussed in a preceding section,[1] are that the recipient should be compensated for the work she undertook for the class, for the risks she took in doing so, and for stepping forward to serve as a sort of "private attorney general." The tests courts apply in determining whether or not to approve a proposed incentive award, described in the succeeding section,[2] similarly focus on the services that the applicant

counsel in an unusual position, seeking to convince a court they should pay money. While the amount of money here ($10,000 total) is small relative to the total attorney's fees, it is still an expenditure, and therefore their own financial interest conflicts with the named plaintiffs. Plaintiffs' counsel has the most information about what involvement the named plaintiffs had, yet their description of the named plaintiffs' activities is skimpy. Furthermore, Defendants have no motivation to challenge Plaintiffs' counsel's assertions. In addition, paying plaintiffs could lead to professional plaintiffs. These considerations suggest that it is generally best for incentive awards to be paid out of a common fund or by defendants, rather than by plaintiffs' counsel.").

Campbell v. Fireside Thrift Co., 2004 WL 49708, *12 (Cal. App. 1st Dist. 2004), unpublished/noncitable ("[I]t also appears to us to present at least a potential conflict of interest for class counsel to negotiate the payment of an incentive award out of their own fees, because of the resulting divergence between their own interests, those of the class representative, and those of the class as a whole.").

[10]The expense rationale for an award is discussed in the preceding section of the Treatise. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[11]For a discussion of the recovery of nontaxable costs in class actions, *see* Rubenstein, 5 **Newberg on Class Actions** §§ 16:5 to 16:10 (5th ed.).

**[Section 17:6]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[2]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

Appx0909
Case 6-24-00345-PL Document 162-66 Page 690 1 Filed: 07/06/2024 144

provided to the class.[3] Occasionally, these tests are framed in terms of whether the "class representative" provided these services to the class,[4] but the rationale—that a class member should be rewarded for her service to the class—can apply to a wider group of class members.

Thus, lawyers have sought incentive awards for at least four types of class members:

- *Class representatives* are those plaintiffs whom class counsel proposes, and a court appoints, to represent the class. These class representatives serve as the formal "client" on behalf of the class. As such, they are the class members most likely to undertake the tasks that justify an incentive award and hence are the primary beneficiaries of such awards.

- *Named plaintiffs* are those plaintiffs identified individually in the complaint, on whose behalf the case is initially lodged as a putative class action. Class counsel need not put forward all named plaintiffs, or only named plaintiffs, as proposed class representatives. And even if class counsel does propose that all of the named plaintiffs serve as class representatives, a court might approve some but not others. In many cases, however, the class representatives proposed by class counsel and approved by the court will be precisely (and only) those plaintiffs named in the complaint, meaning the two concepts will overlap completely. For that reason, courts often utilize the terms interchangeably, though in some circumstances, the two are not synonymous. Specifically, in some cases, a named plaintiff will not serve as a formal class representative, but by virtue of having

---

[3]*See, e.g.,* Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) (directing courts to consider "[1] the actions the plaintiff has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation").

[4]*See, e.g.,* Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995) (stating that in reviewing a proposed incentive award, a court should consider: "1) the risk to *the class representative* in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the *class representative*; 3) the amount of time and effort spent by the *class representative*; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the *class representative* as a result of the litigation") (emphasis added).

520

been named in the complaint, she may have undertaken some of the tasks that would make her eligible for an incentive award.[5]

- *Other class members* who are neither class representatives nor named plaintiffs might be eligible for incentive awards if they meaningfully participated in the litigation and conferred a benefit on the class. Typically, such awards may be paid to class members who, for example, were deposed by the defendant.[6] While any

---

[5]In re TFT-LCD (Flat Panel) Antitrust Litigation, 2013-1 Trade Cas. (CCH) ¶ 78318, 2013 WL 1365900, *17 (N.D. Cal. 2013), appeal dismissed, (9th Circ. 13-15929) (July 12, 2013) and appeal dismissed, (9th Circ. 13-15915) (June 12, 2014) and appeal dismissed, (9th Circ. 13-15916, 13-15930) (June 13, 2014) and appeal dismissed, (9th Circ. 13-15917) (June 13, 2014) ("The Court approves incentive awards of $15,000 to each of the 40 court-appointed class representatives, and $7,500 for each of eight additional named plaintiffs. The Court recognizes the contribution these class representatives and named plaintiffs made to this litigation and finds the amounts requested are reasonable in light of these contributions.").

*Cf.* Shames v. Hertz Corp., 2012-2 Trade Cas. (CCH) ¶ 78120, 2012 WL 5392159, *22 (S.D. Cal. 2012), appeal dismissed, (9th Circ. 12-57247) (Jan. 23, 2013) and appeal dismissed, (9th Circ. 12-57211, 12-57026) (July 16, 2013) and appeal dismissed, (9th Cir 12-27205) (Sept. 20, 2013) (approving incentive award for class representative but noting that second individual, "though a named plaintiff, has not been put forth as a class representative and does not seek an incentive award").

*But see* Mancini v. Ticketmaster, 2013 WL 3995269, *2 (C.D. Cal. 2013), appeal dismissed, (9th Cir. 13-56536) (Oct. 4, 2013) (denying incentive award to named plaintiffs who were not approved class representatives and finding the named plaintiffs' argument that they, like the class representatives, also "incurred risks of liability for defendants' costs, had little to personally gain from the litigation, and remained involved for many years, including producing documents, appearing for deposition and submitting declarations," unpersuasive).

[6]Shaw v. Interthinx, Inc., 2015 WL 1867861, *4 (D. Colo. 2015) (granting incentive awards where the "[n]amed Plaintiffs and Class Counsel request approval of $10,000 incentive awards to each of the five Named Plaintiffs and $2,500 incentive awards to each of the two Deposed Opt-in Plaintiffs—representing *in toto* less than 1% of the maximum value of the common fund, or .1667% for each Named Plaintiff and .04167% for each Deposed Opt-in Plaintiff").

Camp v. Progressive Corp., 2004 WL 2149079, *7 (E.D. La. 2004) (awarding $2,500 to non-representative class members who gave a deposition, and $1,000 to non-representative class members who were not deposed but who assisted in the preparation of discovery responses, in class action to recover unpaid wages under the FLSA).

521

NEWBERG ON CLASS ACTIONS

class member may therefore be eligible for an incentive award based on her work on behalf of the class, courts are hesitant to provide awards to large groups of plaintiffs, even if active in the litigation, beyond the core group identified as class representatives (or named plaintiffs).[7]

- *Objectors.* Counsel who object to a class settlement might also seek an incentive award for the class member on whose behalf they lodged the objection. Specifically, any class member who does not opt out of the class may object to a proposed settlement or attorney fee award at the conclusion of the class suit.[8] In doing so, an objector may provide a service to the class and therefore be eligible for an incentive award. Objector incentive awards are considered in a separate section at the end of this unit of the Treatise.[9]

## § 17:7  Frequency of incentive awards

There are several studies that provide some limited empirical evidence concerning the frequency and size of incentive awards. One study, conducted by the Federal Judicial Center ("FJC"), examined class action terminations in four districts in the early 1990s, with some passing references to incentive awards.[1] The most comprehensive published study of incentive awards looked at 374 opinions in

---

[7]*See, e.g.,* Staton v. Boeing Co., 327 F.3d 938, 976, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (denying higher awards to "[t]he two hundred-odd IIRs who were not class representatives" partly because they "were not essential to the litigation, although they may have been helpful to it").

[8]The objection process is discussed in detail elsewhere in the Treatise. *See* Rubenstein, 4 **Newberg on Class Actions** §§ 13:20 to 13:37 (5th ed.).

[9]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:20 (5th ed.).

[Section 17:7]

[1]Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule (1996). A report on that study is published elsewhere. *See* Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996).

522

class action settlements published from 1993-2002.[2] The Treatise author's own database contains information on incentive awards in nearly 1,200 class actions resolved between 2006–2011.[3] These studies provide data on the frequency with which courts approve incentive awards.

The FJC study from the early 1990s reported that a "substantial minority of all certified, settled class actions in which the court approved a settlement included designated awards to the named class representatives."[4] Specifically, courts granted incentive awards in the four federal districts in 26% (E.D. Pa.), 46% (S.D. Fla.), 40% (N.D. Ill.), and 37% (N.D. Cal.) of all cases, for a total of awards in 44 of 126 cases, or 34.9%.[5] The comprehensive 10 year study found that 27.8% (104) of all 374 cases involved incentive awards.[6] The 1993–2002 study further broke down incentive award frequency by case type. The data show that incentive awards were most frequently granted in consumer credit (59.1%) and commercial cases (57.1%) and least frequently granted in mass tort (7.1%) and corporate cases (4.2%), while no awards were granted in six tax refund cases.[7]

The Treatise author's own data base suggests a remarkable shift in the frequency of class actions culminating in incentive awards, as presented in Table 1, below.

[2]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303 (2006).

[3]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[4]Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996).

[5]Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule* 120 fig.16 (1996).

[6]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1320 (2006).

[7]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1323 tbl.2 (2006).

### Table 1
### Empirical Data on Frequency of Incentive Awards

| Awards Granted | 1993–2002 Study[8] | 2006–2011 Study[9] |
|---|---|---|
| Antitrust | 35% | 79.4% |
| Civil Rights | 10.5% | 94.6% |
| Consumer | 33.3% | 93.4% |
| Employment- Discrimination | 46.2% | 75.0% |
| Employment—Wages/Benefits | 23.1% | 87.8% |
| Securities | 24.5% | 38.7% |
| TOTAL (all case types including types not included above) | 27.8% | 71.3% |

The more recent data suggest four interesting trends. *First,* while the 1993–2002 study found courts providing incentive awards in 27.8% of all cases, the 2006–2011 data show courts providing incentive awards in 71.3% of all cases. The frequency with which incentive awards are awarded therefore appears to have increased by 156% in recent years, with awards being provided in almost three quarters of all cases. *Second,* the increase occurs across case types, as set forth in Table 1, below. *Third,* securities cases remain those with the lowest percentage of award grants, which is consistent with the statutory framework of the PSLRA.[10] Nonetheless, it appears that some form of remuneration is paid to class representatives in about a third of securities cases. *Fourth,* while incentive awards have proliferated, they appear to have simultaneously become more modest; the size of incentive awards is discussed in the succeeding section of the

---

[8]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1323 tbl.2 (2006).

[9]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[10]For a discussion of incentive awards under the PSLRA, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

Treatise.[11]

The increased prevalence of incentive awards in our study was is so stunning, that we broke the data down among each of the six years of the study (2006–2011). Doing so demonstrated that the frequency of incentive awards increased across those years (but for a blip in the second year). Therefore, our conclusion that courts approved incentive awards in 71.3% of all cases between 2006–2011 masks the facts that courts approved awards in 69.6% and 62.8% of cases in the first two years (2006–2007) but in nearly 80% of all cases (78.6%) by 2011. These data are shown in Graph 1, below.

### Graph 1
### Empirical Data on Frequency of Incentive Awards— 2006–2011[12]



---

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:8 (5th ed.).

[12]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

The increased frequency with which courts have provided incentive awards may be attributable to a combination of several factors. The earlier study went back to 1993, which was about when incentive awards began,[13] so it is not surprising that the practice would have been sparser in those years. As the practice increased, it is quite likely that class counsel sought incentive awards more often, not that courts *sua sponte* offered them more often. However, the dramatic change over time also suggests that courts showed little resistance to the increasing requests for such awards. Neither study provides data on the frequency with which requested awards are approved, rejected, or reduced; but the case law contains far more cases routinely approving awards than outright rejecting them.[14]

These newer data provide strong support for the conclusion that incentive awards are a quite common part of class action practice today.

## § 17:8   Size of incentive awards

There are several studies that provide some limited empirical evidence concerning the frequency and size of incentive awards. One study, conducted by the Federal Judicial Center ("FJC"), examined class action terminations in four districts in the early 1990s, with some passing references to incentive awards.[1] The most comprehensive published study of incentive awards themselves looked at 374

---

[13]On the history of incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:2 (5th ed.).

[14]*See, e.g.,* In re Dry Max Pampers Litigation, 724 F.3d 713, 717, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("The district court entered its 'Final Approval Order and Final Judgment' later that afternoon [of the fairness hearing]. With the exception of a few typographical changes, the order was a verbatim copy of a proposed order [including incentive award provisions] that the parties had submitted to the court before the hearing. The order was conclusory, for the most part merely reciting the requirements of Rule 23 in stating that they were met. About Greenberg's objections, the order had nothing to say.").

**[Section 17:8]**

[1]Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule* (1996). A report on that study is published elsewhere. *See* Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the

526

opinions in class action settlements published from 1993–2002.[2] The author's own database contains information on incentive awards in approximately 1,200 class actions resolved between 2006–2011.[3] The studies provide data on the size of incentive awards.

The size of incentive awards can be viewed at the case level (total amount of incentive awards approved in the case) or at the individual level (amount per class representative), with data available on both average and median sizes. The FJC study from the early 1990s reported that the "median amounts of all awards to class representatives in the four districts were $7500 in E.D. Pa. and N.D. Ill., $12,000 in S.D. Fla., and $17,000 in N.D. Cal. . . . The median award per representative in three courts was under $3000 and in N.D. Cal. was $7560."[4] The data from the two more recent studies appear in Table 1 below.

Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996).

[2]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303 (2006).

[3]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[4]Thomas E. Willging, Laural L. Hooper and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 101 (1996). The larger version of this study shows these numbers to be $2,500 (E.D. Pa.), $2,583 (S.D. Fla.), $2,964 (N.D. Ill.). Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rule* 121 (1996) (fig. 18).

## Table 1
### Empirical Data on Size of Incentive Awards

|  | 1993–2002 Study[5] In 2002 $ | 2006–2011 Study[6] In 2002 $ | 2006–2011 Study[7] In 2011 $ |
|---|---|---|---|
| Median Total Incentive Award | $18,191 | $8,398 | $10,500 |
| Median per Plaintiff | $4,357 | $4,199 | $5,250 |
| Mean Total Incentive Award | $128,803 | $26,326 | $32,915 |
| Mean per Plaintiff | $15,992 | $9,355 | $11,697 |

The two studies show that the average award per plaintiff ranged from $9,355 (in 2002 dollars) in one study to $15,992 (in 2002 dollars) in the other, while the median award per plaintiff in both studies, adjusted to 2002 dollars, fell right between $4,000–$4,500. Both studies therefore show much higher means than medians, suggesting there are some cases in the study with extremely high rewards (driving the average much higher than the median).

This conclusion is supported by data from the 1993–2002 study that breaks down incentive award size by case type. The data show that the mean incentive award per representative was largest in employment discrimination cases ($69,850.20) and smallest in consumer credit cases ($1,326.30).[8] The employment discrimination numbers are far higher than the mean or median numbers, likely because the named plaintiffs in these cases are being rewarded for the risks of retaliation that they faced, as well as for their more routine services provided to the class.

It is difficult to draw any conclusions about trends—the

---

[5]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303, 1346, 1348 (2006).

[6]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[7]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

[8]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303, 1333 tbl.5 (2006).

later study (from 2006–2011) had a slightly lower median award per plaintiff than the earlier data (1993–2002), and the later data also showed a 42% decrease in the mean award per plaintiff when all the data is adjusted to 2002 dollars (from $15,992 to $9,355). It is plausible that this decrease reflects a growing judicial unease with the practice of incentive awards and greater attention to their size. However, as discussed in the preceding section of the Treatise,[9] awards are far more common today than they were 15 years ago, suggesting that perhaps the proliferation of awards has simultaneously tempered their magnitude.

While the size of incentive awards vary from case to case, they may also vary within one case. As discussed in a succeeding section,[10] courts employ multifactor tests in reviewing proposed incentive awards; these factors focus the court on issues related to the class representatives' work on the case and the risks they encountered undertaking that work. Two class representatives within the same case might have undertaken different levels of work or encountered different levels of risk, hence justifying different levels of incentive awards.[11]

## § 17:9  Judicial review—Generally

As Rule 23 does not explicitly authorize incentive awards for class representatives, there is neither a rule-based process for seeking judicial approval nor a rule-based standard governing the court's decision. Yet, as the awards are made in conjunction with a class action settlement—typically from the class's funds[1] and to the class's representatives[2]—there is no doubt that a court must approve of the disbursement.

---

[9]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:7 (5th ed.).

[10]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[11]Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("A differential payment may be appropriate in order to make the class representative whole. The representative plaintiff may have lost wages, vacation time or commissions from sales because of time spent at depositions or other proceedings. A class representative who has been exposed to a demonstrable risk of employer retaliation or whose future employability has been impaired may be worthy of receiving an additional payment, lest others be dissuaded.") (citations omitted).

**[Section 17:9]**

[1]For a discussion of the source of incentive awards, *see* Rubenstein, 5

§ 17:9                         NEWBERG ON CLASS ACTIONS

Five sets of issues arise in the judicial review process:

- When is a motion seeking approval of incentive awards brought forward?[3]
- What is the burden of proof the movant must meet to justify an incentive award?[4]
- What documentation is required?[5]
- What standards do courts apply in assessing the reasonableness of a proposed award?[6]
- What practices are disfavored?[7]

## § 17:10   Judicial review—Timing of motion

Incentive awards arise at the time of a proposed settlement of a class action. The parties typically include a provision for incentive awards in the negotiated settlement agreement. A court thus reviews the proposed award in conjunction with its preliminary review of the proposed settlement.[1] If preliminary approval is granted, notice of the proposed settlement is sent to the class and should include information about any proposed incentive award. The notice should specify the amount that class counsel intend to seek for the class representatives so that the class has that information when reviewing the settlement.[2] Class members have the opportunity to object to the proposed settlement, including the proposed incentive awards, both in writing and at the fairness hearing.[3] Class counsel will then move for final approval of the settlement and their fees, typically folding

**Newberg on Class Actions** § 17:5 (5th ed.).

[2]For a discussion of who is eligible to receive an incentive award, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:6 (5th ed.).

[3]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:10 (5th ed.).

[4]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:11 (5th ed.).

[5]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:12 (5th ed.).

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[7]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

**[Section 17:10]**

[1]For a discussion of the preliminary approval process, *see* Rubenstein, 4 **Newberg on Class Actions** §§ 13:10 to 13:19 (5th ed.).

[2]For a discussion of the content of settlement and fee notice, *see* Rubenstein, 3 **Newberg on Class Actions** §§ 8:13 to 8:25 (5th ed.).

[3]For a discussion of the objection process, *see* Rubenstein, 4 **Newberg**

530

Case 1:24-cv-00575-PLF   Document 45-166   Page 381 of 144

into those motions a request for final approval of the incentive award.[4] Following the fairness hearing, the court's decision granting or rejecting final approval of the settlement and fees typically also reviews the propriety of the proposed awards.

One interesting aspect of this process not discussed in the case law concerns when the class representatives should learn that class counsel and the defendant have negotiated a provision proposing incentive awards and the amount of the proposed awards. The class representative serves a particular function at the moment of a settlement proposal: she is asked to stand in for the absent class members and serve as a representative "client" assessing whether the relief obtained for the class is sufficient. Courts have accordingly expressed concern that the promise of a significant incentive award could persuade the class representative to agree to a settlement not otherwise beneficial to the class.[5] Even though the class representative's claim, like everyone else's, would be compromised at the level of the weak settlement, the size of the incentive award likely so dwarfs the marginal loss from the poor settlement to her personally that she has more reason to embrace the settlement than to resist it. A conflict of interest therefore exists.

Courts have expressed these concerns in policing the *availability* and *size* of incentive awards,[6] but they have not focused on the possibility of addressing the concerns through *process* requirements. When it comes to attorney's fees, it is generally accepted that class counsel and the defendant should not negotiate fees until the settlement terms themselves are in place. The goal of this approach is to ensure

---

on **Class Actions** §§ 13:20 to 13:37 (5th ed.).

[4]For a discussion of the final approval process, *see* Rubenstein, 4 **Newberg on Class Actions** §§ 13:39 to 13:61 (5th ed.).

[5]Lane v. Page, 862 F. Supp. 2d 1182, 1238, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) ("Courts 'have denied preferential allocation on the grounds that the named plaintiff may be tempted to settle an action to the detriment of the class or come to expect a 'bounty' for bringing suit.'" (quoting **Newberg on Class Actions**)).

The Treatise's coverage of the rationale supporting incentive awards examines these concerns in more detail. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[6]For a discussion of excessive incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

that a huge fee offer will not tempt class counsel to settle the class claims on the cheap. With fee discussions forestalled until a later time, they pose less of a threat to the purity of the settlement process. By analogy, the courts could insist that incentive awards not be discussed with (or dangled over) the class representatives until after class counsel has solicited their reactions to the proposed class settlement.[7]

## § 17:11    Judicial review—Burden of proof

The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable. At least three circuits have held that judicial review of incentive awards is searching:

- The Sixth Circuit has held that "applications for incentive awards are *scrutinized carefully* by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain."[1] A number of courts have employed this "scrutinized carefully" language when reviewing proposed incentive awards.[2]
- The Ninth Circuit has held that "district courts must be

---

[7]*See, e.g.*, Lee v. Enterprise Leasing Co.-West, 2015 WL 2345540, *11 (D. Nev. 2015) ("The Court finds that the requested incentive awards are reasonable and appropriate. Importantly, the incentive awards were negotiated after the parties agreed to a settlement to benefit the entire class, so they will not impact the recovery available to other class members.").

**[Section 17:11]**

[1]Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) (emphasis added) (citing **Newberg on Class Actions**).

[2]Arnett v. Bank of America, N.A., 2014 WL 4672458, *11 (D. Or. 2014) ("Although incentive awards are fairly typical in class action cases, they should be scrutinized carefully to ensure that they do not undermine the adequacy of the class representatives." (citation omitted) (internal quotation marks omitted))).

Gascho v. Global Fitness Holdings, LLC, 2014 WL 1350509, *26 (S.D. Ohio 2014), report and recommendation adopted, 2014 WL 3543819 (S.D. Ohio 2014) (" '[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead

532

*vigilant* in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."[3] District courts in the Ninth Circuit have often reiterated this standard in reviewing incentive awards.[4]

---

named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'") (quoting Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003)).

Dickerson v. Cable Communications, Inc., 2013 WL 6178460, *4 (D. Or. 2013) ("Although incentive awards are fairly typical in class action cases, they should be scrutinized carefully to ensure that they do not undermine the adequacy of the class representatives." (citation omitted) (internal quotation marks omitted)).

Lane v. Page, 862 F. Supp. 2d 1182, 1237, Fed. Sec. L. Rep. (CCH) P 96834 (D.N.M. 2012) (" '[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'" (quoting Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003))).

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *6 (D.N.M. 2011) (same).

Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("Payments to class representatives, while not foreclosed, should be closely scrutinized.").

Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 257 (D.N.J. 2005) (holding that because incentive awards would be paid from the common fund and thereby deplete class members' recoveries, "this Court carefully reviews this request to ensure its fairness to the Class").

[3]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) (emphasis added).

[4]Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) ("The Ninth Circuit requires district courts to be 'vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives.'" (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013)).

Bellinghausen v. Tractor Supply Company, 306 F.R.D. 245, 266 (N.D. Cal. 2015) ("The Ninth Circuit has emphasized that 'district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives.'" (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013))).

Miller v. Ghirardelli Chocolate Company, 2015 WL 758094, *7 (N.D. Cal. 2015) (same).

Boring v. Bed Bath & Beyond of California Limited Liability Company, 2014 WL 2967474, *3 (N.D. Cal. 2014) ("[D]istrict courts must

533

- The Eleventh Circuit, in a case unrelated to incentive awards, stated that "[w]hen a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a *substantial burden* falls upon the proponents of the settlement to demonstrate and document its fairness"[5] and that *"careful scrutiny* by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members."[6]

---

be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) )).

Custom LED, LLC v. eBay, Inc, 2014 WL 2916871, *9 (N.D. Cal. 2014) (same).

Cordy v. USS-POSCO Industries, 2014 WL 1724311, *2 (N.D. Cal. 2014) (same).

Wallace v. Countrywide Home Loans, Inc., 22 Wage & Hour Cas. 2d (BNA) 849, 2014 WL 5819870, *4 (C.D. Cal. 2014) (same).

Khanna v. Intercon Sec. Systems, Inc., 2014 WL 1379861, *10 (E.D. Cal. 2014), order corrected, 2015 WL 925707 (E.D. Cal. 2015) (same).

Steinfeld v. Discover Financial Services, 2014 WL 1309692, *2 (N.D. Cal. 2014) (same).

Ritchie v. Van Ru Credit Corp., 2014 WL 956131, *4 (D. Ariz. 2014), subsequent determination, 2014 WL 3955268 (D. Ariz. 2014) (same).

Keirsey v. eBay, Inc, 2014 WL 644738, *1 (N.D. Cal. 2014) (same).

Walsh v. Kindred Healthcare, 2013 WL 6623224, *3 (N.D. Cal. 2013) (same).

Davis v. Cole Haan, Inc., 2013 WL 5718452, *3 (N.D. Cal. 2013) (same).

Wolph v. Acer America Corporation, 2013 WL 5718440, *6 (N.D. Cal. 2013) (same).

Johnson v. General Mills, Inc., 2013 WL 3213832, *7 (C.D. Cal. 2013) ("The Ninth Circuit has recently cautioned that 'district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives.'" (quoting Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) )).

[5]Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983) (emphasis added).

Cohen v. Resolution Trust Corp., 61 F.3d 725, 728 (9th Cir. 1995), opinion vacated, appeal dismissed, 72 F.3d 686 (9th Cir. 1996) (same).

[6]Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983) (emphasis added) (internal quotation marks

534

Courts have also cited this standard when reviewing proposed incentive awards.[7]

This heightened judicial scrutiny toward incentive awards[8] is appropriately consistent with the manner in which courts review class counsel's fee petition, as the court acts in a fiduciary capacity for absent class members during the settlement and fee review process.[9]

A few courts have implied that less scrutiny is required if the proposed incentive award is being paid out of the attorney's fees rather than the common fund.[10] However, as

---

omitted).

[7]Johnson v. General Mills, Inc., 2013 WL 3213832, *7 (C.D. Cal. 2013) (reviewing a proposed incentive award and stating that "'when a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness.'" (quoting Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983))).

Estep v. Blackwell, 2006 WL 3469569, *6 (S.D. Ohio 2006) (same).

Carnegie v. Mutual Sav. Life Ins. Co., 2004 WL 3715446, *23 (N.D. Ala. 2004) (reviewing a proposed incentive award and stating that "[t]he Eleventh Circuit holds that 'a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class,' and that 'a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness'" (quoting Holmes v. Continental Can Co., 706 F.2d 1144, 1147, 1148, 31 Fair Empl. Prac. Cas. (BNA) 1707, 32 Empl. Prac. Dec. (CCH) P 33668, 36 Fed. R. Serv. 2d 817 (11th Cir. 1983))).

[8]In re Herald, Primeo, and Thema Securities Litigation, 2011 WL 4351492, *9 (S.D.N.Y. 2011) ("While incentive awards are not prohibited, they are appropriately subject to heightened judicial scrutiny at the preliminary approval stage.").

[9]*See* Rubenstein, 4 **Newberg on Class Actions** § 13:40 (5th ed.).

[10]In re Cendant Corp., Derivative Action Litigation, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) ("An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.").

In re Presidential Life Securities, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) ("The matter of payments of incentives to the individual plaintiffs who acted as class representatives need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees awarded to plaintiffs' counsel. The interests of the class, of the public, and of the defendant are not directly affected.").

535

discussed elsewhere in the Treatise,[11] the practice of paying incentive awards from the attorney's fees is both rare and problematic.

The succeeding sections survey the documentation courts require,[12] the standards they impose,[13] and the practices they disfavor[14]—all of which imply meaningful judicial review. In fact, there are still many settlements in which courts simply rubber stamp approval papers submitted by the parties without sufficient attention to these payments. The fact that the payments are coming from the common fund and consequently reducing the class members' recoveries accordingly triggers the court's fiduciary duties. However, the magnitude of the incentive awards so pales in comparison to the magnitude of attorney's fees that courts likely pay less attention to them than they otherwise might precisely for that reason.

## § 17:12  Judicial review—Documentation requirement

The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable. As discussed elsewhere in the Treatise,[1] incentive awards are premised on the rationale that their recipients have either provided valuable service to the class and/or faced substantial risks in stepping forward to represent the class.[2] Whether the class representatives in a particular case hit this mark is a ques-

---

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:5 (5th ed.).

[12]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:12 (5th ed.).

[13]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:13 (5th ed.).

[14]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

**[Section 17:12]**

[1]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[2]Courts have articulated two other rationales for incentive awards: to incentivize class members to step forward to represent the class, and to recognize their service as private attorneys general. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.). The latter of these rationales raises few questions of fact, as the goal is achieved, to a great extent, by the provision of the service itself. At least one court, for example, approved a (reduced) incentive award in recognition of this service, even where the class representatives did very little work for the class. Michel v.

536

tion of fact. Accordingly, most courts require factual support for any proposed incentive award.[3] Typically, facts relevant

---

WM Healthcare Solutions, Inc., 2014 WL 497031, *11 (S.D. Ohio 2014) (rejecting a $10,000 incentive award because "the named Plaintiffs' involvement in this case was minimal and their expense in pursuing it negligible, if any" but holding that a $3,000 incentive award was appropriate because "fair class action settlement . . . would not [have been] possible were it not for the willingness of the Class Representatives to participate in this suit" and therefore "for class actions to be effectively litigated, at least one plaintiff must be [encouraged] to take on the role of class representative"). The former rationale—to incentivize class members to step forward in the first place—is sometimes framed as a factual question. *See, e.g.*, Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate *if it is necessary* to *induce* an individual to participate in the suit.") (emphasis added). Nonetheless, courts only occasionally scrutinize whether the incentive award truly induced the class representative's service. *See, e.g.*, Fouks v. Red Wing Hotel Corp., 2013 WL 6169209, *2 (D. Minn. 2013) ("Plaintiffs quote, but fail to satisfy, the prerequisite expressed in those cases that 'an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' . . . Here, Plaintiffs have put forth no evidence or argument that persuades the Court that they required any enticement beyond their potential statutory recovery to bring this case, or that their actions in prosecuting it are deserving of a reward." (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))); Kinder v. Dearborn Federal Sav. Bank, 2013 WL 879301, *3 (E.D. Mich. 2013) ("Kinder has not provided evidence of [any] factors the court should consider with respect to an incentive award. Moreover, in light of Kinder's pursuit of several of these types of cases, the court finds that no additional incentive is necessary beyond the $100 in statutory damages already awarded.").

[3]Bellinghausen v. Tractor Supply Company, 306 F.R.D. 245, 266 (N.D. Cal. 2015) ("A class representative must justify an incentive award through 'evidence demonstrating the quality of plaintiff's representative service,' such as 'substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs.'" (quoting Alberto v. GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008))).

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 991 F. Supp. 2d 437, 448–49, 2014-1 Trade Cas. (CCH) ¶ 78644 (E.D.N.Y. 2014) (finding that the declarations of corporate officers were not enough to justify incentive awards and noting that "Class Counsel are expected to provide, at a minimum, documentation setting forth the approximate value of each Class Plaintiff's claim and each one's proposed incentive award").

In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation, 851 F. Supp. 2d 1040, 1090 (S.D. Tex. 2012) ("For the court to approve the incentive awards—even if they are nominal, and even if the defendant does not object—there must be some evidence in the record

to the incentive award determination are demonstrated in affidavits submitted by class counsel and/or the class representatives, through which these persons testify to the particular services performed, the risks encountered, and any other facts pertinent to the award. Courts may also receive this evidence by live testimony at the fairness hearing.[4] While courts have frequently noted the supporting documentation in approving incentive awards,[5] they regularly reject awards where the relevant facts are not suf-

---

demonstrating that the representative plaintiffs were involved. Absent such evidence, the court lacks an adequate basis to approve the incentive awards.").

*But see* In re Southeastern Milk Antitrust Litigation, 2013 WL 2155387, *8 n.9 (E.D. Tenn. 2013) (granting incentive awards even though "[n]o affidavits or other documentation have been submitted in support of the incentive award request" because "[c]lass representatives . . . have clearly been extensively involved in the litigation, settlement discussions and court proceedings and have committed substantial time to the case as confirmed by the Court's own observations").

[4]For a discussion of the fairness hearing process, *see* Rubenstein, 4 **Newberg on Class Actions** § 13:42 (5th ed.).

[5]**First Circuit (District Court)**

In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation, 2014 WL 6968424, *7 (D. Mass. 2014) (granting incentive awards "[b]ased on the declarations of Class Counsel and the Representative Plaintiffs submitted in support of final settlement approval, [showing that] the Representative Plaintiffs have actively participated and assisted Class Counsel in this litigation for the substantial benefit of the Settlement Class despite facing significant personal limitations and sacrifices, including being deposed on deeply personal matters relating to the loss of a loved one").

**Third Circuit (District Court)**

In re General Instrument Securities Litigation, 209 F. Supp. 2d 423, 435, Fed. Sec. L. Rep. (CCH) P 91667 (E.D. Pa. 2001) ("I therefore conclude that upon submission of affidavits attesting to the fact that time and effort were spent by the designated class representatives pursuing this litigation and providing a general description of same, this Court will approve incentive awards.").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) (rejecting an incentive award for one proposed representative due to lack of documentation but approving an award for another because he "has furnished the Court with an adequate accounting that the time he spent working on matters related to this litigation is approximately thirty-two hours" and "[b]ased on the time records and the representations made by counsel as to the activities undertaken by [the representative] on behalf of the class, the Court shall award him a class representative fee totaling

538

---

$1280 . . . from the D & T settlement fund as compensation for the actual time which he spent on this litigation").

**Sixth Circuit (District Court)**

*Cf.* In re Southeastern Milk Antitrust Litigation, 2013 WL 2155387, *8 n.9 (E.D. Tenn. 2013) (granting incentive awards even though "[n]o affidavits or other documentation have been submitted in support of the incentive award request" because the "[c]lass representatives . . . have clearly been extensively involved in the litigation, settlement discussions and court proceedings and have committed substantial time to the case as confirmed by the Court's own observations").

**Seventh Circuit (District Court)**

In re Southwest Airlines Voucher Litigation, 2013 WL 4510197, *11 (N.D. Ill. 2013), appeal dismissed, (7th Circ. 13-3542)(Jan. 3, 2014) (granting incentive awards based on the record and "class counsel report" showing that the plaintiffs had been active participants throughout the litigation).

**Eighth Circuit (District Court)**

Albright v. Bi-State Development Agency of Missouri-Illinois Metropolitan Dist., 2013 WL 4855304, *1 (E.D. Mo. 2013) ("Plaintiffs have also presented evidence regarding the contributions made by the named class representatives to the action, and the time commitment involved. The Court does not believe that such incentive payments should be granted simply as a matter of course. In light of the evidence presented in this case, however, the Court shall also approve an incentive award of $2,500.00 to each of the class representatives, based on their contributions to the case.").

**Ninth Circuit (District Court)**

R.H. v. Premera Blue Cross, 2014 WL 3867617, *3 n.3 (W.D. Wash. 2014) (granting preliminary approval for a settlement that included incentive awards and stating "[t]he court will accept counsel's declaration representing the time and effort undertaken by class representatives on preliminary approval. However, the court expects that the class representatives will provide declarations to the court detailing the time and effort they dedicated in support of the motion for incentive awards" (citation omitted)).

**District of Columbia Circuit (District Court)**

In re Lorazepam & Clorazepate Antitrust Litigation, 2003-2 Trade Cas. (CCH) ¶ 74134, 2003 WL 22037741, *10–11 (D.D.C. 2003) ("This Court has previously determined that incentive awards to named plaintiffs are not uncommon in class action litigation, particularly where a common fund has been created for the benefit of the entire class . . . Through their affidavits and the Petition for Incentives, Counsel has sufficiently explained that the named Plaintiffs 'ultimately played a role in achieving the $35,000,000 settlement.' . . . For the foregoing reasons, the Court will approve [incentive awards] in the amount of $20,000 to each of the four named Plaintiffs." (citation omitted)).

539

ficiently documented.[6] Courts may also provide preliminary

---

[6]**Second Circuit (District Court)**

In re Nassau County Strip Search Cases, 12 F. Supp. 3d 485, 503 (E.D.N.Y. 2014) (denying incentive awards because, *inter alia,* of "the absence of any information from movants concerning the concomitant costs or consequences, if any, to those class members who were deposed or testified at trial, thereby precluding an appropriate evaluation of their services").

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 991 F. Supp. 2d 437, 448–49, 2014-1 Trade Cas. (CCH) ¶ 78644 (E.D.N.Y. 2014) (finding that the declarations of corporate officers were not enough to justify incentive awards and noting that "Class Counsel are expected to provide, at a minimum, documentation setting forth the approximate value of each Class Plaintiff's claim and each one's proposed incentive award").

**Third Circuit (District Court)**

In re General Instrument Securities Litigation, 209 F. Supp. 2d 423, 434–35, Fed. Sec. L. Rep. (CCH) P 91667 (E.D. Pa. 2001) ("I conclude that it is fair and appropriate to compensate these class representatives for time spent on matters connected with this litigation. The record, however, lacks any evidentiary support for the fact that these four representatives expended time and effort which would justify the incentive awards. Counsel for plaintiffs represented to this Court at the fairness hearing that these four individuals are worthy of such an award. No affidavits in support, however, have been submitted. I therefore conclude that upon submission of affidavits attesting to the fact that time and effort were spent by the designated class representatives pursuing this litigation and providing a general description of same, this Court will approve incentive awards. The attached Order will provide deadlines by which such submissions shall result.").

Seidman v. American Mobile Systems, 965 F. Supp. 612, 626 (E.D. Pa. 1997) (noting that the court "will compensate the class representatives for the time they spent on matters connected to the litigation" but denying an incentive award to one representative because she "has not provided the Court with any documentation as to the time which she spent on matters related to this litigation").

**Fourth Circuit (District Court)**

Jones v. Dominion Resources Services, Inc., 601 F. Supp. 2d 756, 768 (S.D. W. Va. 2009) (reducing proposed incentive awards because "the court has received no evidence of the class representatives' participation in this case" and the record "does not indicate that the class representatives were deposed or produced any personal documents").

**Fifth Circuit (District Court)**

Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 869, 52 Employee Benefits Cas. (BNA) 1427 (S.D. Tex. 2011) (denying incentive award because, *inter alia,* "[w]hile Plaintiff has requested an incentive award of $10,000, significantly she has not provided any details

540

nor documentary support demonstrating the nature of her contribution, the hours she put in, the time consulting with counsel, time spent in discovery proceedings, or what information she provided to counsel").

**Sixth Circuit (District Court)**

Bessey v. Packerland Plainwell, Inc., 2007 WL 3173972, *5 (W.D. Mich. 2007) ("[U]p to this point the plaintiffs have not pointed to any specific factual or legal reasons why each class representative should receive $250 above and beyond what he or she will receive in damages under the settlement . . . [T]he record does not at this point justify the proposed extra payments.").

**Seventh Circuit**

Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 410 (7th Cir. 2000) (affirming the district court's denial of an incentive award where counsel failed to make any serious argument in favor of such an award and where it did not appear that the lead plaintiff "had to devote an inordinate amount of time to the case or that . . . he suffered or risked any retaliation [from the defendant]").

**Eighth Circuit (District Court)**

Fouks v. Red Wing Hotel Corp., 2013 WL 6169209, *3 (D. Minn. 2013) (reducing proposed incentive awards to class representatives because there was "simply no evidence before the Court that the Plaintiffs faced any risks or burdens in undertaking this litigation, or that there exist any other factors that would justify the amount they seek, whether styled as an incentive award or reimbursement").

**Ninth Circuit (District Court)**

Davis v. Cole Haan, Inc., 2013 WL 5718452, *3 (N.D. Cal. 2013) ("Here, without any declaration from the named representatives, or any substantive description of the time devoted and work expended on this case by the named representatives, the Court finds the request for incentive payments to be woefully inadequate. Moreover, although Plaintiffs argue that they risked being held liable for Cole Haan's costs in the event of a defense judgment, there is no declaration attesting that the named representatives would have been held personally responsible, as opposed to counsel, for the costs. Therefore, the Court denies the motion for incentive payments. Again, this Order is without prejudice to a renewed motion upon a proper showing.").

**Tenth Circuit (District Court)**

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *11–13 (D.N.M. 2011) (denying an incentive award because, *inter alia*, the plaintiff "offer[ed] no argument or evidence . . . that other class representative were not forthcoming, and that an incentive award is justified for bringing a representative forward").

**Eleventh Circuit (District Court)**

Grassick v. Avatar Properties, Inc., 2008 WL 5099942, *3 (M.D. Fla. 2008) ("The parties also have failed to establish that the proposed $10,000.00 incentive payment to [the plaintiff] is appropriate. While some

§ 17:12                                    Newberg on Class Actions

approval to a settlement that includes proposed incentive awards absent documentation, but direct counsel to submit the documentation before the final approval stage.[7]

## § 17:13    Judicial review—Standards of assessment

The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable. In the absence of any reference to incentive awards in Rule 23, courts have fashioned different tests for their review of proposed incentive awards. The Seventh Circuit articulated a three-part

---

courts have approved payments to class representatives to compensate them for costs they incurred during the litigation, there is no showing that [the plaintiff] has incurred any costs.").

[7]Torchia v. W.W. Grainger, Inc., 2014 WL 3966292, *11 n.3 (E.D. Cal. 2014) (preliminarily approving an incentive award but requiring the plaintiff to "provide evidence to support her request for the incentive award" prior to the fairness hearing, including "the number of hours expended, broken down by task").

Chesbro v. Best Buy Stores, L.P., 2014 WL 793362, *4 n.5 (W.D. Wash. 2014) (preliminarily approving an incentive award despite not having "any evidence of the amount of hours [the plaintiff] . . . devoted to the case," but noting that "[t]he court expects that counsel will provide evidence of the amount of time [the plaintiff] invested in this case prior to any fairness hearing").

Michel v. WM Healthcare Solutions, Inc., 2014 WL 497031, *3 (S.D. Ohio 2014) (explaining that the court had, at the preliminary approval stage, "reminded counsel that incentive awards were subject to court approval and that the named Plaintiffs would be expected to provide specific evidence demonstrating their involvement in the case in order to justify the incentive award").

Alberto v. GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008) (requiring that "[o]n or before the date of the fairness hearing, the parties should present or be prepared to present evidence of the named plaintiff's substantial efforts taken as class representative to justify the discrepancy between her award and those of the unnamed plaintiffs" (footnote omitted)).

In re HP Power Plug and Graphic Card Litigation, 2008 WL 2697192, *1, 3 (N.D. Cal. 2008), as corrected, (July 8, 2008) (granting incentive awards only after "plaintiffs' counsel submitted a declaration in support of incentive awards . . . assert[ing] that plaintiffs spoke to counsel in advance of filing their complaint, actively participated in reviewing the pleadings and were kept informed regarding the status of the case" after initially failing to approve the awards due to lack of supporting documentation for the request).

542

test in a 1998 decision,[1] and the two other circuits that have directly addressed the question—the Eighth[2] and the Ninth[3]—have each cited that test affirmatively. That said, district courts in the Ninth Circuit tend to employ a five-factor test originally set forth in a 1995 decision of the Northern District of California,[4] while courts in New York tend to employ a six-factor test.[5] As no one test has emerged

---

[Section 17:13]

[1]Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an [incentive] award is warranted, relevant factors include [1] the actions the plaintiff has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation.").

[2]In re U.S. Bancorp Litigation, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving $2,000 awards to five representative plaintiffs and citing to the Seventh Circuit's three-factor test from *Cook* in determining these awards to be "appropriate").

[3]Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments. The district court must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

[4]Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995) (noting the five factors as: "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation").

[5]In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *2 (S.D.N.Y. 2007) (noting the six factors as: 1) the personal risk (if any) incurred by the named plaintiff in becoming and continuing as a litigant; 2) the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise); 3) any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim; 4) the ultimate recovery; 5) the sums awarded in similar cases; and 6) the named plaintiff's requested sum in comparison to each class member's estimated *pro rata* share of the monetary judgment or settlement).

543

as particularly salient,[6] the different tests that courts have employed can be broken down by circuit, as in the accompanying footnote.[7]

---

[6]Roberts v. Texaco, Inc., 979 F. Supp. 185, 201–02, 86 Fair Empl. Prac. Cas. (BNA) 1678 (S.D.N.Y. 1997) ("No meaningful guidelines of broad applicability are discernible from the reported decisions as to the appropriate measure for an [incentive] award, the focus being on special circumstances.").

[7]**Second Circuit (District Court)**
Sanchez v. JMP Ventures, L.L.C., 2015 WL 539506, *5 (S.D.N.Y. 2015) ("Here, [the named plaintiff] requests a service award of $10,000, to be paid from the settlement fund. [The named plaintiff] discussed the case with class counsel and was deposed, but he did not attend mediation or the fairness hearing. We have no doubt that his assistance to class counsel was useful, and for this and his willingness to accept what risks are attendant with being a named plaintiff, we believe he should receive some service award. However, under the facts presented, and in light of the total amount of the settlement fund and the large number of class members to receive payments from that fund, we reduce the amount of the service award to Sanchez to $5,000." (citation omitted)).

In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *2 (S.D.N.Y. 2007) (noting six relevant factors in adjudicating named plaintiffs' requests for incentive awards: 1) the personal risk (if any) incurred by the named plaintiff in becoming and continuing as a litigant; 2) the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise); 3) any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim; 4) the ultimate recovery; 5) the sums awarded in similar cases; and 6) the named plaintiff's requested sum in comparison to each class member's estimated *pro rata* share of the monetary judgment or settlement).

**Third Circuit (District Court)**
Fry v. Hayt, Hayt & Landau, 198 F.R.D. 461, 473 (E.D. Pa. 2000) ("[T]o be entitled to an incentive award, plaintiff must show: (1) the risks that the named plaintiff undertook in commencing class action; (2) any additional burdens assumed by named plaintiffs but not unnamed class members; and (3) the benefits generated to class members through named plaintiff's efforts.").

**Fourth Circuit (District Court)**
Kirven v. Central States Health & Life Co. of Omaha, 2015 WL 1314086, *13 (D.S.C. 2015) ("To determine whether an incentive payment is warranted, the court should consider the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.").

Smith v. Toyota Motor Credit Corp., 2014 WL 4953751. *1 (D. Md. 2014) ("To determine whether an incentive payment is warranted, the

544

The widely employed Seventh Circuit test considers three

court should consider 'the actions the plaintiff[s] [have] taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff[s] expended in pursuing the litigation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Decohen v. Abbasi, LLC, 299 F.R.D. 469, 483 (D. Md. 2014) ("To determine whether an incentive payment is warranted, the court should consider 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) )).

**Fifth Circuit (District Court)**

Slipchenko v. Brunel Energy, Inc., 2015 WL 338358, *13 (S.D. Tex. 2015) ("In deciding whether an incentive award is warranted, courts look to: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the plaintiff expended in pursuing the litigation." (internal quotation marks omitted)).

In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation, 851 F. Supp. 2d 1040, 1089 (S.D. Tex. 2012) (same).

**Sixth Circuit (District Court)**

Kinder v. Dearborn Federal Sav. Bank, 2013 WL 879301, *3 (E.D. Mich. 2013) ("In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." (internal quotation marks omitted)).

In re UnumProvident Corp. Derivative Litigation, 2010 WL 289179, *9 (E.D. Tenn. 2010) ("District courts in the Sixth Circuit have considered the following factors in determining the propriety of incentive awards in class action cases: (1) the action taken by the Class Representatives to protect the interest of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representatives pursuing the litigation." (citing Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 250 (S.D. Ohio 1991))).

In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 275–76 (S.D. Ohio 1997), order rev'd on other grounds, 24 Fed. Appx. 520 (6th Cir. 2001) ("Courts look to a number of factors in deciding whether to grant named plaintiffs incentive awards. Courts in this circuit assess the following factors: (1) whether the actions of the named plaintiffs protected the interests of the class members and have inured to the substantial benefit of the class members; (2) whether the named plaintiffs have assumed substantial indirect or direct financial risk; and (3) the amount of time and effort expended by the named plaintiffs in pursuing the class action

545

litigation. Additional criteria courts may consider in determining whether to approve an incentive award include: (1) the risk to the class representative in commencing the suit; (2) the notoriety and personal difficulties encountered by the class representative; (3) the duration of the litigation; (4) the extent of class representative's personal involvement in discovery; (5) the class representative's personal benefit (or lack thereof) purely in his capacity as a member of the class; and (6) the social benefit derived from the suit." (citations omitted)).

**Seventh Circuit**

Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an [incentive] award is warranted, relevant factors include [1] the actions the plaintiff has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, and [3] the amount of time and effort the plaintiff expended in pursuing the litigation.").

Spicer v. Chicago Bd. Options Exchange, Inc., 844 F. Supp. 1226, 1266 (N.D. Ill. 1993) ("In considering this petition [for incentive awards], we have reviewed the following factors: (1) the actions taken by the class representatives to protect the interests of class members and others; (2) whether those actions resulted in substantial benefit to the class members; and (3) the amount of time and effort spent by the class representatives in pursuing the litigation.").

**Eighth Circuit**

In re U.S. Bancorp Litigation, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving $2,000 awards to five representative plaintiffs and citing to the Seventh Circuit's three-factor test from *Cook* in determining these awards to be "appropriate").

**Ninth Circuit**

Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments. The district court must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.' " (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998))).

Wren v. RGIS Inventory Specialists, 2011 WL 1230826, *32 (N.D. Cal. 2011), order supplemented, 2011 WL 1838562 (N.D. Cal. 2011) ("When considering a request for an incentive payment, the court must evaluate each request individually, taking into account the following factors: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the duration of the litigation and the amount of time and effort the plaintiff expended in pursing it; and (4) the risks to the plaintiff in commencing the litigation, including reasonable fears of workplace retali-

546

factors:

1)  the actions the plaintiff has taken to protect the interests of the class;

2)  the degree to which the class has benefitted from those actions; and

3)  the amount of time and effort the plaintiff expended in pursuing the litigation.[8]

The five-factor test widely used in California directs courts to consider:

1)  the risk to the class representative in commencing suit, both financial and otherwise;

2)  the notoriety and personal difficulties encountered by the class representative;

3)  the amount of time and effort spent by the class representative;

4)  the duration of the litigation; and

---

ation, personal difficulties, and financial risks. Additionally, to ensure that an incentive payment is not excessive, the court must balance the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." (citations omitted) (internal quotation marks omitted)).

**Tenth Circuit (District Court)**

O'Brien v. Airport Concessions, Inc., 2015 WL 232191, *6 (D. Colo. 2015) ("In deciding whether such an award is warranted, 'relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) )).

Shaw v. Interthinx, Inc., 2015 WL 1867861, *8 (D. Colo. 2015) ("[I]ncentive awards are an efficient and productive way to encourage members of a class to become class representatives, and to reward the efforts they make on behalf of the class. The factors to consider in determining an incentive award include: (1) the actions that the class representative took to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the class representative expended in pursuing the litigation." (citation omitted) (internal quotation marks omitted)).

**District of Columbia Circuit (District Court)**

Kifafi v. Hilton Hotels Retirement Plan, 999 F. Supp. 2d 88, 105, 57 Employee Benefits Cas. (BNA) 1941 (D.D.C. 2013) (same).

In re Lorazepam & Clorazepate Antitrust Litigation, 2003-2 Trade Cas. (CCH) ¶ 74134, 2003 WL 22037741, *10 (D.D.C. 2003) (same).

[8]Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

547

　　5)　the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.[9]

The six-factor test widely used in New York directs courts to consider:

　　1)　the personal risk (if any) incurred by the named plaintiff in becoming and continuing as a litigant;

　　2)　the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise);

　　3)　any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course;

　　4)　the ultimate recovery;

　　5)　the sums awarded in similar cases; and

　　6)　the named plaintiff's requested sum in comparison to each class member's estimated *pro rata* share of the monetary judgment or settlement.[10]

What the tests have in common is that they tend to track the rationales for incentive awards, discussed in a prior section,[11] which primarily focus on compensating class representatives for their service to the class and for the risks they took in stepping forward to represent the class. Some of the factors also attempt to guard against disfavored practices such as awards that are larger than normal and/or extravagant compared to each class member's recovery. These disfavored practices are the subject of the succeeding sections.[12]

---

[9]Wren v. RGIS Inventory Specialists, 2011 WL 1230826, *32 n.11 (N.D. Cal. 2011), order supplemented, 2011 WL 1838562 (N.D. Cal. 2011) ("In assessing the reasonableness of an inventive award, several district courts in the Ninth Circuit have applied the five-factor test set forth in *Van Vranken* . . ." (citing Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995))).

[10]In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *2 (S.D.N.Y. 2007).

[11]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[12]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:14 to 17:18 (5th ed.).

548

## § 17:14    Judicial review—Disfavored practices—
Generally

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. The Ninth Circuit, for example, has emphasized that trial courts "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."[2] A series of disfavored practices has emerged and can be enumerated as follows:

- awarding incentive payments only to those class representatives who agree to support a settlement;[3]

- contracting in advance to pay incentive awards to class representatives;[4]

- measuring incentive payments as a percentage of the class's recovery;[5] and

---

[Section 17:14]

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013); *see also* Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) ("The Ninth Circuit requires district courts to be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives. Among other things, the concern about incentive awards and the class representative's adequacy is that, when presented with a potential settlement, the class representative may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large. This is particularly salient when the incentive award is disproportionate to the class's recovery, because the disproportionality may eliminate[ ] a critical check on the fairness of the settlement for the class as a whole. In an extreme case, the conditional incentive award may be so large in relation to the judgment or settlement that if awarded it would significantly diminish the amount of damages received by the class. In such circumstances, a class representative would then have a clear conflict of interest." (citations omitted) (internal quotation marks omitted)).

[3]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:15 (5th ed.).

[4]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:16 (5th ed.).

[5]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:17 (5th ed.).

- overpaying class representatives.[6]

As noted, these topics are each addressed in succeeding sections.

### § 17:15   Judicial review—Disfavored practices—Conditional awards

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those disfavored practices is a settlement agreement that purports to reward those class representatives who agree to support the proposed settlement but not those who oppose it. The Ninth Circuit has labeled these "conditional incentive awards," because "the awards were conditioned on the class representatives' support for the settlement."[2] At least two circuits—the Seventh[3] and the Ninth[4]—have prohibited such provisions.

To appreciate the problem with conditional incentive awards, it is important to review the function of the class

---

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

**[Section 17:15]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1161 (9th Cir. 2013).

[3]Eubank v. Pella Corp., 753 F.3d 718, 723, 88 Fed. R. Serv. 3d 920 (7th Cir. 2014) ("Although the judge rightly made incentive awards to the class representatives who had opposed the settlement as well as to those who had approved it, the settlement agreement itself had provided for incentive awards only to the representatives who supported the settlement. This created a conflict of interest: any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative.").

[4]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013) ("[T]he incentive awards here corrupt the settlement by undermining the adequacy of the class representatives and class counsel. In approving the settlement agreement, the district court misapprehended the scope of our prior precedents. We once again reiterate that district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives. The conditional incentive awards in this settlement run afoul of our precedents by making the settling class representatives inadequate representatives of the class.").

550

representative in a class action. A class action is a form of representative litigation in which one or a few members of a class litigate the claims of all of the members of the class in the aggregate.[5] Class counsel are centrally charged with safeguarding the absent class members' interests,[6] but counsel's interests and those of the class members may diverge. The class representative serves as a stand-in "client" for the whole class, monitoring the progress of the litigation and ensuring class counsel do not compromise the class's interests for their own.[7] These principles may be more ideal than practical in that most class representatives lack the expertise and resources to perform this function well.[8] Nonetheless, the principles are carefully safeguarded in the class setting.

From this perspective, conditional incentive agreements that reward only those class representatives who support a proposed settlement are problematic. When a settlement is proposed, the class representative's role is to review the proposal and to inform class counsel of her views on it. A class representative who disagrees with the terms of the settlement and so informs class counsel provides a valuable ser-

---

[5]Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members . . .").

[6]Fed. R. Civ. P. 23(g)(4) ("*Duty of Class Counsel*. Class counsel must fairly and adequately represent the interests of the class.").

[7]*See* Rubenstein, 1 **Newberg on Class Actions** § 3:52 (5th ed.) ("In theory, the role played by the class representative in a class action is akin to the role played by an individual client in an individual case—the client tends to seek out the attorney, hire and monitor the attorney, and be the person charged with making the critical decisions about the case's goals, including, most importantly, the settlement decision. Put simply, an individual client is the principal and the attorney is her agent." (footnote omitted)).

[8]*See* Rubenstein, 1 **Newberg on Class Actions** § 3:52 (5th ed.) ("Class representatives rarely serve any of these functions in class suits: in small claims cases they have so little at stake that it would be irrational for them to take more than a tangential interest, while in all cases, including larger claim cases, class representatives generally lack the legal acumen to make key decisions about complex class action litigation, much less to monitor savvy class counsel. It has long been understood that class counsel control class actions, perhaps even selecting the class representatives themselves, thereby reversing, not inscribing, the standard attorney/client relationship. Put simply, class action attorneys are the real principals and the class representative/clients their agents." (footnote omitted)).

vice to the class regardless of whether or not her objections are ultimately validated. *First*, that class representative has exercised her own independent judgment and provided an opinion about the settlement to class counsel, providing information or insight class counsel themselves may not have considered. *Second*, that class representative speaks from a position that class counsel does not—that of the client class—and thus has provided information from a unique perspective. *Third*, that class representative has discharged precisely the duty the law seeks from her: to operate as a monitor or check on class counsel by stating her own independent opinions to class counsel and the court. Given how much class action law generally laments the absence of a meaningful check on class counsel by class representatives, those class representatives who do find the independence and voice to challenge class counsel should be applauded, not punished. A structural provision in a settlement agreement that has the effect of squelching class representatives' ability to adequately represent the class by voicing their concerns is, simply, not in the class's best interests.

The Ninth Circuit embraced these principles in a 2013 decision condemning conditional incentive awards.[9] The case was an action against credit reporting agencies under the Fair Credit Reporting Act (and its state law counterpart) for the manner in which they treated debts that had been discharged in bankruptcy. The parties initially reached an injunctive settlement and later negotiated a proposed monetary settlement. The settlement agreement provided for incentive awards, stating:

> On or before October 19, 2009, Proposed 23(b)(3) Settlement Class Counsel shall file an application or applications to the Court for an incentive award, to each of the Named Plaintiffs

---

[9]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157 (9th Cir. 2013). The Treatise's author testified as an expert witness in opposition to conditional incentive awards in the case. *See* Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1166 (9th Cir. 2013) ("Professor William Rubenstein, a class-action expert, testified before the district court that in his experience such provisions are 'not common' and that his research revealed 'not one' settlement agreement that 'contain[ed] a restriction on an incentive award like the one here that permits incentive awards be sought only for those representatives in support of the settlement.' "). The preceding paragraph is taken from Professor Rubenstein's testimony in the matter.

552

serving as class representatives *in support of the Settlement*, and each such award not to exceed $5,000.00.[10]

Class counsel also informed a plaintiff that he would " 'not be entitled to anything' and that he would 'jeopardize the $5,000 [incentive award he] would receive [under the settlement]' if he did not support the settlement,"[11] and class counsel "also told the district court that they had told other plaintiffs that they 'don't see a way for people who don't support the settlement to receive an incentive award.'"[12]

Several of the class representatives objected to the settlement, believing the compensation inadequate; settling class counsel did not seek incentive awards for these class representatives as they were not representatives serving "in support of the Settlement." These representatives therefore also objected to the incentive clause itself, arguing it created a conflict of interest between themselves and the class and between class counsel and the class. The trial court rejected their argument, but the Ninth Circuit reversed. The Ninth Circuit held that the conditional incentive awards "them-selves are sufficient to invalidate this settlement,"[13] reason-ing that:

With the prospect of receiving $5,000 incentive awards only if they supported the settlement, Settling Plaintiffs had very different interests than the rest of the class . . . "[T]he conditional incentive awards changed the motivations for the class representatives. Instead of being solely concerned about the adequacy of the settlement for the absent class members, the class representatives now had a $5,000 incentive to support the settlement regardless of its fairness and a promise of no reward if they opposed the settlement. The conditional incentive awards removed a critical check on the fairness of the class-action settlement, which rests on the unbiased judgment of class representatives similarly situated to absent class

[10]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1162 (9th Cir. 2013) (emphasis added).

[11]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164 (9th Cir. 2013).

[12]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1164-65 (9th Cir. 2013).

[13]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

members.[14]

Because of the conflict between the class representatives' interests and those of the class, the Ninth Circuit held that the conditional incentive awards rendered the class representatives inadequate under Rule 23(a)(4).[15] Moreover, the Ninth Circuit held that the "class representatives' lack of adequacy—based on the conditional incentive awards—also made class counsel inadequate to represent the class."[16]

The Seventh Circuit reached a similar conclusion the following year, stating:

> Although the judge rightly made incentive awards to the class representatives who had opposed the settlement as well as to those who had approved it, the settlement agreement itself had provided for incentive awards only to the representatives who supported the settlement. This created a conflict of interest: any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative.[17]

In sum, two separate circuits have found that conditional incentive awards generate a conflict of interest between class representatives and class counsel, on the one hand, and class representatives and the class, on the other. Such conditional incentive awards thereby render the class representatives and class counsel inadequate, dooming class certification and requiring the rejection of any settlement containing such terms.

## § 17:16    Judicial review—Disfavored practices— Percentage-based awards

As the legal basis for incentive awards is uncertain,[1] and

---

[14]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

[15]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

[16]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1167 (9th Cir. 2013).

[17]Eubank v. Pella Corp., 753 F.3d 718, 723, 88 Fed. R. Serv. 3d 920 (7th Cir. 2014).

**[Section 17:16]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions**

554

as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those disfavored practices is percentage-based incentive awards. When counsel seek, and courts approve, incentive awards, they almost always do so in specific dollar amounts. Often, courts will assess whether the requested dollar-amount award is appropriate by identifying the percentage of the class's recovery that the award represents. If the percentage seems appropriate, courts approve the award;[2] if it is too high, they either reject

§ 17:4 (5th ed.).

[2] **Second Circuit (District Court)**

Sanz v. Johny Utah 51 LLC, 2015 WL 1808935, *1 (S.D.N.Y. 2015) (approving incentive awards of $1,000 to three representatives and noting that "the combined payments represent less than one percent of the overall settlement").

Chambery v. Tuxedo Junction Inc., 2014 WL 3725157, *11 (W.D. N.Y. 2014) (approving proposed "enhancement payments" ($10,700) as "reasonable" and noting that this amount constituted "approximately five percent of the total settlement fund").

Gay v. Tri-Wire Engineering Solutions, Inc., 2014 WL 28640, *13–14 (E.D.N.Y. 2014) (approving $7,500 service award and noting that this figure constituted 4% of the total settlement).

Velez v. Novartis Pharmaceuticals Corp., 2010 WL 4877852, *8, 24–27 (S.D.N.Y. 2010) (approving $3,775,000 in service award payments and noting that this represented "only approximately 2.4 percent of the entire monetary award of $152.5 million (or approximately 2.1 percent of the entire value of the settlement of $175 million)" and acknowledging award was "significant . . . but in the overall context of the settlement . . . but a pittance").

**Third Circuit (District Court)**

Johnson v. Community Bank, N.A., 2013 WL 6185607, *6 (M.D. Pa. 2013) (approving total service awards of $10,000 and recognizing this sum as reasonable given that it comprised 0.4% of total $2.5 million settlement fund).

Sullivan v. DB Investments, Inc., 2008 WL 8747721, *37 (D.N.J. 2008) (approving incentive award and noting that it represented 0.0007% of settlement fund).

**Fourth Circuit (District Court)**

Kirven v. Central States Health & Life Co. of Omaha, 2015 WL 1314086, *14 (D.S.C. 2015) (approving incentive award of $7,563.27 and noting this figure constituted "approximately 0.015% of the gross settlement").

DeWitt v. Darlington County, S.C., 2013 WL 6408371, *15 (D.S.C. 2013) (approving service award of $7,500 and recognizing this amount

555

comprised 3.33% of gross amount of the settlement in the case, with largest proposed amount for lead plaintiff ($2,500) constituting 1.11% of gross settlement amount).

**Fifth Circuit (District Court)**

Jenkins v. Trustmark Nat. Bank, 300 F.R.D. 291, 306 (S.D. Miss. 2014) (approving seven service awards of $5,000 each in part due to recognition that this aggregate sum constituted "less than one percent of the Settlement Fund").

**Sixth Circuit (District Court)**

Shane Group, Inc. v. Blue Cross Blue Shield of Michigan, 2015-1 Trade Cas. (CCH) ¶ 79151, 2015 WL 1498888, *18–19 (E.D. Mich. 2015) (granting $165,000 in incentive awards and noting that these awards were "reasonable" as they constituted 0.55% of settlement fund).

In re Cardizem CD Antitrust Litigation, 218 F.R.D. 508, 535, 2003-2 Trade Cas. (CCH) ¶ 74205 (E.D. Mich. 2003) (approving incentive awards of $160,000 and recognizing these awards to equal just 0.002% of settlement fund).

**Seventh Circuit (District Court)**

Beesley v. International Paper Company, 2014 WL 375432, *4 (S.D. Ill. 2014) (approving seven incentive awards (six of $25,000 and one of $15,000) and noting that "the total award for all of the Named Plaintiffs represents just 0.55 percent of the total Settlement Fund" and that "awards of less than one percent of the fund are well within the ranges that are typically awarded in comparable cases").

In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation, 733 F. Supp. 2d 997, 1016 (E.D. Wis. 2010) (approving incentive awards of $1,000 to each of the 132 class representatives based in part because "the $132,000 total award is only a tiny percentage (0.12%) of the class's overall recovery [of $110.7 million]").

**Eighth Circuit (District Court)**

Sauby v. City of Fargo, 2009 WL 2168942, *3 (D.N.D. 2009) (approving incentive awards totaling $15,000 and noting that this sum constituted only 0.01% of the maximum class recovery).

**Ninth Circuit (District Court)**

Horn v. Bank of America, N.A., 2014 WL 1455917, *7–8 (S.D. Cal. 2014) (approving incentive awards collectively amounting to $50,000 in part because this aggregate figure would constitute "a mere fraction of one percent of the most conservative estimated value of the Settlement").

Williams v. Centerplate, Inc., 2013 WL 4525428, *7 (S.D. Cal. 2013) (approving $5,000 incentive awards for each of three plaintiffs and recognizing this figure as "reasonable" as it comprised "around 2.3% of the common fund").

Cicero v. DirecTV, Inc., 2010 WL 2991486, *7 (C.D. Cal. 2010) (approving two incentive awards totaling $12,500 in part because of court's recognition that this sum constituted "less than one percent of the Settlement").

556

or reduce the award.[3] This method is similar to a percentage cross-check that a court might utilize in assessing the validity of a lodestar-based fee award.[4] There are therefore many court decisions that discuss incentive awards in percentage terms.

However, there are very, very few cases in which class counsel have sought, and courts have approved, incentive awards that are actually measured as a percentage of the common fund recovery.[5] Percentage-based incentive awards

---

Hopson v. Hanesbrands Inc., 2009 WL 928133, *10 (N.D. Cal. 2009) (approving incentive award of $5,000, constituting approximately 1.25% of the settlement amount, and noting that although this was higher than that awarded in other cases, the award was justified under the particular circumstances of the case).

**Tenth Circuit (District Court)**

Chieftain Royalty Co. v. Laredo Petroleum, Inc., 2015 WL 2254606, *1 (W.D. Okla. 2015) (approving "case contribution award" and recognizing this award as comprising 1% of total settlement amount).

Shaw v. Interthinx, Inc., 2015 WL 1867861, *8 (D. Colo. 2015) (approving multiple $10,000 incentive awards and noting that the total sum would represent "less than 1% of the maximum value of the common fund").

**Eleventh Circuit (District Court)**

Carnegie v. Mutual Sav. Life Ins. Co., 2004 WL 3715446, *24 (N.D. Ala. 2004) (approving incentive awards aggregating $10,000, which the court noted constituted "two-tenths of one percent of the total settlement amount").

**District of Columbia Circuit (District Court)**

In re Lorazepam & Clorazepate Antitrust Litigation, 205 F.R.D. 369, 400, 2002-1 Trade Cas. (CCH) ¶ 73649 (D.D.C. 2002) (approving six separate incentive awards (three worth $25,000 and three worth $10,000) and noting that this aggregate sum represented approximately 0.3% of each class's recovery).

[3]A succeeding section of the Treatise discussing courts' rejection of excessive awards contains a list of cases rejecting awards on the basis that they constitute too great a portion of the class's recovery. *See* Rubenstein, 5 **Newberg on Class Actions** § 17:18 (5th ed.).

[4]For a discussion of the percentage cross-check in lodestar fee cases, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:52 (5th ed.).

[5]Chieftain Royalty Co. v. Laredo Petroleum, Inc., 2015 WL 2254606, *4 (W.D. Okla. 2015) ("Class Representative is hereby awarded a Case Contribution Award of one percent (1%) of the $6,651,997.95 Settlement Amount.").

Allapattah Services, Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) ("[T]he Class Representatives are seeking 1.5% of

are disfavored, if not altogether forbidden.

Percentage-based incentive awards may appear appropriate in that they seem to align the class representative's interests with those of the class: the more money the class makes, the higher the percentage award.[6] However, on closer examination, percentage-based incentive awards are problematic. *First*, such awards may skew the class representatives' incentives by encouraging them to hold out for greater recovery (and hence a higher incentive award) when in fact the class's interests would be best served by a settlement. *Second*, relatedly, percentage awards privilege monetary recoveries over other remedies, such as injunctive relief, creating a potential conflict between the interests of the class representative and the class.[7] *Third*, paying the class representatives a portion of the settlement amount

---

the common benefit received by the Class as an incentive award. The basis for the 1.5% request comes from the fact that Class Counsel have reduced their fee from 33 and 1/3% to 31 and 1/3%, and the Class Representatives have sought to maintain their request within the scope of that reduction.").

Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 511 (2011) (affirming district court's award of incentive award equal to "1% of the common fund" ($34,500)).

[6]Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264 P.3d 500, 511 (2011) ("[W]e can find no reason to automatically deny incentive awards that are based upon a percentage of the common fund. We do not consider such awards as antithetical to the interests of the class. To the contrary, the class representative remains aligned with the interests of the class as a whole; the larger the class recovery, the larger the incentive award.").

[7]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959–60, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (noting that *ex ante* incentive agreements between class counsel and class representatives, which tied the requested award to the size of the settlement, "made the contracting class representatives' interests actually different from the class's interests[;]" specifically, "[b]y tying their compensation—in advance—to a sliding scale based on the amount recovered, the incentive agreements disjoined the contingency financial interests of the contracting representatives from the class," because (given a cap on the percentage recovery) "once the threshold cash settlement was met, the agreements created a disincentive to go to trial; going to trial would put their $75,000 at risk in return for only a marginal individual gain even if the verdict were significantly greater than the settlement" and because the "agreements also gave the contracting representatives an interest in a monetary settlement, as distinguished from other remedies, that set them apart from other members of the class").

558

untethers the award from the services that the representa-
tives provided to the class and the risks they took in doing
so. It is true that a court could provide a higher percentage
when the service and risks were greater, but scaling those
rewards according to the size of the common fund is at best
a rough proxy in that the services and risks are not neces-
sarily directly related to the size of the settlement. Thus,
*fourth,* percentage awards threaten to be excessive.[8] *Fifth,*
paying the class representatives a portion of the settlement
fund is simply unseemly: it gives the appearance that the
representative is either a professional plaintiff,[9] or a bounty
hunter, not a servant for the class.[10]

In a leading decision on incentive awards, the Ninth
Circuit held that an agreement between class counsel and
the class representatives at the outset of the case that tied
the amount class counsel would seek as an incentive award
to the class's recovery created a conflict of interest between
the class representatives and the class, rendering those class
representatives inadequate to represent the class.[11] The deci-
sion does not isolate the issue of rewarding class representa-
tives with a percentage-based incentive fee, but its concerns
about scaling the incentive award to the class's recovery are
pertinent.[12]

In short, class counsel rarely seek incentive awards in per-

---

[8]*Cf.* Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631, 264
P.3d 500, 511 (2011) (rejecting defendant's argument that the percentage
approach "provides a disproportionate recovery to that of other class
members" but performing "lodestar" type cross-check to confirm reason-
ableness of proposed percentage incentive award).

[9]*But see* Freebird, Inc. v. Cimarex Energy Co., 46 Kan. App. 2d 631,
264 P.3d 500, 511 (2011) (rejecting defendant's argument that percentage
approach "encourages individuals to become professional plaintiffs").

[10]In this sense, the class representative's service, and reward, are
distinct from the statutorily based reward structure in *qui tam* cases,
where a relator is paid a percentage of the government's recovery for her
whistle-blower activities. *See* 31 U.S.C.A. § 3730 (setting forth False
Claims Act's *qui tam* provisions).

[11]Rodriguez v. West Publishing Corp., 563 F.3d 948, 2009-1 Trade
Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009). For a discussion of
this case and the concerns it posed, *see* Rubenstein, 5 **Newberg on Class
Actions** § 17:17 (5th ed.).

[12]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1
Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (noting that
incentive agreements tying any potential award to the ultimate recovery

559

centage terms. Although courts may check a flat award for excessiveness by reference to the percentage of the fund it represents, courts rarely award incentive payments in percentage terms and strongly disfavor such an approach.

## § 17:17   Judicial review—Disfavored practices—*Ex ante* incentive award agreements

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those disfavored practices is an *ex ante* agreement between putative class counsel and putative class representatives containing certain assurances with regard to incentive awards.

The facts of the primary precedent on point[2] are instructive: in 2005, lawyers in California brought an antitrust class action against West Publishing Company alleging that it had engaged in anti-competitive practices with regard to its bar preparation course, BAR/BRI. As may be evident, the class consisted almost exclusively of lawyers.[3] Some of those lawyers/clients shopped for class action counsel to represent them in suing BAR/BRI. In so doing, they appear to have negotiated, up front, for the lawyers to promise to pursue incentive agreements on their behalf at the conclusion of the case. In particular, the putative class representatives negotiated an agreement with putative class counsel whereby counsel promised to seek a higher award for them as the class's recovery increased, up to a certain

---

"put counsel and the contracting class representatives into a conflict from day one").

**[Section 17:17]**

[1]For a discussion, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]Rodriguez v. West Publishing Corp., 563 F.3d 948, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[3]The class consisted of "those who purchased a BAR/BRI course between August 1, 1997 and July 31, 2006." Rodriguez v. West Publishing Corp., 563 F.3d 948, 954, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009). The class would also have included persons who paid for the bar preparation course but either did not sit for the bar, did not pass the bar, or were not admitted to the bar.

560

cap.[4] This agreement was not revealed to the court at either the class certification stage or the settlement stage, but it came to light after several objectors protested the size of the proposed incentive awards.[5] Without apparently realizing the consequences of their actions, class counsel at that point revealed that they were contractually obligated to seek that level of award. The district court ultimately approved the settlement, but held that the agreements were inappropriate and contrary to public policy for a number of reasons:

> [1] they obligate class counsel to request an arbitrary award not reflective of the amount of work done, or the risks undertaken, or the time spent on the litigation; [2] they create at least the appearance of impropriety; [3] they violate the California Rules of Professional Conduct prohibiting fee-sharing with clients and among lawyers; and [4] they encourage figurehead cases and bounty payments by potential class counsel. [5] The court found it particularly problematic that the incentive agreements correlated the incentive request solely to the settlement or litigated recovery, as the effect was to make the contracting class representatives' interests actually different from the class's interests in settling a case instead of trying it to verdict, seeking injunctive relief, and insisting on compensation greater than $10 million. [6] It further observed that the parties' failure to disclose their agreement to the court, and to the class, violated the contracting representatives' fiduciary duties to the class and duty of candor to the court.[6]

The Ninth Circuit affirmed the settlement's approval because it found that two independently-represented class

---

[4]Rodriguez v. West Publishing Corp., 563 F.3d 948, 957, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) ("The incentive agreements obligated class counsel to seek payment . . . in an amount that slid with the end settlement or verdict amount: if the amount were greater than or equal to $500,000, class counsel would seek a $10,000 award for each of them; if it were $1.5 million or more, counsel would seek a $25,000 award; if it were $5 million or more, counsel would seek $50,000; and if it were $10 million or more, counsel would seek $75,000.").

[5]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (noting that "the incentive agreements came to the fore when Objectors pounced on them in opposing class counsel's motion for incentive awards to the class representatives"). The Treatise's author was an expert witness regarding a fee request that was later filed by some of these objectors' lawyers.

[6]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

representatives did not suffer under the weight of the incentive agreements.[7] However, the Ninth Circuit did agree with the district court that the *ex ante* incentive agreements were contrary to public policy, discussing a host of problems with respect to the agreements:

- *Class representatives suffer conflict of interest.* The Ninth Circuit noted the fact that the agreements "tied the promised request to the ultimate recovery . . . put class counsel and the contracting class representatives into a conflict position from day one."[8] The court found that "[b]y tying their compensation—in advance—to a sliding scale based on the amount recovered, the incentive agreements disjoined the contingency financial interests of the contracting representatives from the class. As the district court observed, once the threshold cash settlement was met, the agreements created a disincentive to go to trial; going to trial would put their $75,000 at risk in return for only a marginal individual gain even if the verdict were significantly greater than the settlement. The agreements also gave the contracting representatives an interest in a monetary settlement, as distinguished from other remedies, that set them apart from other members of the class."[9]

- *Class counsel suffer conflict of interest.* The Ninth Circuit found that class counsel's simultaneous representation of parties with conflicting interests (the class representatives and the class) "implicate California ethics rules that prohibit representation of clients with

---

[7]Rodriguez v. West Publishing Corp., 563 F.3d 948, 961, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) ("[W]e do not believe the district court was required to reject the settlement for inadequate representation. Only five of the seven class representatives had an incentive agreement. 'The adequacy-of-representation requirement is satisfied as long as one of the class representatives is an adequate class representative.' . . . Accordingly, we conclude that the presence of conflicted representatives was harmless." (citation omitted) (quoting Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 n.2, 17 I.E.R. Cas. (BNA) 796, 143 Lab. Cas. (CCH) P 10958, 50 Fed. R. Serv. 3d 511 (9th Cir. 2001), for additional opinion, see, 7 Fed. Appx. 753 (9th Cir. 2001))).

[8]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[9]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959–60, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

562

conflicting interests."[10]

- *Class counsel's entitlement to a fee is plausibly barred.* The Ninth Circuit, again relying on California ethics principles, noted that, "[s]imultaneous representation of clients with conflicting interests (and without written informed consent) is an automatic ethics violation in California and grounds for disqualification" and that under California law, "[a]n attorney cannot recover fees for such conflicting representation."[11]

- *Lack of transparency.* The Ninth Circuit further noted that such agreements must be disclosed at the class certification stage of the lawsuit "where it [is] plainly relevant" because "the district court would certainly have considered its effect in determining whether the conflicted plaintiffs . . . could adequately represent the class. The conflict might have been waived, or otherwise contained, but the point is that uncovering conflicts of interest between the named parties and the class they seek to represent is a critical purpose of the adequacy inquiry."[12]

- *Excessiveness.* Referencing an earlier decision concerning the potential excessiveness of incentive awards, the Ninth Circuit stated that "excess incentive awards may put the class representative in a conflict with the class and present a 'considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations.' The danger is exacerbated if the named plaintiffs have an advance guarantee that a request for a relatively large incentive award will be made that is untethered to any service or value they

---

[10]Rodriguez v. West Publishing Corp., 563 F.3d 948, 960, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[11]Rodriguez v. West Publishing Corp., 563 F.3d 948, 967–68, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (quoting Image Technical Service, Inc. v. Eastman Kodak Co., 136 F.3d 1354, 1358, 1998-1 Trade Cas. (CCH) ¶ 72067 (9th Cir. 1998)) (internal quotation marks omitted).

[12]Rodriguez v. West Publishing Corp., 563 F.3d 948, 959, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

will provide to the class."[13]

- *Class Action Abuse.* The Ninth Circuit also stated that "agreements of this sort infect the class action environment with the troubling appearance of shopping plaintiffships. If allowed, ex ante incentive agreements could tempt potential plaintiffs to sell their lawsuits to attorneys who are the highest bidders, and vice-versa."[14]

Summarizing its decision, the Ninth Circuit stated:

> We conclude that incentive agreements, entered into as part of five named plaintiffs' retainer agreement with counsel, created conflicts among them (later certified as class representatives), their counsel (later certified as class counsel), and the rest of the class. It was inappropriate not to disclose these agreements at the class certification stage, because an ex ante incentive agreement is relevant to whether a named plaintiff who is party to one can adequately represent the class.[15]

While there are a variety of moving parts in the *Rodriguez* case, the decision is fairly damning of *ex ante* incentive agreements, *per se*. It is true that much of the court's concern stemmed from the content of the particular agreement—the sliding scale arrangement and the conflicts it created—but counsel's commitment *ex ante* to seek an incentive award for a putative class representative understandably troubled the court: such an award largely turns on the work the representative undertakes and the risks she faces, neither of which can be fully known *ex ante*. A commitment to seek some of the class's money from a potential recovery to serve these purposes therefore creates a conflict between the proposed class representative and the putative class, as well as between contracting class counsel and the putative class. It would thus not be too much of a stretch to read *Rodriguez* as condemning any *ex ante* agreement that counsel would make to pursue an incentive award. At the least, *Rodriguez* stands for the proposition that such an agreement would

---

[13]Rodriguez v. West Publishing Corp., 563 F.3d 948, 960, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (quoting Staton v. Boeing Co., 327 F.3d 938, 976–77, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003)).

[14]Rodriguez v. West Publishing Corp., 563 F.3d 948, 960, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

[15]Rodriguez v. West Publishing Corp., 563 F.3d 948, 968, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009).

564

have to be disclosed at the class certification stage and the settlement stage of the lawsuit; any lack of transparency about such an agreement would consequently threaten to undermine certification and settlement as well.

## § 17:18 Judicial review—Disfavored practices— Excessive awards

As the legal basis for incentive awards is uncertain,[1] and as such payments tend to be made with the class's money, courts have been somewhat careful in policing certain incentive award practices. One of those practices is excessive incentive awards.

As discussed in a previous section of the Treatise,[2] a primary risk of incentive awards is that they skew the class representative's interests so as to conflict with those of the class she purports to serve. As most class suits are for small amounts of money, a hypothetical case might encompass claims worth $250 per class member with a settlement value of say, $100 per class member. If a settlement is proposed that returns a $20 voucher to each class member, but the class representative is promised a $15,000 incentive award if the settlement is approved, she may forgo resisting the questionable settlement on behalf of the class as she stands to profit so handsomely should it be approved.[3] Courts have therefore long attempted to ensure that the size of potential

---

[Section 17:18]

[1]For a discussion, see Rubenstein, 5 **Newberg on Class Actions** § 17:4 (5th ed.).

[2]See Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[3]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) (noting that in an earlier case, the court had "reversed the district court's approval of a class-action settlement because the settlement provided for disproportionately large payments to class representatives" and explaining that such a settlement "magnified the risks associated with incentive awards because the awards there were much larger than the payments to individual class members, 'eliminat-[ing] a critical check on the fairness of the settlement for the class as a whole' " (quoting Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003))).

Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) ("[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to com-

565

incentive awards are not excessive, lest the class represent-
ative's interests so significantly diverge from those of the
class that she ceases to be an adequate representative of the
class under Rule 23(a)(4).[4]

The Sixth Circuit explained this rationale in a case involv-
ing allegations that a certain diaper caused baby rash.[5] After
a study disproved the link between the diaper and the rash,
the parties settled for some minor forms of relief,[6] while the
named class representatives were promised $1,000 "per af-

---

promise the interest of the class for personal gain." (quoting **Newberg on
Class Actions**)).

Sanz v. Johny Utah 51 LLC, 2015 WL 1808935, *1 (S.D.N.Y. 2015)
("Before awarding an incentive payment . . . a court must ensure that the
named plaintiffs, as fiduciaries to the class, have not been tempted to
receive high incentive awards in exchange for accepting suboptimal settle-
ments for absent class members." (internal quotation marks omitted)).

Partridge v. Shea Mortg. Inc., 2008 WL 5384542, *1 (N.D. Cal.
2008) (denying plaintiffs' motion for an incentive payment in the amount
of $15,000 because the plaintiff had not established any of the five factors
tending to support incentive payments, and expressing concern that incen-
tive payments might induce class representatives to accept settlements
that serve their personal interests rather than the best possible result for
the class as a whole).

Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720, Fed. Sec.
L. Rep. (CCH) P 94403 (E.D.N.Y. 1989) ("If class representatives expect
routinely to receive special awards in addition to their share of the
recovery, they may be tempted to accept suboptimal settlements at the
expense of the class members whose interests they are appointed to
guard.").

[4]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157,
1161 (9th Cir. 2013) ("Moreover, the conditional incentive awards
significantly exceeded in amount what absent class members could expect
to get upon settlement approval. Because these circumstances created a
patent divergence of interests between the named representatives and the
class, we conclude that the class representatives and class counsel did not
adequately represent the absent class members, and for this reason the
district court should not have approved the class-action settlement.").

[5]In re Dry Max Pampers Litigation, 724 F.3d 713, 86 Fed. R. Serv.
3d 216 (6th Cir. 2013).

[6]In re Dry Max Pampers Litigation, 724 F.3d 713, 716, 86 Fed. R.
Serv. 3d 216 (6th Cir. 2013) ("P & G agreed to reinstate, for one year, a
refund program that P & G had already made available to its customers
from July 2010 to December 2010. The program limits refunds to one box
per household, and requires consumers to provide an original receipt and
UPC code clipped from a Pampers box. P & G also agreed, for a period of
two years, to add to its Pampers box-label a single sentence suggesting
that consumers 'consult Pampers.com or call 1-800-Pampers' for 'more in-

566

fected child" and class counsel was to receive $2.73 million in attorney's fees.[7] The district court approved the settlement with seemingly little review[8] and the Sixth Circuit reversed. The Sixth Circuit explicitly took no position on the propriety of incentive payments in general, but characterized such payments to the class representatives and the payment to the class members as "two separate settlement agreements folded into one,"[9] with the former being so great that the class representatives had "no interest in vigorously prosecuting the [interests of] unnamed class members."[10] Summarizing its position, the court stated:

> The propriety of incentive payments is arguably at its height when the award represents a fraction of a class representative's likely damages; for in that case the class representative is left to recover the remainder of his damages by means of the same mechanisms that unnamed class members must re-

formation on common diapering questions such as choosing the right Pampers product for your baby, preventing diaper leaks, diaper rash, and potty training[.]' P & G similarly agreed, for a period of two years, to add to the Pampers website some rudimentary information about diaper rash (*e.g.*, '[d]iaper rash is usually easily treated and improves within a few days after starting treatment') and a suggestion to '[s]ee your child's doctor' if certain severe symptoms develop (*e.g.*, 'pus or weeping discharge'), along with two links to other websites. P & G also agreed to contribute $300,000 to a pediatric resident training program—the recipient program is not identified in the agreement—and $100,000 to the American Academy of Pediatrics to fund a program 'in the area of skin health.' ").

[7]In re Dry Max Pampers Litigation, 724 F.3d 713, 716, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013).

[8]In re Dry Max Pampers Litigation, 724 F.3d 713, 717, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) ("The district court entered its 'Final Approval Order and Final Judgment' later that afternoon [of the fairness hearing]. With the exception of a few typographical changes, the order was a verbatim copy of a proposed order that the parties had submitted to the court before the hearing. The order was conclusory, for the most part merely reciting the requirements of Rule 23 in stating that they were met. About [a class member's] objections, the order had nothing to say.").

[9]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013); *see also* Women's Committee For Equal Employment Opportunity (WC=EO) v. National Broadcasting Co., 76 F.R.D. 173, 180, 19 Fair Empl. Prac. Cas. (BNA) 1703, 15 Empl. Prac. Dec. (CCH) P 7832, 24 Fed. R. Serv. 2d 359 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

[10]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) (internal quotation marks omitted).

cover theirs. The members' incentives are thus aligned. But we should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief.

This case falls into the latter scenario. The $1000-per-child payments provided a *disincentive* for the class members to care about the adequacy of relief afforded unnamed class members, and instead encouraged the class representatives to compromise the interest of the class for personal gain. The result is the settlement agreement in this case. The named plaintiffs are inadequate representatives under Rule 23(a)(4), and the district court abused its discretion in finding the contrary.[11]

The Sixth Circuit's concern in the *Pampers* case was one of proportionality, comparing the size of the incentive award to the size of each class member's individual reward. The Ninth Circuit has expressed concern, as well, about the number of persons receiving such special payment and the relationship of the total amount of special payments to the total settlement in the case.[12]

Courts have found incentive payments to be excessive in four sets of circumstances:

- when the raw number seems too high;[13]
- when the amount sought is disproportionate to the contributions of the named plaintiffs;[14]
- when the amount of the incentive award is far greater than the amount of compensation each individual class

---

[11]In re Dry Max Pampers Litigation, 724 F.3d 713, 722, 86 Fed. R. Serv. 3d 216 (6th Cir. 2013) (citation omitted) (internal quotation marks omitted).

[12]Staton v. Boeing Co., 327 F.3d 938, 977, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("[T]he different orders of magnitude in the present case concerning the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment—here up to $50,000, with an average of more than $30,000—are obvious.").

[13]In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 277 (S.D. Ohio 1997), order rev'd on other grounds, 24 Fed. Appx. 520 (6th Cir. 2001) (declining to approve a proposed incentive award of $25,000 for prison inmate plaintiffs because, *inter alia*, "the requested $25,000 is extremely disproportionate to the amount an inmate can earn otherwise").

[14]**First Circuit (District Court)**

568

In re Puerto Rican Cabotage Antitrust Litigation, 815 F. Supp. 2d 448, 469 (D.P.R. 2011) ("While the Court notes the named plaintiffs' involvement in advancing the present litigation, the Court finds that the amount of the incentive award requested is excessive and unreasonable. The Class Representatives did not undertake substantial risk or suffer notoriety or personal hardships by acting as a named plaintiff. There is no indication that [the Class Representatives] assumed a risk or inconvenience not shared by the other class members which is of such magnitude to merit an incentive award, and Plaintiffs do not provide specific evidence of the purported risk's magnitude." (footnote omitted) (international quotation marks omitted)).

**Second Circuit (District Court)**

Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720, Fed. Sec. L. Rep. (CCH) P 94403 (E.D.N.Y. 1989) (rejecting request for $5,000 incentive award because although plaintiff "took time away from his practice to respond to defendant's document request and to be deposed[,] [b]eyond these normal obligations of class representation . . . he did not perform any extraordinary services to the class").

**Third Circuit (District Court)**

In re Laidlaw Securities Litigation, 1992 WL 236899, *3 (E.D. Pa. 1992) ("Plaintiffs' counsel also request that the court grant an incentive award of $10,000, to be paid out of plaintiffs' counsel's awarded fees, to the lead plaintiff, Donald Singleton. This award would be paid to Mr. Singleton in addition to the payment he would receive out of the settlement fund as a class member. The court perceives no reason for treating Mr. Singleton any differently from other members of the class. There is no indication that Mr. Singleton, by acting as the named class representative, has assumed a risk or inconvenience not shared by the other class members which is of such magnitude to merit the award of an additional $10,000. Therefore, the request to grant an incentive award to the named class representative is denied.").

**Ninth Circuit (District Court)**

Krzesniak v. Cendant Corp., 2008 WL 4291539, *1 (N.D. Cal. 2008) ("As to the amount of the incentive award, the Court finds it excessive. First, the Court notes that Plaintiff does not specify the amount of time and effort he spent on this case. Second, in arguing that $15,000 is at the modest end of the incentive award spectrum, he cites to cases that are clearly distinguishable. In [a prior case] the court awarded $20,000 to each of two named plaintiffs, finding that each plaintiff 'spent in excess of 500 hours' time at counsels' request' in the litigation. Here, there is no evidence before the Court that Plaintiff himself spent anywhere near this amount of time on the present case." (quoting Bogosian v. Gulf Oil Corp., 621 F. Supp. 27, 32, 1985-1 Trade Cas. (CCH) ¶ 66510 (E.D. Pa. 1985))).

In re Heritage Bond Litigation, 2005 WL 1594403, *18 (C.D. Cal. 2005) (approving incentive awards to named plaintiffs but reducing the requested sums because, *inter alia*, "no declaration submitted accurately quantifies how Lead Plaintiffs spent their time during this litigation,"

member is entitled to receive; and,[15]

---

"[t]he Court is only presented with blanket statements as to how Class Representatives participated in this action," and "there is no showing that Lead Plaintiffs' participation placed them at risk of damaged reputation or retaliation").

**Tenth Circuit (District Court)**

In re Sprint Corp. ERISA Litigation, 443 F. Supp. 2d 1249, 1271, 39 Employee Benefits Cas. (BNA) 2810 (D. Kan. 2006) ("As to plaintiffs' request for an award of $15,000 to each of the named plaintiffs . . . the court simply cannot find that such an award is reasonable. The court certainly recognizes that the time these individuals devoted to this lawsuit inured to the common benefit of the class and, to that end, the court believes they are entitled to some type of incentive award above and beyond what the typical class member is receiving. They have performed an important service to the class and the burden of this commitment deserves to be recognized through an award. But, although the aggregate value of the settlement is significant, no class member stands to gain more than $1,000 on an average, per-plaintiff basis. The named plaintiffs devoted approximately 80 hours, on average, to this lawsuit. The court believes that an award of $5,000 adequately compensates each of them for their time.").

[15] **Second Circuit (District Court)**

In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *3 n.10 (S.D.N.Y. 2007) (noting that "the Court concludes that the requested $20,000 per-plaintiff fee would be excessive, especially in light of the indirect, and much smaller, monetary relief accruing to the more than 65,000 absent class members" and stating that the "Court has taken proportionality into account . . . [as] the primary justification offered for the reduction of the incentive award").

Sheppard v. Consolidated Edison Co. of New York, Inc., 2002 WL 2003206, *6 (E.D.N.Y. 2002) ("Although these reasons support an award of incentive payments, I decline to award incentive payments in the extraordinarily high amounts requested. Once again, I find that the amounts sought as incentive awards are grossly disproportionate to the compensation to be paid to the absent class members the plaintiffs seek to represent. In my view, appropriate incentive awards here are one-sixth of the proposed maximum amounts . . .").

**Ninth Circuit**

Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1161, 1165 (9th Cir. 2013) (holding that the "incentive awards significantly exceeded in amount what absent class members could expect to get upon settlement approval" thereby creating a "patent divergence of interests between the named representatives and the class" and stating that "[t]here is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards").

Staton v. Boeing Co., 327 F.3d 938, 946, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) ("Finally, the decree sets up a two-tiered structure for the

570

- when the aggregate amount of incentive awards constitutes too great a portion of the class's full recovery.[16]

---

distribution of monetary damages, awarding each class representative and certain other identified class members an amount of damages on average sixteen times greater than the amount each unnamed class member would receive. At least one person not a member of the class was provided a damages award. The record before us does not reveal sufficient justification either for the large differential in the amounts of damage awards or for the payment of damages to a nonmember of the class. On this ground as well, the district court abused its discretion in approving the settlement.").

Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) (denying preliminary approval of the settlement because "[t]he $10,000 currently earmarked for [the class representative] is more than 7 percent of the total settlement fund, more than 15 percent of the total amount of the common fund earmarked for the class, and more than 37 times the $269 average net recovery of the unnamed class members").

Wallace v. Countrywide Home Loans, Inc., 22 Wage & Hour Cas. 2d (BNA) 849, 2014 WL 5819870, *4 (C.D. Cal. 2014) (reducing requested incentive awards from $50,000 to $1,500 for each named plaintiff because "individual class members are entitled to receive no more than $1,500 under the settlement," and noting that "[a]n incentive award 33 times greater than the maximum possible recovery of other individual class members creates a 'significant disparity,' " particularly as the named plaintiffs did not appear to have suffered "any particular risks or hardships caused by their participation in this litigation").

**Tenth Circuit (District Court)**

In re Sprint Corp. ERISA Litigation, 443 F. Supp. 2d 1249, 1271, 39 Employee Benefits Cas. (BNA) 2810 (D. Kan. 2006) (reducing requested incentive awards from $15,000 to $5,000 for each named plaintiff, despite multi-million dollar settlement amount, because, *inter alia*, no individual class member stood to recover more than $1,000 from the settlement).

[16] **Second Circuit (District Court)**

Ramirez v. Ricoh Americas Corp., 2015 WL 413305, *5 (S.D.N.Y. 2015) ("The fact that the plaintiff requests $20,000, or 5.71% of the settlement fund, as his service award, and there is absent from the motion record any evidence of the reaction of putative class members to the settlement, are of concern to the Court. The Court finds that this factor does not militate in favor of granting the plaintiff's motion.").

Gortat v. Capala Bros., 949 F. Supp. 2d 374, 378, 22 Wage & Hour Cas. 2d (BNA) 1407 (E.D.N.Y. 2013), aff'd, 568 Fed. Appx. 78, 22 Wage & Hour Cas. 2d (BNA) 1420 (2d Cir. 2014) (declining to grant incentive awards that would have constituted 61.74% of the total award granted to all plaintiffs, calling this amount "breathtaking" and explaining that it would have been "an exercise of discretion inexcusably abused").

Sheppard v. Consolidated Edison Co. of New York, Inc., 2002 WL 2003206, *6 (E.D.N.Y. 2002) ("In awarding these payments as part of a

571

Among these practices, perhaps the starkest and surely

settlement, a court must ensure that the named plaintiffs, as fiduciaries to the class, have not been tempted to receive high incentive awards in exchange for accepting suboptimal settlements for absent class members. A particularly suspect arrangement exists where the incentive payments are greatly disproportionate to the recovery set aside for absent class members . . .").

Dornberger v. Metropolitan Life Ins. Co., 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (approving incentive awards because, *inter alia,* "these incentive awards are small in relation to the $13 million . . . fund from which the awards will be made").

**Ninth Circuit**

Staton v. Boeing Co., 327 F.3d 938, 948, 978, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (striking settlement and denying incentive awards because, *inter alia*, the named plaintiffs constituted "less than two percent of the class" but would have received "more than half the monetary award").

Chavez v. Lumber Liquidators, Inc., 2015 WL 2174168, *4 (N.D. Cal. 2015) (denying preliminary approval of settlement because "[t]he $10,000 currently earmarked for [the class representative] is more than 7 percent of the total settlement fund, more than 15 percent of the total amount of the common fund earmarked for the class, and more than 37 times the $269 average net recovery of the unnamed class members").

Bellinghausen v. Tractor Supply Company, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (denying a $15,000 award in part because this would have constituted "2 percent of the gross settlement funds, which is higher than what other courts have found to be acceptable").

Ontiveros v. Zamora, 2014 WL 3057506, *9 (E.D. Cal. 2014) ("An incentive award consisting of one percent of the common fund is unusually high, and some courts have been reticent to approve incentive awards that constituted an even smaller portion of the common fund.").

Daniels v. Aeropostale West, Inc., 22 Wage & Hour Cas. 2d (BNA) 1276, 2014 WL 2215708, *7 (N.D. Cal. 2014) (denying $5,000 incentive award because the request was "excessive" considering that the total proposed settlement amount was $8,645.61).

Ko v. Natura Pet Products, Inc., 2012 WL 3945541, *15 (N.D. Cal. 2012), appeal dismissed, (9th Cir. 12-17296)(Apr. 24, 2013) (reducing incentive award to $5,000 because the requested sum of $20,000 would have been "excessive under the circumstances" as it would have constituted "approximately 1% percent [sic] of the gross settlement amount").

Sandoval v. Tharaldson Employee Management, Inc., 2010 WL 2486346, *10 (C.D. Cal. 2010) (reducing incentive award to $7,500 because this figure constituted "1% of the gross settlement" and noting that the requested sum of $12,500 would have been "excessive under the circumstances").

Krzesniak v. Cendant Corp., 2008 WL 4291539, *2 (N.D. Cal. 2008) (reducing incentive award from $15,000 to $1,500 and noting that approved incentive awards in three other cases represented 0.001%, 0.007%,

572

the most beguiling is the relationship between the incentive award amount and each class member's individual recovery. The problem is that most class actions are for small amounts of money, on the one hand, while incentive awards are meant to compensate class representatives for their service to the class and for the risks that they encountered in providing that service, on the other. However, there is no obvious connection between the size of each class member's individual claims and the appropriate compensation for the named plaintiff's services. The Ninth Circuit noted in one case that "[t]here is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards."[17] The proposed incentive award was anywhere from 192 to 6 times greater than a class member's recovery. The former number surely serves the Ninth Circuit's point, but does the latter? Moreover, even when the proposed $5,000 incentive award is almost 200 times greater than a class member's recovery, if the class representatives have invested significant amounts of time and, for example, faced retaliation or other risks for their efforts, $5,000 does not seem that extravagant a payment.

It is completely understandable that courts would worry about this disparity and a positive development that they in fact do. But there is an aspect of the disparity that is built into the very nature of the endeavor: in class suits, the claims will almost invariably be small in nature, yet the class representatives most worthy of an award will typically be those who worked the hardest and suffered most.

### § 17:19 Incentive awards in securities class actions under the PSLRA

The Private Securities Litigation Reform Act of 1995 ("PSLRA") appears to prohibit incentive awards to class

---

and 0.003% of total payments to class members while $15,000 in the present case would have represented 0.052% of the total payments).

[17]Radcliffe v. Experian Information Solutions Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

representatives in securities class actions,[1] though the actual practices under the PSLRA are more nuanced.[2] With the PSLRA, Congress aimed to transfer control of securities class actions from small-stakes clients (who Congress believed to be controlled by class counsel) to large institutional investors (who Congress thought might better monitor and control class counsel). Imposing limitations on incentive awards was part of that effort, though many critics have noted that if Congress' aim was to encourage institutional involvement, its crackdown on incentive payments may have been counterproductive.[3]

The PSLRA appears to bar incentive awards in two interconnected sections. *First*, 15 U.S.C. § 78u-4(a)(2)(A) requires a plaintiff seeking to serve as a class representative to file a sworn certification with her complaint in which she avers to a series of items, including that she "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's *pro rata* share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." *Second,* 15 U.S.C. § 78u-4(a)(4) states:

The share of any final judgment or of any settlement that is

---

[Section 17:19]

[1] *See* 15 U.S.C.A. § 78u-4(a)(2)(A)(vi), (4) (2010).

[2] In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 2008 WL 2714176, *1 (S.D. Tex. 2008) ("There is a rigorous debate whether it is proper in class actions generally to approve an incentive award to named plaintiffs because these class representatives take risks and perform services that benefit the class." (citing **Newberg on Class Actions**)).

[3] Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1347 (2006) ("A flat rule such as the PSLRA's ban on payments to class representatives not only is not clearly supported but may be counterproductive. The large-scale investors that Congress hoped to have serve as class representatives after the PSLRA may be the investors most sensitive to recovering their opportunity and other costs if they do serve. Therefore, to the extent these sought-after representatives are discouraged from serving by the anti-incentive-award rule, the rule may compete with the perhaps more important goal of securing sophisticated and large representative plaintiffs.").

*See generally* Richard A. Nagareda, Restitution, Rent Extraction, and Class Representatives: Implications of Incentive Awards, 53 UCLA L. Rev. 1483 (2006).

574

awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

Most,[4] though not all,[5] courts have read these provisions as barring incentive awards.

The peculiar aspect of these provisions is that although they appear to bar incentive awards, they simultaneously

---

[4] In re Schering-Plough Corp. Enhance Securities Litigation, 2013 WL 5505744, *37 (D.N.J. 2013), appeal dismissed, (3rd Circ. 13-4328)(Apr. 17, 2014) ("Although the PSLRA specifically prohibits incentive awards or 'bonuses' to Lead Plaintiffs . . .").

Ray v. Lundstrom, Fed. Sec. L. Rep. (CCH) P 97083, 2012 WL 5458425, *3 (D. Neb. 2012) ("Although the PSLRA does not permit incentive awards . . .").

Robles v. Brake Masters Systems, Inc., 2011 WL 9717448, *17 (D.N.M. 2011) ("Congress has expressed hostility to incentive awards in the [PSLRA] which precludes incentive awards in securities-fraud litigation.").

In re TVIA Inc. Securities Litigation, 2008 WL 2693811, *2 (N.D. Cal. 2008) ("[T]his court has itself previously found that in light of the text of § 78u-4(a)(4), and the clear intention to eliminate financial incentives, bonuses and bounties for serving as lead plaintiff, incentive awards and compensatory awards falling outside the costs and expenses specified by the PSLRA are inconsistent with the express goals of § 78u-4(a) (4)." (citing In re ESS Technology, Inc. Securities Litigation, 2007 WL 3231729, *4 (N.D. Cal. 2007))).

Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P 94205, 2007 WL 1101272, *12 (E.D. Pa. 2007) ("The district courts that have awarded incentive awards or requested amounts without requiring any explanation or detailing of the alleged costs in cases where PSLRA clearly applies, appear to be ignoring the clear language of PSLRA.").

Swack v. Credit Suisse First Boston, LLC, Fed. Sec. L. Rep. (CCH) P 94106, 2006 WL 2987053, *5 (D. Mass. 2006) ("I find that a representative plaintiff is only entitled under the PSLRA to an award of 'reasonable costs and expenses' over and above his or her pro rata share of the recovery, and not to a traditional 'compensation' or 'incentive' award. The representative plaintiff's significant stake in the outcome of the litigation is assumed to be sufficient incentive to remain involved in the litigation and to incur such expenses in the first place.").

[5] In re Heritage Bond Litigation, 2005 WL 1594403, *17 (C.D. Cal. 2005) (stating that "[i]t is within this Court's discretion to award incentive fees to named class representatives in a class action suit" and proceeding to do so).

permit named plaintiffs to be reimbursed for "reasonable costs and expenses (including lost wages) . . ."[6] Courts therefore regularly award representative plaintiffs monies under these sections,[7] and such awards are similar to service or incentive awards in regular class suits. Where the courts have split somewhat, however, is in how much documentation they require.[8] Some courts require little documentation and hence appear to treat the reimbursement provision as

---

[6]See 15 U.S.C.A. § 78u-4(a)(4).

[7]In re Schering-Plough Corp. Enhance Securities Litigation, 2013 WL 5505744, *37 (D.N.J. 2013), appeal dismissed, (3rd Circ. 13-4328)(Apr. 17, 2014) ("Reasonable payments to compensate class representatives for the time and effort devoted by them have been approved.").

   In re American Intern. Group, Inc. Securities Litigation, 2012 WL 345509, *6 (S.D.N.Y. 2012) ("Courts in this Circuit routinely award . . . costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." (internal quotation marks omitted)).

   In re Giant Interactive Group, Inc. Securities Litigation, 279 F.R.D. 151, 166 (S.D.N.Y. 2011) (awarding incentive awards to four named plaintiffs and stating that "the Court finds that the lead plaintiffs devoted substantial effort and time to this case, including reviewing filings, producing documents, and travelling to be deposed, making these requests for awards reasonable").

   In re Marsh & McLennan Companies, Inc. Securities Litigation, 2009 WL 5178546, *21 (S.D.N.Y. 2009) (awarding a combined $214,657 to two institutional lead plaintiffs).

   In re American Business Financial Services Inc. Noteholders Ltigiation, Fed. Sec. L. Rep. (CCH) P 95015, 2008 WL 4974782, *19 (E.D. Pa. 2008) (awarding costs and expenses to lead plaintiffs).

   Hicks v. Stanley, Fed. Sec. L. Rep. (CCH) P 93,579, 2005 WL 2757792, *10 (S.D.N.Y. 2005) ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.").

   In re WorldCom, Inc. ERISA Litigation, 33 Employee Benefits Cas. (BNA) 2291, 59 Fed. R. Serv. 3d 1170 (S.D.N.Y. 2004), order clarified, 2004 WL 2922083 (S.D.N.Y. 2004) (awarding $5,000 to each of the three named plaintiffs because they had "performed an important service to the class and the burden of this commitment deserves to be recognized through an award from the common fund").

[8]In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 2008 WL 2714176, *2 (S.D. Tex. 2008) (noting the "split between courts which have read the [PSLRA] narrowly and strictly limited reimburse-

576

quite similar to a flat incentive award.[9] Other courts require

ment to actual costs and expenses incurred, many only when proven with detailed evidence, and other courts that have granted lead plaintiffs incentive awards to encourage high quality monitoring and not insisted that alleged costs and expenses to be detailed or even limited to 'costs and expenses directly relating to representation of the class" (footnote omitted) (internal quotation marks omitted)).

[9]In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation, 364 F. Supp. 2d 980, 1000, Fed. Sec. L. Rep. (CCH) P 93239 (D. Minn. 2005) ("Lead plaintiffs here have fully discharged their PSLRA obligations and have been actively involved throughout the litigation. These individuals communicated with counsel throughout the litigation, reviewed counsels' submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws. The court, therefore, awards the $100,000 collectively to the lead plaintiff group to be distributed among the eight lead plaintiffs in a manner that plaintiffs' co-lead counsel shall determine in their discretion.").

Hicks v. Stanley, Fed. Sec. L. Rep. (CCH) P 93,579, 2005 WL 2757792, *10 (S.D.N.Y. 2005) ("Finally, the court approves the reimbursement of expenses to lead plaintiff Nicholson pursuant to plaintiff's motion. Nicholson spent considerable time discharging his responsibilities as lead plaintiff and class representative. The PSLRA permits lead plaintiffs to recover reasonable costs and expenses related to their representation of the class. Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." (citation omitted)).

Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 355, R.I.C.O. Bus. Disp. Guide (CCH) P 10837 (S.D.N.Y. 2005), aff'd in part, vacated in part, remanded, 443 F.3d 253, R.I.C.O. Bus. Disp. Guide (CCH) P 11050 (2d Cir. 2006) ("In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by the plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery.").

In re WorldCom, Inc. ERISA Litigation, 33 Employee Benefits Cas. (BNA) 2291, 59 Fed. R. Serv. 3d 1170 (S.D.N.Y. 2004), order clarified on other grounds, 2004 WL 2922083 (S.D.N.Y. 2004) (awarding the three named plaintiffs $5,000 each because "the three plaintiffs have been intimately involved in every step of the litigation. The named plaintiffs have performed an important service to the class and the burden of this commitment deserves to be recognized through an award from the common fund.").

In re Infospace, Inc., 330 F. Supp. 2d 1203, 1216 (W.D. Wash. 2004) ("Lead Plaintiffs Amir Heshmatpour and Ronald Wyles on behalf of

577

clear proof of expenses[10] and hence read the provision more

---

Coastline Corporation Ltd. have requested reimbursement of their costs and expenses. A court may award 'reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative serving on behalf of the class.' Amir Heshmatpour requests $5,000, and Ronald Wyles requests $6,600. The Court finds these amounts to be reasonable." (quoting 15 U.S.C.A. § 78U-4(a)(4))).

[10]In re TVIA Inc. Securities Litigation, 2008 WL 2693811, *2 (N.D. Cal. 2008) (finding "no evidence in the conclusory statements provided in [lead plaintiff's] declaration that the compensation he seeks is reimbursement for costs, expenses or lost wages, reasonable or otherwise, as required by the text of § 78u-4(a)(4)" and thus declining to award the requested $15,000 compensation).

Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P 94205, 2007 WL 1101272, *12 (E.D. Pa. 2007) ("The class representative failed to provide this court with any evidence of actual expenses incurred, lost wages, lost vacation time, or lost business opportunities. I conclude that the class representative has failed to demonstrate that he has incurred any 'reasonable costs and expenses' that can be awarded under PSLRA. Thus, the court will not award [named plaintiff] anything beyond his pro rata share of the settlement fund.").

In Re Ntl, Inc. Securities Litigation, 2007 WL 623808, *10 (S.D.N.Y. 2007) ("Lead Plaintiffs have signed certifications pursuant to the PSLRA, but their affidavits fail to explain how they determined their asserted hourly 'lost wages.' Without a better explanation for claims of $200–800 per hour of 'lost wages,' the Court should decline to award such amounts." (citation omitted)).

In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 2007 WL 313474, *25 (S.D.N.Y. 2007) ("Although [the lead plaintiff] claims to have spent time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead plaintiff. Under the PLSRA, it is simply not enough . . . to assert that she took time out of her workday and that her time is conservatively valued at $500 per hour. Accordingly, the Court declines to award reimbursement to [lead plaintiff].").

Swack v. Credit Suisse First Boston, LLC, Fed. Sec. L. Rep. (CCH) P 94106, 2006 WL 2987053, *5 (D. Mass. 2006) ("Since Congress specifically chose to limit recovery in PSLRA cases to reasonable costs and expenses (including lost wages) directly relating to the representation of the class, . . . I find that a representative plaintiff must provide the court with meaningful evidence demonstrating his or her actual costs and expenses (including lost wages) directly relating to the representation of the class . . ." (internal quotation marks omitted)).

Abrams v. Van Kampen Funds, Inc., Fed. Sec. L. Rep. (CCH) P 93,648, 2006 WL 163023, *4 (N.D. Ill. 2006) ("Lead plaintiffs do not contend that any portion of the requested amount represents any actual expenses that either has incurred. They do not claim that they missed any

578

narrowly. In particular, courts are more accepting of familiar nontaxable costs (such as documented travel expenses and fax, photocopy, and telephone charges)[11] but are more skeptical of lost wages or business opportunities, as the latter are often particularly difficult to document.[12]

---

work or other earning opportunity in order to participate in the litigation. Under the PSLRA, lead plaintiffs cannot be awarded additional compensation. The request for a compensatory award will be denied.").

In re KeySpan Corp. Securities Litigation, Fed. Sec. L. Rep. (CCH) P 93534, 2005 WL 3093399, *21 (E.D.N.Y. 2005) ("Counsel fail to provide *any* basis for determining what reasonable costs and expenses were incurred [by lead plaintiffs]. Counsel have not shown how the time expended by the Class Representative and Lead Plaintiffs resulted in actual losses, whether in the form of diminishment in wages, lost sales commissions, missed business opportunities, use of leave or vacation time or actual expenses incurred. Without any proof or detail in this regard, I recommend that Class Representative and Lead Plaintiffs not be awarded any payment beyond their *pro rata* share of the settlement.").

In re AMF Bowling, 334 F. Supp. 2d 462, 470 (S.D.N.Y. 2004) (finding no congressional intent for undocumented reimbursements under the PSLRA and denying requested reimbursements to class representatives in part because of the lack of such documentation).

[11]For a discussion of what constitute nontaxable costs, *see* Rubenstein, 5 **Newberg on Class Actions** § 16:5 (5th ed.).

[12]In re Genta Securities Litigation, 70 Fed. R. Serv. 3d 931 (D.N.J. 2008) ("This Court accepts [lead plaintiff's] assertion that he incurred $5250 in costs from travel expenses, fax and photocopy expenses, and telephone charges. However, [lead plaintiff] has not submitted any evidence showing that he lost wages or business opportunities due to the time he spent working on the instant litigation. Although [lead plaintiff] estimated that he spent 222.36 hours performing duties related to this action, and established his discounted billing rate as $225 per hour, [he] has failed to show that his contributions to this action foreclosed him from obtaining business opportunities or earning wages.").

Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P 94205, 2007 WL 1101272, *12 (E.D. Pa. 2007) ("The class representative failed to provide this court with any evidence of actual expenses incurred, lost wages, lost vacation time, or lost business opportunities. I conclude that the class representative has failed to demonstrate that he has incurred any 'reasonable costs and expenses' that can be awarded under PSLRA. Thus, the court will not award [named plaintiff] anything beyond his pro rata share of the settlement fund.").

In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 2007 WL 313474, *25 (S.D.N.Y. 2007) ("Although [the lead plaintiff] claims to have spent time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead

579

Thus, while Congress sought to limit incentive awards in class suits when it enacted the PSLRA, it did allow some payments to be made to class representatives, and courts have awarded such payments. Empirical data on incentive awards, described elsewhere in the Treatise,[13] nonetheless demonstrate that class representatives are least likely to get incentive awards in securities suits than in any other type of case. One study of cases resolved between 1993–2002 (which therefore straddles the enactment of the PSLRA) reported that courts granted incentive awards in 27.8% of all cases but 24.5% of securities cases.[14] A later study of cases resolved between 2006–2011 reported that courts granted incentive awards in 71.3% of all cases but in only 38.7% of securities cases.[15] To be clear, these data are not differentiating between cases in which counsel never applied for awards and those in which the court rejected an award, so the source of the lower award rate is unclear. Yet its existence is not.

The peculiarity about this state of affairs is that in enacting the PSLRA, Congress explicitly wanted class representatives to seize control of securities cases from class counsel. To accomplish that end, it sought to engage institutional investors in the endeavor by holding that the largest shareholder could be named the lead plaintiff in the case and authorized to hire lead counsel. Yet Congress provided very little incentive for those institutions to undertake that work and, in curtailing incentive awards, it destroyed one of the few incentives that did exist. Moreover, as Professor Nagareda argued some years ago, if the point of incentive awards is to reward *quality monitoring*, it seems particularly odd to limit awards in the very cases in which the goal is to

---

plaintiff. Under the PLRSA, it is simply not enough . . . to assert that she took time out of her workday and that her time is conservatively valued at $500 per hour. Accordingly, the Court declines to award reimbursement to [lead plaintiff].").

[13]*See* Rubenstein, 5 **Newberg on Class Actions** §§ 17:7 to 17:8 (5th ed.).

[14]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1323 tbl.2 (2006).

[15]William B. Rubenstein and Rajat Krishna, *Class Action Incentive Awards: A Comprehensive Empirical Study* (draft on file with author).

580

encourage quality monitors:[16]

> The PSLRA hinders the practical achievement of its own ide-
> als for class representatives by confining incentive awards to
> restitution and rejecting complementary notions of reward. By
> limiting awards to "reasonable costs and expenses," the PSLRA
> seeks to fight the proverbial last war—to respond to perceived
> abuses in the pre-PSLRA era rather than to design a legal
> framework for awards under the changed arrangements for
> lead plaintiffs promoted by the PSLRA itself. When it comes to
> service as a PSLRA lead plaintiff, one substantial sticking
> point for many institutional investors appears to be precisely
> the prospect of merely gaining restitution for their efforts,
> without the possibility of reward beyond their pro rata share
> of any class-wide recovery. This result is ironic, to say the
> least, when the law consciously seeks to induce high-quality
> monitoring from persons who devote their professional lives to
> seeking big financial rewards, not just restitution for the costs
> and expenses of their efforts.[17]

In short, the PSLRA sends a mixed message: it aims to
encourage large stake holders to intervene and seize control
of such cases while insisting that they not be compensated
in the normal manner for doing so.

## § 17:20   Incentive awards for objectors

As discussed in a prior section,[1] class members who
provide a service to the class are eligible to apply for an
incentive award from the court. Typically, it is the class rep-
resentative or named plaintiff who is the applicant, as these

---

[16]Richard A. Nagareda, Restitution, Rent Extraction, and Class
Representatives: Implications of Incentive Awards, 53 UCLA L. Rev. 1483,
1491 (2006) ("The embrace of high-quality monitoring as a public policy
goal and the experience with institutional investors in the post-PSLRA pe-
riod, together, highlight the anomaly of awards confined to 'reasonable
costs and expenses.' In this context, the law wants high-quality monitor-
ing to occur but has encountered obstacles in achieving that goal. If
anything, the logic behind installing institutional investors as lead
plaintiffs supports a more—not less—wide-ranging inquiry for incentive
awards in securities litigation.").

[17]Richard A. Nagareda, Restitution, Rent Extraction, and Class
Representatives: Implications of Incentive Awards, 53 UCLA L. Rev. 1483,
1491 (2006).

**[Section 17:20]**

[1]For a discussion of eligibility for incentive awards, *see* Rubenstein,
5 **Newberg on Class Actions** § 17:6 (5th ed.).

581

parties undertake special functions on behalf of absent class members, sometimes face unique risks in stepping forward to represent the class, and generally serve an important function in enabling a class action by their service to the class.[2] Class members who object to a proposed settlement or fee award and are in some way successful in reshaping the settlement similarly serve an important function in class action practice: because the class representative and class counsel are largely unmonitored agents of the class, those class members who take the time to scrutinize proposed settlements and provide their reactions to the court may assist the court in undertaking its oversight function and serve the class accordingly.[3] Counsel who represent objectors have therefore sought incentive awards on behalf of their objector clients.

Three issues are presented by such proposals: *first,* whether objectors are entitled to seek incentive awards; *second,* if they are, what are the circumstances in which courts should provide such awards; and *third,* if awards are provided, what amount is appropriate.

*Eligibility.* The answer to the first question seems clear: an objector is necessarily a class member and if that class member provides a service to the class, she stands in a similar position to the class representative entitled to an award and should therefore be similarly entitled. Many courts have so held either directly,[4] or indirectly by entertaining objector incentive award petitions, while few courts have held that objectors are never entitled to seek an award.[5] At least one

---

[2]For a discussion of these rationale that underlie incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:3 (5th ed.).

[3]In re Cardinal Health, Inc. Securities Litigation, 550 F. Supp. 2d 751, 753, Fed. Sec. L. Rep. (CCH) P 94714 (S.D. Ohio 2008) (noting that objectors can "add value to the class-action settlement process by: (1) transforming the fairness hearing into a truly adversarial proceeding; (2) supplying the Court with both precedent and argument to gauge the reasonableness of the settlement and lead counsel's fee request; and (3) preventing collusion between lead plaintiff and defendants").

[4]Hartless v. Clorox Co., 273 F.R.D. 630, 647 (S.D. Cal. 2011), aff'd in part, 473 Fed. Appx. 716 (9th Cir. 2012) (recognizing that incentive awards for objectors are "sometimes available . . . if the objection confers a significant benefit to the class").

[5]Rose v. Bank of America Corp., 2015 WL 2379562, *3 (N.D. Cal.

court has entertained a request from a *pro se* objector.[6] Occasionally, class representatives who later become objectors receive incentive awards, but in granting those awards, the courts have not isolated their service as objectors as independently warranting an award.[7] At least one court has denied an objector incentive award in a PSLRA case on the grounds that incentive awards are barred by that statute.[8]

*Standard of review.* Courts generally will approve an

---

2015) ("Without a legal or factual argument, the Objectors plainly request an incentive award of $2,000 each 'for stepping out to protect and serve the class.' In the absence of legal authority that would allow for such an award to an objector, coupled with the complete lack of an explanation as to why such an award would be justified, this request is denied." (citation omitted)).

In re Celexa and Lexapro Marketing and Sales Practices Litigation, 2014 WL 4446464, *10 (D. Mass. 2014) (denying objector's request for a $10,000 incentive award because the objector "invoke[d] no authority for her request for an incentive award to a plaintiff who is not a class representative").

In re classmates.com Consol. Litigation, 2012 WL 3854501, *8–9 (W.D. Wash. 2012) (declining to award an incentive award because "[t]he court is aware of no authority authorizing a 'service award' to an objector" and noting that "[i]f there were such authority, the court assumes that it would treat a participation award to an objector similarly to a participation award to a class representative" but finding that the "objections did not contribute significantly to obtaining any benefit for the class").

[6]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 237-38 (10th Cir. 2009) (entertaining a request for an incentive award but rejecting objector's "invitation to apply to his pro se request for an incentive award the same standards applicable to an objector's request for an attorney fee" because the pro se objector's "position is not parallel to that of an objector seeking payment for his attorney fees").

[7]Martin v. Foster Wheeler Energy Corp., 2008 WL 906472, *9 (M.D. Pa. 2008) (granting incentive awards to two class representatives who later became objectors "for their work as Class Representatives from the inception of the litigation").

Lazy Oil Co. v. Wotco Corp., 95 F. Supp. 2d 290, 292 (W.D. Pa. 1997), aff'd, 166 F.3d 581, 1999-1 Trade Cas. (CCH) ¶ 72420, 42 Fed. R. Serv. 3d 669 (3d Cir. 1999) (granting incentive award to a class representative for his service to the class before he became an objector, but finding that his efforts opposing the settlement "have not enured to the benefit of class members").

[8]In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 2008 WL 4178151, *8 (S.D. Tex. 2008) (denying incentive award for services as class representatives and objectors because "such incentive awards are contrary to the policy behind the PSLRA").

583

award for an objector if she can prove that her objections "conferred a benefit on the class."[9] Thus, for example, an "objector whose arguments result in a reduction of attorney-fee and expense awards provides a benefit to the class."[10] However, courts—understandably skeptical of repeat objectors who recycle formulaic objections—tend to be dismissive of many objectors' contentions about their achievements.[11] As the Tenth Circuit has stated, "because the court is charged with protecting the interests of the class, general, garden-variety objections usually are not helpful to the court, nor do they benefit the class."[12] This position is consistent with the manner in which courts approach requests for fees from objectors' counsel.[13] Thus, absent evidence that objectors' work benefited the class or put them at risk, courts

---

For a discussion of the PSLRA's approach to incentive awards, *see* Rubenstein, 5 **Newberg on Class Actions** § 17:19 (5th ed.).

[9]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 233, 236 (10th Cir. 2009) (affirming the district court's denial of an incentive award to an objector "on the ground that his efforts did not benefit the class").

Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 398–99 (D.N.J. 2012), aff'd, 558 Fed. Appx. 191 (3d Cir. 2014), cert. denied, 135 S. Ct. 231, 190 L. Ed. 2d 135 (2014) ("In deciding whether an objector deserves an incentive award, courts have considered whether: (1) the objector's particular efforts conferred a benefit on the class; (2) the objector incurred personal risk; and/or (3) the objector was substantively involved in the litigation.").

[10]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 236 (10th Cir. 2009).

[11]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 236-37 (10th Cir. 2009) (affirming decision denying incentive award to pro se objector, noting that the lower court had concluded that the "objections did not confer a benefit on the class" because they were "general in nature, largely unsupported by specific citation to the record or to supporting caselaw, and lacking in meaningful analysis" and because "[the objector] had not identified any argument unique to his presentation" and "had not point[ed] to any argument of his that was both asserted in greater detail than other objectors and adopted in substance by the Special Master" (internal quotation marks omitted)).

[12]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 237 (10th Cir. 2009).

[13]*See, e.g.*, Rodriguez v. Disner, 688 F.3d 645, 658–59, 2012-2 Trade Cas. (CCH) ¶ 78006 (9th Cir. 2012) ("Nor is it error to deny fees to objectors whose work is duplicative, or who merely echo each others' arguments and confer no unique benefit to the class."). For a discussion of

584

deny awards.[14]

---

objectors' entitlement to fees, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:60 (5th ed.).

[14]McDonough v. Toys R Us, Inc., 2015-1 Trade Cas. (CCH) ¶ 79040, 2015 WL 263562, *30 (E.D. Pa. 2015) (granting one objector an incentive award of $1,000 because "[a]lthough [the objector] did not participate in discovery, nor was he deposed, his objection provided a significant benefit to the class" but denying incentive awards to two other objectors because "they have not demonstrated that their objections provided a benefit to the class").

Gascho v. Global Fitness Holdings, LLC, 2014 WL 3543819, *6 (S.D. Ohio 2014) (denying attorney's fees and incentive awards to objectors because they "have not provided any benefit to the Class").

Fraley v. Facebook, Inc., 2014 WL 806072, *1–2 (N.D. Cal. 2014) (denying both attorney's fees and incentive award to objector because his objections did not "contribute materially to the proceeding").

In re classmates.com Consol. Litigation, 2012 WL 3854501, *8–9 (W.D. Wash. 2012) (denying an incentive award because "[t]he court is aware of no authority authorizing a 'service award' to an objector" and noting that "[i]f there were such authority, the court assumes that it would treat a participation award to an objector similarly to a participation award to a class representative" but finding that the "objections did not contribute significantly to obtaining any benefit for the class").

Hartless v. Clorox Co., 273 F.R.D. 630, 647 (S.D. Cal. 2011), aff'd in part, 473 Fed. Appx. 716 (9th Cir. 2012) (denying objector's request for incentive award because, *inter alia*, her objections "did not confer a benefit on the class or add anything to this decision").

Parker v. Time Warner Entertainment Co., L.P., 631 F. Supp. 2d 242, 279 (E.D.N.Y. 2009) (denying incentive awards to objectors because "[t]here is no indication that the [objectors] themselves were put at risk or inconvenienced in any meaningful way by lending their names to the objections pursued by their counsel").

Perez v. Asurion Corp., 2007 WL 2591174, *1 (S.D. Fla. 2007) (denying incentive award to objector because there was no evidence that the objector "spent a considerable amount of time assisting with the prosecution of this case").

In re Educational Testing Service Praxis Principles of Learning and Teaching, Grades 7–12 Litigation, 447 F. Supp. 2d 612, 634, 213 Ed. Law Rep. 493 (E.D. La. 2006) (denying incentive awards to objectors because only one of the seven objections offered was meritorious, the court would have recognized that the attorney's fee award was too high even absent that objection, and the "objectors' other objections added nothing to the litigation and, if anything, only prolonged it").

In re Excess Value Ins. Coverage Litigation, 598 F. Supp. 2d 380, 393 (S.D.N.Y. 2005) (denying objectors' request for incentive rewards because "the Class received relatively little Settlement Value and Objectors' efforts have not been shown appreciably to have benefitted the Class" and "the Court needed little or no assistance from the Objectors").

*Amount.* Objector incentive awards are modest. Class representatives tend to serve the class for years, undertake a series of tasks in that function, and face specific risks. Empirical evidence shows that incentive awards for those class representatives average between $10,000–$15,000 per class representative.[15] By contrast, objectors tend to do little more than file a single pleading at the conclusion of the case, possibly appear at the fairness hearing, and plausibly pursue an appeal if the objection is denied.[16] Their service is far more limited than that of the class representative and—despite arguments to the contrary[17]—it is unlikely they would face significant risks by making an objection. Courts

---

[15]Theodore Eisenberg and Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1307–08 (2006) (reporting that incentive awards are granted in 28% of class suits and that the average award per class representative is about $16,000, with the median award per class representative being closer to $4,000).

[16]Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766, 813 (N.D. Ohio 2010), on reconsideration in part, (July 21, 2010) ("The Court held that the named class representatives in this case were entitled to a $5,000 incentive award because each submitted an affidavit describing his extensive involvement in the litigation and assistance to Class Counsel. In contrast, there is no evidence that [the objector] devoted substantial time or effort to this case. He correctly notes that he 'voluntarily involved himself in a case impacting over 400,000 class members,' but does not describe any further involvement with this litigation. Based on that nominal contribution, he is entitled to the nominal sum of $500.00 as an incentive award." (citation omitted)).

[17]Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 399 (D.N.J. 2012), aff'd, 558 Fed. Appx. 191 (3d Cir. 2014), cert. denied, 135 S. Ct. 231, 190 L. Ed. 2d 135 (2014) (reporting objectors' argument that "in challenging the approval of the settlement, they incurred a substantial personal risk by: (1) exposing themselves to the risk of harassing discovery and private investigation from the plaintiffs' attorneys, and (2) posting an appeal bond of $25,000" (citation omitted) (internal quotation marks omitted)).

Park v. Thomson Corp., 633 F. Supp. 2d 8, 14, 2009-2 Trade Cas. (CCH) ¶ 76775 (S.D.N.Y. 2009) (reporting objectors' argument that they were entitled to an award "because they faced the risk of a Rule 11 sanctions motion threatened by Plaintiffs' counsel" but rejecting this argument because "Rule 11 sanctions are a risk borne by all litigants").

In re Apple Inc. Securities Litigation, Fed. Sec. L. Rep. (CCH) P 96312, 2011 WL 1877988, *4 (N.D. Cal. 2011) (reporting objector's argument that he had "exposed himself to the risk of harassing discovery and quite likely faced private investigation from the plaintiffs' attorneys").

586

have therefore awarded small sums to successful objectors —$500 in two cases,[18] $1,000 in two others,[19] $1,500 in one[20]—noting that "[t]he amount of the incentive award is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit."[21]

In sum, while objectors are entitled to seek incentive awards, courts are quite wary of providing such awards and do so only in the rare circumstance where the objector's work substantially served the class's interest, and even then only in nominal sums.

---

[18]Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 400 (D.N.J. 2012), aff'd, 558 Fed. Appx. 191 (3d Cir. 2014), cert. denied, 135 S. Ct. 231, 190 L. Ed. 2d 135 (2014) (awarding objectors $500 incentive payments because of "the[ir] willingness to serve as objectors so that their counsel could pursue a legal challenge that ultimately provided a certain benefit to like car owners and lessees warrants some incentive award").

Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766, 813 (N.D. Ohio 2010), on reconsideration in part, (July 21, 2010) (awarding objector a "nominal sum" of $500 for his "nominal contribution" to the case).

[19]McDonough v. Toys R Us, Inc., 2015-1 Trade Cas. (CCH) ¶ 79040, 2015 WL 263562, *30 (E.D. Pa. 2015) (granting one objector an incentive award of $1,000 because "[a]lthough [the objector] did not participate in discovery, nor was he deposed, his objection provided a significant benefit to the class" but denying incentive awards to two other objectors because "they have not demonstrated that their objections provided a benefit to the class").

In re Apple Inc. Securities Litigation, Fed. Sec. L. Rep. (CCH) P 96312, 2011 WL 1877988, *5 (N.D. Cal. 2011) (finding that an incentive payment of $1,000 would "fairly . . . compensate [the objector] for [his] contributions to this litigation").

[20]Sobel v. Hertz Corp., 53 F. Supp. 3d 1319, 1334 n.13 (D. Nev. 2014) (finding that the objectors' work "did contribute to the value of the resulting settlement" as even opponents noted that "the Court did reference the Objectors arguments and briefing in deciding to reject the failed settlement").

[21]Park v. Thomson Corp., 633 F. Supp. 2d 8, 14, 2009-2 Trade Cas. (CCH) ¶ 76775 (S.D.N.Y. 2009) (quoting Fears v. Wilhelmina Model Agency, Inc., 2005-1 Trade Cas. (CCH) ¶ 74783, 2005 WL 1041134, *3 (S.D.N.Y. 2005), aff'd in part, vacated in part, remanded, 473 F.3d 423, 2007-1 Trade Cas. (CCH) ¶ 75542 (2d Cir. 2007)).

## § 17:21   Appellate review of incentive awards

Appellate courts review a district court's award or denial of an incentive award under an abuse of discretion standard.[1] In adopting this standard (in a case involving a *pro se* objector's right to an incentive award), the Tenth Circuit gave three reasons justifying its use: *first*, that the Circuit reviews attorney fee awards in class actions using an abuse of discretion standard;[2] *second*, that "the district court's familiarity with the parties and the proceedings supports an

---

[Section 17:21]

[1] **Second Circuit**

Lobur v. Parker, 378 Fed. Appx. 63, 65 (2d Cir. 2010) ("We review a district court's grant or denial of incentive awards for the abuse of discretion.").

Silverberg v. People's Bank, 23 Fed. Appx. 46, 48 (2d Cir. 2001) ("The abuse-of-discretion standard of review also applies to the grant or denial of incentive awards for class representatives.").

**Sixth Circuit**

Hadix v. Johnson, 322 F.3d 895, 897, 55 Fed. R. Serv. 3d 116, 2003 FED App. 0072P (6th Cir. 2003) ("Although this circuit has never addressed the issue, we agree with the circuit courts that have concluded that a district court's denial of an incentive award should be reviewed for an abuse of discretion.").

**Seventh Circuit**

Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 408 (7th Cir. 2000) ("Class counsel challenges several aspects of the district court's decisions regarding attorneys' fees, costs, and the requested incentive award for the lead plaintiff. . . . We review the district court's decisions respecting these matters for abuse of discretion, except where counsel challenges the methodology employed by the district court, in which case our review becomes plenary.").

**Ninth Circuit**

In re Mego Financial Corp. Securities Litigation, 213 F.3d 454, 463, Fed. Sec. L. Rep. (CCH) P 90977, 46 Fed. R. Serv. 3d 883 (9th Cir. 2000), as amended, (June 19, 2000) ("[T]he district court did not abuse its discretion in awarding attorney's fees to Class Counsel and in awarding an incentive award to the Class Representatives.").

**Tenth Circuit**

UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 234-35 (10th Cir. 2009) (applying and explaining the circuit's adoption of an abuse of discretion standard).

[2] UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009).

588

abuse-of-discretion standard";[3] and *third*, because incentive awards arise in common fund cases and such cases are equitable in nature, appellate courts "review the district court's exercise of its equitable powers for abuse of discretion."[4]

A district court abuses its discretion when it has "based its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling."[5] Appellate courts that utilize the abuse of discretion standard uphold trial court findings of fact unless they are clearly erroneous, while they review the trial court's legal analysis *de novo*.[6]

---

[3]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009); *see also* Case v. Unified School Dist. No. 233, Johnson County, Kan., 157 F.3d 1243, 1249, 129 Ed. Law Rep. 1003 (10th Cir. 1998) ("We customarily defer to the District Court's judgment [regarding an attorney's fee award] because an appellate court is not well suited to assess the course of litigation and the quality of counsel." (internal quotation marks omitted)).

[4]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009) (internal quotation marks omitted)).

[5]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009) (internal quotation marks omitted)).

[6]UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp., 352 Fed. Appx. 232, 235 (10th Cir. 2009).

589

# EXHIBIT B

No. 18-12344

# In the United States Court of Appeals for the Eleventh Circuit

CHARLES T. JOHNSON,
on behalf of himself and others similarly situated,
*Plaintiff–Appellee*,
JENNA DICKENSON,
*Interested Party–Appellant*,

v.

NPAS SOLUTIONS, LLC,
*Defendant–Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MOTION OF PROFESSOR WILLIAM B. RUBENSTEIN FOR
LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF
PLAINTIFF-APPELLEE'S PETITION FOR REHEARING *EN BANC*

Martin N. Buchanan
LAW OFFICE OF MARTIN N. BUCHANAN, APC
665 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 238-2426
*Counsel for Amicus Curiae*

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *amicus* provides the following Certificate of Interested Persons and Corporate Disclosure Statement.

- Buchanan, Martin N. – Counsel for *Amicus Curiae*

- Davidson, James L. – Counsel for Plaintiff-Appellee

- Davis, John W. – Counsel for Appellant Jenna Dickenson

- Debevoise & Plimpton LLP – Counsel for Defendant-Appellee

- Dickenson, Jenna – Appellant

- Ehren, Michael L. – Counsel for Defendant-Appellee

- Goldberg, Martin B. – Counsel for Defendant-Appellee

- Greenwald Davidson Radbil PLLC – Counsel for Plaintiff-Appellee

- Greenwald, Michael L. – Counsel for Plaintiff-Appellee

- Heinz, Noah S. – Counsel for Plaintiff-Appellee

- Hopkins, Honorable James M. – Magistrate Judge

- Isaacson, Eric Alan – Counsel for Appellant Jenna Dickenson

- Issacharoff, Samuel – Counsel for Plaintiff-Appellee

- Johnson, Charles T. – Plaintiff-Appellee

Appx0982

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

- Johnson, Jesse S. – Counsel for Plaintiff-Appellee

- Keller, Ashley C. – Counsel for Plaintiff-Appellee

- Keller Lenkner LLC – Counsel for Plaintiff-Appellee

- Lash, Alan David – Counsel for Defendant-Appellee

- Lash & Goldberg LLP – Counsel for Defendant-Appellee

- Law Office of John W. Davis – Counsel for Appellant Jenna Dickenson

- Lenkner, Travis D. – Counsel for Plaintiff-Appellee

- Monaghan, Maura K. – Counsel for Defendant-Appellee

- NPAS Solutions, LLC – Defendant-Appellee

- Nutley, C. Benjamin – Counsel for Appellant Jenna Dickenson

- Postman, Warren D. – Counsel for Plaintiff-Appellee

- Radbil, Aaron D. – Counsel for Plaintiff-Appellee

- Rosenberg, Honorable Robin L. – District Court Judge

- Rubenstein, William B. – *Amicus Curiae*

- Stahl, Jacob W. – Counsel for Defendant-Appellee

- Van Wey, Lorelei Jane – Counsel for Defendant-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

1.    NPAS Solutions, LLC is wholly owned by National Patient Accounts Services, Inc., which is wholly owned by Parallon Business Solutions, LLC. The ultimate parent of Parallon Business Solutions, LLC is HCA Healthcare, Inc., a publicly traded company.

2.    No publicly held corporation owns 10% or more of NPAS Solutions' stock.

Dated:  October 29, 2020          Respectfully submitted,

/s/ *Martin N. Buchanan*
Martin N. Buchanan
*Counsel for Amicus Curiae*

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF REHEARING *EN BANC*

Pursuant to Federal Rule of Appellate Procedure 29(b)(3) and Eleventh Circuit Rule 29-3, Professor William B. Rubenstein respectfully requests leave to file the accompanying *amicus curiae* brief in support of rehearing *en banc* in this matter. In support of this request and in demonstration of good cause, *amicus* states as follows:

1.  *Amicus* is the Bruce Bromley Professor of Law at Harvard Law School and (since 2008) the sole author of *Newberg on Class Actions*, the leading treatise on class action law in the United States.

2.  Professor Rubenstein respectfully submits this brief for three independent reasons. *First*, Professor Rubenstein believes the Panel decision to be of exceptional importance because the vast majority of class action settlements involve incentive awards and they have been approved in every other Circuit in the country. *Second,* the Panel's critical decision cites to and relies on the *Newberg* treatise.  The Panel's discussion of Professor Rubenstein's work could be read to suggest that he opposes the practice of incentive awards. Professor Rubenstein seeks to ensure that the record accurately reflects his position on incentive awards. *Third*, *amicus* addresses issues not covered in the briefing to

Appx0985

date by examining (a) the facts underlying *Greenough*; (b) the relevance of Congress's approach to incentive awards in the securities field; and (c) the effect of recent changes to Rule 23 on judicial review of incentive awards.

## CONCLUSION

For these reasons, *amicus* respectfully requests leave to file his *amicus curiae* brief in support of rehearing *en banc*.

Dated: October 29, 2020                    Respectfully submitted,


                                           /s/ *Martin N. Buchanan*
                                           Martin N. Buchanan
                                           LAW OFFICE OF MARTIN N. BUCHANAN, APC
                                           665 W. Broadway, Suite 1700
                                           San Diego, CA 92101
                                           Telephone: (619) 238-2426
                                           *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this motion was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2016. *See* Fed. R. App. P. 27(d)(1), 32(g)(1); 11th Cir. R. 29-1. This motion complies with the type-volume limitation of Rule 27(d)(2) because it contains 261 words, excluding the parts exempted under Rule 32(f).

/s/ *Martin N. Buchanan*
Martin N. Buchanan

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2020, a true and correct copy of this motion was served via the Court's CM/ECF system on all counsel of record.

/s/ *Martin N. Buchanan*
Martin N. Buchanan

No. 18-12344

# In the United States Court of Appeals
# for the Eleventh Circuit

CHARLES T. JOHNSON,
on behalf of himself and others similarly situated,
*Plaintiff–Appellee*,

JENNA DICKENSON,
*Interested Party–Appellant*,

v.

NPAS SOLUTIONS, LLC,
*Defendant–Appellee*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**BRIEF OF PROFESSOR WILLIAM B. RUBENSTEIN AS *AMICUS
CURIAE* IN SUPPORT OF REHEARING *EN BANC***

Martin N. Buchanan
LAW OFFICE OF MARTIN N. BUCHANAN, APC
665 W. Broadway, Suite 1700
San Diego, CA 92101
(619) 238-2426
*Counsel for Amicus Curiae*

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *amicus* provides the following Certificate of Interested Persons and Corporate Disclosure Statement.

- Buchanan, Martin N. – Counsel for *Amicus Curiae*

- Davidson, James L. – Counsel for Plaintiff-Appellee

- Davis, John W. – Counsel for Appellant Jenna Dickenson

- Debevoise & Plimpton LLP – Counsel for Defendant-Appellee

- Dickenson, Jenna – Appellant

- Ehren, Michael L. – Counsel for Defendant-Appellee

- Goldberg, Martin B. – Counsel for Defendant-Appellee

- Greenwald Davidson Radbil PLLC – Counsel for Plaintiff-Appellee

- Greenwald, Michael L. – Counsel for Plaintiff-Appellee

- Heinz, Noah S. – Counsel for Plaintiff-Appellee

- Hopkins, Honorable James M. – Magistrate Judge

- Isaacson, Eric Alan – Counsel for Appellant Jenna Dickenson

- Issacharoff, Samuel – Counsel for Plaintiff-Appellee

- Johnson, Charles T. – Plaintiff-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

- Johnson, Jesse S. – Counsel for Plaintiff-Appellee

- Keller, Ashley C. – Counsel for Plaintiff-Appellee

- Keller Lenkner LLC – Counsel for Plaintiff-Appellee

- Lash, Alan David – Counsel for Defendant-Appellee

- Lash & Goldberg LLP – Counsel for Defendant-Appellee

- Law Office of John W. Davis – Counsel for Appellant Jenna Dickenson

- Lenkner, Travis D. – Counsel for Plaintiff-Appellee

- Monaghan, Maura K. – Counsel for Defendant-Appellee

- NPAS Solutions, LLC – Defendant-Appellee

- Nutley, C. Benjamin – Counsel for Appellant Jenna Dickenson

- Postman, Warren D. – Counsel for Plaintiff-Appellee

- Radbil, Aaron D. – Counsel for Plaintiff-Appellee

- Rosenberg, Honorable Robin L. – District Court Judge

- Rubenstein, William B. – *Amicus Curiae*

- Stahl, Jacob W. – Counsel for Defendant-Appellee

- Van Wey, Lorelei Jane – Counsel for Defendant-Appellee

No. 18-12344, *Johnson v. NPAS Solutions, LLC*

1.    NPAS Solutions, LLC is wholly owned by National Patient Accounts Services, Inc., which is wholly owned by Parallon Business Solutions, LLC. The ultimate parent of Parallon Business Solutions, LLC is HCA Healthcare, Inc., a publicly traded company.

2.    No publicly held corporation owns 10% or more of NPAS Solutions' stock.


Dated:  October 29, 2020          Respectfully submitted,

/s/ *Martin N. Buchanan*
Martin N. Buchanan
*Counsel for Amicus Curiae*

## RULE 35-5(C) STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves the following question of exceptional importance: Whether the common practice of awarding incentive payments to named plaintiffs to compensate them for their efforts protecting absent class members' interests is *per se* unlawful.


Dated:  October 29, 2020          Respectfully submitted,

                                 /s/ *Martin N. Buchanan*
                                 Martin N. Buchanan
                                 *Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

Rule 35-5(c) Statement of Counsel ........................................................i

Table of Contents..................................................................................ii

Table of Citations ............................................................... iii

Identity and Interest of *Amicus Curiae*....................................1

Statement of the Issue Warranting *En Banc* Review..............................2

Argument .................................................................................3

    The Panel's prohibition on incentive awards is an issue of
    exceptional importance, but its decision failed to consider the
    applicable facts and relevant aspects of federal law and Rule
    23 ...............................................................................3

    I. The Panel's decision fails as a matter of equity ..........................3

    II. The Panel's decision fails to account for Congress's approach to
    incentive awards in an analogous setting. .......................................7

    III. The Panel's decision fails to account for relevant 2018
    amendments to Rule 23. ................................................9

Conclusion.................................................................................14

Certificate of Compliance ........................................................15

Certificate of Service ..............................................................15

Appx0993

# TABLE OF CITATIONS

**Cases**                                                                                          **Page(s)**

*Johnson v. NPAS Sols., LLC*,
    975 F.3d 1244 (11th Cir. 2020) ......................................... 3, 6, 7, 10

*Melito v. Experian Mktg. Sols., Inc.*,
    923 F.3d 85 (2d Cir. 2019)................................................... 7

*Sprague v. Ticonic Nat. Bank*,
    307 U.S. 161 (1939) ........................................................... 5

*\*Trustees v. Greenough*,
    105 U.S. 527 (1881) ..................................................... 3, 4, 6

**Statutes**

Private Securities Litigation Reform Act,
    15 U.S.C. §§ 78u-4 et seq. (1995) .................................... 7, 8

**Rules**

\*Fed. R. Civ. P. 23(e)(2)(D)................................................... 3, 11

Fed. R. Civ. P. 23(e)(2), advisory committee's note to
    2018 amendment ...................................................... 10, 11

**Legislative Materials**

S. Rep. No. 104-98 (1995) ......................................................... 8

**Secondary Authorities**

\*William B. Rubenstein, *Newberg on Class Actions*
    (5th ed., June 2020 update) ................................... 5, 10, 13

## Other Authorities

*Consumer Price Index, 1800-*, Federal Reserve Bank of
    Minneapolis (last visited Oct. 25, 2020), https://www.
    minneapolisfed.org/about-us/monetary-policy/inflation-
    calculator/consumer-price-index-1800- ........................................... 4

*Inflation Calculator*, Federal Reserve Bank of Minneapolis
    (last visited Oct. 25, 2020), https://www.minneapolisfed.
    org/about-us/monetary-policy/inflation-calculator.......................... 5

*Judicial Salaries: Supreme Court Justices,* Federal Judicial
    Center (last visited Oct. 26, 2020), https://www.fjc.gov/
    history/judges/judicial-salaries-supreme-court-justices ................. 4

*Salary*, Merriam-Webster Online Dictionary, https://www.
    merriam-webster.com/dictionary/salary (last visited
    Oct. 27, 2020) ..................................................................................... 5

### IDENTITY AND INTEREST OF *AMICUS CURIAE**

*Amicus curiae* Professor William Rubenstein is the Bruce Bromley Professor of Law at Harvard Law School and the author of *Newberg on Class Actions*, the leading American class action law treatise. In 2015, Professor Rubenstein wrote treatise Chapter 17, a 98-page treatment of incentive awards. This review encompassed a range of issues including new empirical evidence about incentive awards.

*Amicus* respectfully submits this brief for three reasons. *First,* *amicus* believes the Panel's categorical rejection of incentive awards to be of exceptional importance because most class actions involve such awards and because they have been approved in every other Circuit. *Second,* as the Panel's decision relies on the *Newberg* treatise, *amicus* seeks to ensure that the record accurately reflects his position. *Third,* *amicus* addresses issues not covered in the briefing to date by examining (a) the facts underlying *Greenough*; (b) the relevance of Congress's approach to incentive awards in the securities field; and (c)

---

* This brief was not authored in whole or in part by counsel for any party. No party, party's counsel, or person—other than *amicus curiae* or his counsel—contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

Appx0996

the effect of recent changes to Rule 23 on judicial review of incentive awards.

Under Federal Rule of Appellate Procedure 29(b)(2), *amicus* may file this brief only by leave of court. By the accompanying motion, *amicus* has so moved.

### STATEMENT OF THE ISSUE WARRANTING *EN BANC* REVIEW

Plaintiff-Appellee Johnson's petition demonstrates that the Panel's decision is of exceptional importance warranting *en banc* review because it misapplies applicable Supreme Court and Eleventh Circuit precedent, conflicts with the holding of every other Circuit on this question, and, in categorically barring incentive awards, affects every class action in this Circuit.

This brief adds three points: the Panel's decision (1) fails on its own terms (as a matter of equity) because it never compared the ***facts*** in *Greenough* to those in this case or in class actions generally; (2) fails to account for Congress's approach to incentive awards in the Private Securities Litigation Reform Act of 1995, an approach which undermines its holding; and (3) fails to acknowledge 2018 congressionally approved changes to Rule 23 that explicitly require a

court reviewing a proposed settlement to ensure "the proposal treats class members *equitably* relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis added). That amendment squarely places review of incentive awards within Rule 23's settlement approval provision going forward and hence renders the Panel's decision—even if permitted to stand—irrelevant to current class action practice. The Panel stated that "if either the Rules Committee or Congress doesn't like the result we've reached, they are free to amend Rule 23 or to provide for incentive awards by statute," *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1260 (11th Cir. 2020), but it appeared unaware of the actions of Congress and the Rules Committee directly on point.

## ARGUMENT

**The Panel's prohibition on incentive awards is an issue of exceptional importance, but its decision failed to consider the applicable facts and relevant aspects of federal law and Rule 23.**

## I.    The Panel's decision fails as a matter of equity.

The Panel found *Greenough* controlling without a full review of the case's facts. Those show that Vose, the active litigant, sought attorney's fees and expenses amounting to $53,938.30 and an additional $49,628.35 for himself. *See Trustees v. Greenough*, 105 U.S. 527, 530

(1881). Specifically, Vose sought payment of "an allowance of $2,500 a year for ten years of personal services," *id.,* plus $9,625 in interest, as well as another $15,003.35 for "railroad fares and hotel bills." *Id.*

Those numbers are staggering: inflation calculators suggest that $1 in 1881 is worth $26.49 in 2019 dollars.[1] Thus, Vose sought a "salary" of $66,225 per year for 10 years,[2] plus interest—or a total of $917,216—as well as $397,439 for hotel bills and travel expenses. This amounts to roughly $1.31 million current dollars. It was also equivalent to (92% of) his attorney's fees and expenses.

Is it any wonder that equity balked?

Here the named plaintiff seeks $6,000 in total (0.46% of what Vose sought), none of it a yearly salary of any kind, and all of it amounting to about 1.3% of what the attorneys seek. Any true ***equitable*** analysis

---

[1] *See Consumer Price Index, 1800-*, Federal Reserve Bank of Minneapolis (last visited Oct. 25, 2020), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800-.

[2] This $66,225 number is perfectly confirmed by the fact that Vose's $2,500 annual salary constituted 25% of the 1881 Supreme Court justice salary of $10,000, while 25% of a current justice's salary ($265,000) is $66,400. *See Judicial Salaries: Supreme Court Justices,* Federal Judicial Center (last visited Oct. 26, 2020), https://www.fjc.gov/history/judges/judicial-salaries-supreme-court-justices.

would find *Greenough* inapposite on the numbers alone. *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 167 (1939) ("As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility.").

Even if the Panel's decision is read as one of type not degree— limiting "salaries" and "personal expenses" regardless of their level— this factual review nonetheless undermines its logic. Vose truly sought a salary—a fixed regular payment, *see Salary*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/salary (last visited Oct. 27, 2020)—while this incentive award ($6,000) and the typical incentive awards are never a fixed regular payment and they hardly amount to a salary. Professor Rubenstein's empirical analysis shows the average incentive award to be $11,697 in 2011 dollars (or $13,299 in 2019 dollars).[3] *See* 5 William B. Rubenstein, *Newberg on Class Actions* § 17:8 (5th ed., June 2020 update) [hereinafter *Newberg on Class Actions*]. These facts undermine the Panel's declaration that,

---

[3] *See Inflation Calculator*, Federal Reserve Bank of Minneapolis (last visited Oct. 25, 2020), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator.

"It seems to us that the modern-day incentive award for a class representative is ***roughly*** analogous to a salary." *Johnson*, 975 F.3d at 1257 (emphasis added). Far too much rides on the word "roughly" for that analogy to land.

Nor is *Greenough's* objection to the category of Vose's request labelled "personal expenses" particularly apposite—again, those payments were for $397,439 in hotel bills and travel expenses, amounts the Court might rightly have found extravagant and hence "personal." The modest level of the typical modern incentive award belies any sense that the representative is dining out at the class's expense.

These facts render *Greenough's* concern—that it "would present too great a temptation to parties to intermeddle in the management of valuable . . . funds . . . if they could calculate upon the allowance of a salary for their time and of having all their private expenses paid," *Greenough*, 105 U.S. at 1157—inapplicable to the modern incentive award and render nonsensical the Panel's conclusion "that modern-day incentive awards present even more pronounced risks than the salary and expense reimbursements disapproved in *Greenough*," *Johnson*, 975 F.3d at 1258.

* * *

These objector's counsel proffered this same *Greenough* argument to the Second Circuit, but that Court rejected it on the grounds that *Greenough's* facts were inapposite. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir.), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019). The Panel declared itself "unpersuaded by the Second Circuit's position," *Johnson*, 975 F.3d at 1258 n.8, but this review has demonstrated that the Second Circuit got it right and the Panel's conflicting conclusion should be reviewed (and reversed) *en banc*.

## II. The Panel's decision fails to account for Congress's approach to incentive awards in an analogous setting.

Far closer in context and time than *Greenough*, is Congress's 1995 approach to incentive awards in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 et seq.

With the PSLRA, Congress aimed to transfer control of securities class actions from small-stakes clients to large institutional investors. Limiting excess payments to named plaintiffs was a critical part of that effort. The PSLRA contains several provisions on point. *First*, the PSLRA requires a putative lead plaintiff to aver that it "will not accept any payment for serving as a representative party on behalf of a class

7

beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." 15 U.S.C. § 78u-4(a)(2)(A)(vi). *Second*, the Act states that the representative's fund allocation "shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class." 15 U.S.C. § 78u-4(a)(4). *Third*, the Act explicitly does ***not*** "limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." *Id.; see also* S. Rep. No. 104-98, at 10 (1995) (explaining that "service as the lead plaintiff may require court appearances or other duties involving time away from work").

These provisions demonstrate three pertinent points:

1. Congress sees incentive awards as a question of fair settlement allocation, not attorney's fees.

2. Congress is aware of incentive awards, knows how to limit them when it wants to do so, and has limited them only in securities cases.

3. Even while limiting incentive awards, Congress acknowledges and permits repayment for lead plaintiffs' efforts.

Appx1003

These points undermine the Panel's decision. The majority declined to analyze the incentive award in terms of intra-class equity, as the dissent would have; failed to appreciate that Congress has limited incentive awards only in securities cases; and failed to acknowledge Congress's approval of repayment of expenses, even when otherwise limiting incentive payments.

The PSLRA post-dates *Greenough* by 114 years*,* and, as a law about modern class action practice, is far closer in context than the trust law at issue in *Greenough*. The Panel should have considered its relevance before holding that *Greenough* categorically bars incentive awards in today's class action.

## III. The Panel's decision fails to account for relevant 2018 amendments to Rule 23.

Quoting Professor Rubenstein's treatise, the Panel held that Rule 23 has nothing to say about incentive awards:

> [The] argument [in support of the incentive award] implies that Rule 23 has something to say about incentive awards, and thus has some bearing on the continuing vitality of *Greenough* and *Pettus*. But it doesn't—and so it doesn't: "Rule 23 does not currently make, and has never made, any reference to incentive awards, service awards, or case contribution awards." The fact that Rule 23 post-dates *Greenough* and *Pettus*, therefore, is irrelevant.

9

*Johnson,* 975 F.3d at 1259 (quoting *Newberg on Class Actions* § 17:4) (footnote omitted).

Professor Rubenstein wrote that sentence in 2015. Congress subsequently approved amendments to Rule 23 that render the sentence out of date.[4]

Prior to December 1, 2018, Rule 23(e) directed a court reviewing a settlement agreement to ensure that the agreement was "fair, reasonable, and adequate." That was the entire standard, although each Circuit developed factors pertinent to that review. Congress approved amendments to Rule 23(e) in late 2018 that codified elements of the Circuit tests. *See* Fed. R. Civ. P. 23(e)(2), advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

One of the new Rule 23 prongs requires a Court reviewing a settlement to ensure that the proposal "treats class members *equitably*

---

[4] Regardless, the fact that Rule 23 did not mention incentive awards explicitly hardly dictates the Panel's conclusion that the Rule was therefore "irrelevant" in making an equitable evaluation of incentive awards. *See infra* Section III.

relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis added). The Advisory Committee noted that this prong "calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others." Fed. R. Civ. P. 23(e)(2), advisory committee's note to 2018 amendment.

New Rule 23(e)(2)(D) should now govern review of incentive awards. An incentive award constitutes an extra allocation of the settlement fund to the class representative and a court asked to approve a settlement agreement encompassing such an allocation would need to ensure that it nonetheless "treats class members *equitably* relative to each other."

The facts of this case are exemplary. The parties' settlement established a fund (Doc. 37-1 at Pg. 17 ¶5.1), stated how the fund would be allocated (¶5.2), and noted that the "class plaintiff" would seek "an incentive payment (in addition to any pro rata distribution he may receive [from the fund])." (¶6.2). Counsel then sought settlement approval, including of the incentive award, under Rule 23(e) (Docs. 38, 43).

The objector challenged the incentive award, alleging that it exceeded the amounts recovered by the other class members (Doc. 42 at Pg. 15), then argued to the Panel that the incentive award was a "settlement allocation[] that treat[s] the named plaintiffs better than absent class members," App. Br. at 52, and that "the [d]isparity in this case between [the representative's] $6,000 bonus and the relief obtained for the rest of the class . . . casts doubt on . . . the adequacy of the Settlement," *id.* at 53; *see also id.* at 57 (characterizing award as a "disproportionate payment").

Thus, although counsel lodged the request for judicial approval of the incentive award with their fee petition (Doc. 44 at Pgs. 15–16), they were not seeking a fee award governed by Rule 23(h). They were seeking judicial approval of their settlement agreement allocating extra money to the representative—and Rule 23(e)'s settlement approval provisions govern review of that request.

When an incentive award is properly scrutinized as a question of intra-class equity, its fairness comes into focus. Class representatives and absent class members are differently situated with regard to the litigation, as their titles suggest. A court can—indeed should—take

account of that fact in reviewing a proposed settlement. As Professor Rubenstein explains in the *Newberg* treatise:

> Incentive awards surely make it look as if the class representatives are being treated differently than other class members, but . . . [they] are not similarly situated to other class members. They have typically done something the absent class members have not—stepped forward and worked on behalf of the class—and thus to award them only the same recovery as the other class members risks disadvantaging the class representatives by treating these dissimilarly-situated individuals as if they were similarly-situated . . . . In other words, incentive awards may be necessary to ensure that class representatives are treated equally to other class members, rewarded both for the value of their claims (like all other class members) but also for their unique service to the class.

5 *Newberg on Class Actions* § 17:3.

That is not to say that all incentive awards are equitable—an excessive award, such as that sought in *Greenough*, would surely be inequitable. *See id.* at § 17:18. But it is to say that Congress has now given judges the explicit authority to scrutinize the equity of incentive awards through the lens of Rule 23(e).

Thus, even if the Court were inclined to leave in place the Panel's reasoning as to this pre-2018 settlement, the full Circuit should clarify the inapplicability of the holding to judicial review of settlements after December 1, 2018.

## CONCLUSION

For these reasons, the Court should grant the petition for rehearing *en banc*.

Dated: October 29, 2020          Respectfully submitted,

/s/ *Martin N. Buchanan*
Martin N. Buchanan
LAW OFFICE OF MARTIN N. BUCHANAN, APC
665 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 238-2426
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2016. *See* Fed. R. App. 29(a)(4), 32(g)(1). This brief complies with the type-volume limitation of Eleventh Circuit Rule 29-3 because it contains 2,594 words, excluding the parts exempted under Rule 32(f). *See* Fed. R. App. 29(b)(4).

*/s/ Martin N. Buchanan*
Martin N. Buchanan

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2020, a true and correct copy of this brief was served via the Court's CM/ECF system on all counsel of record.

*/s/ Martin N. Buchanan*
Martin N. Buchanan

CERTIFICATE OF SUBMISSION AND SERVICE
AND REQUEST FOR INCLUSION ON THE PUBLIC RECORD

I hereby certify that, on October 11, 2023, I am submitting and serving the foregoing

WRITTEN STATEMENT OF ERIC ALAN ISAACSON OF INTENT TO APPEAR IN

PERSON AT THE OCTOBER 12, 2023, FINAL- APPROVAL HEARING *IN NATIONAL*

*VETERANS LEGAL SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA* by

emailing it to the following email addresses provided for objectors' submissions in the official

long-form Class-Action Settlement Notice in this matter:

DCDPACERFeesSettlement@dcd.uscourts.gov
The Honorable Paul L. Friedman
United States District Court for the District of Columbia 333 Constitution Avenue, NW,
Washington, DC 20001

deepak@guptawessler.com
Gupta Wessler PLLC
2001 K Street, NW, Suite 850 North Washington, DC 20006

brenda.gonzalez.horowitz@usdoj.gov
Brenda Gonzáles Horowitz
Assistant United States Attorney Patrick Henry Building
601 D Street, N.W.
Washington, DC 20530

I further respectfully request that both the forgoing duly served and submitted WRITTEN

STATEMENT OF ERIC ALAN ISAACSON OF INTENT TO APPEAR IN PERSON AT THE

OCTOBER 12, 2023, FINAL- APPROVAL HEARING *IN NATIONAL VETERANS LEGAL*

*SERVICES PROGRAM, ET AL. V. UNITED STATES OF AMERICA* and my previously served

and submitted September 12, 2023, OBJECTION OF ERIC ALAN ISAACSON ) TO

PROPOSED SETTLEMENT IN *NATIONAL VETERANS LEGAL SERVICES ) PROGRAM, ET*

*AL. V. UNITED STATES OF ) AMERICA,* be included in the publicly available PACER-

accessible district-court docket in the foregoing matter.


                                        _____
                                              /s/ Eric Alan Isaacson
                                              Eric Alan Isaacson
                                                   (pro se)



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL            )      Civil No. 16-745-PLF
SERVICES PROGRAM, NATIONAL         )
CONSUMER LAW CENTER, and           )      NOTICE OF APPEAL
ALLIANCE FOR JUSTICE, for themselves )
and all others similarly situated,      )      OF CLASS MEMBER AND OBJECTOR
                                   )
                                   )      ERIC ALAN ISAACSON
                Plaintiffs,        )
                                   )
        vs.                        )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                Defendant.         )
_____ )

    Notice is hereby given that Eric Alan Isaacson, a Class Member and Objector in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from the OPINION (DE169), and the FINAL JUDGMENT AND ORDER ON FINAL APPROVAL OF CLASS SETTLEMENT, ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS (DE170), that were entered March 20, 2024, as well as from any prior rulings, opinions, or orders that merge therein.

    DATED: April 17, 2024

Respectfully Submitted,

_____
Eric Alan Isaacson

LAW OFFICE OF ERIC ALAN ISAACSON
6580 Avenida Mirola
La Jolla, CA 92037-6231
Telephone: (858) 263-9581
email: ericalanisaacson@icloud.com

RECEIVED
Mail Room

APR 18 2024

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury under the laws of the United States that the foregoing statement that on April 17, 2024, I served my Notice of Appeal from the OPINION (DE169), and the FINAL JUDGMENT AND ORDER ON FINAL APPROVAL OF CLASS SETTLEMENT, ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS (DE170), by placing true and correct copies of said Notice in sealed envelopes, placed in the US mail with first-class postage prepaid, addressed to each of the following:

The Honorable Paul L. Friedman
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

DCDPACERFeesSettlement@dcd.uscourts.gov

Deepak Gupta
Gupta Wessler PLLC
2001 K Street, NW, Suite 850
North Washington, DC 20006

deepak@guptawessler.com

Brenda Gonzáles Horowitz
Assistant United States Attorney
Patrick Henry Building
601 D Street, N.W.
Washington, DC 20530

brenda.gonzalez.horowitz@usdoj.gov

Eric Alan Isaacson
(pro se)

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
NATIONAL VETERANS LEGAL            )  Civil Action
SERVICES PROGRAM, et al.,          )  No. 16-745
              Plaintiffs,          )
vs.                                )
                                   )
UNITED STATES OF AMERICA,          )  October 12, 2023
                                   )  10:12 a.m.
              Defendant.           )  Washington, D.C.
                                   )
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SETTLEMENT HEARING**
**BEFORE THE HONORABLE PAUL L. FRIEDMAN,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES:**</u>

FOR THE PLAINTIFFS: DEEPAK GUPTA
                    JONATHAN TAYLOR
                    Gupta Wessler LLP
                    2001 K Street, NW, Suite 850 North
                    Washington, DC 20006
                    (202) 888-1741
                    Email: deepak@guptawessler.com

                    JONATHAN E. TAYLOR
                    Gupta Wessler PLLC
                    1900 L Street, NW, Suite 312
                    Washington, DC 20036
                    (202) 888-1741

                    MEGHAN S.B. OLIVER
                    CHARLOTTE LOPER
                    Motley Rice, LLC
                    28 Bridgeside Boulevard
                    Mt. Pleasant, SC 29464
                    (843) 216-9492
                    Email: moliver@motleyrice.com

                    WILLIAM H. NARWOLD
                    1 Corporate Center
                    20 Church Street, 17th Floor
                    Hartford, CT 06103
                    (860) 882-1676
                    Email: bnarwold@motleyrice.com

**(<u>Appearances Continued</u>)**

**<u>APPEARANCES (continued)</u>:**


FOR THE DEFENSE:      BRENDA A. GONZALEZ HOROWITZ
                      DOJ-USAO
                      U.S. Department of Justice
                      601 D Street NW
                      Washington, DC 20530
                      (202) 252-2512
                      Email: brenda.gonzalez.horowitz@usdoj.gov


                      ERIC ALAN ISAACSON, PRO SE
                      6580 Avenida Mirola
                      La Jolla, CA 92037
                      (858) 263-9581


ALSO PRESENT:         WILLIAM MEYERS, General Counsel,
                      Administration Office of the Courts

                      RENEE BURBANK, Director of Litigation
                      National Veterans Legal Services Program

                      STUART ROSSMAN, Director of Litigation
                      National Consumer Law Center

                      DON KOZICH, Objector

Court Reporter:       Elizabeth Saint-Loth, RPR, FCRR
                      Official Court Reporter
                      U.S. Courthouse


        This hearing was held via videoconference and/or
   telephonically and is, therefore, subject to the limitations
   associated with audio difficulties while using technology,
                 i.e., static interference, etc.


          Proceedings reported by machine shorthand.
      Transcript produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2                  THE COURTROOM DEPUTY:  This is Civil Action

3       16-745, National Veterans Legal Services Program, et al.

4       versus the United States.

5                  Counsel, please step forward to the podium and

6       state your appearances for the record.

7                  MR. GUPTA:  Good morning, Your Honor.

8       Deepak Gupta, class counsel for the plaintiffs.

9                  THE COURT:  Good morning.

10                 Anybody else at counsel table?

11                 MR. NARWOLD:  Good morning, Your Honor.

12      Bill Narwold from Motley Rice, also for the class.

13                 Meghan Oliver --

14                 THE COURT:  Let me just say this.  Since we have

15      people on Zoom, the only way they can hear you is if you

16      speak from a microphone.

17                 THE COURTROOM DEPUTY:  Counsel, would you please

18      approach the podium.

19                 MR. NARWOLD:  Good morning, Your Honor.

20      Bill Narwold, Motley Rice, also on behalf of the plaintiffs.

21                 MS. OLIVER:  Meghan Oliver, also with Motley Rice,

22      on behalf of the plaintiffs.

23                 MR. TAYLOR:  Good morning, Your Honor.

24      Jonathan Taylor, Gupta Wessler, also appearing for the

25      plaintiffs.

1           MS. GONZALEZ HOROWITZ:  Good morning, Your Honor.

2   Assistant U.S. Attorney Brenda Gonzalez Horowitz; and with

3   me I have William Meyers, General Counsel of the

4   Administration Office of the Courts, on behalf of the

5   United States.

6           THE COURT:  Good morning to all of you.

7           MR. ISAACSON:  Good morning.

8           THE COURT:  Yes, sir.

9           MR. ISAACSON:  May it please the Court.

10          Good morning.  I am Eric Allan Isaacson.  I am an

11  objector.  I will be speaking after their presentations.

12  Thank you, Your Honor.

13          THE COURT:  Thank you.  Good morning.

14          All right.  So just to set the stage, this case,

15  National Veterans Legal Services Program, National Consumer

16  Law Center, and Alliance for Justice versus the

17  United States of America, which I always refer to as the

18  "Pacer case," was originally handled by my now retired --

19  and I must say quite happily retired colleague, Judge

20  Huvelle.  Judge Ellen Segal Huvelle had this case from its

21  inception in 2016 until she retired, then I took the case

22  over.

23          She considered the arguments of counsel about what

24  services, shall we say, were properly payable through Pacer

25  fees and what were not.  The Pacer fees are fees that are

1   charged, as I understand it, to law firms and lawyers and to

2   others who want to get, through the courts and the court

3   system, information about cases in which they are not

4   counsel.  If you are counsel, you are notified

5   automatically.

6          Now, all of this, of course, is a great thing

7   because when I started as a judge everything was on paper

8   and there was nothing electronic.  Then we put all of the

9   civil stuff on electronic filing, accessed it

10  electronically.  As Mr. Meyers will recall, if he has been

11  around long enough, criminal was a little harder because of

12  concerns about security for defendants and witnesses; but,

13  eventually, we wound up having all civil and all criminal

14  electronic filings; orders accessible electronically.  You

15  can sit in your office and be notified if you are counsel in

16  a case about what is happening in your case.  If it's not

17  your case, and you are interested, you go on Pacer and you

18  pay a fee.

19         Now, the only problem with the system is that it

20  used to be if you didn't get to the courthouse by 4:00 or

21  4:30 you couldn't file.  Now, if it's 11:59 p.m. you are

22  still timely, which makes law clerks' work harder and makes

23  lawyers' work harder.  That's an aside.

24         As I recall, there are seven categories of things

25  that Pacer fees are ultimately used for.  When this was

1    before Judge Huvelle, she considered arguments from the

2    plaintiffs and arguments from the government, the

3    Administrative Office of the Courts, represented by the

4    Justice Department; and she rejected both arguments.  She

5    found a middle ground and concluded that there were a great

6    many things that the Administrative Office of the Courts was

7    charging users for, but there were some things -- that were

8    legitimate, but there were some things that were not.

9         She wrote an opinion, 291 F. Supp. 3d. 123, in

10    which she explained her reasoning under the relevant

11    statutes and legislative history, and the case then went to

12    the federal circuit.

13         In reading their opinion, at 968 Fed 3d. 1340, as

14    I understand it, the parties essentially made the same

15    arguments they had made to Judge Huvelle in the federal

16    Circuit, rejected both sides' arguments; agreed with Judge

17    Huvelle, finding a middle ground.  And like any district

18    judge, I am sure she was delighted to read the first

19    paragraph of the opinion in which the Circuit said:  We

20    conclude that the district court got it just right.  As I

21    tell my friends in the D.C. Circuit, they don't say that

22    often enough.

23         As to the seven categories -- and you-all can

24    correct me if I am wrong on any of this; I just thought it

25    would be useful to try to, on the record, sort of set the

1    stage.  I guess there were six categories.

2          As to the six categories, Judge Huvelle and the

3    Circuit -- well, the first category is funding the operation

4    of Pacer itself, and that was clearly fundable through the

5    fees; then there were six additional categories.  She said

6    that funding the case management and electronic case filing

7    system, which I just talked about, CM/ECF, was legitimate

8    use of the fees; the electronic bankruptcy noticing, called

9    EBM, was legitimate.  There was a study called the "State of

10   Mississippi Study," she said no; it was wrong to use the

11   fees for that.  Violent Crime Control Act notification

12   system, she and the Circuit both said no.  Web-based juror

13   services, E-juror; again, no.  And finally, courtroom

14   technology, as I read it, you can correct me if I'm wrong,

15   the Circuit said mostly no, but there were a few exceptions.

16         They explained the reasoning and why they thought

17   she was right and concluded that Pacer fees, under the

18   statute, are limited to the amount needed to cover expenses

19   incurred and services providing public access to federal

20   court electronic docketing information; and then they sent

21   it back.  They affirmed, and sent it back to Judge Huvelle

22   for further proceedings consistent with their opinion.

23         That's where I come in and that's where you came

24   in.  Because after a lot of -- as I read it -- a lot of

25   effort -- not to prejudge anything, arm's length

1    negotiation, a settlement agreement was reached which sets

2    up, what would seem to me, to be kind of a complicated

3    system but a necessary system to reach all of the users over

4    the relevant years.  And so, on remand, there was a lot less

5    for me to do than might have been the case.  After all was

6    said and done, there was a settlement agreement concluded

7    and filed.

8         Having reviewed that in the filings that you

9    provided with it, I, on May 8, 2023, entered an order

10   granting plaintiffs' revised motion for preliminary approval

11   of class settlement and, then, the process to get us to

12   today, the yin, including the notices sent out; and I am

13   sure there will be some discussion of the adequacy of those

14   notices and whether everybody was properly attempted to be

15   reached and in all of the other things that you need to do

16   to get where we are.  And since then there have been

17   numerous filings by the parties, briefs, affidavits, or

18   declarations, and by some objectors as well.

19        So in scheduling the settlement hearing in Docket

20   No. 112, in my order of October 4, 2023 -- I have earlier

21   orders, too -- but it essentially set up how we were going

22   to do this, and that people -- certain people could appear

23   and speak if they wanted to virtually, and people here could

24   speak in person.  There would also be a public line for

25   anybody who wanted to hear what goes on in these proceedings

 1    but not participate.

 2            Essentially, what I had set forth in this order

 3    was that we would start with the parties, the plaintiffs'

 4    class counsel in the United States, having up to 20 minutes

 5    to make opening remarks; and then I would hear from

 6    objectors.  And anyone who had submitted a written statement

 7    and wants to be heard can have ten minutes to talk, and

 8    anybody who has not written a submitted written statement

 9    can have five minutes to talk if they're here.  Counsel will

10    have time to respond to those objections and to make a

11    closing statement.

12            Then we, separately, will have an argument on

13    attorney's fees, with each side getting 15 minutes to

14    present their positions and to answer questions from me.

15            So unless anybody has anything preliminarily or

16    procedurally you want to say before we dive into it, I guess

17    we can start with the openings.

18            MR. GUPTA:  Good morning, Your Honor.

19            I am Deepak Gupta, class counsel in this matter.

20    It is an honor to be here to present this historic class

21    action settlement for the Court's consideration at the final

22    approval stage.

23            I just want to start by thanking the Court and the

24    court staff for the work that went into arranging this

25    hearing, thoughtfully, and for ensuring that the class

1    representatives, as well as class members, can appear and be

2    heard today, both in person and remotely.  We do have a

3    couple of folks remotely on Zoom.

4           Before we begin, I would just like to recognize

5    the people who are here in the courtroom this morning and

6    remotely as well, without whom we never would have gotten to

7    this point.

8           With me at counsel table, my colleague John Taylor

9    from the Gupta Wessler firm, who was there from the very

10   beginning and every step of this case.  My colleagues Bill

11   Narwold and Meghan Oliver from the Motley Rice firm, with

12   whom we worked hand in glove; and Charlotte Loper as well

13   from the Motley Rice firm.

14          If the Court has questions about the mechanics of

15   notice or class administration, claims administration, my

16   colleagues from Motley Rice, particularly Meghan Oliver, are

17   here to answer those.

18          We also have four people here from the class

19   representatives, both in the courtroom and via Zoom, that I

20   would like to thank for their service in this case and

21   introduce to the Court and indicate who will be speaking

22   here today.

23          In the courtroom we have Jake Faleschini.

24          THE COURT:  Say that more into the microphone,

25   please.

1          MR. GUPTA:   Jake Faleschini, he is the director of

2     justice programs at the Alliance for Justice, and he is

3     going to say a few words on behalf of AFJ in support of the

4     settlement.  Also in the courtroom we have Ryan Kelly, who

5     is a staff attorney with the National Veterans Legal

6     Services Program.

7          And via Zoom we're joined by Renee Burbank.  She

8     is the litigation director at the National Veterans Legal

9     Services Program.  She's sorry she couldn't be here in

10    person today.  She has plenty of experience with class

11    actions; is actually a published expert on illegal exaction

12    claims, of all things.  She, too, will speak briefly in

13    support of the settlement.

14         And finally, last but not least, Stuart Rossman is

15    also joining us via Zoom from Boston; he is the litigation

16    director of the National Consumer Law Center.  He also

17    happens to be a leading expert on class actions and class

18    action settlements.  He will say a few words this morning in

19    support of the settlement.  We will try to keep all of those

20    statements brief.

21         So just a few words on the process first.  Those

22    who are unfamiliar with class actions might wonder why we

23    have a big hearing when a case is settled.  What is there to

24    talk about?  The case is over.  The parties have agreed to

25    settle it.

1         But a class action settlement like this one binds

2    hundreds of thousands of people.  People who haven't been

3    necessarily participating in the litigation.  And so it's

4    essential to the process that the Court ensure for itself

5    that the settlement is fair, that we allow people to have

6    notice and an opportunity to be heard.  And I think it's

7    important not just that the settlement is fair, it's

8    important that the public that will be bound understands

9    that it's fair and that they have had a say in the matter if

10   they want one.

11        So as the Court is well aware and, Judge Friedman,

12   as you discussed earlier, we go through kind of a three-step

13   process.

14        First, preliminary approval, which as you have

15   mentioned, you have already done that.

16        Then the Court directs reasonable notice to all

17   class members who would be bound; that, too, has already

18   occurred here.  We have given individual notice to about

19   500,000 people and publication notice as well.

20        The third step is where we are now, final

21   approval.  We have this hearing, we have objections, a

22   public fairness hearing, and the Court considers whether the

23   settlement meets the criteria spelled out in Rule 23.

24        We think we have extensively briefed all of the

25   factors that the Court considers under Rule 23, so I am not

1    going to belabor them here unless the Court has questions.

2    We believe it's clear that the class representatives and

3    class counsel have vigorously represented the class

4    throughout this long and hard-fought litigation.

5            We believe the settlement is the product of an

6    informed arm's length negotiation; that the settlement

7    relief provided to the class is adequate and, indeed,

8    exceptional, particularly given the costs, risks and delays

9    of potential further litigation which could well have

10   occurred on remand for many more years; and that the

11   settlement treats class members equitably relative to each

12   other.  Of course, the plaintiffs and class counsel support

13   the settlement.

14           I do want to say a few words, if I may, about the

15   unusual nature of this litigation because I think it does

16   bear on the analysis.

17           Pacer fees have long been the subject of

18   widespread criticism because they thwart equal access to

19   justice and inhibit public understanding of the courts.  But

20   until this case was filed, folks who care about this issue

21   just did not see litigation as a realistic path to reform.

22   As I noted in my declaration in support of the final

23   approval portion, I have actually been aware of and focusing

24   on these issues surrounding Pacer fees for a long time,

25   going back two decades to my time as a staff lawyer at the

1   Public Citizen Litigation Group which works on transparency

2   issues.

3          Despite much controversy and criticism, though, it

4   was always assumed that a case like this could never be

5   brought.  First, because the judiciary has statutory

6   authority to charge at least some fees.  So no litigation on

7   its own, just within the four corners of the litigation, was

8   ever going to bring down the Pacer-fee paywall and result in

9   a completely free Pacer system.

10          Second, a few lawyers with the necessary

11   experience in complex litigation, one might say, would be

12   crazy enough to sue the federal judiciary and spend

13   substantial time and money over many years on an endeavor

14   with little hope of payment.

15          Third, even if you could show that the fees were

16   unlawful and excessive and obtain qualified counsel, it was

17   still assumed that this was all beyond the reach of

18   litigation because the judiciary is exempt from the

19   Administrative Procedure Act and so injunctive relief would

20   not be possible.  Previous litigation had been dismissed for

21   lack of jurisdiction.  It was hard to know how there would

22   be an alternative basis for jurisdiction, a cause of action,

23   and a waiver of sovereign immunity.

24          So that is, in part, why this case is so unusual.

25          In the history of American litigation, this case

1   and this settlement are unique.  This is the first-ever

2   certified class action against the judiciary for monetary

3   relief and the first settlement of such a case.

4          When we filed this case seven years ago seeking to

5   hold the judiciary accountable for overcharging people for

6   access to court records, I doubt that anyone in Vegas would

7   have given us good odds.  We were mounting a head-on legal

8   challenge to a fee schedule that was set by the Judicial

9   Conference of the United States, presided over by the Chief

10  Justice.  We were asking that the judiciary fork over

11  millions of dollars to people who paid the fees.

12         But I think it is a testament to our judicial

13  institutions that we could bring this case at all, a case

14  against the federal court system in the federal court

15  system, and that we were not laughed out of court.  I am not

16  sure if there is another nation on earth whose judicial

17  institutions would have been as fair-minded and as open

18  about such litigation.

19         It was not easy.  It was risky.  The

20  Administrative Office was not used to facing litigation or

21  discovery, and the Justice Department put up a strong fight.

22  But we never felt and our clients never felt that our

23  arguments were being ignored and rejected by the courts

24  because of the identity of the defendant.  To the contrary,

25  judges at the trial level and the appellate level heard our

1    arguments, gave them fair consideration, and we think ruled

2    effectively in our favor every step of the way.

3        I think you are right, Judge Friedman.  Judge

4    Huvelle chartered a middle path.  She found liability and so

5    did the federal circuit, unanimously.  We defeated the

6    government's motion to dismiss.  We obtained certification

7    of nationwide class in a case against the judiciary.

8    Through discovery, we were able to shine a light on how the

9    Administrative Office of the U.S. Courts had been using

10   Pacer fees; bringing new facts to life and spurring action

11   in the legislature.  And that discovery, in turn, led to

12   Judge Huvelle's unprecedented decision which, yes, it didn't

13   give us everything that we asked for when we swung for the

14   fences, but it did hold that the AO had violated the law by

15   using Pacer fees to fund certain activities.  Within months,

16   the AO announced that those activities would no longer be

17   funded with Pacer fees.

18       When we went up on appeal, we were able to muster

19   extensive amicus support from retired federal judges,

20   numerous media organizations, technology companies,

21   libraries, civil rights groups.  And the suit also garnered

22   widespread media coverage that brought public awareness to

23   these efforts.

24       Before long, the AO announced that it was doubling

25   the $15 quarterly fee waiver, eliminating Pacer fees for

1  approximately 75 percent of Pacer users.

2          As you mentioned, we secured what we think is a

3  landmark federal circuit opinion unanimously affirming this

4  Court's summary judgment ruling holding that the judiciary

5  had unlawfully overcharged people.

6          I think it's worth noting another thing that the

7  federal circuit said besides that Judge Huvelle got it just

8  right.  The federal circuit also acknowledged the important

9  First Amendment stakes here.  It acknowledged that, as it

10  put it, quote:  "If large swaths of the public cannot afford

11  the fees required to access court records, it will diminish

12  the public's ability to participate and then serve as a

13  check upon the judicial process," which is an essential

14  component in our structure of self-government.

15          So a few words about the settlement itself.

16          After more than seven years, we now have a

17  landmark settlement under which the government must

18  reimburse the vast majority of Pacer users in full; 100

19  cents on the dollar for past Pacer charges.  The settlement

20  creates a common fund of $125 million from which each class

21  member will be automatically reimbursed up to $350 for any

22  Pacer fees paid in the eight-year class period.  And the

23  remainder, those who paid over 350, will receive their

24  pro rata share of any remaining funds.

25          This is notable because, unlike most class

1    actions -- almost every class action I have been involved

2    in -- there is no claims process; the money is distributed

3    automatically to class members.  By any measure, we think

4    this litigation has been an extraordinary achievement and we

5    think more so given the odds that were stacked against it.

6    It has also sparked widespread public interest in the need

7    to reform Pacer fees and has jump-started legislative action

8    that continues until this day.

9            Following the federal circuit's decision, the

10   House of Representatives passed a bipartisan bill, which is

11   not something that happens --

12           THE COURT:  It must have been a few years ago.

13           MR. GUPTA:  It was a few years ago, but it did.

14           It passed just a few years ago.  Even in these

15   times, it passed a bipartisan bill to eliminate Pacer fees,

16   and it really is truly a bipartisan effort; and the measure

17   advanced out of the Senate Judiciary Committee.

18           The Judicial Conference, too, now supports

19   legislation providing for free Pacer access to noncommercial

20   users.  If Congress were to enact such legislation, it would

21   produce an outcome that the plaintiffs had no way of

22   achieving through litigation alone given the jurisdictional

23   limitations.

24           Now, as I mentioned earlier, the purpose of a

25   hearing like this is to hear from class members; and not

1    just the class representatives, but class members who pay

2    may be opposed to the settlement and who wish to be heard.

3    No case is perfect.  Every settlement is a compromise.  And

4    of course, there are always things you wish you could

5    accomplish.  We wish we could have brought down the

6    Pacer-fee paywall entirely, but we couldn't because of the

7    jurisdictional limitations.

8            In any case of this size, with hundreds of

9    thousands of class members, one anticipates at least some

10   substantial number of objections, but this isn't just any

11   class.

12           This is a class that comprises every federal court

13   litigator.  It includes law firms of all stripes, including

14   the world's largest law firms; it includes journalists and

15   media organizations; it includes sophisticated data

16   companies with a lot of money at stake; and it includes a

17   whole lot of pro se litigants.  This is a class of

18   rabble-rousers.

19           In the wake of the settlement, we saw not just

20   extensive press coverage and public interest but, also, many

21   inquiries from individual class members.  Since the

22   settlement, class counsel has responded to over 300 class

23   member calls and emails.

24           THE COURT:  Say that again.  I didn't --

25           MR. GUPTA:  300.

1          THE COURT:  300 what?

2          MR. GUPTA:  300 class member calls and emails.

3   Many of those communications involved multiple

4   communications back and forth.  They came from all manner of

5   class members.

6          The class administrator KCC has received

7   approximately 250 calls through its automated telephone

8   line.  So the objections here, I think, really are the story

9   of the dog that didn't bark.  None of the many

10  organizations --

11         THE COURT:  So they were all, these calls, to

12  class counsel and to KCC?

13         MR. GUPTA:  Correct.

14         THE COURT:  Out of that number or that number

15  plus, how many objections were actually filed?

16         MR. GUPTA:  There were five objections that were

17  actually filed, all of them pro se.  One we may discuss

18  later by someone we believe is not a class member, and I

19  think only two that are appearing today.  I may be wrong

20  about that, we'll see.

21         THE COURT:  One of the things -- and this may not

22  be the appropriate time.

23         I think, in reading your papers, in addition to

24  the five objections, you also mentioned something like 34

25  attempts to opt out, some of which may have come too late.

1    So at some point I hope you will address that or someone

2    will address that.

3              MR. GUPTA:  Yes.

4              Ms. Oliver has the statistics on that.  I think

5    that number is correct.  I think that's the number of valid

6    opt-outs.  We are happy to discuss that.

7              But the point I am making is that there is a dog

8    that didn't bark; no transparency groups, no law firms, no

9    data companies, no groups that represent underrepresented

10   litigants; none of them have come forward.  I think that's a

11   measure of the universal support for the settlement.

12             Of course, we want to hear from those objectors,

13   and they have the right to speak today; and that's an

14   important part of the process.

15             THE COURT:  I have read all of the objections that

16   have been filed thoroughly, including what Mr. Isaacson

17   filed last night.

18             MR. GUPTA:  But first, if I may, Your Honor, I

19   would like to turn things over to the class representatives

20   to just say a few words.

21             THE COURT:  Sure.

22             MR. GUPTA:  We can start with Jake Faleschini from

23   the Alliance for Justice.

24             MR. FALESCHINI:  Good morning, Your Honor.

25             THE COURT:  Mr. Faleschini, good morning.

1          MR. FALESCHINI:  Good morning.

2          My name is Jake Faleschini.  I am the program

3     director for the justice team at --

4          THE COURT:  Could you spell your last name for the

5     court reporter.

6          MR. FALESCHINI:  Absolutely.  It's

7     F-A-L-E-S-C-H-I-N-I.

8          THE COURT:  Thank you.

9          MR. FALESCHINI:  I am with the Alliance for

10    Justice.

11         I am happy to say that AFJ supports the proposed

12    class action settlement and the accompanying requests for

13    fees, costs, and service awards.  AFJ is proud to have

14    brought this case.

15         The Alliance for Justice is a national

16    organization and alliance of approximately 150 public

17    interest member organizations that share a commitment to an

18    equitable, just, and free society.

19         Among other things, AFJ works to ensure that the

20    federal judiciary advances core constitutional values and

21    preserves unfettered access to justice for all Americans.

22         Our organization and many of our member

23    organizations regularly use Pacer to access court documents

24    for research on how court cases impact the issues that we

25    care most about.

1        When the courts charge exorbitant fees for access

2    to these documents, it puts our organizations at a

3    disadvantage vis-à-vis more wealthy interests.  In practice,

4    it gatekeeps access to important information, public

5    information, and it limits our collective ability to inform

6    the public about those happenings.

7        AFJ served as a named plaintiff in this class

8    action since its filing in April 2016, a period of more than

9    seven years.  For much of that time until his departure for

10   a position at the U.S. Senate last year, AFJ's legal

11   director, Daniel Goldberg, oversaw this litigation on AFJ's

12   behalf.  Among other things, Mr. Goldberg received updates

13   on motion practices and court rulings from class counsel,

14   reviewed draft pleadings, consulted on strategy, and

15   provided a declaration in support of class certification on

16   AFJ's behalf.

17       I understand that counsel will seek a service

18   award for AFJ of $10,000.  We conservatively estimate that

19   the value of the attorney time incurred by AFJ over the

20   seven-year life of this case exceeds that amount when

21   calculated at market rates.

22       Thank you, Your Honor.

23       THE COURT:  Thank you.

24       MR. GUPTA:  Next, Your Honor, if she's available

25   by Zoom, Renee Burbank from the National Veterans Legal

1    Services Program would like to speak.

2              THE COURT:  Yes.  Ms. Burbank.

3              MS. BURBANK:  Good morning.

4              I am on Zoom.  Can you hear me?

5              THE COURT:  We can hear you.  Thank you.

6              MS. BURBANK:  Thank you, Your Honor.

7              As the attorney just said, my name is Renee

8    Burbank; spelled B-U-R-B-A-N-K.  I am the director of

9    litigation at National Veterans Legal Services Program, also

10   known as NVLSP.

11             We're a national nonprofit veterans service

12   organization and we represent all manner of active-duty

13   personnel and veterans when they are seeking benefits from

14   the federal government due to their service and disabilities

15   incurred or made worse through their service.

16             As an organization, NVLSP represents thousands of

17   veterans every year in court cases, including class actions

18   and individual representation; and we provide education and

19   research on the state of the law to advocates all over the

20   country.

21             Veterans overall, however, largely proceed pro se

22   without attorney representation when they go to the courts

23   to obtain benefits from the government.  And in order to

24   understand the state of the law, access to federal public

25   dockets is critical.  Specifically for NVLSP, we spend many

1    hours every year researching the law all over the country

2    and what is happening with veterans' benefits and other

3    Department of Defense-related activities that affect the

4    benefits and recognition that our military and veterans have

5    earned.

6          As you have already been apprised by Alliance for

7    Justice, we strongly support the settlement and the fees and

8    costs that reflect the complexity and unique nature of this

9    litigation.

10          NVLSP, as one of the named plaintiffs in this

11    class action, has spent a considerable amount of time and

12    effort on this case, understanding the filings as they were

13    being drafted, and providing input prior to class

14    certification, and to also understand and be able to tell

15    others about the status of the Pacer litigation.  Because

16    NVLSP is the first-named plaintiff, we have also received

17    some of those inquiries; we forward them to class counsel

18    when we receive them.  But we did get some information or,

19    rather, inquiry from individual class members wanting to

20    know about this important case.

21          The time that we have spent, the approximate

22    amount of billing rates that we would have for the time

23    incurred that NVLSP has spent is reflected in my declaration

24    previously filed with the Court.  And I think that that

25    declaration, as well as Attorney Gupta's explanation today,

1    adequately and accurately explains why the settlement is

2    appropriate in this case.  NVLSP agrees with that

3    assessment, and we support the settlement.

4            Thank you, Your Honor.

5            THE COURT:  Thank you very much, Ms. Burbank.

6            MR. GUPTA:  And finally, Your Honor, Stuart

7    Rossman, the litigation director of the National Consumer

8    Law Center is also with us.

9            MR. ROSSMAN:  Thank you very much, Your Honor.

10   I hope you can hear me.

11           THE COURT:  Yes.

12           MR. ROSSMAN:  I just want to thank you for

13   allowing me to appear from Boston by Zoom.  It's a pleasure

14   to be able to appear before the Court in support of the

15   settlement in this particular case.

16           As it has already been stated, the National

17   Consumer Law Center has been a named class representative in

18   this case from its inception.

19           National Consumer Law Center is a 54-year-old

20   organization, originally partnered with the Legal Services

21   Corporation where we served as the national support center

22   on behalf of legal services in the area of consumer law.

23   Since 1995, we have been a private nonprofit 501(c)(3)

24   organization.

25           We represent the interests of low-income consumers

1   in the areas of consumer finance, affordable home ownership

2   and access to utilities.  As such, there are two areas in

3   which NCLC is highly dependent on access to the federal

4   court records through the Pacer system.  NCLC is the

5   publisher of a 22-set -- volume set of consumer law manuals

6   which rely heavily on federal law, specifically on federal

7   consumer laws, which, obviously, are updated on an annual

8   basis.  At this point we're digital, so they're being

9   uploaded on a daily basis.  And as an organization, we make

10  heavy use of Pacer ourselves in order to be able to maintain

11  our materials.

12          Beyond that, however, working with our primary

13  finance, which is not the direct service for consumers [sic]

14  but the lead services organizations that represent them,

15  legal services and public interest organizations, all rely

16  upon access to Pacer in order to provide representation to

17  their clients under the statutes like the Fair Lending Act,

18  the Fair Credit Reporting Act, Fair Debt Collection

19  Practices Act, Economic Opportunity Act -- I can go on.

20          Virtually all of the consumer laws in the

21  United States are based upon federal statutes that were

22  enacted from 1968 to the present.

23          So, therefore, having access to Pacer, these are

24  nonprofit public-interest organizations and legal services

25  organizations that have limited resources and, therefore,

1    the effort that was put into this case by the attorneys who

2    brought the litigation has direct impact not only on my own

3    organization but the groups that we serve as a national

4    service organization with national resources for legal

5    services organizations.

6            I do want to comment as well in terms of the

7    service award that is being requested on behalf of National

8    Consumer Law Center.  I have been involved in this case

9    since its inception seven and a half years ago.  I must say

10   that I outlasted the judge on the case but I am, in fact,

11   going to be retiring at the end of December of this year --

12           THE COURT:  At the end of when?  When are you

13   retiring?

14           MR. ROSSMAN:  At the end of December.

15           THE COURT:  So you would love me to approve the

16   settlement and approve it before you retire?

17           MR. ROSSMAN:  You know, I would be more than

18   happy.  But since anything that you approve is going to be

19   going to my organization, whatever we receive we would

20   greatly appreciate it.

21           I am looking forward to retirement.  My wife

22   retired two years ago and every morning she reminds me how

23   good retirement is.

24           THE COURT:  You know, I have been a senior judge

25   for some time; and what you just said, I hear that at home a

1    lot.

2           MR. ROSSMAN:  Yes.  There are some vacations and

3    trips that we have not been able to do, along with spending

4    some time with my grandchildren which is something that --

5    actually, what I really want to do is *The New York Times*

6    crossword puzzle the day after --

7           THE COURT:  My wife prefers Friday and Saturday

8    because they're the hardest.

9           MR. ROSSMAN:  I agree, Your Honor.  It is a great

10   motivation (indiscernible).

11          In any event, I have not only reviewed the

12   pleadings in this case.  I filed a declaration to the Court

13   to support class certification.  We provided discovery in

14   this case.  I have gone back and checked my time records on

15   it.  I have spent more than 250 [sic] hours working on this

16   case over the last seven and a half years.  And at my

17   current billing rate in Massachusetts, that would well

18   exceed the amount of the service award that is being

19   requested on behalf of the National Consumer Law Center.

20          I am happy to be able to respond to any questions

21   you have about the work that we have done in this case.

22          I will just finish by saying that over the last 25

23   years as the NCLC litigation director, I have been of

24   counsel or co-counsel in over 150 class action cases.  It's

25   an unusual situation for me to be a client.  It's been an

1    eye-opening experience for me.  I suspect it's been an

2    eye-opening experience for my counsel whom I have challenged

3    on occasions during the course of the last seven and a half

4    years.  But I think they have done an outstanding job in

5    terms of the work that they have done in this case as well

6    as the outcome it has achieved.  We are highly satisfied and

7    we completely endorse the settlement going forward.

8              So I thank you very much for the time that you

9    have given me to speak, Your Honor, and I am happy to answer

10   any questions that you have.

11             THE COURT:  Thank you very much, Mr. Rossman.

12             Mr. Gupta.

13             MR. GUPTA:  That's all we have for our opening

14   representation.  Thank you.

15             THE COURT:  Then I will hear from the government.

16             MS. GONZALEZ HOROWITZ:  Good morning, Your Honor.

17             Thank you for an opportunity to have the parties

18   and the class members appear before the Court today to

19   discuss the settlement approval in this, I think, as

20   Mr. Gupta called it, a landmark class action case.

21             Your Honor, you are aware that your task today is

22   to determine whether the proposed settlement is fair,

23   reasonable, and adequate for the class members.

24             You need not decide that settlement is perfect or

25   that it's even the best possible.  Stated another way, the

1    Court must examine whether the interests of the class are

2    better served by the settlement than by further litigation.

3            In evaluating that, the Court should determine

4    whether the settlement is adequate and reasonable and not

5    whether a better settlement is conceivable.

6            As demonstrated by both parties' filings in the

7    evidence and information that's been provided to you, this

8    settlement is an outstanding result; I think, as Mr. Gupta

9    called it, landmark for the class members and more than

10   meets the legal requirements for final approval.

11           This Court is well aware of the general principle

12   that settlement is always favored, especially in class

13   actions, where the avoidance of formal litigation can save

14   valuable time and resources; the same is certainly true

15   here.  As Mr. Gupta said, no settlement is perfect.

16           The United States concurs with plaintiffs that

17   this Court should grant final approval.  The settlement

18   proposal was negotiated at arm's length, the relief provided

19   for the class is more than adequate, and the proposal treats

20   class members equitably relative to each other.  Although

21   the parties address these factors extensively in their

22   filings, I would like to take a moment to address these

23   today.

24           First, although I was not personally involved in

25   the mediation and negotiation phase of this litigation, the

1    record before the Court amply demonstrates that the

2    settlement proposal was negotiated at arm's length.

3        As noted in the parties' filings, the parties

4    appeared before an experienced mediator with both parties

5    recognizing the litigation risk in moving forward.

6        The government vigorously defended this action

7    from its inception, as the Court mentioned earlier today in

8    its opening remarks and as Mr. Gupta discussed when giving

9    some of the procedural history and background of this case.

10        The Court and, later, the federal circuit upheld

11    certain electronic public access expenditures, while finding

12    that the Administrative Office of the Courts exceeded its

13    statutory authority as to others.  This has been a

14    hard-fought litigation for a significant period of time.

15    The parties engaged in informal discovery prior to

16    settlement discussions and, thus, were well informed.

17        As other judges in this district have noted, in

18    the absence of any evidence or collusion or coercion on the

19    part of the parties, the Court has no reason to doubt that

20    the settlement was the product of legitimate negotiation on

21    both sides; and the Court certainly has no reason to doubt

22    that here.

23        Second, the settlement provides for a common fund

24    of 125 million, and will provide a full recovery of up to

25    $350 to each class member for fees paid during the class

1    period, with the remaining funds to be distributed on a

2    pro rata basis to those class members who paid more than

3    $350 in fees during the class period.  This relief is more

4    than adequate especially considering some of the risks to

5    the class which I will address momentarily.

6            There is nothing inequitable about the plan of

7    allocation and distributing payments pro rata with a

8    guaranteed payment up to a certain amount in a common fund

9    case such as this one is not unusual.

10           As reflected in the parties' filings, the

11   allocation plan was the result of a compromise between the

12   parties and supports the Administrative Office's

13   long-standing policy of access to judicial records.

14           This principle is even more forceful here where

15   the E-Government Act allows for differentiation between

16   individuals.  Consistent with the statutory notes

17   articulated in 28 U.S.C. Section 1913, the statute permits

18   electronic public access fees to, quote:  "Distinguish

19   between classes of persons and shall provide for exempting

20   persons or classes of persons from the fees in order to

21   avoid unreasonable burdens and to promote public access to

22   such information."

23           As one of the objectors recognizes,

24   differentiation between class members can be permissible

25   when it is justified; and in this instance, it is certainly

1    justified considering the Administrative Office's interest

2    in ensuring public access especially to individual and

3    smaller users.

4         The settlement distribution will ensure that the

5    average Pacer user receives full compensation up to $350

6    which, for many users, will result in a full compensation of

7    all fees paid.  In other words, the settlement is consistent

8    with congressional intent.

9         Moreover, efforts taken by the judiciary to ensure

10   that public access fees do not create unnecessary barriers

11   or burdens to the public have resulted in an allocation of

12   the vast majority of Pacer maintenance costs to the system's

13   largest users, which are typically commercial entities that

14   re-sell Pacer data for profit.  That comes from the report

15   of the proceedings of the Judicial Conference of the

16   United States in September of 2019.

17        To address the concerns lodged by objectors that

18   the settlement either favors small users or institutional

19   ones which I think, as the parties have noted, are

20   diametrically opposed objections or does not favor

21   institutional users enough, the settlement is a marriage of

22   the parties' litigating positions which, in the end, is the

23   hallmark of compromise.  The settlement need not be perfect

24   but, rather, reasonable.

25        Finally, Your Honor, I want to address the terms

1    of the settlement in relation to the strength of plaintiffs'

2    case.  It is the government's position that absent a

3    settlement, the class would have faced significant

4    difficulty in demonstrating that the Administrative Office

5    would not have used the funds on otherwise permitted

6    categories.  This was a position that the government took at

7    all stages of the litigation; and as with any litigation, of

8    course, there are risks to both sides if the case were to

9    proceed.  But especially here, the results achieved are

10   extraordinary when compared to the difficulties the class

11   may have if the litigation were to move forward.  That, of

12   course, is without even considering the time, expense,

13   burden, and resources that the parties and, of course, the

14   Court, in turn, would expend if the case were to proceed to

15   additional discovery on damages and later to trial.  These

16   factors only further counsel in favor of approval of the

17   settlement agreement.

18        Because the Court has a lot of time at the end of

19   the hearing to discuss plaintiffs' motion for attorney's

20   fees, service awards, and costs, I will not address that

21   here other than to say that the government, in its response

22   to plaintiffs' motion, raised some questions in general

23   principles for this Court to consider in determining the

24   ultimate award.

25        In sum, Your Honor, we concur with plaintiffs in

1   the class that the Court should approve the settlement.

2   Thank you.

3           THE COURT:   Thank you.

4           So it seems to me now, under the schedule I've

5   set, at some point I want to hear from Ms. Oliver about the

6   opt-out question.  But I think at this point I will hear

7   from Mr. Isaacson who is here and has filed a number of

8   things; one a while ago and one last night.

9           He is here in person to speak to his objections.

10  I am happy to hear from him.  Later I will hear from other

11  people if they want to be heard.

12          So good morning, sir.

13          MR. ISAACSON:   Good morning, Your Honor.

14          May it please the Court.

15          I am Eric Alan Isaacson, a member of the class to

16  be bound by the settlement.  I filed a timely objection on

17  September 12 and in response to this Court's order regarding

18  the hearing.  And preceding the hearing, I filed a written

19  statement that indicated my intent to appear here in person,

20  not remotely, as Mr. Gupta's filing stated.  Also, to

21  address some of the filings that they did, I think that they

22  were after the fact and late when it comes to the

23  requirements of Rule 23.

24          I think that the primary fairness problem with

25  this settlement -- well, I think there are two serious

1    fairness problems with the settlement.  Rule 23 asks whether

2    the settlement treats class members equitably with respect

3    to one another.

4          The big problem is that, as Mr. Gupta says, this

5    class includes the world's largest law firms.  The world's

6    largest law firms are very sophisticated and they did not

7    file an objection.  They didn't file an objection because

8    they know that they got fully reimbursed for their Pacer

9    expenses years ago.  They bill in 30-day cycles.  They pay

10   Pacer bills, and the clients then reimburse them for the

11   Pacer bills.  Class counsel in class actions that almost

12   always settlement, almost always produce a settlement fund

13   from which the class action law firms are fully reimbursed

14   for their Pacer expenses.

15         You have got a class that includes a lot of very

16   large Pacer users that spent a lot on Pacer; they got fully

17   reimbursed for it.  And you have got a claims process --

18   well, it's not a claims process.  They brag that there are

19   going to be no claims made, which means they are not even

20   asking people:  Have you been reimbursed for your Pacer

21   expenses?

22         THE COURT:  So at this point, I take it, is that

23   when the big law firms bill their clients quarterly or

24   whenever they bill, they included -- they say:  In doing

25   legal research for you on this matter, we used Pacer, and it

1    cost X dollars, and we're billing you for that.

2          MR. ISAACSON:  Yes, Your Honor.  That would be my

3    understanding.

4          I worked in a large law firm for about three years

5    at the beginning of my career.  I worked at large

6    plaintiffs' class action firms for the majority of my

7    career.  My understanding is that the law firms that are

8    going to be some of the biggest claimants are going to

9    receive the biggest payments over the pro rata distribution

10   part of this settlement -- have already been fully

11   compensated.

12         Now, one way to address that was the government's

13   position that you had to have a large minimum payment.  You

14   have got a large minimum payment and they ended up getting

15   negotiated down to $350.  If it's a large minimum payment,

16   double that or three times that, you are still dealing with

17   people getting the minimum payment who are members of the

18   public, who are not in a class that have been reimbursed for

19   this stuff; that would be one way to deal with it.  The

20   settlement is unfair if it does not have a larger minimum

21   payment and does not ask large claimants or large payees:

22   Have you been reimbursed?  I think it treats class members

23   inequitably relative to one another.

24         I think it's very ironic that the government, in

25   the settlement negotiations regarding the allocation of the

1    funds, did a better job advocating for the public interest

2    and for the interest of class members who haven't been

3    reimbursed than did class counsel.

4         There may have been arm's length negotiations in

5    the settlement process with respect to the total amount of

6    the settlement.  But when it comes to the allocation of the

7    funds, the government's position was preferable to the

8    plaintiffs' class action lawyers; I think that's most

9    unfortunate.

10        It is, I think, not coincidental that plaintiffs'

11   class action firms like themselves benefit from a low

12   minimum amount and high allocation to the pro rata

13   distribution.

14        I think that the $10,000 service awards are

15   problematic, I think, according to Supreme Court authority,

16   Supreme Court opinion; I addressed that in my papers.

17        With respect to the settlement adequacy as amended

18   in 2018, Federal Rule of Civil Procedure 23 requires the

19   Court, in evaluating adequacy of the settlement to consider,

20   and I quote:  "The terms of any proposed award of attorney's

21   fees."  That's Rule 23(e)(2)(C)(iii).

22        THE COURT:  Hold on one second.

23        Which part of 23?

24        MR. ISAACSON:  Rule 23(e), which deals with

25   settlement approval in class actions.

```
 1              THE COURT:  Right.

 2              MR. ISAACSON:  Subsection (2), Subsection (C),

 3   Subsection (iii).

 4              THE COURT:  So it says that:  If the proposed

 5   class -- only in finding it's fair, reasonable, and adequate

 6   after considering the following.  And (C)(iii) basically

 7   says --

 8              MR. ISAACSON:  Which I think --

 9              THE COURT:  -- that the class represented class

10   counsel -- I'm sorry, that the relief provided for the class

11   is adequate taking into account the terms of any proposed

12   award of attorney's fees including timing of payment.

13              So essentially, as you read this, there are two

14   questions on attorney's fees:  One is, are they entitled to

15   attorney's fees?  And secondly, how much?

16              MR. ISAACSON:  Yes, Your Honor.

17              THE COURT:  And this says that in determining

18   adequacy I have to consider both of those?

19              MR. ISAACSON:  Yes, Your Honor.

20              In considering adequacy of the settlement, you

21   need to consider that.  The reason is because in class

22   actions there is a tendency for class action lawyers to

23   settle cases on terms that guarantee themselves large

24   attorney's fee awards; in this case, four or five and a half

25   times their reasonable hourly billing rates if you look at
```

1    their lodestar -- their claimed lodestar, and compare it to

2    the fee award that they're asking for.

3           This is a case where class counsel has come in and

4    said:  We have got a quarter of the damages in this case --

5    because it's apparently a $500 million case according to

6    their expert Professor Fitzpatrick -- we have got a quarter

7    of the damages in this case, give us four times our billing

8    rates.  I don't think that's appropriate, Your Honor.

9           I think that it's going to be necessary, if you

10   want to approve the settlement, to dramatically reduce the

11   attorney's fees that they're requesting.

12          Now, they didn't document their lodestar; that's a

13   problem.  I think that's designed, quite frankly, to force

14   the Court to choose to do a percentage award rather than a

15   lodestar award.  I don't think that it's ethical for class

16   counsel to do that.  I think they need to provide the data

17   that would be necessary for the Court to make the choice.

18   And all of the circuits except for the District of Columbia

19   Circuit and the Eleventh Circuit have held that that is a

20   choice for the Court to make.

21          THE COURT:  Choice between what?

22          MR. ISAACSON:  Between lodestar award and

23   percentage of the fund award.

24          THE COURT:  What about the federal circuit?

25          MR. ISAACSON:  The federal circuit I think

1    indicates that you can choose between the two, you have

2    discretion.  But it is not something that they can force.

3              I think the recent *Health Care Republic* [sic] case

4    strongly indicates you ought to do a lodestar cross-check.

5              THE COURT:  A lodestar cross-check is different

6    from a lodestar.  In other words, as I understand it -- we

7    are going to talk about this more later.

8              As I understand it, there are cases in which you

9    apply the lodestar.  We used to call it -- I forget what it

10   used to be called, the U.S. Attorney's matrix, the D.C.

11   Attorney General's matrix, the Laffey Matrix.  We have all

12   of these things in this court which applies to certain kinds

13   of cases and in certain cases.  Then there are the common

14   fund cases which, I believe -- and we will talk more about

15   this later.  The case law seems to suggest that a percentage

16   of the fund is more normal than the lodestar, but there is

17   then the discussion of a separate thing called the lodestar

18   cross-check.  So there is the lodestar versus the percentage

19   of the fund, and then there is:  When you do a percentage of

20   the fund do you also do a lodestar cross-check, and is that

21   something judges have the discretion to do or not do to

22   satisfy themselves or to do a, for lack of a better word,

23   cross-check, or is it something that some courts require be

24   done?

25             I don't want to -- you can continue talk about

1    this.  I will let you talk later this morning when we get to

2    the separate discussion of attorney's fees; I will let you

3    get up again and talk some more about that in response to

4    what counsel says.

5         In my mind at least, there is a vast difference

6    between a lodestar and lodestar cross-check; they serve

7    different functions.

8         MR. ISAACSON:  Your Honor, my understanding is the

9    Court is supposed to act as a fiduciary for the class.

10        THE COURT:  I agree.

11        MR. ISAACSON:  If we go back to the earliest

12   common fund cases, the Supreme Court in *Greenough* says the

13   Court needs to act with a zealous regard for the rights of

14   the class.  And you need to -- in evaluating whether to do a

15   percentage award and the amount of the percentage award,

16   consider whether it's going to cause a windfall to class

17   counsel, which I think, in this case, it does because they

18   are saying:  We recovered one quarter of the damages in this

19   case, give us four times our claimed lodestar.  Which they

20   haven't really documented, and they haven't documented the

21   fees.  They end up having supplemental submission from both

22   Fitzpatrick and Rubenstein supporting their fee application

23   on reply.  I think that's inappropriate because Rule 23(h)

24   says that they're supposed to put in the supporting

25   documentation in connection with the motion.  I think it's

1    unfair and improper to put it in on reply both because,

2    ordinarily, you don't get to introduce additional evidence

3    on reply and because Rule 23(h) required them to file that

4    stuff before the objections were due.

5              I think it's also important to realize that even

6    if a judge is not going to go through line by line in their

7    lodestar submissions and billing submissions, even if class

8    members, for the most part, aren't going to be sophisticated

9    enough to go through line by line, if those filings and that

10   evidence is made a part of their public record that other

11   folks may do it.

12             In the *State Street* securities fraud litigation

13   there was settlement in the District of Massachusetts.  A

14   reporter for the Boston Globe went through the fee

15   applications after the district judge had approved the

16   attorney's fees and said:  Hey, there is a guy that gets

17   paid a lot of money but didn't do anything.  What's up?

18   Said:  Hey, there are folks who billed time and they are

19   being compensated more than once for it, more than one law

20   firm they were working for at the same time for the same

21   fees.  It's important for transparency that they have a

22   complete filing of the information.

23             Now, in this case, I think a fee award of five

24   percent would more than cover their claimed lodestar and

25   would be more than adequate and would address the concerns

1    that I have got.

2          When it comes to presumptions with respect to

3    fees, the *Health Republic* case says that you can't presume

4    that the fee application is appropriate.  You have got to be

5    very critical of it.

6          The Supreme Court in *Perdue* said it's

7    presumptively sufficient for class counsel to get an

8    unenhanced lodestar award that presumptively covers the

9    costs and risks of class action litigation and that if they

10   want more than that they need to demonstrate with clear

11   evidence why they need to get more than that.

12          THE COURT:  Okay.

13          MR. ISAACSON:  In this case, I think that goes to

14   fairness of the settlement.

15          Now, if I am going to be able to address the fee

16   issues after they speak about fees --

17          THE COURT:  Yes.

18          MR. ISAACSON:  -- I will wait for that.

19          Thank you very much, Your Honor.

20          THE COURT:  Thank you very much, Mr. Isaacson.

21          Are there any other objectors in the courtroom or

22   on Zoom who want to be heard?  Any objectors?

23          I see someone.

24          MR. KOZICH:  Yes, Your Honor.

25          THE COURT:  Mr. Kozich, yes, sir.  Mr. Kozich has

1   filed a written objection which I have read.  I will hear

2   from you, Mr. Kozich.

3            MR. KOZICH:  Thank you, Your Honor.

4            One of the persons who spoke said there were

5   500,000 users who were actually entitled to some sort of

6   reimbursement for their Pacer fees; and they never had an

7   accounting of who is going to receive what money from the

8   settlement.

9            Now, one of the other attorneys that I know is a

10  class member -- but I am not a class member because --

11  basically saying that I didn't pay Pacer fees in a time that

12  is a class period.

13           I remember that I did pay Pacer fees during that

14  time but I was only able to find invoices that I submitted

15  to the Court.  The Pacer people tried to do a check on me,

16  they couldn't find my account at all.  So I don't know if

17  Pacer purposely lost my account or whatever.  I am claiming

18  that I am a class member and I would like to present my

19  argument now.

20           Now the --

21           THE COURT:  Are you objecting to aspects of the

22  settlement or are you objecting to the fact that you are not

23  being included in the class and getting your fair share, or

24  both?

25           MR. KOZICH:  Both, Your Honor.

1              THE COURT:  Okay.  Go ahead.

2              MR. KOZICH:  Okay.  The government entered into it

3    in December of 2002.  It mandates that Pacer cannot charge

4    beyond the margins -- marginal cost of document production

5    or transmission.  Transmission time is at the speed of

6    light, so at 186,000 miles per second; therefore,

7    transmission time is much less than one second and certainly

8    less than one cent per page to transmit.  All of that money,

9    the pennies that it cost to transmit, they already had the

10   documents, they're just transmitting the documents, it's

11   proper to pay Pacer.

12             The defendant instituted excessive Pacer fees.  I

13   only have two documents; one from August 18th of 2014, and

14   one from April 1st, 2017, which is charging ten cents per

15   page for excessive fees.  So the period of time to then come

16   back before 4/21/10 [sic] because they're charging excessive

17   fees back then too.

18             Ten cents per page is what Office Depot charged

19   before COVID.  It includes costs of copier, toner, drums,

20   paper, electricity, copies.  Pacer did not incur any of

21   these costs, only the cost of transmission, because the

22   document is already there.

23             The lawsuit was filed in 2016.  Class period is

24   from April the 10th, 2010, through May 31st of 2018.  This

25   period is why we cut off so -- just a short period of time

1    at any time before April the 10th or after May 31st of 2018,

2    when Pacer was charging ten cents a page.

3         Who picked the period?  I don't know who picked

4    the period.  Pacer users who pay less than $50 in excessive

5    Pacer fees -- I didn't pay my Pacer fee, but you see $250

6    because I am a disabled veteran.  And I was looking for

7    issues regarding the housing tax credit properties.  I had

8    an issue with the Broward County Housing Authority.  I was

9    researching records of California, Oregon, Washington, and

10   all over the country, actually, for help with my case.  So I

11   didn't pay the Pacer fees because I couldn't afford it, the

12   high fees.  Pacer cut me off from using Pacer, and I am

13   still cut off from Pacer.  I guess Pacer could waive the

14   fees; they haven't done that.

15        And then for the quarter ending for the year

16   ending 2010, Pacer had a net profit of 26,611,000.15 as part

17   of my filing of 163, Exhibit E, extrapolating a period,

18   which is a period of 37 quarters; basically at a net profit

19   for 2010, $984,626,129.

20        If you take over the settlement, there is still a

21   net profit of $859,626,129 [sic].  Net profit.  It's not

22   supposed to be making a profit, they're supposed to be

23   dealing at cost.  That money should be distributed to the

24   users who pay the excessive fees so that they can be made

25   whole.  They are not being made whole by the settlement.

1          I presented evidence that I owed $354.67 in Pacer

2     excessive fees for the period July 1st, 2015, through

3     September 30th, 2015.  My account number is 2792766.

4          I remind the Court that Pacer couldn't find my

5     account.  So I don't know what they did with it; they lost

6     it or something.

7          I am opposed to the settlement because people are

8     not being made whole.  It's the big large law firms, big

9     corporations, and the big nonprofits that are making most of

10    the money because the small guy who you see incur fees is

11    not going to be made whole and maybe deserves to be made

12    whole by the settlement.

13         I am opposed to the settlement.  I would like to

14    know how -- who the money is going to go to before the Court

15    reaches a settlement on the amount that's being distributed.

16    I think the nonprofits and big corporations is taking a big

17    chunk of the money, and the small guy is not being made

18    whole.  Thank you, Judge.

19         THE COURT:  Thank you very much, Mr. Kozich.

20         Are there any other objectors in the courtroom or

21    on Zoom that want to be heard?

22         I don't hear anybody speaking up.

23         As I understand it, and as I have -- I have read

24    all of the objections.  In addition to Mr. Isaacson and

25    Mr. Kozich, there are only three other objectors:  Geoffrey

1    Miller, Alexander Jiggets, and Aaron Greenspan.  I have read

2    their objections, and none of them are here on Zoom or

3    otherwise.  None of them indicated that they wanted to be

4    heard today.

5         So I would suggest that maybe a logical thing to

6    do is to now hear responses to the objections.  You don't

7    need to use the full time, use whatever time you need, the

8    same for the government, and then we'll take a break.  Then

9    I will hear from Ms. Oliver on opt-outs and from whoever is

10   going to speak about attorney's fees.  I think we should

11   deal with the objections, both the written ones and those

12   who spoke today to support their written submissions.

13        Mr. Gupta.

14        MR. GUPTA:  Thank you, Your Honor.

15        I will try to be brief but, of course, I want to

16   be sure I answer any questions the Court has.

17        THE COURT:  Yes.

18        MR. GUPTA:  I do think we have tried to adequately

19   brief the responses to the objections.  I can discuss

20   Mr. Isaacson's objection first.

21        We thought it was interesting that you had two

22   sort of diametrically opposed objections.  You had

23   Mr. Miller's objection.  The complaint there is, we are

24   favoring the small users by compromising with this minimum

25   distribution.  Mr. Miller's complaint was:  We're favoring

1   the little guy over the big guy.

2          Mr. Isaacson's complaint, as I understand it, is

3   precisely the opposite.  He is saying:  You are favoring the

4   big guy over the little guy.  I suppose maybe that's a

5   measure of the fact that it's a compromise and we met

6   somewhere in between with the two positions.

7          I find Mr. Isaacson's objection, in particular, a

8   little difficult to understand because what he is saying is,

9   in his words, is grossly inappropriate was that we advocated

10   for a pro rata distribution of the funds; that was our

11   position in the negotiations with the government.

12          As we say in our reply brief, the Supreme Court

13   has said that a pro rata distribution is the typical measure

14   of fairness, both in modern class actions and in equity.

15   Fair treatment -- the Supreme Court said in *Ortiz* -- is

16   assured by the straightforward pro rata distribution of

17   proceeds from litigation amongst the class.  It's hard to

18   understand how our advocacy for a pro rata distribution

19   somehow ill-served the class or how this structure

20   discriminates against the small users on whose behalf we

21   brought this case.

22          If you look at the class representatives, you can

23   see that the whole point of this case was about access to

24   justice for the little guys, as it were.

25          Mr. Isaacson points out that large law firms often

1    will seek reimbursement from their clients for expenses like

2    Pacer fees.  This is something we gave considerable thought

3    to, both in bringing the case and also in settling the case.

4            I just wanted to draw the Court's attention to a

5    footnote in our reply brief because it can get missed; a

6    footnote at page 5.  We actually found a case.  It's a case

7    from the Northern District of Illinois where a similar kind

8    of objection was made to a class action settlement; the idea

9    being that:  You have this settlement with respect to

10    certain charges but, then, there might be a dispute with

11    other people, a matter with other people who reimburse those

12    charges.

13            What the law has always said here -- and this is a

14    long-standing legal principle that is true in Tucker Act

15    cases as well -- is that the claim is held by the person who

16    was subject to the illegal government charge; in that case,

17    that would be the person who paid the Pacer fees.  Any

18    downstream issues with respect to reimbursement by other

19    people is a matter between those people and those other

20    people.

21            That said, because we expected this issue to occur

22    and because we heard about it in the notice period -- I

23    think, actually, you may recall, Judge Friedman, we

24    mentioned this issue to you before final approval as a

25    potential issue.  We have actually worked with the class

1    administrator.  There is a form on the website that allows

2    people to indicate whether or not they paid Pacer fees for

3    somebody else or whether they are being reimbursed.

4              THE COURT:  Say that again.

5              MR. GUPTA:  There is a form on the website that

6    allows people to indicate whether they paid Pacer fees for

7    someone else.  The attempt there is to try to -- to the

8    extent possible -- resolve those questions so that they

9    don't become a problem in administering the settlement.

10             THE COURT:  Is the way it works -- if you get

11   information through this form, what do you do with the

12   information?

13             MR. GUPTA:  I think Ms. Oliver, who is our liaison

14   in cases, is in a much better position to address this.

15             I just -- I do want to emphasize, though, I think

16   this is a question now -- we're turning to a question of how

17   we're administering the settlement but not -- the certain

18   fairness question in this process.

19             THE COURT:  Wait.  Before I turn to Ms. Oliver, I

20   think what I heard you say is that there is a case law --

21             MR. GUPTA:  Yes.

22             THE COURT:  -- that says that -- in terms of

23   not -- settlement of the class action, that if you -- to

24   paraphrase:  If you are to be reimbursed by some third

25   party, not a member of the class --

1          MR. GUPTA:  Right.

2          THE COURT:  -- it doesn't disqualify you from

3     getting the pro rata; it's between you and those other

4     people.

5          MR. GUPTA:  Correct.  As a legal matter, that's

6     the answer to Mr. Isaacson's question.

7          THE COURT:  That's the legal answer.

8          MR. GUPTA:  That's the legal answer.

9          But we didn't kind of want to stop there because

10    we know that this is a real-world issue.  What Ms. Oliver is

11    now going to tell you about is how we have tried to resolve

12    this as a real-world problem.

13         THE COURT:  Come to the microphone, Ms. Oliver.

14    Thank you.

15         MS. OLIVER:  So there were two forms on the

16    website:  One was a payment notification form and the other

17    was an accountholder notification form.  They do two things.

18    The payment notification form allowed the actual payer of

19    the fees to get onto the website and submit information

20    notifying the administrator that they paid Pacer fees on

21    behalf of someone else.  That can be any scenario.  That can

22    be an employer paying for an employee's Pacer fees; it can

23    be a client who actually paid -- they were passed through

24    the law firm to the client; that can be any particular

25    scenario.  There are not limitations on the website as far

1    as who can submit those notifications.

2          There is also a form that allows accountholders to

3    notify the administrator that somebody else paid their Pacer

4    fees for them.  And although they were the user, somebody

5    else paid the Pacer fees.

6          Once those notifications were submitted -- once

7    the payment notifications, so somebody notifying the

8    administrator that they paid Pacer fees on somebody else's

9    behalf -- once those were submitted to the administrator,

10   the administrator then sent an email to the accountholder

11   associated with that account, that was the subject of the

12   notification saying:  Hey, we have received a notification;

13   somebody has told us that they paid Pacer fees for your

14   account.  If you would like to dispute this, you have this

15   long to dispute it; and you can submit this information,

16   we'll then process the information.

17         Through that process, we have received zero

18   disputes.  We have received hundreds of notifications.  We

19   have received 409 of the payment notifications, and zero

20   disputes to any of those 409 payment notifications.

21         THE COURT:  Thank you.

22         MR. GUPTA:  So that is really all I wanted to say

23   about Mr. Isaacson's fairness objection.

24         Unless the Court has questions.

25         I would like to turn to one other issue that he

1     has raised because it's a legal question.

2                 THE COURT:  That he has raised.

3                 MR. GUPTA:  That he has raised.

4                 He has objected to the service awards for the

5     class representatives.  And the reason I want to mention --

6                 THE COURT:  Now, the service awards are the kind

7     of things that the three who spoke earlier on behalf of the

8     named plaintiffs were talking about.

9                 MR. GUPTA:  Right.

10                THE COURT:  Which is, as I understand it, their

11    incentive for participating in the -- being up front and

12    being the named plaintiffs, and all of that.  But in

13    addition, they all spoke to the amount of time they, in

14    fact, actually spent, their institutions actually spent --

15                MR. GUPTA:  Right.

16                THE COURT:  So if you viewed it as a pure

17    incentive -- and you can tell me whether I have got the

18    concepts right -- that might be sufficient under the case

19    law.

20                But in addition, they say here:  Even if we had to

21    prove that if I were billing what my ordinary rate is or, as

22    counsel, if I don't have an ordinary rate, the number of

23    hours I spent, it would have added up to more than 10,000

24    anyway, no matter how you slice it.

25                MR. GUPTA:  That's right.  That's right.

1        You have got it exactly right.  Maybe you have

2   just taken the words out of my mouth.

3        The reason we're teeing this up is that

4   Mr. Isaacson has made this objection in many, many class

5   action settlements.  And the legal argument rests on this

6   Supreme Court case from 1882, the *Greenough* case.  It drew

7   this distinction between the expenses that occurred kind of

8   in the fair prosecution of the case, which can be things

9   like attorney time, and something else which was disapproved

10  which was -- I mean, this is a case before class actions;

11  but you had a bondholder who asked for, basically, a

12  personal salary for having handled a case that benefited a

13  lot of people.  And the Supreme Court said no, you can't

14  have that.

15       So Mr. Greenough's [sic] legal argument is that

16  the modern-day incentive award or case contribution award

17  for class representatives, in his view, is impermissible

18  under that case law.  We think he is wrong.  Virtually every

19  court that has addressed the question has disagreed with

20  him, but he has gotten some courts to agree.

21       What we're saying is:  This case does not even tee

22  up that legal question because even if you were to accept

23  the distinction that he is drawing, we fall on the correct

24  side of the line.  In other words, even if 1882, if you want

25  to think about it that way, the time that these class

1    representatives' lawyers have spent on this case more than

2    justifies these modest service awards.  So that's the only

3    reason I wanted to tee that up.

4          I don't want to be presumptuous, but if the Court

5    is going to approve the settlement and write an order, I

6    think it would be helpful to point out that we fall on the

7    correct side of that line.

8          I won't address the attorney's fees issues because

9    I think you said we will address that later.

10         THE COURT:  No.  We will talk about that.

11         MR. GUPTA:  Just on the issue with Mr. Kozich.  We

12   have spent a fair bit of time with the class administrator

13   and with the government's counsel to get to the bottom of

14   this.  It's not the case that Mr. Kozich's account hasn't

15   been found.  His account has been found.  He does, in fact,

16   have a Pacer account and has long had one.

17         It's just the case that during the class period he

18   did not pay any Pacer fees and, therefore, there is nothing

19   to reimburse.  I do have some sympathy for him.  He said he

20   is a disabled veteran who is trying to use court records to

21   solve problems that he has.  It sounds like he is exactly

22   the sort of person on whose behalf the case was brought.  It

23   so happens that if he didn't pay fees during the Pacer fee

24   [sic] he does not have a claim that is compensable here.

25         That is really all I wanted to say, if the Court

1   has questions.

2          THE COURT:  I have one question about something he

3   said which may not apply to him but might apply to others; I

4   would like a response.  It's actually on page 3 of his

5   filing, Docket No. 163.

6          He says:  The settlement refunds only those

7   persons who paid more than $350 in excessive Pacer fees but

8   is paying zero to those to people who paid less than 350.

9   His argument, as I read it, is -- putting aside whether he

10  qualifies.  His argument, as I read it, is:  If I paid $351

11  over time, I would get $350.

12          If you paid $100, you get zero.

13          MR. GUPTA:  And that is just factually incorrect.

14  It's a misreading of the settlement.

15          I would point you to page 6 of the settlement

16  agreement, paragraph 19, which explains how the first

17  distribution works.

18          It says, in the first distribution:  The

19  administrator allocates to each class member a minimum

20  payment amount equal to the lesser of $350 or the total

21  amount paid in Pacer fees by that class member for the use

22  of Pacer during the class period.  So it's either 350 or the

23  lesser.  If you pay $100 or even $1, you are going to get

24  that back.

25          Then, once you do the pro rata distribution, if

1   you paid 151, you are going to get that $1 back as well.  I

2   think that is just a misunderstanding.

3              THE COURT:  Okay.  I just wanted to clarify.

4              Let me see if the government has anything they

5   would like to say in response.

6              Mr. Narwold?

7              MR. GUPTA:  Yes.  Would the Court like to hear

8   about any of the other objectors?  I do think we have

9   addressed them in our papers.

10             THE COURT:  I don't have any specific questions.

11             I have read the papers and I have read your

12  responses, and they're standing on their papers.

13             MR. GUPTA:  Thank you.

14             THE COURT:  I will evaluate what they have had to

15  say in view of your responses.

16             MR. GUPTA:  Thank you.

17             MS. GONZALEZ HOROWITZ:  Your Honor, I don't really

18  have much to add beyond what's already been put into the

19  record.

20             We did address this issue of the concern about

21  compensating smaller users in my opening remarks to the

22  Court and how that is consistent with the text of the

23  statute, so I would refer the Court back to that.

24             As to Mr. Kozich, we concur with class counsel.

25  We did some further research as to Mr. Kozich's account.  It

1    is true that he has had an account for many years; however,

2    he did not actually pay any fees during the relevant class

3    period.  He has incurred fees during that time.  At multiple

4    points he has been granted the fee waiver which is now --

5    which was $15 at the time; that has now increased to 30.

6            He has -- I believe he mentioned on the call that

7    he has approximately $354 in an outstanding balance but that

8    has not been paid.  And so under the very terms of the class

9    definition, he would not fall as a member of the class.  So

10   unless the Court has any other questions for me, we agree

11   with the statements by class counsel as to the responses to

12   the objections.

13           THE COURT:  Good.  Thank you very much.

14           Why don't we take 15 minutes or so.  No more than

15   15 minutes.

16           I think the logical way to proceed, unless you

17   disagree, is to hear from Ms. Oliver on the opt-outs for the

18   34 people who say they are trying to opt out at this state

19   and, then, to hear from counsel on legal fees and

20   Mr. Isaacson on legal fees.  Thank you.

21           (Whereupon, a recess was taken.)

22           THE COURT:  So I have one follow-up question from

23   earlier.  I am not sure whether it's for Mr. Gupta or

24   Ms. Oliver, or both.

25           It has to do with this question of -- the fact

1    that some -- let's suppose I am a partner at a law firm and

2    I send out my bills and I include the hours, the hourly

3    rate, and all that stuff; but I also include all of the

4    costs and expenses.  And a portion of it is for the work I

5    did for finding stuff on Pacer.  I am charging my client for

6    it, my client has paid for it.

7              A couple of questions.  One, as I understand it,

8    your argument is -- the legal argument is:  It doesn't

9    matter.

10             The practical answer is that there were notices

11   that were sent out and an administrator received -- sent

12   emails to accountholders, and no one had -- there were a lot

13   of notices sent out; the response was that there were no

14   disputes.

15             A couple of questions.

16             One, are these forms or things that were sent out

17   somewhere in the record here?  Are they exhibits or were

18   they exhibits in prior filings?  If so, where are they?

19             Secondly, what did you or the administrators -- I

20   guess you said that what the administrator did when they got

21   the forms was to reach out by email.  Was anything else done

22   or done with responses?

23             So those are the practical questions.

24             The Rule 23 question is -- you say it's not -- it

25   doesn't matter as a matter of law.  But doesn't it --

1    explain to me why it does or does not affect my evaluation

2    of whether the settlement agreement is fair?

3         So the first few questions are kind of practical.

4    Please help me; explain this to me a little further.

5         The second one is:  My job is to decide all of the

6    Rule 23 issues.  Doesn't this affect fair and adequate?

7         MR. GUPTA:  I think -- so first of all, I will

8    just say:  I think the way you recounted it sounds to me

9    exactly right.  Ms. Oliver can address your practical

10   questions, and then I am happy to speak to the Rule 23

11   question.

12        THE COURT:  Okay.

13        MS. OLIVER:  So on the practical questions, we --

14   you mentioned these notices that were sent out.  So there

15   were hundreds of thousands of actual notices, court-approved

16   notices that were sent out.  This was a different process

17   from that.

18        So there were notification forms on the website.

19   We have not filed those notification forms with the

20   substance of those notification forms with the Court, but we

21   can do so.

22        THE COURT:  I would just like to see them just

23   for my own --

24        MS. OLIVER:  Once those notifications were

25   submitted, in the case of an individual notifying the

 1    administrator that they had paid Pacer fees on someone

 2    else's -- on an accountholder's behalf, then the

 3    administrator sent an email and there was no other attempt

 4    to contact.  It was by way of email to the accountholder

 5    saying:  Someone has filed a notification letting us know

 6    that they paid Pacer fees on your behalf.  If you would like

 7    to dispute this, here is the process for doing so.  We have

 8    not filed the substance of that email either, but we can

 9    also do that.

10              THE COURT:  Okay.  Thank you.

11              MS. OLIVER:  And I think --

12              THE COURT:  Nobody had any disputes.

13              MS. OLIVER:  There were no disputes filed as part

14    of that process.

15              THE COURT:  You said something like about 400 came

16    back.

17              MS. OLIVER:  So we had -- there were 409 of the

18    payment notifications filed.  So that's where someone said:

19    I paid Pacer fees on behalf of somebody else.  And then

20    there were 464 accountholder notifications where an

21    accountholder notified the administrator that somebody else

22    had paid their Pacer fees and identifying the payor.

23              THE COURT:  Okay.  Got it.  Thank you.

24              So you file that stuff, and I will at least see

25    what I have got.

1    MS. OLIVER:  We will.

2         THE COURT:  Now the question is:  Does all of this

3    or how does all of this affect fairness and adequacy under

4    the rules?

5         MR. GUPTA:  Your Honor, I think what you said

6    earlier is right.  That, as a legal matter, any sort of

7    potential claim that somebody might have for reimbursement

8    against somebody who paid the fees is a matter of law and

9    equity between those people; and that's what the cases we

10   have been able to find where this comes up in a class action

11   context have said.

12        THE COURT:  You mentioned a footnote in your

13   brief.  Is that the only reference in the briefs to this

14   question?

15        MR. GUPTA:  That is the only reference.  We have

16   raised this in response to an objection by Mr. Isaacson.

17        There is a Northern District of Illinois -- I will

18   point out we were actually surprised we were able to find a

19   case precisely on this point; it's a relatively esoteric

20   point.

21        The broader point is one that is well supported in

22   the law; not just in the Tucker Act context but in all sorts

23   of contexts, including an antitrust case that's going back

24   100 years where you have all sorts of complex payment

25   streams.  The question is:  What do you do about some

1    unreasonable charge that was assessed against one person but

2    then it was reimbursed by another person who has the claim?

3           And the general rule is that there is not a kind

4    of passing-off defense, that it's the person who paid the

5    charge that possesses the claim.  That's certainly true

6    under the Little Tucker Act.

7           THE COURT:  On the broader point, is there

8    specific case law you would point us to or anything in

9    Wright & Miller, Professor Rubenstein or in anybody else's

10   treatise on class actions?

11          MR. GUPTA:  Well, I guess I would just point

12   you -- the point that Mr. Isaacson is making about fairness

13   is that he is saying, as I mentioned earlier, that he thinks

14   it was wrong for us to advocate for a pro rata distribution.

15          In fact, the case law says exactly the opposite,

16   right?  I think *Ortiz* is really probably the best case on

17   this.

18          THE COURT:  Which case?

19          MR. GUPTA:  *Ortiz versus Fibreboard*, the Supreme

20   Court's decision.

21          THE COURT:  So it's basically a subset of that

22   point.

23          MR. GUPTA:  That's right.

24          THE COURT:  If you are settling a big class

25   action, I suppose the only other way you would even think

1    about doing it would be having some classes, and this class

2    is treated that way and that class is treated that way.

3            MR. GUPTA:  Right.

4            What is weird about his point is that he is saying

5    that we're favoring the big folks.  But, in fact, the

6    parties bent over backwards to engage in a settlement

7    structure that has this minimum distribution.  So the little

8    guy is -- we are ensuring that the little guy is getting

9    paid.  I think that's the principal point I would make.  I

10   think it's hard to say that this is an unfair settlement for

11   that reason.

12           One last point which is:  There are a lot of

13   really big users in this class who are not law firms, they

14   are data companies, they aggregate the date, and they don't

15   have this reimbursement issue, so it's important that they

16   get to be able to recoup what they have paid.  Thank you.

17           THE COURT:  Does the government have anything to

18   add on this point?

19           MS. GONZALEZ HOROWITZ:  No, Your Honor.  I don't

20   think we have anything to add.

21           MR. KOZICH:  Your Honor.

22           THE COURT:  Yes, sir.

23           MR. KOZICH:  Can I chime in?

24           THE COURT:  On what?

25           Very briefly.  What do you want to talk about,

1    what we have just been talking about?

2          MR. KOZICH:  Well, it's related.  The Department

3    of Justice said that, basically, I have paid Pacer fees.  I

4    am not part of the class action.  I apologize.  I thought

5    that the settlement was saying that the people paid less

6    than 350 are not getting paid; I misread it.  I read it

7    again.  You are correct.

8          My point is that I would like the Pacer people to

9    go in and reopen my account so I can use Pacer.  I will pay

10   the $4 and some cents that I owe that's a requirement; but I

11   would like the Pacer people to reopen my account if we can

12   do that.

13         THE COURT:  All right.  Well, maybe before the

14   hearing is over, the government can tell you who to talk to

15   or who to email, or something like that.  Okay?

16         MR. KOZICH:  Okay.

17         THE COURT:  So back to where we were.

18         I said, before the break, that I was going to ask

19   Ms. Oliver to explain the 34 objectors [sic] and what, if

20   anything, we do about that at this point, and then we'll

21   move on to the attorney's fees questions.

22         MS. OLIVER:  Before I get to the opt-outs --

23         THE COURT:  The opt-outs, I misspoke.  The

24   opt-outs.

25         MS. OLIVER:  Mr. Gupta had mentioned the numerous

1    class member contacts that we have been handling.  This is

2    our internal log (indicating) of those contacts, emails, and

3    phone calls.  I have handled a number of them.  I have

4    reviewed a number of drafts that Ms. Loper and another

5    lawyer back at our office have handled; so we have been

6    personally handling them.  There is no call center and there

7    are no customer service representatives, though, some days,

8    boy, I wish there were because we've spent a lot of time on

9    those.

10           Opt-outs.  In 2023, there have been 33 timely

11   opt-outs.  I believe the number in the filings was 34.  We

12   identified a duplicate entry in there, so it's really 33;

13   the same person with the same claim ID, there were two of

14   those received.  16 additional were untimely.  When I say

15   "untimely," I don't mean they filed 12 hours later; they

16   filed two days late.  They all had an opportunity to opt out

17   in 2017.

18           THE COURT:  Well, they had an opportunity to opt

19   out in 2017.  And then, pursuant to the notice that was sent

20   out, they had a new opportunity to opt out, right?

21           MS. OLIVER:  We did not -- so the new class

22   period --

23           THE COURT:  I see.

24           MS. OLIVER:  They had an opportunity to opt out in

25   2023.  But everybody who was a part of the earlier certified

1    class from April 21, 2010, through April 21, 2016, had an

2    opportunity to opt out in 2017.  They were not given another

3    opportunity to opt out in 2023.

4         There were ten individuals in 2023 who attempted

5    to opt out, they received the incorrect notice.

6         THE COURT:  That's in addition to the ones you

7    have just been talking about?

8         MS. OLIVER:  So there were 33 that were timely

9    and, then, there were 16 that were not timely.  Within the

10   16, 10 of those individuals received the incorrect notice

11   that told them they had an opportunity to opt out.  All 10

12   of those -- three of them were actually federal government

13   employees.  So the 7 who were not federal government

14   employees and received the incorrect notice were then sent a

15   corrective notice saying:  We goofed, you got the wrong

16   notice.  You had an opportunity to opt out in 2017; you no

17   longer have an opportunity to opt out.

18         THE COURT:  Okay.

19         MS. OLIVER:  And then there were an additional 6

20   individuals who received the correct notice in 2023 from the

21   get-go.  And they tried -- they sent in -- so because they

22   were part of that earlier 2017 group, the website would not

23   let them do it in 2023.  They sent in paper forms trying to

24   opt out, but they already had an opportunity to opt out in

25   2017.  So all of the so-called invalid or late opt-outs in

1    2023 had an opportunity to opt out in 2017.

2              THE COURT:  So the bottom line is those that were

3    filed -- it's because the settlement created a new subclass

4    or new time period --

5              MS. OLIVER:  That's right.

6              THE COURT:  -- an additional time period.

7              MS. OLIVER:  That's right.

8              THE COURT:  So with respect to the people that got

9    in because of the new time period, they were considered

10   timely, and they opted out.

11             MS. OLIVER:  Yes.  And there were 33 of those.

12             THE COURT:  Right.

13             With respect to the others, either because they

14   misunderstood from the get-go or because they were

15   inadvertently misled, they were ultimately not allowed to

16   opt out because they missed their opportunity.

17             MS. OLIVER:  Correct.

18             THE COURT:  And that explains the whole thing.

19             MS. OLIVER:  Yes.  I hope so.

20             THE COURT:  It did.

21             MS. OLIVER:  Thank you.

22             THE COURT:  So let's move on to the attorney's

23   fees question which is -- everybody agrees that class

24   counsel is entitled to attorney's fees.

25             The issues, as I understand them, are:  One,

1    lodestar versus percentage with the subset of percentage

2    of -- percentage with lodestar cross-check.  And the other

3    question is:  How much?

4                    So I think those are the questions.

5                    MR. GUPTA:  I am happy to start, Your Honor, but

6    please jump in if I can help out.

7                    So I think, as you said earlier, there are two

8    approaches; there is the percentage approach and the

9    lodestar approach.  The lodestar approach is generally used

10   outside of common fund class actions the federal circuit has

11   recognized; it's used in garden variety fee shifting cases

12   where there is a statutory fee and it comes out of the

13   defendant's pocket.

14                   The percentage approach is the prevailing approach

15   in common fund class actions.  So courts in common fund

16   class actions overwhelmingly prefer the percentage of the

17   fund approach.  For reasons that you recognized in your

18   Black farmers case, the reason that courts have gravitated

19   to the percentage approach is that it helps align the

20   interests of the lawyers more closely with those of the

21   parties by discouraging the inflation of attorney hours and

22   promoting efficient prosecution and resolution of litigation

23   which benefits the litigants and the judicial system.

24                   So I don't take the government to be quarrelling

25   with the notion that the percentage approach is the

1    appropriate approach here.  I actually don't take them to be

2    quarrelling even with the percentage that we have proposed.

3    There is one objector, Mr. Isaacson, who does quarrel with

4    all of that; we can get into that.

5         I thought it might be helpful -- just in talking

6    about the percentage -- to give you some background here

7    because this is an unusual class action in which there was

8    actually a negotiation between the two parties about the

9    percentage.

10         First, the retainer agreements with the class

11    representatives provide for an attorney fee of 33 percent.

12         THE COURT:  It's contingent.

13         MR. GUPTA:  Correct.  Correct.

14         THE COURT:  So, again, if there was no success --

15         MR. GUPTA:  Correct.

16         THE COURT:  -- even with that retainer agreement,

17    they get zero.

18         MR. GUPTA:  Exactly.  That is the standard kind of

19    contingency fee arrangement in plaintiffs' class action

20    litigation and other kinds of contingency litigation.  So

21    that's -- paragraph 65 of my declaration mentions that.

22         Then the notice that was sent out to class members

23    said:  By participating in this class action, you agree to

24    compensate counsel at 30 percent of the recovery.  That's

25    ECF 43-1 and 44.

1              So we're going from 33 percent down to 30 percent.

2       Then, as I mentioned, we have this unusual negotiation with

3       the government.  In the mind run of class actions -- and

4       Mr. Narwold or Ms. Oliver can speak to this, they have done

5       many, many class actions -- you don't have a cap of this

6       kind, it's just left to the discretion of the Court.  But

7       here --

8              THE COURT:  Even a common fund?

9              MR. GUPTA:  Yes.  The cap is unusual even in a

10      common fund fee where there is already -- before this comes

11      to you in arm's length negotiation about what that cap is,

12      we agreed with the government to cap any fee and expenses at

13      20 percent of the common fund; and then, now what we're

14      requesting is a fee of 19.1 percent.

15             The upshot of all of that is that the percentage

16      that we're requesting is well below the standard one-third

17      recovery and is even below the average for settlements of

18      this range.  Professor Fitzpatrick goes into this in some

19      detail in his declaration, and you will see this at

20      paragraph 19 of his declaration.  For settlements that are

21      within the range of 70 million to 175 million, this

22      percentage is below even the average within that range.

23             Then, as you heard, the government -- this is

24      also, in our experience, quite unusual in a class action.

25      The defendant is coming to you and saying:  This is an

1    outstanding result for the class members; this is a landmark

2    settlement.

3          So we think this is a humbly, I would say, better

4    than average class action and a better than average class

5    action settlement.  Even if you are looking at the average

6    run-of-the-mill class action settlement, the fee that we're

7    requesting is well below the average.

8          Then I think that raises this question of lodestar

9    cross-check.  There has been a lot of ink that's been spilt

10   about precisely how one does the cross-check.  I think I was

11   saying to my friend from the government in the hallway

12   during the break, I think you actually have helped us out.

13   They pointed out some things that we had not provided the

14   Court with that would -- if you choose to do a lodestar

15   cross-check, and it's entirely within the Court's

16   discretion -- that would aid the Court's process in

17   performing that lodestar cross-check and, hopefully, getting

18   some comfort that this is a reasonable fee.  Whether you are

19   looking at it just from a straight percentage standpoint or

20   whether you are looking at it based on the multiplier in the

21   case.  So you have the discretion to do that.  I hope that

22   we have given you the tools necessary that, if you choose to

23   do that --

24          THE COURT:  You will provide additional tools you

25   say?

1          MR. GUPTA:  No, no.  I think we have.

2          THE COURT:  I thought you said she had suggested

3    there were some things she should --

4          MR. GUPTA:  Let me try to say this a little more

5    clearly.

6          What I am saying is that the government's filing,

7    their response, raised a number of questions and issues that

8    were exclusively trained on the question of how one would do

9    the lodestar calculation.  Now, we could have just taken the

10   position that:  Look, all of that is irrelevant because the

11   correct way to do this is it's a percentage fee and our

12   percentage fee is reasonable.  That is our frontline

13   position.

14         But we didn't stop there.  We also provided

15   information and expert reports that I hope show the Court

16   that:  Even if one were to do the cross-check route, that

17   the percentage fee that we're requesting is well within the

18   range of reasonableness.

19         I am happy to answer any questions the Court may

20   have about either the percentage approach or the cross-check

21   but, hopefully, that's a helpful kind of orientation.

22         THE COURT:  As I understand it, the D.C. Circuit

23   may or may not have set out some factors.  The federal

24   circuit -- maybe the D.C. Circuit has and the federal

25   circuits are slightly different, but they are pretty

1    comparable.

2            MR. GUPTA:  They are pretty similar.  And

3    honestly, they are pretty similar across the circuits.  We

4    organized our brief around the federal circuit's factors in

5    the *Health Republic* case.

6            THE COURT:  Do you think, as you read federal

7    circuit's -- not this decision, I don't think.

8            MR. GUPTA:  The *Health Republic* case?

9            THE COURT:  Do you think that that decision

10   requires a lodestar cross-check?

11           MR. GUPTA:  I don't think that it does.  And in

12   fact --

13           THE COURT:  There is some language that suggests

14   it's a little stronger than a recommendation.  I can't find

15   it right now.

16           MR. GUPTA:  The court says:  We are not deciding

17   that question; that's Footnote 2 of the decision.

18           It was an unusual case because the class notice in

19   that case said:  We will do a lodestar cross-check; and then

20   they didn't.

21           So in one sense, it's a very easy case.  The

22   holding of the case is:  When you say you are going to do

23   something, you need to do something.  Right?

24           THE COURT:  Because that's what the class relied

25   upon when they got the notice.

```
 1            MR. GUPTA:  Right.  And I think, also, there were

 2    some judicial eyebrows raised because they said they would

 3    do this cross-check and, then, the fee was 18 or 19 times

 4    the hourly rates.  But the holding -- the holding is one

 5    that is inapplicable here, which is:  If you say you are

 6    going to do it, you have got to do it.

 7            Now, the court said it wasn't deciding the

 8    question of whether a lodestar cross-check was required.

 9    But in Footnote 2 of the decision -- I just want to be

10    candid about this.  The court points out why a cross-check

11    might be warranted.  And I can see why it was warranted on

12    the facts of that case.  So the federal circuit hasn't

13    decided the question.

14            But if you were to write an opinion that's like

15    your Black farmers' decision that says:  Look, the

16    percentage requested here is reasonable; but, in addition, a

17    lodestar cross-check would only confirm that result.  I

18    think that is something that would probably be greeted well

19    by the federal circuit given the language in this decision.

20            THE COURT:  What are the most -- what are the

21    common fund settlement decisions of the courts that are most

22    comparable to the situation we're facing here.  Don't feel

23    like you have to say "Black farmers."

24            MR. GUPTA:  Well, which aspect of this situation,

25    if I may ask?
```

1            THE COURT:  Well, I guess only than the Swedish

2     Hospital and Health -- whatever it's called -- in the

3     federal circuit, in my own decision in Black farmers, are

4     there other cases that you say, "Aha!  This one is really a

5     lot like what we're facing here" for whatever reasons?

6            MR. GUPTA:  I mean, you named the ones that I

7     would point to.  And I would say on *Health Republic* I hope I

8     have persuaded you that it's actually super different.

9            THE COURT:  Which one?

10            MR. GUPTA:  The *Health Republic* case is very, very

11     different from this one.  Right?  I think those are the

12     cases that I would point you to.

13            We also cite a number of Court of Federal Claims

14     cases in our submission; the *Moore* case, the *King County*

15     case, *Quimby* case.  The reason we cite those is it -- in

16     effect, when you are a federal district court in the Little

17     Tucker Act case, you are kind of sitting as the Court of

18     Federal Claims, so we think those are analogous.  They are

19     also cases involving large claims against the federal

20     government, so I think they're analogous.

21            THE COURT:  Helpful.  Thank you.

22            I will hear from the government.

23            MR. GUPTA:  Thank you.

24            MS. GONZALEZ HOROWITZ:  Just so it's clear on the

25     record, Mr. Gupta did say to me out in the hallway that, you

1    know, "I think I helped you."  And for the record, my

2    response was, "I know."

3           Your Honor, I am happy to answer any questions you

4    may have.  I think we do agree, as a general principle, that

5    the D.C. Circuit case law appears to be pretty clear that

6    the percentage of the fund method is the preferred approach

7    in a common fund case such as this one; that's from the

8    Swedish hospital case.

9           We have talked at length about the *Health Republic*

10   case.  I think, like this Court identified, it perhaps

11   suggested strongly that not just in situations where it is

12   required in a class notice to conduct a lodestar

13   cross-check, but the Court, as a general matter, may conduct

14   the cross-check anyway just to assure itself that the amount

15   that is requested is reasonable.  Because, ultimately, that

16   is well within the Court's decision, is to determine what is

17   the reasonableness of the fee.

18          The government had raised some concerns in its

19   filing about the initial submission that plaintiffs made

20   with respect to the justification and the declarations about

21   the lodestar.  I think some of those concerns have been

22   remedied by the documentation that was supplied on reply.

23   Ultimately, it's within this Court's discretion to conduct a

24   cross-check.  But plaintiffs have now provided the Court

25   with some additional information, not just about their

1    lodestar at the rates at which they have requested but,

2    also, their lodestar at the Fitzpatrick matrix rates which

3    the government had noted for the Court essentially has been

4    considered by other judges in this district as a baseline in

5    federal complex litigation.  And, of course, as we

6    recognized in our filing, those cases were not class action

7    cases but they are cases that talk extensively about the

8    going market rates in this district and what complex federal

9    litigation looks like.  I am referring there to the *Brackett*

10   *versus Mayorkas* decision by Chief Judge Boasberg and, also,

11   the *J.T.* decision that we cited in our brief by former Chief

12   Judge Howell.

13          Unless the Court has any questions -- actually, I

14   would also point the Court to one additional case that I

15   think I don't believe I heard class counsel mention but I

16   think would be analogous; it is a Court of Federal Claims

17   case.  But that would be the *Mercier versus United States*,

18   and that's 156 Federal Claims, Fed Claim 580.  It's from

19   2021.

20          THE COURT:  I do have one or two questions.

21          In your initial filing, as I understand your

22   position, you agree:  Percentage of the common fund in the

23   common funds case, not lodestar.  And you think that

24   lodestar cross-check is at least a good idea and, possibly,

25   D.C. Circuit has suggested it should be done -- or the

1    federal circuit?

2              MS. GONZALEZ HOROWITZ:  Just to clarify, the

3    federal circuit, I think, has perhaps stated a stronger

4    emphasis on the cross-check than the D.C. Circuit has.

5              I think the D.C. Circuit was perhaps a little less

6    convinced in the Swedish hospital case but, certainly, the

7    decision from the federal circuit is from earlier this year,

8    so I think that would be persuasive to the Court's analysis.

9    But, ultimately, the circuit case law in this District holds

10   that it's within the Court's discretion to conduct the

11   cross-check.

12             THE COURT:  Now, I was going to say the

13   $64 million question but, really, the $23 million question

14   is, in your initial filing, you argue that the 19.1 percent,

15   or whatever it is, that leads to about a $23 million award

16   is too much.  You didn't tell me what you thought was

17   appropriate.

18             So my two questions are:  In view of subsequent

19   filings, do you still think that that is too much in this

20   case.  If so, where does the government come out in terms of

21   a dollar amount or percentage amount?

22             MS. GONZALEZ HOROWITZ:  So I want to be clear,

23   Your Honor, we didn't oppose plaintiffs' request for

24   23.8 million.  I didn't read our filing to mean that we

25   believed that the 19.1 percent was inappropriate or that it

1    should be reduced.  Ultimately, that is well within the

2    Court's discretion as to what to award.  We are not taking a

3    position on whether the 23.8 is reasonable.

4         We believe that there were some holes in the

5    filing that have been addressed by plaintiffs, by class

6    counsel, on reply about how it is that they came to that

7    lodestar and whether the -- taking aside whether the 19.1 is

8    reasonable, I think everyone agrees the case law, in this

9    District at least, has suggested that anything from 15 to 45

10   percent in a common fund case may be appropriate and, of

11   course, that's always depending on the circumstances of the

12   particular case.

13        Ultimately, if the Court found that 19.1 here,

14   which is slightly below the threshold that the parties had

15   negotiated in the settlement agreement, is appropriate, we

16   wanted to ensure that the Court had sufficient information

17   in the record to base its decision in awarding the full

18   amount of fees.  And I think that plaintiffs have done some

19   of the legwork on the back end to address those concerns.

20        So I just want to be clear.  We're not

21   specifically advocating for a reduction, but we had some

22   concerns about how that amount was calculated.

23        Certainly, we also pointed to the case law about

24   the multiplier.  In this case I think, again, the

25   D.C. Circuit has suggested that it can be between 2 to 4

1    percent depending on which lodestar the Court is working off

2    of; the ranges here can be slightly higher.  Of course,

3    there has been some case law in the federal circuit that has

4    suggested that perhaps it should be on the lower end, closer

5    to the 2 percent.  Again, that is within the Court's

6    discretion to determine.

7         THE COURT:  Okay.  Thank you for clarifying your

8    position.  Actually, it's not a clarification.  I think that

9    it's -- your position is about, because the plaintiffs have

10   filed more supporting documentation for what they're

11   requesting.  Thank you.

12        MS. GONZALEZ HOROWITZ:  Thank you.

13        THE COURT:  So I will hear from Mr. Isaacson.

14        Mr. Isaacson, you already made some points with

15   respect to attorney's fees earlier so why don't we -- please

16   try not to say the same things you have already said; I have

17   heard it, we took notes on it.  We have a transcript we are

18   going to look at.  Whatever additional points you want to

19   make about attorney's fees and/or responses to what has been

20   said.

21        MR. ISAACSON:  Absolutely, Your Honor.

22        One of the things that was said was that there

23   were retainer agreements signed for one-third of the

24   recovery, 33 percent.  The retainer agreements do not bind

25   the class and they do not bind this Court.

1           THE COURT:  Correct.

2           MR. ISAACSON:  There was a statement that an

3   earlier class notice said:  You agree to 30 [sic] percent if

4   you don't opt out.  I did not agree to 30 percent.

5           I saw that notice and I said to myself:  If they

6   try to enforce that, I am objecting because that is wrong;

7   that is not enforceable.  It was grossly inappropriate.

8           They sent a new notice that supersedes that older

9   notice saying I can appear to object to the attorney's fees.

10  So the notion that there is some kind of binding effect of

11  that first notice is --

12          THE COURT:  I don't think there is a binding

13  effect on me of anything.

14          MR. ISAACSON:  Pardon me?

15          THE COURT:  I don't think there is a binding

16  effect on me of anything.

17          MR. ISAACSON:  That's true.

18          THE COURT:  You have pointed out and we have all

19  read Rule 23(e).  You have specifically pointed out the

20  subpart that talks about how fees are a part of fair and

21  adequate.

22          MR. ISAACSON:  Absolutely, Your Honor.

23          They say that the standard is one-third.  Well,

24  that's in personal injury cases.  Personal injury cases are

25  extremely labor intensive; they don't have the economy scale

1    the big class actions do.  One-third is not the appropriate

2    reference.

3         On the question of whether *Health Republic*

4    requires a consideration of the lodestar, I think it does.

5    I think lodestar needs to be considered in determining a

6    reasonable percentage, quite frankly.  It's more appropriate

7    to take the lodestar amount up front to determine the

8    percentage than it is to try to bring it in at the end as

9    merely a cross-check.

10         Now, there are judges like former Chief Judge

11   Vaughn Walker of the Northern District of California who

12   wrote an article saying that judges have an ethical duty to

13   consider the lodestar.  I think it was published in the

14   *Georgetown Journal of Legal Ethics*; there was a co-author

15   whose name escapes me at the moment.

16         The Swedish hospital case was mentioned, that's a

17   D.C. Circuit case which says that:  In common fund cases,

18   attorney's fees must be awarded as a percentage of the fund.

19   The Eleventh Circuit also has held that in a case called

20   Camden I Associates -- *Camden I Condominium Association,*

21   pardon me.  They are the only two circuits that have held

22   that, and their holdings are in conflict with Supreme Court

23   authority.

24         THE COURT:  Which Supreme Court authority in

25   particular?

1          MR. ISAACSON:   The foundational decision

2     established in the common fund doctrine, *Greenough* --

3     *Trustees versus Greenough*; the same one that I rely on with

4     respect to incentive awards.

5          In that case, the court established the common

6     fund doctrine, saying that the class representative could

7     receive compensation from the common fund reimbursing him

8     for his actual outlays incurred.   There was no percentage in

9     that case.

10         The later cases, the Eleventh Circuit in *Camden I*

11     *Condominium Association*, the D.C. Circuit in Swedish

12     hospital -- and I think they both rely on a district court

13     case called *Mashburn*; it might have been out of the District

14     of Alabama.   They all say that *Greenough* was a percent fund

15     case.   It wasn't.   I mean, the trend toward the percent of

16     fund misrepresents the foundational decisions of the Supreme

17     Court.   The first one was not percent of fund.   The second

18     one, *Pettus*, that was percent of fund.   The lower courts

19     awarded 10 percent.   The Supreme Court said that's excessive

20     and cut it to 5 percent.

21         There are cases, I think, from the '20s and '30s

22     where the Supreme Court deals with common fund or equitable

23     fund fee awards.   I don't believe it has ever approved of a

24     common fund fee award or equitable fund fee award that

25     exceeded 10 percent.   So the notion that there is a

1    benchmark of 25 percent or a much higher amount is at odds,

2    again, with the Supreme Court decisions.

3          The *Mercier* case was mentioned.  I think *Mercier*

4    is quite relevant; I mean, it's one of the cases Rubenstein

5    included in his comparators when he deconstructed

6    Fitzpatrick's matrix.  That's a case where there was a

7    65 percent recovery, not 25 percent like in this case.

8    Fitzpatrick was the expert witness in that case and

9    recommended a 30 percent fee award that amounted to a

10   multiplier of 4.4.  The Court said, no, that's way too much;

11   that's a windfall.  I think you need to consider the

12   lodestar in setting the amount of the fee.

13         I think that a reasonable amount of the fee in

14   this case -- 5 percent will more than cover their claimed

15   lodestar.  10 percent would be more than double their

16   lodestar; a multiplier of two.  20 percent is way too much.

17         I also want to note that another case that's often

18   cited as a percent of fund case, the Supreme Court's

19   decision in *Boeing versus Van Gemert,* a 1978 decision.  The

20   fees in that case ultimately were awarded on the lodestar

21   basis; they were not awarded as a percentage of the fund.

22         I spent many years with plaintiffs' class action

23   firms where, quite frankly, the firm management regarded

24   percent of fund fee awards as the way to get paid the most

25   money as quickly as possible.  If you look at a single case

1    and focus only on one case and imagine that is the only case

2    that a law firm is ever going to try then, yeah, it makes

3    sense to think that they're going to try to maximize the

4    recovery in that one case so that they can get a larger -- a

5    percentage of a larger amount; that's not how the Court --

6    how law firms run their practice.  They have a portfolio of

7    cases.

8            In the class action practice, the assumption is

9    that the defendants are going to settle quickly for a

10   fraction of the damages; you can put minimum work in for a

11   fraction of the damages settlement; and based on the minimal

12   hours put in, your percent of fund award will amount to a

13   large multiplier.  That's how you get paid the most.  That

14   is not something that maximizes the interests of classes and

15   recoveries and it, quite frankly, in the long run, does not

16   align the interest of the classes with the interests of

17   counsel.

18           THE COURT:  Okay.  Are you almost done?

19           MR. ISAACSON:  I am almost done.

20           I would also note that when they talk about their

21   projected lodestar for any appeal in the matter, to the

22   extent that an appeal is focusing on attorney's fees,

23   they're not entitled to recover for their work -- applying

24   for or defending attorney's fees in a common fund case.

25           Because Professor Rubenstein and Professor

1    Fitzpatrick are not here to be cross-examined and because I

2    think that their opinions submitted in this case are, with

3    respect to the later ones, untimely and unreliable, I

4    respectfully move to strike them.  I move to strike them as

5    hearsay; they are out-of-court statements to be taken for

6    the truth or falsity of the matters asserted --

7        THE COURT:  I am not sure whether an objector has

8    standing to move to strike.  If you want me to disregard

9    them for the reasons you have --

10        MR. ISAACSON:  I respectfully request you

11    disregard them, Your Honor.  Thank you very much.

12        THE COURT:  Thank you, Mr. Isaacson.

13        Mr. Gupta.

14        MR. GUPTA:  I will try to be brief because it's

15    been a long day, but I do want to make sure that I answer

16    any questions you have.

17        I would just emphasize at the outset that I hope I

18    wasn't misunderstood earlier.  I was not at all suggesting

19    that anything that I was reciting was binding on the Court

20    with respect to those agreements.  I think the Court has

21    absolute discretion and, in fact, a duty to assure itself

22    that the absence --

23        THE COURT:  Somebody said -- I don't know whether

24    it was Mr. Isaacson or one of the parties -- I have

25    fiduciary obligations.

1          MR. GUPTA:  Yes.  The Court acts as a fiduciary on

2     behalf of the absent class members.  And your role here is

3     important because there might not otherwise be adversarial

4     presentation.  And the danger with a class action is that

5     lawyers are going to sell out their clients in exchange for

6     red carpet treatment on attorney's fees, and courts have to

7     be on guard against that.  Now, we don't think this is

8     remotely a case of that kind.

9          You heard what the government said about the

10    quality of settlement, the risks involved.  We're proud of

11    this case.  But I also think that the Court's duty here is

12    important.  I think, just as I mentioned earlier there was a

13    kind of dog that didn't bark, the dog that didn't bark here

14    is you have very sophisticated players in this very, very

15    large class that are paying the fee -- that are going to pay

16    the fee that we're asking and none of them are here

17    objecting.  I think that's notable.

18          The argument that Mr. Isaacson is making about how

19    courts should handle attorney fee applications in reliance

20    on this 1882 case, *Trustees versus Greenough,* is one that,

21    as far as we can tell, has been rejected by every one of the

22    federal circuits, including in many cases in which he has

23    been an objector which he doesn't acknowledge in his

24    objection.

25          If you want to read one of those cases, I might

1    recommend a district court case from a few years back by

2    Judge Ali Nathan in New York; it's the *Bioscrip* case that is

3    cited on page 12.

4            THE COURT:  I mean, without prejudging anything,

5    she's one of the smartest judges I know in the whole

6    country.

7            MR. GUPTA:  Yes.  It won't surprise you to know

8    that it's a pretty darn scholarly opinion and it rejects

9    these arguments, as I have said, as have many other

10   circuits.

11           THE COURT:  What's the cite?  I'm sorry.

12           MR. GUPTA:  That is 273 F. Supp. 3d 474.  You can

13   take a look at page 478 to -89.

14           What she explains is that Mr. Isaacson's argument

15   that there is a presumption against lodestar enhancement in

16   fee shifting cases, that just doesn't apply in the common

17   fund context.  The common fund context is quite different.

18           So I think that that set of arguments has been

19   roundly rejected.  I can't prevent Mr. Isaacson from taking

20   an appeal.  And I don't have -- as I did with the service

21   awards, I don't have a kind of factual argument that will

22   take that issue off the table because his attack is a

23   categorical attack on the way things are done.  He is

24   entitled to make that argument, and I hope he has had a fair

25   hearing.  I don't really have anything else to add unless

1    the Court has questions.

2          I thank the government for pointing out some holes

3    in our filing and causing us to file the things we filed in

4    reply.  I hope that gives the Court the tools it needs to

5    decide this request.  Thank you.

6          MS. GONZALEZ HOROWITZ:  Nothing further by the

7    government.

8          THE COURT:  Well, it seems to me that I have

9    everything I need except for the few things that Ms. Oliver

10   is going to file to edify me about what's going on on the

11   administrative side of things.

12         I know what my responsibilities are.  I think that

13   the filings from both sides in the presentations from

14   counsel this morning, as well as from Mr. Isaacson and

15   Mr. Kozich, have been very, very helpful.  I don't think I

16   need anything more than what I already have, other than

17   those few little educational informative things.  I will try

18   to get to this as soon as I can.  It's an important case.

19         Again, I have to decide whether it's fair and

20   accurate, how significant it is, and the contributions made

21   by counsel and everything.

22         You know, this tool of Pacer and electronic

23   filing, as I said at the beginning, has revolutionized the

24   federal courts in the practice of law.  What we're talking

25   about here is very, very important to a lot of people and

1   institutions.  It involves a lot of money.  But everyone has

2   to be appreciative of whoever developed these technologies,

3   the Administrative Office of the Courts for -- Congress and

4   the Administrative Office of the Courts for making the court

5   system more accessible to the public and to lawyers and to

6   everybody through electronic filings and through Pacer.

7        The AO has done a terrific job and the leadership

8   of the Chief Justices -- I guess it started with Justice

9   Rehnquist and Justice Roberts -- the directors of the

10  Administrative Office, among others, and their staffs.

11       I know that our lives are a lot easier; lawyers'

12  lives are certainly a lot easier.  We need to put this in

13  the perspective of:  We have come a long way, not just since

14  quill pens.  But, frankly -- this is a digression.  It's

15  late in the morning.

16       When I was clerking back here in the old building

17  for Judge Aubrey Robinson, we heard motions hearings.  Now

18  we have an individual calendar system; you know who your

19  judge is from the beginning of the case, unless she retires

20  and dumps things on other judges.

21       We had a master calendar system.  You would look

22  at the docket and you may have seen five, six, seven

23  different judges in a case.  On Wednesdays somebody from the

24  clerk's office would come up with these piles of files --

25  some of you may go back that far -- with these piles of

1    motions and say:  Here are the civil motions for Friday.

2    There might be 30 of them, nothing is electronic; it's all

3    like this (indicating).  Judge Robinson would say:  Okay,

4    you take half, I will take half.  Let's start reading --

5    Judges only had one clerk in those days -- let's start

6    reading; we'll talk on Thursday afternoon.  They may still

7    do it that way in the Eastern District of Virginia; I have

8    argued there.  They decide most things from the bench there.

9    They probably think that we can decide from the bench here

10   more frequently, too, but we don't do that so much anymore.

11   So times have really changed.  That having been said, I am

12   not going to decide this from the bench.  Thank you, all,

13   very much.

14          THE COURTROOM DEPUTY:  This court is adjourned.

15          (Whereupon, the proceeding concludes, 12:49 p.m.)

16                        *  *  *  *  *

17                        **CERTIFICATE**

18          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
19   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
20   ability.

21          This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
22   manner by any party without authorization of the signatory
     below.
23
        Dated this 15th day of May, 2024.
24
        /s/ Elizabeth Saint-Loth, RPR, FCRR
25      Official Court Reporter

### $

**$10,000** [2] - 23:18, 39:14
**$100** [2] - 59:12, 59:23
**$125** [1] - 17:20
**$15** [2] - 16:25, 61:5
**$23** - 82:13, 82:15
**$250** [1] - 48:5
**$350** [8] - 17:21, 32:25, 33:3, 34:5, 38:15, 59:7, 59:11, 59:20
**$351** [1] - 59:10
**$354** [1] - 61:7
**$354.67** [1] - 49:1
**$50** [1] - 48:4
**$500** [1] - 41:5
**$64** [1] - 82:13
**$859,626,129** [1] - 48:21
**$984,626,129** [1] - 48:19

### '

**'20s** [1] - 87:21
**'30s** [1] - 87:21

### /

**/s** [1] - 95:24

### 0

**06103** [1] - 1:23

### 1

**1** [3] - 1:22, 59:23, 60:1
**10** [5] - 70:10, 70:11, 87:19, 87:25, 88:15
**10,000** [1] - 56:23
**100** [2] - 17:18, 65:24
**10:12** [1] - 1:5
**10th** [2] - 47:24, 48:1
**112** [1] - 8:20
**11:59** [1] - 5:21
**12** [4] - 1:5, 36:17, 69:15, 92:3
**123** [1] - 6:9
**125** [1] - 32:24
**12:49** [1] - 95:15
**1340** [1] - 6:13
**15** [4] - 9:13, 61:14, 61:15, 83:9
**150** [2] - 22:16, 29:24
**151** [1] - 60:1
**156** [1] - 81:18

**15th** [1] - 95:23
**16** [3] - 69:14, 70:9, 70:10
**16-745** [2] - 1:3, 3:3
**163** [2] - 48:17, 59:5
**175** [1] - 74:21
**17th** [1] - 1:23
**18** [1] - 78:3
**186,000** [1] - 47:6
**1882** [3] - 57:6, 57:24, 91:20
**18th** [1] - 47:13
**19** [3] - 59:16, 74:20, 78:3
**19.1** [5] - 74:14, 82:14, 82:25, 83:7, 83:13
**1900** [1] - 1:16
**1913** [1] - 33:17
**1968** [1] - 27:22
**1978** [1] - 88:19
**1995** [1] - 26:23
**1st** [2] - 47:14, 49:2

### 2

**2** [5] - 40:2, 77:17, 78:9, 83:25, 84:5
**20** [4] - 1:23, 9:4, 74:13, 88:16
**20006** [1] - 1:13
**2001** [1] - 1:12
**2002** [1] - 47:3
**20036** [1] - 1:16
**2010** [4] - 47:24, 48:16, 48:19, 70:1
**2014** [1] - 47:13
**2015** [2] - 49:2, 49:3
**2016** [4] - 4:21, 23:8, 47:23, 70:1
**2017** [8] - 47:14, 69:17, 69:19, 70:2, 70:16, 70:22, 70:25, 71:1
**2018** [3] - 39:18, 47:24, 48:1
**2019** [1] - 34:16
**202** [3] - 1:13, 1:17, 2:5
**2021** [1] - 81:19
**2023** [10] - 1:5, 8:9, 8:20, 69:10, 69:25, 70:3, 70:4, 70:20, 70:23, 71:1
**2024** [1] - 95:23
**20530** [1] - 2:4
**21** [2] - 70:1
**216-9492** [1] - 1:20
**22-set** [1] - 27:5
**23** [9] - 12:23, 12:25, 36:23, 37:1, 39:18,

39:23, 62:24, 63:6, 63:10
**23(e** [1] - 39:24
**23(e)** [1] - 85:19
**23(e)(2)(C)(iii)** [1] - 39:21
**23(h** [2] - 43:23, 44:3
**23.8** [2] - 82:24, 83:3
**25** [3] - 29:22, 88:1, 88:7
**250** [2] - 20:7, 29:15
**252-2512** [1] - 2:5
**26,611,000.15** [1] - 48:16
**263-9581** [1] - 2:8
**273** [1] - 92:12
**2792766** [1] - 49:3
**28** [2] - 1:19, 33:17
**291** [1] - 6:9
**29464** [1] - 1:20

### 3

**3** [1] - 59:4
**30** [7] - 61:5, 73:24, 74:1, 85:3, 85:4, 88:9, 95:2
**30-day** [1] - 37:9
**300** [4] - 19:22, 19:25, 20:1, 20:2
**30th** [1] - 49:3
**312** [1] - 1:16
**31st** [2] - 47:24, 48:1
**33** [7] - 69:10, 69:12, 70:8, 71:11, 73:11, 74:1, 84:24
**34** [4] - 20:24, 61:18, 68:19, 69:11
**350** [4] - 17:23, 59:8, 59:22, 68:6
**37** [1] - 48:18
**3d** [3] - 6:9, 6:13, 92:12

### 4

**4** [3] - 8:20, 68:10, 83:25
**4.4** [1] - 88:10
**4/21/10** [1] - 47:16
**400** [1] - 64:15
**409** [3] - 55:19, 55:20, 64:17
**43-1** [1] - 73:25
**44** [1] - 73:25
**45** [1] - 83:9
**464** [1] - 64:20
**474** [1] - 92:12
**478** [1] - 92:13
**4:00** [1] - 5:20

**4:30** [1] - 5:21

### 5

**5** [3] - 52:6, 87:20, 88:14
**500,000** [2] - 12:19, 46:5
**501(c)(3** [1] - 26:23
**54-year-old** [1] - 26:19
**580** [1] - 81:18

### 6

**6** [2] - 59:15, 70:19
**601** [1] - 2:4
**65** [2] - 73:21, 88:7
**6580** [1] - 2:7

### 7

**7** [1] - 70:13
**70** [1] - 74:21
**75** [1] - 17:1

### 8

**8** [1] - 8:9
**843** [1] - 1:20
**850** [1] - 1:12
**858** [1] - 2:8
**860** [1] - 1:24
**882-1676** [1] - 1:24
**888-1741** [2] - 1:13, 1:17
**89** [1] - 92:13

### 9

**92037** [1] - 2:8
**968** [1] - 6:13

### A

**a.m** [1] - 1:5
**Aaron** [1] - 50:1
**ability** [2] - 17:12, 23:5, 95:20
**able** [12] - 16:8, 16:18, 25:14, 26:14, 27:10, 29:3, 29:20, 45:15, 46:14, 65:10, 65:18, 67:16
**absence** [2] - 32:18, 90:22
**absent** [2] - 35:2, 91:2
**absolute** [1] - 90:21
**absolutely** [2] - 22:6, 84:21, 85:22
**accept** [1] - 57:22

**access** [21] - 7:19, 13:18, 15:6, 17:11, 18:19, 22:21, 22:23, 23:1, 23:4, 24:24, 27:2, 27:3, 27:16, 27:23, 32:11, 33:13, 33:18, 33:21, 34:2, 34:10, 51:23
**accessed** [1] - 5:9
**accessible** [2] - 5:14, 94:5
**accompanying** [1] - 22:12
**accomplish** [1] - 19:5
**according** [2] - 39:15, 41:5
**account** [14] - 40:11, 46:16, 46:17, 49:3, 49:5, 55:11, 55:14, 58:14, 58:15, 58:16, 60:25, 61:1, 68:9, 68:11
**accountable** [1] - 15:5
**accountholder** [5] - 54:17, 55:10, 64:4, 64:20, 64:21
**accountholder's** [1] - 64:2
**accountholders** [2] - 55:2, 62:12
**accounting** [1] - 46:7
**accurate** [2] - 93:20, 95:18
**accurately** [1] - 26:1
**achieved** [2] - 30:6, 35:9
**achievement** [1] - 18:4
**achieving** [1] - 18:22
**acknowledge** [1] - 91:23
**acknowledged** [2] - 17:8, 17:9
**act** [2] - 43:9, 43:13
**Act** [1] - 7:11, 14:19, 27:17, 27:18, 27:19, 33:15, 52:14, 65:22, 66:6, 79:17
**action** [37] - 9:21, 11:18, 12:1, 14:22, 15:2, 16:10, 18:1, 18:7, 22:12, 23:8, 25:11, 29:24, 30:20, 32:6, 37:13, 38:6, 39:8, 39:11, 40:22, 45:9, 52:8, 53:23, 57:5, 65:10, 66:25, 68:4, 73:7, 73:19, 73:23, 74:24, 75:4, 75:5, 75:6, 81:6,

88:22, 89:8, 91:4
**Action** [2] - 1:2, 3:2
**actions** [18] - 11:11, 11:17, 11:22, 18:1, 24:17, 31:13, 37:11, 39:25, 40:22, 51:14, 57:10, 66:10, 72:10, 72:15, 72:16, 74:3, 74:5, 86:1
**active** [1] - 24:12
**active-duty** [1] - 24:12
**activities** [3] - 16:15, 16:16, 25:3
**acts** [1] - 91:1
**actual** [3] - 54:18, 63:15, 87:8
**add** [4] - 60:18, 67:18, 67:20, 92:25
**added** [1] - 56:23
**addition** [6] - 20:23, 49:24, 56:13, 56:20, 70:6, 78:16
**additional** [10] - 7:5, 35:15, 44:2, 69:14, 70:19, 71:6, 75:24, 80:25, 81:14, 84:18
**address** [18] - 21:1, 21:2, 31:21, 31:22, 33:5, 34:17, 34:25, 35:20, 36:21, 38:12, 44:25, 45:15, 53:14, 58:8, 58:9, 60:20, 63:9, 83:19
**addressed** [4] - 39:16, 57:19, 60:9, 83:5
**adequacy** [6] - 8:13, 39:17, 39:19, 40:18, 40:20, 65:3
**adequate** [10] - 13:7, 30:23, 31:4, 31:19, 33:4, 40:5, 40:11, 44:25, 63:6, 85:21
**adequately** [2] - 26:1, 50:18
**adjourned** [1] - 95:14
**administering** [2] - 53:9, 53:17
**Administration** [2] - 2:10, 4:4
**administration** [2] - 10:15
**administrative** [1] - 93:11
**Administrative** [12] - 6:3, 6:6, 14:19, 15:20, 16:9, 32:12, 33:12, 34:1, 35:4, 94:3, 94:4, 94:10
**administrator** [14] - 20:6, 53:1, 54:20,

55:3, 55:8, 55:9, 55:10, 58:12, 59:19, 62:11, 62:20, 64:1, 64:3, 64:21
**administrators** [1] - 62:19
**advanced** [1] - 18:17
**advances** [1] - 22:20
**adversarial** [1] - 91:3
**advocacy** [1] - 51:18
**advocate** [1] - 66:14
**advocated** [1] - 51:9
**advocates** [1] - 24:19
**advocating** [2] - 39:1, 83:21
**affect** [4] - 25:3, 63:1, 63:6, 65:3
**affidavits** [1] - 8:17
**affirmed** [1] - 7:21
**affirming** [1] - 17:3
**afford** [2] - 17:10, 48:11
**affordable** [1] - 27:1
**AFJ** [7] - 11:3, 22:11, 22:13, 22:19, 23:7, 23:18, 23:19
**AFJ's** [3] - 23:10, 23:11, 23:16
**afternoon** [1] - 95:6
**aggregate** [1] - 67:14
**ago** [8] - 15:4, 18:12, 18:13, 18:14, 28:9, 28:22, 36:8, 37:9
**agree** [5] - 29:9, 43:10, 57:20, 61:10, 73:23, 80:4, 81:22, 85:3, 85:4
**agreed** [3] - 6:16, 11:24, 74:12
**agreement** [7] - 8:1, 8:6, 35:17, 59:16, 63:2, 73:16, 83:15
**agreements** [4] - 73:10, 84:23, 84:24, 90:20
**agrees** [3] - 26:2, 71:23, 83:8
**Aha** [1] - 79:4
**ahead** [1] - 47:1
**aid** [1] - 75:16
**aided** [1] - 2:21
**al** [2] - 1:3, 3:3
**Alabama** [1] - 87:14
**ALAN** [1] - 2:7
**Alan** [1] - 36:15
**Alexander** [1] - 50:1
**Ali** [1] - 92:2
**align** [2] - 72:19, 89:16
**Allan** [1] - 4:10
**alliance** [1] - 22:16

**Alliance** [6] - 4:16, 11:2, 21:23, 22:9, 22:15, 25:6
**allocates** [1] - 59:19
**allocation** [6] - 33:7, 33:11, 34:11, 38:25, 39:6, 39:12
**allow** [1] - 12:5
**allowed** [2] - 54:18, 71:15
**allowing** [1] - 26:13
**allows** [4] - 33:15, 53:1, 53:6, 55:2
**almost** [5] - 18:1, 37:11, 37:12, 89:18, 89:19
**alone** [1] - 18:22
**ALSO** [1] - 2:10
**alternative** [1] - 14:22
**amended** [1] - 39:17
**Amendment** [1] - 17:9
**America** [1] - 4:17
**AMERICA** [1] - 1:5
**American** [1] - 14:25
**Americans** [1] - 22:21
**amicus** [1] - 16:19
**amount** [24] - 7:18, 23:20, 25:11, 25:22, 29:18, 33:8, 39:5, 39:12, 43:15, 49:15, 56:13, 59:20, 59:21, 80:14, 82:21, 83:18, 83:22, 86:7, 88:1, 88:12, 88:13, 89:5, 89:12
**amounted** [1] - 88:9
**amply** [1] - 32:1
**analogous** [3] - 79:18, 79:20, 81:16
**analysis** [2] - 13:16, 82:8
**announced** [2] - 16:16, 16:24
**annual** [1] - 27:7
**answer** [11] - 9:14, 10:17, 30:9, 50:16, 54:6, 54:7, 54:8, 62:10, 76:19, 80:3, 90:15
**anticipates** [1] - 19:9
**antitrust** [1] - 65:23
**anyway** [2] - 56:24, 80:14
**AO** [4] - 16:14, 16:16, 16:24, 94:7
**apologize** [1] - 68:4
**appeal** [4] - 16:18, 89:21, 89:22, 92:20
**appear** [5] - 8:22, 10:1, 26:13, 26:14,

30:18, 36:19, 85:9
**Appearances** [1] - 1:25
**APPEARANCES** [2] - 1:10, 2:1
**appearances** [1] - 3:6
**appeared** [1] - 32:4
**appearing** [2] - 3:24, 20:19
**appellate** [1] - 15:25
**application** [2] - 43:22, 45:4
**applications** [2] - 44:15, 91:19
**applies** [1] - 42:12
**apply** [4] - 42:9, 59:3, 92:16
**applying** [1] - 89:23
**appreciate** [1] - 28:20
**appreciative** [1] - 94:2
**apprised** [1] - 25:6
**approach** [5] - 3:18, 72:8, 72:9, 72:14, 72:17, 72:19, 72:25, 73:1, 76:20, 80:6
**approaches** [1] - 72:8
**appropriate** [10] - 20:22, 26:2, 41:8, 45:4, 73:1, 82:17, 83:10, 83:15, 86:1, 86:6
**approval** [11] - 8:10, 9:22, 12:14, 12:21, 13:23, 30:19, 31:10, 31:17, 35:16, 39:25, 52:24
**approve** [6] - 28:15, 28:16, 28:18, 36:1, 41:10, 58:5
**approved** [3] - 44:15, 63:15, 87:23
**approximate** [1] - 25:21
**April** [6] - 23:8, 47:14, 47:24, 48:1, 70:1
**area** [1] - 26:22
**areas** [2] - 27:1, 27:2
**argue** [1] - 82:14
**argued** [1] - 95:8
**argument** [12] - 9:12, 46:19, 57:5, 57:15, 59:9, 59:10, 62:8, 91:18, 92:14, 92:21, 92:24
**arguments** [10] - 4:23, 6:1, 6:2, 6:4, 6:15, 6:16, 15:23, 16:1, 92:9, 92:18
**arm's** [6] - 7:25, 13:6, 31:18, 32:2, 39:4,

74:11
**arrangement** [1] - 73:19
**arranging** [1] - 9:24
**article** [1] - 86:12
**articulated** [1] - 33:17
**aside** [3] - 5:23, 59:9, 83:7
**aspect** [1] - 78:24
**aspects** [1] - 46:21
**asserted** [1] - 90:6
**assessed** [1] - 66:1
**assessment** [1] - 26:3
**Assistant** [1] - 4:2
**associated** [2] - 2:19, 55:11
**Associates** [1] - 86:20
**Association** [2] - 86:20, 87:11
**assumed** [2] - 14:4, 14:17
**assumption** [1] - 89:8
**assure** [2] - 80:14, 90:21
**assured** [1] - 51:16
**attack** [2] - 92:22, 92:23
**attempt** [2] - 53:7, 64:3
**attempted** [2] - 8:14, 70:4
**attempts** [1] - 20:25
**attention** [1] - 52:4
**attorney** [8] - 11:5, 23:19, 24:7, 24:22, 57:9, 72:21, 73:11, 91:19
**Attorney** [4] - 4:2, 25:25, 42:11
**Attorney's** [1] - 42:10
**attorney's** [22] - 9:13, 35:19, 39:20, 40:12, 40:14, 40:15, 40:24, 41:11, 43:2, 44:16, 50:10, 58:8, 68:21, 71:22, 71:24, 84:15, 84:19, 85:9, 86:18, 89:22, 89:24, 91:6
**attorneys** [2] - 28:1, 46:9
**Aubrey** [1] - 94:17
**audio** [1] - 2:19
**August** [1] - 47:13
**author** [1] - 86:14
**authority** [5] - 14:6, 32:13, 39:15, 86:23, 86:24
**Authority** [1] - 48:8
**authorization** [1] - 95:22

automated [1] - 20:7
automatically [3] - 5:5, 17:21, 18:3
available [1] - 23:24
Avenida [1] - 2:7
average [4] - 34:5, 74:17, 74:22, 75:4, 75:5, 75:7
avoid [1] - 33:21
avoidance [1] - 31:13
award [23] - 23:18, 28:7, 29:18, 35:24, 39:20, 40:12, 41:2, 41:14, 41:15, 41:22, 41:23, 43:15, 44:23, 45:8, 57:16, 82:15, 83:2, 87:24, 88:9, 89:12
awarded [4] - 86:18, 87:19, 88:20, 88:21
awarding [1] - 83:17
awards [11] - 22:13, 35:20, 39:14, 40:24, 56:4, 56:6, 58:2, 87:4, 87:23, 88:24, 92:21
aware [4] - 12:11, 13:23, 30:21, 31:11
awareness [1] - 16:22

**B**

B-U-R-B-A-N-K [1] - 24:8
background [2] - 32:9, 73:6
backwards [1] - 67:6
balance [1] - 61:7
bankruptcy [1] - 7:8
bark [4] - 20:9, 21:8, 91:13
barriers [1] - 34:10
base [1] - 83:17
based [4] - 7:12, 27:21, 75:20, 89:11
baseline [1] - 81:4
basis [5] - 14:22, 27:8, 27:9, 33:2, 88:21
bear [1] - 13:16
become [1] - 53:9
BEFORE [1] - 1:8
begin [1] - 10:4
beginning [4] - 10:10, 38:5, 93:23, 94:19
behalf [18] - 3:20, 3:22, 4:4, 11:3, 23:12, 23:16, 26:22, 28:7, 29:19, 51:20, 54:21, 55:9, 56:7, 58:22, 64:2, 64:6,

64:19, 91:2
belabor [1] - 13:1
below [6] - 74:16, 74:17, 74:22, 75:7, 83:14, 95:22
bench [3] - 95:8, 95:9, 95:12
benchmark [1] - 88:1
benefit [1] - 39:11
benefited [1] - 57:12
benefits [5] - 24:13, 24:23, 25:2, 25:4, 72:23
bent [1] - 67:6
best [3] - 30:25, 66:16, 95:19
better [7] - 31:2, 31:5, 39:1, 42:22, 53:14, 75:3, 75:4
between [15] - 33:11, 33:15, 33:19, 33:24, 41:21, 41:22, 42:1, 43:6, 51:6, 52:19, 54:3, 57:7, 65:9, 73:8, 83:25
beyond [4] - 14:17, 27:12, 47:4, 60:18
big [14] - 11:23, 37:4, 37:23, 49:8, 49:9, 49:16, 51:1, 51:4, 66:24, 67:5, 67:13, 86:1
biggest [2] - 38:8, 38:9
bill [7] - 3:12, 3:20, 18:10, 18:15, 37:9, 37:23, 37:24
Bill [1] - 10:10
billed [1] - 44:18
billing [7] - 25:22, 29:17, 38:1, 40:25, 41:7, 44:7, 56:21
bills [3] - 37:10, 37:11, 62:2
bind [2] - 84:24, 84:25
binding [4] - 85:10, 85:12, 85:15, 90:19
binds [1] - 12:1
Bioscrip [1] - 92:2
bipartisan [3] - 18:10, 18:15, 18:16
bit [1] - 58:12
Black [4] - 72:18, 78:15, 78:23, 79:3
bnarwold@ motleyrice.com [1] - 1:24
Boasberg [1] - 81:10
Boeing [1] - 88:19
bondholder [1] -

57:11
Boston [3] - 11:15, 26:13, 44:14
bottom [2] - 58:13, 71:2
Boulevard [1] - 1:19
bound [3] - 12:8, 12:17, 36:16
boy [1] - 69:8
Brackett [1] - 81:9
brag [1] - 37:18
break [3] - 50:8, 68:18, 75:12
Brenda [1] - 4:2
BRENDA [1] - 2:2
brenda.gonzalez. horowitz@usdoj. gov [1] - 2:5
Bridgeside [1] - 1:19
brief [9] - 11:20, 50:15, 50:19, 51:12, 52:5, 65:13, 77:4, 81:11, 90:14
briefed [1] - 12:24
briefly [2] - 11:12, 67:25
briefs [8] - 8:17, 65:13
bring [3] - 14:8, 15:13, 86:8
bringing [2] - 16:10, 52:3
broader [2] - 65:21, 66:7
brought [7] - 14:5, 16:22, 19:5, 22:14, 28:2, 51:21, 58:22
Broward [1] - 48:8
building [1] - 94:16
BURBANK [3] - 2:11, 24:3, 24:6
Burbank [5] - 11:7, 23:25, 24:2, 24:8, 26:5
burden [1] - 35:13
burdens [2] - 33:21, 34:11

**C**

C)(iii [1] - 40:6
CA [1] - 2:8
calculated [2] - 23:21, 83:22
calculation [1] - 76:9
calendar [2] - 94:18, 94:21
California [1] - 48:9, 86:11
Camden [3] - 86:20, 87:10

candid [1] - 78:10
cannot [2] - 17:10, 47:3
cap [4] - 74:5, 74:9, 74:11, 74:12
care [2] - 13:20, 22:25
Care [1] - 42:3
career [2] - 38:5, 38:7
carpet [1] - 91:6
case [147] - 4:14, 4:18, 4:20, 4:21, 5:16, 5:17, 6:11, 7:6, 8:5, 10:10, 10:20, 11:23, 11:24, 13:20, 14:4, 14:24, 14:25, 15:3, 15:4, 15:13, 16:7, 19:3, 19:8, 22:14, 23:20, 25:12, 25:20, 26:2, 26:15, 26:18, 28:1, 28:8, 28:10, 29:12, 29:14, 29:16, 29:21, 30:5, 30:20, 32:9, 33:9, 35:2, 35:8, 35:14, 40:24, 41:3, 41:4, 41:5, 41:7, 42:3, 42:15, 43:17, 43:19, 44:23, 45:3, 45:13, 48:10, 51:21, 51:23, 52:3, 52:6, 52:16, 53:20, 56:18, 57:6, 57:8, 57:10, 57:12, 57:16, 57:18, 57:21, 58:1, 58:14, 58:17, 58:22, 63:25, 65:19, 65:23, 66:8, 66:15, 66:16, 66:18, 72:18, 75:21, 77:5, 77:8, 77:18, 77:19, 77:21, 77:22, 78:12, 79:10, 79:14, 79:15, 79:17, 80:5, 80:7, 80:8, 80:10, 81:14, 81:17, 81:23, 82:6, 82:9, 82:20, 83:8, 83:10, 83:12, 83:23, 83:24, 84:3, 86:16, 86:17, 86:19, 87:5, 87:9, 87:13, 87:15, 88:3, 88:6, 88:7, 88:8, 88:14, 88:17, 88:18, 88:20, 88:25, 89:1, 89:4, 89:24, 90:2, 91:8, 91:11, 91:20, 92:1, 92:2, 93:18, 94:19, 94:23
cases [31] - 5:3, 22:24, 24:17, 29:24, 40:23, 42:8, 42:13, 42:14, 43:12, 52:15, 53:14,

65:9, 72:11, 79:4, 79:12, 79:14, 79:19, 81:6, 81:7, 85:24, 86:17, 87:10, 87:21, 88:4, 89:7, 91:22, 91:25, 92:16
categorical [1] - 92:23
categories [6] - 5:24, 6:23, 7:1, 7:2, 7:5, 35:6
category [1] - 7:3
causing [1] - 93:3
cent [1] - 47:8
center [2] - 26:21, 69:6
Center [9] - 1:22, 2:13, 4:16, 11:16, 26:8, 26:17, 26:19, 28:8, 29:19
cents [5] - 17:19, 47:14, 47:18, 48:2, 68:10
certain [8] - 8:22, 16:15, 32:11, 33:8, 42:12, 42:13, 52:10, 53:17
certainly [8] - 31:14, 32:21, 33:25, 47:7, 66:5, 82:6, 83:23, 94:12
CERTIFICATE [1] - 95:17
certificate [1] - 95:21
certification [4] - 16:6, 23:15, 25:14, 29:13
certified [2] - 15:2, 69:25
certify [1] - 95:18
challenge [1] - 15:8
challenged [1] - 30:2
changed [1] - 95:11
charge [6] - 14:6, 23:1, 47:3, 52:16, 66:1, 66:5
charged [2] - 5:1, 47:18
charges [3] - 17:19, 52:10, 52:12
charging [5] - 6:7, 47:14, 47:16, 48:2, 62:5
Charlotte [1] - 10:12
CHARLOTTE [1] - 1:18
chartered [1] - 16:4
check [5] - 17:13, 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 46:15, 72:2, 75:9, 75:10, 75:15, 75:17,

76:16, 76:20, 77:10, 77:19, 78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9
**checked** [1] - 29:14
**Chief** [5] - 15:9, 81:10, 81:11, 86:10, 94:8
**chime** [1] - 67:23
**choice** [3] - 41:17, 41:20, 41:21
**choose** [4] - 41:14, 42:1, 75:14, 75:22
**chunk** [1] - 49:17
**Church** [1] - 1:23
**circuit** [18] - 6:12, 16:5, 17:3, 17:7, 17:8, 32:10, 41:24, 41:25, 72:10, 76:24, 78:12, 78:19, 79:3, 82:1, 82:3, 82:7, 82:9, 84:3
**Circuit** [19] - 6:16, 6:19, 6:21, 7:3, 7:12, 7:15, 41:19, 76:22, 76:24, 80:5, 81:25, 82:4, 82:5, 83:25, 86:17, 86:19, 87:10, 87:11
**circuit's** [3] - 18:9, 77:4, 77:7
**circuits** [6] - 41:18, 76:25, 77:3, 86:21, 91:22, 92:10
**circumstances** [1] - 83:11
**cite** [3] - 79:13, 79:15, 92:11
**cited** [3] - 81:11, 88:18, 92:3
**Citizen** [1] - 14:1
**Civil** [3] - 1:2, 3:2, 39:18
**civil** [4] - 5:9, 5:13, 16:21, 95:1
**Claim** [1] - 81:18
**claim** [6] - 52:15, 58:24, 65:7, 66:2, 66:5, 69:13
**claimants** [2] - 38:8, 38:21
**claimed** [4] - 41:1, 43:19, 44:24, 88:14
**claiming** [1] - 46:17
**claims** [7] - 10:15, 11:12, 18:2, 37:17, 37:18, 37:19, 79:19
**Claims** [4] - 79:13, 79:18, 81:16, 81:18
**clarification** [1] - 84:8

**clarify** [2] - 60:3, 82:2
**clarifying** [1] - 84:7
**class** [173] - 3:8, 3:12, 8:11, 9:4, 9:19, 9:20, 9:25, 10:1, 10:15, 10:18, 11:10, 11:17, 11:22, 12:1, 12:17, 13:2, 13:3, 13:7, 13:11, 13:12, 15:2, 16:7, 17:20, 17:22, 17:25, 18:1, 18:3, 18:25, 19:1, 19:9, 19:11, 19:12, 19:17, 19:21, 19:22, 20:2, 20:5, 20:6, 20:12, 20:18, 21:19, 22:12, 23:7, 23:13, 23:15, 24:17, 25:11, 25:13, 25:17, 25:19, 26:17, 29:13, 29:24, 30:18, 30:20, 30:23, 31:1, 31:9, 31:12, 31:19, 31:20, 32:25, 33:2, 33:3, 33:5, 33:24, 35:3, 35:10, 36:1, 36:15, 37:2, 37:5, 37:11, 37:13, 37:15, 38:6, 38:18, 38:22, 39:2, 39:3, 39:8, 39:11, 39:25, 40:5, 40:9, 40:10, 40:21, 40:22, 41:3, 41:15, 43:9, 43:14, 43:16, 44:7, 45:7, 45:9, 46:10, 46:12, 46:18, 46:23, 47:23, 51:14, 51:17, 51:19, 51:22, 52:8, 52:25, 53:23, 53:25, 56:5, 57:4, 57:10, 57:17, 57:25, 58:12, 58:17, 59:19, 59:21, 59:22, 60:24, 61:2, 61:8, 61:9, 61:11, 65:10, 66:10, 66:24, 67:1, 67:2, 67:13, 68:4, 69:1, 69:21, 70:1, 71:23, 72:10, 72:15, 72:16, 73:7, 73:10, 73:19, 73:22, 73:23, 74:3, 74:5, 74:24, 75:1, 75:4, 75:6, 77:18, 77:24, 80:12, 81:6, 81:15, 83:5, 84:25, 85:3, 86:1, 87:6, 88:22, 89:8, 91:2, 91:4, 91:15
**classes** [5] - 33:19, 33:20, 67:1, 89:14, 89:16

**clear** [6] - 13:2, 45:10, 79:24, 80:5, 82:22, 83:20
**clearly** [2] - 7:4, 76:5
**clerk** [1] - 95:5
**clerk's** [1] - 94:24
**clerking** [1] - 94:16
**clerks'** [1] - 5:22
**client** [5] - 29:25, 54:23, 54:24, 62:5, 62:6
**clients** [6] - 15:22, 27:17, 37:10, 37:23, 52:1, 91:5
**closely** [1] - 72:20
**closer** [1] - 84:4
**closing** [1] - 9:11
**CM/ECF** [1] - 7:7
**co** [2] - 29:24, 86:14
**co-author** [1] - 86:14
**co-counsel** [1] - 29:24
**coercion** [1] - 32:18
**coincidental** [1] - 39:10
**colleague** [2] - 4:19, 10:8
**colleagues** [2] - 10:10, 10:16
**Collection** [1] - 27:18
**collective** [1] - 23:5
**collusion** [1] - 32:18
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 41:18
**comfort** [1] - 75:18
**coming** [1] - 74:25
**comment** [1] - 28:6
**commercial** [1] - 34:13
**commitment** [1] - 22:17
**Committee** [1] - 18:17
**common** [25] - 17:20, 32:23, 33:8, 42:13, 43:12, 72:10, 72:15, 74:8, 74:10, 74:13, 78:21, 80:7, 81:22, 81:23, 83:10, 86:17, 87:2, 87:5, 87:7, 87:22, 87:24, 89:24, 92:16, 92:17
**communications** [2] - 20:3, 20:4
**companies** [4] - 16:20, 19:16, 21:9, 67:14
**comparable** [2] - 77:1, 78:22
**comparators** [1] - 88:5
**compare** [1] - 41:1

**compared** [1] - 35:10
**compensable** [1] - 58:24
**compensate** [1] - 73:24
**compensated** [2] - 38:11, 44:19
**compensating** [1] - 60:21
**compensation** [3] - 34:5, 34:6, 87:7
**complaint** [5] - 50:23, 50:25, 51:2
**complete** [2] - 44:22, 95:19
**completely** [2] - 14:9, 30:7
**complex** [4] - 14:11, 65:24, 81:5, 81:8
**complexity** [1] - 25:8
**complicated** [1] - 8:2
**component** [1] - 17:14
**comprises** [1] - 19:12
**compromise** [4] - 19:3, 33:11, 34:23, 51:5
**compromising** [1] - 50:24
**computer** [1] - 2:21
**computer-aided** [1] - 2:21
**conceivable** [1] - 31:5
**concepts** [1] - 56:18
**concern** [1] - 60:20
**concerns** [7] - 5:12, 34:17, 44:25, 80:18, 80:21, 83:19, 83:22
**conclude** [1] - 6:20
**concluded** [2] - 6:5, 7:17, 8:6
**concludes** [1] - 95:15
**concur** [2] - 35:25, 60:24
**concurs** [1] - 31:16
**Condominium** [2] - 86:20, 87:11
**conduct** [4] - 80:12, 80:13, 80:23, 82:10
**Conference** [3] - 15:9, 18:18, 34:15
**confirm** [1] - 78:17
**conflict** [1] - 86:22
**Congress** [3] - 18:20, 94:3
**congressional** [1] - 34:8
**connection** [1] - 43:25
**conservatively** [1] - 23:18
**consider** [7] - 35:23,

39:19, 40:18, 40:21, 43:16, 86:13, 88:11
**considerable** [2] - 25:11, 52:2
**consideration** [3] - 9:21, 16:1, 86:4
**considered** [6] - 4:23, 6:1, 71:9, 81:4, 86:5, 95:21
**considering** [5] - 33:4, 34:1, 35:12, 40:6, 40:20
**considers** [2] - 12:22, 12:25
**consistent** [4] - 7:22, 33:16, 34:7, 60:22
**constitutes** [1] - 95:18
**constitutional** [1] - 22:20
**consulted** [1] - 23:14
**consumer** [3] - 26:22, 27:1, 27:5, 27:7, 27:20
**Consumer** [8] - 2:13, 4:15, 11:16, 26:7, 26:17, 26:19, 28:8, 29:19
**consumers** [2] - 26:25, 27:13
**contact** [1] - 64:4
**contacts** [2] - 69:1, 69:2
**context** [4] - 65:11, 65:22, 92:17
**contexts** [1] - 65:23
**contingency** [2] - 73:19, 73:20
**contingent** [1] - 73:12
**continue** [1] - 42:25
**Continued** [1] - 1:25
**continued** [1] - 2:1
**continues** [1] - 18:8
**contrary** [1] - 15:24
**contribution** [1] - 57:16
**contributions** [1] - 93:20
**Control** [1] - 7:11
**controversy** [1] - 14:3
**convinced** [1] - 82:6
**copier** [1] - 47:19
**copies** [1] - 47:20
**core** [1] - 22:20
**corners** [1] - 14:7
**Corporate** [1] - 1:22
**Corporation** [1] - 26:21
**corporations** [2] - 49:9, 49:16
**correct** [15] - 6:24,

7:14, 20:13, 21:5, 54:5, 57:23, 58:7, 68:7, 70:20, 71:17, 73:13, 73:15, 76:11, 85:1

**corrective** [1] - 70:15

**cost** [5] - 38:1, 47:4, 47:9, 47:21, 48:23

**costs** [9] - 13:8, 22:13, 25:8, 34:12, 35:20, 45:9, 47:19, 47:21, 62:4

**Counsel** [2] - 2:10, 4:3

**counsel** [44] - 3:5, 3:8, 3:10, 3:17, 4:23, 5:4, 5:15, 9:4, 9:9, 9:19, 10:8, 13:3, 13:12, 14:16, 19:22, 20:12, 23:13, 23:17, 25:17, 29:24, 30:2, 35:16, 37:11, 39:3, 40:10, 41:3, 41:16, 43:4, 43:17, 45:7, 56:22, 58:13, 60:24, 61:11, 61:19, 71:24, 73:24, 81:15, 83:6, 89:17, 93:14, 93:21

**country** [4] - 24:20, 25:1, 48:10, 92:6

**County** [2] - 48:8, 79:14

**couple** [3] - 10:3, 62:7, 62:15

**course** [12] - 5:6, 13:12, 19:4, 21:12, 30:3, 35:8, 35:12, 35:13, 50:15, 81:5, 83:11, 84:2

**Court** [87] - 2:15, 2:16, 4:9, 9:23, 10:14, 10:21, 12:4, 12:11, 12:16, 12:22, 12:25, 13:1, 25:24, 26:14, 29:12, 30:18, 31:1, 31:3, 31:11, 31:17, 32:1, 32:7, 32:10, 32:19, 32:21, 35:14, 35:18, 35:23, 36:1, 36:14, 39:15, 39:16, 39:19, 41:14, 41:17, 41:20, 43:9, 43:12, 43:13, 45:6, 46:15, 49:4, 49:14, 50:16, 51:12, 51:15, 55:24, 57:6, 57:13, 58:4, 58:25, 60:7, 60:22, 60:23, 61:10, 63:20, 74:6, 75:14, 76:15, 76:19, 79:13, 79:17, 80:10, 80:13, 80:24,

81:3, 81:13, 81:14, 81:16, 83:13, 83:16, 84:1, 84:25, 86:22, 86:24, 87:17, 87:19, 87:22, 88:2, 88:10, 89:5, 90:19, 90:20, 91:1, 93:1, 93:4, 95:25

**court** [30] - 5:2, 6:20, 7:20, 9:24, 15:6, 15:14, 15:15, 17:11, 19:12, 22:5, 22:23, 22:24, 23:13, 24:17, 27:4, 42:12, 57:19, 58:20, 63:15, 77:16, 78:7, 78:10, 79:16, 87:5, 87:12, 90:5, 92:1, 94:4, 95:14

**COURT** [128] - 1:1, 1:9, 3:9, 3:14, 4:6, 4:8, 4:13, 10:24, 18:12, 19:24, 20:1, 20:11, 20:14, 20:21, 21:15, 21:21, 21:25, 22:4, 22:8, 23:23, 24:2, 24:5, 26:5, 26:11, 28:12, 28:15, 28:24, 29:7, 30:11, 30:15, 36:3, 37:22, 39:22, 40:1, 40:4, 40:9, 40:17, 41:21, 41:24, 42:5, 43:10, 45:12, 45:17, 45:20, 45:25, 46:21, 47:1, 49:19, 50:17, 53:4, 53:10, 53:19, 53:22, 54:2, 54:7, 54:13, 55:21, 56:2, 56:6, 56:10, 56:16, 58:10, 59:2, 60:3, 60:10, 60:14, 61:13, 61:22, 63:12, 63:22, 64:10, 64:12, 64:15, 64:23, 65:2, 65:12, 66:7, 66:18, 66:21, 66:24, 67:17, 67:22, 67:24, 68:13, 68:17, 68:23, 69:18, 69:23, 70:6, 70:18, 71:2, 71:6, 71:8, 71:12, 71:18, 71:20, 71:22, 73:12, 73:14, 73:16, 74:8, 75:24, 76:2, 76:22, 77:6, 77:9, 77:13, 77:24, 78:20, 79:1, 79:9, 79:21, 81:20, 82:12, 84:7, 84:13, 85:1, 85:12, 85:15, 85:18, 86:24, 89:18, 90:7, 90:12, 90:23, 92:4, 92:11, 93:8

**Court's** [15] - 9:21, 17:4, 36:17, 52:4, 66:20, 75:15, 75:16, 80:16, 80:23, 82:8, 82:10, 83:2, 84:5, 88:18, 91:11

**court-approved** [1] - 63:15

**Courthouse** [1] - 2:16

**courthouse** [1] - 5:20

**courtroom** [7] - 7:13, 10:5, 10:19, 10:23, 11:4, 45:21, 49:20

**COURTROOM** [3] - 3:2, 3:17, 95:14

**courts** [14] - 5:2, 13:19, 15:23, 23:1, 24:22, 42:23, 57:20, 72:15, 72:18, 78:21, 87:18, 91:6, 91:19, 93:24

**Courts** [8] - 2:10, 4:4, 6:3, 6:6, 16:9, 32:12, 94:3, 94:4

**cover** [3] - 7:18, 44:24, 88:14

**coverage** [2] - 16:22, 19:20

**covers** [1] - 45:8

**COVID** [1] - 47:19

**crazy** [1] - 14:12

**create** [1] - 34:10

**created** [1] - 71:3

**creates** [1] - 17:20

**Credit** [1] - 27:18

**credit** [1] - 48:7

**Crime** [1] - 7:11

**criminal** [2] - 5:11, 5:13

**criteria** [1] - 12:23

**critical** [2] - 24:25, 45:5

**criticism** [2] - 13:18, 14:3

**cross** [27] - 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 72:2, 75:9, 75:10, 75:15, 75:17, 76:16, 76:20, 77:10, 77:19, 78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9, 90:1

**cross-check** [26] - 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 72:2, 75:9, 75:10, 75:15, 75:17, 76:16, 76:20, 77:10, 77:19,

78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9

**cross-examined** [1] - 90:1

**crossword** [1] - 29:6

**CT** [1] - 1:23

**current** [1] - 29:17

**customer** [1] - 69:7

**cut** [4] - 47:25, 48:12, 48:13, 87:20

**cycles** [1] - 37:9

---

# D

**D.C** [12] - 1:6, 6:21, 42:10, 76:22, 76:24, 80:5, 81:25, 82:4, 82:5, 83:25, 86:17, 87:11

**daily** [1] - 27:9

**damages** [6] - 35:15, 41:4, 41:7, 43:18, 89:10, 89:11

**danger** [1] - 91:4

**Daniel** [1] - 23:11

**darn** [1] - 92:8

**data** [5] - 19:15, 21:9, 34:14, 41:16, 67:14

**date** [1] - 67:14

**Dated** [1] - 95:23

**days** [3] - 69:7, 69:16, 95:5

**DC** [3] - 1:13, 1:16, 2:4

**deal** [2] - 38:19, 50:11

**dealing** [2] - 38:16, 48:23

**deals** [2] - 39:24, 87:22

**Debt** [1] - 27:18

**decades** [1] - 13:25

**December** [3] - 28:11, 28:14, 47:3

**decide** [7] - 30:24, 63:5, 93:5, 93:19, 95:8, 95:9, 95:12

**decided** [1] - 78:13

**deciding** [2] - 77:16, 78:7

**decision** [18] - 16:12, 18:9, 66:20, 77:7, 77:9, 77:17, 78:9, 78:15, 78:19, 79:3, 80:16, 81:10, 81:11, 82:7, 83:17, 87:1, 88:19

**decisions** [3] - 78:21, 87:16, 88:2

**declaration** [8] -

78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:25, 82:4, 82:11, 86:9

**cross-examined** [1] - 90:1

**crossword** [1] - 29:6

**CT** [1] - 1:23

**current** [1] - 29:17

**customer** [1] - 69:7

**cut** [4] - 47:25, 48:12, 48:13, 87:20

**cycles** [1] - 37:9

13:22, 23:15, 25:23, 25:25, 29:12, 73:21, 74:19, 74:20

**declarations** [2] - 8:18, 80:20

**deconstructed** [1] - 88:5

**Deepak** [2] - 3:8, 9:19

**DEEPAK** [1] - 1:11

**deepak@ guptawessler.com** [1] - 1:14

**defeated** [1] - 16:5

**Defendant** [1] - 1:6

**defendant** [3] - 15:24, 47:12, 74:25

**defendant's** [1] - 72:13

**defendants** [2] - 5:12, 89:9

**defended** [1] - 32:6

**defending** [1] - 89:24

**defense** [1] - 66:4

**DEFENSE** [1] - 2:2

**Defense** [1] - 25:3

**Defense-related** [1] - 25:3

**definition** [1] - 61:9

**delays** [1] - 13:8

**delighted** [1] - 6:18

**demonstrate** [1] - 45:10

**demonstrated** [1] - 31:6

**demonstrates** [1] - 32:1

**demonstrating** [1] - 35:4

**Department** [5] - 2:3, 6:4, 15:21, 25:3, 68:2

**departure** [1] - 23:9

**dependent** [1] - 27:3

**Depot** [1] - 47:18

**DEPUTY** [3] - 3:2, 3:17, 95:14

**deserves** [1] - 49:11

**designed** [1] - 41:13

**despite** [1] - 14:3

**detail** [1] - 74:19

**determine** [5] - 30:22, 31:3, 80:16, 84:6, 86:7

**determining** [3] - 35:23, 40:17, 86:5

**developed** [1] - 94:2

**diametrically** [1] - 34:20, 50:22

**difference** [1] - 43:5

**different** [8] - 42:5,

43:7, 63:16, 76:25, 79:8, 79:11, 92:17, 94:23
**differentiation** [2] - 33:15, 33:24
**difficult** [1] - 51:8
**difficulties** [2] - 2:19, 35:10
**difficulty** [1] - 35:4
**digital** [1] - 27:8
**digression** [1] - 94:14
**diminish** [1] - 17:11
**direct** [2] - 27:13, 28:2
**director** [8] - 11:1, 11:8; 11:16, 22:3, 23:11, 24:8, 26:7, 29:23
**Director** [2] - 2:11, 2:13
**directors** [1] - 94:9
**directs** [1] - 12:16
**disabilities** [1] - 24:14
**disabled** [2] - 48:6, 58:20
**disadvantage** [1] - 23:3
**disagree** [1] - 61:17
**disagreed** [1] - 57:19
**disapproved** [1] - 57:9
**disassembled** [1] - 95:21
**discouraging** [1] - 72:21
**discovery** [6] - 15:21, 16:8, 16:11, 29:13, 32:15, 35:15
**discretion** [10] - 42:2, 42:21, 74:6, 75:16, 75:21, 80:23, 82:10, 83:2, 84:6, 90:21
**discriminates** [1] - 51:20
**discuss** [5] - 20:17, 21:6, 30:19, 35:19, 50:19
**discussed** [2] - 12:12, 32:8
**discussion** [3] - 8:13, 42:17, 43:2
**discussions** [1] - 32:16
**dismiss** [1] - 16:6
**dismissed** [1] - 14:20
**dispute** [4] - 52:10, 55:14, 55:15, 64:7
**disputes** [5] - 55:18, 55:20, 62:14, 64:12, 64:13
**disqualify** [1] - 54:2
**disregard** [2] - 90:8,

90:11
**distinction** [2] - 57:7, 57:23
**distinguish** [1] - 33:18
**distributed** [4] - 18:2, 33:1, 48:23, 49:15
**distributing** [1] - 33:7
**distribution** [13] - 34:4, 38:9, 39:13, 50:25, 51:10, 51:13, 51:16, 51:18, 59:17, 59:18, 59:25, 66:14, 67:7
**District** [9] - 41:18, 44:13, 52:7, 65:17, 82:9, 83:9, 86:11, 87:13, 95:7
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [9] - 6:17, 6:20, 32:17, 44:15, 79:16, 81:4, 81:8, 87:12, 92:1
**dive** [1] - 9:16
**docket** [1] - 94:22
**Docket** [2] - 8:19, 59:5
**docketing** [1] - 7:20
**dockets** [1] - 24:25
**doctrine** [2] - 87:2, 87:6
**document** [3] - 41:12, 47:4, 47:22
**documentation** [3] - 43:25, 80:22, 84:10
**documented** [2] - 43:20
**documents** [5] - 22:23, 23:2, 47:10, 47:13
**dog** [4] - 20:9, 21:7, 91:13
**DOJ** [1] - 2:3
**DOJ-USAO** [1] - 2:3
**dollar** [2] - 17:19, 82:21
**dollars** [2] - 15:11, 38:1
**DON** [1] - 2:14
**done** [16] - 8:6, 12:15, 29:21, 30:4, 30:5, 42:24, 48:14, 62:21, 62:22, 74:4, 81:25, 83:18, 89:18, 89:19, 92:23, 94:7
**double** [2] - 38:16, 88:15
**doubling** [1] - 16:24
**doubt** [5] - 15:6, 32:19, 32:21
**down** [4] - 14:8, 19:5,

38:15, 74:1
**downstream** [1] - 52:18
**draft** [1] - 23:14
**drafted** [1] - 25:13
**drafts** [1] - 69:4
**dramatically** [1] - 41:10
**draw** [1] - 52:4
**drawing** [1] - 57:23
**drew** [1] - 57:6
**drums** [1] - 47:19
**due** [2] - 24:14, 44:4
**dumps** [1] - 94:20
**duplicate** [1] - 69:12
**during** [10] - 30:3, 32:25, 33:3, 46:13, 58:17, 58:23, 59:22, 61:2, 61:3, 75:12
**duty** [4] - 24:12, 86:12, 90:21, 91:11

# E

**E-Government** [1] - 33:15
**E-juror** [1] - 7:13
**earliest** [1] - 43:11
**earned** [1] - 25:5
**earth** [1] - 15:16
**easier** [2] - 94:11, 94:12
**Eastern** [1] - 95:7
**easy** [2] - 15:19, 77:21
**EBM** [1] - 7:9
**ECF** [1] - 73:25
**Economic** [1] - 27:19
**economy** [1] - 85:25
**edify** [1] - 93:10
**education** [1] - 24:18
**educational** [1] - 93:17
**effect** [4] - 79:16, 85:10, 85:13, 85:16
**effectively** [1] - 16:2
**efficient** [1] - 72:22
**effort** [4] - 7:25, 18:16, 25:12, 28:1
**efforts** [1] - 16:23, 34:9
**eight** [1] - 17:22
**eight-year** [1] - 17:22
**either** [5] - 34:18, 59:22, 64:8, 71:13, 76:20
**electricity** [1] - 47:20
**electronic** [11] - 5:8, 5:9, 5:14, 7:6, 7:8, 7:20, 32:11, 33:18, 93:22, 94:6, 95:2

**electronically** [2] - 5:10, 5:14
**Eleventh** [3] - 41:19, 86:19, 87:10
**eliminate** [1] - 18:15
**eliminating** [1] - 16:25
**Elizabeth** [2] - 2:15, 95:24
**ELIZABETH** [1] - 95:18
**Ellen** [1] - 4:20
**email** [6] - 55:10, 62:21, 64:3, 64:4, 64:8, 68:15
**Email** [4] - 1:14, 1:21, 1:24, 2:5
**emails** [4] - 19:23, 20:2, 62:12, 69:2
**emphasis** [1] - 82:4
**emphasize** [2] - 53:15, 90:17
**employee's** [1] - 54:22
**employees** [2] - 70:13, 70:14
**employer** [1] - 54:22
**enact** [1] - 18:20
**enacted** [1] - 27:22
**end** [9] - 28:11, 28:12, 28:14, 34:22, 35:18, 43:21, 83:19, 84:4, 86:8
**endeavor** [1] - 14:13
**ended** [1] - 38:14
**ending** [2] - 48:15, 48:16
**endorse** [1] - 30:7
**enforce** [1] - 85:6
**enforceable** [1] - 85:7
**engage** [1] - 67:6
**engaged** [1] - 32:15
**enhancement** [1] - 92:15
**ensure** [5] - 12:4, 22:19, 34:4, 34:9, 83:16
**ensuring** [3] - 9:25, 34:2, 67:8
**entered** [2] - 8:9, 47:2
**entirely** [2] - 19:6, 75:15
**entities** [1] - 34:13
**entitled** [5] - 40:14, 46:5, 71:24, 89:23, 92:24
**entry** [1] - 69:12
**equal** [2] - 13:18, 59:20
**equitable** [3] - 22:18, 87:22, 87:24
**equitably** [3] - 13:11,

31:20, 37:2
**equity** [2] - 51:14, 65:9
**ERIC** [1] - 2:7
**Eric** [2] - 4:10, 36:15
**escapes** [1] - 86:15
**esoteric** [1] - 65:19
**especially** [4] - 31:12, 33:4, 34:2, 35:9
**essential** [2] - 12:4, 17:13
**essentially** [5] - 6:14, 8:21, 9:2, 40:13, 81:3
**established** [2] - 87:2, 87:5
**estimate** [1] - 23:18
**et** [2] - 1:3, 3:3
**etc** [1] - 2:19
**ethical** [2] - 41:15, 86:12
**Ethics** [1] - 86:14
**evaluate** [1] - 60:14
**evaluating** [3] - 31:3, 39:19, 43:14
**evaluation** [1] - 63:1
**event** [1] - 29:11
**eventually** [1] - 5:13
**evidence** [6] - 31:7, 32:18, 44:2, 44:10, 45:11, 49:1
**exaction** [1] - 11:11
**exactly** [5] - 57:1, 58:21, 63:9, 66:15, 73:18
**examine** [1] - 31:1
**examined** [1] - 90:1
**exceed** [1] - 29:18
**exceeded** [2] - 32:12, 87:25
**exceeds** [1] - 23:20
**except** [2] - 41:18, 93:9
**exceptional** [1] - 13:8
**exceptions** [1] - 7:15
**excessive** [9] - 14:16, 47:12, 47:15, 47:16, 48:4, 48:24, 49:2, 59:7, 87:19
**exchange** [1] - 91:5
**exclusively** [1] - 76:8
**exempt** [1] - 14:18
**exempting** [1] - 33:19
**Exhibit** [1] - 48:17
**exhibits** [2] - 62:17, 62:18
**exorbitant** [1] - 23:1
**expected** [1] - 52:21
**expend** [1] - 35:14
**expenditures** [1] -

32:11
**expense** [1] - 35:12
**expenses** [8] - 7:18, 37:9, 37:14, 37:21, 52:1, 57:7, 62:4, 74:12
**experience** [5] - 11:10, 14:11, 30:1, 30:2, 74:24
**experienced** [1] - 32:4
**expert** [5] - 11:11, 11:17, 41:6, 76:15, 88:8
**explain** [3] - 63:1, 63:4, 68:19
**explained** [2] - 6:10, 7:16
**explains** [4] - 26:1, 59:16, 71:18, 92:14
**explanation** [1] - 25:25
**extensive** [2] - 16:19, 19:20
**extensively** [3] - 12:24, 31:21, 81:7
**extent** [2] - 53:8, 89:22
**extraordinary** [2] - 18:4, 35:10
**extrapolating** [1] - 48:17
**extremely** [1] - 85:25
**eye** [2] - 30:1, 30:2
**eye-opening** [2] - 30:1, 30:2
**eyebrows** [1] - 78:2

# F

**F-A-L-E-S-C-H-I-N-I** [1] - 22:7
**faced** [1] - 35:3
**facing** [3] - 15:20, 78:22, 79:5
**fact** [11] - 28:10, 36:22, 46:22, 51:5, 56:14, 58:15, 61:25, 66:15, 67:5, 77:12, 90:21
**factors** [5] - 12:25, 31:21, 35:16, 76:23, 77:4
**facts** [2] - 16:10, 78:12
**factual** [1] - 92:21
**factually** [1] - 59:13
**Fair** [3] - 27:17, 27:18
**fair** [16] - 12:5, 12:7, 12:9, 15:17, 16:1, 30:22, 40:5, 46:23, 51:15, 57:8, 58:12,

63:2, 63:6, 85:20, 92:24, 93:19
**fair-minded** [1] - 15:17
**fairness** [9] - 12:22, 36:24, 37:1, 45:14, 51:14, 53:18, 55:23, 65:3, 66:12
**FALESCHINI** [4] - 21:24, 22:1, 22:6, 22:9
**Faleschini** [5] - 10:23, 11:1, 21:22, 21:25, 22:2
**fall** [3] - 57:23, 58:6, 61:9
**falsity** [1] - 90:6
**far** [3] - 54:25, 91:21, 94:25
**farmers** [3] - 72:18, 78:23, 79:3
**farmers'** [1] - 78:15
**favor** [3] - 16:2, 34:20, 35:16
**favored** [1] - 31:12
**favoring** [4] - 50:24, 50:25, 51:3, 67:5
**favors** [1] - 34:18
**FCRR** [3] - 2:15, 95:18, 95:24
**Fed** [2] - 6:13, 81:18
**Federal** [4] - 39:18, 79:13, 79:18, 81:16, 81:18
**federal** [43] - 6:12, 6:15, 7:19, 14:12, 15:14, 16:5, 16:19, 17:3, 17:7, 17:8, 18:9, 19:12, 22:20, 24:14, 24:24, 27:3, 27:6, 27:21, 32:10, 41:24, 41:25, 70:12, 70:13, 72:10, 76:23, 76:24, 77:4, 77:6, 78:12, 78:19, 79:3, 79:16, 79:19, 81:5, 81:8, 82:1, 82:3, 82:7, 84:3, 91:22, 93:24
**fee** [40] - 5:18, 14:8, 15:8, 16:25, 19:6, 40:24, 41:2, 43:22, 44:14, 44:23, 45:4, 45:15, 48:5, 58:23, 61:4, 72:11, 72:12, 73:11, 73:19, 74:10, 74:12, 74:14, 75:6, 75:18, 76:11, 76:12, 76:17, 78:3, 80:17, 87:23, 87:24, 88:9,

88:12, 88:13, 88:24, 91:15, 91:16, 91:19, 92:16
**fees** [96] - 4:25, 5:25, 7:5, 7:8, 7:11, 7:17, 9:13, 13:17, 13:24, 14:6, 14:15, 15:11, 16:10, 16:15, 16:17, 16:25, 17:11, 17:22, 18:7, 18:15, 22:13, 23:1, 25:7, 32:25, 33:3, 33:18, 33:20, 34:7, 34:10, 35:20, 39:21, 40:12, 40:14, 40:15, 41:11, 43:2, 43:21, 44:16, 44:21, 45:3, 45:16, 46:6, 46:11, 46:13, 47:12, 47:15, 47:17, 48:5, 48:11, 48:12, 48:14, 48:24, 49:2, 49:10, 50:10, 52:2, 52:17, 53:2, 53:6, 54:19, 54:20, 54:22, 55:4, 55:5, 55:8, 55:13, 58:8, 58:18, 58:23, 59:7, 59:21, 61:2, 61:3, 61:19, 61:20, 64:1, 64:6, 64:19, 64:22, 65:8, 68:3, 68:21, 71:23, 71:24, 83:18, 84:15, 84:19, 85:9, 85:20, 86:18, 88:20, 89:22, 89:24, 91:6
**felt** [2] - 15:22
**fences** [1] - 16:14
**few** [15] - 7:15, 11:3, 11:18, 11:21, 13:14, 14:10, 17:15, 18:12, 18:13, 18:14, 21:20, 63:3, 92:1, 93:9, 93:17
**Fibreboard** [1] - 66:19
**fiduciary** [3] - 43:9, 90:25, 91:1
**fight** [1] - 15:21
**file** [7] - 5:21, 37:7, 44:3, 64:24, 93:3, 93:10
**filed** [24] - 8:7, 13:20, 15:4, 20:15, 20:17, 21:16, 21:17, 25:24, 29:12, 36:7, 36:16, 36:18, 46:1, 47:23, 63:19, 64:5, 64:8, 64:13, 64:18, 69:15, 69:16, 71:3, 84:10, 93:3
**files** [1] - 94:24

**filing** [16] - 5:9, 7:6, 23:8, 36:20, 44:22, 48:17, 59:5, 76:6, 80:19, 81:6, 81:21, 82:14, 82:24, 83:5, 93:3, 93:23
**filings** [15] - 5:14, 8:8, 8:17, 25:12, 31:6, 31:22, 32:3, 33:10, 36:21, 44:9, 62:18, 69:11, 82:19, 93:13, 94:6
**final** [6] - 9:21, 12:20, 13:22, 31:10, 31:17, 52:24
**finally** [4] - 7:13, 11:14, 26:6, 34:25
**finance** [2] - 27:1, 27:13
**finish** [1] - 29:22
**firm** [9] - 10:9, 10:11, 10:13, 38:4, 44:20, 54:24, 62:1, 88:23, 89:2
**firms** [16] - 5:1, 19:13, 19:14, 21:8, 37:5, 37:6, 37:13, 37:23, 38:6, 38:7, 39:11, 49:8, 51:25, 67:13, 88:23, 89:6
**First** [1] - 17:9
**first** [18] - 6:18, 7:3, 11:21, 12:14, 14:5, 15:1, 15:3, 21:18, 25:16, 31:24, 50:20, 59:16, 59:18, 63:3, 63:7, 73:10, 85:11, 87:17
**first-ever** [1] - 15:1
**first-named** [1] - 25:16
**Fitzpatrick** [6] - 41:6, 43:22, 74:18, 81:2, 88:8, 90:1
**Fitzpatrick's** [1] - 88:6
**five** [6] - 9:9, 20:16, 20:24, 40:24, 44:23, 94:22
**Floor** [1] - 1:23
**focus** [1] - 89:1
**focusing** [2] - 13:23, 89:22
**folks** [5] - 10:3, 13:20, 44:11, 44:18, 67:5
**follow** [1] - 61:22
**follow-up** [1] - 61:22
**following** [2] - 18:9, 40:6
**footnote** [3] - 52:5, 52:6, 65:12
**Footnote** [2] - 77:17,

78:9
**FOR** [3] - 1:1, 1:11, 2:2
**force** [2] - 41:13, 42:2
**forceful** [1] - 33:14
**foregoing** [1] - 95:18
**forget** [1] - 42:9
**fork** [1] - 15:10
**form** [7] - 53:1, 53:5, 53:11, 54:16, 54:17, 54:18, 55:2
**formal** [1] - 31:13
**former** [2] - 81:11, 86:10
**forms** [7] - 54:15, 62:16, 62:21, 63:18, 63:19, 63:20, 70:23
**forth** [2] - 9:2, 20:4
**forward** [7] - 3:5, 21:10, 25:17, 28:21, 30:7, 32:5, 35:11
**fought** [2] - 13:4, 32:14
**foundational** [2] - 87:1, 87:16
**four** [5] - 10:18, 14:7, 40:24, 41:7, 43:19
**fraction** [2] - 89:10, 89:11
**frankly** [5] - 41:13, 86:6, 88:23, 89:15, 94:14
**fraud** [1] - 44:12
**free** [3] - 14:9, 18:19, 22:18
**frequently** [1] - 95:10
**Friday** [2] - 29:7, 95:1
**Friedman** [3] - 12:11, 16:3, 52:23
**FRIEDMAN** [1] - 1:8
**friend** [1] - 75:11
**friends** [1] - 6:21
**front** [2] - 56:11, 86:7
**frontline** [1] - 76:12
**full** [7] - 17:18, 32:24, 34:5, 34:6, 50:7, 83:17, 95:19
**fully** [4] - 37:8, 37:13, 37:16, 38:10
**functions** [1] - 43:7
**fund** [43] - 16:15, 17:20, 32:23, 33:8, 37:12, 41:23, 42:14, 42:16, 42:19, 42:20, 43:12, 72:10, 72:15, 72:17, 74:8, 74:10, 74:13, 78:21, 80:6, 80:7, 81:22, 83:10, 86:17, 86:18, 87:2, 87:6, 87:7, 87:14,

87:16, 87:17, 87:18,
87:22, 87:23, 87:24,
88:18, 88:21, 88:24,
89:12, 89:24, 92:17
**fundable** [1] - 7:4
**funded** [1] - 16:17
**funding** [2] - 7:3, 7:6
**funds** [7] - 17:24,
33:1, 35:5, 39:1,
39:7, 51:10, 81:23

## G

**garden** [1] - 72:11
**garnered** [1] - 16:21
**gatekeeps** [1] - 23:4
**Gemert** [1] - 88:19
**General** [2] - 2:10, 4:3
**general** [5] - 31:11,
35:22, 66:3, 80:4,
80:13
**General's** [1] - 42:11
**generally** [1] - 72:9
**Geoffrey** [1] - 49:25
**Georgetown** [1] -
86:14
**get-go** [2] - 70:21,
71:14
**given** [9] - 12:18, 13:8,
15:7, 18:5, 18:22,
30:9, 70:2, 75:22,
78:19
**Globe** [1] - 44:14
**glove** [1] - 10:12
**Goldberg** [2] - 23:11,
23:12
**GONZALEZ** [10] - 2:2,
4:1, 30:16, 60:17,
67:19, 79:24, 82:2,
82:22, 84:12, 93:6
**Gonzalez** [1] - 4:2
**goofed** [1] - 70:15
**Government** [1] -
33:15
**government** [32] - 6:2,
17:14, 17:17, 24:14,
24:23, 30:15, 32:6,
35:6, 35:21, 38:24,
47:2, 50:8, 51:11,
52:16, 60:4, 67:17,
68:14, 70:12, 70:13,
72:24, 74:3, 74:12,
74:23, 75:11, 79:20,
79:22, 80:18, 81:3,
82:20, 91:9, 93:2,
93:7
**government's** [6] -
16:6, 35:2, 38:12,
39:7, 58:13, 76:6
**grandchildren** [1] -

29:4
**grant** [1] - 31:17
**granted** [1] - 61:4
**granting** [1] - 8:10
**gravitated** [1] - 72:18
**great** [3] - 5:6, 6:5,
29:9
**greatly** [1] - 28:20
**Greenough** [6] -
43:12, 57:6, 87:2,
87:3, 87:14, 91:20
**Greenough's** [1] -
57:15
**Greenspan** [1] - 50:1
**greeted** [1] - 78:18
**grossly** [2] - 51:9,
85:7
**ground** [2] - 6:5, 6:17
**Group** [1] - 14:1
**group** [1] - 70:22
**groups** [4] - 16:21,
21:8, 21:9, 28:3
**guarantee** [1] - 40:23
**guaranteed** [1] - 33:8
**guard** [1] - 91:7
**guess** [7] - 7:1, 9:16,
48:13, 62:20, 66:11,
77:1, 94:8
**GUPTA** [60] - 1:11,
3:7, 9:18, 11:1,
18:13, 19:25, 20:2,
20:13, 20:16, 21:3,
21:18, 21:22, 23:24,
26:6, 30:13, 50:14,
50:18, 53:5, 53:13,
53:21, 54:1, 54:5,
54:8, 55:22, 56:3,
56:9, 56:15, 56:25,
58:11, 59:13, 60:7,
60:13, 60:16, 63:7,
65:5, 65:15, 66:11,
66:19, 66:23, 67:3,
72:5, 73:13, 73:15,
73:18, 74:9, 76:1,
76:4, 77:2, 77:8,
77:11, 77:16, 78:1,
78:24, 79:6, 79:10,
79:23, 90:14, 91:1,
92:7, 92:12
**Gupta** [17] - 1:12,
1:15, 3:8, 3:24, 9:19,
10:9, 30:12, 30:20,
31:8, 31:15, 32:8,
37:4, 50:13, 61:23,
68:25, 79:25, 90:13
**Gupta's** [2] - 25:25,
36:20
**guy** [9] - 44:16, 49:10,
49:17, 51:1, 51:4,
67:8

**guys** [1] - 51:24

## H

**half** [6] - 28:9, 29:16,
30:3, 40:24, 95:4
**hallmark** [1] - 34:23
**hallway** [2] - 75:11,
79:25
**hand** [1] - 10:12
**handle** [1] - 91:19
**handled** [4] - 4:18,
57:12, 69:3, 69:5
**handling** [2] - 69:1,
69:6
**happenings** [1] - 23:6
**happily** [1] - 4:19
**happy** [10] - 21:6,
22:11, 28:18, 29:20,
30:9, 36:10, 63:10,
72:5, 76:19, 80:3
**hard** [5] - 13:4, 14:21,
32:14, 51:17, 67:10
**hard-fought** [2] - 13:4,
32:14
**harder** [3] - 5:11, 5:22,
5:23
**hardest** [1] - 29:8
**Hartford** [1] - 1:23
**head** [1] - 15:7
**head-on** [1] - 15:7
**Health** [9] - 42:3, 45:3,
77:5, 77:8, 79:2,
79:7, 79:10, 80:9,
86:3
**hear** [23] - 3:15, 8:25,
9:5, 18:25, 21:12,
24:4, 24:5, 26:10,
28:25, 30:15, 36:5,
36:6, 36:10, 46:1,
49:22, 50:6, 50:9,
60:7, 61:17, 61:19,
79:22, 84:13
**heard** [16] - 9:7, 10:2,
12:6, 15:25, 19:2,
36:11, 45:22, 49:21,
50:4, 52:22, 53:20,
74:23, 81:15, 84:17,
91:9, 94:17
**hearing** [12] - 2:18,
8:19, 9:25, 11:23,
12:21, 12:22, 18:25,
35:19, 36:18, 68:14,
92:25
**HEARING** [1] - 1:8
**hearings** [1] - 94:17
**hearsay** [1] - 90:5
**heavily** [1] - 77:6
**heavy** [1] - 27:10
**held** [5] - 2:18, 41:19,

52:15, 86:19, 86:21
**help** [3] - 48:10, 63:4,
72:6
**helped** [2] - 75:12,
80:1
**helpful** [5] - 58:6,
73:5, 76:21, 79:21,
93:15
**helps** [1] - 72:19
**hereby** [1] - 95:18
**high** [2] - 39:12, 48:12
**higher** [2] - 84:2, 88:1
**highly** [2] - 27:3, 30:6
**historic** [1] - 9:20
**history** [3] - 6:11,
14:25, 32:9
**hold** [3] - 15:5, 16:14,
39:22
**holding** [4] - 17:4,
77:22, 78:4
**holdings** [1] - 86:22
**holds** [1] - 82:9
**holes** [2] - 83:4, 93:2
**home** [2] - 27:1, 28:25
**honestly** [1] - 77:3
**honor** [1] - 9:20
**Honor** [42] - 3:7, 3:11,
3:19, 3:23, 4:1, 4:12,
9:18, 21:18, 21:24,
23:22, 23:24, 24:6,
26:4, 26:6, 26:9,
29:9, 30:9, 30:16,
30:21, 34:25, 35:25,
36:13, 38:2, 40:16,
40:19, 41:8, 43:8,
45:19, 45:24, 46:3,
46:25, 50:14, 60:17,
65:5, 67:19, 67:21,
72:5, 80:3, 82:23,
84:21, 85:22, 90:11
**HONORABLE** [1] - 1:8
**hope** [10] - 14:14,
21:1, 26:10, 71:19,
75:21, 76:15, 79:7,
90:17, 92:24, 93:4
**hopefully** [2] - 75:17,
76:21
**HOROWITZ** [10] - 2:2,
4:1, 30:16, 60:17,
67:19, 79:24, 82:2,
82:22, 84:12, 93:6
**Horowitz** [1] - 4:2
**Hospital** [1] - 79:2
**hospital** [4] - 80:8,
82:6, 86:16, 87:12
**hourly** [3] - 40:25,
62:2, 78:4
**hours** [7] - 25:1,
29:15, 56:23, 62:2,
69:15, 72:21, 89:12

**House** [1] - 18:10
**housing** [1] - 48:7
**Housing** [1] - 48:8
**Howell** [1] - 81:12
**humbly** [1] - 75:3
**hundreds** [4] - 12:2,
19:8, 55:18, 63:15
**Huvelle** [9] - 4:20, 6:1,
6:15, 6:17, 7:2, 7:21,
16:4, 17:7
**Huvelle's** [1] - 16:12

## I

**i.e** [1] - 2:19
**ID** [1] - 69:13
**idea** [2] - 52:8, 81:24
**identified** [2] - 69:12,
80:10
**identifying** [1] - 64:22
**identity** [1] - 15:24
**ignored** [1] - 15:23
**iii** [1] - 40:3
**ill** [1] - 51:19
**ill-served** [1] - 51:19
**illegal** [2] - 11:11,
52:16
**Illinois** [2] - 52:7,
65:17
**imagine** [1] - 89:1
**immunity** [1] - 14:23
**impact** [2] - 22:24,
28:2
**impermissible** [1] -
57:17
**important** [13] - 12:7,
12:8, 17:8, 21:14,
23:4, 25:20, 44:5,
44:21, 67:15, 91:3,
91:12, 93:18, 93:25
**improper** [1] - 44:1
**inadvertently** [1] -
71:15
**inapplicable** [1] - 78:5
**inappropriate** [4] -
43:23, 51:9, 82:25,
85:7
**incentive** [4] - 56:11,
56:17, 57:16, 87:4
**inception** [4] - 4:21,
26:18, 28:9, 32:7
**include** [2] - 62:2,
62:3
**included** [3] - 37:24,
46:23, 88:5
**includes** [7] - 19:13,
19:14, 19:15, 19:16,
37:5, 37:15, 47:19
**including** [7] - 8:12,
19:13, 21:16, 24:17,

40:12, 65:23, 91:22
**income** [1] - 26:25
**incorrect** [4] - 59:13, 70:5, 70:10, 70:14
**increased** [1] - 61:5
**incur** [2] - 47:20, 49:10
**incurred** [6] - 7:19, 23:19, 24:15, 25:23, 61:3, 87:8
**indeed** [1] - 13:7
**indicate** [3] - 10:21, 53:2, 53:6
**indicated** [2] - 36:19, 50:3
**indicates** [2] - 42:1, 42:4
**indicating** [1] - 69:2
**indicating)** [1] - 95:3
**indiscernible)** [1] - 29:10
**individual** [7] - 12:18, 19:21, 24:18, 25:19, 34:2, 63:25, 94:18
**individuals** [4] - 33:16, 70:4, 70:10, 70:20
**inequitable** [1] - 33:6
**inequitably** [1] - 38:23
**inflation** [1] - 72:21
**inform** [1] - 23:5
**informal** [1] - 32:15
**information** [16] - 5:3, 7:20, 23:4, 23:5, 25:18, 31:7, 33:22, 44:22, 53:11, 53:12, 54:19, 55:15, 55:16, 76:15, 80:25, 83:16
**informative** [1] - 93:17
**informed** [2] - 13:6, 32:16
**inhibit** [1] - 13:19
**initial** [3] - 80:19, 81:21, 82:14
**injunctive** [1] - 14:19
**injury** [2] - 85:24
**ink** [1] - 75:9
**input** [1] - 25:13
**inquiries** [2] - 19:21, 25:17
**inquiry** [1] - 25:19
**instance** [1] - 33:25
**instituted** [1] - 47:12
**institutional** [2] - 34:18, 34:21
**institutions** [4] - 15:13, 15:17, 56:14, 94:1
**intensive** [1] - 85:25
**intent** [2] - 34:8, 36:19

**interest** [9] - 18:6, 19:20, 22:17, 27:15, 27:24, 34:1, 39:1, 39:2, 89:16
**interested** [1] - 5:17
**interesting** [1] - 50:21
**interests** [6] - 23:3, 26:25, 31:1, 72:20, 89:14, 89:16
**interference** [1] - 2:19
**internal** [1] - 69:2
**introduce** [2] - 10:21, 44:2
**invalid** [1] - 70:25
**invoices** [1] - 46:14
**involved** [5] - 18:1, 20:3, 28:8, 31:24, 91:10
**involves** [1] - 94:1
**involving** [1] - 79:19
**ironic** [1] - 38:24
**irrelevant** [1] - 76:10
**Isaacson** [6] - 4:10, 21:16, 36:7, 36:15, 45:20, 49:24
**ISAACSON** [24] - 2:7, 4:7, 4:9, 36:13, 38:2, 39:24, 40:2, 40:8, 40:16, 40:19, 41:22, 41:25, 43:8, 43:11, 45:13, 45:18, 84:21, 85:2, 85:14, 85:17, 85:22, 87:1, 89:19, 90:10
**isaacson** [13] - 51:25, 57:4, 61:20, 65:16, 66:12, 73:3, 84:13, 84:14, 90:12, 90:24, 91:18, 92:19, 93:14
**Isaacson's** [1] - 50:20
**isaacson's** [5] - 51:2, 51:7, 54:6, 55:23, 92:14
**issue** [11] - 13:20, 48:8, 52:21, 52:24, 52:25, 54:10, 55:25, 58:11, 60:20, 67:15, 92:22
**issues** [10] - 13:24, 14:2, 22:24, 45:16, 48:7, 52:18, 58:8, 63:6, 71:25, 76:7
**itself** [5] - 7:4, 12:4, 17:15, 80:14, 90:21

**J**

**J.T** [1] - 81:11
**Jake** [4] - 10:23, 11:1, 21:22, 22:2

**Jiggets** [1] - 50:1
**job** [4] - 30:4, 39:1, 63:5, 94:7
**John** [1] - 10:8
**joined** [1] - 11:7
**joining** [1] - 11:15
**Jolla** [1] - 2:8
**Jonathan** [1] - 3:24
**JONATHAN** [2] - 1:11, 1:15
**Journal** [1] - 86:14
**journalists** [1] - 19:14
**judge** [7] - 5:7, 6:18, 28:10, 28:24, 44:6, 44:15, 94:19
**JUDGE** [1] - 1:9
**Judge** [20] - 4:19, 4:20, 6:1, 6:15, 6:16, 7:2, 7:21, 12:11, 16:3, 16:12, 17:7, 49:18, 52:23, 81:10, 81:12, 86:10, 92:2, 94:17, 95:3
**Judges** [1] - 95:5
**judges** [10] - 15:25, 16:19, 32:17, 42:21, 81:4, 86:10, 86:12, 92:5, 94:20, 94:23
**judgment** [1] - 17:4
**Judicial** [3] - 15:8, 18:18, 34:15
**judicial** [6] - 15:12, 15:16, 17:13, 33:13, 72:23, 78:2
**Judiciary** [1] - 18:17
**judiciary** [10] - 14:5, 14:12, 14:18, 15:2, 15:5, 15:10, 16:7, 17:4, 22:20, 34:9
**July** [1] - 49:2
**jump** [2] - 18:7, 72:6
**jump-started** [1] - 18:7
**jurisdiction** [2] - 14:21, 14:22
**jurisdictional** [2] - 18:22, 19:7
**juror** [2] - 7:12, 7:13
**Justice** [13] - 2:3, 4:16, 6:4, 11:2, 15:10, 15:21, 21:23, 22:10, 22:15, 25:7, 68:3, 94:8, 94:9
**justice** [5] - 11:2, 13:19, 22:3, 22:21, 51:24
**Justices** [1] - 94:8
**justification** [1] - 80:20
**justified** [2] - 33:25,

34:1
**justifies** [1] - 58:2

**K**

**KCC** [2] - 20:6, 20:12
**keep** [1] - 11:19
**Kelly** [1] - 11:4
**kind** [16] - 8:2, 12:12, 52:7, 54:9, 56:6, 57:7, 63:3, 66:3, 73:18, 74:6, 76:21, 79:17, 85:10, 91:8, 91:13, 92:21
**kinds** [2] - 42:12, 73:20
**King** [1] - 79:14
**known** [1] - 24:10
**Kozich** [8] - 45:25, 46:2, 49:19, 49:25, 58:11, 60:24, 93:15
**KOZICH** [9] - 2:14, 45:24, 46:3, 46:25, 47:2, 67:21, 67:23, 68:2, 68:16
**Kozich's** [2] - 58:14, 60:25

**L**

**labor** [1] - 85:25
**lack** [2] - 14:21, 42:22
**Laffey** [1] - 42:11
**landmark** [5] - 17:3, 17:17, 30:20, 31:9, 75:1
**language** [2] - 77:13, 78:19
**large** [15] - 17:10, 37:16, 38:4, 38:5, 38:13, 38:14, 38:15, 38:21, 40:23, 49:8, 51:25, 79:19, 89:13, 91:15
**largely** [1] - 24:21
**larger** [3] - 38:20, 89:4, 89:5
**largest** [4] - 19:14, 34:13, 37:5, 37:6
**last** [9] - 11:14, 21:17, 22:4, 23:10, 29:16, 29:22, 30:3, 36:8, 67:12
**late** [5] - 20:25, 36:22, 69:16, 70:25, 94:15
**laughed** [1] - 15:15
**law** [42] - 5:1, 5:22, 16:14, 19:13, 19:14, 21:8, 24:19, 24:24, 25:1, 26:22, 27:5,

27:6, 37:5, 37:6, 37:13, 37:23, 38:4, 38:7, 42:15, 44:19, 49:8, 51:25, 52:13, 53:20, 54:24, 56:19, 57:18, 62:1, 62:25, 65:8, 65:22, 66:8, 66:15, 67:13, 80:5, 82:9, 83:8, 83:23, 84:3, 89:2, 89:6, 93:24
**Law** [8] - 2:13, 4:16, 11:16, 26:8, 26:17, 26:19, 28:8, 29:19
**laws** [2] - 27:7, 27:20
**lawsuit** [1] - 47:23
**lawyer** [2] - 13:25, 69:5
**lawyers** [5] - 5:1, 14:10, 39:8, 40:22, 58:1, 72:20, 91:5, 94:5
**lawyers'** [2] - 5:23, 94:11
**lead** [1] - 27:14
**leadership** [1] - 94:7
**leading** [1] - 11:17
**leads** [1] - 82:15
**least** [7] - 11:14, 14:6, 19:9, 43:5, 64:24, 81:24, 83:9
**led** [1] - 16:11
**left** [1] - 74:6
**legal** [20] - 15:7, 23:10, 26:22, 27:15, 27:24, 28:4, 31:10, 37:25, 52:14, 54:5, 54:7, 54:8, 56:1, 57:5, 57:15, 57:22, 61:19, 61:20, 62:8, 65:6
**LEGAL** [1] - 1:2
**Legal** [9] - 2:12, 3:3, 4:15, 11:5, 11:8, 23:25, 24:9, 26:20, 86:14
**legislation** [2] - 18:19, 18:20
**legislative** [2] - 6:11, 18:7
**legislature** [1] - 16:11
**legitimate** [4] - 6:8, 7:7, 7:9, 32:20
**legwork** [1] - 83:19
**Lending** [1] - 27:17
**length** [7] - 7:25, 13:6, 31:18, 32:2, 39:4, 74:11, 80:9
**less** [7] - 8:4, 47:7, 47:8, 48:4, 59:8,

68:5, 82:5
**lesser** [2] - 59:20,
59:23
**letting** [1] - 64:5
**level** [2] - 15:25
**liability** [1] - 16:4
**liaison** [1] - 53:13
**libraries** [1] - 16:21
**life** [2] - 16:10, 23:20
**light** [2] - 16:8, 47:6
**limitations** [4] - 2:18,
18:23, 19:7, 54:25
**limited** [2] - 7:18,
27:25
**limits** [1] - 23:5
**line** [9] - 8:24, 20:8,
44:6, 44:9, 57:24,
58:7, 71:2
**litigants** [3] - 19:17,
21:10, 72:23
**litigating** [1] - 34:22
**Litigation** [3] - 2:11,
2:13, 14:1
**litigation** [40] - 11:8,
11:15, 12:3, 13:4,
13:9, 13:15, 13:21,
14:6, 14:7, 14:11,
14:18, 14:20, 14:25,
15:18, 15:20, 18:4,
18:22, 23:11, 24:9,
25:9, 25:15, 26:7,
28:2, 29:23, 31:2,
31:13, 31:25, 32:5,
32:14, 35:7, 35:11,
44:12, 45:9, 51:17,
72:22, 73:20, 81:5,
81:9
**litigator** [1] - 19:13
**lives** [2] - 94:11, 94:12
**LLC** [1] - 1:19
**LLP** [1] - 1:12
**lodestar** [49] - 41:1,
41:12, 41:15, 41:22,
42:4, 42:5, 42:6,
42:9, 42:16, 42:17,
42:18, 42:20, 43:6,
43:19, 44:7, 44:24,
45:8, 72:1, 72:2,
72:9, 75:8, 75:14,
75:17, 76:9, 77:10,
77:19, 78:8, 78:17,
80:12, 80:21, 81:1,
81:2, 81:23, 81:24,
83:7, 84:1, 86:4,
86:5, 86:7, 86:13,
88:12, 88:15, 88:16,
88:20, 89:21, 92:15
**lodged** [1] - 34:17
**log** [1] - 69:2
**logical** [2] - 50:5,

61:16
**long-standing** [2] -
33:13, 52:14
**look** [8] - 40:25, 51:22,
76:10, 78:15, 84:18,
88:25, 92:13, 94:21
**looking** [5] - 28:21,
48:6, 75:5, 75:19,
75:20
**looks** [1] - 81:9
**Loper** [2] - 10:12, 69:4
**LOPER** [1] - 1:18
**lost** [2] - 46:17, 49:5
**LOTH** [1] - 95:18
**Loth** [2] - 2:15, 95:24
**love** [1] - 28:15
**low** [2] - 26:25, 39:11
**low-income** [1] -
26:25
**lower** [2] - 84:4, 87:18

## M

**machine** [1] - 2:21
**maintain** [1] - 27:10
**maintenance** [1] -
34:12
**majority** [3] - 17:18,
34:12, 38:6
**management** [2] - 7:6,
88:23
**mandates** [1] - 47:3
**manner** [2] - 20:4,
24:12, 95:22
**manuals** [1] - 27:5
**marginal** [1] - 47:4
**margins** [1] - 47:4
**market** [2] - 23:21,
81:8
**marriage** [1] - 34:21
**Mashburn** [1] - 87:13
**Massachusetts** [2] -
29:17, 44:13
**master** [1] - 94:21
**materials** [1] - 27:11
**matrix** [4] - 42:10,
42:11, 81:2, 88:6
**Matrix** [1] - 42:11
**matter** [14] - 9:19,
12:9, 37:25, 52:11,
52:19, 54:5, 56:24,
62:9, 62:25, 65:6,
65:8, 80:13, 89:21
**matters** [1] - 90:6
**maximize** [1] - 89:3
**maximizes** [1] - 89:14
**Mayorkas** [1] - 81:10
**mean** [7] - 57:10,
69:15, 79:6, 82:24,
87:15, 88:4, 92:4

**means** [1] - 37:19
**measure** [5] - 18:3,
18:16, 21:11, 51:5,
51:13
**mechanics** [1] - 10:14
**media** [3] - 16:20,
16:22, 19:15
**mediation** [1] - 31:25
**mediator** [1] - 32:4
**meets** [2] - 12:23,
31:10
**Meghan** [4] - 3:13,
3:21, 10:11, 10:16
**MEGHAN** [1] - 1:18
**member** [16] - 17:21,
19:23, 20:2, 20:18,
22:17, 22:22, 32:25,
36:15, 46:10, 46:18,
53:25, 59:19, 59:21,
61:9, 69:1
**members** [24] - 10:1,
12:17, 13:11, 18:3,
18:25, 19:1, 19:9,
19:21, 20:5, 25:19,
30:18, 30:23, 31:9,
31:20, 33:2, 33:24,
37:2, 38:17, 38:22,
39:2, 44:8, 73:22,
75:1, 91:2
**mention** [2] - 56:5,
81:15
**mentioned** [15] -
12:15, 17:2, 18:24,
20:24, 32:7, 52:24,
61:6, 63:14, 65:12,
66:13, 68:25, 74:2,
86:16, 88:3, 91:12
**mentions** [1] - 73:21
**Mercier** [3] - 81:17,
88:3
**merely** [1] - 86:9
**met** [1] - 51:5
**method** [1] - 80:6
**MEYERS** [1] - 2:10
**Meyers** [2] - 4:3, 5:10
**microphone** [3] -
3:16, 10:24, 54:13
**middle** [3] - 6:5, 6:17,
16:4
**might** [13] - 8:5, 11:22,
14:11, 52:10, 56:18,
59:3, 65:7, 73:5,
78:11, 87:13, 91:3,
91:25, 95:2
**miles** [1] - 47:6
**military** [1] - 25:4
**mill** [1] - 75:6
**Miller** [2] - 50:1, 66:9
**Miller's** [2] - 50:23,
50:25

**million** [9] - 17:20,
32:24, 41:5, 74:21,
82:13, 82:15, 82:24
**millions** [1] - 15:11
**mind** [2] - 43:5, 74:3
**minded** [1] - 15:17
**minimal** [1] - 89:11
**minimum** [10] - 38:13,
38:14, 38:15, 38:17,
38:20, 39:12, 50:24,
59:19, 67:7, 89:10
**minutes** [6] - 9:4, 9:7,
9:9, 9:13, 61:14,
61:15
**Mirola** [1] - 2:7
**misled** [1] - 71:15
**misread** [1] - 68:6
**misreading** [1] - 59:14
**misrepresents** [1] -
87:16
**missed** [2] - 52:5,
71:16
**Mississippi** [1] - 7:10
**misspoke** [1] - 68:23
**misunderstanding** [1]
- 60:2
**misunderstood** [2] -
71:14, 90:18
**modern** [2] - 51:14,
57:16
**modern-day** [1] -
57:16
**modest** [1] - 58:2
**moliver@motleyrice.
com** [1] - 1:21
**moment** [2] - 31:22,
86:15
**momentarily** [1] - 33:5
**monetary** [1] - 15:2
**money** [12] - 14:13,
18:2, 19:16, 44:17,
46:7, 47:8, 48:23,
49:10, 49:14, 49:17,
88:25, 94:1
**months** [1] - 16:15
**Moore** [1] - 79:14
**moreover** [1] - 34:9
**morning** [24] - 3:7,
3:9, 3:11, 3:19, 3:23,
4:1, 4:6, 4:7, 4:10,
4:13, 9:18, 10:5,
11:18, 21:24, 21:25,
22:1, 24:3, 28:22,
30:16, 36:12, 36:13,
43:1, 93:14, 94:15
**most** [10] - 17:25,
22:25, 39:8, 44:8,
49:9, 78:20, 78:21,
88:24, 89:13, 95:8
**mostly** [1] - 7:15

**motion** [6] - 8:10,
16:6, 23:13, 35:19,
35:22, 43:25
**motions** [3] - 94:17,
95:1
**motivation** [1] - 29:10
**Motley** [7] - 1:19, 3:12,
3:20, 3:21, 10:11,
10:13, 10:16
**mounting** [1] - 15:7
**mouth** [1] - 57:2
**move** [6] - 35:11,
68:21, 71:22, 90:4,
90:8
**moving** [1] - 32:5
**MR** [103] - 3:7, 3:11,
3:19, 3:23, 4:7, 4:9,
9:18, 11:1, 18:13,
19:25, 20:2, 20:13,
20:16, 21:3, 21:18,
21:22, 21:24, 22:1,
22:6, 22:9, 23:24,
26:6, 26:9, 26:12,
28:14, 28:17, 29:2,
29:9, 30:13, 36:13,
38:2, 39:24, 40:2,
40:8, 40:16, 40:19,
41:22, 41:25, 43:8,
43:11, 45:13, 45:18,
45:24, 46:3, 46:25,
47:2, 50:14, 50:18,
53:5, 53:13, 53:21,
54:1, 54:5, 54:8,
55:22, 56:3, 56:9,
56:15, 56:25, 58:11,
59:13, 60:7, 60:13,
60:16, 63:7, 65:5,
65:15, 66:11, 66:19,
66:23, 67:3, 67:21,
67:23, 68:2, 68:16,
72:5, 73:13, 73:15,
73:18, 74:9, 76:1,
76:4, 77:2, 77:8,
77:11, 77:16, 78:1,
78:24, 79:6, 79:10,
79:23, 84:21, 85:2,
85:14, 85:17, 85:22,
87:1, 89:19, 90:10,
90:14, 91:1, 92:7,
92:12
**MS** [31] - 3:21, 4:1,
24:3, 24:6, 30:16,
54:15, 60:17, 63:13,
63:24, 64:11, 64:13,
64:17, 65:1, 67:19,
68:22, 68:25, 69:21,
69:24, 70:8, 70:19,
71:5, 71:7, 71:11,
71:17, 71:19, 71:21,
79:24, 82:2, 82:22,

84:12, 93:6
**Mt** [1] - 1:20
**multiple** [2] - 20:3, 61:3
**multiplier** [5] - 75:20, 83:24, 88:10, 88:16, 89:13
**must** [6] - 4:19, 17:17, 18:12, 28:9, 31:1, 86:18
**muster** [1] - 16:18

## N

**name** [4] - 22:2, 22:4, 24:7, 86:15
**named** [7] - 23:7, 25:10, 25:16, 26:17, 56:8, 56:12, 79:6
**Narwold** [5] - 3:12, 3:20, 10:11, 60:6, 74:4
**NARWOLD** [3] - 1:22, 3:11, 3:19
**Nathan** [1] - 92:2
**nation** [1] - 15:16
**national** [5] - 22:15, 24:11, 26:21, 28:3, 28:4
**National** [15] - 2:12, 2:13, 3:3, 4:15, 11:5, 11:8, 11:16, 23:25, 24:9, 26:7, 26:16, 26:19, 28:7, 29:19
**NATIONAL** [1] - 1:2
**nationwide** [1] - 16:7
**nature** [2] - 13:15, 25:8
**NCLC** [3] - 27:3, 27:4, 29:23
**necessarily** [1] - 12:3
**necessary** [5] - 8:3, 14:10, 41:9, 41:17, 75:22
**need** [16] - 8:15, 18:6, 30:24, 34:23, 40:21, 41:16, 43:14, 45:10, 45:11, 50:7, 77:23, 88:11, 93:9, 93:16, 94:12
**needed** [1] - 7:18
**needs** [3] - 43:13, 86:5, 93:4
**negotiated** [4] - 31:18, 32:2, 38:15, 83:15
**negotiation** [7] - 8:1, 13:6, 31:25, 32:20, 73:8, 74:2, 74:11
**negotiations** [3] - 38:25, 39:4, 51:11

**net** [4] - 48:16, 48:18, 48:21
**never** [5] - 10:6, 14:4, 15:22, 46:6
**new** [7] - 16:10, 69:20, 69:21, 71:3, 71:4, 71:9, 85:8
**New** [2] - 29:5, 92:2
**next** [1] - 23:24
**night** [2] - 21:17, 36:8
**nobody** [1] - 64:12
**noncommercial** [1] - 18:19
**none** [5] - 20:9, 21:10, 50:2, 50:3, 91:16
**nonprofit** [3] - 24:11, 26:23, 27:24
**nonprofits** [2] - 49:9, 49:16
**normal** [1] - 42:16
**North** [1] - 1:12
**Northern** [3] - 52:7, 65:17, 86:11
**notable** [1] - 17:25, 91:17
**note** [2] - 88:17, 89:20
**noted** [5] - 13:22, 32:3, 32:17, 34:19, 81:3
**notes** [3] - 33:16, 84:17, 95:19
**nothing** [5] - 5:8, 33:6, 58:18, 93:6, 95:2
**notice** [22] - 10:15, 12:6, 12:16, 12:18, 12:19, 52:22, 69:19, 70:5, 70:10, 70:14, 70:15, 70:16, 70:20, 73:22, 77:18, 77:25, 80:12, 85:3, 85:5, 85:8, 85:9, 85:11
**notices** [7] - 8:12, 8:14, 62:10, 62:13, 63:14, 63:15, 63:16
**noticing** [1] - 7:8
**notification** [10] - 7:11, 54:16, 54:17, 54:18, 55:12, 63:18, 63:19, 63:20, 64:5
**notifications** [9] - 55:1, 55:6, 55:7, 55:18, 55:19, 55:20, 63:24, 64:18, 64:20
**notified** [5] - 5:4, 5:15, 64:21
**notify** [1] - 55:3
**notifying** [3] - 54:20, 55:7, 63:25
**noting** [1] - 17:6
**notion** [1] - 72:25,

85:10, 87:25
**null** [1] - 95:21
**number** [13] - 19:10, 20:14, 21:5, 36:7, 49:3, 56:22, 69:3, 69:4, 69:11, 76:7, 79:13
**numerous** [3] - 8:17, 16:20, 68:25
**NVLSP** [7] - 24:10, 24:16, 24:25, 25:10, 25:16, 25:23, 26:2
**NW** [3] - 1:12, 1:16, 2:4

## O

**object** [1] - 85:9
**objected** [1] - 56:4
**objecting** [4] - 46:21, 46:22, 85:6, 91:17
**objection** [12] - 36:16, 37:7, 46:1, 50:20, 50:23, 51:7, 52:8, 55:23, 57:4, 65:16, 91:24
**objections** [18] - 9:10, 12:21, 19:10, 20:8, 20:15, 20:16, 20:24, 21:15, 34:20, 36:9, 44:4, 49:24, 50:2, 50:6, 50:11, 50:19, 50:22, 61:12
**objector** [4] - 4:11, 73:3, 90:7, 91:23
**Objector** [1] - 2:14
**objectors** [11] - 8:18, 9:6, 21:12, 33:23, 34:17, 45:21, 45:22, 49:20, 49:25, 60:8, 68:19
**obligations** [1] - 90:25
**obtain** [2] - 14:16, 24:23
**obtained** [1] - 16:6
**obviously** [1] - 27:7
**occasions** [1] - 30:3
**occur** [1] - 52:21
**occurred** [3] - 12:18, 13:10, 57:7
**October** [2] - 1:5, 8:20
**odds** [3] - 15:7, 18:5, 88:1
**OF** [3] - 1:1, 1:5, 1:8
**Office** [12] - 2:10, 4:4, 6:3, 6:6, 15:20, 16:9, 32:12, 35:4, 47:18, 94:3, 94:4, 94:10
**office** [3] - 5:15, 69:5, 94:24

**Office's** [2] - 33:12, 34:1
**Official** [1] - 2:16
**official** [1] - 95:25
**often** [3] - 6:22, 51:25, 88:17
**old** [1] - 94:16
**older** [1] - 85:8
**OLIVER** [21] - 1:18, 3:21, 54:15, 63:13, 63:24, 64:11, 64:13, 64:17, 65:1, 68:22, 68:25, 69:21, 69:24, 70:8, 70:19, 71:5, 71:7, 71:11, 71:17, 71:19, 71:21
**Oliver** [17] - 3:13, 3:21, 10:11, 10:16, 21:4, 36:5, 50:9, 53:13, 53:19, 54:10, 54:13, 61:17, 61:24, 63:9, 68:19, 74:4, 93:9
**once** [6] - 44:19, 55:6, 55:9, 59:25, 63:24
**one** [67] - 12:1, 12:10, 14:11, 19:9, 20:17, 20:21, 25:10, 33:9, 33:23, 36:8, 37:3, 38:12, 38:19, 38:23, 39:22, 40:14, 43:18, 44:19, 46:4, 46:9, 47:7, 47:8, 47:13, 47:14, 54:16, 55:25, 58:16, 59:2, 61:22, 62:7, 62:12, 62:16, 63:5, 65:21, 66:1, 67:12, 71:25, 73:3, 74:16, 75:10, 76:8, 76:16, 77:21, 78:4, 79:4, 79:9, 79:11, 80:7, 81:14, 81:20, 84:22, 84:23, 85:23, 86:1, 87:3, 87:17, 87:18, 88:4, 89:1, 89:4, 90:24, 91:20, 91:21, 91:25, 92:5, 95:5
**one-third** [4] - 74:16, 84:23, 85:23, 86:1
**ones** [5] - 34:19, 50:11, 70:6, 79:6, 90:3
**open** [1] - 15:17
**opening** [6] - 9:5, 30:1, 30:2, 30:13, 32:8, 60:21
**openings** [1] - 9:17
**operation** [1] - 7:3
**opinion** [8] - 6:9, 6:13,

6:19, 7:22, 17:3, 39:16, 78:14, 92:8
**opinions** [1] - 90:2
**opportunity** [14] - 12:6, 30:17, 69:16, 69:18, 69:20, 69:24, 70:2, 70:3, 70:11, 70:16, 70:17, 70:24, 71:1, 71:16
**Opportunity** [1] - 27:19
**oppose** [1] - 82:23
**opposed** [5] - 19:2, 34:20, 49:7, 49:13, 50:22
**opposite** [2] - 51:3, 66:15
**opt** [27] - 20:25, 21:6, 36:6, 50:9, 61:17, 61:18, 68:22, 68:23, 68:24, 69:10, 69:11, 69:16, 69:18, 69:20, 69:24, 70:2, 70:3, 70:5, 70:11, 70:16, 70:17, 70:24, 70:25, 71:1, 71:16, 85:4
**opt-out** [1] - 36:6
**opt-outs** [9] - 21:6, 50:9, 61:17, 68:22, 68:23, 68:24, 69:10, 69:11, 70:25
**opted** [1] - 71:10
**order** [9] - 8:9, 8:20, 9:2, 24:23, 27:10, 27:16, 33:20, 36:17, 58:5
**orders** [2] - 5:14, 8:21
**ordinarily** [1] - 44:2
**ordinary** [2] - 56:21, 56:22
**Oregon** [1] - 48:9
**organization** [10] - 22:16, 22:22, 24:12, 24:16, 26:20, 26:24, 27:9, 28:3, 28:4, 28:19
**organizations** [11] - 16:20, 19:15, 20:10, 22:17, 22:23, 23:2, 27:14, 27:15, 27:24, 27:25, 28:5
**organized** [1] - 77:4
**orientation** [1] - 76:21
**originally** [2] - 4:18, 26:20
**Ortiz** [3] - 51:15, 66:16, 66:19
**otherwise** [3] - 35:5, 50:3, 91:3
**ought** [1] - 42:4

**ourselves** [1] - 27:10
**out-of-court** [1] - 90:5
**outcome** [2] - 18:21, 30:6
**outlasted** [1] - 28:10
**outlays** [1] - 87:8
**outs** [9] - 21:6, 50:9, 61:17, 68:22, 68:23, 68:24, 69:10, 69:11, 70:25
**outset** [1] - 90:17
**outside** [1] - 72:10
**outstanding** [4] - 30:4, 31:8, 61:7, 75:1
**overall** [1] - 24:21
**overcharged** [1] - 17:5
**overcharging** [1] - 15:5
**oversaw** [1] - 23:11
**overwhelmingly** [1] - 72:16
**owe** [1] - 68:10
**owed** [1] - 49:1
**own** [4] - 14:7, 28:2, 63:23, 79:3
**ownership** [1] - 27:1

**P**

**p.m** [2] - 5:21, 95:15
**Pacer** [88] - 4:18, 4:24, 4:25, 5:17, 5:25, 7:4, 7:17, 13:17, 13:24, 14:8, 14:9, 16:10, 16:15, 16:17, 16:25, 17:1, 17:18, 17:19, 17:22, 18:7, 18:15, 18:19, 19:6, 22:23, 25:15, 27:4, 27:10, 27:16, 27:23, 34:5, 34:12, 34:14, 37:8, 37:10, 37:11, 37:14, 37:16, 37:20, 37:25, 46:6, 46:11, 46:13, 46:15, 46:17, 47:3, 47:11, 47:12, 47:20, 48:2, 48:4, 48:5, 48:11, 48:12, 48:13, 48:16, 49:1, 49:4, 52:2, 52:17, 53:2, 53:6, 54:20, 54:22, 55:3, 55:5, 55:8, 55:13, 58:16, 58:18, 58:23, 59:7, 59:21, 59:22, 62:5, 64:1, 64:6, 64:19, 64:22, 68:3, 68:8, 68:9, 68:11, 93:22, 94:6
**Pacer-fee** [2] - 14:8,

19:6
**page** [9] - 47:8, 47:15, 47:18, 48:2, 52:6, 59:4, 59:15, 92:3, 92:13
**paid** [37] - 15:11, 17:22, 17:23, 32:25, 33:2, 34:7, 44:17, 52:17, 53:2, 53:6, 54:20, 54:23, 55:3, 55:5, 55:8, 55:13, 59:7, 59:8, 59:10, 59:12, 59:21, 60:1, 61:8, 62:6, 64:1, 64:6, 64:19, 64:22, 65:8, 66:4, 67:9, 67:16, 68:3, 68:5, 68:8, 88:24, 89:13
**paper** [3] - 5:7, 47:20, 70:23
**papers** [5] - 20:23, 39:16, 60:9, 60:11, 60:12
**paragraph** [4] - 6:19, 59:16, 73:21, 74:20
**paraphrase** [1] - 53:24
**pardon** [2] - 85:14, 86:21
**part** [13] - 14:24, 21:14, 32:19, 38:10, 39:23, 44:8, 44:10, 48:16, 64:13, 68:4, 69:25, 70:22, 85:20
**participate** [2] - 9:1, 17:12
**participating** [3] - 12:3, 56:11, 73:23
**particular** [5] - 26:15, 51:7, 54:24, 83:12, 86:25
**particularly** [2] - 10:16, 13:8
**parties** [18] - 6:14, 8:17, 9:3, 11:24, 30:17, 31:21, 32:3, 32:4, 32:15, 32:19, 33:12, 34:19, 35:13, 67:6, 72:21, 73:8, 83:14, 90:24
**parties'** [4] - 31:6, 32:3, 33:10, 34:22
**partner** [1] - 62:1
**partnered** [1] - 26:20
**party** [2] - 53:25, 95:22
**passed** [4] - 18:10, 18:14, 18:15, 54:23
**passing** [1] - 66:4
**passing-off** [1] - 66:4
**past** [1] - 17:19

**path** [2] - 13:21, 16:4
**PAUL** [1] - 1:8
**pay** [16] - 5:18, 19:1, 37:9, 46:11, 46:13, 47:11, 48:4, 48:5, 48:11, 48:24, 58:18, 58:23, 59:23, 61:2, 68:9, 91:15
**payable** [1] - 4:24
**payees** [1] - 38:21
**payer** [1] - 54:18
**paying** [3] - 54:22, 59:8, 91:15
**payment** [16] - 14:14, 33:8, 38:13, 38:14, 38:15, 38:17, 38:21, 40:12, 54:16, 54:18, 55:7, 55:19, 55:20, 59:20, 64:18, 65:24
**payments** [2] - 33:7, 38:9
**payor** [1] - 64:22
**paywall** [2] - 14:8, 19:6
**pennies** [1] - 47:9
**pens** [1] - 94:14
**people** [35] - 3:15, 8:22, 8:23, 10:5, 10:18, 12:2, 12:5, 12:19, 15:5, 15:11, 17:5, 36:11, 37:20, 38:17, 46:15, 49:7, 52:11, 52:19, 52:20, 53:2, 53:6, 54:4, 57:13, 59:8, 61:18, 65:9, 68:5, 68:8, 68:11, 71:8, 93:25
**per** [4] - 47:6, 47:8, 47:14, 47:18
**percent** [33] - 17:1, 44:24, 73:11, 73:24, 74:1, 74:13, 74:14, 82:14, 82:25, 83:10, 84:1, 84:5, 84:24, 85:3, 85:4, 87:14, 87:15, 87:17, 87:18, 87:19, 87:20, 87:25, 88:1, 88:7, 88:9, 88:14, 88:15, 88:16, 88:18, 88:24, 89:12
**percentage** [35] - 41:14, 41:23, 42:15, 42:18, 42:19, 43:15, 72:1, 72:2, 72:8, 72:14, 72:16, 72:19, 72:25, 73:2, 73:6, 73:9, 74:15, 74:22, 75:19, 76:11, 76:12, 76:17, 76:20, 78:16, 80:6, 81:22, 82:21,

86:6, 86:8, 86:18, 87:8, 88:21, 89:5
**Perdue** [1] - 45:6
**perfect** [4] - 19:3, 30:24, 31:15, 34:23
**performing** [1] - 75:17
**perhaps** [4] - 80:10, 82:3, 82:5, 84:4
**period** [23] - 17:22, 23:8, 32:14, 33:1, 33:3, 46:12, 47:15, 47:23, 47:25, 48:3, 48:4, 48:17, 48:18, 49:2, 52:22, 58:17, 59:22, 61:3, 69:22, 71:4, 71:6, 71:9
**permissible** [1] - 33:24
**permits** [1] - 33:17
**permitted** [1] - 35:5
**person** [12] - 8:24, 10:2, 11:10, 36:9, 36:19, 52:15, 52:17, 58:22, 66:1, 66:2, 66:4, 69:13
**personal** [2] - 57:12, 85:24
**personally** [2] - 31:24, 69:6
**personnel** [1] - 24:13
**persons** [5] - 33:19, 33:20, 46:4, 59:7
**perspective** [1] - 94:13
**persuaded** [1] - 79:8
**persuasive** [1] - 82:8
**Pettus** [1] - 87:18
**phase** [1] - 31:25
**phone** [1] - 69:3
**photocopied** [1] - 95:21
**picked** [2] - 48:3
**piles** [2] - 94:24, 94:25
**plaintiff** [2] - 23:7, 25:16
**Plaintiffs** [1] - 1:3
**plaintiffs** [17] - 3:8, 3:20, 3:22, 3:25, 6:2, 13:12, 18:21, 25:10, 31:16, 35:25, 56:8, 56:12, 80:19, 80:24, 83:5, 83:18, 84:9
**PLAINTIFFS** [1] - 1:1
**plaintiffs'** [11] - 8:10, 9:3, 35:1, 35:19, 35:22, 38:6, 39:8, 39:10, 73:19, 82:23, 88:22
**plan** [2] - 33:6, 33:11
**players** [1] - 91:14

**pleadings** [2] - 23:14, 29:12
**Pleasant** [1] - 1:20
**pleasure** [1] - 26:13
**plenty** [1] - 11:10
**PLLC** [1] - 1:15
**plus** [1] - 20:15
**pocket** [1] - 72:13
**podium** [2] - 3:5, 3:18
**point** [28] - 10:7, 21:1, 21:7, 27:8, 36:5, 36:6, 37:22, 51:23, 58:6, 59:15, 65:18, 65:19, 65:20, 65:21, 66:7, 66:8, 66:11, 66:12, 66:22, 67:4, 67:9, 67:12, 67:18, 68:8, 68:20, 79:7, 79:12, 81:14
**pointed** [4] - 75:13, 83:23, 85:18, 85:19
**pointing** [1] - 93:2
**points** [5] - 51:25, 61:4, 78:10, 84:14, 84:18
**policy** [1] - 33:13
**portfolio** [1] - 89:6
**portion** [2] - 13:23, 62:4
**position** [13] - 23:10, 35:2, 35:6, 38:13, 39:7, 51:11, 53:14, 76:10, 76:13, 81:22, 83:3, 84:8, 84:9
**positions** [3] - 9:14, 34:22, 51:6
**possesses** [1] - 66:5
**possible** [4] - 14:20, 30:25, 53:8, 88:25
**possibly** [1] - 81:24
**potential** [3] - 13:9, 52:25, 65:7
**practical** [5] - 62:10, 62:23, 63:3, 63:9, 63:13
**practice** [4] - 23:3, 89:6, 89:8, 93:24
**Practices** [1] - 27:19
**practices** [1] - 23:13
**preceding** [1] - 36:18
**precisely** [3] - 51:3, 65:19, 75:10
**prefer** [1] - 72:16
**preferable** [1] - 39:7
**preferred** [1] - 80:6
**prefers** [1] - 29:7
**prejudge** [1] - 7:25
**prejudging** [1] - 92:4
**preliminarily** [1] - 9:15
**preliminary** [2] - 8:10,

12:14
**PRESENT** [1] - 2:10
**present** [4] - 9:14, 9:20, 27:22, 46:18
**presentation** [1] - 91:4
**presentations** [2] - 4:11, 93:13
**presented** [1] - 49:1
**preserves** [1] - 22:21
**presided** [1] - 15:9
**press** [1] - 19:20
**presume** [1] - 45:3
**presumption** [1] - 92:15
**presumptions** [1] - 45:2
**presumptively** [2] - 45:7, 45:8
**presumptuous** [1] - 58:4
**pretty** [5] - 76:25, 77:2, 77:3, 80:5, 92:8
**prevailing** [1] - 72:14
**prevent** [1] - 92:19
**previous** [1] - 14:20
**previously** [1] - 25:24
**primary** [2] - 27:12, 36:24
**principal** [1] - 67:9
**principle** [4] - 31:11, 33:14, 52:14, 80:4
**principles** [1] - 35:23
**private** [1] - 26:23
**PRO** [1] - 2:7
**pro** [15] - 17:24, 19:17, 20:17, 24:21, 33:2, 33:7, 38:9, 39:12, 51:10, 51:13, 51:16, 51:18, 54:3, 59:25, 66:14
**problem** [6] - 5:19, 36:24, 37:4, 41:13, 53:9, 54:12
**problematic** [1] - 39:15
**problems** [2] - 37:1, 58:21
**procedural** [1] - 32:9
**procedurally** [1] - 9:16
**Procedure** [2] - 14:19, 39:18
**proceed** [4] - 24:21, 35:9, 35:14, 61:16
**proceeding** [1] - 95:15
**proceedings** [4] - 7:22, 8:25, 34:15, 95:19
**Proceedings** [1] -

2:21
**proceeds** [1] - 51:17
**process** [17] - 8:11, 11:21, 12:4, 12:13, 17:13, 18:2, 21:14, 37:17, 37:18, 39:5, 53:18, 55:16, 55:17, 63:16, 64:7, 64:14, 75:16
**produce** [2] - 18:21, 37:12
**produced** [1] - 2:1
**product** [2] - 13:5, 32:20
**production** [1] - 47:4
**Professor** [5] - 41:6, 66:9, 74:18, 89:25
**profit** [6] - 34:14, 48:16, 48:18, 48:21, 48:22
**PROGRAM** [1] - 1:3
**program** [1] - 22:2
**Program** [7] - 2:12, 3:3, 4:15, 11:6, 11:9, 24:1, 24:9
**programs** [1] - 11:2
**projected** [1] - 89:21
**promote** [1] - 33:21
**promoting** [1] - 72:22
**proper** [1] - 47:11
**properly** [2] - 4:24, 8:14
**properties** [1] - 48:7
**proposal** [3] - 31:18, 31:19, 32:2
**proposed** [6] - 22:11, 30:22, 39:20, 40:4, 40:11, 73:2
**prosecution** [2] - 57:8, 72:22
**proud** [2] - 22:13, 91:10
**prove** [1] - 56:21
**provide** [7] - 24:18, 27:16, 32:24, 33:19, 41:16, 73:11, 75:24
**provided** [10] - 8:9, 13:7, 23:15, 29:13, 31:7, 31:18, 40:10, 75:13, 76:14, 80:24
**provides** [1] - 32:23
**providing** [3] - 7:19, 18:19, 25:13
**Public** [1] - 14:1
**public** [25] - 7:19, 8:24, 12:8, 12:22, 13:19, 16:22, 17:10, 18:6, 19:20, 22:16, 23:4, 23:6, 24:24, 27:15, 27:24, 32:11,

33:18, 33:21, 34:2, 34:10, 34:11, 38:18, 39:1, 44:10, 94:5
**public's** [1] - 17:12
**public-interest** [1] - 27:24
**publication** [1] - 12:19
**published** [2] - 11:11, 86:13
**publisher** [1] - 27:5
**pure** [1] - 56:16
**purpose** [1] - 18:24
**purposely** [1] - 46:17
**pursuant** [1] - 69:19
**put** [10] - 5:8, 15:21, 17:10, 28:1, 43:24, 44:1, 60:18, 89:10, 89:12, 94:12
**puts** [1] - 23:2
**putting** [1] - 59:9
**puzzle** [1] - 29:6

## Q

**qualified** [1] - 14:16
**qualifies** [1] - 59:10
**quality** [1] - 91:10
**quarrel** [1] - 73:3
**quarrelling** [1] - 72:24, 73:2
**quarter** [4] - 41:4, 41:6, 43:18, 48:15
**quarterly** [2] - 16:25, 37:23
**quarters** [1] - 48:18
**questions** [29] - 9:14, 10:14, 13:1, 29:20, 30:10, 35:22, 40:14, 50:16, 53:8, 55:24, 59:1, 60:10, 61:10, 62:7, 62:15, 62:23, 63:3, 63:10, 63:13, 68:21, 72:4, 76:7, 76:19, 80:3, 81:13, 81:20, 82:18, 90:16, 93:1
**quickly** [2] - 88:25, 89:9
**quill** [1] - 94:14
**Quimby** [1] - 79:15
**quite** [6] - 4:19, 41:13, 74:24, 86:6, 88:4, 88:23, 89:15, 92:17
**quote** [3] - 17:10, 33:18, 39:20

## R

**rabble** [1] - 19:18
**rabble-rousers** [1] -

19:18
**raised** [8] - 35:22, 56:1, 56:2, 56:3, 65:16, 76:7, 78:2, 80:18
**raises** [1] - 75:8
**range** [4] - 74:18, 74:21, 74:22, 76:18
**ranges** [1] - 84:2
**rata** [12] - 17:24, 33:2, 33:7, 38:9, 39:12, 51:10, 51:13, 51:16, 51:18, 54:3, 59:25, 66:14
**rate** [4] - 29:17, 56:21, 56:22, 62:3
**rates** [8] - 23:21, 25:22, 40:25, 41:8, 78:4, 81:1, 81:2, 81:8
**rather** [1] - 25:19, 34:24, 41:14
**re** [1] - 34:14
**re-sell** [1] - 34:14
**reach** [3] - 8:3, 14:17, 62:21
**reached** [2] - 8:1, 8:15
**reaches** [1] - 49:15
**read** [17] - 6:18, 7:14, 7:24, 21:15, 40:13, 46:1, 49:23, 50:1, 59:9, 59:10, 60:11, 68:6, 77:6, 82:24, 85:19, 91:25
**reading** [4] - 6:13, 20:23, 95:4, 95:6
**real** [2] - 54:10, 54:12
**real-world** [2] - 54:10, 54:12
**realistic** [1] - 13:21
**realize** [1] - 44:5
**really** [14] - 18:16, 20:8, 29:5, 43:20, 55:22, 58:25, 60:17, 66:16, 67:13, 69:12, 79:4, 82:13, 92:25, 95:11
**reason** [9] - 32:19, 32:21, 40:21, 56:5, 57:3, 58:3, 67:11, 72:18, 79:15
**reasonable** [14] - 12:16, 30:23, 31:4, 34:24, 40:5, 40:25, 75:18, 76:12, 78:16, 80:15, 83:3, 83:8, 86:6, 88:13
**reasonableness** [2] - 76:18, 80:17
**reasoning** [2] - 6:10,

7:16
**reasons** [3] - 72:17, 79:5, 90:9
**receive** [6] - 17:23, 25:18, 28:19, 38:9, 46:7, 87:8
**received** [13] - 20:6, 23:12, 25:16, 55:12, 55:17, 55:18, 55:19, 62:11, 69:14, 70:5, 70:10, 70:14, 70:20
**receives** [1] - 34:5
**recent** [1] - 42:3
**recess** [1] - 61:21
**reciting** [1] - 90:19
**recognition** [1] - 25:4
**recognize** [1] - 10:4
**recognized** [3] - 72:11, 72:17, 81:6
**recognizes** [1] - 33:23
**recognizing** [1] - 32:5
**recommend** [1] - 92:1
**recommendation** [1] - 77:14
**recommended** [1] - 88:9
**record** [9] - 3:6, 6:25, 32:1, 44:10, 60:19, 62:17, 79:25, 80:1, 83:17
**records** [7] - 15:6, 17:11, 27:4, 29:14, 33:13, 48:9, 58:20
**recounted** [1] - 63:8
**recoup** [1] - 67:16
**recover** [1] - 89:23
**recovered** [1] - 43:18
**recoveries** [1] - 89:15
**recovery** [6] - 32:24, 73:24, 74:17, 84:24, 88:7, 89:4
**red** [1] - 91:6
**reduce** [1] - 41:10
**reduced** [1] - 83:1
**reduction** [1] - 83:21
**refer** [2] - 4:17, 60:23
**reference** [3] - 65:13, 65:15, 86:2
**referring** [1] - 81:9
**reflect** [1] - 25:8
**reflected** [2] - 25:23, 33:10
**reform** [2] - 13:21, 18:7
**refunds** [1] - 59:6
**regard** [1] - 43:13
**regarded** [1] - 88:23
**regarding** [3] - 36:17, 38:25, 48:7
**regularly** [1] - 22:23

**Rehnquist** [1] - 94:9

**reimburse** [4] - 17:18, 37:10, 52:11, 58:19

**reimbursed** [11] - 17:21, 37:8, 37:13, 37:17, 37:20, 38:18, 38:22, 39:3, 53:3, 53:24, 66:2

**reimbursement** [5] - 46:6, 52:1, 52:18, 65:7, 67:15

**reimbursing** [1] - 87:7

**rejected** [5] - 6:4, 6:16, 15:23, 91:21, 92:19

**rejects** [1] - 92:8

**related** - 25:3, 68:2

**relation** [1] - 35:1

**relative** [3] - 13:11, 31:20, 38:23

**relatively** [1] - 65:19

**relevant** [4] - 6:10, 8:4, 61:2, 88:4

**reliance** [1] - 91:19

**relied** [1] - 77:24

**relief** [6] - 13:7, 14:19, 15:3, 31:18, 33:3, 40:10

**rely** [4] - 27:6, 27:15, 87:3, 87:12

**remainder** [1] - 17:23

**remaining** [2] - 17:24, 33:1

**remand** [2] - 8:4, 13:10

**remarks** [3] - 9:5, 32:8, 60:21

**remedied** [1] - 80:22

**remember** [1] - 46:13

**remind** [1] - 49:4

**reminds** [1] - 28:22

**remotely** [5] - 10:2, 10:3, 10:6, 36:20, 91:8

**RENEE** [1] - 2:11

**Renee** [3] - 11:7, 23:25, 24:7

**reopen** [2] - 68:9, 68:11

**reply** [8] - 43:23, 44:1, 44:3, 51:12, 52:5, 80:22, 83:6, 93:4

**report** [1] - 34:14

**reported** [1] - 2:21

**reporter** [2] - 22:5, 44:14

**Reporter** [3] - 2:15, 2:16, 95:25

**Reporting** [1] - 27:18

**reports** [1] - 76:15

**represent** [4] - 21:9, 24:12, 26:25, 27:14

**representation** [4] - 24:18, 24:22, 27:16, 30:14

**representative** [2] - 26:17, 87:6

**representatives** [10] - 10:1, 10:19, 13:2, 19:1, 21:19, 51:22, 56:5, 57:17, 69:7, 73:11

**Representatives** [1] - 18:10

**representatives'** [1] - 58:1

**represented** [3] - 6:3, 13:3, 40:9

**represents** [1] - 24:16

**Republic** [8] - 42:3, 45:3, 77:5, 77:8, 79:7, 79:10, 80:9, 86:3

**request** [3] - 82:23, 90:10, 93:5

**requested** [5] - 28:7, 29:19, 78:16, 80:15, 81:1

**requesting** [6] - 41:11, 74:14, 74:16, 75:7, 76:17, 84:11

**requests** [1] - 22:12

**require** [1] - 42:23

**required** [4] - 17:11, 44:3, 78:8, 80:12

**requirement** [1] - 68:10

**requirements** [2] - 31:10, 36:23

**requires** [3] - 39:18, 77:10, 86:4

**research** [4] - 22:24, 24:19, 37:25, 60:25

**researching** [2] - 25:1, 48:9

**resolution** [1] - 72:22

**resolve** [2] - 53:8, 54:11

**resources** [4] - 27:25, 28:4, 31:14, 35:13

**respect** [13] - 37:2, 39:5, 39:17, 45:2, 52:9, 52:18, 71:8, 71:13, 80:20, 84:15, 87:4, 90:3, 90:20

**respectfully** [1] - 90:4, 90:10

**respond** [2] - 9:10, 29:20

**responded** [1] - 19:22

**response** [9] - 35:21, 36:17, 43:3, 59:4, 60:5, 62:13, 65:16, 76:7, 80:2

**responses** [7] - 50:6, 50:19, 60:12, 60:15, 61:11, 62:22, 84:19

**responsibilities** [1] - 93:12

**rests** [1] - 57:5

**result** [6] - 14:8, 31:8, 33:11, 34:6, 75:1, 78:17

**resulted** [1] - 34:11

**results** [1] - 35:9

**retainer** [4] - 73:10, 73:16, 84:23, 84:24

**retire** [1] - 28:16

**retired** [5] - 4:18, 4:19, 4:21, 16:19, 28:22

**retirement** [2] - 28:21, 28:23

**retires** [1] - 94:19

**retiring** [2] - 28:11, 28:13

**reviewed** [4] - 8:8, 23:14, 29:11, 69:4

**revised** [1] - 8:10

**revolutionized** [1] - 93:23

**Rice** [7] - 1:19, 3:12, 3:20, 3:21, 10:11, 10:13, 10:16

**rights** [2] - 16:21, 43:13

**risk** [1] - 32:5

**risks** [5] - 13:8, 33:4, 35:8, 45:9, 91:10

**risky** [1] - 15:19

**Roberts** [1] - 94:9

**Robinson** [2] - 94:17, 95:3

**role** [1] - 91:2

**Rossman** [3] - 11:14, 26:7, 30:11

**ROSSMAN** [7] - 2:13, 26:9, 26:12, 28:14, 28:17, 29:2, 29:9

**roundly** [1] - 92:19

**rousers** [1] - 19:18

**route** [1] - 76:16

**RPR** [3] - 2:15, 95:18, 95:24

**Rubenstein** [4] - 43:22, 66:9, 88:4, 89:25

**rule** [1] - 66:3

**Rule** [13] - 12:23, 12:25, 36:23, 37:1, 39:18, 39:21, 39:24,

43:23, 44:3, 62:24, 63:6, 63:10, 85:19

**ruled** [1] - 16:1

**rules** [1] - 65:4

**ruling** [1] - 17:4

**rulings** [1] - 23:13

**run** [4] - 74:3, 75:6, 89:6, 89:15

**run-of-the-mill** [1] - 75:6

**Ryan** [1] - 11:4

## S

**S.B** [1] - 1:18

**SAINT** [1] - 95:18

**Saint** [2] - 2:15, 95:24

**SAINT-LOTH** [1] - 95:18

**Saint-Loth** [2] - 2:15, 95:24

**salary** [1] - 57:12

**satisfied** [1] - 30:6

**satisfy** [1] - 42:22

**Saturday** [1] - 29:7

**save** [1] - 31:13

**saw** [2] - 19:19, 85:5

**SC** [1] - 1:20

**scale** [1] - 85:25

**scenario** [2] - 54:21, 54:25

**schedule** [2] - 15:8, 36:4

**scheduling** [1] - 8:19

**scholarly** [1] - 92:8

**se** [3] - 19:17, 20:17, 24:21

**SE** [1] - 2:7

**second** [7] - 14:10, 32:23, 39:22, 47:6, 47:7, 63:5, 87:17

**secondly** [2] - 40:15, 62:19

**Section** [1] - 33:17

**secured** [1] - 17:2

**securities** [1] - 44:12

**security** [1] - 5:12

**see** [12] - 13:21, 20:20, 45:23, 48:5, 49:10, 51:23, 60:4, 63:22, 64:24, 69:23, 74:19, 78:11

**seek** [2] - 23:17, 52:1

**seeking** [1] - 15:4, 24:13

**seem** [1] - 8:2

**Segal** [1] - 4:20

**self** [1] - 17:14

**self-government** [1] - 17:14

**sell** [2] - 34:14, 91:5

**Senate** [2] - 18:17, 23:10

**send** [1] - 62:2

**senior** [1] - 28:24

**SENIOR** [1] - 1:9

**sense** [2] - 77:21, 89:3

**sent** [17] - 7:20, 7:21, 8:12, 55:10, 62:11, 62:13, 62:16, 63:14, 63:16, 64:3, 69:19, 70:14, 70:21, 70:23, 73:22, 85:8

**separate** [2] - 42:17, 43:2

**separately** [1] - 9:12

**September** [3] - 34:16, 36:17, 49:3

**serious** [1] - 36:25

**serve** [3] - 17:12, 28:3, 43:6

**served** [4] - 23:7, 26:21, 31:2, 51:19

**service** [17] - 10:20, 22:13, 23:17, 24:11, 24:14, 24:15, 27:13, 28:4, 28:7, 29:18, 35:20, 39:14, 56:4, 56:6, 58:2, 69:7, 92:20

**Services** [8] - 2:12, 3:3, 4:15, 11:6, 11:9, 24:1, 24:9, 26:20

**SERVICES** [1] - 1:3

**services** [8] - 4:24, 7:13, 7:19, 26:22, 27:14, 27:15, 27:24, 28:5

**set** [9] - 4:14, 6:25, 8:21, 9:2, 15:8, 27:5, 36:5, 76:23, 92:18

**sets** [1] - 8:1

**setting** [1] - 88:12

**settle** [3] - 11:25, 40:23, 89:9

**settled** [1] - 11:23

**settlement** [103] - 8:1, 8:6, 8:11, 8:19, 9:21, 11:4, 11:13, 11:19, 12:1, 12:5, 12:7, 12:23, 13:5, 13:6, 13:11, 13:13, 15:1, 15:3, 17:15, 17:17, 17:19, 19:2, 19:3, 19:19, 19:22, 21:11, 22:12, 25:7, 26:1, 26:3, 26:15, 28:16, 30:7, 30:19, 30:22, 30:24, 31:2, 31:4, 31:5, 31:8, 31:12,

31:15, 31:17, 32:2,
32:16, 32:20, 32:23,
34:4, 34:7, 34:18,
34:21, 34:23, 35:1,
35:3, 35:17, 36:1,
36:16, 36:25, 37:1,
37:2, 37:12, 38:10,
38:20, 38:25, 39:5,
39:6, 39:17, 39:19,
39:25, 40:20, 41:10,
44:13, 45:14, 46:8,
46:22, 48:20, 48:25,
49:7, 49:12, 49:13,
49:15, 52:8, 52:9,
53:9, 53:17, 53:23,
58:5, 59:6, 59:14,
59:15, 63:2, 67:6,
67:10, 68:5, 71:3,
75:2, 75:5, 75:6,
78:21, 83:15, 89:11,
91:10
**SETTLEMENT** [1] -
1:8
**settlements** [4] -
11:18, 57:5, 74:17,
74:20
**settling** [2] - 52:3,
66:24
**seven** [10] - 5:24,
6:23, 15:4, 17:16,
23:9, 23:20, 28:9,
29:16, 30:3, 94:22
**seven-year** [1] - 23:20
**shall** [3] - 4:24, 33:19,
95:21
**share** [3] - 17:24,
22:17, 46:23
**shifting** [2] - 72:11,
92:16
**shine** [1] - 16:8
**short** [1] - 47:25
**shorthand** [1] - 2:21
**show** [2] - 14:15,
76:15
**sic** [8] - 27:13, 29:15,
42:3, 47:16, 57:15,
58:24, 68:19, 85:3
**sic]** [1] - 48:21
**side** [4] - 9:13, 57:24,
58:7, 93:11
**sides** [3] - 32:21, 35:8,
93:13
**sides'** [1] - 6:16
**signatory** [1] - 95:22
**signed** [1] - 84:23
**significant** [3] - 32:14,
35:3, 93:20
**similar** [3] - 52:7,
77:2, 77:3
**single** [1] - 88:25

**sit** [1] - 5:15
**sitting** [1] - 79:17
**situation** [3] - 29:25,
78:22, 78:24
**situations** [1] - 80:11
**six** [4] - 7:1, 7:2, 7:5,
94:22
**size** [1] - 19:8
**slice** [1] - 56:24
**slightly** [3] - 76:25,
83:14, 84:2
**small** [5] - 34:18,
49:10, 49:17, 50:24,
51:20
**smaller** [2] - 34:3,
60:21
**smartest** [1] - 92:5
**so-called** [1] - 70:25
**society** [1] - 22:18
**solve** [1] - 58:21
**someone** [8] - 20:18,
21:1, 45:23, 53:7,
54:21, 64:1, 64:5,
64:18
**somewhere** [2] - 51:6,
62:17
**soon** [1] - 93:18
**sophisticated** [4] -
19:15, 37:6, 44:8,
91:14
**sorry** [3] - 11:9, 40:10,
92:11
**sort** [5] - 6:25, 46:5,
50:22, 58:22, 65:6
**sorts** [2] - 65:22,
65:24
**sounds** [2] - 58:21,
63:8
**sovereign** [1] - 14:23
**sparked** [1] - 18:6
**speaking** [3] - 4:11,
10:21, 49:22
**specific** [2] - 60:10,
66:8
**specifically** [4] -
24:25, 27:6, 83:21,
85:19
**speed** [1] - 47:5
**spell** [1] - 22:4
**spelled** [2] - 12:23,
24:8
**spend** [2] - 14:12,
24:25
**spending** [1] - 29:3
**spent** [12] - 25:11,
25:21, 25:23, 29:15,
37:16, 56:14, 56:23,
58:1, 58:12, 69:8,
88:22
**spilt** [1] - 75:9

**spurring** [1] - 16:10
**stacked** [1] - 18:5
**staff** [3] - 9:24, 11:5,
13:25
**staffs** [1] - 94:10
**stage** [3] - 4:14, 7:1,
9:22
**stages** [1] - 35:7
**stake** [1] - 19:16
**stakes** [1] - 17:9
**standard** [3] - 73:18,
74:16, 85:23
**standing** [4] - 33:13,
52:14, 60:12, 90:8
**standpoint** [1] - 75:19
**start** [7] - 9:3, 9:17,
9:23, 21:22, 72:5,
95:4, 95:5
**started** [3] - 5:7, 18:7,
94:8
**State** [2] - 7:9, 44:12
**state** [4] - 3:6, 24:19,
24:24, 61:18
**statement** [5] - 9:6,
9:8, 9:11, 36:19,
85:2
**statements** [3] -
11:20, 61:11, 90:5
**STATES** [3] - 1:1, 1:5,
1:9
**States** [9] - 3:4, 4:5,
4:17, 9:4, 15:9,
27:21, 31:16, 34:16,
81:17
**static** [1] - 2:19
**statistics** [1] - 21:4
**status** [1] - 25:15
**statute** [3] - 7:18,
33:17, 60:23
**statutes** [3] - 6:11,
27:17, 27:21
**statutory** [4] - 14:5,
32:13, 33:16, 72:12
**stenographic** [1] -
95:19
**step** [5] - 3:5, 10:10,
12:12, 12:20, 16:2
**still** [7] - 5:22, 14:17,
38:16, 48:13, 48:20,
82:19, 95:6
**stop** [2] - 54:9, 76:14
**story** [1] - 20:8
**straight** [1] - 75:19
**straightforward** [1] -
51:16
**strategy** [1] - 23:14
**streams** [1] - 65:25
**Street** [5] - 1:12, 1:16,
1:23, 2:4, 44:12
**strength** [1] - 35:1

**strike** [3] - 90:4, 90:8
**stripes** [1] - 19:13
**strong** [1] - 15:21
**stronger** [2] - 77:14,
82:3
**strongly** [3] - 25:7,
42:4, 80:11
**structure** [3] - 17:14,
51:19, 67:7
**Stuart** [2] - 11:14, 26:6
**STUART** [1] - 2:13
**study** [1] - 7:9
**Study** [1] - 7:10
**stuff** [6] - 5:9, 38:19,
44:4, 62:3, 62:5,
64:24
**subclass** [1] - 71:3
**subject** [4] - 2:18,
13:17, 52:16, 55:11
**submission** [1] -
43:21, 79:14, 80:19
**submissions** [1] -
44:7, 50:12
**submit** [3] - 54:19,
55:1, 55:15
**submitted** [7] - 9:6,
9:8, 46:14, 55:6,
55:9, 63:25, 90:2
**subpart** [1] - 85:20
**subsection** [1] - 40:2
**Subsection** [2] - 40:2,
40:3
**subsequent** [1] -
82:18
**subset** [2] - 66:21,
72:1
**substance** [2] - 63:20,
64:8
**substantial** [2] -
14:13, 19:10
**success** [1] - 73:14
**sue** [1] - 14:12
**sufficient** [3] - 45:7,
56:18, 83:16
**suggest** [2] - 42:15,
50:5
**suggested** [6] - 76:2,
80:11, 81:25, 83:9,
83:25, 84:4
**suggesting** [1] - 90:18
**suggests** [1] - 77:13
**suit** [1] - 16:21
**Suite** [2] - 1:12, 1:16
**sum** [1] - 35:25
**summary** [1] - 17:4
**super** [1] - 79:8
**supersedes** [1] - 85:8
**Supp** [2] - 6:9, 92:12
**supplemental** [1] -
43:21

**supplied** [1] - 80:22
**support** [14] - 11:3,
11:13, 11:19, 13:12,
13:22, 16:19, 21:11,
23:15, 25:7, 26:3,
26:14, 26:21, 29:13,
50:12
**supported** [1] - 65:21
**supporting** [3] -
43:22, 43:24, 84:10
**supports** [3] - 18:18,
22:11, 33:12
**suppose** [3] - 51:4,
62:1, 66:25
**supposed** [4] - 43:9,
43:24, 48:22
**Supreme** [16] - 39:15,
39:16, 43:12, 45:6,
51:12, 51:15, 57:6,
57:13, 66:19, 86:22,
86:24, 87:16, 87:19,
87:22, 88:2, 88:18
**surprise** [1] - 92:7
**surprised** [1] - 65:18
**surrounding** [1] -
13:24
**suspect** [1] - 30:1
**swaths** [1] - 17:10
**Swedish** [5] - 79:1,
80:8, 82:6, 86:16,
87:11
**swung** [1] - 16:13
**sympathy** [1] - 58:19
**system** [14] - 5:3,
5:19, 7:7, 7:12, 8:3,
14:9, 15:14, 15:15,
27:4, 72:23, 94:5,
94:18, 94:21
**system's** [1] - 34:12

## T

**table** [3] - 3:10, 10:8,
92:22
**talks** [1] - 85:20
**task** [1] - 30:21
**tax** [1] - 48:7
**TAYLOR** [3] - 1:11,
1:15, 3:23
**Taylor** [2] - 3:24, 10:8
**team** [1] - 22:3
**technologies** [1] -
94:2
**technology** [3] - 2:19,
7:14, 16:20
**tee** [2] - 57:21, 58:3
**teeing** [1] - 57:3
**telephone** [1] - 20:7
**telephonically** [1] -
2:18

**ten** [5] - 9:7, 47:14, 47:18, 48:2, 70:4
**tendency** [1] - 40:22
**terms** [9] - 28:6, 30:5, 34:25, 39:20, 40:11, 40:23, 53:22, 61:8, 82:20
**terrific** [1] - 94:7
**testament** [1] - 15:12
**text** [1] - 60:22
**thanking** [1] - 9:23
**THE** [133] - 1:1, 1:8, 1:11, 2:2, 3:2, 3:9, 3:14, 3:17, 4:6, 4:8, 4:13, 10:24, 18:12, 19:24, 20:1, 20:11, 20:14, 20:21, 21:15, 21:21, 21:25, 22:4, 22:8, 23:23, 24:2, 24:5, 26:5, 26:11, 28:12, 28:15, 28:24, 29:7, 30:11, 30:15, 36:3, 37:22, 39:22, 40:1, 40:4, 40:9, 40:17, 41:21, 41:24, 42:5, 43:10, 45:12, 45:17, 45:20, 45:25, 46:21, 47:1, 49:19, 50:17, 53:4, 53:10, 53:19, 53:22, 54:2, 54:7, 54:13, 55:21, 56:2, 56:6, 56:10, 56:16, 58:10, 59:2, 60:3, 60:10, 60:14, 61:13, 61:22, 63:12, 63:22, 64:10, 64:12, 64:15, 64:23, 65:2, 65:12, 66:7, 66:18, 66:21, 66:24, 67:17, 67:22, 67:24, 68:13, 68:17, 68:23, 69:18, 69:23, 70:6, 70:18, 71:2, 71:6, 71:8, 71:12, 71:18, 71:20, 71:22, 73:12, 73:14, 73:16, 74:8, 75:24, 76:2, 76:22, 77:6, 77:9, 77:13, 77:24, 78:20, 79:1, 79:9, 79:21, 81:20, 82:12, 84:7, 84:13, 85:1, 85:12, 85:15, 85:18, 86:24, 89:18, 90:7, 90:12, 90:23, 92:4, 92:11, 93:8, 95:14
**themselves** [3] - 39:11, 40:23, 42:22
**therefore** [5] - 2:18, 27:23, 27:25, 47:6, 58:18

**thinks** [1] - 66:13
**third** [7] - 12:20, 14:15, 53:24, 74:16, 84:23, 85:23, 86:1
**thoroughly** [1] - 21:16
**thoughtfully** [1] - 9:25
**thousands** [4] - 12:2, 19:9, 24:16, 63:15
**three** [6] - 12:12, 38:4, 38:16, 49:25, 56:7, 70:12
**three-step** [1] - 12:12
**threshold** [1] - 83:14
**throughout** [1] - 13:4
**Thursday** [1] - 95:6
**thwart** [1] - 13:18
**timely** [6] - 5:22, 36:16, 69:10, 70:8, 70:9, 71:10
**timing** [1] - 40:12
**today** [13] - 8:12, 10:2, 10:22, 11:10, 20:19, 21:13, 25:25, 30:18, 30:21, 31:23, 32:7, 50:4, 50:12
**toner** [1] - 47:19
**took** [3] - 4:21, 35:6, 84:17
**tool** [1] - 93:22
**tools** [3] - 75:22, 75:24, 93:4
**total** [2] - 39:5, 59:20
**toward** [1] - 87:15
**trained** [1] - 76:8
**transcript** [4] - 84:17, 95:19, 95:19, 95:21
**TRANSCRIPT** [1] - 1:8
**Transcript** [1] - 2:21
**transcription** [1] - 2:21
**transmission** [4] - 47:5, 47:7, 47:21
**transmit** [2] - 47:8, 47:9
**transmitting** [1] - 47:10
**transparency** [3] - 14:1, 21:8, 44:21
**treated** [1] - 67:2
**treatise** [1] - 66:10
**treatment** [2] - 51:15, 91:6
**treats** [3] - 13:11, 31:19, 37:2, 38:22
**trend** [1] - 87:15
**trial** [2] - 15:25, 35:15
**tried** [4] - 46:15, 50:18, 54:11, 70:21
**trips** [1] - 29:3
**true** [7] - 31:14, 52:14,

61:1, 66:5, 85:17, 95:18, 95:19
**truly** [1] - 18:16
**Trustees** [2] - 87:3, 91:20
**truth** [1] - 90:6
**try** [6] - 6:25, 11:19, 50:15, 53:7, 76:4, 84:16, 85:6, 86:8, 89:2, 89:3, 90:14, 93:17
**trying** [3] - 58:20, 61:18, 70:23
**Tucker** [4] - 52:14, 65:22, 66:6, 79:17
**turn** [4] - 16:11, 21:19, 35:14, 53:19, 55:25
**turning** [1] - 53:16
**two** [20] - 13:25, 20:19, 27:2, 28:22, 36:25, 40:13, 42:1, 47:13, 50:21, 51:6, 54:15, 54:17, 69:13, 69:16, 72:7, 73:8, 81:20, 82:18, 86:21, 88:16
**typical** [1] - 51:13
**typically** [1] - 34:13

**U**

**U.S** [6] - 2:3, 2:16, 4:2, 16:9, 23:10, 42:10
**U.S.C** [1] - 33:17
**ultimate** [1] - 35:24
**ultimately** [8] - 5:25, 71:15, 80:15, 80:23, 82:9, 83:1, 83:13, 88:20
**unanimously** [2] - 16:5, 17:3
**under** [11] - 6:10, 7:17, 12:25, 17:17, 27:17, 36:4, 56:18, 57:18, 61:8, 65:3, 66:6
**underrepresented** [1] - 21:9
**unenhanced** [1] - 45:8
**unfair** [3] - 38:20, 44:1, 67:10
**unfamiliar** [1] - 11:22
**unfettered** [1] - 22:21
**unfortunate** [1] - 39:9
**unique** [2] - 15:1, 25:8
**United** [9] - 3:4, 4:5, 4:17, 9:4, 15:9, 27:21, 31:16, 34:16, 81:17
**UNITED** [3] - 1:1, 1:5, 1:9

**universal** [1] - 21:11
**unlawful** [1] - 14:16
**unlawfully** [1] - 17:5
**unless** [8] - 9:15, 13:1, 55:24, 61:10, 61:16, 81:13, 92:25, 94:19
**unlike** [1] - 17:25
**unnecessary** [1] - 34:10
**unprecedented** [1] - 16:12
**unreasonable** [2] - 33:21, 66:1
**unreliable** [1] - 90:3
**untimely** [3] - 69:14, 69:15, 90:3
**unusual** [9] - 13:15, 14:24, 29:25, 33:9, 73:7, 74:2, 74:9, 74:24, 77:18
**up** [24] - 5:13, 8:2, 8:21, 9:4, 15:21, 16:18, 17:21, 32:24, 33:8, 34:5, 38:14, 43:3, 43:21, 44:17, 49:22, 56:11, 56:23, 57:3, 57:22, 58:3, 61:22, 65:10, 86:7, 94:24
**updated** [1] - 27:7
**updates** [1] - 23:12
**upheld** [1] - 32:10
**uploaded** [1] - 27:9
**upshot** [1] - 74:15
**USAO** [1] - 2:3
**useful** [1] - 6:25
**user** [2] - 34:5, 55:4
**users** [18] - 6:7, 8:3, 17:1, 17:18, 18:20, 34:3, 34:6, 34:13, 34:18, 34:21, 37:16, 46:5, 48:4, 48:24, 50:24, 51:20, 60:21, 67:13
**utilities** [1] - 27:2

**V**

**vacations** [1] - 29:2
**valid** [1] - 21:5
**valuable** [1] - 31:14
**value** [1] - 23:19
**values** [1] - 22:20
**Van** [1] - 88:19
**variety** [1] - 72:11
**vast** [3] - 17:18, 34:12, 43:5
**Vaughn** [1] - 86:11
**Vegas** [1] - 15:6
**versus** [10] - 3:4, 4:16,

42:18, 66:19, 72:1, 81:10, 81:17, 87:3, 88:19, 91:20
**veteran** [2] - 48:6, 58:20
**VETERANS** [1] - 1:2
**Veterans** [7] - 2:12, 3:3, 4:15, 11:5, 11:8, 23:25, 24:9
**veterans** [5] - 24:11, 24:13, 24:17, 24:21, 25:4
**veterans'** [1] - 25:2
**via** [4] - 2:18, 10:19, 11:7, 11:15
**videoconference** [1] - 2:18
**view** [3] - 57:17, 60:15, 82:18
**viewed** [1] - 56:16
**vigorously** [2] - 13:3, 32:6
**violated** [1] - 16:14
**violent** [1] - 7:11
**Virginia** [1] - 95:7
**virtually** [3] - 8:23, 27:20, 57:18
**vis-à-vis** [1] - 23:3
**void** [1] - 95:21
**volume** [1] - 27:5
**vs** [1] - 1:4

**W**

**wait** [2] - 45:18, 53:19
**waive** [1] - 48:13
**waiver** [3] - 14:23, 16:25, 61:4
**wake** [1] - 19:19
**Walker** [1] - 86:11
**wants** [1] - 9:7
**warranted** [2] - 78:11
**Washington** [5] - 1:6, 1:13, 1:16, 2:4, 48:9
**wealthy** [1] - 23:3
**Web** [1] - 7:12
**Web-based** [1] - 7:12
**website** [7] - 53:1, 53:5, 54:16, 54:19, 54:25, 63:18, 70:22
**Wednesdays** [1] - 94:23
**weird** [1] - 67:4
**Wessler** [4] - 1:12, 1:15, 3:24, 10:9
**whole** [10] - 19:17, 48:25, 49:8, 49:11, 49:12, 49:18, 51:23, 71:18, 92:5
**widespread** [3] -

13:18, 16:22, 18:6
**wife** [2] - 28:21, 29:7
**WILLIAM** [2] - 1:22, 2:10
**William** [1] - 4:3
**windfall** [2] - 43:16, 88:11
**wish** [4] - 19:2, 19:4, 19:5, 69:8
**witness** [1] - 88:8
**witnesses** [1] - 5:12
**wonder** [1] - 11:22
**word** [1] - 42:22
**words** [11] - 11:3, 11:18, 11:21, 13:14, 17:15, 21:20, 34:7, 42:6, 51:9, 57:2, 57:24
**works** [4] - 14:1, 22:19, 53:10, 59:17
**world** [2] - 54:10, 54:12
**world's** [3] - 19:14, 37:5
**worse** [1] - 24:15
**worth** [1] - 17:6
**wound** [1] - 5:13
**Wright** [1] - 66:9
**write** [2] - 58:5, 78:14
**written** [7] - 9:6, 9:8, 36:18, 46:1, 50:11, 50:12
**wrote** [2] - 6:9, 86:12

## Y

**year** [8] - 17:22, 23:10, 23:20, 24:17, 25:1, 28:11, 48:15, 82:7
**years** [20] - 8:4, 13:10, 14:13, 15:4, 17:16, 18:12, 18:13, 18:14, 23:9, 28:9, 28:22, 29:16, 29:23, 30:4, 37:9, 38:4, 61:1, 65:24, 88:22, 92:1
**yin** [1] - 8:12
**York** [2] - 29:5, 92:2
**you-all** [1] - 6:23

## Z

**zealous** [1] - 43:13
**zero** [5] - 55:17, 55:19, 59:8, 59:12, 73:17
**Zoom** [11] - 3:15, 10:3, 10:19, 11:7, 11:15, 23:25, 24:4, 26:13, 45:22, 49:21, 50:2