No. 24-1757

# In the United States Court of Appeals for the Federal Circuit

NATIONAL VETERANS LEGAL SERVICES PROGRAM,
NATIONAL CONSUMER LAW CENTER,
ALLIANCE FOR JUSTICE,
*Plaintiffs-Appellees*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee*

v.

ERIC ALAN ISAACSON,
*Interested Party-Appellant*

On Appeal from the United States District Court
for the District of Columbia, Civil Case No. 1:16-0745-PLF
(The Hon. Paul L. Friedman)

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

WILLIAM H. NARWOLD
MOTLEY RICE LLC
20 Church Street
17th Floor
Hartford, CT 06103
(860) 882 -1676

MEGHAN OLIVER
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9492

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Plaintiffs-Appellees*

October 11, 2024

i

## CERTIFICATE OF INTEREST

As required by Federal Circuit Rule 47.4, I certify the following:

1.  The full names of all parties represented by me are: National Veterans Legal Services Program, National Consumer Law Center, and Alliance For Justice, for themselves and all others similarly situated.

2.  The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3.  There are no parent corporations or publicly held companies that own 10% or more of the stock of any named party represented by me.

4.  The names of all law firms and the partners and associates that appeared for the plaintiffs-appellees now represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

    ELIZABETH SMITH
    MOTLEY RICE LLC
    20 Church Street, 17th Floor
    Hartford, CT 06103

5.  Plaintiffs-Appellees know of no pending matters in this or any court that will directly affect or be directly affected by this Court's decision in this appeal. This case was previously before this Court in *National Veterans Legal Services Program v. United States*, 968 F.3d 1340 (Fed. Cir. 2020).

Dated: October 11, 2024

/s/ Deepak Gupta
DEEPAK GUPTA
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

i

# **TABLE OF CONTENTS**

Table of authorities ................................................................................. iv

Statement of related cases ....................................................................... ix

Introduction ................................................................................................ 1

Jurisdictional statement .......................................................................... 5

Statement of the issues ............................................................................ 5

Statement of the case ............................................................................... 6

    I.     Factual and procedural background ............................................ 6

          A.    The legal framework for PACER fees ..................................... 6

          B.    Pre-settlement district court proceedings ........................... 8

          C.    Appellate proceedings ........................................................... 11

    II.    Mediation and settlement ......................................................... 13

    III.   Overview of the settlement agreement .................................... 15

          A.    The settlement class .............................................................. 15

          B.    The settlement relief ............................................................ 16

          C.    The released claims .............................................................. 17

          D.    Notice to settlement class and requests for exclusion ........ 17

          E.    Allocation and payment ...................................................... 17

          F.    Service awards, attorneys' fees, and costs .......................... 20

    IV    Proceedings for final approval of the settlement and for attorneys' fees, costs, and service awards ............................. 21

          A.    Objections .............................................................................. 21

B.     The settlement hearing .............................................................23

C.     District court approval of the settlement agreement.................27

Summary of argument ...........................................................................30

Standard of review ................................................................................32

Argument ...............................................................................................33

I.     The district court had jurisdiction to certify the class and approve this settlement under the Little Tucker Act ........................33

     A.     As the district court correctly held—and this Court's precedents make clear—this case does not involve any claim that exceeds $10,000 .......................................................34

     B.     Mr. Isaacson's jurisdictional challenge contravenes this Court's precedents, is unworkable and internally inconsistent, and would unduly punish class members............37

II.     The district court did not abuse its discretion by approving a pro rata distribution among class members as fair.............................42

III.     The district court did not abuse its discretion in awarding attorneys' fees ....................................................................................45

IV.     The district court did not abuse its discretion by approving payments to the nonprofit class representatives that cover time incurred by their in-house counsel ......................................................52

Conclusion ............................................................................................55

# TABLE OF AUTHORITIES

## Cases

*Aerolineas Argentinas v. United States,*
    77 F.3d 1564 (Fed. Cir. 1996) ......................................................... 3, 44

*Alaska Airlines v. Austin,*
    801 F. Supp. 760 (D.D.C. 1992) ............................................. 35, 36, 38

*Alaska Airlines, Inc. v. Johnson,*
    8 F.3d 791 (Fed. Cir. 1993) ....................................................... *passim*

*American Airlines, Inc. v. Austin,*
    778 F. Supp. 72 (D.D.C. 1991) ............................................... 35, 36, 39

*American Pipe & Construction Co. v. Utah,*
    414 U.S. 538 (1974) ........................................................................ 41

*Baker v. United States,*
    722 F.2d 517 (9th Cir. 1983) ........................................................... 37

*Berry v. Schulman,*
    807 F.3d 600 (4th Cir. 2015) .......................................................... 54

*Blue Cross & Blue Shield of Kansas City Welfare Benefit Plan*
    *v. United States,*
    2024 WL 3738315 (2024) ............................................................... 42

*Brown Park Estates-Fairfield Development Co. v. United States,*
    127 F.3d 1449 (Fed. Cir. 1997) ...................................................... 40

*California Public Emploeeys' Retirement Systems v. ANZ Securities, Inc.,*
    582 U.S. 497 (2017) ........................................................................ 41

*Caligiuri v. Symantec Corp.,*
    855 F.3d 860 (8th Cir. 2017) .......................................................... 54

*Central Railroad & Banking Co. v. Pettus,*
    113 U.S. 116 (1885) ................................................................... 32, 53

*China Agritech, Inc. v. Resh*,
    138 S. Ct. 1800 (2018) .................................................................. 32

*Chula Vista City School District v. Bennett*,
    824 F.2d 1573 (Fed. Cir. 1987) .................................................... 34

*Cobell v. Jewell*,
    802 F.3d 12 (D.C. Cir. 2015) ...................................................... 52

*Fisher v. United States*,
    No. 15-1575 (Fed. Cl.) ................................................................. 17

*Florin v. Nationsbank of Georgia, N.A.*,
    34 F.3d 560 (7th Cir. 1994) ........................................................ 46

*Fresno County Employees' Retirement Association v.*
    *Isaacson/Weaver Family Trust*,
    925 F.3d 63 (2d Cir. 2019) .................................................... 27, 46

*Haggart v. Woodley*,
    809 F.3d 1336 (Fed. Cir. 2016) ................................................... 32

*Hatter v. United States*,
    203 F.3d 795 (Fed. Cir. 2000) ..................................................... 41

*Health Republic Insurance Company v. United States*,
    58 F.4th 1365 (Fed. Cir. 2023) ................................ 26, 31, 47, 50

*Hyland v. Navient Corp.*,
    48 F.4th 110 (2d Cir. 2022) ........................................................ 54

*In re Apple Inc. Device Performance Litigation*,
    50 F.4th 769 (9th Cir. 2022) ....................................................... 54

*In re AT & T Mobility Wireless Data Services Sales Tax Litigation*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ......................................... 44

*In re BioScrip, Inc. Securities Litigation*,
    273 F. Supp. 3d 474 (S.D.N.Y. 2017) ..................................... 27, 46

*In re Home Depot Inc.*,
    931 F.3d 1065 (11th Cir. 2019) ................................................... 46

*In re Lorazepam & Clorazepate Antitrust Litigation,*
    205 F.R.D. 369 (D.D.C. 2002) ........................................................ 52

*In re Synthroid Marketing Litigation,*
    264 F.3d 712 (7th Cir. 2001) ......................................................... 54

*International Union, United Automotive, Aerospace, & Agricultural*
    *Implement Workers of America v. General Motors Corp.,*
    497 F.3d 615 (6th Cir. 2007) ......................................................... 43

*Iosilevich v. United States,*
    2024 WL 1211326 (E.D.N.Y. 2024) ............................................... 37

*Isaacson/Weaver Family Trust v. Fresno County*
    *Employees' Retirement Association,*
    140 S. Ct. 385 (2019) .................................................................... 27

*John R. Sand & Gravel Co. v. United States,*
    552 U.S. 130 (2008) ................................................................ 30, 42

*Johnson v. NPAS Solutions, LLC,*
    975 F.3d 1244 (11th Cir. 2020) ..................................................... 53

*Keepseagle v. Perdue,*
    856 F.3d 1039 (D.C. Cir. 2017) ..................................................... 52

*Kelly v. United States,*
    171 Fed. Cl. 550 (2024) ................................................................ 42

*Mercier v. United States,*
    156 Fed. Cl. 580 (2021) ................................................................ 52

*Moses v. N.Y. Times Co.,*
    79 F.4th 235 (2d Cir. 2023) ..................................................... 32, 54

*Murray v. Grocery Delivery E-Services USA Inc.,*
    55 F.4th 340 (1st Cir. 2022) .......................................................... 54

*National Motor Freight Traffic Association, Inc. v.*
    *General Services Administration,*
    25 F. Supp. 3d 52 (D.D.C. 2014) ................................................... 36

*NVLSP v. United States,*
    968 F.3d 1340, (Fed. Cir. 2020) .................................................................*passim*

*Ontario Power Generation, Inc. v. United States,*
    369 F.3d 1298 (Fed. Cir. 2004)........................................................................44

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) .......................................................................................43

*Pelzer v. Vassalle,*
    655 F. App'x 352 (6th Cir. 2016) ...................................................................54

*Perdue v. Kenny A. ex. rel. Winn,*
    559 U.S. 542 (2010) .......................................................................................46

*Reoforce, Inc. v. United States,*
    853 F.3d 1249 (Fed. Cir. 2017) .......................................................................42

*South Pacific Co. v. Darnell-Taenzer Lumber Co.,*
    245 U.S. 531 (1918)........................................................................................44

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ..........................................................................46

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011) ............................................................................54

*Swedish Hospital Corp. v. Shalala,*
    1 F.3d 1261 (D.C. Cir. 1993)...........................................................................47

*Telecare Corp. v. Leavitt,*
    409 F.3d 1345 (Fed. Cir. 2005) ......................................................................34

*Tennille v. W. Union Co.,*
    785 F.3d 422 (10th Cir. 2015) ........................................................................54

*Trustees v. Greenough,*
    105 U.S. 527 (1882) ...........................................................................32, 52, 53

*United States v. Bormes,*
    568 U.S. 6 (2012)............................................................................................34

*United States v. Louisville & Nashville Railroad Co.*,
   221 F.2d 698 (6th Cir. 1955) ................................................................... 38

*Williams v. United States*,
   240 F.3d 1019 (Fed. Cir. 2001) ............................................................... 40

**Statutes**

28 U.S.C. § 1346 .............................................................................. 8, 34, 37

28 U.S.C. § 1913 ............................................................................... 6, 7, 15

**Other authorities**

Adam Liptak,
   *Attacking a Pay Wall that Hides Public Court Filings*,
   N.Y. Times, Feb. 4, 2019 ...................................................................... 3, 11

*Public Records Belong to the Public*,
   N.Y. Times, Feb. 7, 2019 .......................................................................... 4

S. Rep. No. 107-174 (2002) ......................................................................... 7

## STATEMENT OF RELATED CASES

This case was previously before this Court on interlocutory cross-appeals in

*National Veterans Legal Services Program v. United States*, 968 F.3d 1340 (Fed. Cir. 2020).

## INTRODUCTION

This is the second appeal to this Court arising out of a case that is unique in American history: a certified class action against the federal judiciary, concerning the fees that the judiciary charges for access to records through the Public Access to Court Electronic Records system, or PACER. Four years ago, this Court held that the district court "had jurisdiction under the Little Tucker Act" over the plaintiffs' class-action complaint, which "alleged that each individual download of a public record for which they were charged gave rise to a separate 'illegal exaction' claim." *NVLSP v. United States*, 968 F.3d 1340, 1345 (Fed. Cir. 2020).

This time, the appeal concerns the district court's approval of a "historic" class-action settlement that ends over eight years of hard-fought litigation. Appx47. Under this settlement, the federal government will reimburse the vast majority of PACER users in full—100 cents on the dollar—for past PACER charges. The settlement creates a common fund of $125 million from which each class member will automatically be reimbursed up to $350 for any PACER fees paid during the class period. Those who paid over $350 in fees during will receive their pro rata share of the remaining settlement funds, and any unclaimed funds will be allocated evenly among the class. In addition to this remarkable monetary relief, the case has spurred the judiciary to eliminate fees for approximately 75% of users going forward and has prompted action in Congress to abolish the fees altogether.

By any measure, this litigation has been an extraordinary triumph—and even more so given the odds stacked against it. PACER fees have long been the subject of criticism because they thwart equal access to justice and inhibit public understanding of the courts. But until this case, litigation wasn't seen as a realistic path to reform.

That was for three reasons. *First*, the judiciary has statutory authority to charge at least some fees, so litigation alone could never result in a free PACER system. *Second*, few lawyers experienced in complex federal litigation would be willing to sue the federal judiciary, with little hope of payment. *Third*, even if PACER fees could be shown to be excessive and qualified counsel could be secured, the fees still seemed immune from litigation. The judiciary is exempt from the Administrative Procedure Act, a prior lawsuit challenging PACER fees had been dismissed for lack of jurisdiction, and advocates were unable for years to identify an alternative basis for jurisdiction, a cause of action, and a statutory waiver of sovereign immunity. So they devoted their efforts to other strategies: making some records freely available in a separate database, downloading records in bulk, and mounting various public-information campaigns. These efforts were important, but they didn't take on the lawfulness of PACER fees. Despite public criticism—and despite being reproached in 2009 and 2010 by Senator Lieberman, the sponsor of a 2002 law curtailing the judiciary's authority to charge fees—the Administrative Office of the U.S. Courts still did not reduce PACER fees. Instead, the AO increased fees in 2012.

There things stood until 2016, when three nonprofits filed this lawsuit under the Little Tucker Act, which "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because the Act provides jurisdiction only for claims seeking money for past overpayments, the plaintiffs could not demand that the judiciary lower PACER fees going forward. They could seek only retroactive monetary relief for past overcharges. Even with this built-in jurisdictional limitation, this lawsuit has been a resounding success. The plaintiffs defeated a motion to dismiss and obtained certification of a nationwide class by early 2017. Through discovery they were then able to shine a light on how the AO had used the fees. Many things funded by the fees—such as flat screens for jurors— had nothing to do with PACER. This discovery in turn led to an unprecedented judicial decision: In March 2018, the district court held that the AO had violated the law by using PACER fees to fund certain unrelated activities. Within months, the AO announced that these activities would "no longer be funded" with PACER fees.

Success continued on appeal in this Court. The plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups, and the sponsor of the 2002 law"—all detailing the harms of high PACER fees. *See* Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019, https://perma.cc/LN5E-EBE9. Media outlets published

editorials championing the suit. *See, e.g.*, *Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7. And before long, the AO announced that it was doubling the $15 quarterly fee waiver for PACER, eliminating fees for approximately 75% of PACER users. Then the plaintiffs secured a landmark opinion from this Court affirming the district court's decision. *NVLSP*, 968 F.3d 1340. The litigation sparked widespread public interest in the need to reform PACER fees and jumpstarted legislative action that continues to this day. Following this Court's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced in the Senate. The Judicial Conference, too, now supports legislation providing for free noncommercial PACER access. Were Congress to enact such legislation into law, it would produce an outcome that the plaintiffs could not achieve through litigation alone.

Although this case was brought on behalf of perhaps the most litigious class of people and entities ever assembled in a single action, the reception to the settlement was universally positive. Out of a nationwide class of hundreds of thousands—including sophisticated data aggregators, federal-court litigators, and law firms of every stripe—just one serial class-action objector, Eric Alan Isaacson, appears pro se to contend that this historic settlement should not be approved. Mr. Isaacson told the district court that this is a "run-of-the-mill settlement" and that class counsel has "achieved a remarkably mediocre result." Appx4499. In his assessment, this first-ever

class action against the federal judiciary "was obviously an easy one to litigate" and an "easy one to settle." Appx4510. After a fairness hearing at which Mr. Isaacson was able to fully air his criticisms, the district court carefully rejected each one—concerning the settlement's fairness, the award of attorneys' fees, and the payments to the non-profit class representatives. Now on appeal, Mr. Isaacson devotes most of his efforts to challenging the district court's jurisdiction under the Little Tucker Act. But that argument, which even the government disagrees with, is foreclosed by binding precedent and is incoherent and unworkable in any event. The Court should affirm approval of the settlement and bring this litigation to a close.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over all the claims in this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a) for the reasons explained in the first argument section of this brief. The district court issued its opinion approving of the parties' class-action settlement and entered final judgment on March 20, 2024. Appx1–54. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(2).

## STATEMENT OF THE ISSUES

**I. Jurisdiction.** Did the Little Tucker Act deprive the district court of jurisdiction to certify this class, and approve this settlement, because the class includes members for whom "complete relief" on all of their illegal-exaction claims could collectively exceed $10,000? Isaacson Br. 18.

5

**II. Fairness.** Did the district court abuse its discretion by approving this settlement as fair notwithstanding Mr. Isaacson's complaint that "too much" of the monetary relief is "allocated pro rata"? Appx24.

**III. Fees.** Did the district court abuse its discretion by awarding fees that "reflect a reasonable lodestar multiplier" given the "high risk of nonrecovery" and that also "reflect a percentage" that "aligns with the best case analogues" and that is "around the average for common funds of similar size—even though Class Counsel's representation, and the result they achieved for the class, were well above average"? Appx41, 45.

**IV. Payments.** Did the district court abuse its discretion in awarding $10,000 payments to class representatives who have each "expended over $10,000 worth of attorney time and expenses in leading this litigation"? Appx46.

## STATEMENT OF THE CASE

### I.   Factual and procedural background

### A.    The legal framework for PACER fees

By statute, the judiciary has long had authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then set at $0.07 per page) were "higher than the marginal cost of disseminating the information," creating excess fee revenue that the judiciary had begun using to fund

other projects. S. Rep. No. 107-174, at 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.*

To this end, Congress passed the E-Government Act of 2002, which amended the statute by adding the words "only to the extent necessary." 28 U.S.C. § 1913 note. Despite this limitation, the AO twice increased PACER fees in the years after the E-Government Act's passage—first to $0.08 per page, and then $0.10 per page—at a time when the costs of electronic data storage plunged exponentially. Appx4218. This widening disparity prompted the Act's sponsor, Senator Lieberman, to reproach the AO for charging fees that were "well higher than the cost of dissemination," "against the requirement of the E-Government Act." Appx2734, 2739.

Excessive PACER fees have inflicted harms on litigants and the public alike. Whereas the impact of excess fees on the judiciary's $7-billion annual budget is slight, these harms are anything but: High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts. And the AO had further compounded the harmful effects of high fees in recent years by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

**B.    Pre-settlement district court proceedings**

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this lawsuit. Appx107–121. From the start, the plaintiffs were represented by an expert team drawn from the law firms of Gupta Wessler LLP, a litigation boutique with experience bringing complex cases against the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. The plaintiffs asked the court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges—the only relief available to them under the Little Tucker Act. Appx120; *see* 28 U.S.C. § 1346(a). Because the judiciary is not subject to the APA, 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek injunctive relief requiring the AO to lower PACER fees in the future.

The district court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. Appx506–514. A month later, in January 2017, the district court certified a nationwide opt-out class of all individuals and entities who paid PACER fees between April 21, 2010, and April 21, 2016, excluding federal-government entities and class counsel. Appx2433–2453. Although the government did not contest the class's compliance with the Little Tucker Act's $10,000-per-claim cap, the court surveyed the cases to assure itself that it possessed jurisdiction. It held that the Little Tucker Act conferred jurisdiction over all claims in the class under the governing

8

case law, which permits plaintiffs to seek "over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Appx2440. Because "no class member has a claim exceeding $10,000 for a single PACER transaction," and the government did not dispute this, the court held that none of the claims "exceed the jurisdictional limitation of the Little Tucker Act." Appx2441. The court then certified the plaintiffs' illegal-exaction Little Tucker Act claims for classwide treatment and appointed Gupta Wessler and Motley Rice as co-lead class counsel. Appx2433.

The plaintiffs subsequently submitted a proposal for class notice and retained KCC Class Action Services (or KCC) as claims administrator. The district court approved the plan in April 2017, Appx2582–2585, and notice was provided to the class in accordance with the Court's order. Among other things, the notice informed class members that, "[b]y participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." Appx2573–2574. Of the approximately 395,000 people who received notice, only about 1,100 opted out of the class. Appx4221.

Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only what the judiciary labeled as "Public Access Services," but also "Case Management/Electronic Case Files System" (or CM/ECF); "Electronic Bankruptcy

Notification"; "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi [Study]." Based on this discovery, the parties filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." Appx2607–2608. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. *Id.* The government, by contrast, took the position that all PACER fees paid by class members during the class period were permissible. It argued that the statute authorizes fees to recover the costs of any project related to disseminating information through electronic means. Appx3003–3004.

In March 2018, the district court took a third view. As the court saw it, the E-Government Act "effectively affirmed the judiciary's use of [PACER] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." Appx3481. The court thus held that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most … Courtroom Technology." Appx3476–3477.

In the months that followed, the AO took steps "to implement the district court's ruling" and "reduce potential future legal exposure." Appx4222–4223. It announced in July 2018 that these four categories would "no longer be funded" with PACER fees. Appx4223. "The Judiciary will instead seek appropriated funds for those categories," as it does for over 98% of its budget. *Id*. A year later, the AO announced that it was doubling the quarterly fee waiver for PACER—from $15 to $30—which had the effect of eliminating fees for about 75% of PACER users. *Id*.

## C.    Appellate proceedings

Both parties sought permission for an interlocutory appeal, which this Court granted. The parties adhered to their same interpretations of the statute on appeal. The plaintiffs' position was supported by a broad array of amici curiae—prominent retired federal judges, Senator Lieberman, media organizations, legal-technology firms, and civil-liberties groups from across the ideological spectrum—detailing the harms caused by high PACER fees. *See* Liptak, *Attacking a Pay Wall that Hides Public Court Filings*. In response, the government defended the full amount of PACER fees, while strenuously arguing that the court lacked jurisdiction under the Little Tucker Act. The government did not deny that "each download for which a charge is paid gives rise to a separate illegal exaction claim," U.S. Br., 2019 WL 1762811, at *12, as the district court held. Instead, it argued that there was no jurisdiction because the E-Government Act did not include an express cause of action for damages.

This Court rejected the government's jurisdictional argument and largely affirmed the district court's conclusions. It held that the court "had jurisdiction under the Little Tucker Act" over the class complaint, which "alleged that each individual download of a public record for which they were charged gave rise to a separate 'illegal exaction' claim." *NVLSP*, 968 F.3d at 1345, 1349. And the Court "reject[ed] the government's argument that, to confer jurisdiction, the complaint must identify precisely the amount each plaintiff has individual overpaid." *Id.* at 1349 n.9.

On the merits, the Court "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *Id.* at 1350. It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (those not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. This Court noted that CM/ECF was a "potential source of liability" because the Court could not confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* at 1358. It left it to the district court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

12

Following this Court's decision, federal lawmakers swung into action to address the problems highlighted by this litigation. The House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. Appx4224.

## II.    Mediation and settlement

On remand, the case was reassigned to Judge Friedman, and the parties came together to discuss the path forward. They understood that litigating the case to trial would entail significant uncertainty and delay. Appx9, 4225. Years of protracted litigation lay ahead. And the range of potential outcomes was enormous: On one side, the government argued that it owed zero damages to the class because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower (a litigating position that also made it difficult for the judiciary to lower fees while the case remained pending). *Id.* On the other side, the plaintiffs maintained that liability had already been established for four categories of expenses and that some portion of the CM/ECF expenditures was likely improper as well. *Id.*

Hoping to bridge this divide and avoid a lengthy delay, the parties were able to agree on certain structural aspects of a potential settlement and to engage in mediation on the amount and details. Appx9, 4225. In December 2020, at the parties' request, the district court stayed the proceedings until June 2021, to allow the parties to enter into private mediation. Appx4225. Over the next few months, the parties

exchanged information and substantive memos providing a comprehensive view of the strengths and weaknesses of the case. Appx4225. The parties scheduled an all-day mediation in early May 2021, to be supervised by Professor Eric D. Green, an experienced and accomplished mediator agreed upon by the parties. Appx9.

With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. Appx9–10, Appx4226. The government eventually agreed to structure the settlement as a common-fund settlement, not a claims-made settlement, and the plaintiffs agreed to consider the government's final offer concerning the total amount of that fund. Appx9–10. But by the time the session ended, the parties still hadn't agreed on the total amount of the common fund or other important terms—including how the money would be allocated and distributed to class members, what to do with any unclaimed funds after the initial distribution, and the scope of the release. Appx4226. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were ultimately able to agree on the total amount of the common fund, inclusive of all costs, attorneys' fees, and service awards. *Id*. The parties then spent several months continuing to negotiate other key terms, while the district court repeatedly extended its stay to allow the discussions to proceed. *Id*.

Further progress was slow, and at times the parties reached potentially insurmountable impasses. *Id*. A particular sticking point concerned the allocation of

settlement funds. *Id.*; Appx10. Consistent with the parties' litigating positions, the plaintiffs argued that funds should be distributed pro rata to class members, while the government argued for a large minimum amount per class member, which it maintained was in keeping with the AO's statutory authority (and longstanding policy) to "distinguish between classes of persons" in setting PACER fees "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note; Appx4226–4227. Over a period of many months, the parties were able to resolve their differences and to reach a compromise on these competing approaches: a minimum payment of $350—the smallest amount the government would agree to—with a pro rata distribution beyond that amount. Appx4226.

The final version of the settlement was executed in July 2022. Appx4227; Appx4254. The parties executed an amendment in September 2022 making certain technical modifications to the agreement, and a second amendment in April 2023 making further technical modifications. Appx4257–4259 & Appx4261–4263.

## III. Overview of the settlement agreement

### A. The settlement class

The settlement agreement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the class period"), excluding opt-outs, federal agencies, and class counsel. Appx3978; 3993–3994. The class period

does not go beyond May 31, 2018, because the AO stopped using PACER fees to fund the four categories of prohibited expenses after this date.

This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010, and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016, and May 31, 2018. Appx3998. Because people in this second group are not part of the original class, they did not receive notice or a right to opt out when the original class was certified. For that reason, under the settlement, these additional class members received notice and a right to opt out in 2023. *Id.*

### B.    The settlement relief

The settlement provides for a total common-fund payment by the United States of $125 million, which covers the monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. Appx3979.

If the district court's approval of the settlement is affirmed by this Court, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust. Appx3979, 3981. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. Appx3981.

### C.    The released claims

In exchange for the relief provided by the settlement, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the class period. Appx3980.[1]

### D.    Notice to settlement class and requests for exclusion

In July and August 2023, KCC sent court-approved settlement notices to over 500,000 PACER accountholders. Appx4288, 4290. Approximately 100,000 of these people had an opportunity to request exclusion from the settlement class because they were not part of the initial class. Appx4288–4289. Only 33 of them did so. Appx10. KCC "also issued publication notice through a widely disseminated press release and a banking newsletter." Appx10; *see* Appx4289–4290.

### E.    Allocation and payment

Under the settlement, class members will not have to submit a claim to receive payment. Appx3978, 3981. Instead, KCC will use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.* These efforts include (1) sending checks to class members using PACER payment data maintained by the government; (2) allowing class members to notify

---

[1] This release excluded the claims that were then pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). Appx3980. That unrelated case—which was voluntarily dismissed with prejudice in 2023—alleged that PACER overcharges users due to a systemic billing error concerning the display of some HTML docket sheets.

KCC that someone else paid PACER fees on their behalf and is the proper recipient of any settlement funds; and (3) allowing individuals or entities to notify KCC that they paid PACER fees on behalf of someone else and are the proper recipients of settlement funds. Appx3978, 3982–3984, 4291–4292.

The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. Appx3982. KCC will then distribute any court-approved service awards to the named plaintiffs and any court-approved attorneys' fees and costs to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to $100 million.

***First distribution.*** KCC will distribute the Remaining Amount to class members using the following formula: It will first allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. Appx3982–3983. Next, KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* KCC will then deduct this Aggregate Minimum Payment Amount from the Remaining Amount and allocate the

remainder pro rata to all class members who paid more than $350 in PACER fees during the class period. *Id.*

Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the class period will receive a payment equal to the total amount of fees paid by that class member during the class period; and (b) each class member who paid over $350 in PACER fees during the class period will receive a payment of $350 plus their allocated pro-rata share of the total left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. Appx3983.

KCC will complete disbursement of each class member's share of the recovery within 180 days of receiving the $125 million from the United States, or within 180 days of receiving the necessary information from AO, whichever is later. Appx3997–3998. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. *Id.*

**Second distribution.** If, despite these efforts, unclaimed or undistributed funds remain in the settlement trust one year after the $125 million payment by the

United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. Appx3997–3998. First, the only class members eligible for a second distribution will be those who (1) paid over $350 in PACER fees during the class period and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) exceeding their total PACER fees paid during the class period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. Appx3985. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate it. *Id.*

### F.    Service awards, attorneys' fees, and costs

As noted, the settlement authorizes the plaintiffs to request service awards of up to $10,000 per class representative and an award of attorneys' fees and litigation

expenses, and for KCC to retain from the trust all notice and administration costs that it actually and reasonably incurred. Appx3982, 3986. Any amounts awarded by the court will be paid out of the common fund. *Id.* As required by Federal Rule of Civil Procedure 23(h), Class Members had the right to object these requests. *Id.*

## IV.    Proceedings for final approval of the settlement and for attorneys' fees, costs, and service awards

### A.    Objections

The plaintiffs moved for final approval of the settlement and, as authorized by the settlement, for attorneys' fees, litigation expenses, settlement-administration and notice costs, and service awards for the three class representatives in a total amount equal to 20% of the $125 million common fund. Specifically, they sought $29,654.98 in expenses, $1,077,000 in settlement-administration and notice costs, $30,000 in total service awards, and $23,863,345.02 in attorneys' fees. Appx4096.

Class members had a nearly universal positive reaction to the settlement. Of the hundreds of thousands of people in the class, class counsel received just three objections from class members, all of them pro se. These objectors each complained that the settlement is unfair—but in different and even contradictory ways:

*1. Aaron Greenspan's objection.* Mr. Greenspan noted that he "was the plaintiff in one of the only lawsuits—if not the only lawsuit—to ever challenge the PACER fee structure, prior to this one." Appx4661. He contended that, because he "should not have had to pay a single penny to the federal government for fees that

were unlawfully charged in the first place," "all of that money should be refunded in full." *Id.* ("I want my money—stolen by the courts—back. All of it. And I want the [AO] staff and the judges who approved this held accountable, by name."). Mr. Greenspan believed that "the judiciary has scammed the American public." *Id.* In his view, "the plaintiffs [were] 100% right, the government [was] 100% wrong," and so any "legal limitations" on the refund of all fees paid are "manifestly unjust." *Id.*

*2. Eric Alan Isaacson's objection.* Mr. Isaacson, a serial class-action objector, contended that this is a "run-of-the-mill settlement" and that class counsel "achieved a remarkably mediocre result." Appx4499. In his assessment, this first-ever class action against the federal judiciary "was obviously an easy one to litigate" and an "easy one to settle." Appx4510. Mr. Isaacson objected to the requested fees and service awards. He also objected to the settlement's fairness, complaining that class counsel disserved the class "by advocating a purely pro-rata distribution of settlement funds"—an approach that, in his view, "favor[s] large institutional users," whose claims (he also argued) exceed the scope of Little Tucker Act jurisdiction. Appx4501, 4504–4505; *see* Appx4501 ("Plaintiffs' advocacy for pro-rata distribution was grossly inappropriate. The 'blend' reached as a compromise allocates far too much to a pro rata distribution that unfairly advantages large users and law firms[.]").

*3. Geoffrey Miller's objection.* Mr. Miller's objection was exactly the opposite: Whereas Mr. Isaacson believed that class counsel's sin was to "favor large

institutional users," *id.*, Mr. Miller thought that the settlement "favor[s] smaller users." Appx4465. And while Mr. Isaacson believed that counsel advocated too vigorously for a pro rata distribution, Mr. Miller said that they didn't do so vigorously enough. He derided the settlement's allocation plan—which reimburses every PACER user for up to $350 in fees paid, with a pro rata distribution to users who paid more—as a "[r]edistribution of wealth." *Id.* Mr. Miller did not contend that he himself is an allegedly disfavored large institutional user. And no large institutional users saw fit to object, despite their presumed access to sophisticated legal counsel. Mr. Miller had "no problem with the total cash compensation or with the proposed maximum of 20% of the common fund for" fees and service awards. Appx4464.[2]

## B.    The settlement hearing

The district court held a settlement hearing in October 2023. Counsel for both parties, as well as representatives for each named plaintiff, spoke in support of the settlement. Appx11. Mr. Isaacson and a second objector who is not a class member (Mr. Kozich) appeared to voice their objections. *Id.* No other objector elected to appear, either in person or by Zoom.

---

[2] In addition to these three objections, the district court received an untimely email from Alexander Jiggetts, indicating that he "oppose[s] the settlement" because he was "the first person to complain about Pacer Fees" and has not been credited for his efforts. Appx4463. The court also received an untimely objection by Don Kozich, Appx4467–4475, who is not a class member. Appx17. Nevertheless, the court carefully considered both of these objections. Appx11.

Class counsel emphasized the near "universal support for the settlement," telling the court: "[T]here is a dog that didn't bark; no transparency groups, no law firms, no data companies, no groups that represent underrepresented litigants; none of them have come forward"—underscoring the success of the settlement. Appx4726. The three named plaintiffs also praised the settlement. A representative of National Veterans Legal Services Program, herself an expert on illegal-exaction claims under the Little Tucker Act, "strongly support[ed] the settlement and the fees and costs that reflect the complexity and unique nature of this litigation." Appx4730. She noted that many veterans are class members who will benefit from the historic relief provided by the settlement. Appx4729–4730. A representative of National Consumer Law Center explained how heavily the organization relies on PACER in accessing court records, lauded class counsel's efforts in litigating the case, and noted that the requested service award was well below the value of the time he spent on the case. Appx4732–4735. The Alliance for Justice representative likewise noted that the requested service award was likely far below the value of attorney time spent on the case. Appx4728.

Counsel for the government, too, spoke in favor of the settlement. She agreed that this is a "landmark class action case" and that the "settlement is an outstanding result" that "more than meets the legal requirements for final approval." Appx4735–4736. Responding to Mr. Isaacson's and Mr. Miller's contradictory concerns about

the allocation of settlement funds, she responded: "There is nothing inequitable about the plan of allocation and distributing payments pro rata with a guaranteed payment up to a certain amount in a common fund case such as this one is not unusual." Appx4738. As she explained, "the allocation plan was the result of a compromise between the parties and supports the [AO]'s long-standing policy of access to judicial records." *Id.* In that way, "the settlement is a marriage of the parties' litigating positions which, in the end, is the hallmark of compromise." Appx4739.

Next, Mr. Isaacson spoke to oppose the settlement. Appx4741–4750. Consistent with his written opposition, he took the position that the minimum-payment cap should have been "double" or "three times" $350 so that "large law firms," many of whom may have been reimbursed by their clients for PACER fees, would receive less. Appx4741–4744. He also challenged the service awards for the named plaintiffs. Appx4744.

Class counsel responded to his objections. Counsel explained that, as a legal matter, whether a law firm was later reimbursed for fees is irrelevant; the claim is still theirs. Appx4757. "Any downstream issues with respect to reimbursement by other people is a matter between [that firm] and those other people." *Id.* Yet counsel also explained that "we didn't … want to stop there because we know that this is a real-world issue." Appx4759. So they took steps to collect information on clients that paid fees for big law firms to make it easier for them to be reimbursed down the line.

Appx4757–4760. As to Mr. Isaacson's objection to the service awards, counsel explained that "the time that these class representatives' lawyers have spent on this case more than justifies these modest service awards." Appx4762–4763.

The court then turned to the issue of attorneys' fees. It emphasized its "fiduciary obligations" to the class, Appx4795, and understood that it would have to decide two questions, Appx4776–4777. The first question: Which methodology should be used in setting an appropriate fee—the "percentage-of-the-fund method, through which a reasonable fee is based on a percentage of the fund bestowed on the class," or the "lodestar" method, "through which the court calculates the product of reasonable hours times a reasonable rate and then adjusts that lodestar result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings"? *Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1371 (Fed. Cir. 2023) (cleaned up)); *see* Appx4777. On that question, the court indicated that it thought that the best approach was to use the percentage-of-the-fund method with a "loadstar crosscheck." Appx4782. "And the other question is: How much?" Appx4777.

Class counsel explained why they thought that their fee request was reasonable given the particulars of the case, while Mr. Isaacson expounded on his view that the court should use the lodestar method. Appx4793. Class counsel agreed with Mr. Isaacson that the court plays an "important role" as "a fiduciary on behalf of the absent class members." Appx4796. But, he continued, Mr. Isaacson's "categorical

26

attack[s]" on the percentage-of-the-fund approach in common-fund cases have been "rejected by every one of the federal circuits," including those in which Mr. Isaacson himself was the objector. Appx4796–4797; *see, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 478–89 (S.D.N.Y. 2017), *aff'd sub nom. Fresno Cnty. Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63 (2d Cir. 2019), *cert. denied* 140 S. Ct. 385 (2019).

### C.    District court approval of the settlement agreement

Five months later, in March 2024, the district court issued a 48-page opinion approving the settlement and granting the plaintiffs' request for attorneys' fees, settlement costs, litigation expenses, and service awards. "Having carefully considered the parties' arguments and all of the objections that have been filed with the Court and expressed at the Settlement Hearing," the district court concluded that the "historic settlement" reached after nearly eight years of hard-fought litigation was "fair, reasonable, and adequate." Appx15, 47. In doing so, the court rejected Mr. Isaacson's characterization of the $125 million settlement amount as "remarkably mediocre," and pointed out that such "views do not properly account for the formidable arguments that were available to the government if the case had proceeded to trial." Appx21. "The common fund amount," the court explained, is "impressively large in comparison to the risks of continuing to litigate." Appx21.

The court also concluded that the allocation of that amount is fair. It observed that, as the "contradictory positions" advanced by Mr. Isaacson and Mr. Miller

show, the "$350 figure" represents a "good compromise" of "two competing goals: First, to give relief to small-scale PACER users," as the E-Government Act authorizes the AO to do, and "second, to treat all class members—including large-scale users like law firms—equitably based on what they actually paid." Appx23–34.

Further, the court explained why "there were good reasons" for the settlement to treat class members the same regardless of whether they've been reimbursed for the fees. Appx26. For one thing, Little Tucker Act damages are available only "to those who paid unlawful fees to the government, to those who paid unlawful fees to others at the direction of the government … or to those against whom the government took action." Appx26–27. The clients of law firms do not "fit into any of these categories," making the firms "likely the *only* plaintiffs who could have brought claims against the government" in this litigation. *Id.* For another thing, "law firm class members are better equipped" than KCC "to determine which of their clients to reimburse for PACER charges, and by how much." Appx28.

The court separately rejected Mr. Isaacson's argument that class members "whose aggregated claims total over $10,000 fall outside of Little Tucker Act jurisdiction." Appx26. The court explained that this argument "misunderstands the law." *Id.* "A suit in a district court under the Little Tucker Act may seek over $10,000 in total monetary relief as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." *Id.*

On attorneys' fees, the district court understood that it "acts as a fiduciary" for the class and "must independently determine the reasonableness of the requested fees." Appx29–30. In keeping with this Court's decision in *Health Republic*, the district court elected to use the percentage-of-the-fund method for determining a reasonable fee, which "promotes efficiency and ensures that class counsel is compensated primarily based on the result achieved," while conducting a "lodestar cross-check" to "confirm that the fee awarded properly accounts for the effort Class Counsel expended to litigate the case." Appx33–34. Applying the factors identified in *Health Republic*, the district court awarded an amount that "reflect[s] a reasonable lodestar multiplier" (about 3.96) that "is warranted due to the risk Class Counsel took on in agreeing to litigate the case"—namely, the "exceptionally high risk of nonrecovery." Appx35, 45; *see* Appx35–37 (detailing risks). The amount also "reflect[s] a percentage" (about 19.1) that "aligns with the best case analogues" and is "around the average for common funds of similar size—even though Class Counsel's representation, and the result they achieved for the class, were well above average." Appx41, 45.

Finally, the court awarded $10,000 to each named plaintiff because each had spent "over $10,000 worth of attorney time and expenses in leading this litigation." Appx46. Following the court's decision, only Mr. Isaacson appealed.

## SUMMARY OF ARGUMENT

**I. Jurisdiction.** The district court had jurisdiction under the Little Tucker Act to certify the class and approve this settlement. Mr. Isaacson's eleventh-hour jurisdictional challenge contravenes this Court's precedents, is unworkable, and would unfairly punish class members. As the district court correctly held and this Court's precedents make clear, this case does not involve any claim exceeding $10,000. The Little Tucker Act allows suits seeking over $10,000 in total relief, as long as each individual claim does not exceed $10,000. *See Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 797 (Fed. Cir. 1993). Here, each PACER transaction gives rise to a separate claim under $10,000. Mr. Isaacson's argument that class members with over $10,000 in total claims must be excluded misunderstands the law and runs contrary to this Court's prior ruling in this case. *See NVLSP*, 968 F.3d at 1349 n.9 (Fed. Cir. 2020). His position is also untenable and internally inconsistent and would have the absurd result of leaving those who suffered the most illegal exactions unable to recover due to the jurisdictional statute of limitations in the Court of Federal Claims. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008).

**II. Fairness.** The district court did not abuse its discretion in approving the pro rata distribution to class members as fair. A pro rata distribution has always been a traditional measure of fairness. And, far from selling out smaller PACER users, this settlement prioritizes them by providing full reimbursement up to $350 and

distributing the remainder proportionally. The district court properly rejected arguments that some class members should not recover because they may have been reimbursed by others. The claims of these class members are just as valid, and any reimbursement issues with third parties are beyond the scope of this litigation.

**III. Fees.** The district court did not abuse its discretion in awarding attorneys' fees. *First*, Mr. Isaacson's argument that fees are presumptively limited to the unenhanced lodestar contradicts this Court's precedents and is not the law in any circuit. *See Health Republic Ins. Co.*, 58 F.4th at 1371 (Fed. Cir. 2023). *Second*, contrary to Mr. Isaacson's assertion, the district court did not "rubber-stamp" class counsel's fee request. Rather, the court engaged in careful independent analysis as a fiduciary for the class, conducting a thorough inquiry including a lodestar cross-check. *Third*, the district court properly followed this Court's precedent in *Health Republic* in using the percentage-of-fund method with a lodestar cross-check, not the D.C. Circuit's approach as Mr. Isaacson claims. *Fourth*, while Mr. Isaacson cites the government's initial concern about insufficient information, he fails to acknowledge that the government later informed the court that its concerns were fully addressed by additional information that provided a sufficient basis for the cross-check and fee award.

**IV. Payments to class representatives.** The district court did not abuse its discretion in approving payments to the class representatives who actively oversaw

this litigation for eight years. Courts routinely approve service awards to class representatives, including organizations that have provided in-house counsel to aid in prosecuting the case. This case does not present the abstract legal question that Mr. Isaacson tries to tee up because the outcome would be the same even under his preferred cases. The payments here compensate for attorney time and expenses in prosecuting the suit, which are allowable even under the 19th century cases he cites. *See Trustees v. Greenough*, 105 U.S. 527, 537 (1882). In any event, neither *Greenough* nor *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), prohibits incentive awards in class actions, as the overwhelming majority of circuits have concluded. *See Moses v. N.Y. Times Co.*, 79 F.4th 235, 256 (2d Cir. 2023). Mr. Isaacson ignores this wealth of contrary authority and the Supreme Court's recent recognition that class representatives may receive awards above their individual claims. *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 n.7 (2018).

## STANDARD OF REVIEW

This Court applies de novo review to jurisdictional questions under the Little Tucker Act. *NVLSP*, 968 F.3d at 1347. It reviews a district court's approval of a class-action settlement and award of reasonable attorneys' fees and service awards for "abuse of discretion." *Haggart v. Woodley*, 809 F.3d 1336, 1346 (Fed. Cir. 2016).

## ARGUMENT

### I.  The district court had jurisdiction to certify the class and approve this settlement under the Little Tucker Act.

Mr. Isaacson's lead argument is that the district court lacked jurisdiction under the Little Tucker Act to approve the settlement because it includes people for whom "complete relief" would exceed $10,000. Isaacson Br. 18. But, under the governing case law, a Little Tucker Act case "may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Appx26. The district court applied that rule in first certifying the class in 2017, Appx2440–2441, and this Court subsequently held that the court "had jurisdiction under the Little Tucker Act" over the complaint, which "alleged that each individual download of a public record for which they were charged gave rise to a separate 'illegal exaction' claim." *NVLSP*, 968 F.3d at 1345.

The district court properly adhered to this rule in approving the settlement. Even the federal government—for whose benefit the $10,000 limit exists—agrees that, under the governing case law, the court had jurisdiction over all the claims. Mr. Isaacson's argument, by contrast, cannot be reconciled with that case law. It would require exactly what this Court held that the Little Tucker Act does *not* require: that the plaintiffs "identify precisely the amount each plaintiff has individually overpaid." *Id.* at 1349 n.9. And given that the statute of limitations in the Court of Federal Claims is jurisdictional, it would harshly punish those who paid the most in overcharges.

A.    **As the district court correctly held—and this Court's precedents make clear—this case does not involve any claim that exceeds $10,000.**

The basis for jurisdiction in this case is the Little Tucker Act, which waives the federal government's sovereign immunity and confers "jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1348 (Fed. Cir. 2005).

By its terms, the Little Tucker Act grants district courts "original jurisdiction, concurrent with the United States Court of Federal Claims," over any non-tort, non-tax "claim against the United States, not exceeding $10,000," 28 U.S.C. § 1346(a)(2), while vesting exclusive appellate jurisdiction in this Circuit, *id.* § 1295(a). This Court has made clear that, in a class action, "there will be no aggregation of claims" for purposes of assessing the $10,000 limit. *Chula Vista City Sch. Dist. v. Bennett*, 824 F.2d 1573, 1579 (Fed. Cir. 1987); *see also United States v. Bormes*, 568 U.S. 6, 16 n.1 (2012). This Court has also made clear that the statute does not require that each plaintiff's total recovery be $10,000 or less. Quite the contrary: This Court's precedent holds that even a single plaintiff seeking millions of dollars may bring suit in district court under the Little Tucker Act if the total amount sought represents the accumulation of many separate transactions, each of which gives rise to a separate claim that does not itself exceed $10,000. *See Alaska Airlines, Inc.*, 8 F.3d at 797.

34

In the 1990s, airlines brought two suits in district court seeking to recover what they claimed were illegal exactions by the government. In one case, the General Services Administration deducted roughly $100 million from future payments it owed the airlines after determining that it had overpaid for plane tickets. *Alaska Airlines v. Austin*, 801 F. Supp. 760, 762 (D.D.C. 1992). In the other, it "withheld future payments to the airlines to offset" the costs of tickets never used. *Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 74 (D.D.C. 1991). The airlines claimed that GSA was "recouping alleged overcharges from them in violation of the law," and sought "return of the funds" that had "been assessed against them unlawfully." *Alaska Airlines*, 801 F. Supp. at 761.

In both cases, the court recognized that each airline was seeking well over $10,000 but determined that the total amount each plaintiff sought "represents the accumulation of disputes over alleged overcharges on thousands of individual tickets," *id.* at 762—a conclusion that was affirmed by this Court on appeal, *Alaska Airlines*, 8 F.3d at 797. As a result, the district court held that the asserted overcharge for each individual ticket constituted its own claim under the Little Tucker Act— even though the airlines paid numerous overcharges at a time through GSA's withholdings, and even though each case presented one "straightforward" legal question. *Alaska Airlines*, 801 F. Supp. at 762. Because "[e]ach contested overcharge is based on a single ticket and is for less than $10,000," the court had jurisdiction under the Little Tucker Act. *Id.* The court explained that "[t]he Government cannot escape

35

[Little Tucker Act] jurisdiction by taking a lump sum offset that totals over $10,000 and then alleging that the claims should be aggregated." *Am. Airlines*, 778 F. Supp. at 76. On appeal, this Court agreed, holding that "the district court had concurrent jurisdiction with the Court of Federal Claims." *Alaska Airlines*, 8 F.3d at 797.

Under this precedent, as the district court below correctly explained, "[a] suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Appx26; Appx2440; *see also Nat'l Motor Freight Traffic Ass'n, Inc. v. Gen. Servs. Admin.*, 25 F. Supp. 3d 52, 57, 60–61 (D.D.C. 2014) (following this rule and finding Little Tucker Act jurisdiction over illegal-exaction claims arising from "thousands" of separate transactions because "each disputed overcharge [was] for an amount less than $10,000") (cleaned up).

That rule governs here. As this Court noted when it held that "the district court had jurisdiction under the Little Tucker Act," the "[p]laintiffs alleged that each individual download of a public record for which they were charged gave rise to a separate 'illegal exaction' claim." *NVLSP*, 968 F.3d at 1345; *see* Appx120. Each class member thus has multiple illegal-exaction claims, none exceeding $10,000. Even if a tiny fraction of class members could receive more than $10,000 total, that "represents the accumulation of disputes over alleged overcharges on thousands of individual [transactions]"; it is no bar to jurisdiction. *Alaska Airlines*, 801 F. Supp. at 762.

**B.     Mr. Isaacson's jurisdictional challenge contravenes this Court's precedents, is unworkable and internally inconsistent, and would unduly punish class members.**

Despite these cases, Mr. Isaacson contends that the district court below lacked jurisdiction to certify the class and approve the settlement because the class includes people who paid more than $10,000 in PACER fees during the class period. As he sees it (at 18), "[a]ny class member for whom complete relief would total over $10,000 must be excluded from the class." He therefore argues (at 21–22) that "[t]hose whose Class Period PACER expenditures exceeded $10,000 should have been excluded."

As the district court explained, "[t]his argument misunderstands the law." Appx26. The Little Tucker Act does not cap a plaintiff's total relief. The text of the statute covers a "civil action *or claim* … not exceeding $10,000." 28 U.S.C. § 1346(a)(2) (emphasis added). It thus confers jurisdiction "over each Little Tucker Act claim seeking $10,000 or less—even if those claims in aggregate seek[] more than $10,000." *Iosilevich v. United States*, 2024 WL 1211326, *7 (E.D.N.Y. 2024). The $10,000 "limit is not violated when plaintiffs combine a number of claims that are individually less than $10,000 but cumulatively exceed that amount," *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983)—just what this Court recognized in *Alaska Airlines*, 8 F.3d at 797.

Mr. Isaacson dismisses this Court's conclusion in *Alaska Airlines* as "dictum" and spends ten pages (at 31–40) trying to distinguish that litigation on its facts. He asks the Court to instead follow a 1947 First Circuit case and a smattering of other

cases from other jurisdictions. *See* Isaacson Br. 25–27. But as he points out (at 15–16), Little Tucker Act claims have been "properly governed by Federal Circuit law" ever since this Court was created in 1982—not "regional circuit law." And this Court's jurisdictional conclusion in *Alaska Airlines*, far from being "dictum," was integral to the Court's disposition. It was the *only* reason that the Court gave for why a "line of authority" that would have required a different result did not apply. *See* 8 F.3d at 797.

Nor does Mr. Isaacson offer any principled way to distinguish *Alaska Airlines*. He says that it should be disregarded (at 29, 33) because the claims in that case were "based on the variable terms" of "discrete contracts." That is both wrong and beside the point. It is wrong because the claims there did not turn on the meaning of any "contractual obligations," much less variable obligations; rather, they turned on the meaning of the statute on which the government relied in imposing the overcharges. *Alaska Airlines*, 8 F.3d at 797; *see Alaska Airlines*, 801 F. Supp. at 763 ("The[] complaint cannot be resolved by reference to the terms of any contract."); *accord United States v. Louisville & Nashville R.R. Co.*, 221 F.2d 698, 700–02 (6th Cir. 1955) (holding that each of 74 different shipments gave rise to its own Little Tucker Act claim even though they presented "similar factual situations and identical questions of law"). It is also beside the point: Just as each individual ticket gave rise to a separate contractual claim, "each individual download of a public record for which [users] were charged gave rise to a separate 'illegal exaction' claim." *NVLSP*, 968 F.3d at 1345. Indeed,

before someone can access a particular record using PACER, the person must agree "[t]o accept charges" of a particular amount, shown on the computer screen along with a "Transaction Receipt" detailing the charges. Here is an example:

To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser.

| Pacer Service Center | | | |
|---|---|---|---|
| | Transaction Receipt | | |
| | Mon May 2 09:27:00 2016 | | |
| Pacer Login: | | Client Code: | |
| Description: | Image1-0 | Case Number: | 1:16-cv-00745-ESH |
| Billable Pages: | 15 | Cost: | 1.50 |

View Document

Each transaction, then, triggers a separate charge that separately violates the statute. Accordingly, each such charge forms the basis of a separate illegal-exaction claim in the same way that each ticket formed the basis of a separate claim in *Alaska Airlines*.[3]

Mr. Isaacson's position contradicts not only *Alaska Airlines*, but this Court's prior decision in this very case. This Court rejected the argument that, "to confer jurisdiction, the complaint [here] must identify precisely the amount each plaintiff has individually overpaid" in PACER charges. *Id.* at 1349 n.9. Yet Mr. Isaacson would require just that. Although he contends that everyone who paid over $10,000 in fees during the class period must be excluded from the class, that is not correct

---

[3] The government's decision to collect payment on a "lump sum" basis—that is, to wait to charge the user's credit card until the end of the quarter—does not allow it to "escape" Little Tucker Act jurisdiction. *Am. Airlines*, 778 F. Supp. at 76. And the government is not arguing that it does. When the government collects the payment affects *when* the claim accrues—not *whether* the claim is to be treated as its own claim.

even under his view of the law. The plaintiffs have always conceded that the AO could charge *some* amount in fees. So Mr. Isaacson would require them to "identify precisely the amount each plaintiff has individually overpaid" during the class period to establish jurisdiction, *id.*—an unworkable test that defies this Court's precedent.

Mr. Isaacson's position is untenable for another reason. He argues (at 27–28) that "[e]ach Class Members has a single claim" during the class period. But each class member does *not* have a "single claim" for statute-of-limitations purposes. Each class member has a claim that accrued during the class period only because, under this Court's "continuing claim[s] doctrine," each "plaintiff's claim could be broken down into a series of independent and distinct wrongs or events, each such wrong or event having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1457 (Fed. Cir. 1997). Under that doctrine, "[e]ach wrong constituted" its own "violation of a statute," and hence its own claim. *Id.* Mr. Isaacson offers no support for the idea that plaintiffs can have multiple distinct claims for purposes of the statute of limitations but not for purposes of the Little Tucker Act.

If anything, this Court has said the opposite. In 2001, Judge Plager issued a dissenting opinion addressing this topic in *Williams v. United States*, 240 F.3d 1019 (Fed. Cir. 2001)—and the majority agreed with his analysis. *See id.* at 1025 & n.2 (holding that the district court had jurisdiction over at least one claim and "adopt[ing]," if necessary, "the jurisdictional analysis set out in the dissenting opinion"). Judge Plager

would have treated the plaintiffs' complaint for backpay "as stating a separate cause of action for each [monthly] pay period," the way that backpay claims are treated for statute-of-limitations purposes. *Id.* at 1059–60. To him, "[i]t would be improper to treat the analogous question of the trial court's jurisdiction under the Little Tucker Act differently from the separate cause of action limitations theory enunciated in *Hatter* [*v. United States*, 203 F.3d 795 (Fed. Cir. 2000) (en banc)]." *Id.* at 1060.[4]

Finally, Mr. Isaacson—who claims to be championing the interests of absent class members—is advocating a position that would punish those who suffered the greatest number of illegal exactions during the class period. He says (at 22) that "[t]he filing of this action tolled the limitations period for them to file their own individual actions in the U.S. Court of Federal [C]laims," citing *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). The "source of the tolling rule applied in *American Pipe* is the judicial power to promote equity, rather than to interpret and enforce statutory provisions." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 509 (2017). But the Court of Federal Claims' limitations period, 28 U.S.C. § 2501, is "jurisdictional and not susceptible to equitable tolling" or waiver. *John R. Sand & Gravel Co.*, 552 U.S. at

---

[4] Mr. Isaacson relies (at 24) on two backpay cases from this Court to support his position. But those cases both predate this Court's en banc decision in *Hatter*, as well as the *Williams* majority's embrace of Judge Plager's jurisdictional analysis. They also predate *Alaska Airlines* and, at any rate, do not alter the rule that "[a] suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000." Appx26; Appx2440.

136 (cleaned up); *see also Reoforce, Inc. v. United States*, 853 F.3d 1249, 1264 (Fed. Cir. 2017).

Thus, multiple cases have recently held that "*American Pipe* tolling cannot be applied

to toll the deadlines mandated by 28 U.S.C. § 2501." *Blue Cross & Blue Shield of Kansas*

*City Welfare Benefit Plan v. United States*, — Fed. Cl. —, 2024 WL 3738315, *10 (2024); *see*

*Kelly v. United States*, 171 Fed. Cl. 550, 560 (2024). Under those cases, Mr. Isaacson's

position would leave class members with the largest potential recoveries out in the

cold. Because the class period here ended more than six years ago, they would be

forever barred from being able to obtain compensation for the unlawfully excessive

fees that they paid during the class period. Fortunately, that is not the law.

## II.    The district court did not abuse its discretion by approving a pro rata distribution among class members as fair.

Turning from jurisdiction to the merits, Mr. Isaacson's primary objection (at

40) is that the district court "plainly abused its discretion by approving the Settlement

as fair." He regards any "pro rata distribution" of monetary relief among class

members as "fundamentally unfair and inequitable" and gripes that this settlement

"allocates far too much to a pro-rata distribution that unfairly advantages large users

and law firms." Isaacson Br. 46. His complaint, in other words, is that it is unfair to

allocate more to those who paid more and less to those who paid less. Or, put another

way, he thinks that the settlement treats class members *too* equitably.

This criticism is hard to fathom. Although neither Rule 23 nor due process

demand a purely pro rata distribution in every case, *Int'l Union, United Auto., Aerospace,*

*& Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007), it has always been true—both in modern class actions and at common law—that "fair treatment" is "assured by straightforward pro rata distribution of" settlement proceeds. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999); *see id.* at 840–41 (explaining that, historically, "the simple equity of a pro rata distribution provid[ed] the required fairness"). Accordingly, as the district court observed, "courts routinely approve settlements providing for pro rata distributions of common funds because such distributions directly account for the differences in the value of the claims of different class members." Appx25.

Far from selling out those who paid less in fees, this settlement *prioritizes* the smallest PACER users—in accordance with the E-Government Act and the federal judiciary's policy of ensuring access. Appx24. It does this by reimbursing every class member for up to $350 in fees and by distributing the remainder in a way that is proportional to the overcharges paid by each class member. This allocation led one objector to complain that the settlement "unfairly favor[s] small-scale users over large-scale users," Appx24—the polar opposite of Mr. Isaacson's complaint. These positions, as the district court remarked, "cannot both be correct, and the fact that each of them was made indicates, if anything, a good compromise." Appx24–25. The district court found "absolutely no indication that Class Counsel 'sold out' any group of class members." Appx23.

Mr. Isaacson's contrary argument rests on his mistaken view (at 41–43) that some "large" PACER users don't deserve to recover *at all* because, even though they paid unlawful fees, they may have been later reimbursed by others—for example, law firms reimbursed by clients. The district court gave compelling reasons for rejecting this view, none of which Mr. Isaacson addresses.

First, as the court recognized, the claims of these class members were "just as valid as the claims of other class members." Appx26. The law has long held that those harmed "in the first instance by paying [an] unreasonable charge" may recover the full amount, even if they have "pass[ed] on" the charge to others. *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918). And damages under the Little Tucker Act are available to "those who paid unlawful fees to the government," not to third-party reimbursors, so it was likely impossible for the third parties "to recover anything from the government." Appx26–27 (citing *Aerolineas Argentinas*, 77 F.3d at 1573; *Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1303 (Fed. Cir. 2004)). The reimbursement issue thus poses no barrier here—"the question whether such Class Members must in turn reimburse [others] is a separate matter involving a question of law and equity between [them]." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (rejecting similar objections). Such matters, the district court correctly noted, are "beyond the scope of this litigation." Appx27.

**III.  The district court did not abuse its discretion in awarding attorneys' fees.**

On fees, Mr. Isaacson makes what appear to be four distinct arguments. *First*, he takes the position that fees in a class action are "presumptively" limited to class counsel's "unenhanced lodestar"—a position that contradicts this Court's precedents and is not the law in any circuit. Isaacson Br. 51–52, 56. *Second*, he asserts that the court below "threw causation to the wind" and "exercised no meaningful discretion" but simply "rubber-stamped" class counsel's fee request—a characterization that is untethered from reality. Isaacson Br. 52, 57, & 62. *Third*, he takes aim at a different circuit's precedent (at 58) holding that "attorneys' fees in common-fund cases must be awarded as a percentage of the fund"—even though the court below followed *this Court's* precedent, understood that it had "discretion to use either" the percentage-of-the-fund method or the lodestar method, and conducted a "lodestar cross-check" to confirm the reasonableness of the award. Appx30, 34. *Fourth*, he relies on the government's initial concern (at 63–65) that class counsel did not provide sufficient information for a lodestar cross-check—without acknowledging that the government later told the district court that its concern "ha[d] been addressed" by "additional information" provided by class counsel and that there was "sufficient information in the record" for the court to conduct a cross-check and award fees. Appx4785, 4788.

None of these arguments come close to establishing an abuse of discretion.

45

**1.** Mr. Isaacson's chief contention (at 51–52, 56) is that fees in a class action are "presumptively" limited to class counsel's "unenhanced lodestar." For support, he cites *Perdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542 (2010) (which interprets a fee-shifting statute) and several 19th-century cases that predate Rule 23. *See* Isaacson Br. 49–52. But as other courts have recognized in rejecting this argument and approving other settlements to which Mr. Isaacson has objected, "the *Perdue* presumption against a lodestar enhancement does not apply when a court awards fees from a common fund created after a [class] settlement" and no fee-shifting statute is available. *BioScrip*, 273 F. Supp. 3d at 478–89 (cleaned up); *see Fresno Cnty.*, 925 F.3d at 67–72 (affirming *BioScrip* and rejecting same argument). Every circuit to have addressed the question has held that "Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases" and "restricting the use of multipliers in statutory fee-shifting cases does not apply to common-fund cases." *In re Home Depot Inc.*, 931 F.3d 1065, 1085 (11th Cir. 2019); *see Fresno Cnty.*, 925 F.3d at 67–72; *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 564–65 (7th Cir. 1994); *Staton v. Boeing Co.*, 327 F.3d 938, 967–69 (9th Cir. 2003).

Mr. Isaacson does not cite or acknowledge any of these cases. Nor does he cite or acknowledge what this Court reiterated in *Health Republic*: that the "percentage-of-the-fund method" is a permissible way to set fees in a common-fund class action, and that even, under the lodestar method, a multiplier of up to four is the "norm," while a higher multiplier may be justified by the circumstances of a "particular case,"

including "the risk of nonpayment," the lack of significant "object[ion] to the award," and whether the notice indicated an "agreement by the class to a specified percentage." 58 F.4th at 1371, 1375–77. As the district court found, and Mr. Isaacson does not meaningfully dispute, each of those factors is present here.

Nor does Mr. Isaacson have anything to say about the reasons *why* courts have overwhelmingly turned away from the lodestar method in favor of the percentage approach, detailed in *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993), and by Professor Brian Fitzpatrick below, *see* Appx4146–4164. The "percentage method," as the district court noted, "promotes efficiency and ensures that class counsel is compensated primarily based on the result achieved." Appx33. It also replicates the market for plaintiff-side legal services, which rewards results, not hours.

Mr. Isaacson offers no retort, nor any countervailing benefits to his preferred approach. Although he asserts (at 50, 52) that the fee award is "clearly excessive" and "cannot be deemed reasonable," he does not explain what is unreasonable about an arrangement in which class members (1) owe no legal fees in the event that they do not prevail, (2) receive eight years of high-quality representation in a complex, risky, and novel class action, and (3) ultimately share in a $125 million settlement that (at a minimum) makes them whole up to $350, while paying less than 20% of that total in fees. Class members themselves apparently saw no unfairness in that arrangement. They were informed that, "[b]y participating in the Class, you agree to pay Class

Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." Appx2573–2574. And out of all the class members here, only Mr. Isaacson came forward to contest the request, repackaging many of the same arguments that he has made in other cases.

**2.** Mr. Isaacson's next argument is that the district court failed to "act[] as a fiduciary" for the class and "exercised no meaningful discretion" or "independent analysis" in awarding fees. Isaacson Br. 5, 48, 62. That does not reflect what actually happened. Judge Friedman went out of his way to emphasize that he was obligated to engage in "independent scrutiny of an award's reasonableness"—scrutiny that he said was "particularly important in common-fund cases." Appx29. He also stressed that "the court acts as fiduciary for the beneficiaries of the fund because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set and because there is no adversary process that can be relied upon in the setting of a reasonable fee." Appx30. He then engaged in a careful, independent inquiry spanning nearly 20 pages, in which he found it appropriate to conduct a lodestar cross-check to assure himself that he was awarding a reasonable fee, and did so without even relying on two declarations from the plaintiffs' experts. Appx39.

At the end of his analysis, Judge Friedman awarded an amount that "reflect[s] a reasonable lodestar multiplier" of 3.96, a multiplier that is not only "within the normal range of one to four," but that he found to be independently "warranted" by

48

the "exceptionally high risk of nonrecovery." Appx35, 45; *see* Appx35–37 (detailing risks).[5] He also undertook his own examination of the "closest analogues" in the case law, searching "to locate good comparisons," and ultimately awarded a fee that "reflect[s] a percentage of the fund" that "aligns with the best case analogues" and is "around the average for common funds of similar size—even though Class Counsel's representation, and the result they achieved for the class, were well above average." Appx40–41, 45. He elaborated: "Class counsel provided exceptional service to the class for over seven years, all the while in danger of being paid nothing (or close to it)." Appx45. "They took the case from an untested idea, to a certified class, to a win on partial summary judgment, to a successful appeal," and then "negotiated with the federal government to deliver to the class much of the recovery the class sought," resulting in a "historic settlement" with near universal support. Appx47.

---

[5] A simple math exercise shows why the court was right on this score. To "properly incentivize … contingency representation," a multiplier would have to at least be "the inverse of the riskiness of the case." Appx4163. Here, there were at least three novel, fiercely contested, and independently case-dispositive issues: Is there jurisdiction for this claim? Can a class action for monetary relief be certified against the federal judiciary? And did the judiciary violate the statute, and do so in a way that created liability? If the government prevailed on even just one of these issues, there would be no classwide liability and no fees. So if the government had even a 40% chance of prevailing on each of these independent issues, that would mean that the plaintiffs had little more than a 20% chance of obtaining any classwide relief, justifying a multiplier of five. And, if Professor Fitzpatrick were right that "[n]one of these questions were even 50-50 propositions for the class when this litigation began," the multiplier would have to be over eight to account for the risk. Appx4158–59.

That is nothing like what the lower court did in *Health Republic*, on which Mr. Isaacson heavily relies. There, the court awarded a $185 million fee that was "18 to 19 times" the lodestar, and it did so without conducting a lodestar cross-check—even though a cross-check had been "expressly guaranteed" in the class notice. 58 F.4th at 1372–73. The court included a single sentence in its opinion stating that, "even if [it] applied the lodestar crosscheck, a multiplier of 18–19 would, at least, not be outside the realm of reasonableness." *Id.* at 1372. In vacating the award, this Court explained that "[a] multiplier of 18 or 19 is far outside" the "norm" of "1 to 4," and "so would require exceptional justification." *Id.* at 1376. By offering *no* justification, and instead assuming that the request should be granted unless an objector could show that it fell outside some broad "range of reasonableness" such that a "reduction of fees [would be] justified," the trial court abused its discretion. *Id.* at 1376.

The district court here did not nothing of the sort. It is not remotely accurate to say that the court "misconceived its task as one in which the request for fees was presumptively to be granted, subject only to challengers' demonstration that the request is outside the range of reasonableness and must be reduced." *Id.* Nor did the court abuse its discretion simply because it considered whether class counsel, having moved for a fee award, was entitled the award sought. Mr. Isaacson's argument to the contrary represents a dramatic overreading of *Health Republic*, and a dramatic distortion of what the district court did below.

**3.** Mr. Isaacson also criticizes "the D.C. Circuit's requirement that fees be awarded as a percentage of the fund," and says that the district court "opted to follow" that requirement here. Isaacson Br. 58–59, 61. Not true. The court below followed this Court's precedent. It understood that it had "discretion to use either" method for calculating fees, and it elected to use the percentage-of-the-fund method with a "lodestar cross-check." Appx30, 34. It did not abuse its discretion in doing so.

**4.** Finally, Mr. Isaacson complains (at 63) that the information before the district court was "inadequate" to allow for a lodestar cross-check. But the lodestar cross-check does not require examination of every time entry. As the district court put it: The lodestar cross-check "must remain a cross-check" of the "reasonable percentage of a common fund," and "no more," lest it become the lodestar method through the backdoor. Appx45; *see* Appx4160. "The point is not to identify the precise outdoor temperature at noon but to know whether or not a coat might be necessary when venturing out for lunch. Here, the temperature is just fine." *Id.*

Although Mr. Isaacson notes (at 63–65) that the government was initially concerned that information supporting class counsel's hourly rates was insufficient for a cross-check, that is only half the story. The other half, which Mr. Isaacson omits, is that the government later told the court that its concern "ha[d] been addressed" by "additional information" provided by counsel and that, as a result, there was "sufficient information in the record" for the cross-check. Appx4785, 4788.

Indeed, after the government raised its concerns, class counsel further substantiated the reasonableness of their rates with supplemental declarations from their experts, Professor William Rubenstein of Harvard Law School and Professor Fitzpatrick of Vanderbilt Law School. Based on a large data set of class actions in D.C. (including DC-based Court of Federal Claims matters), Professor Rubenstein concluded that "data from commensurate cases provide strong empirical support for the conclusion that the hourly rates Class Counsel propose are within the normal range." Appx4390.

## IV. The district court did not abuse its discretion by approving payments to the nonprofit class representatives that cover time incurred by their in-house counsel.

Mr. Isaacson's last objection is to the $10,000 payments for the three nonprofit class representatives. Courts routinely award such payments—known variously as service, incentive, or case-contribution awards—to class representatives. *See, e.g., Keepseagle v. Perdue*, 856 F.3d 1039, 1056 (D.C. Cir. 2017); *Cobell v. Jewell*, 802 F.3d 12, 24–25 (D.C. Cir. 2015); *Mercier v. United States*, 156 Fed. Cl. 580, 590 (2021). And courts have specifically approved of service awards for organizations where, as here, they "provided in-house counsel" who aided in prosecuting the case and "direct[ed] class counsel in settling the case." *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002). As he did below, Mr. Isaacson asks this Court to depart from this settled practice and conclude that service awards are categorically barred based on two 19th-century cases, *see Trustees v. Greenough*, 105 U.S. 527 (1882); *Cent. R.R. &*

*Banking Co. v. Pettus*, 113 U.S. 116 (1885), and the Eleventh Circuit's decision in *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020).

But, as the district court recognized, this case simply doesn't present the abstract legal question that Mr. Isaacson tries to tee up because the outcome would be the same even under his preferred cases: "[E]ven the Eleventh Circuit—and the Supreme Court cases on which Mr. Isaacson relies—acknowledges that '[a] plaintiff suing on behalf of a class can be reimbursed for attorneys' fees and expenses incurred in carrying on the litigation.'" Appx46 (quoting *Johnson*, 975 F.3d at 1257). *Greenough* allowed a bondholder, whose suit benefited others, to recover his "reasonable costs, counsel fees, charges, and expenses incurred in the fair prosecution of the suit," but held that he couldn't recover an annual salary for his "personal services" or recoup his "private expenses." 105 U.S. at 537; *see Johnson*, 975 F.3d at 1257 (drawing this line).

Because the requested payments here fall on the right side of this line—that is, because they cover time by "counsel … incurred in the fair prosecution of the suit," 105 U.S. at 537—this case doesn't present a suitable vehicle for Mr. Isaacson's crusade against service awards. As the district court found, "each Named Plaintiff in this case has expended over $10,000 worth of attorney time and expenses in leading this litigation." Appx46. For eight years, experienced lawyers at each organization have "performed invaluable work" that could otherwise have been performed by "outside counsel hired by each organization at far greater expense." *Id.* "The

53

requested awards here are thus entirely unlike typical incentive awards: They are not for the personal services or private expenses of an individual class representative nor do they reflect any sort of personal 'salary' or 'bounty.' They instead reflect a bargain price for work that was actually performed by experienced in-house counsel and that was necessary to carry out the prosecution of this suit." Appx4435. Put differently: If National Veterans Legal Services Program had hired an outside law firm to perform the same work, and sought fees from the common fund for that work, there would be no question that it would be compensable. Indeed, it would've been compensable in full, at market rates, even if this were a garden-variety statutory fee-shifting case. Mr. Isaacson offers no explanation for why the non-profit class representatives here should be denied a more modest payment to compensate them for their substantial contributions to this groundbreaking litigation over the past eight years.

In any event, "neither *Greenough* nor *Pettus* prohibits incentive awards in class actions," and an "overwhelming majority" of circuits "have concluded that district courts are permitted to grant incentive awards." *Moses*, 79 F.4th at 253, 256.[6] Mr. Isaacson does not acknowledge this wealth of contrary authority—even though

---

[6] *Accord Hyland v. Navient Corp.*, 48 F.4th 110, 123–24 (2d Cir. 2022); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785–86 (9th Cir. 2022); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 353 (1st Cir. 2022); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017); *Pelzer v. Vassalle*, 655 F. App'x 352, 361 (6th Cir. 2016); *Tennille v. W. Union Co.*, 785 F.3d 422, 434–35 (10th Cir. 2015); *Berry v. Schulman*, 807 F.3d 600, 613–14 (4th Cir. 2015); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001).

much of it comes from recent appeals in which he has unsuccessfully pressed this issue across the circuits. Nor does he acknowledge the Supreme Court's recent recognition that, in a typical class action, "[t]he class representative might receive a share of class recovery above and beyond her individual claim"—for example, through a "$25,000 incentive award." *China Agritech, Inc. v. Resh*, 584 U.S. 732, 747 n.7 (2018). Because it discusses incentive awards in Rule 23 class actions, *China Agritech*— not *Greenough* or *Pettus*—is the more relevant source for guidance on the Supreme Court's view of incentive awards. And it is consistent with the prevailing view that, as the Supreme Court put it, "[t]he plaintiff who" does the work "to lead the class" may get an "attendant financial benefit." *Id.* at 747.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

WILLIAM H. NARWOLD
MOTLEY RICE LLC
20 Church Street
17th Floor
Hartford, CT 06103
(860) 882 -1676

MEGHAN OLIVER
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9492

October 11, 2024                    *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,989 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Baskerville font.

*/s/Deepak Gupta*
Deepak Gupta